**VOLUME I OF V, PAGES Appx1-1136**

**2023-2144, 2023-2145, 2023-2146, 2023-2147,
2023-2414, 2023-2415, 2023-2442 and 2023-2443**

# United States Court of Appeals
# for the Federal Circuit

BRIGHT DATA LTD.,

*Appellant,*

– v. –

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB, OXYSALES,
UAB, THE DATA COMPANY TECHNOLOGIES INC., MAJOR DATA UAB,
CORETECH LT, UAB,

*Appellees.*

*On Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00103, IPR2022-
00135, IPR2022-00138, IPR2022-00353, IPR2022-00915, IPR2022-
00916, IPR2021-01492, IPR2022- 00861, IPR2021-01493 and
IPR2022-00862*

## JOINT APPENDIX

KORULA T. CHERIAN
ROBERT M. HARKINS, JR.
CHERIAN LLP
2001 Addison Street, Suite 275
Berkeley, California 94704
(510) 944-0190
sunnyc@cherianllp.com
bobh@cherianllp.com

THOMAS M. DUNHAM
RONALD R. WIELKOPOLSKI
CHERIAN LLP
1901 L Street NW, Suite 700
Washington, DC 20036
(202) 838-1560
tomd@cherianllp.com
ronw@cherianllp.com

*Counsel for Appellant*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS     (800) 4-APPEAL • (323482)

DANIEL S. LEVENTHAL
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
(713) 651-5151
daniel.leventhal@nortonrosefulbright.com

MARK T. GARRETT
STEPHANIE N. DEBROW
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
(512) 474-5201
mark.garrett@nortonrosefulbright.com
stephanie.debrow@nortonrosefulbright.com

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200
jonathan.franklin@nortonrosefulbright.com

*Counsel for Appellees Code200, UAB,
Teso LT, UAB, metacluster lt, UAB,
Oxysales, UAB, and coretech lt, UAB*

MICHAEL N. RADER
WOLF GREENFIELD & SACKS, PC
605 Third Avenue, 25th Floor
New York, New York 10158
(212) 697-7890
mrader@wolfgreenfield.com

ADAM WICHMAN
WOLF GREENFIELD & SACKS, PC
600 Atlantic Avenue, 23rd Floor
Boston, Massachusetts 02210
(617) 646-8000
awichman@wolfgreenfield.com

*Counsel for Appellee The Data Company
Technologies Inc.*

JASON R. BARTLETT
WENSHENG MA
MASCHOFF BRENNAN
450 Sansome Street, Suite 1005
San Francisco, California 94111
(418) 738-6334
jbartlett@mabr.com
vma@mabr.com

*Counsel for Appellee Major Data UAB*

# TABLE OF CONTENTS
# JOINT APPENDIX

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 37 | Final Written Decision: original (IPR2022-00103) | 5/30/2023 | Appx1 |
| 49 | Final Written Decision: original (IPR2022-00135) | 5/25/2023 | Appx151 |
| 50 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal Granting Motion to Exclude 35 U.S.C. § 318(a); 37 C.F.R. § 42.14; 37 C.F.R. § 42.64 (IPR2022-00138) | 5/9/2023 | Appx323 |
| 36 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal 35 U.S.C. § 318(a); 37 C.F.R. § 42.14(IPR2022-00353) | 6/27/2023 | Appx493 |
| 53 | Final Written Decision (IPR2021-1492) | | Appx647 |
| 53 | Final Written Decision (IPR2021-1493) | | Appx714 |
| 50 | Final Written Decision (IPR2022-0915) | | Appx957 |
| 50 | Final Written Decision (IPR2022-0916) | | Appx1045 |
| 1001 | Exhibit 1001 – United States Patent No. 11,044,342 (IPR2022-00103) | | Appx1137 |
| 1001 | Exhibit 1001 – United States Patent No. 10,257,319 (IPR2022-00135) | | Appx1170 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1001 | Exhibit 1001 - United States Patent No. 10,484,510 (IPR2022-00138) | | Appx1199 |
| 1002 | Exhibit 1002 - United States Patent No. 11,044,344 (IPR2022-00353) | | Appx1229 |
| | Certified Index (IPR2022-00103) | | Appx1439 |
| | Certified Index (IPR2022-00135) | | Appx1440 |
| | Certified Index (IPR2022-00138) | | Appx1442 |
| | Certified Index (IPR2022-00353) | | Appx1444 |
| | Certified List IPR2021-01492 | | Appx1445 |
| | Certified List IPR2021-01493 | | Appx1447 |
| | Certified List IPR2022-00915 | | Appx1449 |
| | Certified List IPR2022-00916 | | Appx1451 |
| | **IPR2022-00103** | | |
| 1 | 342 IPR Petition | 10/29/2021 | Appx1485 |
| 15 | Patent Owner Response [Public] | 9/14/2022 | Appx1775 |
| 21 | Petitioners' Reply | 12/16/2022 | Appx1916 |
| 34 | Petitioners' Updated Mandatory Notices | 3/22/2023 | Appx2080 |
| 1003 | Exhibit 1003: Freedman Declaration | 10/29/2021 | Appx2327 |
| 1004 | Exhibit 1004: Crowds | 10/29/2021 | Appx2391 |
| 1006 | Exhibit 1006: RFC 2616 | 10/29/2021 | Appx2418 |
| 1009 | Exhibit 1009: Opp to MTD | 10/29/2021 | Appx2873 |
| 1011 | Exhibit 1011: Teso CC Order | 10/29/2021 | Appx2943 |
| 1012 | Exhibit 1012: Code200 CC Order | 10/29/2021 | Appx2969 |
| 1013 | Exhibit 1013: Teso O2 Micro Motion | 10/29/2021 | Appx2996 |
| 1014 | Exhibit 1014: Teso Supp CC Order | 10/29/2021 | Appx3007 |
| 1018 | Exhibit 1018: '319 PH | 10/29/2021 | Appx3207 |
| 1019 | Exhibit 1019: '936 PH | 10/29/2021 | Appx3356 |
| 1024 | Exhibit 1024: '936 Patent | 10/29/2021 | Appx3907 |
| 1050 | Exhibit 1050: Williams Deposition Transcript | 12/16/2022 | Appx5448 |
| 2008 | Exhibit 2008 - select portions of 11044342 PH | 3/9/2022 | Appx5626 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2009 | Exhibit 2009 - select portions of 11044344 PH | 3/9/2022 | Appx5664 |
| 2019 | Exhibit 2019 - EDTX-2-19-cv-00395-47 Sur Reply | 3/9/2022 | Appx6294 |
| 2020 | Exhibit 2020 - EDTX-2-19-cv-00395-476 Order | 3/9/2022 | Appx6306 |
| 2021 | Exhibit 2021 - EDTX-2-19-cv-00395-303 Order | 3/9/2022 | Appx6319 |
| 2022 | Exhibit 2022 - EDTX-2-19-cv-00395-516 Jury Verdict | 3/9/2022 | Appx6334 |
| 2026 | Exhibit 2026 - Freedman Deposition Transcript 8.23.2022 | 9/14/2022 | Appx6493 |
| 2029 | Exhibit 2029 - EDTX-2-21-cv-225-146 | 9/14/2022 | Appx6584 |
| 2030 | Exhibit 2030 - CONSUMER _ Cambridge English Dictionary | 9/14/2022 | Appx6632 |
| 2031 | Exhibit 2031 - Cambridge Advanced Learners Dictionary | 9/14/2022 | Appx6644 |
| 2032 | Exhibit 2032 - Cambridge Academic Content Dictionary | 9/14/2022 | Appx6649 |
| 2033 | Exhibit 2033 - CONSUMER _ Collins English Dictionary | 9/14/2022 | Appx6651 |
| 2034 | Exhibit 2034 - Collins COBUILD Advanced Dictionary | 9/14/2022 | Appx6664 |
| 2035 | Exhibit 2035 - Network Fundamentals Study Guide | 9/14/2022 | Appx6668 |
| 2036 | Exhibit 2036 - Computer Networks 5th ed | 9/14/2022 | Appx6677 |
| 2037 | Exhibit 2037 - Computer Networks 4th ed | 9/14/2022 | Appx6684 |
| 2045 | Exhibit 2045 - EMK acquires Luminati | 9/14/2022 | Appx6786 |
| 2046 | Exhibit 2046 - Frost Sullivan Report (2019) | 9/14/2022 | Appx6833 |
| 2065 | Exhibit 2065 - Williams Declaration [Public] | 9/14/2022 | Appx7160 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2071 | Exhibit 2071 - Patent Owner's Demonstrative Exhibits | 3/9/2023 | Appx7295 |

## IPR2022-00135

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review | 11/3/2021 | Appx7355 |
| 23 | Petitioner's Reply to Patent Owner's Response | 11/16/2022 | Appx7876 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/3/2021 | Appx9181 |
| 1005 | Exhibit 1005 - Patent Owner's Opening Claim Construction Brief, Luminati Networks Ltd. v. Teso LT et al., 2:19-cv-00395-JRG | 11/3/2021 | Appx9338 |
| 1008 | Exhibit 1008 - Corrected Patent Owner's Preliminary Response, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/3/2021 | Appx9451 |
| 1010 | Exhibit 1010 - U.S. Patent Application Publication No. 2008/0228938 ("Plamondon") | 11/3/2021 | Appx9493 |
| 1080 | Exhibit 1080 - U.S. Patent Application Publication No. US 2003/0009518 (Harrow) | 11/16/2022 | Appx16828 |
| 1108 | Exhibit 1108 - Declaration of Dr. Vernon Thomas Rhyne III in Support of Plaintiff Luminati Network Ltd.'s Claim Constructions, Bright Data Ltd. v. Teso LT et al. (E.D. Tex. Sept. 29, 2020) | 11/16/2022 | Appx17940 |
| 1110 | Exhibit 1110 - Non-Final Office Action mailed March 23, 2022, Reexamination No. 90/014,876 | 11/16/2022 | Appx18038 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1111 | Exhibit 1111 - Final Office Action mailed June 21, 2022, Reexamination Nos. 90/014,827 & 90/014,624 | 11/16/2022 | Appx18131 |
| 1115 | Exhibit 1115 - Complaint, Luminati Networks Ltd. v. Teso LT et al. (E.D. Tex. Dec. 6, 2019) | 11/16/2022 | Appx18218 |
| 2002 | Exhibit 2002 - US10469614 | 3/8/2022 | Appx18549 |
| 2009 | Exhibit 2009 - EDTX-2-19-cv-00395-145 Reply | 3/8/2022 | Appx18951 |

## IPR2022-00138

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petitioner for Inter Partes Review | 11/4/2021 | Appx20128 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/4/2021 | Appx21753 |
| 1008 | Exhibit 1008 - Patent Owner's Preliminary Response, Code200 UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx21964 |
| 1067 | Exhibit 1067 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27389 |
| 1068 | Exhibit 1068 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27401 |
| 1069 | Exhibit 1069 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27404 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1070 | Exhibit 1070 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27486 |

## IPR2022-00353

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | 344 IPR Petition | 12/23/2021 | Appx32756 |
| 2025 | Exhibit 2025 - Williams Declaration [Public] | 9/19/2022 | Appx38198 |

## IPR2021-01492

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of US Patent No. 10,257,319 | 9/3/2021 | Appx38947 |
| 12 | Institution Decision: Grant | 3/21/2022 | Appx39170 |
| 20 | Order: Termination as to Petitioner | 5/27/2022 | Appx39238 |
| 25 | Institution decision and grant of joinder, IPR2022-00861 | 10/19/2022 | Appx39297 |
| 40 | Petitioners' Reply to Patent Owner's Opposition | 3/20/2023 | Appx39580 |
| 41 | Patent Owner's Sur-Reply | 5/1/2023 | Appx39627 |
| 51 | Other: Hearing transcript | 6/9/2023 | Appx39752 |
| 1005 | Expert Declaration of Keith J. Teruya | 9/3/2021 | Appx40448 |
| 1008 | Ex. 1008 (MorphMix) | 9/3/2021 | Appx40570 |
| 1012 | Ex. 1012 (US6,795,848 to Border) | 9/3/2021 | Appx41496 |
| 1021 | Ex. 1021 (EDTX-2-19-cv-00395 Pre-trial Transcript) | 9/3/2021 | Appx41946 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1102 | EDTX-2-21-cv-00225 Docket Sheet | 1/18/2022 | Appx42187 |
| 1111 | Ex. 1111 - Deposition Transcript of Dr. Tim A. Williams, dated February 23, 2023 | 3/20/2023 | Appx42574 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx45236 |

## IPR2021-01493

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of U.S. Patent No. 10,484,510 | 9/3/2021 | Appx46015 |
| 19 | Order: Dismissing Petitioner From the Proceeding | 5/27/2022 | Appx46300 |
| 24 | Institution decision and grant of joinder, IPR2022-00862 | 10/19/2022 | Appx46356 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx52520 |

## IPR2022-00861

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx53405 |

## IPR2022-00862

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx58751 |

## IPR2022-00915

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx64071 |
| 14 | Decision denying Motion for Joinder | 7/29/2022 | Appx64264 |
| 1111 | Deposition Transcript of Dr. Tim A. Williams | 3/20/2023 | Appx67615 |
| 2013 | EX. 2013 - EDTX-2-19-cv-395-282 | 6/23/2022 | Appx69372 |

## IPR2022-00916

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx71096 |
| 14 | Decision Denying Motion for Joinder | 7/29/2022 | Appx71292 |

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                                           Paper 37
571-272-7822                                                    Entered: May 30, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB, and
OXYSALES, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

————————

IPR2022-00103
Patent 11,044,342 B2

————————

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motions to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

Appx1

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

## I.  INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, 15, 16, and 18–23 (the "challenged claims") of U.S. Patent No. 11,044,342 B2 (Ex. 1001, "the '342 patent") are unpatentable.

*A. Procedural Background*

Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; and Oxysales, UAB (collectively, "Petitioner")[1] filed a Petition requesting *inter partes* review of claims 1, 2, 6–11, 13, 15, 16, and 18–23 of the '342 patent, along with the supporting Declaration of Dr. Michael J. Freedman.  Paper 1 ("Pet."); Ex. 1003.  Bright Data Ltd. ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 6.  On June 1, 2022, pursuant to 35 U.S.C. § 314(a), we instituted *inter partes* review based on the following grounds:

---

[1] Petitioner identifies coretech lt, UAB as another real party-in-interest. Pet. 4–5.

Appx2

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

| Claims Challenged | 35 U.S.C. §[2] | Reference(s) |
|---|---|---|
| 1, 2, 6, 7, 15, 16, 18–23 | 102(b) | Crowds[3] |
| 1, 2, 6, 7, 15, 16, 18–23 | 103(a) | Crowds |
| 8, 9 | 103(a) | Crowds, RFC 1122[4,] |
| 10, 11, 13 | 103(a) | Crowds, RFC 2616[5] |

Pet. 12–14; Paper 7 ("Inst. Dec."), 6–7.

Patent Owner filed a Patent Owner Response ("PO Resp."), along with the Declaration of Tim Williams, Ph.D.  Paper 14; Ex. 2065.  Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response.  Paper 21. Patent Owner filed a Sur-reply ("PO Sur-reply").  Paper 24.

An oral hearing was conducted on March 14, 2023.  A transcript of the hearing is included in the record.  Paper 35 ("Tr.").

*B. Related Matters*

The parties identify several court proceedings that involve patents related to the '342 patent.  Pet. 5–6; Paper 4, 2.  In particular, the parties

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013.  Because the '342 patent claims priority to a provisional application that was filed before this date, with Petitioner not contesting that priority, the pre-AIA versions of §§ 102 and 103 apply.  *See* Ex. 1001, code (60).

[3] Michael K. Reiter, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, at 66–92 (Ex. 1004).

[4] Requirements for Internet Hosts – Communication Layers, Network Working Group, RFC 1122, October, 1989 (Ex. 1040).

[5] Hypertext Transfer Protocol—HTTP/1.1, Network Working Group, RFC 2616, The Internet Society, 1999 (Ex. 1006).

3

Appx3

IPR2022-00103
Patent 11,044,342 B2

identify *Luminati Networks Ltd.*[6] *v. Teso LT, UAB, et al.*, No. 2:19-cv-395
(E.D. Tex.) ("the *Teso* district court litigation"). The parties do not,
however, identify any district court cases that involve the '342 patent. *Id.*

The parties also identify several *inter partes* reviews for patents
related to the '342 patent, but similarly, none of these cases challenged
claims of the '342 patent. Pet. 6–7; Paper 4, 1. In addition, Patent Owner
identifies *ex parte* reexaminations ordered for related patents, Control
No. 90/014,875 and Control No. 90/014,876, which have been stayed. Paper
4, 1; *see* IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

C. *The '342 Patent*

The '342 patent is titled "System Providing Faster And More Efficient
Data Communication" and issued on June 22, 2021, from an application
filed on October 13, 2019. Ex. 1001, codes (22), (45), (54). The patent is
subject to a terminal disclaimer. *Id.* at code (*). The application for
the '342 patent claims priority to several applications, including U.S.
Provisional Application No. 61/249,624, filed October 8, 2009. *Id.*
at code (60).

The '342 patent is directed to addressing the "need for a new method
of data transfer that is fast for the consumer, cheap for the content distributor
and does not require infrastructure investment for ISPs." Ex. 1001, 1:54–56.
The '342 patent states that other "attempts at making the Internet faster for
the consumer and cheaper for the broadcaster," such as proxy servers and
peer-to-peer file sharing, have various shortcomings. *Id.* at 1:58–3:3.
The '342 patent provides a system and method "for faster and more efficient

---

[6] Luminati Networks Ltd. is now Bright Data Ltd.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below. *Id.* at 3:13–16, 4:3–5.



FIG. 3

Figure 3, above, is a schematic diagram depicting communication network 100 including a number of communication devices. Ex. 1001, 4:54–61. Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67. Acceleration server 162 includes acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:11–16.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. Ex. 1001, 12:62–13:3. If

5

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–13. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36. The connection established between the agent and client may be a Transmission Control Protocol [TCP] connection. *Id.* at 17:61–64.

Each agent responds to the client with information as to "whether the agent has seen a previous request for this resource that has been fulfilled," and "which can help the client to download the request information from peers in the network." Ex. 1001, 13:51–58. The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:64–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

The '342 patent has 24 claims. Claim 1, the only independent claim in the '342 patent, is illustrative of the claimed subject matter and is reproduced below, with bracketed designations added to the limitations for reference purposes.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

1. [pre] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content that is identified by a first Uniform Resource Locator (URL), the method by a first client device comprising:

[a] executing, by the first client device, a web browser application or an email application;

[b] establishing a Transmission Control Protocol (TCP) connection with a second server;

[c] receiving, the first content from the web server over an Internet; and

[d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first URL.

Ex. 1001, 19:18–31.

## II.   ANALYSIS OF PATENTABILITY OF CLAIMS 1, 2, 6–11, 13, 15, 16, and 18–23

### A. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that at least one claim of the '342 patent is anticipated or would have been obvious. Inst. Dec. 20–28.  Here, we must consider whether Petitioner has established by a preponderance of the evidence that claims 1, 2, 6–11, 13, 15, 16, and 18–23 of the '342 patent are anticipated or would have been obvious.  35 U.S.C. § 316(e).  We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 8, 9; *see also In re NuVasive, Inc*., 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising the same argument in the patent owner

7

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

response).  Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief."  Consolidated Trial Practice Guide (Nov. 2019)[7] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and evidence advanced by Petitioner to support its unpatentability contentions. In this regard, the record contains persuasive arguments and evidence presented by Petitioner regarding the manner in which the prior art discloses the corresponding limitations of claims 1, 2, 6–11, 13, 15, 16, and 18–23 of the '342 patent and the rationale for combining the asserted references.

B.  *Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems" as of the date of the invention. Pet. 14–15 (citing Ex. 1003 ¶ 29).

Patent Owner proposes that person of ordinary skill in the art is someone who "had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and [] two [or more] years of experience in Internet Communications" at the time of the invention.  PO Resp. 2 (citing Ex. 2065 ¶ 28).  Patent Owner asserts that its proposed definition has subtle differences with that of Petitioner, but "the analysis

---

[7] *Available at*
https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

herein is the same under either definition." *Id*. (citing Ex. 2065 ¶ 29). Petitioner also agrees that the slight differences in the levels of skill are not relevant to the evaluation of the merits.  Pet. Reply 2.

In the Decision on Institution, we adopted the assessment of qualifications offered by Petitioner, which we also adopt here.  Inst. Dec. 14. The assessment offered by Petitioner is consistent with the '342 patent and the prior art before us.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2021).  Under the principles set forth by our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek,*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

*Inc*., 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d
at 1312–17).

> 1. *"client device"*
>
> a. *Petitioner's Assertions*

Petitioner asserts that the district court's constructions in the *Teso*
district court litigation should apply in this case.  Pet. 19.  In particular,
Petitioner points to two claim construction orders in that case—an original
order (Ex. 1011) and a supplemental order (Ex. 1014).  Petitioner also relies
on a claim construction order in *Bright Data Ltd. v. Code200, UAB*, Case
No. 2:19-cv-00396 (E.D. Tex.) ("the Code200 Litigation"), which is directed
to related patents.  Pet. 5, 23 (citing Ex. 1012).  As Petitioner notes, the
magistrate judge construed "client device" as "communication device that is
operating in the role of a client."  *Id*. at 18.  Petitioner argues that the district
court repeatedly addressed and rejected Patent Owner's arguments on the
claim construction for these terms.  *Id*. (citing Ex. 1011, 11–12).  Petitioner
also refers to the claim construction order in *Bright Data Ltd. v. NetNut Ltd*.,
No. 2:21-cv-225 (E.D. Tex.) ("the *NetNut* litigation"), which reaffirmed its
analysis and where Patent Owner's construction based on "consumer
computer" was rejected.  Pet. Reply 8 n. 2 (citing Ex. 2029), 11 n. 3 (citing
Ex. 2029).

Petitioner asserts that the district court's claim interpretation for
"client device" means that the "device ***operat[es] in the role of*** a client or
server, respectively."  Pet. 19–20 (citing Ex. 1003 ¶ 48) (emphases in

10

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

original).  Petitioner refers to RFC 2616, which defines clients based on the roles being performed.  *Id*. at 20 (citing Ex. 1006, 8).

In support, Petitioner points to the '342 patent Specification, which distinguishes the "client" and "agent" based on roles, and not separate hardware or operating system.  Pet. 21 (citing Ex. 1003 ¶ 50).  Petitioner refers to the Specification's disclosure that a "'communication device' that 'contains three separate modules that run in parallel, namely, a client module 224, a peer module 226, and an agent module 228, each of which comes into play according to the specific role that the communication device 200 is partaking in the communication network 100 at a given time.'"  *Id*. (quoting Ex. 1001, 9:20–25).

*b. Patent Owner's Assertions*

Patent Owner asserts that a person of ordinary skill in the art would understand the term "client device" to be a "consumer computer," or alternatively, to be a "consumer communication device."  PO Resp. 11 (citing Ex. 2065 ¶ 64).  Patent Owner argues that these constructions are consistent with the claim language, Specification, and the prosecution histories.  *Id*.  Patent Owner contends that a person of ordinary skill in the art would understand a client device is a communication device because the Specification states that "each communication device may serve as a client, peer, or agent" which "informs" a person of skill "that client 102, peers 112, 114, 116, and agent 122 are all 'client devices' in the context of the [S]pecification."  *Id*. (citing Ex. 2065 ¶ 71; Ex. 1001, 4:44–50, 5:21–29).

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer by its

11

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

disclosure of a requesting client device ↔ proxy server ↔ proxy client device ↔web server architecture.  PO Resp. 12 (citing Ex. 1001, 4:44–50, 5:21–29, 9:12–50; Ex. 2065 ¶ 73).  Patent Owner alleges that the Specification explains that when executing the fetching method, "the requesting client device may be executing the client module 224 disclosed in FIG. 6, while the proxy client device may be executing the agent module 228 disclosed in FIG. 6."  *Id*.  Based upon this, Patent Owner contends that a person of ordinary skill in the art "would understand in the context of the [S]pecification, a client device is a consumer computer with specific software to operate in accordance with the claims."  *Id*.  Referring to Figure 6 of the Specification, Patent Owner asserts that a person of ordinary skill in the art would understand that "one 'client device' may be configured to be the requesting client device and another 'client device' may be configured to be the proxy client device."  *Id*. at 13 (citing Ex. 2065 ¶ 74).  In support, Patent Owner also refers to modified annotated Figure 3, reproduced below, alleging that agent 122 is disclosed as a client device "that is selected, for example, because agent 122 is closest to the web server 152."  *Id*. at 8, 13 (citing Ex. 2065 ¶¶ 64, 75–76).

12

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2



Patent Owner alleges that a person of ordinary skill's understanding of requesting client device (purple) ↔ second server (green) ↔ first client device (red) ↔ web server (blue) would correspond to client 102 ↔ second server 6 ↔ agent 122 ↔ web server 152, shown in Patent Owner's version of modified annotated Figure 3, above.  PO Resp. 7–8.

Patent Owner further asserts that in light of the Specification, "a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone."  PO Resp. 13 (citing Ex. 2065 ¶ 77 (citing Ex. 1001, 2:44–46 ("In the network 50, files are stored on computers of consumers, referred to herein as client devices." (emphasis omitted)))).

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons.  PO Resp. 14–16.  First, Patent Owner asserts that, although the district court found that there was no express lexicography in the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Specification, the Specification states that "computers of consumers" are "referred to herein as client devices." *Id*. at 14 (citing Ex. 2065 ¶ 77; Ex. 1001, 2:44–46). Patent Owner further asserts that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id*. (citing Ex. 2065 ¶ 77). Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content. *Id*. at 14–15 (citing Ex. 1011, 11). Rather, Patent Owner argues, the common understanding of "consumer" as "a person who buys goods or services for their own use" is not a deviation from the use of the term in the Specification, and personal use is often distinguished from commercial use. *Id*. (citing Ex. 2030; Ex. 2031, 5; Ex. 2032, 4; Ex. 2033; Ex. 2034, 4; Ex. 2065 ¶ 78; 15 U.S.C. § 6809(9); 12 C.F.R. § 332). Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of consumers," and there were statements made during the prosecution of grandfather application to the '342 patent that refer to this issue. *Id*. at 15–16 (citing Ex. 2065 ¶ 70; Ex. 1001, 2:44–46; Ex. 1019, 84).

Patent Owner contends that in the '342 patent, "a client device is not a server." PO Resp. 16. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction that a client device is unable to act as a server in all cases. *Id*. (citing Ex. 1011, 12). According to Patent Owner, a person of ordinary skill

14

Appx14

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

in the art would have understood that a client device is not a server in the context of the patent, and the MPEP does not require that a negative limitation be recited verbatim in the Specification. *Id*. (citing *Ex parte Parks*, 30 USPQ2d 1234, 1236 (Bd. Pat. App. & Inter. 1993)). Patent Owner argues that the Specification describes the shortcomings of using a proxy server as an intermediary, and therefore provides a reason to exclude a client device encompassing a proxy server. *Id*. (citing Ex. 1001, 2:24–32; Ex. 1011, 12; Ex. 2044 ¶ 84; *Santarus, Inc. v. Par Pharm., Inc*., 694 F.3d 1344, 1351 (Fed. Cir. 2012)).

Patent Owner contends that, in view of the recited architecture of the '342 patent claims that distinguishes between client devices and servers, the use of three interchangeable devices in a pathway would not disclose that architecture. PO Resp. 17 (citing Ex. 2065 ¶ 79). Patent Owner also argues that the recited architecture in the '342 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the use of a client device, rather than a proxy server, as an intermediary, and that this distinction is consistent with an *Alice* order in the *Teso* litigation. *Id*. (citing Ex. 2065 ¶ 80; Ex. 2021, 8–9); PO Sur-reply 2. Patent Owner further contends that the district court "repeatedly acknowledged that a client device is not a merely general-purpose computer." *Id*. (citing Ex. 2029, 14–15).

Patent Owner argues that a person of ordinary skill in the art would have understood "that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 18 (citing Ex. 2065 ¶ 81). Patent Owner contends that a person of ordinary skill in the art would be informed by statements made during prosecution that a

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

client device is not a dedicated network device, which typically uses a single or relatively few connections, and is resource limited (e.g., bandwidth and storage), unlike a server. *Id.* Patent Owner also argues that a person of skill would have understood that a client device typically is understood "(a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time . . . and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs." *Id.* (citing Ex. 2065 ¶ 82). Patent Owner asserts that a person of ordinary skill's understanding of "client" would have been consistent with its plain and ordinary meaning, which is "an application that runs on a personal computer or workstation and relies on a server to perform some operations." *Id.* at 18–19 (citing Ex. 2065 ¶ 83; Ex. 2035; Ex. 2036, 5; Ex. 2037, 7). Patent Owner contends that a person of ordinary skill would have understood that there are structural differences between client devices and servers. *Id.* (citing Ex. 2065 ¶ 85).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of the Specification, a person of ordinary skill in the art would have understood that proxy server 6 must be structurally different from agent 122 and that "a server is not a client device and that a client device is not a server." PO Resp. 19–20 (citing Ex. 2065 ¶ 86). Patent Owner argues that "Petitioners' expert appears to agree that proxy server 6 of Figure 1 and agent 122 of Figure 3 would be operating in the same roles at a given point in time," so under the Board's preliminary constructions "Figure 3 collapses onto Figure 1" and fails to account for structural differences between a proxy server and a client device. *Id.* at 20. Patent Owner points to Dr. Freedman's

16

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

testimony in  testimony in the *Teso* district court litigation agreement that in
Figure 1, client devices 14 and 16 are operating in the role of a client and
web server 32 is operating in the role of a server. *Id*. at 20–23 (citing
Ex. 2065 ¶¶ 87–95; Ex. 2047, 282:1–285:6; 286:1–6). Patent Owner
contends that for Figure 1 under the Board's preliminary role-based
constructions, "proxy server 6 would be [] operating in the role of a client
when receiving responses from web server 32 and [] operating in the role of
a server when sending the received responses on to client devices 14,16,"
with Petitioner's experts agreement. *Id*. at 24 (citing Ex. 2065 ¶ 97;
Ex. 2026, 34:14–21; 35:7–14). Patent Owner asserts that for Figure 3 under
the Board's preliminary role-based constructions, "client 102 is operating in
the role of a client and web server 152 is operating in the role of a server"
and "agent 122 would be [] operating in the role of a client when receiving
responses from web server 152 and [] operating in the role of a server when
sending the received responses on to client device 102," with Petitioner's
expert agreeing. *Id*. at 25–26 (citing Ex. 2065 at ¶¶ 99–102). Patent Owner
argues that the experts agree that proxy server 6 of Figure 1 and agent 122 of
Figure 3 operate in the same roles at a given point in time and there is
nothing to distinguish the architectures of Figures 1 and 3. *Id*. at 26–27
(citing Ex. 206 ¶ 103). Patent Owner asserts that Figures 1 and 3 inform a
person of ordinary skill in the art "that a server is not a client device and that
a client device is not a server," so "role-based constructions are not

17

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

appropriate because they fail to account for these structural differences between proxy servers and client devices." *Id*. at 27 (citing Ex. 2065 ¶ 104).

Patent Owner additionally refers to the prosecution history of U.S. Patent No. 10,069,936 ("the '936 patent), the great grandparent of the '342 patent. PO Resp. 28–31. Patent Owner argues that this prosecution history "clearly distinguishes client devices from servers." *Id*. at 28 (citing Ex. 2065 ¶ 106). Patent Owner asserts that during prosecution, the applicant amended the claims to "specify that the 'devices' being used as intermediaries are 'clients' in contrast to the teachings of Garcia," which was a reference used by the examiner to reject the then-pending claims. *Id*. at 29 (citing Ex. 1019, 125). Patent Owner points to the applicant's statement that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality," and further that "[t]he Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id*. (citing 1019, 125 (emphasis omitted)). Additionally, Patent Owner refers to the examiner's statement that "Garcia fails to teach a group of clients for data communication between the web server and a requesting client via one or more clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving the content from the selected client," contending that "the examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." *Id*. (citing Ex. 1019, 125; Ex. 2065 ¶ 108). Patent Owner also refers to the applicant's statement that "[c]lient devices, such as client 105 in the Garcia reference,

18

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

are end-units that request information from servers, use client-related software . . . and are typically consumer owned and operated." *Id*. at 29–30 (citing Ex. 1019, 84 (emphasis omitted)).   Patent Owner further asserts that "the examiner acknowledged that 'the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification.'" *Id*. at 30 (citing Ex. 1019, 17 (emphasis omitted)). Patent Owner contends that "this shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id*. (citing Ex. 2065 ¶ 111).

Patent Owner also refers to the prosecution history of U.S. Patent No. 10,257,319 ("the '319 patent"), which is the grandparent of the '342 patent, asserting that it shows that servers and client devices are not interchangeable general use computers.  PO Resp. 31 (citing Ex. 2065 ¶ 113).  In that prosecution, the applicant contended that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id*. (citing Ex. 1018, 163).  Patent Owner further cites the applicant's statement that "the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device." *Id*. at 32 (citing Ex. 1018, 16–17).  Patent Owner also refers to the prosecution histories of U.S. Patent No. 10,484,510 ("the '510 patent") and the '342 patent, arguing that the examiner acknowledged the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

"environment" of the claimed method, which "shows that the examiner appreciated the unique architecture disclosed . . . and the novel use of a proxy client device within that architecture." *Id*. at 33 (citing Ex. 1007, 12; Ex. 1017, 9; Ex. 2065 ¶¶ 116–117). Patent Owner also asserts that the examiner reviewed and initialed Crowds, RFC 1122, and RFC 2616 during the prosecution of the '342 patent. *Id*. at 33–34 (citing Ex. 2008, 2–3, 12, 20).

> c. Analysis

For the reasons discussed below, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in out Institution Decision and we find to apply here in view of the full record. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server. *See* PO Resp. 10–34.

> i. Claim Language

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[c], the first client device, "receive[s], the first content from the web server over an Internet," which serves to receive content from the Internet. *See* Ex. 1001, 19:27–28. In step 1[c], the first client device is acting as a client in receiving content. In step 1[d], the first client device "send[s] the received first content, to the second

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

server." *See id*. at 19:29–31.  In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1.  Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term.  Pet. 18–20 (citing Ex. 1011, 10–14; Ex. 1014, 7–11); Pet. Reply 2–3.  Patent Owner agrees that if the role-based construction were adopted, in its modified Figure 3, "agent 122 would be (i) operating in the role of a server when receiving requests from client device 102 and (ii) operating in the role of a client when sending requests to web server 1522," with Petitioner's expert agreeing to the same.  PO Resp. 25–26 (citing Ex. 2065 ¶ 101).

Petitioner refers to Patent Owner's assertions in the *Teso* district court litigation, where Patent Owner mapped client 102 to the "second server" and agent 122 to the "first client device" as shown in annotated Figure 3, reproduced below, for claim 1 of '510 patent, which has substantially the same Specification as the '342 patent.  Pet. 21 (citing Ex. 1009, 15[8]; Ex. 1003 ¶ 49).

---

[8] Petitioner refers to page 20 of Exhibit 1009, but the correct reference appears to be page 15 of that Exhibit.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Independent claim 1 of the '510 Patent also recites a method that employs the same specific, concrete server-client device-web server architecture illustrated above with steps performed by the client device: A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method **by a first client device** comprising: establishing a Transmission Control Protocol (TCP) connection with a **second server**; sending, to the **web server** over an Internet, the first content identifier;



FIG. 3

receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and

sending the received first content, to the **second server** over the established TCP connection, in response to the receiving of the first content identifier.

As shown in annotated Figure 3 above, Patent Owner equates client 102 (green) to the "second server" and agent 122 (red) to the "first client device" in accordance with the roles required in the claim elements.[9]  Ex. 1009, 15. That is, Patent Owner asserts that the "first client device" (shown in red) is equivalent to agent 122, which sends the first content identifier to the web server, receives content requested from the web server, and sends that content to client 102 (the second server).  Thus, under this understanding,

---

[9] We recognize that Patent Owner modified its position in its Response to assert that both client 102 and agent 122 are both client devices.  PO Resp. 7–8, 12–13 (citing Ex 2065 ¶¶ 64, 74–76).  We address the issue of two devices acting as client devices below in the discussion on modified Figure 3 in the discussion of Dr. Williams's testimony.

22

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This reflects a role-based interpretation of the claim terms; different terms are defined by their function.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1014, 7–11. For instance, for related patents that share substantially identical specifications to that of the '342 patent, the district court found that under the steps of a claim, the "client device" operates as an intermediary to perform steps including "sending, to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1011, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1014, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id*. We agree with the district court's construction of "client device" as "a communication device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1011, 12.

Appx23

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

We note that Patent Owner's argument that a client device is not a server (PO Resp. 16) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server, as well as a server to forward content under the method claims. We discuss this issue further below in more detail.

*ii. Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '342 patent Specification. The '342 patent Specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles:

> Due to the functionality provided by software stored within each communication device, which may be the same in each communication device, *each communication device may serve as a client, peer, or agent*, depending upon the requirements of the network.

Ex. 1001, 4:46–50 (emphases added). Accordingly, the Specification states that the components identified in Figure 3 may perform different functions based on their stored software. *Id.* Further, as Petitioner asserts, communication devices includes computer components as well as client, peer, and agent modules, so that they "may server as a client, agent, or peer." Pet. 21–22; Ex. 1001, 5:52–6:40, 9:20–25, Fig. 4, Fig. 6). More specifically, the Specification explains that "each of [the software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the communication network 100 *at a given time*." Ex. 1001, 9:20–25 (emphasis added). The Specification thus supports the role-based

24

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Patent Owner argues that a person of ordinary skill in the art, when considering Figure 6 and associated text, would understand that "one 'client device' may be configured to be the *requesting client device* and another 'client device' may be configured to be the *proxy client device*." PO Resp. 13 (citing Ex. 2065 ¶ 74) (emphases added). In further support, Patent Owner refers to its modified annotated Figure 3, reproduced *supra* Section II.C.1.b, and asserts that a person of ordinary skill in the art would understand that client 102 (in purple) corresponds to the requesting client device client and agent 122 (in red) corresponds to the proxy client device. *Id*. (citing Ex. 2065 ¶¶ 75–76). Patent Owner contends that "[a]gent 122 is disclosed as a 'client device' (as opposed to a server) that is selected, for example, because agent 122 is closest to the web server 152." *Id*. (citing Ex. 2044 ¶ 75 (citing Ex. 1001, 5:27–36)).

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." This configuration is not shown in any figure in the '342 patent or disclosed in the Specification. *See* Ex. 1050, 45:4–8. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 64 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and the invention of Figure 3. Ex. 1001, 2:9–18,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

2:24–32, 4:41–45.  But Dr. Williams provides no explanation or a rationale to combine the prior art with an embodiment of the invention.[10]  Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed, but we do not discern that these characterizations are disclosed in the Specification.  In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '342 patent Specification's disclosures, we do not agree that it discloses the architecture of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server in the first place, as Patent Owner asserts.  *See* PO Resp. 12 (citing Ex. 1001, 4:44–50, 5:21–29, 9:12–50).  Moreover, we do not agree that Patent Owner's argument based upon "architecture" should govern the construction of "client device" in light of the claim language and the Specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time.  *See* Ex. 1001, 4:48–52, 9:21–26.  The district court agreed, finding that "a component can be configured to operate in different roles— so long as it does not 'simultaneously serve as more than one of: the client

---

[10] At his deposition, Dr. Williams referred to Exhibit 1001, column 5, lines 41–48 for support of the modification.  Ex. 1050, 44:11–45:3.  The general description that the testimony referred to does not support any rationale that the modification provided by Patent Owner is the purported architecture that Patent Owner argues is inventive.  *See* PO Resp. 12–13.

26

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

device, the first server/second server, and the web server.'" Ex. 1009, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* district court litigation (Ex. 2021) are consistent with its understanding of the architecture required by the claims of the '342 patent and its "novel" use of a client device as an intermediary. PO Resp. 17 (citing Ex. 2065 ¶ 80; Ex. 2021, 8–9). We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopted here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2021. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id*. at 5. Further, after the *Alice* order issued, in February, 2021, the district court consistently maintained its claim constructions (Ex. 2029, 16).

Patent Owner argues that in the '342 patent, "a client device is not a server." PO Resp. 16. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in step 1[c] in receiving content, and acts as a server in step 1[d] to forward content. *See* Ex. 1001, 19:27–31. Patent Owner has agreed under the claim language a device can have different functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is specifically not a server—is not supported by the specification."

27

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Ex. 1011, 11.  The district court refers to the Specification's disclosure that a "communication device" may act as a client, peer, or agent.  *Id*. at 12 (citing related '319 patent, 4:48–49).  The district court also found, and we agree, that although the patent does not list "servers" in "communication devices," "that is not sufficient to construe 'client device' as unable to act as a server in all cases," in view of the case law that negative claim limitations are "supported when the specification describes a reason to exclude the relevant limitation."  *Id*. (citing *Santarus*, 694 F.3d at 1351).

Here, Patent Owner further argues that a person of ordinary skill would understand that a client device is not a server—there are descriptions of communications devices having client, peer, and agent modules, but no server module and the MPEP "does not require that the negative limitation be recited verbatim in the specification."  PO Resp. 16 (citing Ex. 2065 ¶ 74).  We believe Patent Owner's reference is intended to refer to MPEP § 2173.05(i).  This MPEP Section states that any negative limitation "must have basis in the original disclosure," and "[t]he mere absence of a positive recitation is not basis for an exclusion."  MPEP § 2173.05(i).  Patent Owner does not identify any disclosure in the Specification that states that a client device cannot be a server.  Moreover, we note that under Patent Owner's analysis in the *Teso* litigation, the claimed "first client device," which may act as a server in claim 1, is identified as "Agent 122" of Figure 3.  Ex. 1009, 15.  As discussed, the Specification provides support that an agent

28

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

can act in different roles with software modules allowing different functions.
Ex. 1001, 4:46–50.

Patent Owner also asserts that under a "role-based" construction,
"Figure 3 collapses onto Figure 1." PO Resp. 20. According to Patent
Owner, such constructions "do not account for structural differences
between a proxy server (in Figure 1) and a proxy client device (in
Figure 3)." *Id.*. In comparing Figures 1 and 3, Patent Owner recasts the
alleged invention as being directed to the avoidance of "a proxy client
device encompassing a proxy server," and ties that alleged objective (which
is contrary to the description of these devices in the Specification) to the
construction of the term "client device." *Id.* at 16 (citing Ex. 1001, 2:24–32;
Ex. 2044 ¶ 84). We do not agree with this argument. As Petitioner
responds, Patent Owner's argument is based solely on the alleged structure
of proxy server as the point of the differentiation of the invention from the
prior art. But the Specification makes it clear that these devices are capable
of assuming different roles, and thus points to other alleged improvements,
such as the agent performing different functions,[11] and the use of an
acceleration server, that serve to differentiate the disclosed invention from
the prior art. *See* Pet. Reply 12–13 (citing Ex. 1001, code (57), 14:42–47,
Fig. 10). Here, the language that the applicant ultimately chose for claim 1
does not recite these improvements actually described in the Specification.
Instead, Patent Owner more broadly claims the use of a "first client device"

---

[11] As Petitioner notes, in the improved system of the '342 patent, the agent
may at times act as a proxy and at other times may perform different
functions. Pet. Reply 12–13 (citing Ex. 14:42–47, Fig. 10).

Appx29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

that functions as a proxy, that is, it acts as a client and as a server at different times, as discussed above.  In sum, we find no support for a "proxy client device" in modified Figure 3, that Patent Owner presents as  the claimed improvement over a "proxy server," for the reasons discussed above, that is, there is no support for a "proxy client device" or for modified Figure 3 in the Specification or the claims.  *See* PO Resp. 12–13.

Similarly, Patent Owner argues that proxy server 6 of Figure 1 must be structurally different from agent 122 of Figure 3.  PO Resp. 19.  Patent Owner asserts that Petitioner's expert agrees that these devices would be operating in the same roles at a given point in time.  *Id*.  Patent Owner asserts that a server is not a client device and the structural differences should be accounted for in claim construction in order preserve claim validity.  *Id*. at 20 (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc*., 279 F.3d 1357, 1367 (Fed. Cir. 2002)).  We do not agree with this assertion.  The Federal Circuit has held that claims should be construed to preserve validity only when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327.  And a claim construction cannot be adopted "that is at odds with the clear language of the claim and the written description." *Rhine v. Casio, Inc*., 183 F.3d 1342, 1345 (Fed. Cir. 1999). We do not find that this is a circumstance where the claim term interpretation is ambiguous in view of the evidence of record based on the claim language and the written description, as discussed above.  Thus, we do not adopt an alternative construction only to preserve the validity of claim 1.

30

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1012, 13. Petitioner also points to buttressing evidence in RPC 2616, which defines the terms "client" and "server" based on roles, where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. 20 (citing Ex. 1006, 8 (emphases omitted)). Thus, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '342 patent may act as a server as well as a client.

Patent Owner also contends that under Petitioner's assertions "any device that operates in the role of a client is a 'client device' and any device that operates in the role of a server is a 'server.'" PO Sur-reply 1 (emphases omitted). Patent Owner asserts that "[u]nder Petitioners' constructions, an intermediary device would be both a "client device" and a "server" albeit at different points in time." *Id*. Patent Owner argues that the proposed constructions improperly focus on a role being performed *at a particular point in time*. PO Resp. 10. We disagree with Patent Owner's assertions that the under the proper construction the device has to act exclusively in only one role with one function at all times. As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles. In fact, to require that a device operate exclusively only in a single role and not be able to operate in different roles at different time is inconsistent with the language of claim 1,

31

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

where the first client device has to act as a client and as a server at different times.  Nevertheless, the device must be capable of performing the roles required by the claim limitations.  The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.  Ex. 1012, 14.  The district found that it could not do so because the components were separately recited, which indicated a distinction between the components. *Id*. at 14–15.  The district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer  ↔ computer ↔ computer architecture*."  Ex. 1014, 10 (emphasis added).  Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'"  *Id*. (emphasis omitted).

Patent Owner additionally argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices."  PO Resp. 14 (citing Ex. 2065 ¶ 77; Ex. 1001, 2:44–46).  Our view is that the Patent Owner takes the Specification's disclosure out of context.  The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

system known as BitTorrent. Ex. 1001, 2:40–52. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id*. at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1011, 11 (emphasis omitted). We also agree with the district court's finding that the Specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1011, 11; *see also* Ex. 1001, 1:54–59; PO Resp. 14.

Patent Owner additionally asserts that a person of ordinary skill would have understood that a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 18. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id*. at 14 (citing Ex. 2065 ¶ 77). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2065 ¶¶ 77, 81–82. We discuss the prosecution history below, but notably, Dr. Williams does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to

33

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id.*

Accordingly, we find that the '342 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

### iii. Prosecution History

Patent Owner argues that the prosecution history of the '342 patent, its parent (the '510 patent), its grandparent (the '319 patent), and its great grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")), support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 27–34.

Patent Owner points to statements in the prosecution history of the great grandparent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 28–31 (citing Ex. 1019, 17, 84, 93, 125, 136; Ex. 2065 ¶¶ 106, 108, 111–112). More specifically, Patent Owner asserts that the applicant argued that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality . . . and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 29 (citing Ex. 1019, 125 (emphasis omitted)). Patent Owner refers to an examiner's response stating that Garcia "fails to teach a group of clients for data communication between the web server and a requesting client via . . . clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving content from the selected client." *Id.* (citing

34

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Ex. 1019, 95).  Patent Owner contends that this statement shows that "the examiner recognized a server cannot be equated to a client device."  *Id.* (citing Ex. 2065 ¶ 108).  Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in the reference client devices "are typically consumer owned and operated."  *Id.* at 29–30 (citing Ex. 1019, 84–85) (emphasis omitted).  Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, **within its environment**, is allowable subject matter over the prior art."  *Id.* at 30 (citing Ex. 1019, 17).

The claims that were under consideration in the '936 patent prosecution were different than the claims at issue here.  A "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device," "client communication device," and "client(s)."  *See* Ex. 1019, 22–26; 115–119, 194–199, 246–256.  Similarly, the issued claims in the '936 patent recite "requesting client" and a separate "client" and the issued claims have multiple steps that differ from those of the '342 patent.  *See*, *e.g.*, Ex. 1024, 19:16–52.  Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '342 patent.[12]  Further, considering the varying terms used, we do not find that the applicant's statements during prosecution on patentability regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope

---

[12] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations.  Ex. 1019, 64, 94–95.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

of the "client device" term used in the claims here. *See* Ex. 1072, 349, 624–625; *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 1019, 17.

Additionally, as discussed above, the '342 patent's claim language and Specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for a great grandfather of the '342 patent and also involved evolving claim term amendments. S*ee Telcordia Technologies, Inc. v. Cisco Systems, Inc*., 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification."). For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '342 patent claims than the claim language and Specification of the '342 patent itself. As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317. This is particularly true here, where the prosecution history at issue involves a great grandfather

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a grandparent to the '342 patent. PO Resp. 31–32. Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id*. at 31 (citing Ex. 1018, 16). Patent Owner also cites the applicant's assertion that "the Examiner does not sufficiently establish that the 'ordered combination' of the recited elements also fails to 'transform the nature of the claim' into a patent-eligible application." *Id*. at 31–32 (citing Ex. 1018, 16). Patent Owner further cites the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." *Id*. at 32 (citing Ex. 1018, 9).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device." *See* Ex. 1018, 14–18.

Appx37

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Patent Owner additionally refers to the prosecution history of the parent '510 patent and '342 patent and the examiner's statement that the "environment" of the claimed methods supported patentability.  PO Resp. 33–34.  We do not discern that there is any disavowal of claim scope by the applicant in the prosecution of the '342 patent or the parent '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*iv.  Conclusion*

Based on evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

2.  "*second server*"

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested clarification that the term is "a device that is operating in the role of a server and that is not the first client device."  Ex. 1011, 14; Ex. 1014, 8.  The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server."  Ex. 1014, 11.

Petitioner proposes the adoption of the district court's construction of the term.  Pet. 19.  Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different than the client device.  PO Resp. 34–36.

Patent Owner's arguments, in the most part, repeat those presented for the "client device."  *See* PO Resp. 34–38.  That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer

38

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id*.

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1011, 14; Ex. 1014, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments *supra* Section II.C.1 that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client

39

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

device," so client devices and servers are distinguished.  PO Resp. 34 (citing Ex. 2029, 20, 23).  We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously."  Ex. 2029, 20–21. Patent Owner also argues that the district court indicated that a "server" is not a communication device.  PO Resp. 35 (citing Ex. 1014, 10).  However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the Specification does "not include servers as a type of 'communication device,' [ ] that is not sufficient to construe 'client device' as unable to act as a server in all cases."  Ex. 1014, 10.  Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server.  PO Resp. 36–39.

### 3. Other Terms

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes.  *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g*, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd*., 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs*., 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

41

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

*E   Anticipation of Claims 1, 2, 6, 7, 15, 16, and 18–23 By Crowds*

Petitioner contends that claims 1, 2, 6, 7, 15, 16, and 18–23 are unpatentable under 35 U.S.C. § 102 because they are anticipated by Crowds.  Pet. 24–48.  Patent Owner argues that Crowds does not disclose all the limitations of the claims.  PO Resp. 44–52.

We begin our discussion with summary of Crowds, and then address the evidence and arguments presented.

*1.   Crowds (Ex. 1004)*

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions."  Ex. 1004, 2.[13]  In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server.  *Id.*  In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator."  *Id.*  In Crowds, a user is represented "by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)."  *Id.* at 13.  "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd."  *Id.*  Exemplary paths for web requests from crowd users are shown in Figure 2, reproduced below:

---

[13] Unless otherwise stated, citations to exhibits use the page numbers identified by the parties.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, above, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." Ex. 1004, 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

> ### *2. Discussion*
>
> #### *a. Claim 1*

The Petition asserts that Crowds discloses all the limitations of claim 1. Pet. 24–38. Below we consider the claim 1 limitations in turn.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

### *i. Limitations of the Preamble*

Petitioner asserts that Crowds discloses the claimed web server of the preamble limitations[14] that responds to HTTP requests and stores a first content identifier identified by a first URL.  Pet. 27–29.  Petitioner refers to annotated Figure 2 of Crowds, reproduced below.



As shown in Petitioner's annotated version of Figure 2 of Crowds, above, Petitioner refers to the path 5→4→6→server (highlighted in green), with boxed "5" mapped to the web server.  Pet. 28–29.  As shown, Petitioner identifies jondo 6 as the first client device (jondo 6).  *Id*. at 28.  Petitioner identifies the device on which jondo 4 resides as the claimed second server (jondo 4).  *Id*. at 29.

---

[14] The preamble provides antecedent basis for the terms "first client device" and "web server," among others.  We determine that the preamble is limiting.  *See* Ex. 1011, 9 (parties agree preambles of claims in related patents are limiting).

44

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Patent Owner contends that Crowds does not disclose the architecture of the claims of the '342 patent.  PO Resp. 47–50.  We address these issues below in the discussion of limitation 1[b].  Patent Owner does not present any other arguments specific to this limitation.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses the limitations of the preamble of claim 1.

### *ii.  Limitation 1[a]*

Petitioner asserts that Crowds discloses limitation 1[a] because a person of ordinary skill in the art would understand that jondo 6 is operating in the role of a client executing a web browser application.  Pet. 29 (citing Ex. 1003 ¶ 75).  More specifically, Petitioner asserts that "jondo 6 is a communication device because it is a device (user's computer) that, due at least in part to the jondo application residing on it, facilitates communication between other devices, including web server 5 and jondo 4."  *Id.* (citing Ex. 1004, 8–9; Ex. 1003 ¶ 76).  Petitioner argues that "[j]ondo 6 operates in the role of a client at least because, as the web request originating at jondo 5 is traveling to web server 5 in the Mapped Path, jondo 6 is serving as a client of web server 5."  *Id.* at 30 (citing Ex. 1003 ¶ 76; Ex. 1004, 8–9).  Petitioner contends that Crowds discloses the use of a web browser by jondos.  *Id.* (citing Ex. 1004, 8, 13–15, 23–24).  Petitioner asserts that "Crowds explains that each jondo depicted in Figure 2 serves as an initiator and that each 'request' by an initiator travels from that device's web browser to its jondo, thus making explicit that jondo 6 in the Mapped Path executes a web

45

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

browser application." *Id*. (citing Ex. 1004, 8, 8 n.1, 13–15; Ex. 1001 ¶ 77). Petitioner also refers to Crowd's disclosure of the computers running jondos use a "Netscape 3.01 browser." *Id*. at 31 (citing Ex. 1004, 16–17).

We agree with Petitioner that jondo 6 is operating in the role of a client executing a web browser application because jondo 6 serves as a client of web server 5 when web requests originating at jondo 5 are sent by jondo 6 to web server 5 in the mapped path. Ex. 1004, 8–9. We address other arguments related to the disclosure of a "first client device" below in the section on limitation 1[d].

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses the limitation 1[a].

### iii. Limitation 1[b]

Petitioner asserts that limitation 1[b] is performed by Crowds because a person of ordinary skill in the art would understand that jondo 6 would establish of a TCP connection between jondo 6 (first client device) and jondo 4 (the second server). Pet. 31 (citing Ex. 1003 ¶ 79). Petitioner argues that:

> jondo 4 in the Mapped Path is a 'server' under the above definition [the district court's construction] because jondo 4 operates in the role of a server (it serves at least jondo 5 by receiving jondo 5's web request and sending it on to jondo 6 and later sending web server 5's response (received from jondo 6) back to jondo 5, and therefore provide a service to jondo 5), and it is not the same physical device as jondo 6 (i.e., the first client device).

Pet. 31 (citing Ex. 1003 ¶ 80; Ex. 1004, 8–9). In further support, Petitioner refers to Crowds's disclosure that each jondo in the path "receives the [first

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

user] request" from the prior jondo and determines whether to forward the
request to another jondo or complete the path and "submit[] the request to
the end server for which the request was destined." *Id*. at 32 (citing
Ex. 1003 ¶ 81; Ex. 1004, 8). Petitioner argues that a person of ordinary skill
in the art would have recognized that jondo 4 and jondo 6 communicate with
each other using a TCP connection, with Crowds disclosing "detect[ion] by
the TCP/IP connection to the jondo breaking or being refused." *Id*. (citing
Ex. 1003 ¶ 81; Ex. 1004, 16).

Patent Owner argues that the portions of Crowds relied upon by
Petitioner disclose only "establishing a TCP connection in the context of a
jondo sending a request for content." PO Resp. 45 (citing Ex. 2065 ¶ 154).
Patent Owner asserts that a "jondo does not establish any TCP connections
with other jondos until that first jondo receives a request for content from the
user's browser." *Id*. (citing Ex. 1004, 8). Patent Owner contends that in the
path "5→4→6→5 and in the context of jondo 4 sending a request for
content to jondo 6, jondo 4 is operating in the role of a client and jondo 6 is
operating in the role of a server." *Id.* Patent Owner argues that jondo 4
cannot be the "second server," "because at that point in time, when jondo 4
is sending a request to jondo 6, jondo 4 is operating in the role of a client,
not a server." *Id*. Patent Owner asserts that Petitioner's expert agrees that at
that point in time, jondo 4 is acting in the role of a client. *Id*. (citing
Ex. 2047, 305:13–19).

Patent Owner's arguments are based on the premise that if a device is
operating in a certain role performing a function *at a point in time*, it cannot
be the claimed element. In other words, Patent Owner is asserting that a

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

component has to operate exclusively in a single role in order to disclose a claim element.  We are not persuaded by these contentions because we have not adopted Patent Owner's proposed claim constructions.

As discussed, *supra* Section II.C.2, we have adopted the district court's role-based construction, where a "server" is a "server that is not the client device," that is, the term means "a device that is operating in the role of a server and that is not the first client device."  As Petitioner asserts, and we agree, Crowd's jondo 4 operates in the role of a server because it serves by sending the received jondo 5's web request on to jondo 6 and sending web server 5's response back to jondo 5.  *See* Pet. 31; Ex. 1003 ¶ 80.  We also agree with Petitioner that jondo 4 is not the same physical device as jondo 6 (the first client device).  Accordingly, jondo 4 meets the claim construction for the term "second server" adopted here.  That jondo 4 may at times also act as a client is acceptable—as discussed *supra* Section II.C.1.c, a device may perform different roles with different functions at different times.  Dr. Freedman's testimony (Ex. 2047, 305:13–29) reflects that jondo 4 acts in the role of a server and can also act as a client, which is consistent with the role-based claim interpretation.

Patent Owner additionally argues that Crowds does not disclose the architecture of claim 1.  PO Resp. 47–50.  Patent Owner asserts that Crowds "does not disclose a 'first client device' between a 'second server' and a 'web server.'"  *Id*. at 47–48.  Patent Owner argues that the jondos of Crowds are user computers and there is no indication that these are dedicated user devices.  *Id*. at 48.  Patent Owner also asserts that there is no indication that Crowds's jondos are capable of a large number of connection or provide for

48

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

scalability for increasing resources. *Id*. Patent Owner contends that the jondos of Crowds are interchangeable network devices and there are no differences between them, and it is not appropriate to call one jondo a "client device" and another a "server." *Id*. at 49. Patent Owner also asserts that does not disclose the second server ↔ first client device ↔ web server architecture of the '342 patent claims. *Id*. at 49–50. Patent Owner contends that Crowds does not disclose each limitation of claim 1 "as arranged in the claim" and one of ordinary skill in the art would "at once envisage" the claim 1 invention. *Id*. at 50. Patent Owner also asserts that Petitioner provides no analysis "regarding modifying jondo 4 to be a server under Patent Owner's proposed constructions." *Id*. at 53 (citing Ex. 2065 ¶ 178; Ex. 2026, 20:20–21:6).

Most of Patent Owner's arguments are based on claim constructions that we have not adopted and further on premises related to claim construction such as that certain components have specific structural requirements or a component has to operate exclusively in a single role in order to disclose a claim element. We are not persuaded by these contentions for the reasons discussed above.

We additionally do not agree with Patent Owner's assertions that Crowds does not disclose the elements "as arranged in the claim" and would not "envisage" that arrangement or that Crowds does not disclose the second server ↔ first client device ↔ web server architecture of the '342 patent claims. As shown in annotated Figure 2 of Crowds, and in Petitioner's reliance on the path 5→4→6→server as discussed for the preamble above, Crowds explicitly discloses the architecture of second server ↔ first client

49

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

device ↔ web server.  *See* Pet. 27–29; Ex. 1004, Fig. 2.  This is the configuration as arranged in the claim.  As also discussed, we find that Crowd's disclosures support Petitioner's contention that jondo 6 acts as the claimed "first client device," jondo 4 acts as the claimed "second server," and as discussed below, and server 5 acts as the claimed "web server."  As such, Petitioner demonstrates that Crowds discloses the components "as arranged in the claim," and which could be understood by one of ordinary skill in the art as depicted in the configuration of Figure 2.  We do not agree with Patent Owner that relying on component that meets the claim construction and also is in a configuration that is explicitly disclosed would require any "modification."  *See* PO Resp. 53.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[b].

### iv.  Limitation 1[c]

For limitation 1[c], Petitioner asserts that a person of ordinary skill in the art would have understood that web server 5 in the path of Figure 2 of Crowds is the claimed web server.  Pet. 34.  Petitioner contends that the claimed web server responds to HTTP requests and stores a first content that is identified by a URL.  *Id*. (citing Ex. 1003 ¶ 85).  Petitioner asserts that Crowds discloses jondo 6 receiving the web page (requested initially by jondo 5) from web server 5.  *Id*. (citing Ex. 1003 ¶ 84).  Petitioner argues that Crowds discloses that users request web pages and the web servers in Figure 2 return the requested content to initiators, including jondo 5.  *Id*. at 34–35 (citing Ex. 1003 ¶¶ 86–87; Ex. 1006, 8–9, 17).  Petitioner also

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

contends that Crowds discloses that devices running jondos identify requests by URLs.  *Id*. at 35 (citing Ex. 1006, 24).

Patent Owner does not present any additional arguments specific to this limitation.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[c].

### v. Limitation 1[d]

For limitation 1[d], Petitioner asserts that Crowds discloses "jondo 6 sending the web page it receives from web server 5 to jondo 4 over the established TCP connection, in response to jondo 4 receiving the URL identifying the web page from jondo 5."  Pet. 37 (citing Ex. 1003 ¶ 91; Ex. 1006, 8–9).  Petitioner further argues that "when jondo 6 sends content to jondo 4 upon receiving that content from server '5,' it does so 'in response to the receiving of the first content identifier.'"  *Id*. at 38 (citing Ex. 1003 ¶ 92).

Patent Owner asserts that Crowds does not disclose a "first client device" sending the received first content to a "second server" as recited in claim 1.  PO Resp. 46 (citing Ex. 2065 ¶ 158).  Patent Owner contends that Petitioner argues that jondo 6 sends the received first content to jondo 4 in the path 5→4→6→5.  *Id*. at 46–47 (citing Pet. 36).  Patent Owner argues that jondo 6 cannot correspond to the "first client device" "because at that point in time, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client."  *Id*. at 47 (citing Ex. 2065 ¶ 158).  Patent Owner also contends that jondo 4 cannot correspond to

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

the "second server" as Petitioners allege that jondo 4 cannot correspond to the "second server" "because at that point in time, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server." *Id.* (citing Ex. 2065 ¶ 158).

As discussed for limitation 1[a], we agree with Petitioner that jondo 6 meets the claim construction of a "client device" adopted there, that is, a "communication device that is operating in the role of a client." More specifically, as Petitioner asserts, and we agree, jondo 6 is a communication device because its application facilitates communication between other devices and it operates in the role of a client when the web request travels to web server 5. Pet. 29–30. We do not agree with Patent Owner's arguments that jondo 6 is not disclosed by Crowds. As discussed for limitation 1[b], it is acceptable that jondo 6 may also act as a server at times. Under the claim construction adopted, a device may perform different roles with different functions at different times. For instance, as discussed, under the language of claim 1, a first client server acts as both a server and client. Jondo 4, which meets the construction of the term "second server," may also act in the role of a client at times for similar reasons.

We also agree with Petitioner (Pet. Reply 10) that even if Patent Owner's proposed construction that a "client device" is a "consumer computer" is adopted (PO Resp. 11), Crowd's jondo 6 meets that construction. Crowds discloses that it utilizes users "into a large and geographically diverse," using their own computer, to act as the "jondos." Ex. 1004, 1, 8. Dr. Williams agrees that the user computers of Crowds are "consumer computers." Ex. 1050, 9:11–16.

52

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[d].

### vi. Conclusion

We note that Patent Owner has presented evidence of secondary considerations. *See* PO Resp. 57–75. Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 1 of the '342 patent.

### b. Claims 6 and 7

Claim 6 recites

6. The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol ( HTTP ) server, the third server responds to HTTP requests and stores a second content identified by a second URL, the method by the first client device further comprising:

> receiving the second URL;
>
> sending , to the third server over the Internet in response to the receiving, the second URL; and
>
> receiving the second content from the third server over the Internet in response to the sending.

Ex. 1001, 19:57–67.

Claim 7 depends from claim 6.

53

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Petitioner asserts that Crowds discloses the limitations of claim 6 by the additional path 3→1→6→server, as shown in annotated Figure 2 of Crowds, reproduced below. Pet. 40.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In annotated Figure 2, above, the path 3→1→6→server is shown in blue. Pet. 40 (citing Ex. 1004, 8–9; Ex. 1003 ¶ 96). Petitioner asserts that web server 3 (in square box) meets the claimed third server and, in the blue path, jondo 6 (first client device) receives a URL originating from the device on which jondo 3 resides, from the device on which jondo 1 resides, and sends that URL to web server 3 over the Internet in response to that receiving. *Id.* at 41 (citing Ex. 1004, 8–9, 24, Fig. 6; Ex. 1003 ¶ 96).

Patent Owner argues that in the blue path of 3→1→6→web server 3 Crowds does not disclose a first client device receiving a second URL "because *at that point in time*, when jondo is receiving the second URL from jondo 1, jondo 6 is operating in the role of a server, not a client." PO

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Resp. 51 (citing Ex. 2065 ¶ 171) (emphasis added).  Patent Owner argues that claim 7 depends from claim 6, and also fails by the dependence.  We do not agree with these arguments for the same reasons discussed above for limitations 1[b] and [d]: under the claim construction adopted, a device may perform different roles with different functions at different times.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 6 and 7.

### c.  Claim 15

Claim 15 depends from claim 1, further reciting: "comprising receiving, by the first client device from the second server over the established TCP connection, the first URL."  Ex. 1001, 20:40–42.  Petitioner asserts that under Crowds "in order for jondo 6 to have received the web page from web server 5 . . .  jondo 6 received the URL that identified that web page . . . from jondo 4 over the established TCP connection between them, which jondo 4 received from jondo 5."  Pet. 42 (citing Ex. 1004, 8; Ex. 1003 ¶ 98).  Patent Owner repeats the same arguments discussed for limitations 1[b] and [d], which is that "because *at that point in time*, when jondo 6 is receiving a request from jondo 4, jondo 6 is operating in the role of a server, not a client" and "because *at that point in time*, when jondo 4 is sending a request to jondo 6, jondo 4 is operating in the role of a client, not a server."  PO Resp. 53 (citing Ex. 2065 ¶ 176) (emphasis added).  We do not find these arguments undermine Petitioner's showing of Crowd's disclosure of the limitations of claim 15 for the reasons discussed above under limitations 1[b] and [d].

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 15.

### d. Claims 2, 16, and 18–23

Petitioner presents evidence and arguments in support of Crowds's disclosure of the limitations of claims 2, 16, and 18–23. Pet. 38–40, 42–47. Patent Owner does not present any arguments specific to these claims. *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 2, 16 and 18–23.

### F. Obviousness of Claims 1, 2, 6, 7, 15, 16, and 18–23 over Crowds

#### 1. Prior Art Teachings and Alleged Teaching Away

Petitioner contends that claims 1, 2, 6, 7, 15, 16, and 18–23 would have been obvious over Crowds. Pet. 24–48. Petitioner argues, in the alternative, that a person of ordinary skill in the art "would have found it obvious for a TCP connection between jondo 4 and jondo 6 to have been established when jondo 4 connected to jondo 6" for the teaching of limitation 1[b]. *Id*. at 32. For limitation 1[c], Petitioner asserts, in the alternative, that a person of ordinary skill in the art would have found the mapped path in Crowds "to have operated over the Internet." *Id*. at 37.

Patent Owner argues that Crowds teaches away from the claimed methods of the '342 patent because: 1) Crowds does not provide the initiator with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does

56

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

not teach the initiator to purposefully select a jondo to form a pathway.  PO Resp. 55–56.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims.  As to the third issue, a "purposeful" selection of a device is also not claimed.  Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).  As to the second issue of Crowds's latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim.  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013).  Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1004, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Accordingly, we do not find that Crowds teaches away from the claimed invention of the '342 patent.

We find that Petitioner's evidence and argument is sufficient to show one of ordinary skill in the art would be motivated to modify Crowds and it teaches the limitations of claims 1, 2, 6, 7, 15, 16, and 18–23.  Patent Owner also asserts that the obviousness of the claims is supported by objective

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise, and we address those issues below.

### 2. Objective Indicia of Nonobviousness

Patent Owner asserts that obviousness is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–75; PO Sur-reply 23–27. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 22–26.

### a. Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of

59

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b. Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "commercialized a novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods." PO Resp. 57 (citing Ex. 2065 ¶ 130). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* (citing Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 71 (citing Ex. 2046, 4, 45; Ex. 2065 ¶ 186). According to Patent Owner, "just last year alone," its "residential proxy service generated revenues of $53.7 million." *Id.* at 69 (citing Ex. 2065 ¶ 138). Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

$200 million in 2017" is further evidence of commercial success.  *Id.* (citing Ex. 2065 ¶ 137).

Patent Owner asserts that its "residential proxy service practices the methods claimed in the '342 [p]atent," and provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 6–9, 15–16, and 18–24 of the '342 [p]atent."  PO Resp. 59–67.  Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '342 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122."  *Id.* at 67.  According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '342 [p]atent and is coextensive with them."  *Id.*  Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service is (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* at 68.  Finally, Patent Owner argues that "the district court found that sufficient nexus was established."  PO Sur-reply 23 n.10.

Petitioner responds that Patent Owner "has failed to carry its burden of showing that any of its purported secondary considerations has the requisite nexus to the claimed invention."  Pet. Reply 22.  Petitioner asserts that Patent Owner's secondary considerations arguments are irrelevant because they are based on the use of a "residential proxy service" and

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

"residential consumer computers." *Id*. at 23.  According to Petitioner, "the first client device does not require (nor do any of the Challenged Claims require) the use of a consumer computer, much less a 'residential' consumer computer." *Id*.  Petitioner further contends that "[l]ikewise, none of the Challenged Claims requires that the first client device have a 'residential IP address.'" *Id*. at 23–24.  Petitioner asserts that the challenged claims also do not require "scalability" and the "commercial success evidence lacks the required nexus for at least this reason alone." *Id*. at 24.  Petitioner also argues that Patent Owner's expert testified that Patent Owner's alleged prior art-distinguishing feature, the use of a consumer computer as the claimed first client device, was already present in the prior art. *Id*. (citing Ex. 1050, 8:14–9:16).

We find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success.  First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373.  To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.  For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses."  PO Resp. 68; *see id.*

62

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

at 57 (pointing to Patent Owner's "novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address"), 71 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services")).

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See supra* Section II.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 57–59,

63

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

68, 71.  Therefore, Patent Owner has failed to prove that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established."  PO Sur-reply 23 n.10 (citing Ex. 2020, 4).  Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention."  Ex. 2020, 4.  The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation.  It is also not clear from the record whether the district court actually made a finding on the merits of nexus, or simply determined that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need."  PO Resp. 72.  According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses" because there "were usually (a) associated with commercial IP addresses; and (b) limited

64

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 187). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "residential IP network" solves the need to "dramatically increase the [number] of IP addresses that can be included in a proxy network." *Id.* at 72 (citing Ex. 2065 ¶ 187; Ex. 2048, 7; Ex. 2049, 182:22–197:21).

Petitioner responds that there is no nexus between the products that allegedly filled the long-felt need and the challenged claims. Pet. Reply 24–25. Petitioner also contends that Patent Owner provides no objective evidence of a problem's existence. *Id.* at 25.

For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 72. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d. *Copying*

Patent Owner argues that "[d]uring the jury trial in the Tex. Litigation, evidence of Oxylabs copying Bright Data's residential proxy service (then known as 'Hola') was presented." PO Resp. 73 (citing Ex. 2065 ¶ 188).

65

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 188). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 73–74 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6; Ex. 2065 ¶ 189). "This testimony," according to Patent Owner, "is strong evidence of copying." *Id.* at 74 (citing Ex. 2065 ¶ 189).

Petitioner responds that there is no nexus between the products that were allegedly copied and the challenged claims. Pet. Reply 25–26.

For similar reasons as for commercial success and long-felt need, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 73–74. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

### e. Industry Praise

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '342 [p]atent as described above." PO Resp. 75 (citing Ex. 2065 ¶ 191). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* (citing Ex. 2065 ¶ 192).

Petitioner responds the industry praise evidence fails for the same reasons as those for commercial success. Pet. Reply 26.

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 75. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### 3. Conclusion on Obviousness

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show nexus with the claimed invention. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims 1, 2, 6, 7, 15, 16, and 18–23 of the '342 patent in view of Crowds.

Appx67

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6, 7, 15, 16, and 18–23 would have been obvious over Crowds.

> G. *Obviousness of Claims 8 and 9 over Crowds and RFC 1122 and Claims 10, 11, and 13 over Crowds and RFC 2616*

Petitioner asserts that claims 8 and 9 would have been obvious over Crowds and RFC 1122 and claims 10, 11, and 13 would have been obvious over Crowds and RFC 2616.  Pet. 48–60.

RFC 1122 is titled "Requirements for Internet Hosts – Communication Layers" and provides requirements for link layer, Internet layer, and transport protocols.  Ex. 1040, 1.  RFC 1122 was published in October 1989, and Dr. Freedman testifies that it was published by established standards organizations and was intended to be viewed by interested Internet engineering audience at large.  *Id*.; Ex. 1003 ¶ 63. RFC 2616 is titled "Hypertext Transfer Protocol -- HTTP/1.1" and it "specifies an Internet standards track protocol for the Internet community." Ex. 1006, 1.  RFC 2616 was published in 1999 and Dr. Freedman testifies that it "was the definitive specification for HTTP version 1.1 protocol."  *Id.* at 1; Ex. 1003 ¶ 66.

Claim 8 depends from claim 1 and further recites "further comprising periodically communicating over the TCP connection between the second server and the first client device."  Ex. 1001, 20:4–6.  Claim 9 depends from claims 8 and further recites "wherein the periodically communicating comprises exchanging 'keep alive' messages."  *Id*. at 20:7–9.  For claims 8 and 9, Petitioner asserts that a person of ordinary skill would have modified

68

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

Crowds so that for a given path the jondo device would "periodically communicate by exchanging TCP keep-alive messages with each other over established TCP connections" in accordance with RPC 1122. Pet. 51–52 (citing Ex. 1003 ¶¶ 112; Ex. 1040, 102). Petitioner asserts that a person of ordinary skill in the art "would have been motivated to implement TCP keep-alives on Crowds' jondos to detect when a peer jondo has crashed and to prevent termination of the TCP connection due to inactivity." *Id*. at 51 (citing Ex. 1003 ¶ 51).

Claim 10 depends from claim 1, and further recites "determining, by the first client device, that the received first content, is valid." Ex. 1001, 20:11–13. Claim 11 depends from claim 10, and further recites "wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." *Id*. at 20:14–16. Claim 13 depends from claim 1, and further recites:

> 13. The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of first content, the receiving of the first URL, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:
>> downloading, by the first client device from the Internet, the software application, and
>> installing, by the first client device, the downloaded software application.

Ex. 1001, 20:26–37.

Petitioner argues that as to claim 10, it would have been obvious for a person of ordinary skill in the art to modify Crowds to cache content as

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

described in RFC 2616.  Pet. 55.  Petitioner asserts that caching was a well-known to a person of ordinary skill in the art "that 'significantly improve[d] performance' by 'eliminat[ing] the need to send requests in many cases, and [] eliminat[ing] the need to send full responses in many other cases'" and the implementation would have benefited Crowds.  *Id*. at 55–56 (citing Ex. 1003 ¶ 115; Ex. 1006, 47).  Petitioner explains that with this implementation, "jondo 6 would have sent a 'conditional request' to web server 5 containing the 'cache validator" for the cached web page," and "if the web page was valid, jondo 6 would have received from web server 5 a response with a 'special status code,'" which teaches the limitations of claims and 11.  *Id*. at 57 (citing Ex. 1006, 54; Ex. 1006 ¶¶ 116–117).

For claim 13, Petitioner asserts that a person of ordinary skill in the art "would have understood that a jondo is a software application that includes computer instructions."  Pet. 58 (citing Ex. 1003 ¶ 120).  Petitioner argues that it would have been obvious to a person of ordinary skill in the art that "in view of Crowds authors' desire to widely distribute the jondo application for that application to have been resident on jondo 6 after downloading same over the Internet and then installing same on the device."  *Id*. (citing 1003 ¶ 119; Ex. 1004, 2, 3, 25).  Petitioner also asserts that it would have been obvious to a person of skill "to modify Crowds in view of RFC 2616 to cache content," as discussed for claim 10, and "[i]n the modified Crowds, the jondo software computer instructions would have caused a processor in jondo 6 to cache."  *Id*. at 59 (citing Ex. 1003 ¶ 121).  Further, "[i]n Crowds modified by RFC 2616, the 'most up-to-date response held by the cache' of jondo 6 . . . would have been the stored web page

70

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

jondo 6 received from web server 5," and a person of skill would have known that it would have been advantageous for jondo 6 and other jondo devices "to implement such send-stored-content functionality because it sped up web access times." *Id*. at 60 (citing Ex. 1003 ¶ 122).

Patent Owner only asserts that Petitioner provides no analysis that RFC 1122 or RFC 2616 that would cure the deficiencies of Crowds as to claim 1, does not present any arguments specific to these claims. PO Resp. 54.

We have reviewed Petitioner's evidence and arguments and find it is sufficient to show that the references teach the limitations of the claims, with motivation to support the combination of the prior art references.

For the reasons explained *supra* Section II.F.2, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show a nexus with the claimed invention. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of these challenged claims.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 8 and 9 would have been obvious over Crowds and RFC 1122 and claims 10, 11, and 13 would have been obvious over Crowds and RFC 2616.

### III. MOTIONS TO SEAL

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2039, 2040, 2041–2044, and 2065 and associated portions of Patent Owner Response, and to enter an

71

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

agreed-upon Joint Protective Order.  Paper 16; Ex. 2066.  Patent Owner
asserts that Exhibit 2039 contains sensitive technical information, Exhibits
2040–2044 contain source code and related files, Ex. 2044 is an expert
declaration that references some of the sensitive information in the exhibits,
and portions of the Patent Owner Response incorporates some of the
sensitive information.  Paper 16, 2–7.  Patent Owner argues that it would be
harmed by the public disclosure of its highly sensitive information, which it
has taken steps to guard against disclosure, which outweighs the public's
interests.  *Id*.  This Motion is unopposed.

   We have reviewed the exhibits at issue, including the redacted
portions of the exhibits and Patent Owner Response, and the explanations of
the confidential nature of the materials for which sealing is sought, as
discussed in the Motion.  We grant the Motion to Seal and the associated
request to enter the Protective Order.  Paper 16; Ex. 2066.

   Patent Owner filed another Motion to Seal which seeks to seal
Exhibit 2069.  Paper 22, 2.  Patent Owner asserts that Exhibit 2069 is an
email making corrections to source code which has not been publicly
disclosed and steps have been taken to guard against its disclosure, and
Patent Owner would be harmed by disclosure of this information.  *Id*. at 2–4.
Petitioner does not oppose this Motion to Seal.

   We have reviewed Exhibit 2069.  We find that the information is
sensitive and falls within the criteria for protection.  Accordingly, we grant
Patent Owner's Motion to Seal Exhibit 2069 (Paper 22).

Appx72

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

## IV. CONCLUSION[15]

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that claims challenged claims 1, 2, 6–11, 13, 15, 16, and 18–23 of the '342 patent are unpatentable.  In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 6, 7, 15, 16, 18–23 | 102 | Crowds | 1, 2, 6, 7, 15, 16, 18–23 | |
| 1, 2, 6, 7, 15, 16, 18–23 | 103 | Crowds | 1, 2, 6, 7, 15, 16, 18–23 | |
| 8, 9 | 103 | Crowds, RFC 1122 | 8, 9 | |
| 10, 11, 13 | 103 | Crowds, RFC 2616 | 10, 11, 13 | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 15, 16, 18–23 | |

---

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

## V. ORDER

Accordingly, it is

ORDERED that claims 1, 2, 6–11, 13, 15, 16, and 18–23 of U.S. Patent No. 11,044,342 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motions to Seal (Papers 16, 22) are *granted*;

FURTHER ORDERED that the request to enter the protective order is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00103
Patent 11,044,342 B2

PETITIONER:

Mark T. Garrett
Daniel S. Leventhal
James G. Warriner
NORTON ROSE FULBRIGHT
mark.garrett@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
jim.warriner@nortonrosefulbright.com

PATENT OWNER:

Thomas M. Dunham
Elizabeth A. O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

Appx75

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                                    Paper 49
Tel: 571-272-7822                                          Date: May 25, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

––––––––––––––––––––––––

BEFORE THE PATENT TRIAL AND APPEAL BOARD

––––––––––––––––––––––––

THE DATA COMPANY TECHNOLOGIES INC.,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

––––––––––––––––––––––––

IPR2022-00135
Patent 10,257,319 B2

––––––––––––––––––––––––

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges.*

CASS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motions to Seal
Granting Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14; 37 C.F.R. § 42.64*

IPR2022-00135
Patent 10,257,319 B2

# I. INTRODUCTION

## A. Background

In this *inter partes* review, The Data Company Technologies Inc. ("Petitioner") challenges the patentability of claims 1–29 (the "challenged claims") of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent"), which is assigned to Bright Data Ltd. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review. For the reasons discussed below, Petitioner has proven by a preponderance of the evidence that claims 1–29 are unpatentable.

## B. Procedural History

In this proceeding, Petitioner relies upon the following references:

1. Plamondon, U.S. Patent Application Publication US 2008/0228938 A1, published September 18, 2008 (Ex. 1010).

2. RFC 2616, *Hypertext Transfer Protocol—HTTP/1.1, Network Working Group*, The Internet Society, 1999 (Ex. 1018).

3. RFC 1122, *Requirements for Internet Hosts–Communication Layers*, Network Working Group, Internet Engineering Task Force, 1989 (Ex. 1014).

4. IEEE 802.11-2007, *IEEE Standard for Information Technology–Telecommunications and Information Exchange Between Systems - Local and Metropolitan Area Networks–Specific Requirements–Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications*, IEEE Standards, June 12, 2007 (Ex. 1022).

5. Price, U. S. Patent Application Publication US 2006/0026304 A1, published February 2, 2006 (Ex. 1023).

6. Kozat, U. S. Patent Application Publication US 2009/0055471 A1, published February 26, 2009 (Ex. 1024).

2

IPR2022-00135
Patent 10,257,319 B2

Petition ("Pet.") viii, 2.

Petitioner submitted a declaration from Prof. David Levin (Ex. 1003, "Levin Decl."). Patent Owner submitted a Declaration of Dr. V. Thomas Rhyne with the Preliminary Response (Ex. 2001, "Rhyne Decl."), and submitted a declaration from Dr. Tim A. Williams with the Patent Owner Response (Ex. 2044, "Williams Decl.").

Petitioner challenges the Patentability of claims 1–29 on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1, 12–14, 21–27 | 102(b) | Plamondon |
| 28, 29 | 103(a) | Plamondon |
| 15–17 | 103(a) | Plamondon, RFC 2616 |
| 17, 18 | 103(a) | Plamondon, RFC 1122 |
| 2 | 103(a) | Plamondon, IEEE 802.11-2007 |
| 2–5, 19, 20 | 103(a) | Plamondon, Price |
| 6–11 | 103(a) | Plamondon, Kozat |

Pet. 2. Patent Owner filed a Preliminary Response. Paper 7 ("Prelim. Resp."). With our permission, Petitioner filed a Reply to the Preliminary

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '319 patent claims priority to a provisional application that was filed before this date, we apply the pre-AIA versions of §§ 102 and 103. *See* Ex. 1001, code (60).

IPR2022-00135
Patent 10,257,319 B2

Response (Paper 8), and Patent Owner filed a Sur-reply to Petitioner's Reply
(Paper 9).

During the trial, Patent Owner filed a Response (Paper 16, "PO
Resp."), Petitioner filed a Reply (Paper 23, "Pet. Reply"), and Patent Owner
filed a Sur-reply (Paper 29, "PO Sur-reply").

An oral hearing was held on March 1, 2023, a transcript of which
appears in the record. Paper 48 ("Tr.").

*C. Real Parties-in-Interest*

Petitioner identifies itself as the only real party-in-interest. Pet. xiv.
Without conceding that they are real parties in interest, Petitioner also
identifies Avantis Team Technologies Ltd. and Cytronix Ltd. *Id.*

Patent Owner identifies Bright Data Ltd. as the only real party-in-
interest. Paper 4, 1.

*D. Related Matters*

The parties identify several district court proceedings involving the
'319 patent and its child, U.S. Patent No. 10,484,510 ("the '510 patent"),[2]
including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the
"NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*,
No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation"). Pet. xv; Paper 4, 1–2.

The '319 patent is or was previously before the Board in IPR2020-
01266 (institution denied), IPR2021-01492 (pending), IPR2022-00861
(joined with IPR2021-01492), IPR2022-00915 (pending), IPR2022-01109
(terminated) and IPR2023-00038 (terminated). Pet. xiv–xv; Paper 5, 1;

---

[2] The '510 patent is based on a continuation of the application for the '319
patent. Ex. 1025, code (60).

4

IPR2022-00135
Patent 10,257,319 B2

Paper 39, 3. The '510 patent is or was involved in IPR2020-01358 (institution denied), IPR2021-01493 (pending), IPR2021-00862 (joined with IPR2021-01493), IPR2022-00916 (pending), IPR2022-01110 (terminated), and IPR2023-00039 (terminated). Paper 5, 1–2; Paper 39, 3–4.

In addition, Patent Owner identifies two *ex parte* reexaminations, Control Nos. 90/014,875 and 90/014,876, that have been ordered for the '319 and '510 patents, respectively. Paper 5, 2. Those reexaminations have since been stayed by the Board. *See* IPR2021-01492, Paper 14 (Apr. 7, 2022); IPR2021-01493, Paper 13 (Apr. 7, 2022).

### E. The '319 Patent

The '319 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, (54). According to the '319 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." *Id.* at 1:54–56. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:58–59; 2:24–2:32; 2:59–3:3.

The '319 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:41–44):

5

IPR2022-00135
Patent 10,257,319 B2



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:43–45. Due to the functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:46–50.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67. Acceleration server 162 includes an acceleration server storage device 164

6

IPR2022-00135
Patent 10,257,319 B2

with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:8–15.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

7

IPR2022-00135
Patent 10,257,319 B2

### F. Illustrative Claim

The '319 patent has 29 claims. As noted, all claims are challenged in the Petition. Pet. 1. Claim 1, the only independent claim in the '319 patent, is illustrative of the claimed subject matter and is reproduced below:[3]

> 1. [1P1] A method
>
> [1P2] for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests,
>
> [1P3] the first server stores a first content identified by a first content identifier, and
>
> [1P4] for use with a second server, the method by the first client device comprising:
>
> [1B] receiving, from the second server, the first content identifier;
>
> [1C] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
>
> [1D] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and
>
> [1E] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16–32.

### II. ANALYSIS OF THE CHALLENGED CLAIMS

### A. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that at

---

[3] References in brackets provided by Petitioner have been added and spacing has been altered.

IPR2022-00135
Patent 10,257,319 B2

least one claim of the '319 patent would have been anticipated or obvious. Inst. Dec. 17–34. Here, we must consider whether Petitioner has established by a preponderance of the evidence that claims 1–29 of the '319 patent would have been anticipated or obvious. 35 U.S.C. § 316(e). We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived." Paper 13, 9; *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising the same argument in the patent owner response). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated Trial Practice Guide (Nov. 2019)[4] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and evidence advanced by Petitioner to support its unpatentability contentions. In this regard, the record contains persuasive arguments and evidence presented by Petitioner regarding the manner in which the prior art discloses the corresponding limitations of claims 1–29 of the '319 patent and the rationale for combining the asserted references.

*B. Level of Ordinary Skill in the* Art

Referring to a Preliminary Response in IPR2020-01358, Petitioner adopts Patent Owner's assessment that a person of ordinary skill in the art is "an individual who, as of October 8, 2009 . . . had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or

---

[4] *Available at*
https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

9

Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." Pet. 7 (citing Ex. 1008, 18; Ex. 1003 ¶¶ 30–37) (alteration in original).

Patent Owner submits that a person of ordinary skill in the art should have the qualifications identified by Petitioner and adopts them. PO Resp. 2 (citing Ex. 1003 ¶ 34; Ex. 2044 ¶ 30).

We adopt the assessment offered by the parties as it is consistent with the '319 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by the Federal Circuit, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek,*

IPR2022-00135
Patent 10,257,319 B2

*Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at
1312–17).

> 1. *"client device"*
> > a. *Petitioner's Assertions*

Petitioner asserts that the district court's construction in *Luminati
Networks Ltd. v. Teso LT, UAB*, No. 2:19-cv-395 (E.D. Tex.) ("*Teso*
litigation")[5] should be applied here for the term "client device." Pet. 9. In
the district court litigation, the magistrate judge construed "client device" as
"communication device that is operating in the role of a client." *Id.*;
Ex. 1006, 12. Petitioner points to two claim construction orders in that
case—an original order (Ex. 1006) and a supplemental order (Ex. 1009). In
those orders, the magistrate judge construed the preamble of claim 1 to be
limiting, and also construed the terms "second server" and "client device."
Pet. 9. Petitioner also refers to the claim construction order in *Luminati
Networks Ltd. v. Code200*, No. 2:19-cv-396 (E.D. Tex.), which concerns
patents with the same specification as the '319 patent, where it was found
that "the role-based construction applies 'regardless of any additional role
the device may serve, including as a server.'" Pet. Reply 3 (citing Ex. 1082,
13). Petitioner indicates that in the Texas litigations, the constructions were
adopted by the district judge. *Id.* (citing Ex. 1074; Ex. 1083). Petitioner
also refers to the claim construction order in *Bright Data Ltd. v. NetNut Ltd.*,

---

[5] Luminati Networks Ltd. is now Bright Data Ltd.

11

No. 2:21-cv-225 (E.D. Tex.), where Patent Owner's construction based on "consumer computer" was rejected. *Id*. at 4 (citing Ex. 2013, 10–16).

### b. Patent Owner's Assertions

Patent Owner asserts that a person of ordinary skill in the art would have understood the term "client device" to be a "consumer computer," or alternatively, to be a "consumer communication device." PO Resp. 10 (citing Ex. 2044 ¶ 69). Patent Owner argues that these constructions are consistent with the claim language, Specification, and the prosecution histories. *Id*. at 10–11. Patent Owner contends that a person of ordinary skill in the art would have understood that a client device is a communication device because the Specification states that "each communication device may serve as a client, peer, or agent" which "informs" a person of skill "that client 102, peers 112, 114, 116, and agent 122 are all 'client devices' in the context of the [S]pecification." *Id*. at 11 (citing Ex. 2044 ¶ 70; Ex. 1001, 4:44–50, 5:21–29).

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer by its disclosure of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server architecture. PO Resp. 11–12 (citing Ex. 1001, 4:44–50, 5:21–29, 9:12–50). Patent Owner alleges that the Specification explains that when executing the fetching method, "the requesting client device may be executing the client module 224 disclosed in FIG. 6, while the proxy client device may be executing the agent module 228 disclosed in FIG. 6." *Id*. at 12. Based upon this, Patent Owner contends that a person of ordinary skill in the art "would understand in the context of the '319 [p]atent, a client device is a consumer computer with specific software to operate in

12

IPR2022-00135
Patent 10,257,319 B2

accordance with the claims." *Id.* Referring to Figure 6 of the Specification,
Patent Owner asserts that a person of ordinary skill in the art would
understand that "one 'client device' may be configured to be the requesting
client device and another 'client device' may be configured to be the proxy
client device." *Id.* (citing Ex. 2044 ¶ 73). In support, Patent Owner also
refers to modified annotated Figure 3, reproduced below, alleging that agent
122 is disclosed as a client device "that is selected, for example, because
agent 122 is closest to the web server 152." *Id.* at 8, 12–13 (citing Ex. 2044
¶¶ 74–75).



Patent Owner alleges that a person of ordinary skill's understanding of
requesting client device (purple) ↔ second server (green) ↔ first client
device (red) ↔ web server (blue) would correspond to client 102 ↔ proxy
server 6 ↔ agent 122 ↔ web server 152, shown in Patent Owner's version

13

IPR2022-00135
Patent 10,257,319 B2

of modified annotated Figure 3 of the '319 patent, above, which presents a schematic diagram of the network. *Id.* at 8.

Patent Owner further asserts that in light of the Specification, "a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 13 (citing Ex. 2044 ¶ 76 (citing Ex. 1001, 2:44–46 ("In the network 50, files are stored on computers of consumers, referred to herein as client devices.") (emphasis omitted))).

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. PO Resp. 13–15. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the Specification, the Specification states that "computers of consumers" are "referred to herein as client devices." *Id.* at 13 (citing Ex. 2044 ¶ 76; Ex. 1001, 2:47–49). Patent Owner further asserts that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id.* at 13–14 (citing Ex. 2044 ¶ 76). Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content. *Id.* at 14 (citing Ex. 1006, 11). Rather, Patent Owner argues, the common understanding of "consumer" as "a person who buys goods or services for their own use" is not a deviation from the use of the term in the Specification, and personal use is often distinguished from commercial use. *Id.* at 14 (citing Ex. 2015; Ex. 2016; 15 U.S.C. § 6809(9); 12 C.F.R. § 332.3(e)(1)). Third, Patent Owner disagrees with the district

14

IPR2022-00135
Patent 10,257,319 B2

court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of consumers," and there were statements made during the prosecution of the parent application to the '319 patent that refer to this issue. *Id*. at 14–15 (citing Ex. 2044 ¶ 76; Ex. 1001, 2:44–46; Ex. 1072, 624).

Patent Owner contends that in the '319 patent, "a client device is not a server." PO Resp. 15. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction that a client device is unable to act as a server in all cases. *Id*. (citing Ex. 1006, 12). According to Patent Owner, a person of ordinary skill in the art would have understood that a client device is not a server in the context of the patent, and the MPEP does not require that a negative limitation be recited verbatim in the Specification. *Id*. (citing, *inter alia*, Ex. 2044 ¶ 62). Patent Owner argues that the Specification describes the shortcomings of using a proxy server as an intermediary, and therefore provides a reason to exclude a client device encompassing a proxy server. *Id*. at 16 (citing Ex. 1001, 2:24–32; Ex. 1006, 12; Ex. 2044 ¶ 83).

Patent Owner asserts that, in view of the recited architecture of the '319 patent claims that distinguishes between client devices and servers, the use of three interchangeable general use computers in a pathway would not disclose that architecture. PO Resp. 16 (citing Ex. 2044 ¶¶ 78–79). Patent Owner also argues that the recited architecture in the '319 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the use of a client device, rather than a proxy server, as an intermediary, and that this distinction is consistent with an *Alice* order in the

15

IPR2022-00135
Patent 10,257,319 B2

*Teso* litigation. *Id*. at 16–17 (citing Ex. 2044 ¶ 79; Ex. 2007, 8–9); PO Sur-reply 2. Patent Owner further contends that the district court "repeatedly acknowledged that a client device is not a merely general-purpose computer." PO Resp. 16 (citing Ex. 2013, 14–15).

Patent Owner argues that a person of ordinary skill in the art would have understood "that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 17 (citing Ex. 2044 ¶ 80). Patent Owner contends that a person of ordinary skill in the art would be informed by statements made during prosecution that a client device is not a dedicated network device, typically uses a single or relatively few connections, and is resource limited (e.g., bandwidth and storage), unlike a server. *Id*. Patent Owner also argues that a person of skill would have understood that a client device typically is understood "(a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time . . . and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to users over system costs." *Id*. at 17–18 (citing Ex. 2044 ¶ 81). Patent Owner asserts that a person of ordinary skill's understanding of "client" would have been consistent with its plain and ordinary meaning, which is "an application that runs on a personal computer or workstation and relies on a server to perform some operations." *Id*. at 18 (citing Ex. 2044 ¶ 82; Ex. 2017; Ex. 2045). Patent Owner contends that a person of ordinary skill would have understood that there are structural differences between client devices and servers. *Id*. (citing Ex. 2044 ¶ 84).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of the Specification, a person of ordinary skill in the art would have understood

16

Appx166

that proxy server 6 must be structurally different from agent 122 and that "a server is not a client device and that a client device is not a server." PO Resp. 19 (citing Ex. 2044 ¶ 85). Patent Owner argues that "Petitioner's expert agreed that server 6 of Figure 1 and agent 122 of Figure 3 would be operating in the same roles at a given point in time," so under the Board's preliminary constructions "Figure 3 collapses onto Figure 1" and fails to account for structural differences between a proxy server and a client device. *Id.* (emphases omitted). Patent Owner points to Petitioner's expert's agreement that in Figure 1, client devices 14 and 16 are operating in the role of a client and web server 32 is operating in the role of a server under the Board's preliminary constructions. *Id.* at 20 (citing Ex. 2044 ¶ 87; Ex. 2010, 51:3–9, 51:11–20, 53:17–21, 53:22–54:3, 54:4–10, 54:23–55:5). Patent Owner also asserts that Petitioner's expert agrees that in Figure 3, client 102 is operating in the role of a client and web server 152 is operating in the role of a server under the Board's preliminary constructions. *Id.* at 21 (citing Ex. 2044 ¶ 92; Ex. 2010, 56:8–12, 56:13–18, 57:8–14, 57:15–18, 57:19–25, 58:15–20).

Patent Owner additionally refers to the prosecution history of U.S. Patent No. 10,069,936 ("the '936 patent), the parent of the '319 patent. PO Resp. 24. Patent Owner argues that this prosecution history "clearly distinguishes client devices from servers." *Id.* (citing Ex. 2044 ¶ 99). Patent Owner asserts that during prosecution, the applicant amended the claims to "specify that the 'devices' being used as intermediaries are 'clients' in contrast to the teachings of Garcia," which was a reference used by the examiner to reject the then-pending claims. *Id.* (citing Ex. 1072, 304, 349). Patent Owner points to the applicant's statement that "the 'device' was

equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality," and further that "[t]he Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 24–25 (citing Ex. 1072, 349 (emphasis omitted)). Patent Owner also refers to the applicant's statement that "[c]lient devices, such as client 105 in the Garcia reference, are end-units that request information from servers, use client-related software . . . and are typically consumer owned and operated." *Id.* at 25 (citing Ex. 1072, 624) (emphasis omitted). Additionally, Patent Owner refers to the examiner's statement that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification," contending that "[t]he examiner's acknowledgement of the 'environment' . . . shows that the examiner appreciated the unique architecture disclosed in the specification and the novel use of a proxy client device within that architecture." *Id.* at 26 (citing Ex. 1072, 741 (emphasis omitted); Ex. 2044 ¶ 104).

Patent Owner also refers to the prosecution history of the '319 patent, asserting that it shows that servers and client devices are not interchangeable. PO Resp. 27 (citing Ex. 2044 ¶ 106). In that prosecution, the applicant contended that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* (citing Ex. 1002, 163) (alteration in original). Patent Owner further cites the applicant's statement that "the conventional arrangement involves

18

fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device." *Id.* (citing Ex. 1002, 163–164). Patent Owner also refers to the prosecution history of the '510 patent, arguing that the examiner acknowledged the "environment" of the claimed method, which "shows that the examiner appreciated the unique architecture disclosed . . . and the novel use of a proxy client device within that architecture." *Id.* at 28 (citing Ex. 1002, 653; Ex. 2044 ¶ 107).

### c. Analysis

For the reasons discussed below, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in out Institution Decision and continue to apply here. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server. *See* PO Resp. 10–28.

### i. Claim Language

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the method is for use with a "first client device." In step [1C], the first client device, "send[s], to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier," which serves to request content from the first server (web server). *See* Ex. 1001, 19:24–26. In step [1C], the first client device is acting as a client in requesting content. In step [1E], the first client device "send[s], the first content by the first client device to the

19

second server, in response to the receiving of the first content identifier."
*See id*. at 19:30–32. In step [1E], the first client device is acting as a server
to forward content.

The parties address the issue that the "first client device" acts in
differing roles in claim 1. Petitioner asserts that the claim's required
functionality is consistent with the district court's determinations on the
role-based nature of the term. Pet. Reply 10 (citing Ex. 1082, 13). Patent
Owner agrees that if the role-based construction were adopted, in its
modified Figure 3, "agent 122 would be (i) operating in the role of a server
when receiving requests from client device 102 and (ii) operating in the role
of a client when sending requests to web server 1522," with Petitioner's
expert agreeing to the same. PO Resp. 21–22 (citing Ex. 2010, 56:19–25;
57:1–7).

One of Patent Owner's experts, Dr. Rhyne, who provided a
declaration in this proceeding (Ex. 2001), also provided testimony in the
*Teso* litigation that is consistent with the role-based nature of claim terms as
set forth in the claim language (Ex. 1108). In the *Teso* litigation, Dr. Rhyne
testified that the steps required by claim 1 of the '319 patent are illustrated
by an annotated Figure 3 of the patent, reproduced below, which shows
client 102 acting in the role of the claimed "second server," and agent 122
acting in the role of "first client server" as follows:

> 11. To illustrate the steps required by independent claim 1 of
> the '319 and '510 Patents, in light of the claim language and the
> above disclosures from the common specification, the "client
> 102" of Figure 3 is an example of the "second server" of the
> claims, with the numbered arrows corresponding with the
> bracketed letters identifying the elements of the claims as
> shown in the annotated table following the figure. (I note that

20

IPR2022-00135
Patent 10,257,319 B2

the step identified as "A" is the only [] claimed element in the
'510 patent.).

Ex. 1108 ¶ 11.



FIG. 3

| '319 Patent | '510 Patent |
|---|---|
| 1. A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:<br>    [B] receiving, from the second server, the first content identifier;<br>    [C] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier; | 1. A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:<br>    [A] establishing a Transmission Control Protocol (TCP) connection with a second server;<br>    [C] sending, to the web server over an Internet, the first content identifier;<br>    [D] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and |

| '319 Patent | '510 Patent |
|---|---|
| [D] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and<br>    [E] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier. | [E] sending the received first content, to the second server over the established TCP connection, [B] in response to the receiving of the first content identifier. |

*Id.* As shown in the above testimony, annotated Figure 3 of the '319 patent, and claim chart, Dr. Rhyne equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server) (arrow E). Thus, under

21

this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This reflects a role-based interpretation of the claim terms; different terms are defined by their function.

Patent Owner argues that Dr. Rhyne's testimony has been mischaracterized and taken out of context, and that the associated briefing and Dr. Rhyne's testimony were only intended "to illustrate the lines of communication showing the steps performed by the proxy client device" of the patent. PO Resp. 9; PO Sur-reply 16 n.7.[6] We do not agree. We find that Dr. Rhyne's cited testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1009, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1006, 3–4 (second two alterations in original). Consistent with the claim language, the district court

---

[6] We recognize that Dr. Rhyne modified his testimony in his Preliminary Response Declaration to testify that both client 102 and agent 122 are client devices. Ex 2001 ¶¶ 44, 46–47. We address the issue of two devices acting as client devices below in the discussion of modified Figure 3 in the discussion of Dr. Williams's testimony.

IPR2022-00135
Patent 10,257,319 B2

recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1009, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id*. For related patents that share substantially identical specifications to that of the '319 patent, the district court similarly found that the role-based construction applies "regardless of any additional role the device may serve, including as a server." Ex. 1082, 13. We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1009, 10.

We note that Patent Owner's argument that a client device is not a server (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail further below.

*ii. Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '319 patent Specification. The Specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles:

> *Due to the functionality provided by software stored within each communication device*, which may be the same in each communication device, *each communication device may serve*

23

*as a client, peer, or agent*, depending upon the requirements of
the network.

Ex. 1001, 4:46–50 (emphases added).  Accordingly, the Specification states
that the components identified in Figure 3 may perform different functions
based on their stored software.  *Id.*  Further, as Petitioner asserts, a
communication device includes memory 210, which stores software 212
with accelerator application 220, which includes client, peer and agent
modules.  Pet. Reply 11 (citing Ex. 1001, 5:58–6:40, 9:20–26, Fig. 4,
Fig. 6).  The Specification explains that "each of the [software modules]
comes into play *according to the specific role that the communication device
200 is partaking* in the communication network 100 *at a given time*."
Ex. 1001, 9:23–25 (emphasis added).  The Specification thus supports the
role-based function of the network components, with components operating
in different roles at different times, which is consistent with the claim
language.

    In opposition, Patent Owner argues that a person of ordinary skill in
the art, when considering Figure 6 and associated text, would understand
that "one 'client device' may be configured to be the *requesting client device*
and another 'client device' may be configured to be the *proxy client device*."
PO Resp. 12 (citing Ex. 2044 ¶ 73) (emphases added).  In further support,
Patent Owner refers to its modified annotated Figure 3, reproduced *supra*
Section II.C.1.b, and asserts that a person of ordinary skill in the art would
understand that client 102 (in purple) corresponds to the requesting client
device client and agent 122 (in red) corresponds to the proxy client device.
*Id.* (citing Ex. 2044 ¶¶ 74–75).  Patent Owner contends that "[a]gent 122 is
disclosed as a 'client device' (as opposed to a server) that is selected, for

24

IPR2022-00135
Patent 10,257,319 B2

example, because agent 122 is closest to the web server 152." *Id.* at 12–13
(citing Ex. 2044 ¶ 75 (citing Ex. 1001, 5:27)).

We do not find that the evidence of record supports Patent Owner's
assertions on this issue. Dr. Williams's testimony, and Patent Owner's
arguments, are based upon a modified version of Figure 3, which inserts
"proxy server 6" between "client device" and "agent." This configuration is
not shown in any figure in the '319 patent or disclosed in the Specification.
Ex. 2044 ¶¶ 62, 64; Ex. 1081, 16:12–23. Dr. Williams testifies that a person
of ordinary skill in the art "would understand that proxy server 6 of Figure 1
*could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2044
¶ 64 (emphasis added). Dr. Williams combines the "proxy server 6" of the
prior art shown in Figure 1 and the invention of Figure 3. *See* Ex. 1001,
2:10–18, 2:24–32, 4:41–50. But Dr. Williams provides no explanation or a
rationale to combine the prior art with an embodiment of the invention.
Further, Dr. Williams testifies that different "client devices," i.e., a
"requesting client device" and a "proxy client device" are disclosed, but we
do not discern that these characterizations are disclosed in the Specification.
In view of the lack of support, we afford little weight to Dr. Williams's
testimony on this issue.

Thus, in view of the '319 patent Specification's disclosures, we do not
agree that it discloses the architecture of a requesting client device ↔ proxy
server ↔ proxy client device ↔ web server in the first place, as Patent
Owner asserts. *See* PO Resp. 11. Moreover, we do not agree that Patent
Owner's argument based upon "architecture" should govern the construction
of "client device" in light of the claim language and the Specification's
disclosures demonstrating that communications devices may serve in

25

IPR2022-00135
Patent 10,257,319 B2

different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–50, 9:20–25. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1009, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2007) are consistent with its understanding of the architecture required by the claims of the '319 patent and its "novel" use of a client device as an intermediary. PO Resp. 16–17 (citing Ex. 2007, 8–9; Ex. 2044 ¶ 79); *see also id.* at 23. We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopted here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2007. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id.* at 5. Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions (Exs. 1009, 2013), and the district judge formally adopted the magistrate judge's constructions without modifications (Exs. 1074, 1083).

Patent Owner argues that in the '319 patent, "a client device is not a server." PO Resp. 15. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a

26

IPR2022-00135
Patent 10,257,319 B2

server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in step [1C] to request content, and acts as a server in step [1E] to forward content. Dr. Rhyne agrees that the claim language conforms to this functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is specifically not a server—is not supported by the specification." Ex. 1006, 11. The district court refers to the Specification's disclosure that a "communication device" may act as a client, peer, or agent. *Id.* at 12 (citing Ex. 1001, 4:48–49). The district court also found, and we agree, that although the patent does not list "servers" in "communication devices," "that is not sufficient to construe 'client device' as unable to act as a server in all cases," in view of the case law that negative claim limitations are "supported when the specification describes a reason to exclude the relevant limitation." *Id.* (citing *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012)). The district court found that there was no support for Patent Owner's exclusion of servers in the construction of "client device" in the '510 or '319 patents. *Id.*

Here, Patent Owner further argues that a person of ordinary skill would understand that a client device is not a server—there are descriptions of communications devices having client, peer, and agent modules, but no server module; and the MPEP "does not require that the negative limitation be recited verbatim in the specification." PO Resp. 15 (citing Ex. 2044 ¶ 62). We believe Patent Owner's reference is intended to refer to MPEP § 2173.05(i). This MPEP Section states that any negative limitation "must have basis in the original disclosure," and "[t]he mere absence of a positive recitation is not basis for an exclusion." MPEP § 2173.05(i). Patent Owner

27

does not identify any disclosure in the Specification that states that a client device cannot be a server. Moreover, we note that under Dr. Rhyne's analysis in the *Teso* litigation, the claimed "first client device," which may act as a server in claim 1, is identified as "Agent 122" of Figure 3. Ex. 1108 ¶ 11. As discussed, the Specification provides support that an agent can act in different roles with software modules allowing different functions. Ex. 1001, 4:46–50.

Patent Owner also argues that proxy server 6 of Figure 1 must be structurally different from agent 122 of Figure 3. PO Resp. 19. Patent Owner asserts that Petitioner's expert agrees that these devices would be operating in the same roles at a given point in time. *Id.* Patent Owner asserts that a server is not a client device and the structural differences should be accounted for in claim construction in order preserve claim validity. *Id.* (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002)). We do not agree with this assertion. The Federal Circuit has held that claims should be construed to preserve validity only when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327. And a claim construction cannot be adopted "that is at odds with the clear language of the claim and the written description." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). We do not find that this is a circumstance where the claim term interpretation is ambiguous in view of the evidence of record based on the

28

IPR2022-00135
Patent 10,257,319 B2

claim language and the written description, as discussed above. Thus, we do not adopt an alternative construction only to preserve the validity of claim 1.

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1082, 13. Petitioner also points to buttressing evidence in RPC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 11 (citing Ex. 1018, 9 (emphases omitted)). We agree with Petitioner that RPC 2616 serves as intrinsic evidence because it is cited in the '319 patent in its discussion on the operation of the agent, client, or peer. Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '319 patent may act as a server as well as a client.

Patent Owner also contends that under Petitioner's assertions "any device that operates in the role of a client is a 'client device' and any device that operates in the role of a server is a 'server.'" PO Sur-reply 1 (emphases omitted). Patent Owner argues that if there is no any exclusivity in roles, "there is no difference between Petitioner's constructions for 'client device' and 'server.'" *Id*. We disagree. As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles. Nevertheless, the device must be capable of performing

29

IPR2022-00135
Patent 10,257,319 B2

the roles required by the claim limitations. The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server. Ex. 1082, 14. The district found that it could not because the components were separately recited, which indicated a distinction between the components. *Id.* at 14–15. The district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer ↔ computer ↔ computer architecture*." Ex. 1009, 10 (emphasis added, alterations in original). Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" *Id.* (emphasis omitted).

Additionally, Patent Owner argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices." PO Resp. 13 (citing Ex. 2044 ¶ 76; Ex. 1001, 2:47–49). Our view is that the Patent Owner takes the Specification's disclosure out of context. The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:40–46. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the

30

IPR2022-00135
Patent 10,257,319 B2

invention. *See id.* at 2:4–3:3, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1006, 11 (emphasis omitted). We also agree with the district court's finding that the Specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1006, 11; *see also* Ex. 1001, 1:54–57, 1:58–59; PO Resp. 13–14.

Patent Owner additionally asserts that a person of ordinary skill would have understood that a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 17–18. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id.* at 13–14 (citing Ex. 2044 ¶ 76). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2044 ¶¶ 76, 80–81. We discuss the prosecution history below, but notably Dr. Williams does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id.*

Accordingly, we find that the '319 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

31

*iii. Prosecution History*

Patent Owner argues that the prosecution history of the '319 patent, its parent (U.S. Patent No. 10,069,936 ("the '936 patent")), and the '510 patent support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 23–28.

Patent Owner points to statements in the prosecution history of the parent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 24 (citing Ex. 1072, 304, 349). More specifically, Patent Owner asserts that the applicant argued that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality . . . and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 24–25 (citing Ex. 1072, 349 (emphasis omitted)). Patent Owner refers to an examiner's response stating that Garcia "fails to teach a group of clients for data communication between the web server and a requesting client via . . . clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving content from the selected client." *Id.* at 25 (citing Ex. 1072, 594). Patent Owner contends that this statement shows that "the examiner recognized a server cannot be equated to a client device." *Id.* (citing Ex. 2044 ¶ 100) (alterations in original). Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in the reference client devices "are typically consumer owned and operated." *Id.* at 25–26 (citing Ex. 1072, 624–625; Ex. 2044 ¶ 103) (emphasis omitted). Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the

independent claims, **within its environment**, is allowable subject matter over the prior art." *Id.* at 26 (citing Ex. 1072, 741).

The claims that were under consideration in the '936 patent prosecution were significantly different than the claims at issue here. The claims originally recited "devices," which were then amended to "clients." Ex. 1072, 349. Moreover, a "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device" or separate "requesting client" and "client." *See id.* at 339–348. Similarly, the issued claims in the '936 patent recite "requesting client" and a separate "client" and the issued claims have multiple steps that differ from those of the '319 patent. *See, e.g.*, Ex. 2012, 19:16–52. Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '319 patent.[7] Further, considering the varying terms used, we do not find that the applicant's statements during prosecution on patentability regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope of the "client device" term used in the claims here. *See* Ex. 1072, 349, 624–625; *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 1072, 741.

---

[7] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations. Ex. 1072, 314, 593–594.

IPR2022-00135
Patent 10,257,319 B2

Additionally, as discussed above, the '319 patent's claim language and Specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for the parent of the '319 patent and also involved evolving claim term amendments. *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification."). For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '319 patent claims than the claim language and Specification of the '319 patent itself. As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317. This is particularly true here, where the prosecution history at issue involves a parent application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent. PO Resp. 27–28. Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id*. at 27 (citing Ex. 1002, 163) (alteration in original). Patent Owner also

34

IPR2022-00135
Patent 10,257,319 B2

cites the applicant's assertion that "the Examiner does not sufficiently establish that the 'ordered combination' of the recited elements also fails to 'transform the nature of the claim' into a patent-eligible application." *Id.* (citing Ex. 1002, 163). Patent Owner further cites to the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." *Id.* at 27–28 (citing Ex. 1002, 653) (emphasis omitted).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device." *See* Ex. 1002, 163–164.

Patent Owner additionally refers to the prosecution history of the '510 patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 28. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

### *iv. Conclusion*

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

35

IPR2022-00135
Patent 10,257,319 B2

> 2. "second server"

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested clarification that the term is "a device that is operating in the role of a server and that is not the first client device." Ex. 1006, 14; Ex. 1009, 8. The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server." Ex. 1009, 11.

Petitioner proposes the adoption of the district court's construction of the term, with the clarification. Pet. 9. Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different than the client device. PO Resp. 30.

Patent Owner's arguments, in the most part, repeat those presented for the "client device." *See* PO Resp. 29–33. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1006, 14; Ex. 1009, 8. This construction is consistent with the role-based interpretation of the claim

36

components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the first content . . . to the second server" in limitation [1E], so the "second server" has to be a separate component.

In Section II.C.1 above, we addressed the majority of Patent Owner's arguments that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished. PO Resp. 29 (citing Ex. 2013, 20). We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously." Ex. 2013, 20–21. Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 30 (citing Ex. 1009, 10). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the Specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client

37

IPR2022-00135
Patent 10,257,319 B2

device' as unable to act as a server in all cases." Ex. 1009, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. PO Resp. 30–32.

### 3. Other Terms

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate, a claim a prior art reference must disclose every limitation of the claimed invention"; any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the

IPR2022-00135
Patent 10,257,319 B2

invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### E. Anticipation of Claims 1, 12–14, and 21–27 by Plamondon

Petitioner contends that claims 1, 12–14, and 21–27 are anticipated by Plamondon. Pet. 10–34. To support its contentions, Petitioner provides explanations as to how Plamondon discloses each claim limitation. *Id.* Petitioner relies also upon the testimony from Dr. Levin to support its contentions. Ex. 1003 ¶¶ 165–276. Patent Owner argues that Plamondon does not disclose all the limitations of these claims. PO Resp. 36–52.

We begin our discussion with a brief summary of Plamondon, and then address the evidence and arguments presented by Petitioner and Patent Owner.

### 1. Plamondon (Ex. 1010)

Plamondon is directed to accelerating and optimizing network traffic, such as HTTP-based network traffic. Ex. 1010, code (57). Plamondon discloses techniques in the areas of proxy caching, protocol acceleration, domain name resolution acceleration, and compression improvements. *Id.* The acceleration and optimization techniques discussed in Plamondon "may be deployed on the client as a client agent or as part of a browser, as well as on any type and form of intermediary device, such as an appliance, proxying

39

IPR2022-00135
Patent 10,257,319 B2

device or any type of interception caching and/or proxying device." *Id.*

Figure 1A, reproduced below, is a block diagram of a network environment for a client to access a server via network optimization appliances. *Id.* ¶ 142.



**FIG. 1A**

As shown in Figure 1A of Plamondon, above, a network environment has one or more clients 102*a*–102*n* in communication with one or more servers 106*a*–106*n* via networks 104. Communication of client 102 with server 106 is via network optimization appliances, which are generally referred to as appliance 200. *Id.* ¶ 202.

Network 104 can be a local area network (LAN) or a wide area network (WAN), such as the Internet or the World Wide Web. *Id.* ¶ 203.

40

IPR2022-00135
Patent 10,257,319 B2

### 2. Discussion

#### a. Claim 1

The Petition asserts that Plamondon discloses all the limitations of claim 1. Pet. 15–25. Below we consider the claim 1 limitations in turn.

#### i. Preamble

Petitioner provides an annotated version of Figure 1C of Plamondon, a block diagram of the network, reproduced below. Pet. 12.



Petitioner asserts that Plamondon's appliance 200 is the "first client device" recited in the preamble (limitation 1P2), and is in a communication path between client device 102, a "second server," and server 106, which is the claimed (limitation 1P2) "first server." Pet. 15 (citing Ex. 1010, Figs. 1A–1C, ¶¶ 48, 52, 77, 421, 672). Petitioner contends that when appliance 200 requests objects from server 106 on behalf of client 102, or forwards client 102's request to server 106, appliance 200 acts "in the role of a client" under the district court's construction of "first client device." *Id.* (citing Ex. 1006, 12; Ex. 1010 ¶¶ 48–52, 444–451, Figs. 6A–6B; Ex. 1003 ¶ 168).

Petitioner asserts that the "first server" in preamble limitation 1P2 is disclosed by Plamondon's server 106, which is an HTTP server (limitation

41

1P2). Pet. 16 (citing Ex. 1010 ¶ 210). Petitioner explains that "Plamondon describes client 102 transmitting an HTTP request to server 106 and '[i]n response to the request, the server transmits an HTTP response.'" *Id.* (citing Ex. 1010 ¶ 598; Ex. 1003 ¶¶ 171–175) (alteration in original).

Petitioner contends that preamble limitation 1P3 is met by Plamondon because server 106 ("first server") stores content in the form of web pages identified by URLs. *Id.* (citing Ex. 1010 ¶ 463). As discussed, Petitioner contends the "second server" (preamble limitation 1P4) is met by Plamondon's client 102. *Id.* at 17.

Petitioner applies the district court's construction of "second server" as "a device that is operating in the role of a server and that is not the first client device." Pet. 17. Petitioner explains that client 102 is described as a "computing device" that can be any server. *Id.* (citing Ex. 1010 ¶ 238). Petitioner explains that client 102 can function in two roles: as a client node "seeking access to applications on a server," but also as an application server for other clients. *Id.* (citing Ex. 1010 ¶ 210). Further, Petitioner demonstrates that client 102 is "distinct" from the first client device (appliance 200) and the web server (server 106). *Id.* at 18 (citing Ex. 1003 ¶ 188).

Patent Owner presents arguments that Plamondon does not disclose the required architecture of claim 1 and additionally argues that client 102 and appliance 200 of Plamondon do not serve to disclose the claimed elements. *See* PO Resp. 38–46; PO Sur-reply 19. We address the architecture issue here and we address the arguments on the client 102 and appliance 200 below in the discussion of the claimed steps.

42

On the architecture issue, Patent Owner argues that Petitioner appears to agree with Patent Owner's proposed architecture of requesting client device ↔ second server ↔ first client device ↔ web server. PO Resp. 39 (citing Pet. 13; Ex. 2044 ¶ 155). Patent Owner does not explain its argument, which is directed to a description of *Plamondon's* architecture and is, therefore, is not relevant to how the claims of the '319 patent are construed nor to the issue of Plamondon's anticipation of the claims.

Patent Owner also argues that Plamondon's disclosures are directed to a corporate network environment, and Plamondon does not teach hiding the identity of client 102 from server 106. PO Resp. 39 (citing Ex. 2044 ¶ 156). Patent Owner contends that "Plamondon does not teach a network with millions of appliances." *Id*. at 40. We do not find that these arguments undermine Petitioner's showing because they are directed to limitations that do not appear in the claims.

We have reviewed the evidence and argument and on this record we determine that Petitioner has demonstrated that Plamondon discloses the limitations of the preamble of claim 1.

*ii. Step [1B]*

Petitioner contends this step is disclosed by Plamondon when "appliance 200 receives requests for web objects ('first content') identified by URLs ('content identifiers') from client 102 ('second server')." Pet. 18 (citing Ex. 1010, Figs. 6A–6B, ¶¶ 11–12, 444, 672). Petitioner also contends that "[i]t was well-known in 2009 that a URL, or the URL's more general form the URI, identified content on the Internet. *Id.* (citing Ex. 1003 ¶¶ 192–193).

43

IPR2022-00135
Patent 10,257,319 B2

Patent Owner argues that Plamondon "does not disclose a 'first client device' receiving the first content identifier from a 'second server' as recited in claim 1." PO Resp. 36 (citing Ex. 2044 ¶ 147). Patent Owner asserts that when appliance 200 receives requests for content identified by URLs from client 102, "appliance 200 is operating in the role of a server, not a client." *Id.* "Therefore," according to Patent Owner, "under the role-based constructions, appliance 200 cannot correspond to the 'first client device' of the '319 [p]atent's claims as Petitioner alleges." *Id.* at 36–37 (citing Ex. 2044 ¶ 147). Patent Owner further contends that, "at the same point in time, client 102 is operating in the role of a client, not a server," and therefore "client 102 cannot correspond to the 'second server' of the '319 [p]atent's claims, as Petitioner alleges." *Id.* at 37 (citing Ex. 2044 ¶ 148).

Patent Owner also argues that Plamondon does not disclose the claim 1 limitations "as arranged in the claim" and a person of ordinary skill in the art "would not 'at once envisage'" the invention of the claim. PO Resp. 40–41. Patent Owner refers to Petitioner's assertion that "computing device 100 [and thus each client 102, server 106, and appliance 200] can be <u>any</u> . . . desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone . . . or other form of computing or telecommunications device," and argues that this does not inform a person of ordinary skill in the art that client 101 corresponds to the "second server" of the claims. *Id.* at 43 (citing Pet. 12; Ex. 2044 ¶ 164) (alterations in original). Patent Owner asserts that the cited portion of Plamondon "recites a long list of different network components" and this does not inform a person of ordinary skill in the art of the specific architecture in which the method claims operate. *Id.* (citing Ex. 2044 ¶ 165). Patent Owner contends that a person of skill

44

"would not pick and choose to make client 102 a server" and combine it with the appliance 200 "client device," and there is no guidance to do so. *Id.* at 43–44 (citing Ex. 2044 ¶ 165). Patent Owner argues that "Petitioner contends client 102, appliance 200, and server 106 are interchangeable network components and it doesn't matter which is which" and that is "opposite to the disclosure of the '319 patent." *Id.* at 44 (citing Ex. 2044 ¶ 167). Patent Owner also asserts that Petitioner, absent motivation, is modifying "1) client 102 by a selecting a 'server' from the list of possible components and (2) appliance 200 by selecting a 'client device' from the list of possible components." PO Sur-reply 19 (citing Pet. Reply 21–22). Patent Owner also asserts that Petitioner's expert testimony lacks detail on network architecture and is biased by hindsight. PO Resp. 46 (citing Ex. 1003 ¶ 160; Ex. 2010, 103:5–8, 107:10–12, 109:3–11, 127:22–25; Ex. 2044 ¶ 167).

Many of Patent Owner's arguments are based on the premise that a component has to operate exclusively in a single role in order to disclose a claim element. We are not persuaded by these contentions because we have not adopted Patent Owner's proposed claim constructions.

As discussed, *supra* Section II.C.1, we have adopted the district court's role-based construction, where "client device" is construed as a "communication device that is operating in the role of a client." This construction is based upon, *inter alia*, claim 1's language where in step [1C], the "first client device" is acting as a client in requesting content and in step [1E], the "first client device" is acting as a server to forward content. That is, a "first client device" may switch roles and perform different roles with different functions at different times, but still is a "first client device." Here, Petitioner asserts that Plamondon's client 102 is the "second server" because

the reference explicitly states that client 102 can be "any . . . server" and it can function as an application server for other clients. Pet. 17 (citing Ex. 1010 ¶¶ 210, 229, 238). We agree. As Petitioner contends, Plamondon discloses that computing device 100 can be any server, where client 102 can be any type of a computing device and can be a server. Ex. 1010 ¶¶ 229, 238. Additionally, Plamondon discloses that client 102 serves a role as an application server providing access to applications for other clients. *Id.* ¶ 210. That an application server may be different than a proxy server does not mean that it does not function as a server. *See* PO Resp. 41–42.

Contrary to Patent Owner's arguments, there is no issue with client 102 acting in the role of a client when a connection is established between client 102 (second server) and appliance 200 (the claimed first client device). As discussed in the claim construction section above, although a component may not simultaneously serve more than one function at any particular time, components can operate in different roles. That is, a component does not have to exclusively operate in only a single role—it may operate in different roles at different times. Dr. Levin's cross-examination testimony (Ex. 2010, 61:15–25) reflects that client 102 acts in a certain role "at particular . . . times" and at another time it may act in different role, which is consistent with the role-based claim interpretation.

The same issue applies to Patent Owner's argument that, when appliance 200 receives requests for content identified by URLs from client 102, "appliance 200 is operating in the role of a server." PO Resp. 36. Appliance 200 does not have to act exclusively in the role of a client.

We also do not agree with Patent Owner's argument that a person of ordinary skill in the art "would not envisage" Plamondon's components as

46

arranged in claim 1. As discussed above, Plamondon explicitly discloses the configuration as shown in annotated Figure 1C, reproduced above. *See* Pet. 12; Ex. 1010, Fig. 1C. Dr. Levin provides supporting testimony. Ex. 1003 ¶¶ 155–184. We do not agree that Petitioner's expert testimony reflects hindsight because it is based on roles of Plamondon's components in the configuration that is disclosed in Figure 1C. *See id.* As discussed, Plamondon explicitly discloses that client 102, as a computing device, may be a server, and functions as application server for other clients. Ex. 1010 ¶¶ 210, 238. We find that Plamondon's disclosures support Petitioner's contention that appliance 200 acts as the claimed "first client device" and server 106 acts as the claimed "web server," which we discuss below. As such, Petitioner demonstrates that Plamondon discloses the components "as arranged in the claim" in accordance with Figure 1C. We do not agree with Patent Owner that relying on component in a configuration that is explicitly disclosed represents a "modification." *See* PO Sur-reply 19–20.

Patent Owner's arguments as to why a person of ordinary skill "would not 'at once envisage'" the claimed components from Plamondon's disclosure appear to center on Plamondon's listing of "desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone . . . or other form of computing or telecommunications device" as communication devices, such as client 102. PO Resp. 42–43; PO Sur-reply 19–20. However, this is not a situation where one of ordinary skill in the art would have to envisage a "server"—a "server" is expressly disclosed in Plamondon's listing of possible communication devices. *See In re Petering*, 301 F.2d 676, 682 (CCPA 1962). Moreover, Plamondon discloses

47

that client 102 functions as an application server. Ex. 1010 ¶ 210. Accordingly, we do not find that Patent Owner's arguments rebut Petitioner's showing of Plamondon's disclosure of limitation [1B].

We have reviewed the evidence and argument and on this record we determine that Petitioner has demonstrated that Plamondon discloses limitation [1B].

### iii. Step [1C]

Petitioner contends that this step is disclosed by Plamondon when "[a]ppliance 200 requests objects by URL from server 106 ('first server') based on the HTTP requests [that] it intercepts from client 102." Pet. 19; Ex. 1003 ¶¶ 195–199. Petitioner explains that in Plamondon's "parallel revalidation technique," "appliance 200 revalidates a cached object with server 106 in parallel with serving the object, from its cache, to client 102." Pet. 19 (citing Ex. 1010 ¶¶ 442–453). The appliance "then sends the URL to server 106 to get object status." *Id.* "If server 106 caches the object, appliance 200 sends server 106 the object request." *Id.* Furthermore, Petitioner explains that "[e]very HTTP request includes a content identifier for the requested content." *Id.*; Ex. 1003 ¶¶ 198–199; *see also* Ex. 1010, Figs. 6A, 6B (showing appliance 200 transmitting a request for status of an object from the originating server).

Petitioner asserts, and we agree, that Plamondon's appliance 200 acts as the claimed "first client device." Appliance 200 is described as being on any form of computing device such as "computing device 100," and "computing device 100 can be any workstation, desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone, [or] smart phone." *See* Ex. 1010 ¶¶ 229, 238. Plamondon discloses that appliance 200

48

IPR2022-00135
Patent 10,257,319 B2

operates in the role of a client by sending a first content identifier by requesting objects by URL from server 106 (web server) based on HTTP requests from client 102 (second server). *Id*. at Figs. 6A–6B, ¶¶ 444, 488.

Patent Owner argues that a person of ordinary skill in the art would understand that Plamondon's appliance 200 is a corporation server, and a person of ordinary skill in the art would not understand it to be a client device. PO Resp. 45 (citing Ex. 2044 ¶ 171; Ex. 1010 ¶ 206). Patent Owner asserts that Plamondon's disclosures do not provide "sufficient specificity" that a person of ordinary skill in the art would envisage the architecture in which the claimed methods of the '319 patent operate. *Id*. (citing Ex. 2044 ¶ 172). Patent Owner contends that appliance 200 operates in the role of a server and cannot correspond to the "first client device," and that Petitioner's expert agreed with this position. *Id*. at 37–38 (citing Ex. 2010, 63:20–64:2, 69:14–19, 89:16–90:4, 77:10–17, 78:7–13, 77:14–20; Ex. 2044 ¶ 151).

We have addressed Patent Owner's arguments on the specificity of Plamondon's disclosures in the discussion on limitation [1B], and we do not agree with them for similar reasons for this limitation. As to Patent Owner's assertions that Plamondon's appliance 200 would not be understood to be a client device, we do not agree. Under the claim construction we have adopted, Plamondon's appliance operates in the role of a client by requesting content. Additionally, Patent Owner's argument that appliance 200 acts as a server and cannot be a "first client device" hinges on whether a device has to operate in an exclusive role, an argument we do not accept. *See supra*, Section II.C.1. Although appliance 200 may operate in the role of a server

49

IPR2022-00135
Patent 10,257,319 B2

as in limitation [1E], it may also operate in the role of a client device, based on the same rationale discussed.  *Id.*

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation [1C].

*iv. Step [1D]*

Petitioner explains that this step is met because "Plamondon's parallel revalidation of cached objects includes appliance 200 receiving updated content from server 106 ('first server') in response to sending the URL identifying the requested content."  Pet. 21 (citing Ex. 1010 ¶ 450); Ex. 1003 ¶¶ 200–204.  Dr. Levin explains that "[t]he communication takes place over the Internet connection."  Ex. 1003 ¶ 201.  According to Petitioner, "Plamondon's proxy server functionality likewise includes appliance 200 receiving requested content over the Internet from server 106 in response to sending the URL identifying the requested content, which also meets step [1D]."  Pet. 23 (citing Ex. 1010 ¶ 437; Ex. 1003 ¶¶ 203–204).

Patent Owner does not present any arguments specific to this limitation.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation [1D].

*v. Step [1E]*

Petitioner contends this step is met by Plamondon because "[a]fter appliance 200 receives or intercepts the URL identifying requested content, Plamondon's parallel revalidation includes appliance 200 sending the requested content (the 'first content' . . . ) to client device 102 ('second

50

Appx200

IPR2022-00135
Patent 10,257,319 B2

server') in response to receiving the client's request, which included the first content identifier (URL)." Pet. 23 (citation omitted); Ex. 1003 ¶¶ 205–208. According to Petitioner, "[t]his includes appliance 200 immediately sending client 102 valid cached content." Pet. 23 (citing Ex. 1010, Fig. 6B, ¶¶ 444, 447 ("the appliance transmits . . . the cached object to the client 102 in response to the client's request at step 615"); Ex. 1003 ¶¶ 206–207).

Patent Owner argues that Plamondon does not disclose that the "first client device" sends the first received content to a "second server" as recited in claim 1. PO Resp. 37 (citing Ex. 2044 ¶ 151). Patent Owner argues that at this point in time appliance 200 is operating in the role of a server, not a client, and that Petitioner's expert agreed with this position. *Id.* at 37–38 (citing Ex. 2044 ¶ 151; Ex. 2010, 63:20–64:2, 69:14–19, 89:16–90:4, 77:10–17, 78:7–13, 77:14–20). Patent Owner also argues that client 102 is operating in the role of a client, not a server, at the same time. *Id.* at 38 (citing Ex. 2044 ¶ 152). These arguments are based on the premise that a device has to exclusively act in a certain role, and that role cannot vary at during different time. For the reasons discussed for limitation [1B] and [1C], we do not agree with Patent Owner's arguments.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation [1E].

### vi. Conclusion

We note that Patent Owner has presented evidence of secondary considerations. *See* PO Resp. 57–75. Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

51

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 1 of the '319 patent.

### b. Claim 14

Claim 14 recites "[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid." Ex. 1001, 20:41–43. Dr. Levin testifies that "Plamondon includes a focus on validating content stored in the cache of appliance 200 ('first client device')." Ex. 1003 ¶ 230. Petitioner asserts, with Dr. Levin's supporting testimony, that Plamondon discloses validating content stored in a cache of appliance 200, which is the first client device. Pet. 28. Petitioner argues that Plamondon discloses that "the method includes receiving a request for an object from a requester . . . [and] determining (i) that the object exists in the local cache and (ii) that a status identifier associated with the object indicates that the object is valid." *Id*. at 28–29 (citing Ex. 1010 ¶ 43; *see also id*. ¶¶ 48, 450–451; Ex. 1003 ¶¶ 229–231) (emphasis omitted, alteration in original). Petitioner also asserts that claim 14 does not limit when the validity determination is performed. *Id*. at 28.

Patent Owner argues that paragraphs 43 and 48 of Plamondon are vague, Petitioner mischaracterizes them, and they do not inform a person of ordinary skill in the art that appliance 200 performs the limitations of claim 14. PO Resp. 48 (citing Ex. 2044 ¶ 176). Patent Owner asserts that Petitioner mischaracterizes paragraphs 450 and 451 of Plamondon, arguing that in the view of a person of ordinary skill in the art it is the server 106, and not appliance 200, that determines the validity of the "first content." *Id*. at 46–47 (citing Ex. 2044 ¶¶ 177, 179). Patent Owner refers to the cited

52

IPR2022-00135
Patent 10,257,319 B2

second request, but argues that this does "not disclose appliance 200 determining the validity of the first content received **in response to the first request**." *Id*. at 49 (citing Ex. 1010 ¶ 451; Ex. 2044 ¶ 180).

In a section titled "F. Systems and Methods of Performing Parallel Revalidation of Cached Objects," Plamondon discloses that "while revalidating the cached object in parallel to serving the cached object to a first request[] for the object from the same client 102," "the appliance 200 performs a second revalidation of step 620 in response to the second request." Ex. 1010 ¶ 451. Here, appliance 200 ("first client device") is performing a "second revalidation" of the object ("first content"). Contrary to Patent Owner's arguments, we do not find that the fact that the revalidation is done in response to a second request is of any moment. We agree with Petitioner that claim 14 does not limit when the validity determination is performed and it does not have to be in response to a "first request." Pet. 28; Pet. Reply 23; Ex. 1003 ¶ 230. Thus, we do not find that Patent Owner's arguments undermine Petitioner's showing that Plamondon discloses the limitations of claim 14.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 14 of the '319 patent.

### c. Claim 24

Claim 24 recites "[t]he method according to claim 1, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol." Ex. 1001, 22:3–6.

Petitioner argues that a "TCP connection is 'established' when both hosts participate in creating the connection." Pet. 31 (citing Ex. 1011 ¶ 11; Ex. 1012, 10–12; Ex. 1003 ¶ 116). According to Petitioner, the TCP protocol is defined by RFC 793, an Internet standard from 1981, which explains that "[t]he [TCP] connection becomes 'established' when sequence numbers have been synchronized in both directions." *Id.* at 32 (citing Ex. 1012, 12; Ex. 1003 ¶¶ 126, 130) (alteration in original). Petitioner also contends that "Plamondon describes appliance 200 establishing a TCP connection with client 102 ('second server') via network stack 267," which "describes appliance 200 establishing a TCP connection with client 102 using TCP/IP protocol." *Id.* (citing Ex. 1010 ¶ 256; Ex. 1003 ¶¶ 250–262).

Patent Owner argues that "[t]he portions of Plamondon cited by Petitioner only disclose establishing a TCP connection in the context of client 102 sending a request for content," and "[t]he majority of the cited paragraphs describe the hardware used for establishing a TCP connection, which does not address the context in which a TCP connection is established." PO Resp. 50–51 (citing Ex. 2044 ¶¶ 186–189; Ex. 1010 ¶¶ 186, 252–256, 270, 275, 350, 571–572). Patent Owner also argues that "[i]n the context of sending a request for content, client 102 is operating in the role of a client," and "never changes roles," so it "cannot correspond to the 'second server' of the '319 [p]atent's claims." *Id.* at 51 (citing Ex. 2044 ¶ 190; Ex. 2010, 60:23–61:10, 61:11–16, 64:24–65:1, 65:9–12, 65:3–8). Patent Owner further contends that, "[a]t the same point in time, appliance 200 is operating in the role of a server," and "cannot correspond to the 'first client device' of the '319 [p]atent's claims." *Id.* at 52 (citing Ex. 2044 ¶ 191; Ex. 2010, 61:17–25, 65:13–20).

54

IPR2022-00135
Patent 10,257,319 B2

We find that Petitioner has sufficiently shown that Plamondon teaches this limitation. Contrary to Patent Owner's arguments, there is no issue with client 102 acting in the role of a client when a TCP connection is established between client 102 (second server) and appliance 200 (the claimed first client device). As discussed in the claim construction section above, although a component may not simultaneously serve more than one function at any particular time, components can operate in different roles. That is, a component does not have to exclusively operate in only a single role—it may operate in different roles at different times. Dr. Levin's cross-examination testimony (Ex. 2010, 61:15–25) reflects that client 102 acts in a certain role "at particular . . . times" and at another time it may act in different role, which is consistent with the role-based claim interpretation.

The same issue applies to Patent Owner's argument that, when the TCP connection is established, "appliance 200 is operating in the role of a server." PO Resp. 52. Appliance 200 does not have to act exclusively in the role of a client.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 24 of the '319 patent.

### d. Claims 12, 13, 21–23, and 25–27

Claims 12, 13, 21–23, and 25–27 depend from claim 1 and further recites additional limitations. Ex. 1001, 20:28–40, 21:9–22:2, 22:7–24.

Claim 12 recites "[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the first server, the first content, and wherein the sending of the HTTP request is in response to the receiving of the first content identifier."

55

IPR2022-00135
Patent 10,257,319 B2

Ex. 1001, 20:28–32.  Petitioner argues that, "[i]n Plamondon's parallel revalidation, appliance 200 ('first client device') stores updated objects ('first content') received from server 106 ('first server')."  Pet. 25–26 (citing Ex. 1010 ¶¶ 257, 431, 444, 450 Figs. 2A, 6A–6B; Ex. 1003 ¶¶ 211–216).  Petitioner also contends that, in this parallel revalidation, appliance 200 sends the HTTP request to server 106 (step 620) in response to receiving a message from client 102 ("second server") with the URL ("first content identifier") (step 605).  *Id.* at 27 (citing Ex. 1010 ¶¶ 41, 242, 447, 449, Figs. 6A–6B; Ex. 1003 ¶¶ 218–219).

Claim 13 recites "[t]he method according to claim 12, further comprising: receiving, from a second client device, the first content identifier; and sending the stored first content by the first client device to the second client device, in response to the receiving of the first content identifier from the second client device."  Ex. 1001, 20:33–40.  Petitioner argues that appliance 200 receives requests for the same content from multiple sources (including a second client 102) that include the URL ("first content identifier"), for the same reasons that the original request includes it.  Pet. 27 (citing Ex. 1010 ¶ 451; Ex. 1003 ¶¶ 221–223).  Petitioner also contends that appliance 200 ("first client device") stores requested content and sends it to the second client device in response to receiving the request from the second client device (including the first content identifier).  *Id.* at 28 (citing Ex. 1010 ¶ 451; Ex. 1003 ¶¶ 225–227).

Claim 21 recites:

The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and

56

Appx206

> wherein the first client device is a Transmission Control
> Protocol/Internet Protocol (TCP/IP) client that communicates
> respectively with the first or second server over the Internet
> based on, or according to, TCP/IP protocol or connection.

Ex. 1001, 21:9–17. Petitioner argues that "Plamondon describes appliance 200 ('first client device') communicating with server 106 ('first server') over network 104', and with client 102 ('second server') over network 104," and that "[n]etworks 104 and 104' can be the Internet." Pet. 29 (citing Ex. 1010 ¶ 203, Fig. 1C; Ex. 1003 ¶¶ 145–154). Petitioner argues that "Plamondon further describes appliance 200 having network stack 267 that implements any TCP/IP protocol" between appliance 200 and both client 102 and server 106. *Id.* (citing Ex. 1010 ¶¶ 252–254, 256; Ex. 1003 ¶¶ 233–236).

Claim 22 recites "[t]he method, according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards." Ex. 1001, 21:18–21. Petitioner argues that "Plamondon describes appliance 200 ('first client device') communicating with client device 102 ('second server') and server 106 ('first server') over the Internet through network stack 267," which "communicates according to the TCP or UDP protocols." Pet. 30 (citing Ex. 1010 ¶ 254; Ex. 1003 ¶¶ 238–240).

Claim 23 recites "[t]he method according to claim 1, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL), and wherein the method further comprising executing, by the first client device, a web browser application or an email application." Ex. 1001, 21:22–22:2. Petitioner argues that "servers 106 are web servers" and, therefore, the "first

57

content" discussed for claim 1 "includes web-page content." Pet. 30 (citing Ex. 1010 ¶¶ 462, 532, 549, 559). Petitioner also asserts that "Plamondon discloses client 102 'streaming video and/or audio,'" so "Plamondon's system would also pull audio or video from server 106." *Id.* (citing Ex. 1003 ¶¶ 242–244). According to Petitioner, "the first content identifier for these objects comprises URLs, which were conventional identifiers for web-based objects." *Id.* at 31 (citing Ex. 1010 ¶¶ 11–12; Ex. 1003 ¶ 245). Petitioner further contends that "Plamondon teaches a network optimization engine 250 running on appliance 200." *Id.* (citing Ex. 1010 ¶¶ 250, 252–254, Fig. 2A). Finally, Petitioner argues that "Plamondon's teaches that all its techniques, systems and methods 'may be deployed in a browser or for a browser,' including 'any portion of network optimization engine 250' in appliance 200," which "means appliance 200 executes a web browser application as claimed." *Id.* (citing Ex. 1010 ¶¶ 12, 246, 361, 680–682; Ex. 1003 ¶¶ 247–248).

Claim 25 recites "[t]he method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection." Ex. 1001, 22:7–12. Petitioner argues that Plamondon anticipates claim 25 for the same reasons it anticipates claim 21. Pet. 33.

Claim 26 recites "[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system." Ex. 1001, 22:13–14. Petitioner argues that Plamondon discloses that "appliance 200 . . . run[s] any operating system such as . . . Microsoft

58

IPR2022-00135
Patent 10,257,319 B2

Windows® . . . Unix and Linux . . . [or] Mac OS®," which are "client operating systems" as claimed. Pet. 33 (citing Ex. 1010 ¶ 249; Ex. 1003 ¶¶ 266–268) (emphasis omitted, all but last alterations in original).

Claim 27 recites "[t]he method according to claim 1, wherein the steps are sequentially executed." Ex. 1001, 22:15–16. Petitioner provides explanations and evidence as to how the steps of Plamondon are sequentially executed. Pet. 33–34 (citing Ex. 1010 ¶¶ 437, 444, 450, 451; Ex. 1003 ¶¶ 270–276).

Patent Owner does not present any arguments specific to these claims. *See generally* PO Resp.; PO Sur-reply.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claims 12, 13, 21–23, and 25–27 of the '319 patent.

F. *Obviousness of Claims 2–5, 19, and 20 Over Plamondon and Price*

Petitioner contends that claims 2–5 would have been obvious over the combination of Plamondon and Price. Pet. 45–57. Patent Owner argues that the combination of Plamondon and Price does not disclose all the limitations of the claims and the rationale to combine the references is insufficient. PO Resp. 53–55; PO Sur-reply 26. Patent Owner also asserts that the obviousness of the claims is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–75; PO Sur-reply 21–23.

1. *Discussion of Prior Art Teachings and Rationale to Combine*

Claim 2 recites "[t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first

59

Appx209

IPR2022-00135
Patent 10,257,319 B2

client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname." Ex. 1001, 19:33–40.

Price describes a computing device acting to coordinate the management of software versions. Ex. 1023 ¶¶ 25–26. In Price, if the coordinating computer determines that "a newer version of the same software" exists, it "delivers . . . the currently available software" to the connected device and the "software version of the . . . connected device is replaced" with the newer version. *Id*. ¶¶ 53, 65.

Petitioner asserts that a person of ordinary skill in the art would have been motivated to combine Plamondon and Price because "the networked devices in Plamondon's architecture presents the software versioning problem that Price solves" in accordance with Price's rationale that "[d]igital-based devices often require updated software versions." Pet. 46. (citing Ex. 1023 ¶ 4) (alteration in original). Petitioner also contends that "the need for regularly applying software patches to networked equipment was well-known in the art as a fundamental best practice for cybersecurity" and Price would provide a mechanism to Plamondon for applying software patches. *Id*. at 47 (citing Ex. 1003 ¶¶ 393–400). Petitioner asserts that combining Plamondon with Price brings together prior art elements according to known methods, to yield predictable results. *Id*. (citing Ex. 1003 ¶¶ 401–407).

Claim 2 requires that "the first client device is identified by a Media Access Control (MAC) address." Petitioner asserts that "Plamondon's appliance 200 ('first client device') is identified by MAC address in an IEEE

60

IPR2022-00135
Patent 10,257,319 B2

802.11-compliant network or wired Ethernet." Pet. 48 (citing Ex. 1010
¶ 253; Ex. 1003 ¶¶ 353–355, 358, 362–366, 375, 409; Pet. § X). Petitioner
argues that "Plamondon describes appliance 200 connecting to clients 102
over network 104 by WiFi or Ethernet, using the MAC address as an
identifier." *Id*. (citing Ex. 1010 ¶ 253).

Claim 2 also requires sending "a first message to the second server,
and wherein the first messages comprises the first IP address, the MAC
address, or the hostname." Petitioner asserts that in the Plamondon-Price
combination "when appliance 200 is 'activated' and 'operated with initially
loaded software,' it 'automatically register[s]' with the coordinating
computer (client 102a)." Pet. 49 (citing Ex. 1023 ¶¶ 44, 48; Ex. 1003 ¶ 410)
(alteration in original). Petitioner asserts that appliance 200 connects to the
coordinating computer over Plamondon's network, and the connections in
Plamondon and Price can be an IEEE 802.11 link or Ethernet. *Id*. (citing Ex.
1003 ¶¶ 409–411). Petitioner contends that, "[i]n these embodiments,
Plamondon-Price provides a first message from appliance 200 to client 102a
comprising the MAC address." *Id*. In support, Dr. Levin testifies that "[a]ll
application messages sent on a WiFi or Ethernet link would include the
source MAC address." Ex. 1003 ¶ 412.

Patent Owner argues that Price does not cure the deficiencies in
Plamondon as to claim 1. PO Resp. 53. Patent Owner also contends that
Petitioner relies on IEEE 802.11-2007 in the obviousness analysis of claim
2, but it does not include the IEEE reference in the ground. *Id*. at 53–54.
Petitioner argues that paragraphs 204, 216, 228, and 253 of Plamondon and
paragraph 29 of Price do not teach the claim limitations. *Id*. (citing Ex. 2044
¶ 218).

61

IPR2022-00135
Patent 10,257,319 B2

Patent Owner also asserts that Petitioner relies on alleged security concerns as a motivation to modify Plamondon, but "Plamondon already teaches that policy engine 236 of the appliance 200 addresses security concerns." PO Resp. 54 (citing Ex. 1010 ¶ 354; Ex. 2044 ¶ 220). Patent Owner contends that there is no motivation to modify Plamondon because the reference already provides a solution to the alleged problem. *Id*. Patent Owner argues that a person of ordinary skill in the art "would not be motivated to modify Plamondon based on the teachings of Price because such a combination would result in inefficiencies." *Id*. at 55 (citing Ex. 2044 ¶ 221). Patent Owner refers to Petitioner's expert testimony and asserts that a person of ordinary skill in the art "would not be motivated to combine Plamondon and Price such that client 102a would resend the same software that was just downloaded by appliance 200 back to appliance 200 again." *Id*. (citing Ex. 2044 ¶ 222; Ex. 1003 ¶¶ 448, 450).

We find that Petitioner has demonstrated that claim 2 would have been obvious over Plamondon and Price. Paragraph 253 of Plamondon discusses network communications using a network stack including those using TCP/IP protocols for the teaching of the limitation that the first client device is identified by a MAC address. Ex. 1010 ¶ 253. Plamondon also discloses that the network stack "has any type and form of a wireless protocol, such as IEEE 802.11." *Id.* Dr. Levin testifies that "[a]s a networking device, appliance 200 would have a MAC address" and "[e]very networking component has a MAC address." Ex. 1003 ¶¶ 354, 379. Dr. Williams concurs, testifying that MAC addresses are assigned for devices and "[e]very device that connects to WiFi has a MAC address." Ex. 1081, 9:18–21, 11:4–5. Petitioner relies on the sufficiency of the evidence in the

62

IPR2022-00135
Patent 10,257,319 B2

view of a person of ordinary skill in the art and, accordingly, it is not necessary to have included IEEE 802.11 as prior art in the ground.

As to the rationale to combine Plamondon and Price, we are not persuaded by Patent Owner's argument that there is no motivation to modify Plamondon because the reference already provides a solution to the alleged problem of security concerns. *See* PO Resp. 54. Obviousness "does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away." *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014) (citing *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013)) (emphasis omitted). Even if Plamondon discloses security controls like access, authentication, and authorization control of client's connection to a network (Ex. 1010 ¶ 354), applying software patches to networked equipment by the software updates of Price would provide additional benefits. Additionally, as to the alleged inefficiencies with different software downloads in the combination, as Dr. Levin testifies, there may be different software applications requiring different methods of updating, which supports different methods of software updating. Ex. 2010, 145:1–25. In sum, Petitioner presents several bases for the rationale to combine Plamondon and Price—software versioning, improvements in cybersecurity, combining prior art elements according to known methods to yield predictable results—that are sufficient to provide articulated reasoning with a rational underpinning to support the legal conclusion of obviousness. *See* Pet. 46–48; Ex. 1003 ¶¶ 392–407.

63

IPR2022-00135
Patent 10,257,319 B2

Accordingly, Petitioner's evidence and argument demonstrate that Plamondon and Price teach the limitations of claim 2, with articulated reasoning with support for the combination of references.

Patent Owner does not present any arguments specific to claims 3–5 and 19–20. *See generally* PO Resp.; PO Sur-reply. We have reviewed the evidence and argument for claims 3–5 and 19–20, and determine that it teaches the limitations of these claims, with motivation to combine Plamondon and Price.

### 2. Objective Indicia of Nonobviousness

Patent Owner asserts that obviousness is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–75, PO Sur-reply 21–23. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 26–28.

### a. Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en

64

IPR2022-00135
Patent 10,257,319 B2

route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented

65

invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

> b. *Commercial Success*

Patent Owner argues that nonobviousness is supported by the fact that it "commercialized a novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods." PO Resp. 57 (citing Ex. 2044 ¶ 121). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* at 57 (citing Ex. 2014). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 71 (citing Ex. 2025, 4; Ex. 2044 ¶ 229). According to Patent Owner, "just last year alone," its "residential proxy service generated revenues of $53.7 million." *Id.* (citing Ex. 2044 ¶ 129). Patent Owner further contends that EMK Capital's

66

IPR2022-00135
Patent 10,257,319 B2

acquisition of a majority stake in Patent Owner "at an enterprise value of
$200 million in 2017" is further evidence of commercial success. *Id.* at 70
(citing Ex. 2044 ¶ 128).

Patent Owner asserts that its "residential proxy service practices the
methods claimed in the '319 [p]atent," and provides claim charts purporting
to show how "this commercial embedment practices at least claims 1–3,
17–18, 21–22, and 24–29 of the '319 [p]atent." PO Resp. 57, 59–68. Patent
Owner argues that its "residential proxy service directly corresponds to the
network architecture of the modified version of Figure 3 of the '319 patent
where the requesting client device corresponds to client 102, the Super
Proxy corresponds to proxy server 6, and the proxy client device
corresponds to agent 122." *Id.* at 68–69. According to Patent Owner, its
"residential proxy service is 'reasonably commensurate in scope with the
scope of the claims'" and "embodies the claimed features of the '319
[p]atent and is coextensive with them." *Id.* at 69. Additionally, Patent
Owner argues that "[t]he features driving the commercial success of [its]
residential proxy service is (a) the proxy client devices have residential IP
addresses that lower the risk of blocking by the web server and (b) the
scalability of this architecture given the large number of proxy client devices
having residential IP addresses." *Id.* Finally, Patent Owner argues that "the
district court found that sufficient nexus was established." PO Sur-reply 21.

Petitioner responds that Patent Owner's secondary considerations
arguments are irrelevant because they "rely on alleged use of 'residential'
proxies (with residential IP addresses)" and, under the court's construction,
"'residential' proxies enjoy no nexus." Pet. Reply 26. According to
Petitioner, "[r]esidential proxies' alleged benefits—anonymity, lowering

67

IPR2022-00135
Patent 10,257,319 B2

blocking risk, and scalability—are neither claimed, nor even mentioned in the specification." *Id.* at 27 (citing Ex. 1001; Ex. 1081, 88:2–12) (citations omitted) (emphases omitted). Petitioner further contends that Patent Owner has presented "no competent evidence of commercial success" because its alleged 2021 revenue (provided by counsel) and source code (provided by a consultant) "are hearsay, unauthenticated, and lack foundation." *Id.* at 28 (citing Ex. 2044 ¶ 129; Ex. 1081, 63:21–64:16, 74:21–76:3, 89:7–92:2, 97:24–98:24, 99:8–100:1). Finally, Petitioner argues that there is "no evidence the 2021 product practices any claim." *Id.* (citing Ex. 1081, 75:2–24).

We find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 69; *see id.* at 57 (pointing to Patent Owner's "novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address"), 71 (asserting

68

IPR2022-00135
Patent 10,257,319 B2

that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services"); Ex. 2044 ¶ 126).

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See* § II.C.1, *supra*. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 69. Therefore, Patent Owner has failed to prove that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

69

IPR2022-00135
Patent 10,257,319 B2

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 21. Patent Owner relies on the district court's ruling on the defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." *Id.*; Ex. 1084, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court actually made a finding on the merits of nexus, or simply determined that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 72. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target website," but "that website could still likely identify data center server IP addresses as proxy addresses" because there "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2044 ¶ 230). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends

70

IPR2022-00135
Patent 10,257,319 B2

that its "residential IP network" solves the need to "dramatically increase the number of IP addresses that can be included in a proxy network." *Id.* at 72–73 (citing Ex. 2044 ¶ 120; Ex. 2029, 7; Ex. 2026, 182:22–197:21).

Petitioner responds that there is no nexus between the products that allegedly filled the long-felt need and the challenged claims. Pet. Reply 26–27. Petitioner also contends that Patent Owner's evidence of long-felt need "is hearsay from another proceeding" that is "not in the record." *Id.* at 28 (emphases omitted).

For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 72. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d. Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service (then known as 'Hola') was presented." PO Resp. 73 (citing Ex. 2044 ¶ 231). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2026, 202:12–204:8;

71

IPR2022-00135
Patent 10,257,319 B2

Ex. 2027, 94:23–95:9, 95:20–27:23, 131:23–132:7; 152:8–153:6). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 73–74 (citing Ex. 2027, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6). "This testimony," according to Patent Owner, "is strong evidence of copying." *Id.* at 74 (citing Ex. 2044 ¶ 232).

Petitioner responds that there is no nexus between the products that were allegedly copied and the challenged claims. Pet. Reply 26–27. Petitioner also contends that Patent Owner's evidence of copying "is also hearsay, mostly not in this record," and that the testimony filed in this proceeding "is either irrelevant or contradicts" Patent Owner. *Id.* at 28 (emphases omitted).

For similar reasons as for commercial success and long-felt need, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 73–74. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

### *e. Industry Praise*

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the

72

Appx222

IPR2022-00135
Patent 10,257,319 B2

claims of the '319 [p]atent as described above." PO Resp. 75 (citing Ex. 2031, 23–24; Ex. 2044 ¶ 234). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* (citing Exs. 2032–2034; Ex. 2044 ¶ 234).

Petitioner responds that there is no nexus between the products that were the subject of the purported industry praise, because "residential proxies" are "unclaimed," as discussed for the other objective indicia of nonobviousness. Pet. Reply 28.

For similar reasons as for the other objective indicia, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 75. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### 3. Conclusion on Obviousness

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show nexus with the claimed invention. Thus, the secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims 2–5 and 19–20 under this ground.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 2–5 and 19–20 would have been obvious over the combination of Plamondon and Price.

73

IPR2022-00135
Patent 10,257,319 B2

### F. *Obviousness of Claims 6–11 Over Plamondon and Kozat*

Claim 6 recites

The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:

      identifying, an HTTP request for the second content;

      sending, to the second server over the Internet in response to the identifying, the second content identifier and a criterion; and

      receiving, over the Internet in response to the sending, from a second client device selected from a plurality of client devices according to the criterion, a part of, or a whole of, the second content.

Ex. 1001, 19:58–20:4.

Claim 7 recites "[t]he method according to claim 6, wherein the criterion is stored in the first client device, and the method further comprising selecting, by the first client device, the second client device from the plurality of client devices, according to the stored criterion." Ex. 1001, 20:5–9.

Claim 8 recites "[t]he method according to claim 7, wherein the criterion is based on, or comprises, the geographical location of the plurality of client devices, or a response time when communicating with the first client device." Ex. 1001, 20:10–14.

Claim 9 recites "[t]he method according to claim 7, wherein the second client device is the quickest to respond to queries from the first client device." Ex. 1001, 20:15–17.

Claim 10 recites "[t]he method according to claim 7, further comprising sending, by the first client device, a notification message to a

74

IPR2022-00135
Patent 10,257,319 B2

device from the plurality of client devices that was not selected as part of the selecting." Ex. 1001, 20:18–21.

Claim 11 recites "[t]he method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application, and wherein the identifying comprises intercepting, by a driver in the first client device, the request for the second content respectively from the web browser application or the email application." Ex. 1001, 20:22–27.

Kozat is directed to a peer-to-peer content delivery network that uses media servers to clients that cache segments of the media content. Ex. 1024 ¶¶ 10, 18, 29, 37. Control servers in Kozat "keep track of the current supply, current demand, and predicted future demand of all segments of media files," and make caching decisions for the peers. *Id.* at code (57), ¶¶ 20, 21, 29, 37. Kozat improves peer-to-peer architectures by being able to optimize the system with respect to the demand for various content. *Id.* ¶¶ 8, 10.

Petitioner asserts that Plamondon in combination with Kozat teaches the limitations of claims 6–11 and there is motivation to combine the references. Pet. 57–69. Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Plamondon and Kozat because "[c]ombining Plamondon with Kozat's P2P techniques would improve Plamondon's performance by increasing transfer speeds and reducing peak loads, since Kozat's control server would ensure that requests were distributed efficiently among peers," and this technique would provide an "effective way to pair peers and match supply and demand." *Id.* at 59 (citing Ex. 1003 ¶¶ 463–469, 474; Ex. 1024 ¶¶ 3, 21–22).

75

IPR2022-00135
Patent 10,257,319 B2

Petitioner also provides evidence and argument in support of the teachings of the limitations of claims 6–11 by the combination of Plamondon and Kozat. Pet. 62–69.

Patent Owner argues that Kozat does not cure the deficiencies in Plamondon as to claim 1. PO Resp. 55. Patent Owner also contends that a person of ordinary skill in the art "would not be motivated to combine Plamondon and Kozat" because "Kozat is directed to media streaming with only caching and peer-to-peer forwarding," and that Petitioner's expert agreed with its position. *Id*. at 56 (citing Ex. 2044 ¶ 226; Ex. 2010, 125:24–126:1). Patent Owner additionally asserts that, although Petitioner argues that appliance 200 should be modified to include Kozat's control-server functionality to determine if and where an object is cached, Plamondon already provides a cache management system so Kozat's addition would be unnecessary. *Id*. (citing Pet. 40; Ex. 2044 ¶ 227). Patent Owner contends that Petitioner's expert agreed that the prefetcher of Plamondon worked without the addition of Kozat. *Id*. (citing Ex. 2010, 152:11–18). Beyond these arguments concerning motivation to combine, Patent Owner does not provide any additional arguments specific to claims 6–11.

We have reviewed the evidence and argument presented by Petitioner and find that it provides articulated reasoning with a rational underpinning for the combination of Plamondon and Kozat. We agree with Dr. Levin's testimony that Plamondon's use of caches would have motivated consideration of Kozat's peer-to-peer system cache management techniques (*see* Ex. 1003 ¶ 465), even with Kozat being directed towards media streaming, because Plamondon also discloses that its client 102 may execute applications to "stream[s] video and/or audio." Ex. 1010 ¶ 246. We also

76

IPR2022-00135
Patent 10,257,319 B2

agree with Dr. Levin that persons of ordinary skill would have been motivated to use Kozat's techniques to augment Plamondon because they would "improve Plamondon's performance by increasing transfer speeds and reducing peak loads" because Kozat's control server distributes requests efficiently by "maximiz[ing] the utility of available cache spaces" and "match[ing] supply and demand." Ex. 1003 ¶ 469 (citing Ex. 1024 ¶¶ 21–22). We agree that the implementation of "Kozat's control server in Plamondon's appliance 200 would further improve appliance 200's role as a 'performance enhancing proxy.'" *Id*. Contrary to Patent Owner's arguments, although Plamondon already provides a cache management system, the evidence supports that Kozat's techniques would improve it, thus providing a motivation to combine the references.

We have reviewed Petitioner's evidence and argument and find it is sufficient to show that Plamondon and Kozat teach the limitations of claims 6–11, with motivation to support the combination of Plamondon and Kozat.

For the reasons explained *supra* Section II.F.2, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show nexus with the claimed invention. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims 6–11 under this ground.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 6–11 would have been obvious over the combination of Plamondon and Kozat.

77

IPR2022-00135
Patent 10,257,319 B2

### G. Obviousness of Claims 2, 15–18, and 28–29 Over Plamondon Alone or in Combination With Other Prior Art

Petitioner asserts that claims 28 and 29 would have been obvious over Plamondon; claims 15–17 would have been obvious over Plamondon and RFC 2616; claims 17 and 18 would have been obvious over Plamondon and RFC 1122; and claim 2 would have been obvious over Plamondon and IEEE 802.11-2007. Pet. 35–45. Petitioner provides argument and evidence in support of its challenges. *Id.* Petitioner argues, with Dr. Levin's supporting testimony, that the secondary references were known standards (Ex. 1003 ¶¶ 288, 299, 330, 353) or use "well-established knowledge" (*id.* ¶ 285) to support its obvious assertions.

Patent Owner does not present any arguments specific to these grounds. *See generally* PO Resp.; PO Sur-reply.

We have reviewed Petitioner's evidence and arguments and find it is sufficient to show that the references teach the limitations of these claims, with motivation to support the combination of the prior art references.

For the reasons explained *supra* Section II.F.2, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show a nexus with the claimed invention. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims under these grounds.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 28 and 29 would have been obvious over Plamondon; claims 15–17 would have been obvious over Plamondon and RFC 2616; claims 17 and 18 would have

78

IPR2022-00135
Patent 10,257,319 B2

been obvious over Plamondon and RFC 1122; and claim 2 would have been obvious over Plamondon and IEEE 802.11-2007.

## III. MOTIONS TO SEAL

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2018, 2020, 2021–2024, and 2044 and associated portions of Patent Owner Response, and to enter an agreed-upon Joint Protective Order. Paper 18; Ex. 2046. Patent Owner asserts that Exhibit 2018 contains sensitive technical information, Exhibits 2020–2024 contain source code and related files, and Exhibit 2044 is an expert declaration that references some of the sensitive information in the exhibits. Paper 18, 2–7. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, which it has taken steps to guard against disclosure, which outweighs the public's interests. *Id*. This Motion is unopposed.

We have reviewed the exhibits at issue, including the redacted portions of Exhibit 2044, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal and the associated request to enter the Protective Order. Paper 18.

Patent Owner filed another Motion to Seal which seeks to seal Exhibit 2051 and Exhibit 1081. Paper 26, 2. Patent Owner asserts that Exhibit 2051 contains a document related to source code that has not been publicly disclosed and steps have been taken to guard against its disclosure. *Id*. at 3–4. Patent Owner contends that the portions of Exhibit 1081, a deposition transcript of Dr. Williams, which it seeks to redact, contain highly sensitive, technical details that have not been publicly disclosed. *Id*. at 5–11.

79

Petitioner does not oppose the grant of sealing for Exhibit 2051, but opposes the motion as to the redacted portions of Exhibit 1081.  Paper 27, 2. Petitioner argues that the some of the redacted material is not sensitive as it "merely identifies the programming language" (Ex. 1081, 46:13–17), or has already been disclosed (*id*. at 62:5–63:14, 77:24–78:25, 93:5–95:18; 96:9–97:18).  Paper 27, 4–8 (emphases omitted).  Patent Owner responds by asserting that the information at issue is confidential and neither Petitioner nor Patent Owner relied on the redacted testimony in its briefing.  Paper 28, 1–2.  As such, Patent Owner argues that the "redactions do not diminish the understandability of the public record."  *Id*. at 2.  Patent Owner also distinguishes Petitioner's case law, and argues that the redacted testimony "relates to specific details about the operation of Bright Data's commercial services."  *Id*. at 2–3, 5.

We have reviewed the redacted portions of Exhibit 1081.  We find that the information is sensitive and falls within the criteria for protection in the Joint Protective Order as it includes unpublished technical information. *See* Ex. 2046 ¶ 4.  While we agree with Petitioner that some of the materials discussed had previously been disclosed, nevertheless, the testimony at issue include specific details of Patent Owner's software provided in response to detailed questioning.  Accordingly, we grant Patent Owner's Motion to Seal for Exhibits 1081 and 2051 (Paper 26).

## IV. MOTION TO EXCLUDE

Petitioner filed versions of Exhibits 2026 and 2027 that are alleged to contain corrections, and these exhibits contain excerpts from a transcript of a trial involving Patent Owner and a third party (Teso).  Paper 32; Ex. 2026; Ex. 2027.  With the Board's leave, Petitioner filed a Motion to Exclude these

IPR2022-00135
Patent 10,257,319 B2

corrected versions.  Paper 35.  Petitioner contends that the corrected exhibits (CE 2026 and 2027) "are piecemeal excerpts from transcripts of a federal court trial" between Patent Owner and non-parties to these proceedings and Patent Owner "cites the excerpts as purported secondary considerations evidence."  *Id.* at 1.  Petitioner seeks to exclude these exhibits as inadmissible hearsay.  *Id.* at 2–5.  Petitioner argues that the documents constitute inadmissible hearsay because they are offered "to prove the truth of the matter asserted in the statement," and no hearsay exceptions, including the residual hearsay exception, apply.  *Id.*; Fed. R. Evid. § 801(c).

Patent Owner opposes the Motion because:  1) the portions of the exhibits at issue are not hearsay; 2) Federal Rules of Evidence § 703 applies as the bases of expert opinion; and 3) the residual hearsay exception applies under Federal Rules of Evidence § 807.  Paper 36, 1–5.

Patent Owner asserts that the Board need not decide the Motion because "[i]f the Board finds no anticipation [of claim 1], then the Board need not evaluate any secondary considerations of non-obviousness" and consider the corrected exhibits.  Paper 36, 1.  Patent Owner contends that the corrected exhibits "were offered as evidence of what they describe, for example, context for otherwise admissible evidence."  *Id.* at 2.  Patent Owner asserts that, even if the exhibits are deemed hearsay, they are admissible as the bases of an expert opinion under the Federal Rules of Evidence § 703.  *Id.* at 3.  Patent Owner asserts that it is reasonable for Dr. Williams to rely on the testimony of the trial witnesses because the testimony was taken under oath, at trial, and each witness was examined by lawyers with similar opportunity and motive to fully develop the testimony.  *Id.* (citing Ex. 2044 ¶¶ 229–232).  Patent Owner argues that it is reasonable

81

for Dr. Williams to consider, for example, the testimony on the development, and Petitioner has not presented any indication that the evidence is not reliable. *Id.* Patent Owner contends that experts in this field would reasonably rely on under-oath testimony from a related litigation in forming opinions, Petitioner did not move to exclude Dr. Williams's opinions, and Petitioner had the opportunity to question Dr. Williams and did not do so. *Id.* at 3–4.

Patent Owner further argues that the residual exception under Federal Rules of Evidence § 807 applies because the witnesses "were cross-examined by parties with similar motive and opportunity," "[t]rial testimony under oath possesses guarantees of trustworthiness," and the testimony has been corroborated. Paper 36, 4–5.

We reviewed the corrected exhibits and the portions of Patent Owner's Response and Sur-reply that cite to these exhibits to determine how the exhibits were intended to be used, and we determine that the contents of the exhibits are intended "to prove the truth of the matter asserted in the statement" and are hearsay. *See* PO Resp. 72–73 (citing Ex. 2026); *id.* at 71–72, 73–74 (citing Ex. 2027). There is no dispute that the transcripts are from another proceeding. We agree with Petitioner that prior testimony from another case, which is not subject to cross-examination by the opposing party, is hearsay if offered for the truth of the matter.

We also do not find that the exhibits are subject to an exception under Federal Rules of Evidence § 703 as the bases of the expert's opinion testimony. An expert may base an opinion on facts or data if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject. Fed. R. Evid. § 703. However, that does

82

not make the underlying facts admissible. *See* Rule 703 Committee Notes – 2000 amendment ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."). Moreover, although Patent Owner alleges that the testimony is to "facts or data," we do not agree. The trial testimony relied upon involves discussions that may perhaps provide context, but may or may not be true, and the testimony was not subject to cross-examination in this proceeding. *See* Ex. 2044 ¶¶ 230–232 (citing Ex. 2026, 182:22–197:21, 202:12–204:8; Ex. 2027, 90:3–93:7, 94:23–95:9; 95:20–97:23, 103:18–104:10, 131:23–132:7, 152:8–153:6).

As to the residual exception of Federal Rule of Evidence § 807, in order to be admissible under this exception, a hearsay statement must be "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and also be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. § 807. Here, more probative evidence could have provided by Patent Owner, for instance, by declarations submitted in this proceeding that could have been subject to cross-examination.

Additionally, we note that the testimony at issue is only relevant to alleged factual issues in support of the long-felt need and copying elements of secondary considerations. *See* PO Resp. 72–74. As discussed *supra* Section II.F.2, because we determined that the limited issue of whether nexus had been shown was dispositive as to long-felt need and copying, we

IPR2022-00135
Patent 10,257,319 B2

did not rely on the information in the exhibits at issue in making our determinations.

Accordingly, we *grant* Petitioner's Motion To Exclude.

## V. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that challenged claims 1–29 of the '319 patent are unpatentable. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 12–14, 21–27 | 102 | Plamondon | 1, 12–14, 21–27 | |
| 28, 29 | 103 | Plamondon | 28, 29 | |
| 15–17 | 103 | Plamondon, RFC 2616 | 15–17 | |
| 17, 18 | 103 | Plamondon, RFC 1122 | 17, 18 | |
| 2 | 103 | Plamondon, IEEE 802.11-2007 | 2 | |
| 2–5, 19, 20 | 103 | Plamondon, Price | 2–5, 19, 20 | |
| 6–11 | 103 | Plamondon, Kozat | 6–11 | |
| **Overall Outcome** | | | 1–29 | |

## V. ORDER

Accordingly, it is

ORDERED that claims 1–29 of U.S. Patent No. 10,257,319 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motions to Seal (Papers 18, 26) are *granted*;

84

IPR2022-00135
Patent 10,257,319 B2

FURTHER ORDERED that the Motion to Exclude (Paper 35) is *granted*;

FURTHER ORDERED that the request to enter the protective order is granted;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00135
Patent 10,257,319 B2

For PETITIONER:

Michael Rader
Adam Wichman
Gregory Nieberg
WOLF, GREENFIELD & SACKS, P.C.
mrader-ptab@wolfgreenfield.com
awichman-ptab@wolfgreenfield.com
gnieberg-ptab@wolfgreenfield.com


For PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@cherianllp.com

86

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                               Paper: 50
571-272-7822                                          Entered: May 9, 2023


UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

THE DATA COMPANY TECHNOLOGIES INC.,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

———————

IPR2022-00138
Patent 10,484,510 B2

———————


Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motions to Seal
Granting Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14; 37 C.F.R. § 42.64*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

## I. INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that challenged claims 1–12 and 15–24 (the "challenged claims") of U.S. Patent No. 10,484,510 B2 (Ex. 1001, "the '510 patent") are unpatentable.

### A. Procedural Background

The Data Company Technologies Inc.[1] ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–12 and 15–24 of the '510 patent, along with the supporting Declaration of Dave Levin, Ph.D. Paper 2 ("Pet."); Ex. 1003. Bright Data Ltd. ("Patent Owner") filed a Preliminary Response to the Petition, along with the supporting Declaration of V. Thomas Rhyne, Ph.D. Paper 6; Ex. 2001. On May 11, 2022, pursuant to 35 U.S.C. § 314(a), we instituted *inter partes* review based on the following grounds:

| Claims Challenged | 35 U.S.C. §[2] | Reference(s) |
|---|---|---|
| 1, 10, 12, 15–23 | 102(b) | Plamondon[3] |

---

[1] Without conceding that these parties are real parties in interest, Petitioner also identifies Avantis Team Technologies Ltd. and Cytronix Ltd. Pet. xiii.
[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '510 patent claims priority to a provisional application that was filed before this date, pre-AIA versions of §§ 102 and 103 apply. *See* Ex. 1001, code (60).
[3] U.S. Patent Application Publication US 2008/0228938 A1, published September 18, 2008 (Ex. 1010).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

| Claims Challenged | 35 U.S.C. §[2] | Reference(s) |
|---|---|---|
| 24 | 103(a) | Plamondon |
| 8, 11 | 103(a) | Plamondon, RFC 2616[4] |
| 8, 9 | 103(a) | Plamondon, RFC 1122[5] |
| 2 | 103(a) | Plamondon, IEEE 802.11-2007[6] |
| 2–5 | 103(a) | Plamondon, Price[7] |
| 6, 7 | 103(a) | Plamondon, Kozat[8] |

Pet. 2; Paper 12 ("Inst. Dec."), 6–7.

Patent Owner filed a Patent Owner Response ("PO Resp."), along with the Declaration of Tim Williams, Ph.D.  Paper 16; Ex. 2044.  Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response.  Paper 25. Patent Owner filed a Sur-reply ("PO Sur-reply").  Paper 30.

An oral hearing was conducted on February 10, 2023.  A transcript of the hearing is included in the record.  Paper 49 ("Tr.").

---

[4] Hypertext Transfer Protocol—HTTP/1.1, Network Working Group, RFC 2616, The Internet Society, 1999 (Ex. 1018).
[5] Requirements for Internet Hosts–Communication Layers, Network Working Group, RFC 1122, Internet Engineering Task Force, 1989 (Ex. 1014).
[6] 802.11-2007–IEEE Standard for Information Technology– Telecommunications and Information Exchange Between Systems - Local and Metropolitan Area Networks–Specific Requirements–Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, IEEE Standards, June 12, 2007 (Ex. 1022).
[7] U. S. Patent Application Publication US 2006/0026304 A1, published February 2, 2006 (Ex. 1023).
[8] U. S. Patent Application Publication US 2009/0055471 A1, published February 26, 2009 (Ex. 1024).

Appx325

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

### B. Related Matters

The parties identify four district court proceedings involving the '510 patent and a related patent (U.S. Patent No. 10,257,319 ("the '319 patent")):

*Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (pending);

*Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (pending);

*Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 2:19-cv-397 (E.D. Tex.) (dismissed); and

*Luminati Networks Ltd. v. Tefincom S.A.*, No. 2:19-cv-414 (E.D. Tex.) (pending).

Pet. xiv; Paper 5, 2.

The '510 patent is also before the Board in IPR2020-01358, which has been consolidated with IPR2021-01493. *See* IPR2021-01493, Paper 24. The related '319 patent is before the Board in IPR2020-01358, which has been consolidated with IPR2021-01492. *See* IPR2021-01492, Paper 25. The '319 patent is also at issue in IPR2022-00135. Patent Owner also identifies other district court actions involving the '510 patent and '319 patent. Paper 5, 2.

In addition, Patent Owner identifies *ex parte* reexaminations, Control No. 90/014,875 and Control No. 90/014,876, that have been ordered for the '319 and '510 patents, respectively. Paper 5, 2. Those reexaminations have been stayed. *See* IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

### C.  The '510 Patent

The '510 patent is titled "System Providing Faster And More Efficient Data Communication" and issued on November 19, 2019 from an application filed on February 17, 2019.  Ex. 1001, codes (22), (45), (54). The patent is subject to a terminal disclaimer.  *Id*. at code (*).  The application for the '510 patent claims priority to several applications, including U.S. Provisional Application No. 61/249,624, filed October 8, 2009.  *Id*. at code (60).

The '510 patent is directed to addressing the "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs."  Ex. 1001, 1:57–59. The '510 patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings.  *Id.* at 1:61–3:6.  The '510 patent provides a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below.  *Id.* at 3:16–18, 4:5–7.

5

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2



FIG. 3

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices.  Ex. 1001, 4:56–58.  Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122.  *Id.* at 4:58–60.  Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet."  *Id.* at 4:65–5:2.  Acceleration server 162 includes acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein."  *Id.* at 5:14–17.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser.  Ex. 1001, 12:62–13:3.  If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162.  *Id.* at 13:8–15.  Acceleration server

6

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36. The connection established between the agent and client may be a Transmission Control Protocol (TCP) connection. *Id.* at 17:61–64.

Each agent responds to the client with information as to "whether the agent has seen a previous request for this resource that has been fulfilled," and "which can help the client to download the request information from peers in the network." Ex. 1001, 13:51–57. The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

The '510 patent has 24 claims. Claim 1, the only independent claim in the '510 patent, is illustrative of the claimed subject matter and is

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

reproduced below, with bracketed designations added for reference

purposes.[9]

> 1. [pre] A method for use with a web server that responds to
> Hypertext Transfer Protocol (HTTP) requests and stores a first content
> identified by a first content identifier, the method by a first client
> device comprising:
>
>> [a] establishing a Transmission Control Protocol (TCP)
>> connection with a second server;
>>
>> [b] sending, to the web server over an Internet, the first content
>> identifier;
>>
>> [c] receiving, the first content from the web server over the
>> Internet in response to the sending of the first content identifier;
>> and
>>
>> [d] sending the received first content, to the second server over
>> the established TCP connection, in response to the receiving of
>> the first content identifier.

Ex. 1001, 19:18–31.

## II.   ANALYSIS OF PATENTABILITY OF CLAIMS 1–12 and 15–24

### A. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and

evidence advanced by Petitioner demonstrated a reasonable likelihood that at

least one claim of the '510 patent would have been anticipated or obvious.

Inst. Dec. 20–39.  Here, we must consider whether Petitioner has established

by a preponderance of the evidence that claims 1–12 and 15–24 of the '510

patent would have been anticipated or obvious.  35 U.S.C. § 316(e).  We

previously instructed Patent Owner that "Patent Owner is cautioned that any

---

[9] Petitioner uses letter designations, but appears to present letter designations
for steps 1[b]–[d] that are out of sequence. *See* Pet. 21–32.  The
designations we use herein reflect sequential lettering.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

arguments not raised in the response may be deemed waived."  Paper 13, 9;
*see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016)
(holding patent owner waived an argument addressed in the preliminary
response by not raising the same argument in the patent owner response).
Additionally, the Board's Trial Practice Guide states that the Patent Owner
Response "should identify all the involved claims that are believed to be
patentable and state the basis for that belief."  Consolidated Trial Practice
Guide (Nov. 2019)[10] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and
evidence advanced by Petitioner to support its unpatentability contentions.
In this regard, the record contains persuasive arguments and evidence
presented by Petitioner regarding the manner in which the prior art discloses
the corresponding limitations of claims 1–12 and 15–24 of the '510 patent
and the rationale for combining the asserted references.

B. *Level of Ordinary Skill in the Art*

Petitioner refers to a Preliminary Response in IPR2020-01358, and
states that it adopts Patent Owner's assessment that a person of ordinary skill
in the art is "an individual who, as of October 8, 2009 . . . had a Master's
Degree or higher in the field of Electrical Engineering, Computer
Engineering, or Computer Science or as of that time had a Bachelor's
Degree in the same fields and two or more years of experience in Internet
Communications."  Pet. 7 (citing Ex. 1008, 19; Ex. 1003 ¶¶ 30–37).  Patent
Owner submits that a person of ordinary skill in the art should have the

---

[10] *Available at*
https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

qualifications identified by Petitioner and adopts them.  PO Resp. 2 (citing Ex. 1003 ¶ 34; Ex. 2044 ¶ 30).

We adopt the assessment offered by the parties as it is consistent with the '510 patent and the prior art before us.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C.  Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2021).  Under the principles set forth by our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

### 1.  *"client device"*

#### a. Petitioner's Assertions

Petitioner asserts that the district court's construction in *Luminati Networks Ltd. v. Teso LT, UAB*, No. 2:19-cv-395 (E.D. Tex.) ("*Teso*

10

Appx332

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

litigation")[11] should be applied here for the term "client device." Pet. 9. In the district court litigation, the magistrate judge construed "client device" as "communication device that is operating in the role of a client." *Id*.; Ex. 1006, 12. Petitioner points to two claim construction orders in that case—an original order (Ex. 1006) and a supplemental order (Ex. 1009). In those orders, the magistrate judge construed the preamble of claim 1 to be limiting, and also construed the terms "second server" and "client device." Pet. 9. Petitioner also refers to the claim construction order in *Luminati Networks Ltd. v. Code200*, No. 2:19-cv-396 (E.D. Tex.), which concerns patents with the same specification as the '510 patent, where it was found that "the role-based construction applies 'regardless of any additional role the device may serve, including as a server.'" Pet. Reply at 3 (citing Ex. 1082, 13). Petitioner indicates that in the Texas litigations, the constructions were adopted by the district judge. *Id*. (citing Ex. 1074; Ex. 1083). Petitioner also refers to the claim construction order in *Bright Data Ltd. v. NetNut Ltd*., No. 2:21-cv-225 (E.D. Tex.), where Patent Owner's construction based on "consumer computer" was rejected. *Id*. at 4 (citing Ex. 2013, 10–16).

*b. Patent Owner's Assertions*

Patent Owner asserts that a person of ordinary skill in the art would understand the term "client device" to be a "consumer computer," or alternatively, to be a "consumer communication device." PO Resp. 10 (citing Ex. 2044 ¶ 69). Patent Owner argues that these constructions are consistent with the claim language, Specification, and the prosecution

---

[11] Luminati Networks Ltd. is now Bright Data Ltd.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

histories.  *Id*.  Patent Owner contends that a person of ordinary skill in the art would understand a client device is a communication device because the Specification states that "each communication device may serve as a client, peer, or agent" which "informs" a person of skill "that client 102, peers 112, 114, 116, and agent 122 are all 'client devices' in the context of the [S]pecification."  *Id*. at 10–11 (citing Ex. 2044 ¶ 70; Ex. 1001, 4:46–52, 5:23–31).

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer by its disclosure of a requesting client device ↔ proxy server ↔ proxy client device ↔web server architecture.  PO Resp. 11 (citing Ex. 1001, 4:46–52, 5:23–31, 9:14–51).  Patent Owner alleges that the Specification explains that when executing the fetching method, "the requesting client device may be executing the client module 224 disclosed in FIG. 6, while the proxy client device may be executing the agent module 228 disclosed in FIG. 6."  *Id*.  Based upon this, Patent Owner contends that a person of ordinary skill in the art "would understand in the context of the '510 [p]atent, a client device is a consumer computer with specific software to operate in accordance with the claims."  *Id.*  Referring to Figure 6 of the Specification, Patent Owner asserts that a person of ordinary skill in the art would understand that "one 'client device' may be configured to be the requesting client device and another 'client device' may be configured to be the proxy client device."  *Id*. at 12 (citing Ex. 2044 ¶ 73).  In support, Patent Owner also refers to modified annotated Figure 3, reproduced below, alleging that agent 122 is disclosed as

12

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

a client device "that is selected, for example, because agent 122 is closest to the web server 152." *Id.* (citing Ex. 2044 ¶¶ 74–75).



Patent Owner alleges that a person of ordinary skill's understanding of requesting client device (purple) ↔ second server (green) ↔ first client device (red) ↔ web server (blue) would correspond to client 102 ↔ second server 6 ↔ agent 122 ↔ web server 152, shown in Patent Owner's version of modified annotated Figure 3 of the '510 patent, above, which presents a schematic diagram of the network. PO Resp. 7–8.

Patent Owner further asserts that in light of the Specification, "a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 12 (citing Ex. 2044 ¶ 76 (citing Ex. 1001 at 2:47–49 ("In the network 50, files are stored on

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

computers of consumers, referred to herein as client devices." (emphasis omitted)))).

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons.  PO Resp. 12–14.  First, Patent Owner asserts that, although the district court found that there was no express lexicography in the Specification, the Specification states that "computers of consumers" are "referred to herein as client devices."  *Id*. at 13 (citing Ex. 2044 ¶ 76; Ex. 1001, 2:47–49).  Patent Owner further asserts that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server.  *Id*. (citing Ex. 2044 ¶ 76).  Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content.  *Id*. (citing Ex. 1006, 11).  Rather, Patent Owner argues, the common understanding of "consumer" as "a person who buys goods or services for their own use" is not a deviation from the use of the term in the Specification, and personal use is often distinguished from commercial use. *Id*. at 13–14 (citing Ex. 2015; Ex. 2016; 15 U.S.C. § 6809(9); 12 C.F.R. § 332.3(e)(1)).  Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of consumers," and there were statements made during the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

prosecution of grandfather application to the '510 patent that refer to this issue. *Id*. at 14 (citing Ex. 2044 ¶ 76; Ex. 1001, 2:47–49; Ex. 1072, 624).

Patent Owner contends that in the '510 patent, "a client device is not a server." PO Resp. 14. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction that a client device is unable to act as a server in all cases. *Id*. at 14–15 (citing Ex. 1006, 12). According to Patent Owner, a person of ordinary skill in the art would have understood that a client device is not a server in the context of the patent, and the MPEP does not require that a negative limitation be recited verbatim in the Specification. *Id*. at 15 (citing, *inter alia*, Ex. 2044 ¶ 62). Patent Owner argues that the Specification describes the shortcomings of using a proxy server as an intermediary, and therefore provides a reason to exclude a client device encompassing a proxy server. *Id*. (citing Ex. 1001, 2:27–35; Ex. 1006, 12; Ex. 2044 ¶ 83).

Patent Owner asserts that, in view of the recited architecture of the '510 patent claims that distinguishes between client devices and servers, the use of three interchangeable devices in a pathway would not disclose that architecture. PO Resp. 15–16 (citing Ex. 2044 ¶ 78). Patent Owner also argues that the recited architecture in the '510 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the use of a client device, rather than a proxy server, as an intermediary, and that this distinction is consistent with an *Alice* order in the *Teso* litigation. *Id*. at 16 (citing Ex. 2044 ¶ 79; Ex. 2007, 8–9); PO Sur-reply 2. Patent Owner further contends that the district court "repeatedly acknowledged that a

15

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

client device is not a merely general-purpose computer." PO Resp. 16
(citing Ex. 2013, 14–15; Ex. 2044 ¶ 78).

Patent Owner argues that a person of ordinary skill in the art would
have understood "that a client device is typically portable and easily moved,
like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 16
(citing Ex. 2044 ¶ 80). Patent Owner contends that a person of ordinary skill
in the art would be informed by statements made during prosecution that a
client device is not a dedicated network device, which typically uses a single
or relatively few connections, and is resource limited (e.g., bandwidth and
storage), unlike a server. *Id*. at 16–17. Patent Owner also argues that a
person of skill would have understood that a client device typically is
understood "(a) to be regularly switched off and taken offline; (b) to be
capable of processing only a limited number of requests at any given time . .
. and/or (c) to have lesser fault tolerance, lesser reliability, and lesser
scalability, prioritizing value to users over system costs." *Id*. at 17 (citing
Ex. 2044 ¶ 81). Patent Owner asserts that a person of ordinary skill's
understanding of "client" would have been consistent with its plain and
ordinary meaning, which is "an application that runs on a personal computer
or workstation and relies on a server to perform some operations." *Id*.
(citing Ex. 2044 ¶ 82; Ex. 2017; Ex. 2045). Patent Owner contends that a
person of ordinary skill would have understood that there are structural
differences between client devices and servers. *Id*. (citing Ex. 2044 ¶ 84).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of
the Specification, a person of ordinary skill in the art would have understood
that proxy server 6 must be structurally different from agent 122 and that "a

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

server is not a client device and that a client device is not a server."  PO
Resp. 18 (citing Ex. 2044 ¶ 85).  Patent Owner argues that "Petitioner's
expert agreed that server 6 of Figure 1 and agent 122 of Figure 3 would be
operating in the same roles at a given point in time," so under the Board's
preliminary constructions "Figure 3 collapses onto Figure 1" and fails to
account for structural differences between a proxy server and a client device.
*Id*. (emphases omitted).  Patent Owner points to Petitioner's expert's
agreement that in Figure 1, client devices 14 and 16 are operating in the role
of a client and web server 32 is operating in the role of a server under the
Board's preliminary constructions.  *Id*. at 19 (citing Ex. 2044 ¶ 87; Ex. 2010,
51:3–9, 51:11–20, 53:17–21, 53:22–54:3, 54:4–10, 54:23–55:5).  Patent
Owner also asserts that Petitioner's expert agrees that in Figure 3, client 102
is operating in the role of a client and web server 152 is operating in the role
of a server under the Board's preliminary constructions.  *Id*. at 20 (citing Ex.
2044 ¶ 92; Ex. 2010, 56:8– 12, 56:13–18, 57:8–14, 57:15–18, 57:19–25,
58:15–20).

Patent Owner additionally refers to the prosecution history of U.S.
Patent No. 10,069,936 ("the '936 patent), the grandparent of the '510 patent.
PO Resp. 23.  Patent Owner argues that this prosecution history "clearly
distinguishes client devices from servers." *Id*. (citing Ex. 2044 ¶ 99).  Patent
Owner asserts that during prosecution, the applicant amended the claims to
"specify that the 'devices' being used as intermediaries are 'clients' in
contrast to the teachings of Garcia," which was a reference used by the
examiner to reject the then-pending claims. *Id*. (citing Ex. 1072, 304, 349).
Patent Owner points to the applicant's statement that "the 'device' was

17

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

equated in the Garcia reference to the cache server 306, which is clearly a
dedicated device and performs a server functionality," and further that "[t]he
Garcia reference is silent, and actually teaches away from identifying and
using another client device for supporting a content request by a specific
client." *Id*. (citing 1072, 349 (emphasis omitted)).  Patent Owner also refers
to the applicant's statement that "[c]lient devices, such as client 105 in the
Garcia reference, are end-units that request information from servers, use
client-related software . . . and are typically consumer owned and operated."
*Id*. at 24 (citing Ex. 1072, 624 (emphasis omitted)).  Additionally, Patent
Owner refers to the examiner's statement that "the limitations of the
independent claims, within its environment, is allowable subject matter over
the prior art, in light of the specification," contending that "[t]he examiner's
acknowledgement of the 'environment' . . .  shows that the examiner
appreciated the unique architecture disclosed in the specification and the
novel use of a proxy client device within that architecture." *Id*. at 25 (citing
Ex. 1072, 741 (emphasis omitted); Ex. 2044 ¶ 104).

Patent Owner also refers to the prosecution history of the '319 patent,
which is the parent of the '510 patent, asserting that it shows that servers and
client devices are not interchangeable.  PO Resp. 25 (citing Ex. 2044 ¶ 106).
In that prosecution, the applicant contended that "the claims involve specific
networking of physical elements such as servers and clients, connected via
various networks forming a specific structure and relationships, which are
physical apparatuses, and are NO[T] a 'generic computer' as stated in the
Action." *Id*. (citing Ex. 1073, 163).  Patent Owner further cites the
applicant's statement that "the conventional arrangement involves fetching

18

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

data by a client device from a server device, while the claims disclose a
server receiving information from another server via a client device." *Id*. at
26 (citing Ex. 1073, 163–164).  Patent Owner also refers to the prosecution
history of the '510 patent, arguing that the examiner acknowledged the
"environment" of the claimed method, which "shows that the examiner
appreciated the unique architecture disclosed . . . and the novel use of a
proxy client device within that architecture." *Id*. at 27 (citing Ex. 1002, 519;
Ex. 2044 ¶ 109).

### c. Analysis

For the reasons discussed below, we determine that the evidence of
record supports the district court's construction of the term "client device" as
a "communication device that is operating in the role of a client" that we
adopted in out Institution Decision and continue to apply here.  Conversely,
we find that the evidence does not support Patent Owner's view that a
"client device" is a "consumer computer," or alternatively, a "consumer
communication device," where the "client device" cannot be a server.  *See*
PO Resp. 10–27.

### i. Claim Language

Under *Phillips*, we begin with the language of the claims themselves.
*See Phillips*, 415 F.3d at 1314.  In claim 1, the steps of the claims are
performed by a "first client device."  In step 1[b], the first client device,
"send[s], to the web server over the Internet, the first content identifier,"
which serves to request content from the web server.  *See* Ex. 1001, 19:24–
25.  In step 1[b], the first client device is acting as a client in requesting
content.  In step 1[d], the first client device "send[s] the received first

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

content, to the second server." *See id*. at 19:29–30.  In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1.  Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term.  Pet. Reply 10 (citing Ex. 1082, 13).  Patent Owner agrees that if the role-based construction were adopted, in its modified Figure 3, "agent 122 would be (i) operating in the role of a server when receiving requests from client device 102 and (ii) operating in the role of a client when sending requests to web server 1522," with Petitioner's expert agreeing to the same.  PO Resp. 20–21 (citing Ex. 2010, 56:19–25; 57:1–7).

One of Patent Owner's experts, Dr. Rhyne, who provided a declaration in this proceeding (Ex. 2001), also provided testimony in the *Teso* litigation that is consistent with the role-based nature of claim terms as set forth in the claim language (Ex. 1108).  In the *Teso* litigation, Dr. Rhyne testified that the steps required by claim 1 of the '510 patent are illustrated by an annotated Figure 3 of the patent, reproduced below, which shows client 102 acting in the role of the claimed "second server," and agent 122 acting in the role of "first client server" as follows:

> 11. To illustrate the steps required by independent claim 1 of the '319 and '510 Patents, in light of the claim language and the above disclosures from the common specification, the "client 102" of Figure 3 is an example of the "second server" of the claims, with the numbered arrows corresponding with the bracketed letters identifying the elements of the claims as shown in the annotated table following the figure.  (I note that the step

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

identified as "A" is the only [] claimed element in the '510 patent.).

Ex. 1008 ¶ 11.



FIG. 3

| '319 Patent | '510 Patent |
|---|---|
| 1. A method for use with a **first client device**, for use with a **first server** that comprises a **web server** that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a **second server**, the method by the **first client device** comprising: [B] receiving, from the **second server**, the first content identifier; [C] sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier; | 1. A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a **first client device** comprising: [A] establishing a Transmission Control Protocol (TCP) connection with a **second server**; [C] sending, to the **web server** over an Internet, the first content identifier; [D] receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and |

| '319 Patent | '510 Patent |
|---|---|
| [D] receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and [E] sending, the first content by the **first client device** to the **second server**, in response to the receiving of the first content identifier. | [E] sending the received first content, to the **second server** over the established TCP connection, [B] in response to the receiving of the first content identifier. |

*Id.* As shown in the above testimony, annotated Figure 3 of the '510 patent, and claim chart, Dr. Rhyne equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server) (arrow E). Thus, under

21

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This reflects a role-based interpretation of the claim terms; different terms are defined by their function.

Patent Owner argues that Dr. Rhyne's testimony has been mischaracterized and taken out of context, and that the associated briefing and Dr. Rhyne's testimony were only intended "to illustrate the steps" of the patent. PO Resp. 8–9; PO Sur-reply 16 n.7.[12] We find that Dr. Rhyne's cited testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1009, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "sending, to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1006, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not

---

[12] We recognize that Dr. Rhyne modified his testimony in his Preliminary Response Declaration to testify that both client 102 and agent 122 are both client devices. Ex 2001 ¶¶ 44, 46. We address the issue of two devices acting as client devices below in the discussion on modified Figure 3 in the discussion of Dr. Williams's testimony.

22

Appx344

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

'simultaneously serve as more than one of: the client device, the first
server/second server, and the web server.'" *Id*. at 10 (emphasis omitted).
That is, although the district court determined that a single component could
not simultaneously serve more than one function at any particular time,
components could operate in different roles, such as the claimed "client
device." *Id*. For related patents that share substantially identical
specifications to that of the '510 patent, the district court similarly found that
"the role-based construction applies 'regardless of any additional role the
device may serve, including as a server.'" Ex. 1082, 13. We agree with the
district court's construction of "client device" as "a device that is operating
in the role of a client" because this interpretation is consistent with the
limitations of the claims. *See* Ex. 1009, 10.

We note that Patent Owner's argument that a client device is not a
server (PO Resp. 14) is not supported by the claim language, which
describes a "client device" that acts as a client to request content from the
web server as well as a server to forward content under the method claims.
We discuss this issue further below in more detail.

*ii. Specification*

The district court's interpretation of the term "client device," adopted
here, is also consistent with the '510 patent Specification. The
Specification, when describing the "multiple communication devices"
depicted in Figure 3, states that the same components may assume different
roles:

> *Due to the functionality provided by software stored within each
> communication device*, which may be the same in each
> communication device, *each communication device may serve as*

23

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

> *a client, peer, or agent*, depending upon the requirements of the
> network.

Ex. 1001, 4:47–52 (emphases added).  Accordingly, the Specification states

that the components identified in Figure 3 may perform different functions

based on their stored software.  *Id*.  Further, as Petitioner asserts, a

communication device includes memory 210, which stores software 212

with accelerator application 220, which includes client, peer and agent

modules.  Pet. Reply 11 (citing Ex. 1001, 5:60–6:42, 9:21–27, Fig. 4,

Fig. 6).  The Specification explains that "each of the [software modules]

comes into play *according to the specific role that the communication device

200 is partaking* in the communication network 100 *at a given time*."  Ex.

1001, 9:21–26 (emphasis added).  The Specification thus supports the role-

based function of the network components, with components operating in

different roles at different times, which is consistent with the claim

language.

　　　In opposition, Patent Owner argues that a person of ordinary skill in

the art, when considering Figure 6 and associated text, would understand

that "one 'client device' may be configured to be the *requesting client device*

and another 'client device' may be configured to be the *proxy client device*."

PO Resp. 12 (citing Ex. 2044 ¶ 73) (emphases added).  In further support,

Patent Owner refers to its modified annotated Figure 3, reproduced *supra*

Section II.C.1.b, and asserts that a person of ordinary skill in the art would

understand that client 102 (in purple) corresponds to the requesting client

device client and agent 122 (in red) corresponds to the proxy client device.

*Id*. (citing Ex. 2044 ¶¶ 74–75).  Patent Owner contends that "[a]gent 122 is

disclosed as a "client device" (as opposed to a server) that is selected, for

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

example, because agent 122 is closest to the web server 152." *Id*. (citing Ex. 2044 ¶ 75 (citing Ex. 1001, 5:27–36)).

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." This configuration is not shown in any figure in the '510 patent or disclosed in the Specification. Ex. 2044 ¶ 64; Ex. 1081, 16:12–23. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2044 ¶ 64 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and the invention of Figure 3. Ex. 1001, 2:11–21, 2:27–35, 4:43–46. But Dr. Williams provides no explanation or a rationale to combine the prior art with an embodiment of the invention. Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed, but we do not discern that these characterizations are disclosed in the Specification. In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '510 patent Specification's disclosures, we do not agree that it discloses the architecture of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server in the first place, as Patent Owner asserts. *See* PO Resp. 11 (citing Ex. 1001, 4:46–52, 5:23–31, 9:14–51). Moreover, we do not agree that Patent Owner's argument based upon "architecture" should govern the construction of "client device" in light of

25

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

the claim language and the Specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:48–52, 9:21–26. The district court agreed, finding that "a component can be configured to operate in different roles— so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1009, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2007) are consistent with its understanding of the architecture required by the claims of the '510 patent and its "novel" use of a client device as an intermediary. PO Resp. 16 (citing Ex. 2007, 8–9; Ex. 2044 ¶ 79); *see also* PO Resp. 22. We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopted here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2007. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id*. at 5. Further, after the *Alice* order issued, in February, 2021, the district court consistently maintained its claim constructions (Ex. 1009, 2013), and

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

the district judge formally adopted the magistrate judge's constructions without modifications (Ex. 1074, 1083).

Patent Owner argues that in the '510 patent, "a client device is not a server." PO Resp. 14. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in step 1[b] to request content, and acts as a server in step 1[d] to forward content. Dr. Rhyne agrees that the claim language conforms to this functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is specifically not a server—is not supported by the specification." Ex. 1006, 11. The district court refers to the Specification's disclosure that a "communication device" may act as a client, peer, or agent. *Id*. at 12 (citing related '319 patent, 4:48–49). The district court also found, and we agree, that although the patent does not list "servers" in "communication devices," "that is not sufficient to construe 'client device' as unable to act as a server in all cases," in view of the case law that negative claim limitations are "supported when the specification describes a reason to exclude the relevant limitation." *Id*. (citing *Santarus, Inc. v. Par Pharm., Inc*., 694 F.3d 1344, 1351 (Fed. Cir. 2012)). The district court found that there was no support for Patent Owner's exclusion of servers in the construction of "client device" in the '510 or '319 patents. *Id*.

Here, Patent Owner further argues that a person of ordinary skill would understand that a client device is not a server—there are descriptions of communications devices having client, peer, and agent modules, but no

27

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

server module; and the MPEP "does not require that the negative limitation be recited verbatim in the specification." PO Resp. 15 (citing Ex. 2044 ¶ 62). We believe Patent Owner's reference is intended to refer to MPEP § 2173.05(i). This MPEP Section states that any negative limitation "must have basis in the original disclosure," and "[t]he mere absence of a positive recitation is not basis for an exclusion." MPEP § 2173.05(i). Patent Owner does not identify any disclosure in the Specification that states that a client device cannot be a server. Moreover, we note that under Dr. Rhyne's analysis in the *Teso* litigation, the claimed "first client device," which may act as a server in claim 1, is identified as "Agent 122" of Figure 3. Ex. 1108 ¶ 11. As discussed, the Specification provides support that an agent can act in different roles with software modules allowing different functions. Ex. 1001, 4:48–52.

Patent Owner also argues that proxy server 6 of Figure 1 must be structurally different from agent 122 of Figure 3. PO Resp. 18. Patent Owner asserts that Petitioner's expert agrees that these devices would be operating in the same roles at a given point in time. *Id.* Patent Owner asserts that a server is not a client device and the structural differences should be accounted for in claim construction in order preserve claim validity. *Id.* (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002)). We do not agree with this assertion. The Federal Circuit has held that claims should be construed to preserve validity only when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327. And a claim construction cannot be adopted

28

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

"that is at odds with the clear language of the claim and the written description." *Rhine v. Casio, Inc*., 183 F.3d 1342, 1345 (Fed. Cir. 1999). We do not find that this is a circumstance where the claim term interpretation is ambiguous in view of the evidence of record based on the claim language and the written description, as discussed above. Thus, we do not adopt an alternative construction only to preserve the validity of claim 1.

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1082, 13. Petitioner also points to buttressing evidence in RPC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 11 (citing Ex. 1018, 9 (emphases omitted)). We agree with Petitioner that RPC 2616 serves as intrinsic evidence because it is cited in the '510 patent in its discussion on the operation of the agent, client, or peer. Ex. 1001, 16:12–28; *see V-Formation v. Benetton Group & Rollerblade, Inc*., 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner also contends that under Petitioner's assertions "any device that operates in the role of a client is a 'client device' and any device that operates in the role of a server is a 'server.'" PO Sur-reply 1 (emphases

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

omitted). Patent Owner argues that if there is no any exclusivity in roles, "there is no difference between Petitioner's constructions for 'client device' and 'server.'" *Id*. We disagree. As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles. Nevertheless, the device must be capable of performing the roles required by the claim limitations. The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server. Ex. 1082, 14. The district found that it could not because the components were separately recited, which indicated a distinction between the components. *Id*. at 14–15. The district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer  ↔ computer ↔ computer architecture*." Ex. 1009, 10 (emphasis added). Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" *Id*. (emphasis omitted).

Additionally, Patent Owner argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices." PO Resp. 13 (citing

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Ex. 2044 ¶ 76; Ex. 1001, 2:47–49). Our view is that the Patent Owner takes the Specification's disclosure out of context. The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:43–49. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id*. at 2:43–3:12, 4:3–4, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1006, 11 (emphasis omitted). We also agree with the district court's finding that the Specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1006, 11; *see also* Ex. 1001, 1:55–59, 1:61–62; PO Resp. 13.

Patent Owner additionally asserts that a person of ordinary skill would have understood that a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 16–17. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id*. at 13 (citing Ex. 2044 ¶ 76). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2044 ¶¶ 76, 80–81. We discuss the prosecution history below, but notably Dr. Williams

31

Appx353

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id*.

Accordingly, we find that the '510 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

### *iii. Prosecution History*

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")), support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 22–27.

Patent Owner points to statements in the prosecution history of the grandparent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 23 (citing Ex. 1072, 304, 349). More specifically, Patent Owner asserts that the applicant argued that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality . . . and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id*. (citing Ex. 1072, 349 (emphasis omitted)). Patent Owner refers to an examiner's response stating that Garcia "fails to teach a group of clients for data communication between the web server and a requesting client via . . . clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving content

32

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

from the selected client." *Id*. at 23–24 (citing Ex. 1072, 594). Patent Owner contends that this statement shows that "the examiner recognized a server cannot be equated to a client device." *Id*. at 24 (citing Ex. 2044 ¶ 100). Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in the reference client devices "are typically consumer owned and operated." *Id*. at 24 (citing Ex. 1072, 624–625; Ex. 2044 ¶ 103) (emphasis omitted). Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, **within its environment**, is allowable subject matter over the prior art." *Id*. at 25 (citing Ex. 1072, 741).

The claims that were under consideration in the '936 patent prosecution were significantly different than the claims at issue here. The claims originally recited "devices," which were then amended to "clients." Ex. 1072, 349. Moreover, a "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device" or separate "requesting client" and "client." *See id*. at 339–348. Similarly, the issued claims in the '936 patent recite "requesting client" and a separate "client" and the issued claims have multiple steps that differ from those of the '510 patent. *See*, *e.g*., Ex. 2012, 19:16–52. Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '510 patent.[13] Further, considering the varying terms

---

[13] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations. Ex. 1072, 314, 593–594.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

used, we do not find that the applicant's statements during prosecution on patentability regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope of the "client device" term used in the claims here. *See* Ex. 1072, 349, 624–625; *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 1072, 741.

Additionally, as discussed above, the '510 patent's claim language and Specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for a grandfather of the '510 patent and also involved evolving claim term amendments. *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification."). For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '510 patent claims than the claim language and Specification of the '510 patent itself. As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415

34

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

F.3d at 1317.  This is particularly true here, where the prosecution history at issue involves a grandfather application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a parent to the '510 patent.  PO Resp. 25–26.  Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action."  *Id.* at 25 (citing Ex. 1073, 163).  Patent Owner also cites the applicant's assertion that "the Examiner does not sufficiently establish that the 'ordered combination' of the recited elements also fails to 'transform the nature of the claim' into a patent-eligible application."  *Id.* at 25–26 (citing Ex. 1073, 163).  Patent Owner further cites to the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification."  *Id.* at 26 (citing Ex. 1073, 653).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction.  Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated

35

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

disclaimer of the scope of the claim term "client device." *See* Ex. 1073, 163–164.

Patent Owner additionally refers to the prosecution history of the '510 patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 27. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

### *iv. Conclusion*

Based on evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

### *2. "second server"*

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested clarification that the term is "a device that is operating in the role of a server and that is not the first client device." Ex. 1006, 14; Ex. 1009, 8. The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server." Ex. 1009, 11.

Petitioner proposes the adoption of the district court's construction of the term, with the clarification. Pet. 9. Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different than the client device. PO Resp. 28.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Patent Owner's arguments, in the most part, repeat those presented for the "client device." *See* PO Resp. 27–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id*.

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1006, 14; Ex. 1009, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments *supra* Section II.C.1 that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished.  PO Resp. 27–28 (citing Ex. 2013, 20, 23).  We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously." Ex. 2013, 20–21.  Patent Owner also argues that the district court indicated that a "server" is not a communication device.  PO Resp. 28 (citing Ex. 1009, 10).  However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the Specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1009, 10.  Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server.  PO Resp. 29–30.

### 3. Other Terms

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes.  *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd*., 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate, a claim a prior art reference must disclose every limitation of the claimed invention;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs*., 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

### E. Anticipation of Claims 1, 10, 12, and 15–23 By Plamondon

Petitioner contends that claims 1, 10, 12, and 15–23 are unpatentable under 35 U.S.C. § 102 because they are  anticipated by Plamondon.  Pet. 16–43.  Patent Owner argues that Plamondon does not disclose all the limitations of the claims.  PO Resp. 34–50.

We begin our discussion with summary of Plamondon, and then address the evidence and arguments presented.

### 1. Plamondon (Ex. 1010)

Plamondon is directed to accelerating and optimizing network traffic, such as HTTP-based network traffic.  Ex. 1010, code (57).  Plamondon discloses techniques in the areas of proxy caching, protocol acceleration, domain name resolution acceleration, and compression improvements.  *Id*. The acceleration and optimization techniques discussed in Plamondon "may be deployed on the client as a client agent or as part of a browser, as well as on any type and form of intermediary device, such as an appliance, proxying device or any type of interception caching and/or proxying device."  *Id*. Figure 1A, reproduced below, is a block diagram of a network environment for a client to access a server via network optimization appliances.  *Id*. ¶ 142.

40

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2



**FIG. 1A**

As shown in Figure 1A of Plamondon, above, the network environment has one or more clients 102*a*–102*n* in communication with one or more servers 106*a*–106*n* via networks, where the communication of client 102 with the server 106 is via network optimization appliances, which are generally referred to as appliance 200. Ex. 1010 ¶ 202. Network 104 can be a local area network (LAN) or a wide area network (WAN), such as the Internet or the World Wide Web. *Id*. ¶ 203.

    *2. Discussion*

        *a. Claim 1*

The Petition asserts that Plamondon discloses all the limitations of claim 1. Pet. 21–32. Below we consider the claim 1 limitations in turn.

        *i. Limitations of the Preamble*

Petitioner provides an annotated version of Figure 1C of Plamondon, a block diagram of the network, reproduced below. Pet. 18.

41

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2



Plamondon, Fig. 1C
(color added by Petitioner)

Petitioner asserts that Plamondon teaches the preamble limitations[14] where Plamondon's appliance 200 (shown in red) is the claimed "first client device" and is in a communication path between client device 102, a "second server" (shown in green), and server 106, which is the claimed "web server" (shown in blue), as shown in annotated Figure 1C above.  Pet. 18, 21 (citing Ex. 1010, Figs. 1A–1C, ¶¶ 48, 52, 77, 421, 672).  Petitioner contends that when appliance 200 requests objects from server 106 on behalf of client 102, or forwards client 102's request to server 106, appliance 200 acts "in the role of a client" under the district court's construction of "first client device."  *Id*. (citing Ex. 1002 ¶¶ 165–166; Ex. 1010 ¶¶ 48–52, 444–451, Figs. 6A–6B).  Petitioner contends that Plamondon discloses that client 102 transmits an HTTP request to server 106 and "[i]n response to the

---

[14] The preamble provides antecedent basis for the terms "first client device" and "web server," among others.  We determine that the preamble is limiting.  *See* Ex. 1006, 9 (parties agree preambles of claims in related patents are limiting).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

request, the server transmits an HTTP response." *Id*. at 22 (citing Ex. 1010 ¶ 598).

Petitioner asserts that appliance 200 "is a device for accelerating, optimizing or otherwise improving the performance…of any type and form of network traffic." Pet. 17 (citing Ex. 1010 ¶ 206). Petitioner contends that appliance 200 does this by "[a]cting 'as a proxy between a client requesting objects [e.g., web pages] and an object server responding to client requests.'" *Id*. (citing Ex. 1010 ¶ 48); *see also* Ex. 1003 ¶¶ 153–155. Petitioner argues that appliance 200 also "[r]etriev[es] from servers, and cach[es] (i.e., stor[es]), objects that it can serve to a client in response to the client's request." *Id*. (citing Ex. 1010 ¶¶ 48–53, 442–453). Petitioner asserts that Plamondon discloses that "client 102, server 106, and appliance 200 . . . may be deployed as . . . any type and form of computing device," which is also identified generically as "computing device 100." *Id*. at 18 (citing Ex. 1010 ¶ 229) (emphasis omitted). Further, Petitioner argues that Plamondon discloses that "computing device 100 [and thus each client 102, server 106, and appliance 200] can be any . . . desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone . . . or other form of computing or telecommunications device." *Id*. (citing Ex. 1010 ¶ 238; Ex. 1003 ¶¶ 156–158) (emphasis omitted).

Patent Owner presents arguments that Plamondon does not disclose the required architecture of claim 1 and additionally argues that client 102 and appliance 200 of Plamondon do not serve to disclose the claimed elements. *See* PO Resp. 37–44; PO Sur-reply 19. We address the

43

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

architecture issue here and we address the arguments on the client 102 and
appliance 200 below in the discussion of the claimed steps.

On the architecture issue, Patent Owner argues that Petitioner appears
to agree with Patent Owner's proposed architecture of requesting client
device ↔ second server ↔ first client device ↔ web server.  PO Resp. 38
(citing Pet. 19; Ex. 2044 ¶ 159).  Patent Owner does not explain its
argument, which is directed to a description of *Plamondon's* architecture and
is, therefore, is not relevant to how the claims of the '510 patent are
construed nor to the issue of Plamondon's anticipation of the claims.

Patent Owner also argues that Plamondon's disclosures are directed to
a corporate network environment, and Plamondon does not teach hiding the
identity of client 102 from server 106.  PO Resp. 38 (citing Ex. 2044 ¶ 160).
Patent Owner contends that "Plamondon does not teach a network with
millions of appliances."  *Id*. at 39.  We do not find that these arguments
undermine Petitioner's showing because they are directed to limitations that
do not appear in the claims.

We have reviewed the evidence and argument and on this record we
determine that Petitioner has demonstrated that Plamondon discloses the
limitations of the preamble of claim 1.

*ii.  Limitation 1[a]*

Petitioner asserts that limitation 1[a] is disclosed by Plamondon's
client 102, which can be any server.  Pet. 23 (citing Ex. 1010 ¶ 238).  For
support, Petitioner relies upon Plamondon's disclosure that the client "has
the capacity to function as both a client node seeking access to applications
on a server and as an application server providing access to hosted

44

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

applications for other clients." *Id*. (citing Ex. 1010 ¶ 210, *also* citing *id.* ¶¶ 285, 443; Ex. 1003 ¶¶ 40–43, 184–185 (emphasis omitted)). Petitioner asserts that the appliance 200 (the claimed first client device) participates in creating a TCP connection with client 102 via network stack 267. *Id*. at 24. Petitioner refers to Plamondon's disclosure that "[i]n one embodiment, the appliance 200 provides for or maintains a transport layer connection between a client 102 and server 106 using a single network stack 267." *Id*. (citing Ex. 1010 ¶ 256, *also id*. ¶¶ 252–256, 270, 275, 350; Ex. 1003 ¶¶ 187– 193).

Patent Owner argues that Plamondon does not disclose the claimed step because the cited portions of Plamondon that relate to establishing a TCP connection describe the hardware for establishing a connection, but this does not address the context, which is client 102 sending a request for content. PO Resp. 34; *see also id*. at 40. Patent Owner asserts that "[i]n the context of sending a request for content, client 102 is operating in the role of a client." *Id*. at 35. Patent Owner contends that "[c]lient 102 never changes roles in the architecture actually disclosed in Plamondon" and so "under the role-based constructions, client 102 cannot correspond to the 'second server.'" *Id*. (citing Ex. 2044 ¶ 151). Patent Owner additionally argues that "[a]t that same point in time, appliance 200 is operating in the role of a server." *Id*. at 36 (citing Ex. 2044 ¶ 152). Patent Owner contends that Petitioner's expert agrees with this. *Id*. (citing Ex. 2010, 61:17–25). Patent Owner argues that a person of ordinary skill in the art would understand that "an application server normally hosts applications that can be remotely accessed and executed by a requesting client," and a person of ordinary skill

45

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

in the art "would understand that an application server is different from a proxy server." *Id*. at 40–41 (citing Ex. 2044 ¶¶ 166–167).

Patent Owner also argues that Plamondon does not disclose the claim 1 limitations "as arranged in the claim" and a person of ordinary skill in the art "would not envisage" the invention of the claim. PO Resp. 39. Patent Owner refers to Petitioner's assertion that "computing device 100 [and thus each client 102, server 106, and appliance 200] can be any . . . desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone . . . or other form of computing or telecommunications device," and argues that this does not inform a person of ordinary skill in the art that client 101 corresponds to the "second server" of the claims. *Id*. at 41–42 (citing Pet. 18; Ex. 2044 ¶ 168). Patent Owner asserts that the cited portion of Plamondon "recites a long list of different network components" and this does not inform a person of ordinary skill in the art of the specific architecture in which the method claims operate. *Id*. at 42 (citing Ex. 2044 ¶ 169). Patent Owner contends that a person of skill "would not pick and choose to make client 102 a server" and combine it with the appliance 200 "client device," and there is no guidance to do so. *Id*. Patent Owner argues that "Petitioner contends client 102, appliance 200, and server 106 are interchangeable network components and it doesn't matter which is which" and that is "opposite to the disclosure of the '510 patent." *Id*. at 43 (citing Ex. 2044 ¶ 171). Patent Owner also asserts that Petitioner, absent motivation, is modifying "1) client 102 by a selecting a 'server' from the list of possible components and (2) appliance 200 by selecting a 'client device' from the list of possible components." PO Sur-reply 19 (citing Pet. Reply

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

21–22).  Patent Owner also asserts that Petitioner's expert testimony lacks detail on network architecture and is biased by hindsight.  PO Resp. 45 (citing Ex. 1003 ¶ 158; Ex. 2010, 103:5–8, 107:10–12, 109:3–11, 127:22–25; Ex. 2044 ¶ 171).

Many of Patent Owner's arguments are based on the premise that a component has to operate exclusively in a single role in order to disclose a claim element.  We are not persuaded by these contentions because we have not adopted Patent Owner's proposed claim constructions.

As discussed, *supra* Section II.C.1, we have adopted the district court's role-based construction, where "client device" is construed as a "communication device that is operating in the role of a client."  This construction is based upon, *inter alia*, claim 1's language where in step 1[b], the "first client device" is acting as a client in requesting content and in step 1[d], the "first client device" is acting as a server to forward content.  That is, a "first client device" may switch roles and perform different roles with different functions at different times, but still is a "first client device."  Here, Petitioner asserts that Plamondon's client 102 is the "second server" because the reference explicitly states that client 102 can be "any . . . server" and it can function as an application server for other clients.  Pet. 23 (citing Ex. 1010 ¶¶ 210, 238).  We agree.  As Petitioner contends, Plamondon discloses that computing device 100 can be any server, where client 102 can be any type of a computing device and can be a server.  Ex. 1010 ¶¶ 229, 238.  Additionally, Plamondon discloses that client 102 serves a role as an application server providing access to applications for other clients.  *Id*.

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

¶ 210.  That an application server may be different than a proxy server does not mean that it does not function as a server.  *See* PO Resp. 40–41.

Contrary to Patent Owner's arguments, there is no issue with client 102 acting in the role of a client when a TCP connection is established between client 102 (second server) and appliance 200 (the claimed first client device).  As discussed in the claim construction section above, although a component may not simultaneously serve more than one function at any particular time, components can operate in different roles.  That is, a component does not have to exclusively operate in only a single role—it may operate in different roles at different times.  Dr. Levin's cross-examination testimony (Ex. 2010, 61:15–25) reflects that client 102 acts in a certain role "at particular . . . times" and at another time it may act in different role, which is consistent with the role-based claim interpretation.

The same issue applies to Patent Owner's argument that, when the TCP connection is established, "appliance 200 is operating in the role of a server."  PO Resp. 36.  Appliance 200 does not have to act exclusively in the role of a client.

We also do not agree with Patent Owner's argument that a person of ordinary skill in the art "would not envisage" Plamondon's components as arranged in claim 1.  As discussed above, Plamondon explicitly discloses the configuration as shown in annotated Figure 1C, reproduced above.  *See* Pet. 16–20; Ex. 1010, Fig. 1C.  Dr. Levin provides supporting testimony. Ex. 1003 ¶¶ 153–180.  We do not agree that Petitioner's expert testimony reflects hindsight because it is based on roles of Plamondon's components in the configuration that is disclosed in Figure 1C.  *See id.*  As discussed,

48

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Plamondon explicitly discloses that client 102, as a computing device, may be a server, and functions as application server for other clients. Ex. 1010 ¶¶ 210, 238. We find that Plamondon's disclosures support Petitioner's contention that appliance 200 acts as the claimed "first client device" and server 106 acts as the claimed "web server," which we discuss below. As such, Petitioner demonstrates that Plamondon discloses the components "as arranged in the claim" in accordance with Figure 1C. We do not agree with Patent Owner that relying on component in a configuration that is explicitly disclosed represents a "modification." *See* PO Sur-reply 19.

Patent Owner's arguments as to why a person of ordinary skill "would not 'at once envisage'" the claimed components from Plamondon's disclosure appear to center on Plamondon's listing of "desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone . . . or other form of computing or telecommunications device" as communication devices, such as client 102. PO Resp. 41–42; PO Sur-reply 19–20; *see also* Pet. 18; Ex. 1010 ¶ 238. However, this is not a situation where one of ordinary skill in the art would have to envisage a "server"—a "server" is expressly disclosed in Plamondon's listing of possible communication devices. *See In re Petering*, 301 F.2d 676, 682 (CCPA 1962). Moreover, Plamondon discloses that client 102 functions as an application server. Ex. 1010 ¶ 210. Accordingly, we do not find that Patent Owner's arguments rebut Petitioner's showing of Plamondon's disclosure of limitation 1[a].

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

We have reviewed the evidence and argument and on this record we determine that Petitioner has demonstrated that Plamondon discloses limitation 1[a].

### iii. Limitation 1[b]

For limitation 1[b], Petitioner argues that in Plamondon, appliance 200 connects to server 106, which is the claimed "web server," via network 104 or 104', which is the Internet.  Pet. 25 (citing Ex. 1010 ¶¶ 13, 203, Figs. 1A–1C, 6A–6B; Ex. 1003 ¶¶ 144–152, 195).  Petitioner refers to Plamondon's parallel revalidation technique, where "the appliance 200 identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator."  *Id.* (citing Ex. 1010 ¶¶ 446, 12).  Petitioner further refers to Plamondon's Figures 6A and 6B, wherein "the appliance transmits a request for a status [of] the object from an originating server."  *Id.* at 26–27 (citing Ex. 1010 ¶¶ 444, 488, Figs. 6A–6B; Ex. 1003 ¶¶ 166, 172, 198).

Petitioner asserts, and we agree, that Plamondon's appliance 200 acts as the claimed "first client device."  Appliance 200 is described as being on any form of computing device such as "computing device 100," and "computing device 100 can be any workstation, desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone, [or] smart phone."  *See* Ex. 1010 ¶¶ 229, 238.  Plamondon discloses that appliance 200 operates in the role of a client by sending a first content identifier by requesting objects by URL from server 106 (web server) based on HTTP requests from client 102 (second server).  *Id.*, Figs. 6A–6B, ¶¶ 444, 488.

50

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Patent Owner argues that a person of ordinary skill in the art would understand that Plamondon's appliance 200 is a corporation server, and a person of ordinary skill in the art would not understand it to be a client device.  PO Resp. 44 (citing Ex. 2044 ¶ 175; Ex. 1010 ¶ 206).  Patent Owner asserts that Plamondon's disclosures do not provide "sufficient specificity" that a person of ordinary skill in the art would envisage the architecture in which the claimed methods of the '510 patent operate.  *Id.* (citing Ex. 2044 ¶ 176).  Patent Owner contends that appliance 200 operates in the role of a server and cannot correspond to the "first client device," and that Petitioner's expert agreed with this position.  *Id.* at 36 (citing Ex. 2010, 61:17–25; Ex. 2044 ¶ 153).

We have addressed Patent Owner's arguments on the specificity of Plamondon's disclosures in the discussion on limitation 1[a], and we do not agree with them for similar reasons for this limitation.  As to Patent Owner's assertions that Plamondon's appliance 200 would not be understood to be a client device, we do not agree.  Under the claim construction we have adopted, Plamondon's appliance operates in the role of a client by requesting content.  Additionally, Patent Owner's argument that appliance 200 acts as a server and cannot be a "first client device" hinges on whether a device has to operate in an exclusive role, an argument we do not accept.  *See supra*, Section II.E.2.a.ii.  Although appliance 200 may operate in the role of a server as in limitation 1[d], it may also operate in the role of a client device, based on the same rationale discussed.  *Id.*

51

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation 1[b].

### iv. Limitation 1[c]

For limitation 1[c], Petitioner contends that in Plamondon's parallel revalidation of a cached object, appliance 200 receives updated content from server 106, the web server, in response to sending the URL identifying the requested content, and appliance 200 receives a status of the object or an updated copy of the object from the server at step 625 in response to the request at step 620.  Pet. 28 (citing Ex. 1010 ¶¶ 442, 444, 449–451, Figs. 6A–6B).  Petitioner refers to Plamondon's Figure 6A and the receipt of an updated version of an object by appliance 200 for the disclosure of this limitation.  *Id*. at 29.

Patent Owner does not present any arguments specific to this limitation.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation 1[c].

### v. Limitation 1[d]

For limitation 1[d], Petitioner asserts that after appliance 200 receives the URL identifying requested content, Plamondon's parallel revalidation includes appliance 200 sending the requested content to client device 102 in response to receiving the client's request, which included the first content identifier (URL).  Pet. 30.  Petitioner also asserts that Plamondon's disclosures include circumstances in which appliance 200 sends requested

52

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

content to client 102 after receiving it from server 106.  *Id*. at 32 (citing Ex. 1010 ¶¶ 451, 436–438).

Patent Owner asserts that Plamondon does not disclose that the "first client device" sends the first received content to "second server" as recited in claim 1.  PO Resp. 36 (citing Ex. 2044 ¶ 155).  Patent Owner argues that at this point in time appliance 200 is operating in the role of a server, not a client, and that Petitioner's expert agreed with this position.  *Id*. at 36–37 (citing Ex. 2044 ¶ 155; Ex. 2010, 63:20–64:2).  Patent Owner also argues that client 102 is operating in the role of a client, not a server, at the same time.  *Id*. at 37 (citing Ex. 2044 ¶ 156).  These arguments are based on the premise that a device has to exclusively act in a certain role, and that role cannot vary at during different time.  For the reasons discussed for limitation 1[a] and 1[b], we do not agree with Patent Owner's arguments.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Plamondon discloses limitation 1[d].

### *vi. Conclusion*

We note that Patent Owner has presented evidence of secondary considerations.  *See* PO Resp. 54–70.  Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102.  *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 1 of the '510 patent.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

### b. Claim 10

Claim 10 recites "[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid." Ex. 1001, 20:10–12. Dr. Levin testifies that "Plamondon includes a heavy focus on validating content stored in the cache of appliance 200 ('first client device')." Ex. 1003 ¶ 217. Petitioner asserts, with Dr. Levin's supporting testimony, that Plamondon discloses validating content stored in a cache of appliance 200, which is the first client device. Pet. 32. Petitioner argues that Plamondon discloses that "the method includes receiving a request for an object from a requester . . . [and] determining (i) that the object exists in the local cache and (ii) that a status identifier associated with the object indicates that the object is valid." *Id*. at 32–33 (citing Ex. 1010 ¶ 43; *see also id*. ¶¶ 48, 450–451; Ex. 1003 ¶¶ 216–218) (emphasis omitted). Petitioner also asserts that claim 10 does not limit when the validity determination is performed. *Id*. at 32.

Patent Owner argues that paragraphs 43 and 48 of Plamondon are vague, Petitioner mischaracterizes them, and they do not inform a person of ordinary skill in the art that appliance 200 performs the limitations of claim 10. PO Resp. 46 (citing Ex. 2044 ¶ 180). Patent Owner asserts that Petitioner mischaracterizes paragraphs 450 and 451 of Plamondon, arguing that in the view of a person of ordinary skill in the art it is the server 106, and not appliance 200, that determines the validity of the "first content." *Id*. at 46–47 (citing Ex. 2044 ¶¶ 181, 183). Patent Owner refers to the cited second request, but this does "not disclose appliance 200 determining the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

validity of the first content received **in response to the first request**." *Id*. at 47 (citing Ex. 1010 ¶ 451; Ex. 2044 ¶ 184).

In a section titled "F. Systems and Methods of Performing Parallel Revalidation of Cached Objects," Plamondon discloses that "while revalidating the cached object in parallel to serving the cached object to a first request[] for the object from the same client 102," "the appliance 200 performs a second revalidation of step 620 in response to the second request." Ex. 1010 ¶ 451. Here, appliance 200 ("first client device") is performing a "second revalidation" of the object ("first content"). Contrary to Patent Owner's arguments, we do not find that the revalidation is done in response to a second request is of any moment. We agree with Petitioner that claim 10 does not limit when the validity determination is performed and it does not have to be in response to a "first request." Pet. 32; Pet. Reply 23; Ex. 1003 ¶ 217. Thus, we do not find that Patent Owner's arguments undermine Petitioner's showing that Plamondon discloses the limitations of claim 10.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 10 of the '510 patent.

### c. Claim 12

Claim 12 depends from claim 10, further reciting: "sending, a message over the Internet in response to the determining that the received first content, is not valid; and receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first content."

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Ex. 1001, 20:17–25.  Petitioner asserts that in Plamondon's parallel
revalidation method, appliance 200 transmits a message to web server 106
after determining that "the remaining period of the expiration of the cached
object exceeds a predetermined threshold."  Pet. 33 (citing Ex. 1010 ¶¶ 451,
449–450).  Petitioner contends that selected second appliance 200' is the
"second client device."  *Id.* at 34 (citing Ex. 1010 ¶¶ 229, 238, 452).
Petitioner argues that the "selecting appliance 200' from a plurality of client
devices" is performed by Plamondon's prefetcher 904 sending requests to
second appliance 200' "because the cache management system indexes
appliance 200' as maintaining the object."  *Id.* (citing Ex. 1010 ¶ 446).  In
support, Dr. Levin testifies that "Plamondon's prefetcher 904 knows to send
requests to second appliance 200' because the cache management system
indexes appliance 200' as maintaining the object," where Plamondon
discloses that "the cache 232 is located on another device 100, such as an
appliance 200'."  Ex. 1003 ¶ 226 (emphasis omitted).  Petitioner contends
that "[i]n response to the content request at step 1030, at step 1035 appliance
200 receives the content from appliance 200'."  *Id.* at 34–35 (citing Ex. 1010
¶¶ 446, 542, Figs. 10A–10B; Ex. 1003 ¶¶ 225–228).

Patent Owner repeats the arguments relating to claim 10, that we do
not find persuasive for the reasons discussed above.  PO Resp. 49.  Patent
Owner further argues that, under Petitioner's assertions, when appliance 200
receives the content from appliance 200', appliance 200' is operating in the
role of a server and not a client.  *Id.*  This argument is premised on an
alleged requirement that a component has to exclusively operate in only a

56

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

single role, but as discussed *supra* Section II.E.2.a.iii, a component does not have to exclusively operate in one role under the claim construction adopted.

Patent Owner also argues that "Plamondon does not disclose purposeful selecting of appliance 200' from a plurality of client devices" because "any alleged message sent by appliance 200 must necessarily pass through appliance 200'." PO Resp. 49–50 (citing Ex. 1010, Fig. 1A; Ex. 2044 ¶¶ 194–195; Ex. 2010, 95:20–96:4). Dr. Williams testifies that Plamondon "does not disclose that a request from client 102 is sent to appliance 200' instead of appliance 200" so "client 102 is not bypassing appliance 200 in favor of appliance 200'." Ex. 2044 ¶ 195. Patent Owner argues that "even if a message is sent to appliance 200', that does not qualify as selecting appliance 200' from a plurality of client devices, because the message is actually sent to both appliances 200, 200'." PO Sur-reply 25. We do not agree with these arguments. In paragraph 446 of Plamondon, it discloses that "the appliance 200 determines [whether] the object identified by the request is stored in a cache," but the cache may be "located *on another device 100, such as appliance 200'*" and "the appliance 200 may transmit a message or request to a cache manager on the appliance *or another device 100* to determine if the object exists or is located in the cache." Ex. 1010 ¶ 446 (emphases added). Patent Owner's argument is based on the view that because a message is sent to appliance 200 this negates that appliance 200' is selected. Nevertheless, even if a request is first sent to appliance 200, a message is also sent to appliance 200' to select it. *See* Pet. Reply 24. Thus, we do not find that Patent Owner's arguments

57

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

undermine Petitioner's showing that Plamondon discloses the limitations of claim 12.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claim 12 of the '510 patent.

### d. Claims 15–23

Claims 15–23 depend from claim 1 and further recites additional limitations.  Ex. 1001, 20:41–21:1– 11.

Claim 15 recites "[t]he method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier."  Petitioner argues that "Plamondon describes appliance 200 requesting objects by URL from the server 106 ("first server") based on the HTTP requests that it intercepts from client 102."  Pet. 35.  Petitioner refers to Plamondon's disclosure that "the appliance 200 identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator of the request" and in the communication "appliance 200 receives the URL (first content identifier) from client 102 [which] takes place over the established TCP connection."  *Id*. (citing Ex. 1010 ¶¶ 442–453; Ex. 1003 ¶¶ 230–232).

Claim 16 recites "[t]he method according to claim 1, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier."  Petitioner asserts that in Plamondon appliance 200 sends an HTTP request to server 106, which includes the URL

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

for the first content, which appliance 200 received in a message from client 102.   Pet. 36 (citing Ex. 1010 ¶¶ 442–453; Ex. 1003 ¶¶ 234–236).

Claim 17 recites "[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the web server, the first content."  Petitioner contends that in Plamondon, "the appliance 200 receives . . . an updated copy of the object from the server . . . [i]f the object has changed, the appliance 200 stores the updated object to the cache 232."  Pet. 36 (citing Ex. 1010 ¶¶ 257, 450, 431, Figs. 2A, 6A–6B; Ex. 1003 ¶¶ 238–244) (emphasis omitted).

Claim 18 recites "[t]he method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol."  Petitioner asserts that the step of limitation 1[a] "established that the second server ('client 102') and first client device ('appliance 200') communicate via a TCP connection."  Pet. 38.  Petitioner contends that the devices communicate over network 104 and 104', which can be the Internet.  *Id*. (citing Ex. 1010 ¶ 203; Ex. 1003 ¶¶ 145–152, 247–249).

Claim 19 recites "[t]he method according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards."  Petitioner asserts that in Plamondon network stack 267 communicates according to the

59

Appx381

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

TCP or UDP protocols.  Pet. 39 (citing Ex. 1010 ¶ 254; Ex. 1003 ¶¶ 251–253).

Claim 20 recites "[t]he method according to claim 1, wherein the first content comprises web-page, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL)." Petitioner argues that Plamondon discloses that the "first content" includes web page content, and it also discloses that client 102 "stream[s] video and/or audio," so it would also pull audio or video content.  Pet. 39 (citing Ex. 1010 ¶¶ 462, 532, 549, 559; Ex. 1003 ¶¶ 255–257).

Claim 21 recites "[t]he method according to claim 1, further comprising executing, by the first client device, a web browser application or an email application."  Petitioner contends that Plamondon discloses that its techniques, systems and methods "may be deployed in a browser or for a browser."  Pet. 40 (citing Ex. 1010 ¶¶ 12, 680; Ex. 1003 ¶¶ 261–262).

Claim 22 recites "[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system." Petitioner asserts that Plamondon discloses that "appliance 200 . . . run[s] any operating system such as . . . Microsoft® Windows . . . Unix and Linux . . . Mac OS®."  Pet. 40 (citing Ex. 1010 ¶ 249; Ex. 1003 ¶¶ 264–266) (emphasis omitted).

Claim 23 recites "[t]he method according to claim 1, wherein the steps are sequentially executed."  Petitioner provides explanations and evidence as to how the steps of Plamondon are sequentially executed.  Pet. 41–42 (citing, *inter alia*, Ex. 1003 ¶¶ 268–278).

60

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Patent Owner does not present any arguments specific to these claims. *See generally* PO Resp.; PO Sur-reply.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Plamondon anticipates claims 15–23 of the '510 patent.

### F. Obviousness of Claims 2–5 over Plamondon and Price

Petitioner contends that claims 2–5 would have been obvious over the combination of Plamondon and Price. Pet. 52–60. Patent Owner argues that the combination of Plamondon and Price does not disclose all the limitations of the claims and the rationale to combine the references is insufficient. PO Resp. 51– 53; PO Sur-reply 25–26. Patent Owner also asserts that the obviousness of the claims is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 54–70; PO Sur-reply 21–23.

### 1. Discussion of Prior Art Teachings and Rationale to Combine

Claim 2 recites "[t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname."

Price describes a computing device acting to coordinate the management of software versions. Ex. 1023 ¶¶ 25–26. In Price, if the coordinating computer determines that "a newer version of the same software" exists, it "delivers . . . the currently available software" to the

61

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

connected device and the "software version of the . . . connected device is replaced" with the newer version.  *Id*. ¶¶ 53, 65.

Petitioner asserts that a person of ordinary skill in the art would have been motivated to combine Plamondon and Price because "the networked devices in Plamondon's architecture presents the software versioning problem that Price solves" in accordance with Price's rationale that "[d]igital-based devices often require updated software versions."  Pet. 53. (citing Ex. 1023 ¶ 4).  Petitioner also contends that "the need for regularly applying software patches to networked equipment was well-known in the art as a fundamental best practice for cybersecurity" and Price would provide a mechanism to Plamondon for applying software patches.  *Id*. (citing Ex. 1003 ¶¶ 379–386).  Petitioner asserts that combining Plamondon with Price brings together prior art elements according to known methods, to yield predictable results.  *Id*. at 54 (citing Ex. 1003 ¶¶ 387–393).

Claim 2 requires that "the first client device is identified by a Media Access Control (MAC) address."  Petitioner asserts that "Plamondon's appliance 200 ('first client device') is identified by MAC address in an IEEE 802.11-compliant network or wired Ethernet."  Pet. 55 (citing Ex. 1010 ¶ 253; Ex. 1003 ¶¶ 366, 395; Pet. § X).  Petitioner argues that "Plamondon describes appliance 200 connecting to clients 102 over network 104 by WiFi or Ethernet, using the MAC address as an identifier."  *Id*. (citing Ex. 1010 ¶ 253).

Claim 2 also requires sending "a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname."  Petitioner asserts that in the Plamondon-Price

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

combination "when appliance 200 is 'activated' and 'operated with initially loaded software,' it 'automatically register[s]' with the coordinating computer (client 102a)." Pet. 55 (citing Ex. 1023 ¶¶ 44, 48; Ex. 1003 ¶ 397). Petitioner asserts that appliance 200 connects to the coordinating computer over Plamondon's network, and the connections in Plamondon and Price can be an IEEE 802.11 link or Ethernet. *Id*. at 56 (citing Ex. 1003 ¶¶ 397–399). Petitioner contends that the "first message from appliance 200 to client 102a comprising the MAC address." *Id*. In support, Dr. Levin testifies that "[a]ll application messages sent on a WiFi or Ethernet link would include the source MAC address." Ex. 1003 ¶ 399.

Patent Owner argues that Price does not cure the deficiencies in Plamondon as to claim 1. PO Resp. 51. Patent Owner also contends that Petitioner relies on IEEE 802.11-2007 in the obviousness analysis of claim 2, but it does not include the IEEE reference in the ground. *Id*. Petitioner argues that paragraphs 204, 216, 228, and 253 of Plamondon and paragraph 29 of Price do not teach the claim limitations. *Id*. (citing Ex. 2044 ¶ 216).

Patent Owner also asserts that Petitioner relies on alleged security concerns as a motivation to modify Plamondon, but "Plamondon already teaches that policy engine 236 of the appliance 200 addresses security concerns." PO Resp. 52 (citing Ex. 1010 ¶ 354; Ex. 2044 ¶ 218). Patent Owner contends that there is no motivation to modify Plamondon because the reference already provides a solution to the alleged problem. *Id*. Patent Owner argues that a person of ordinary skill in the art "would not be motivated to modify Plamondon based on the teachings of Price because such a combination would result in inefficiencies." *Id*. (citing Ex. 2044

63

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

¶ 219).  Patent Owner refers to Petitioner's expert testimony in IPR2022-00135, and asserts that a person of ordinary skill in the art "would not be motivated to combine Plamondon and Price such that client 102a would resend the same software that was just downloaded by appliance 200 back to appliance 200 again."  *Id*. at 52–53 (citing Ex. 2044 ¶ 220; IPR2022-00135, Ex. 1003 ¶¶ 448, 450).

Petitioner relies on paragraph 253 of Plamondon which discusses network communications using a network stack including those using TCP/IP protocols for the teaching of the limitation that the first client device is identified by a MAC address.  Pet. 55.  Plamondon discloses that the network stack "has any type and form of a wireless protocol, such as IEEE 802.11."  Ex. 2044 ¶ 215.  Dr. Levin testifies that "as a networking device, appliance 200 would have a MAC address" and "[e]very networking component has a MAC address."  Ex. 1003 ¶¶ 341, 366.  Dr. Williams concurs, testifying that MAC addresses are assigned for devices and "[e]very device that connects to WiFi has a MAC address."  Ex. 1081, 9:18–21, 11:4–5.  Petitioner relies on the sufficiency of the evidence in the view of a person of ordinary skill in the art and, accordingly, it is not necessary to have included IEEE 802.11 as prior art in the ground.

As to the rationale to combine Plamondon and Price, we are not persuaded by Patent Owner's argument that there is no motivation to modify Plamondon because the reference already provides a solution to the alleged problem of security concerns.  PO Resp. 52.  Obviousness "does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away."  *PAR Pharm., Inc. v. TWI Pharms.*,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Inc., 773 F.3d 1186, 1197–98 (Fed. Cir. 2014) (citing *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013)) (emphasis omitted). Even if Plamondon discloses security controls like access, authentication, and authorization control of client's connection to a network (Ex. 1010 ¶ 354), applying software patches to networked equipment by the software updates of Price would provide additional benefits. Additionally, as to the alleged inefficiencies with different software downloads in the combination, as Dr. Levin testifies, there may be different software applications requiring different methods of updating, which supports different methods of software updating. Ex. 2010, 145:1–25. In sum, Petitioner presents several bases for the rationale to combine Plamondon and Price—software versioning, improvements in cybersecurity, combining prior art elements according to known methods to yield predictable results—that are sufficient to provide articulated reasoning with a rational underpinning to support the legal conclusion of obviousness. *See* Pet. 53–54; Ex. 1003 ¶¶ 378–393.

Accordingly, Petitioner's evidence and argument is sufficient to show that Plamondon and Price teach the limitations of claim 2, with articulated reasoning with support for the combination of references. Patent Owner does not present any arguments specific to claims 3–5. *See generally* PO Resp.; PO Sur-reply. We have reviewed the evidence and argument for claims 3–5, and determine that it is sufficient to teach the limitations of these claims, with sufficient motivation to combine Plamondon and Price.

*2. Discussion of Objective Indicia of Nonobviousness*

Patent Owner asserts that obviousness is supported by objective indicia of nonobviousness, including commercial success, long-felt need,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

copying, and industry praise.  PO Resp. 54–70; PO Sur-reply 21–23.
Petitioner disagrees, contending that Patent Owner's arguments rely on the
use of residential proxies with residential IP addresses, which do not have a
nexus to the claims, and that Patent Owner's arguments regarding
commercial success, long-felt need, copying, and industry praise suffer from
additional evidentiary infirmities.  Pet. Reply 27–29.

*a.  Legal Standards*

Objective indicia of nonobviousness may include long-felt but
unsolved need, failure of others, unexpected results, commercial success,
copying, licensing, industry praise, and expert skepticism.  *Mintz v. Dietz &
Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).  "[O]bjective indicia
'may often be the most probative and cogent evidence of nonobviousness in
the record,'" and "help turn back the clock and place the claims in the
context that led to their invention."  *Id.* at 1378.  Evidence of objective
indicia of nonobviousness "must always when present be considered en
route to a determination of obviousness."  *Transocean Offshore Deepwater
Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir.
2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed.
Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the
obviousness inquiry 'if there is a nexus between the claimed invention and
the [objective indicia of nonobviousness].'"  *In re Affinity Labs of Tex., LLC*,
856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech.,
Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)).  For objective indicia of
nonobviousness to be accorded substantial weight, their proponent must

66

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is

67

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b. Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "commercialized a novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods." PO Resp. 54 (citing Ex. 2044 ¶ 121). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* at 54–55 (citing Ex. 2014). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 66 (citing Ex. 2025, 4; Ex. 2044 ¶ 228). According to Patent Owner, "just last year alone," its "residential proxy service generated revenues of $53.7 million." *Id.* at 65–66 (citing Ex. 2044 ¶ 129). Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* at 65 (citing Ex. 2044 ¶ 128).

Patent Owner asserts that its "residential proxy service practices the methods claimed in the '510 [p]atent," and provides claim charts purporting to show how "this commercial embedment practices at least claims 1–3, 8–9, 15–16, 18–20, and 20–24 of the '510 [p]atent." PO Resp. 54, 56–64. Patent Owner argues that its "residential proxy service directly corresponds to the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 64. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '510 [p]atent and is coextensive with them." *Id.* Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service is (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 21.

Petitioner responds that Patent Owner's secondary considerations arguments are irrelevant because they "rely on alleged use of 'residential' proxies (with residential IP addresses)" and, under the court's construction, "'residential' proxies enjoy no nexus." Pet. Reply 27. According to Petitioner, "[r]esidential proxies' alleged benefits—anonymity, lowering blocking risk, and scalability—are neither claimed, nor even mentioned in the specification." *Id.* at 28 (citing Ex. 1001; Ex. 1081, 88:2–12) (citations omitted) (emphases omitted). Petitioner further contends that Patent Owner has presented "no competent evidence of commercial success" because its alleged 2021 revenue (provided by counsel) and source code (provided by a consultant) "are hearsay, unauthenticated, and lack foundation." *Id.* (citing Ex. 1081, 63:21–64:16, 74:21–76:3, 89:7–92:2, 97:24–98:24, 99:8–100:1).

69

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Finally, Petitioner argues that there is "no evidence the 2021 product practices any claim." *Id.* (citing Ex. 1081, 75:2–24).

We find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 64; *see id.* at 54 (pointing to Patent Owner's "novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address"), 66 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services")).

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

computer" or "consumer communication device." *See supra* Section II.C.1.
At most, Patent Owner presents evidence that the challenged claims broadly
cover the products relied on for commercial success, which is insufficient to
show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a
presumption of nexus cannot be established by simply showing that "the
patent claims broadly cover the product that is the subject of the evidence of
secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent
Owner may "prove nexus by showing that the evidence of secondary
considerations is the 'direct result of the unique characteristics of the
claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed
above, however, the "unique characteristics" that Patent Owner points to as
"driving the commercial success" of its products—the use of a residential
proxy service, residential consumer computers, and residential IP
addresses—are not recited in the challenged claims. *See* PO Resp. 54–55,
66. Therefore, Patent Owner has failed to prove that commercial success of
its products is the "direct result" of the claimed invention's unique
characteristics.

We also are not persuaded by Patent Owner's argument that "the
district court found that sufficient nexus was established." PO Sur-reply 21.
Patent Owner relies on the district court's ruling on defendants' motion to
strike the opinions of Patent Owner's expert Dr. Rhyne, where the district
court stated that it was denying the portion of "the motion requesting the
Court to preclude Dr. Rhyne from testifying regarding secondary
considerations of nonobviousness" because it "found that Dr. Rhyne

71

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

established a sufficient nexus between the secondary considerations and the claimed invention." *Id.*; Ex. 1084, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court actually made a finding on the merits of nexus, or simply determined that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 67. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target website," but "that website could still likely identify data center server IP addresses as proxy addresses" because there "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2044 ¶ 229). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "residential IP network" solves the need to "dramatically increase the number of IP addresses that can be included in a proxy network." *Id.* at 67 (citing Ex. 2044 ¶ 229; Ex. 2029, 7; Ex. 2026, 182:22–197:21).

Petitioner responds that there is no nexus between the products that allegedly filled the long-felt need and the challenged claims. Pet. Reply 27–28. Petitioner also contends that Patent Owner's evidence of long-felt need

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

"is hearsay from another proceeding" that is "not in the record." *Id.* at 29 (emphases and citation omitted).

For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 67. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d. Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service (then known as 'Hola') was presented." PO Resp. 68 (citing Ex. 2044 ¶ 230). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2026, 202:12–204:8; Ex. 2027, 131:23–132:7; 152:8–153:6). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.*

73

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

at 68–69 (citing Ex. 2027, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6). "This testimony," according to Patent Owner, "is strong evidence of copying." *Id.* at 69 (citing Ex. 2044 ¶ 231).

Petitioner responds that there is no nexus between the products that were allegedly copied and the challenged claims. Pet. Reply 27–28. Petitioner also contends that Patent Owner's evidence of copying "is also hearsay, mostly not in this record," and that the testimony filed in this proceeding "is either irrelevant or contradicts" Patent Owner. *Id.* at 29 (emphases and citation omitted).

For similar reasons as for commercial success and long-felt need, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 68–69. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

*e. Industry Praise*

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '510 [p]atent as described above." PO Resp. 69 (citing Ex. 2031, 23–24; Ex. 2044 ¶ 233). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the

74

Appx396

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

advantages of using a residential proxy service." *Id.* (citing Exs. 2032–
2034; Ex. 2044 ¶ 233).

Petitioner responds that there is no nexus between the products that
were the subject of the purported industry praise, because "residential
proxies" are "unclaimed," as discussed for the other objective indicia of
nonobviousness. Pet. Reply 29.

For similar reasons as for the other objective indicia, we agree with
Petitioner that no nexus has been shown between Patent Owner's evidence
of industry praise and the challenged claims. Patent Owner ties the evidence
of industry praise to its "residential proxy service," which is not recited in
the challenged claims. PO Resp. 69. Therefore, Patent Owner has failed to
make the requisite showing that the alleged industry praise has a nexus to the
claimed invention.

*3. Conclusion on Obviousness*

For the reasons explained above, we conclude that Patent Owner's
evidence purportedly showing commercial success, long-felt need, copying,
and industry praise lacks merit because it does not show nexus with the
claimed invention. Thus, the secondary considerations are not sufficient to
outweigh Petitioner's evidence of obviousness of challenged claims 2–5
under this ground.

Accordingly, Petitioner has demonstrated by a preponderance of the
evidence that claims 2–5 would have been obvious over the combination of
Plamondon and Price.

75

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

### G. Obviousness of Claims 6 and 7 over Plamondon and Kozat

Claim 6 recites

The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:

> receiving the second content identifier;

> sending, to the third server over the Internet in response to the receiving, the second content identifier;

> and receiving the second content from the third server over the Internet in response to the sending.

Claim 7 recites "[t]he method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application."

Kozat is directed to a peer-to-peer content delivery network that uses media servers to clients that cache segments of the media content. Ex. 1024 ¶¶ 10, 18, 29, 37. Control servers in Kozat "keep track of the current supply, current demand, and predicted future demand of all segments of media files," and make caching decisions for the peers. *Id.*, code (57), ¶¶ 20, 21, 29, 37). Kozat improves peer-to-peer architectures by being able to optimize the system with respect to the demand for various content. *Id.* ¶¶ 8, 10.

Petitioner asserts that Plamondon in combination with Kozat teaches the limitations of claims 6 and 7 and there is motivation to combine the references. Pet. 60–67. Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Plamondon and Kozat because "[c]ombining Plamondon with Kozat's P2P techniques would

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

improve Plamondon's performance by increasing transfer speeds and reducing peak loads, since Kozat's control server would ensure that requests were distributed efficiently among peers," and this technique would provide an "effective way to pair peers and match supply and demand."  Pet. 62 (citing Ex. 1003 ¶¶ 437–438, 443; Ex. 1024 ¶¶ 3, 21–22).

Petitioner also provides evidence and argument in support of the teachings of the limitations of claims 6 and 7 by the combination of Plamondon and Kozat.

Patent Owner argues that Kozat does not cure the deficiencies in Plamondon as to claim 1.  PO Resp. 53.  Patent Owner contends that a person of ordinary skill in the art "would not be motivated to combine Plamondon and Kozat" because "Kozat is directed to media streaming with only caching and peer-to-peer forwarding."  *Id*. (citing Ex. 2044 ¶ 224). Patent Owner argues that Petitioner's expert agreed with its position.  *Id*. (citing Ex. 2010, 125:24–126:1).  Patent Owner additionally asserts that, although Petitioner argues that appliance 200 should be modified to include Kozat's control-server functionality to determine if and where an object is cached, Plamondon already provides a cache management system so Kozat's addition would be unnecessary.  *Id*. at 53–54 (citing Pet. 34; Ex. 2044 ¶¶ 225–226).  Patent Owner contends that Petitioner's expert agreed that the prefetcher of Plamondon worked without the addition of Kozat.  *Id*. at 54 (citing Ex. 2010, 152:11–18).  Patent Owner does not provide any arguments specific to claim 7.

We have reviewed the evidence and argument presented by Petitioner and find that it provides articulated reasoning with a rational underpinning

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

for the combination of Plamondon and Kozat.  We agree with Dr. Levin's
testimony that Plamondon's use of caches would have motivated
consideration of Kozat's peer-to-peer system cache management techniques
(*see* Ex. 1003 ¶ 434), even with Kozat being directed towards media
streaming, because Plamondon also discloses that its client 102 may execute
applications to "stream[s] video and/or audio."  Ex. 1010 ¶ 246.  We also
agree with Dr. Levin that persons of ordinary skill would have been
motivated to use Kozat's techniques to augment Plamondon because they
would "improve Plamondon's performance by increasing transfer speeds
and reducing peak loads" because Kozat's control server distributes requests
efficiently by "maximiz[ing] the utility of available cache spaces" and
"match[ing] supply and demand."  Pet. 62; Ex. 1003 ¶ 438 (citing Ex. 1024
¶¶ 21–22).  We agree that the implementation of "Kozat's control server in
Plamondon's appliance 200 *would further improve* appliance 200's role as a
'performance enhancing proxy.'"  *Id*.  Contrary to Patent Owner's
arguments, although Plamondon already provides a cache management
system, the evidence supports that Kozat's techniques would improve it,
thus providing a motivation to combine the references.

　　　We have reviewed Petitioner's evidence and argument and find it is
sufficient to show that Plamondon and Kozat teach the limitations of claims
6 and 7, with motivation to support the combination of Plamondon and
Kozat.

　　　For the reasons explained *supra* Section II.F.2, we conclude that
Patent Owner's evidence purportedly showing commercial success, long-felt
need, copying, and industry praise lacks merit because it does not show

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

nexus with the claimed invention.  Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims 6 and 7 under this ground.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 6 and 7 would have been obvious over the combination of Plamondon and Kozat.

### H.  Obviousness of Claims 2, 8, 9, 11, and 24 over Plamondon Alone Or In Combination with Other Prior Art

Petitioner asserts that claim 24 would have been obvious over Plamondon; claims 8 and 11 would have been obvious over Plamondon and RFC 2616; claims 8 and 9 would have been obvious over Plamondon and RFC 1122; and claim 2 would have been obvious over Plamondon and IEEE 802.11-2007.  Pet. 43– 51.  Petitioner provides argument and evidence in support of its challenges.  *Id*.  Petitioner argues, with Dr. Levin's supporting testimony, that the secondary references were known standards (Ex. 1003 ¶¶ 286, 297, 317, 340) or use "well-established knowledge" (*id*. ¶ 283) to support its obvious assertions.

Patent Owner does not present any arguments specific to these grounds.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed Petitioner's evidence and arguments and find it is sufficient to show that the references teach the limitations of claims, with motivation to support the combination of the prior art references.

For the reasons explained *supra* Section II.F.2, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because it does not show a

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

nexus with the claimed invention.  Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness of challenged claims under these grounds.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 24 would have been obvious over Plamondon; claims 8 and 11 would have been obvious over Plamondon and RFC 2616; claims 8 and 9 would have been obvious over Plamondon and RFC 1122; and claim 2 would have been obvious over Plamondon and IEEE 802.11-2007.

### III. MOTIONS TO SEAL

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2018, 2020, 2021–2024, and 2044 and associated portions of Patent Owner Response, and to enter an agreed-upon Joint Protective Order.  Paper 20; Ex. 2052.  Patent Owner asserts that Exhibit 2018 contains sensitive technical information, Exhibits 2020–2024 contain source code and related files, and Ex. 2044 is an expert declaration that references some of the sensitive information in the exhibits. Paper 20, 2–7.  Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, which it has taken steps to guard against disclosure, which outweighs the public's interests.  *Id*.  This Motion is unopposed.

We have reviewed the exhibits at issue, including the redacted portions of Exhibit 2044, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion.  We grant the Motion to Seal and the associated request to enter the Protective

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

Order.  Paper 20.  We also grant the request to withdraw the Motion to Seal which was filed as Exhibit 18.

Patent Owner filed another Motion to Seal which seeks to seal Exhibit 2055 and Exhibit 1081.  Paper 28, 2.  Patent Owner asserts that Exhibit 2055 contains a document related to source code that has not been publicly disclosed and steps have been taken to guard against its disclosure.  *Id*. at 3–4.  Patent Owner contends that the portions of Exhibit 1081, a deposition transcript of Dr. Williams, which it seeks to redact, contain highly sensitive, technical details that have not been publicly disclosed.  *Id*. at 5–11. Petitioner does not oppose the grant of sealing for Exhibit 2055, but opposes the motion as to the redacted portions of Exhibit 1081.  Paper 29, 2. Petitioner argues that the some of the redacted material is not sensitive as it "merely identifies the programming language" (Ex. 1018, 46:13–17), or has already been disclosed (*id*. at 62:5–63:14, 77:24–78:25, 93:5–95:18; 96:9–97:18).  Paper 29, 4–8 (emphases omitted).  Patent Owner responds by asserting that the information at issue is confidential and neither Petitioner nor Patent Owner relied on the redacted testimony in its briefing.  Paper 31, 1–2.  As such, Patent Owner argues that the "redactions do not diminish the understandability of the public record."  *Id*. at 2.  Patent Owner distinguishes Petitioner's case law.  *Id*. at 2–3.  Patent Owner argues that the redacted testimony "relates to specific details about the operation of Bright Data's commercial services."  *Id*. at 5.

We have reviewed the redacted portions of Exhibit 1018.  We find that the information is sensitive and falls within the criteria for protection in the Joint Protective Order as it includes unpublished technical information.

81

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

*See* Ex. 2052 ¶ 4.  While we agree with Petitioner that some of the materials discussed had previously been disclosed, nevertheless, the testimony at issue include specific details of Patent Owner's software provided in response to detailed questioning.  Accordingly, we grant Patent Owner's Motion to Seal for Exhibits 1018 and 2055 (Paper 28).

## IV.  MOTION TO EXCLUDE

Petitioner filed versions of Exhibits 2026 and 2027 that are alleged to contain corrections, and these exhibits contain excerpts from a transcript of a trial involving Patent Owner and a third party (Teso).  Paper 46; Ex. 2026; Ex. 2027.  With the Board's leave, Petitioner filed a Motion to Exclude these corrected versions.  Paper 38.  Petitioner contends that the corrected exhibits (CE 2026 and 2027) "are piecemeal excerpts from transcripts of a federal court trial" between Patent Owner and non-parties to these proceedings and Patent Owner "cites the excerpts as purported secondary considerations evidence."  *Id*. at 1.  Petitioner seeks to exclude these exhibits as inadmissible hearsay.  *Id*. at 2–5.  Petitioner argues that the documents constitute inadmissible hearsay because they are offered "to prove the truth of the matter asserted in the statement," and no hearsay exceptions, including the residual hearsay exception, apply.  *Id*.; Fed. R. Evid. § 801(c).

Patent Owner opposes the Motion because:  1) the portions of the exhibits at issue are not hearsay; 2) Federal Rules of Evidence § 703 applies as the bases of expert opinion; and 3) the residual hearsay exception applies under Federal Rules of Evidence § 807.  Paper 39, 1–5.

Patent Owner asserts that the Board need not decide the Motion because "[i]f the Board finds no anticipation [of claim 1], then the Board

82

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

need not evaluate any secondary considerations of non-obviousness" and consider the corrected exhibits.  Paper 39, 1.  Patent Owner contends that the corrected exhibits "were offered as evidence of what they describe, for example, context for otherwise admissible evidence."  *Id*. at 2.  Patent Owner asserts that, even if the exhibits are deemed hearsay, they are admissible as the bases of an expert opinion under the Federal Rules of Evidence § 703.  *Id*. at 3.  Patent Owner asserts that it is reasonable for Dr. Williams to rely on the testimony of the trial witnesses because the testimony was taken under oath, at trial, and each witness was examined by lawyers with similar opportunity and motive to fully develop the testimony.  *Id*. (citing Ex. 2044 ¶¶ 228–231).  Patent Owner argues that it is reasonable for Dr. Williams to consider, for example, the testimony on the development, and Petitioner has not presented any indication that the evidence is not reliable.  *Id*.  Patent Owner contends that experts in this field would reasonably rely on under-oath testimony from a related litigation in forming opinions, Petitioner did not move to exclude Dr. Williams's opinions, and Petitioner had the opportunity to question Dr. Williams and did not do so.  *Id*. at 3–4.

Patent Owner further argues that the residual exception under Federal Rules of Evidence § 807 applies because the witnesses "were cross-examined by parties with similar motive and opportunity," "[t]rial testimony under oath possesses guarantees of trustworthiness," and the testimony has been corroborated.  Paper 39, 4–5.

We reviewed the corrected exhibits and the portions of Patent Owner's Response and Sur-reply that cite to these exhibits to determine how

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

the exhibits were intended to be used, and we determine that the contents of the exhibits are intended "to prove the truth of the matter asserted in the statement" and are hearsay. *See* PO Resp. 67 (citing Ex. 2026); PO Resp. 68 (citing Ex. 2027). There is no dispute that the transcripts are from another proceeding. We agree with Petitioner that prior testimony from another case, which is not subject to cross-examination by the opposing party, is hearsay if offered for the truth of the matter.

We also do not find that the exhibits are subject to an exception under Federal Rules of Evidence § 703 as the bases of the expert's opinion testimony. An expert may base an opinion on facts or data if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject. Fed. R. Evid. § 703. However, that does not make the underlying facts admissible. *See* Rule 703 Committee Notes – 2000 amendment ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."). Moreover, although Patent Owner alleges that the testimony is to "facts or data," we do not agree. The testimony relied upon is to trial testimony is for discussions that may perhaps provide context, but may or may not be true, and the testimony was not subject to cross-examination is this proceeding. *See* Ex. 2044 (citing Ex. 2026, 182:22–197:21; Ex. 2027, 90:3–93:7, 94:23–95:9; 95:20–97:23, 103:18–104:10, 131:23–132:7, 152:8–153:6).

As to the residual exception of Federal Rule of Evidence § 807, in

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

order to be admissible under this exception, a hearsay statement must be "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and also be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. § 807. Here, more probative evidence could have provided by Patent Owner, for instance, by declarations submitted in this proceeding that could have been subject to cross-examination.

Additionally, we note that the testimony at issue is only relevant to alleged factual issues in support of the long-felt need and copying elements of secondary considerations. *See* PO Resp. 67–68. As discussed *supra* Section II.F.2, because we determined that the limited issue of whether nexus had been shown was dispositive as to long-felt need and copying, we did not rely on the information in the exhibits at issue in making our determinations.

Accordingly, we *grant* Petitioner's Motion To Exclude.

### V. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that claims challenged claims 1–12 and 15–24 of the '510 patent are unpatentable. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 10, 12, 15–23 | 102 | Plamondon | 1, 10, 12, 15–23 | |

85

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 24 | 103 | Plamondon | 24 | |
| 8, 11 | 103 | Plamondon, RFC 2616 | 8, 11 | |
| 8, 9 | 103 | Plamondon, RFC 1122 | 8, 9 | |
| 2 | 103 | Plamondon, IEEE 802.11-2007 | 2 | |
| 2–5 | 103 | Plamondon, Price | 2–5 | |
| 6, 7 | 103 | Plamondon, Kozat | 6, 7 | |
| **Overall Outcome** | | | 1–12, 15–24 | |

## VI. ORDER

Accordingly, it is

ORDERED that claims 1–12 and 15–24 of U.S. Patent No. 10,484,510 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motions to Seal (Papers 20, 28) are *granted*;

FURTHER ORDERED that the Motion to Exclude (Paper 38) is *granted*;

FURTHER ORDERED that the request to enter the protective order is granted;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it

Appx408

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00138
Patent 10,484,510 B2

PETITIONER:

Michael Rader
Adam Wichman
Gregory Nieberg
Wolf, Greenfield & Sacks, P.C.
MRader-PTAB@wolfgreenfield.com
AWichman-PTAB@wolfgreenfield.com
GNieberg-PTAB@wolfgreenfield.com

PATENT OWNER:

Thomas M. Dunham
Elizabeth A. O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                                                Paper:  36
571-272-7822                                                        Entered: June 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB, and
OXYSALES, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

————————

IPR2022-00353
Patent 11,044,344 B2

————————

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motions to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

## I.  INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, and 41–46 (the "challenged claims") of U.S. Patent No. 11,044,344 B2 (Ex. 1002, "the '344 patent") are unpatentable.

*A. Procedural Background*

Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; and Oxysales, UAB (collectively, "Petitioner")[1] filed a Petition requesting *inter partes* review of claims 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, and 41–46 of the '344 patent, along with the supporting Declaration of Dr. Michael J. Freedman.  Paper 1 ("Pet."); Ex. 1003.  Bright Data Ltd. ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 6.  On July 1, 2022, pursuant to 35 U.S.C. § 314(a), we instituted *inter partes* review based on the following grounds:

---

[1] Petitioner identifies coretech lt, UAB as another real party-in-interest. Pet. 4–5.

2

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

| Claims Challenged | 35 U.S.C. §[2] | Reference(s) |
|---|---|---|
| 1, 2, 6, 7, 16, 18–23 | 102(b) | Crowds[3] |
| 1, 2, 6, 7, 16, 18–25, 29, 30, 39, 41–46 | 103(a) | Crowds |
| 8, 9, 31, 32 | 103(a) | Crowds, RFC 1122[4,] |
| 10, 11, 13, 33, 34, 36 | 103(a) | Crowds, RFC 2616[5] |

Pet. 10–12; Paper 8 ("Inst. Dec."), 6–7.

Patent Owner filed a Patent Owner Response ("PO Resp."), along with the Declaration of Tim Williams, Ph.D. Paper 13; Ex. 2025. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 20. Patent Owner filed a Sur-reply ("PO Sur-reply"). Paper 23.

An oral hearing was conducted on March 14, 2023. A transcript of the hearing is included in the record. Paper 34.

*B. Related Matters*

The parties identify several court proceedings that involve patents related to the '344 patent. Pet. 2–3; Paper 5, 2–3. In particular, the parties identify *Luminati Networks Ltd.*[6] *v. Teso LT, UAB, et al.*, No. 2:19-cv-395

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '344 patent claims priority to a provisional application that was filed before this date, with Petitioner not contesting that priority, the pre-AIA versions of §§ 102 and 103 apply. *See* Ex. 1002, code (60).

[3] Michael K. Reiter, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, at 66–92 (Ex. 1004).

[4] Requirements for Internet Hosts – Communication Layers, Network Working Group, RFC 1122, October, 1989 (Ex. 1040).

[5] Hypertext Transfer Protocol—HTTP/1.1, Network Working Group, RFC 2616, The Internet Society, 1999 (Ex. 1006).

[6] Luminati Networks Ltd. is now Bright Data Ltd.

3

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

(E.D. Tex.) ("the *Teso* district court litigation"). The parties do not, however, identify any district court cases that involve the '344 patent. *Id*.

The parties also identify several *inter partes* reviews for patents related to the '344 patent, but similarly, none of these cases challenged claims of the '344 patent. Pet. 3–5; Paper 5, 1–2. In addition, Patent Owner identifies *ex parte* reexaminations ordered for related patents, Control No. 90/014,875 and Control No. 90/014,876, which have been stayed. Paper 5, 2; *see* IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

*C. The '344 Patent*

The '344 patent is titled "System Providing Faster And More Efficient Data Communication" and issued on June 22, 2021, from an application filed on October 24, 2019. Ex. 1002, codes (22), (45), (54). The patent is subject to a terminal disclaimer. *Id*. at code (*). The application for the '344 patent claims priority to several applications, including U.S. Provisional Application No. 61/249,624, filed October 8, 2009. *Id*. at code (60).

The '344 patent is directed to addressing the "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." Ex. 1002, 1:54–56. The '344 patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id*. at 1:58–3:3. The '344 patent provides a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below. *Id*. at 3:13–16, 4:3–5.

4

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2



FIG. 3

Figure 3, above, is a schematic diagram depicting communication network 100 including a number of communication devices.  Ex. 1002, 4:54–61.  Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122.  *Id.* at 4:56–58.  Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet."  *Id.* at 4:63–67.  Acceleration server 162 includes acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein."  *Id.* at 5:11–16.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser.  Ex. 1002, 12:62–13:3.  If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162.  *Id.* at 13:8–13.  Acceleration

5

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36. The connection established between the agent and client may be a Transmission Control Protocol [TCP] connection. *Id*. at 17:61–64.

Each agent responds to the client with information as to "whether the agent has seen a previous request for this resource that has been fulfilled," and "which can help the client to download the requested information from peers in the network." Ex. 1002, 13:51–58. The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:64–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

The '344 patent has 46 claims. Claims 1 and 24 are the only independent claims. Claim 1 is illustrative of the claimed subject matter and is reproduced below, with bracketed designations added to the limitations for reference purposes.

1. [pre] A method for use with a web server that stores a first web-page identified by a first Uniform Resource Locator (URL), the method by a first client device comprising:

6

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

> [a] communicating with a second server;
>
> [b] receiving, from the second server, the first URL;
>
> [c] sending, to the web server over the Internet, the first URL;
>
> [d] receiving, the first web-page from the web server over the Internet in response to the sending of the first URL; and
>
> [e] sending the received first web-page to the second server, in response to the receiving of the first URL.

Ex. 1002, 19:16–25.

## II.  ANALYSIS OF PATENTABILITY OF CLAIMS 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, AND 41–46

### A. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that at least one claim of the '344 patent is anticipated or would have been obvious. Inst. Dec. 16–25.  Here, we must consider whether Petitioner has established by a preponderance of the evidence that claims 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, and 41–46 of the '344 patent are anticipated or would have been obvious.  35 U.S.C. § 316(e).  We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 9, 9; *see also In re NuVasive, Inc*., 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising the same argument in the patent owner response).  Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the

7

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

involved claims that are believed to be patentable and state the basis for that belief."  Consolidated Trial Practice Guide (Nov. 2019)[7] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and evidence advanced by Petitioner to support its unpatentability contentions. In this regard, the record contains persuasive arguments and evidence presented by Petitioner regarding the manner in which the prior art discloses the corresponding limitations of claims 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, and 41–46 of the '344 patent and the rationale for combining the asserted references.

### B. Level of Ordinary Skill in the Art

According to Petitioner, a person of ordinary skill in the art "would have had at least a bachelor's degree in Computer Science or related field (or equivalent experience), and at least two years' experience working with and programming networked computer systems" as of the date of the invention. Pet. 12–13 (citing Ex. 1003 ¶ 30).

Patent Owner proposes that person of ordinary skill in the art is someone who "had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications" at the time of the invention.  PO Resp. 2 (citing Ex. 2025 ¶ 28).  Patent Owner asserts that its proposed definition has subtle differences with that of Petitioner, but "[t]he analysis herein is the same under either definition."  *Id*. (citing Ex. 2025 ¶ 29).

---

[7] *Available at*
https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

Appx500

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Petitioner also agrees that the slight differences in the levels of skill are not relevant to the evaluation of the merits.  Pet. Reply 2.

In the Decision on Institution, we adopted the assessment of qualifications offered by Petitioner, which we also adopt here.  Inst. Dec. 11. The assessment offered by Petitioner is consistent with the '344 patent and the prior art before us.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C.  Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2021).  Under the principles set forth by the Federal Circuit, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek,*

9

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

*Inc*., 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d
at 1312–17).

### 1. "client device"

#### a. Petitioner's Assertions

Petitioner asserts that the district court's constructions in the *Teso*
district court litigation should apply in this case.  Pet. 14–17.  In particular,
Petitioner points to two claim construction orders in that case—an original
order (Ex. 1011) and a supplemental order (Ex. 1014).  Petitioner also relies
on a claim construction order in *Bright Data Ltd. v. Code200, UAB*, Case
No. 2:19-cv-00396 (E.D. Tex.) ("the Code200 Litigation"), which is directed
to related patents.  Pet. 2 (citing Ex. 1012).  As Petitioner notes, the
magistrate judge in the Code200 Litigation construed "client device" as
"communication device that is operating in the role of a client."  *Id*. at 14.
Petitioner argues that the district court has repeatedly addressed and rejected
Patent Owner's arguments on the claim construction for this term.  *Id*.
(citing Ex. 1011, 11–12; Ex. 1014, 7–11).  Petitioner also refers to the claim
construction order in *Bright Data Ltd. v. NetNut Ltd*., No. 2:21-cv-225 (E.D.
Tex.) ("the *NetNut* litigation"), in which the district court reaffirmed its
analysis and rejected Patent Owner's construction of "client device" as
referring to "consumer computer."  Pet. Reply 9 n.2 (citing Ex. 2029), 11 n.3
(citing Ex. 2029).  Petitioner refers to RFC 2616, which defines clients based
on the roles being performed.  *Id*. at 16 (citing Ex. 1006, 8).

In support, Petitioner points to the '344 patent Specification, which
distinguishes the "client" and "agent" based on roles, and not separate
hardware or operating system.  Pet. 17 (citing Ex. 1003 ¶ 50).  Petitioner

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

refers to the Specification's disclosure that a "'communication device' that 'contains three separate modules that run in parallel, namely, a client module 224, a peer module 226, and an agent module 228, each of which comes into play according to the specific role that the communication device 200 is partaking in the communication network 100 at a given time.'" *Id.* (emphasis omitted) (quoting Ex. 1002, 9:20–25).

### b. Patent Owner's Assertions

Patent Owner asserts that a person of ordinary skill in the art would understand the term "client device" to be a "consumer computer," or alternatively, to be a "consumer communication device." PO Resp. 11 (citing Ex. 2025 ¶¶ 64, 70). Patent Owner argues that these constructions are consistent with the claim language, the Specification, and the prosecution histories. *Id.* Patent Owner contends that a person of ordinary skill in the art would understand a client device is a communication device because the Specification states that "each communication device may serve as a client, peer, or agent" which "informs" a person of skill "that client 102, peers 112, 114, 116, and agent 122 are all 'client devices' in the context of the [S]pecification." *Id.* at 11–12 (citing Ex. 2025 ¶ 71; Ex. 1002, 4:44–50, 5:21–29).

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer by its disclosure of "a requesting client device ↔ proxy server ↔ proxy client device ↔web server architecture." PO Resp. 12 (citing Ex. 1002, 4:44–50, 5:21–29, 9:12–50; Ex. 2025 ¶ 73) (coloring omitted). Patent Owner alleges that the Specification explains that when executing the fetching method, "the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

requesting client device may be executing the client module 224 disclosed in
FIG. 6, while the proxy client device may be executing the agent
module 228 disclosed in FIG. 6." *Id*.  Based upon this, Patent Owner
contends that a person of ordinary skill in the art "would understand in the
context of the [S]pecification, a client device is a consumer computer with
specific software to operate in accordance with the claims." *Id.* at 12–13.

Referring to Figure 6 of the Specification, Patent Owner asserts that a
person of ordinary skill in the art would understand that "one 'client device'
may be configured to be the requesting client device and another 'client
device' may be configured to be the proxy client device." *Id*. at 13 (citing
Ex. 2025 ¶ 74).  In support, Patent Owner also refers to a modified,
annotated version Figure 3, reproduced below, alleging that agent 122 is
disclosed as a client device "that is selected, for example, because agent 122
is closest to the web server 152." *Id*. at 9, 13 (citing Ex. 1002, 5:27, 5:30–
34; Ex. 2025 ¶¶ 64, 75–76).  In this modified version of Figure 3, Patent
Owner inserts "Proxy Server 6" (outlined in green) between client 102
(outlined in purple) and agent 122 (outlined in red).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2



Patent Owner alleges that a person of ordinary skill would understand that the proxy server, as shown in modified Figure 3 above, "could be inserted between client 102 and agent 122," and that an architecture showing requesting client device (purple) ↔ second server (green) ↔ first client device (red) ↔ web server (blue) would correspond to the architecture client 102 ↔ second server 6 ↔ agent 122 ↔ web server 152, shown in Patent Owner's modified annotated Figure 3.  PO Resp. 7–8.

Patent Owner further asserts that in light of the Specification, "a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone."  PO Resp. 13–14 (citing Ex. 2025 ¶ 77 (citing Ex. 1002, 2:44–46 ("In the network 50, files are stored on computers of consumers, referred to herein as client devices." (emphasis omitted)))).

Patent Owner acknowledges that the district court rejected Patent Owner's construction equating "client device" with "consumer computer."

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

PO Resp. 14. Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 14–16. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the Specification, the Specification states that "computers of consumers" are "referred to herein as client devices." *Id.* at 14 (citing Ex. 2025 ¶ 77; Ex. 1002, 2:44–46). Patent Owner further asserts that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device, and that a consumer device is not a dedicated proxy server. *Id.* (citing Ex. 2025 ¶ 77). Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content. *Id.* at 15 (citing Ex. 1011, 11). Rather, Patent Owner argues, the common understanding of "consumer" as "a person who buys goods or services for their own use" is not a deviation from the use of the term in the Specification, and personal use is often distinguished from commercial use. *Id.* (citing Ex. 2030; Ex. 2031, 5; Ex. 2032, 4; Ex. 2033; Ex. 2034, 4; Ex. 2025 ¶ 78; 15 U.S.C. § 6809(9); 12 C.F.R. § 332). Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of consumers," and there were statements made during the prosecution of a grandparent application to the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

'344 patent that refer to this issue. *Id*. at 15–16 (citing Ex. 2025 ¶ 70; Ex. 1002, 2:44–46; Ex. 1019, 84).

Patent Owner contends that in the '344 patent, "a client device is not a server." PO Resp. 16. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction that a client device is unable to act as a server in all cases. *Id*. (citing Ex. 1011, 12). According to Patent Owner, a person of ordinary skill in the art would have understood that a client device is not a server in the context of the patent, and the MPEP does not require that a negative limitation be recited verbatim in the Specification. *Id*. (citing *Ex parte Parks*, 30 USPQ2d 1234, 1236 (Bd. Pat. App. & Inter. 1993)). Patent Owner argues that the Specification describes the shortcomings of using a proxy server as an intermediary, and therefore provides a reason to exclude a client device encompassing a proxy server. *Id*. at 16–17 (citing Ex. 1002, 2:24–32; Ex. 1011, 12; Ex. 2044 ¶ 84; *Santarus, Inc. v. Par Pharm., Inc*., 694 F.3d 1344, 1351 (Fed. Cir. 2012)).

Patent Owner contends that, in view of the recited architecture of the '344 patent claims that distinguishes between client devices and servers, the use of three interchangeable devices in a pathway would not disclose that architecture. PO Resp. 17 (citing Ex. 2025 ¶ 79). Patent Owner also argues that the recited architecture in the '344 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the use of a client device, rather than a proxy server, as an intermediary, and that this distinction is consistent with an *Alice*[8] order in the *Teso* district court

---

[8] *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

litigation. *Id*. at 17–18 (citing Ex. 2025 ¶ 80; Ex. 2021, 8–9); PO Sur-reply
2. Patent Owner further contends that the district court "repeatedly
acknowledged that a client device is not merely a general-purpose
computer." *Id*. at 17 (citing Ex. 2029, 14–15).

Patent Owner argues that a person of ordinary skill in the art would
have understood "that a client device is typically portable and easily moved,
like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 18
(citing Ex. 2025 ¶ 81). Patent Owner contends that a person of ordinary skill
in the art would be informed by statements made during prosecution that a
client device is not a dedicated network device, which typically uses a single
or relatively few connections, and is resource limited (e.g., bandwidth and
storage), unlike a server. *Id*. Patent Owner also argues that a person of skill
would have understood that a client device typically is understood "(a) to be
regularly switched off and taken offline; (b) to be capable of processing only
a limited number of requests at any given time . . . and/or (c) to have lesser
fault tolerance, lesser reliability, and lesser scalability, prioritizing value to
client device users over system costs." *Id*. at 18–19 (citing Ex. 2025
¶¶ 81– 82). Patent Owner asserts that a person of ordinary skill's
understanding of "client" would have been consistent with its plain and
ordinary meaning, which is "an application that runs on a personal computer
or workstation and relies on a server to perform some operations." *Id*. at 19
(citing Ex. 2025 ¶ 83; Ex. 2035; Ex. 2036, 5; Ex. 2037, 7). Patent Owner
contends that a person of ordinary skill would have understood that there are

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

structural differences between client devices and servers. *Id*. (citing Ex. 2025 ¶ 85).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of the Specification, a person of ordinary skill in the art would have understood that proxy server 6 must be structurally different from agent 122 and that "a server is not a client device and that a client device is not a server." PO Resp. 20 (citing Ex. 2025 ¶ 86). Patent Owner argues that "Petitioners' expert appears to agree that proxy server 6 of Figure 1 and agent 122 of Figure 3 would be operating in the same roles at a given point in time," so under the Board's preliminary constructions "Figure 3 collapses onto Figure 1" and fails to account for structural differences between a proxy server and a client device. *Id*. Patent Owner points to Dr. Freedman's testimony in the *Teso* district court litigation agreeing that in Figure 1, client devices 14 and 16 are operating in the role of a client and web server 32 is operating in the role of a server. *Id*. at 21–24 (citing Ex. 2025 ¶¶ 87–95; Ex. 2047, 282:1–285:6; 286:1–6). Patent Owner contends that for Figure 1 under the Board's preliminary role-based constructions, "proxy server 6 would be [] operating in the role of a client when receiving responses from web server 32 and [] operating in the role of a server when sending the received responses on to client devices 14,16," with Petitioner's expert's agreement. *Id*. at 24–25 (citing Ex. 2025 ¶ 96; Ex. 2026, 30:15–25; 31:14–21). Patent Owner asserts that for Figure 3 under the Board's preliminary role-based constructions, "client 102 is operating in the role of a client and web server 152 is operating in the role of a server" and "agent 122 would be [] operating in the role of a client when receiving responses from web server

17

Appx509

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

152 and [] operating in the role of a server when sending the received responses on to client device 102," with Petitioner's expert agreeing. *Id*. at 25–26 (citing Ex. 2025 ¶¶ 97–99). Patent Owner argues that the experts agree that proxy server 6 of Figure 1 and agent 122 of Figure 3 operate in the same roles at a given point in time and there is nothing to distinguish the architectures of Figures 1 and 3. *Id*. at 27 (citing Ex. 2025 ¶ 103). Patent Owner asserts that Figures 1 and 3 inform a person of ordinary skill in the art "that a server is not a client device and that a client device is not a server," so "role-based constructions are not appropriate because they fail to account for these structural differences between proxy servers and client devices." *Id*. (citing Ex. 2025 ¶ 104).

Patent Owner additionally refers to the prosecution history of U.S. Patent No. 10,069,936 ("the '936 patent"), the great grandparent of the '344 patent. PO Resp. 28–31. Patent Owner argues that this prosecution history "clearly distinguishes client devices from servers." *Id*. at 29 (citing Ex. 2025 ¶ 106). Patent Owner asserts that during prosecution, the applicant amended the claims to "specify that the 'devices' being used as intermediaries are 'clients' in contrast to the teachings of Garcia," which was a reference used by the examiner to reject the then-pending claims. *Id*. (citing Ex. 1019, 125). Patent Owner points to the applicant's statement that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality," and further that "[t]he Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id*. (citing Ex. 1019, 125 (emphasis omitted)). Additionally, Patent

18

Appx510

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Owner refers to the examiner's statement that "Garcia fails to teach a group of clients for data communication between the web server and a requesting client via one or more clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving the content from the selected client," contending that "the examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." *Id*. at 30 (citing Ex. 1019, 95; Ex. 2025 ¶ 108). Patent Owner also refers to the applicant's statement that "[c]lient devices, such as client 105 in the Garcia reference, are end-units that request information from servers, use client-related software . . . and are typically consumer owned and operated." *Id*. at 30 (citing Ex. 1019, 84 (emphasis omitted)). Patent Owner further asserts that "the examiner acknowledged that 'the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification.'" *Id*. at 31 (citing Ex. 1019, 17 (emphasis omitted)). Patent Owner contends that "this shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id*. (citing Ex. 2025 ¶ 111).

Patent Owner also refers to the prosecution history of U.S. Patent No. 10,257,319 ("the '319 patent"), which is the grandparent of the '344 patent, asserting that it shows that servers and client devices are not interchangeable general use computers. PO Resp. 32 (citing Ex. 2025 ¶ 113). In that prosecution, the applicant contended that "the claims involve specific networking of physical elements such as servers and clients,

19

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id*. (citing Ex. 1018, 163). Patent Owner further cites the applicant's statement that "the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device." *Id*. (citing Ex. 1018, 16–17). Patent Owner also refers to the prosecution histories of U.S. Patent No. 10,491,712 ("the '712 patent") and the '344 patent, arguing that the examiner acknowledged the "environment" of the claimed method, which "shows that the examiner appreciated the unique architecture disclosed . . . and the novel use of a proxy client device within that architecture." *Id*. at 33–34 (citing Ex. 1005, 11; Ex. 1041, 8–9; Ex. 2025 ¶¶ 116–117). Patent Owner also asserts that the examiner reviewed and initialed Crowds, RFC 1122, and RFC 2616 during the prosecution of the '344 patent. *Id*. at 34 (citing Ex. 2009, 6, 14, 18–19).

  *c. Analysis*

    For the reasons discussed below, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in out Institution Decision and we find applies here in view of the full record. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server. *See* PO Resp. 10–34.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

*i. Claim Language*

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[c], the first web server "send[s], to the web server over the Internet, the first URL" and in step 1[d], the first client device, "receive[s], the first web-page from the web server over the Internet," which serves to receive content from the Internet. *See* Ex. 1002, 19:21–23. In steps 1[c] and [d], the first client device is acting as a client in requesting and receiving content. In step 1[e], the first client device "send[s] the received first web-page to the second server." *See id*. at 19:24–35. In step 1[e], the first client device is acting as a server to forward content. *See* Ex. 1050, 28:8–11.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term. Pet. 14–16 (citing Ex. 1011, 11–12; Ex. 1014, 7–11); Pet. Reply 2–3. Patent Owner agrees that if the role-based construction were adopted, in its modified Figure 3, "agent 122 would be (i) operating in the role of a server when receiving requests from client device 102 and (ii) operating in the role of a client when sending requests to web server 1522," with Petitioner's expert agreeing to the same. PO Resp. 26 (citing Ex. 2025 ¶ 101).

Petitioner refers to Patent Owner's assertions in the *Teso* district court litigation, where Patent Owner identified client 102 with the "second server" and agent 122 to the "first client device" as shown in annotated Figure 3,

21

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

reproduced below, for claim 1 of '510 patent, which has substantially the same Specification as the '342 patent. Pet. Reply 14–15 (citing Ex. 1009, 20).

Independent claim 1 of the '510 Patent also recites a method that employs the same specific, concrete server-client device-web server architecture illustrated above with steps performed by the client device: A method for use with a <u>web server</u> that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method **by a first client device** comprising: establishing a Transmission Control Protocol (TCP) connection with a <u>second server</u>; sending, to the <u>web server</u> over an Internet, the first content identifier; receiving, the first content from the <u>web server</u> over the Internet in response to the sending of the first content identifier; and sending the received first content, to the <u>second server</u> over the established TCP connection, in response to the receiving of the first content identifier.



FIG. 3

As shown in annotated Figure 3 above, Patent Owner equated client 102 (green) to the "second server" and agent 122 (red) to the "first client device" in accordance with the roles required in the claim elements.[9]

---

[9] We recognize that Patent Owner modified its position in its Response to assert that both client 102 and agent 122 are both client devices. PO Resp. 7–8, 12–13 (citing Ex. 2025 ¶¶ 64, 73–76). We address the issue of two devices acting as client devices below in the discussion on modified Figure 3 in the discussion of Dr. Williams's testimony.

22

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

That is, Patent Owner asserts that the "first client device" (shown in red) is equivalent to agent 122, which sends the first content identifier to the web server, receives content requested from the web server, and sends that content to client 102 (the second server). Thus, under this presentation, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This assertion by Patent Owner reflects a role-based interpretation of the claim terms; different terms are defined by their function.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1014, 7–11. For instance, for related patents that share substantially identical specifications to that of the '344 patent, the district court found that under the steps of a claim, the "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1011, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1014, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the

23

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

claimed "client device." *Id*. We agree with the district court's construction of "client device" as a "communication device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1011, 12.

We note that Patent Owner's argument that a client device is not a server (PO Resp. 16) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server, as well as a server to forward content under the method claims. We discuss this issue further below in more detail.

### *ii. Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '344 patent Specification. The '344 patent Specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles:

> *Due to the functionality provided by software stored within each communication device*, which may be the same in each communication device, *each communication device may serve as a client, peer, or agent*, depending upon requirements of the network.

Ex. 1002, 4:46–50 (emphases added). Accordingly, the Specification states that the components identified in Figure 3 may perform different functions based on their stored software. *Id*. More specifically, the Specification explains that "each of [the software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the communication network 100 *at a given time*." Ex. 1002, 9:20–25 (emphasis added). The Specification thus supports the role-based function of the

24

Appx516

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Patent Owner argues that a person of ordinary skill in the art, when considering Figure 6 and associated text, would understand that "one 'client device' may be configured to be the *requesting client device* and another 'client device' may be configured to be the *proxy client device*." PO Resp. 13 (citing Ex. 2025 ¶ 74) (emphases added). In further support, Patent Owner refers to its modified annotated Figure 3, reproduced *supra* Section II.C.1.b, and asserts that a person of ordinary skill in the art would understand that client 102 (in purple) corresponds to the requesting client device client and agent 122 (in red) corresponds to the proxy client device. *Id*. (citing Ex. 2025 ¶¶ 75–76). Patent Owner contends that "[a]gent 122 is disclosed as a 'client device' (as opposed to a server) that is selected, for example, because agent 122 is closest to the web server 152." *Id*. (citing Ex. 2044 ¶ 76 (citing Ex. 1002, 5:27, 5:30–34)).

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, in which Patent Owner has inserted "proxy server 6" between "client device" and "agent." This configuration is not shown in any figure in the '344 patent or disclosed in the Specification. *See* Ex. 1050, 45:4–8. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2025 ¶ 64 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and the invention of Figure 3.

25

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Ex. 1002, 2:8–18, 2:24–32, 4:41–45.  But Dr. Williams provides no explanation or a rationale to combine the prior art with an embodiment of the invention.[10]  Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device," are disclosed, but we do not find that these characterizations are disclosed in the Specification.  In view of the lack of record support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '344 patent Specification's disclosures, we do not agree that it discloses the architecture of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server in the first place, as Patent Owner asserts.  *See* PO Resp. 12 (citing Ex. 1002, 4:44–50, 5:21–29, 9:12–50).  Moreover, we do not agree that Patent Owner's argument based upon "architecture" should govern the construction of "client device" in light of the claim language and the Specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time.  *See* Ex. 1002, 4:46–53, 9:20–26.  The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client

---

[10] Dr. Williams testifies that Petitioner's expert agreed that using a proxy server between a requesting client device and a web server would be well known to a person of ordinary skill in the art.  Ex. 1025, 33, n.1 (citing Ex. 2026, 93:15–24).  Even if true that a person of ordinary art knew that the modification could be done, the modified Figure 3 is not disclosed in the '344 patent and Patent Owner does not explain why the modified version of the Figure should direct claim construction.

26

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

device, the first server/second server, and the web server.'" Ex. 1014, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* district court litigation (Ex. 2021) are consistent with its understanding of the architecture required by the claims of the '344 patent and its "novel" use of a client device as an intermediary. PO Resp. 17 (citing Ex. 2025 ¶ 80; Ex. 2021, 8–9). We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopted here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2021. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id*. at 5. Further, after the *Alice* order issued, in February, 2021, the district court consistently maintained its claim constructions (Ex. 2029, 16).

Patent Owner argues that in the '344 patent, "a client device is not a server." PO Resp. 16. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in steps 1[c] and [d] in requesting and receiving content, and acts as a server in step 1[e] in sending content to the second server. *See* Ex. 1002, 19:21–25. Patent Owner has agreed that under the claim language, a device can have different functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

specifically not a server—is not supported by the specification."
Ex. 1011, 10.  The district court refers to the Specification's disclosure that a
"communication device" may act as a client, peer, or agent.  *Id*. at 12 (citing
related '319 patent, 4:48–49).  The district court also found, and we agree,
that although the patent does not list "servers" as "communication devices,"
"that is not sufficient to construe 'client device' as unable to act as a server
in all cases," in view of the case law that negative claim limitations are
"supported when the specification describes a reason to exclude the relevant
limitation."  *Id*. (citing *Santarus*, 694 F.3d at 1351).

Here, Patent Owner further argues that a person of ordinary skill
would understand that a client device is not a server—there are descriptions
of communications devices having client, peer, and agent modules, but no
server module and the MPEP "does not require that the negative limitation
be recited verbatim in the specification."  PO Resp. 16 (citing Ex. 2025
¶ 74).  We believe Patent Owner's reference is intended to refer to MPEP
§ 2173.05(i).  This MPEP Section states that any negative limitation "must
have basis in the original disclosure," and "[t]he mere absence of a positive
recitation is not basis for an exclusion."  MPEP § 2173.05(i).  Patent Owner
does not identify any disclosure in the Specification that states that a client
device cannot be a server.  Moreover, we note that under Patent Owner's
analysis in the *Teso* district court litigation, the claimed "first client device,"
which may act as a server in claim 1, is identified as "Agent 122" of Figure
3. Ex. 1009, 15.  As discussed, the Specification provides support that an

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

agent can act in different roles with software modules allowing different functions. Ex. 1002, 4:46–50.

Patent Owner also asserts that under a "role-based" construction, "Figure 3 collapses onto Figure 1." PO Resp. 20. According to Patent Owner, such constructions "do not account for structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3)." *Id*. In comparing Figures 1 and 3, Patent Owner recasts the alleged invention as being directed to the avoidance of "a proxy client device encompassing a proxy server," and ties that alleged objective (which is contrary to the description of these devices in the Specification) to the construction of the term "client device." *Id*. at 16–17 (citing Ex. 1002, 2:24– 32; Ex. 2044 ¶ 84). We do not agree with this argument as it is based solely on the alleged structure of proxy server as the point of the differentiation of the invention from the prior art. But the Specification makes it clear that these devices are capable of assuming different roles, and thus points to other alleged improvements, such as the agent performing different functions, and the use of an acceleration server, that serve to differentiate the disclosed invention from the prior art. Ex. 1002, code (57), Fig. 10. Here, the language that the applicant ultimately chose for claim 1 does not recite those improvements actually described in the Specification. Instead, Patent Owner more broadly claims the use of a "first client device" that functions as a proxy, that is, it acts as a client and as a server at different times, as discussed above. In sum, we find no support for a "proxy client device" in modified Figure 3, that Patent Owner presents as the claimed improvement over a "proxy server," for the reasons discussed above, that is, there is no

29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

support for a "proxy client device" or for modified Figure 3 in the Specification or the claims.

Similarly, Patent Owner argues that proxy server 6 of Figure 1 must be structurally different from agent 122 of Figure 3. PO Resp. 19. Patent Owner asserts that Petitioner's expert agrees that these devices would be operating in the same roles at a given point in time. *Id*. at 20. Patent Owner asserts that a server is not a client device and the structural differences should be accounted for in claim construction in order preserve claim validity. *Id*. (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc*., 279 F.3d 1357, 1367 (Fed. Cir. 2002)). We do not agree with this assertion. The Federal Circuit has held that claims should be construed to preserve validity only when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327. And a claim construction cannot be adopted "that is at odds with the clear language of the claim and the written description." *Rhine v. Casio, Inc*., 183 F.3d 1342, 1345 (Fed. Cir. 1999). We do not find that this is a circumstance where the claim term interpretation is ambiguous in view of the evidence of record based on the claim language and the written description, as discussed above. Thus, we do not adopt an alternative construction only to preserve the validity of claim 1.

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1012, 13. Petitioner also points to buttressing evidence in RPC 2616, which defines the terms "client"

30

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

and "server" based on roles, where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection."  Pet. 16 (citing Ex. 1006, 8 (emphases omitted)).  Thus, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '344 patent may act as a server as well as a client.

Patent Owner also contends that under Petitioner's assertions "any device that operates in the role of a client is a 'client device' and any device that operates in the role of a server is a 'server.'"  PO Sur-reply 1 (emphases omitted).  Patent Owner asserts that "[u]nder Petitioners' constructions, an intermediary device would be both a 'client device' and a 'server' albeit at different points in time."  *Id*.  Patent Owner argues that the proposed constructions improperly focus on a role being performed *at a given point in time*.  PO Resp. 11.  We disagree with Patent Owner's assertions that the under the proper construction the device has to act exclusively in only one role with one function at all times.  As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles.  In fact, to require that a device operate exclusively only in a single role and not be able to operate in different roles at different time is inconsistent with the language of claim 1, where the first client device has to act as a client and as a server at different times.  Nevertheless, the device must be capable of performing the roles required by the claim limitations. The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.  Ex. 1012, 14.  The district found

31

Appx523

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

that it could not do so because the components were separately recited, which indicated a distinction between the components. *Id*. at 14–15. The district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer ↔ computer ↔ computer architecture*." Ex. 1014, 10 (emphasis added). Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" *Id*. (emphasis omitted).

Patent Owner additionally argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices." PO Resp. 14 (citing Ex. 2025 ¶ 77; Ex. 1002, 2:44–46). Our view is that the Patent Owner takes the Specification's disclosure out of context. The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1002, 2:40–52. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id*. at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the

32

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

description of the claimed inventions." Ex. 1011, 11 (emphasis omitted). We also agree with the district court's finding that the Specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1011, 11; *see also* Ex. 1002, 1:54–59; PO Resp. 14.

Patent Owner additionally asserts that a person of ordinary skill would have understood that a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 18–19. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is distinguished from a commercial device and that a consumer device is not a dedicated proxy server. *Id*. at 14 (citing Ex. 2025 ¶ 77). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2025 ¶¶ 77, 81–82. We discuss the prosecution history below, but notably, Dr. Williams does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id*.

Accordingly, we find that the '344 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### iii. Prosecution History

Patent Owner argues that the prosecution history of the '344 patent, its parent (the '712 patent), its grandparent (the '319 patent), and its great grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")) support the conclusion that the claimed "client device" should be distinguished from a server.  PO Resp. 28–34.

Patent Owner points to statements in the prosecution history of the great grandparent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection.  PO Resp. 29–31 (citing Ex. 1019, 17, 84, 93, 125, 136; Ex. 2025 ¶¶ 106, 108, 111–112).  More specifically, Patent Owner asserts that the applicant argued that "the 'device' was equated in the Garcia reference to the cache server 306, which is clearly a dedicated device and performs a server functionality . . . and actually teaches away from identifying and using another client device for supporting a content request by a specific client."  *Id*. at 29 (citing Ex. 1019, 125 (emphasis omitted)).  Patent Owner refers to an examiner's response stating that Garcia "fails to teach a group of clients for data communication between the web server and a requesting client via . . . clients selected from the group and [] the selected client receiving the content from the web server and [] the requesting client receiving content from the selected client."  *Id*. at 30 (citing Ex. 1019, 95).  Patent Owner contends that this statement shows that "the examiner recognized a server cannot be equated to a client device."  *Id*. (citing Ex. 2025 ¶ 108).  Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in the reference client devices "are typically consumer owned and operated."  *Id*. at 30 (citing Ex. 1019,

Appx526

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

84–85) (emphasis omitted).  Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, **within its environment**, is allowable subject matter over the prior art."  *Id*. at 31 (citing Ex. 1019, 17).

The claims that were under consideration in the '936 patent prosecution were different than the claims at issue here.  A "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device," "client communication device," and "client(s)."  *See* Ex. 1019, 22–26; 115–119, 194–199, 246–256.  Similarly, the issued claims in the '936 patent recite "requesting client" and a separate "client," and the issued claims have multiple steps that differ from those of the '344 patent.  *See*, *e.g*., Ex. 1024, 19:16–52.  Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '344 patent.[11]  Further, considering the varying terms used, we do not find that the applicant's statements during prosecution on patentability regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope of the "client device" term used in the claims here.  *See* Ex. 1072, 349, 624–625; *In re Am. Acad. Of Sci. Tech Ctr*., 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction.").  Also, the examiner's

---

[11] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations.  Ex. 1019, 64, 94–95.

Appx527

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

statements do not reflect an understanding of any disavowal of the scope of any claim terms.  *See* Ex. 1019, 17.

Additionally, as discussed above, the '344 patent's claim language and Specification clearly support a role-based interpretation of the term "client device."  In contrast, the '936 patent prosecution is for a great grandparent of the '344 patent and also involved evolving claim term amendments.  S*ee Telcordia Techs., Inc. v. Cisco Sys., Inc*., 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification.").  For this reason, we find the '936 patent prosecution history to be less pertinent to the construction of the '344 patent claims than the claim language and Specification of the '344 patent itself.  As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.  *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317.  This is particularly true here, where the prosecution history at issue involves a great grandparent application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a grandparent to the '344 patent.  PO Resp. 32–33.  Patent Owner refers to applicant's argument that "the claims

36

Appx528

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id*. at 32 (citing Ex. 1018, 16). Patent Owner also cites the applicant's assertion that "the Examiner does not sufficiently establish that the 'ordered combination' of the recited elements also fails to 'transform the nature of the claim' into a patent-eligible application." *Id*. (citing Ex. 1018, 16). Patent Owner further cites the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." *Id*. at 33 (citing Ex. 1018, 9).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device." *See* Ex. 1018, 14–18.

Patent Owner additionally refers to the prosecution history of the parent '712 patent and '344 patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 33–34. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution of the '344 patent or the parent '712 patent, nor does the examiner indicate an understanding of any disclaimer.

37

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

*iv. Conclusion*

Based on evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

2. "*second server*"

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested clarification that the term is "a device that is operating in the role of a server and that is not the first client device." Ex. 1011, 14; Ex. 1014, 8. The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server." Ex. 1014, 11.

Petitioner proposes the adoption of the district court's construction of the term. Pet. 16. Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different than the client device. PO Resp. 34–37.

Patent Owner's arguments, in the most part, repeat those presented for the "client device." *See* PO Resp. 34–38. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id*.

38

Appx530

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1011, 14; Ex. 1014, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short of being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first web-page to the second server" in limitation 1[e], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments *supra* Section II.C.1 that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished. PO Resp. 35 (citing Ex. 2029, 20, 23). We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the server had to be capable of acting in the role of a server, and that a device

39

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

could not "act as a server and as a client simultaneously." Ex. 2029, 20–21.
Patent Owner also argues that the district court indicated that a "server" is
not a communication device. PO Resp. 36 (citing Ex. 1014, 10). However,
the district court found, and we agree, that "a component can be *configured*
to operate in different roles," so long as it does not serve in different roles
simultaneously, and although the Specification does "not include servers as a
type of 'communication device,' [ ] that is not sufficient to construe 'client
device' as unable to act as a server in all cases." Ex. 1014, 10. Additionally,
in view of the role-based construction for the components, we reject Patent
Owner's other arguments on required structure and characteristics of a
server. PO Resp. 36–39.

### 3. Other Terms

We determine that we need not expressly construe any other claim
terms to resolve the parties' disputes. *See Realtime Data, LLC v. Iancu*,
912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe
'only those terms . . . that are in controversy, and only to the extent
necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am.
Sci. & Eng'g*, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference
discloses each and every limitation of the claimed invention, either explicitly
or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir.
1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365
(Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose
every limitation of the claimed invention;" any limitation not explicitly

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

taught must be inherently taught and would be so understood by a person experienced in the field.); *In re Baxter Travenol Labs*., 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*E. Anticipation of Claims 1, 2, 6, 7, 16, and 18–23 By Crowds*

Petitioner contends that claims 1, 2, 6, 7, 16, and 18–23 are unpatentable under 35 U.S.C. § 102 because they are anticipated by Crowds. Pet. 17–43. Patent Owner argues that Crowds does not disclose all the limitations of the claims. PO Resp. 44–52.

We begin our discussion with summary of Crowds, and then address the evidence and arguments presented.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### 1. Crowds (Ex. 1004)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1004, 2.[12]  In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.*  In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.*  In Crowds, a user is represented "by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8.  "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2, reproduced below:

---

[12] Unless otherwise stated, citations to exhibits use the page numbers identified by the parties.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, above, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." Ex. 1004, 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

### 2. Discussion

#### a. Claim 1

The Petition asserts that Crowds discloses all the limitations of claim 1. Pet. 20–29. Below we consider the claim 1 limitations in turn.

43

Appx535

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### *i. Limitations of the Preamble*

Petitioner asserts that Crowds discloses the claimed web server of the preamble limitations[13] that responds to receiving a URL and stores a web page.  Pet. 20–21.  Petitioner refers to annotated Figure 2 of Crowds, reproduced below.



As shown in Petitioner's annotated version of Figure 2 of Crowds, above, Petitioner refers to the path 5→4→6→server (highlighted in green), with boxed "5" identified as the web server.  Pet. 20–21.  As shown, Petitioner identifies jondo 6 as the first client device (jondo 6).  *Id*. at 21.  Petitioner identifies the device on which jondo 4 resides as the claimed second server (jondo 4).  *Id*.

---

[13] The preamble provides antecedent basis for the terms "first client device" and "web server," among others.  We determine that the preamble is limiting.  *See* Ex. 1011, 9 (parties agree preambles of claims in related patents are limiting).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Patent Owner contends that Crowds does not disclose the architecture of the claims of the '344 patent.  PO Resp. 48–50.  We address these issues below in the discussion of limitation 1[b].  Patent Owner does not present any other arguments specific to this limitation.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses the limitations of the preamble of claim 1.

### ii.  Limitation 1[a]

Petitioner asserts that Crowds discloses limitation 1[a] because a person of ordinary skill in the art would understand that jondo 6 is operating in the role of a client, and that jondo 6 communicates with jondo 4, which operates in the role of a server.  Pet. 22 (citing Ex. 1003 ¶ 72).  More specifically, Petitioner asserts that "jondo 6 is a communication device because it is a device (user's computer) that, due at least in part to the jondo application residing on it, facilitates communication between other devices, including web server 5 and jondo 4 in the Mapped Path."  *Id*. (citing Ex. 1003 ¶ 73; Ex. 1004, 8–9).  Petitioner also contends that "[j]ondo 6 operates in the role of a client at least because, as the web request originating at jondo 5 is traveling to web server 5 in the Mapped Path, jondo 6 is serving as a client of web server 5."  *Id*. (citing Ex. 1003 ¶ 73; Ex. 1004, 8–9).

We agree with Petitioner that jondo 6 is operating in the role of a client because it serves as a client of web server 5 when requests originating at jondo 5 are sent by jondo 6 to web server 5 in the identified path.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Ex. 1004, 8–9.  We address other arguments related to the disclosure of a "first client device" below in the section on limitation 1[e].

Patent Owner does not present any arguments specific to this limitation.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated by a preponderance that Crowds discloses the limitation 1[a].

### iii.  Limitation 1[b]

Petitioner asserts that limitation 1[b] is performed by Crowds because jondo 6 receives a URL from jondo 4.  Pet. 23 (citing Ex. 1003 ¶ 76). Petitioner refers to Crowds disclosure that a user selects the jondo on her computer as her web proxy in her web browser for all services, including HTTP, and the request can result in "a retrieved web page."  *Id*. (citing Ex. 1004, 8, n.1, 14, 17). Petitioner argues that "jondo 4 operates in the role of a server (it serves at least jondo 5 by receiving jondo 5's web request and sending it on to jondo 6 and later sending web server 5's response (received from jondo 6) back to jondo 5, thus providing a service to jondo 5), and it is not the same physical device as jondo 6 (the first client device)."  *Id*. at 22–23 (citing Ex. 1003 ¶ 74; Ex. 1004, 8–9).

Patent Owner argues that "Crowds does not disclose a 'first client device' receiving the alleged first URL from a 'second server' as recited in claim 1."  PO Resp. 45 (citing Ex. 2025 ¶ 157).  Patent Owner contends that in the path "5→4→6→5 and in the context of jondo 4 sending a request for content to jondo 6, jondo 4 is operating in the role of a client and jondo 6 is operating in the role of a server."  *Id.*  Patent Owner argues that jondo 4

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

cannot be the "second server," "because at that point in time, when jondo 4 is sending a request to jondo 6, jondo 4 is operating in the role of a client, not a server." *Id*. Patent Owner asserts that Petitioner's expert agrees that at that point in time, jondo 4 is acting in the role of a client. *Id*. at 45–46 (citing Ex. 2047, 305:13–19).

Patent Owner's arguments are based on the premise that if a device is operating in a certain role performing a function *at a point in time*, it cannot be the claimed element. In other words, Patent Owner is asserting that a component has to operate exclusively in a single role in order to disclose a claim element. We are not persuaded by these contentions because we have not adopted Patent Owner's proposed claim constructions.

As discussed *supra*, Section II.C.2, we have adopted the district court's role-based construction, where a "server" is a "server that is not the client device," that is, the term means "a device that is operating in the role of a server and that is not the first client device." As Petitioner asserts, and we agree, Crowd's jondo 4 operates in the role of a server because it serves by sending the received jondo 5's web request on to jondo 6 and sending web server 5's response back to jondo 5. *See* Pet. 22–23; Ex. 1003 ¶ 74. We also agree with Petitioner that jondo 4 is not the same physical device as jondo 6 (the first client device). *Id*. Accordingly, jondo 4 meets the claim construction for the term "second server" adopted here. That jondo 4 may at times also act as a client is acceptable—as discussed *supra* Section II.C.1.c, a device may perform different roles with different functions at different times. Dr. Freedman's testimony (Ex. 2047, 305:13–29) reflects that

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

jondo 4 acts in the role of a server and can also act as a client, which is consistent with the role-based claim interpretation.

Patent Owner additionally argues that Crowds does not disclose the architecture of claim 1.  PO Resp. 48–50.  Patent Owner asserts that Crowds "does not disclose a 'first client device' between a 'second server' and a 'web server.'"  *Id*. at 48.  Patent Owner argues that the jondos of Crowds are user computers and there is no indication that these are dedicated user devices.  *Id*.  Patent Owner also asserts that there is no indication that Crowds's jondos are capable of a large number of connections or provide for scalability for increasing resources.  *Id*. at 48–49.  Patent Owner contends that the jondos of Crowds are interchangeable network devices and there are no differences between them, and it is not appropriate to call one jondo a "client device" and another a "server."  *Id*. at 49.  Patent Owner also asserts that does not disclose the second server ↔ first client device ↔ web server architecture of the '344 patent claims.  *Id*. at 49–50.  Patent Owner contends that Crowds does not disclose each limitation of claim 1 "as arranged in the claim" and one of ordinary skill in the art would "at once envisage" the claim 1 invention.  *Id*. at 50.  Patent Owner also asserts that Petitioner provides no analysis "regarding modifying jondo 4 to be a server under Patent Owner's proposed constructions."  *Id*. at 52–53 (citing Ex. 2025 ¶ 180; Ex. 2026, 26:8–18, 20:20–21:6).

Most of Patent Owner's arguments are based on claim constructions that we have not adopted and further on premises related to claim construction such as that certain components have specific structural requirements or a component has to operate exclusively in a single role in

48

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

order to disclose a claim element.  We are not persuaded by these
contentions for the reasons discussed above.

We additionally do not agree with Patent Owner's assertions that
Crowds does not disclose the elements "as arranged in the claim" and would
not "envisage" that arrangement or that Crowds does not disclose the second
server ↔ first client device ↔ web server architecture of the '344 patent
claims.  As shown in annotated Figure 2 of Crowds, and in Petitioner's
reliance on the path 5→4→6→server as discussed for the preamble above,
Crowds explicitly discloses the architecture of second server ↔ first client
device ↔ web server.  *See* Pet. 21; Ex. 1004, Fig. 2.  This is the
configuration as arranged in the claim.  As also discussed, we find that
Crowd's disclosures support Petitioner's contention that jondo 6 acts as the
claimed "first client device," jondo 4 acts as the claimed "second server,"
and as discussed below, and server 5 acts as the claimed "web server."  As
such, Petitioner demonstrates that Crowds discloses the components "as
arranged in the claim," and which could be understood by one of ordinary
skill in the art as depicted in the configuration of Figure 2.  We do not agree
with Patent Owner that relying on component that meets the claim
construction and also is in a configuration that is explicitly disclosed would
require any "modification."  *See* PO Resp. 52–53.

We have reviewed the evidence and argument, and on this record, we
determine that Petitioner has demonstrated that Crowds discloses
limitation 1[b].

49

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### iv. Limitation 1[c]

For limitation 1[c], Petitioner asserts that Crowds discloses that jondo 6 sends the first URL it received from jondo 4 to web server 5. Pet. 25 (citing Ex. 1003 ¶ 79). Petitioner argues that a person of ordinary skill in the art would understand that Crowds describes a request traveling from the initiating jondo device (jondo 5) to the intended web server (web server 5) through the intermediate jondo devices (jondos 4 and 6). *Id.* (citing Ex. 1003 ¶ 81; Ex. 1004, 8–9). Patent Owner does not present any additional arguments specific to this limitation. *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[c].

### v. Limitation 1[d]

For limitation 1[d], Petitioner asserts that Crowds discloses "jondo 6 receives a web page from web server 5 in response to sending the URL to web server 5." Pet. 27 (citing Ex. 1003 ¶ 84; Ex. 1004, 8–9). Petitioner argues that a person of ordinary skill in the art would have understood that Crowds discloses that web server 5 stored a web page identified by that URL, and because Crowds discloses replies from web servers following the same path (in reverse) as the request, jondo 6 receives web server 5's reply in response to jondo 6 sending that URL to web server 5, with the reply containing a web page. *Id.* (citing Ex. 1003 ¶ 85; Ex. 1004, 8, n.1, 9, 14, 17). Patent Owner does not present any additional arguments specific to this limitation. *See generally* PO Resp.; PO Sur-reply.

50

Appx542

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[d].

### vi. Limitation 1[e]

For limitation 1[e], Petitioner asserts that in Crowds, "jondo 6 sends the web page it receives from web server 5 to jondo 4, in response to jondo 4 receiving the URL identifying the web page from jondo 5." Pet. 28 (citing Ex. 1003 ¶ 87; Ex. 1004, 8–9). Petitioner argues that in Crowds, "when jondo 6 sends content (i.e., the web page it receives from web server 5) to jondo 4 upon receiving that content from web server 5, it does so 'in response to *the receiving of the first URL*.'" *Id.* at 28–29 (citing Ex. 1003 ¶ 88).

Petitioner asserts that a person of ordinary skill in the art "would have understood that jondo 6 is a communication device because it is a device (user's computer) that, due at least in part to the jondo application residing on it, facilitates communication between other devices, including web server 5 and jondo 4 in the Mapped Path. Pet. 22 (citing Ex. 1003 ¶ 73; Ex. 1004, 8–9). Petitioner also contends that "[j]ondo 6 operates in the role of a client at least because, as the web request originating at jondo 5 is traveling to web server 5 in the Mapped Path, jondo 6 is serving as a client of web server 5." *Id.* (citing Ex. 1003 ¶ 73; Ex. 1004, 8–9).

Patent Owner asserts that Crowds does not disclose a "first client device" sending the received first web-page to a "second server" as recited in claim 1. PO Resp. 47 (citing Ex. 2025 ¶ 160). Patent Owner contends that Petitioner argues that jondo 6 sends the received first content to jondo 4

51

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

in the path 5→4→6→5. *Id.* (citing Pet. 28). Patent Owner argues that jondo 6 cannot correspond to the "first client device" "because at that point in time, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client." *Id.* (citing Ex. 2025 ¶ 160). Patent Owner also contends that "jondo 4 cannot correspond to the 'second server' as Petitioners allege because at that point in time, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server." *Id.* (citing Ex. 2025 ¶ 160).

We agree with Petitioner that jondo 6 meets the claim construction of a "client device" adopted here, that is, a "communication device that is operating in the role of a client." More specifically, as Petitioner asserts, and we agree, jondo 6 is a communication device because its application facilitates communication between other devices and it operates in the role of a client when the web request travels to web server 5. Pet. 22. We do not agree with Patent Owner's arguments that jondo 6 is not disclosed by Crowds. As discussed for limitation 1[b], it is acceptable that jondo 6 may also act as a server at times. Under the claim construction adopted, a device may perform different roles with different functions at different times. For instance, as discussed, under the language of claim 1, a first client server acts as both a server and client. Jondo 4, which meets the construction of the term "second server," may also act in the role of a client at times for similar reasons.

We also agree with Petitioner (Pet. Reply 10) that even if Patent Owner's proposed construction that a "client device" is a "consumer computer" is adopted (PO Resp. 11), Crowd's jondo 6 meets that

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

construction.  Crowds discloses that it utilizes users "into a large and geographically diverse," using their own computer, to act as the "jondos." Ex. 1004, 1, 8.  Dr. Williams agrees that the user computers of Crowds are "consumer computers."  Ex. 1050, 8:14–9:16.

### vii. Conclusion

We note that Patent Owner has presented evidence of secondary considerations.  *See* PO Resp. 57–75.  Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102.  *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 1 of the '344 patent.

### b. Claims 6 and 7

Claim 6 recites

6. The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol ( HTTP ) server, the third server responds to HTTP requests and stores a second content identified by a second URL, the method by the first client device further comprising:

> receiving the second URL;

> sending, to the third server over the Internet in response to the receiving, the second URL; and

> receiving the second content from the third server over the Internet in response to the sending.

Ex. 1002, 19:51–61.

Claim 7 depends from claim 6.

53

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Petitioner asserts that Crowds discloses the limitations of claim 6 by the additional path 3→1→6→server, as shown in annotated Figure 2 of Crowds, reproduced below. Pet. 33.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In annotated Figure 2, above, the path 3→1→6→server is shown in blue. Pet. 33–34 (citing Ex. 1004, 8–9; Ex. 1003 ¶ 96). Petitioner asserts that web server 3 (in square box) meets the claimed third server and, in the blue path, jondo 6 (first client device) receives a URL originating from the device on which jondo 3 resides, from the device on which jondo 1 resides, and sends that URL to web server 3 over the Internet in response to that receiving. *Id.* at 35 (citing Ex. 1004, 8–9, 24, Fig. 6; Ex. 1003 ¶ 101).

Patent Owner argues that in the blue path of 3→1→6→web server 3 Crowds does not disclose a first client device receiving the second URL "because *at that point in time*" when jondo is receiving the second URL from jondo 1, "jondo 6 is operating in the role of a server, not a client." PO

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Resp. 51 (citing Ex. 2025 ¶ 173) (emphasis added).  Patent Owner argues that claim 7 depends from claim 6, and also fails by the dependence.  *Id*. at 51.  We do not agree with these arguments for the same reasons discussed above for limitations 1[b] and [e]: under the claim construction adopted, a device may perform different roles with different functions at different times.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 6 and 7.

### c. *Claim 20*

Claim 20 depends from claim 1, further reciting: "wherein the first web-page comprises audio, or video content, and wherein the communicating comprises establishing a Transmission Control Protocol (TCP) connection with a second server."  Ex. 1002, 20:59–62.  Petitioner asserts that Crowds teaches that the communication between jondo 6 and jondo 4 comprises establishing a TCP connection between them, wherein "jondo 6 send[s] a message to jondo 4 containing jondo 6's IP address during, as part of, or in response to a start-up of jondo 6."  Pet. 29 (citing Section VII.A.8), 29; Ex. 1003 ¶¶ 89, 108.  In particular, "Crowds states that each jondo in the path 'receives the [first user] request' from the prior jondo and 'determines whether or not to forward the request to another jondo' or complete the path and 'submit[] the request to the end server for which the request was destined,'" which a person of ordinary skill in the art would recognize as being a communication with a TCP connection.  *Id*. at 30 (citing Ex. 1004, 8 (failures "detected by the TCP/IP connection to the jondo

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

breaking or being refused."); Ex. 1003 ¶ 92).  Patent Owner repeats the same arguments discussed for limitations 1[b] and [e], which is that in Crowds "when a jondo is admitted to a crowd, that jondo does not establish any TCP connections with other jondos until that first jondo receives a request for content from the user's browser" and "*at that point in time*, jondo 4 is operating in the role of a client and jondo 6 is operating in the role of a server."  PO Resp. 52 (citing Ex. 2025 ¶¶ 178–179) (emphasis added).  We do not find these arguments undermine Petitioner's showing of Crowd's disclosure of the limitations of claim 20 for the reasons discussed above under limitations 1[b] and [e].

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 20.

### d.  Claims 2, 16, 18, 19, and 21–23

Petitioner presents evidence and arguments in support of Crowds's disclosure of the limitations of claims 2, 16, 18, 19, and 21–23.  Pet. 29–43. Patent Owner does not present any arguments specific to these claims.  *See generally* PO Resp.; PO Sur-reply.

We have reviewed the evidence and argument, and on this record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 2, 16, 18, 19, and 21–23.

56

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### F. Obviousness of Claims 1, 2, 6, 7, 16, 18–25, 29, 30, 39, and 41–46 over Crowds

#### 1. Prior Art Teachings and Alleged Teaching Away

Petitioner contends that claims 1, 2, 6, 7, 16, 18–25, 29, 30, and 41–46 would have been obvious over Crowds. Pet. 17–51. In addition to the arguments and evidence presented on anticipation, for limitation 1[c], Petitioner asserts, in the alternative, that a person of ordinary skill in the art would have found the identified path in Crowds "to have operated over the Internet." *Id*. at 27. And in addition to the arguments and evidence presented for anticipation, for claim 24, which claims an additional web server, Petitioner asserts that under Crowds the use of additional web servers are disclosed which may be used for web page storage. *Id*. at 43–48 (citing, *inter alia*, Ex. 1004, 8–9 ("[s]ubsequent requests initiated at the same jondo follow the same path (except perhaps going to a different end server).").

Patent Owner argues the Petitioner's obviousness analysis is deficient. PO Resp. 52–57. We disagree. For example, Patent Owner argues that Crowds teaches away from the claimed methods of the '344 patent because: 1) Crowds does not provide the initiator with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 55–57.

For the first issue, Patent Owner argues that Crowds does not provide anonymity for the originating requesting jondo. PO Resp. 55–56. More specifically, Patent Owner asserts that based on the flip of a biased coin, a jondo may send a request directly to the target web server. *Id*. (citing Ex. 2025 ¶ 187). We do not find this argument persuasive because Crowds

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

discloses that a goal of the use of the jondos is to provide anonymity by routing the messages through other jondos.  *See* Ex. 1004, 2–5.  And, while the jondo can select itself for routing, given that multiple jondos are selected in a path, other jondos will generally be selected for anonymity.  *See id*. at 8.  Moreover, anonymity is not a limitation of the claims.  As to the third issue, a "purposeful" selection of a device is also not claimed.  Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue.  *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc*., 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).  As to the second issue, of Crowds's latency, Patent Owner does not explain, nor does Dr. Williams provide support for, why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim.  *Galderma Labs., L.P. v. Tolmar, Inc*., 737 F.3d 731, 738 (Fed. Cir. 2013).  Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1004, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims.  *See Meiresonne v. Google, Inc*., 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Accordingly, we do not find that Crowds teaches away from the claimed invention of the '344 patent.

Patent Owner also argues that Crowds does not disclose the claimed architecture or teach modifying jondo 4.  PO Resp. 52–53.  We have addressed those arguments above and do not find them persuasive for the same reasons.  Patent Owner also argues that the teachings as to claim 24 are

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

deficient for the same reasons as claim 1, which we do not find persuasive as discussed above. *Id*. at 53–54.

We find that Petitioner's evidence and argument show that one of ordinary skill in the art would be motivated to modify Crowds as asserted by Petitioner and as such, Crowds teaches the limitations of claims 1, 2, 6, 7, 16, 18–25, 29, 30, 39, and 41–46.

Patent Owner also asserts that the nonobviousness of the claims is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise, and we address those issues below.

### 2. Objective Indicia of Nonobviousness

Patent Owner asserts that nonobviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–75; PO Sur-reply 23–27. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which it contends do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 22–26.

### a. Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in

59

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies

60

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b. Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "commercialized a novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods." PO Resp. 57 (citing Ex. 2025 ¶ 133). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service."

61

Appx553

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

*Id.* at 57–58 (citing Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 71 (citing Ex. 2046, 4, 45; Ex. 2025 ¶ 192). According to Patent Owner, "just last year alone," its "residential proxy service generated revenues of $53.7 million." *Id.* at 70 (citing Ex. 2025 ¶ 141). Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* (citing Ex. 2025 ¶ 140).

Patent Owner asserts that its "residential proxy service practices the methods claimed in the '344 [p]atent," and provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 6–9, 16, 18–25, 29–32, 39, and 41–46 of the '344 [p]atent." PO Resp. 59–68. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '344 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 68. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '344 [p]atent and is coextensive with them." *Id.* Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service is (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id*. at 69. Finally, Patent Owner argues that "the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

district court found that sufficient nexus was established." PO Sur-reply 23
n.12 (citing Ex. 2020, 4).

Petitioner responds that Patent Owner "has failed to carry its burden
of showing that any of its purported secondary considerations has the
requisite nexus to the claimed invention." Pet. Reply 22. Petitioner asserts
that Patent Owner's secondary considerations arguments are irrelevant
because they are based on the use of a "residential proxy service" and
"residential consumer computers." *Id*. at 23. According to Petitioner, "the
first client device does not require (nor do any of the Challenged Claims
require) the use of a consumer computer, much less a 'residential' consumer
computer." *Id*. Petitioner further contends that "[l]ikewise, none of the
Challenged Claims requires that the first client device have a 'residential IP
address.'" *Id*. Petitioner asserts that the challenged claims also do not
require "scalability" and the "commercial success evidence lacks the
required nexus for at least this reason alone." *Id*. Petitioner also argues that
Patent Owner's expert testified that Patent Owner's alleged prior art-
distinguishing feature, the use of a consumer computer as the claimed first
client device, was already present in the prior art. *Id*. at 24 (citing Ex. 1050,
8:14–9:16).

We find that Patent Owner has failed to establish a nexus between the
challenged claims and the products that Patent Owner relies on to show
commercial success. First, we find that Patent Owner has not established a
presumption of nexus because it has not shown that the products that it relies
on for commercial success embody and are coextensive with the challenged
claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner

63

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.  For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses."  PO Resp. 69; *see id.* at 57 (pointing to Patent Owner's "novel 'residential proxy service' that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address"), 71 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services").

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses.  Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device."  *See supra* Section II.C.1.  At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus.  *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74.  As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims.  *See* PO Resp. 57–59, 68, 71.  Therefore, Patent Owner has failed to prove that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established."  PO Sur-reply 23 n.12 (citing Ex. 2020, 4).  Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention."  Ex. 2020, 4.  The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation.  It is also not clear from evidence of record in this proceeding whether the district court actually made a finding on the merits of nexus, or simply determined

65

Appx557

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 72. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that web site could still likely identify data center server IP addresses as proxy addresses" because there "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2025 ¶ 193). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "residential IP network" solves the need to "dramatically increase the [number] of IP addresses that can be included in a proxy network." *Id.* (citing Ex. 2025 ¶ 193; Ex. 2048, 7; Ex. 2049, 182:22–197:21).

Petitioner responds that there is no nexus between the products that allegedly filled the long-felt need and the challenged claims. Pet. Reply 24–25. Petitioner also contends that Patent Owner provides no objective evidence of a problem's existence. *Id.* at 25.

For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

service" including proxy client devices that "have residential IP addresses." PO Resp. 72.  As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d. Copying

Patent Owner argues that "[d]uring the jury trial in the Tex. Litigation [*Teso* district court litigation], evidence of Oxylabs copying Bright Data's residential proxy service, then under the name 'Hola,' was presented."  PO Resp. 73 (citing Ex. 2025 ¶ 194).  Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7, 152:8–153:6; Ex. 2025 ¶ 194).  Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 73–74 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6; Ex. 2025 ¶ 195).  "This" testimony, according to Patent Owner, "is strong evidence of copying." *Id.* at 74 (citing Ex. 2025 ¶ 195).

Petitioner responds that there is no nexus between the products that were allegedly copied and the challenged claims.  Pet. Reply 25.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

For similar reasons as for commercial success and long-felt need, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 73–74. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

*e. Industry Praise*

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '344 [p]atent as described above." PO Resp. 75 (citing Ex. 2025 ¶ 197). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* (citing Ex. 2025 ¶ 197).

Petitioner responds the industry praise evidence fails for the same reasons as those for commercial success. Pet. Reply 25.

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 75. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

68

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

### 3. Conclusion on Obviousness

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit because Patent Owner has not shown nexus with the claimed invention. Thus, weighting secondary considerations together with Petitioner's evidence of obviousness, Petitioner has established the obviousness of the challenged claims 1, 2, 6, 7, 16, 18–25, 29, 30, 39, and 41–46 of the '344 patent in view of Crowds.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6, 7, 16, 18–25, 29, 30, 39, and 41–46 would have been obvious over Crowds.

### G. Obviousness of Claims 8, 9, 31, and 32 over Crowds and RFC 1122 and Claims 10, 11, 13, 33, 34, and 36 over Crowds and RFC 2616

Petitioner asserts that claims 8 and 9 would have been obvious over Crowds and RFC 1122 and claims 10, 11, 13, 33, 34, and 36 would have been obvious over Crowds and RFC 2616. Pet. 51–64.

RFC 1122 is titled "Requirements for Internet Hosts – Communication Layers" and provides requirements for link layer, Internet layer, and transport protocols. Ex. 1040, 1. RFC 1122 was published in October 1989, and Dr. Freedman testifies that it was published by established standards organizations and was intended to be viewed by interested Internet engineering audience at large. *Id*.; Ex. 1003 ¶ 63. RFC 2616 is titled "Hypertext Transfer Protocol -- HTTP/1.1" and it "specifies an Internet standards track protocol for the Internet community."

69

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

Ex. 1006, 1. RFC 2616 was published in 1999 and Dr. Freedman testifies that it "was the definitive specification for HTTP version 1.1 protocol." *Id.*; Ex. 1003 ¶ 66.

Claim 8 depends from claim 1 and further recites "further comprising periodically communicating over the TCP connection between the second server and the first client device." Ex. 1002, 19:65–67. Claim 9 depends from claims 8 and further recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." *Id*. at 20:1–3. Claims 31 and 32 have similar limitations. For claims 8 and 9, Petitioner asserts that a person of ordinary skill would have modified Crowds so that for a given path the jondo device would "periodically communicate by exchanging TCP keep-alive messages with each other over established TCP connections" in accordance with RPC 1122. Pet. 54 (citing Ex. 1003 ¶ 141; Ex. 1040, 102). Petitioner asserts that a person of ordinary skill in the art "would have been motivated to implement TCP keep-alives on Crowds' jondos to detect when a peer jondo has crashed and to prevent termination of the TCP connection due to inactivity." *Id*.

Claim 10 depends from claim 1, and further recites "determining, by the first client device, that the received first web-page, is valid." Ex. 1002, 20:4–6. Claim 11 depends from claim 10, and further recites "wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." *Id*. at 20:6–9. Claim 13 depends from claim 1, and recites:

> 13. The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of

70

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

> the Hypertext Transfer Protocol (HTTP) request, the receiving and
> storing of first content, the receiving of the first URL, and the sending
> of the part of, or the whole of, the stored first content, and the
> sending of a part of, or the whole of, the stored first web-page, the
> method is further preceded by:
>
> > downloading, by the first client device from the Internet, the
> > software application, and
> >
> > installing, by the first client device, the downloaded software
> > application.

Ex. 1002, 20:20–27.

Claims 33, 34, and 36 contain similar limitations to claims 10, 11, and
13, respectively.

Petitioner argues that as to claim 10, it would have been obvious for a
person of ordinary skill in the art to modify Crowds to cache content as
described in RFC 2616.  Pet. 58.  Petitioner asserts that caching was a well-
known functionality to a person of ordinary skill in the art "that
'significantly improve[d] performance' by 'eliminat[ing] the need to send
requests in many cases, and [] eliminat[ing] the need to send full responses
in many other cases'" and the implementation would have benefited Crowds.
*Id*. (citing Ex. 1003 ¶ 145; Ex. 1006, 47).  Petitioner explains that with this
implementation, "jondo 6 would have sent a 'conditional request' to web
server 5 containing the 'cache validator' for the cached web page," and "if
the web page was valid, jondo 6 would have received from web server 5 a
response with a 'special status code,'" which teaches the limitations of
claims 10 and 11.  *Id*. at 60 (citing Ex. 1006, 54; Ex. 1003 ¶ 146).

For claim 13, Petitioner asserts that a person of ordinary skill in the art
"would have understood that a jondo is a software application that includes

71

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

computer instructions." Pet. 62 (citing Ex. 1003 ¶ 150).  Petitioner argues that it would have been obvious to a person of ordinary skill in the art that "in view of Crowds authors' desire to widely distribute the jondo application for that application to have been resident on jondo 6 after downloading same over the Internet and then installing same on the device." *Id*. at 61 (citing Ex. 1003 ¶ 149; Ex. 1004, 2, 3, 25).  Petitioner also asserts that it would have been obvious to a person of skill "to modify Crowds in view of RFC 2616 to cache content," as discussed for claim 10, and "[i]n the modified Crowds, the jondo software computer instructions would have caused a processor in jondo 6 to cache." *Id*. at 62–63 (citing Ex. 1003 ¶ 151).  Further, "[i]n Crowds modified by RFC 2616, the 'most up-to-date response held by the cache' of jondo 6 . . . would have been the stored web page jondo 6 received from web server 5," and a person of skill would have known that it would have been advantageous for jondo 6 and other jondo devices "to implement such send-stored-content functionality because it sped up web access times." *Id*. at 63 (citing Ex. 1003 ¶ 152).

Patent Owner only asserts that Petitioner provides no analysis that RFC 1122 or RFC 2616 that would cure the deficiencies of Crowds as to claim 1, and does not present any arguments specific to these claims.  PO Resp. 55.

We have reviewed Petitioner's evidence and arguments and find that the references teach the limitations of the claims, with motivation to support the combination of the prior art references.

For the reasons explained *supra* Section II.F.2, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

need, copying, and industry praise lacks merit because it does not show a nexus with the claimed invention.  Thus, weighting secondary considerations together with Petitioner's evidence of obviousness, Petitioner has established the obviousness of the challenged claims.

Having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 8, 9, 31, and 32 would have been obvious over Crowds and RFC 1122 and claims 10, 11, 13, 33, 34, and 36 would have been obvious over Crowds and RFC 2616.

## III. MOTIONS TO SEAL

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2039, 2040, 2041–2044, and 2025 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order.  Paper 15; Ex. 2062.  Patent Owner asserts that Exhibit 2039 contains sensitive technical information, Exhibits 2040–2044 contain source code and related files, Ex. 2045 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporates some of the sensitive information.  Paper 15, 2–7.  Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, which it has taken steps to guard against disclosure, which outweighs the public's interests.  *Id.*  This Motion is unopposed.

We have reviewed the exhibits at issue, including the redacted portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

discussed in the Motion.  We grant the Motion to Seal and the associated request to enter the Protective Order.  Paper 15; Ex. 2062.

Patent Owner filed another Motion to Seal, which seeks to seal Exhibit 2065.  Paper 21, 2.  Patent Owner asserts that Exhibit 2065 is an email making corrections to source code, which has not been publicly disclosed, and steps have been taken to guard against its disclosure, and Patent Owner would be harmed by disclosure of this information.  *Id*. at 2–4. Petitioner does not oppose this Motion to Seal.

We have reviewed Exhibit 2065.  We find that the information is sensitive and falls within the criteria for protection.  Accordingly, we grant Patent Owner's Motion to Seal Exhibit 2069 (Paper 21).

### IV. CONCLUSION[14]

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that claims challenged claims 1, 2, 6–11, 13, 15, 16, and 18–23 of the '344 patent are unpatentable.  In summary:

---

[14] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2). Patent Owner is further reminded that under 37 C.F.R. 42.73(d)(3)(i), a patent owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent a claim that is not patentably distinct from a cancelled claim.

74

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 6, 7, 16, 18–23 | 102 | Crowds | 1, 2, 6, 7, 16, 18–23 | |
| 1, 2, 6, 7, 16, 18–25, 29, 30, 39, 41–46 | 103 | Crowds | 1, 2, 6, 7, 16, 18–25, 29, 30, 39, 41–46 | |
| 8, 9, 31, 32 | 103 | Crowds, RFC 1122 | 8, 9, 31, 32 | |
| 10, 11, 13, 33, 34, 36 | 103 | Crowds, RFC 2616 | 10, 11, 13, 33, 34, 36 | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, 41–46 | |

V. ORDER

Accordingly, it is

ORDERED that claims 1, 2, 6–11, 13, 16, 18–25, 29–34, 36, 39, and 41–46 of U.S. Patent No. 11,044,344 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motions to Seal (Papers 15, 21) are *granted*;

FURTHER ORDERED that the request to enter the protective order is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

76

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00353
Patent 11,044,344 B2

PETITIONER:

Mark T. Garrett
Daniel S. Leventhal
James G. Warriner
NORTON ROSE FULBRIGHT
mark.garrett@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
jim.warriner@nortonrosefulbright.com

PATENT OWNER:

Thomas M. Dunham
Elizabeth A. O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

77

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                        Paper 53
Tel: 571-272-7822                    Entered: September 22, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB;
OXYSALES, UAB; AND CORETECH LT, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

———————————————

IPR2021-01492[1]
Patent 10,257,319 B2

———————————————

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges.*

GIANNETTI, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

———————————

[1] Joined by the petitioners in IPR2022-00861.

IPR2021-01492
Patent 10,257,319 B2

## I.   INTRODUCTION

On September 3, 2021, NetNut Ltd. (NetNut") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1, 2, 12, 14, 15, 17–19, and 21–29 (the "challenged claims") of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent"). Patent Owner, Bright Data Ltd.,[2] filed a Preliminary Response (Paper 9, "Prelim. Resp.").

We determined that NetNut's Petition established a reasonable likelihood that it would prevail with respect to at least one claim, and on March 21, 2022, we instituted *inter partes* review as to all challenged claims of the '319 patent and all grounds of unpatentability asserted in the Petition. Paper 12 ("Institution Dec.").

On April 18, 2022, Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and coretech lt, UAB (collectively, "Petitioner")[3] filed a "substantially identical" petition challenging the same claims of the '319 patent on the same grounds as the Petition filed by NetNut, accompanied by a request for joinder to this proceeding. IPR2022-00861 Papers 1, 7.

On May 24, 2022, NetNut and Patent Owner submitted a joint motion to terminate this proceeding as to NetNut, as a result of a settlement. Paper 17. On May 27, 2022, we granted the motion and terminated NetNut as a party to this proceeding but did not terminate the proceeding. Paper 20.

---

[2] Bright Data Ltd. was formerly known as Luminati Networks, Ltd. *See* Pet. 1; Prelim. Resp. 11 n.8.

[3] Our references to "Petitioner" also include NetNut prior to its termination as a party.

2

Appx648

IPR2021-01492
Patent 10,257,319 B2

On October 19, 2022, we instituted *inter partes* review in IPR2022-00861 and granted the joinder request.  IPR2022-00861 Paper 19.[4]

Following institution of this proceeding, Patent Owner filed a Response.  Paper 31 ("PO Resp."), Petitioner filed a Reply (Paper 40, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 41, "PO Sur-reply").

An oral hearing was held on June 9, 2023.  A transcript of that hearing is part of the record.  Paper 51 ("Hearing Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a).  For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable.

## II.  BACKGROUND
### A.  Related Matters

The parties identify several district court proceedings involving the '319 patent and a related patent, U.S. Patent No. 10,484,510 ("the '510 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "*NetNut* Litigation");[5] and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "*Teso* Litigation").  Pet. 2–3; Paper 4, 1–2.

---

[4] On August 23, 2022, the USPTO Director, *sua sponte*, vacated our initial decision denying *inter partes* review in IPR2022-00861 and remanded the case to the Board.  *See* IPR2022-00861 Paper 18.

[5] Patent Owner alternatively refers to this case as the "*NetNut II* Litigation." *See* Prelim. Resp. 25.

3

IPR2021-01492
Patent 10,257,319 B2

The parties also identify a number of district court actions involving patents related to the '319 patent. *See* Pet. 3–4; Paper 4, 2–3.

The '319 patent was previously before the Board in IPR2020-01266 (institution denied). Pet. 4; Paper 4, 1. The '510 patent is involved in IPR2021-01493 (pending), and was previously before the Board in IPR2020-01358 (institution denied). Pet. 5; Paper 4, 1. The parties also identify a number of other USPTO proceedings involving patents related to the '319 patent. *See* Pet. 4–5; Paper 4, 2.

In addition, Patent Owner identifies *ex parte* reexaminations requested for the '319 and '510 patents, respectively, Control No. 90/014,875 and Control No. 90/014,876. Paper 6, 1–2; Prelim. Resp. 17. Those reexamination proceedings have been stayed by the Board. IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

### B. Real Parties-in-Interest

The Petition filed by NetNut identifies NetNut Ltd. as the only real party-in-interest. Pet. 2. The petition in IPR2022-00861 identifies Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and coretech lt, UAB as the real parties-in-interest. IPR2022-00861 Paper 1, 3. Patent Owner identifies Bright Data Ltd. as the only real party-in-interest. Paper 4, 1.

### C. The '319 Patent (Ex. 1001)

The '319 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, (54). According to the '319 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." *Id.* at 1:54–56. The patent states that other "attempts

4

IPR2021-01492
Patent 10,257,319 B2

at making the Internet faster for the consumer and cheaper for the
broadcaster," such as proxy servers and peer-to-peer file sharing, have
various shortcomings. *Id.* at 1:58–59; 2:24–2:32; 2:59–3:3.

The '319 patent describes a system and method "for faster and more
efficient data communication within a communication network," such as in
the network illustrated in Figure 3, reproduced below (*id.* at 4:41–44):



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100
including a number of communication devices. *Id.* at 4:43–45. Due to the
functionality provided by software stored within each communication

5

IPR2021-01492
Patent 10,257,319 B2

device, "each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:46–50.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:8–14.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such

6

IPR2021-01492
Patent 10,257,319 B2

a case, the agent may then provide the client with the list of peers and checksums of the chunks[6] that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

### D. Illustrative Claim

The '319 patent has 29 claims. As noted, claims 1, 2, 12, 14, 15, 17–19, and 21–29 are challenged in the Petition. Pet. 1. Claim 1, the only independent claim in the '319 patent, is illustrative of the claimed subject matter and is reproduced below:[7]

> 1. [Preamble] A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:
>
> [1a] receiving, from the second server, the first content identifier;

---

[6] "[C]hunks . . . are defined as equally sized pieces of data that together form the whole content of the URL, namely, the entire content whose location is described by the URL." Ex. 1001, 10:60–63.

[7] Paragraph references in brackets tracking Petitioner's analysis have been added.

IPR2021-01492
Patent 10,257,319 B2

[1b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

[1c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

[1d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16–32.

### E. Prior Art References and Other Evidence

Petitioner relies on the following references:

1. Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2. Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border");

3. Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

4. Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya. Ex. 1005 ("Teruya Decl."). Patent Owner submitted a Declaration of Dr. V. Thomas Rhyne with its Preliminary Response. Ex. 2006.[8] After institution, Patent Owner submitted a Declaration of Dr.

---

[8] According to Patent Owner, Dr. Rhyne's declaration was previously submitted in IPR2020-01266.

IPR2021-01492
Patent 10,257,319 B2

Tim A. Williams. Paper 2065 ("Williams Decl.").[9]  Petitioner has submitted

a transcript of Dr. Williams's deposition. Ex. 1111 ("Williams Dep.").

Patent Owner has submitted a transcript of Mr. Teruya's deposition from

IPR2022-00861, also involving the '319 patent and whose petitioners have

been joined with this proceeding. Ex. 2067.

### E.  The Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability. Pet. 10.

| Claim(s) Challenged | Basis 35 U.S.C. § | Reference(s)[10] |
|---|---|---|
| 1, 19, 21–29[11] | 102[12] | Crowds |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border |

---

[9] Patent Owner submitted both confidential and public (redacted) versions of Dr. Williams's declaration.

[10]  The Petition's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 10.  We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not attempting to supply missing limitations or incorporating an unspecified disclosure by reference.

[11] Although the Petition's listing of the asserted grounds excludes claim 23 for this ground (*see* Pet. 10), the Petition includes claim 23 in its analysis of anticipation based on Crowds (*see id.* at 38).  Accordingly, we include claim 23 here.

[12] Because the application from which the '319 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions.  Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

9

IPR2021-01492
Patent 10,257,319 B2

| Claim(s) Challenged | Basis 35 U.S.C. § | Reference(s)[10] |
|---|---|---|
| 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27–29[13] | 103 | Border, RFC 2616 |
| 1, 17, 19, 21–29 | 102 | MorphMix |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, RFC 2616 |

### III. ANALYSIS OF THE CHALLENGED CLAIMS

#### A.  Anticipation and Obviousness

The Federal Circuit addressed the legal standard for anticipation in

*Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016):

> Under 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim."

815 F.3d at 1341 (citation omitted) (footnote omitted).  The Federal Circuit

went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015))

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the

differences between the claimed invention and the prior art are such that the

claimed invention as a whole would have been obvious before the effective

---

[13] Although the Petition's listing of the asserted grounds does not identify claim 19 for this ground (*see* Pet. 10), the Petition includes claim 19 in its analysis of obviousness based on Border and RFC 2616 (*see id.* at 58). Accordingly, we include claim 19 here.

10

Appx656

IPR2021-01492
Patent 10,257,319 B2

filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103 (2011). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Patent Owner has presented any evidence on the fourth *Graham* factor. *See infra*, Section III.F.3.

## B. Level of Ordinary Skill in the Art

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 20 (citing Teruya Decl. ¶¶ 25–27). Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.*

Patent Owner submits that a person of ordinary skill in the art would have "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications" as of 10/8/2009. Prelim. Resp. 47; PO Resp. 2. But Patent Owner acknowledges that its analysis "does not change under the Board's preliminary definition." PO Resp. 2.

11

Appx657

IPR2021-01492
Patent 10,257,319 B2

In our Institution Decision, we adopted Petitioner's formulation. Institution Dec. 17–18. We regarded Petitioner's more specific definition as consistent with the '319 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). For this reason, for the purpose of this decision, we continue to apply Petitioner's formulation. We find, however, that this definition and Patent Owner's definition of a person of ordinary skill in the art are not materially different, and furthermore, that our decision would be the same using either definition.

### C.   Claim Construction

For this *inter partes* review, the Board applies the same claim construction standard as that applied in federal courts. *See* 37 C.F.R § 42.100(b) (2019). Under this standard, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citations omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citation omitted).

12

IPR2021-01492
Patent 10,257,319 B2

Petitioner asserts that the district court's claim constructions in the *Teso* Litigation,[14] are appropriate in this case. Pet. 21. In particular, Petitioner points to two claim construction orders in that case—the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). Pet. 21–22.

In the *Teso* Litigation, the parties agreed to certain constructions that were subsequently adopted by the district court. *Id.* at 21. Thus, the district court construed the preamble of claim 1 of the '319 patent to be limiting, and construed certain other terms to have their "plain and ordinary meaning." *Id.* In addition, the district court construed certain disputed terms, including "client device" and "second server." *Id.* at 21–22. The district court construed "client device" as "communication device that is operating in the role of a client." Ex. 1017, 12.[15] The district court initially construed "second server" as "server that is not the client device." *Id.* at 14. Later, the court granted the defendants' request for clarification as to the scope of this construction, and in a supplemental order, determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." Ex. 1020, 8, 11.

Initially, Patent Owner agreed that we should apply the claim constructions in the *Teso* Order for the preamble, "client device," and "second server." Prelim. Resp. 48. For "second server," Patent Owner

---

[14] *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.). The case caption in this litigation was later changed to identify plaintiff as Bright Data Ltd. Ex. 1020, 1.

[15] Unless otherwise specified, citations to exhibits use the page numbers assigned by the parties and not the original page numbers.

IPR2021-01492
Patent 10,257,319 B2

initially proposed that we apply the district court's construction of that term from the *Teso* Order ("server that is not the client device"). *Id.* (citing Ex. 1017, 14). Patent Owner quoted from the *Teso* Supplemental Order (Ex, 1020) which states that the district court "is not now changing the scope of the terms in any way," and alleged that Petitioner is "seeking a broader construction of the term 'second server' to remove the requirements that it be a server." Prelim. Resp. 49.

For the purposes of our Institution Decision, we adopted the district court's construction for the "second server" as clarified in the *Teso* Supplemental Order. Institution Dec. 19 (citing Ex. 1020, 11). Thus, we adopted the district court's original construction, with the clarification that the second server is "a device that is operating in the role of a server and that is not the first client device." *Id.* (citing Ex. 1020, 8). We determined that this construction is consistent with the extrinsic evidence offered by Petitioner, as well as the construction of "server" adopted by the Board in IPR2021-00458, involving a patent similar to the '319 patent. *Id.* at 19–20 (citing Ex. 1018, 5; IPR2021-00458, Paper 11. 21). Specifically, we adopted the district court's clarification that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* at 20 (citing Ex. 1020, 10 (internal quotation marks omitted)).

Post-institution, Patent Owner objects to what it describes as the Petitioner's "purely role-based" constructions. PO Resp. 8–27. Patent Owner contends that "[t]he purely role-based constructions contradict the Court's Orders because they refer to generic devices operating in a particular

14

Appx660

IPR2021-01492
Patent 10,257,319 B2

role." *Id.* at 10. Patent Owner continues, '[t]he purely role-based constructions fail to account for the *physical/structural differences* between client devices and servers." *Id.* (emphasis added)

More specifically, Patent Owner now contends that the Petitioner "deviated from the Court's construction for the term 'client device' and do[es] not attribute any special meaning to the term 'communication device.'" *Id.* at 8. Patent Owner further contends that Petitioner "treat[s] client devices and servers as interchangeable general purpose computers*.*" *Id.* at 9.

For the reasons that follow, we do not agree with Patent Owner's argument that we should not follow Petitioner's proposed constructions for "client device" and "second server," which adopt the district court's constructions of these terms. Instead, we maintain the construction for those terms we adopted for our Institution Decision.

> *1.    Contentions of the Parties*
>   *a)    Client Device*

As noted *supra*, Patent Owner's position on construction issues has shifted during the course of this proceeding. Initially, Patent Owner agreed that we should apply the role-based claim construction for client device in the *Teso* Order: "'client device' means [a] 'communication device that is operating in the role of a client.'" Prelim. Resp. 48 (quoting Ex. 1017, 12) (emphasis omitted). As the case progressed, while maintaining its support for the district court's constructions, Patent Owner presented a few twists. Referring both to "client device" and "second server," according to Patent Owner's new theory, the district court "expressly rejected referring to these terms as generic devices operating in a particular role." PO Resp. 9. Patent

IPR2021-01492
Patent 10,257,319 B2

Owner now contends that "[t]he Court found that a "client device" is a physical communication device, which has a special meaning in the context of the specification." *Id.* Patent Owner argues that "[a] communication device in the context of the specification is not simply any device that communicates over the Internet." *Id.* According to Patent Owner, in the *NetNut* Litigation (*see supra*), NetNut "proposed a construction of "client" as 'a device operating in the role of a client.'" *Id.* at 10 (citing Ex. 2021, 14). Patent Owner argues that "the Court expressly rejected removing the word 'communication' from its construction of this term." *Id.* (citing Ex. 2021, 14) (emphasis omitted). From this, Patent Owner concludes that "'communication device' has a special meaning in the context of the specification as referring to a 'client device.'" *Id.* Further, Patent Owner contends a "'client device' in the context of the specification is not merely a general-purpose computer." *Id.* at 10–11.

Patent Owner expands on this newly-proposed construction of "client device" by equating the term "client device" with "consumer computer" or, alternatively, a "consumer communication device." PO Resp. 22. Patent Owner contends these newly-proposed constructions are "consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.* at 22–23.

In its Sur-reply, Patent Owner relies on an additional theory, based on the alleged "novel architecture" of the claims. PO Sur-reply 6–7. And at oral argument Patent Owner relied heavily on yet another theory, the "at-every-moment construction." Hearing Tr. 42:7–10. *See* discussion *infra*.

Petitioner responds that "[t]he District Court rejected [Patent Owner's] 'consumer computer' argument three times." Pet. Reply 12.

IPR2021-01492
Patent 10,257,319 B2

Petitioner argues that "Judge Payne ruled that 'client device' is 'defined by the role' and not 'by the components of the device.'" *Id.* (citing Ex. 1112, 13).[16] Petitioner also points to an order in the *Teso* litigation, in which Patent Owner's former expert Dr. Rhyne was instructed by Judge Gilstrap "not to testify before the jury that a client device cannot be a server." *Id.* at 13 (citing Ex. 1116, 4).

Petitioner argues that the district court's constructions are consistent with the intrinsic evidence in the case. Pet. Reply 13–17. Petitioner points out that the specification describes a communication device 200 that can "function in different 'roles,'" e.g., client, peer or agent. *Id.* at 14 (citing Ex. 1001 9:20–26). Petitioner points to an annotated Figure 3 submitted to the district court by Patent Owner which equates client 202 with the claimed second server and the claimed client device with agent 222. *Id.*

Petitioner cites RFC ("Request for Comment") 2616, which describes the protocol for HTTP, as support for its role-based construction. *Id.* at 15. This RFC, which is cited in the '319 patent, states that "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Ex. 1013, 8. Finally, Petitioner argues that the Patent Owner's prosecution history arguments, based on a parent patent, are incorrect for several reasons. *Id.* at 15–17. Among other reasons, Petitioner argues, the cited history refers to a "cache server," and the different clams of the parent application do not recite "client device." *Id.* at 16.

---

[16] Petitioner cites Judge Gilstrap's order adopting Magistrate Judge Payne's constructions. Pet. Reply 12 (citing Exs. 1113, 1114).

17

Appx663

IPR2021-01492
Patent 10,257,319 B2

       *b)*    *Second Server*

Patent Owner contends that the district court "acknowledged that servers are not disclosed as a type of 'communication device' in the specification." PO Resp. 11. From this, Patent Owner reasons that "[t]he purely role-based constructions are not appropriate because they fail to recognize the special meaning of 'communication device' in the context of the specification." *Id.* at 12.

Petitioner responds that "[a]lthough [Patent Owner] cites to a selective excerpt stating that 'a server is not a communication device,' the Court's actual statement rejected PO's argument 'that a client device is specifically not a server.'" Pet. Reply 13 (citing Ex. 1020, 10).

      *2.*    *Analysis – Client Device and Second Server*

Patent Owner's representations of the district court's rulings on claim construction are incomplete and inaccurate. For the reasons discussed, we find that the claim construction rulings by the district court in the *Teso* and *NetNut* district court litigations support Petitioner and do not favor Patent Owner.

In the earlier *Teso* litigation, Patent Owner argued that "client device" in the '319 patent should be construed as a "consumer computer." Ex. 1017, 10. The district court rejected that construction: "[T]he Court finds the language on which [Patent Owner] relies is not sufficient to redefine the meaning of the term to 'consumer computer.'" *Id.* at 11. The district court also rejected Patent Owner's argument that "a client device is specifically not a server." *Id.* The district court reasoned that "[the '319 patent] do[es] not include servers as a type of 'communication device,' but that is not sufficient to construe 'client device' as unable to act as a server in all cases."

18

Appx664

IPR2021-01492
Patent 10,257,319 B2

*Id.* at 12.  Instead, the district court adopted a role-based construction for "client device":  a "communication device that is operating *in the role* of a client."  *Id.* (emphasis added).

The district court in the *Teso* Litigation also rejected Patent Owner's structural argument that a client device must have a "client dedicated operating system."  *Id.* at 14–15.  In reaching this conclusion, the district court explained that "[Patent Owner] cites nothing from the intrinsic record showing a client device *must* have a 'client dedicated operating system.'" *Id.* at 15.

In the later claim construction order in the *NetNut* Litigation, the district court referred to its earlier *Teso* claim construction orders and concluded that "[n]either [Patent Owner] nor Defendant persuasively justifies departing from the Court's prior construction and analysis." Ex. 1115, 13.  The court specifically rejected again Patent Owner's argument trying to limit the construction of "client device" to a consumer device.  *Id.* The court reasoned that "[Patent Owner's] argument that it is indisputable that the specification *never* refers to a server as a communication device . . . does not justify limiting the Court's construction to consumer devices."  *Id.* at 13–14 (internal quotation marks omitted).  And the court reminded the parties that "the Court has previously found that 'a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.'"  *Id.* at 14 (citing Ex. 1017, 10).

The *Teso* district court also construed "second server." Ex. 1017, 13–14.  The court noted that "[t]he parties dispute whether the second server must be a distinct device from the client device and the web server."  *Id.* at

19

IPR2021-01492
Patent 10,257,319 B2

13. The court concluded that "[b]oth the claims and specification show that the client device and second server are different devices." *Id*. at 13-14. However, the court also made it clear that a given device can perform multiple roles: "Client, peer, agent, and server are roles a device can perform." *Id*. at 14. The court provided the following example: "Nothing in the intrinsic record suggests one device cannot perform both the role of a web server and a second server. To construe the claim in such a way would improperly import a limitation into the claim language." *Id*. at 14.

The district court clarified this statement in the supplemental *Teso* order, explaining that "a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10. In making this clarification, the district court explained that "[t]he Court is not changing the construction of 'first server' and 'second server,' as this understanding is already embedded in those terms' construction." *Id*. at 11. Further, in the *NetNut* Litigation, the district court endorsed the statement in the *Teso* supplemental order that 'a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more that one of: the client device, the first server/second server, and the web server.'" Ex. 1115, 20 (quoting Ex 1020, 10). We find these decisions and their reasoning support Petitioner's position on the proper constructions for "client device" and "second server."

We find insufficient support for Patent Owner's position on the construction of "client device" and "second server" in the claim language, patent specification, or the prosecution history. The term "consumer computer" that is central to Patent Owner's argument does not appear in the

IPR2021-01492
Patent 10,257,319 B2

patent claims, and consumer computers are referenced only once in the specification, in connection with the description of prior art peer-to-peer networks. *See* Ex. 1001, 2:45. The '319 patent criticizes such peer-to-peer networks as not suitable for use with the Internet. *Id.* at 2:64–3:3. We find that this disclosure does not equate client devices with consumer computers, and further find that a person of ordinary skill would not look to this disclosure for guidance in construing "client device."

Instead, we agree with the district court and find that the '319 patent specification supports Petitioner's role-based constructions. Thus, the specification informs us that "[d]ue to functionality provided by software stored within each communication device, . . . each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100." Ex. 1001, 4:46–51. The specification also reminds us that "[a]s previously mentioned, it should be noted that the communication device 200 of FIG. 4 may serve as a client, agent, or peer." *Id.* 5:55–57. Similarly, the specification discloses that each of the modules shown in Figure 6 (including client module 224) "comes into play according to the specific role that the communication device 200 is partaking in the communication network 100 at a given time." *Id.* at 9:22–26.

Patent Owner refers us to the prosecution history of the related '936 patent.[17] PO Resp. 25–28. Patent Owner asserts that to overcome a rejection, "[a]pplicant repeatedly argued that client devices are different from servers." *Id*. at 19. Patent Owner contends that "[t]he examiner recognized a server cannot be equated to a client device regardless of the

---

[17] U.S. Patent No. 10,069,936.

IPR2021-01492
Patent 10,257,319 B2

role being performed at a given moment in time." *Id.* We do not find these arguments to be persuasive. Patent Owner relies on a statement in the Examiner's Notice of Allowance as evidence that "the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id.* at 20. This is an overstatement. The Examiner's Reasons for Allowance lists several limitations from the independent claims: Ex. 2026, 43–44. The examiner's statement that "the limitations of the independent claims, within its environment, is allowable subject matter" could refer to any one of these limitations or to all of them together. We do not find that the inclusion of "within its environment" in the examiner's statement provides any clarity on the examiner's basis for allowance of the claims. The same ambiguity exists in Patent Owner's arguments based on the '319 and '510[18] patent prosecution histories. PO Resp. 21–22.

As a general rule, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). In light of the much clearer statements in the '319 patent specification, referred to *supra*, and in the district court claim construction analysis, we are not persuaded by Patent Owner's arguments based on ambiguous prosecution history.

Finally, we find that other evidence of record favors a role-based construction for these terms. For example, RFC 2616 is version 1.1 of

---

[18] U.S. Patent No. 10,484,510.

IPR2021-01492
Patent 10,257,319 B2

"Hypertext Transfer Protocol – HTTP/1.1," which defines the HTTP protocol used in Internet communications. Ex. 1013, 1, 7. RFC 2616 explains that "[a]ny given program may be capable of being both a client and a server, our use of these terms refers only to the role being performed by the program for a particular connection." Ex. 1013, 8.

Patent Owner bases another argument on comparing Figures 1 and 3 of the '319 patent. PO Resp. 14–18. Patent Owner contends that "[i]f one were to apply the purely role-based constructions, there is nothing to distinguish the architectures of Figure 1 and Figure 3." *Id.* at 18 (emphasis omitted). We do not find this argument to be persuasive. We find it telling that Patent Owner's previous expert, Dr. Rhyne, identified client 202 in Figure 3 of the '319 patent as the claimed "second server" in a claim construction submission to the district court in the *Teso* litigation. *See* Ex. 1126, 8–9, 15. The annotations to Figure 3 provided by Dr. Rhyne[19] include a color code that associates the server, client device, and web server in claim 1 of the '319 patent with corresponding components of the figure. *Id.* at 8. From the accompanying text it is clear, and we therefore find, that the purpose of the submission was to explain how the various elements of the claim (including the "second server," color-coded in green) are depicted in the specification for the purpose of influencing claim construction.

Dr. Rhyne's color code was carried through Patent Owner's claim construction analysis of the "second server" limitation. *See, e.g., id.* at 18–19 (quoting Dr. Rhyne's testimony highlighted to include a green color code

---

[19] Petitioner attributes this drawing to Dr. Rhyne. Hearing Tr. 20:10–14. Patent Owner does not dispute that Dr. Rhyne prepared the drawing. *Id.* at 44:12–19.

for "second server"). We find Patent Owner's explanation, including that Dr. Rhyne was merely arguing that "instead of client 102, you can have a server sit between two clients," or its later arguments comparing Figure 3 to Figure 1, are not credible. *See* Hearing Tr. 45:1–4.

Two other claim construction arguments by Patent Owner bear mentioning. The first is based on the alleged "novel architecture" claimed in the '319 patent. *See, e.g.*, PO Resp. 44 ("Border does not disclose a first client device located between a second server and a web server as recited in claim 1"); PO Sur-reply 6–7. We will discuss this further in connection with our analysis of the prior art. Suffice it to say, for now, that this allegedly novel architecture is not described in the '319 patent. To illustrate this architecture, Patent Owner relies on a diagram that merges various elements from Figures 1 and 3 in the '319 patent:



IPR2021-01492
Patent 10,257,319 B2

PO Resp. 8. This diagram modifies Figure 3 of the '319 patent by inserting the prior art proxy server (in green) from Figure 1. Because this diagram does not appear anywhere in the '319 patent and this configuration is not described in the patent, it is a not part of the intrinsic record. We do not find this made-up configuration supports Patent Owner's claim construction arguments based on "novel architecture."

Likewise, we do not find merit in Patent Owner's "particular point in time" theory, namely, that Petitioner's role-based constructions "focus only on the role being performed by a network component at a particular point in time and not the physical structure of the component." PO Resp. 1. We reject this theory as attempting to add a limitation to the claims, and as a variation on arguments already made by Patent Owner and rejected by the district court and by us as contrary to the finding that "a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more that one of: the client device.'" Ex. 1115, 14 (quoting *Teso* supplemental order, Ex. 1020, 10).

### 3.    *Other Constructions*

We only construe terms that are necessary to resolve disputed disputes. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). We determine that no other terms require explicit construction. To the extent we need to interpret any other terms, we will do so in the context of the analysis of the prior art that follows.

25

Appx671

IPR2021-01492
Patent 10,257,319 B2

### 4. Conclusion on Claim Construction

For the reasons given by Petitioner and the district court, and those summarized *supra,* we maintain or previous constructions for "client device" and "second server." *See* Institution Dec. 18–20.

### D. Description of the Principal Prior Art References

### 1. Crowds (Ex. 1006)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2 (*id*. at 9), reproduced below:

26

IPR2021-01492
Patent 10,257,319 B2



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

> ### 2. *Border (Ex. 1012)*

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, (54). Border describes "[a] communication system for retrieving web content." *Id.* at (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser." *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server

27

IPR2021-01492
Patent 10,257,319 B2

and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

28

IPR2021-01492
Patent 10,257,319 B2

### 3. *MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. *Id.* at 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two

29

IPR2021-01492
Patent 10,257,319 B2

nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

### 4.    *RFC 2616 (Ex. 1013)*

This RFC (Request for Comments) documents version 1.1 of the HTTP protocol, which is "foundational to the World Wide Web." Pet. 27; Teruya Decl. ¶ 53.

### E.    *Anticipation Based on Crowds*

Petitioner asserts that claims 1, 19, and 21–29 are anticipated by Crowds. Pet. 28–39. Petitioner provides an element-by-element claim analysis, supported by expert testimony, in relation to Crowds. *Id.*; Teruya Decl. ¶¶ 55–89.

### 1.    *Claim 1*

*Preamble*

Petitioner contends the preamble of claim 1 is disclosed in Crowds. Pet. 29–31. Petitioner asserts "Crowds discloses a layout in which (*e.g.*, in one instance) jondo 6 serves as the first client device, jondo 4 serves as the second server, and Web Server 5 is the first server." *Id.* at 29. Petitioner provides an annotated version of Crowds's Figure 2, *supra*, to illustrate the correspondences between Crowds's disclosure and certain of the preamble elements recited in claim 1. *Id.* at 30. This annotated figure is reproduced below:

IPR2021-01492
Patent 10,257,319 B2



*Id.* Annotated Figure 2 of Crowds is a diagram showing multiple paths between jondos and web servers. *Id.* at 30. Figure 2 has been annotated by Petitioner to show the elements in Crowds corresponding to the "first client device," "first server," and "second server" recited in claim 1. *Id.* at 29. Specifically, Petitioner identifies the recited "first client device" with jondo 6. *Id.* Petitioner identifies the "first server" with Web Server 5. *Id.* Petitioner identifies the "second server" with jondo 4. *Id.* Petitioner explains that "[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5." *Id.* at 30.

Petitioner addresses each step of claim 1 in relation to Crowds as follows (Pet. 31–36):

> a)    *receiving, from the second server, the first content identifier*

Petitioner contends this step 1a is disclosed by the path "5→4→6→ server" in Figure 2 of Crowds. Pet. 31. Petitioner explains that "Crowds

Appx677

IPR2021-01492
Patent 10,257,319 B2

discloses that jondo 6 (first client device) receives a 'request' (first content identifier or 'FCI') from jondo 4 (the second server)." *Id.* Petitioner further explains that "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." *Id.* (citing Ex. 1006, 8; Teruya Decl. ¶¶ 58–59).

> b)     *sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier*

Petitioner contends that this step 1b is disclosed when "[j]ondo 6, having received the FCI per step (a), then sends it in an HTTP request to the web server, according to step (b)." Pet. 33. Petitioner explains that the jondos "operate as HTTP proxies." *Id.* at 33–35. Petitioner explains further, "[i]n the example '5→4→6→server' path discussed above, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server, or 'first server.'" *Id.* at 34.

> c)     *receiving, the first content from the first server over the Internet in response to the sending of the first content identifier*

Petitioner contends step 1c is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." *Id.* at 35. Petitioner explains further, "the 'first client device' (jondo '6' above) sends the FCI to the first server, or target web server '5'. The last jondo in the path then receives the 'first content,' such as the user specified web page." *Id.* at 35–36.

IPR2021-01492
Patent 10,257,319 B2

> *d)    sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier*

Petitioner contends this step 1d is met in Crowds when "[a]s discussed regarding step (c) above, the first client device (jondo 6) receives the first content from the web server.  In response, it then sends the content on to the requester, jondo 4, per step (d)."  Pet. 36.

> *e)    Analysis – Anticipation of Claim 1 by Crowds*

Patent Owner contends that Crowds does not disclose claim 1.  PO Resp. 31–36.  Patent Owner contends that "Crowds does not disclose a 'first client device' or a 'second server' as recited in the preamble of claim 1 under the purely role-based constructions."  PO Resp. 31–32.  Likewise, Patent Owner contends that Crowds does not disclose steps 2 and 4 (corresponding, respectively, to claim limitations 1a and 1d) "under the purely role-based constructions."  *Id.* at 32–33.  Patent Owner presents various other arguments, many of which were previously presented in the Preliminary Response and addressed in the Institution Decision.  *Id.* at 33–39.

Fundamentally, however, Patent Owner's arguments fail because they demonstrate a lack of recognition that Patent Owner's claim constructions, based on various structural distinctions between components and system architecture, were rejected by the district court in the *Teso* and *NetNut* Litigations, and by the Board in the Institution Decision and in Section III.C, *supra*.  Petitioner's anticipation analysis is persuasive because it is based on the operation of jondos 4 and 6, which is not disputed by Patent Owner, and because it demonstrates how this operation meets the steps of the claimed method under the claim constructions we have adopted.  In contrast, Patent

33

Appx679

IPR2021-01492
Patent 10,257,319 B2

Owner's opposition is based on its proposed claim constructions that have been rejected by us and the district court.

For example, Patent Owner insists that "[t]here is no way for a [person of ordinary skill] to determine whether jondos 6 and 4 are client devices or servers under the purely role-based constructions because . . . jondos 6 and 4 operate in different roles at different points in time." PO Resp. 31. As Petitioner points out, this argument is based on the "at all times" mis-application of the claims discussed in Section III.C, *supra*. Pet. Reply 17. That is, Patent Owner's argument assumes that the claims require the first client device to act as a client at all times and the second server to act as a server at all times. *Id.* This argument is unavailing because it is contrary to a role-based construction, and as Petitioner points out, it is undermined by claim 1 of the '319 patent. *Id.* at 17–18. Claim 1 requires the first client device to receive a request for content from the second server in one step and send a response with content to the second server in another. In this scenario, the first client device sometimes acts in the role of a server in responding to the content request from the second server and the second server sometimes acts in the role of a client in making the content request. Patent Owner's "at all times" argument would eviscerate claim 1 and, as Patent Owner's expert, Dr. Williams, conceded, this does not "make sense." Williams Dep. 137:8–15. We find, therefore, that Patent Owner's "at all times" argument would make claim 1 "impossible to practice," and is therefore is unavailing for the reasons given by Petitioner and summarized above. Pet. Reply 17–19.

We find Patent Owner's other arguments equally unpersuasive. PO Resp. 33–30. For example, Patent Owner's argues that Petitioner "fail[s] to

IPR2021-01492
Patent 10,257,319 B2

distinguish the jondos other than the role being performed *at a particular point in time*." *Id.* at 33 (emphasis added). This "point in time" argument is a variation of Patent Owner's "at all times" argument discussed *infra*. As we have stated, we do not agree with this argument because it is contrary to our role-based construction and to the language of the claims.

Patent Owner's structural arguments based on "system architecture" fail because they, too, are based on its rejected claim construction theories. *See* PO Resp. 33–35. For example, Patent Owner reprises its previous arguments that "[a]ll jondos of Crowds are identical user computers," and "Petitioner[] fail[s] to distinguish the jondos other than the role being performed at a particular point in time." *Id.* at 33. We do not agree with these arguments because they ignore the claim language and claim constructions adopted by us and the district court for reasons previously given.

As another example, Patent Owner contends that "Petitioners arbitrarily identify one jondo as a 'client device' and another identical jondo as a 'server' to improperly map Crowds onto the claims." PO Resp. 34. We do not agree with this argument. The district court's claim constructions for the terms "server" and "client device," which we have adopted, make it clear that these components are defined by their function, not their structure. Ex. 1020, 7–11. Thus, for example, the district court clarified that the second server is "a device that is operating *in the role of a server* and that is not the first client device." *Id.* at 11 (emphasis added); *see also* discussion in Section III.C, *supra*.

Patent Owner presents several more "structural" arguments. For example, Patent Owner contends Petitioner "ignore[s] the specific

35

IPR2021-01492
Patent 10,257,319 B2

architecture in which the claimed methods operate." PO Resp. 35. Patent
Owner argues that "the jondos of Crowds are user computers and there is no
indication that the jondos are dedicated network elements." *Id.* Patent
Owner argues that there is no indication that the jondos remain online with
greater availability and maximum up time. *Id.* Patent Owner argues that
"[t]here is no disclosure that jondos of Crowds are capable of a large number
of connections." *Id.* All of these and the related structural arguments ignore
the language of claim 1, a method claim that does not impose the
characteristics on the recited client device and second server that Patent
Owner seeks to impose, and the rulings of the district court we have adopted,
including that "a component can be *configured* to operate in different roles--
so long as it does not 'simultaneously serve as more that one of: the client
device.'" Ex. 1020, 10.

Patent Owner's arguments based on perceived structural differences
and differences in system architecture are fundamentally wrong because they
focus on the alleged need for devices that are not identical or
interchangeable, i.e., on alleged differences in structure between the server
and the client device. This same argument was dismissed by the district
court as "an oversimplification of the issue." Ex. 1020, 10. As noted *supra*,
the district court went on to explain that "a component can be *configured* to
operate in different roles—so long as it does not 'simultaneously serve as
more than one of: the client device, the first server/second server, and the
web server." *Id.* (internal quotation marks omitted) (emphasis in original)."
As is discussed *supra*, for the reasons given, we agree with Petitioner and
the district court that "a component can be *configured* to operate in different
roles." Ex. 1020, 10. We find, therefore, that Crowds discloses a first client

Appx682

IPR2021-01492
Patent 10,257,319 B2

device (jondo 6) located between a second server (jondo 4) and Web Server 5 for the reasons given by Petitioner including those summarized above. We are persuaded by Petitioner's analysis that Petitioner has demonstrated anticipation of claim 1 by Crowds by a preponderance of the evidence.

### 2.    Claims 19, 21–29

These claims depend, directly or indirectly, from claim 1. Petitioner provides a claim-by-claim analysis for each of these claims in relation to Crowds. Pet. 37–39. Petitioner's analysis shows that Crowds discloses the additional limitations of these claims. For example, Petitioner demonstrates that Crowds discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo whose operation meets the limitations of claims 19, 28, and 29. *See* Pet. 7 (citing Ex. 1006, 91[20]; Teruya Decl. ¶¶ 76–77).

Patent Owner responds to Petitioner's analysis of dependent claims 18, 19, and 24. PO Resp. 40–41. Claim 18 is not challenged in this ground and will be discussed further in the following sections in connection with Petitioner's obviousness challenges. *See, e.g.*, Section III.F, *infra*.

Claim 19 calls for downloading and installing a computer application that causes the computer processor to send an HTTP request for and to receive and store the "first content." Claim 19 recites:

> The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the

---

[20] This cite is to the original page number and corresponds to page 26 of the exhibit.

IPR2021-01492
Patent 10,257,319 B2

> part of, or the whole of, the stored first content, the method is
> further preceded by:
>
>> downloading, by the first client device from the Internet,
>> the software application; and installing, by the first client
>> device, the downloaded software application.

Ex. 1001, 20:62–21:6.  Patent Owner contends that Petitioner fails to show
that Crowds discloses or teaches the recited "storing of the first content" and
"sending… the stored first content" as recited in claim 19.  PO Resp. 40.

We disagree.  As Petitioner points out, Crowds discloses typical user
computers with memory that satisfies the storing and sending steps.  Pet.
Reply 23 (citing Williams Decl. ¶ 161).  Claim 19 does not specify any
particular means of "storing of the first content" and "sending . . . the stored
first content."  We, therefore, agree with Petitioner and find that Crowds
discloses "user computers," and that the use of typical computer memory
would satisfy those steps.  *See* Pet. Reply 23.  We find that a person of
ordinary skill in the art at the time of the invention would have understood
that a "user computer" such as those described in Crowds would typically
have computer memory and storage capabilities in order to function in the
manner that Crowds operates, which satisfies the limitations required by
claim 19.  *See* Section III.D.1, above.

As Petitioner observes, Patent Owner does not dispute Petitioner's
evidence that Crowds discloses downloading and installing the software
application.  Pet. Reply 23.  Crowds expressly discloses that "we have
distributed over 1400 copies of the Crowds code free-of-charge in response
to user requests, and we are maintaining the blender for an active crowd on
the Internet.  Information about obtaining the Crowds code can be found at
http://www.research.att.com/projects/crowds."  Ex. 1006, 26.  Mr. Teruya

38

Appx684

testifies that this disclosure in Crowds "states how a user could download from the Internet for installation" "a software package that implements a jondo, whose operation is per Claim 1." Teruya Decl. ¶ 76. We find that for the reasons given by Petitioner, and not disputed by Patent Owner, Crowds discloses downloading and installing the software application.

Patent Owner's argument for claim 24 repeats the "at all times" theory discussed *supra*. PO Resp. 41–42. For reasons given, above and by Petitioner, we reject this argument. *See* Pet. Reply 23.

### 3. Conclusion on Anticipation by Crowds

For the reasons given by Petitioner, including those summarized above, we find that Petitioner demonstrates that Crowds anticipates claims 1, 19, and 21–29 of the '319 patent by a preponderance of the evidence.

### F. Obviousness Based on Crowds and RFC 2616

Petitioner contends that the claims anticipated by Crowds (claims 1, 19, and 21–29), as well as claims 2, 14. 15, 17, and 18, would have been obvious in light of Crowds and RFC 2616. Pet. 39–44.

Petitioner refers to RFC 2616 and contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill] developing software for like applications would have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." *Id.* at 40.

Regarding Patent Owner's proposed claim constructions, Petitioner contends that "[e]ven if the Board were to construe 'second server' as requiring a specialized data-center class device, such an adaptation would have been obvious." *Id.* at 41 (citing Ex. 1006, 15–19). Petitioner contends "[a person of ordinary skill] would have been aware, in 2009, of equipment

IPR2021-01492
Patent 10,257,319 B2

commonly used as 'servers,' including workstation computers and computers running UNIX and Microsoft operating systems as disclosed by Crowds." *Id.* (citing Ex. 1006, 17). For support, Petitioner relies on testimony from Mr. Teruya. Teruya Decl. ¶¶ 98–99.

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on Crowds. PO Resp. 36–39. We have addressed Patent Owner's structural arguments and why we reject them in Section III.E, *supra*.

### 1. Analysis

Because we have already determined that they are anticipated by Crowds, we do not separately address claims 1, 19, and 21–29 under this ground. For those claims, we rely on the Petition and our anticipation analysis in Section III.E to show that they would also have been obvious in light of Crowds and RFC 2616.

### a) Claims 2, 4, 15, 17

As noted *supra,* these dependent claims are not included in Petitioner's anticipation ground. Petitioner presents analysis of claims 2, 14, 15, and 17 in light of Crowds and RFC 2616. Pet. 41–44. Petitioner relies of RFC 2616 for disclosures such as the validity check in claims 14 and 15. *See id.* at 42.

Patent Owner does not respond separately to Petitioner's analysis of these claims. *See* PO Resp. 39–41. We are persuaded by Petitioner's analysis that Petitioner has demonstrated each limitation of those claims is taught or suggested by Crowds and RFC 2616.

40

IPR2021-01492
Patent 10,257,319 B2

> b)    *Claim 18*

Claim 18 depends indirectly from claim 1 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." Ex. 1001, 20:59–61.  Petitioner contends that Crowds discloses that jondos communicate over TCP/IP connections and detect TCP/IP connection failures, and that "keep-alive" messaging for TCP/IP connections is disclosed in RFC 1122.  Pet. 43 (citing Ex. 1016 § 4.2.3.6).  Mr. Teruya testifies that "[a] [person of ordinary skill] would know that this shows that Crowds relies upon TCP connections.  It would have been obvious to a [person of ordinary skill] to have performed this disclosed 'detecting' by using the 'keep-alive' implementation taught by RFC 1122."  Teruya Decl. ¶ 105.

Patent Owner responds that RFC 1122 "is not a reference" in this ground.  PO. Resp. 40.  Petitioner responds that "keep-alive" messages are mentioned in the '319 patent and in RFC 1122.  Pet. Reply 22.  We agree with Petitioner that this proves that such messages would be part of a person of ordinary skill's general knowledge.  *Id.*; *see also Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

We therefore do not credit Patent Owner's arguments and find that Petitioner demonstrates that the cited prior art teaches or suggests the limitations of claim 18.  PO Resp. 40.

> 2.    *Teaching Away*

Patent Owner contends that Crowds "teaches away" and that "a [person of ordinary skill] would not be motivated to arrive at the claimed

IPR2021-01492
Patent 10,257,319 B2

methods based on the teachings of Crowds." PO Resp. 38–40. For example, Patent Owner contends that Crowds does not provide the "initiator" (the requesting jondo) with "anonymity as to the target web server." *Id.* at 38. Patent Owner continues, "Crowds states that it merely offers an initiator 'some degree of deniability' that it originated a particular request." *Id.* (quoting Ex. 1004, 2).

Patent Owner's "teaching away" argument based on alleged shortcomings of Crowds is unavailing. "A prior art reference does not teach away if it merely expresses a general preference for an alternative invention but does not criticize, discredit or otherwise discourage investigation into the invention claimed." *Incept LLC v. Palette Life Scis., Inc.*, No. 2021-2063, 2023 WL 5248043, at *5 (Fed. Cir. Aug. 16, 2023) (quoting *UCB, Inc. v. Actavis Laby's UT, Inc.*, 65 F.4th 679, 692 (Fed. Cir. 2023) (internal quotation marks omitted)). Moreover, Petitioner points out that the alleged "teachings" focused on by Patent Owner that Crowds allegedly "teaches away" from are not reflected in the claims. Pet. Reply 24. We agree with Petitioner that "[n]one of the proposed combinations [of references] concern anonymity, latency, or anything else in PO's 'teaching away' arguments." *Id.* For the reasons given, we find that Patent Owner's "teaching away" argument has little relevance and we accord it minimal weight.

### 3. *Objective Indicia*

Patent Owner relies on objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 68–75; PO Sur-reply 27–29. Petitioner responds that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's

IPR2021-01492
Patent 10,257,319 B2

arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 24–26.

### a)    Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, the proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, No. 2022-1765, 2023 WL 5440530, at *5 (Fed. Cir. Aug. 24, 2023).

43

Appx689

IPR2021-01492
Patent 10,257,319 B2

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130; s*ee also Volvo Penta of the Americas, LLC v. Brunswick Corp.,* 2023 WL 5440530, at *5 ("A presumption of nexus requires both that the product embodies the invention and is coextensive with it.")

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Brown & Williamson*, 229 F.3d at 1130. Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944

44

IPR2021-01492
Patent 10,257,319 B2

F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

> *b)    Commercial Success*

Patent Owner argues that nonobviousness is supported by the fact that it "provides a residential proxy service that practices the methods claimed in the '319 Patent." PO Resp. 57 (citing Williams Decl. ¶ 262). Patent Owner contends its proxy service "provides various users' client devices." *Id.* Patent Owner states it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* (citing Ex. 2038). According to Patent Owner, in 2021, its "residential proxy service generated revenues of $53.7 million." *Id.* at 70 (citing Williams Decl. ¶ 270). Patent Owner contends also that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* (citing Williams Decl. ¶ 269).

Patent Owner asserts that its residential proxy service "practices the methods claimed in the '319 Patent," and Patent Owner provides claim charts and source code purporting to show how "this commercial embodiment practices at least claims 1–2, 17–18, and 21–29 of the '319 Patent." PO Resp. 57–68. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '319 Patent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6,

45

IPR2021-01492
Patent 10,257,319 B2

and the proxy client device corresponds to agent 122." *Id.* at 68. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '319 Patent and is coextensive with them." *Id.* Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* at 68–69. Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 23 n.11.

Petitioner responds that the alleged commercial success lacks nexus to the claimed invention. Pet. Reply 24–26. Petitioner points to the two features allegedly "driving" the alleged commercial success (use of "residential IP addresses" and "scalability") cited by Patent Owner. *Id.* at 24. Petitioner argues that in naming those features, Patent Owner "admits a lack of nexus because neither feature is claimed." *Id.* Petitioner points out that the '319 patent "never uses the words 'residential,' 'scalable,' or 'scalability.'" *Id.* Petitioner argues that Dr. Williams, Patent Owner's expert, admits that the use of residential IP addresses is not claimed in the '319 patent. *Id.* (citing Williams Dep. 56:4–6, 56:19–57:6). Petitioner also takes issue with Dr. Williams's testimony regarding Patent Owner's sales figures. *Id.* at 24–25 ("Williams did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'").

46

IPR2021-01492
Patent 10,257,319 B2

We find for the following reasons and those given by Petitioner, including those summarized above, that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products it relies on for commercial success embody and are "coextensive" with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 68; *see id.* at 57 (pointing to Patent Owner's "residential proxy service" that uses laptops, desktops, tablets, laptop, or smartphones), 71 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services")). The challenged claims, however, do not include these limitations allegedly "driving" commercial success.

At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

47

IPR2021-01492
Patent 10,257,319 B2

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. Therefore, Patent Owner fails to prove that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11. Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's district court expert, Dr. Rhyne. *See* Ex. 2004, 4. In its order, the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness." *Id.* The district court "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." *Id.* The district court's two-sentence order does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing an explanation. Moreover, Patent Owner does not show us where the district court actually made a finding on the existence of a nexus. It appears to us that the district court was simply determining that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

48

IPR2021-01492
Patent 10,257,319 B2

c)    *Long-Felt Need*

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 71. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses." *Id.* at 71 (citing Williams Decl. ¶ 272). Patent Owner asserts, in contrast, that its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* at 72.

To establish a long-felt need, three elements must be proven: First, the need must have been a persistent one that was recognized by ordinarily skilled artisans. *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967). Second, the long-felt need must not have been satisfied by another before Patent Owner's invention. *See Newell Companies, Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 768 (Fed. Cir. 1988). Third, the invention must, in fact, satisfy the long-felt need. *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971). Patent Owner has failed to provide the necessary evidence or present the analysis necessary to establish long-felt need.

To demonstrate long felt need, a patentee must point to an "articulated identified problem and evidence of efforts to solve that problem" which were, before the invention, unsuccessful. *Tex. Instruments v. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). Patent Owner's reliance on generalities fails to provide us with persuasive evidence of an "articulated identified problem," much less evidence of failed efforts to solve that problem.

49

IPR2021-01492
Patent 10,257,319 B2

As noted, for objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 2023 WL 5440530, at *5 (citing *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)). Petitioner responds that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of alleged long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a long-felt need are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 72. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, for the reasons given, we find that Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

*d)    Copying*

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name 'Hola,' was presented." PO Resp. 72 (citing Williams Decl. ¶ 273). Patent Owner argues that its representative Ofer Vilenski asked an employee of Oxylabs Tomas Okmanas to incorporate Patent Owner's software development kit (SDK) in Oxylabs' applications. *Id.* Mr. Okmanas did not agree, but Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* at 73 (citing Ex. 2047, 94:23–95:9, 65:20–97:3; Williams Decl. ¶ 273).

50

IPR2021-01492
Patent 10,257,319 B2

Patent Owner also asserts that Mr. Okmanas testified that he sent an email to a third party stating he was looking for "a system that works like hola.org," and that that Oxylabs "wanted to develop its own residential proxy service." *Id.* He testified that "he believed that he needed to do what Bright Data . . . were doing to be successful." *Id.* at 73–74 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6; Williams Decl. ¶ 274). This testimony, according to Patent Owner, "is strong evidence of copying." *Id.* at 74 (citing Williams Decl. ¶ 274).

The standard for proving copying requires "duplication of features of the patentee's work based on access to that work, lest all infringement be mistakenly treated as copying." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019). The proponent of objective evidence offered to prove copying must show that a nexus exists between the evidence and the claimed features of the invention. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1082 (Fed. Cir. 2016); *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d at 1138.

For similar reasons as for commercial success and long-felt need, we find that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied. Patent Owner refers only generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 73–74. As explained above, however, the challenged claims do not recite or require a residential proxy service or an SDK. Nor does Patent Owner provide a product comparison that would suggest copying.

51

IPR2021-01492
Patent 10,257,319 B2

Therefore, we find that Patent Owner has failed to make the requisite showing that the claimed invention was copied.

e)    *Industry Praise*

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '319 Patent." PO Resp. 74 (citing Williams Decl. ¶ 276). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* (citing Williams Decl. ¶ 276).

Petitioner responds the industry praise evidence fails for the same reasons as that for commercial success. Pet. Reply 26.

For similar reasons as for the other objective indicia identified by Patent Owner, we find that no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 75. Moreover, three of the four articles cited by Patent Owner to support its "industry praise" argument do not even mention Patent Owner's products, but instead promote products of its competitors. *See* Exs. 2052–2054. Therefore, we find that Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

4.    *Conclusion on Obviousness*

For the reasons explained above, we find that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight because it does not show a nexus with the claimed invention. Thus, we find that secondary

IPR2021-01492
Patent 10,257,319 B2

considerations are not sufficient to outweigh Petitioner's evidence of obviousness. We therefore determine for the reasons given by Petitioner and those summarized above that Petitioner has demonstrated by a preponderance of evidence that challenged claims 1, 2, 14, 15, 17–19, and 21–29 of the '319 patent would have been obvious in view of Crowds and RFC 2616.

### G. Anticipation Based on Border

Petitioner asserts that claims 1, 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border. Pet. 44–46. Petitioner provides an element-by-element claim analysis, supported by expert testimony. *Id.* at 46–55; Teruya Decl. ¶¶ 107–123.

#### 1. Claim 1

Petitioner contends that Border anticipates claim 1. Pet. 46–51. Petitioner asserts that the preamble is disclosed by Border. *Id.* at 46. For example, Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the web page referenced by the requested URL. *Id.* (citing Teruya Decl. ¶¶ 107–108).

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. *Id.* at 46–52. For example, Petitioner asserts that the "receiving" step (step 1a) is met when "[w]eb content is retrieved from a web server that stores the web content by forwarding a 'URL request message to a web server and receiv[ing] the URL content from the web

IPR2021-01492
Patent 10,257,319 B2

server.'" *Id.* at 47 (citing Ex. 1012, 2:52–54). Similarly, the "sending" step
(step 1b) is met when "[u]pstream server 107 (the first client device) issues a
GET request to web server 109 for the content at a specified URL." *Id.* at 49
(citing Ex, 1012, Fig. 2, 5:33–36) (footnote omitted). Petitioner provides
similar analyses for the additional steps (steps 1c and 1d) of claim 1. Mr.
Teruya provides supporting testimony. Teruya Decl. ¶¶ 109–123.

　　Patent Owner's response to this challenge echoes its response to the
challenge based on Crowds. *Compare* PO Resp. 42–46 *with id*. at 31–36.
For example, Patent Owner contends Border does not disclose a "first client
device" or "second server" because "[t]here is no way for a [person of
ordinary skill] to determine whether upstream/downstream servers 107, 105
are client devices or servers under the purely role-based constructions." *Id.*
at 42. Patent Owner contends also that "upstream/downstream servers
107, 105 operate in different roles at different points in time." *Id.*

　　As with Crowds, Patent Owner focuses on steps 1a and 1d (referred
by Patent Owner as steps 1 and 4, respectively). PO Resp. 42–43. Patent
Owner reprises its argument that a server cannot operate in the role of a
client, and vice versa. *Id.* For the reasons given in our discussion of Crowds
in Section III.E, *supra*, we do not agree with those arguments as they are
contrary to the claim constructions we have adopted and the claim language.
Similarly, we have rejected Patent Owner's arguments based upon "the
architecture of claim 1," as exemplified in Patent Owner's redrawing of
Figure 3, as not supported by the '319 patent disclosure. *See* PO Resp. 44–
45. Patent Owner again asserts: "Petitioner[] fail[s] to explain why one
proxy server would be a server and another proxy server would be a client
device under Patent Owner's proposed constructions." *Id.* at 45. For the

IPR2021-01492
Patent 10,257,319 B2

reasons previously given, we do not agree with these structural arguments as they are based on an arrangement not disclosed in the patent specification and rely on Patent Owner's rejected claim construction arguments. *See supra*, Section III.C.

Patent Owner's argument that "Border does not teach claim 1" (PO Resp. 45–46) and Border teaches away (*id*. at 47–48) mirror the similar arguments directed to Crowds. *See* PO Resp. 36–39. For the reason given in our discussion of Crowds, *supra* in Sections III.E and III.F, we do not agree with those arguments. We find that for the reasons given by Petitioner and those summarized above, Border teaches or suggests each limitation of claim 1 and Petitioner has shown by a preponderance of evidence that Border anticipates that claim.

> 2. *Claims 12, 14, 21, 22, 24, 25, and 27–29*

These claims depend, directly or indirectly, from claim 1. Petitioner provides an analysis for each of these claims in relation to Border. Pet. 52–55; Teruya Decl. ¶¶ 124–134. Petitioner's analysis shows that Border discloses the additional limitations of these claims. For example, Petitioner demonstrates that Border discloses storing the received content in claim 12: "In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117." *Id*. at 52 (citing Ex. 1012, 5:36–38).

Patent Owner does not respond separately to Petitioner's analysis of these dependent claims. For the reasons given we are persuaded by Petitioner's analysis that Petitioner has demonstrated by a preponderance of the evidence that claims 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border.

IPR2021-01492
Patent 10,257,319 B2

### H.  Obviousness Based on Border and RFC 2616

Petitioner contends that the claims anticipated by Border alone (claims 1, 12, 14, 19, 21, 22, 24, 25, and 27–29), as well as claims 15 and 17–19, would have been obvious in light of Border and RFC 2616.  Pet. 55–59.

### 1.    Claim 1

Petitioner contends claim 1 would have been obvious in light of Border and RFC 2616:  "Since Border is also directed at improving those communications . . . within the same standards-defined environment, a [person of ordinary skill] developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP."  Pet. 56 (citing Teruya Decl. ¶¶ 135–137).

Addressing Patent Owner's proposed claim constructions, Petitioner contends that "[t]here is no question that downstream server 105 (the "second server") [in Border] is disclosed as a "server" and that the GET request disclosed in Border transmits a content identifier (URL).  Nor is there any difference between the data flow recited in claim 1 and that disclosed in Border.  *Id.* (citing Teruya Decl. ¶¶ 138–39).  Further, Petitioner asserts "[a]s for the 'first client device'—Border expressly discloses that its proxy servers can be implemented on personal computers."  *Id.* (citing Ex. 1012, 3:58–61, 4:51–53; 10:6–11:8).  Petitioner continues: "To the extent that is deemed insufficient disclosure of a consumer computer (should that even be required), it would have been obvious to a [person of ordinary skill in the art], based on general Internet knowledge, that any computing device capable of operating a 'proxy' as defined in RFC 2616, could serve as a first

56

IPR2021-01492
Patent 10,257,319 B2

client device, and that this would include most consumer computers with a network interface." *Id.* (citing Teruya Decl. ¶¶ 140–142).

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on Border. PO Resp. 44–48. We have addressed Patent Owner's nearly identical arguments directed to Crowds in Sections III.E and III.F, *supra*. We incorporate those discussion here.

Addressing dependent claims 12, 14, 15, 17–19, 21, 22, 24, 25, and 27–29, Petitioner demonstrates that the combination of Border and RFC 2616 discloses the additional limitations of those claims. Pet. 57–59; Teruya Decl. ¶¶ 143–151.

Because we have already determined that they are anticipated by Border, we do not separately address claims 12, 14, 22, 24, 25, and 27–29 under this ground. For those claims, we rely on our anticipation analysis in Section III.G. and the analysis in the Petition to show that they would also have been obvious in light of Border and RFC 2616.

> 2. *Claims 15 and 19*

As noted *supra*, these dependent claims are not included in Petitioner's anticipation ground. Petitioner presents analyses of claims 15 and 19 in light of Border and RFC 2616. Pet. 57–58, Teruya Decl. ¶¶ 143–145.

Claim 15 recites a validity check. Petitioner presents an obviousness analysis of claim 15 in light of Crowds and RFC 2616. Pet. 57. Petitioner relies on Border for its disclosure of "the first client device determining the received (and cached) first content valid." *Id.* Petitioner relies of RFC 2616 for disclosing "highly similar, standardized, mechanisms for accomplishing

57

Appx703

IPR2021-01492
Patent 10,257,319 B2

this." *Id.* Petitioner explains that "[i]t would have been advantageous, and obvious to a [person of ordinary skill], in view of the additional (and standardized) cache control mechanisms of RFC 2616, to have incorporated those further mechanisms into an implementation making use of the other teachings of Border, with predictable results. *Id.* (citing Teruya Decl. ¶ 145).

Claim 19, discussed in Section III.E.2, *supra*, calls for downloading software. Petitioner contends "it is routine and would have been obvious to download and install such software applications, in this case, software to run the proxy devices in Border." Pet. 58 (citing Teruya ¶ 134).

Patent Owner does not respond separately to Petitioner's analysis of these claims. *See* PO Resp. 48. We are persuaded by Petitioner's analysis and find that Petitioner has demonstrated these claims are taught or suggested by Border and RFC 2616.

      3.    *Claims 17 and 18*

Claim 17 depends from claim 1 and calls for periodic communications between the first server and the first client device. Ex. 1001, 20:56–58. Claim 18 depends from claim 17 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." Ex. 1001, 20:59–61. Patent Owner does not separately address claim 17. PO Resp. 48.

We have addressed Patent Owner's similar arguments for claim 18 in connection with Crowds. *See supra*, Section III.E.1. Petitioner contends "keep-alive" messaging is disclosed in RFC 1122. Pet. 53. Mr. Teruya testifies that "[a] person of ordinary skill] knowing that Border used persistent connections would have been motivated to use keep alives as

58

IPR2021-01492
Patent 10,257,319 B2

taught by RFC 1122 as a standard manner of maintaining such connections."
Teruya Decl. ¶ 149. Patent Owner responds that RFC 1122 "is not a
reference" in this ground. PO Resp. 48. Petitioner responds that "keep-
alive" messages are mentioned in the '319 patent and in RFC 1122. Pet.
Reply 22. As previously stated, we agree with Petitioner that this proves
that such messages would be part of a person of ordinary skill's general
knowledge. *Id.; see also Ariosa Diagnostics*, 805 F.3d at 1365 ("Art can
legitimately serve to document the knowledge that skilled artisans would
bring to bear in reading the prior art identified as producing obviousness.");
Section III.F.1, *supra*. We therefore do not credit Patent Owner's argument
that the cited prior art in this ground fails to teach or suggest the limitations
of claim 18. PO Resp. 49.

### 4. Conclusion on Obviousness

For the reasons explained above, we find that Patent Owner's
evidence purportedly showing commercial success, long-felt need, copying,
and industry praise is entitled to little weight. Thus, secondary
considerations are not sufficient to outweigh Petitioner's evidence of
obviousness.

We therefore determine for the reasons given that Petitioner
demonstrates by a preponderance of the evidence that challenged claims 1,
2, 14, 15, 17–19, 21, 22, 24, 25, and 27–29 of the '319 patent would have
been obvious in view of Border and RFC 2616.

### I. Anticipation Based on MorphMix

Petitioner asserts that claims 1, 17, 19, and 21–29 are anticipated by
MorphMix. Pet. 59–61. Petitioner provides an element-by-element claim

IPR2021-01492
Patent 10,257,319 B2

analysis, supported by expert testimony. *Id.* at 61–71; Teruya Decl. ¶¶ 152–193.

### 1. Claim 1

Petitioner contends claim 1 is disclosed by MorphMix. Pet. 61–67. For example, Petitioner identifies the claimed first client device as last node (c) in MorphMix. *Id.* at 61. Petitioner identifies the claimed second server as intermediate node (b). *Id.* at 62. Petitioner identifies the claim's first server as server (s). *Id.* Petitioner identifies the claimed first content identifier as "the 'application data' or the requested URL it contains." *Id.* And Petitioner identifies the first content as the "requested web page at the requested URL." *Id.* (citing Teruya Decl. ¶¶ 159–160).

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in MorphMix. *Id.* at 61–67. For example, the "receiving" step (step 1a) is met because "Figure 5.4 of MorphMix shows that in the course of servicing a request from node a, 'application data' (for the request) is passed from node b (second sever) to node c (first client device), which then connects with the web server." *Id.* at 62. Further, the "sending" step (step 1b) is met because "[n]ode c (first client device) sends a HTTP request comprising the FCI (AD and/or the URL within the AD) to the first server (s)." *Id.* at 65. Petitioner provides analyses for the additional steps (steps 1c and 1d) of claim 1. *Id.* at 66–67. Mr. Teruya provides supporting testimony. Teruya Decl. ¶¶ 152–180.

Patent Owner responds with a repeat of the arguments previously discussed. PO Resp. 48–54. For example, Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, MorphMix does not disclose a 'first client device' or a 'second server' as recited in

60

Appx706

claim 1 under the purely role-based constructions." *Id.* at 48. Patent Owner contends MorphMix does not disclose steps 1a and 1d. *Id.* at 49–50. For step 1a, Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, during performance of this method step, under the purely role-based constructions, node (b) is operating in the role of a client, not a server, and therefore node (b) cannot be a server…Also, under the purely role-based constructions, node (c) is operating in the role of a server, not a client, and therefore node (c) cannot be a client device." *Id.* at 49 (citation omitted). Patent Owner makes a similar argument for step 1d. *Id.* at 50. We do not agree with these arguments for reasons previously discussed. Among other reasons, they are not based on the language of the claims or the disclosure in the specification, and we have rejected Patent Owner's claim constructions that Patent Owner contends support these arguments. *See* Section III.C.

We find, for the reasons given by Petitioner and those summarized above, that MorphMix teaches or suggests each limitation of claim 1. We find that Petitioner has demonstrated by a preponderance of the evidence that MorphMix anticipates claim 1.

### 2. *Claims 17, 19, and 21–29*

Petitioner provides an analysis for each of these dependent claims in relation to MorphMix. Pet. 67–71; Teruya Decl. ¶¶ 181–193. Petitioner's analysis shows that MorphMix discloses the additional limitations of these claims. For example, Petitioner demonstrates that MorphMix discloses the periodic communication step in claim 17: "The 'second server' and 'first client device' of MorphMix are nodes, and each communicates via the MorphMix protocol for establishing and maintaining virtual tunnels. Each

61

sends HTTP protocol messages through this tunnel to handle web requests." *Id.* at 67–68 (internal citation omitted).

Patent Owner does not respond separately to Petitioner's analysis of these dependent claims. PO Resp. 54. For the reasons given, we are persuaded by Petitioner's analysis and therefore find that Petitioner has demonstrated by a preponderance of evidence that claims 17, 19, and 21–29 are anticipated by MorphMix.

### J. Obviousness Based on MorphMix and RFC 2616

Petitioner contends that the claims anticipated by MorphMix alone (claims 1, 17, 19, and 21–29), as well as claims 2, 14, 15, and 18, would have been obvious in light of MorphMix and RFC 2616. Pet. 71–76.

#### 1. Analysis

Petitioner contends that claim 1 would have been obvious in light of MorphMix and RFC 2616. Pet. 71–72. Petitioner explains, because MorphMix is also directed at improving communications (in this case, providing anonymity) using standard protocols such as TCP/IP, "within the same-standards defined environment, a [person of ordinary skill] developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP." *Id.* at 71 (citing Teruya Decl. ¶¶ 194–195).

Addressing claim 1, Petitioner contends that "Patent Owner sought to construe 'client device' as a 'consumer computer.'" *Id.* at 72. Petitioner continues, "[t]here is no § 102 issue with MorphMix on that score, as MorphMix (expressly called a 'peer-to-peer' based system) clearly contemplates the use of consumer-class computers." *Id.* at 72. Petitioner

further explains that "[a]s for the 'second server,' . . . node b acts in the role of a server to node a." *Id.* Still further addressing the claimed "first content identifier," Petitioner points out that MorphMix discloses a "continuous series of user activity via URL requests." *Id.* at 72 (citing Ex. 1008 at 94). Furthermore, "the [person of ordinary skill] would know from RFC 2616 § 5.1.2 that a URL includes a content identifier." *Id.*

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on MorphMix. PO Resp. 51–54. We have addressed Patent Owner's similar arguments in Section III.I, *supra*, and in our discussions of Crowds and Border, *supra*. We incorporate those discussions here.

Addressing dependent claims 2, 14, 15, 18, 19, and 21–29, Petitioner demonstrates that MorphMix and RFC 2616 disclose the additional limitations added by those claims. *Id.* at 71–76; Teruya Decl. ¶¶ 200–211.

We have already determined that claims 17, 19, and 21–29 are anticipated by MorphMix. For those claims, we rely on our anticipation analysis in Section III.I to show that they would also have been obvious in light of MorphMix and RFC 2616.[21]

For claims 18 and 19, Patent Owner repeats arguments from the Crowds and Border challenges that we have addressed. *See* Sections III.F.1 and III.H.1, *supra*. Patent Owner does not further address this obviousness ground. PO Resp. 54–33.

---

[21] Although claim 17 is listed in the section heading for this obviousness challenge, the Petition does not directly address claim 17 in this analysis of obviousness. *See* Pet. 71, 75. Previously, we determined that claim 17 is anticipated by MorphMix. *See* Section III.I.2, *supra*. For this reason, we find that claim 17 is also obvious over MorphMix and RFC 2616.

IPR2021-01492
Patent 10,257,319 B2

### 2. Conclusion

For the reasons explained above, we find that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise are entitled to little weight. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness.

We therefore determine for the reasons given that Petitioner demonstrates by a preponderance of the evidence that claims 1, 2, 14, 15, 17–19, and 27–29, of the '319 patent would have been obvious in view of MorphMix and RFC 2616.

### IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 19, 21–29 | 102 | Crowds | 1, 19, 21–29 | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 | 1, 2, 14, 15, 17–19, 21–29 | |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border | 1, 12, 14, 21, 22, 24, 25, 27–29 | |
| 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27– | 103 | Border, RFC 2616 | 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27–297 | |

64

IPR2021-01492
Patent 10,257,319 B2

| 297 | | | | |
|---|---|---|---|---|
| 1, 17, 19, 21–29 | 102 | MorphMix | 1, 17, 19, 21–29 | |
| 1, 2, 14, 15, 17–9, 21–29 | 103 | MorphMix. RFC 2616 | 1, 2, 14, 15, 17–9, 21–29 | |
| **Overall Outcome** | | | 1, 2, 12, 14, 15, 17–19, 21–29 | |

## V.  MOTION TO SEAL

Patent Owner has filed an unopposed Motion to Seal.  Paper 33. The Motion requests sealing of Exhibits 2039 (network diagram), 2041–2044 (source code files), and 2065 (expert declaration), and Patent Owner's Response (Paper 31).  Paper 33, 2.  The Motion also includes a request to enter an agreed protective order.  *See* Exhibit 2068.

We have reviewed this Motion and the documents at issue and have considered the explanations of the confidential nature of the materials for which sealing is sought.  We find there is good cause and therefore we grant the Motion to Seal and the associated request to enter the parties' agreed protective order.[22]

## VI.  ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable;

---

[22] Petitioner also filed a Motion to Exclude New Evidence (Paper 46), which was withdrawn at the oral hearing, without objection by Patent Owner. *See* Hearing Tr. 5:5–12.

IPR2021-01492
Patent 10,257,319 B2

FURTHER ORDERED that the request to enter the parties' agreed protective order (Ex. 2068) is granted;

FURTHER ORDERED that the Motion to Seal (Papers 33) is granted;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Decision that can be made publicly available;

FURTHER ORDERED that the present Decision shall remain under seal until any joint motion to seal the Decision is resolved;

FURTHER ORDERED that the present Decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.[23]

---

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2021-01492
Patent 10,257,319 B2

PETITIONER:

Ronald Abramson
Mord Lewis
Ari Jaffess
LISTON ABRAMSON LLP
ron.abramson@listonabramson.com
michael.lewis@listonabramson.com
ari.jaffess@listonabramson.com

PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

67

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                                                    Paper: 53
571-272-7822                                                      Entered: September 22, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB,
OXYSALES, UAB, AND CORETECH LT, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

————————

IPR2021-01493[1]
Patent 10,484,510 B2

————————

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

---

[1] The Petitioners in IPR2022-00862 were joined to this case, with IPR2022-00862 then terminated. *See* Paper 24, 35–38.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

## I.  INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, and 15–24 (the "challenged claims") of U.S. Patent No. 10,484,510 B2 (Ex. 1001, "the '510 patent") are unpatentable.

### A. Procedural Background

In IPR2022-00862, Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and Coretech LT, UAB (collectively, "Code200" or "Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 6– 11, 13, and 15–24 of the '510 patent, along with the supporting Declaration of Keith J. Teruya.  IPR2022-00862, Paper 1 ("Pet."); IPR2022-00862, Ex. 1005 ("Teruya Decl.").  Bright Data Ltd.[2] ("Patent Owner") filed a Preliminary Response to the Petition.  IPR2022-00862, Paper 15.  With the Petition, Petitioner also filed a Motion for Joinder with this case, IPR2021-01493.  IPR2022-00862, Paper 7, Paper 13.

On July 25, 2022, we issued a Decision in IPR2022-00862 exercising discretion to deny institution based on an assessment of factors set forth in *General Plastic Industrial Co. Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i) (*General Plastic*).  IPR2022-00862, Paper 17.  Our Decision also denied joinder of the parties in IPR2022-00862 to this case, IPR2021-01493.  *Id.* at

---

[2] Bright Data Ltd. was formerly known as Luminati Networks Ltd.  *See* PO Resp. 68.

2

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

17. The Director reviewed our Decision *sua sponte*, vacated the Decision, and remanded the case to the panel, with orders that our Decision denying institution and joinder be reconsidered consistent with the review. IPR2022-00862, Paper 18 ("Remand Decision").

Pursuant to and consistent with the Remand Decision, we considered the Petition, Joinder Motion, and Preliminary Response in IPR2022-00862, instituted *inter partes* review, and granted joinder of the parties to this case. Paper 24 ("Inst. Dec."). More specifically, we instituted *inter partes* review based on the following grounds:

| Claims Challenged | 35 U.S.C. §[3] | Reference(s)/Basis[4] |
|---|---|---|
| 1, 6, 7, 13[5], 15, 16, 18–24 | 102(b) | Crowds[6] |

---

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '510 patent claims priority to a provisional application that was filed before this date, with Petitioner not contesting that priority, the pre-AIA versions of §§ 102 and 103 apply. *See* Ex. 1001, code (60); Pet. 17.

[4] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 10. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations.

[5] The Petition includes assertions for claim 13 under the Crowds anticipation ground. Pet. 33. Accordingly, we include this claim in the summary table, although not included in the Petition's summary table. *Id.* at 10.

[6] Michael K. Reiter, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, at 66–92 (Ex. 1006).

3

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

| Claims Challenged | 35 U.S.C. §[3] | Reference(s)/Basis[4] |
|---|---|---|
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | Crowds, RFC 2616[7] |
| 1, 6, 10, 15–20, 23, 24 | 102(b) | Border[8] |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103(a) | Border, RFC 2616 |
| 1, 6–8, 13, 15, 16, 18–24 | 102(b) | MorphMix[9] |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | MorphMix, RFC 2616 |

Pet. 10; Inst. Dec. 5[10], 38.

Patent Owner filed a Patent Owner Response ("PO Resp."), along with the Declaration of Tim Williams, Ph.D. Paper 30; Ex. 2065. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 40. Patent Owner filed a Sur-reply ("PO Sur-reply"). Paper 41.

An oral hearing was conducted on June 9, 2023. A transcript of the hearing is included in the record. Paper 51 ("Tr.").

B. Related Matters

The '510 patent has been the subject of numerous proceedings in district court and the Board. Pet. 3–5; IPR2022-00862, Paper 10, 1–5. In particular, the parties identify four district court proceedings involving the

---

[7] Hypertext Transfer Protocol—HTTP/1.1, Network Working Group, RFC 2616, The Internet Society, 1999 (Ex. 1013).
[8] U. S. Patent No. 6,795,848, issued September 21, 2004 (Ex. 1012).
[9] Marc Rennhard, MorphMix—A Peer-to-Peer-based System for Anonymous Internet Access (2004) (Ph.D. dissertation, Swiss Federal Institute of Technology) (Ex. 1008).
[10] In the Institution Decision, the summary table inadvertently includes claim 22 in the Border anticipation ground, which Petitioner did not challenge under this ground. *See* Pet. 10; Inst. Dec. 5.

4

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

'510 patent and a related patent (U.S. Patent No. 10,257,319 ("the '319

patent")):

> *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.)
> (pending);
>
> *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv395 (E.D.
> Tex.) (pending) ("the Teso litigation");
>
> *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 2:19-cv397
> (E.D. Tex.) (dismissed); and
>
> *Luminati Networks Ltd. v. Tefincom S.A.,* No. 2:19-cv-414
> (E.D. Tex.) (pending).

Pet. 3; IPR2022-00862, Paper 10, 2–3.

The '510 patent has also been before the Board in IPR2020-00138 and

IPR2022-00916. Pet. 5; IPR2022-00862, Paper 10, 1–2.

In addition, Patent Owner identifies *ex parte* reexaminations, Control

No. 90/014,875 and Control No. 90/014,876, that have been ordered for U.S.

Patent No. 10,257,319, a patent related to the '510 patent, and for the '510

patent, respectively. IPR2022-00862, Paper 10, 2. Those reexaminations

have been stayed. *See* IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

*C. The '510 Patent*

The '510 patent is titled "System Providing Faster and More Efficient

Data Communication" and issued on November 19, 2019 from an

application filed on February 17, 2019. Ex. 1001, codes (22), (45), (54).

The patent is subject to a terminal disclaimer. *Id*. at code (*). The

application for the '510 patent claims priority to several applications,

including U.S. Provisional Application No. 61/249,624, filed October 8,

2009. *Id*. at code (60).

5

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

The '510 patent is directed to addressing the "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." Ex. 1001, 1:57–59. The '510 patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:61–3:6. The '510 patent provides a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below. *Id.* at 3:16–18, 4:5–7.



FIG. 3

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. Ex. 1001, 4:56–48. Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:58–60. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of

6

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

the many such servers on the Internet." *Id.* at 4:65–5:2. Acceleration server
162 includes an acceleration server storage device 164 with an acceleration
server database, which "stores Internet Protocol (IP) addresses of
communication devices within the communication network 100 having
acceleration software stored therein." *Id.* at 5:14–17.

In operation, a client may request a resource on the network, for
example, through the use of an Internet browser. Ex. 1001, 12:62–13:3. If
server 152 is the target of the request, the client sends the IP address of
server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server
162 then prepares a list of agents that can handle the request, which includes
communication devices "that are currently online, and whose IP address is
numerically close to the IP of the destination Web server 152." *Id.* at
13:19–29. The client then sends the original request to the agents in the list
to find out which "is best suited to be the one agent that will assist with this
request." *Id.* at 13:31–36. The connection established between the agent
and client may be a Transmission Control Protocol ("TCP") connection. *Id.*
at 17:61–64.

Each agent responds to the client with information as to "whether the
agent has seen a previous request for this resource that has been fulfilled,"
and "which can help the client to download the request information from
peers in the network." Ex. 1001, 13:51–57. The client selects an agent
based on a number of factors, and the selected agent determines whether
data stored in its memory or the memory of the peers "still mirrors the
information that would have been received from the server itself for this
request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

the necessary information to service the request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

The '510 patent has twenty-four claims. Claim 1, the only independent claim, is illustrative of the claimed subject matter and is reproduced below, with bracketed designations added to the limitations for reference purposes.

> 1. [pre] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
>
> > [a] establishing a Transmission Control Protocol (TCP) connection with a second server;
> >
> > [b] sending, to the web server over an Internet, the first content identifier;
> >
> > [c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
> >
> > [d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

Ex. 1001, 19:18–31.

## II. ANALYSIS OF PATENTABILITY OF CLAIMS 1, 2, 6–11, 13, AND 15–24

*A. The Parties' Arguments*

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that at least one claim of the '510 patent is anticipated or would have been obvious. Inst. Dec. 23–35. Here, we must consider whether Petitioner has established

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of the '510 patent are anticipated or would have been obvious. 35 U.S.C. § 316(e). We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived." Paper 25, 9; *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument in the preliminary response by not raising the same argument in the patent owner response). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated Trial Practice Guide (Nov. 2019)[11] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and evidence advanced by Petitioner to support its unpatentability contentions. In this regard, the record contains persuasive arguments and evidence presented by Petitioner regarding the manner in which the prior art discloses or teaches the corresponding limitations of claims 1, 2, 6–11, 13, and 15–24 of the '510 patent and the rationale for combining the asserted obviousness references.

B. *Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date."

---

[11] *Available at* https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

9

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Pet. 15 (citing Teruya Decl. ¶¶ 25–27). Petitioner further states that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.*

Patent Owner submits that a person of ordinary skill in the art "would have a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." PO Resp. 2 (citing Ex. 2065 ¶ 25). Patent Owner states that "Patent Owner's analysis herein does not change under the Board's preliminary definition of a" person of ordinary skill in the art. *Id.* at 2 (citing IPR2022-01493, Paper 11, 18; Ex. 2065 ¶ 26).

In the Decision on Institution, we adopted the assessment of qualifications offered by Petitioner, which we also adopt here. Inst. Dec. 14–15. The assessment offered by Petitioner is consistent with the '510 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

*C. Claim Construction*

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by the Federal Circuit, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

(en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

   *1. "client device"*

    *a. Petitioner's Assertions*

  Petitioner asserts that the district court's constructions in the *Teso* district court litigation should apply in this case. Pet. 15–20. In particular, Petitioner points to two claim construction orders in that case—an original order (Ex. 1017) and a supplemental order (Ex. 1020). Petitioner also relies on a claim construction order in *Bright Data Ltd. v. Code200, UAB*, Case No. 2:19-cv-00396 (E.D. Tex.) ("the Code200 Litigation"), which is directed to related patents. Pet. Reply 13 (citing Ex. 1112).

  As Petitioner notes, the magistrate judge construed "client device" as "communication device that is operating in the role of a client," and found that "role-based construction applies 'regardless of any additional role the device may serve, including as a server.'" Pet. Reply 13 (citing Ex. 1017, 10–12; Ex. 1112, 13 (emphasis omitted)). Petitioner argues that the district court has repeatedly addressed and rejected Patent Owner's arguments on the claim construction for this term. *Id.* (citing Ex. 1112). Petitioner indicates that the magistrate judge's constructions were adopted by the district judge. *Id.* (citing Ex. 1113; Ex. 1114). Petitioner also refers to the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

district court's ruling that precluded Patent Owner from arguing that "a client device cannot be a server." *Id*. (citing Ex. 1116, 4). Petitioner additionally refers to the claim construction order in *Bright Data Ltd. v. NetNut Ltd*., No. 2:21-cv-225 (E.D. Tex.) ("the *NetNut* litigation"), in which the district court rejected a proposed construction of the term "client device" as a "consumer computer." *Id*. at 13 n.6 (citing Ex. 1115, 10–16). Petitioner refers to RFC 2616, which is referenced in the '510 patent, and asserts that it "confirms that 'client' means 'program that establishes connections for the purpose of sending requests,'" where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." *Id*. at 15–16 (citing Ex. 1013, 8 (emphases omitted); Ex. 1001, 16:21–22.).

In further support, Petitioner points to the '510 patent Specification, where "a 'client device' is an entity that receives the content from the intermediate agent device." Pet. 20 (citing Ex. 1001, 9:27–36). Petitioner asserts that "the same device [client device], thus acting as a 'client' for one content retrieval, can also act, in another content retrieval in the same system, as one the of the intermediate 'agent' nodes, and also operate in the role of a server," which is consistent with the district court's construction.

Petitioner also refers to a mapping of Figure 3 of the '510 patent showing the claimed elements, as shown in annotated Figure 3 below. Pet. 18–19.

Appx725

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2



As shown in annotated Figure 3, above, Petitioner contends that the "second server" is marked in green (client 102), the "client device" is marked in red (agent 122), and the "first server" is marked in blue (web server 152), which is "a logical and reasonable mapping." Pet. 18–19. Petitioner points out that this is the mapping that Patent Owner used in briefing in a related litigation. *Id.* (citing Ex. 1004, 19–20).

Petitioner also asserts that under Patent Owner's proposed claim construction a "client device" has to: (1) be a "consumer computer;" (2) be "typically portable and easily moved;" (3) be "not a dedicated network element;" (4) use single or relatively few connections;" (5) be "resource limited (e.g., bandwidth and storage), unlike a server;" (6) be "regularly switched off and taken offline;" (7) be "capable of processing only a limited number of requests at any given time;" and (8) have "lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs." Pet. Reply 1–2 (citing PO Resp. 25–28; Ex. 2065 ¶¶ 120, 124–125; Ex. 1111, 53:24–54:8:1). Petitioner argues that these

13

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

characteristics are highly subjective, indefinite, and not supported by the Specification. *Id*. at 2–6.

### b. Patent Owner's Assertions

Patent Owner asserts that a person of ordinary skill in the art would understand the term "client device" to mean "a consumer computer" or a "consumer communication device." PO Resp. 23 (citing Ex. 2065 ¶ 114). Patent Owner argues that these constructions are consistent with the term's plain and ordinary meaning, the Specification, the prosecution histories, and extrinsic evidence. *See id*. at 23–28. Patent Owner contends that the district court claim constructions should be applied, but argues that Petitioner has deviated from the district court's construction of the term "client device" because there is no attribution of special meaning to the term "communication device." *Id*. at 8. Patent Owner further asserts that in the *NetNut* litigation, the district court "expressly rejected removing the word 'communication' from its construction of" the term "client device." *Id*. at 10 (citing Ex. 2021, 14) (emphases omitted)). Patent Owner argues that Petitioner only applies role-based constructions and "treat[s] client devices and servers as interchangeable general purpose computers." *Id*. at 9. Instead, Patent Owner argues, the district court "found that a 'client device' is a physical communication device, which has a special meaning in the context of the specification. A communication device . . . is not simply any device that communicates over the Internet." *Id*. Patent Owner argues that purely role-based constructions "contradict the Court's Orders because they refer to generic devices operating in a particular role," and they "fail to

14

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

account for the physical/structural differences between client devices and servers." *Id.* at 10.

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer so a person of ordinary skill in the art would understand client 102 and agent 122 to both be client devices. PO Resp. 6 (citing Ex. 1001, 4:46–52, 5:23–31, 9:14–51, 15:39–42, 15:51–52, Fig. 6; Ex. 2065 ¶¶ 56–58). Patent Owner contends that a person of ordinary skill "would understand that proxy server 6 of Figure 1 could be inserted between client 102 and agent 122 of Figure 3," with the result being modified Figure 3, reproduced below. *Id.* at 7–8 (citing Ex. 2065 ¶ 59).



Patent Owner alleges that, as shown in modified Figure 3 above, a person of ordinary skill in the art would understand that client device ↔ second server ↔ first client device ↔ web server would correspond to client 102 (purple) ↔ proxy server 6 (green) ↔ agent 122 (red) ↔ web server 152 (blue) of

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

modified annotated Figure 3.  PO Resp. 7–8 (citing Ex. 2065 ¶ 59).  Patent
Owner further argues that the Specification distinguishes between servers
and client devices and "[u]nder Petitioners' application of their purely role-
based constructions, there would be nothing to distinguish intermediary
proxy server 6 (which is a server) from intermediary agent 122 (which is a
client device)."  PO Sur-reply 8 (citing PO Resp. 14–18).

Patent Owner further asserts that a person of ordinary skill in the art
would understand that "a client device is typically portable and easily
moved, like, for example, a laptop, desktop, tablet or smartphone."  PO
Resp. 26 (citing Ex. 2065 ¶ 124).  Patent Owner contends that a person of
ordinary skill's understanding is evidenced by extrinsic evidence, with "a
definition of a client as 'an application that runs on a personal computer or
workstation and relies on a server to perform some operations.'"  *Id*. at 27
(citing Ex. 2035; Ex. 2036, 5; Ex. 2037, 7; Ex. 2065 ¶ 126).  Patent Owner
contends that a person of ordinary skill in the art would understand that a
client device typically (a) is regularly switched off and taken offline; (b) is
capable of processing only a limited number of requests; and (c) has lesser
fault tolerance, lesser reliability, and lesser scalability.  *Id*. (citing Ex. 2065
¶ 125).  Patent Owner argues that a person of ordinary skill in the art "would
understand there are structural differences between client devices and
servers in the context of the specification."  *Id*. at 28 (citing Ex. 2065 ¶ 128).
Patent Owner contends that a person of ordinary skill in the art would be
informed by statements made during prosecution that a client device is not a
dedicated network device, typically uses a single or relatively few

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

connections, and is resource limited (e.g., bandwidth and storage), unlike a server. *Id.* at 26–27 (citing Ex. 2065 ¶ 124).

Patent Owner acknowledges that the district court rejected Patent Owner's construction equating "client device" with "consumer computer." PO Resp. 23. Patent Owner argues, however, that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 23–25. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the Specification, the Specification states that "computers of consumers" are "referred to herein as client devices." *Id.* at 23 (citing Ex. 1001, 2:47–49). Patent Owner further contends that the Specification indicates a special meaning for the term and a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '510 Patent." *Id.* at 23–24 (citing *Kyocera Senco Indus. Tools, Inc. v. ITC*, 22 F.4th 1369, 1379 (Fed. Cir. 2022)). Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content. *Id.* at 24 (citing Ex. 1017, 11). Rather, Patent Owner argues, the common understanding of "consumer" is "a person who buys goods or services for their own use" or "someone who buys goods or services for personal use." *Id.* (citing Ex. 2030; Ex. 2031, 5; Ex. 2032, 4; Ex. 2033; Ex. 2034, 4; Ex. 2065 ¶ 121; 15 U.S.C. § 6809(9); 12 C.F.R. § 332). Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

consumers," and that relevant statements were made in the prosecution history. *Id*. at 25 (citing Ex. 1017, 11).

Patent Owner contends that in the context of the '510 patent, "a client device is not a server." PO Resp. 25. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction of client device, namely, that a client device is unable to act as a server in all cases. *Id*. (citing Ex. 1017, 12). Patent Owner further asserts that the district court did not have the benefit of the detailed discussion provided by Patent Owner concerning Figures 1 and 3. *Id*. (citing Ex. 2065 ¶ 131). Patent Owner submits that "under the purely role-based constructions, a client device may operate in the role of a server at some points in time, but that does not transform a physical client device into a physical server," and a person of ordinary skill in the art would understand that a client device is not a server in view of the '510 patent. *Id*.

Patent Owner contends that, in view of the recited architecture of the '510 patent claims that distinguishes between client devices and servers, the use of three interchangeable devices in a pathway would not disclose that architecture. PO Resp. 13 (citing Ex. 2065 ¶¶ 75–76). Patent Owner also argues that the recited architecture in the '510 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the non-interchangeability and non-role-based nature of the devices, and these distinctions are consistent with an *Alice*[12] order in the *Teso* district court litigation. *Id*. at 12–13 (citing Ex. 2065 ¶¶ 75–76, 80; Ex. 2024, 6–11); PO Sur-reply 6–7. Patent Owner refers to the district court's finding that found

---

[12] *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

that "it is not the individual steps of the method that render the Asserted Claims non-abstract, it is the network architecture as a whole." *Id*. at 13 (citing Ex. 2024, 9).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of the Specification, a person of ordinary skill in the art would have understood that proxy server 6 must be structurally different from agent 122 and that "a server is not a client device and that a client device is not a server." PO Resp. 15 (citing Ex. 2065 ¶ 83). Patent Owner argues that under "purely role-based constructions, proxy server 6 of Figure 1 and agent 122 of Figure 3 would be operating in the same roles at a given point in time," so under the Board's preliminary constructions "Figure 3 collapses onto Figure 1" and fails to account for structural differences between a proxy server and a client device. *Id*. More specifically, Patent Owner contends that, as shown in Figure 1, under role-based constructions, "proxy server 6 (i) receives requests from client devices 14, 16 and (ii) sends requests to web server 32," so "proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id*. at 16 (citing Ex. 2065 ¶ 86). Patent Owner asserts that for Figure 3, under role-based constructions, "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152," so "agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id*. at 17–18 (citing Ex. 2065 ¶¶ 91– 92). Patent Owner argues that with proxy server 6 of Figure 1 and agent 122 of Figure 3 operating in the same roles at a given point in time, "there is nothing to distinguish the architectures of Figures 1 and 3." *Id*. at 18 (citing Ex. 2065 ¶ 93). Patent Owner asserts that "purely role-based constructions

19

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

are not appropriate because they fail to account for these structural differences between proxy servers and proxy client devices." *Id.* at 18 (citing Ex. 2065 ¶ 94).

Patent Owner additionally refers to the prosecution history of U.S. Patent No. 10,069,936 ("the '936 patent"), the grandparent of the '510 patent. PO Resp. 19–22. Patent Owner argues that this prosecution history "clearly distinguishes client devices from servers." *Id.* at 19 (citing Ex. 2065 ¶ 97). Patent Owner asserts that during prosecution, the applicant "repeatedly argued that client devices are different from servers." *Id.* (citing Ex. 2026, 163–164, 96–97). Patent Owner points to the applicant's statement that "[t]here is a clear distinction in the art and as taught by the Garcia reference between clients and servers," and "[c]lient devices, such as client 105 in the Garcia reference, are end-units that request information from servers, use client-related software such as Web browser software, communicate over the Internet using ISP connection, and are typically consumer owned and operated." *Id.* at 20 ((citing Ex. 2026, 163) (emphases omitted)).

Additionally, Dr. Williams refers to the examiner's statement that "Garcia fails to teach a group of clients for data communication; (a) each of the devices sending its identifier to the first server; (b) the first server receiving and storing the identifiers of the devices; (d) the first server selecting one of the clients from the group; and (f) the selected client receiving the content from the web server; and (g) the requesting client receiving the content from the selected client." Ex. 2065 ¶ 98 (citing Ex. 2026, 124). Dr. Williams testifies that "the examiner recognized a

20

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

server cannot be equated to a client device regardless of the role being performed at a given moment in time." *Id.* ¶ 99.

Patent Owner asserts that "the examiner acknowledged that 'the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification.'" PO Resp. 21 (citing Ex. 2026, 44 (emphasis omitted)). Patent Owner contends that this "shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id.* (citing Ex. 2065 ¶ 102). Patent Owner also refers to the prosecution history of the '319 patent, which is the parent of the '510 patent, asserting that it shows that servers and client devices are not interchangeable general use computers. PO Resp. 21 (citing Ex. 2065 ¶ 104). During prosecution of the '319 patent, the applicant contended that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* (citing Ex. 2066, 282). Patent Owner further cites to the applicant's statement that "the claimed components as a combination perform functions that are not merely generic – It is respectfully submitted that the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device, which

21

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

is unique and solves a specific problem such as anonymity when fetching information." *Id*. at 22 (citing Ex. 2066, 282–283 (emphases omitted)).

Patent Owner also refers to the prosecution history of the '510 patent, arguing that the examiner acknowledged the "environment" of the claimed method, which "shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id*. at 22–23 (Ex. 2065 ¶ 108).

> ### c. Analysis

For the reasons discussed below, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" which we adopted in our Institution Decision and we apply here in view of the full record. *See* Inst. Dec. 17. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server. *See* PO Resp. 23.

> ### i. Claim Language

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[b], the first client device, "send[s], to the web server over the Internet, the first content identifier," which serves to request content from the web server. *See* Ex. 1001, 19:24–25. In step 1[b], the first client device is acting as a client in requesting content. In step 1[d], the first client device "send[s] the received first

22

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

content, to the second server." *See id.* at 19:29–30. In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term. Pet. 16, 18–19 (citing Ex. 1020, 10); Pet. Reply 13–16 (citing Ex. 1017, 10–12; Ex. 1112, 13; Ex. 1020, 8–11; Ex. 1113; Ex. 1114; Ex. 1001, 5:51–6:42, 9:21–27; Ex. 1126, 8; Ex. 1004, 19–20). Patent Owner agrees that if the role-based construction were adopted, for Figure 3, "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152," so "agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." PO Resp. 17–18 (citing Ex. 2065 ¶¶ 91–92).

Petitioner refers to Patent Owner's assertions in the *Teso* district court litigation, where Patent Owner identified client 102 with the "second server" and agent 122 with the "first client device" as shown in annotated Figure 3 and an annotated version of claim 1 of the '510 patent, reproduced below. Pet. Reply 14–15 (citing Ex. 1126, 8; Ex. 1004, 19–20).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Although each of the Asserted Claims involve methods performed within a **server** – **client device** – **web server** architecture, the claim terms differ int hat the "first" **server** in the '319 and '510 Patents is referred to as the "second" **server** in the '614 Patent. Fig. 3 is annotated below to illustrate the claimed steps [A], [B], [C], [D], and/or [E] performed by the **client device** in conjunction with the **server** and **web server**.



1. A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first **client device** comprising:
    [A] establishing a Transmission Control Protocol (TCP) connection with a **second server**;
    [C] sending, to the **web server** over an Internet, the first content identifier;
    [D] receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and
    [E] sending the received first content, to the **second server** over the established TCP connection, [B] in response to the receiving of the first content identifier.

Ex. 1126, 8–9 (omitting assertions for '319 patent). As shown in annotated Figure 3 above, Patent Owner equated client 102 (green) to the "second server" and agent 122 (red) to the "first client device" in accordance with the roles required in the claim elements.[13]

_____

[13] We recognize that Patent Owner modified its position in its Response to assert that both client 102 and agent 122 are client devices. PO Resp. 6–7 (citing Ex. 2065 ¶¶ 56–59). We address the issue of two devices acting as

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

That is, Patent Owner asserted that the "first client device" (shown in red) is equivalent to agent 122, which sends the first content identifier to the web server, receives content requested from the web server, and sends that content to client 102 (the second server). Thus, under Patent Owner's presentation, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This assertion by Patent Owner reflects a role-based interpretation of the claim terms; different devices shown in Figure 3 are identifiable as the recited clients or servers based on their functionality.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function performed by a recited component serves to define the recited component. Ex. 1020, 7–11. For instance, the district court found that under the steps of a claim, a "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also "sending the received first content." Ex. 1017, 3–4; *see also* Ex. 1020, 10. Consistent with the claim language, the district court recognized that "a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10. That is, although the district court determined that a single

---

client devices below in the discussion on modified Figure 3 under Dr. Williams' testimony.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id.* We agree with the district court's construction of "client device" as a "communication device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1017, 12.

We note that Patent Owner's argument that a client device is not a server (PO Resp. 15, 25) is not supported by the claim language, which describes a "client device" acting as a client to request content from the web server, as well as acting as a server to forward content under the method claims. We discuss this issue further below in more detail.

### ii. Specification

The district court's interpretation of the term "client device," adopted here, is also consistent with the '510 patent Specification. The '510 patent Specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles:

> *Due to the functionality provided by software stored within each communication device*, which may be the same in each communication device, *each communication device may serve as a client, peer, or agent*, depending upon requirements of the network.

Ex. 1001, 4:46–50 (emphases added). Accordingly, the Specification states that the components identified in Figure 3 may perform different functions based on their stored software. *Id.* More specifically, the Specification explains that "each of [the software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the

26

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

communication network 100 *at a given time*." Ex. 1001, 9:20–25 (emphasis added). The Specification thus supports the role-based identification of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Dr. Williams testifies that a person of ordinary skill in the art, when considering Figure 6 and associated text, would understand that "one 'client device' may be configured to be the *requesting client device* and another 'client device' may be configured to be the *proxy client device*." Ex. 2065 ¶ 117 (emphases added). Dr. Williams further testifies, similar to the discussion for modified Figure 3, reproduced *supra,* Section II.C.1.b (Patent Owner's assertions), that a person of ordinary skill in the art would understand that client 102 (in purple) corresponds to the *requesting client device* and agent 122 (in red) corresponds to the *proxy client device. Id.* ¶¶ 118–119. Dr. Williams testifies that "[a]gent 122 is disclosed as a client device (as opposed to a server) that is selected, for example, because agent 122 is closest to the web server 152." *Id.* ¶ 119.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams' testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, in which Patent Owner has inserted "proxy server 6" between "client device" and "agent." We do not discern that this configuration is shown in any figure of the '510 patent or disclosed in the Specification, and, consistent with this, Dr. Williams testifies that proxy server 6 shown in prior art Figure 1 was cut out and pasted into Figure 3. *See* Ex. 1001; Ex. 1111, 112:20–24. Dr. Williams also testifies that a person of ordinary skill in the art "would understand that

27

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 59 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and the invention of Figure 3. Ex. 1001, 2:8–18, 2:24–32, 4:41–45. But Dr. Williams provides no specific explanation or a rationale to combine this prior art with this embodiment of the invention.[14] Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device," are disclosed, but we do not find that these characterizations are disclosed in the Specification. In view of the lack of record support, we afford little weight to Dr. Williams' testimony on this issue.

Thus, in view of the '510 patent Specification's disclosures, we do not agree that it discloses the architecture of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server in the first place, as Patent Owner asserts. *See* PO Resp. 7–8 (citing Ex. 2065 ¶ 59). Moreover, we do not agree that Patent Owner's argument based upon alleged "architecture" (*id.* at 13) should govern the construction of "client device" in light of the

---

[14] At his deposition, Dr. Williams further testified that "a POSA [person of ordinary skill in the art] would understand that other network elements can be present within the diagram of Figure 3. And a well understood network element would be a proxy server, as is clearly disclosed in Figure 1, that a proxy server can be inserted into a network," as well as "just as with routers, a POSA would understand that a proxy server is a normal network element to be inserted within a network, as was disclosed in Figure 1." Ex. 1111, 112:7–12, 113:8–11. However, even if a person of ordinary skill in the art knew that the modification *could* be done, Figure 3, as modified by Patent Owner, is not disclosed in the '510 patent and Patent Owner does not explain why the modified version of the Figure should direct claim construction.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

claim language and the Specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which comes into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–53, 9:20–26. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* district court litigation (Ex. 2024) are consistent with its understanding of the architecture required by the claims of the '510 patent. PO Resp. 12–13 (citing Ex. 2065 ¶¶ 75–76, 80; Ex. 2024, 6–11). We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopt here. The order addressed a Motion for Judgement on the Pleadings Under Fed. R. Civ. P. 12(c). Ex. 2024, 1. The *Alice* order addressed patent eligibility, not claim construction. *See id.* at 1–12. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id.* at 5. Further, after the *Alice* order issued in February, 2021, the district court consistently

29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

maintained its claim constructions with the adoption of the magistrate judge's claim construction order in September, 2021. *Id*. at 16; Ex. 1114.

Patent Owner argues that in the '510 patent, "a client device is not a server." PO Resp. 15, 25. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in step 1[b] to request content, and acts as a server in step 1[d] to forward content. *See* Ex. 1001, 19:24–31. Patent Owner has agreed that under the claim language, a device can have different functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is specifically not a server—is not supported by the specification." Ex. 1020, 10 (quoting Ex. 1017, 11). The district court refers to the Specification's disclosure that a "communication device" may act as a client, peer, or agent. Ex. 1017, 11–12 (citing related '319 patent, 4:48–49). The district court also found, and we agree, that although the patent does not list "servers" as "communication devices," "that is not sufficient to construe 'client device' as unable to act as a server in all cases," in view of the case law that negative claim limitations are "supported when the specification describes a reason to exclude the relevant limitation." *Id*. at 12 (citing *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012). Moreover, we note that under Patent Owner's analysis in the *Teso* district court litigation, the claimed "first client device," which may act as a server in claim 1, is identified as "Agent 122" of Figure 3. Ex. 1126, 8–9. As discussed, the Specification provides support that an agent can act in

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

different roles with software modules allowing different functions.
Ex. 1001, 4:46–50.

Patent Owner also asserts that under a "role-based" construction, "Figure 3 collapses onto Figure 1." PO Resp. 15. According to Patent Owner, such constructions "do not account for structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3)." *Id.* Patent Owner casts the alleged invention as being directed to the exclusion of "a proxy client device encompassing a proxy server." *Id.* at 43–44 (Ex. 2065 ¶ 50). We do not agree with Patent Owner's arguments as they are based solely on an alleged proxy server and its structure as the point of differentiation between the invention and the prior art. The Specification makes it clear that the devices identified by Patent Owner are capable of assuming different roles, and the Specification instead points to other alleged improvements, such as the agent performing different functions and the use of an acceleration server, that serve to differentiate the disclosed invention from the prior art. Ex. 1001, code (57), Fig. 10. Here, the language that the applicant ultimately chose for claim 1 does not recite some improvements, such as the use of an acceleration server, described in the Specification. Instead, the applicant more broadly recited in claim 1 the use of a "first client device" that functions as a proxy, that is, it acts as a client and as a server at different times, as discussed above.

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner also

31

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

points to buttressing evidence in RFC 2616, which defines the terms "client" and "server" based on their roles, whereby "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." *See* Pet. Reply 15–16 (citing Ex. 1013, 8 (emphases omitted); Ex. 1001, 16:21–22.). Thus, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner asserts that under an "application of the purely role-based constructions, an intermediary device would be both a 'client device' and a 'second server' albeit at different points in time," that is, Patent Owner's view is that a device must operate as a client or server device only. PO Sur-reply. 13. We disagree with Patent Owner's assertions that under a proper construction of the term "client device," the device has to act exclusively in only one role with one function at all times. As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles. In fact, to require that a device operate exclusively only in a single role and not be able to operate in different roles at different times is inconsistent with the language of claim 1, where the first client device has to act as a client and as a server at different times. The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server. Ex. 1112, 14. The district found that a single component could not simultaneously do so because the components were separately recited, which indicated a distinction between

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

the components. *Id*. at 14–15. Nevertheless, the district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer ↔ computer ↔ computer architecture*." Ex. 1020, 10 (emphasis added). Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" *Id*. (emphasis omitted).

Patent Owner additionally argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices." See PO Resp. 23 (citing Ex. 1001, 2:44–46). Our view is that Patent Owner takes the Specification's disclosure out of context. The "computers of consumers" discussed in the Specification are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:40–52. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id*. at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the Specification

33

Appx746

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1017, 11; *see also* Ex. 1001, 1:54–59; PO Resp. 23.

Patent Owner additionally asserts that a person of ordinary skill would have understood that, among other things, a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 26–27. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is not a dedicated proxy server. *Id*. at 26 (citing Ex. 2065 ¶ 120). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2065 ¶ 120. We discuss the prosecution history below, but notably, Dr. Williams does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to the prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id*. Petitioner argues that the alleged characteristics for a "client device" are highly subjective and indefinite and are not supported by the Specification (Pet. Reply 2–6), and we agree.

Accordingly, we find that the '510 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

34

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

### iii. Prosecution History

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent the '936 patent support the conclusion that the claimed "client device" should be distinguished from a server.  PO Resp. 18–23.

Patent Owner points to statements in the prosecution history of the grandparent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection.  PO Resp. 19–21 (citing Ex. 2026, 44, 77, 96–97, 163–164, 172, 215; Ex. 2065 ¶¶ 97, 99, 102).  More specifically, Patent Owner asserts that the applicant argued that the cache server 306 of Garcia is clearly a dedicated device and performs a server functionality.  *Id*. at 19 (citing Ex. 2026, 215).  Patent Owner refers to the examiner's responses and asserts that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment."  *Id*. at 20 (citing Ex. 2065 ¶ 99).  Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in Garcia client devices "are typically consumer owned and operated."  *Id*. at 20 (citing Ex. 2026, 163) (emphasis omitted).  Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, **within its environment**, is allowable subject matter over the prior art."  *Id*. at 21 (citing Ex. 2026, 44).

The claims that were under consideration in the '936 patent's prosecution were different than the claims at issue here.  A "client device" was not recited in the claims that were under examination then; rather, the claims recited either a "device," "client communication device," or

35

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

"client(s)." *See, e.g.,* Ex. 2026, 205–215. Similarly, the issued claims in the '936 patent recite a "requesting client" and a separate "client," and the issued claims have multiple steps that differ from those of the '510 patent. *See* Ex. 2025, 19:16–52. Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent's claims to the assessment of claim construction for the '510 patent's claims.[15] Further, considering the varying terms used, we do not find that the applicant's statements during prosecution of the '936 patent regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope of the "client device" term used in the claims here. *See* Ex. 2026, 205–215; *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 2026, 44.

Additionally, as discussed above, the '510 patent's claim language and Specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for a grandparent of the '510 patent and also involved evolving claim terms undergoing amendments. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the

---

[15] We note that although the examiner found that Garcia alone did not teach some steps of the '936 patent's claims, the examiner nonetheless found that Garcia taught a "client" for many of the limitations. Ex. 2026, 124–125, 173–175, 458–460.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

plain language of the claims and the direct teaching of the specification.").
For this reason, we find the '936 patent prosecution history to be less
pertinent to the construction of the '510 patent's claims than the claim
language and Specification of the '510 patent itself. As the Federal Circuit
has explained, because the prosecution history represents an ongoing
negotiation between the PTO and the applicant, rather than the final product
of that negotiation, it often lacks the clarity of the specification and thus is
less useful for claim construction purposes. *See Inverness Med. Switz.
GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002)
(the ambiguity of the prosecution history made it less relevant to claim
construction); *Phillips*, 415 F.3d at 1317. This is particularly true here,
where the prosecution history at issue involves a grandparent application
with different claims having different claim language from the patent and
claims under review.

   Patent Owner also presents arguments based on the prosecution
history of the '319 patent, which is a parent to the '510 patent. PO Resp.
21–22. Patent Owner refers to the applicant's argument that "the claims
involve specific networking of physical elements such as servers and clients,
connected via various networks forming a specific structure and
relationships, which are physical apparatuses, and are NO[T] a 'generic
computer' as stated in the Action." *Id*. at 21 (citing Ex. 2066, 282). Patent
Owner also cites the applicant's assertion that: "[i]t is respectfully submitted
that the conventional arrangement involves fetching data by a client device
from a server device, while the claims disclose a server receiving
information from another server via a client device." *Id*. at 22 (citing

37

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Ex. 2066, 282–283 (emphases omitted)).  Patent Owner further cites the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." *Id*. (citing Ex. 2066, 50 (emphases omitted)).

Patent Owner's arguments based on the '319 patent's prosecution history concern patent eligibility, not claim construction.  Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device." *See* Ex. 2066, 282–283.

Patent Owner additionally refers to the prosecution history of the '510 patent and the examiner's statement that the "environment" of the claimed methods supported patentability.  PO Resp. 22–23.  We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*iv.  Conclusion*

Based on evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

2. *"second server"*

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested the following clarification: that the term is "a device that is operating in the role of a server and that is not the first client device." Ex. 1017, 14; Ex. 1014, 8. The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server." Ex. 1020, 11.

Petitioner proposes the adoption of the district court's construction of the term. Pet. 16. Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different from the client device. PO Resp. 28–31.

Patent Owner's arguments, in the most part, repeat those presented for the "client device." *Compare* PO Resp. 9–23 *with id*. at 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a communication device or consumer computer and would be a commercial device with certain operational properties. *Id*. at 28–31.

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is

39

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short of being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments, *supra* Section II.C.1, that concern alleged required architectural and structural requirements, and the assertion that a "client device" cannot be a server. Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 29 (citing Ex. 1020, 10). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and that although the Specification does "not include servers as a type of 'communication device,' [] that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. PO Resp. 29–31.

40

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

### 3. Other Terms

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g*, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field.); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

41

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### E. Anticipation of Claims 1, 6, 7, 13 , 15, 16, 18–24 By Crowds

Petitioner contends that claims 1, 6, 7, 13, 15, 16, 18–24 are unpatentable under 35 U.S.C. § 102 because they are anticipated by Crowds. Pet. 22–35. Patent Owner argues that Crowds does not disclose all the limitations of the claims. PO Resp. 31–41.

We begin our discussion with summary of Crowds, and then address the evidence and arguments presented.

### 1. Crowds (Ex. 1006)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2.[16] In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, a user is represented "by a process on her

---

[16] Unless otherwise stated, citations to exhibits are to the pagination designations added to Crowds, and not to its original pagination. Petitioner uses the pagination designations of the original document.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2, reproduced below:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, above, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." Ex. 1006, 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

43

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

### 2. Discussion

#### a. Claim 1

The Petition asserts that Crowds discloses all the limitations of claim 1. Pet. 20–29. Below we consider the claim 1 limitations in turn.

#### i. Limitations of the Preamble

Petitioner asserts that Crowds discloses the claimed web server of the preamble limitations[17] that stores the first content. Pet. 24. Petitioner refers to annotated Figure 2 of Crowds, reproduced below. *Id.*



Figure 2 of Crowds (annotated)

As shown in Petitioner's annotated version of Figure 2 of Crowds, Petitioner refers to the path 5→4→6→server (highlighted in green), with boxed "5"

---

[17] The preamble provides antecedent basis for the terms "first client device" and "web server," among others. We determine that the preamble is limiting. *See* Ex. 1017, 9 (parties agree preambles of claims in related patents are limiting).

44

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

acting as the web server.  Pet. 23–24.  Petitioner asserts that "[i]n accordance with the preamble, a first client device (jondo 6) performs the claim steps, fetching requested content from a web server, '5.'"  *Id*.  We agree with Petitioner that jondo 6 is operating in the role of a client because it serves as a client of web server 5 when requests originating at jondo 5 (circled) are sent by jondo 6 to web server 5 in the identified path.  Ex. 1006, 8–9.

Patent Owner contends that Crowds does not disclose a "first client device" as recited in the preamble under a role-based construction because a person of ordinary skill in the art would not be able to determine whether jondo 6 is a client device or a server under the purely role-based constructions because "jondo 6 operates in different roles at different points in time."  PO Resp. 31.

Patent Owner's arguments are based on the premise that if a device is operating in a certain role performing a certain function *at one point in time* and in a different role performing a different function at *another point in time*, it cannot be the claimed element.  In other words, Patent Owner is asserting that a component has to operate exclusively in a single role at all times in order to disclose a claim element.  We are not persuaded by this contention because we have not adopted Patent Owner's proposed claim constructions.

As discussed *supra*, Section II.C.2, we have adopted the district court's role-based construction, where a "client device" is a "client device" as a "communication device that is operating in the role of a client."  As Petitioner asserts, and we agree, Crowds' jondo 6 operates in the role of a "first client device" because "it acts as in the role of a client in requesting the

45

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

service of content from web server 5." Pet. 25, *see also id*. at 26–28; Teruya
Decl. ¶ 60. We also agree with Petitioner's assertion that communication
paths are established between, for instance, jondo 6 (first client device) and
jondo 4 (second server), as discussed for limitation 1[a] below, which
supports Petitioner's contention that jondo 6 acts as a communication
device. Pet. 25–26; Teruya Decl. ¶ 64. Accordingly, jondo 6 meets the
claim construction for the term "first client device" adopted here. That
jondo 6 may at times also act as a server is acceptable—as discussed *supra*
Section II.C.1.c, a device may perform different roles with different
functions at different times.

Patent Owner additionally argues that Crowds does not disclose the
architecture of claim 1. PO Resp. 33–36. Patent Owner asserts that Crowds
"does not disclose a 'first client device' between a 'second server' and a
'web server.'" *Id*. at 33 (citing Ex. 2065 ¶ 165). Patent Owner argues that
the jondos of Crowds are identical user computers and Petitioner has failed
to distinguish them "other than the role being performed at a particular point
in time." *Id*. at 33–34. Patent Owner contends that jondo 4 of Crowds does
not correspond to the "second server" of claim 1, where a person of ordinary
skill in the art "would understand the 'second server' of claim 1 to be, for
example, a proxy server located between a requesting client device and a
proxy client device." *Id*. at 34 (citing Ex. 2065 ¶ 165). Patent Owner asserts
that Petitioner's identification of identical jondos as "client device[s]" or
"server[s]" is "arbitrary." *Id*. (citing Ex. 2065 ¶ 166). Patent Owner argues
that a person of ordinary skill in the art would understand that jondo 4 is a
client device, and not a server, and Petitioner's expert testified that "all

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

jondos are client devices." *Id*. at 35 (citing IPR2021-01492, Teruya Decl.
¶ 55; Ex. 2065 ¶ 167). Patent Owner also asserts that there is no indication
that Crowds' jondos are dedicated network devices, are capable of a large
number of connections, or provide for scalability for increasing resources.
*Id*. at 35 (citing Ex. 1004, 14–15, 17; Ex. 2065 ¶ 167).

Most of Patent Owner's arguments are based on claim constructions
that we have not adopted, for example, that certain components have specific
structural requirements or a component has to operate exclusively in a single
role in order to disclose a claim element. We are not persuaded by these
contentions for the reasons discussed above. Further, although Crowds'
jondos may act as "client devices," as Petitioner's expert, Mr. Teruya
testifies (IPR2021-01492, Teruya Decl. ¶ 55), the jondos may also take
different roles.

We additionally do not agree with Patent Owner's assertions that
Crowds does not disclose the second server ↔ first client device ↔ web
server architecture of the '510 patent's claims. As shown in annotated
Figure 2 of Crowds, and in Petitioner's reliance on the path
5→4→6→server as discussed for the preamble above, Crowds explicitly
discloses the architecture of second server ↔ first client device ↔ web
server. *See* Pet. 24; Ex. 1006, Fig. 2. This is the configuration arranged in
the claim. As also discussed, we find that Crowds' disclosures support
Petitioner's contention that jondo 6 acts as the claimed "first client device,"
server 5 acts as the claimed "web server," and, as discussed below, jondo 4
acts as the claimed "second server." As such, Petitioner demonstrates that
Crowds discloses the components as arranged in the claim, and which could

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

be understood by one of ordinary skill in the art as depicted in the configuration of Figure 2.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses the limitations of the preamble of claim 1.

### ii. Limitation 1[a]

Petitioner asserts that limitation 1[a] is performed by Crowds by the establishment of a TCP connection between jondo 6 (first client device) and jondo 4 (the second server). Pet. 27–28. Petitioner asserts that jondo 6 is a client device because "it acts as in the role of a client in requesting the service of content from web server 5." *Id.* at 27. Petitioner further asserts that jondo 4 is a server because it provides a service to requesting jondo 5 consistent with Crowds' "description [which] uses client-server terminology, where one jondo is a client of its successor on the path." *Id.* (citing Ex. 1006, 8). Petitioner argues that a communication path is established when jondo 5 receives a user request and sets up static paths over TCP, and, more specifically, when "a TCP connection is established between the first client device and the second server." *Id.* at 28 (citing Ex. 1006, 8, 16). We agree with Petitioner that Crowds discloses that jondo 6 (first client device) establishes a TCP connection with jondo 4 (second server). *See* Ex. 1006, 8, 15–16; Teruya Decl. ¶ 64.

Patent Owner argues that under role-based construction, when jondo 6 receives a request from jondo 4, jondo 6 is operating in the role of server, and not a client and when jondo 4 sends a request to jondo 6, jondo 4 is operating in the role of a client and not a server. PO Resp. 32 (citing

48

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Ex. 2065 ¶ 157). Patent Owner also refers to Petitioner's assertion that "higher-powered devices" to run proxy servers, without running their own web browsers, and asserts that "Petitioner's alleged modification of Crowds is contrary to the teachings of Crowds." *Id.* at 36–37 (citing Pet. 37).

As discussed above for the preamble, a device may perform different roles with different functions at different times. We have adopted the district court's role-based construction, *supra*, Section II.C.2, where a "server" is a "server that is not the client device," that is, the term means "a device that is operating in the role of a server and that is not the first client device." As Petitioner asserts, we agree that Crowds' jondo 4 operates in the role of a server by providing a service to requesting jondo 5. Pet. 27; Teruya Decl. ¶¶ 61–62. Further, jondo 4 is not the same physical device as jondo 6 (the first client device). Under the role-based claim construction adopted here, we need not reach the issue of Crowds' teaching of higher-powered devices. *See* Pet. 37–38 (Petitioner making the alternative assertion "if the Board were to construe 'second server' as requiring a specialized data-center class device."). Further, we do not agree with Patent Owner that relying on a component that meets the claim construction and also is in a configuration that is explicitly disclosed would require any "modification."

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[a].

### iii. Limitation 1[b]

For limitation 1[b], Petitioner asserts that in Crowds' 5→4→6→server example, the first client device (jondo 6) sends a web

49

Appx762

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

request via HTTP to the target web server (boxed element 5). Pet. 28 (citing Ex. 1006, 8–9, Fig. 2). Petitioner asserts that the HTTP request comprises the first content identifier, that is, the request contains a URL. *Id.* at 27. Petitioner contends that the first content identifier may be considered to be either "the disclosed 'request' itself, or the URL that the request contains." *Id.* at 28 (citing Teruya Decl. ¶¶ 70–72).

Patent Owner does not make any arguments specific to this limitation.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[b].

### iv. Limitation 1[c]

For limitation 1[c], Petitioner asserts that under the Crowds' example path, jondo 6, the recited first server device, will receive the requested content in response to sending the first client identifier. Pet. 30–31. Petitioner argues that this content routing is in accordance with Crowds' disclosure that the "server replies traverse the same path as the requests, only in reverse." *Id.* (citing Ex. 1006, 8–9) (emphasis omitted). Patent Owner does not make any arguments specific to this limitation.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses the limitation 1[c].

### v. Limitation 1[d]

For limitation 1[d], Petitioner asserts that a TCP connection exists between jondos 6 and 4. Pet. 31–32. And consistent with Crowds' disclosure that replies travels on the same path, but in reverse, Petitioner

50

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

argues that jondo 6 sends the requested content to jondo 4, the second server. *Id.* at 31.

Patent Owner asserts that under "the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client" and "when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server." PO Resp. 33 (citing Ex. 2065 ¶¶ 161–162). As such, Patent Owner argues that Crowds does not teach that jondo 6 is a client device or jondo 4 is a server. *Id.* (citing Ex. 2065 ¶ 163). We have addressed this argument above and do not find it persuasive.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[d].

### vi. Conclusion

We note that Patent Owner has presented evidence of secondary considerations. *See* PO Resp. 57–75. Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 1 of the '510 patent.

### b. Claims 6, 7, and 21

Claim 6 recites

6. The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP)

51

Appx764

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

> server, the third server responds to HTTP requests and stores a second
> content identified by a second URL, the method by the first client
> device further comprising:
>
>> receiving the second URL;
>>
>> sending, to the third server over the Internet in response to the
>> receiving, the second URL; and
>>
>> receiving the second content from the third server over the
>> Internet in response to the sending.

Ex. 1001, 19:51–61.

Claim 7 depends from claim 6, and further recites "executing, by the first client device, a web browser application or an email application." Ex. 1001, 20:2–3. Claim 21 depends from claim 1 and recites a similar limitation to claim 7.

Petitioner asserts that Crowds discloses the limitations of claim 6 by the additional path 3→1→6→server, as shown in blue in annotated Figure 2 of Crowds, reproduced below. Pet. 32–33.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

52

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

In annotated Figure 2, above, the path 3→1→6→server is shown in blue. Pet. 32–33 (citing Ex. 1006, 8–9; Teruya Decl. ¶¶ 79–81). Petitioner asserts that web server 3 (in square box) meets the claimed third server and, in the blue path, jondo 6 (first client device) receives a request comprising the second content identifier from jondo 1, which it sends that URL to web server 3. *Id.* For claims 7 and 21, Petitioner asserts that the client devices in Crowds run web browsers. *Id.* at 33.

Patent Owner does not present any arguments specific to these claims.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 6, 7, and 21.

### c. Claims 13 and 24

Claim 13 recites:

13. The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

> downloading, by the first client device from the Internet, the software application; and

> installing, by the first client device, the downloaded software application.

Ex. 1001, 20:13–38. Claim 24 recites: "A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1." *Id.* at 21:8–11.

53

Appx766

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

For both claims, Petitioner asserts that Crowds discloses the download of a software package that implements a jondo. Pet. 33 (citing Ex. 1006, 26; Teruya Decl. ¶¶ 87–88). Patent Owner contends that Petitioner fails to show that Crowds discloses or teaches the recited "storing of the first content" and "sending . . . the stored first content" as recited in claim 13. PO Resp. 40 (citing Ex. 2065 ¶ 185). However, as Petitioner contends, and we agree, Crowds discloses the use of typical user computers with memory that satisfy this storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 164). Patent Owner does not present any arguments specific to claim 24.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 13 and 24.

### d. Claim 15

Claim 15 depends from claim 1 and recites "further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier." Ex. 1001, 20:41–44. Petitioner relies on the 5→4→6→server path shown in green in annotated Figure 2 of Crowds, reproduced below.

54

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2



Petitioner asserts that in the path shown in annotated Figure 2, above, the first client device (jondo 6) receives from the second server (jondo 4), the first content identifier over an established TCP connection. Pet. 33–34 (citing Teruya Decl. ¶¶ 89–91).

Patent Owner argues that, as for claim 1, jondo 4 is operating as a client, not a server, and jondo 6 is operating as a server, not a client. PO Resp. 41 (citing Ex. 2065 ¶¶ 189–190). We have not adopted Patent Owner's proposed claim construction and, for the reasons discussed above for claim 1, we are not persuaded by Patent Owner's arguments.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 15.

*e. Claim 16*

Claim 16 depends from claim 1 and recites "wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier." Ex. 1001, 20:45–48. Petitioner asserts, that as

55

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

discussed for claim 1, jondo 6 (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier. Pet. 34 (citing Teruya Decl. ¶¶ 92–93). Patent Owner does not present any arguments specific to claim 16.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 16.

### f. Claims 18 and 19

Claims 18 depends from claim 1 and is directed to a TCP/IP server, wherein the first client device is a TCP/IP client. Ex. 1001, 20:52–59. Claim 19 depends from claim 1 and recites "wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards." *Id.* at 20:60–63. Petitioner asserts that a TCP connection is established between jondo 4 and jondo 6, and paths are random, so a jondo may participate as a TCP client or server. Pet. 34 (citing Teruya Decl. ¶¶ 94–95). Petitioner also relies on Crowds' disclosure that the devices may operate over the Internet based on FTP. *Id.* at 35 (citing Ex. 1006, 8 n.1). Patent Owner does not present any arguments specific to claims 18 and 19.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 18 and 19.

### g. Claim 20

Claim 20 depends from claim 1, further reciting: "wherein the first web-page comprises audio, or video content, and wherein the first content

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

identifier comprises a Uniform Resource Locator (URL)." Ex. 1001, 20:64–67. Petitioner asserts that, as discussed for claim 1, Crowds discloses that the first content is a web page identified by a URL. Pet. 35. Patent Owner does not present any arguments specific to claim 20.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 20.

### h. Claim 22

Claim 22 depends from claim 1 and recites "further comprising storing, operating, or using, a client operating system." Ex. 1001, 21:4–5. Petitioner refers to Crowds' disclosure that the jondo software was programmed for "portability across Unix and Microsoft platforms" and SunOS, and a person of ordinary skill in the art would understand that these refer to client operating systems. Pet. 35 (citing Teruya Decl. ¶ 100). Patent Owner does not present any arguments specific to claim 22.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 22.

### i. Claim 23

Claim 23 depends from claim 1 and recites "wherein the steps are sequentially executed." Ex. 1001, 21:6–7. Petitioner refers to the steps disclosed in Crowds and identifies that they are performed sequentially. Pet. 35–36 (citing Teruya Decl. ¶¶ 102–104; Ex. 1006, 8–9, Fig. 2). Patent Owner does not present any arguments specific to claim 23.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 23.

### F. Obviousness of Claims 1, 2, 6–11, 13, 15, 16, 18–24 over Crowds and RFC 2616

Petitioner contends that the claims anticipated by Crowds (claims 1, 6, 7, 13, 15, 16, and 18–24), as well as claims 2 and 8–11, would have been obvious in light of Crowds and RFC 2616. Pet. 35–41. Because we have already determined that claims 1, 6, 7, 13, 15, 16, and 18–24 are anticipated by Crowds, we do not separately address them under this ground. For those claims, we rely on the Petition and our anticipation analysis under Crowds to show that they would also have been obvious in light of Crowds and RFC 2616.

### 1. Analysis of Obviousness Assertions

RFC 2616 documents version 1.1 of the HTTP protocol, which is "foundational to the World Wide Web." Ex. 1013; Teruya Decl. ¶ 53. Petitioner asserts that the '510 patent cited to RFC 2616 for a definition of HTTP, and Crowds concerns communications using the same protocols. Pet. 36–37 (citing Ex. 1001, 16:21–28; Ex. 1006, 16, 23–24). Petitioner contends that those "[w]orking in the field of the '510 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol." *Id.* at 35 (citing Teruya Decl. ¶ 106). Petitioner argues that a person of ordinary skill in the art "developing software for like applications [like Crowds] would

58

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." Teruya Decl. ¶¶ 105–110.

Claim 2 depends from claim 1, where the first client device is identified by a Media Access Control (MAC) address or a hostname, and where the first client device sends in response to a start-up or power-up, a first message comprising the first client IP address, the MAC address, or the hostname. Ex. 1001, 19:32–39. Petitioner asserts that Crowds discloses that jondos have host names and a set-up phase, where other jondos learn information including their IP address, shared password, and use this information when selecting a jondo as a proxy. *Id*. at 38 (citing Ex. 1006, 8, 22, Fig. 6). Mr. Teruya testifies that it would have been obvious to a person of ordinary skill that a jondo (participating as the second server) would receive a message from the first jondo (first client device) during the first jondo's initialization period, which includes the first jondo's IP address. Teruya Decl. ¶ 122.

Claim 8 depends from claim 1 and recites "further comprising periodically communicating over the TCP connection between the second server and the first client device." Ex. 1001, 20:4–6. Claim 9 depends from claim 8 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." *Id*. at 20:7–10. Petitioner argues that Crowds discloses that the static communication paths "are clearly 'persistent' connections," that last for more than one transaction. Pet. 39–40 (citing Teruya Decl. ¶ 123). Petitioner refers to RFC 2616, where the default behavior is "to use persistent connections, so the two HTTP end-points can send and receive more than one HTTP request and response pair,"

59

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

and asserts that claims 8 and 9 would have been obvious to a skilled artisan based on Crowds in view of RFC 2616 and their knowledge. *Id.* (citing Ex. 1013 § 8.1).

Claim 10 depends from claim 1 and recites "further comprising determining, by the first client device, that the received first content, is valid." Ex. 1001, 20:11–13. Claim 11 depends from claim 10 and recites "wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." *Id.* at 20:14–16. Petitioner argues that RFC 2616 discloses headers that implement these claims. Pet. 41 (citing Ex. 1013 § 14.9). Petitioner refers to the techniques utilized in the '510 patent, which are identical to those of RFC 2616, and asserts that a person of skill in the art would "take advantage of this widely adopted standard." *Id.* at 41 (citing Teruya Decl. ¶¶ 132–134).

Patent Owner does not respond separately to Petitioner's analysis of claims 2 and 8–11. *See* PO Resp. 31–38. We are persuaded by Petitioner's analysis that Petitioner has demonstrated each limitation of these claims is taught or suggested by the combination of Crowds and RFC 2616.

Patent Owner argues, however, that the Petitioner's obviousness analysis is deficient because Crowds teaches away from the claimed methods of the '510 patent. PO Resp. 38–39. We disagree. Patent Owner more specifically argues that Crowds teaches away from the claimed methods of the '510 patent because: 1) Crowds does not provide the initiator of a request with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3)

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Crowds does not teach the initiator to purposefully select a jondo to form a pathway. *Id.*

For the first issue, Patent Owner argues that Crowds does not provide anonymity for the originating requesting jondo. PO Resp. 38–39. More specifically, Patent Owner asserts that based on the flip of a biased coin, a jondo may send a request directly to the target web server. *Id.* (citing Ex. 2065 ¶ 179). We do not find this argument persuasive because Crowds discloses that a goal of the use of the jondos is to provide anonymity by routing the messages through other jondos. *See* Ex. 1006, 2–5. And, while the jondo can select itself for routing, given that multiple jondos are selected in a path, other jondos will generally be selected for anonymity. *See id.* at 8. Moreover, anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013). As to the second issue concerning Crowds' alleged latency, Patent Owner does not explain, nor does Dr. Williams provide support for, why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging the approach taken in

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Additionally, there is no claim limitation related to process speed or latency. Accordingly, we do not find that Crowds teaches away from the claimed invention of the '510 patent.

We find that Petitioner's evidence and argument show that one of ordinary skill in the art would have been motivated to combine Crowds and RFC 2616 as asserted by Petitioner and the combination teaches the limitations of claims 1, 2, 6–11, 13, 15, 16, 18–24.

Patent Owner also asserts that the nonobviousness of the claims is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise, and we address those issues below.

### 2. Objective Indicia of Nonobviousness

Patent Owner asserts that nonobviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–73; PO Sur-reply 27–29. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which it contends do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success suffer from additional evidentiary infirmities. Pet. Reply 24–26.

### a. Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz &*

62

Appx775

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

*Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, No. 2022-1765, 2023 WL 5440530, at *5 (Fed. Cir. Aug. 24, 2023).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)).  In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).  On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.*  Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373.  Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b.  *Commercial Success*

Patent Owner argues that nonobviousness is supported by commercial success due to "[t]he features driving the commercial success of Bright

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Data's residential proxy service [which] are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP." PO Resp. 69 (citing Ex. 2065 ¶ 272). According to Patent Owner, its "residential proxy service generated revenues of $53.7 million." *Id.* at 69 (citing Ex. 2065 ¶ 275). Patent Owner contends that "Bright Data's residential proxy service has grown to dominate the market." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* at 68 (citing Ex. 2065 ¶ 274).

Patent Owner asserts that its residential proxy service practices the methods claimed in the '510 [p]atent, and provides claim charts purporting to show how "this commercial embodiment [for the residential proxy service] practices at least claims 1–2, 6–9, 15–16, 18–20, and 22–24 of the '510 [p]atent." PO Resp. 57–67. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 67. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims.'" *Id.*

Petitioner asserts that Patent Owner's secondary considerations arguments and evidence do not demonstrate a nexus with the challenged claims. Pet. Reply 24–26. More specifically, Petitioner points to the two

65

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

features allegedly "driving" the alleged commercial success (use of "residential IP addresses" and "scalability") cited by Patent Owner. *Id.* at 24. Petitioner argues that in naming those features, Patent Owner "admits a lack of nexus because neither feature is claimed." *Id.* at 24. Petitioner points out that the '510 patent "never uses the words 'residential,' 'scalable,' or 'scalability.'" *Id.* Petitioner argues that Dr. Williams, Patent Owner's expert, admits that the use of residential IP addresses is not claimed in the '510 patent. *Id.* at 25 (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner also disputes Dr. Williams' testimony regarding Patent Owner's sales figures, arguing that "Williams did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" *Id.* (citing Ex. 1111, 168:23–169:3)

We find that Patent Owner has failed to establish a nexus between the challenged claims and the products and processes that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products or processes that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products and processes that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

having residential IP addresses." PO Resp. 67; *see id.* at 55 (pointing to Patent Owner's "residential proxy service" that uses laptops, desktops, or smartphones), 69 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services").

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses or their operation. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See supra* Section II.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 55–69. Therefore, Patent Owner has failed to prove that commercial success of its

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11 (citing Ex. 2004, 4). Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2004, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from evidence of record in this proceeding whether the district court actually made a finding on the merits of nexus, or simply determined that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 69–70. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that web site could still likely identify data center server IP addresses as proxy addresses" because they "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic

68

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

location." *Id.* at 70 (citing Ex. 2065 ¶ 277). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "proxy client devices" solves the need to "dramatically increase the [number] of IP addresses that can be included in a proxy network." *Id.* (citing Ex. 2065 ¶ 193; Ex. 2048, 4; Ex. 2049, 182:22–197:21).

As noted, for objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *Volvo*, 2023 WL 5440530, at *5. Petitioner argues that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of alleged long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 70. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d. Copying

Patent Owner argues that "[d]uring the jury trial in the Tex. Litigation [*Teso* district court litigation], evidence of Oxylabs copying Bright Data's

69

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

residential proxy service, then under the name 'Hola,' was presented." PO
Resp. 71 (citing Ex. 2065 ¶ 278). Specifically, Patent Owner argues that its
representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas
Okmanas) to incorporate its software development kit (SDK) in Oxylabs'
applications, but that instead Oxylabs "subsequently released their own SDK
for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–
204:8; Ex. 2047, 131:23–132:7, 152:8–153:6; Ex. 2065 ¶ 278). Patent
Owner also asserts that Mr. Okmanas testified that he was looking for "a
system that works like hola.org," that Oxylabs "wanted to develop its own
residential proxy service," and that "he believed that he needed to do what
Bright Data (previously known as Luminati and Hola) were doing to be
successful." *Id.* at 71–72 (citing Ex. 2047, 95:20–97:1, 103:18–104:10,
149:13–150:8, 152:18–153:6; Ex. 2065 ¶ 278). "This" testimony, according
to Patent Owner, "is strong evidence of copying." *Id.* at 72 (citing Ex. 2065
¶ 279).

Petitioner argues that there is no nexus shown here between the
products and the challenged claims. Pet. Reply 24–26. For similar reasons
as for commercial success, we agree with Petitioner that no nexus has been
shown between Patent Owner's evidence of alleged copying and the
challenged claims. Although Patent Owner does not point to specific
aspects of Patent Owner's products that it alleges were copied, it refers
generally to "Bright Data's residential proxy service" known as "Hola" and
the software development kit relating to it. PO Resp. 71–72. As explained
above, however, the challenged claims do not recite or require a residential

70

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

### e. Industry Praise

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '510 [p]atent as described above." PO Resp. 72 (citing Ex. 2051, 23–24; Ex. 2065 ¶ 197). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* at 72–73 (citing Exs. 2052–2054; Ex. 2065 ¶ 281).

Petitioner argues that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 71–72. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### 3. Conclusion on Obviousness

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing Patent Owner's secondary considerations evidence together with Petitioner's evidence of obviousness, we find Petitioner has established the obviousness

Appx784

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

of challenged claims 1, 2, 6–11, 13, 15, 16, 18–24 of the '510 patent in view of Crowds and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, 15, 16, 18–24 would have been obvious over Crowds and RFC 2616.

### G. Anticipation of Claims 1, 6, 10, 15–20, 23, and 24 By Border

Petitioner asserts that claims 1, 6, 10, 15–20, 23, and 24 are anticipated by Border. Pet. 41–54. We begin with a description of Border and then analyze the arguments and evidence presented.

#### 1. Border (Ex. 1012)

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser. *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

72

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

> 2. *Analysis*

> a. *Claim 1*

Referring to Figure 1 of Border, Petitioner asserts that the recited "first client device" is upstream server 107, the recited "second server" is downstream server 105, the recited "web server" is web server 109, the

73

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

recited "first content identifier" is the requested URL, and the recited "first content" is the requested web page at the requested URL.  Pet. 44.

For limitation 1[a], Petitioner asserts that a persistent TCP connection is established between upstream server 107 and downstream server 105 in Border.  Pet. 44 (citing Ex. 1012, 7:51–58; Teruya Decl. ¶ 146).  Petitioner asserts that downstream server 105 is the "second server" because "it accepts a connection from web browser 103 and sends back a response to web browser 103's GET request."  *Id*. at 45.  Petitioner also contends that "upstream server 107 acts in the role of a 'client,' as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server."  *Id*.

For limitation 1[b], Petitioner contends that Figure 2 of Border depicts upstream server 107 issuing a GET request to web server 109, and the request is for a URL.  Pet. 46 (citing Ex. 1012, 5:32–35, Fig. 2).  For limitation 1[c], Petitioner argues that, in response to the upstream server 107 request, "the web server 109 transmits the requested HTML page to the upstream server."  *Id*. at 47 (citing Ex. 1012, Fig. 2).  Petitioner contends that, based on this disclosure, "Border teaches the first client device receiving the first content (the web page at the requested URL) from the web server in response to sending the first content identifier (the requested URL)."  *Id*.

For limitation 1[d], Petitioner contends that in Border, "[a]fter receiving the web page from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105'" as shown in Figure 2.  Pet. 48.  More specifically, Petitioner contends that "[d]ownstream server 105

74

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a 'server.'" *Id.* Petitioner asserts that "the same persistent TCP connection exists between upstream server 107 and downstream server 105," and communications go through this connection. *Id.* at 48–49 (citing Teruya Decl. ¶¶ 160–162).

Patent Owner's presents similar arguments for Border as those presented for Crowds. PO Resp. 42–44. For example, Patent Owner contends Border does not disclose a "first client device" or "second server" because the devices are similar "except for the role being performed at a particular point in time." *Id.* at 42. Patent Owner repeats its argument that, for example, a server cannot operate in the role of a client, and vice versa; the architecture of the '510 patent is not disclosed in Border; and Border's disclosure of general-purpose computers is not sufficient. *Id.* at 43–44. For the reasons provided in our above discussion of Crowds, we do not agree with those arguments as they are contrary to the claim constructions we adopted. Similarly, we have rejected Patent Owner's arguments based upon the alleged architecture of claim 1 and failure to disclose certain limitations for the reasons discussed above.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Border anticipates claim 1 of the '510 patent.

> *b. Claims 6, 10, 15–20, 23, and 24*

Petitioner asserts that Border discloses all the limitations of claims 6, 10, 15–20, 23, and 24. Pet. 49–54. Patent Owner presents no arguments

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

specific to any of these claims, except for claim 15.  PO Resp. 46–47.  Patent Owner argues that Border does not disclose the limitations of claim 15 because, for instance, "under the purely role-based constructions, downstream server 105 cannot be a server."  *Id*. at 46.  This and other arguments directed to claim 15 are similarly based on claim constructions not adopted here.  *See id*. at 46–47.  For the reasons provided in our above discussion of Crowds, we do not agree with those arguments as they are contrary to the claim constructions we have adopted and the claim language.

Thus, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Border anticipates claims 6, 10, 15–20, 23, and 24 of the '510 patent.

*H.  Obviousness of Claims 1, 6, 8–11, 13, 15–20, and 22–24 Over Border and RFC 2616*

Petitioner contends that the claims anticipated by Border (claims 1, 6, 10, 15–20, 23, and 24), as well as claims 8, 9, 11, 13, and 22, would have been obvious in light of Border and RFC 2616.  Pet. 54–58.  Because we have already determined that clams 1, 6, 10, 15–20, 23, and 24 are anticipated by Border, we do not separately address them under this ground.  For those claims, we rely on the Petition and our anticipation analysis under Border to show that they would also have been obvious in light of Border and RFC 2616.

Petitioner states that Border discloses a system for retrieving web content, and that "HTTP is an application level protocol that is employed for information transfer over the Web."  Pet. 54 (citing Ex. 1012, 7:26–29.)  Petitioner argues that "Border expressly incorporates RFC 2616," and a

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

person of ordinary skill in the art would have been motivated to combine Border with general internet knowledge and the disclosures of RFC2616. *Id.*

For claims 8 and 9, Petitioner asserts that it would have been obvious for a person of ordinary skill in the art to rely on knowledge of TCP and HTTP communication protocols for keep-alive messages, which would, for instance, be beneficial in settings like those disclosed by Border. Pet. 55–56 (citing Teruya Decl. ¶¶ 200–204). For claim 11, Petitioner asserts that it would have been obvious to utilize the methods of RFC 2616 in Border's checking of cache validity. *Id.* at 56–57 (citing Teruya Decl. ¶¶ 205–208). For claim 13, Petitioner argues that it is routine to download and install software, such as software that configures the proxy devices in Border. *Id.* at 57 (citing Teruya Decl. ¶¶ 212–213). For claim 22, Petitioner asserts that it would "be obvious that a device performing client functions, such as requesting services comprising content delivery from a web server, would have a suitable O/S to support the making and receiving of such requests." *Id.* at 58 (citing Teruya Decl. ¶¶ 214–217).

In addition to the arguments that it presented for Border's anticipation grounds, Patent Owner presents similar arguments for Border's obviousness grounds as it had presented for Crowds' obviousness grounds, that is, that Broder teaches away because it does not address initiator anonymity and it uses a different network structure. PO Resp. 44–46. We are not persuaded by these arguments because anonymity is not a limitation of the claims nor is the alleged network structure relevant because we have not adopted Patent Owner's claim construction, as discussed above.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Additionally, for the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing secondary considerations together with Petitioner's evidence of obviousness, we find Petitioner has established the obviousness of challenged claims 1, 6, 8–11, 13, 15–20, and 22–24 of the '510 patent in view of Border and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 6, 8–11, 13, 15–20, and 22–24 would have been obvious over Border and RFC 2616.

### I. Anticipation of Claims 1, 6–8, 13, 15, 16, and 18–24 By MorphMix

Petitioner asserts that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix. Pet. 59–72. We begin with a description of MorphMix and then analyze the arguments and evidence presented.

### 1. MorphMix (Ex. 1008)

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time."

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

*Id.* at 118.  An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, above, participating nodes have a virtual link to one or more other nodes at any time.  Ex. 1008, 119.  This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes."  *Id.*  In Figure 5.1, node *a* has five neighbors with which it has established virtual links.  *Id.*  In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*."  *Id.*  "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server."  *Id.* at 120.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

### 2. Analysis

#### a. Claim 1

In its assertions directed to claim 1, Petitioner identifies the recited "first client device" as the last node (c) of MorphMix, the recited "second server" as intermediate node (b), the recited "first server" as server (s), the recited "first content identifier" as the application data (or the requested URL it contains), and the recited "first content" as the requested web page at the requested URL. Pet. 60–61.

For limitation 1[a], Petitioner contends that a TCP connection is established between nodes, and node (c) acts as a first client device and intermediate node (b) acts as a second server. Pet. 61–62. For limitation 1[b], Petitioner asserts that node (c) sends the application data and/or the URL within the application data to the first server(s), as shown in Figure 5.4. *Id*. at 63. For limitation 1[c], Petitioner contends that the node (c) receives the "first content," such as the web page, where MorphMix "[s]end[s] data back from the server to the client works exactly in the opposite way" as the information is sent to the server. *Id*. at 64 (citing Ex. 1008, 105). Accordingly, in MorphMix, Petitioner argues, the first client device (the last node before the target web server) receives the requested first content for sending back down the path to the requesting user. *Id*. at 63–64. For limitation 1[d], Petitioner contends that "[t]he first client device (node c) sends the first content (or web page content) back to the second server (node b, the prior node in the path)." *Id*. at 65.

Patent Owner has similar arguments for MorphMix as those previously discussed for Crowds. PO Resp. 47–51. For example, Patent

80

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, MorphMix does not disclose a 'first client device' as recited in claim 1 under the purely role-based constructions." *Id.* at 47. Patent Owner also contends MorphMix does not disclose step 1[d] of claim 1. *Id.* at 47–48. Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, during performance of this method step, under the purely role-based constructions, node (c) is operating in the role of a server, not a client, and therefore node (c) cannot be a client device . . . Also, under the purely role-based constructions, node (b) is operating in the role of a client, not a server, and therefore node (b) cannot be a server." *Id.* Patent Owner also contends that Petitioner does not analyze the claims under Patent Owner's claim constructions and MorphMix does not disclose the architecture of claim 1. *Id.* at 48–50. We do not agree with these arguments for reasons previously discussed for Crowds. Among other reasons, the arguments are not based on the language of the claims or the disclosure in the Specification, and we have rejected Patent Owner's claim constructions.

### b. Claims 6–8, 13, 15, 16, 18–24

Petitioner asserts that MorphMix discloses all the limitations of claims 6–8, 13, 15, 16, 18–24. Pet. 65–72. Patent Owner presents no arguments specific to any of these claims, except that Patent Owner argues that MorphMix does not disclose the limitations of claims 13 and 15. PO Resp. 52–53. For claim 13, Patent Owner asserts that Petitioner does not show that "the software application causes the processor on node (c) to store the first content or send the stored first content as recited in [the] claim." *Id.* For

81

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

claim 15, Patent Owner asserts that "under the purely role-based constructions, node (b) is operating in the role of a client, not a server, and therefore node (b) cannot be a server" and "node (c) is operating in the role of a server, not a client, and therefore node (c) cannot be a client device." *Id.* at 53. Other arguments directed to claim 15 are similarly based on claim constructions not adopted here. *See id.* at 52–53.

For claim 13, as Petitioner contends, and we agree, MorphMix discloses the use of typical user computers with memory that satisfies this storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 241). For claim 15, we do not agree with Patent Owner's arguments as they are contrary to the claim constructions we have adopted and the claim language.

Thus, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that MorphMix anticipates claims 6–8, 13, 15, 16, 18–24 of the '510 patent.

*J. Obviousness of Claims 1, 2, 6–11, 13, 15, 16, and 18–24 Over Border and RFC 2616*

Petitioner contends that the claims anticipated by MorphMix (claims 1, 6–8, 13, 15, 16, and 18–24), as well as claims 2 and 9–11, would have been obvious in light of MorphMix and RFC 2616. Pet. 72–77. Because we have already determined that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix, we do not separately address them under this ground. For those claims, we rely on the Petition and our anticipation analysis under MorphMix to show that they would also have been obvious in light of MorphMix and RFC 2616.

Petitioner relies on the rationale provided for combining Crowds and RFC 2616 for the combination of RFC 2616 with MorphMix. Pet. 72. For

82

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

claim 2, Patent Owner argues that when a node joins the MorphMix network, it sends a message to other nodes comprising the node's IP address, port, public key, and other information, and a person of ordinary skill in the art would know that a MAC address is an element of the data link layer of the open systems interconnection (OSI) underlying network communications over the Internet, so MorphMix discloses that, upon second server startup, there would have been a message sent that included an IP address.  *Id.* at 74–75 (citing Teruya Decl. ¶¶ 283–89).  For claim 9, Petitioner asserts that it would have been obvious for a person of ordinary skill in the art to rely on knowledge of TCP and HTTP communication protocols and RFC 2616 for keep-alive messages which would, for instance, be beneficial in settings like those disclosed by MorphMix for the reasons discussed for Crowds and Border.  Pet. 75 (citing Teruya Decl. ¶¶ 290–293).  For claims 10 and 11, Petitioner asserts that it would have been obvious to utilize the methods of RFC 2616 in MorphMix for validity checking, as discussed above for Crowds.  *Id.* at 76 (citing Teruya Decl. ¶¶ 294–297).

In addition to the arguments presented for MorphMix's anticipation grounds, Patent Owner presents similar arguments for MorphMix's obviousness grounds as those presented for Crowds' obviousness grounds, that is, that MorphMix teaches away because it suffers from poor performance, increased latency and has problems like lack of a centralized lookup service and "free riding."  PO Resp. 51–52.  We are not persuaded by these arguments because none of these arguments relate to a limitation of the claims or why a person of ordinary skill in the art would not have considered RFC 2616 in combination with MorphMix.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

Additionally, for the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing Patent Owner's secondary considerations evidence together with Petitioner's evidence of obviousness, Petitioner has established the obviousness of challenged claims 1, 6, 8–11, 13, 15–20, and 22–24 of the '510 patent in view of MorphMix and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious over MorphMix and RFC 2616.

### III. MOTION TO SEAL[18]

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order. Paper 32; Ex. 2068. Patent Owner asserts that Exhibit 2039 contains sensitive technical information, Exhibits 2041–2044 contain source code and related files, Ex. 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporates some of the sensitive information. Paper 32, 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, which

---

[18] Petitioner filed a Motion to Exclude Evidence (Paper 46), which was withdrawn. *See* Tr. 5:5–12.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the redacted portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal and the associated request to enter the Protective Order. Paper 32; Ex. 2068.

### IV. CONCLUSION[19]

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, and 15–24 of the '510 patent are unpatentable. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 13, 15, 16, 18–24 | 102(b) | Crowds | 1, 6, 7, 13, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, | 103(a) | Crowds, RFC | 1, 2, 6–11, 13, | |

[19] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.* *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2). Patent Owner is further reminded that under 37 C.F.R. 42.73(d)(3)(i), a patent owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent a claim that is not patentably distinct from a cancelled claim.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15, 16, 18–24 | | 2616 | 15, 16, 18–24 | |
| 1, 6, 10, 15–20, 23, 24 | 102(b) | Border | 1, 6, 10, 15–20, 23, 24 | |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103(a) | Border, RFC 2616 | 1, 6, 8–11, 13, 15–20, 22–24 | |
| 1, 6–8, 13, 15, 16, 18–24 | 102(b) | MorphMix | 1, 6–8, 13, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | MorphMix, RFC 2616 | 1, 2, 6–11, 13, 15, 16, 18–24 | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 15–24 | |

V. ORDER

Accordingly, it is

ORDERED that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 11,044,510 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motion to Seal (Paper 32) is *granted*;

FURTHER ORDERED that the request to enter the protective order is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Appx800

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01493
Patent 10,484,510 B2

PETITIONER:

Craig Tolliver
George "Jorde" Scott
John C. Heuton
CHARHON CALLAHAN ROBSON
& GARZA, PLLC
ctolliver@ccrglaw.com
jscott@ccrglaw.com
jheuton@ccrglaw.com

PATENT OWNER:

Thomas M. Dunham
Elizabeth A. O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

88

<span style="color:red">NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL</span>

Trials@uspto.gov               Paper 50
Tel: 571-272-7822       Entered: September 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MAJOR DATA UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

_____

IPR2022-00915
Patent 10,257,319 B2

_____

Before THOMAS L. GIANNETTI, KEVIN C. TROCK, and
SHEILA F. McSHANE, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal and Protective Order
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

## I.   INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner, Major Data UAB, has shown by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## II.   BACKGROUND

### A.   *Procedural History*

Major Data UAB ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent (the "challenged claims").  Bright Data Ltd.[1] ("Patent Owner") filed a Preliminary Response.  Paper 12.  With authorization from the panel, Petitioner filed a Preliminary Reply (Paper 16), and Patent Owner filed a Preliminary Sur-reply (Paper 17).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on grounds presented in the Petition.  Paper 18 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 30, "PO Resp."), Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 38, "PO Sur-reply").

---

[1] According to Petitioner, Bright Data Ltd. was formerly known as Luminati Networks, Ltd.  *See* Pet. 1.

2

Appx958

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

On June 9, 2023, an oral hearing was held. A transcript of the hearing is made part of the record. *See* Paper 48.

## B. Related Matters

The parties identify several district court proceedings involving the '319 patent and a related patent, U.S. Patent No. 10,484,510 ("the '510 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation"). Pet. 3–4; Paper 6, 2–3. The parties also identify a number of district court actions involving patents related to the '319 patent. *Id.*

According to the parties, the '319 patent has been before the Board in IPR2020-01266, IPR2021-01492, IPR2022-00135, and IPR2022-00861. Pet. 4; Paper 6, 1–2. The parties also identify a number of other USPTO proceedings involving patents related to the '319 patent. *See* Pet. 4–6; Paper 6, 1–2.

In addition, Patent Owner identifies *ex parte* reexaminations requested and ordered for the '319 and '510 patents, respectively, Control No. 90/014,875 and Control No. 90/014,876, and which have been stayed. Paper 6, 2; IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

## C. Real Parties-in-Interest

Petitioner identifies Major Data UAB as the real party-in-interest. Pet. 2. Patent Owner "certifies that Bright Data Ltd. is the real party-in-interest." Paper 6, 1. In its Response, Patent Owner does not challenge Petitioner's identification of Major Data UAB as the real party-in-interest. *See generally* PO Resp.

3

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

*D. The '319 Patent*

　　The '319 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, code (54). According to the '319 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." *Id.* at 1:54–56. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:58–59; 2:24–2:32; 2:59–3:3.

　　The '319 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:41–44):

4

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:43–45. Due to the functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:46–50.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:8–14.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

*E.   Illustrative Claim*

The '319 patent has 29 claims.  Claim 1 is the only independent claim of the '319 patent, and is illustrative of the claimed subject matter.[2]

> 1. [Preamble] A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:
>
> [a] receiving, from the second server, the first content identifier;
>
> [b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
>
> [c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and
>
> [d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16–32.

---

[2] Paragraph references in brackets proposed by Petitioner.  *See* Pet. 25–34.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

*F.   Prior Art References and Other Evidence*

Petitioner relies on the following references:

1.   Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2.   Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

3.   Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border"); and

4.   Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya. Ex. 1005 ("Teruya Decl."). Patent Owner relies on the Declaration of Tim A. Williams, Ph.D. Ex. 2065 ("Williams Decl.").

8

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

### G. Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability. Pet. 11.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)[3] |
|---|---|---|
| 1, 19, 21–22, 24–29[4] | 102[5] | Crowds |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border |
| 1, 12, 14, 15, 17–18, 21, 22, 24, 25, 27–29[6] | 103 | Border, RFC 2616 |
| 1, 17, 19, 21–29 | 102 | MorphMix |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, RFC 2616 |

---

[3] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 11. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations. General knowledge in the art, unsupported by the references, cannot supply a missing limitation. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 36 (Nov. 2019), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

[4] We note that Petitioner's listing of the asserted grounds excludes claim 23 for this ground. *See* Pet. 11. However, Petitioner includes claim 23 in its analysis of anticipation based on Crowds (*see id.* at 35).

[5] Because the application from which the '319 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, code (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

[6] We note that Petitioner's listing of the asserted grounds excludes claim 19 for this ground. *See* Pet. 11. However, Petitioner includes claim 19 in its analysis of obviousness based on Border (*see id.* at 57).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

### III.  ANALYSIS OF THE CHALLENGED CLAIMS

*A.  Applicable Legal Standards*

The Federal Circuit addressed the legal standard for anticipation in

*Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016):

> Under 35 U.S.C. § 102(b), a prior art reference will anticipate if
> it "disclose[s] each and every element of the claimed invention
> . . . arranged or combined in the same way as in the claim."

815 F.3d at 1341 (citation omitted) (footnote omitted).  The Federal Circuit

went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes]
> not expressly spell out' all the limitations arranged or combined
> as in the claim, if a person of skill in the art, reading the
> reference, would at 'once envisage' the claimed arrangement or
> combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015)).

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the

differences between the claimed invention and the prior art are such that the

claimed invention as a whole would have been obvious before the effective

filing date of the claimed invention to a person having ordinary skill in the

art to which the claimed invention pertains." 35 U.S.C. § 103 (2011).  The

question of obviousness is resolved on the basis of underlying factual

determinations, including: (1) the scope and content of the prior art; (2) any

differences between the claimed subject matter and the prior art; (3) the level

of skill in the art; and (4) so-called "secondary considerations," including

commercial success, long-felt but unsolved needs, failure of others, and

unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

B.   *Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 16.  Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.* at 16–17 (citing Ex. 1005 ¶¶ 25–27).

Patent Owner submits that a person of ordinary skill in the art would have had "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." PO Resp. 2 (citing Ex. 2065 ¶ 25).  Patent Owner notes that its analysis does not change under the Board's preliminary assessment of a person of ordinary skill in the art in the Institution Decision, wherein Petitioner's proposed level of qualifications was adopted. *Id.*; Dec. 15.

We regard Petitioner's more specific definition as consistent with the '319 patent and the prior art before us.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill).  Therefore, we adopt Petitioner's formulation.

C.   *Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b) (2023), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

11

Appx967

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

(Fed. Cir. 2005) (en banc). Under *Phillips*, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1312–13 (citations omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citation omitted).

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner contends that the district court's constructions in *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation")[7], are appropriate for use in this case. Pet. 17–19. In particular, Petitioner points to two claim construction orders in that case—the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). According to Petitioner, the parties in the Teso Litigation agreed to certain

---

[7] The case caption in the Teso Litigation was later changed to identify the plaintiff as Bright Data Ltd. *See* Ex. 1020, 1.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

constructions that were subsequently adopted by the district court. Pet. 17. There, the district court construed the preamble of claim 1 of the '319 patent to be limiting and construed certain other terms to have their "plain and ordinary meaning." *Id.*

Petitioner also points out that the district court in the Teso Litigation construed certain disputed claim terms, including "client device" and "second server." *Id.* at 17–18. There, the district court construed "client device" as a "communication device that is operating in the role of a client." *Id.*; Ex. 1017, 12. The district court also initially construed "second server" as a "server that is not the client device." Pet. 18. Later, the court granted defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." *Id.* (emphasis omitted); Ex. 1020, 8, 11.

Patent Owner now proposes constructions for the claim terms "client device" and "second server" that are different than those determined by the district court in the Teso Litigation. *See* PO Resp. 22–31. We discuss Patent Owner's proposed constructions below.

### 1. Client Device

In our Institution Decision, we concurred with the district court's reasoning and agreed with its construction for the claim term "client device" as a "communication device that is operating in the role of a client." Dec. 17–18.

In its Response, Patent Owner contends that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer

13

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

computer,'" or alternatively, "would understand the term 'client device' to mean a 'consumer communication device.'" PO Resp. 22. Patent Owner argues that "[t]hese proposed constructions are consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.* at 22–23.

Patent Owner's proposed construction of the claim term "client "device" as a "consumer computer," however, was previously considered, and rejected, by the district court in the Teso Litigation. *See, e.g.*, Ex. 1017, 10–12. Patent Owner takes issue with the evidence and the reasoning used by the district court to reject Patent Owner's previously proposed construction. *See, e.g.*, PO Resp. 23–27.

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 23–24. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the specification, the specification states that "computers of consumers" are "referred to herein as client devices" and the term "client device" is used in the claims. *Id.* at 23 (citing Ex. 1001, 2:44–46). Patent Owner asserts that "the term 'client device' has a special meaning in the context of the '319 Patent" and that, therefore, upon reading the specification, a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '319 Patent." PO Resp. 23 (citing Ex. 2065 ¶ 112).

Second, Patent Owner disagrees with the district court's finding that in the specification the term "consumer" refers to a consumer of content as opposed to a broadcaster of content. PO Resp. 24 (citing Ex. 1017, 11).

14

Appx970

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner argues, instead, that the common understanding of "consumer" is "a person who buys goods or services for their own use" or "someone who buys goods or services for personal use." PO Resp. 24 (citing Ex. 2007; Ex. 2035, 5; Ex. 2037, 4; Ex. 2065 ¶ 119.

Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear in connection with the description of the claimed invention, contending instead that the specification "defines client devices as consumer computers." PO Resp. 24.

Patent Owner argues that a person of ordinary skill in the art "would understand a client device is a 'communication device' in the context of the specification" and that "a client device is a consumer computer with specific software to operate in accordance with the claims." PO Resp. 25 (citing Ex. 2065 ¶¶ 113, 114; Ex. 1017; Ex. 1020; Ex. 2006; *see also* Ex. 1001 at 4:44–50; 5:21–29; 9:12–50). Patent Owner argues that "[i]n the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 25 (citing Ex. 2065 ¶ 118). Patent Owner further argues that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 122).

Patent Owner also argues that a person of ordinary skill in the art

would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser

15

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

> scalability, prioritizing value to client device users over system
> costs. EX.2065 at ¶123.

PO Resp. 27. "These client device-attributes," Patent Owner argues,
"distinguish a client device from a server." *Id.*

Patent Owner argues that a person of ordinary skill in the art "would
understand there are structural differences between client devices and
servers in the context of the specification and there is no contradictory
disclosure in the specification or in the prosecution histories." *Id.* (citing Ex.
2065 ¶ 126). "Rather," Patent Owner argues, "client devices are repeatedly
distinguished from servers in the specification and the prosecution
histories." PO Resp. 27.

We have considered Patent Owner's evidence and arguments that the
district court's construction of the claim term "client device" is incorrect.
For the reasons discussed below, however, we determine that the evidence of
record supports the district court's construction of the term "client device" as
a "communication device that is operating in the role of a client" that we
adopted in our Institution Decision and continue to apply here. Conversely,
we find that the evidence does not support Patent Owner's view that a
"client device" is a "consumer computer," or alternatively, a "consumer
communication device," where the "client device" cannot be a server.

> a)      *Claim Language*

Under *Phillips*, we begin with the language of the claims themselves.
*See Phillips*, 415 F.3d at 1314. In claim 1, the method is for use with a "first
client device." In step 1[b], the first client device, "send[s], to the first
server over the Internet, a Hypertext Transfer Protocol (HTTP) request that

16

Appx972

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

comprises the first content identifier," which serves to request content from the first server (web server). *See* Ex. 1001, 19:24–26. In step 1[b], the first client device is acting as a client in requesting content. In step 1[d], the first client device "send[s], the first content by the first client device to the second server, in response to the receiving of the first content identifier." *See id*. at 19:30–32. In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term and the specification. Pet. Reply 13–16. Patent Owner agrees that under a role-based construction, "a client device may operate in the role of a server at some points in time." PO Resp. 25.

According to Petitioner, in district court Patent Owner "*affirmatively argued* in its claim-construction brief that the claimed 'second server' mapped to the Client 102 role (in green) and the 'client device' mapped to the Agent 122 role (in red), per PO's annotated Figure 3" confirming a role-based construction. Pet. Reply 14–15 (citing Ex. 1126, 8; Ex. 1004, 19–20). Patent Owner's annotated version of Figure 3 of the '319 patent is shown below.

17

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



**FIG. 3**

As shown above, Patent Owner's annotated Figure 3 of the '319 patent, presented in the district court litigation, equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server) (arrow E). Ex 1126, 4. Thus, under this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102 in response to a request for the content from client 102. This reflects a role-based interpretation of the claim

18

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

terms; different devices are defined by their function and can be either clients or servers depending on the function they perform.

Patent Owner argues that "the district court briefing was taken out of context and merely used to illustrate the lines of communication." PO Sur-reply 9, n.4 (citing PO Resp. 6–7, n.1). We do not agree. We find that the cited district court testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.[8]

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1020, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1017, 3–4 (second two alterations in original). Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020,

---

[8] We note that Patent Owner's argument that "a server is not a client device and that a client device is not a server" (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail below.

19

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id.* For related patents that share substantially identical specifications to that of the '319 patent, the district court similarly found that the role-based construction applies "regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1020, 10.

> b) *Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '319 patent specification. The '319 specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles: "[d]ue to the functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve *as a client, peer, or agent*, depending upon the requirements of the network." Ex. 1001, 4:46–50 (emphases added). Thus, the '319 specification indicates that the components identified in Figure 3 may play different roles that perform different functions based on their stored software. *Id.*

Further, according to the '319 specification, a communication device includes memory 210, which stores software 212 with accelerator application 220, which includes client, peer and agent modules. Ex. 1001,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

5:58–6:40, 9:20–26, Fig. 4, Fig. 6. The '319 specification also explains that "each of the [software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the communication network 100 *at a given time.*" *Id.* at 9:23–25 (emphasis added). The '319 specification thus supports the role-based function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In contrast, Patent Owner argues that a person of ordinary skill in the art, when considering Figures 1 and 3 of the '319 patent, would understand that a server is not a client device and that a client device is not a server. PO Resp. 15 (citing Ex. 2065 ¶ 82). Patent Owner argues that proxy server 6 of Figure 1 "must be structurally different from agent 122 of Figure 3," and that "purely role-based constructions do not account for the structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3) and therefore, the purely role-based constructions are not appropriate." *Id.*

For example, Patent Owner asserts with respect to Figure 1 that "proxy server 6 (i) receives requests from client devices 14, 16 and (ii) sends requests to web server 32." PO Resp. 16 (citing Ex. 2065 ¶ 85). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner makes a similar argument with respect to Figure 3. With respect to Figure 3, Patent Owner asserts that "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152." PO

Appx977

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Resp. 17 (citing Ex. 2065 ¶ 90). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner's expert, Dr. Williams, testifies that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time," and that "there is nothing to distinguish the architectures of Figure 1 and Figure 3." Ex. 2065 ¶ 92. According to Dr. Williams, purely role-based constructions are not appropriate because they fail to account for structural differences between proxy servers and proxy client devices. *Id.* ¶ 93.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." Patent Owner's modified version of Figure 3 is shown below.

22

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



Patent Owner's modified version of Figure 3, shown above, inserts "proxy server 6" outlined in green, between "client 102" outlined in purple and "agent 122" outlined in red.  *See* PO Resp. 8.  Patent Owner's modified configuration of Figure 3 is not shown in any figure of the '319 patent or disclosed anywhere in the specification.  Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3."  Ex. 2065 ¶ 59 (emphasis added).  Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and an embodiment of the claimed invention depicted in Figure 3.  *See* Ex. 1001, 2:8–18, 2:24–32, 4:41–50.  Dr. Williams, however, provides no explanation or rationale for combining the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

prior art with an embodiment of the claimed invention.  Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed, but we do not discern that these characterizations are disclosed in the '319 specification.  In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '319 patent specification's disclosures, we do not agree with Patent Owner that it discloses the architecture of a requesting client (102) ↔ proxy server (6) ↔ agent (122) ↔ web server (152), as Patent Owner asserts.  *See* PO Resp. 7–8.  Moreover, we do not agree that Patent Owner's argument based upon "architecture" should govern the construction of "client device" in light of the claim language and the specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time.  *See* Ex. 1001, 4:46–50, 9:20–25.  The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'"  Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2012) are consistent with its understanding of the architecture required by the claims of the '319 patent and its "novel" use of a client device as an intermediary.  PO Resp. 12–13, 20.  We do not

24

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopt here.  The *Alice* order addressed patent eligibility, not claim construction.  *See* Ex. 2012.  Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as a "communication device that is operating in the role of a client," and did not modify that construction.  *Id*. at 5.  Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions.  *See* Exs. 1020, 1115.

We agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server."  Ex. 1112, 13.  Petitioner points to buttressing evidence in RFC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection."  Pet. Reply 15 (citing Ex. 1013, 9) (emphases omitted)).  We agree with Petitioner that RFC 2616 serves as intrinsic evidence because it is cited in the '319 patent in its discussion on the operation of the agent, client, or peer, particularly, in how these devices can use the HTTP protocol to determine whether an HTTP request they have received is still valid.  Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).  Accordingly, we determine that the weight of the evidence supports the

25

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

conclusion that a "client device" as recited in the claims of the '319 patent may act as a server as well as a client.

Patent Owner asserts that the term "client device" means "consumer computer" which is distinct from a server, and that a person of ordinary skill would understand a "consumer computer" to be "a laptop, tablet, or smartphone." PO Resp. 25. Patent Owner asserts that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved," and "is not a dedicated network element, unlike a server," and "typically uses a single or relatively few connections." *Id.* at 26. Patent Owner cites to Dr. Williams' testimony as support for these assertions. *See* Ex. 2065 ¶¶ 112–126.

Dr. Williams testifies that his understanding is "consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." *Id.* ¶ 112. We discuss the prosecution history below, but note here that Dr. Williams does not identify any specific portions of the '319 specification that supports Patent Owner's assertions as to the alleged structure and nature of the client device. Rather, Dr. Williams merely asserts that "[i]n my opinion a POSA would understand" or "I also agree with the applicant's statements." *See, e.g., id.* ¶¶ 122–123.

Dr. Williams testifies that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer'" because the '319 specification states that "files are stored on computers of consumers, referred to herein as client devices." *Id.* ¶ 112 (citing Ex. 1001, 2:44–46); *see also* PO Resp. 22. Our view is that the Patent Owner takes the

26

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

specification's disclosure out of context. The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:40–52. The '319 specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id*. at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. *Id.*; *see also* Ex. 1001, 1:54–59; PO Resp. 24.

Accordingly, we find that the '319 patent specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client" as construed by the district court and as adopted here. We also find that the '319 patent specification does not support Patent Owner's position that a person of ordinary skill in the art would understand the term "client device" to mean a "consumer computer" or a "consumer communication device." *See* PO Resp. 22–27.

### c)  *Prosecution History*

Patent Owner argues that the prosecution history of the '319 patent, its parent (U.S. Patent No. 10,069,936 ("the '936 patent")), and a child patent (U.S. Patent No. 10,484,510 ("the '510 patent")), support the conclusion

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

that the claimed "client device" should be distinguished from a server. *See* PO Resp. 18–22; PO Sur-reply 19–21.

Patent Owner points to statements in the prosecution history of the parent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 19–21. Patent Owner asserts that the applicant responded to rejections over the Garcia reference, stating that the cache server 306 of Garcia "is clearly a dedicated device and performs a server functionality. The Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 19 (citing Ex. 2009, 215) (emphasis omitted).

Patent Owner argues that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." PO Resp. 19 (citing Ex. 2065 ¶ 98). Patent Owner argues that the applicant clearly distinguished servers from client devices, arguing that "server devices are known in the art to be dedicated devices to store information objects, to be provided to clients upon request." PO Resp. 20 (citing Ex. 2009, 163). Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art," and further asserts that "the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." PO Resp. 20 (citing Ex. 2065 ¶ 101).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

The claims that were under consideration in the '936 patent prosecution, however, were significantly different than the claims at issue here. The claims originally recited "devices," which were then amended to "clients." Ex. 2009, 692–697. Moreover, a "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device" or separate "requesting client" and "client." *See id.* at 57–65. Similarly, the issued claims in the '936 patent recite a "requesting client" and a separate "client" and the issued claims have multiple steps that differ from those of the '319 patent. *See, e.g.*, Ex. 2011, 19:16–52. Given these material differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '319 patent. Further, considering the varying terms used, we do not find that the applicant's statements during prosecution of the '936 patent distinguishing a recited "device" or "client" from the devices disclosed in Garcia are sufficient to act as a disclaimer of the scope of the "client device" term as used in the claims of the '319 patent here. *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 2009, 741.

Additionally, as discussed above, the '319 patent's claim language and specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for the parent of the '319 patent and involved evolving claim term amendments. *See*

29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

*Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375
(Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain
language of the claims and the direct teaching of the specification."). For
this reason, we find the '936 prosecution history to be less pertinent to the
construction of the '319 patent claims than the claim language and
specification of the '319 patent itself. As the Federal Circuit has explained,
because the prosecution history represents an ongoing negotiation between
the PTO and the applicant, rather than the final product of that negotiation, it
often lacks the clarity of the specification and thus is less useful for claim
construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert
Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the
prosecution history made it less relevant to claim construction); *Phillips*, 415
F.3d at 1317. This is particularly true here, where the prosecution history at
issue involves a parent application with different claims having different
claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution
history of the '319 patent. PO Resp. 21–22. Patent Owner refers to
applicant's argument that "the claims involve specific networking of
physical elements such as servers and clients, connected via various
networks forming a specific structure and relationships, which are physical
apparatuses, and are NO[T] a 'generic computer' as stated in the Action."
*Id*. at 21 (citing Ex. 1002, 282) (alteration in original). Patent Owner further
cites to the examiner's statement in the Notice of Allowance that "the
limitations of the independent claims, within its environment, is allowable

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

subject matter over the prior art, in light of the specification." *Id.* (citing Ex. 1002, 50) (emphasis omitted).

Patent Owner's arguments based on the '319 patent prosecution, however, concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated a disclaimer of the scope of the claim term "client device." *See* Ex. 1002, 163–164.

Patent Owner additionally refers to the prosecution history of the '510 child patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*d)    Conclusion*

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

*2.    Second Server*

In our Institution Decision, we concurred with the district court's reasoning and agreed with its clarified construction of the claim term "second server" as a "device that is operating in the role of a server and that is not the client device." Dec. 18–19.

31

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

In its Response, Patent Owner asserts that a person of ordinary skill in the art "would understand the term 'second server' to mean [a] 'server that is not **a** client device.'" PO Resp. 28 (citing Ex. 2065 ¶ 131). Patent Owner argues that this proposed construction "is consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." PO Resp. 28. "For example," Patent Owner argues, "the Court construed 'client device' as a communication device and based on that construction, a server is not a client device at least in part because a server is not a communication device." *Id.*

Patent Owner argues that "[a] server is structurally different from a client device," and that "[e]ven if, under the purely role-based constructions, a server may operate in the role of a client at some points in time, that does not transform a server into a 'client device' in the context of the '319 Patent." *Id.* at 29 (citing Ex. 2065 ¶¶ 129–130).

Patent Owner also argues that a person of ordinary skill in the art "would understand that a server is not a consumer computer," and "would consider a server to be a commercial network element, rather than a consumer device," because a server has a number of "server-attributes [that] distinguish a server from a client device." PO Resp. 29–30 (citing Ex. 2065 ¶¶ 132–133). "Treating client devices and servers as interchangeable, general purpose computers," Patent Owner argues, "is inconsistent with the disclosure in the '319 Patent, the prosecution histories, and the Court's Orders." PO Resp. 31 (citing Ex. 2065 ¶ 135).

Petitioner takes the position that the district court's claim construction of "second server" as a "device that is operating in the role of a server and

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

that is not the first client device" is appropriate and that the Board should adopt and apply that construction. *See* Pet. 18–19; Pet. Reply 13–16.

Petitioner argues that Patent Owner's proposed construction is inappropriate, highly subjective, indefinite, and not supported by the '319 specification. *See* Pet. Reply 1–10. Petitioner argues that Patent Owner's "second server" characteristics cannot be found in the specification. *Id.* at 9. Petitioner argues that the '319 patent's "Figure 3 provides 'an example of a communication network in accordance with the present invention,' but does not show any "second server" under PO's construction." *Id.* (citing Ex. 1001, 4:3–5). According to Petitioner, Dr. Williams at his deposition conceded this point.

> Q. Do any of the components drawn in Figure 3 correspond to the second server of Claim 1 of the '319 patent under your construction of second server?
>
> A. No.

Ex. 1111, 110:17–21.

Petitioner also points out that Patent Owner "*altered* Figure 3 by adding a "Proxy Server 6" between the "Client" and "Agent." Pet. Reply 9–10 (citing PO Resp. 8; Ex, 2065 ¶ 59). According to Petitioner, Dr. Williams admitted that "he cut Proxy Server 6 out of prior art Figure 1 and pasted it into Figure 3." Pet. Reply 10 (citing Ex. 1111, 112:20–24). Petitioner points out that the '319 specification "never describes Proxy Server 6 communicating with the Agent 122 or Client 102" as shown in Patent Owner's altered Figure 3. Pet. Reply 10 (citing Ex. 1111, 114:2–14, 117:11–118:2).

33

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner's arguments, for the most part, repeat those presented for construction of the "client device" claim term. *See* PO Resp. 9–22, 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss in Section II.C.1, above. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short of being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the first content . . . to the second server" in limitation 1[d], so the "second server" has to be a separate component.

In Section II.C.1 above, we addressed Patent Owner's arguments that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Patent Owner also argues

34

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

that the district court indicated that servers are not a type of communication device.  PO Resp. 11 (citing Ex. 2065 ¶ 70).  However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases."  Ex. 1020, 10.  Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on the required structure and characteristics of a server.  *See* PO Resp. 28–31; PO Sur-reply 8–10.

D.  *Prior Art References*

1.  *Crowds (Ex. 1006)*

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions."  Ex. 1006, 2.  In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server.  *Id.*  In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator."  *Id.*  In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)."  *Id.* at 8.  "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd."  *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2 (*id.* at 9), reproduced below:

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

　　　2.　　*Border (Ex. 1012)*

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser." *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and

36

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

"selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system,

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–32.

      *3.    MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

38

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. Ex. 1008, 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

> 4.   *RFC 2616 (Ex. 1013)*

RFC 2616 is a request for comments document concerning version 1.1 of the Hypertext Transfer Protocol (HTTP), which is "foundational to the World Wide Web." Pet. 36–37; Ex. 1005 ¶ 53. HTTP is an application-level protocol for distributed, collaborative, hypermedia information systems. Ex. 1013, 1. HTTP is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems. *Id.* RFC 2616 specifies Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. *Id.*

E.   *Anticipation Based on Crowds*

> 1.   *Independent Claim 1*
>
> Preamble

The preamble of claim 1 reads as follows:

> *A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first*

39

Appx995

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

> *server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:*

Ex. 1001, 19:16–21.

Petitioner contends the preamble of claim 1 is met by Crowds. Pet. 25–27. Petitioner asserts "Crowds discloses a layout in which (e.g., in one instance) jondo 6 serves as the first client device, jondo 4 serves as the second server, and Web Server 5 is the first server." *Id.* at 26. Petitioner provides an annotated version of Crowds's Figure 2 to illustrate the correspondences between Crowds' disclosure and portions of the preamble's language recited in claim 1. *Id.* This annotated figure is reproduced below:



Petitioner's annotated Figure 2 of Crowds, above, is a diagram showing multiple paths between jondos and Web servers. *Id.* Figure 2 has been annotated by Petitioner to show the elements in Crowds corresponding to the "first client device," "first server," and "second server" recited in

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

claim 1. *Id.* Specifically, Petitioner identifies the recited "first client device" with jondo 6. *Id.* at 27. Petitioner identifies the "first server" with Web server 5. *Id.* Petitioner identifies the "second server" with jondo 4. *Id.* Petitioner explains that "[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5." *Id.*

In its Response, Patent Owner argues that Crowds does not disclose the limitations of claim 1. *See* PO Resp. 31–36. With respect to the preamble, Patent Owner argues that "Crowds does not disclose a 'first client device' or a 'second server' as recited in the preamble of claim 1 under the purely role-based constructions." *Id.* at 31 (citing Ex. 2065 ¶ 150). Patent Owner argues that "[t]here is no way for a [person of ordinary skill in the art] to determine whether jondos 6 and 4 are client devices or servers under the purely role-based constructions because . . . jondos 6 and 4 operate in different roles at different points in time." *Id.* Patent Owner argues that "[t]he 'first client device' is necessarily and consistently a client device during the performance of method claim 1," and that "[s]imilarly, the 'second server' is necessarily and consistently a server during the performance of method claim 1." *Id.* (citing Ex. 2065 ¶¶ 142–148).

We disagree with Patent Owner because Patent Owner's arguments reject the role-based claim construction adopted by the district court and applied here, wherein the recited "client device" is a "communication device that is operating in the role of a client" and the recited "second server" is a "device that is operating in the role of a server and that is not the client device." Patent Owner's argument improperly limits the operation of the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

"client device" and the "second server" to a single role, even though the district court recognized, consistent with the claim language, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

We, therefore, agree with Petitioner that Crowds meets the subject matter described in the preamble.

> a) *receiving, from the second server, the first content identifier*

Petitioner contends this step is disclosed by the path "5→4→6→ server" in Figure 2 of Crowds. Pet. 27. Petitioner explains that "Crowds discloses that jondo 6 (first client device) receives a 'request' (first content identifier or 'FCI') from jondo 4 (the second server)." *Id.* Petitioner further explains that "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' i.e., requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." *Id.* at 28 (citing Ex. 1006, 73[9]; Ex. 1005 ¶¶ 58–59). Petitioner explains that "each 'request' contains a URL," and that "[t]he 'requests' are clearly *HTTP requests* as understood by a [person of ordinary skill in the art], as reflected, *e.g.*, where Crowds notes that the requests have 'HTTP headers.'" Pet. 28 (citing Ex. 1006, 90). Petitioner explains that "[a]n *HTTP request* for

---

[9] Petitioner's citations to Crowds (Ex. 1006) in the Petition are to Crowds' original, internal pagination (66–92), and not to the pagination (1–27) applied by counsel.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

content available from a web server by definition contains a URL." Pet. 28
(citing Ex. 1005 ¶¶ 61–64).

Patent Owner argues that "when jondo 6 receives a request from
jondo 4, jondo 6 is operating in the role of a server, not a client." PO Resp.
32 (citing Ex. 2065 ¶ 153). "Moreover," Patent Owner argues, "when jondo
4 sends a request to jondo 6, jondo 4 is operating in the role of a client, not a
server." *Id.* (citing Ex. 2065 ¶ 154). Therefore, Patent Owner concludes,
"jondo 6 cannot be a client device during performance of this method step"
and "jondo 4 cannot be a server during performance of this method step."
*Id.*

We disagree with Patent Owner's argument for several reasons. First,
Patent Owner's argument requires the recited "client device" to operate in
the client role at all times and that the recited "second server" must operate
in the server role at all times. But such a rigid restriction on the operational
roles of the client device and the second server are contradicted by the
express language of claim 1 and would make claim 1 "incapable of ever
being practiced," as Petitioner argues. *See* Pet. 18–19. For example, Claim
1 requires that the "first client device" receive a request (with the content
identifier) from the "second server" in step 1, and expressly requires the
"first client device" to send a response (with the content) back to the "second
server" in step 4. Thus, claim 1 expressly requires that the "first client
device" must sometimes operate in the role of a server and that the "second
server" must sometimes operate in the role of a client.

Second, Patent Owner's rigid application of operational roles is
inconsistent with the claim construction adopted by the district court and

43

Appx999

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

applied here. The district court expressly acknowledged, and we agree, that consistent with the claim language "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Accordingly, we agree with Petitioner that Crowds discloses the subject matter described in limitation 1[a].

> b)    *sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier*

Petitioner contends that this step is disclosed by Crowds when "[j]ondo 6, having received the FCI per step (a), then sends it in an HTTP request to the web server, according to step (b)." Pet. 30. Petitioner explains that the jondos "operate as HTTP proxies." *Id.* Petitioner explains further, "[i]n the example '5→4→6→server' path discussed above, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server, or 'first server.'" *Id.* at 31 (citing Ex. 1006, 73–74, Fig. 2).

Petitioner illustrates this step by annotating Figure 2 of Crowds, shown below.

44

Appx1000

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



Figure 2 of Crowds (annotated)

Petitioner's annotated Figure 2 of Crowds, shown above, illustrates (circled in red) first client device (jondo 6) sending the HTTP request comprising the FCI to first server (target web server 5).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[b]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[b]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 65–69.

> c)      receiving, *the first content from the first server over the Internet in response to the sending of the first content identifier*

Petitioner contends limitation 1[c] is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." Pet. 32. Petitioner explains that "the 'first client device' (jondo '6' above) sends the FCI to the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

first server, or target web server '5'. The last jondo in the path then receives the 'first content,' such as the user specified web page." *Id.* at 32–33. Petitioner further explains that "[t]he initiating jondo establishes the random path of jondos 'that carries its users' transactions to **and from** their intended web servers.'" *Id.* at 33 (citing Ex. 1006, 73). "Further," Petitioner explains, "server replies traverse the **same path as the requests, only in reverse**." Pet. 33 (citing Ex. 1006, 74). "Accordingly," Petitioner explains, "the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user." Pet. 33 (citing Ex. 1005 ¶¶ 70–72).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[c]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[c]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 70–72.

> d)    *sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier*

Petitioner contends this step is disclosed by Crowds where Crowds explains "[a]s discussed regarding step (c) above, the first client device (jondo 6) receives the first content from the web server. In response, it then sends the content on to the requester, jondo 4, per step (d)." Pet. 33.

Petitioner explains that

Jondo "6" previously receives the FCI from the second server (jondo "4" in the above example path). Further, as explained immediately above, the random path of jondos "carries its users' transactions to **and from** their intended web servers." Ex. 1006

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

at 73. "[S]erver replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. The first client device (here, jondo "6") sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo). The second server, jondo "4," can then send the web page content back to the requesting user (here, jondo "5").

Patent Owner argues that

[u]nder the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client. EX.2065 at ¶158. Therefore, under the purely role-based constructions, jondo 6 cannot be a client device during performance of this method step. *Id.* Moreover, under the purely role-based constructions, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server. EX.2065 at ¶159. Therefore, jondo 4 cannot be a server during performance of this method step. *Id.*

PO Resp. 33.

We do not agree with Patent Owner's argument. The district court's claim construction for the "server" terms, which we adopted, makes it clear that a server is defined by its function, not its structure. Ex. 1020, 7–11. Thus, the district court clarified that the second server is "a device that is *operating in the role of a server* and that is not the first client device." *Id.* at 8, 11 (emphasis added). Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court in its claim construction. Rather, the district court explained that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

server/second server, and the web server." *Id.* at 11 (internal quotation marks omitted).

Petitioner's anticipation analysis is persuasive because it is based on the operation of jondos 4 and 6, and whether this operation meets the steps of the claimed method. In contrast, Patent Owner's opposition is based on a construction rejected by us and the district court.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Crowds, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses all the limitations of independent claim 1.

### 2. Dependent Claims 21–29

#### a) Dependent Claim 21

Dependent claim 21 recites the following limitations:

> *The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates respectively with the first or second server over the Internet based on, or according to, TCP/IP protocol or connection.*

Ex. 1001, 21:9–17.

Petitioner contends that Crowds confirms the use of TCP/IP when Crowds states that "failures are detected by the TCP/IP connection to the jondo breaking or being refused." Pet. 34 (citing Ex. 1006, 81). Petitioner argues that "[b]ecause the second server and first client device are jondos . . .

48

Appx1004

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

this discloses that they establish a TCP connection with each other." Pet. 34.
Petitioner also contends that "Crowds discloses the use of the HTTP
protocol for communications between jondos and web servers." *Id.*
According to Petitioner, a person of ordinary skill in the art "would have
understood at the time that HTTP works on top of TCP, at the application
layer of the TCP/IP networking model." Pet. 34–35 (citing Ex. 1005 ¶¶ 78–
80). "Like HTTP," Petitioner argues, "the TCP/IP networking model was
well known" to a person of ordinary skill in the art. *Id.* According to
Petitioner, "Crowds' disclosure of usage of HTTP would therefore
additionally disclose usage of TCP/IP (with both the first and second
servers)." Pet. 35 (citing Ex. 1005 ¶ 81).

Patent Owner does not specifically address Petitioner's arguments or
evidence concerning dependent claim 21. *See* PO Resp. 40–41. Neither
does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, in particular
Crowds' disclosure that a jondo's communication path may be rerouted
"when the failure of a jondo is unmistakenly detected . . . by the TCP/IP
connection to the jondo breaking or being refused," (Ex. 1006, 81) we are
persuaded that Petitioner has demonstrated by a preponderance of the
evidence that Crowds discloses the limitations of dependent claim 21.

### b) *Dependent Claim 22*

Dependent claim 22 recites the following limitations: "*[t]he method
according to claim 1, wherein the first client device communicates over the
Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#,
SMTP, or SQL standards.*" Ex. 1001, 21:18–21.

Appx1005

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Petitioner points out that Crowds states that FTP requests must also go through the crowd. Pet. 35 (citing Ex. 1006, 73 n.1). Petitioner argues that "[t]he first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP)." *Id.*

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, in particular Crowds' disclosure that FTP services must be proxied (Ex. 1006, 73 n.1), we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 22.

c)    *Dependent Claim 23*

Dependent claim 23 recites the following limitations: "*[t]he method according to claim 1, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL), and wherein the method further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 21:22–22:2.

Petitioner asserts that Crowds discloses the first content being a web page. Pet. 35 (citing Ex. 1006, 79). Petitioner also asserts that "Crowds also discloses the first content identifier being a URL and the first client device executing a web browser application." *Id.* (citing Ex. 1006, 89) (using Netscape browser to browse a web page at a URL). According to Petitioner, a person of ordinary skill in the art "would thus understand Crowds to disclose claim 23." Pet. 35 (citing Ex. 1005 ¶¶ 83–84).

Appx1006

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 23.

> d)     *Dependent Claim 24*

Dependent claim 24 recites the following limitations: "*[t]he method according to claim 1, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol.*" Ex. 1001, 22:3–6.

For dependent claim 24, Petitioner cites to the same evidence in Crowds as it did for dependent claim 21.

Patent Owner argues that

> [t]he portions of Crowds cited and relied upon by Petitioner only disclose establishing a TCP connection in the context of a jondo sending a request for content. Petition at 34-35; EX.2065 at ¶186; EX.1004 at 8. At that point in time, under the purely role-based constructions, jondo 4 is operating in the role of a client and jondo 6 is operating in the role of a server. EX.2065 at ¶187. Therefore, under the purely role-based constructions, jondo 4 cannot correspond to the "second server" and jondo 6 cannot correspond to the "first client device" as Petitioner alleges. *Id.* Under Patent Owner's proposed constructions, as discussed above, jondo 4 is not a server. EX.2065 at ¶188.

PO Resp. 41.

Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that components, such as jondos, cannot operate in

51

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

different roles, an argument that was rejected by the district court in its claim construction. The district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 24 for the same reasons explained above for dependent claim 21.

> e)    *Dependent Claim 25*

Dependent claim 25 recites the following limitations: "*[t]he method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection.*" Ex. 1001, 22:7–12.

For dependent claim 25, Petitioner cites to the same evidence in Crowds as it did for dependent claim 21.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 25. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 25 for the same reasons discussed above for dependent claim 21.

52

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

>  f)    *Dependent Claim 26*

Dependent claim 26 recites the following limitations:  "*[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system.*"  Ex. 1001, 22:13–14.

Petitioner asserts that "Crowds discloses jondos '*storing, operating, or using, a client operating system,*' specifically SunOS 4.1.4."  Pet. 35 (citing Ex. 1006, 82).  Petitioner asserts that "Crowds further discloses that the jondo software application was programmed to allow for 'portability across Unix and Microsoft platforms.'"  Pet. 34–35 (citing Ex. 1006, 81).  According to Petitioner, a person of ordinary skill in the art "would understand Unix, Microsoft, and SunOS to refer to client operating systems."  Pet. 36 (citing Ex. 1005 ¶¶ 85–86).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 26.  *See* PO Resp. 40–41.  Neither does Dr. Williams.  *See* Ex. 2065 ¶¶ 180–189.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 26, in particular where Crowd discloses a crowd of four jondos operating on SunOS 4.1.4.

>  g)    *Dependent Claim 27*

Dependent claim 27 recites the following limitations: "*[t]he method according to claim 1, wherein the steps are sequentially executed.*"  Ex. 1001, 22:15–16.

53

Appx1009

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Petitioner contends that Crowds discloses the four method steps of claim 1 executed sequentially as further required by dependent claim 27. Petitioner explains that

> [t]he web request is forwarded along the path (*e.g.*, 5→4→6→server) such that the "first client device" (here, jondo "6") receives the web request (and content identifier in the URL) from the "second server" (here, jondo "4"), and sends the web request to the "first server" or target web server. Ex. 1006 at 73 and Fig. 2. "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 74. The "first client device" receives the web content from the web server, and sends it back to the "second server."

Pet. 36 (citing Ex. 1005 ¶¶ 87–89).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 27. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 27, in particular where the four method steps of claim 1 are sequentially executed by Crowds in the manner described by Petitioner.

> h)    *Dependent Claim 28*

Dependent claim 28 recites the following limitations: "*[a] non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 22:17–20.

Petitioner asserts that Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

of [claim 28]." Pet. 34 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶ 76–77.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 28. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Crowds states that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.researchy.att.com/projects/crowds." Ex. 1006, 91.

This statement by Crowds clearly indicates that the Crowds' code has been distributed free-of-charge in response to user requests and that the Crowds' blender is being maintained on the Internet for an active crowd. Mr. Teruya testifies that this statement by Crowds discloses a software package that implements a jondo, "whose operation is per Claim 1." Ex. 1005 ¶ 76.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 28. The evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being maintained on the Internet for the operation of an active crowd. Crowds' disclosure of the method of claim 1 is discussed in Section III.E.1, above.

*i)      Dependent Claim 29*

Dependent claim 29 recites the following limitations: "*[a] client device comprising a non-transitory computer readable medium containing*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

*computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*"  Ex. 1001, 22:21–24.

Petitioner asserts that Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 29]."  Pet. 34 (citing Ex. 1006, 91).  Mr. Teruya provides supporting testimony.  *See* Ex. 1005 ¶ 76–77.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 29.  *See* PO Resp. 40–41.  Neither does Dr. Williams.  *See* Ex. 2065 ¶¶ 180–189.

Crowds states that "we have distributed over 1400 copies of the Crowds' code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet.  Information about obtaining the Crowds' code can be found at http://www.researchy.att.com/projects/crowds."  Ex. 1006, 91.

This statement by Crowds clearly indicates that the Crowds' code has been distributed free-of-charge in response to user requests and that the Crowds' blender is being maintained on the Internet for an active crowd.  Mr. Teruya testifies that this statement by Crowds discloses a software package that implements a jondo, "whose operation is per Claim 1."  Ex. 1005 ¶ 76.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 29, because the evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being

Appx1012

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

maintained on the Internet for the operation of an active crowd. Crowds disclosure of the method of claim 1 is discussed in Section III.E.1, above.

### 3.   Conclusion on Anticipation - Crowds

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 21–29 are anticipated by Crowds.

### F.   Obviousness Based on Crowds and RFC 2616

Petitioner contends that claims 1, 2, 14, 15, 17–19, and 21–29 would have been obvious in light of Crowds and RFC 2616. Pet. 36–41. Because we have already determined that independent claim 1 is anticipated by Crowds, we only consider whether dependent claims 2, 14, 15, and 17–19[10] would have been obvious in light of Crowds and RFC 2616 as Petitioner contends. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) ("[I]t is well settled that a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." (citations and internal quotation marks omitted)).

### 1.   Rationale to Combine

Petitioner explains that working in the field of the '319 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP. Indeed, based in part upon the

---

[10] We have also found that dependent claims 21–29 are anticipated by Crowds. *See* Section II.E.3, above.

57

Appx1013

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

technology addressed by the '319 patent, we determined that a person of ordinary skill in this art would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems. *See* Section III.B. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including HTTP and TCP/IP protocols. *Id.*

Petitioner points out that the '319 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." Pet. 37 (citing Ex. 1001, 4:64–67). The '319 patent acknowledges that HTTP and TCP/IP are known to a person of ordinary skill in the art, stating "[a]*s is known by those having ordinary skill in the art*, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." Ex. 1001, 17:22–24 (emphasis added). Indeed, the '319 patent cites to RFC 2616 for a definition of HTTP. *Id.*, 16:21–28; 20:44–46 (Claim 15 referring to an HTTP header "according to, or based on, IETF RFC 2616").

Petitioner points out that "Crowds concerns communications using these same protocols." Pet. 37 (citing Ex. 1006, 81 (TCP), 88–89 (HTTP)). Petitioner contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill in the art] developing software for like applications would have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." Pet. 37 (citing Ex. 1005 ¶¶ 90–94).

58

Appx1014

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner does not specifically address Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616. *See* PO Resp. 36–39. Instead, Patent Owner argues that "Crowds does not teach that a jondo may be a server," that "Crowds does not disclose or teach putting a server in the "mix," or that "Crowds also does not disclose or teach a crowd member that does not run its own web browser." *Id.* at 36. None of these arguments, however, addresses Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616 described directly above. Rather, Patent Owner's arguments only address a contingent alternative proffered by Petitioner with respect to claim 1 "if the Board were to construe 'second server' as requiring a specialized data-center class device," which we did not adopt. *See* Pet. 38.

We find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Crowds and RFC 2616 in the manner described by Petitioner because both Crowds and RFC 2616 are directed to improving networked communications so that a person of ordinary skill in the art developing software for similar applications would have had an incentive to combine the disclosure of Crowds with the knowledge of Internet standards governing HTTP described by RFC 2616.

## 2. Teaching Away

Patent Owner argues that Crowds teaches away from the claimed methods of the '319 patent because: 1) Crowds does not provide the initiator with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 38–39.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).

As to the second issue of Crowds' latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Accordingly, we do not find that Crowds teaches away from the claimed invention of the '319 patent as Patent Owner contends.

### 3.    *Objective Indicia of Nonobviousness*

Patent Owner asserts that non-obviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–74; PO Sur-reply 27–29. Petitioner disagrees,

60

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 24–26.

> a)    *Legal Standards*

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed

61

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of

62

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

> b) *Commercial Success*

Patent Owner argues that nonobviousness is supported by the fact that it commercialized a "'residential proxy service" that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods. PO Resp. 57 (citing Ex. 2065 ¶ 262). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* (citing Ex. 2065 ¶ 263; Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 70. According to Patent Owner, in 2021 Bright Data's "residential proxy service generated revenues of $53.7 million." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is evidence of commercial success. *Id.* (citing Ex. 2065 ¶ 269).

Patent Owner asserts that it "provides a residential proxy service that practices the methods claimed in the '319 [p]atent," and provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 17–18, and 21–29 of the '319 [p]atent." PO Resp. 57–68. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '319 [p]atent where the requesting client device corresponds to client 102, the

63

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 68. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '319 [p]atent and is coextensive with them." *Id.*

Additionally, Patent Owner argues that the features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses. *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11.

Petitioner points out that Patent Owner "asserts that two things 'driv[e]' the commercial success of its 'residential proxy service': use of 'residential IP addresses' and 'scalability' from the 'large number' of clients with 'residential IP addresses.'" Pet. Reply, 24–25 (citing PO Resp. 68–69). Petitioner argues that Patent Owner "therefore admits a lack of nexus, because neither the use of 'residential IP addresses' or 'scalability' from a 'large number' of clients with residential IP addresses are claimed." Pet. Reply 25.

Petitioner alleges that Dr. Williams "admits that use of 'residential' IP addresses is not claimed." *Id.* (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner argues that Dr. Williams "cites to 2021 sales figures as showing 'commercial success,' but provides no analysis tying those sales figures to any allegedly embodying PO product." Pet. Reply, 25 (citing Ex. 2065

64

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

¶ 270). Petitioner argues that Dr. Williams "did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" Pet. Reply, 26 (citing Ex. 1111, 168:23–169:3). Petitioner points out that Dr. Williams "did not have 'the data' to know what feature(s) drove revenue." Pet. Reply, 26 (citing Ex. 1111, 176:7–177:21).

Based on this record, we find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.

For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 68; *see id.* at 57 (pointing to Patent Owner's "residential proxy service [that] provides various user's client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other user's requesting client devices"), 70 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" wherein its "residential proxy service generated revenues of $53.7 million in the year 2021").

65

Appx1021

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

The challenged claims, however, do not recite any limitations requiring residential proxies, residential computers, or residential IP addresses.  Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device."  *See* Section III.C.  At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to establish a nexus.  *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'"  *Fox Factory*, 944 F.3d at 1373–74.  As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims.  *See* PO Resp. 57–59, 68–71.  Therefore, Patent Owner has failed to demonstrate that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established."  PO Sur-reply 27 n.11 (citing Ex. 2014, 4).  Patent Owner relies on the district court's ruling

Appx1022

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2014, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court's finding was that nexus had been established, or simply that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony to establish nexus at trial.

*c) Long-Felt Need*

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 71. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses" because they "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 187). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "residential IP network" solves the need to "dramatically increase the [number] of IP addresses that can be included in a proxy network." *Id.*

67

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

For similar reasons as for commercial success, Patent Owner has not established that there is a nexus between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 71. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

> ### d) Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name as 'Hola,' was presented." PO Resp. 72 (citing Ex. 2065 ¶ 273). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 273). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 73 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8; Ex. 2065

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

¶ 274). "This testimony," according to Patent Owner, "is strong evidence of copying." *Id.* (citing Ex. 2065 ¶ 274).

For similar reasons as for commercial success and long-felt need, no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 72–73. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '319 [p]atent as described above." PO Resp. 74 (citing Ex. 2065 ¶ 276). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.*

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 74. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

69

Appx1025

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

### e)    Conclusion

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight in our obviousness analysis because Patent Owner has not shown a sufficient nexus to the evidence presented and the claimed invention.

### 4.    Dependent Claim 2

Dependent claim 2 recites the following limitations:

> *[t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.*

Ex. 1001, 19:33–40.

According to Petitioner, Crowds discloses that jondos have host names: "[t]he user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services." Pet. 39 (citing Ex. 1006, 73; *see also* Fig. 6 (identifying host names of multiple available jondos). Petitioner asserts that "Crowds also discloses a setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy." Pet. 39. "In the setup phase," Petitioner explains, "the Blender gets the IP address of the joining jondo." *Id.* (citing Ex. 1006, 87). According to Petitioner, "[t]he blender then informs the other jondos of the new member and shared key, so that 'all members are

70

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

equipped with the data they need for the new member to participate in the crowd.'" Pet. 39 (quoting Ex. 1006, 87).

According to Petitioner, it would be obvious to a person of ordinary skill in the art "that the other jondo (*e.g.*, the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address." Pet. 39 (Ex. 1005 ¶¶ 100–102).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 2, wherein during the setup phase a user selects a jondo as a web proxy by specifying a host name as the proxy for all services such that other jondos learn this information including their IP address shared password, and use this information when selecting a jondo as a proxy.

### 5.     *Dependent Claim 14*

Dependent claim 14 recites the following limitations: "*[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.*" Ex. 1001, 20:41–43.

Petitioner asserts that RFC 2616 discloses headers that implement the subject matter of claim 14. Pet. 40 (citing Ex. 1013 § 14.9). Petitioner argues that "the techniques for this taught by RFC 2616 are identical to the 'Cache-Control' directives utilized in the ['319] Patent to implement this

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

functionality." Pet. 40. The cache-control directives described in RFC 2616 include "[c]ontrols over cache revalidation and reload." Ex. 1013 § 14.9.

Figure 12 of the '319 patent provides a flow chart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. The '319 patent acknowledges that "the HTTP protocol, *defined by RFC 2616*, outlines specific methods . . . within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information." Ex. 1001, 16:21–25 (emphasis added).

Petitioner argues that it "would have been obvious for [a person of ordinary skill in the art] faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616." Pet. 40 (citing Ex. 1005 ¶ 103).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 14. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 14.

6.    *Dependent Claim 15*

Dependent claim 15 recites the following limitations: "*[t]he method according to claim 14, wherein the determining is based on the received*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

*HTTP header according to, or based on, IETF RFC 2616."* Ex. 1001,
20:44–46.

Petitioner uses the same arguments and evidence for dependent claim
15 that it used for dependent claim 14.

Patent Owner does not specifically address Petitioner's arguments or
evidence concerning dependent claim 15. *See* PO Resp. 40–41. Neither
does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has
demonstrated by a preponderance of the evidence that the combined
teachings of Crowds and RFC 2616 meet the recited limitations of
dependent claim 15.

### 7. Dependent Claim 17

Dependent claim 17 recites the following limitations: "*[t]he method
according to claim 1, further comprising periodically communicating
between the second server and the first client device."* Ex. 1001, 20:56–58.

Petitioner asserts that Crowds discloses that jondos periodically
communicate with each other to ensure the liveness of other jondos. Pet. 40
(citing Ex. 1006, 87) (referring to line 25 of Figure 3). Petitioner argues that
a person of ordinary skill in the art "would have known that such verification
could be easily done by using standard 'keep-alive' messaging." Pet. 40.
Petitioner also argues that "[t]he random path retrieval mechanism itself
(discussed above), especially where a web page with multiple embedded
objects (images, etc.) is involved, entails periodic communication between
the first client device and the second server, separately meeting the
limitations of claim 17." *Id.* (citing Ex. 1005 ¶ 104).

73

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 17. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 17.

> 8.    *Dependent Claim 18*

Dependent claim 18 recites the following limitations: "*[t]he method according to claim 17, wherein the periodically communicating comprises exchanging 'keep alive' messages."* Ex. 1001, 20:59–61.

Petitioner asserts that a "keep-alive" mechanism for TCP connections (involving "periodically probing the other end of a connection") is disclosed in RFC 1122. Pet. 40 (citing Ex. 1016 § 4.2.3.6). Petitioner asserts that Crowds "confirms that jondos communicate over TCP/IP connections: in discussing potential points of failure, Crowds states that 'such failures are detected by the TCP/IP connection to the jondo breaking or being refused,' reflecting that Crowds relies upon TCP connections." Pet. 41 (emphasis omitted)(citing Ex. 1006, 81). Petitioner argues "[i]t would have been obvious to [a person of ordinary skill in the art] to have performed this disclosed 'detecting' by using the 'keep-alive' implementation taught by RFC 1122." Pet. 41 (citing Ex. 1005 ¶ 105).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 17. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

74

Appx1030

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 18.

> 9.     *Dependent Claim 19*

Dependent claim 19 recites the following limitations:

> *The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by :*
>
> *downloading, by the first client device from the Internet, the software application; and*
>
> *installing, by the first client device, the downloaded software application.*

Ex. 1001, 20:62–21:6.

Petitioner asserts that Crowds discloses the additional limitations of claim 19. Pet. 41 (citing Pet. Secs. 8.1.3–8.1.6; Ex. 1005 ¶ 106). Petitioner argues that Crowds "discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 19]." Pet. 34 (citing Ex. 1006, 91; Ex. 1005 ¶¶ 76–77).[11]

---

[11] Petitioner indicates that "[f]or purposes hereof, Petitioner will treat the steps recited in the first clause of claim 19 as corresponding to steps (b)-(d) of claim 1." Pet. 34, n.3.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches 'storing of the first content' and 'sending… the stored first content' as recited in claim 19." PO Resp. 40 (citing Pet. 34). Patent Owner argues that "Petitioner does not show that the software package causes the processor on the jondo to store the first content or send the stored first content as recited in claim 19." PO Resp. 40 (citing Ex. 2065 ¶ 183).

> In its Reply, Petitioner argues that
>
> claim 19 "adds two method steps regarding software application downloading and installation. PO does not dispute that the prior art discloses those steps, but instead refers to the language "the receiving and storing of the first content" used in claim 19 to refer back to claim 1 (even though "the storing" has no antecedent basis). POR, 40, 55. PO's argument fails because claim 19 does not specify any particular means of storing the HTTP content, and therefore the use of typical computer memory satisfies this step. Williams admits that typical "user computers" are disclosed in Crowds (EX-2065, ¶ 161).

Pet. Reply 23.

In its Sur-reply, Patent Owner states that it "focuses on independent claim 1 and defers to its analysis of the dependent claims as set forth in the [Patent Owner Response]. PO Sur-reply 22, n.9 (citing PO Resp. 40–41; 48; 54–55).

Claim 19 does not specify any particular means of "storing of the first content" and "sending . . . the stored first content." We agree with Petitioner that Crowds discloses "user computers" and that the use of typical computer memory would satisfy the storing step. Dr. Williams also acknowledges that the jondos of Crowds are "user computers". Ex. 2065 ¶ 161. A person of ordinary skill in the art at the time of the invention would understand that a

Appx1032

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

"user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates. *See* Section III.B, above.

For downloading of the software application, Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, 91. Mr. Teruya testifies that this statement discloses a software package that implements a jondo, "whose operation is per Claim 1." Ex. 1005 ¶ 76. Patent Owner presents no argument to rebut this evidence.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 19.

10. *Conclusion on Obviousness - Crowds and RFC 2616*

Based upon consideration of the entire record, including Petitioner's arguments and evidence and Patent Owner's arguments and evidence of secondary considerations, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 14, 15, and 17–19 would have been obvious over the combined teachings of Crowds and RFC 2616 and that a person of ordinary skill in the art would have combined the teachings of Crowds and RFC 2616 in the manner described by Petitioner. As noted above, we give little weight to Patent Owner's evidence of secondary considerations in our obviousness analysis because Patent Owner

77

Appx1033

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

has failed to establish a sufficient nexus between that evidence and the challenged claims.

G.  *Anticipation Based on Border*

Petitioner asserts that claims 1, 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border.  Pet. 41–53.  Because we have already determined that claims 1, 14, and 21–29 are unpatentable based on other grounds, we only consider whether claim 12 is anticipated by Border as Petitioner contends.  However, in order to anticipate claim 12, Border must first disclose the limitations of independent claim 1, which dependent claim 12 incorporates.  For ease of reference, Figure 1 from Border is set out below.

*FIG. 1*



Figure 1 from Border, above, is a diagram depicting a communication system employing a downstream proxy server and an upstream proxy server for accessing a web server.

78

Appx1034

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

>    *1.    Independent Claim 1*

The preamble of claim 1 reads as follows:

> *A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:*

Ex. 1001, 19:16–21.

Petitioner asserts that the preamble of claim 1 is disclosed by Border. Pet. 44. Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the requested web page at the requested URL. *Id.* (citing Ex. 1005 ¶¶ 107–108).

The remaining steps of claim 1 are as follows:

> *[a] receiving, from the second server, the first content identifier;*

> *[b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;*

> *[c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and*

> *[d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.*

Ex. 1001, 19:22–32.

79

Appx1035

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. Pet. 44–49. Petitioner asserts that the "receiving, from the second server" (step a) is met when "[w]eb content is retrieved from a web server that stores the web content by forwarding a 'URL request message to a web server and receiv[ing] the URL content from the web server.'" *Id.* at 44 (citing Ex. 1012, 2:52–54). Similarly, the "sending, to the first server" (step b) is met when "[u]pstream server 107 (the first client device) issues a GET request to web server 109 for the content at a specified URL." Pet. 47 (citing Ex. 1012, Fig. 2, 5:33–36) (footnote omitted). "Receiving, the first content" (step c) is met when "[i]n response to upstream server 107 'issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server.'" Pet. 48 (citing Ex. 1012, 5:34–37). "Sending, the first content" (step d) is met "[a]fter receiving the web page at the requested URL from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105,'" and "[d]ownstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, per the second server's role as a 'server.'" Pet. 49 (citing Ex. 1012, 5:38–40). Mr. Teruya provides supporting testimony. Ex. 1005 ¶¶ 109–123.

These communication steps are depicted in Border's Figure 2, shown below.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2



Border's Figure 2, above, is a sequence diagram showing the
communications between the web server, upstream and downstream servers,
and browser of Border.

For the preamble, Patent Owner relies on the same arguments it made
with respect to Crowds.  PO Resp. 42 ("For the same reasons discussed
above regarding Crowds, Border does not disclose a 'first client device' or a
'second server' as recited in the preamble") (citing Ex. 2065 ¶ 197).  Patent
Owner's arguments are unavailing for the same reasons we discussed with
respect to Crowds.  *See* Section III.E.1, above.

81

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

For "receiving, from the second server" step 1[a], Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds, during performance of this method step, under the purely role-based constructions, downstream server 105 is operating in the role of a client, not a server, and therefore downstream server 105 cannot be a server."  PO Resp. 42.  Patent Owner's arguments with respect to claim 1 step [a] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.a, above.

Patent Owner also makes the same arguments with respect to the "sending, the first content" step 1[d] that it made with respect to Crowds. *See* PO Resp. 43 ("[f]or the same reasons discussed above regarding Crowds").  Patent Owner's arguments with respect to claim 1 step [d] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.d, above.

Patent Owner's other arguments with respect to Border, for example that "Border does not disclose the architecture of claim 1 under Patent Owner's proposed constructions" (PO Resp. 44–45) are unavailing because they argue proposed claim constructions that we did not adopt.  *See* Section III.C, above.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Border, as well as Patent Owner's evidence and arguments.  For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of independent claim 1.

82

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

>     *2.    Dependent Claim 12*

Dependent claim 12 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the first server, the first content, and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.*"

>    Petitioner contends that Border discloses these limitations because
>
>     Border discloses upstream server 107 sending the GET request to web server 109 after it receives the requested URL from downstream server 105, where upstream server 107 further comprises HTTP cache 117. Ex. 1012, 4:8-11. In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.*, 5:36-38.

Pet. 50 (citing Ex. 1005 ¶ 124).

With respect to claim 12, Patent Owner argues that "[b]ecause Border does not disclose or teach independent claim 1, Border does not disclose or teach dependent claim[] 12." PO Resp. 48 (citing Dec. 9; Ex. 2065 ¶ 218). Because we have already determined that Border discloses all the limitations of independent claim 1, Patent Owner's argument is unavailing. *See* Section III.G.1, above.

We have considered Petitioner's evidence and arguments as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of dependent claim 12.

83

Appx1039

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

### H. Obviousness Based on Border and RFC 2616

Petitioner contends that claims 1, 12, 14, 15, 17, 18, 21, 22, 24, 25, and 27–29 would have been obvious in light of Border and RFC 2616. Pet. 53–57. Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

### I. Anticipation Based on MorphMix

Petitioner asserts that claims 1, 17, 19, and 21–29 are anticipated by MorphMix. Pet. 58–61. Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

### J. Obviousness Based on MorphMix and RFC 2616

Petitioner contends that claims 1, 2, 14, 15, 17–19, 21–29 would have been obvious over MorphMix in light of RFC 2616. Pet. 70–75. Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

## IV. MOTION TO SEAL AND PROTECTIVE ORDER[12]

Patent Owner has filed a Motion to Seal and to Enter the Joint Protective Order (Paper 32, "Motion"), which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order (Ex. 2071). Paper 32, 1. Patent Owner asserts that Exhibit 2039 contains sensitive

---

[12] Petitioner has filed a Motion to Exclude Evidence (Paper 43), which was withdrawn at the Oral Hearing without objection by Patent Owner. *See* Paper 48, 5.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

technical network information, Exhibits 2041–2044 contain source code and related files, Exhibit 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporate some of the sensitive information. *Id.* at 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, that it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal (Paper 32) and the associated request to enter the Protective Order (Ex. 2071).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 are unpatentable on the bases set forth in the following table.[13]

---

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

85

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 19, 21–29 | 102 | Crowds | 1, 21–29 | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, Knowledge of POSITA, RFC 2616 | 2, 14, 15, 17–19 | |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border | 12 | |
| 1, 12, 14, 15, 17, 18, 21, 22, 24, 25, 27–29 | 103 | Border, Knowledge of POSITA, RFC 2616[14] | | |
| 1, 17, 19, 21–29 | 102 | MorphMix | | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, Knowledge of POSITA, RFC 2616 | | |
| **Overall Outcome** | | | 1, 2, 12, 14, 15, 17–19, 21–29 | |

---

[14] Because each of these challenged claims is held unpatentable on other grounds, we do not reach grounds 4–6 in the Petition.

Appx1042

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 are unpatentable;

FURTHER ORDERED that the Motion to Seal (Patent Owner's Response (Paper 30), Exs. 2039, 2041–2044, and 2065) is *granted*;

FURTHER ORDERED that the request to enter the Protective Order (Ex. 2071) is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Appx1043

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00915
Patent 10,257,319 B2

PETITIONER:

Liang Huang
Wensheng Ma
MAURIEL KAPOUYTIAN WOODS LLP
rhuang@mkwllp.com
wma@mkwllp.com

PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

88

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                        Paper 50
Tel: 571-272-7822                    Entered: September 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

MAJOR DATA UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

————————————

IPR2022-00916
Patent 10,484,510 B2

————————————

Before THOMAS L. GIANNETTI, KEVIN C. TROCK, and
SHEILA F. McSHANE, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal and Protective Order
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

# I.   INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C.
§ 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and
37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that
Petitioner, Major Data UAB, has shown by a preponderance of the evidence
that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 (Ex.
1001, "the '510 patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018);
37 C.F.R. § 42.1(d) (2019).

# II.   BACKGROUND

## A.  *Procedural History*

Major Data UAB ("Petitioner") filed a Petition (Paper 1, "Pet.") 
requesting *inter partes* review of claims 1, 2, 6–11, 13, and 15–24 of the
'510 patent (the "challenged claims").  Bright Data Ltd.[1] ("Patent Owner")
filed a Preliminary Response.  Paper 12.  With authorization from the panel,
Petitioner filed a Preliminary Reply (Paper 16), and Patent Owner filed a
Preliminary Sur-reply (Paper 17).  Based upon the record at that time, we
instituted *inter partes* review on all challenged claims on grounds presented
in the Petition.  Paper 18 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 31,
"PO Resp."), Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent
Owner filed a Sur-reply (Paper 38, "PO Sur-reply").

---

[1] According to Petitioner, Bright Data Ltd. was formerly known as Luminati
Networks, Ltd.  *See* Pet. 1.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

On June 9, 2023, an oral hearing was held.  A transcript of the hearing is made part of the record.  *See* Paper 48.

### B.  Related Matters

The parties identify several district court proceedings involving the '510 patent and a related patent, U.S. Patent No. 10,257,319 ("the '319 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation").  Pet. 2–3; Paper 6, 2–3.  The parties also identify a number of district court actions involving patents related to the '510 patent.  *Id.*

According to the parties, the '510 patent has been before the Board in IPR2020-01358, IPR2021-01493, IPR2022-00138, and IPR2022-00862.  Pet. 4; Paper 6, 1–2.

In addition, Patent Owner identifies an *ex parte* reexamination proceeding involving the '510 patent, Control No. 90/014,876, which has been stayed.  Paper 6, 2; IPR2021-01493, Paper 13.

### C.  Real Parties-in-Interest

Petitioner identifies Major Data UAB as the real party-in-interest. Pet. 2.  Patent Owner "certifies that Bright Data Ltd. is the real party-in-interest."  Paper 6, 1.

### D.  The '510 Patent

The '510 patent is titled "System Providing Faster and More Efficient Data Communication."  Ex. 1001, code (54).  According to the '510 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

infrastructure investment for ISPs." *Id.* at 1:57–59. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:61–62.

The '510 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:43–45):



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:5–7. Due to the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:50–52.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:58–60. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:67–5:2. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:10–18.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:65–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such

5

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

E.  *Illustrative Claim*

Claim 1 is the only independent challenged claim of the '510 patent, and is illustrative of the claimed subject matter.[2]

> 1. [Preamble] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
>
> [a] establishing a Transmission Control Protocol (TCP) connection with a second server;
>
> [b] sending, to the web server over an Internet, the first content identifier;
>
> [c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
>
> [d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

---

[2] Paragraph references in brackets proposed by Petitioner. *See* Pet. 25–31.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Ex. 1001, 19:18–31.

*F.   Prior Art References and Other Evidence*

Petitioner relies on the following references:

1.   Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2.   Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

3.   Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border"); and

4.   Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya.  Ex. 1005 ("Teruya Decl.").  Patent Owner relies on the Declaration of Tim A. Williams, Ph.D.  Ex. 2065 ("Williams Decl.").

7

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

## G. *Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability.  Pet. 11.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)[3] |
|---|---|---|
| 1, 6, 7, 15, 16, and 18–24[4] | 102[5] | Crowds |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | Crowds, RFC 2616 |
| 1, 6, 10, 15–20, 23, and 24 | 102 | Border |
| 1, 6, 8–11, 13, 15–20, and 22–24 | 103 | Border, RFC 2616 |
| 1, 6–8, 13, 15, 16, and 18–24 | 102 | MorphMix |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | MorphMix, RFC 2616 |

---

[3]  Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]."  Pet. 11.  We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations. General knowledge in the art, unsupported by the references, cannot supply a missing limitation.  *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 36 (Nov. 2019), *available at* https://www.uspto.gov/ TrialPracticeGuideConsolidated.

[4]  We note that Petitioner's listing of the asserted grounds excludes claim 13 for this ground.  S*ee* Pet. 11.  However, Petitioner includes claim 13 in its analysis of anticipation based on Crowds (*see id.* at 33).

[5]  Because the application from which the '510 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions.  Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

### III. ANALYSIS OF THE CHALLENGED CLAIMS

*A.  Applicable Legal Standards*

The Federal Circuit addressed the legal standard for anticipation in *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016), stating that "[u]nder 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim." 815 F.3d at 1341 (alteration in original).  The Federal Circuit went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at 'once envisage' the claimed arrangement or combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)) (alteration in original).

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103 (2011).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

9

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

B.   *Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 16. Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.* (citing Ex. 1005 ¶¶ 25–27, 51–54).

Patent Owner submits that a person of ordinary skill in the art would have had "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet communications." PO Resp. 2 (citing Ex. 2065 ¶ 25). Patent Owner notes that its analysis does not change under the Board's preliminary assessment of a person of ordinary skill in the art in the Institution Decision, wherein Petitioner's proposed level of qualifications was adopted. PO Resp. 2; Dec. 13–14.

We regard Petitioner's more specific definition as consistent with the '510 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). Therefore, we adopt Petitioner's description.

C.   *Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b) (2023), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

10

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

(Fed. Cir. 2005) (en banc). Under *Phillips*, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner contends that the district court's constructions in *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation")[6], are appropriate for use in this case. Pet. 16–19. In particular, Petitioner points to two claim construction orders in that case— the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). According to Petitioner, the parties in the Teso Litigation agreed to certain constructions that were subsequently adopted by the district court. Pet. 16–

---

[6] The case caption in the Teso Litigation was later changed to identify the plaintiff as Bright Data Ltd. *See* Ex. 1020, 1.

11

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

17.  There, the district court construed the preamble of claim 1 of the '510 patent to be limiting and construed certain other terms to have their "plain and ordinary meaning." *Id.*

Petitioner also points out that the district court in the Teso Litigation construed certain disputed claim terms, including "client device" and "second server." *Id.* at 17.  There, the district court construed "client device" as a "communication device that is operating in the role of a client." *Id.*; Ex. 1017, 12.  The district court also initially construed "second server" as a "server that is not the client device."  Pet. 17.  Later, the court granted defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." *Id.*; Ex. 1020, 8, 11.

Patent Owner now proposes constructions for the claim terms "client device" and "second server" that are different than those determined by the district court in the Teso Litigation.  *See* PO Resp. 23–31.  We discuss Patent Owner's proposed constructions below.

### 1.   Client Device

In our Institution Decision, we concurred with the district court's reasoning and agreed with its construction for the claim term "client device" as a "communication device that is operating in the role of a client."  Dec. 17–18.

In its Response, Patent Owner contends that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer,'" or alternatively, "would understand the term 'client device' to mean a 'consumer communication device.'"  PO Resp. 23.  Patent Owner

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

argues that "[t]hese proposed constructions are consistent with the claim
language, the specification, and the prosecution histories distinguishing
client devices and servers." *Id.*

Patent Owner's proposed construction of the claim term "client
"device" as a "consumer computer," however, was previously considered,
and rejected, by the district court in the Teso Litigation. *See, e.g.*, Ex. 1017,
10–12. Patent Owner takes issue with the evidence and the reasoning used
by the district court to reject Patent Owner's previously proposed
construction. *See, e.g.*, PO Resp. 23–28.

Patent Owner argues that the district court's rejection of its proposed
construction of a "client device" as "consumer computer" is wrong for three
reasons. *Id.* at 23–25. First, Patent Owner asserts that, although the district
court found that there was no express lexicography in the specification, the
specification states that "computers of consumers" are "referred to herein as
client devices" and the term "client device" is used in the claims. *Id.* at 23
(citing Ex. 1001, 2:47–49). Patent Owner asserts that "the term 'client
device' has a special meaning in the context of the '510 Patent" and that,
therefore, upon reading the specification, a person of ordinary skill in the art
"would understand a 'client device' is a consumer computer in the context of
the '510 Patent." PO Resp. 24 (citing Ex. 2065 ¶ 114).

Second, Patent Owner disagrees with the district court's finding that
in the specification the term "consumer" refers to a consumer of content as
opposed to a broadcaster of content. PO Resp. 24 (citing Ex. 1017, 11).
Patent Owner argues, instead, that the common understanding of
"consumer" is "a person who buys goods or services for their own use" or

13

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

"someone who buys goods or services for personal use." PO Resp. 24 (citing Ex. 2007; Ex. 2035, 5; Ex. 2036, 4; Ex. 2008; Ex. 2037, 4; Ex. 2065 ¶ 121.

Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear in connection with the description of the claimed invention, contending instead that the specification "defines client devices as consumer computers." PO Resp. 25.

Patent Owner argues that a person of ordinary skill in the art "would understand a client device is a 'communication device' in the context of the specification," and that "a client device is a consumer computer with specific software to operate in accordance with the claims." PO Resp. 26 (citing Ex. 2065 ¶¶ 115, 116; Ex. 1017; Ex. 1020; Ex. 2006; s*ee also* Ex. 1001, 4:56–52; 5:23–31; 9:14–51). Patent Owner argues that "[i]n the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 120). Patent Owner further argues that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 124).

Patent Owner also argues that a person of ordinary skill in the art

> would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs. EX.2065 at ¶125.

14

Appx1058

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

PO Res. 27. "These client device-attributes," Patent Owner argues, "distinguish a client device from a server." *Id.*

Patent Owner argues that a person of ordinary skill in the art "would understand there are structural differences between client devices and servers in the context of the specification and there is no contradictory disclosure in the specification or in the prosecution histories." *Id.* at 28 (citing Ex. 2065 ¶ 128). "Rather," Patent Owner argues, "client devices are repeatedly distinguished from servers in the specification and the prosecution histories." PO Resp. 28.

We have considered Patent Owner's evidence and arguments that the district court's construction of the claim term "client device" is incorrect. For the reasons discussed below, however, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in our Institution Decision and continue to apply here. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server.

a)    *Claim Language*

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[b], the first client device, "send[s], to the web server over the Internet, the first content identifier," which serves to request content from the web server. *See* Ex. 1001, 19:24–25. In step 1[b], the first client device is acting as a client in requesting

15

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

content.  In step 1[d], the first client device "send[s] the received first content, to the second server."  *See id*. at 19:29–30.  In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1.  Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term.  Pet. Reply 13–14.  Patent Owner notes that under a role-based construction, "a client device may operate in the role of a server at some points in time."  PO Resp. 25.

According to Petitioner, in district court Patent Owner "affirmatively argued in its claim-construction brief that the claimed 'second server' mapped to the Client 102 role (in green) and the 'client device' mapped to the Agent 122 role (in red), per PO's annotated Figure 3 below," confirming a role-based construction.  Pet. Reply 14–15.

16

Appx1060

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



**FIG. 3**

Patent Owner's annotated Figure 3, above, presented in the district court litigation equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server shown in green) (arrow E). Ex. 1126, 4. Thus, given this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102 in response to a request for the content from client 102.

17

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

This reflects a role-based interpretation of the claim terms; different devices are defined by their function and can be either clients or servers depending on the function they perform.

Patent Owner argues that "the district court briefing was taken out of context and merely used to illustrate the lines of communication." PO Sur-reply 9, n.4 (citing PO Resp. 6–7, n.1). We do not agree. We find that the district court testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.[7]

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1020, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "sending, to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1017, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first

---

[7] We note that Patent Owner's argument that "a server is not a client device and that a client device is not a server" (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail below.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id.* We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See id.* at 10–11.

> b)    *Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '510 patent specification. The specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles: "[d]ue to the functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon the requirements of the network." Ex. 1001, 4:47–52 (emphases added). Accordingly, the specification states that the components identified in Figure 3 may play different roles that perform different functions based on their stored software. *Id.*

Moreover, a communication device as described in the '510 patent includes memory 210, which stores software 212 with accelerator application 220, which includes client, peer and agent modules. *See* Ex. 1001, 5:60–6:42, 9:21–27, Fig. 4, Fig. 6). The specification explains that "each of the [software modules] comes into play *according to the specific*

19

Appx1063

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

*role that the communication device 200 is partaking* in the communication network 100 *at a given time*." *Id.* at 9:21–26 (emphasis added). The specification thus supports the role-based function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Patent Owner argues that a person of ordinary skill in the art, when considering Figures 1 and 3 of the '319 patent, would understand that a server is not a client device and that a client device is not a server. PO Resp. 15. Patent Owner argues that proxy server 6 of Figure 1 "must be structurally different from agent 122 of Figure 3," and that "purely role-based constructions do not account for the structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3) and therefore, the purely role-based constructions are not appropriate." *Id.*

For example, Patent Owner asserts with respect to Figure 1 that "proxy server 6 (i) receives requests from client devices 14, 16 and (ii) sends requests to web server 32." PO Resp. 16 (citing Ex. 2065 ¶ 86). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner makes a similar argument with respect to Figure 3. With respect to Figure 3, Patent Owner asserts that "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152." PO Resp. 17 (citing Ex. 2065 ¶ 91). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions,

20

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner's expert, Dr. Williams, testifies that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time," and that "there is nothing to distinguish the architecture of Figure 1 and Figure 3." Ex. 2065 ¶ 93. According to Dr. Williams, purely role-based constructions are not appropriate because they fail to account for structural differences between proxy servers and proxy client devices. *Id.* ¶ 94.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." Patent Owner's modified version of Figure 3 is shown below. *See* PO Resp. 7–8.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



　　　　Patent Owner's modified version of Figure 3, shown above, inserts
"proxy server 6" outlined in green, between "client 102" outlined in purple
and "agent 122" outlined in red.  Patent Owner's modified configuration of
Figure 3 is not shown in any figure of the '510 patent or disclosed anywhere
in the specification.  Dr. Williams testifies that a person of ordinary skill in
the art "would understand that proxy server 6 of Figure 1 *could be* inserted
between client 102 and agent 122 of Figure 3."  Ex. 2065 ¶ 59 (emphasis
added).  Dr. Williams combines the "proxy server 6" of the prior art shown
in Figure 1 and an embodiment of the claimed invention depicted in Figure
3.  *See* Ex. 1001, 2:8–18, 2:24–32, 4:41–50.  Dr. Williams, however,
provides no explanation or rationale for combining the prior art with an

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

embodiment of the claimed invention. Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed (*see* Ex. 2065 ¶ 59), but we do not discern that these characterizations are described in the '510 specification. In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '510 patent specification, we do not agree with Patent Owner that it discloses the architecture of a requesting client (102) ↔ proxy server (6) ↔ agent (122) ↔ web server (152), as Patent Owner asserts. *See* PO Resp. 7–8. Moreover, we do not agree that Patent Owner's argument that the "architecture" should govern the construction of "client device" in light of the claim language and the specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–50, 9:20–25. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2012) are consistent with its understanding of the architecture required by the claims of the '510 patent and its "novel" use of a client device as an intermediary. PO Resp. 12–13. We do not find that the district court's *Alice* order alters or modifies the claim construction

23

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

the court adopted there, and that we adopt here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2012. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as a "communication device that is operating in the role of a client," and did not modify that construction. *Id*. at 5. Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions. *See* Exs. 1020, 1115.

We agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner points to buttressing evidence in RFC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 15 (citing Ex. 1013, 9 (emphases omitted)). We agree with Petitioner that RFC 2616 serves as intrinsic evidence because it is cited in the '510 patent in its discussion on the operation of the agent, client, or peer, particularly, in how these devices can use the HTTP protocol to determine whether an HTTP request they have received is still valid. Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner also asserts that the term "client device" means "consumer computer" which is distinct from a server, and that a person of ordinary skill would understand a "consumer computer" to be "a laptop, tablet, or smartphone." PO Resp. 25. Patent Owner asserts that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved," and "is not a dedicated network element, unlike a server," and "typically uses a single or relatively few connections." *Id.* at 26. Patent Owner cites to Dr. Williams' testimony as support for these assertions. *See* Ex. 2065 ¶¶ 114–125.

Dr. Williams testifies that his understanding is "consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." *Id.* ¶ 114. We discuss the prosecution history below, but note here that Dr. Williams does not identify any specific portions of the '510 specification that supports Patent Owner's assertions as to the alleged structure and nature of the client device. Rather, Dr. Williams merely asserts that "[i]n my opinion a POSA would understand" or other similar statement. *See, e.g.,* Ex. 2065 ¶¶ 124–128.

Dr. Williams testifies that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer'" because the '319 specification states that "files are stored on computers of consumers, referred to herein as client devices." *Id.* ¶ 114 (citing Ex. 1001, 2:47–49); *see also* PO Resp. 23. Our view is that the Patent Owner takes the specification's disclosure out of context. The "computers of consumers"

25

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:43–61. The '510 specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id.* at 2:43–3:6, 4:3–4, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. *Id.*; *see also* Ex. 1001, 1:57–62; PO Resp. 24.

Accordingly, we find that the '510 patent's specification disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client" as construed by the district court and as adopted here. We also find that the '510 patent's specification does not support Patent Owner's assertion that a person of ordinary skill in the art would understand the term "client device" to mean a "consumer computer" or a "consumer communication device."

c) *Prosecution History*

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")), support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 18–23.

26

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Patent Owner points to statements in the prosecution history of the '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. *Id.* at 19–21. More specifically, Patent Owner asserts that the applicant argued that the cache server 306 of Garcia "is clearly a dedicated device and performs a server functionality. The Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 19 (citing Ex. 2009, 215 (emphasis omitted)).

Patent Owner contends that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." PO Resp. 20 (citing Ex. 2065 ¶ 99). Patent Owner points out that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art," and further asserts that "[t]he examiner's acknowledgement of the 'environment' in which the claims operate shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture. PO Resp. 21 (quoting Ex. 2009, 44; citing Ex. 2065 ¶ 102).

The claims that were under consideration in the '936 patent prosecution, however, were significantly different than the claims at issue here. The issued claims in the '936 patent recite "requesting client" and a separate "client" and have multiple steps that differ from those of the '510 patent. *See*, *e.g.*, Ex. 2011, 19:16–52. Given these differences, we discount the applicability of statements made during the patentability assessment of

27

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

the '936 patent prosecution to the assessment of claim construction for the '510 patent.[8]  Further, considering the varying terms used, we do not find that the applicant's statements during prosecution distinguishing a recited "device" or "client" from the devices disclosed in Garcia are sufficient to act as a disclaimer of the scope of the "client device" term as used in the claims of the '510 patent here.  *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction.").  Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms.

Additionally, as discussed above, the '510 patent's claim language and specification clearly support a role-based interpretation of the term "client device."  In contrast, the '936 patent prosecution is for a grandfather of the '510 patent and involved evolving claim term amendments.  *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification.").  For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '510 patent claims than the claim language and specification of the '510 patent itself.  As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often

---

[8] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations.  Ex. 1072, 314, 593–594.

28

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317. This is particularly true here, where the prosecution history at issue involves a grandfather application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a parent to the '510 patent. PO Resp. 21–22. Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* at 21 (citing Ex. 2066, 282). Patent Owner cites to the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." PO Resp. 22 (citing Ex. 2066, 50).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device."

29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Patent Owner additionally refers to the prosecution history of the '510 patent and again references the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22 (citing Ex. 1002, 41). We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*d)    Conclusion*

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

*2.    Second Server*

In our Institution Decision, we concurred with the district court's reasoning and agreed with its clarified construction of the claim term "second server" as a "device that is operating in the role of a server and that is not the client device." Dec. 18–19.

Patent Owner appears to propose that a server is not a client device, and, more specifically, that a server is structurally different than a client device. *See* PO Resp. 28. Patent Owner's arguments, for the most part, repeat the same arguments presented for "client device." *See id.* at 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

30

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

We continue to agree with the district court's interpretation of the claim term "second server," which we have adopted, because it is consistent with the evidence of record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss in Section II.C.1, above. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, but is able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments in Section II.C.1, above, that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished. PO Resp. 11 (citing Ex. 2006, 23). We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the

31

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously." Ex. 2013, 20–21.

Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 28 (citing Ex. 2065 ¶ 133). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. *See* PO Resp. 28–31.

D. *Prior Art References*

1. *Crowds (Ex. 1006)*

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.*

32

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Exemplary paths for web requests from crowd users are shown in Figure 2 (*id*. at 9), reproduced below:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "$1 \rightarrow 5 \rightarrow$ server; $2 \rightarrow 6 \rightarrow 2 \rightarrow$ server; $3 \rightarrow 1 \rightarrow 6 \rightarrow$ server; $4 \rightarrow 4 \rightarrow$ server; $5 \rightarrow 4 \rightarrow 6 \rightarrow$ server; and $6 \rightarrow 3 \rightarrow$ server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

### 2. Border (Ex. 1012)

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from

33

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

a web browser. *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through

34

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

### 3. *MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:

35

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time.  Ex. 1008, 119.  This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.*  In Figure 5.1, node *a* has five neighbors with which it has established virtual links.  *Id.*  In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.*  "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

> 4. *RFC 2616 (Ex. 1013)*

RFC 2616 is a request for comments document concerning version 1.1 of the Hypertext Transfer Protocol (HTTP), which is "foundational to the World Wide Web."  Pet. 23; Ex. 1005 ¶ 53.  HTTP is an application-level

36

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

protocol for distributed, collaborative, hypermedia information systems. Ex. 1013, 1. HTTP is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems. *Id.* RFC 2616 specifies Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. *Id.*

E.  *Anticipation Based on Crowds*

1.  *Claim 1*

*Preamble*

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:*

Ex. 1001, 19:18–21.

Petitioner explains that in Crowds,

[a] user's request to a web server is not passed directly to the web server, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again. The web request is eventually submitted to the web server by a random [crowd] member.

Pet. 24.

Petitioner's annotated Figure 2 from Crowds is shown below.

37

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Figure 2 of Crowds (annotated

*Id.* at 25.

Petitioner asserts that its annotated Figure 2 from Crowds, above, "shows an example from Crowds path with one possible path, '5→4→6→server,' highlighted in green." *Id.* Petitioner asserts that "[i]n accordance with the preamble, a first client device (jondo 6) performs the claim steps, fetching requested content from a web server, "5". *Id.* According to Petitioner, "[t]he web server stores the first content." *Id.* at 26. (citing Ex. 1006, 74–75 (referring to web server "replies"), 85, Fig. 3 (referring to pages and 1-kilobyte embedded images resident on a web server), 88–89 (responding to HTTP requests). Petitioner explains that "jondo 6 corresponds to the first client device in the preamble, and the first content on the web server is identified by a first content identifier (a URL)." 6 (citing Ex. 1005 ¶¶ 55–58).

With respect to the preamble, Patent Owner argues that "Crowds does not disclose a 'first client device' as recited in the preamble of claim 1 under

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

the purely role-based constructions." PO Resp. 31 (citing Ex. 2065 ¶ 152). Patent Owner argues that "[t]here is no way for a [person of ordinary skill in the art] to determine whether jondo 6 is a client device or a server under the purely role-based constructions because . . . jondo 6 operates in different roles at different points in time." *Id.* Patent Owner argues that "[t]he 'first client device' is necessarily and consistently a client device during the performance of method claim 1," and that "[f]or at least this reason, Crowds does not disclose the preamble of claim 1." *Id.* at 31–32 (citing Ex. 2065 ¶¶ 144–150).

We disagree with Patent Owner because Patent Owner's arguments reject the role-based claim construction adopted by the district court and applied here, wherein the recited "client device" is a "communication device that is operating in the role of a client." Patent Owner's argument improperly limits the operation of the "client device" to a single role, even though the district court recognized, consistent with the claim language, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

We, therefore, agree with Petitioner that Crowds meets the subject matter recited in the preamble.

>    a)    *establishing a Transmission Control Protocol (TCP) connection with a second server;*

Petitioner contends that "Crowds discloses establishing a TCP connection between jondo 6 (first client device) and jondo 4 (the second

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

server)." Pet. 26. Petitioner asserts that "[j]ondo 6 may be regarded as a client device in the example path (and thus the first client device) for at least the reason that (under the court's construction) it acts as in the role of a client in requesting the service of content from web server 5." *Id.* Petitioner also asserts that "[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5." *Id.* Petitioner points out that "Crowds explains that "[its] description uses client-server terminology, where one jondo is a client of its successor on the path." *Id.* ( citing Ex. 1006, 74). Referring to Crowds annotated Figure 2 (shown above), Petitioner argues that "jondo 5 is thus a client of jondo 4 (its successor on the path), and by the same 'client-server terminology,' jondo 4 serves in the role of a server to jondo 5." Pet. 26.

Petitioner points out that "Crowds refers to jondos throughout as having involvement in the role of a server, with statements such as '[l]ike all network servers, jondos are identified by their IP address and port number.'" *Id.* at 26–27 (citing Ex. 1006, 90). Petitioner argues that "[j]ondo 4 may be regarded as a server under this disclosure." Pet. 27 (citing Ex. 1005 ¶¶ 59–63).

Petitioner also asserts that "Crowds discloses communicating over a 'static path' of jondos, that is, 'one path for all its users' communications.'" Pet. 27 (citing Ex. 1006, 80–81). Petitioner asserts that "Crowds discloses that this path is established when jondo 5 receives a user request from a browser." Pet. 27 (citing Ex. 1006, 73). Petitioner argues that Crowds "sets up these static paths over TCP, as reflected when it states that such a path would be 'altered when failures are detected in the path,' including where

40

Appx1084

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

'the TCP/IP connection to the jondo breaking or being refused.'" Pet. 27 (emphasis omitted) (citing Ex. 1006, 81). "This disclosure," Petitioner argues, "reflects that the static path over jondos as discussed in Crowds comprises TCP/IP connection between the jondos. Therefore, a TCP connection is established between the first client device and the second server, which are both jondos in the example path." Pet. 27.

Patent Owner argues that "[t]he portions of Crowds cited and relied upon by Petitioner only disclose establishing a TCP connection in the context of a jondo sending a request for content." PO Resp. 32 (citing Pet. 26–27; Ex. 2065 ¶ 154; Ex. 1004, 8). Patent Owner argues that "when jondo 6 receives a request from jondo 4, jondo 6 is operating in the role of a server, not a client." PO Resp. 32 (citing Ex. 2065 ¶ 156). "Therefore," Patent Owner concludes, "jondo 6 cannot be a client device during performance of this method step." *Id.*

"Moreover," Patent Owner argues, "when jondo 4 sends a request to jondo 6, jondo 4 is operating in the role of a client, not a server." PO Resp 32 (citing Ex. 2065 ¶ 157). "Therefore," Patent Owner concludes, "jondo 4 cannot be a server during performance of this method step." *Id.*

We disagree with Patent Owner's argument for several reasons. First, Patent Owner's argument requires the recited "client device" to operate in a client role at all times and that the recited "second server" must operate in a server role at all times. But such a rigid restriction on the operational roles of the client device and the second server are contradicted by the express language of claim 1 and would make claim 1 incapable of being practiced. For example, claim 1 expressly requires that "a first client device . . .

41

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

receive[] the first content from the web server," and also expressly requires that the "first client device . . . send[] the received first content, to the second server." Thus, claim 1 expressly requires that the "first client device" must sometimes operate in the role of a "client" and must also sometimes operate in the role of a "server."

Second, Patent Owner's rigid application of operational roles is inconsistent with the claim construction adopted by the district court and applied here. The district court expressly acknowledged, and we agree, that consistent with the claim language "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Accordingly, we agree with Petitioner that Crowds discloses the subject matter recited in limitation 1[a].

> b)   *sending, to the web server over an Internet, the first content identifier;*

Petitioner contends limitation 1[b] is disclosed by Crowds. Petitioner explains that "[i]n the example '5→4→6→server' path, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server." Pet. 27 (citing Ex. 1006, 73–74, Fig. 2). Petitioner illustrates this step by annotating Figure 2 of Crowds, shown below.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



Figure 2 of Crowds (annotated)

Petitioner explains that its annotated Figure 2 of Crowds, shown above, illustrates "[c]ircled in red . . . the step corresponding to first client device [jondo 6] sending to the web server [5] the HTTP request comprising the first content identifier ('FCI')."  According to Petitioner, "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server."  Pet. 28 (citing Ex. 1006, 73).

Petitioner explains that "[t]he web server responds to the 'request' by returning the requested content."  *Id.* (citing Ex. 1006, 73–74; Ex. 1005 ¶¶ 66–68).  Petitioner asserts that "the 'request' itself may be regarded as the FCI," and that "each 'request' contains a URL."  Pet. 28–29.  According to Petitioner, "[t]he 'requests' are HTTP requests as understood by [a person of ordinary skill in the art], as reflected, *e.g.*, where Crowds notes that the requests have 'HTTP headers,'" because "[a]n HTTP request for content

43

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

available from a web server by definition contains a URL." *Id.* at 29–30 (emphasis omitted) (citing Ex. 1005 ¶¶ 70–71; Ex. 1006, 90).

Petitioner concludes that "the FCI limitation in this claim step may be considered met by either the disclosed 'request' itself, or the URL that the request contains." Pet. 30 (citing Ex. 1005 ¶ 72).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[b]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[b]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 66–72. Mr. Teruya explains that in Crowds, a user (jondo) can begin browsing the Internet anonymously by making a "request" to a web server by opening a URL, where other jondos are acting as the user's HTTP proxy for the browser. *See id.* ¶ 70 (citing Ex. 1006, Fig. 6). Mr. Teruya explains that in Crowds, the "requests" are HTTP requests because they have HTTP headers and under the standards for HTTP protocol, HTTP requests for content from a web server contain a URL. Ex. 1005 ¶ 71 (citing Ex. 1006, 90; Ex. 1013 § 5.1.2).

> c)    *receiving, the first content from the web server over the Internet in response to the sending of the first content identifier;*

Petitioner contends limitation 1[c] is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." Pet. 30. Petitioner explains that "the 'first client device' (jondo '6') sends the FCI to target web server '5'. The last jondo in the path then receives the 'first content,' such

44

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

as the user specified web page." *Id.* Petitioner further explains that "[t]he
initiating jondo establishes the random path of jondos 'that carries its users'
transactions to **and from** their intended web servers.'" *Id.* (citing Ex. 1006,
73). "Further," Petitioner explains, "server replies traverse the **same path as
the requests, only in reverse**." Pet. 30 (citing Ex. 1006, 74).
"Accordingly," Petitioner explains, "the first client device in Crowds (the
last jondo in the path before the target web server) receives the requested
web page (first content) for sending back down the path to the requesting
user." Pet. 30 (citing Ex. 1005 ¶¶ 73–75).

Patent Owner does not specifically dispute Petitioner's evidence and
arguments with respect to limitation 1[c]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter
described in limitation 1[c]. Petitioner's arguments are supported by the
testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 73–75.

> *d)   sending, the first content by the first client device
> to the second server, in response to the receiving of the
> first content identifier*

Petitioner contends this step is disclosed by Crowds, because "[a]
TCP connection exists between jondos '6' and '4', as part of the specified
'path.'" Pet. 31; *see also id.* at 27–30 (limitation (b)).

Petitioner explains that "[a]s also discussed above, the first client
device (jondo '6' in the above example path) receives the first content from
the web server, and the random path of jondos 'carries its users' transactions
to **and from** their intended web servers,' and 'server replies traverse the
**same path as the requests, only in reverse**.'" Pet. 31 (citing Ex. 1006, 73–
74). Petitioner explains that "jondo '6' sends the first content (web page

45

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

content) back to the second server (here, jondo '4,' the prior jondo)," and

"[j]ondo '4' can then send the web page content back to the requesting user

(here, jondo '5')." Pet. 31 (citing Ex. 1005 ¶¶ 76–78).

> Patent Owner argues that
>
> Petitioner fails to apply the purely role-based constructions at the particular point in time, for the particular transaction, recited in step 4 of claim 1. EX.2065 at ¶160.
>
> Under the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client. EX.2065 at ¶161. Therefore, under the purely role-based constructions, jondo 6 cannot be a client device during performance of this method step. *Id.*
>
> Moreover, under the purely role-based constructions, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server. EX.2065 at ¶162. Therefore, jondo 4 cannot be a server during performance of this method step. *Id.*

PO Resp. 33.

We do not agree with Patent Owner's argument. The district court's

claim construction for the "server" terms, which we adopted, makes it clear

that a server is defined by its function, not its structure. Ex. 1020, 7–11.

Thus, the district court clarified that the second server is "a device that is

*operating in the role of a server* and that is not the first client device." *Id.* at

8, 11 (emphasis added). Patent Owner's argument is unavailing because it

rigidly focuses on an alleged requirement that devices cannot operate in

different roles, an argument that was rejected by the district court in its claim

construction. Rather, the district court explained, and we agree, that "a

component can be *configured* to operate in different roles—so long as it

46

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* at 10 (internal quotation marks omitted).

Here, Petitioner points out, and we agree, the first client device (jondo "6" in Petitioner's example path) receives the first content from the web server, and the random path of jondos "carries its users' transactions to and from their intended web servers, and the web server's replies traverse the same path as the requests, only in reverse. *See* Pet. 31 (citing Ex. 1006, 73–74). Petitioner explains that jondo "6" sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo), and jondo "4" can then send the web page content back to the requesting user, here, jondo "5." Pet. 31 (citing Ex. 1005 ¶¶ 76–78). Mr. Teruya's testimony supports Petitioner's position.

Petitioner's analysis is persuasive because it is based on the operation of jondos 4 and 6, and whether this operation meets the steps of the claimed method. In contrast, Patent Owner's opposition is based on a construction rejected by us and the district court.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Crowds, as well as Patent Owner's evidence and arguments. For the reasons discussed above, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses all the limitations of independent claim 1.

> 2.    *Dependent Claims 6, 7, 15, 16, 18–24*
>> a)    *Dependent Claim 6*

Dependent claim 6 recites the following limitations:

47

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

> *The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:*
>
> *receiving the second content identifier;*
>
> *sending, to the third server over the Internet in response to the receiving, the second content identifier; and*
>
> *receiving the second content from the third server over the Internet in response to the sending.*

Ex. 1001, 19:57–67.

Petitioner contends that Crowds discloses dependent claim 6 because "Figure 2 of Crowds discloses several exemplary paths of jondos and web servers." Pet. 31. Petitioner's annotated Figure 2 of Crowds is shown below.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Figure 2 of Crowds (annotated

*Id.* at 32 (citing Ex. 1006, 73). Petitioner explains with respect to its annotated Figure 2 of Crowds, shown above, that "[i]n addition to the

48

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

5→4→6→server '5' path discussed [in Petition] Section 8.1.1 (green), Crowds discloses a 3→1→6→server '3' path (in blue)." *Id.* Petitioner contends that "[f]or the same reasons the 5→4→6→server '5' path discloses Claim 1, the 3→1→6→server '3' path discloses Claim 6: jondo '6' (first client device) receives a request comprising a second content identifier from jondo '1,' which it sends to server '3' (the third server, which is a web server). Jondo '6' then receives the second content from server '3.'" *Id.* (citing Ex. 1006, 74; Ex. 1005 ¶¶ 79–81). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 79–81.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 6, in particular where Crowds discloses a 3→1→6→server "3" path, where jondo "6" (the first client device) receives a request comprising a second content identifier from jondo "1," which it sends to server "3" (the third server, which is a web server), and jondo "6" then receives the second content from server "3." Pet. 31–32 (citing Ex. 1006 73–74).

### b)     Dependent Claim 7

Dependent claim 7 recites the following limitations: "*[t]he method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 20:1–3.

49

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Petitioner contends that Crowds discloses dependent claim 7 because "Crowds discloses every client device running a web browser as a GUI." Pet. 32 (citing Ex. 1006, 81, 88–89). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 7, because Crowds discloses a web browser being run by a client device (jondo). *See* Ex. 1006, 89.

c)    *Dependent Claim 15*

Dependent claim 15 recites the following limitations: "*[t]he method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier.*" Ex. 1001, 20:41–44.

Petitioner contends that Crowds discloses dependent claim 15 because "The first client device is jondo '6,' the second server is jondo '4,' and a TCP connection exists between jondo '6' and jondo '4.'" Pet. 33 (citing *id.* at 25–31 (Pet. Section 8.1.1)). Petitioner provides an annotated version of Crowds' Figure 2, shown below.

50

Appx1094

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2



Figure 2 of Crowds (annotated)

With respect to Petitioner's annotated version of Crowds' Figure 2, above, Petitioner explains that "[c]olored in green . . . is the '5→4→6→server' path in Figure 2, and the red circle corresponds to the first client device (jondo '6') receiving, from the second server (jondo '4'), the first content identifier *over the established TCP connection*." Pet. 33. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 89–91.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches claim 15 under either construction." PO Resp. 40 (citing Pet. 33). Patent Owner argues that "[f]or the same reasons discussed above regarding step 1 of claim 1, during performance of this method step, under the purely role-based constructions, jondo 4 is operating in the role of a client, not a server, and therefore, jondo 4 cannot be a server." *Id.* at 41 (citing Ex. 2065 ¶ 189). "Also," Patent Owner argues, "under the purely role-based constructions, jondo 6 is operating in the role of a server, not a

51

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

client, and therefore jondo 6 cannot be a client device." PO Resp. 41 (citing Ex. 2065 ¶ 190). "Under Patent Owner's proposed constructions . . . jondo 4 is not a server." PO Resp. 41 (citing Ex. 2065 ¶ 192).

We disagree with Patent Owner. Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10 (internal quotation marks omitted).

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 15, because Crowds discloses a first client device (jondo "6") receiving, from a second server (jondo "4"), the first content identifier over an established TCP connection. *See* Ex. 1006, 89.

d)    *Dependent Claim 16*

Dependent claim 16 recites the following limitations: "*[t]he method according to claim 1, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.*" Ex. 1001, 20:45–48.

Petitioner contends Crowds discloses dependent claim 16 because "jondo '6' (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier." Pet. 34 (citing

52

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

*id.* at 25–31 (Pet. Section 8.1.1)). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 92–93.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 16, because Crowds shows that jondo 6 (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier. *See* Ex. 1006, 73–74, Fig. 2.

### e) Dependent Claim 18

Dependent claim 18 recites the following limitations:

> *The method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.*

Ex. 1001, 20:52–59.

Petitioner contends that Crowds discloses dependent claim 18 because "[a] TCP connection is established between jondo '6' and jondo 4.'" Pet. 34 (*see also id.* at 25–31 (Section 8.1.1)). Petitioner explains that in Crowds, "[e]ach jondo is a client of its successor on the path (Crowds, 74), and since paths are random, a jondo may participate in different paths as a TCP client or a TCP server." Pet. 34 (citing Ex. 1005 ¶¶ 94–95). According to

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Petitioner, Crowds "states that FTP requests must also go through the crowd. The first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP)." Pet. 34 (citing Ex. 1006, 73 n.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 18, because Crowds explains that its path failures are detected "by the TCP/IP connection to the jondo breaking or being refused," disclosing that connections between jondos, including connections between a first client device (*e.g.* jondo 6) and a second server (*e.g.* jondo 4) are TCP/IP connections. *See* Ex. 1006, 73–74, 81, Fig. 2.

### f)     *Dependent Claim 19*

Dependent claim 19 recites the following limitations: "*[t]he method according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.*" Ex. 1001, 20:60–63.

Petitioner relies on the same evidence and arguments for dependent claim 19 as is does for dependent claim 18. *See* Pet. 34. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 19 for the reasons explained with respect to dependent claim 18.

> g)    *Dependent Claim 20*

Dependent claim 20 recites the following limitations: "*[t]he method according to claim 1, wherein the first content comprises webpage, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL)."* Ex. 1001, 20:64–67.

Petitioner contends that Crowds discloses dependent claim 20 because "Crowds discloses that the first content is a web page identified by a URL." Pet. 34 (citing *id.* at 25–31 (Pet. Section 8.1.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 97–98.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 20 because as Petitioner explains with respect to claim 1 steps [b] and [c], in the example "5→4→6→server" path of Crowds, the "first client device" (jondo 6) sends a web request containing a URL via HTTP to the target web server 5, because as Crowds states in Figure 6, "[t]o

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

begin browsing anonymously, simply open a URL." *See* Pet. 27–30; Ex.
1006, 73–74, 88–89, Figs. 2, 6.

> h)     *Dependent Claim 21*

Dependent claim 21 recites the following limitations: "*[t]he method
according to claim 1, further comprising executing, by the first client device,
a web browser application or an email application.*" Ex. 1001, 21:1–3.

Petitioner relies on the same evidence and arguments for dependent
claim 21 as is does for dependent claim 7. *See* Pet. 32. Petitioner's
arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005
¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or
evidence concerning dependent claim 21. *See* PO Resp. 40–41. Neither
does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a
preponderance of the evidence that Crowds discloses the limitations of
dependent claim 21 for the reasons explained with respect to dependent
claim 7.

> i)     *Dependent Claim 22*

Dependent claim 22 recites the following limitations: "*[t]he method
according to claim 1, further comprising storing, operating, or using, a
client operating system.*" Ex. 1001, 21:4–5.

Petitioner contends Crowds discloses dependent claim 22 because
"Crowds discloses jondos "*storing, operating, or using, a client operating
system,*" specifically SunOS 4.1.4. Pet. 35 (citing Ex. 1006, 82). Petitioner
asserts that "Crowds further discloses that the jondo software application

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

was programmed to allow for 'portability across Unix and Microsoft platforms,'" and that a person of ordinary skill in the art "would understand Unix, Microsoft, and SunOS to refer to client operating systems." Pet. 35 (citing Ex. 1005 ¶¶ 99–101).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 22, in particular where Crowd discloses a crowd of four jondos operating on SunOS 4.1.4. *See* Ex. 1006, 82.

> *j)      Dependent Claim 23*

Dependent claim 23 recites the following limitations: "*[t]he method according to claim 1, wherein the steps are sequentially executed.*" Ex. 1001, 21:6–7.

Petitioner contends that Crowds discloses the method steps of claim 1 sequentially executed when after the random path is first established, the web request is then "forwarded along the path (*e.g.*, 5→4→6→server) such that the 'first client device' (here, jondo '6') receives the web request (and content identifier in the URL) from the 'second server' (here, jondo '4'), and sends the web request to the 'first server' or target web server." Pet. 35 (citing Ex. 1006, 73 and Fig. 2). Petitioner points out that Crowds explains that "[S]erver replies traverse the same path as the requests, only in reverse," such that "the 'first client device' receives the web content from the web server, and sends it back to the 'second server,'" thus utilizing the claimed

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

sequence. Pet. 35 (citing *id.* at 25–31). Petitioner arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 102–104.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 23, in particular where the method steps of claim 1 are sequentially executed by Crowds in the manner described by Petitioner.

      *k)*    *Dependent Claim 24*

Dependent claim 24 recites the following limitations: "*[a] non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 21:8–11.

Petitioner contends Crowds discloses dependent claim 24 because Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 24]." Pet. 33 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶¶ 87–88.

Crowds states that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, Page 91. Patent Owner does not specifically address Petitioner's arguments or evidence

58

Appx1102

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

concerning dependent claim 24. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 24. The evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being maintained on the Internet for the operation of an active crowd. Crowds' disclosure of the method of claim 1 is discussed in Section III.E.1, above.

3.    *Conclusion on Anticipation - Crowds*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 6, 7, 15, 16, and 18–24 are anticipated by Crowds.

F.  *Obviousness Based on Crowds and RFC 2616*

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious in light of Crowds and RFC 2616. Pet. 36–41. Because we have already determined that independent claim 1 is anticipated by Crowds, as well as dependent claims 6, 7, 15, 16, and 18–24, we only consider whether claims 2, 8–11, and 13 would have been obvious in light of Crowds and RFC 2616 as Petitioner contends. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) ("[I]t is well settled that a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." (citations and internal quotation marks omitted)).

59

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

### 1. Rationale to Combine

Petitioner asserts that "[w]orking in the field of the '510 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol." Pet. 36. Based in part upon the technology addressed by the '510 patent, we determined that a person of ordinary skill in this art would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems. *See* Section III.B. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including HTTP and TCP/IP protocols. *Id.*

Petitioner points out that the '510 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." Pet. 36 (citing Ex. 1001, 4:64–67). The '510 patent acknowledges that "[a]s is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." Ex. 1001, 17:23–25. The '510 patent also cites to RFC 2616 for a definition of HTTP. *Id.* at 16:21–28.

Petitioner points out that "Crowds concerns communications using these same protocols." Pet. 36 (citing Ex. 1006, 81 (TCP), 88–89 (HTTP). Petitioner contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill in the art] developing software for like applications would have had a powerful motivation to

60

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

combine its disclosure with knowledge of Internet standards governing HTTP." Pet. 36 (citing Ex. 1005 ¶¶ 105–110).

Patent Owner does not specifically address Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616. *See* PO Resp. 36–41. Instead, Patent Owner argues that "Crowds does not teach that a jondo may be a server," that "Crowds does not disclose or teach putting a server in the "mix," or that "Crowds also does not disclose or teach a crowd member that does not run its own web browser." *Id.* at 36. None of these arguments, however, addresses Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616 described above. Rather, Patent Owner's arguments only address a contingent alternative proffered by Petitioner with respect to claim 1 "if the Board were to construe 'second server' as requiring a specialized data-center class device," which we did not adopt. *See* Pet. 37–38.

We find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Crowds and RFC 2616 in the manner described by Petitioner because both Crowds and RFC 2616 are directed to improving networked communications so that a person of ordinary skill in the art developing software for similar applications would have had an incentive to combine the teachings of Crowds with the knowledge of Internet standards governing HTTP described by RFC 2616.

### 2.    *Teaching Away*

Patent Owner argues that Crowds teaches away from the claimed methods of the '510 patent because: 1) Crowds does not provide the initiator

61

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 38–39.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).

As to the second issue of Crowds' latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Accordingly, we do not find that Crowds teaches away from the claimed invention of the '510 patent as Patent Owner contends.

62

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

### 3. Objective Indicia of Nonobviousness

Patent Owner asserts that non-obviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 55–73; PO Sur-reply 27–29. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional infirmities. Pet. Reply 24–26.

### a) Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC,*

63

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

64

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b)   Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "provides a residential proxy service that practices the methods claimed in the '510 patent" that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or desktop having a residential IP address, as a proxy client device. PO Resp. 55 (citing Ex. 2065 ¶ 267). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." PO Resp 55 (citing Ex. 2065 ¶ 268; Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." PO Resp. 69. According to Patent Owner, in 2021 Bright Data's "residential proxy service generated revenues of $53.7 million." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is evidence of commercial success. *Id.* at 68 (citing Ex. 2065 ¶ 274).

Patent Owner asserts that "the commercial success of Bright Data's residential proxy service is driven by the claimed methods' novel use of a proxy client device." PO Resp. 69 (citing Ex. 2065 ¶ 276). Patent Owner

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 6–9, 15–16, 18–20, and 22–24 of the '510 Patent." PO Resp. 57–66. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 67 (citing Ex. 2065 ¶ 271). According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '510 Patent and is coextensive with them." PO Resp. 67.

Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 27, n.11.

Petitioner points out that Patent Owner "asserts that two things 'driv[e]' the commercial success of its 'residential proxy service': use of 'residential IP addresses' and 'scalability' from the 'large number' of clients with 'residential IP addresses.'" Pet Reply 24 (citing PO Resp. 67–68). Petitioner argues that Patent Owner "therefore admits a lack of nexus, because neither the use of 'residential IP addresses' or 'scalability' from a

66

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

'large number' of clients with residential IP addresses are claimed." Pet.
Reply 24.

Petitioner alleges that Dr. Williams "admits that use of 'residential' IP
addresses is not claimed." *Id.* at 25 (citing Ex. 1111, 56:4–6, 56:19–57:6).
Petitioner argues that Dr. Williams "cites to 2021 sales figures as showing
'commercial success,' but provides no analysis tying those sales figures to
any allegedly embodying PO product." Pet. Reply 25 (citing Ex. 2065
¶ 275). Petitioner argues that Dr. Williams "did nothing to determine
commercial 'success,' other than observing 'revenues in the millions of
dollars per month.'" Pet. Reply 25 (citing Ex. 1111, 168:23–169:3).
Petitioner points out that Dr. Williams "did not have 'the data' to know what
feature(s) drove revenue." Pet. Reply 25–26 (citing Ex. 1111, 176:7–
177:21).

Based on this record, we find that Patent Owner has failed to establish
a nexus between the challenged claims and the products that Patent Owner
relies on to show commercial success. First, we find that Patent Owner has
not established a presumption of nexus because it has not shown that the
products that it relies on for commercial success embody and are
coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373.
To the contrary, Patent Owner relies on features of its products that are not
claimed, including the use of a residential proxy service, residential
consumer computers, and residential IP addresses, as the basis for the
commercial success of its products.

For example, Patent Owner identifies "[t]he features driving the
commercial success" of its products as "the proxy client devices hav[ing]

67

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 67; *see id.* at 55 (pointing to Patent Owner's "residential proxy service [that] provides various users' client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other user's requesting client devices"), 69 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" wherein its "residential proxy service generated revenues of $53.7 million in the year 2021").

The challenged claims, however, do not recite any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See* Section III.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to establish a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential

68

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

proxy service, residential consumer computers, and residential IP
addresses—are not recited in the challenged claims. *See* PO Resp. 55–57,
67–69. Therefore, Patent Owner has failed to demonstrate that commercial
success of its products is the "direct result" of the claimed invention's
unique characteristics.

We also are not persuaded by Patent Owner's argument that "the
district court found that sufficient nexus was established." PO Sur-reply 27,
n.10 (citing Ex. 2014, 4). Patent Owner relies on the district court's ruling
on defendants' motion to strike the opinions of Patent Owner's expert Dr.
Rhyne, where the district court stated that it was denying the portion of "the
motion requesting the Court to preclude Dr. Rhyne from testifying regarding
secondary considerations of nonobviousness" because it "found that Dr.
Rhyne established a sufficient nexus between the secondary considerations
and the claimed invention." Ex. 2014, 4. The district court's order,
however, does not explain the basis for its ruling, and Patent Owner does not
point to anything in the record providing such an explanation. It is also not
clear from the record whether the district court's finding was that nexus had
been established, or simply that Dr. Rhyne had provided sufficient
disclosure in his expert report to offer testimony to establish nexus at trial.

*c)*    *Long-Felt Need*

Patent Owner argues that its residential proxy service "solved a long
felt, but unresolved need." PO Resp. 70. According to Patent Owner,
"traditional data center server proxies could provide some anonymity for the
user in accessing a target web site," but "that website could still likely
identify data center server IP addresses as proxy addresses" because they

69

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

"were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 277). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." PO Resp 70. Patent Owner further contends that its proxy client devices "can dramatically increase the scale of IP addresses that can be included in a proxy network." *Id.*

For similar reasons as for commercial success, Patent Owner has not established that there is a nexus between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 67. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d)   Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name as 'Hola,' was presented." PO Resp. 71 (citing Ex. 2065 ¶ 278). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs'

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

own residential proxy network." PO Resp. 71 (citing Ex. 2049, 202:12–
204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 278). Patent
Owner also asserts that Mr. Okmanas testified that he was looking for "a
system that works like hola.org," that Oxylabs "wanted to develop its own
residential proxy service," and that "he believed that he needed to do what
Bright Data (previously known as Luminati and Hola) were doing to be
successful." PO Resp. 71–72 (citing Ex. 2047, 95:20–97:1, 103:18–104:10,
149:13–150:8; Ex. 2065 ¶ 279). "This testimony," according to Patent
Owner, "is strong evidence of copying." PO Resp. 72 (citing Ex. 2065
¶ 279).

For similar reasons as for commercial success and long-felt need, no
nexus has been shown between Patent Owner's evidence of copying and the
challenged claims. Although Patent Owner does not point to specific
aspects of Patent Owner's products that it alleges were copied, it refers
generally to "Bright Data's residential proxy service" known as "Hola" and
the software development kit relating to it. PO Resp. 71–72. As explained
above, however, the challenged claims do not recite or require a residential
proxy service. Therefore, Patent Owner has failed to make the requisite
showing that the claimed invention was copied.

Patent Owner argues that its "residential proxy service has received
industry praise including from competitors, and that . . . praise is tied to the
claims of the '510 [p]atent as described above." PO Resp. 72–73 (citing Ex.
2065 ¶ 281). Patent Owner further contends that "competitors like Oxylabs,
Smartproxy, and Microleaves have praised the advantages of using a
residential proxy service." PO Resp. 73.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. *Id.* Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### e) Conclusion

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight in our obviousness analysis because Patent Owner has not shown a sufficient nexus to the evidence presented and the claimed invention.

### 4. Dependent Claim 2

Dependent claim 2 recites the following limitations:

> *[t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.*

Ex. 1001, 19:32–39.

According to Petitioner, Crowds discloses that jondos have host names: "[t]he user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services." Pet. 38 (citing Ex. 1006, 73; *see also id.* at Fig. 6 (identifying host names of multiple available jondos). Petitioner asserts that "Crowds also discloses a

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy." Pet. 39. "In the setup phase," Petitioner explains, "the Blender gets the IP address of the joining jondo." *Id.* (citing Ex. 1006, 87). According to Petitioner, "[t]he blender then informs the other jondos of the new member and shared key, so that 'all members are equipped with the data they need for the new member to participate in the crowd.'" Pet. 39 (quoting Ex. 1006, 87).

According to Petitioner, it would be obvious to a person of ordinary skill in the art "that the other jondo (*e.g.*, the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address." Pet. 39 (Ex. 1005 ¶¶ 118–122).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 2, wherein during the setup phase a new user selects a jondo as a web proxy by specifying a host name as the proxy for all services such that other jondos learn this information including the IP address shared password, and use this information when selecting a jondo as a proxy.

73

Appx1117

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

>    *5.    Dependent Claim 8*

Dependent claim 8 recites the following limitations: "*[t]he method according to claim 1, further comprising periodically communicating over the TCP connection between the second server and the first client device.*" Ex. 1001, 20:4–6.

According to Petitioner, "Crowds discloses establishing a static path over a series of jondos, consisting of TCP connections, and that HTTP requests are passed over these connections." Pet. 39 (citing Ex. 1006, 80 (discussing static paths)). Petitioner asserts that "Crowds also discloses support for embedded images within webpages, which would cause HTTP clients and servers to re-use persistent connections to fetch both web objects using the same TCP/IP connection." Pet. 39 (citing Ex. 1006, 83; Ex. 1005 ¶ 124).

According to Petitioner "Crowds discloses group membership management techniques by which jondos track the liveness of other jondos in the system," such that a "jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed." Pet. 40 (citing Ex. 1006, Fig. 3, line 25). Petitioner explains that "jondos periodically communicate with one another, and thus detect when another jondo fails to respond to the periodic communication," and that a person of ordinary skill in the art "would understand that a peer-to-peer system such as Crowds would maintain group membership by periodically communicating to ensure the liveness of other jondos." Pet. 40 (citing Ex. 1005 ¶ 125).

Petitioner explains that "[u]nder RFC 2616, the then current specification for HTTP (version 1.1), the default behavior where HTTP is

74

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

sent over TCP was (and is) to use persistent connections, so the two HTTP
end-points can send and receive more than one HTTP request and response
pair." Pet. 40 (citing Ex. 1013 § 8.1). Petitioner further explains that
"[p]ersistent connections were also supported in HTTP/1.0 with the use of
explicit Keep-Alive HTTP headers and also documented in HTTP/1.1"
where "[e]xchanging keep alive messages was a standard feature of devices
communicating via persistent HTTP connections." Pet. 40 (citing Ex. 1013
§§ 8.1.3, 13.5.1, 19.6; Ex. 1023 § 19.7.1).

Petitioner argues that it "would have been obvious to have used an
implementation in accordance with RFC 2616, which would have entailed
both periodic communication between the jondos, and doing so by
exchanging "keep-alive" messages." Pet. 41 "Doing so," argues Petitioner,
"would have been obvious because it was an existing, known
implementation that could easily have been employed to implement the
disclosed feature of detecting breaks in the TCP connection, with predictable
results." *Id.* (citing Ex. 1005 ¶ 130).

Patent Owner does not specifically address Petitioner's arguments or
evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41.
Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the
evidence that the combined teachings of Crowds and RFC 2616, such as
through the use of periodic "keep-alive" messages or other periodic
communications over persistent HTTP/TCP connections between jondos
acting as a second server and first client device meet the recited limitations
of dependent claim 8.

75

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

### 6.    *Dependent Claim 9*

Dependent claim 9 recites the following limitations: "*[t]he method according to claim 8, wherein the periodically communicating comprises exchanging 'keep alive' messages.*" Ex. 1001, 20:7–9.

Petitioner relies on the same arguments and evidence for dependent claim 9 as it does for dependent claim 8.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 9 for the reasons explained with respect to dependent claim 8.

### 7.    *Dependent Claim 10*

Dependent claim 10 recites the following limitations: "*[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.*" Ex. 1001, 20:10–12.

Petitioner asserts that RFC 2616 discloses headers that implement the subject matter of claim 10. Pet. 41 (citing Ex. 1013 at § 14.9). Petitioner argues that "the techniques for this taught by RFC 2616 are identical to the 'Cache-Control' directives utilized in the ['510] Patent to implement this functionality." Pet. 40. The cache-control directives described in RFC 2616 include, for example, "[c]ontrols over cache revalidation and reload." *See* Ex. 1013 § 14.9.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Figure 12 of the '510 patent provides a flow chart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. The '510 patent acknowledges that "the HTTP protocol, *defined by RFC 2616*, outlines specific methods . . . within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information." Ex. 1001, 16:21–25 (emphasis added).

Petitioner argues that it "would have been obvious for [a person of ordinary skill in the art] faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616." *Id.* (citing Ex. 1005 ¶¶ 132–134).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 10.

### 8. Dependent Claim 11

Dependent claim 11 recites the following limitations: "*[t]he method according to claim 10, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.*" Ex. 1001, 20:13–15.

77

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Petitioner uses the same arguments and evidence for dependent claim 11 that it used for dependent claim 10.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 11 for the reasons discussed with respect to dependent claim 10.

> 9.    *Dependent Claim 13*

Dependent claim 13 recites the following limitations:

> *The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:*

> *downloading, by the first client device from the Internet, the software application; and*

> *installing, by the first client device, the downloaded software application.*

Petitioner contends that Crowds discloses dependent claim 13 because Crowds "discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 13]." Pet. 33

78

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

(citing Ex. 1006, 91). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 87–88.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches 'storing of the first content' and 'sending . . . the stored first content' as recited in claim 13." PO Resp. 40. Patent Owner also argues that "Petitioner does not show that the software package causes the processor on the jondo to store the first content or send the stored first content as recited in claim 13." *Id.* (citing Ex. 2065 ¶ 185). Patent Owner's arguments are supported by Dr. Williams' testimony. *See* Ex. 2065 ¶¶ 184–186.

In its Reply, Petitioner points out that

[c]laim 13, challenged by PO as to Crowds and MorphMix, adds two method steps regarding the downloading and installing of a software application. PO does not dispute that the prior art discloses those steps, but instead refers to the language "the receiving and storing of the first content" and "sending … stored first content" used in claim 13 to refer back to claim 1 (even though "the storing" has no antecedent basis). POR, 40, 52. PO's argument fails because claim 13 does not specify any particular means of storage of the HTTP content, and therefore the use of typical computer memory satisfies this step. Williams admits that typical "user computers" are disclosed in Crowds (EX-2065, ¶ 164).

Pet. Reply 23.

In its Sur-reply, Patent Owner does not address the issues raised by Petitioner in its Reply, but instead "focuses on independent claim 1 and defers to its analysis of the dependent claims as set forth in the [Patent Owner Response]," which related to the storage limitations. PO Sur-reply 22, n.9 (citing PO Resp. 40–41; 46–47; 52–53). However, as Petitioner

79

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

contends, and we agree, Crowds discloses typical user computers with memory that satisfies the storing step.  Pet. Reply 23 (citing Ex. 2065 ¶ 164). Dr. Williams also acknowledges that the jondos of Crowds are "user computers".  Ex. 2065 ¶ 164.  A person of ordinary skill in the art at the time of the invention would understand that a "user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates.  *See* Section III.B, above.

For downloading of the software application, Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet.  Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds" (Ex. 1006, 91), and Patent Owner has presented no argument to rebut this evidence.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 13.

### 10.    *Conclusion on Obviousness - Crowds and RFC 2616*

Based upon consideration of the entire record, including Petitioner's arguments and evidence and Patent Owner's arguments and evidence of secondary considerations, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 8–11, and 13 would have been obvious over the combined teachings of Crowds and RFC 2616 and

80

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

that a person of ordinary skill in the art would have combined the teachings
of Crowds and RFC 2616 in the manner described by Petitioner. As noted
above, we give little weight to Patent Owner's evidence of secondary
considerations in our obviousness analysis because Patent Owner has failed
to establish a sufficient nexus between that evidence and the challenged
claims.

*G. Anticipation Based on Border*

Petitioner asserts that claims 1, 6, 10, 15–20, 23, and 24 are
anticipated by Border. Pet. 42–55. Because we have already determined
that claims 1, 6, 10, 15, 16, 18–20, 23, and 24 are unpatentable, we only
consider whether claim 17 is anticipated by Border as Petitioner contends.
However, in order to anticipate dependent claim 17, Border must first
disclose the limitations of independent claim 1, which are incorporated into
claim 17. For ease of reference, Figure 1 from Border is set out below.

*FIG. 1*



81

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Figure 1 from Border, above, is a diagram depicting a communication system employing a downstream proxy server and an upstream proxy server for accessing a web server.

### 1. Independent Claim 1

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:*

Ex. 1001, 19:18–21.

Petitioner asserts that the preamble of claim 1 is disclosed by Border. Pet. 45. Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the requested web page at the requested URL. *Id.* (citing Ex. 1005 ¶¶ 137–145).

The remaining steps of claim 1 are as follows:

*[a] establishing a Transmission Control Protocol (TCP) connection with a second server;*

*[b] sending, to the web server over an Internet, the first content identifier;*

*[c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and*

82

Appx1126

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

> *[d] sending the received first content, to the second server over*
> *the established TCP connection, in response to the receiving of*
> *the first content identifier.*

Ex. 1001, 19:22–31.

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. Pet. 42–50.

Petitioner asserts that step 1[a] is met because "Figure 1 of Border shows a persistent TCP ('P-TCP') connection between upstream server (107) (first client device) and downstream server 105 (second server)." Pet. 45–46 (citing Ex. 1012, 7:51–58; Ex. 1005 ¶ 146). Petitioner explains that

> downstream server 105 (expressly called a "server" in Border) is
> the "second server," as it accepts a connection from web browser
> 103 and sends back a response to web browser 103's GET
> request. Down-stream server 105 retrieves the requested first
> content by communicating with web server 109 (the "first
> server") through upstream server 107 ("first client device").

Pet. 46.

With respect to the second step 1[b], Petitioner asserts that this step is met when "[u]pstream server 107 (the first client device) issues a GET request to Web server 109," where the "request (GET) is for a URL." Pet. 47 (citing Ex. 1012, 5:18–24, 32–35, Fig. 2; Ex. 1005 ¶¶ 152–156) (footnote omitted).

As for the third step 1[c], Petitioner asserts that this step is met when "[i]n response to upstream server 107 'issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server.'" Pet. 48 (citing Ex. 1012, 5:34–37, Fig. 2).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

For the fourth step 1[d], Petitioner asserts this step is met when "[a]fter receiving the web page from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105,'" and "[d]ownstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a 'server.'"  Pet. 49–50 (citing Ex. 1012, 5:38–41; Ex. 1005 ¶¶ 160–162).

Petitioner explains that these communication steps are depicted in Border's Figure 2, shown below.



84

Appx1128

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Border's Figure 2, above, is a sequence diagram showing the communications between the web server, upstream and downstream servers, and browser of Border.

For the preamble, Patent Owner relies on the same arguments it made with respect to Crowds. PO Resp. 41 ("For the same reasons discussed above regarding Crowds, Border does not disclose a 'first client device' as recited in the preamble of claim 1") (citing Ex. 2065 ¶ 201). Patent Owner's arguments concerning the preamble are unavailing for the same reasons we discussed with respect to Crowds. *See* Section III.E.1, above.

For claim 1 steps 1[a]–1[c], Patent Owner does not provide any specific arguments. *See* PO Resp. 41–43.

For step 1[d], Patent Owner argues that

[f]or the same reasons discussed above regarding Crowds, during performance of this method step, under the purely role-based constructions, upstream server 107 is operating in the role of a server, not a client, and therefore, upstream server 107 cannot be a client device. EX.2065 at ¶204. Also, under the purely role-based constructions, downstream server 105 is operating in the role of a client, not a server, and therefore downstream server 105 cannot be a server. EX.2065 at ¶205. For at least these reasons, Border does not disclose claim 1 under the purely role-based constructions. EX.2065 at ¶206.

PO Resp. 42.

Patent Owner's arguments with respect to claim 1 step [d] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.d, above. Patent Owner's arguments are unavailing because they rigidly focus on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10 (internal quotation marks omitted).

Patent Owner's other arguments with respect to Border, for example that "Border does not disclose the architecture of claim 1 under Patent Owner's proposed constructions" (PO Resp. 42–43) are unavailing because they argue proposed claim constructions that we did not adopt. *See* Section III.C, above.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Border, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of independent claim 1.

>    2.    *Dependent Claim 17*

Dependent claim 17 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the web server, the first content.*" Ex. 1001, 20:49–51.

For claim 17, Petitioner argues that "[i]n response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117." Pet. 53 (citing Ex. 1012, 5:36–38; Ex. 1005 ¶¶ 179–180).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

Patent Owner argues that "[b]ecause Border does not disclose or teach independent claim 1, Border does not disclose or teach dependent [claim 17]." PO Resp. 46 (citing Dec. 8; Ex. 2065 ¶ 216). Because we have already determined that Border discloses all the limitations of independent claim 1, Patent Owner's argument is unavailing. *See* Section III.G.1, above.

We have considered Petitioner's evidence and arguments as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of dependent claim 17.

H. *Obviousness Based on Border and RFC 2616*

Petitioner contends that claims 1, 6, 8–11, 13, 15–20, and 22–24 would have been obvious in light of Border and RFC 2616. Pet. 53–57. Because we have determined that these claims are unpatentable on other grounds, we do not reach Petitioner's arguments on this ground.

I. *Anticipation Based on MorphMix*

Petitioner asserts that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix. Pet. 60–73. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

J. *Obviousness Based on MorphMix and RFC 2616*

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious over MorphMix in light of RFC 2616. Pet. 73–78. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

## IV. MOTION TO SEAL AND PROTECTIVE ORDER[9]

Patent Owner has filed a Motion to Seal and to Enter the Joint Protective Order (Paper 32, "Motion"), which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order (Ex. 2071). Paper 32, 1. Patent Owner asserts that Exhibit 2039 contains sensitive technical network information, Exhibits 2041–2044 contain source code and related files, Exhibit 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporate some of the sensitive information. *Id.* at 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, that it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal (Paper 32) and the associated request to enter the Protective Order (Ex. 2071).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13,

---

[9]Petitioner has filed a Motion to Exclude Evidence (Paper 43), which was withdrawn at the Oral Hearing without objection by Patent Owner. *See* Paper 48, 5.

Appx1132

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable on the bases
set forth in the following table.[10]

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
Final Decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 13, 15, 16, 18–24 | 102 | Crowds | 1, 6, 7, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | Crowds, Knowledge of POSITA, RFC 2616 | 2, 8–11, 13 | |
| 1, 6, 10, 15–20, 23, 24 | 102 | Border | 17 | |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103 | Border, Knowledge of POSITA, RFC 2616[11] | | |
| 1, 6–8, 13, 15, 16, 18–24 | 102 | MorphMix | | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | MorphMix, Knowledge of POSITA, RFC 2616 | | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 15–24 | |

---

[11] Because each of these challenged claims is held unpatentable on other grounds, we do not reach grounds 4–6 in the Petition.

90

Appx1134

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable;

FURTHER ORDERED that the Motion to Seal (Patent Owner's Response (Paper 30), Exs. 2039, 2041–2044, and 2065) is *granted*;

FURTHER ORDERED that the request to enter the Protective Order (Ex. 2071) is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2022-00916
Patent 10,484,510 B2

PETITIONER:

Liang Huang
Wensheng Ma
MAURIEL KAPOUYTIAN WOODS LLP
rhuang@mkwllp.com
wma@mkwllp.com


PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

92

Appx1136