**VOLUME II OF V, PAGES Appx1137-9477**

**2023-2144, 2023-2145, 2023-2146, 2023-2147,
2023-2414, 2023-2415, 2023-2442 and 2023-2443**

# United States Court of Appeals
# for the Federal Circuit

BRIGHT DATA LTD.,

*Appellant,*

– v. –

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB, OXYSALES,
UAB, THE DATA COMPANY TECHNOLOGIES INC., MAJOR DATA UAB,
CORETECH LT, UAB,

*Appellees.*

*On Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00103, IPR2022-
00135, IPR2022-00138, IPR2022-00353, IPR2022-00915, IPR2022-
00916, IPR2021-01492, IPR2022- 00861, IPR2021-01493 and
IPR2022-00862*

## JOINT APPENDIX

KORULA T. CHERIAN
ROBERT M. HARKINS, JR.
CHERIAN LLP
2001 Addison Street, Suite 275
Berkeley, California 94704
(510) 944-0190
sunnyc@cherianllp.com
bobh@cherianllp.com

THOMAS M. DUNHAM
RONALD R. WIELKOPOLSKI
CHERIAN LLP
1901 L Street NW, Suite 700
Washington, DC 20036
(202) 838-1560
tomd@cherianllp.com
ronw@cherianllp.com

*Counsel for Appellant*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (323482)

DANIEL S. LEVENTHAL
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
(713) 651-5151
daniel.leventhal@nortonrosefulbright.com

MARK T. GARRETT
STEPHANIE N. DEBROW
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
(512) 474-5201
mark.garrett@nortonrosefulbright.com
stephanie.debrow@nortonrosefulbright.com

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200
jonathan.franklin@nortonrosefulbright.com

*Counsel for Appellees Code200, UAB,
Teso LT, UAB, metacluster lt, UAB,
Oxysales, UAB, and coretech lt, UAB*

MICHAEL N. RADER
WOLF GREENFIELD & SACKS, PC
605 Third Avenue, 25th Floor
New York, New York 10158
(212) 697-7890
mrader@wolfgreenfield.com

ADAM WICHMAN
WOLF GREENFIELD & SACKS, PC
600 Atlantic Avenue, 23rd Floor
Boston, Massachusetts 02210
(617) 646-8000
awichman@wolfgreenfield.com

*Counsel for Appellee The Data Company
Technologies Inc.*

JASON R. BARTLETT
WENSHENG MA
MASCHOFF BRENNAN
450 Sansome Street, Suite 1005
San Francisco, California 94111
(418) 738-6334
jbartlett@mabr.com
vma@mabr.com

*Counsel for Appellee Major Data UAB*

# TABLE OF CONTENTS
# JOINT APPENDIX

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 37 | Final Written Decision: original (IPR2022-00103) | 5/30/2023 | Appx1 |
| 49 | Final Written Decision: original (IPR2022-00135) | 5/25/2023 | Appx151 |
| 50 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal Granting Motion to Exclude 35 U.S.C. § 318(a); 37 C.F.R. § 42.14; 37 C.F.R. § 42.64 (IPR2022-00138) | 5/9/2023 | Appx323 |
| 36 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal 35 U.S.C. § 318(a); 37 C.F.R. § 42.14(IPR2022-00353) | 6/27/2023 | Appx493 |
| 53 | Final Written Decision (IPR2021-1492) | | Appx647 |
| 53 | Final Written Decision (IPR2021-1493) | | Appx714 |
| 50 | Final Written Decision (IPR2022-0915) | | Appx957 |
| 50 | Final Written Decision (IPR2022-0916) | | Appx1045 |
| 1001 | Exhibit 1001 – United States Patent No. 11,044,342 (IPR2022-00103) | | Appx1137 |
| 1001 | Exhibit 1001 – United States Patent No. 10,257,319 (IPR2022-00135) | | Appx1170 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1001 | Exhibit 1001 - United States Patent No. 10,484,510 (IPR2022-00138) | | Appx1199 |
| 1002 | Exhibit 1002 - United States Patent No. 11,044,344 (IPR2022-00353) | | Appx1229 |
| | Certified Index (IPR2022-00103) | | Appx1439 |
| | Certified Index (IPR2022-00135) | | Appx1440 |
| | Certified Index (IPR2022-00138) | | Appx1442 |
| | Certified Index (IPR2022-00353) | | Appx1444 |
| | Certified List IPR2021-01492 | | Appx1445 |
| | Certified List IPR2021-01493 | | Appx1447 |
| | Certified List IPR2022-00915 | | Appx1449 |
| | Certified List IPR2022-00916 | | Appx1451 |
| | **IPR2022-00103** | | |
| 1 | 342 IPR Petition | 10/29/2021 | Appx1485 |
| 15 | Patent Owner Response [Public] | 9/14/2022 | Appx1775 |
| 21 | Petitioners' Reply | 12/16/2022 | Appx1916 |
| 34 | Petitioners' Updated Mandatory Notices | 3/22/2023 | Appx2080 |
| 1003 | Exhibit 1003: Freedman Declaration | 10/29/2021 | Appx2327 |
| 1004 | Exhibit 1004: Crowds | 10/29/2021 | Appx2391 |
| 1006 | Exhibit 1006: RFC 2616 | 10/29/2021 | Appx2418 |
| 1009 | Exhibit 1009: Opp to MTD | 10/29/2021 | Appx2873 |
| 1011 | Exhibit 1011: Teso CC Order | 10/29/2021 | Appx2943 |
| 1012 | Exhibit 1012: Code200 CC Order | 10/29/2021 | Appx2969 |
| 1013 | Exhibit 1013: Teso O2 Micro Motion | 10/29/2021 | Appx2996 |
| 1014 | Exhibit 1014: Teso Supp CC Order | 10/29/2021 | Appx3007 |
| 1018 | Exhibit 1018: '319 PH | 10/29/2021 | Appx3207 |
| 1019 | Exhibit 1019: '936 PH | 10/29/2021 | Appx3356 |
| 1024 | Exhibit 1024: '936 Patent | 10/29/2021 | Appx3907 |
| 1050 | Exhibit 1050: Williams Deposition Transcript | 12/16/2022 | Appx5448 |
| 2008 | Exhibit 2008 - select portions of 11044342 PH | 3/9/2022 | Appx5626 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2009 | Exhibit 2009 - select portions of 11044344 PH | 3/9/2022 | Appx5664 |
| 2019 | Exhibit 2019 - EDTX-2-19-cv-00395-47 Sur Reply | 3/9/2022 | Appx6294 |
| 2020 | Exhibit 2020 - EDTX-2-19-cv-00395-476 Order | 3/9/2022 | Appx6306 |
| 2021 | Exhibit 2021 - EDTX-2-19-cv-00395-303 Order | 3/9/2022 | Appx6319 |
| 2022 | Exhibit 2022 - EDTX-2-19-cv-00395-516 Jury Verdict | 3/9/2022 | Appx6334 |
| 2026 | Exhibit 2026 - Freedman Deposition Transcript 8.23.2022 | 9/14/2022 | Appx6493 |
| 2029 | Exhibit 2029 - EDTX-2-21-cv-225-146 | 9/14/2022 | Appx6584 |
| 2030 | Exhibit 2030 - CONSUMER _ Cambridge English Dictionary | 9/14/2022 | Appx6632 |
| 2031 | Exhibit 2031 - Cambridge Advanced Learners Dictionary | 9/14/2022 | Appx6644 |
| 2032 | Exhibit 2032 - Cambridge Academic Content Dictionary | 9/14/2022 | Appx6649 |
| 2033 | Exhibit 2033 - CONSUMER _ Collins English Dictionary | 9/14/2022 | Appx6651 |
| 2034 | Exhibit 2034 - Collins COBUILD Advanced Dictionary | 9/14/2022 | Appx6664 |
| 2035 | Exhibit 2035 - Network Fundamentals Study Guide | 9/14/2022 | Appx6668 |
| 2036 | Exhibit 2036 - Computer Networks 5th ed | 9/14/2022 | Appx6677 |
| 2037 | Exhibit 2037 - Computer Networks 4th ed | 9/14/2022 | Appx6684 |
| 2045 | Exhibit 2045 - EMK acquires Luminati | 9/14/2022 | Appx6786 |
| 2046 | Exhibit 2046 - Frost Sullivan Report (2019) | 9/14/2022 | Appx6833 |
| 2065 | Exhibit 2065 - Williams Declaration [Public] | 9/14/2022 | Appx7160 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2071 | Exhibit 2071 - Patent Owner's Demonstrative Exhibits | 3/9/2023 | Appx7295 |

## IPR2022-00135

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review | 11/3/2021 | Appx7355 |
| 23 | Petitioner's Reply to Patent Owner's Response | 11/16/2022 | Appx7876 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/3/2021 | Appx9181 |
| 1005 | Exhibit 1005 - Patent Owner's Opening Claim Construction Brief, Luminati Networks Ltd. v. Teso LT et al., 2:19-cv-00395-JRG | 11/3/2021 | Appx9338 |
| 1008 | Exhibit 1008 - Corrected Patent Owner's Preliminary Response, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/3/2021 | Appx9451 |
| 1010 | Exhibit 1010 - U.S. Patent Application Publication No. 2008/0228938 ("Plamondon") | 11/3/2021 | Appx9493 |
| 1080 | Exhibit 1080 - U.S. Patent Application Publication No. US 2003/0009518 (Harrow) | 11/16/2022 | Appx16828 |
| 1108 | Exhibit 1108 - Declaration of Dr. Vernon Thomas Rhyne III in Support of Plaintiff Luminati Network Ltd.'s Claim Constructions, Bright Data Ltd. v. Teso LT et al. (E.D. Tex. Sept. 29, 2020) | 11/16/2022 | Appx17940 |
| 1110 | Exhibit 1110 - Non-Final Office Action mailed March 23, 2022, Reexamination No. 90/014,876 | 11/16/2022 | Appx18038 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1111 | Exhibit 1111 - Final Office Action mailed June 21, 2022, Reexamination Nos. 90/014,827 & 90/014,624 | 11/16/2022 | Appx18131 |
| 1115 | Exhibit 1115 - Complaint, Luminati Networks Ltd. v. Teso LT et al. (E.D. Tex. Dec. 6, 2019) | 11/16/2022 | Appx18218 |
| 2002 | Exhibit 2002 - US10469614 | 3/8/2022 | Appx18549 |
| 2009 | Exhibit 2009 - EDTX-2-19-cv-00395-145 Reply | 3/8/2022 | Appx18951 |

## IPR2022-00138

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petitioner for Inter Partes Review | 11/4/2021 | Appx20128 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/4/2021 | Appx21753 |
| 1008 | Exhibit 1008 - Patent Owner's Preliminary Response, Code200 UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx21964 |
| 1067 | Exhibit 1067 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27389 |
| 1068 | Exhibit 1068 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27401 |
| 1069 | Exhibit 1069 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27404 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1070 | Exhibit 1070 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27486 |

## IPR2022-00353

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | 344 IPR Petition | 12/23/2021 | Appx32756 |
| 2025 | Exhibit 2025 - Williams Declaration [Public] | 9/19/2022 | Appx38198 |

## IPR2021-01492

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of US Patent No. 10,257,319 | 9/3/2021 | Appx38947 |
| 12 | Institution Decision: Grant | 3/21/2022 | Appx39170 |
| 20 | Order: Termination as to Petitioner | 5/27/2022 | Appx39238 |
| 25 | Institution decision and grant of joinder, IPR2022-00861 | 10/19/2022 | Appx39297 |
| 40 | Petitioners' Reply to Patent Owner's Opposition | 3/20/2023 | Appx39580 |
| 41 | Patent Owner's Sur-Reply | 5/1/2023 | Appx39627 |
| 51 | Other: Hearing transcript | 6/9/2023 | Appx39752 |
| 1005 | Expert Declaration of Keith J. Teruya | 9/3/2021 | Appx40448 |
| 1008 | Ex. 1008 (MorphMix) | 9/3/2021 | Appx40570 |
| 1012 | Ex. 1012 (US6,795,848 to Border) | 9/3/2021 | Appx41496 |
| 1021 | Ex. 1021 (EDTX-2-19-cv-00395 Pre-trial Transcript) | 9/3/2021 | Appx41946 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1102 | EDTX-2-21-cv-00225 Docket Sheet | 1/18/2022 | Appx42187 |
| 1111 | Ex. 1111 - Deposition Transcript of Dr. Tim A. Williams, dated February 23, 2023 | 3/20/2023 | Appx42574 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx45236 |

### IPR2021-01493

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of U.S. Patent No. 10,484,510 | 9/3/2021 | Appx46015 |
| 19 | Order: Dismissing Petitioner From the Proceeding | 5/27/2022 | Appx46300 |
| 24 | Institution decision and grant of joinder, IPR2022-00862 | 10/19/2022 | Appx46356 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx52520 |

### IPR2022-00861

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx53405 |

### IPR2022-00862

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx58751 |

**IPR2022-00915**

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx64071 |
| 14 | Decision denying Motion for Joinder | 7/29/2022 | Appx64264 |
| 1111 | Deposition Transcript of Dr. Tim A. Williams | 3/20/2023 | Appx67615 |
| 2013 | EX. 2013 - EDTX-2-19-cv-395-282 | 6/23/2022 | Appx69372 |

**IPR2022-00916**

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx71096 |
| 14 | Decision Denying Motion for Joinder | 7/29/2022 | Appx71292 |



US011044342B2

(12) **United States Patent**
    Shribman et al.

(10) Patent No.: **US 11,044,342 B2**
(45) Date of Patent:    ***Jun. 22, 2021**

(54) **SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION**

(71) Applicant: **LUMINATI NETWORKS LTD.**, Netanya (IL)

(72) Inventors: **Derry Shribman**, Tel Aviv (IL); **Ofer Vilenski**, Moshav Hadar Am (IL)

(73) Assignee: **BRIGHT DATA LTD.**, Netanya (IL)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/600,507**

(22) Filed:    **Oct. 13, 2019**

(65)        **Prior Publication Data**

    US 2020/0045144 A1        Feb. 6, 2020

        **Related U.S. Application Data**

(60) Continuation of application No. 16/278,107, filed on Feb. 17, 2019, now Pat. No. 10,484,510, which is a
(Continued)

(51) **Int. Cl.**
    *H04L 29/06*        (2006.01)
    *H04L 12/24*        (2006.01)
    *H04L 29/08*        (2006.01)

(52) **U.S. Cl.**
    CPC ............ ***H04L 67/42*** (2013.01); ***H04L 41/046*** (2013.01); ***H04L 67/1002*** (2013.01);
(Continued)

(58) **Field of Classification Search**
    CPC ....... H04L 67/42; H04L 67/22; H04L 67/108; H04L 67/02; H04L 67/2819; H04L 67/2814; H04L 41/046; H04L 41/00
    See application file for complete search history.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

    3,922,494 A    11/1975    Cooper et al.
    4,347,827 A    9/1982    Lo Cascio
(Continued)

FOREIGN PATENT DOCUMENTS

    CN    101075242 A    11/2007
    CN    101179389 A    5/2008
(Continued)

OTHER PUBLICATIONS

Reed et al, "Anonymous Connections and Onion Routing", Naval Research Laboratory, Mar. 1998 https://www.onion-router.net/Publications/JSAC-1998.pdf (Year: 1998).
(Continued)

*Primary Examiner* — Minh Chau Nguyen
(74) *Attorney, Agent, or Firm* — May Patents Ltd. c/o Dorit Shem-Tov

(57)        **ABSTRACT**

A system designed for increasing network communication speed for users, while lowering network congestion for content owners and ISPs. The system employs network elements including an acceleration server, clients, agents, and peers, where communication requests generated by applications are intercepted by the client on the same machine. The IP address of the server in the communication request is transmitted to the acceleration server, which provides a list of agents to use for this IP address. The communication request is sent to the agents. One or more of the agents respond with a list of peers that have previously seen some or all of the content which is the response to this request (after checking whether this data is still valid). The client then downloads the data from these peers in parts and in parallel, thereby speeding up the Web transfer, releasing congestion from the Web by fetching the information from multiple sources, and relieving traffic from Web servers by offloading the data transfers from them to nearby peers.

**24 Claims, 15 Drawing Sheets**



Code200
Ex. 1001
Page 1 of 33

Appx1137

**US 11,044,342 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 15/957,945, filed on Apr. 20, 2018, now Pat. No. 10,257,319, which is a continuation of application No. 14/025,109, filed on Sep. 12, 2013, now Pat. No. 10,069,936, which is a division of application No. 12/836,059, filed on Jul. 14, 2010, now Pat. No. 8,560,604.

(60) Provisional application No. 61/249,624, filed on Oct. 8, 2009.

(52) **U.S. Cl.**
CPC ........ *H04L 67/108* (2013.01); *H04L 67/1023* (2013.01); *H04L 67/1063* (2013.01); *H04L 67/22* (2013.01); *H04L 67/2814* (2013.01); *H04L 67/2819* (2013.01); *H04L 67/02* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,855,894 A | 8/1989 | Asahi | |
| 4,937,781 A | 6/1990 | Lee et al. | |
| 5,519,693 A | 5/1996 | Galuszka | |
| 5,577,243 A | 11/1996 | Sherwood et al. | |
| 5,734,829 A | 3/1998 | Robinson | |
| 5,758,195 A | 5/1998 | Balmer | |
| 5,826,014 A | 10/1998 | Coley | |
| 5,974,566 A | 10/1999 | Ault | |
| 6,012,083 A | 1/2000 | Savitzky | |
| 6,012,090 A | 1/2000 | Chung | |
| 6,061,278 A | 5/2000 | Kato et al. | |
| 6,134,584 A | 10/2000 | Chang | |
| 6,154,782 A | 11/2000 | Kawaguchi | |
| 6,185,625 B1 | 2/2001 | Tso | |
| 6,266,704 B1 | 7/2001 | Reed | |
| 6,173,330 B1 | 9/2001 | Guo et al. | |
| 6,311,216 B1 | 10/2001 | Smith | |
| 6,389,422 B1 | 5/2002 | Doi | |
| 6,389,462 B1 | 5/2002 | Cohen | |
| 6,421,733 B1 | 7/2002 | Tso | |
| 6,466,470 B1 | 10/2002 | Chang | |
| 6,513,061 B1 | 1/2003 | Ebata | |
| 6,519,693 B1 | 2/2003 | Debey | |
| 6,665,715 B1 | 12/2003 | Houri | |
| 6,687,732 B1 | 2/2004 | Bector | |
| 6,701,374 B2 | 3/2004 | Gupta | |
| 6,785,705 B1 | 8/2004 | Kocherlakota | |
| 6,792,461 B1 | 9/2004 | Hericourt | |
| 6,795,848 B1 | 9/2004 | Border et al. | |
| 6,842,463 B1 | 1/2005 | Drwiega | |
| 6,868,453 B1 | 3/2005 | Watanabe | |
| 6,895,011 B1 | 5/2005 | Lassers | |
| 6,961,783 B1 | 11/2005 | Cook | |
| 7,007,228 B1 | 2/2006 | Carro | |
| 7,047,315 B1 | 5/2006 | Srivastava | |
| 7,080,158 B1 | 7/2006 | Squire | |
| 7,009,927 B2 | 8/2006 | Cudd | |
| 7,120,666 B2 | 10/2006 | McCanne et al. | |
| 7,139,579 B2 | 11/2006 | Hatano | |
| 7,203,741 B2 | 4/2007 | Marco et al. | |
| 7,234,059 B1 | 6/2007 | Beaver | |
| 7,543,018 B2 | 6/2009 | Appelman | |
| 7,558,942 B1 | 7/2009 | Chen et al. | |
| 7,620,703 B1 | 11/2009 | Shteyn | |
| 7,673,048 B1 | 3/2010 | O'Toole | |
| 7,702,784 B2 | 4/2010 | Berstis | |
| 7,706,362 B1 | 4/2010 | Senthilnathan | |
| 7,719,971 B1 | 5/2010 | Issa | |
| 7,742,485 B2 | 6/2010 | Zhang | |
| 7,751,628 B1 | 7/2010 | Reisman | |
| 7,783,777 B1 | 8/2010 | Pabla | |
| 7,788,378 B2 | 8/2010 | Rao | |
| 7,805,517 B2 | 9/2010 | Shim | |

| | | | |
|---|---|---|---|
| 7,818,430 B2 | 10/2010 | Zuckerman | |
| 7,831,720 B1 | 11/2010 | Noureddine | |
| 7,860,988 B2 | 12/2010 | Aoki | |
| 7,865,585 B2* | 1/2011 | Samuels ................. H04L 67/28 |
| | | | 709/223 |
| 7,877,511 B1 | 1/2011 | Berger | |
| 7,890,547 B2 | 2/2011 | Hotti | |
| 7,890,624 B2 | 2/2011 | Bivens | |
| 7,894,431 B2 | 2/2011 | Goring | |
| 7,929,429 B2 | 4/2011 | Bornstein | |
| 7,970,835 B2 | 6/2011 | St. Jacques | |
| 7,984,110 B1 | 7/2011 | Raman | |
| 8,135,912 B2 | 3/2012 | Shribman et al. | |
| 8,156,275 B2 | 4/2012 | de Cesare | |
| 8,171,101 B2 | 5/2012 | Gladwin et al. | |
| 8,375,434 B2 | 2/2013 | Cottrell | |
| 8,464,350 B2 | 6/2013 | Kanevsky | |
| 8,479,251 B2 | 7/2013 | Feinleib et al. | |
| 8,499,059 B2 | 7/2013 | Stoyanov | |
| 8,516,084 B1 | 8/2013 | Grieve | |
| 8,527,631 B1 | 9/2013 | Liang | |
| 8,533,628 B2 | 9/2013 | Rohrabaugh | |
| 8,577,724 B1 | 11/2013 | Gandhi | |
| 8,595,786 B2 | 11/2013 | Choi | |
| 8,639,630 B2 | 1/2014 | Fomenko et al. | |
| 8,769,035 B2 | 1/2014 | Resch et al. | |
| 8,719,430 B2 | 5/2014 | Van Ackere | |
| 8,719,505 B2 | 5/2014 | Shribman et al. | |
| 8,832,179 B2 | 9/2014 | Owen et al. | |
| 8,838,811 B2 | 9/2014 | Chen | |
| 8,935,798 B1 | 1/2015 | Smith | |
| 9,201,808 B2 | 1/2015 | Shribman et al. | |
| 8,972,602 B2 | 3/2015 | Mithyantha | |
| 8,990,357 B2 | 3/2015 | Graham-Cumming | |
| 8,996,856 B2 | 3/2015 | Amit | |
| 9,015,335 B1* | 4/2015 | Gigliotti ............ H04N 21/8455 |
| | | | 709/231 |
| 9,059,938 B1 | 6/2015 | Strand | |
| 9,100,320 B2 | 8/2015 | Hsy | |
| 9,122,554 B2 | 9/2015 | Callaghan | |
| 9,154,557 B2 | 10/2015 | Lev-Ran | |
| 9,177,157 B2 | 11/2015 | Binder | |
| 9,237,210 B2 | 1/2016 | Liu | |
| 9,253,164 B2 | 2/2016 | Gouge | |
| 9,313,100 B1 | 4/2016 | Jenkins | |
| 9,374,244 B1 | 6/2016 | Reed | |
| 9,418,243 B2 | 8/2016 | Bauer | |
| 9,444,903 B2 | 9/2016 | Nuaimi | |
| 9,584,529 B2 | 2/2017 | Su | |
| 9,705,959 B1 | 7/2017 | Strand | |
| 9,979,674 B1 | 5/2018 | Kumar | |
| 9,990,295 B2 | 6/2018 | Shribman et al. | |
| 10,182,466 B2 | 1/2019 | Nirantar | |
| 10,277,711 B2 | 4/2019 | Shribman | |
| 10,361,911 B2 | 7/2019 | Brandwine | |
| 10,404,791 B2 | 9/2019 | Puri | |
| 10,410,244 B2 | 9/2019 | Toval | |
| 10,484,337 B2 | 11/2019 | Subbarayan | |
| 10,484,510 B2 | 11/2019 | Shribman | |
| 10,560,509 B2 | 2/2020 | Lo | |
| 10,594,660 B2 | 3/2020 | Smith | |
| 10,637,956 B1 | 4/2020 | Juravicius | |
| 10,645,654 B1 | 5/2020 | Backholm | |
| 10,650,166 B1 | 5/2020 | Sundberg | |
| 2001/0033583 A1 | 10/2001 | Rabenko et al. | |
| 2001/0054020 A1* | 12/2001 | Barth ................. G06Q 30/0613 |
| | | | 705/37 |
| 2002/0007413 A1 | 1/2002 | Garcia-Luna-Aceves et al. |
| 2002/0026517 A1 | 2/2002 | Watson | |
| 2002/0065930 A1 | 5/2002 | Rhodes | |
| 2002/0069241 A1 | 6/2002 | Narlikar et al. | |
| 2002/0091760 A1 | 7/2002 | Rozen | |
| 2002/0103823 A1 | 8/2002 | Jackson | |
| 2002/0120874 A1 | 8/2002 | Shu et al. | |
| 2002/0123895 A1 | 9/2002 | Potekhin | |
| 2002/0133647 A1 | 9/2002 | Marco et al. | |
| 2002/0194183 A1 | 12/2002 | Yoakum | |
| 2002/0194292 A1 | 12/2002 | King | |
| 2003/0009518 A1 | 1/2003 | Harrow et al. | |

**US 11,044,342 B2**

Page 3

(56)     **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 2003/0009583 A1 | 1/2003 | Chan et al. |
| 2003/0018834 A1 | 1/2003 | Eilers |
| 2003/0074403 A1 | 4/2003 | Harrow et al. |
| 2003/0097408 A1 | 5/2003 | Kageyama |
| 2003/0115364 A1 | 6/2003 | Shu et al. |
| 2003/0163413 A1 | 8/2003 | Wiczkowski |
| 2003/0174648 A1 | 9/2003 | Wang et al. |
| 2003/0187925 A1 | 10/2003 | Inala |
| 2003/0200307 A1 | 10/2003 | Raju et al. |
| 2003/0204602 A1 | 10/2003 | Hudson |
| 2003/0210694 A1 | 11/2003 | Jayaraman et al. |
| 2003/0229718 A1 | 12/2003 | Tock |
| 2003/0229785 A1 | 12/2003 | Daseke |
| 2004/0044731 A1 | 3/2004 | Chen |
| 2004/0054748 A1 | 3/2004 | Ackaouy |
| 2004/0068579 A1 | 4/2004 | Marmigere |
| 2004/0088646 A1 | 5/2004 | Yeager et al. |
| 2004/0107242 A1 | 6/2004 | Vert et al. |
| 2004/0117455 A1 | 6/2004 | Kaminsky |
| 2004/0133692 A1 | 7/2004 | Blanchet |
| 2004/0221207 A1 | 11/2004 | Yokota |
| 2004/0230593 A1 | 11/2004 | Rudin |
| 2004/0236962 A1 | 11/2004 | Wong |
| 2004/0254907 A1 | 12/2004 | Crow et al. |
| 2004/0263479 A1 | 12/2004 | Shkolnikov |
| 2004/0264506 A1 | 12/2004 | Furukawa |
| 2005/0015552 A1 | 1/2005 | So et al. |
| 2005/0022236 A1 | 1/2005 | Ito et al. |
| 2005/0027782 A1 | 2/2005 | Jalan |
| 2005/0050097 A1 | 3/2005 | Yeh |
| 2005/0096753 A1 | 5/2005 | Arling |
| 2005/0097441 A1 | 5/2005 | Herbach |
| 2005/0108244 A1 | 5/2005 | Riise |
| 2005/0108551 A1 | 5/2005 | Toomey |
| 2005/0165903 A1 | 7/2005 | Doan |
| 2005/0228964 A1 | 10/2005 | Sechrest et al. |
| 2005/0235044 A1 | 10/2005 | Tazuma |
| 2006/0015545 A1 | 1/2006 | Ezra |
| 2006/0036755 A1 | 2/2006 | Abdullah |
| 2006/0039352 A1 | 2/2006 | Karstens |
| 2006/0047844 A1 | 3/2006 | Deng |
| 2006/0059091 A1 | 3/2006 | Wang |
| 2006/0075114 A1 | 4/2006 | Panasyuk |
| 2006/0155995 A1 | 7/2006 | Torvinen |
| 2006/0184647 A1 | 8/2006 | Dixit |
| 2006/0212542 A1* | 9/2006 | Fang ................... H04L 67/104 |
| | | 709/219 |
| 2006/0212584 A1* | 9/2006 | Yu ....................... G06F 16/9574 |
| | | 709/227 |
| 2006/0224687 A1 | 10/2006 | Popkin |
| 2006/0259728 A1 | 11/2006 | Chandrasekaran et al. |
| 2006/0271438 A1 | 11/2006 | Shotland |
| 2006/0280191 A1 | 12/2006 | Nishida |
| 2007/0011674 A1 | 1/2007 | Joo |
| 2007/0047452 A1 | 3/2007 | Lohr |
| 2007/0050522 A1 | 3/2007 | Grove |
| 2007/0073878 A1 | 3/2007 | Issa |
| 2007/0088821 A1 | 4/2007 | Sankuratripati |
| 2007/0100839 A1 | 5/2007 | Kim |
| 2007/0142036 A1 | 6/2007 | Wikman |
| 2007/0156855 A1 | 7/2007 | Johnson |
| 2007/0171921 A1 | 7/2007 | Wookey |
| 2007/0174742 A1 | 7/2007 | Sigurdsson |
| 2007/0180111 A1 | 8/2007 | Chmaytelli |
| 2007/0226810 A1 | 9/2007 | Hotti |
| 2007/0239655 A1 | 10/2007 | Agetsuma et al. |
| 2007/0283026 A1 | 12/2007 | Lohmar |
| 2008/0008089 A1 | 1/2008 | Bornstein et al. |
| 2008/0025506 A1 | 1/2008 | Muraoka |
| 2008/0037536 A1 | 2/2008 | Padmanabhan |
| 2008/0052156 A1 | 2/2008 | Brenner |
| 2008/0071925 A1 | 3/2008 | Leighton |
| 2008/0098101 A1 | 4/2008 | Black |
| 2008/0109446 A1 | 5/2008 | Wang |
| 2008/0120427 A1 | 5/2008 | Ramanathan |
| 2008/0125123 A1 | 5/2008 | Dorenbosch et al. |
| 2008/0134258 A1 | 6/2008 | Goose et al. |
| 2008/0196098 A1 | 8/2008 | Cottrell |
| 2008/0201438 A1 | 8/2008 | Mandre |
| 2008/0209028 A1 | 8/2008 | Kurup |
| 2008/0222244 A1 | 9/2008 | Huang |
| 2008/0222267 A1 | 9/2008 | Horn |
| 2008/0222291 A1 | 9/2008 | Weller et al. |
| 2008/0225710 A1 | 9/2008 | Raja |
| 2008/0228537 A1 | 9/2008 | Monfried |
| 2008/0235391 A1 | 9/2008 | Painter et al. |
| 2008/0235623 A1 | 9/2008 | Li |
| 2008/0235746 A1 | 9/2008 | Peters |
| 2008/0086730 A1 | 10/2008 | Vertes |
| 2008/0256175 A1 | 10/2008 | Lee |
| 2008/0263180 A1 | 10/2008 | Hurst |
| 2008/0320151 A1 | 12/2008 | McCanne |
| 2009/0010426 A1 | 1/2009 | Redmond |
| 2009/0037529 A1 | 2/2009 | Armon-Kest |
| 2009/0055749 A1 | 2/2009 | Chatterjee |
| 2009/0070489 A1 | 3/2009 | Lu |
| 2009/0077233 A1 | 3/2009 | Kurebayashi |
| 2009/0138538 A1 | 5/2009 | Klein |
| 2009/0150534 A1 | 6/2009 | Miller |
| 2009/0150930 A1 | 6/2009 | Sherwin |
| 2009/0161554 A1 | 6/2009 | Agarwal |
| 2009/0182843 A1 | 7/2009 | Hluchyj |
| 2009/0193498 A1 | 7/2009 | Agarwal |
| 2009/0199000 A1 | 8/2009 | Hsu |
| 2009/0216887 A1 | 8/2009 | Hertle |
| 2009/0217122 A1 | 8/2009 | Yokokawa et al. |
| 2009/0217351 A1 | 8/2009 | Burch |
| 2009/0232003 A1 | 9/2009 | Vasseur |
| 2009/0234970 A1 | 9/2009 | Sun |
| 2009/0248793 A1 | 10/2009 | Jacobsson |
| 2009/0262724 A1 | 10/2009 | Suzuki |
| 2009/0279559 A1 | 11/2009 | Wong et al. |
| 2009/0292816 A1 | 11/2009 | Etchegoyen |
| 2009/0300208 A1 | 12/2009 | Lepeska |
| 2009/0313318 A1 | 12/2009 | Dye |
| 2009/0319502 A1 | 12/2009 | Chalouhi et al. |
| 2009/0327489 A1 | 12/2009 | Swildens |
| 2010/0036954 A1 | 2/2010 | Sakata |
| 2010/0042724 A1 | 2/2010 | Jeon |
| 2010/0066808 A1 | 3/2010 | Tucker et al. |
| 2010/0085977 A1 | 4/2010 | Khalid et al. |
| 2010/0094970 A1 | 4/2010 | Zuckerman et al. |
| 2010/0115063 A1 | 6/2010 | Gladwin et al. |
| 2010/0154044 A1 | 6/2010 | Manku |
| 2010/0161756 A1 | 6/2010 | Lewis |
| 2010/0161760 A1 | 6/2010 | Maloo |
| 2010/0162126 A1 | 6/2010 | Donaldson |
| 2010/0180082 A1 | 7/2010 | Sebastian |
| 2010/0235438 A1 | 9/2010 | Narayanan et al. |
| 2010/0235473 A1 | 9/2010 | Koren |
| 2010/0262650 A1 | 10/2010 | Chauhan |
| 2010/0293555 A1 | 11/2010 | Vepsalainen |
| 2010/0322237 A1 | 12/2010 | Raja |
| 2010/0329270 A1 | 12/2010 | Asati et al. |
| 2011/0007665 A1 | 1/2011 | Dinur |
| 2011/0022582 A1 | 1/2011 | Unnikrishnan |
| 2011/0023125 A1 | 1/2011 | Kim |
| 2011/0035503 A1* | 2/2011 | Zaid .................... H04L 63/0442 |
| | | 709/228 |
| 2011/0066924 A1 | 3/2011 | Dorso |
| 2011/0087733 A1 | 4/2011 | Shribman et al. |
| 2011/0117938 A1 | 5/2011 | Pyo |
| 2011/0128911 A1 | 6/2011 | Shaheen |
| 2011/0154477 A1 | 6/2011 | Parla |
| 2011/0173345 A1 | 7/2011 | Knox |
| 2011/0264809 A1 | 10/2011 | Koster |
| 2011/0282997 A1 | 11/2011 | Prince |
| 2011/0314347 A1 | 12/2011 | Nakano et al. |
| 2012/0023212 A1 | 1/2012 | Roth |
| 2012/0096116 A1 | 4/2012 | Mislove |
| 2012/0099566 A1 | 4/2012 | Laine et al. |
| 2012/0124173 A1 | 5/2012 | De et al. |
| 2012/0124239 A1 | 5/2012 | Shribman et al. |
| 2012/0136926 A1 | 5/2012 | Dillon |

Appx1139

**US 11,044,342 B2**

Page 4

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2012/0144047 A1 | 6/2012 | Armstrong |
| 2012/0164980 A1 | 6/2012 | Van Phan |
| 2012/0166582 A1 | 6/2012 | Binder |
| 2012/0185947 A1 | 7/2012 | Phillips |
| 2012/0198524 A1 | 8/2012 | Celebisoy |
| 2012/0239811 A1 | 9/2012 | Kohli |
| 2012/0246273 A1 | 9/2012 | Bornstein |
| 2012/0254370 A1 | 10/2012 | Bacher |
| 2012/0254456 A1 | 10/2012 | Visharam et al. |
| 2012/0264520 A1 | 10/2012 | Marsland |
| 2012/0290717 A1 | 11/2012 | Luna |
| 2012/0297041 A1 | 11/2012 | Momchilov |
| 2012/0323674 A1 | 12/2012 | Simmons |
| 2013/0007031 A1 | 1/2013 | Makino |
| 2013/0007232 A1 | 1/2013 | Wang |
| 2013/0007253 A1 | 1/2013 | Li |
| 2013/0019258 A1 | 1/2013 | Bhatia |
| 2013/0047020 A1 | 2/2013 | Hershko |
| 2013/0064370 A1 | 3/2013 | Gouge |
| 2013/0067086 A1 | 3/2013 | Hershko |
| 2013/0072723 A1 | 3/2013 | Sandholm |
| 2013/0080498 A1 | 3/2013 | Desilva |
| 2013/0080575 A1 | 3/2013 | Prince |
| 2013/0083800 A1 | 4/2013 | Lezama Bounine |
| 2013/0117413 A1 | 5/2013 | Kaneko |
| 2013/0151709 A1 | 6/2013 | Luna |
| 2013/0157699 A1 | 6/2013 | Talwar |
| 2013/0166768 A1 | 6/2013 | Gouache et al. |
| 2013/0167045 A1 | 6/2013 | Xu |
| 2013/0171964 A1 | 7/2013 | Bhatia |
| 2013/0173756 A1 | 7/2013 | Luna |
| 2013/0201316 A1 | 8/2013 | Binder et al. |
| 2013/0212462 A1 | 8/2013 | Athas |
| 2013/0219281 A1 | 8/2013 | Trevelyan |
| 2013/0219458 A1 | 8/2013 | Ramanathan |
| 2013/0263280 A1 | 10/2013 | Cote |
| 2013/0268357 A1 | 10/2013 | Heath |
| 2013/0272519 A1 | 10/2013 | Huang |
| 2013/0304796 A1 | 11/2013 | Jackowski |
| 2013/0326607 A1 | 12/2013 | Feng |
| 2014/0013001 A1 | 1/2014 | Cox |
| 2014/0082260 A1 | 3/2014 | Oh et al. |
| 2014/0189802 A1 | 7/2014 | Montgomery |
| 2014/0199044 A1 | 7/2014 | Gupta |
| 2014/0201323 A1 | 7/2014 | Fall |
| 2014/0222974 A1 | 8/2014 | Liu |
| 2014/0244778 A1 | 8/2014 | Wyatt |
| 2014/0258465 A1 | 9/2014 | Li |
| 2014/0301334 A1 | 10/2014 | Labranche et al. |
| 2014/0310709 A1 | 10/2014 | Nirantar |
| 2014/0337308 A1 | 11/2014 | De Francisci Morales |
| 2014/0359081 A1 | 12/2014 | Van Deventer |
| 2014/0376403 A1 | 12/2014 | Shao |
| 2015/0006615 A1 | 1/2015 | Wainner |
| 2015/0016261 A1 | 1/2015 | Backholm |
| 2015/0026239 A1 | 1/2015 | Hofmann |
| 2015/0026341 A1 | 1/2015 | Blacka |
| 2015/0032803 A1 | 1/2015 | Graham-Cumming |
| 2015/0033001 A1 | 1/2015 | Ivanov |
| 2015/0036485 A1 | 2/2015 | Poulson |
| 2015/0039674 A1 | 2/2015 | Agarwal |
| 2015/0067819 A1 | 3/2015 | Shribman et al. |
| 2015/0135302 A1 | 5/2015 | Cohen |
| 2015/0149431 A1 | 5/2015 | Trevelyan |
| 2015/0172324 A1 | 6/2015 | Calme |
| 2015/0172406 A1 | 6/2015 | Hansen |
| 2015/0189401 A1 | 7/2015 | Yi |
| 2015/0206176 A1 | 7/2015 | Toval |
| 2015/0206197 A1 | 7/2015 | Toval |
| 2015/0244839 A1 | 8/2015 | Horn |
| 2015/0268905 A1 | 9/2015 | Chakirov |
| 2015/0295988 A1 | 10/2015 | Goodwin |
| 2015/0317218 A1 | 11/2015 | Verde |
| 2015/0341812 A1 | 11/2015 | Dion |
| 2015/0347118 A1 | 12/2015 | Yeung |
| 2015/0350362 A1 | 12/2015 | Pollack |
| 2015/0358648 A1 | 12/2015 | Limberg |
| 2015/0372972 A1 | 12/2015 | Kennedy |
| 2016/0021430 A1 | 1/2016 | LaBosco et al. |
| 2016/0035019 A1 | 2/2016 | Rosner |
| 2016/0098049 A1 | 4/2016 | Fan |
| 2016/0105530 A1 | 4/2016 | Shribman |
| 2016/0140405 A1 | 5/2016 | Graumann |
| 2016/0170814 A1 | 6/2016 | Li |
| 2016/0205028 A1 | 7/2016 | Luna |
| 2016/0241664 A1 | 8/2016 | Xia |
| 2016/0294956 A1 | 10/2016 | Fix |
| 2016/0323409 A1 | 11/2016 | Kôlhi |
| 2016/0337464 A1 | 11/2016 | Eriksson |
| 2016/0352628 A1 | 12/2016 | Tirumaleswar et al. |
| 2016/0366233 A1 | 12/2016 | Le |
| 2017/0041416 A1 | 2/2017 | Zhou |
| 2017/0155654 A1 | 6/2017 | Burke |
| 2017/0221092 A1 | 8/2017 | Toval |
| 2017/0230434 A1 | 8/2017 | Wang |
| 2017/0250861 A1 | 8/2017 | Gheorghe |
| 2018/0020324 A1 | 1/2018 | Beauford |
| 2018/0034766 A1 | 2/2018 | Chiba |
| 2018/0042067 A1 | 2/2018 | Nirantar |
| 2018/0063228 A1 | 3/2018 | Deen |
| 2018/0077624 A1 | 3/2018 | Jung |
| 2018/0131668 A1 | 5/2018 | Prince |
| 2018/0225387 A1 | 8/2018 | Pang |
| 2018/0227210 A1 | 8/2018 | Cosgrove |
| 2018/0262388 A1 | 9/2018 | Johnson |
| 2018/0375952 A1 | 12/2018 | Knecht |
| 2019/0037047 A1 | 1/2019 | Shribman |
| 2019/0050164 A1 | 2/2019 | Kotian |
| 2019/0059083 A1 | 2/2019 | Backholm |
| 2019/0068740 A1 | 2/2019 | Graham-Cumming |
| 2019/0098518 A1 | 3/2019 | Luna |
| 2019/0110173 A1 | 4/2019 | Collier |
| 2019/0138560 A1 | 5/2019 | Holloway |
| 2019/0155665 A1 | 5/2019 | Bott |
| 2019/0166520 A1 | 5/2019 | Luna |
| 2019/0180316 A1 | 6/2019 | Toval |
| 2019/0199611 A1 | 6/2019 | Kotadia |
| 2019/0238510 A1 | 8/2019 | Li |
| 2019/0260859 A1 | 8/2019 | Patil |
| 2019/0372878 A1 | 12/2019 | Chakra |
| 2019/0379766 A1 | 12/2019 | Decenzo |
| 2019/0387430 A1 | 12/2019 | Ingerman |
| 2020/0007494 A1 | 1/2020 | Prince |
| 2020/0159622 A1 | 5/2020 | Chintagunta |
| 2020/0162432 A1 | 5/2020 | Ludin |
| 2020/0169536 A1 | 5/2020 | Santelia |
| 2020/0184035 A1 | 6/2020 | Santelia |
| 2020/0186614 A1 | 6/2020 | Luna |
| 2020/0259893 A1 | 8/2020 | James |
| 2020/0287867 A1 | 9/2020 | Knecht |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102314348 | 1/2012 |
| EP | 0948176 A2 | 10/1999 |
| EP | 1672826 | 6/2006 |
| EP | 2597869 A1 | 12/2013 |
| EP | 2597869 A1 | 5/2015 |
| EP | 2922275 B1 | 3/2016 |
| GB | 2418108 A | 3/2006 |
| JP | H11-355302 | 12/1999 |
| JP | 2007280388 | 10/2007 |
| KR | 1020090097034 | 9/2009 |
| RU | 2343536 C2 | 10/2009 |
| WO | 2000/018078 A1 | 3/2000 |
| WO | 2004094980 | 11/2004 |
| WO | 2004094980 A2 | 11/2004 |
| WO | 2007/136665 | 11/2007 |
| WO | 2010090562 A1 | 8/2010 |
| WO | 2010090562 A1 | 12/2010 |
| WO | 2011068784 A1 | 9/2011 |
| WO | 2015034752 A1 | 3/2015 |

US 11,044,342 B2

Page 5

(56)                **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | 2015/157646 | 10/2015 |
| WO | 2016181383 | 11/2016 |
| WO | 2019/043687 | 3/2019 |

OTHER PUBLICATIONS

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages).
"On the Leakage of Personally Identifiable Information via Online Social Networks"—Wills et al, AT&T, Apr. 2009 http://www2.research.att.com/~bala/papers/wosn09.pdf.
Notice of Preliminary Rejection in KR Application No. 10-2012-7011711 dated Jul. 15, 2016.
Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Report, The Institute of Electronics, Information and Communication Engineers, May 14, 2009.
Octoparse Blog: "Top 20 Web Crawling Tools to Scrape the Websites Quickly", Aug. 23, 2019 (15 pages).
Screen captures from YouTube video clip entitle "nVpn.net | Double your Safety and use Socks5 + nVpn" 38 pages, last accessed Nov. 20, 2018 <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
Screen captures from YouTube video clip entitle "Andromeda" 47 pages, publicly known and available as of at least 2011 <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
SpyEye, https://www.symantec.com/security-center/writeup/2010-020216-0135-9; http://securesql.info/riskyclouds/spyeye-user-manual; known as of at least 2010 (13 pages).
Screen captures from YouTube video clip entitle "Change Your Country IP Address & Location with Easy Hide IP Software" 9 pages, publicly known and available as of at least 2011, <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.
CoralCDN ("CoralCDN"), https://pdos.csail.mit.edu/6.824/papers/freedman-coral.pdf (14 Pages).
European Search Report for EP 14182547.1, dated Jul. 30, 2015.
R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002].
"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Computer Science Dept., Oct. 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf.
International Search Report of PCT/US2010/034072 dated Jul. 1, 2010.
YouTube video clip entitled "nVpn.net | Double your Safety and use Socks5 + nVpn" <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
YouTube video clip entitled "Andromeda" <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
YouTube video clip entitled "Change Your Country IP Address & Location with Easy Hide IP Software" <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.
Michael J. Freedman, Princeton University, "Experiences with CoralCDN: a five-year operational view", Proceeding NSDI'10 Proceedings of the 7th USENIX conference on Networked systems design and implementation San Jose, California—Apr. 28-30, 2010 (17 pages).
"The BitTorrent Protocol Specification", Website: https://web.archive.org/web/20120513011037/http://www.bittorrent.org/beps/bep_0003.html describing BitTorrent dated Jan. 10, 2008 downloaded using web archive on Aug. 16, 2019 (6 pages).
"BitTorrent", Website: https://en.wikipedia.org/w/index.php?title=BitTorrent&oldid=530466721 describing BitTorrent dated Dec. 30, 2012 downloaded using Wikipedia on Aug. 16, 2019 (9 pages).

"VIP Socks/VPN Service", Website: http://vip72.com:80/?drgn=1 describing VIP72 proxy service dated Jan. 2010 downloaded using VIP Technologies webpage on Aug. 16, 2019 (3 pages).
"Welcome to Easy Hide IP", Website: https://web.archive.org/web/20130702093456/http://www.easy-hide-ip.com:80/ describing Easy Hide IP dated Jan. 26, 2007 downloaded using web archive on Aug. 16, 2019 (2 pages).
"You make it fun; we'll make it run", Website: https://web.archive.org/web/20130726050810/https://www.coralcdn.org describing CoralCDN dated Jan. 25, 2005 downloaded using web archive on Aug. 16, 2019 (2 pages).
"Net Transport", Website: http://www.xi-soft.com/default.htm describing Net Transport Overview dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (2 pages).
Net Transport—Develop History, Website: http://www.xi-soft.com/download.htm describing Net Transport Download dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (10 pages).
Net Transport FAQ, Website: http://www.xi-soft.com/faq.htm describing Net Transport FAQ dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (4 pages).
Net Transport News, Website: http://www.xi-soft.com/news.htm describing Net Transport News dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (5 pages).
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,749.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,785.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,433.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,451.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,476.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,496.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,363.
Third-party submission under 37 CFR 1.290 filed on Jul. 22, 2019 and entered in U.S. Appl. No. 16/292,364.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,374.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,382.
Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,250.
Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,315.
"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Feb. 12, 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf (Year 2011) (16 pages).
Berners-Lee et al., RFC 1945, Hypertext Transfer Protocol, HTTP/1.0 (May 1996) (60 pages).
Leech et al., RFC 1928, Socks Protocol, Version 5 (Internet Engineering Task Force, Network Working Group, Mar. 1996) (9 pages).
Wessels, "Squid: The Definitive Guide," ISBN-10: 9780596001629, ISBN-13: 978-0596001629, O'Reilly Media; 1st Ed. (Jan. 1, 2004) (468 pages).
Luotonen, "Web Proxy Servers," ISBN-10: 0136806120, ISBN-13: 978-0136806127, Prentice Hall; 1st Ed. (Dec. 30, 1997) (452 pages).
Loutonen et al., "World-Wide Web proxies," Computer Networks and ISDN Systems 27, 147-154 (Elsevier Science B. V.) (1994) (8 pages).
Cooper et al., RFC 3040, Internet Web Replication and Caching Taxonomy (Jan. 2001) (32 pages).
ISO/IEC 23009-1:2012(E), MPEG-DASH standard, Jan. 5, 2012 (133 pages).
ProxyList.net, as captured by the Wayback Machine (web.archive.org), on Jul. 17, 2011 (1 page).
Printout of VIP72 Youtube web page at https://www.youtube.com/watch?v=L0Hct2kSnn4, retrieved Nov. 21, 2019 (1 page).

Appx1141

**US 11,044,342 B2**

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

VIP72 Scene Images extracted from VIP72.com/nvpnnet, MPEG-4 video recording of "nVPN.net | Double your Safety and use Socks5 +nVpn", accessed from https://www.youtube.com/watch?v= L0Hct2kSnn4, published Sep. 11, 2011 (221 pages).

Certification dated Nov. 8, 2019 of Anjali Shresta of Google, Proof of Date for VIP72 Youtube web page and video (4 pages).

VIP72.com home page as of 2013 from Wayback Machine (3 pages).

International Search Report issued in PCT Application No. PCT/ US2010/051881 dated Dec. 9, 2010.

Supplementary European Search Report issued in EP Application No. 10822724 dated Apr. 24, 2013.

"Keep Alive"—Imperva, 2019 https://www.imperva.com/learn/ performance/keep-alive (2019) (3 pages).

Third party observation filed on Jun. 21, 2019 in PCT Application No. PCT/IL2018/050910 (7 pages).

IETF named: IPv6 Tunnel Broker, Apr. 1999—First uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).

RFC 3053 (Jan. 2001) named: IPv6 Tunnel Broker—Secod uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).

Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Engineers Report, The Institute of Electronics, Information and Communication, May 14, 2009.

Michael K. Reiter and Aviel D. Rubin, "Crowds: Anonymity for Web Transactions", ACM Transactions on Information and System Security, Nov. 1998 (27 pages).

Rennhard, Marc, "MorphMix—A Peer-to-Peer based System for Anonymous Internet Access", 2004 (307 pages).

Ari Luotonen, "Web Proxy Servers", ISBN-10: 0136806120, ISBN-13: 978-0136806127, Prentice Hall; 1st Ed. 1998 (452 pages).

RFC 760, DOD Standard Internet Protocol, Jan. 1980 (46 pages).

RFC 2547, BGP/MPLS VPNs, Mar. 1999 (25 pages).

RFC 1180, A TCP/IP Tutorial, Jan. 1991 (28 pages).

RFC 1122, Requirements for Internet Hosts—Communication Layers, Oct. 1989 (116 pages).

Andrei Popescu, Google, Inc, Geolocation API Specification, W3C Working Draft Dec. 22, 2008 (8 pages).

Andrei Popescu, Google, Inc, Geolocation API Specification, W3C Recommendation Oct. 24, 2013 (10 pages).

Yong Wang, et. al., Towards Street-Level Client-Independent IP Geolocation, 2011 (14 pages).

William R. Stanek, Introducing Microsoft Windows Vista 81, 2006 (9 pages).

IETF RFC 2460 "Internet Protocol, Version 6 (IPv6)", Dec. 1998 (39 pages).

IETF RFC 793 "Protocol Specification", Sep. 1981 (90 pages).

IETF RFC 1349 "Type of Service in the Internet Protocol Suite", Jul. 1992 (28 pages).

IEEE Std 802-2001, IEEE Standard for Local and Metropolitan Area Networks: Overview and Architecture, Feb. 7, 2002 (47 pages).

Scott Lowe, Use Resource Monitor to monitor network performance— TechRepublic, Jul. 29, 2011 (11 pages).

Greg Shultz, Windows Vista's Task Manager: The harder-to-detect changes—TechRepublic, Feb. 21, 2007 (16 pages).

Gavin Gear, Windows 8 Task Manager In-Depth, Jun. 6, 2013 (32 pages).

IETF RFC 2914, "Congestion Control Principles", Sep. 2000 (17 pages).

IETF RFC 4026, "Provider Provisioned Virtual Private Network (VPN) Terminology", Mar. 2005 (20 pages).

Kozierok, The TCP/IP Guide—TCP Connection Preparation, Apr. 6, 2005 (3 pages).

Jovovic, Turning your HD TV into an Android SmartTV is easier than you think!, Feb. 26, 2013 (3 pages).

Allen, A Software Developer's Guide to HTTP Part III—Connections, Jan. 26, 2012 (10 pages).

Google Scholar: MorphMix citation in Alessandro Acquisti, et al., Digital Privacy: Theory, Technologies, and Practices (2007) (2 pages).

RFC 959, File Transfer Protocol (FTP), Oct. 1985 (69 pages).

RFC 821, Jonathan B. Postel, Simple Mail Transfer Protocol, Aug. 1982 (70 pages).

RFC 918, Post Office Protocol, Oct. 1984 (5 pages).

RFC 937, Post Office Protocol—Version 2, Feb. 1985 (24 pages).

Roger Dingledine et al., "The Free Haven Project: Distributed Anonymous Storage Service", Dec. 17, 2000 (23 pages).

Michael Freedman et al., "Tartan: A Peer-to-Peer Anonymizing Network Layer", Nov. 18-22, 2002 (14 pages).

RFC 791, DARPA Internet Program Protocol Specification, Sep. 1981 (49 pages).

RFC 1034, "Domain Names—Concepts and Facilities", Nov. 1987 (55 pages).

RFC 1035, "Domain Names—Implementation and Specification", Nov. 1987 (54 pages).

RFC 1939, Post Office Protocol—Version 3, May 1996 (23 pages).

RFC 3022, Traditional IP Network Address Translator (Traditional NAT), Jan. 2001 (16 pages).

RFC 2068, Hypertext Transfer Protocol—HTTP/1.1, Jan. 1997 (162 pages).

RFC 1919, Classical versus Transparent IP Proxies, Mar. 1996 (35 pages).

HAProxy Reference Manual, Version 1.2.18, Willy Tarreau, May 25, 2008 (40 pages).

HAProxy Architecture Guide, Version 1.2.18, Willy Tarreau, May 25, 2008 (23 pages).

RFC 2663 entitled: "IP Network Address Translator (NAT) Terminology and Considerations", Aug. 1999 (30 pages).

Li et at, "Toward the Identification of Anonymous Web Proxies", University of Cambridge & University of Genoa, Apr. 3, 2009 (2 pages).

"Anonymizing Proxies: What They Are and Who They Work"— Enterprise Services Mar. 2013 (Year: 2012) (2 pages).

Selected pages from the website proxifier.com as of Feb. 2008 (15 pages).

Proxychains source code (Oct. 20, 2004) (53 pages).

RFC 1918, Address Allocation for Private Internets, Feb. 1996 (9 pages).

RFC 2131, Dynamic Host Configuration Protocol, Mar. 1997 (45 pages).

RFC 4388, Dynamic Host Configuration Protocol (DHCP) Leasequery, Feb. 2006 (27 pages).

Authors Alain Durand (IMAG) et al., "IPv6 Tunnel Broker <draft-ietf-ngtrans-broker-00.txt>", Internet Society (ISOC), Apr. 2, 1999 (14 pages).

Sophie Gastellier-Prevost et al., "Defeating pharming attacks at the client-side", Network and System Security (NSS), Sep. 6, 2011 (8 pages).

Bharat K et al. "Mirror, Mirror on the Web: a study of host pairs with replicated content", Computer Networks, Amsterdam, vol. 31, No. 11-16, May 17, 1999 (12 pages).

European Search Report of EP 20190259 dated Dec. 16, 2020.

European Search Report of EP 20195090 dated Dec. 8, 2020.

RFC 2187, "Application of Internet Cache Protocol (ICP), version 2", Sep. 1997 (24 pages).

Duane Wessels, "ICP and the Squid Web Cache", Aug. 13, 1997 (25 pages).

RFC 1738, "Uniform Resource Locators (URL)", Dec. 1994 (25 pages).

European Search Report of EP 20195075 dated Nov. 13, 2020.

David Gourley et al, "HTTP-The-Definitive-Guide", O'Reilly Media, Inc. Sep. 27, 2002 (658 pages).

Floss Manuals, "Circumvention Tools", Free Software Foundation Inc., May 31, 2021 (240 pages).

David Fifield et al, "Blocking resistant communication through domain fronting", Proceeding on Privacy Enhanching Technologies 2015, May 15, 2015 (19 pages).

Appx1142

**US 11,044,342 B2**

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

Wang Qiyan et al, "CensorSpoofer: Asymmetric Communication
with IP Spoofing for ensorship-Resistant Web Browsing", Mar. 9,
2012 (16 pages).

* cited by examiner

Appx1143



**FIG. 1**



**FIG. 2**



**FIG. 3**

Appx1146



FIG. 4



**FIG. 5**



FIG. 6

**162**

**ACCELERATION DATABASE 164**

166 AGENT IP A ONLINE/OFFLINE

>>> INDEXED BY: AGENT IP ADDRESS

**CACHE DATABASE 282**

286 LIST OF URLS:

288 URL 1

290 URL

292 URL HTTP HEADERS

294 LAST CHECKED ON SERVER

296 LAST CHANGED ON SERVER

298 LIST OF CHUNKS FOR THIS URL:

300 CHUNK 1

302 CHUNK CHECKSUM

304 CHUNK DATA

306 LIST OF PEERS:

308 PEER 1

310 PEER 1 IP ADDRESS

312 PEER 2 CONNECTION STATUS

**FIG. 7**



**FIG. 8**



FIG. 9

Appx1152



EACH AGENT THAT RECEIVES CLIENT REQUEST RESPONDS TO CLIENT WITH WHETHER IT HAS INFO. REGARDING REQUEST THAT CAN ASSIST CLIENT TO DOWNLOAD REQUESTED INFO. FROM PEERS IN NETWORK    382

CLIENT SELECTS SPECIFIC AGENT    384

CLIENT NOTIFIES SELECTED AGENT OF USE FOR REQUEST AND NOTIFIES OTHER AGENTS OF LACK OF USE    386

CLIENT FORWARDS SELECTED AGENT REQUEST FOR FIRST X NUMBER OF CHUNKS    388

DOES SELECTED AGENT HAVE INFO. REGARDING REQUESTED CHUNKS AND IS INFO. STILL VALID?    390

YES

IF INFO. STILL VALID, SELECTED AGENT RESPONDS TO CLIENT WITH CHECKSUM OF CHUNK, LIST OF PEERS THAT CONTAIN CHUNKS, AND IF ONLY A PORTION OF INFO., HEADERS    392

LIST OF PEERS FOR EACH CHUNK IS SORTED BY GEOGRAPHICAL PROXIMITY TO REQUESTING CLIENT    394

LIST OF CLOSEST PEERS TO CLIENT IS SENT TO CLIENT    396

NO

SELECTED AGENT SENDS REQUEST DIRECTLY TO SERVER    400

SELECTED AGENT STORES INFO. FROM SERVER IN ITS DATABASE    402

SELECTED AGENT PREPARES RESPONSE (LIST) FOR CLIENT, WHERE RESPONSE INCLUDES CHECKSUM OF CHUNK, HEADERS, AND PROVIDES ITSELF AS THE ONLY PEER FOR THESE CHUNKS    404

LIST IS FORWARDED BACK TO CLIENT    406

**FIG. 10**

Page 17 of 33

Appx1153



CLIENT RECEIVES RESPONSE FROM THE AGENT AND FOR EACH OF X CHUNKS, CLIENT SENDS A REQUEST TO EACH OF THE PEERS LISTED FOR THE CHUNK TO DOWNLOAD THE DATA OF THAT CHUNK          422

PEERS RESPOND REGARDING WHETHER THEY STILL HAVE THE DATA OF THE CHUNK          424

CLIENT SELECTS QUICKEST PEER WITH DATA OF THE CHUCK  426

CHOSEN PEER SENDS CHUNK TO CLIENT          428

CLIENT STORES CHUNKS IN ITS CACHE FOR FUTURE USE          430

IF ANY CHUNKS WERE NOT LOADED FROM ANY OF THE PEERS, CLIENT REQUESTS CHUNKS AGAIN FROM AGENT          432

CLIENT ACKNOWLEDGES TO THE AGENT WHICH OF THE CHUNKS IT RECEIVED PROPERLY          434

AGENT LOOKS UP CHUNKS IN DATABASE OF AGENT AND ADDS CLIENT TO LIST OF PEERS FOR THESE CHUNKS          436

CLIENT PASSES DATA TO APPLICATION OF CLIENT THAT MADE REQUEST 438

CLIENT CHECKS WHETHER ALL OF THE CHUNKS FOR REQUEST WERE RECEIVED          440

**FIG. 11**

420



**FIG. 12**



550

CHECK "KEEP ALIVE" WITH NETWORK ELEMENTS (CLIENTS/AGENTS/PEERS), AND UPDATE DATABASE AS TO THEIR STATUS (ON-LINE / OFF-LINE)
552

WAIT FOR CLIENT REQUEST
554

TYPE OF REQUEST RECEIVED?
556

SIGN_UP

FIND_AGENT

CHECK_VERSION

ADD THE CLIENT TO LIST OF POTENTIAL AGENTS, SORTED BY IP ADDRESS OF THE NETWORK ELEMENTS (CLIENTS, PEERS, AGENTS)
558

CREATE A NEW, EMPTY AGENT LIST
560

RETURN TO THE CLIENT THE VERSION OF THE LATEST AVAILABLE SOFTWARE, AND A URL OF WHERE TO DOWNLOAD THE LATEST VERSION
566

SEARCH THE AGENT DATABASE FOR THE NEXT 5 ACTIVE AGENTS THAT HAS THE IP ADDRESS THAT IS CLOSEST TO THE TARGET SERVER IP
(E.G. 192.166.3.103 IS CLOSER TO 192.166.3.212 THEN TO 192.167.3.104)
562

SEND THE AGENT LIST TO THE CLIENT
564

FIG. 13

Page 20 of 33

Appx1156



**FIG. 14**



FIG. 15

US 11,044,342 B2

1

# SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation application of U.S. non-provisional patent application Ser. No. 14/025,109, filed Sep. 12, 2013, which is a divisional application of U.S. non-provisional patent application entitled "SYSTEM AND METHOD FOR PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION" having Ser. No. 12/836,059, filed Jul. 14, 2010 and issued as U.S. Pat. No. 8,560,604 on Oct. 15, 2013, and claims priority to U.S. provisional patent application entitled "SYSTEM AND METHOD FOR REDUCING INTERNET CONGESTION," having Ser. No. 61/249,624, filed Oct. 8, 2009, which are hereby incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present invention is related to Internet communication, and more particularly, to improving data communication speed and bandwidth efficiency on the Internet.

## BACKGROUND OF THE INVENTION

There are several trends in network and Internet usage, which tremendously increase the bandwidth that is being used on the Internet. One such trend is that more and more video is being viewed on demand on the Internet. Such viewing includes the viewing of both large and short video clips. In addition, regular shows and full-featured films may be viewed on the Internet. Another trend that is increasing the traffic on the Internet is that Web sites (such as shopping portals, news portals, and social networks) are becoming global, meaning that the Web sites are serving people in many diverse places on the globe, and thus the data is traversing over longer stretches of the Internet, increasing the congestion.

The increase in bandwidth consumption has created several major problems, a few of which are described below:

The problem for users—the current Internet bandwidth is not sufficient, and thus the effective 'speed' experienced by users is slow;

The problem for content owners—the tremendous amount of data being viewed by users is costing large amounts of money in hosting and bandwidth costs; and

The problem for Internet Service Providers (ISPs)—the growth in Internet traffic is requiring the ISPs to increase the infrastructure costs (communication lines, routers, etc.) at tremendous financial expense.

The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved.

There have been many attempts at making the Internet faster for the consumer and cheaper for the broadcaster. Each such attempt is lacking in some aspect to become a widespread, practical solution, or is a partial solution in that it solves only a subset of the major problems associated with the increase in Internet traffic. Most of the previous solutions require billions of dollars in capital investment for a comprehensive solution. Many of these attempts are lacking in that much of the content on the Internet has become dynamically created per the user and the session of the user (this is

2

what used to be called the "Web2.0" trend). This may be seen on the Amazon Web site and the Salesforce Web site, for example, where most of the page views on these Web sites is tailored to the viewer, and is thus different for any two viewers. This dynamic information makes it impossible for most of the solutions offered to date to store the content and provide it to others seeking similar content.

One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram providing an example of use of a proxy within a network 2. A proxy, or proxy server 4, 6, 8 is a device that is placed between one or more clients, illustrated in FIG. 1 as client devices 10, 12, 14, 16, 18, 20, that request data, via the Internet 22, and a Web server or Web servers 30, 32, 34 from which they are requesting the data. The proxy server 4, 6, 8 requests the data from the Web servers 30, 32, 34 on their behalf, and caches the responses from the Web servers 30, 32, 34, to provide to other client devices that make similar requests. If the proxy server 4, 6, 8 is geographically close enough to the client devices 10, 12, 14, 16, 18, 20, and if the storage and bandwidth of the proxy server 4, 6, 8 are large enough, the proxy server 4, 6, 8 will speed up the requests for the client devices 10, 12, 14, 16, 18, 20 that it is serving.

It should be noted, however, that to provide a comprehensive solution for Internet surfing, the proxy servers of FIG. 1 would need to be deployed at every point around the world where the Internet is being consumed, and the storage size of the proxy servers at each location would need to be near the size of all the data stored anywhere on the Internet. The abovementioned would lead to massive costs that are impractical. In addition, these proxy solutions cannot deal well with dynamic data that is prevalent now on the Web.

There have been commercial companies, such as Akamai, that have deployed such proxies locally around the world, and that are serving a select small group of sites on the Internet. If all sites on the Web were to be solved with such a solution, the capital investment would be in the range of billions of dollars. In addition, this type of solution does not handle dynamic content.

To create large distribution systems without the large hardware costs involved with a proxy solution, "peer-to-peer file sharing" solutions have been introduced, such as, for example, BitTorrent. FIG. 2 is a schematic diagram providing an example of a peer-to-peer file transfer network 50. In the network 50, files are stored on computers of consumers, referred to herein as client devices 60. Each consumer can serve up data to other consumers, via the Internet 62, thus taking the load of serving off of the distributors and saving them the associated costs, and providing the consumer multiple points from which to download the data, referred to herein as peers 70, 72, 74, 76, 78, thus increasing the speed of the download. However, each such peer-to-peer solution must have some sort of index by which to find the required data. In typical peer-to-peer file sharing systems, because the index is on a server 80, or distributed among several servers, the number of files available in the system is not very large (otherwise, the server costs would be very large, or the lookup time would be very long).

The peer-to-peer file sharing solution is acceptable in file sharing systems, because there are not that many media files that are of interest to the mass (probably in the order of magnitude of millions of movies and songs that are of interest). Storing and maintaining an index of millions of entries is practical technically and economically. However, if this system were to be used to serve the hundreds of billions of files that are available on the Internet of today, the cost of storing and maintaining such an index would be

Appx1159

US 11,044,342 B2

3

again in the billions of dollars. In addition, these types of peer-to-peer sharing systems are not able to deal with dynamic HTTP data.

In conclusion, a system does not exist that enables fast transmission of most of the data on the Internet, that does not incur tremendous costs, and/or that provides only a very partial solution to the problem of Internet traffic congestion. Thus, a heretofore unaddressed need exists in the industry to address the aforementioned deficiencies and inadequacies.

SUMMARY OF THE INVENTION

The present system and method provides for faster and more efficient data communication within a communication network. Briefly described, in architecture, one embodiment of the system, among others, can be implemented as follows. A network is provided for accelerating data communication, wherein the network contains: at least one client communication device for originating a data request for obtaining the data from a data server; at least one agent communication device which is assigned to the data server for receiving the data request from the client communication device, wherein the agent keeps track of which client communication devices have received responses to data requests from the assigned data server; at least one peer communication device for storing portions of data received in response to the data request by the at least one client communication device, wherein the portions of data may be transmitted to the at least one client communication device upon request by the client communication device; and at least one acceleration server for deciding which agent communication device is to be assigned to which data server and providing this information to the at least one client communication device.

The present system and method also provides a communication device within a network, wherein the communication device contains: a memory; and a processor configured by the memory to perform the steps of: originating a data request for obtaining data from a data server; being assigned to a data server, referred to as an assigned data server; receiving a data request from a separate device within the network, and keeping track of which client communication devices within the network have received responses to data requests from the assigned data server; and storing portions of data received in response to the originated data request, wherein the portions of data may be transmitted to communication device upon request by the communication device.

Other systems, methods, features, and advantages of the present invention will be or become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional systems, methods, features, and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

BRIEF DESCRIPTION OF THE DRAWINGS

Many aspects of the invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. 1 is a schematic diagram providing a prior art example of use of a proxy within a network.

4

FIG. 2 is a schematic diagram providing a prior art example of a peer-to-peer file transfer network.

FIG. 3 is a schematic diagram providing an example of a communication network in accordance with the present invention.

FIG. 4 is a schematic diagram further illustrating a communication device of the communication network of FIG. 3.

FIG. 5 is a schematic diagram further illustrating the memory of FIG. 4.

FIG. 6 is a schematic diagram further illustrating elements of the acceleration application of FIG. 5, as well as communication paths of the acceleration application.

FIG. 7 is a chart further illustrating two of the main databases utilized within the communication network.

FIG. 8 is a flowchart illustrating operation of the acceleration system initializer module.

FIG. 9 is a flowchart further illustrating communication between different elements of the communication network.

FIG. 10 is a flowchart continuing the flowchart of FIG. 9 and focused on agent response to the HTTP request.

FIG. 11 is a flowchart continuing the flowchart of FIG. 10, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent.

FIG. 12 is a flowchart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid.

FIG. 13 is a flowchart outlining operation of the acceleration server.

FIG. 14 is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention.

FIG. 15 is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

DETAILED DESCRIPTION

The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network 100 is provided by the schematic diagram of FIG. 3. The network 100 of FIG. 3 contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100, as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. 4.

Returning to FIG. 3, the exemplary embodiment of the network 100 illustrates that one of the communication devices is functioning as a client 102. The client 102 is capable of communication with one or more peers 112, 114, 116 and one or more agents 122. For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

The communication network 100 also contains a Web server 152. The Web server 152 is the server from which the client 102 is requesting information and may be, for example, a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet. It should be noted that the server 152 is not limited

Appx1160

US 11,044,342 B2

5

to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the server may be a server capable of handling a different protocol. It should also be noted that while the present description refers to the use of HTTP, the present invention may relate to any other communication protocol and HTTP is not intended to be a limitation to the present invention.

The communication network 100 further contains an acceleration server 162 having an acceleration server storage device 164. As is described in more detail herein, the acceleration server storage device 164 has contained therein an acceleration server database. The acceleration server database stores Internet protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein. Specifically, the acceleration server database contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network 100. For each such agent, the acceleration server assigns a list of IP addresses.

In the communication network 100 of FIG. 3, the application in the client 102 is requesting information from the Web server 152, which is why the software within the communication device designated this communication device to work as a client. In addition, since the agent 122 receives the request from the client 102 as the communication device closest to the Web server 152, functionality of the agent 122, as provided by the software of the agent 122, designates this communication device to work as an agent. It should be noted, that in accordance with an alternative embodiment of the invention, the agent need not be the communication device that is closest to the Web server. Instead, a different communication device may be selected to be the agent.

Since the peers 112, 114, 116 contain at least portions of the information sought by the client 102 from the Web server 152, functionality of the peers 112, 114, 116, as provided by the software of the peers 112, 114, 116, designates these communication devices to work as peers. It should be noted that the process of designating clients, agents, and peers is described in detail herein. It should also be noted that the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 may differ from the number illustrated by FIG. 3. In fact, the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 are not intended to be limited by the current description.

Prior to describing functionality performed within a communication network 100, the following further describes a communication device 200, in accordance with a first exemplary embodiment of the invention. FIG. 4 is a schematic diagram further illustrating a communication device 200 of the communication network 100, which contains general components of a computer. As previously mentioned, it should be noted that the communication device 200 of FIG. 4 may serve as a client, agent, or peer.

Generally, in terms of hardware architecture, as shown in FIG. 4, the communication device 200 includes a processor 202, memory 210, at least one storage device 208, and one or more input and/or output (I/O) devices 240 (or peripherals) that are communicatively coupled via a local interface 250. The local interface 250 can be, for example but not limited to, one or more buses or other wired or wireless connections, as is known in the art. The local interface 250 may have additional elements, which are omitted for simplicity, such as controllers, buffers (caches), drivers, repeat-

6

ers, and receivers, to enable communications. Further, the local interface 250 may include address, control, and/or data connections to enable appropriate communications among the aforementioned components.

The processor 202 is a hardware device for executing software, particularly that stored in the memory 210. The processor 52 can be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the communication device 200, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, or generally any device for executing software instructions.

The memory 210, which is further illustrated and described by the description of FIG. 5, can include any one or combination of volatile memory elements (e.g., random access memory (RAM, such as DRAM, SRAM, SDRAM, etc.)) and nonvolatile memory elements (e.g., ROM, hard drive, tape, CDROM, etc.). Moreover, the memory 210 may incorporate electronic, magnetic, optical, and/or other types of storage media. Note that the memory 210 can have a distributed architecture, where various components are situated remote from one another, but can be accessed by the processor 202.

The software 212 located within the memory 210 may include one or more separate programs, each of which contains an ordered listing of executable instructions for implementing logical functions of the communication device 200, as described below. In the example of FIG. 4, the software 212 in the memory 210 at least contains an acceleration application 220 and an Internet browser 214. In addition, the memory 210 may contain an operating system (O/S) 230. The operating system 230 essentially controls the execution of computer programs and provides scheduling, input-output control, file and data management, memory management, and communication control and related services. It should be noted that, in addition to the acceleration application 220, Internet browser 214, and operating system 230, the memory 210 may contain other software applications.

While the present description refers to a request from the client originating from an Internet browser, the present invention is not limited to requests originating from Internet browsers. Instead, a request may originate from an email program or any other program that would be used to request data that is stored on a Web server, or other server holding data that is requested by the client device.

Functionality of the communication device 200 may be provided by a source program, executable program (object code), script, or any other entity containing a set of instructions to be performed. When a source program, then the program needs to be translated via a compiler, assembler, interpreter, or the like, which may or may not be included within the memory 210, so as to operate properly in connection with the operating system 230. Furthermore, functionality of the communication device 200 can be written as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions.

The I/O devices 240 may include input devices, for example but not limited to, a keyboard, mouse, scanner, microphone, etc. Furthermore, the I/O devices 240 may also include output devices, for example but not limited to, a printer, display, etc. Finally, the I/O devices 240 may further include devices that communicate via both inputs and outputs, for instance but not limited to, a modulator/demodu-

Appx1161

US 11,044,342 B2

7                                                      8

lator (modem; for accessing another device, system, or network), a radio frequency (RF) or other transceiver, a telephonic interface, a bridge, a router, etc.

When the communication device **200** is in operation, the processor **202** is configured to execute the software **212** stored within the memory **210**, to communicate data to and from the memory **210**, and to generally control operations of the communication device **200** pursuant to the software **212**. The software **212** and the 0/S **230**, in whole or in part, but typically the latter, are read by the processor **202**, perhaps buffered within the processor **202**, and then executed.

When functionality of the communication device **200** is implemented in software, as is shown in FIG. **4**, it should be noted that the functionality can be stored on any computer readable medium for use by or in connection with any computer related system or method. In the context of this document, a computer readable medium is an electronic, magnetic, optical, or other physical device or means that can contain or store a computer program for use by or in connection with a computer related system or method. The functionality of the communication device **200** can be embodied in any computer-readable medium for use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions. In the context of this document, a "computer-readable medium" can be any means that can store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device.

The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM, EEPROM, or Flash memory) (electronic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-readable medium could even be paper or another suitable medium upon which the program is printed, as the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

In an alternative embodiment, where the functionality of the communication device **200** is implemented in hardware, the functionality can be implemented with any or a combination of the following technologies, which are each well known in the art: a discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit (ASIC) having appropriate combinational logic gates, a programmable gate array (s) (PGA), a field programmable gate array (FPGA), etc.

The at least one storage device **208** of the communication device **200** may be one of many different categories of storage device. As is described in more detail herein, the storage device **208** may include a configuration database **280** and a cache database **282**. Alternatively, the configuration database **280** and cache database **282** may be located on different storage devices that are in communication with the communication device **200**. The description that follows

assumes that the configuration database **280** and cache database **282** are located on the same storage device, however, it should be noted that the present invention is not intended to be limited to this configuration.

The configuration database **280** stores configuration data that is common to all elements of the communication network **100** and is used to provide set up and synchronization information to different modules of the acceleration application **220** stored within the memory **210**, as is described in further detail herein. The cache database **282** stores responses to HTTP requests that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. As is explained in additional detail herein, the responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this information and will use this communication device as either a peer or an agent.

In addition to the abovementioned, as is explained in further detail herein, the cache database **282** has stored therein a list of URLs that the communication device is aware of (i.e., has seen requests for). For each URL, the cache database **282** has stored therein the URL itself, HTTP headers returned by the Web Server for this URL, when the last time was that the contents of this URL was loaded directly from the Web Server, when the contents of the URL had last changed on the Web Server, as well as a list of chunks that contain the contents of this URL, and the chunks of data themselves. Chunks in the present description are defined as equally sized pieces of data that together form the whole content of the URL. It should be noted that while the present description provides for chunks being equally sized pieces of data, in accordance with an alternative embodiment of the invention, the chunks may instead be of different size.

FIG. **5** is a schematic diagram further illustrating the memory **210** of FIG. **4**. As shown by FIG. **5**, the memory **210** may be separated into two basic levels, namely, an operating system level **260** and an application level **270**. The operating system level **260** contains the operating system **230**, wherein the operating system **230** further contains at least one device driver **262** and at least one communication stack **264**. The device drivers **262** are software modules that are responsible for the basic operating commands for various hardware devices of the communication device **200**, such as the processor **202**, the storage device **208** and the I/O devices **240**. In addition, the communication stacks **264** provide applications of the communication device **200** with a means of communicating within the network **100** by implementing various standard communication protocols.

The application level **270** includes any application that is running on the communication device **200**. As a result, the application level **270** includes the Internet browser **214**, which is used to view information that is located on remote Web servers, the acceleration application **220**, as described in more detail below, and any other applications **216** stored on the communication device **200**.

As is explained in additional detail below, the acceleration application **220** intercepts the requests being made by applications of the communication device (client) that use the Internet, in order to modify the requests and route the requests through the communication network. There are various methods that may be used to intercept such requests. One such method is to create an intermediate driver **272**, which is also located within the memory **210**, that attaches

Appx1162

US 11,044,342 B2

9                                                        10

itself to all communication applications, intercepts outgoing requests of the communication applications of the communication device **200**, such as the Internet browser **214**, and routes the requests to the acceleration application **220**. Once the acceleration application **220** modifies the requests, routes the requests to other system elements on the communication network **100**, and receives replies from other system elements of the communication network **100**, the acceleration application **220** returns the replies to the intermediate driver **272**, which provides the replies back to the requesting communication application.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application **220**, as well as communication paths of the acceleration application **220**. The acceleration application **220** contains an acceleration system initializer module **222**, which is called when the acceleration application **220** is started. The acceleration system initializer module **222** is capable of initializing all elements of the communication device **200** The acceleration application **220** also contains three separate modules that run in parallel, namely, a client module **224**, a peer module **226**, and an agent module **228**, each of which comes into play according to the specific role that the communication device **200** is partaking in the communication network **100** at a given time. The role of each module is further described herein.

The client module **224** provides functionality required when the communication device **200** is requesting information from the Web server **152**, such as, for example, but not limited to, Web pages, data, video, or audio. The client module **224** causes the communication device **200** having the client module **224** therein to intercept the information request and pass the information request on to other elements of the communication network **100**, such as, servers, agents or peers. This process is further described in detail herein.

The peer module **226** provides functionality required by the communication device **200** when answering other clients within the communication network **100** and providing the other clients with information that they request, which this communication device **200**, having this peer module **226** therein, has already downloaded at a separate time. This process is further described in detail herein.

The agent module **228** provides functionality required when other communication devices of the communication network **100** acting as clients query this communication device **200**, having this agent module **228** therein, as an agent, to obtain a list of peers within the communication network **100** that contain requested information. This process is further described in detail herein.

The acceleration application **220** interacts with both the configuration database **280** and the cache database **282** of the storage device **208**. As previously mentioned herein, the configuration database **280** stores configuration data that may be common to all communication devices of the communication network **100** and is used to provide setup and synchronization information to different modules **222**, **224**, **226**, **228** of the acceleration application **220** stored within the memory **210**.

The cache database **282** stores responses to information requests, such as, for example, HTTP requests, that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. The responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to

retrieve this same information and will use this communication device **200** as either a peer or an agent. This process is described in detail herein.

Information stored within the cache database **282** may include any information associated with a request sent by the client. As an example, such information may include, metadata and actual requested data. For example, for an HTTP request for a video, the metadata may include the version of the Web server answering the request from the client and the data would be the requested video itself. In a situation where there is no more room for storage in the cache database, the software of the associated communication device may cause the communication device to erase previous data stored in order to clear room for the new data to store in the cache database. As an example, such previous data may include data that is most likely not to be used again. Such data may be old data or data that is known to no longer be valid. The communication device may choose to erase the least relevant data, according to any of several methods that are well known in the art.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network **100**, namely, the acceleration server database **164** and the cache database **282**. As previously mentioned, the acceleration server database **164** stores IP addresses of communication devices located within the communication network **100**, which have acceleration software stored therein. Specifically, the acceleration server database **164** contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. The acceleration server assigns a list of IP addresses to each communication device functioning as an agent. Each communication device will be the agent for any Web servers whose IP address is in the range 'owned' by that communication device. As an example, when a first ever communication device goes online, namely, the first communication device as described herein having the acceleration application **220** therein, the acceleration server assigns all IP addresses in the world to this communication device, and this communication device will be the agent for any Web server. When a second communication device goes online it will share the IP address list with the first communication device, so that each of the communication devices will be responsible for a different part of the world wide web servers.

The cache database **282** of the communication device **200** has stored therein a list of URLs **286** of which the communication device **200** is aware. The communication device **200** becomes aware of a URL each time that the communication device **200** receives a request for information located at a specific URL. As shown by FIG. **7**, for each URL **288** within the list of URLs **286**, the cache database **282** stores: the URL itself **290**; HTTP headers **292** returned by the Web Server **152** for this URL; when the last time **294** was that the contents of this URL were loaded directly from the Web Server **152**; when the contents of the URL last changed **296** on the Web Server **152**; and a list of chunks **298** that contain the contents of this URL, and the content of the chunk. As previously mentioned, chunks, in the present description, are defined as equally sized pieces of data that together form the entire content of the URL, namely, the entire content whose location is described by the URL. As a non-limiting example, a chunk size of, for example, 16 KB can be used, so that any HTTP response will be split up into chunks of 16 KB. In accordance with an alternative embodiment of the invention, if the last chunk of the response is not

Appx1163

US 11,044,342 B2

11

large enough to fill the designated chunk size, such as 16 KB for the present example, the remaining portion of the chunk will be left empty.

For each such chunk **300**, the cache database **282** includes the checksum of the chunk **302**, the data of the chunk **304** itself, and a list of peers **306** that most likely have the data for this chunk. As is described in additional detail herein, the data for the chunk may be used by other clients within the communication network **100** when other communication devices of the communication network **100** serve as peers to the clients, from which to download the chunk data.

For each chunk, a checksum is calculated and stored along side of the chunk itself. The checksum may be calculated in any of numerous ways known to those in the art. The purpose of having the checksum is to be able to identify data uniquely, whereas the checksum is the "key" to the data, where the data is the chunk. As an example, a client may want to load the contents of a URL, resulting in the agent that is servicing this request sending the checksums of the chunks to the client, along with the peers that store these chunks. It is to be noted that there could be a different peer for every different chunk. The client then communicates with each such peer, and provides the checksum of the chunk that it would like the peer to transmit back to the client. The peer looks up the checksum (the key) in its cache database, and provides back the chunk (data) that corresponds to this checksum (the key). As shown by FIG. **7**, for each peer **308** within the list of peers **306**, the cache database **282** includes the peer IP address **310**, as well as the connection status **312** of the peer, which represents whether the peer **308** is online or not.

In accordance with one embodiment of the invention, the cache database **282** may be indexed by URL and by Checksum. Having the cache database indexed in this manner is beneficial due to the following reason. When the agent is using the cache database, the agent receives a request from a client for the URL that the client is looking for. In such a case the agent needs the cache database to be indexed by the URL, to assist in finding a list of corresponding peers that have the chunks of this URL. When the peers are using this cache database, the peers obtain a request from the client for a particular checksum, and the peers need the database to be indexed by the checksum so that they can quickly find the correct chunk. Of course, as would be understood by one having ordinary skill in the art, the cache database may instead be indexed in any other manner.

Having described components of the communication network **100**, the following further describes how such components interact and individually function. FIG. **8** is a flowchart **300** illustrating operation of the acceleration system initializer module **222** (hereafter referred to as the initializer **222** for purposes of brevity). It should be noted that any process descriptions or blocks in flowcharts should be understood as representing modules, segments, portions of code, or steps that include one or more instructions for implementing specific logical functions in the process, and alternative implementations are included within the scope of the present invention in which functions may be executed out of order from that shown or discussed, including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art of the present invention.

The initializer **222** is the first element of the communication device **200** to operate as the communication device **200** starts up (block **302**). As the initializer **222** starts, it first communicates with the acceleration server **162** to sign up with the acceleration server **162**. This is performed by

12

providing the acceleration server **162** with the hostname, and all IP addresses and media access control (MAC) addresses of the interfaces on the communication device **200** having the initializer **222** thereon.

In accordance with an alternative embodiment of the invention, as shown by block **304**, the initializer **222** checks with the acceleration server **162** whether a more updated version of the acceleration application software is available. This may be performed by any one of many known methods, such as, but not limited to, by providing the version number of the acceleration application software to the acceleration server **162**. The message received back from the acceleration server **162** indicates whether there is a newer version of the acceleration application software or not. If a newer version of the acceleration application software exists, the initializer **222** downloads the latest version of the acceleration application software from the acceleration server **162**, or from a different location, and installs the latest version on the communication device **200**. In addition to the abovementioned, the initializer **222** may also schedule additional version checks for every set period of time thereafter. As an example, the initializer **222** may check for system updates every two days.

As shown by block **306**, the initializer **222** then redirects outgoing network traffic from the communication device **200** to flow through the acceleration application **162**. As previously mentioned, one way to redirect the outgoing network traffic is to insert an intermediate driver **212** that intercepts and redirects the traffic. It should be noted that there are many other ways to implement this redirection, which are well known to those having ordinary skill in the art.

As shown by block **308**, the initializer **222** then launches the client module **224** of the communication device **200**, and configures the client module **224** of the communication device **200** to intercept to all outgoing network communications of the communication device **200** and route the outgoing network communications to the client module **224**, from the intermediate driver **272** or other routing method implemented. This is performed so that the client module **224** is able to receive all network traffic coming from the network applications, modify the network traffic if necessary, and re-route the traffic. As is known by those having ordinary skill in the art, in order to re-route the traffic, the traffic needs to be modified, as an example, to change the destination of requests.

As shown by block **310**, the initializer **222** then launches the agent module **228** and the peer module **226** to run on the communication device **200**. The agent module **228** and peer module **226** listen on pre-determined ports of the communication device **200**, so that incoming network traffic on these ports gets routed to the agent module **228** and peer module **226**. As is explained in further detail herein, the abovementioned enables the communication device **200** to function as an agent and as a peer for other communication devices within the communication network **100**, as needed.

FIG. **9** is a flowchart **350** further illustrating communication between different elements of the communication network **100**, in accordance with the present system and method for providing faster and more efficient data communication.

As shown by block **352**, an application running on the client **200** initiates a request for a resource on a network. Such a request may be, for example, "GET http://www.aol.com/index.html HTTP/1.1". The request may come from an Internet browser **214** located on the client **200**, where the Internet browser **214** is loading a page from the Internet, an

Appx1164

US 11,044,342 B2

13
14

application that wants to download information from the Internet, fetch or send email, or any other network communication request.

Through the intermediate driver **272**, or other such mechanism as may be implemented that is re-routing the communication to the client module **224** of the client **200**, the resource request is intercepted by the client module **224** that is running on the client **200** (block **354**). The client module **224** then looks up the IP address of the server **152** that is the target of the resource request (e.g., the IP address of the Web server that is the host of www.aol.com in the example above), and sends this IP address to the acceleration server **162** (block **356**) in order to obtain a list of communication devices that the client **200** can use as agents (hereafter referred to as agents). It should be noted that the process of performing an IP lookup for a server is known by one having ordinary skill in the art, and therefore is not described further herein.

In response to receiving the IP address of the server **152**, the acceleration server **162** prepares a list of agents that may be suitable to handle the request from this IP address (block **358**). The size of the list can differ based on implementation. For exemplary purposes, the following provides an example where a list of five agents is prepared by the acceleration server **162**. The list of agents is created by the acceleration server **162** by finding the communication devices of the communication network **100** that are currently online, and whose IP address is numerically close to the IP of the destination Web server **152**. A further description of the abovementioned process is described here in.

As shown by block **360**, the client module **224** then sends the original request (e.g., "GET http://www.aol.com/index-.html HTTP/1.1") to all the agents in the list received from the acceleration server **162** in order to find out which of the agents in the list is best suited to be the one agent that will assist with this request.

It should be noted that, in accordance with an alternative embodiment of the invention, the communication device **200** may be connected to a device that is actually requesting data. In such an alternative embodiment, the communication device would be a modular device connected to a requesting device, where the requesting device, such as, for example, a personal data assistant (PDA) or other device, would request data, and the communication device connected thereto, either through a physical connection, wireless connection, or any other connection, would receive the data request and function as described herein. In addition, as previously mentioned, it should be noted that the HTTP request may be replaced by any request for resources on the Web.

FIG. **10** is a flowchart continuing the flowchart **380** of FIG. **9** and focused on agent response to the request. As shown by block **382**, upon receiving the request from the client **200**, each agent that received the request from the client responds to the client **200** with whether it has information regarding the request, which can help the client to download the requested information from peers in the network. Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have.

As shown by block **384**, the client then decides which of the agents in the list to use as its agent for this particular information request. To determine which agent in the list to use as its agent for the particular information request, the client may consider multiple factors, such as, for example, factoring the speed of the reply by each agent and whether that agent does or does not have the information required. There are multiple ways to implement this agent selection, one practical way being to start a timer of a small window of time, such as, for example, 5 ms, after receiving the first response from the agents, and after the small window, choosing from the list of agents that responded, the agent that has the information about the request, or in the case that none of the agents responded, to choose the first agent from the list received from the acceleration server **162**.

As shown by block **386**, after selecting an agent, the client notifies the selected agent that it is going to use it for this request, and notifies the other agents that they will not be used for this request. The client then sends the selected agent a request for the first five chunks of data of the original information request (block **388**). By specifying to the selected agent the requested chunks by their order in the full response, the client receives the peer list and checksums of the requested chunks from the selected agent. As an example, for the first five chunks the client will ask the selected agent for chunks one through five, and for the fourth batch of five chunks the client will ask the agent for chunks sixteen through twenty. As previously mentioned, additional or fewer chunks may be requested at a single time.

As shown by block **390**, after receiving the request from the client, the selected agent determines whether it has information regarding the requested chunks of data by looking up the request in its cache database and determining if the selected agent has stored therein information regarding peers of the communication network that have stored the requested data of the request, or whether the selected agent itself has the requested data of the request stored in its memory. In addition to determining if the selected agent contains an entry for this request in its database, the selected agent may also determine if this information is still valid. Specifically, the selected agent determines whether the data that is stored within the memory of the selected agent or the memory of the peers, still mirrors the information that would have been received from the server itself for this request. A further description of the process utilized by the selected agent to determine if the information is still valid, is described in detail herein.

As shown by block **392**, if the information (requested data of the request) exists and is still valid, then the agent prepares a response to the client, which includes for each of the chunks: (i) the checksum of the chunk; (ii) a list of peers that according to the database of the selected agent contains these chunks; and (iii) if these are the first five chunks of the information, then the selected agent also provides the specific protocol's headers that would have been received from the server, had the initial request from the client been made directly to the server.

As shown by block **394**, the list of peers for each chunk is sorted by geographical proximity to the requesting client. In accordance with the present example, only the five closest peers are kept in the list for every chunk, and the rest of the peers are discarded from this list. As shown by block **396**, the prepared response, namely, the list of closest peers, is sent back to the client. It should be noted that, if this were the last set of chunks to be provided for this request, then it would be beneficial to include information about this to the client.

If the selected agent discovers that it does not have information about this request, or if the selected agent discovers that the information it has is no longer valid, the selected agent needs to load the information directly from the server in order to be able to provide an answer to the requesting client. As shown by block **400**, the selected agent

Appx1165

US 11,044,342 B2

15

then sends the request directly to the server. The selected agent then stores the information it receives from the server (both the headers of the request, as well as chunks of the response itself) in its database, for this particular response to the client, as well as for future use to other clients that may request this data (block 402). The selected agent then prepares a response (list) for the client, where the response includes the protocol headers (if these are the first five chunks), and the checksums of the five chunks, and provides itself as the only peer for these chunks (block 404). This list is then sent back to the client (block 406).

FIG. 11 is a flowchart 420 continuing the flowchart of FIG. 10, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent. As shown by block 422, the client receives the response from the agent (including the list of chunks and their corresponding data, including peers and other information previously mentioned) and, for each of the five chunks, the client sends a request to each of the peers listed for the chunk to download the chunk. The chunk request that the client sends to each of the peers is the checksum of the data that the client seeks to receive, which is the key (identifier) of the chunk.

As shown by block 424, the peers then respond regarding whether they still have the data of the chunk. As an example, some of the peers may not currently be online, some may be online but may have discarded the relevant information, and some may still have the relevant information, namely, the chunk. As shown by block 426, the client then selects the quickest peer that responds with a positive answer regarding the requested information, the client lets that peer know that it is chosen to provide the client with the chunk, and the client notifies the other peers that they are not chosen.

As shown by block 428, the chosen peer then sends the chunk to the client. It should be noted that if no peers answer the request of the client, the client goes back to the agent noting that the peers were all negative, and the agent either provides a list of 5 other agents, if they exist, or the agent goes on to download the information directly from the Web server as happens in the case where no peers exist as described above.

The client then stores the chunks in its cache for future use (block 430), when the client may need to provide the chunks to a requesting communication device when acting as a peer for another client that is looking for the same information. As shown by block 432, if some of the chunks were not loaded from any of the peers, the client requests the chunks again from the agent in a next round of requests, flagging these chunks as chunks that were not loadable from the client list of peers. In this situation, the agent will load the data directly from the server and provide it back to the client.

The client then acknowledges to the agent which of the chunks it received properly (block 434). The agent then looks up these chunks in the database of the agent, and adds the client to the list of peers for these chunks, specifically, since this client is now storing these chunks, and can provide these chunks to other clients that turn to it as a peer (block 436).

As shown by block 438, the client then passes the data on to the Web browser or other application of the client that made the original request, for it to use as it had originally intended. The client then checks whether all of the chunks for this request were received (block 440), by checking the flag set by the agent. Specifically, when the agent is providing the list of the last 5 chunks, the agent includes that information as part of its reply to the client, which is referred

16

to herein as a flag. This information is what enables the client to know that all information has been received for a particular resource request.

If the last received chunks were not the last chunks for this request, the processing flow of the client continues by returning to the functionality of block 384 of FIG. 10, but instead sending the chosen agent a request for the next five chunks of data of the original information request. Alternatively, if all chunks for this request were received, the request is complete, and the flow starts again at block 352 of FIG. 9.

FIG. 12 is a flowchart 500 illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. Specifically, the following provides an example of how the agent, client, or peer can determine whether particular data that is stored within the memory of the agent, or the memory of a peer or client, still mirrors the information that is currently on the Web server. As shown by block 502, the HTTP request is looked up in the cache database of the agent, client or peer that is checking the validity of the HTTP request. As an example, the HTTP protocol, defined by RFC 2616, outlines specific methods that Web servers can define within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information such as "max age" to indicate how long this data may be cached before becoming invalid, "no cache" to indicate that the data may never be cached, and using other information.

As shown by block 504, these standard methods of validation are tested on the HTTP request information in question. As shown by block 506, a determination is made whether the requested information that is stored is valid or not. If the requested information is valid, a "VALID" response is returned (block 508). Alternatively, if the requested information is not valid, an HTTP conditional request is sent to the relevant Web server, to determine if the data stored for this request is still valid (block 510). If the data stored for this request is still valid, a "VALID" response is returned (block 508). Alternatively, if the data stored for this request is not valid, an "INVALID" response is returned (block 514). It should be noted, that the abovementioned description with regard to FIG. 12 is an explanation of how to check if HTTP information is still valid. There are similar methods of determining validity for any other protocol, which may be utilized, and which those having ordinary skill in the art would appreciate and understand.

FIG. 13 is a flowchart 550 outlining operation of the acceleration server, whose main responsibility in the present system and method is to provide clients with information regarding which agents serve which requests, and to keep the network elements all up to date with the latest software updates. As shown by block 552, the acceleration server sends "keep alive" signals to the network elements, and keeps track within its database as to which network elements are online. As shown by block 554, the acceleration server continues to wait for a client request and continues to determine if one is received.

Once a request is received, the acceleration server tests the type of request received (block 556). If the client request is to sign up the client within the network, an event that happens every time that the client starts running on its host machine, then that client is added to the list of agents stored on the acceleration server, sorted by the IP address of the client (block 558).

If the request is to find an agent to use for a particular request, the acceleration server creates a new agent list, which is empty (block 560). The acceleration server then

Appx1166

US 11,044,342 B2

17

searches the agent database for the next 5 active agents whose IP address is closest to the IP address of the server who is targeted in the request (block 562). In this context, 192.166.3.103 is closer to 192.166.3.212 than to 192.167.3.104. The acceleration server then sends this agent list to the client (block 564).

If instead, the request is to check the version of the latest acceleration software then the acceleration server sends that network element (client, peer or agent) the version number of the latest existing acceleration software version, and a URL from where to download the new version, for the case that the element needs to upgrade to the new version (block 566).

While the abovementioned example is focused on HTTP requests for data, as previously mentioned, other protocol requests are equally capable of being handled by the present system and method. As an example, in separate embodiments the acceleration method described may accelerate any communication protocol at any OSI layer (SMTP, DNS, UDP, ETHERNET, etc.). In the following alternative embodiment, it is illustrated how the acceleration method may accelerate TCPIP. As is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol. For purposes of illustration of TCPIP communication, reference may be made to FIG. 3, wherein the Web server is a TCPIP server.

In TCPIP there are three communication commands that are of particular interest, namely, connect, write, and read. Connect is a command issued by an application in the communication device that is initiating the communication to instruct the TCPIP stack to connect to a remote communication device. The connect message includes the IP address of the communication device, and the port number to connect to. An application uses the write command to instruct the TCPIP stack to send a message (i.e., data) to a communication device to which it is connected. In addition, an application uses the read command to ask the TCPIP stack to provide the message that was sent from the remote communication device to which it is connected. A communication session typically exists of a connect, followed by a read and write on both sides.

FIG. 14 is a flowchart 600 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention. As shown by blocks 601 and 602 when an application of the communication device makes a request to the communications stack to connect with the TCPIP server, that communication is intercepted by the acceleration application.

To find an agent, upon receiving that connect message from the communication device application, which includes the IP address of the TCPIP server and the port to connect to, the acceleration application in the client makes a request to the acceleration server to find out who the agent for the communication with the TCPIP server is. This step is performed in a similar manner to that described with regard to the main HTTP embodiment of the invention (block 604). As shown by block 606, the server then provides the client with a list of agents, for example, a primary agent and four others.

To establish a connection, as shown by block 608, the client issues a TCPIP connect with the primary agent or one of the other agents if the primary agent does not succeed, to create a connection with the agent. The client then sends to the agent the IP address of the TCPIP server and connection port that were provided by the communication device application (block 610). As shown by block 612, that agent in turn

18

issues a TCPIP connect to the TCPIP server to the port it received from the client, to create a connection with the agent.

FIG. 15 is a flowchart 800 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

As shown by block 802, if the network application within the client wants to send a message to the TCPIP server, the network application within the client writes the message to the TCPIP stack in the operating system of the client. This WRITE command is received by the acceleration application of the client and handled in the manner described below. If the TCPIP server wants to send a message to the client, the TCPIP server writes the message to the TCPIP stack of TCPIP operating system, on the connection to the agent, since this agent is where the server received the original connection. This WRITE command is received by the acceleration application of the agent and handled in the manner described below.

When the acceleration application of the client receives a message from the network application of the client to be sent to the agent, or when the acceleration application of the agent receives a message from the connection to the TCPIP server that is to be sent to the client, the acceleration application proceeds to send the message to the communication device on the other side. For instance, if the client has intercepted the message from the communication application, the client sends the message to the agent, and if it is the agent that intercepted the message from the connection to the TCPIP server, such as the TCPIP server sending a message that is intended for the communication with client, the agent sends the message to the client in the following manner:

As shown by block 804, the acceleration application breaks up the content of the message to chunks and calculates the corresponding checksums, in the same manner as in the main embodiment described herein. The acceleration application then looks up each checksum in its cache database (block 806). As shown by block 808, the acceleration application checks if the checksum exists in the cache database. Hit does, then, as shown by block 810, the acceleration application prepares a list of peers that have already received the chunk of the checksum in the past (if any), and adds the communication device of the other side to the list of communication devices that have received this chunk (adds it to the peer list of the checksum in its database), to be provided to other communication devices requesting this information in the future. As shown by block 812, the list of peers is sent to the receiving communication device, which, as shown by block 814 retrieves the chunks from the peers in the list received, in the same manner as in the main embodiment.

If the checksum does not exist within the cache database of the sending communication device then, as shown by block 820, the acceleration application adds the checksum and chunk to its cache database, sends the chunk to the communication device on the other side, and adds the other communication device to the list of peers for that checksum in its database.

As shown by block 816, a determination is then made as to whether all chunks have been received. If all chunks have not been received, the process continues on again from block 806.

Once all data has been received, as shown by block 818, the acceleration application passes the data on to the

Appx1167

19

20

requester. Specifically, in the client, the acceleration application passes on the complete data to the communication application, and in the agent, the acceleration application passes on the complete data to the requesting TCPIP server.

It should be emphasized that the above-described embodiments of the present invention are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiments of the invention without departing substantially from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

The invention claimed is:

**1**. A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content that is identified by a first Uniform Resource Locator (URL), the method by a first client device comprising:

    executing, by the first client device, a web browser application or an email application;

    establishing a Transmission Control Protocol (TCP) connection with a second server;

    receiving, the first content from the web server over an Internet; and

    sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first URL.

**2**. The method according to claim **1**, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the first client MAC address, or the first client hostname.

**3**. The method according to claim **2**, for use with a first application stored in the first client device and associated with a first version number, wherein the first message comprises the first version number.

**4**. The method according to claim **3**, for use with a second application that is a version of the first application, is stored in the second server, and is associated with a second version number, wherein the method further comprising receiving, by the first client device from the second server, in response to the first message, a second message that comprises the second version number.

**5**. The method according to claim **4**, wherein the method further comprising downloading over the Internet, by the first client device from the second server, in response to the first message, the second application from the second server, and installing the second application in the first client device as a replacement for the first application.

**6**. The method according to claim **1**, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second URL, the method by the first client device further comprising:

    receiving the second URL;

    sending, to the third server over the Internet in response to the receiving, the second URL; and

    receiving the second content from the third server over the Internet in response to the sending.

**7**. The method according to claim **6**, further comprising executing, by the first client device, a web browser application or an email application.

**8**. The method according to claim **1**, further comprising periodically communicating over the TCP connection between the second server and the first client device.

**9**. The method according to claim **8**, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**10**. The method according to claim **1**, further comprising determining, by the first client device, that the received first content, is valid.

**11**. The method according to claim **10**, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**12**. The method according to claim **10**, further comprising:

    sending, a message over the Internet in response to the determining that the received first content, is not valid; and

    receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first content.

**13**. The method according to claim **1**, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first URL, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

    downloading, by the first client device from the Internet, the software application; and

    installing, by the first client device, the downloaded software application.

**14**. The method according to claim **13**, wherein the software application is downloaded from the second server.

**15**. The method according to claim **1**, further comprising receiving, by the first client device from the second server over the established TCP connection, the first URL.

**16**. The method according to claim **1**, wherein the sending of the first URL to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first URL.

**17**. The method according to claim **1**, further comprising storing, by the first client device in response to the receiving from the web server, the first content.

**18**. The method according to claim **1**, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

**19**. The method according to claim **1**, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP #, SMTP, or SQL standards.

**20**. The method according to claim **1**, wherein the first content comprises web-page, audio, or video content.

**21**. The method according to claim **1**, further comprising sending, to the web server over the Internet, the first URL, and wherein the receiving of the first content from the web server is in response to the sending of the first URL.

Appx1168

US 11,044,342 B2

21

22

**22**. The method according to claim **1**, further comprising storing, operating, or using, a client operating system.

**23**. The method according to claim **1**, wherein the steps are sequentially executed.

**24**. A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **1**.

\* \* \* \* \*

Page 33 of 33

Appx1169



US010257319B2

(12) **United States Patent**     (10) **Patent No.:     US 10,257,319 B2**
Shribman et al.                                      (45) **Date of Patent:          Apr. 9, 2019**

(54) **SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION**

(71) Applicant: **WEB SPARK LTD.**, Netanya (IL)

(72) Inventors: **Derry Shribman**, Tel Aviv (IL); **Ofer Vilenski**, Moshav Hadar Am (IL)

(73) Assignee: **WEB SPARK LTD.**, Netanya (IL)

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/957,945**

(22) Filed:     **Apr. 20, 2018**

(65) **Prior Publication Data**

US 2018/0241851 A1     Aug. 23, 2018

**Related U.S. Application Data**

(60) Continuation of application No. 14/025,109, filed on Sep. 12, 2013, which is a division of application No.
(Continued)

(51) **Int. Cl.**
**H04L 29/06**     (2006.01)
**H04L 29/08**     (2006.01)
**H04L 12/24**     (2006.01)

(52) **U.S. Cl.**
CPC ............ **H04L 67/42** (2013.01); **H04L 41/046** (2013.01); **H04L 67/1002** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... H04L 67/42; H04L 41/046; H04L 67/108; H04L 67/22
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,922,494 A     11/1975   Cooper et al.
4,937,781 A     6/1990    Lee et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN     101075242 A     11/2007
CN     101179389 A     5/2008
(Continued)

OTHER PUBLICATIONS

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages).
(Continued)

*Primary Examiner* — Minh Chau Nguyen
(74) *Attorney, Agent, or Firm* — May Patents Ltd. c/o Dorit Shem-Tov

(57)                    **ABSTRACT**

A system designed for increasing network communication speed for users, while lowering network congestion for content owners and ISPs. The system employs network elements including an acceleration server, clients, agents, and peers, where communication requests generated by applications are intercepted by the client on the same machine. The IP address of the server in the communication request is transmitted to the acceleration server, which provides a list of agents to use for this IP address. The communication request is sent to the agents. One or more of the agents respond with a list of peers that have previously seen some or all of the content which is the response to this request (after checking whether this data is still valid). The client then downloads the data from these peers in parts and in parallel, thereby speeding up the Web transfer, releasing congestion from the Web by fetching the information from multiple sources, and relieving traffic from Web servers by offloading the data transfers from them to nearby peers.

**29 Claims, 15 Drawing Sheets**



Data Co Exhibit 1001
Data Co v. Bright Data

**US 10,257,319 B2**

Page 2

### Related U.S. Application Data

12/836,059, filed on Jul. 14, 2010, now Pat. No. 8,560,604.

(60) Provisional application No. 61/249,624, filed on Oct. 8, 2009.

(52) **U.S. Cl.**
    CPC ........ *H04L 67/108* (2013.01); *H04L 67/1023* (2013.01); *H04L 67/1063* (2013.01); *H04L 67/22* (2013.01); *H04L 67/2814* (2013.01); *H04L 67/2819* (2013.01); *H04L 67/02* (2013.01)

(58) **Field of Classification Search**
    USPC .......................................................... 709/202
    See application file for complete search history.

(56)                    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,577,243 A | 11/1996 | Sherwood et al. | |
| 5,758,195 A | 5/1998 | Balmer | |
| 6,061,278 A | 5/2000 | Kato et al. | |
| 6,154,782 A | 11/2000 | Kawaguchi | |
| 6,173,330 B1 | 1/2001 | Guo et al. | |
| 6,466,470 B1 | 10/2002 | Chang | |
| 6,868,453 B1 * | 3/2005 | Watanabe ........ | G06F 17/30861 707/E17.107 |
| 7,120,666 B2 | 10/2006 | McCanne et al. | |
| 7,203,741 B2 | 4/2007 | Marco et al. | |
| 7,558,942 B1 | 7/2009 | Chen et al. | |
| 7,788,378 B2 | 8/2010 | Rao | |
| 7,818,430 B2 | 10/2010 | Zuckerman | |
| 7,865,585 B2 | 1/2011 | Samuels et al. | |
| 7,890,547 B2 | 2/2011 | Hotti | |
| 7,970,835 B2 | 6/2011 | St. Jacques | |
| 8,135,912 B2 | 3/2012 | Shribman et al. | |
| 8,171,101 B2 | 5/2012 | Gladwin et al. | |
| 8,479,251 B2 | 7/2013 | Feinleib et al. | |
| 8,499,059 B2 | 7/2013 | Stoyanov | |
| 8,595,786 B2 * | 11/2013 | Choi ....................... | H04L 1/005 725/151 |
| 8,769,035 B2 | 1/2014 | Resch et al. | |
| 8,719,505 B2 | 5/2014 | Shribman et al. | |
| 8,832,179 B2 | 9/2014 | Owen et al. | |
| 9,201,808 B2 | 12/2015 | Shribman et al. | |
| 9,253,164 B2 | 2/2016 | Gouge | |
| 9,990,295 B2 | 6/2018 | Shribman et al. | |
| 2001/0033583 A1 | 10/2001 | Rabenko et al. | |
| 2002/0007413 A1 | 1/2002 | Garcia-Luna-Aceves et al. | |
| 2002/0065930 A1 | 5/2002 | Rhodes | |
| 2002/0069241 A1 | 6/2002 | Narlikar et al. | |
| 2002/0120874 A1 | 8/2002 | Shu et al. | |
| 2002/0123895 A1 | 9/2002 | Potekhin | |
| 2002/0133621 A1 | 9/2002 | Marco et al. | |
| 2003/0009518 A1 | 1/2003 | Harrow et al. | |
| 2003/0009583 A1 | 1/2003 | Chan et al. | |
| 2003/0074403 A1 | 4/2003 | Harrow et al. | |
| 2003/0097408 A1 | 5/2003 | Kageyama | |
| 2003/0115364 A1 | 6/2003 | Shu et al. | |
| 2003/0174648 A1 | 9/2003 | Wang et al. | |
| 2003/0200307 A1 | 10/2003 | Raju et al. | |
| 2003/0204602 A1 | 10/2003 | Hudson et al. | |
| 2003/0210694 A1 | 11/2003 | Jayaraman et al. | |
| 2004/0088646 A1 | 5/2004 | Yeager et al. | |
| 2004/0107242 A1 | 6/2004 | Vert et al. | |
| 2004/0254907 A1 | 12/2004 | Crow et al. | |
| 2004/0264506 A1 | 12/2004 | Furukawa | |
| 2005/0015552 A1 | 1/2005 | So et al. | |
| 2005/0022236 A1 | 1/2005 | Ito et al. | |
| 2005/0097441 A1 * | 5/2005 | Herbach ................ | G06F 21/10 715/229 |
| 2005/0228964 A1 | 10/2005 | Sechrest et al. | |
| 2006/0036755 A1 | 2/2006 | Abdullah | |
| 2006/0212542 A1 * | 9/2006 | Fang .................... | H04L 67/104 709/219 |
| 2006/0212584 A1 * | 9/2006 | Yu ..................... | G06F 17/30902 709/227 |
| 2006/0259728 A1 | 11/2006 | Chandrasekaran et al. | |
| 2007/0073878 A1 | 3/2007 | Issa | |
| 2007/0100839 A1 | 5/2007 | Kim | |
| 2007/0156855 A1 | 7/2007 | Johnson | |
| 2007/0226810 A1 | 9/2007 | Hotti | |
| 2007/0239655 A1 | 10/2007 | Agetsuma | |
| 2008/0008089 A1 | 1/2008 | Bornstein et al. | |
| 2008/0025506 A1 | 1/2008 | Muraoka | |
| 2008/0109446 A1 | 5/2008 | Wang | |
| 2008/0125123 A1 | 5/2008 | Dorenbosch | |
| 2008/0222291 A1 | 9/2008 | Weller et al. | |
| 2008/0235391 A1 | 9/2008 | Painter et al. | |
| 2008/0086730 A1 | 10/2008 | Vertes | |
| 2008/0256175 A1 | 10/2008 | Lee | |
| 2009/0037529 A1 | 2/2009 | Armon-Kest | |
| 2009/0182843 A1 | 7/2009 | Hluchyj | |
| 2009/0217122 A1 | 8/2009 | Yokokawa et al. | |
| 2009/0279559 A1 | 11/2009 | Wong et al. | |
| 2009/0319502 A1 | 12/2009 | Chalouhi et al. | |
| 2010/0066808 A1 | 3/2010 | Tucker et al. | |
| 2010/0085977 A1 | 4/2010 | Khalid et al. | |
| 2010/0094970 A1 | 4/2010 | Zuckerman | |
| 2010/0115063 A1 | 6/2010 | Gladwin et al. | |
| 2010/0154044 A1 | 6/2010 | Manku | |
| 2010/0235438 A1 | 9/2010 | Narayanan et al. | |
| 2010/0293355 A1 | 11/2010 | Vepsalainen | |
| 2010/0329270 A1 | 12/2010 | Asati et al. | |
| 2011/0035503 A1 * | 2/2011 | Zaid .................... | H04L 63/0407 709/228 |
| 2011/0066924 A1 | 3/2011 | Dorso | |
| 2011/0087733 A1 | 4/2011 | Shribman et al. | |
| 2011/0128911 A1 | 6/2011 | Shaheen | |
| 2011/0314347 A1 | 12/2011 | Nakano et al. | |
| 2012/0099566 A1 | 4/2012 | Laine et al. | |
| 2012/0124173 A1 | 5/2012 | De et al. | |
| 2012/0124239 A1 | 5/2012 | Shribman et al. | |
| 2012/0254370 A1 | 10/2012 | Bacher | |
| 2012/0254456 A1 | 10/2012 | Visharam et al. | |
| 2013/0007253 A1 | 1/2013 | Li | |
| 2013/0157699 A1 | 6/2013 | Talwar | |
| 2013/0166768 A1 | 6/2013 | Gouache et al. | |
| 2013/0201316 A1 | 8/2013 | Binder et al. | |
| 2013/0272519 A1 | 10/2013 | Huang | |
| 2013/0326607 A1 | 12/2013 | Feng | |
| 2014/0082260 A1 | 3/2014 | Oh et al. | |
| 2014/0301334 A1 | 10/2014 | Labranche | |
| 2014/0376403 A1 | 12/2014 | Shao | |
| 2015/0033001 A1 | 1/2015 | Ivanov | |
| 2015/0067819 A1 | 3/2015 | Shribman et al. | |
| 2015/0358648 A1 | 12/2015 | Limberg | |
| 2016/0021430 A1 | 1/2016 | LaBosco et al. | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0948176 A2 | 10/1999 |
| EP | 2597869 A1 | 12/2013 |
| EP | 2597869 A1 | 5/2015 |
| JP | 2007280388 | 10/2007 |
| KR | 1020090097034 | 9/2009 |
| RU | 2343536 C2 | 10/2009 |
| WO | 2000/018078 A1 | 3/2000 |
| WO | 2010090562 A1 | 8/2010 |
| WO | 2011068784 A1 | 6/2011 |
| WO | 2015034752 A1 | 3/2015 |

#### OTHER PUBLICATIONS

Notice of Preliminary Rejection in KR Application No. 10-2012-7011711 dated Jul. 15, 2016.

Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Report, The Institute of Electronics, Information and Communication Engineers, May 14, 2009.

US 10,257,319 B2

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

International Search Report dated in PCT Application No. PCT/US2010/051881 dated Dec. 9, 2010.
Supplementary European Search Report dated in EP Application No. 10822724 dated Apr. 24, 2013.
Screen captures from YouTube video clip entitle "nVpn.net | Double your Safety and use Socks5 + nVpn" 38 pages, last accessed Nov. 20, 2018 <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
Screen captures from YouTube video clip entitle "Andromeda" 47 pages, publicly known and available as of at least 2011 <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
SpyEye, https://www.symantec.com/security-center/writeup/2010-020216-0135-9; http://securesql.info/riskyclouds/spyeye-user-manual; known as of at least 2010 (13 pages).
Screen captures from YouTube video clip entitle "Change Your Country IP Address & Location with Easy Hide IP Software" 9 pages, publicly known and available as of at least 2011, <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.
CoralCDN ("CoralCDN"), https://pdos.csail.mit.edu/6.824/papers/freedman-coral.pdf (14 Pages).

European Search Report for EP 14182547.1, dated Jul. 30, 2015.
R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002].
"On the leakage of personally identifiable information via online social networks", Wills et al. AT&T, Apr. 2009 http://www2.research.att.com/-bala/papers/wosn09.pdf.
"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Computer Science Dept., Oct. 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf.
International Search Report of PCT/US2010/034072 dated Jul. 1, 2010.
YouTube video clip entitled "nVpn.net | Double your Safety and use Socks5 + nVpn" <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
YouTube video clip entitled "Andromeda" <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
YouTube video clip entitled "Change Your Country IP Address & Location with Easy Hide IP Software" <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.

* cited by examiner



**FIG. 1**

Appx1173



**FIG. 2**



**FIG. 3**



FIG. 4



**FIG. 5**



FIG. 6



**FIG. 7**

162

| ACCELERATION DATABASE 164 | | |
|---|---|---|
| 166 AGENT IP A ONLINE/OFFLINE | | |
| >>> INDEXED BY : AGENT IP ADDRESS | | |
| CACHE DATABASE 282 | | |
| 286 LIST OF URLs: | | |
| 288 URL 1 | | |
| 290 URL | | |
| 292 URL HTTP HEADERS | | |
| 294 LAST CHECKED ON SERVER | | |
| 296 LAST CHANGED ON SERVER | | |
| 298 LIST OF CHUNKS FOR THIS URL: | | |
| 300 CHUNK 1 | | |
| 302 CHUNK CHECKSUM | | |
| 304 CHUNK DATA | | |
| 306 LIST OF PEERS: | | |
| 308 PEER 1 | | |
| 310 PEER 1 IP ADDRESS | | |
| 312 PEER 2 CONNECTION STATUS | | |



FIG. 8



**FIG. 9**

Appx1181



FIG. 10

Appx1182



CLIENT RECEIVES RESPONSE FROM THE AGENT AND FOR EACH OF X CHUNKS, CLIENT SENDS A REQUEST TO EACH OF THE PEERS LISTED FOR THE CHUNK TO DOWNLOAD THE DATA OF THAT CHUNK          422

PEERS RESPOND REGARDING WHETHER THEY STILL HAVE THE DATA OF THE CHUNK          424

CLIENT SELECTS QUICKEST PEER WITH DATA OF THE CHUCK          426

CHOSEN PEER SENDS CHUNK TO CLIENT          428

CLIENT STORES CHUNKS IN ITS CACHE FOR FUTURE USE          430

IF ANY CHUNKS WERE NOT LOADED FROM ANY OF THE PEERS, CLIENT REQUESTS CHUNKS AGAIN FROM AGENT          432

CLIENT ACKNOWLEDGES TO THE AGENT WHICH OF THE CHUNKS IT RECEIVED PROPERLY          434

AGENT LOOKS UP CHUNKS IN DATABASE OF AGENT AND ADDS CLIENT TO LIST OF PEERS FOR THESE CHUNKS          436

CLIENT PASSES DATA TO APPLICATION OF CLIENT THAT MADE REQUEST 438

CLIENT CHECKS WHETHER ALL OF THE CHUNKS FOR REQUEST WERE RECEIVED 440

FIG. 11

420



**FIG. 12**



**FIG. 13**



600

NETWORK APPLICATION ON CLIENT ISSUES REQUEST TO
CONNECT TO A TCPIP SERVER
601

CONNECTION REQUEST IS INTERCEPTED BY
ACCELERATION APPLICATION ON THE CLIENT
602

CLIENT MODULE SENDS THE IP ADDRESS OF THE TCPIP
SERVER TO THE ACCELERATION SERVER TO OBTAIN AN
AGENT LIST
604

ACCELERATION SERVER PREPARES A LIST OF AGENTS
THAT MAY BE SUITABLE TO HANDLE THE REQUEST FROM
THIS IP ADDRESS (FOR EXAMPLE, A PRIMARY AGENT AND
FOUR SECONDARY AGENTS), AND SENDS THE LIST TO THE
CLIENT
606

CLIENT ISSUES A TCPIP CONNECT WITH THE PRIMARY
AGENT (OR ONE OF THE OTHER AGENTS IF THE PRIMARY
AGENT CONNECT DOES NOT SUCCEED) TO ESTABLISH A
TCPIP CONNECTION WITH AN AGENT
608

CLIENT SENDS TO THE AGENT THE IP ADDRESS OF THE
TCPIP SERVER THAT THE COMMUNICATION APPLICATION
WANTS TO CONNECT WITH, AND THE PORT TO WHICH IT
WANTS TO CONNECT
610

AGENT ISSUES A TCPIP CONNECT WITH THE TCPIP
SERVER TO THE IP AND PORT RECEIVED FROM THE CLIENT
612

FIG. 14

Appx1186



FIG. 15

800

US 10,257,319 B2

1

# SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation application of U.S. non-provisional patent application Ser. No. 14/025,109, filed Sep. 12, 2013, which is a divisional application of U.S. non-provisional patent application entitled "SYSTEM AND METHOD FOR PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION" having Ser. No. 12/836,059, filed Jul. 14, 2010 and issued as U.S. Pat. No. 8,560,604 on Oct. 15, 2013, and claims priority to U.S. provisional patent application entitled "SYSTEM AND METHOD FOR REDUCING INTERNET CONGESTION," having Ser. No. 61/249,624, filed Oct. 8, 2009, which are hereby incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present invention is related to Internet communication, and more particularly, to improving data communication speed and bandwidth efficiency on the Internet.

## BACKGROUND OF THE INVENTION

There are several trends in network and Internet usage, which tremendously increase the bandwidth that is being used on the Internet. One such trend is that more and more video is being viewed on demand on the Internet. Such viewing includes the viewing of both large and short video clips. In addition, regular shows and full-featured films may be viewed on the Internet. Another trend that is increasing the traffic on the Internet is that Web sites (such as shopping portals, news portals, and social networks) are becoming global, meaning that the Web sites are serving people in many diverse places on the globe, and thus the data is traversing over longer stretches of the Internet, increasing the congestion.

The increase in bandwidth consumption has created several major problems, a few of which are described below:
The problem for users—the current Internet bandwidth is not sufficient, and thus the effective 'speed' experienced by users is slow;
The problem for content owners—the tremendous amount of data being viewed by users is costing large amounts of money in hosting and bandwidth costs; and
The problem for Internet Service Providers (ISPs)—the growth in Internet traffic is requiring the ISPs to increase the infrastructure costs (communication lines, routers, etc.) at tremendous financial expense.

The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved.

There have been many attempts at making the Internet faster for the consumer and cheaper for the broadcaster. Each such attempt is lacking in some aspect to become a widespread, practical solution, or is a partial solution in that it solves only a subset of the major problems associated with the increase in Internet traffic. Most of the previous solutions require billions of dollars in capital investment for a comprehensive solution. Many of these attempts are lacking in that much of the content on the Internet has become dynamically created per the user and the session of the user (this is

2

what used to be called the "Web2.0" trend). This may be seen on the Amazon Web site and the Salesforce Web site, for example, where most of the page views on these Web sites is tailored to the viewer, and is thus different for any two viewers. This dynamic information makes it impossible for most of the solutions offered to date to store the content and provide it to others seeking similar content.

One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram providing an example of use of a proxy within a network 2. A proxy, or proxy server 4, 6, 8 is a device that is placed between one or more clients, illustrated in FIG. 1 as client devices 10, 12, 14, 16, 18, 20, that request data, via the Internet 22, and a Web server or Web servers 30, 32, 34 from which they are requesting the data. The proxy server 4, 6, 8 requests the data from the Web servers 30, 32, 34 on their behalf, and caches the responses from the Web servers 30, 32, 34, to provide to other client devices that make similar requests. If the proxy server 4, 6, 8 is geographically close enough to the client devices 10, 12, 14, 16, 18, 20, and if the storage and bandwidth of the proxy server 4, 6, 8 are large enough, the proxy server 4, 6, 8 will speed up the requests for the client devices 10, 12, 14, 16, 18, 20 that it is serving.

It should be noted, however, that to provide a comprehensive solution for Internet surfing, the proxy servers of FIG. 1 would need to be deployed at every point around the world where the Internet is being consumed, and the storage size of the proxy servers at each location would need to be near the size of all the data stored anywhere on the Internet. The abovementioned would lead to massive costs that are impractical. In addition, these proxy solutions cannot deal well with dynamic data that is prevalent now on the Web.

There have been commercial companies, such as Akamai, that have deployed such proxies locally around the world, and that are serving a select small group of sites on the Internet. If all sites on the Web were to be solved with such a solution, the capital investment would be in the range of billions of dollars. In addition, this type of solution does not handle dynamic content.

To create large distribution systems without the large hardware costs involved with a proxy solution, "peer-to-peer file sharing" solutions have been introduced, such as, for example, BitTorrent. FIG. 2 is a schematic diagram providing an example of a peer-to-peer file transfer network 50. In the network 50, files are stored on computers of consumers, referred to herein as client devices 60. Each consumer can serve up data to other consumers, via the Internet 62, thus taking the load of serving off of the distributors and saving them the associated costs, and providing the consumer multiple points from which to download the data, referred to herein as peers 70, 72, 74, 76, 78, thus increasing the speed of the download. However, each such peer-to-peer solution must have some sort of index by which to find the required data. In typical peer-to-peer file sharing systems, because the index is on a server 80, or distributed among several servers, the number of files available in the system is not very large (otherwise, the server costs would be very large, or the lookup time would be very long).

The peer-to-peer file sharing solution is acceptable in file sharing systems, because there are not that many media files that are of interest to the mass (probably in the order of magnitude of millions of movies and songs that are of interest). Storing and maintaining an index of millions of entries is practical technically and economically. However, if this system were to be used to serve the hundreds of billions of files that are available on the Internet of today, the cost of storing and maintaining such an index would be

US 10,257,319 B2

**3**

again in the billions of dollars. In addition, these types of peer-to-peer file sharing systems are not able to deal with dynamic HTTP data.

In conclusion, a system does not exist that enables fast transmission of most of the data on the Internet, that does not incur tremendous costs, and/or that provides only a very partial solution to the problem of Internet traffic congestion. Thus, a heretofore unaddressed need exists in the industry to address the aforementioned deficiencies and inadequacies.

SUMMARY OF THE INVENTION

The present system and method provides for faster and more efficient data communication within a communication network. Briefly described, in architecture, one embodiment of the system, among others, can be implemented as follows. A network is provided for accelerating data communication, wherein the network contains: at least one client communication device for originating a data request for obtaining the data from a data server; at least one agent communication device which is assigned to the data server for receiving the data request from the client communication device, wherein the agent keeps track of which client communication devices have received responses to data requests from the assigned data server; at least one peer communication device for storing portions of data received in response to the data request by the at least one client communication device, wherein the portions of data may be transmitted to the at least one client communication device upon request by the client communication device; and at least one acceleration server for deciding which agent communication device is to be assigned to which data server and providing this information to the at least one client communication device.

The present system and method also provides a communication device within a network, wherein the communication device contains: a memory; and a processor configured by the memory to perform the steps of: originating a data request for obtaining data from a data server; being assigned to a data server, referred to as an assigned data server; receiving a data request from a separate device within the network, and keeping track of which client communication devices within the network have received responses to data requests from the assigned data server; and storing portions of data received in response to the originated data request, wherein the portions of data may be transmitted to communication device upon request by the communication device.

Other systems, methods, features, and advantages of the present invention will be or become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional systems, methods, features, and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

BRIEF DESCRIPTION OF THE DRAWINGS

Many aspects of the invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. **1** is a schematic diagram providing a prior art example of use of a proxy within a network.

**4**

FIG. **2** is a schematic diagram providing a prior art example of a peer-to-peer file transfer network.

FIG. **3** is a schematic diagram providing an example of a communication network in accordance with the present invention.

FIG. **4** is a schematic diagram further illustrating a communication device of the communication network of FIG. **3**.

FIG. **5** is a schematic diagram further illustrating the memory of FIG. **4**.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application of FIG. **5**, as well as communication paths of the acceleration application.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network.

FIG. **8** is a flowchart illustrating operation of the acceleration system initializer module.

FIG. **9** is a flowchart further illustrating communication between different elements of the communication network.

FIG. **10** is a flowchart continuing the flowchart of FIG. **9** and focused on agent response to the HTTP request.

FIG. **11** is a flowchart continuing the flowchart of FIG. **10**, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent.

FIG. **12** is a flowchart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid.

FIG. **13** is a flowchart outlining operation of the acceleration server.

FIG. **14** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention.

FIG. **15** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

DETAILED DESCRIPTION

The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network **100** is provided by the schematic diagram of FIG. **3**. The network **100** of FIG. **3** contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network **100**, as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. **4**.

Returning to FIG. **3**, the exemplary embodiment of the network **100** illustrates that one of the communication devices is functioning as a client **102**. The client **102** is capable of communication with one or more peers **112**, **114**, **116** and one or more agents **122**. For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

The communication network **100** also contains a Web server **152**. The Web server **152** is the server from which the client **102** is requesting information and may be, for example, a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet. It should be noted that the server **152** is not limited

US 10,257,319 B2

5                                                      6

to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the server may be a server capable of handling a different protocol. It should also be noted that while the present description refers to the use of HTTP, the present invention may relate to any other communication protocol and HTTP is not intended to be a limitation to the present invention.

The communication network 100 further contains an acceleration server 162 having an acceleration server storage device 164. As is described in more detail herein, the acceleration server storage device 164 has contained therein an acceleration server database. The acceleration server database stores Internet protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein. Specifically, the acceleration server database contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network 100. For each such agent, the acceleration server assigns a list of IP addresses.

In the communication network 100 of FIG. 3, the application in the client 102 is requesting information from the Web server 152, which is why the software within the communication device designated this communication device to work as a client. In addition, since the agent 122 receives the request from the client 102 as the communication device closest to the Web server 152, functionality of the agent 122, as provided by the software of the agent 122, designates this communication device to work as an agent. It should be noted, that in accordance with an alternative embodiment of the invention, the agent need not be the communication device that is closest to the Web server. Instead, a different communication device may be selected to be the agent.

Since the peers 112, 114, 116 contain at least portions of the information sought by the client 102 from the Web server 152, functionality of the peers 112, 114, 116, as provided by the software of the peers 112, 114, 116, designates these communication devices to work as peers. It should be noted that the process of designating clients, agents, and peers is described in detail herein. It should also be noted that the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 may differ from the number illustrated by FIG. 3. In fact, the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 are not intended to be limited by the current description.

Prior to describing functionality performed within a communication network 100, the following further describes a communication device 200, in accordance with a first exemplary embodiment of the invention. FIG. 4 is a schematic diagram further illustrating a communication device 200 of the communication network 100, which contains general components of a computer. As previously mentioned, it should be noted that the communication device 200 of FIG. 4 may serve as a client, agent, or peer.

Generally, in terms of hardware architecture, as shown in FIG. 4, the communication device 200 includes a processor 202, memory 210, at least one storage device 208, and one or more input and/or output (I/O) devices 240 (or peripherals) that are communicatively coupled via a local interface 250. The local interface 250 can be, for example but not limited to, one or more buses or other wired or wireless connections, as is known in the art. The local interface 250 may have additional elements, which are omitted for simplicity, such as controllers, buffers (caches), drivers, repeat-

ers, and receivers, to enable communications. Further, the local interface 250 may include address, control, and/or data connections to enable appropriate communications among the aforementioned components.

The processor 202 is a hardware device for executing software, particularly that stored in the memory 210. The processor 52 can be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the communication device 200, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, or generally any device for executing software instructions.

The memory 210, which is further illustrated and described by the description of FIG. 5, can include any one or combination of volatile memory elements (e.g., random access memory (RAM, such as DRAM, SRAM, SDRAM, etc.)) and nonvolatile memory elements (e.g., ROM, hard drive, tape, CDROM, etc.). Moreover, the memory 210 may incorporate electronic, magnetic, optical, and/or other types of storage media. Note that the memory 210 can have a distributed architecture, where various components are situated remote from one another, but can be accessed by the processor 202.

The software 212 located within the memory 210 may include one or more separate programs, each of which contains an ordered listing of executable instructions for implementing logical functions of the communication device 200, as described below. In the example of FIG. 4, the software 212 in the memory 210 at least contains an acceleration application 220 and an Internet browser 214. In addition, the memory 210 may contain an operating system (O/S) 230. The operating system 230 essentially controls the execution of computer programs and provides scheduling, input-output control, file and data management, memory management, and communication control and related services. It should be noted that, in addition to the acceleration application 220, Internet browser 214, and operating system 230, the memory 210 may contain other software applications.

While the present description refers to a request from the client originating from an Internet browser, the present invention is not limited to requests originating from Internet browsers. Instead, a request may originate from an email program or any other program that would be used to request data that is stored on a Web server, or other server holding data that is requested by the client device.

Functionality of the communication device 200 may be provided by a source program, executable program (object code), script, or any other entity containing a set of instructions to be performed. When a source program, then the program needs to be translated via a compiler, assembler, interpreter, or the like, which may or may not be included within the memory 210, so as to operate properly in connection with the operating system 230. Furthermore, functionality of the communication device 200 can be written as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions.

The I/O devices 240 may include input devices, for example but not limited to, a keyboard, mouse, scanner, microphone, etc. Furthermore, the I/O devices 240 may also include output devices, for example but not limited to, a printer, display, etc. Finally, the I/O devices 240 may further include devices that communicate via both inputs and outputs, for instance but not limited to, a modulator/demodu-

US 10,257,319 B2

7

lator (modem; for accessing another device, system, or network), a radio frequency (RF) or other transceiver, a telephonic interface, a bridge, a router, etc.

When the communication device **200** is in operation, the processor **202** is configured to execute the software **212** stored within the memory **210**, to communicate data to and from the memory **210**, and to generally control operations of the communication device **200** pursuant to the software **212**. The software **212** and the O/S **230**, in whole or in part, but typically the latter, are read by the processor **202**, perhaps buffered within the processor **202**, and then executed.

When functionality of the communication device **200** is implemented in software, as is shown in FIG. **4**, it should be noted that the functionality can be stored on any computer readable medium for use by or in connection with any computer related system or method. In the context of this document, a computer readable medium is an electronic, magnetic, optical, or other physical device or means that can contain or store a computer program for use by or in connection with a computer related system or method. The functionality of the communication device **200** can be embodied in any computer-readable medium for use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions. In the context of this document, a "computer-readable medium" can be any means that can store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device.

The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM, EEPROM, or Flash memory) (electronic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-readable medium could even be paper or another suitable medium upon which the program is printed, as the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

In an alternative embodiment, where the functionality of the communication device **200** is implemented in hardware, the functionality can be implemented with any or a combination of the following technologies, which are each well known in the art: a discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit (ASIC) having appropriate combinational logic gates, a programmable gate array(s) (PGA), a field programmable gate array (FPGA), etc.

The at least one storage device **208** of the communication device **200** may be one of many different categories of storage device. As is described in more detail herein, the storage device **208** may include a configuration database **280** and a cache database **282**. Alternatively, the configuration database **280** and cache database **282** may be located on different storage devices that are in communication with the

8

communication device **200**. The description that follows assumes that the configuration database **280** and cache database **282** are located on the same storage device, however, it should be noted that the present invention is not intended to be limited to this configuration.

The configuration database **280** stores configuration data that is common to all elements of the communication network **100** and is used to provide set up and synchronization information to different modules of the acceleration application **220** stored within the memory **210**, as is described in further detail herein. The cache database **282** stores responses to HTTP requests that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. As is explained in additional detail herein, the responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this information and will use this communication device as either a peer or an agent.

In addition to the abovementioned, as is explained in further detail herein, the cache database **282** has stored therein a list of URLs that the communication device is aware of (i.e., has seen requests for). For each URL, the cache database **282** has stored therein the URL itself, HTTP headers returned by the Web Server for this URL, when the last time was that the contents of this URL was loaded directly from the Web Server, when the contents of the URL had last changed on the Web Server, as well as a list of chunks that contain the contents of this URL, and the chunks of data themselves. Chunks in the present description are defined as equally sized pieces of data that together form the whole content of the URL. It should be noted that while the present description provides for chunks being equally sized pieces of data, in accordance with an alternative embodiment of the invention, the chunks may instead be of different size.

FIG. **5** is a schematic diagram further illustrating the memory **210** of FIG. **4**. As shown by FIG. **5**, the memory **210** may be separated into two basic levels, namely, an operating system level **260** and an application level **270**. The operating system level **260** contains the operating system **230**, wherein the operating system **230** further contains at least one device driver **262** and at least one communication stack **264**. The device drivers **262** are software modules that are responsible for the basic operating commands for various hardware devices of the communication device **200**, such as the processor **202**, the storage device **208** and the I/O devices **240**. In addition, the communication stacks **264** provide applications of the communication device **200** with a means of communicating within the network **100** by implementing various standard communication protocols.

The application level **270** includes any application that is running on the communication device **200**. As a result, the application level **270** includes the Internet browser **214**, which is used to view information that is located on remote Web servers, the acceleration application **220**, as described in more detail below, and any other applications **216** stored on the communication device **200**.

As is explained in additional detail below, the acceleration application **220** intercepts the requests being made by applications of the communication device (client) that use the Internet, in order to modify the requests and route the requests through the communication network. There are various methods that may be used to intercept such requests. One such method is to create an intermediate driver **272**, which is also located within the memory **210**, that attaches

US 10,257,319 B2

9                                                          10

itself to all communication applications, intercepts outgoing requests of the communication applications of the communication device **200**, such as the Internet browser **214**, and routes the requests to the acceleration application **220**. Once the acceleration application **220** modifies the requests, routes the requests to other system elements on the communication network **100**, and receives replies from other system elements of the communication network **100**, the acceleration application **220** returns the replies to the intermediate driver **272**, which provides the replies back to the requesting communication application.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application **220**, as well as communication paths of the acceleration application **220**. The acceleration application **220** contains an acceleration system initializer module **222**, which is called when the acceleration application **220** is started. The acceleration system initializer module **222** is capable of initializing all elements of the communication device **200** The acceleration application **220** also contains three separate modules that run in parallel, namely, a client module **224**, a peer module **226**, and an agent module **228**, each of which comes into play according to the specific role that the communication device **200** is partaking in the communication network **100** at a given time. The role of each module is further described herein.

The client module **224** provides functionality required when the communication device **200** is requesting information from the Web server **152**, such as, for example, but not limited to, Web pages, data, video, or audio. The client module **224** causes the communication device **200** having the client module **224** therein to intercept the information request and pass the information request on to other elements of the communication network **100**, such as, servers, agents or peers. This process is further described in detail herein.

The peer module **226** provides functionality required by the communication device **200** when answering other clients within the communication network **100** and providing the other clients with information that they request, which this communication device **200**, having this peer module **226** therein, has already downloaded at a separate time. This process is further described in detail herein.

The agent module **228** provides functionality required when other communication devices of the communication network **100** acting as clients query this communication device **200**, having this agent module **228** therein, as an agent, to obtain a list of peers within the communication network **100** that contain requested information. This process is further described in detail herein.

The acceleration application **220** interacts with both the configuration database **280** and the cache database **282** of the storage device **208**. As previously mentioned herein, the configuration database **280** stores configuration data that may be common to all communication devices of the communication network **100** and is used to provide setup and synchronization information to different modules **222**, **224**, **226**, **228** of the acceleration application **220** stored within the memory **210**.

The cache database **282** stores responses to information requests, such as, for example, HTTP requests, that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. The responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this same information and will use this communication device **200** as either a peer or an agent. This process is described in detail herein.

Information stored within the cache database **282** may include any information associated with a request sent by the client. As an example, such information may include, metadata and actual requested data. For example, for an HTTP request for a video, the metadata may include the version of the Web server answering the request from the client and the data would be the requested video itself. In a situation where there is no more room for storage in the cache database, the software of the associated communication device may cause the communication device to erase previous data stored in order to clear room for the new data to store in the cache database. As an example, such previous data may include data that is most likely not to be used again. Such data may be old data or data that is known to no longer be valid. The communication device may choose to erase the least relevant data, according to any of several methods that are well known in the art.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network **100**, namely, the acceleration server database **164** and the cache database **282**. As previously mentioned, the acceleration server database **164** stores IP addresses of communication devices located within the communication network **100**, which have acceleration software stored therein. Specifically, the acceleration server database **164** contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. The acceleration server assigns a list of IP addresses to each communication device functioning as an agent. Each communication device will be the agent for any Web servers whose IP address is in the range 'owned' by that communication device. As an example, when a first ever communication device goes online, namely, the first communication device as described herein having the acceleration application **220** therein, the acceleration server assigns all IP addresses in the world to this communication device, and this communication device will be the agent for any Web server. When a second communication device goes online it will share the IP address list with the first communication device, so that each of the communication devices will be responsible for a different part of the world wide web servers.

The cache database **282** of the communication device **200** has stored therein a list of URLs **286** of which the communication device **200** is aware. The communication device **200** becomes aware of a URL each time that the communication device **200** receives a request for information located at a specific URL. As shown by FIG. **7**, for each URL **288** within the list of URLs **286**, the cache database **282** stores: the URL itself **290**; HTTP headers **292** returned by the Web Server **152** for this URL; when the last time **294** was that the contents of this URL were loaded directly from the Web Server **152**; when the contents of the URL last changed **296** on the Web Server **152**; and a list of chunks **298** that contain the contents of this URL, and the content of the chunk. As previously mentioned, chunks, in the present description, are defined as equally sized pieces of data that together form the entire content of the URL, namely, the entire content whose location is described by the URL. As a non-limiting example, a chunk size of, for example, 16 KB can be used, so that any HTTP response will be split up into chunks of 16 KB. In accordance with an alternative embodiment of the invention, if the last chunk of the response is not

US 10,257,319 B2

11                                                                                                12

large enough to fill the designated chunk size, such as 16 KB for the present example, the remaining portion of the chunk will be left empty.

For each such chunk **300**, the cache database **282** includes the checksum of the chunk **302**, the data of the chunk **304** itself, and a list of peers **306** that most likely have the data for this chunk. As is described in additional detail herein, the data for the chunk may be used by other clients within the communication network **100** when other communication devices of the communication network **100** serve as peers to the clients, from which to download the chunk data.

For each chunk, a checksum is calculated and stored along side of the chunk itself. The checksum may be calculated in any of numerous ways known to those in the art. The purpose of having the checksum is to be able to identify data uniquely, whereas the checksum is the "key" to the data, where the data is the chunk. As an example, a client may want to load the contents of a URL, resulting in the agent that is servicing this request sending the checksums of the chunks to the client, along with the peers that store these chunks. It is to be noted that there could be a different peer for every different chunk. The client then communicates with each such peer, and provides the checksum of the chunk that it would like the peer to transmit back to the client. The peer looks up the checksum (the key) in its cache database, and provides back the chunk (data) that corresponds to this checksum (the key). As shown by FIG. **7**, for each peer **308** within the list of peers **306**, the cache database **282** includes the peer IP address **310**, as well as the connection status **312** of the peer, which represents whether the peer **308** is online or not.

In accordance with one embodiment of the invention, the cache database **282** may be indexed by URL and by Checksum. Having the cache database indexed in this manner is beneficial due to the following reason. When the agent is using the cache database, the agent receives a request from a client for the URL that the client is looking for. In such a case the agent needs the cache database to be indexed by the URL, to assist in finding a list of corresponding peers that have the chunks of this URL. When the peers are using this cache database, the peers obtain a request from the client for a particular checksum, and the peers need the database to be indexed by the checksum so that they can quickly find the correct chunk. Of course, as would be understood by one having ordinary skill in the art, the cache database may instead be indexed in any other manner.

Having described components of the communication network **100**, the following further describes how such components interact and individually function. FIG. **8** is a flowchart **300** illustrating operation of the acceleration system initializer module **222** (hereafter referred to as the initializer **222** for purposes of brevity). It should be noted that any process descriptions or blocks in flowcharts should be understood as representing modules, segments, portions of code, or steps that include one or more instructions for implementing specific logical functions in the process, and alternative implementations are included within the scope of the present invention in which functions may be executed out of order from that shown or discussed, including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art of the present invention.

The initializer **222** is the first element of the communication device **200** to operate as the communication device **200** starts up (block **302**). As the initializer **222** starts, it first communicates with the acceleration server **162** to sign up with the acceleration server **162**. This is performed by providing the acceleration server **162** with the hostname, and all IP addresses and media access control (MAC) addresses of the interfaces on the communication device **200** having the initializer **222** thereon.

In accordance with an alternative embodiment of the invention, as shown by block **304**, the initializer **222** checks with the acceleration server **162** whether a more updated version of the acceleration application software is available. This may be performed by any one of many known methods, such as, but not limited to, by providing the version number of the acceleration application software to the acceleration server **162**. The message received back from the acceleration server **162** indicates whether there is a newer version of the acceleration application software or not. If a newer version of the acceleration application software exists, the initializer **222** downloads the latest version of the acceleration application software from the acceleration server **162**, or from a different location, and installs the latest version on the communication device **200**. In addition to the abovementioned, the initializer **222** may also schedule additional version checks for every set period of time thereafter. As an example, the initializer **222** may check for system updates every two days.

As shown by block **306**, the initializer **222** then redirects outgoing network traffic from the communication device **200** to flow through the acceleration application **162**. As previously mentioned, one way to redirect the outgoing network traffic is to insert an intermediate driver **212** that intercepts and redirects the traffic. It should be noted that there are many other ways to implement this redirection, which are well known to those having ordinary skill in the art.

As shown by block **308**, the initializer **222** then launches the client module **224** of the communication device **200**, and configures the client module **224** of the communication device **200** to intercept to all outgoing network communications of the communication device **200** and route the outgoing network communications to the client module **224**, from the intermediate driver **272** or other routing method implemented. This is performed so that the client module **224** is able to receive all network traffic coming from the network applications, modify the network traffic if necessary, and re-route the traffic. As is known by those having ordinary skill in the art, in order to re-route the traffic, the traffic needs to be modified, as an example, to change the destination of requests.

As shown by block **310**, the initializer **222** then launches the agent module **228** and the peer module **226** to run on the communication device **200**. The agent module **228** and peer module **226** listen on pre-determined ports of the communication device **200**, so that incoming network traffic on these ports gets routed to the agent module **228** and peer module **226**. As is explained in further detail herein, the abovementioned enables the communication device **200** to function as an agent and as a peer for other communication devices within the communication network **100**, as needed.

FIG. **9** is a flowchart **350** further illustrating communication between different elements of the communication network **100**, in accordance with the present system and method for providing faster and more efficient data communication.

As shown by block **352**, an application running on the client **200** initiates a request for a resource on a network. Such a request may be, for example, "GET http://www.aol.com/index.html HTTP/1.1". The request may come from an Internet browser **214** located on the client **200**, where the Internet browser **214** is loading a page from the Internet, an

US 10,257,319 B2

13                                                                14

application that wants to download information from the Internet, fetch or send email, or any other network communication request.

Through the intermediate driver **272**, or other such mechanism as may be implemented that is re-routing the communication to the client module **224** of the client **200**, the resource request is intercepted by the client module **224** that is running on the client **200** (block **354**). The client module **224** then looks up the IP address of the server **152** that is the target of the resource request (e.g., the IP address of the Web server that is the host of www.aol.com in the example above), and sends this IP address to the acceleration server **162** (block **356**) in order to obtain a list of communication devices that the client **200** can use as agents (hereafter referred to as agents). It should be noted that the process of performing an IP lookup for a server is known by one having ordinary skill in the art, and therefore is not described further herein.

In response to receiving the IP address of the server **152**, the acceleration server **162** prepares a list of agents that may be suitable to handle the request from this IP address (block **358**). The size of the list can differ based on implementation. For exemplary purposes, the following provides an example where a list of five agents is prepared by the acceleration server **162**. The list of agents is created by the acceleration server **162** by finding the communication devices of the communication network **100** that are currently online, and whose IP address is numerically close to the IP of the destination Web server **152**. A further description of the abovementioned process is described here in.

As shown by block **360**, the client module **224** then sends the original request (e.g., "GET http://www.aol.com/index.html HTTP/1.1") to all the agents in the list received from the acceleration server **162** in order to find out which of the agents in the list is best suited to be the one agent that will assist with this request.

It should be noted that, in accordance with an alternative embodiment of the invention, the communication device **200** may be connected to a device that is actually requesting data. In such an alternative embodiment, the communication device would be a modular device connected to a requesting device, where the requesting device, such as, for example, a personal data assistant (PDA) or other device, would request data, and the communication device connected thereto, either through a physical connection, wireless connection, or any other connection, would receive the data request and function as described therein. In addition, as previously mentioned, it should be noted that the HTTP request may be replaced by any request for resources on the Web.

FIG. **10** is a flowchart continuing the flowchart **380** of FIG. **9** and focused on agent response to the request. As shown by block **382**, upon receiving the request from the client **200**, each agent that received the request from the client responds to the client **200** with whether it has information regarding the request, which can help the client to download the requested information from peers in the network. Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have.

As shown by block **384**, the client then decides which of the agents in the list to use as its agent for this particular information request. To determine which agent in the list to use as its agent for the particular information request, the client may consider multiple factors, such as, for example, factoring the speed of the reply by each agent and whether that agent does or does not have the information required. There are multiple ways to implement this agent selection, one practical way being to start a timer of a small window of time, such as, for example, 5 ms, after receiving the first response from the agents, and after the small window, choosing from the list of agents that responded, the agent that has the information about the request, or in the case that none of the agents responded, to choose the first agent from the list received from the acceleration server **162**.

As shown by block **386**, after selecting an agent, the client notifies the selected agent that it is going to use it for this request, and notifies the other agents that they will not be used for this request. The client then sends the selected agent a request for the first five chunks of data of the original information request (block **388**). By specifying to the selected agent the requested chunks by their order in the full response, the client receives the peer list and checksums of the requested chunks from the selected agent. As an example, for the first five chunks the client will ask the selected agent for chunks one through five, and for the fourth batch of five chunks the client will ask the agent for chunks sixteen through twenty. As previously mentioned, additional or fewer chunks may be requested at a single time.

As shown by block **390**, after receiving the request from the client, the selected agent determines whether it has information regarding the requested chunks of data by looking up the request in its cache database and determining if the selected agent has stored therein information regarding peers of the communication network that have stored the requested data of the request, or whether the selected agent itself has the requested data of the request stored in its memory. In addition to determining if the selected agent contains an entry for this request in its database, the selected agent may also determine if this information is still valid. Specifically, the selected agent determines whether the data that is stored within the memory of the selected agent or the memory of the peers, still mirrors the information that would have been received from the server itself for this request. A further description of the process utilized by the selected agent to determine if the information is still valid, is described in detail herein.

As shown by block **392**, if the information (requested data of the request) exists and is still valid, then the agent prepares a response to the client, which includes for each of the chunks: (i) the checksum of the chunk; (ii) a list of peers that according to the database of the selected agent contains these chunks; and (iii) if these are the first five chunks of the information, then the selected agent also provides the specific protocol's headers that would have been received from the server, had the initial request from the client been made directly to the server.

As shown by block **394**, the list of peers for each chunk is sorted by geographical proximity to the requesting client. In accordance with the present example, only the five closest peers are kept in the list for every chunk, and the rest of the peers are discarded from this list. As shown by block **396**, the prepared response, namely, the list of closest peers, is sent back to the client. It should be noted that, if this were the last set of chunks to be provided for this request, then it would be beneficial to include information about this to the client.

If the selected agent discovers that it does not have information about this request, or if the selected agent discovers that the information it has is no longer valid, the selected agent needs to load the information directly from the server in order to be able to provide an answer to the requesting client. As shown by block **400**, the selected agent

US 10,257,319 B2

15

16

then sends the request directly to the server. The selected agent then stores the information it receives from the server (both the headers of the request, as well as chunks of the response itself) in its database, for this particular response to the client, as well as for future use to other clients that may request this data (block 402). The selected agent then prepares a response (list) for the client, where the response includes the protocol headers (if these are the first five chunks), and the checksums of the five chunks, and provides itself as the only peer for these chunks (block 404). This list is then sent back to the client (block 406).

FIG. 11 is a flowchart 420 continuing the flowchart of FIG. 10, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent. As shown by block 422, the client receives the response from the agent (including the list of chunks and their corresponding data, including peers and other information previously mentioned) and, for each of the five chunks, the client sends a request to each of the peers listed for the chunk to download the chunk. The chunk request that the client sends to each of the peers is the checksum of the data that the client seeks to receive, which is the key (identifier) of the chunk.

As shown by block 424, the peers then respond regarding whether they still have the data of the chunk. As an example, some of the peers may not currently be online, some may be online but may have discarded the relevant information, and some may still have the relevant information, namely, the chunk. As shown by block 426, the client then selects the quickest peer that responds with a positive answer regarding the requested information, the client lets that peer know that it is chosen to provide the client with the chunk, and the client notifies the other peers that they are not chosen.

As shown by block 428, the chosen peer then sends the chunk to the client. It should be noted that if no peers answer the request of the client, the client goes back to the agent noting that the peers were all negative, and the agent either provides a list of 5 other agents, if they exist, or the agent goes on to download the information directly from the Web server as happens in the case where no peers exist as described above.

The client then stores the chunks in its cache for future use (block 430), when the client may need to provide the chunks to a requesting communication device when acting as a peer for another client that is looking for the same information. As shown by block 432, if some of the chunks were not loaded from any of the peers, the client requests the chunks again from the agent in a next round of requests, flagging these chunks as chunks that were not loadable from the client list of peers. In this situation, the agent will load the data directly from the server and provide it back to the client.

The client then acknowledges to the agent which of the chunks it received properly (block 434). The agent then looks up these chunks in the database of the agent, and adds the client to the list of peers for these chunks, specifically, since this client is now storing these chunks, and can provide these chunks to other clients that turn to it as a peer (block 436).

As shown by block 438, the client then passes the data on to the Web browser or other application of the client that made the original request, for it to use as it had originally intended. The client then checks whether all of the chunks for this request were received (block 440), by checking the flag set by the agent. Specifically, when the agent is providing the list of the last 5 chunks, the agent includes that information as part of its reply to the client, which is referred

to herein as a flag. This information is what enables the client to know that all information has been received for a particular resource request.

If the last received chunks were not the last chunks for this request, the processing flow of the client continues by returning to the functionality of block 384 of FIG. 10, but instead sending the chosen agent a request for the next five chunks of data of the original information request. Alternatively, if all chunks for this request were received, the request is complete, and the flow starts again at block 352 of FIG. 9.

FIG. 12 is a flowchart 500 illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. Specifically, the following provides an example of how the agent, client, or peer can determine whether particular data that is stored within the memory of the agent, or the memory of a peer or client, still mirrors the information that is currently on the Web server. As shown by block 502, the HTTP request is looked up in the cache database of the agent, client or peer that is checking the validity of the HTTP request. As an example, the HTTP protocol, defined by RFC 2616, outlines specific methods that Web servers can define within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information such as "max age" to indicate how long this data may be cached before becoming invalid, "no cache" to indicate that the data may never be cached, and using other information.

As shown by block 504, these standard methods of validation are tested on the HTTP request information in question. As shown by block 506, a determination is made whether the requested information that is stored is valid or not. If the requested information is valid, a "VALID" response is returned (block 508). Alternatively, if the requested information is not valid, an HTTP conditional request is sent to the relevant Web server, to determine if the data stored for this request is still valid (block 510). If the data stored for this request is still valid, a "VALID" response is returned (block 508). Alternatively, if the data stored for this request is not valid, an "INVALID" response is returned (block 514). It should be noted, that the abovementioned description with regard to FIG. 12 is an explanation of how to check if HTTP information is still valid. There are similar methods of determining validity for any other protocol, which may be utilized, and which those having ordinary skill in the art would appreciate and understand.

FIG. 13 is a flowchart 550 outlining operation of the acceleration server, whose main responsibility in the present system and method is to provide clients with information regarding which agents serve which requests, and to keep the network elements all up to date with the latest software updates. As shown by block 552, the acceleration server sends "keep alive" signals to the network elements, and keeps track within its database as to which network elements are online. As shown by block 554, the acceleration server continues to wait for a client request and continues to determine if one is received.

Once a request is received, the acceleration server tests the type of request received (block 556). If the client request is to sign up the client within the network, an event that happens every time that the client starts running on its host machine, then that client is added to the list of agents stored on the acceleration server, sorted by the IP address of the client (block 558).

If the request is to find an agent to use for a particular request, the acceleration server creates a new agent list, which is empty (block 560). The acceleration server then

US 10,257,319 B2

17                                                                18

searches the agent database for the next 5 active agents whose IP address is closest to the IP address of the server who is targeted in the request (block 562). In this context, 192.166.3.103 is closer to 192.166.3.212 than to 192.167.3.104. The acceleration server then sends this agent list to the client (block 564).

If instead, the request is to check the version of the latest acceleration software then the acceleration server sends that network element (client, peer or agent) the version number of the latest existing acceleration software version, and a URL from where to download the new version, for the case that the element needs to upgrade to the new version (block 566).

While the abovementioned example is focused on HTTP requests for data, as previously mentioned, other protocol requests are equally capable of being handled by the present system and method. As an example, in separate embodiments the acceleration method described may accelerate any communication protocol at any OSI layer (SMTP, DNS, UDP, ETHERNET, etc.). In the following alternative embodiment, it is illustrated how the acceleration method may accelerate TCPIP. As is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol. For purposes of illustration of TCPIP communication, reference may be made to FIG. 3, wherein the Web server is a TCPIP server.

In TCPIP there are three communication commands that are of particular interest, namely, connect, write, and read. Connect is a command issued by an application in the communication device that is initiating the communication to instruct the TCPIP stack to connect to a remote communication device. The connect message includes the IP address of the communication device, and the port number to connect to. An application uses the write command to instruct the TCPIP stack to send a message (i.e., data) to a communication device to which it is connected. In addition, an application uses the read command to ask the TCPIP stack to provide the message that was sent from the remote communication device to which it is connected. A communication session typically exists of a connect, followed by a read and write on both sides.

FIG. 14 is a flowchart 600 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention. As shown by blocks 601 and 602 when an application of the communication device makes a request to the communications stack to connect with the TCPIP server, that communication is intercepted by the acceleration application.

To find an agent, upon receiving that connect message from the communication device application, which includes the IP address of the TCPIP server and the port to connect to, the acceleration application in the client makes a request to the acceleration server to find out who the agent for the communication with the TCPIP server is. This step is performed in a similar manner to that described with regard to the main HTTP embodiment of the invention (block 604). As shown by block 606, the server then provides the client with a list of agents, for example, a primary agent and four others.

To establish a connection, as shown by block 608, the client issues a TCPIP connect with the primary agent or one of the other agents if the primary agent does not succeed, to create a connection with the agent. The client then sends to the agent the IP address of the TCPIP server and connection port that were provided by the communication device application (block 610). As shown by block 612, that agent in turn

issues a TCPIP connect to the TCPIP server to the port it received from the client, to create a connection with the agent.

FIG. 15 is a flowchart 800 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

As shown by block 802, if the network application within the client wants to send a message to the TCPIP server, the network application within the client writes the message to the TCPIP stack in the operating system of the client. This WRITE command is received by the acceleration application of the client and handled in the manner described below. If the TCPIP server wants to send a message to the client, the TCPIP server writes the message to the TCPIP stack of TCPIP operating system, on the connection to the agent, since this agent is where the server received the original connection. This WRITE command is received by the acceleration application of the agent and handled in the manner described below.

When the acceleration application of the client receives a message from the network application of the client to be sent to the agent, or when the acceleration application of the agent receives a message from the connection to the TCPIP server that is to be sent to the client, the acceleration application proceeds to send the message to the communication device on the other side. For instance, if the client has intercepted the message from the communication application, the client sends the message to the agent, and if it is the agent that intercepted the message from the connection to the TCPIP server, such as the TCPIP server sending a message that is intended for the communication with client, the agent sends the message to the client in the following manner:

As shown by block 804, the acceleration application breaks up the content of the message to chunks and calculates the corresponding checksums, in the same manner as in the main embodiment described herein. The acceleration application then looks up each checksum in its cache database (block 806). As shown by block 808, the acceleration application checks if the checksum exists in the cache database. Hit does, then, as shown by block 810, the acceleration application prepares a list of peers that have already received the chunk of the checksum in the past (if any), and adds the communication device of the other side to the list of communication devices that have received this chunk (adds it to the peer list of the checksum in its database), to be provided to other communication devices requesting this information in the future. As shown by block 812, the list of peers is sent to the receiving communication device, which, as shown by block 814 retrieves the chunks from the peers in the list received, in the same manner as in the main embodiment.

If the checksum does not exist within the cache database of the sending communication device then, as shown by block 820, the acceleration application adds the checksum and chunk to its cache database, sends the chunk to the communication device on the other side, and adds the other communication device to the list of peers for that checksum in its database.

As shown by block 816, a determination is then made as to whether all chunks have been received. If all chunks have not been received, the process continues on again from block 806.

Once all data has been received, as shown by block 818, the acceleration application passes the data on to the

US 10,257,319 B2

19

20

requester. Specifically, in the client, the acceleration application passes on the complete data to the communication application, and in the agent, the acceleration application passes on the complete data to the requesting TCPIP server.

It should be emphasized that the above-described embodiments of the present invention are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiments of the invention without departing substantially from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

The invention claimed is:

**1.** A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:

receiving, from the second server, the first content identifier;

sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

**2.** The method according to claim **1**, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.

**3.** The method according to claim **2**, for use with a first application stored in the first client device and associated with a first version number, wherein the first message comprises the first version number.

**4.** The method according to claim **3**, for use with a second application that is a version of the first application, is stored in the second server, and is associated with a second version number, wherein the method further comprising receiving, by the first client device from the second server, in response to the first message, a second message that comprises the second version number.

**5.** The method according to claim **4**, wherein the method further comprising downloading over the Internet, by the first client device from the second server, in response to the first message, the second application from the second server, and installing the second application in the first client device as a replacement for the first application.

**6.** The method according to claim **1**, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:

identifying, an HTTP request for the second content;

sending, to the second server over the Internet in response to the identifying, the second content identifier and a criterion; and

receiving, over the Internet in response to the sending, from a second client device selected from a plurality of client devices according to the criterion, a part of, or a whole of, the second content.

**7.** The method according to claim **6**, wherein the criterion is stored in the first client device, and the method further comprising selecting, by the first client device, the second client device from the plurality of client devices, according to the stored criterion.

**8.** The method according to claim **7**, wherein the criterion is based on, or comprises, the geographical location of the plurality of client devices, or a response time when communicating with the first client device.

**9.** The method according to claim **7**, wherein the second client device is the quickest to respond to queries from the first client device.

**10.** The method according to claim **7**, further comprising sending, by the first client device, a notification message to a device from the plurality of client devices that was not selected as part of the selecting.

**11.** The method according to claim **6**, further comprising executing, by the first client device, a web browser application or an email application, and wherein the identifying comprises intercepting, by a driver in the first client device, the request for the second content respectively from the web browser application or the email application.

**12.** The method according to claim **1**, further comprising storing, by the first client device in response to the receiving from the first server, the first content, and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.

**13.** The method according to claim **12**, further comprising:

receiving, from a second client device, the first content identifier; and

sending, the stored first content by the first client device to the second client device, in response to the receiving of the first content identifier from the second client device.

**14.** The method according to claim **1**, further comprising determining, by the first client device, that the received first content, is valid.

**15.** The method according to claim **14**, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**16.** The method according to claim **15**, further comprising:

sending, a message over the Internet in response to the determining that the received first content, is not valid; and

receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first content.

**17.** The method according to claim **1**, further comprising periodically communicating between the second server and the first client device.

**18.** The method according to claim **17**, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**19.** The method according to claim **1**, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and

US 10,257,319 B2

21

22

the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

downloading, by the first client device from the Internet, the software application; and

installing, by the first client device, the downloaded software application.

**20**. The method according to claim **19**, wherein the software application is downloaded from the second server.

**21**. The method according to claim **1**, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates respectively with the first or second server over the Internet based on, or according to, TCP/IP protocol or connection.

**22**. The method according to claim **1**, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**23**. The method according to claim **1**, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL), and wherein the method further comprising executing, by the first client device, a web browser application or an email application.

**24**. The method according to claim **1**, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol.

**25**. The method according to claim **1**, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection.

**26**. The method according to claim **1**, further comprising storing, operating, or using, a client operating system.

**27**. The method according to claim **1**, wherein the steps are sequentially executed.

**28**. A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **1**.

**29**. A client device comprising a non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **1**.

* * * * *



US010484510B2

(12) **United States Patent**
　　Shribman et al.

(10) Patent No.:　**US 10,484,510 B2**
(45) **Date of Patent:**　**\*Nov. 19, 2019**

(54) **SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION**

(71) Applicant: **WEB SPARK LTD.**, Netanya (IL)

(72) Inventors: **Derry Shribman**, Tel Aviv (IL); **Ofer Vilenski**, Moshav Hadar Am (IL)

(73) Assignee: **WEB SPARK LTD.**, Netanya (IL)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/278,107**

(22) Filed: **Feb. 17, 2019**

(65) **Prior Publication Data**

US 2019/0182360 A1　Jun. 13, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/957,945, filed on Apr. 20, 2018, now Pat. No. 10,257,319, which is a
(Continued)

(51) **Int. Cl.**
　*H04L 29/06*　(2006.01)
　*H04L 29/08*　(2006.01)
　*H04L 12/24*　(2006.01)

(52) **U.S. Cl.**
　CPC ............ *H04L 67/42* (2013.01); *H04L 41/046* (2013.01); *H04L 67/1002* (2013.01);
(Continued)

(58) **Field of Classification Search**
　CPC ... H04L 67/42; H04L 41/046; H04L 67/1002; H04L 67/22; H04L 67/02
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,922,494 A | 11/1975 | Cooper et al. |
| 4,937,781 A | 6/1990 | Lee et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101075242 A | 11/2007 |
| CN | 101179389 A | 5/2008 |

(Continued)

OTHER PUBLICATIONS

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,749.

*Primary Examiner* — Minh Chau Nguyen
(74) *Attorney, Agent, or Firm* — May Patents Ltd. c/o Dorit Shem-Tov

(57) **ABSTRACT**

A system designed for increasing network communication speed for users, while lowering network congestion for content owners and ISPs. The system employs network elements including an acceleration server, clients, agents, and peers, where communication requests generated by applications are intercepted by the client on the same machine. The IP address of the server in the communication request is transmitted to the acceleration server, which provides a list of agents to use for this IP address. The communication request is sent to the agents. One or more of the agents respond with a list of peers that have previously seen some or all of the content which is the response to this request (after checking whether this data is still valid). The client then downloads the data from these peers in parts and in parallel, thereby speeding up the Web transfer, releasing congestion from the Web by fetching the information from multiple sources, and relieving traffic from Web servers by offloading the data transfers from them to nearby peers.

**24 Claims, 15 Drawing Sheets**



Data Co Exhibit 1001
Data Co v. Bright Data

**US 10,484,510 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/025,109, filed on Sep. 12, 2013, now Pat. No. 10,069,936, which is a division of application No. 12/836,059, filed on Jul. 14, 2010, now Pat. No. 8,560,604.

(60) Provisional application No. 61/249,624, filed on Oct. 8, 2009.

(52) **U.S. Cl.**
CPC ........ **H04L 67/108** (2013.01); **H04L 67/1023** (2013.01); **H04L 67/1063** (2013.01); **H04L 67/22** (2013.01); **H04L 67/2814** (2013.01); **H04L 67/2819** (2013.01); **H04L 67/02** (2013.01)

(58) **Field of Classification Search**
USPC .......................................................... 709/202
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,519,693 | A | 5/1996 | Galuszka |
| 5,577,243 | A | 11/1996 | Sherwood et al. |
| 5,758,195 | A | 5/1998 | Balmer |
| 6,061,278 | A | 5/2000 | Kato et al. |
| 6,154,782 | A | 11/2000 | Kawaguchi |
| 6,173,330 | B1 | 9/2001 | Guo et al. |
| 6,466,470 | B1 | 10/2002 | Chang |
| 6,519,693 | B1 | 2/2003 | Debey |
| 6,868,453 | B1 | 3/2005 | Watanabe |
| 6,895,011 | B1 | 5/2005 | Lassers |
| 7,120,666 | B2 | 10/2006 | McCanne et al. |
| 7,203,741 | B2 | 4/2007 | Marco et al. |
| 7,234,059 | B1 | 6/2007 | Beaver |
| 7,558,942 | B1 | 7/2009 | Chen et al. |
| 7,673,048 | B1 | 3/2010 | O'Toole |
| 7,742,485 | B2 | 6/2010 | Zhang |
| 7,751,628 | B1 | 7/2010 | Reisman |
| 7,783,777 | B1 | 8/2010 | Pabla |
| 7,788,378 | B2 | 8/2010 | Rao |
| 7,818,430 | B2 | 10/2010 | Zuckerman |
| 7,831,720 | B1 | 11/2010 | Noureddine |
| 7,865,585 | B2 * | 1/2011 | Samuels ................ H04L 67/28 709/217 |
| 7,890,547 | B2 | 2/2011 | Hotti |
| 7,970,835 | B2 | 6/2011 | St. Jacques |
| 8,135,912 | B2 | 3/2012 | Shribman et al. |
| 8,171,101 | B2 | 5/2012 | Gladwin et al. |
| 8,479,251 | B2 | 7/2013 | Feinleib et al. |
| 8,499,059 | B2 | 7/2013 | Stoyanov |
| 8,595,786 | B2 | 11/2013 | Choi |
| 8,639,630 | B2 | 1/2014 | Fomenko et al. |
| 8,769,035 | B2 | 1/2014 | Resch et al. |
| 8,719,430 | B2 | 5/2014 | Van Ackere |
| 8,719,505 | B2 | 6/2014 | Shribman et al. |
| 8,832,179 | B2 | 9/2014 | Owen et al. |
| 8,838,811 | B2 | 9/2014 | Chen |
| 9,201,808 | B2 | 1/2015 | Shribman et al. |
| 9,015,335 | B1 * | 4/2015 | Gigliotti ................ G06F 16/40 709/231 |
| 9,177,157 | B2 | 11/2015 | Binder |
| 9,253,164 | B2 | 2/2016 | Gouge |
| 9,990,295 | B2 | 6/2018 | Shribman et al. |
| 2001/0033583 | A1 | 10/2001 | Rabenko et al. |
| 2001/0054020 | A1 * | 12/2001 | Barth ................ G06Q 10/00 705/37 |
| 2002/0007413 | A1 | 1/2002 | Garcia-Luna-Aceves et al. |
| 2002/0065930 | A1 | 5/2002 | Rhodes |
| 2002/0069241 | A1 | 6/2002 | Narlikar |
| 2002/0091760 | A1 | 7/2002 | Rozen |
| 2002/0120874 | A1 | 8/2002 | Shu et al. |
| 2002/0123895 | A1 | 9/2002 | Potekhin |

| | | | |
|---|---|---|---|
| 2002/0133621 | A1 | 9/2002 | Marco et al. |
| 2003/0009518 | A1 | 1/2003 | Harrow et al. |
| 2003/0009583 | A1 | 1/2003 | Chan et al. |
| 2003/0074403 | A1 | 4/2003 | Harrow et al. |
| 2003/0097408 | A1 | 5/2003 | Kageyama |
| 2003/0115364 | A1 | 6/2003 | Shu et al. |
| 2003/0174648 | A1 | 9/2003 | Wang et al. |
| 2003/0200307 | A1 | 10/2003 | Raju et al. |
| 2003/0204602 | A1 | 10/2003 | Hudson |
| 2003/0210694 | A1 | 11/2003 | Jayaraman et al. |
| 2003/0229718 | A1 | 12/2003 | Tock |
| 2003/0229785 | A1 | 12/2003 | Daseke |
| 2004/0088646 | A1 | 5/2004 | Yeager et al. |
| 2004/0107242 | A1 | 6/2004 | Vert et al. |
| 2004/0254907 | A1 | 12/2004 | Crow et al. |
| 2004/0264506 | A1 | 12/2004 | Furukawa |
| 2005/0015552 | A1 | 1/2005 | So et al. |
| 2005/0022236 | A1 | 1/2005 | Ito et al. |
| 2005/0027782 | A1 | 2/2005 | Jalan |
| 2005/0097441 | A1 | 5/2005 | Herbach |
| 2005/0228964 | A1 | 10/2005 | Sechrest et al. |
| 2006/0036755 | A1 | 2/2006 | Abdullah |
| 2006/0039352 | A1 | 2/2006 | Karstens |
| 2006/0047844 | A1 | 3/2006 | Deng |
| 2006/0212542 | A1 * | 9/2006 | Fang ................ H04L 67/104 709/219 |
| 2006/0212584 | A1 * | 9/2006 | Yu ................ H04L 67/104 709/227 |
| 2006/0224687 | A1 | 10/2006 | Popkin |
| 2006/0259728 | A1 | 11/2006 | Chandrasekaran et al. |
| 2007/0050522 | A1 | 3/2007 | Grove |
| 2007/0073878 | A1 | 3/2007 | Issa |
| 2007/0100839 | A1 | 5/2007 | Kim |
| 2007/0142036 | A1 | 6/2007 | Wikman |
| 2007/0156855 | A1 | 7/2007 | Johnson |
| 2007/0174246 | A1 | 7/2007 | Sigurdsson |
| 2007/0226810 | A1 | 9/2007 | Hotti |
| 2007/0239655 | A1 | 10/2007 | Agetsuma et al. |
| 2008/0008089 | A1 | 1/2008 | Bornstein et al. |
| 2008/0025506 | A1 | 1/2008 | Muraoka |
| 2008/0109446 | A1 | 5/2008 | Wang |
| 2008/0125123 | A1 | 5/2008 | Dorenbosch et al. |
| 2008/0222291 | A1 | 9/2008 | Weller |
| 2008/0235391 | A1 | 9/2008 | Painter et al. |
| 2008/0086730 | A1 | 10/2008 | Vertes |
| 2008/0256175 | A1 | 10/2008 | Lee |
| 2009/0010426 | A1 | 1/2009 | Redmond |
| 2009/0037529 | A1 | 2/2009 | Armon-Kest |
| 2009/0182843 | A1 | 7/2009 | Hluchyj |
| 2009/0216887 | A1 | 8/2009 | Hertle |
| 2009/0217122 | A1 | 8/2009 | Yokokawa et al. |
| 2009/0232003 | A1 | 9/2009 | Vasseur |
| 2009/0248793 | A1 | 10/2009 | Jacobsson |
| 2009/0279559 | A1 | 11/2009 | Wong et al. |
| 2009/0292816 | A1 | 11/2009 | Etchegoyen |
| 2009/0319502 | A1 | 12/2009 | Chalouhi et al. |
| 2010/0066808 | A1 | 3/2010 | Tucker et al. |
| 2010/0085977 | A1 | 4/2010 | Khalid et al. |
| 2010/0094970 | A1 | 4/2010 | Zuckerman et al. |
| 2010/0115063 | A1 | 6/2010 | Gladwin et al. |
| 2010/0154044 | A1 | 6/2010 | Manku |
| 2010/0235438 | A1 | 9/2010 | Narayanan |
| 2010/0262650 | A1 | 10/2010 | Chauhan |
| 2010/0293555 | A1 | 11/2010 | Vepsalainen |
| 2010/0329270 | A1 | 12/2010 | Asati et al. |
| 2011/0035503 | A1 * | 2/2011 | Zaid ................ H04L 63/0407 709/228 |
| 2011/0066924 | A1 | 3/2011 | Dorso |
| 2011/0087733 | A1 | 4/2011 | Shribman |
| 2011/0128911 | A1 | 6/2011 | Shaheen |
| 2011/0264809 | A1 | 10/2011 | Koster |
| 2011/0314347 | A1 | 12/2011 | Nakano et al. |
| 2012/0099566 | A1 | 4/2012 | Laine et al. |
| 2012/0124173 | A1 | 5/2012 | De et al. |
| 2012/0124239 | A1 | 5/2012 | Shribman |
| 2012/0164980 | A1 | 6/2012 | Van Phan |
| 2012/0166582 | A1 | 6/2012 | Binder |
| 2012/0246273 | A1 | 9/2012 | Bornstein |
| 2012/0254370 | A1 | 10/2012 | Bacher |

**US 10,484,510 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2012/0254456 | A1 | 10/2012 | Visharam |
| 2013/0007293 | A1 | 1/2013 | Wang |
| 2013/0007253 | A1 | 1/2013 | Li |
| 2013/0064370 | A1 | 3/2013 | Gouge |
| 2013/0080575 | A1 | 3/2013 | Prince |
| 2013/0157699 | A1 | 6/2013 | Talwar |
| 2013/0166768 | A1 | 6/2013 | Gouache et al. |
| 2013/0171964 | A1 | 7/2013 | Bhatia |
| 2013/0201316 | A1 | 8/2013 | Binder et al. |
| 2013/0219458 | A1 | 8/2013 | Ramanathan |
| 2013/0272519 | A1 | 10/2013 | Huang |
| 2013/0304796 | A1 | 11/2013 | Jackowski |
| 2013/0326607 | A1 | 12/2013 | Feng |
| 2014/0082260 | A1 | 3/2014 | Oh et al. |
| 2014/0189802 | A1 | 7/2014 | Montgomery |
| 2014/0301334 | A1 | 10/2014 | Labranche et al. |
| 2014/0359081 | A1 | 12/2014 | Van Deventer |
| 2014/0376403 | A1 | 12/2014 | Shao |
| 2015/0033001 | A1 | 1/2015 | Ivanov |
| 2015/0067819 | A1 | 3/2015 | Shribman |
| 2015/0189401 | A1 | 7/2015 | Yi |
| 2015/0206176 | A1 | 7/2015 | Toval |
| 2015/0206197 | A1 | 7/2015 | Toval |
| 2015/0341812 | A1 | 11/2015 | Dion |
| 2015/0358648 | A1 | 12/2015 | Limberg |
| 2016/0021430 | A1 | 1/2016 | LaBosco et al. |
| 2016/0105530 | A1 | 4/2016 | Shribman |
| 2017/0221092 | A1 | 8/2017 | Toval |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0948176 A2 | 10/1999 |
| EP | 2597869 A1 | 5/2013 |
| EP | 2597869 A1 | 5/2015 |
| EP | 2922275 B1 | 3/2016 |
| JP | 2007280388 | 10/2007 |
| KR | 1020090097034 | 9/2009 |
| RU | 2343536 C2 | 10/2009 |
| WO | 2000/018078 A1 | 3/2000 |
| WO | 2004094980 | 11/2004 |
| WO | 2010090562 A1 | 8/2010 |
| WO | 2010090562 A1 | 12/2010 |
| WO | 2011068784 A1 | 9/2011 |
| WO | 2015034752 A1 | 3/2015 |

OTHER PUBLICATIONS

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,785.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,433.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,451.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,476.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,496.

Third-party submission under 37 CFR 1.290 filed on Jul. 22, 2019 and entered in U.S. Appl. No. 16/292,363.

Third-party submission under 37 CFR 1.290 filed on Jul. 22, 2019 and entered in U.S. Appl. No. 16/292,364.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,374.

Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,382.

Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,250.

Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,315.

"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Feb. 12, 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf (Year 2011) (16 pages).

"Keep Alive"—Imperva, 2019 https://www.imperva.com/learn/performance/keep-alive (2019) (3 pages).

Third party observation filed on Jun. 21, 2019 in PCT Application No. PCT/IL2018/050910 (7 pages).

IETF named: IPy6 Tunnel Broker, Apr. 1999—First uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).

RFC 3053 (Jan. 2001) named: IPv6 Tunnel Broker—Secod uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).

International Search Report issued in PCT Application No. PCT/US2010/051881 dated Dec. 9, 2010.

Supplementary European Search Report issued in EP Application No. 10822724 dated Apr. 24, 2013.

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages).

"On the Leakage of Personally Identifiable Information via Online Social Networks"—Wills et al, AT&T, Apr. 2009 http://www2.research.att.com/~bala/papers/wosn09.pdf.

Notice of Preliminary Rejection in KR Application No. 10-2012-7011711 dated Jul. 15, 2016.

Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Report, The Institute of Electronics, Information and Communication Engineers, May 14, 2009.

Reed et al, "Anonymous Connections and Onion Routing", Naval Research Laboratory, Mar. 1998 https://www.onion-router.net/Publications/JSAC-1998.pdf (Year: 1998).

Michael J. Freedman, Princeton University, "Experiences with CoralCDN: a five-year operational view", Proceeding NSDI'10 Proceedings of the 7th USENIX conference on Networked systems design and implementation San Jose, California—Apr. 28-30, 2010 (17 pages).

"The BitTorrent Protocol Specification", Website: https://web.archive.org/web/20120513011037/http:/www.bittorrent.org/beps/bep_0003.html describing BitTorrent dated Jan. 10, 2008 downloaded using web archive on Aug. 16, 2019 (6 pages).

"BitTorrent", Website: https://en.wikipedia.org/w/index.php?title=BitTorrent&oldid=530466721 describing BitTorrent dated Dec. 30, 2012 downloaded using Wikipedia on Aug. 16, 2019 (9 pages).

"VIP Socks/VPN Service", Website: http://vip72.com:80/?drgn=1 describing VIP72 proxy service dated Jan. 2010 downloaded using VIP Technologies webpage on Aug. 16, 2019 (3 pages).

"Welcome to Easy Hide IP", Website: https://web.archive.org/web/20130702093456/http://www.easy-hide-ip.com:80/describing Easy Hide IP dated Jun. 26, 2007 downloaded using web archive on Aug. 16, 2019 (2 pages).

"You make it fun; we'll make it run", Website: https://web.archive.org/web/20130726050810/https://www.coralcdn.org describing CoralCDN dated Jan. 25, 2005 downloaded using web archive on Aug. 16, 2019 (2 pages).

"Net Transport", Website: http://www.xi-soft.com/default.htm describing Net Transport Overview dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (2 pages).

Net Transport—Develop History, Website: http://www.xi-soft.com/download.htm describing Net Transport Download dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (10 pages).

Net Transport FAQ, Website: http://www.xi-soft.com/faq.htm describing Net Transport FAQ dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (4 pages).

Net Transport News, Website: http://www.xi-soft.com/news.htm describing Net Transport News dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (5 pages).

Screen captures from YouTube video clip entitle "nVpn.net | Double your Safety and use Socks5 + nVpn" 38 pages, last accessed Nov. 20, 2018 <https://www.youtube.com/watch?v=1.0Hct2kSnn4>.

Screen captures from YouTube video clip entitle "Andromeda" 47 pages, publicly known and available as of at least 2011 <https://www.youtube.com/watch?v=yRRYpFLbKNU>.

**US 10,484,510 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

SpyEye, https://www.symantec.com/security-center/writeup/2010-020216-0135-9; http://securesql.info/riskyclouds/spyeye-user-manual; known as of at least 2010 (13 pages).

Screen captures from YouTube video clip entitle "Change Your Country IP Address & Location with Easy Hide IP Software" 9 pages, publicly known and available as of at least 2011, <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.

CoralCDN ("CoralCDN"), https://pdos.csail.mit.edu/6.824/papers/freedman-coral.pdf (14 Pages).

European Search Report for EP 14182547.1, dated Jul. 30, 2015.

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002].

"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Computer Science Dept., Oct. 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf.

International Search Report of PCT/US2010/034072 dated Jul. 1, 2010.

YouTube video clip entitled "nVpn.net | Double your Safety and use Socks5 + nVpn" <https://www.youtube.com/watch?v=L0Hct2kSnn4>.

YouTube video clip entitled "Andromeda" <https://www.youtube.com/watch?v=yRRYpFLbKNU>.

YouTube video clip entitled "Change Your Country IP Address & Location with Easy Hide IP Software" <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-b9DTc>.

* cited by examiner



**FIG. 1**



**FIG. 2**



**FIG. 3**



FIG. 4

Appx1206



**FIG. 5**

Appx1207



FIG. 6



162

**ACCELERATION DATABASE 164**

166 AGENT IP A|ONLINE/OFFLINE

>>> INDEXED BY: AGENT IP ADDRESS

**CACHE DATABASE 282**

286 LIST OF URLS:

288 URL 1

290 URL

292 URL HTTP HEADERS

294 LAST CHECKED ON SERVER

296 LAST CHANGED ON SERVER

298 LIST OF CHUNKS FOR THIS URL:

300 CHUNK 1

302 CHUNK CHECKSUM

304 CHUNK DATA

306 LIST OF PEERS:

308 PEER 1

310 PEER 1 IP ADDRESS

312 PEER 2 CONNECTION STATUS

**FIG. 7**



300

INITIALIZER SIGNS UP WITH
ACCELERATION SERVER
302

DETERMINE IF THERE IS AN
UPDATED VERSION OF
APPLICATION?
304

INITIALIZER REDIRECTS
OUTGOING NETWORK TRAFFIC
306

INITIALIZER LAUNCHES CLIENT
MODULE AND CONFIGURES
CLIENT MODULE TO INTERCEPT
ALL OUTGOING NETWORK
COMMUNICATIONS
308

INITIALIZER LAUNCHES AGENT
MODULE AND PEER MODULE
310

FIG. 8



FIG. 9



EACH AGENT THAT RECEIVES CLIENT REQUEST RESPONDS TO CLIENT WITH WHETHER IT HAS INFO. REGARDING REQUEST THAT CAN ASSIST CLIENT TO DOWNLOAD REQUESTED INFO. FROM PEERS IN NETWORK        382

CLIENT SELECTS SPECIFIC AGENT        384

CLIENT NOTIFIES SELECTED AGENT OF USE FOR REQUEST AND NOTIFIES OTHER AGENTS OF LACK OF USE        386

CLIENT FORWARDS SELECTED AGENT REQUEST FOR FIRST X NUMBER OF CHUNKS        388

DOES SELECTED AGENT HAVE INFO. REGARDING REQUESTED CHUNKS AND IS INFO. STILL VALID?        390

YES

IF INFO. STILL VALID, SELECTED AGENT RESPONDS TO CLIENT WITH CHECKSUM OF CHUNK, LIST OF PEERS THAT CONTAIN CHUNKS, AND IF ONLY A PORTION OF INFO., HEADERS        392

LIST OF PEERS FOR EACH CHUNK IS SORTED BY GEOGRAPHICAL PROXIMITY TO REQUESTING CLIENT        394

LIST OF CLOSEST PEERS TO CLIENT IS SENT TO CLIENT        396

NO

SELECTED AGENT SENDS REQUEST DIRECTLY TO SERVER        400

SELECTED AGENT STORES INFO. FROM SERVER IN ITS DATABASE        402

SELECTED AGENT PREPARES RESPONSE (LIST) FOR CLIENT, WHERE RESPONSE INCLUDES CHECKSUM OF CHUNK, HEADERS, AND PROVIDES ITSELF AS THE ONLY PEER FOR THESE CHUNKS        404

LIST IS FORWARDED BACK TO CLIENT        406

FIG. 10

Appx1212



CLIENT RECEIVES RESPONSE FROM THE AGENT AND FOR EACH OF X CHUNKS, CLIENT SENDS A REQUEST TO EACH OF THE PEERS LISTED FOR THE CHUNK TO DOWNLOAD THE DATA OF THAT CHUNK     422

PEERS RESPOND REGARDING WHETHER THEY STILL HAVE THE DATA OF THE CHUNK     424

CLIENT SELECTS QUICKEST PEER WITH DATA OF THE CHUCK  426

CHOSEN PEER SENDS CHUNK TO CLIENT     428

CLIENT STORES CHUNKS IN ITS CACHE FOR FUTURE USE     430

IF ANY CHUNKS WERE NOT LOADED FROM ANY OF THE PEERS, CLIENT REQUESTS CHUNKS AGAIN FROM AGENT     432

CLIENT ACKNOWLEDGES TO THE AGENT WHICH OF THE CHUNKS IT RECEIVED PROPERLY     434

AGENT LOOKS UP CHUNKS IN DATABASE OF AGENT AND ADDS CLIENT TO LIST OF PEERS FOR THESE CHUNKS     436

CLIENT PASSES DATA TO APPLICATION OF CLIENT THAT MADE REQUEST 438

CLIENT CHECKS WHETHER ALL OF THE CHUNKS FOR REQUEST WERE RECEIVED 440

**FIG. 11**

420



**FIG. 12**



550

CHECK "KEEP ALIVE" WITH NETWORK
ELEMENTS (CLIENTS/AGENTS/PEERS), AND
UPDATE DATABASE AS TO THEIR STATUS
(ON-LINE / OFF-LINE)
552

WAIT FOR CLIENT REQUEST
554

TYPE OF REQUEST RECEIVED?
556

SIGN_UP    FIND_AGENT    CHECK_VERSION

ADD THE CLIENT TO LIST OF
POTENTIAL AGENTS,
SORTED BY IP ADDRESS OF
THE NETWORK ELEMENTS
(CLIENTS, PEERS, AGENTS)
558

CREATE A NEW, EMPTY AGENT LIST
560

RETURN TO THE CLIENT THE VERSION OF
THE LATEST AVAILABLE SOFTWARE, AND
A URL OF WHERE TO DOWNLOAD THE
LATEST VERSION
566

SEARCH THE AGENT DATABASE
FOR THE NEXT 5 ACTIVE AGENTS
THAT HAS THE IP ADDRESS THAT
IS CLOSEST TO THE TARGET
SERVER IP
(E.G. 192.166.3.103 IS CLOSER TO
192.166.3.212 THEN TO
192.167.3.104)
562

SEND THE AGENT LIST TO THE
CLIENT
564

FIG. 13



FIG. 14



ACCELERATION APPLICATION INTERCEPTS A TCPIP WRITE COMMAND FROM THE COMMUNICATION APPLICATION (ON CLIENT) OR FROM TCPIP SERVER (ON AGENT) 802

DATA OF WRITE COMMAND IS BROKEN UP INTO CHUNKS AND CHECKSUMS ARE CALCULATED FOR EACH CHUNK 804

ACCELERATION APPLICATION LOOKS UP EACH CHUNK'S CHECKSUM IN ITS CACHE DATABASE 806

DOES AN ENTRY FOR THE CHECKSUM EXIST IN THE CACHE DATABASE? 808

YES

NO

ACCELERATION APPLICATION PREPARES LIST OF PEERS THAT HAVE RECEIVED THIS CHUNK IN THE PAST 810

ACCELERATION APPLICATION SENDS PEER LIST TO COMMUNICATION DEVICE IT IS COMMUNICATING WITH (CLIENT TO AGENT, OR AGENT TO CLIENT), AND ADDS THAT COMMUNICATION DEVICE TO THE LIST OF PEERS FOR THAT CHUNK 812

COMMUNICATION DEVICE WITH ACCELERATION APPLICATION THAT RECEIVED THE LIST OF PEERS CONNECTS TO AT LEAST ONE OF THE PEERS AND DOWNLOADS THE CHUNK FROM IT 814

ACCELERATION APPLICATION ADDS THE CHUNK AND ITS CHECKSUM TO ITS CACHE DATABASE, AND SENDS THE CHUNK ITSELF TO THE COMMUNICATION DEVICE IT IS COMMUNICATING WITH (CLIENT TO AGENT, OR AGENT TO CLIENT), AND ADDS THAT COMMUNICATION DEVICE TO THE LIST OF PEERS FOR THAT CHUNK 820

NO

HAVE ALL CHUNK DATA BEEN TRANSFERRED TO THE OTHER SIDE? 816

YES

ACCELERATION APPLICATION PASSES ON THE COMPLETE DATA RECEIVED ON TO THE REQUESTER – IN THE CLIENT IT PASSES IT ON TO THE COMMUNICATION APPLICATION, AND IN THE AGENT IT PASSES IT ON TO THE TCPIP SERVER 818

FIG. 15

800

US 10,484,510 B2

1

# SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation application of U.S. non-provisional patent application Ser. No. 15/957,945, filed Apr. 20, 2018, which is a continuation application of U.S. non-provisional patent application Ser. No. 14/025,109, filed Sep. 12, 2013 and issued as U.S. Pat. No. 10,069,936 on Sep. 4, 2018, which is a divisional application of U.S. non-provisional patent application entitled "SYSTEM AND METHOD FOR PROVIDING FASTER, AND MORE EFFICIENT DATA COMMUNICATION" having Ser. No. 12/836,059, filed Jul. 14, 2010 and issued as U.S. Pat. No. 8,560,604 on Oct. 15, 2013, and claims priority to U.S. provisional patent application entitled "SYSTEM AND METHOD FOR REDUCING INTERNET CONGES-TION," having Ser. No. 61/249,624, filed Oct. 8, 2009, which are hereby incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present invention is related to Internet communica-tion, and more particularly, to improving data communica-tion speed and bandwidth efficiency on the Internet.

## BACKGROUND OF THE INVENTION

There are several trends in network and Internet usage, which tremendously increase the bandwidth that is being used on the Internet. One such trend is that more and more video is being viewed on demand on the Internet. Such viewing includes the viewing of both large and short video clips. In addition, regular shows and full-featured films may be viewed on the Internet. Another trend that is increasing the traffic on the Internet is that Web sites (such as shopping portals, news portals, and social networks) are becoming global, meaning that the Web sites are serving people in many diverse places on the globe, and thus the data is traversing over longer stretches of the Internet, increasing the congestion.

The increase in bandwidth consumption has created sev-eral major problems, a few of which are described below:

The problem for users—the current Internet bandwidth is not sufficient, and thus the effective 'speed' experienced by users is slow;

The problem for content owners—the tremendous amount of data being viewed by users is costing large amounts of money in hosting and bandwidth costs; and

The problem for Internet Service Providers (ISPs)—the growth in Internet traffic is requiring the ISPs to increase the infrastructure costs (communication lines, routers, etc.) at tremendous financial expense.

The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved.

There have been many attempts at making the Internet faster for the consumer and cheaper for the broadcaster. Each such attempt is lacking in some aspect to become a widespread, practical solution, or is a partial solution in that it solves only a subset of the major problems associated with the increase in Internet traffic. Most of the previous solutions require billions of dollars in capital investment for a com-prehensive solution. Many of these attempts are lacking in that much of the content on the Internet has become dynami-cally created per the user and the session of the user (this is what used to be called the "Web2.0" trend). This may be seen on the Amazon Web site and the Salesforce Web site, for example, where most of the page views on these Web sites is tailored to the viewer, and is thus different for any two viewers. This dynamic information makes it impossible for most of the solutions offered to date to store the content and provide it to others seeking similar content.

One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram providing an example of use of a proxy within a network 2. A proxy, or proxy server 4, 6, 8 is a device that is placed between one or more clients, illustrated in FIG. 1 as client devices 10, 12, 14, 16, 18, 20, that request data, via the Internet 22, and a Web server or Web servers 30, 32, 34 from which they are requesting the data. The proxy server 4, 6, 8 requests the data from the Web servers 30, 32, 34 on their behalf, and caches the responses from the Web servers 30, 32, 34, to provide to other client devices that make similar requests. If the proxy server 4, 6, 8 is geographically close enough to the client devices 10, 12, 14, 16, 18, 20, and if the storage and bandwidth of the proxy server 4, 6, 8 are large enough, the proxy server 4, 6, 8 will speed up the requests for the client devices 10, 12, 14, 16, 18, 20 that it is serving.

It should be noted, however, that to provide a compre-hensive solution for Internet surfing, the proxy servers of FIG. 1 would need to be deployed at every point around the world where the Internet is being consumed, and the storage size of the proxy servers at each location would need to be near the size of all the data stored anywhere on the Internet. The abovementioned would lead to massive costs that are impractical. In addition, these proxy solutions cannot deal well with dynamic data that is prevalent now on the Web.

There have been commercial companies, such as Akamai, that have deployed such proxies locally around the world, and that are serving a select small group of sites on the Internet. If all sites on the Web were to be solved with such a solution, the capital investment would be in the range of billions of dollars. In addition, this type of solution does not handle dynamic content.

To distribute large distribution systems without the large hardware costs involved with a proxy solution, "peer-to-peer file sharing" solutions have been introduced, such as, for example, BitTorrent. FIG. 2 is a schematic diagram provid-ing an example of a peer-to-peer file transfer network 50. In the network 50, files are stored on computers of consumers, referred to herein as client devices 60. Each consumer can serve up data to other consumers, via the Internet 62, thus taking the load of serving off of the distributors and saving them the associated costs, and providing the consumer multiple points from which to download the data, referred to herein as peers 70, 72, 74, 76, 78, thus increasing the speed of the download. However, each such peer-to-peer solution must have some sort of index by which to find the required data. In typical peer-to-peer file sharing systems, because the index is on a server 80, or distributed among several servers, the number of files available in the system is not very large (otherwise, the server costs would be very large, or the lookup time would be very long).

The peer-to-peer file sharing solution is acceptable in file sharing systems, because there are not that many media files that are of interest to the mass (probably in the order of magnitude of millions of movies and songs that are of interest). Storing and maintaining an index of millions of entries is practical technically and economically. However,

US 10,484,510 B2

3

4

if this system were to be used to serve the hundreds of billions of files that are available on the Internet of today, the cost of storing and maintaining such an index would be again in the billions of dollars. In addition, these types of peer-to-peer file sharing systems are not able to deal with dynamic HTTP data.

In conclusion, a system does not exist that enables fast transmission of most of the data on the Internet, that does not incur tremendous costs, and/or that provides only a very partial solution to the problem of Internet traffic congestion. Thus, a heretofore unaddressed need exists in the industry to address the aforementioned deficiencies and inadequacies.

SUMMARY OF THE INVENTION

The present system and method provides for faster and more efficient data communication within a communication network. Briefly described, in architecture, one embodiment of the system, among others, can be implemented as follows. A network is provided for accelerating data communication, wherein the network contains: at least one client communication device for originating a data request for obtaining the data from a data server; at least one agent communication device which is assigned to the data server for receiving the data request from the client communication device, wherein the agent keeps track of which client communication devices have received responses to data requests from the assigned data server; at least one peer communication device for storing portions of data received in response to the data request by the at least one client communication device, wherein the portions of data may be transmitted to the at least one client communication device upon request by the client communication device; and at least one acceleration server for deciding which agent communication device is to be assigned to which data server and providing this information to the at least one client communication device.

The present system and method also provides a communication device within a network, wherein the communication device contains: a memory; and a processor configured by the memory to perform the steps of originating a data request for obtaining data from a data server; being assigned to a data server, referred to as an assigned data server; receiving a data request from a separate device within the network, and keeping track of which client communication devices within the network have received responses to data requests from the assigned data server; and storing portions of data received in response to the originated data request, wherein the portions of data may be transmitted to communication device upon request by the communication device.

Other systems, methods, features, and advantages of the present invention will be or become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional systems, methods, features, and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

BRIEF DESCRIPTION OF THE DRAWINGS

Many aspects of the invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. **1** is a schematic diagram providing a prior art example of use of a proxy within a network.

FIG. **2** is a schematic diagram providing a prior art example of a peer-to-peer file transfer network.

FIG. **3** is a schematic diagram providing an example of a communication network in accordance with the present invention.

FIG. **4** is a schematic diagram further illustrating a communication device of the communication network of FIG. **3**.

FIG. **5** is a schematic diagram further illustrating the memory of FIG. **4**.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application of FIG. **5**, as well as communication paths of the acceleration application.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network.

FIG. **8** is a flowchart illustrating operation of the acceleration system initializer module.

FIG. **9** is a flowchart further illustrating communication between different elements of the communication network.

FIG. **10** is a flowchart continuing the flowchart of FIG. **9** and focused on agent response to the HTTP request.

FIG. **11** is a flowchart continuing the flowchart of FIG. **10**, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent.

FIG. **12** is a flowchart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid.

FIG. **13** is a flowchart outlining operation of the acceleration server.

FIG. **14** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention.

FIG. **15** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

DETAILED DESCRIPTION

The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network **100** is provided by the schematic diagram of FIG. **3**. The network **100** of FIG. **3** contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network **100**, as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. **4**.

Returning to FIG. **3**, the exemplary embodiment of the network **100** illustrates that one of the communication devices is functioning as a client **102**. The client **102** is capable of communication with one or more peers **112**, **114**, **116** and one or more agents **122**. For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

The communication network **100** also contains a Web server **152**. The Web server **152** is the server from which the client **102** is requesting information and may be, for example, a typical HTTP server, such as those being used to

5

deliver content on any of the many such servers on the Internet. It should be noted that the server **152** is not limited to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the server may be a server capable of handling a different protocol. It should also be noted that while the present description refers to the use of HTTP, the present invention may relate to any other communication protocol and HTTP is not intended to be a limitation to the present invention.

The communication network **100** further contains an acceleration server **162** having an acceleration server storage device **164**. As is described in more detail herein, the acceleration server storage device **164** has contained therein an acceleration server database. The acceleration server database stores Internet protocol (IP) addresses of communication devices within the communication network **100** having acceleration software stored therein. Specifically, the acceleration server database contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. For each such agent, the acceleration server assigns a list of IP addresses.

In the communication network **100** of FIG. **3**, the application in the client **102** is requesting information from the Web server **152**, which is why the software within the communication device designated this communication device to work as a client. In addition, since the agent **122** receives the request from the client **102** is the communication device closest to the Web server **152**, functionality of the agent **122**, as provided by the software of the agent **122**, designates this communication device to work as an agent. It should be noted, that in accordance with an alternative embodiment of the invention, the agent need not be the communication device that is closest to the Web server. Instead, a different communication device may be selected to be the agent.

Since the peers **112**, **114**, **116** contain at least portions of the information sought by the client **102** from the Web server **152**, functionality of the peers **112**, **114**, **116**, as provided by the software of the peers **112**, **114**, **116**, designates these communication devices to work as peers. It should be noted that the process of designating clients, agents, and peers is described in detail herein, it should also be noted that the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network **100** may differ from the number illustrated by FIG. **3**. In fact, the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network **100** are not intended to be limited by the current description.

Prior to describing functionality performed within a communication network **100**, the following further describes a communication device **200**, in accordance with a first exemplary embodiment of the invention. FIG. **4** is a schematic diagram further illustrating a communication device **200** of the communication network **100**, which contains general components of a computer. As previously mentioned, it should be noted that the communication device **200** of FIG. **4** may serve as a client, agent, or peer.

Generally, in s of hardware architecture, as shown in FIG. **4**, the communication device **200** includes a processor **202**, memory **210**, at least one storage device **208**, and one or more input and/or output (I/O) devices **240** (or peripherals) that are communicatively coupled via a local interface **250**. The local interface **250** can be, for example but not limited to, one or more buses or other wired or wireless connections, as is known in the art. The local interface **250** may have

6

additional elements, which are omitted for simplicity, such as controllers, buffers (caches), drivers, repeaters, and receivers, to enable communications. Further, the local interface **250** may include address, control, and/or data connections to enable appropriate communications among the aforementioned components.

The processor **202** is a hardware device for executing software, particularly that stored in the memory **210**. The processor **52** can be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the communication device **200**, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, or generally any device for executing software instructions.

The memory **210**, which is further illustrated and described by the description of FIG. **5**, can include any one or combination of volatile memory elements (e.g., random access memory (RAM, such as DRAM, SRAM, SDRAM, etc.)) and nonvolatile memory elements (e.g., ROM, hard drive, tape, CDROM, etc.). Moreover, the memory **210** may incorporate electronic, magnetic, optical, and/or other types of storage media. Note that the memory **210** can have a distributed architecture, where various components are situated remote from one another, but can be accessed by the processor **202**.

The software **212** located within the memory **210** may include one or more separate programs, each of which contains an ordered listing of executable instructions for implementing logical functions of the communication device **200**, as described below. In the example of FIG. **4**, the software **212** in the memory **210** at least contains an acceleration application **220** and an Internet browser **214**. In addition, the memory **210** may contain an operating system (O/S) **230**. The operating system **230** essentially controls the execution of computer programs and provides scheduling, input-output control, file and data management, memory management, and communication control and related services. It should be noted that, in addition to the acceleration application **220**, Internet browser **214**, and operating system **230**, the memory **210** may contain other software applications.

While the present description refers to a request from the client originating from an Internet browser, the present invention is not limited to requests originating from Internet browsers. Instead, a request may originate from an email program or any other program that would be used to request data that is stored on a Web server, or other server holding data that is requested by the client device.

Functionality of the communication device **200** may be provided by a source program, executable program (object code), script, or any other entity containing a set of instructions to be performed. When a source program, then the program needs to be translated via a compiler, assembler, interpreter, or the like, which may or may not be included within the memory **210**, so as to operate properly in connection with the operating system **230**. Furthermore, functionality of the communication device **200** can be written as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions.

The I/O devices **240** may include input devices, for example but not limited to, a keyboard, mouse, scanner, microphone, etc. Furthermore, the I/O devices **240** may also include output devices, for example but not limited to, a printer, display, etc. Finally, the I/O devices **240** may further

US 10,484,510 B2

7

include devices that communicate via both inputs and outputs, for instance but not limited to, a modulator/demodulator (modem; for accessing another device, system, or network), a radio frequency (RF) or other transceiver, a telephonic interface, a bridge, a router, etc.

When the communication device **200** is in operation, the processor **202** is configured to execute the software **212** stored within the memory **210**, to communicate data to and from the memory **210**, and to generally control operations of the communication device **200** pursuant to the software **212**. The software **212** and the O/S **230**, in whole or in part, but typically the latter, are read by the processor **202**, perhaps buffered within the processor **202**, and then executed.

When functionality of the communication device **200** is implemented in software, as is shown in FIG. **4**, it should be noted that the functionality can be stored on any computer readable medium for use by or in connection with any computer related system or method. In the context of this document, a computer readable medium is an electronic, magnetic, optical, or other physical device or means that can contain or store a computer program for use by or in connection with a computer related system or method. The functionality of the communication device **200** can be embodied in any computer-readable medium for use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions. In the context of this document, a "computer-readable medium" can be any means that can store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device.

The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM, EEPROM, or Flash memory) (electronic an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-readable medium could even be paper or another suitable medium upon which the program is printed, as the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

In an alternative embodiment, where the functionality of the communication device **200** is implemented in hardware, the functionality can be implemented with any or a combination of the following technologies, which are each well known in the art: a discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit (ASIC) having appropriate combinational logic gates, a programmable gate array (s) (PGA), a field programmable gate array (FPGA), etc.

The at least one storage device **208** of the communication device **200** may be one of many different categories of storage device. As is described in more detail herein, the storage device **208** may include a configuration database **280** and a cache database **282**. Alternatively, the configuration database **280** and cache database **282** may be located on

8

different storage devices that are in communication with the communication device **200**. The description that follows assumes that the configuration database **280** and cache database **282** are located on the same storage device, however, it should be noted that the present invention is not intended to be limited to this configuration.

The configuration database **280** stores configuration data that is common to all elements of the communication network **100** and is used to provide set up and synchronization information to different modules of the acceleration application **220** stored within the memory **210**, as is described in further detail herein. The cache database **282** stores responses to HTTP requests that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. As is explained in additional detail herein, the responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this information and will use this communication device as either a peer or an agent.

In addition to the abovementioned, as is explained in further detail herein, the cache database **282** has stored therein a list of URLs that the communication device is aware of (i.e., has seen requests for). For each URL, the cache database **282** has stored therein the URL HTTP headers returned by the Web Server for this URL, when the last time was that the contents of this URL was loaded directly from the Web Server, when the contents of the URL had last changed on the Web Server, as well as a list of chunks that contain the contents of this URL, and the chunks of data themselves. Chunks in the present description are defined as equally sized pieces of data that together form the whole content of the URL. It should be noted that while the present description provides for chunks being equally sized pieces of data, in accordance with an alternative embodiment of the invention, the chunks may instead be of different size.

FIG. **5** is a schematic diagram further illustrating the memory **210** of FIG. **4**. As shown by FIG. **5**, the memory **210** may be separated into two basic levels, namely, an operating system level **260** and an application level **270**. The operating system level **260** contains the operating system **230**, wherein the operating system **230** further contains at least one device driver **262** and at least one communication stack **264**. The device drivers **262** are software modules that are responsible for the basic operating commands for various hardware devices of the communication device **200**, such as the processor **202**, the storage device **208** and the I/O devices **240**. In addition, the communication stacks **264** provide applications of the communication device **200** with a means of communicating within the network **100** by implementing various standard communication protocols.

The application level **270** includes any application that is running on the communication device **200**. As a result, the application level **270** includes the Internet browser **214**, which is used to view information that is located on remote Web servers, the acceleration application **220**, as described in more detail below, and any other applications **216** stored on the communication device **200**.

As is explained in additional detail below, the acceleration application **220** intercepts the requests being made by applications of the communication device (client) that use the Internet, in order to modify the requests and route the requests through the communication network. There are various methods that may be used to intercept such requests.

US 10,484,510 B2

9                                                              10

One such method is to create an intermediate driver **272**, which is also located within the memory **210**, that attaches itself to all communication applications, intercepts outgoing requests of the communication applications of the communication device **200**, such as the Internet browser **214**, and routes the requests to the acceleration application **220**. Once the acceleration application **220** modifies the requests, routes the requests to other system elements on the communication network **100**, and receives replies from other system elements of the communication network **100**, the acceleration application **220** returns the replies to the intermediate driver **272**, which provides the replies back to the requesting communication application.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application **220**, as well as communication paths of the acceleration application **220**. The acceleration application **220** contains an acceleration system initializer module **222**, which is called when the acceleration application **220** is started. The acceleration system initializer module **222** is capable of initializing all elements of the acceleration application **220** of the communication device **200** The acceleration application **220** also contains three separate modules that run in parallel, namely, a client module **224**, a peer module **226**, and an agent module **228**, each of which comes into play according to the specific role that the communication device **200** is partaking in the communication network **100** at a given time. The role of each module is further described herein.

The client module **224** provides functionality required when the communication device **200** is requesting information from the Web server **152**, such as, for example, but not limited to, Web pages, data, video, or audio. The client module **224** causes the communication device **200** having the client module **224** therein to intercept the information request and pass the information request on to other elements of the communication network **100**, such as, servers, agents or peers. This process is further described in detail herein.

The peer module **226** provides functionality required by the communication device **200** when answering other clients within the communication network **100** and providing the other clients with information that they request, which this communication device **200**, having this peer module **226** therein, has already downloaded at a separate time. This process is further described in detail herein.

The agent module **228** provides functionality required when other communication devices of the communication network **100** acting as clients query this communication device **200**, having this agent module **228** therein, as an agent, to obtain a list of peers within the communication network **100** that contain requested information. This process is further described in detail herein.

The acceleration application **220** interacts with both the configuration database **280** and the cache database **282** of the storage device **208**. As previously mentioned herein, the configuration database **280** stores configuration data that may be common to all communication devices of the communication network **100** and is used to provide setup and synchronization information to different modules **222**, **224**, **226**, **228** of the acceleration application **220** stored within the memory **210**.

The cache database **282** stores responses to information requests, such as, for example, HTTP requests, that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. The responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this same information and will use this communication device **200** as either a peer or an agent. This process is described in detail herein.

Information stored within the cache database **282** may include any information associated with a request sent by the client. As an example, such information may include, metadata and actual requested data. For example, for an HTTP request for a video, the metadata may include the version of the Web server answering the request from the client and the data would be the requested video itself. In a situation where there is no more room for storage in the cache database, the software of the associated communication device may cause the communication device to erase previous data stored in order to clear room for the new data to store in the cache database. As an example, such previous data may include data that is most likely not to be used again. Such data may be old data or data that is known to no longer be valid. The communication device may choose to erase the least relevant data, according to any of several methods that are well known in the art.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network **100**, namely, the acceleration server database **164** and the cache database **282**. As previously mentioned, the acceleration server database **164** stores IP addresses of communication devices located within the communication network **100**, which have acceleration software stored therein. Specifically, the acceleration server database **164** contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. The acceleration server assigns a list of IP addresses to each communication device functioning as an agent. Each communication device will be the agent for any Web servers whose IP address is in the range 'owned' by that communication device. As an example, when a first ever communication device goes online, namely, the first communication device as described herein having the acceleration application **220** therein, the acceleration server assigns all IP addresses in the world to this communication device, and this communication device will be the agent for any Web server. When a second communication device goes online it will share the IP address list with the first communication device, so that each of the communication devices will be responsible for a different part of the world wide web servers.

The cache database **282** of the communication device **200** has stored therein a list of URLs **286** of which the communication device **200** is aware. The communication device **200** becomes aware of a URL each time that the communication device **200** receives a request for information located at a specific URL. As shown by FIG. **7**, for each URL **288** within the list of URLs **286**, the cache database **282** stores: the URL itself **290**; HTTP headers **292** returned by the Web Server **152** for this URL; when the last time **294** was that the contents of this URL were loaded directly from the Web Server **152**; when the contents of the URL last changed **296** on the Web Server **152**; and a list of chunks **298** that contain the contents of this URL, and the content of the chunk. As previously mentioned, chunks, in the present description, are defined as equally sized pieces of data that together form the entire content of the URL, namely, the entire content whose location is described by the URL. As a non-limiting example, a chunk size of, for example, 16 KB can be used, so that any HTTP response will be split up into chunks of 16 KB. In accordance with an alternative embodiment of the invention, if the last chunk of the response is not

US 10,484,510 B2

11                                              12

large enough to fill the designated chunk size, such as 16 KB for the present example, the remaining portion of the chunk will be left empty.

For each such chunk **300**, the cache database **282** includes the checksum of the chunk **302**, the data of the chunk **304** itself, and a list of peers **306** that most likely have the data for this chunk. As is described in additional detail herein, the data for the chunk may be used by other clients within the communication network **100** when other communication devices of the communication network **100** serve as peers to the clients, from which to download the chunk data.

For each of the chunk, a checksum is calculated and stored along side of the chunk itself. The checksum may be calculated in any of numerous ways known to those in the art. The purpose of having the checksum is to be able to identify data uniquely, whereas the checksum is the "key" to the data, where the data is the chunk. As an example, a client may want to load the contents of a URL, resulting in the agent that is servicing this request sending the checksums of the chunks to the client, along with the peers that store these chunks. It is to be noted that there could be a different peer for every different chunk. The client then communicates with each such peer, and provides the checksum of the chunk that it would like the peer to transmit back to the client. The peer looks up the checksum (the key) in its cache database, and provides back the chunk (data) that corresponds to this checksum (the key). As shown by FIG. **7**, for each peer **308** within the list of peers **306**, the cache database **282** includes the peer IP address **310**, as well as the connection status **312** of the peer, which represents whether the peer **308** is online or not.

In accordance with one embodiment of the invention, the cache database **282** may be indexed by URL and by Checksum. Having the cache database indexed in this manner is beneficial due to the following reason. When the agent is using the cache database, the agent receives a request from a client for the URL that the client is looking for. In such a case the agent needs the cache database to be indexed by the URL, to assist in finding a list of corresponding peers that have the chunks of this URL. When the peers are using this cache database, the peers Obtain a request from the client for a particular checksum, and the peers need the database to be indexed by the checksum so that they can quickly find the correct chunk. Of course, as would be understood by one having ordinary skill in the art, the cache database may instead be indexed in any other manner.

Having described components of the communication network **100**, the following further describes how such components interact and individually function. FIG. **8** is a flowchart **300** illustrating operation of the acceleration system initializer module **222** (hereafter referred to as the initializer **222** for purposes of brevity). It should be noted that any process descriptions or blocks in flowcharts should be understood as representing modules, segments, portions of code, or steps that include one or more instructions for implementing specific logical functions in the process, and alternative implementations are included within the scope of the present invention in which functions may be executed out of order from that shown or discussed, including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art of the present invention.

The initializer **222** is the first element of the communication device **200** to operate as the communication device **200** starts up (block **302**). As the initializer **222** starts, it first communicates with the acceleration server **162** to sign up with the acceleration server **162**. This is performed by providing the acceleration server **162** with the hostname, and all IP addresses and media access control (MAC) addresses of the interfaces on the communication device **200** having the initializer **222** thereon.

In accordance with an alternative embodiment of the invention, as shown by block **304**, the initializer **222** checks with the acceleration server **162** whether a more updated version of the acceleration application software is available. This may be performed by any one of many known methods, such as, but not limited to, by providing the version number of the acceleration application software to the acceleration server **162**. The message received back from the acceleration server **162** indicates whether there is a newer version of the acceleration application software or not. If a newer version of the acceleration application software exists, the initializer **222** downloads the latest version of the acceleration application software from the acceleration server **162**, or from a different location, and installs the latest version on the communication device **200**. In addition to the abovementioned, the initializer **222** may also schedule additional version checks for every set period of time thereafter. As an example, the initializer **222** may check for system updates every two days.

As shown by block **306**, the initializer **222** then redirects outgoing network traffic from the communication device **200** to flow through the acceleration application **162**. As previously mentioned, one way to redirect the outgoing network traffic is to insert an intermediate driver **212** that intercepts and redirects the traffic. It should be noted that there are many other ways to implement this redirection, which are well known to those having ordinary skill in the art.

As shown by block **308**, the initializer **222** then launches the client module **224** of the communication device **200**, and configures the client module **224** of the communication device **200** to intercept to all outgoing network communications of the communication device **200** and route the outgoing network communications to the client module **224**, from the intermediate driver **272** or other routing method implemented. This is performed so that the client module **224** is able to receive all network traffic coming from the network applications, modify the network traffic if necessary, and re-route the traffic. As is known by those having ordinary skill in the art, in order to re-route the traffic, the traffic needs to be modified, as an example, to change the destination of requests.

As shown by block **310**, the initializer **222** then launches the agent module **228** and the peer module **226** to run on the communication device **200**. The agent module **228** and peer module **226** listen on pre-determined ports of the communication device **200**, so that incoming network traffic on these ports gets routed to the agent module **228** and peer module **226**. As is explained in further detail herein, the abovementioned enables the communication device **200** to function as an agent and as a peer for other communication devices within the communication network **100**, as needed.

FIG. **9** is a flowchart **350** further illustrating communication between different elements of the communication network **100**, in accordance with the present system and method for providing faster and more efficient data communication.

As shown by block **352**, an application running on the client **200** initiates a request for a resource on a network. Such a request may be, for example, "GET http://www.aol.com/index.html HTTP/1.1". The request may come from an Internet browser **214** located on the client **200**, where the Internet browser **214** is loading a page from the Internet, an

US 10,484,510 B2

13

application that wants to download information from the Internet, fetch or send email, or any other network communication request.

Through the intermediate driver **272**, or other such mechanism as may be implemented that is re-routing the communication to the client module **224** of the client **200**, the resource request is intercepted by the client module **224** that is running on the client **200** (block **354**). The client module **224** then looks up the IP address of the server **152** that is the target of the resource request (e.g., the IP address of the Web server that is the host of www.aol.com in the example above), and sends this IP address to the acceleration server **162** (block **356**) in order to obtain a list of communication devices that the client **200** can use as agents (hereafter referred to as agents). It should be noted that the process of performing an IP lookup for a server is known by one having ordinary skill in the art, and therefore is not described further herein.

In response to receiving the IP address of the server **152**, the acceleration server **162** prepares a list of agents that may be suitable to handle the request from this IP address (block **358**). The size of the list can differ based on implementation. For exemplary purposes, the following provides an example where a list of five agents is prepared by the acceleration server **162**. The list of agents is created by the acceleration server **162** by finding the communication devices of the communication network **100** that are currently online, and whose IP address is numerically close to the IP of the destination Web server **152**. A further description of the abovementioned process is described here in.

As shown by block **360**, the client module **224** then sends the original request (e.g., "GET http://www.aol.com/index.html HTTP/1.1") to all the agents in the list received from the acceleration server **162** in order to find out which of the agents in the list is best suited to be the one agent that will assist with this request.

It should be noted that, in accordance with an alternative embodiment of the invention, the communication device **200** may be connected to a device that is actually requesting data. In such an alternative embodiment, the communication device would be a modular device connected to a requesting device, where the requesting device, such as, for example, a personal data assistant (PDA) or other device, would request data, and the communication device connected thereto, either through a physical connection, wireless connection, or any other connection, would receive the data request and function as described herein. In addition, as previously mentioned, it should be noted that the HTTP request may be replaced by any request for resources on the Web.

FIG. **10** is a flowchart continuing the flowchart **380** of FIG. **9** and focused on agent response to the request. As shown by block **382**, upon receiving the request from the client **200**, each agent that received the request from the client responds to the client **200** with whether it has information regarding the request, which can help the client to download the requested information from peers in the network. Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have.

As shown by block **384**, the client then decides which of the agents in the list to use as its agent for this particular information request. To determine which agent in the list to use as its agent for the particular information request, the client may consider multiple factors, such as, for example, factoring the speed of the reply by each agent and whether

14

that agent does or does not have the information required. There are multiple ways to implement this agent selection, one practical way being to start a timer of a small window of time, such as, for example, 5 ms, after receiving the first response from the agents, and after the small window, choosing from the list of agents that responded, the agent that has the information about the request, or in the case that none of the agents responded, to choose the first agent from the list received from the acceleration server **162**.

As shown by block **386**, after selecting an agent, the client notifies the selected agent that it is going to use it for this request, and notifies the other agents that they will not be used for this request. The client then sends the selected agent a request for the first five chunks of data of the original information request (block **388**). By specifying to the selected agent the requested chunks by their order in the full response, the client receives the peer list and checksums of the requested chunks from the selected agent. As an example, for the first five chunks the client will ask the selected agent for chunks one through five, and for the fourth batch of five chunks the client will ask the agent for chunks sixteen through twenty. As previously mentioned, additional or fewer chunks may be requested at a single time.

As shown by block **390**, after receiving the request from the client, the selected agent determines whether it has information regarding the requested chunks of data by looking up the request in its cache database and determining if the selected agent has stored therein information regarding peers of the communication network that have stored the requested data of the request, or whether the selected agent itself has the requested data of the request stored in its memory. In addition to determining if the selected agent contains an entry for this request in its database, the selected agent may also determine if this information is still valid. Specifically, the selected agent determines whether the data that is stored within the memory of the selected agent or the memory of the peers, still mirrors the information that would have been received from the server itself for this request. A further description of the process utilized by the selected agent to determine if the information is still valid, is described in detail herein.

As shown by block **392**, if the information (requested data of the request) exists and is still valid, then the agent prepares a response to the client, which includes for each of the chunks: (i) the checksum of the chunk; (ii) a list of peers that according to the database of the selected agent contains these chunks; and (iii) if these are the first five chunks of the information, then the selected agent also provides the specific protocol's headers that would have been received from the server, had the initial request from the client been made directly to the server.

As shown by block **394**, the list of peers for each chunk is sorted by geographical proximity to the requesting client. In accordance with the present example, only the five closest peers are kept in the list for every chunk, and the rest of the peers are discarded from this list. As shown by block **396**, the prepared response, namely, the list of closest peers, is sent back to the client. It should be noted that, if this were the last set of chunks to be provided for this request, then it would be beneficial to include information about this to the client.

If the selected agent discovers that it does not have information about this request, or if the selected agent discovers that the information it has is no longer valid, the selected agent needs to load the information directly from the server in order to be able to provide an answer to the requesting client. As shown by block **400**, the selected agent

US 10,484,510 B2

15

then sends the request directly to the server. The selected agent then stores the information it receives from the server (both the headers of the request, as well as chunks of the response itself) in its database, for this particular response to the client, as well as for future use to other clients that may request this data (block **402**). The selected agent then prepares a response (list) for the client, where the response includes the protocol headers (if these are the first five chunks), and the checksums of the five chunks, and provides itself as the only peer for these chunks (block **404**). This list is then sent back to the client (block **406**).

FIG. **11** is a flowchart **420** continuing the flowchart of FIG. **10**, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent. As shown by block **422**, the client receives the response from the agent (including the list of chunks and their corresponding data, including peers and other information previously mentioned) and, for each of the five chunks, the client sends a request to each of the peers listed for the chunk to download the chunk. The chunk request that the client sends to each of the peers is the checksum of the data that the client seeks to receive, which is the key (identifier) of the chunk.

As shown by block **424**, the peers then respond regarding whether they still have the data of the chunk. As an example, some of the peers may not currently be online, some may be online but may have discarded the relevant information, and some may still have the relevant information, namely, the chunk. As shown by block **426**, the client then selects the quickest peer that responds with a positive answer regarding the requested information, the client lets that peer know that it is chosen to provide the client with the chunk, and the client notifies the other peers that they are not chosen.

As shown by block **428**, the chosen peer then sends the chunk to the client. It should be noted that if no peers answer the request of the client, the client goes back to the agent noting that the peers were all negative, and the agent either provides a list of 5 other agents, if they exist, or the agent goes on to download the information directly from the Web server as happens in the case where no peers exist as described above.

The client then stores the chunks in its cache for future use (block **430**), when the client may need to provide the chunks to a requesting communication device when acting as a peer for another client that is looking for the same information. As shown by block **432**, if some of the chunks were not loaded from any of the peers, the client requests the chunks again from the agent in a next round of requests, flagging these chunks as chunks that were not loadable from the client list of peers. In this situation, the agent will load the data directly from the server and provide it back to the client.

The client then acknowledges to the agent which of the chunks it received properly (block **434**). The agent then looks up these chunks in the database of the agent, and adds the client to the list of peers for these chunks, specifically, since this client is now storing these chunks, and can provide these chunks to other clients that turn to it as a peer (block **436**).

As shown by block **438**, the client then passes the data on to the Web browser or other application of the client that made the original request, for it to use as it had originally intended. The client then checks whether all of the chunks for this request were received (block **440**), by checking the flag set by the agent. Specifically, when the agent is providing the list of the last 5 chunks, the agent includes that information as part of its reply to the client, which is referred

16

to herein as a flag. This information is what enables the client to know that all information has been received for a particular resource request.

If the last received chunks were not the last chunks for this request, the processing flow of the client continues by returning to the functionality of block **384** of FIG. **10**, but instead sending the chosen agent a request for the next five chunks of data of the original information request. Alternatively, if all chunks for this request were received, the request is complete, and the flow starts again at block **352** of FIG. **9**.

FIG. **12** is a flowchart **500** illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. Specifically, the following provides an example of how the agent, client, or peer can determine whether particular data that is stored within the memory of the agent, or the memory of a peer or client, still mirrors the information that is currently on the Web server. As shown by block **502**, the HTTP request is looked up in the cache database of the agent, client or peer that is checking the validity of the HTTP request. As an example, the HTTP protocol, defined by RFC 2616, outlines specific methods that Web servers can define within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information such as "max age" to indicate how long this data may be cached before becoming invalid, "no cache" to indicate that the data may never be cached, and using other information.

As shown by block **504**, these standard methods of validation are tested on the HTTP request information in question. As shown by block **506**, a determination is made whether the requested information that is stored is valid or not. If the requested information is valid, a "VALID" response is returned (block **508**). Alternatively, if the requested information is not valid, an HTTP conditional request is sent to the relevant Web server, to determine if the data stored for this request is still valid (block **510**). If the data stored for this request is still valid, a "VALID" response is returned (block **508**). Alternatively, if the data stored for this request is not valid, an "INVALID" response is returned (block **514**). It should be noted, that the abovementioned description with regard to FIG. **12** is an explanation of how to check if HTTP information is still valid. There are similar methods of determining validity for any other protocol, which may be utilized, and which those having ordinary skill in the art would appreciate and understand.

FIG. **13** is a flowchart **550** outlining operation of the acceleration server, whose main responsibility in the present system and method is to provide clients with information regarding which agents serve which requests, and to keep the network elements all up to date with the latest software updates. As shown by block **552**, the acceleration server sends "keep alive" signals to the network elements, and keeps track within its database as to which network elements are online. As shown by block **554**, the acceleration server continues to wait for a client request and continues to determine if one is received.

Once a request is received, the acceleration server tests the type of request received (block **556**). If the client request is to sign up the client within the network, an event that happens every time that the client starts running on its host machine, then that client is added to the list of agents stored on the acceleration server, sorted by the IP address of the client (block **558**).

If the request is to find an agent to use for a particular request, the acceleration server creates a new agent list, which is empty (block **560**). The acceleration server then

US 10,484,510 B2

17                                                    18

searches the agent database for the next **5** active agents whose IP address is closest to the IP address of the server who is targeted in the request (block **562**). In this context, 192.166.3.103 is closer to 192.166.1.212 than to 192.167.3.104. The acceleration server then sends this agent list to the client (block **564**).

If instead, the request is to check the version of the latest acceleration software then the acceleration server sends that network element (client, peer or agent) the version number of the latest existing acceleration software version, and a URL from where to download the new version, for the case that the element needs to upgrade to the new version (block **566**).

While the abovementioned example is focused on HTTP requests for data, as previously mentioned, other protocol requests are equally capable of being handled by the present system and method. As an example, in separate embodiments the acceleration method described may accelerate any communication protocol at any OSI layer (SMTP, DNS, UDP, ETHERNET, etc.). In the following alternative embodiment, it is illustrated how the acceleration method may accelerate TCPIP. As is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol. For purposes of illustration of TCPIP communication, reference may be made to FIG. **3**, wherein the Web server is a TCPIP server.

In TCPIP there are three communication commands that are of particular interest, namely, connect, write, and read. Connect is a command issued by an application in the communication device that is initiating the communication to instruct the TCPIP stack to connect to a remote communication device. The connect message includes the IP address of the communication device, and the port number to connect to. An application uses the write command to instruct the TCPIP stack to send a message (i.e., data) to a communication device to which it is connected. In addition, an application uses the read command to ask the TCPIP stack to provide the message that was sent from the remote communication device to which it is connected. A communication session typically exists of a connect, followed by a read and write on both sides.

FIG. **14** is a flowchart **600** further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention. As shown by blocks **601** and **602** when an application of the communication device makes a request to the communications stack to connect with the TCPIP server, that communication is intercepted by the acceleration application.

To find an agent, upon receiving that connect message from communication device application, which includes the IP address of the TCPIP server and the port to connect to, the acceleration application in the client makes a request to the acceleration server to find out who the agent for the communication with the TCPIP server is. This step is performed in a similar manner to that described with regard to the main HTTP embodiment of the invention (block **604**). As shown by block **606**, the server then provides the client with a list of agents, for example, a primary agent and four others.

To establish a connection, as shown by block **608**, the client issues a TCPIP connect with the primary agent or one of the other agents if the primary agent does not succeed, to create a connection with the agent. The client then sends to the agent the IP address of the TCPIP server and connection port that were provided by the communication device application (block **610**). As shown by block **612**, that agent in turn

issues a TCPIP connect to the TCPIP server to the port it received from the client, to create a connection with the agent.

FIG. **15** is a flowchart **800** further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

As shown by block **802**, if the network application within the client wants to send a message to the TCPIP server, the network application within the client writes the message to the TCPIP stack in the operating system of the client. This WRITE command is received by the acceleration application of the client and handled in the manner described below. If the TCPIP server wants to send a message to the client, the TCPIP server writes the message to the TCPIP stack of TCPIP operating system, on the connection to the agent, since this agent is where the server received the original connection. This WRITE command is received by the acceleration application of the agent and handled in the manner described below.

When the acceleration application of the client receives a message from the network application of the client to be sent to the agent, or when the acceleration application of the agent receives a message from the connection to the TCPIP server that is to be sent to the client, the acceleration application proceeds to send the message to the communication device on the other side. For instance, if the client has intercepted the message from the communication application, the client sends the message to the agent, and if it is the agent that intercepted the message from the connection to the TCPIP server, such as the TCPIP server sending a message that is intended for the communication with client, the agent sends the message to the client in the following manner:

As shown by block **804**, the acceleration application breaks up the content of the message to chunks and calculates the corresponding checksums, in the same manner as in the main embodiment described herein. The acceleration application then looks up each checksum in its cache database (block **806**). As shown by block **808**, the acceleration application checks if the checksum exists in the cache database. If it does, then, as shown by block **810**, the acceleration application prepares a list of peers that have already received the chunk of the checksum in the past (if any), and adds the communication device of the other side to the list of communication devices that have received this chunk (adds it to the peer list of the checksum in its database), to be provided to other communication devices requesting this information in the future. As shown by block **812**, the list of peers is sent to the receiving communication device, which, as shown by block **814** retrieves the chunks from the peers in the list received, in the same manner as in the main embodiment.

If the checksum does not exist within the cache database of the sending communication device then, as shown by block **820**, the acceleration application adds the checksum and chunk to its cache database, sends the chunk to the communication device on the other side, and adds the other communication device to the list of peers for that checksum in its database.

As shown by block **816**, a determination is then made as to whether all chunks have been received, if all chunks have not been received, the process continues on again from block **806**.

Once all data has been received, as shown by block **818**, the acceleration application passes the data on to the

US 10,484,510 B2

19

20

requester. Specifically, in the client, the acceleration application passes on the complete data to the communication application, and in the agent, the acceleration application passes on the complete data to the requesting TCPIP server.

It should be emphasized that the above-described embodiments of the present invention are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiments of the invention without departing substantially from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

The invention claimed is:

**1**. A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:

establishing a Transmission Control Protocol (TCP) connection with a second server;

sending, to the web server over an Internet, the first content identifier;

receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and

sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

**2**. The method according to claim **1**, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.

**3**. The method according to claim **2**, for use with a first application stored in the first client device and associated with a first version number, wherein the first message comprises the first version number.

**4**. The method according to claim **3**, for use with a second application that is a version of the first application, is stored in the second server, and is associated with a second version number, wherein the method further comprising receiving, by the first client device from the second server, in response to the first message, a second message that comprises the second version number.

**5**. The method according to claim **4**, wherein the method further comprising downloading over the Internet, by the first client device from the second server, in response to the first message, the second application from the second server, and installing the second application in the first client device as a replacement for the first application.

**6**. The method according to claim **1**, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:

receiving the second content identifier;

sending, to the third server over the Internet in response to the receiving, the second content identifier; and

receiving the second content from the third server over the Internet in response to the sending.

**7**. The method according to claim **6**, further comprising executing, by the first client device, a web browser application or an email application.

**8**. The method according to claim **1**, further comprising periodically communicating over the TCP connection between the second server and the first client device.

**9**. The method according to claim **8**, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**10**. The method according to claim **1**, further comprising determining, by the first client device, that the received first content, is valid.

**11**. The method according to claim **10**, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**12**. The method according to claim **10**, further comprising:

sending, a message over the Internet in response to the determining that the received first content, is not valid; and

receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first content.

**13**. The method according to claim **1**, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, stored first content, the method is further preceded by:

downloading, by the first client device from the Internet, the software application; and

installing, by the first client device, the downloaded software application.

**14**. The method according to claim **13**, wherein the software application is downloaded from the second server.

**15**. The method according to claim **1**, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier.

**16**. The method according to claim **1**, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.

**17**. The method according to claim **1**, further comprising storing, by the first client device in response to the receiving from the web server, the first content.

**18**. The method according to claim **1**, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

**19**. The method according to claim **1**, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**20**. The method according to claim **1**, wherein the first content comprises web-page, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL).

US 10,484,510 B2

21

**21**. The method according to claim **1**, further comprising executing, by the first client device, a web browser application or an email application.

**22**. The method according to claim **1**, further comprising storing, operating, or using, a client operating system.

**23**. The method according to claim **1**, wherein the steps are sequentially executed.

**24**. A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **1**.

* * * * *



US011044344B2

(12) **United States Patent**
Shribman et al.

(10) Patent No.: **US 11,044,344 B2**
(45) Date of Patent:     *Jun. 22, 2021

(54) **SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION**

(71) Applicant: **BRIGHT DATA LTD.,** Netanya (IL)

(72) Inventors: **Derry Shribman,** Tel Aviv (IL); **Ofer Vilenski,** Moshav Hadar Am (IL)

(73) Assignee: **BRIGHT DATA LTD.,** Netanya (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/662,800**

(22) Filed: **Oct. 24, 2019**

(65) **Prior Publication Data**

US 2020/0059540 A1     Feb. 20, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/278,106, filed on Feb. 17, 2019, now Pat. No. 10,491,712, which is a
(Continued)

(51) **Int. Cl.**
| | | |
|---|---|---|
| *H04L 29/06* | (2006.01) | |
| *H04L 12/24* | (2006.01) | |
| *H04L 29/08* | (2006.01) | |

(52) **U.S. Cl.**
CPC ............ *H04L 67/42* (2013.01); *H04L 41/046* (2013.01); *H04L 67/1002* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... H04L 67/42; H04L 67/02; H04L 67/22; H04L 67/108; H04L 67/1023;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,922,494 A | 11/1975 | Cooper et al. | |
| 4,347,827 A | 9/1982 | Lo Cascio | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 101075242 A | 11/2007 | |
| CN | 101179389 A | 5/2008 | |

(Continued)

OTHER PUBLICATIONS

Michael K. Reiter and Aviel D. Rubin, "Crowds: Anonymity for Web Transactions", ACM Transactions on Information and System Security, Nov. 1998 (27 pages).
(Continued)

*Primary Examiner* — Minh Chau Nguyen
(74) *Attorney, Agent, or Firm* — May Patents Ltd.

(57) **ABSTRACT**

A system designed for increasing network communication speed for users, while lowering network congestion for content owners and ISPs. The system employs network elements including an acceleration server, clients, agents, and peers, where communication requests generated by applications are intercepted by the client on the same machine. The IP address of the server in the communication request is transmitted to the acceleration server, which provides a list of agents to use for this IP address. The communication request is sent to the agents. One or more of the agents respond with a list of peers that have previously seen some or all of the content which is the response to this request (after checking whether this data is still valid). The client then downloads the data from these peers in parts and in parallel, thereby speeding up the Web transfer, releasing congestion from the Web by fetching the information from multiple sources, and relieving traffic from Web servers by offloading the data transfers from them to nearby peers.

**46 Claims, 15 Drawing Sheets**



Code200
Ex. 1002
Page 1 of 33

**US 11,044,344 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 15/957,945, filed on Apr. 20, 2018, now Pat. No. 10,257,319, which is a continuation of application No. 14/025,109, filed on Sep. 12, 2013, now Pat. No. 10,069,936, which is a division of application No. 12/836,695, filed on Jul. 14, 2010, now Pat. No. 8,560,604.

(60) Provisional application No. 61/249,624, filed on Oct. 8, 2009.

(52) **U.S. Cl.**
CPC ...... *H04L 67/108* (2013.01); *H04L 67/1023* (2013.01); *H04L 67/1063* (2013.01); *H04L 67/22* (2013.01); *H04L 67/2814* (2013.01); *H04L 67/2819* (2013.01); *H04L 67/02* (2013.01)

(58) **Field of Classification Search**
CPC ... H04L 67/1063; H04L 41/00; H04L 41/046; H04L 67/2814; H04L 67/2819
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,855,894 A | 8/1989 | Asahi | |
| 4,937,781 A | 6/1990 | Lee et al. | |
| 5,519,693 A | 5/1996 | Galuszka | |
| 5,577,243 A | 11/1996 | Sherwood et al. | |
| 5,734,829 A | 3/1998 | Robinson | |
| 5,758,195 A | 5/1998 | Balmer | |
| 5,826,014 A | 10/1998 | Coley | |
| 5,974,566 A | 10/1999 | Ault | |
| 6,012,083 A | 1/2000 | Savitzky | |
| 6,012,090 A | 1/2000 | Chung | |
| 6,061,278 A | 5/2000 | Kato et al. | |
| 6,134,584 A | 10/2000 | Chang | |
| 6,154,782 A | 11/2000 | Kawaguchi | |
| 6,173,330 B1 | 1/2001 | Guo et al. | |
| 6,185,625 B1 | 2/2001 | Tso | |
| 6,266,704 B1 | 7/2001 | Reed | |
| 6,311,216 B1 | 10/2001 | Smith | |
| 6,389,422 B1 | 5/2002 | Doi | |
| 6,389,462 B1 | 5/2002 | Cohen | |
| 6,421,733 B1 | 7/2002 | Tso | |
| 6,466,470 B1 | 10/2002 | Chang | |
| 6,513,061 B1 | 1/2003 | Ebata | |
| 6,519,693 B1 | 2/2003 | Debey | |
| 6,665,715 B1 | 12/2003 | Houri | |
| 6,687,732 B1 | 2/2004 | Bector | |
| 6,701,374 B2 | 3/2004 | Gupta | |
| 6,785,705 B1 | 8/2004 | Kocherlakota | |
| 6,792,461 B1 | 9/2004 | Hericourt | |
| 6,795,848 B1 | 9/2004 | Border et al. | |
| 6,842,463 B1 | 1/2005 | Drwiega | |
| 6,868,453 B1 | 3/2005 | Watanabe | |
| 6,895,011 B1 | 5/2005 | Lassers | |
| 6,961,783 B1 | 11/2005 | Cook | |
| 7,007,228 B1 | 2/2006 | Carro | |
| 7,047,315 B1 | 5/2006 | Srivastava | |
| 7,080,158 B1 | 7/2006 | Squire | |
| 7,009,927 B2 | 8/2006 | Cudd | |
| 7,120,666 B2 | 10/2006 | McCanne et al. | |
| 7,139,579 B2 | 11/2006 | Hatano | |
| 7,203,741 B2 | 4/2007 | Marco et al. | |
| 7,234,059 B1 | 6/2007 | Beaver | |
| 7,543,018 B2 | 6/2009 | Appelman | |
| 7,558,942 B1 | 7/2009 | Chen et al. | |
| 7,620,703 B1 | 11/2009 | Shteyn | |
| 7,673,048 B1 | 3/2010 | O'Toole | |
| 7,702,784 B2 | 4/2010 | Berstis | |
| 7,706,362 B1 | 4/2010 | Senthilnathan | |
| 7,719,971 B1 | 5/2010 | Issa | |

| | | | |
|---|---|---|---|
| 7,742,485 B2 | 6/2010 | Zhang | |
| 7,751,628 B1 | 7/2010 | Reisman | |
| 7,783,777 B1 | 8/2010 | Pabla | |
| 7,788,378 B2 | 8/2010 | Rao | |
| 7,805,517 B2 | 9/2010 | Shim | |
| 7,818,430 B2 | 10/2010 | Zuckerman | |
| 7,831,720 B1 | 11/2010 | Noureddine | |
| 7,860,988 B2 | 12/2010 | Aoki | |
| 7,865,585 B2 * | 1/2011 | Samuels ................ H04L 67/28 709/223 |
| 7,877,511 B1 | 1/2011 | Berger | |
| 7,890,547 B2 | 2/2011 | Hotti | |
| 7,890,624 B2 | 2/2011 | Bivens | |
| 7,894,431 B2 | 2/2011 | Goring | |
| 7,929,429 B2 | 4/2011 | Bornstein | |
| 7,970,835 B2 | 6/2011 | St. Jacques | |
| 7,984,110 B1 | 7/2011 | Raman | |
| 8,135,912 B2 | 3/2012 | Shribman et al. | |
| 8,156,275 B2 | 4/2012 | de Cesare | |
| 8,171,101 B2 | 5/2012 | Gladwin et al. | |
| 8,375,434 B2 | 2/2013 | Cottrell | |
| 8,464,350 B2 | 6/2013 | Kanevsky | |
| 8,479,251 B2 | 7/2013 | Feinleib et al. | |
| 8,499,059 B2 | 7/2013 | Stoyanov | |
| 8,516,084 B1 | 8/2013 | Grieve | |
| 8,527,631 B1 | 9/2013 | Liang | |
| 8,533,628 B2 | 9/2013 | Rohrabaugh | |
| 8,577,724 B1 | 11/2013 | Gandhi | |
| 8,595,786 B2 | 11/2013 | Choi | |
| 8,639,630 B2 | 1/2014 | Fomenko et al. | |
| 8,719,430 B2 | 5/2014 | Van Ackere | |
| 8,719,505 B2 | 5/2014 | Shribman et al. | |
| 8,769,035 B2 | 7/2014 | Resch et al. | |
| 8,832,179 B2 | 9/2014 | Owen et al. | |
| 8,838,811 B2 | 9/2014 | Chen | |
| 8,935,798 B1 | 1/2015 | Smith | |
| 8,972,602 B2 | 3/2015 | Mithyantha | |
| 8,990,357 B2 | 3/2015 | Graham-Cumming | |
| 8,996,856 B2 | 3/2015 | Amit | |
| 9,015,335 B1 * | 4/2015 | Gigliotti ............ H04N 21/8455 709/231 |
| 9,059,938 B1 | 6/2015 | Strand | |
| 9,100,320 B2 | 8/2015 | Hsy | |
| 9,122,554 B2 | 9/2015 | Callaghan | |
| 9,154,557 B2 | 10/2015 | Lev-Ran | |
| 9,177,157 B2 | 11/2015 | Binder | |
| 9,201,808 B2 | 12/2015 | Shribman et al. | |
| 9,237,210 B2 | 1/2016 | Liu | |
| 9,253,164 B2 | 2/2016 | Gouge | |
| 9,313,100 B1 | 4/2016 | Jenkins | |
| 9,374,244 B1 | 6/2016 | Reed | |
| 9,418,243 B2 | 8/2016 | Bauer | |
| 9,444,903 B2 | 9/2016 | Nuaimi | |
| 9,584,529 B2 | 2/2017 | Su | |
| 9,705,959 B1 | 7/2017 | Strand | |
| 9,979,674 B1 | 5/2018 | Kumar | |
| 9,990,295 B2 | 6/2018 | Shribman et al. | |
| 10,182,466 B2 | 1/2019 | Nirantar | |
| 10,277,711 B2 | 4/2019 | Shribman | |
| 10,361,911 B2 | 7/2019 | Brandwine | |
| 10,404,791 B2 | 9/2019 | Puri | |
| 10,410,244 B2 | 9/2019 | Toval | |
| 10,484,337 B2 | 11/2019 | Subbarayan | |
| 10,484,510 B2 | 11/2019 | Shribman | |
| 10,560,509 B2 | 2/2020 | Lo | |
| 10,594,660 B2 | 3/2020 | Smith | |
| 10,637,956 B1 | 4/2020 | Juravicius | |
| 10,645,654 B1 | 5/2020 | Backholm | |
| 10,650,166 B1 | 5/2020 | Sundberg | |
| 2001/0033583 A1 | 10/2001 | Rabenko et al. | |
| 2001/0054020 A1 * | 12/2001 | Barth ................ G06Q 30/0613 705/37 |
| 2002/0007413 A1 | 1/2002 | Garcia-Luna-Aceves et al. | |
| 2002/0026517 A1 | 2/2002 | Watson | |
| 2002/0065930 A1 | 5/2002 | Rhodes | |
| 2002/0069241 A1 | 6/2002 | Narlikar et al. | |
| 2002/0091760 A1 | 7/2002 | Rozen | |
| 2002/0103823 A1 | 8/2002 | Jackson | |
| 2002/0120874 A1 | 8/2002 | Shu et al. | |

Appx1230

**US 11,044,344 B2**

Page 3

(56)            **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 2002/0123895 A1 | 9/2002 | Potekhin |
| 2002/0133621 A1 | 9/2002 | Marco et al. |
| 2002/0194183 A1 | 12/2002 | Yoakum |
| 2002/0194292 A1 | 12/2002 | King |
| 2003/0009518 A1 | 1/2003 | Harrow et al. |
| 2003/0009583 A1 | 1/2003 | Chan et al. |
| 2003/0018834 A1 | 1/2003 | Eilers |
| 2003/0074403 A1 | 4/2003 | Harrow et al. |
| 2003/0097408 A1 | 5/2003 | Kageyama |
| 2003/0115364 A1 | 6/2003 | Shu et al. |
| 2003/0163413 A1 | 8/2003 | Wiczkowski |
| 2003/0174648 A1 | 9/2003 | Wang et al. |
| 2003/0187925 A1 | 10/2003 | Inala |
| 2003/0200307 A1 | 10/2003 | Raju et al. |
| 2003/0204602 A1 | 10/2003 | Hudson et al. |
| 2003/0210694 A1 | 11/2003 | Jayaraman et al. |
| 2003/0229718 A1 | 12/2003 | Tock |
| 2003/0229785 A1 | 12/2003 | Daseke |
| 2004/0044731 A1 | 3/2004 | Chen |
| 2004/0054748 A1 | 3/2004 | Ackaouy |
| 2004/0068579 A1 | 4/2004 | Marmigere |
| 2004/0088646 A1 | 5/2004 | Yeager et al. |
| 2004/0107242 A1 | 6/2004 | Vert et al. |
| 2004/0117455 A1 | 6/2004 | Kaminsky |
| 2004/0133692 A1 | 7/2004 | Blanchet |
| 2004/0221207 A1 | 11/2004 | Yokota |
| 2004/0230593 A1 | 11/2004 | Rudin |
| 2004/0236962 A1 | 11/2004 | Wong |
| 2004/0254907 A1 | 12/2004 | Crow et al. |
| 2004/0263479 A1 | 12/2004 | Shkolnikov |
| 2004/0264506 A1 | 12/2004 | Furukawa |
| 2005/0015552 A1 | 1/2005 | So et al. |
| 2005/0022236 A1 | 1/2005 | Ito et al. |
| 2005/0027782 A1 | 2/2005 | Jalan |
| 2005/0050097 A1 | 3/2005 | Yeh |
| 2005/0096753 A1 | 5/2005 | Arling |
| 2005/0097441 A1 | 5/2005 | Herbach |
| 2005/0108244 A1 | 5/2005 | Riise |
| 2005/0108551 A1 | 5/2005 | Toomey |
| 2005/0165903 A1 | 7/2005 | Doan |
| 2005/0228964 A1 | 10/2005 | Sechrest et al. |
| 2005/0235044 A1 | 10/2005 | Tazuma |
| 2006/0015545 A1 | 1/2006 | Ezra |
| 2006/0036755 A1 | 2/2006 | Abdullah |
| 2006/0039352 A1 | 2/2006 | Karstens |
| 2006/0047844 A1 | 3/2006 | Deng |
| 2006/0059091 A1 | 3/2006 | Wang |
| 2006/0075114 A1 | 4/2006 | Panasyuk |
| 2006/0155995 A1 | 7/2006 | Torvinen |
| 2006/0184647 A1 | 8/2006 | Dixit |
| 2006/0212542 A1* | 9/2006 | Fang .................. H04L 67/104 |
| | | 709/219 |
| 2006/0212584 A1* | 9/2006 | Yu ...................... G06F 16/9574 |
| | | 709/227 |
| 2006/0224687 A1 | 10/2006 | Popkin |
| 2006/0259728 A1 | 11/2006 | Chandrasekaran et al. |
| 2006/0271438 A1 | 11/2006 | Shotland |
| 2006/0280191 A1 | 12/2006 | Nishida |
| 2007/0011674 A1 | 1/2007 | Joo |
| 2007/0047452 A1 | 3/2007 | Lohr |
| 2007/0050522 A1 | 3/2007 | Grove |
| 2007/0073878 A1 | 3/2007 | Issa |
| 2007/0088821 A1 | 4/2007 | Sankuratripati |
| 2007/0100839 A1 | 5/2007 | Kim |
| 2007/0142036 A1 | 6/2007 | Wikman |
| 2007/0156855 A1 | 7/2007 | Johnson |
| 2007/0171921 A1 | 7/2007 | Wookey |
| 2007/0174246 A1 | 7/2007 | Sigurdsson |
| 2007/0180111 A1 | 8/2007 | Chmaytelli |
| 2007/0226810 A1 | 9/2007 | Hotti |
| 2007/0239655 A1 | 10/2007 | Agetsuma |
| 2007/0283026 A1 | 12/2007 | Lohmar |
| 2008/0008089 A1 | 1/2008 | Bornstein et al. |
| 2008/0025506 A1 | 1/2008 | Muraoka |
| 2008/0037536 A1 | 2/2008 | Padmanabhan |
| 2008/0052156 A1 | 2/2008 | Brenner |
| 2008/0071925 A1 | 3/2008 | Leighton |
| 2008/0098101 A1 | 4/2008 | Black |
| 2008/0109446 A1 | 5/2008 | Wang |
| 2008/0120427 A1 | 5/2008 | Ramanathan |
| 2008/0125123 A1 | 5/2008 | Dorenbosch |
| 2008/0134258 A1 | 6/2008 | Goose et al. |
| 2008/0196098 A1 | 8/2008 | Cottrell |
| 2008/0201438 A1 | 8/2008 | Mandre |
| 2008/0209028 A1 | 8/2008 | Kurup |
| 2008/0222244 A1 | 9/2008 | Huang |
| 2008/0222267 A1 | 9/2008 | Horn |
| 2008/0222291 A1 | 9/2008 | Weller et al. |
| 2008/0225710 A1 | 9/2008 | Raja |
| 2008/0228537 A1 | 9/2008 | Monfried |
| 2008/0235391 A1 | 9/2008 | Painter et al. |
| 2008/0235623 A1 | 9/2008 | Li |
| 2008/0235746 A1 | 9/2008 | Peters |
| 2008/0086730 A1 | 10/2008 | Vertes |
| 2008/0256175 A1 | 10/2008 | Lee |
| 2008/0263180 A1 | 10/2008 | Hurst |
| 2008/0320151 A1 | 12/2008 | McCanne |
| 2009/0010426 A1 | 1/2009 | Redmond |
| 2009/0037529 A1 | 2/2009 | Armon-Kest |
| 2009/0055749 A1 | 2/2009 | Chatterjee |
| 2009/0070489 A1 | 3/2009 | Lu |
| 2009/0077233 A1 | 3/2009 | Kurebayashi |
| 2009/0138538 A1 | 5/2009 | Klein |
| 2009/0150534 A1 | 6/2009 | Miller |
| 2009/0150930 A1 | 6/2009 | Sherwin |
| 2009/0161554 A1 | 6/2009 | Agarwal |
| 2009/0182843 A1 | 7/2009 | Hluchyj |
| 2009/0193498 A1 | 7/2009 | Agarwal |
| 2009/0199000 A1 | 8/2009 | Hsu |
| 2009/0216887 A1 | 8/2009 | Hertle |
| 2009/0217122 A1 | 8/2009 | Yokokawa et al. |
| 2009/0217351 A1 | 8/2009 | Burch |
| 2009/0232003 A1 | 9/2009 | Vasseur |
| 2009/0234970 A1 | 9/2009 | Sun |
| 2009/0248793 A1 | 10/2009 | Jacobsson |
| 2009/0262724 A1 | 10/2009 | Suzuki |
| 2009/0279559 A1 | 11/2009 | Wong et al. |
| 2009/0292816 A1 | 11/2009 | Etchegoyen |
| 2009/0300208 A1 | 12/2009 | Lepeska |
| 2009/0313318 A1 | 12/2009 | Dye |
| 2009/0319502 A1 | 12/2009 | Chalouhi et al. |
| 2009/0327489 A1 | 12/2009 | Swildens |
| 2010/0036954 A1 | 2/2010 | Sakata |
| 2010/0042724 A1 | 2/2010 | Jeon |
| 2010/0066808 A1 | 3/2010 | Tucker et al. |
| 2010/0085977 A1 | 4/2010 | Khalid et al. |
| 2010/0094970 A1 | 4/2010 | Zuckerman |
| 2010/0115063 A1 | 5/2010 | Gladwin et al. |
| 2010/0154044 A1 | 6/2010 | Manku |
| 2010/0161756 A1 | 6/2010 | Lewis |
| 2010/0161760 A1 | 6/2010 | Maloo |
| 2010/0162126 A1 | 6/2010 | Donaldson |
| 2010/0180082 A1 | 7/2010 | Sebastian |
| 2010/0235438 A1 | 9/2010 | Narayanan et al. |
| 2010/0235473 A1 | 9/2010 | Koren |
| 2010/0262650 A1 | 10/2010 | Chauhan |
| 2010/0293555 A1 | 11/2010 | Vepsalainen |
| 2010/0322237 A1 | 12/2010 | Raja |
| 2010/0329270 A1 | 12/2010 | Asati et al. |
| 2011/0007665 A1 | 1/2011 | Dinur |
| 2011/0022582 A1 | 1/2011 | Unnikrishnan |
| 2011/0023125 A1 | 1/2011 | Kim |
| 2011/0035503 A1* | 2/2011 | Zaid .................. H04L 63/0442 |
| | | 709/228 |
| 2011/0066924 A1 | 3/2011 | Dorso |
| 2011/0087733 A1 | 4/2011 | Shribman et al. |
| 2011/0117938 A1 | 5/2011 | Pyo |
| 2011/0128911 A1 | 6/2011 | Shaheen |
| 2011/0154477 A1 | 6/2011 | Parla |
| 2011/0173345 A1 | 7/2011 | Knox |
| 2011/0264809 A1 | 10/2011 | Koster |
| 2011/0282997 A1 | 11/2011 | Prince |
| 2011/0314347 A1 | 12/2011 | Nakano et al. |
| 2012/0023212 A1 | 1/2012 | Roth |

**US 11,044,344 B2**

Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2012/0096116 A1 | 4/2012 | Mislove |
| 2012/0099566 A1 | 4/2012 | Laine et al. |
| 2012/0124173 A1 | 5/2012 | De et al. |
| 2012/0124239 A1 | 5/2012 | Shribman et al. |
| 2012/0136926 A1 | 5/2012 | Dillon |
| 2012/0144047 A1 | 6/2012 | Armstrong |
| 2012/0164980 A1 | 6/2012 | Van Phan |
| 2012/0166582 A1 | 6/2012 | Binder |
| 2012/0185947 A1 | 7/2012 | Phillips |
| 2012/0198524 A1 | 8/2012 | Celebisoy |
| 2012/0239811 A1 | 9/2012 | Kohli |
| 2012/0246273 A1 | 9/2012 | Bornstein |
| 2012/0254370 A1 | 10/2012 | Bacher |
| 2012/0254456 A1 | 10/2012 | Visharam et al. |
| 2012/0264520 A1 | 10/2012 | Marsland |
| 2012/0290717 A1 | 11/2012 | Luna |
| 2012/0297041 A1 | 11/2012 | Momchilov |
| 2012/0323674 A1 | 12/2012 | Simmons |
| 2013/0007031 A1 | 1/2013 | Makino |
| 2013/0007232 A1 | 1/2013 | Wang |
| 2013/0007253 A1 | 1/2013 | Li |
| 2013/0019258 A1 | 1/2013 | Bhatia |
| 2013/0047020 A1 | 2/2013 | Hershko |
| 2013/0064370 A1 | 3/2013 | Gouge |
| 2013/0067086 A1 | 3/2013 | Hershko |
| 2013/0072233 A1 | 3/2013 | Sandholm |
| 2013/0080498 A1 | 3/2013 | Desilva |
| 2013/0080575 A1 | 3/2013 | Prince |
| 2013/0083800 A1 | 4/2013 | Lezama Bounine |
| 2013/0117413 A1 | 5/2013 | Kaneko |
| 2013/0151709 A1 | 6/2013 | Luna |
| 2013/0151709 A1 | 6/2013 | Talwar |
| 2013/0166768 A1 | 6/2013 | Gouache et al. |
| 2013/0167045 A1 | 6/2013 | Xu |
| 2013/0171964 A1 | 7/2013 | Bhatia |
| 2013/0173756 A1 | 7/2013 | Luna |
| 2013/0201316 A1 | 8/2013 | Binder et al. |
| 2013/0212462 A1 | 8/2013 | Athas |
| 2013/0219281 A1 | 8/2013 | Trevelyan |
| 2013/0219458 A1 | 8/2013 | Ramanathan |
| 2013/0263280 A1 | 10/2013 | Cote et al. |
| 2013/0268357 A1 | 10/2013 | Heath |
| 2013/0272519 A1 | 10/2013 | Huang |
| 2013/0304796 A1 | 11/2013 | Jackowski |
| 2013/0326607 A1 | 12/2013 | Feng |
| 2014/0013001 A1 | 1/2014 | Cox |
| 2014/0082260 A1 | 3/2014 | Oh et al. |
| 2014/0189802 A1 | 7/2014 | Montgomery |
| 2014/0199044 A1 | 7/2014 | Gupta |
| 2014/0201323 A1 | 7/2014 | Fall |
| 2014/0222974 A1 | 8/2014 | Liu |
| 2014/0244778 A1 | 8/2014 | Wyatt |
| 2014/0258465 A1 | 9/2014 | Li |
| 2014/0301334 A1 | 10/2014 | Labranche |
| 2014/0310709 A1 | 10/2014 | Nirantar |
| 2014/0337308 A1 | 11/2014 | De Francisci Morales |
| 2014/0359081 A1 | 12/2014 | Van Deventer |
| 2014/0376403 A1 | 12/2014 | Shao |
| 2015/0006615 A1 | 1/2015 | Wainner |
| 2015/0016261 A1 | 1/2015 | Backholm |
| 2015/0026239 A1 | 1/2015 | Hofmann |
| 2015/0026341 A1 | 1/2015 | Blacka |
| 2015/0032803 A1 | 1/2015 | Graham-Cumming |
| 2015/0033001 A1 | 1/2015 | Ivanov |
| 2015/0036485 A1 | 2/2015 | Poulson |
| 2015/0039674 A1 | 2/2015 | Agarwal |
| 2015/0067819 A1 | 3/2015 | Shribman et al. |
| 2015/0135302 A1 | 5/2015 | Cohen |
| 2015/0149431 A1 | 5/2015 | Trevelyan |
| 2015/0172324 A1 | 6/2015 | Calme |
| 2015/0172406 A1 | 6/2015 | Hansen |
| 2015/0189401 A1 | 7/2015 | Yi |
| 2015/0206176 A1 | 7/2015 | Toval |
| 2015/0206197 A1 | 7/2015 | Toval |
| 2015/0244839 A1 | 8/2015 | Horn |
| 2015/0268905 A1 | 9/2015 | Chakirov |
| 2015/0295988 A1 | 10/2015 | Goodwin |
| 2015/0317218 A1 | 11/2015 | Verde |
| 2015/0341812 A1 | 11/2015 | Dion |
| 2015/0347118 A1 | 12/2015 | Yeung |
| 2015/0350362 A1 | 12/2015 | Pollack |
| 2015/0358648 A1 | 12/2015 | Limberg |
| 2015/0372972 A1 | 12/2015 | Kennedy |
| 2016/0021430 A1 | 1/2016 | LaBosco et al. |
| 2016/0035019 A1 | 2/2016 | Rosner |
| 2016/0098049 A1 | 4/2016 | Fan |
| 2016/0105530 A1 | 4/2016 | Shribman |
| 2016/0140405 A1 | 5/2016 | Graumann |
| 2016/0170814 A1 | 6/2016 | Li et al. |
| 2016/0205028 A1 | 7/2016 | Luna |
| 2016/0241664 A1 | 8/2016 | Xia |
| 2016/0294956 A1 | 10/2016 | Fix |
| 2016/0323409 A1 | 11/2016 | Kõlhi |
| 2016/0337464 A1 | 11/2016 | Eriksson |
| 2016/0352628 A1 | 12/2016 | Reddy et al. |
| 2016/0366233 A1 | 12/2016 | Le |
| 2017/0041416 A1 | 2/2017 | Zhou |
| 2017/0155654 A1 | 6/2017 | Burke |
| 2017/0221092 A1 | 8/2017 | Toval |
| 2017/0230434 A1 | 8/2017 | Wang |
| 2017/0250861 A1 | 8/2017 | Gheorghe |
| 2018/0020324 A1 | 1/2018 | Beauford |
| 2018/0034766 A1 | 2/2018 | Chiba |
| 2018/0042067 A1 | 2/2018 | Nirantar |
| 2018/0063228 A1 | 3/2018 | Deen |
| 2018/0077624 A1 | 3/2018 | Jung |
| 2018/0131668 A1 | 5/2018 | Prince |
| 2018/0225387 A1 | 8/2018 | Pang |
| 2018/0227210 A1 | 8/2018 | Cosgrove |
| 2018/0262388 A1 | 9/2018 | Johnson |
| 2018/0375952 A1 | 12/2018 | Knecht |
| 2019/0037047 A1 | 1/2019 | Shribman |
| 2019/0050164 A1 | 2/2019 | Kotian |
| 2019/0050903 A1 | 2/2019 | Backholm |
| 2019/0068740 A1 | 2/2019 | Graham-Cumming |
| 2019/0098518 A1 | 3/2019 | Luna |
| 2019/0110173 A1 | 4/2019 | Collier |
| 2019/0138560 A1 | 5/2019 | Holloway |
| 2019/0155665 A1 | 5/2019 | Bott |
| 2019/0166520 A1 | 5/2019 | Luna |
| 2019/0180316 A1 | 6/2019 | Toval |
| 2019/0199611 A1 | 6/2019 | Kotadia |
| 2019/0238510 A1 | 8/2019 | Li |
| 2019/0260859 A1 | 8/2019 | Patil |
| 2019/0372878 A1 | 12/2019 | Chakra |
| 2019/0379766 A1 | 12/2019 | Decenzo |
| 2019/0387430 A1 | 12/2019 | Ingerman |
| 2020/0007494 A1 | 1/2020 | Prince |
| 2020/0159622 A1 | 5/2020 | Chintagunta |
| 2020/0162432 A1 | 5/2020 | Ludin |
| 2020/0169536 A1 | 5/2020 | Santelia |
| 2020/0184035 A1 | 6/2020 | Santelia |
| 2020/0186614 A1 | 6/2020 | Luna |
| 2020/0259893 A1 | 8/2020 | James |
| 2020/0287867 A1 | 9/2020 | Knecht |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102314348 | 1/2012 |
| EP | 0948176 A2 | 10/1999 |
| EP | 1672826 | 6/2006 |
| EP | 2597869 A1 | 5/2013 |
| EP | 2597869 A1 | 5/2015 |
| EP | 2922275 B1 | 3/2016 |
| GB | 2418108 A | 3/2006 |
| JP | H11-355302 | 12/1999 |
| JP | 2007280388 | 10/2007 |
| KR | 1020090097034 | 9/2009 |
| RU | 2343536 C2 | 10/2009 |
| WO | 2000/018078 A1 | 3/2000 |
| WO | 2004094980 | 11/2004 |
| WO | 2004094980 A2 | 11/2004 |
| WO | 2007/136665 | 11/2007 |
| WO | 2010090562 A1 | 8/2010 |

Appx1232

## US 11,044,344 B2

Page 5

(56)        **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | 2010090562 A1 | 12/2010 |
| WO | 2011068784 A1 | 9/2011 |
| WO | 2015034752 A1 | 3/2015 |
| WO | 2015/157646 | 10/2015 |
| WO | 2016181383 | 11/2016 |
| WO | 2019/043687 | 3/2019 |

OTHER PUBLICATIONS

Rennhard, Marc, "MorphMix—A Peer-to-Peer based System for Anonymous Internet Access", 2004 (307 pages).
Ari Luotonen, "Web Proxy Servers," ISBN-10: 0136806120, ISBN-13: 978-0136806127, Prentice Hall; 1st Ed. 1998 (452 pages).
RFC 760, DOD Standard Internet Protocol, Jan. 1980 (46 pages).
RFC 2547, BGP/MPLS VPNs, Mar. 1999 (25 pages).
RFC 1180, A TCP/IP Tutorial, Jan. 1991 (28 pages).
RFC 1122, Requirements for Internet Hosts—Communication Layers, Oct. 1989 (116 pages).
Andrei Popescu, Google, Inc, Geolocation API Specification, W3C Working Draft Dec. 22, 2008 (8 pages).
Andrei Popescu, Google, Inc, Geolocation API Specification, W3C Recommendation Oct. 24, 2013 (10 pages).
Yong Wang, et. al., Towards Street-Level Client-Independent IP Geolocation, 2011 (14 pages).
William R. Stanek, Introducing Microsoft Windows Vista 81, 2006 (9 pages).
IETF RFC 2460 "Internet Protocol, Version 6 (IPv6)", Dec. 1998 (39 pages).
IETF RFC 793 "Protocol Specification", Sep. 1981 (90 pages).
IETF RFC 1349 "Type of Service in the Internet Protocol Suite", Jul. 1992 (28 pages).
IEEE Std 802-2001, IEEE Standard for Local and Metropolitan Area Networks: Overview and Architecture, Feb. 7, 2002 (47 pages).
Scott Lowe, Use Resource Monitor to monitor network performance—TechRepublic, Jul. 29, 2011 (11 pages).
Greg Shultz, Windows Vista's Task Manager: The harder-to-detect changes—TechRepublic, Feb. 21, 2007 (16 pages).
Gavin Gear, Windows 8 Task Manager In-Depth, Jun. 6, 2013 (32 pages).
IETF RFC 2914, "Congestion Control Principles", Sep. 2000 (17 pages).
IETF RFC 4026, "Provider Provisioned Virtual Private Network (VPN) Terminology", Mar. 2005 (20 pages).
Berners-Lee et al., RFC 1945, Hypertext Transfer Protocol, HTTP/1.0 (May 1996) (60 pages).
Leech et al., RFC 1928, Socks Protocol, Version 5 (Internet Engineering Task Force, Network Working Group, Mar. 1996) (9 pages).
Wessels, "Squid: The Definitive Guide," ISBN-10: 9780596001629, ISBN-13: 978-0596001629, O'Reilly Media; 1st Ed. (Jan. 1, 2004) (468 pages).
Luotonen, "Web Proxy Servers," ISBN-10: 0136806120, ISBN-13: 978-0136806127, Prentice Hall; 1st Ed. (Dec. 30, 1997) (452 pages).
Loutonen et al., "World-Wide Web proxies," Computer Networks and ISDN Systems 27, 147-154 (Elsevier Science B. V.) (1994) (8 pages).
Cooper et al., RFC 3040, Internet Web Replication and Caching Taxonomy (Jan. 2001) (32 pages).
ISO/IEC 23009-1:2012(E), MPEG-DASH standard, Jan. 5, 2012 (133 pages).
ProxyList.net, as captured by the Wayback Machine (web.archive.org), on Jul. 17, 2011 (1 page).
Printout of VIP72 Youtube web page at https://www.youtube.com/watch?v=L0Hct2kSnn4, retrieved Nov. 21, 2019 (1 page).
VIP72 Scene Images extracted from VIP72.com/nvpnnet, MPEG-4 video recording of "nVPN.net | Double your Safety and use Socks5 +nVpn", accessed from https://www.youtube.com/watch?v=L0Hct2kSnn4, published Sep. 11, 2011 (221 pages).

Certification dated Nov. 8, 2019 of Anjali Shresta of Google, Proof of Date for VIP72 Youtube web page and video (4 pages).
VIP72.com home page as of 2013 from Wayback Machine (3 pages).
Michael J. Freedman, Princeton University, "Experiences with CoralCDN: a five-year operational view", Proceeding NSDI'10 Proceedings of the 7th USENIX conference on Networked systems design and implementation San Jose, California—Apr. 28-30, 2010 (17 pages).
"The BitTorrent Protocol Specification", Website: https://web.archive.org/web/20120513011037/http:/www.bittorrent.org/beps/bep_0003.html describing BitTorrent dated Jan. 10, 2008 downloaded using web archive on Aug. 16, 2019 (6 pages).
"BitTorrent", Website: https://en.wikipedia.org/w/index.php?title=BitTorrent&oldid=530466721 describing BitTorrent dated Dec. 30, 2012 downloaded using Wikipedia on Aug. 16, 2019 (9 pages).
"VIP SOCKS/VPN Service", Website: http://vip72.com:80/?drgn=1 describing VIP72 proxy service dated Jan. 2010 downloaded using VIP Technologies webpage on Aug. 16, 2019 (3 pages).
"Welcome to Easy Hide IP", Website: https://web.archive.org/web/20130702093456/http://www.easy-hide-ip.com:80/ describing Easy Hide IP dated Jun. 26, 2007 downloaded using web archive on Aug. 16, 2019 (2 pages).
"You make it fun; we'll make it run", Website: https://web.archive.org/web/20130726050810/https://www.coralcdn.org describing CoralCDN dated Jan. 25, 2005 downloaded using web archive on Aug. 16, 2019 (2 pages).
"Net Transport", Website: http://www.xi-soft.com/default.htm describing Net Transport Overview dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (2 pages).
Net Transport—Develop History, Website: http://www.xi-soft.com/download.htm describing Net Transport Download dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (10 pages).
Net Transport FAQ, Website: http://www.xi-soft.com/faq.htm describing Net Transport FAQ dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (4 pages).
Net Transport News, Website: http://www.xi-soft.com/news.htm describing Net Transport News dated 2005 downloaded using Net Transport webpage on Aug. 16, 2019 (5 pages).
Reed et al., "Anonymous Connections and Onion Routing", Naval Research Laboratory, Mar. 1998 https://www.onion-router.net/Publications/JSAC-1998.pdf (Year: 1998).
Octoparse Blog: "Top 20 Web Crawling Tools to Scrape the Websites Quickly", Aug. 23, 2019 (15 pages).
Screen captures from YouTube video clip entitle "nVpn.net | Double your Safety and use Socks5 + nVpn" 38 pages, last accessed Nov. 20, 2018 <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
Screen captures from YouTube video clip entitle "Andromeda" 47 pages, publicly known and available as of at least 2011 <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
SpyEye, https://www.symantec.com/security-center/writeup/2010-020216-0135-9; http://secureseq.info/riskyclouds/spyeye-user-manual; known as of at least 2010 (13 pages).
Screen captures from YouTube video clip entitle "Change Your Country IP Address & Location with Easy Hide IP Software" 9 pages, publicly known and available as of at least 2011, <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.
CoralCDN ("CoralCDN"), https://pdos.csail.mit.edu/6.824/papers/freedman-coral.pdf (14 pages).
European Search Report for EP 14182547.1, dated Jul. 30, 2015.
R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2022].
"On the leakage of personally identifiable information via online social networks", Wills et al. At&T, Apr. 2009 http://www2.research.att.com/~bala/papers/wosn09.pdf*.
"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Computer Science Dept., Oct. 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf.

Appx1233

**US 11,044,344 B2**

Page 6

(56)    **References Cited**

OTHER PUBLICATIONS

International Search Report of PCT/US2010/034072 dated Jul. 1, 2010.
YouTube video clip entitled "nVpn.net | Double your Safety and use Socks5 + nVpn" <https://www.youtube.com/watch?v=L0Hct2kSnn4>.
YouTube video clip entitled "Andromeda" <https://www.youtube.com/watch?v=yRRYpFLbKNU>.
YouTube video clip entitled "Change Your Country IP Address & Location with Easy Hide IP Software" <https://www.youtube.com/watch?v=ulwkf1sOfdA and https://www.youtube.com/watch?v=iFEMT-o9DTc>.
RFC 3022, Traditional IP Network Address Translator (Traditional NAT), Jan. 2001 (16 pages).
RFC 2068, Hypertext Transfer Protocol—HTTP/1.1, Jan. 1997 (162 pages).
RFC 1919, Classical versus Transparent IP Proxies, Mar. 1996 (35 pages).
HAProxy Reference Manual, Version 1.2.18, Willy Tarreau, May 25, 2008 (40 pages).
HAProxy Architecture Guide, Version 1.2.18, Willy Tarreau, May 25, 2008 (23 pages).
RFC 2663 entitled: "IP Network Address Translator (NAT) Terminology and Considerations", Aug. 1999 (30 pages).
International Search Report issued in PCT Application No. PCT/US2010/051881 dated Dec. 9, 2010.
Supplementary European Search Report issued in EP Application No. 10822724 dated Apr. 24, 2013.
Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Engineers Report, The Institute of Electronics, Information and Communication, May 14, 2009.
"Keep Alive"—Imperva, 2019 https://www.imperva.com/learn/performance/keep-alive (2019) (3 pages).
Third party observation filed on Jun. 21, 2019 in PCT Application No. PCT/IL2018/050910 (7 pages).
IETF named: IPv6 Tunnel Broker, Apr. 1999—First uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).
RFC 3053 (Jan. 2001) named: IPv6 Tunnel Broker—Secod uploaded document submitted with third party observation dated Jun. 21, 2019 (13 pages).
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,749.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/140,785.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,433.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,451.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,476.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/214,496.
Third-party submission under 37 CFR 1.290 filed on Jul. 22, 2019 and entered in U.S. Appl. No. 16/292,363.
Third-party submission under 37 CFR 1.290 filed on Jul. 22, 2019 and entered in U.S. Appl. No. 16/292,364.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,374.
Third-party submission under 37 CFR 1.290 filed on Jul. 23, 2019 and entered in U.S. Appl. No. 16/292,382.
Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,250.
Third-party submission under 37 CFR 1.290 filed on Jul. 25, 2019 and entered in U.S. Appl. No. 16/365,315.
"Slice Embedding Solutions for Distributed Service Architectures"—Esposito et al., Boston University, Feb. 12, 2011 http://www.cs.bu.edu/techreports/pdf/2011-025-slice-embedding.pdf (Year 2011) (16 pages).

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages).
Notice of Preliminary Rejection in KR Application No. 10-2012-7011711 dated Jul. 15, 2016.
Kei Suzuki, a study on Cooperative Peer Selection Method in P2P Video Delivery, vol. 109, No. 37, IEICE Technical Report, The Institute of Electronics, Information and Communication Engineers, May 14, 2009.
Kozierok, The TCP/IP Guide—TCP Connection Preparation, Apr. 6, 2005 (3 pages).
Jovovic, Turning your HD TV into an Android SmartTV is easier than you think!, Feb. 26, 2013 (3 pages).
Allen, A Software Developer's Guide to HTTP Part III—Connections, Jan. 26, 2012 (10 pages).
Google Scholar: MorphMix citation in Alessandro Acquisti, et al., Digital Privacy: Theory, Technologies, and Practices (2007) (2 pages).
RFC 959, File Transfer Protocol (FTP), Oct. 1985 (69 pages).
RFC 821, Jonathan B. Postel, Simple Mail Transfer Protocol, Aug. 1982 (70 pages).
RFC 918, Post Office Protocol, Oct. 1984 (5 pages).
RFC 937, Post Office Protocol—Version 2, Feb. 1985 (24 pages).
Roger Dingledine et al., "The Free Haven Project: Distributed Anonymous Storage Service", Dec. 17, 2000 (23 pages).
Michael Freedman et al., "Tartan: A Peer-to-Peer Anonymizing Network Layer", Nov. 18-22, 2002 (14 pages).
RFC 791, DARPA Internet Program Protocol Specification, Sep. 1981 (49 pages).
RFC 1034, "Domain Names—Concepts and Facilities", Nov. 1987 (55 pages).
RFC 1035, "Domain Names—Implementation and Specification", Nov. 1987 (54 pages).
RFC 1939, Post Office Protocol—Version 3, May 1996 (23 pages).
Authors Alain Durand (IMAG) et al., "IPv6 Tunnel Broker <draft-ietf-ngtrans-broker-00.txt>", Internet Society (ISOC), Apr. 2, 1999 (14 pages).
Sophie Gastellier-Prevost et al., "Defeating pharming attacks at the client-side", Network and System Security (NSS), Sep. 6, 2011 (8 pages).
Bharat K et al. "Mirror, Mirror on the Web: a study of host pairs with replicated content", Computer Networks, Amsterdam, vol. 31, No. 11-16, May 17, 1999 (12 pages).
European Search Report of EP 20190259 dated Dec. 16, 2020.
European Search Report of EP 20195090 dated Dec. 8, 2020.
RFC 2187, "Application of Internet Cache Protocol (ICP), version 2", Sep. 1997 (24 pages).
Duane Wessels, "ICP and the Squid Web Cache", Aug. 13, 1997 (25 pages).
RFC 1738, "Uniform Resource Locators (URL)", Dec. 1994 (25 pages).
European Search Report of EP 20195075 dated Nov. 13, 2020.
David Gourley et al, "HTTP-The-Definitive-Guide", O'Reilly Media, Inc. Sep. 27, 2002 (658 pages).
Floss Manuals, "Circumvention Tools", Free Software Foundation Inc., May 31, 2021 (240 pages).
David Fifield et al, "Blocking resistant communication through domain fronting", Proceeding on Privacy Enhanching Technologies 2015, May 15, 2015 (19 pages).
Wang Qiyan et al, "CensorSpoofer: Asymmetric Communication with IP Spoofing for ensorship-Resistant Web Browsing", Mar. 9, 2012 (16 pages).
Li et al, "Toward the Identification of Anonymous Web Proxies", University of Cambridge & University of Genoa, Apr. 3, 2009 (2 pages).
"Anonymizing Proxies: What They Are and Who They Work"—Enterprise Services Mar. 2013 (Year: 2012) (2 pages).
Selected pages from the website proxifier.com as of Feb. 2008 (15 pages).
Proxychains source code (Oct. 20, 2004) (53 pages).
RFC 1918, Address Allocation for Private Internets, Feb. 1996 (9 pages).

Appx1234

**US 11,044,344 B2**

Page 7

(56)         **References Cited**

OTHER PUBLICATIONS

RFC 2131, Dynamic Host Configuration Protocol, Mar. 1997 (45 pages).
RFC 4388, Dynamic Host Configuration Protocol (DHCP) Leasequery, Feb. 2006 (27 pages).

* cited by examiner

Appx1235



**FIG. 1**

Appx1236



**FIG. 2**

Appx1237



**FIG. 3**



**FIG. 4**

Appx1239



**FIG. 5**

Appx1240



FIG. 6

162



| ACCELERATION DATABASE 164 | | |
|---|---|---|
| 166 AGENT IP A ONLINE/OFFLINE | | |
| | | |
| >>> INDEXED BY: AGENT IP ADDRESS | | |
| | | |
| CACHE DATABASE 282 | | |
| 286 LIST OF URLS: | | |
| 288 URL 1 | | |
| 290 URL | | |
| 292 URL HTTP HEADERS | | |
| 294 LAST CHECKED ON SERVER | | |
| 296 LAST CHANGED ON SERVER | | |
| 298 LIST OF CHUNKS FOR THIS URL: | | |
| 300 CHUNK 1 | | |
| | 302 CHUNK CHECKSUM | |
| | 304 CHUNK DATA | |
| | 306 LIST OF PEERS: | |
| | | 308 PEER 1 |
| | | 310 PEER 1 IP ADDRESS |
| | | 312 PEER 2 CONNECTION STATUS |

**FIG. 7**

Appx1242



300

INITIALIZER SIGNS UP WITH
ACCELERATION SERVER
302

DETERMINE IF THERE IS AN
UPDATED VERSION OF
APPLICATION?
304

INITIALIZER REDIRECTS
OUTGOING NETWORK TRAFFIC
306

INITIALIZER LAUNCHES CLIENT
MODULE AND CONFIGURES
CLIENT MODULE TO INTERCEPT
ALL OUTGOING NETWORK
COMMUNICATIONS
308

INITIALIZER LAUNCHES AGENT
MODULE AND PEER MODULE
310

# FIG. 8



*350*

APPLICATION ON CLIENT INITIATES
REQUEST FOR A RESOURCE ON A
NETWORK
352

RESOURCE REQUEST IS INTERCEPTED BY
THE CLIENT MODULE
354

CLIENT MODULE LOOKS UP IP ADDRESS OF
SERVER THAT IS TARGET OF RESOURCE
REQUEST AND SENDS IP ADDRESS TO
ACCELERATION SERVER TO OBTAIN LIST
OF COMMUNICATION DEVICES THAT
CLIENT CAN USE AS AGENTS
356

ACCELERATION SERVER PREPARES A LIST
OF AGENTS THAT MAY BE SUITABLE TO
HANDLE THE REQUEST FROM THIS IP
ADDRESS
358

CLIENT SENDS ORIGINAL REQUEST TO ALL
AGENTS IN THE LIST RECEIVED FROM
ACCELERATION SERVER TO DETERMINE
WHICH AGENT IN THE LIST IS BEST SUITED
TO ASSIST WITH THE REQUEST
360

# FIG. 9



FIG. 10

Appx1245



CLIENT RECEIVES RESPONSE FROM THE AGENT AND FOR EACH OF X CHUNKS, CLIENT SENDS A REQUEST TO EACH OF THE PEERS LISTED FOR THE CHUNK TO DOWNLOAD THE DATA OF THAT CHUNK    422

PEERS RESPOND REGARDING WHETHER THEY STILL HAVE THE DATA OF THE CHUNK    424

CLIENT SELECTS QUICKEST PEER WITH DATA OF THE CHUCK    426

CHOSEN PEER SENDS CHUNK TO CLIENT    428

CLIENT STORES CHUNKS IN ITS CACHE FOR FUTURE USE    430

IF ANY CHUNKS WERE NOT LOADED FROM ANY OF THE PEERS, CLIENT REQUESTS CHUNKS AGAIN FROM AGENT    432

CLIENT ACKNOWLEDGES TO THE AGENT WHICH OF THE CHUNKS IT RECEIVED PROPERLY    434

AGENT LOOKS UP CHUNKS IN DATABASE OF AGENT AND ADDS CLIENT TO LIST OF PEERS FOR THESE CHUNKS    436

CLIENT PASSES DATA TO APPLICATION OF CLIENT THAT MADE REQUEST    438

CLIENT CHECKS WHETHER ALL OF THE CHUNKS FOR REQUEST WERE RECEIVED    440

## FIG. 11

420



Appx1246



**FIG. 12**

Appx1247



**FIG. 13**

Appx1248



**FIG. 14**

Appx1249



FIG. 15

800

US 11,044,344 B2

1

# SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation application of U.S. non-provisional patent application Ser. No. 14/025,109, filed Sep. 12, 2013, which is a divisional application of U.S. non-provisional patent application entitled "SYSTEM AND METHOD FOR PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION" having Ser. No. 12/836,059, filed Jul. 14, 2010 and issued as U.S. Pat. No. 8,560,604 on Oct. 15, 2013, and claims priority to U.S. provisional patent application entitled "SYSTEM AND METHOD FOR REDUCING INTERNET CONGESTION," having Ser. No. 61/249,624, filed Oct. 8, 2009, which are hereby incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present invention is related to Internet communication, and more particularly, to improving data communication speed and bandwidth efficiency on the Internet.

## BACKGROUND OF THE INVENTION

There are several trends in network and Internet usage, which tremendously increase the bandwidth that is being used on the Internet. One such trend is that more and more video is being viewed on demand on the Internet. Such viewing includes the viewing of both large and short video clips. In addition, regular shows and full-featured films may be viewed on the Internet. Another trend that is increasing the traffic on the Internet is that Web sites (such as shopping portals, news portals, and social networks) are becoming global, meaning that the Web sites are serving people in many diverse places on the globe, and thus the data is traversing over longer stretches of the Internet, increasing the congestion.

The increase in bandwidth consumption has created several major problems, a few of which are described below:

The problem for users—the current Internet bandwidth is not sufficient, and thus the effective 'speed' experienced by users is slow;

The problem for content owners—the tremendous amount of data being viewed by users is costing large amounts of money in hosting and bandwidth costs; and

The problem for Internet Service Providers (ISPs)—the growth in Internet traffic is requiring the ISPs to increase the infrastructure costs (communication lines, routers, etc.) at tremendous financial expense.

The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved.

There have been many attempts at making the Internet faster for the consumer and cheaper for the broadcaster. Each such attempt is lacking in some aspect to become a widespread, practical solution, or is a partial solution in that it solves only a subset of the major problems associated with the increase in Internet traffic. Most of the previous solutions require billions of dollars in capital investment for a comprehensive solution. Many of these attempts are lacking in that much of the content on the Internet has become dynamically created per the user and the session of the user (this is

2

what used to be called the "Web2.0" trend). This may be seen on the Amazon Web site and the Salesforce Web site, for example, where most of the page views on these Web sites is tailored to the viewer, and is thus different for any two viewers. This dynamic information makes it impossible for most of the solutions offered to date to store the content and provide it to others seeking similar content.

One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram providing an example of use of a proxy within a network 2. A proxy, or proxy server 4, 6, 8 is a device that is placed between one or more clients, illustrated in FIG. 1 as client devices 10, 12, 14, 16, 18, 20, that request data, via the Internet 22, and a Web server or Web servers 30, 32, 34 from which they are requesting the data. The proxy server 4, 6, 8 requests the data from the Web servers 30, 32, 34 on their behalf, and caches the responses from the Web servers 30, 32, 34, to provide to other client devices that make similar requests. If the proxy server 4, 6, 8 is geographically close enough to the client devices 10, 12, 14, 16, 18, 20, and if the storage and bandwidth of the proxy server 4, 6, 8 are large enough, the proxy server 4, 6, 8 will speed up the requests for the client devices 10, 12, 14, 16, 18, 20 that it is serving.

It should be noted, however, that to provide a comprehensive solution for Internet surfing, the proxy servers of FIG. 1 would need to be deployed at every point around the world where the Internet is being consumed, and the storage size of the proxy servers at each location would need to be near the size of all the data stored anywhere on the Internet. The abovementioned would lead to massive costs that are impractical. In addition, these proxy solutions cannot deal well with dynamic data that is prevalent now on the Web.

There have been commercial companies, such as Akamai, that have deployed such proxies locally around the world, and that are serving a select small group of sites on the Internet. If all sites on the Web were to be solved with such a solution, the capital investment would be in the range of billions of dollars. In addition, this type of solution does not handle dynamic content.

To create large distribution systems without the large hardware costs involved with a proxy solution, "peer-to-peer file sharing" solutions have been introduced, such as, for example, BitTorrent. FIG. 2 is a schematic diagram providing an example of a peer-to-peer file transfer network 50. In the network 50, files are stored on computers of consumers, referred to herein as client devices 60. Each consumer can serve up data to other consumers, via the Internet 62, thus taking the load of serving off of the distributors and saving them the associated costs, and providing the consumer multiple points from which to download the data, referred to herein as peers 70, 72, 74, 76, 78, thus increasing the speed of the download. However, each such peer-to-peer solution must have some sort of index by which to find the required data. In typical peer-to-peer file sharing systems, because the index is on a server 80, or distributed among several servers, the number of files available in the system is not very large (otherwise, the server costs would be very large, or the lookup time would be very long).

The peer-to-peer file sharing solution is acceptable in file sharing systems, because there are not that many media files that are of interest to the mass (probably in the order of magnitude of millions of movies and songs that are of interest). Storing and maintaining an index of millions of entries is practical technically and economically. However, if this system were to be used to serve the hundreds of billions of files that are available on the Internet of today, the cost of storing and maintaining such an index would be

US 11,044,344 B2

3                                                              4

again in the billions of dollars. In addition, these types of peer-to-peer file sharing systems are not able to deal with dynamic HTTP data.

In conclusion, a system does not exist that enables fast transmission of most of the data on the Internet, that does not incur tremendous costs, and/or that provides only a very partial solution to the problem of Internet traffic congestion. Thus, a heretofore unaddressed need exists in the industry to address the aforementioned deficiencies and inadequacies.

## SUMMARY OF THE INVENTION

The present system and method provides for faster and more efficient data communication within a communication network. Briefly described, in architecture, one embodiment of the system, among others, can be implemented as follows. A network is provided for accelerating data communication, wherein the network contains: at least one client communication device for originating a data request for obtaining the data from a data server; at least one agent communication device which is assigned to the data server for receiving the data request from the client communication device, wherein the agent keeps track of which client communication devices have received responses to data requests from the assigned data server; at least one peer communication device for storing portions of data received in response to the data request by the at least one client communication device, wherein the portions of data may be transmitted to the at least one client communication device upon request by the client communication device; and at least one acceleration server for deciding which agent communication device is to be assigned to which data server and providing this information to the at least one client communication device.

The present system and method also provides a communication device within a network, wherein the communication device contains: a memory; and a processor configured by the memory to perform the steps of: originating a data request for obtaining data from a data server; being assigned to a data server, referred to as an assigned data server; receiving a data request from a separate device within the network, and keeping track of which client communication devices within the network have received responses to data requests from the assigned data server; and storing portions of data received in response to the originated data request, wherein the portions of data may be transmitted to communication device upon request by the communication device.

Other systems, methods, features, and advantages of the present invention will be or become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional systems, methods, features, and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

Many aspects of the invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. **1** is a schematic diagram providing a prior art example of use of a proxy within a network.

FIG. **2** is a schematic diagram providing a prior art example of a peer-to-peer file transfer network.

FIG. **3** is a schematic diagram providing an example of a communication network in accordance with the present invention.

FIG. **4** is a schematic diagram further illustrating a communication device of the communication network of FIG. **3**.

FIG. **5** is a schematic diagram further illustrating the memory of FIG. **4**.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application of FIG. **5**, as well as communication paths of the acceleration application.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network.

FIG. **8** is a flowchart illustrating operation of the acceleration system initializer module.

FIG. **9** is a flowchart further illustrating communication between different elements of the communication network.

FIG. **10** is a flowchart continuing the flowchart of FIG. **9** and focused on agent response to the HTTP request.

FIG. **11** is a flowchart continuing the flowchart of FIG. **10**, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent.

FIG. **12** is a flowchart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid.

FIG. **13** is a flowchart outlining operation of the acceleration server.

FIG. **14** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention.

FIG. **15** is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

## DETAILED DESCRIPTION

The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network **100** is provided by the schematic diagram of FIG. **3**. The network **100** of FIG. **3** contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network **100**, as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. **4**.

Returning to FIG. **3**, the exemplary embodiment of the network **100** illustrates that one of the communication devices is functioning as a client **102**. The client **102** is capable of communication with one or more peers **112**, **114**, **116** and one or more agents **122**. For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

The communication network **100** also contains a Web server **152**. The Web server **152** is the server from which the client **102** is requesting information and may be, for example, a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet. It should be noted that the server **152** is not limited

Appx1252

US 11,044,344 B2

5

to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the server may be a server capable of handling a different protocol. It should also be noted that while the present description refers to the use of HTTP, the present invention may relate to any other communication protocol and HTTP is not intended to be a limitation to the present invention.

The communication network 100 further contains an acceleration server 162 having an acceleration server storage device 164. As is described in more detail herein, the acceleration server storage device 164 has contained therein an acceleration server database. The acceleration server database stores Internet protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein. Specifically, the acceleration server database contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network 100. For each such agent, the acceleration server assigns a list of IP addresses.

In the communication network 100 of FIG. 3, the application in the client 102 is requesting information from the Web server 152, which is why the software within the communication device designated this communication device to work as a client. In addition, since the agent 122 receives the request from the client 102 as the communication device closest to the Web server 152, functionality of the agent 122, as provided by the software of the agent 122, designates this communication device to work as an agent. It should be noted, that in accordance with an alternative embodiment of the invention, the agent need not be the communication device that is closest to the Web server. Instead, a different communication device may be selected to be the agent.

Since the peers 112, 114, 116 contain at least portions of the information sought by the client 102 from the Web server 152, functionality of the peers 112, 114, 116, as provided by the software of the peers 112, 114, 116, designates these communication devices to work as peers. It should be noted that the process of designating clients, agents, and peers is described in detail herein. It should also be noted that the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 may differ from the number illustrated by FIG. 3. In fact, the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network 100 are not intended to be limited by the current description.

Prior to describing functionality performed within a communication network 100, the following further describes a communication device 200, in accordance with a first exemplary embodiment of the invention. FIG. 4 is a schematic diagram further illustrating a communication device 200 of the communication network 100, which contains general components of a computer. As previously mentioned, it should be noted that the communication device 200 of FIG. 4 may serve as a client, agent, or peer.

Generally, in terms of hardware architecture, as shown in FIG. 4, the communication device 200 includes a processor 202, memory 210, at least one storage device 208, and one or more input and/or output (I/O) devices 240 (or peripherals) that are communicatively coupled via a local interface 250. The local interface 250 can be, for example but not limited to, one or more buses or other wired or wireless connections, as is known in the art. The local interface 250 may have additional elements, which are omitted for simplicity, such as controllers, buffers (caches), drivers, repeat-

6

ers, and receivers, to enable communications. Further, the local interface 250 may include address, control, and/or data connections to enable appropriate communications among the aforementioned components.

The processor 202 is a hardware device for executing software, particularly that stored in the memory 210. The processor 52 can be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the communication device 200, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, or generally any device for executing software instructions.

The memory 210, which is further illustrated and described by the description of FIG. 5, can include any one or combination of volatile memory elements (e.g., random access memory (RAM, such as DRAM, SRAM, SDRAM, etc.)) and nonvolatile memory elements (e.g., ROM, hard drive, tape, CDROM, etc.). Moreover, the memory 210 may incorporate electronic, magnetic, optical, and/or other types of storage media. Note that the memory 210 can have a distributed architecture, where various components are situated remote from one another, but can be accessed by the processor 202.

The software 212 located within the memory 210 may include one or more separate programs, each of which contains an ordered listing of executable instructions for implementing logical functions of the communication device 200, as described below. In the example of FIG. 4, the software 212 in the memory 210 at least contains an acceleration application 220 and an Internet browser 214. In addition, the memory 210 may contain an operating system (O/S) 230. The operating system 230 essentially controls the execution of computer programs and provides scheduling, input-output control, file and data management, memory management, and communication control and related services. It should be noted that, in addition to the acceleration application 220, Internet browser 214, and operating system 230, the memory 210 may contain other software applications.

While the present description refers to a request from the client originating from an Internet browser, the present invention is not limited to requests originating from Internet browsers. Instead, a request may originate from an email program or any other program that would be used to request data that is stored on a Web server, or other server holding data that is requested by the client device.

Functionality of the communication device 200 may be provided by a source program, executable program (object code), script, or any other entity containing a set of instructions to be performed. When a source program, then the program needs to be translated via a compiler, assembler, interpreter, or the like, which may or may not be included within the memory 210, so as to operate properly in connection with the operating system 230. Furthermore, functionality of the communication device 200 can be written as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions.

The I/O devices 240 may include input devices, for example but not limited to, a keyboard, mouse, scanner, microphone, etc. Furthermore, the I/O devices 240 may also include output devices, for example but not limited to, a printer, display, etc. Finally, the I/O devices 240 may further include devices that communicate via both inputs and outputs, for instance but not limited to, a modulator/demodu-

Appx1253

7                                                        8

lator (modem; for accessing another device, system, or network), a radio frequency (RF) or other transceiver, a telephonic interface, a bridge, a router, etc.

When the communication device **200** is in operation, the processor **202** is configured to execute the software **212** stored within the memory **210**, to communicate data to and from the memory **210**, and to generally control operations of the communication device **200** pursuant to the software **212**. The software **212** and the O/S **230**, in whole or in part, but typically the latter, are read by the processor **202**, perhaps buffered within the processor **202**, and then executed.

When functionality of the communication device **200** is implemented in software, as is shown in FIG. **4**, it should be noted that the functionality can be stored on any computer readable medium for use by or in connection with any computer related system or method. In the context of this document, a computer readable medium is an electronic, magnetic, optical, or other physical device or means that can contain or store a computer program for use by or in connection with a computer related system or method. The functionality of the communication device **200** can be embodied in any computer-readable medium for use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions. In the context of this document, a "computer-readable medium" can be any means that can store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device.

The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM, EEPROM, or Flash memory) (electronic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-readable medium could even be paper or another suitable medium upon which the program is printed, as the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

In an alternative embodiment, where the functionality of the communication device **200** is implemented in hardware, the functionality can be implemented with any or a combination of the following technologies, which are each well known in the art: a discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit (ASIC) having appropriate combinational logic gates, a programmable gate array(s) (PGA), a field programmable gate array (FPGA), etc.

The at least one storage device **208** of the communication device **200** may be one of many different categories of storage device. As is described in more detail herein, the storage device **208** may include a configuration database **280** and a cache database **282**. Alternatively, the configuration database **280** and cache database **282** may be located on different storage devices that are in communication with the communication device **200**. The description that follows assumes that the configuration database **280** and cache database **282** are located on the same storage device, however, it should be noted that the present invention is not intended to be limited to this configuration.

The configuration database **280** stores configuration data that is common to all elements of the communication network **100** and is used to provide set up and synchronization information to different modules of the acceleration application **220** stored within the memory **210**, as is described in further detail herein. The cache database **282** stores responses to HTTP requests that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. As is explained in additional detail herein, the responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this information and will use this communication device as either a peer or an agent.

In addition to the abovementioned, as is explained in further detail herein, the cache database **282** has stored therein a list of URLs that the communication device is aware of (i.e., has seen requests for). For each URL, the cache database **282** has stored therein the URL itself, HTTP headers returned by the Web Server for this URL, when the last time was that the contents of this URL was loaded directly from the Web Server, when the contents of the URL had last changed on the Web Server, as well as a list of chunks that contain the contents of this URL, and the chunks of data themselves. Chunks in the present description are defined as equally sized pieces of data that together form the whole content of the URL. It should be noted that while the present description provides for chunks being equally sized pieces of data, in accordance with an alternative embodiment of the invention, the chunks may instead be of different size.

FIG. **5** is a schematic diagram further illustrating the memory **210** of FIG. **4**. As shown by FIG. **5**, the memory **210** may be separated into two basic levels, namely, an operating system level **260** and an application level **270**. The operating system level **260** contains the operating system **230**, wherein the operating system **230** further contains at least one device driver **262** and at least one communication stack **264**. The device drivers **262** are software modules that are responsible for the basic operating commands for various hardware devices of the communication device **200**, such as the processor **202**, the storage device **208** and the I/O devices **240**. In addition, the communication stacks **264** provide applications of the communication device **200** with a means of communicating within the network **100** by implementing various standard communication protocols.

The application level **270** includes any application that is running on the communication device **200**. As a result, the application level **270** includes the Internet browser **214**, which is used to view information that is located on remote Web servers, the acceleration application **220**, as described in more detail below, and any other applications **216** stored on the communication device **200**.

As is explained in additional detail below, the acceleration application **220** intercepts the requests being made by applications of the communication device (client) that use the Internet, in order to modify the requests and route the requests through the communication network. There are various methods that may be used to intercept such requests. One such method is to create an intermediate driver **272**,

US 11,044,344 B2

9

which is also located within the memory 210, that attaches itself to all communication applications, intercepts outgoing requests of the communication applications of the communication device 200, such as the Internet browser 214, and routes the requests to the acceleration application 220. Once the acceleration application 220 modifies the requests, routes the requests to other system elements on the communication network 100, and receives replies from other system elements of the communication network 100, the acceleration application 220 returns the replies to the intermediate driver 272, which provides the replies back to the requesting communication application.

FIG. 6 is a schematic diagram further illustrating elements of the acceleration application 220, as well as communication paths of the acceleration application 220. The acceleration application 220 contains an acceleration system initializer module 222, which is called when the acceleration application 220 is started. The acceleration system initializer module 222 is capable of initializing all elements of the communication device 200 The acceleration application 220 also contains three separate modules that run in parallel, namely, a client module 224, a peer module 226, and an agent module 228, each of which comes into play according to the specific role that the communication device 200 is partaking in the communication network 100 at a given time. The role of each module is further described herein.

The client module 224 provides functionality required when the communication device 200 is requesting information from the Web server 152, such as, for example, but not limited to, Web pages, data, video, or audio. The client module 224 causes the communication device 200 having the client module 224 therein to intercept the information request and pass the information request on to other elements of the communication network 100, such as, servers, agents or peers. This process is further described in detail herein.

The peer module 226 provides functionality required by the communication device 200 when answering other clients within the communication network 100 and providing the other clients with information that they request, which this communication device 200, having this peer module 226 therein, has already downloaded at a separate time. This process is further described in detail herein.

The agent module 228 provides functionality required when other communication devices of the communication network 100 acting as clients query this communication device 200, having this agent module 228 therein, as an agent, to obtain a list of peers within the communication network 100 that contain requested information. This process is further described in detail herein.

The acceleration application 220 interacts with both the configuration database 280 and the cache database 282 of the storage device 208. As previously mentioned herein, the configuration database 280 stores configuration data that may be common to all communication devices of the communication network 100 and is used to provide setup and synchronization information to different modules 222, 224, 226, 228 of the acceleration application 220 stored within the memory 210.

The cache database 282 stores responses to information requests, such as, for example, HTTP requests, that the communication device 200 has dispatched, either for its own consumption or on behalf of other elements of the communication network 100. The responses to HTTP requests are stored within the cache database 282 for future use by this communication device 200, or for other communication devices within the communication network 100 that need to

10

retrieve this same information and will use this communication device 200 as either a peer or an agent. This process is described in detail herein.

Information stored within the cache database 282 may include any information associated with a request sent by the client. As an example, such information may include, metadata and actual requested data. For example, for an HTTP request for a video, the metadata may include the version of the Web server answering the request from the client and the data would be the requested video itself. In a situation where there is no more room for storage in the cache database, the software of the associated communication device may cause the communication device to erase previous data stored in order to clear room for the new data to store in the cache database. As an example, such previous data may include data that is most likely not to be used again. Such data may be old data or data that is known to no longer be valid. The communication device may choose to erase the least relevant data, according to any of several methods that are well known in the art.

FIG. 7 is a chart further illustrating two of the main databases utilized within the communication network 100, namely, the acceleration server database 164 and the cache database 282. As previously mentioned, the acceleration server database 164 stores IP addresses of communication devices located within the communication network 100, which have acceleration software stored therein. Specifically, the acceleration server database 164 contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network 100. The acceleration server assigns a list of IP addresses to each communication device functioning as an agent. Each communication device will be the agent for any Web servers whose IP address is in the range 'owned' by that communication device. As an example, when a first ever communication device goes online, namely, the first communication device as described herein having the acceleration application 220 therein, the acceleration server assigns all IP addresses in the world to this communication device, and this communication device will be the agent for any Web server. When a second communication device goes online it will share the IP address list with the first communication device, so that each of the communication devices will be responsible for a different part of the world wide web servers.

The cache database 282 of the communication device 200 has stored therein a list of URLs 286 of which the communication device 200 is aware. The communication device 200 becomes aware of a URL each time that the communication device 200 receives a request for information located at a specific URL. As shown by FIG. 7, for each URL 288 within the list of URLs 286, the cache database 282 stores: the URL itself 290; HTTP headers 292 returned by the Web Server 152 for this URL; when the last time 294 was that the contents of this URL were loaded directly from the Web Server 152; when the contents of the URL last changed 296 on the Web Server 152; and a list of chunks 298 that contain the contents of this URL, and the content of the chunk. As previously mentioned, chunks, in the present description, are defined as equally sized pieces of data that together form the entire content of the URL, namely, the entire content whose location is described by the URL. As a non-limiting example, a chunk size of, for example, 16 KB can be used, so that any HTTP response will be split up into chunks of 16 KB. In accordance with an alternative embodiment of the invention, if the last chunk of the response is not

Appx1255

US 11,044,344 B2

11

large enough to fill the designated chunk size, such as 16 KB for the present example, the remaining portion of the chunk will be left empty.

For each such chunk **300**, the cache database **282** includes the checksum of the chunk **302**, the data of the chunk **304** itself, and a list of peers **306** that most likely have the data for this chunk. As is described in additional detail herein, the data for the chunk may be used by other clients within the communication network **100** when other communication devices of the communication network **100** serve as peers to the clients, from which to download the chunk data.

For each chunk, a checksum is calculated and stored along side of the chunk itself. The checksum may be calculated in any of numerous ways known to those in the art. The purpose of having the checksum is to be able to identify data uniquely, whereas the checksum is the "key" to the data, where the data is the chunk. As an example, a client may want to load the contents of a URL, resulting in the agent that is servicing this request sending the checksums of the chunks to the client, along with the peers that store these chunks. It is to be noted that there could be a different peer for every different chunk. The client then communicates with each such peer, and provides the checksum of the chunk that it would like the peer to transmit back to the client. The peer looks up the checksum (the key) in its cache database, and provides back the chunk (data) that corresponds to this checksum (the key). As shown by FIG. **7**, for each peer **308** within the list of peers **306**, the cache database **282** includes the peer IP address **310**, as well as the connection status **312** of the peer, which represents whether the peer **308** is online or not.

In accordance with one embodiment of the invention, the cache database **282** may be indexed by URL and by Checksum. Having the cache database indexed in this manner is beneficial due to the following reason. When the agent is using the cache database, the agent receives a request from a client for the URL that the client is looking for. In such a case the agent needs the cache database to be indexed by the URL, to assist in finding a list of corresponding peers that have the chunks of this URL. When the peers are using this cache database, the peers obtain a request from the client for a particular checksum, and the peers need the database to be indexed by the checksum so that they can quickly find the correct chunk. Of course, as would be understood by one having ordinary skill in the art, the cache database may instead be indexed in any other manner.

Having described components of the communication network **100**, the following further describes how such components interact and individually function. FIG. **8** is a flowchart **300** illustrating operation of the acceleration system initializer module **222** (hereafter referred to as the initializer **222** for purposes of brevity). It should be noted that any process descriptions or blocks in flowcharts should be understood as representing modules, segments, portions of code, or steps that include one or more instructions for implementing specific logical functions in the process, and alternative implementations are included within the scope of the present invention in which functions may be executed out of order from that shown or discussed, including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art of the present invention.

The initializer **222** is the first element of the communication device **200** to operate as the communication device **200** starts up (block **302**). As the initializer **222** starts, it first communicates with the acceleration server **162** to sign up with the acceleration server **162**. This is performed by

12

providing the acceleration server **162** with the hostname, and all IP addresses and media access control (MAC) addresses of the interfaces on the communication device **200** having the initializer **222** thereon.

In accordance with an alternative embodiment of the invention, as shown by block **304**, the initializer **222** checks with the acceleration server **162** whether a more updated version of the acceleration application software is available. This may be performed by any one of many known methods, such as, but not limited to, by providing the version number of the acceleration application software to the acceleration server **162**. The message received back from the acceleration server **162** indicates whether there is a newer version of the acceleration application software or not. If a newer version of the acceleration application software exists, the initializer **222** downloads the latest version of the acceleration application software from the acceleration server **162**, or from a different location, and installs the latest version on the communication device **200**. In addition to the abovementioned, the initializer **222** may also schedule additional version checks for every set period of time thereafter. As an example, the initializer **222** may check for system updates every two days.

As shown by block **306**, the initializer **222** then redirects outgoing network traffic from the communication device **200** to flow through the acceleration application **162**. As previously mentioned, one way to redirect the outgoing network traffic is to insert an intermediate driver **212** that intercepts and redirects the traffic. It should be noted that there are many other ways to implement this redirection, which are well known to those having ordinary skill in the art.

As shown by block **308**, the initializer **222** then launches the client module **224** of the communication device **200**, and configures the client module **224** of the communication device **200** to intercept to all outgoing network communications of the communication device **200** and route the outgoing network communications to the client module **224**, from the intermediate driver **272** or other routing method implemented. This is performed so that the client module **224** is able to receive all network traffic coming from the network applications, modify the network traffic if necessary, and re-route the traffic. As is known by those having ordinary skill in the art, in order to re-route the traffic, the traffic needs to be modified, as an example, to change the destination of requests.

As shown by block **310**, the initializer **222** then launches the agent module **228** and the peer module **226** to run on the communication device **200**. The agent module **228** and peer module **226** listen on pre-determined ports of the communication device **200**, so that incoming network traffic on these ports gets routed to the agent module **228** and peer module **226**. As is explained in further detail herein, the abovementioned enables the communication device **200** to function as an agent and as a peer for other communication devices within the communication network **100**, as needed.

FIG. **9** is a flowchart **350** further illustrating communication between different elements of the communication network **100**, in accordance with the present system and method for providing faster and more efficient data communication.

As shown by block **352**, an application running on the client **200** initiates a request for a resource on a network. Such a request may be, for example, "GET http://www.aol.com/index.html HTTP/1.1". The request may come from an Internet browser **214** located on the client **200**, where the Internet browser **214** is loading a page from the Internet, an

Appx1256

US 11,044,344 B2

13

application that wants to download information from the Internet, fetch or send email, or any other network communication request.

Through the intermediate driver **272**, or other such mechanism as may be implemented that is re-routing the communication to the client module **224** of the client **200**, the resource request is intercepted by the client module **224** that is running on the client **200** (block **354**). The client module **224** then looks up the IP address of the server **152** that is the target of the resource request (e.g., the IP address of the Web server that is the host of www.aol.com in the example above), and sends this IP address to the acceleration server **162** (block **356**) in order to obtain a list of communication devices that the client **200** can use as agents (hereafter referred to as agents). It should be noted that the process of performing an IP lookup for a server is known by one having ordinary skill in the art, and therefore is not described further herein.

In response to receiving the IP address of the server **152**, the acceleration server **162** prepares a list of agents that may be suitable to handle the request from this IP address (block **358**). The size of the list can differ based on implementation. For exemplary purposes, the following provides an example where a list of five agents is prepared by the acceleration server **162**. The list of agents is created by the acceleration server **162** by finding the communication devices of the communication network **100** that are currently online, and whose IP address is numerically close to the IP of the destination Web server **152**. A further description of the abovementioned process is described here in.

As shown by block **360**, the client module **224** then sends the original request (e.g., "GET http://www.aol.com/index-.html HTTP/1.1") to all the agents in the list received from the acceleration server **162** in order to find out which of the agents in the list is best suited to be the one agent that will assist with this request.

It should be noted that, in accordance with an alternative embodiment of the invention, the communication device **200** may be connected to a device that is actually requesting data. In such an alternative embodiment, the communication device would be a modular device connected to a requesting device, where the requesting device, such as, for example, a personal data assistant (PDA) or other device, would request data, and the communication device connected thereto, either through a physical connection, wireless connection, or any other connection, would receive the data request and function as described therein. In addition, as previously mentioned, it should be noted that the HTTP request may be replaced by any request for resources on the Web.

FIG. **10** is a flowchart continuing the flowchart **380** of FIG. **9** and focused on agent response to the request. As shown by block **382**, upon receiving the request from the client **200**, each agent that received the request from the client responds to the client **200** with whether it has information regarding the request, which can help the client to download the requested information from peers in the network. Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have.

As shown by block **384**, the client then decides which of the agents in the list to use as its agent for this particular information request. To determine which agent in the list to use as its agent for the particular information request, the client may consider multiple factors, such as, for example, factoring the speed of the reply by each agent and whether

14

that agent does or does not have the information required. There are multiple ways to implement this agent selection, one practical way being to start a timer of a small window of time, such as, for example, 5 ms, after receiving the first response from the agents, and after the small window, choosing from the list of agents that responded, the agent that has the information about the request, or in the case that none of the agents responded, to choose the first agent from the list received from the acceleration server **162**.

As shown by block **386**, after selecting an agent, the client notifies the selected agent that it is going to use it for this request, and notifies the other agents that they will not be used for this request. The client then sends the selected agent a request for the first five chunks of data of the original information request (block **388**). By specifying to the selected agent the requested chunks by their order in the full response, the client receives the peer list and checksums of the requested chunks from the selected agent. As an example, for the first five chunks the client will ask the selected agent for chunks one through five, and for the fourth batch of five chunks the client will ask the agent for chunks sixteen through twenty. As previously mentioned, additional or fewer chunks may be requested at a single time.

As shown by block **390**, after receiving the request from the client, the selected agent determines whether it has information regarding the requested chunks of data by looking up the request in its cache database and determining if the selected agent has stored therein information regarding peers of the communication network that have stored the requested data of the request, or whether the selected agent itself has the requested data of the request stored in its memory. In addition to determining if the selected agent contains an entry for this request in its database, the selected agent may also determine if this information is still valid. Specifically, the selected agent determines whether the data that is stored within the memory of the selected agent or the memory of the peers, still mirrors the information that would have been received from the server itself for this request. A further description of the process utilized by the selected agent to determine if the information is still valid, is described in detail herein.

As shown by block **392**, if the information (requested data of the request) exists and is still valid, then the agent prepares a response to the client, which includes for each of the chunks: (i) the checksum of the chunk; (ii) a list of peers that according to the database of the selected agent contains these chunks; and (iii) if these are the first five chunks of the information, then the selected agent also provides the specific protocol's headers that would have been received from the server, had the initial request from the client been made directly to the server.

As shown by block **394**, the list of peers for each chunk is sorted by geographical proximity to the requesting client. In accordance with the present example, only the five closest peers are kept in the list for every chunk, and the rest of the peers are discarded from this list. As shown by block **396**, the prepared response, namely, the list of closest peers, is sent back to the client. It should be noted that, if this were the last set of chunks to be provided for this request, then it would be beneficial to include information about this to the client.

If the selected agent discovers that it does not have information about this request, or if the selected agent discovers that the information it has is no longer valid, the selected agent needs to load the information directly from the server in order to be able to provide an answer to the requesting client. As shown by block **400**, the selected agent

Appx1257

US 11,044,344 B2

15

16

then sends the request directly to the server. The selected agent then stores the information it receives from the server (both the headers of the request, as well as chunks of the response itself) in its database, for this particular response to the client, as well as for future use to other clients that may request this data (block 402). The selected agent then prepares a response (list) for the client, where the response includes the protocol headers (if these are the first five chunks), and the checksums of the five chunks, and provides itself as the only peer for these chunks (block 404). This list is then sent back to the client (block 406).

FIG. 11 is a flowchart 420 continuing the flowchart of FIG. 10, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent. As shown by block 422, the client receives the response from the agent (including the list of chunks and their corresponding data, including peers and other information previously mentioned) and, for each of the five chunks, the client sends a request to each of the peers listed for the chunk to download the chunk. The chunk request that the client sends to each of the peers is the checksum of the data that the client seeks to receive, which is the key (identifier) of the chunk.

As shown by block 424, the peers then respond regarding whether they still have the data of the chunk. As an example, some of the peers may not currently be online, some may be online but may have discarded the relevant information, and some may still have the relevant information, namely, the chunk. As shown by block 426, the client then selects the quickest peer that responds with a positive answer regarding the requested information, the client lets that peer know that it is chosen to provide the client with the chunk, and the client notifies the other peers that they are not chosen.

As shown by block 428, the chosen peer then sends the chunk to the client. It should be noted that if no peers answer the request of the client, the client goes back to the agent noting that the peers were all negative, and the agent either provides a list of 5 other agents, if they exist, or the agent goes on to download the information directly from the Web server as happens in the case where no peers exist as described above.

The client then stores the chunks in its cache for future use (block 430), when the client may need to provide the chunks to a requesting communication device when acting as a peer for another client that is looking for the same information. As shown by block 432, if some of the chunks were not loaded from any of the peers, the client requests the chunks again from the agent in a next round of requests, flagging these chunks as chunks that were not loadable from the client list of peers. In this situation, the agent will load the data directly from the server and provide it back to the client.

The client then acknowledges to the agent which of the chunks it received properly (block 434). The agent then looks up these chunks in the database of the agent, and adds the client to the list of peers for these chunks, specifically, since this client is now storing these chunks, and can provide these chunks to other clients that turn to it as a peer (block 436).

As shown by block 438, the client then passes the data on to the Web browser or other application of the client that made the original request, for it to use as it had originally intended. The client then checks whether all of the chunks for this request were received (block 440), by checking the flag set by the agent. Specifically, when the agent is providing the list of the last 5 chunks, the agent includes that information as part of its reply to the client, which is referred to herein as a flag. This information is what enables the client to know that all information has been received for a particular resource request.

If the last received chunks were not the last chunks for this request, the processing flow of the client continues by returning to the functionality of block 384 of FIG. 10, but instead sending the chosen agent a request for the next five chunks of data of the original information request. Alternatively, if all chunks for this request were received, the request is complete, and the flow starts again at block 352 of FIG. 9.

FIG. 12 is a flowchart 500 illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. Specifically, the following provides an example of how the agent, client, or peer can determine whether particular data that is stored within the memory of the agent, or the memory of a peer or client, still mirrors the information that is currently on the Web server. As shown by block 502, the HTTP request is looked up in the cache database of the agent, client or peer that is checking the validity of the HTTP request. As an example, the HTTP protocol, defined by RFC 2616, outlines specific methods that Web servers can define within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information such as "max age" to indicate how long this data may be cached before becoming invalid, "no cache" to indicate that the data may never be cached, and using other information.

As shown by block 504, these standard methods of validation are tested on the HTTP request information in question. As shown by block 506, a determination is made whether the requested information that is stored is valid or not. If the requested information is valid, a "VALID" response is returned (block 508). Alternatively, if the requested information is not valid, an HTTP conditional request is sent to the relevant Web server, to determine if the data stored for this request is still valid (block 510). If the data stored for this request is still valid, a "VALID" response is returned (block 508). Alternatively, if the data stored for this request is not valid, an "INVALID" response is returned (block 514). It should be noted, that the abovementioned description with regard to FIG. 12 is an explanation of how to check if HTTP information is still valid. There are similar methods of determining validity for any other protocol, which may be utilized, and which those having ordinary skill in the art would appreciate and understand.

FIG. 13 is a flowchart 550 outlining operation of the acceleration server, whose main responsibility in the present system and method is to provide clients with information regarding which agents serve which requests, and to keep the network elements all up to date with the latest software updates. As shown by block 552, the acceleration server sends "keep alive" signals to the network elements, and keeps track within its database as to which network elements are online. As shown by block 554, the acceleration server continues to wait for a client request and continues to determine if one is received.

Once a request is received, the acceleration server tests the type of request received (block 556). If the client request is to sign up the client within the network, an event that happens every time that the client starts running on its host machine, then that client is added to the list of agents stored on the acceleration server, sorted by the IP address of the client (block 558).

If the request is to find an agent to use for a particular request, the acceleration server creates a new agent list, which is empty (block 560). The acceleration server then

Appx1258

US 11,044,344 B2

17                                                    18

searches the agent database for the next 5 active agents whose IP address is closest to the IP address of the server who is targeted in the request (block 562). In this context, 192.166.3.103 is closer to 192.166.3.212 than to 192.167.3.104. The acceleration server then sends this agent list to the client (block 564).

If instead, the request is to check the version of the latest acceleration software then the acceleration server sends that network element (client, peer or agent) the version number of the latest existing acceleration software version, and a URL from where to download the new version, for the case that the element needs to upgrade to the new version (block 566).

While the abovementioned example is focused on HTTP requests for data, as previously mentioned, other protocol requests are equally capable of being handled by the present system and method. As an example, in separate embodiments the acceleration method described may accelerate any communication protocol at any OSI layer (SMTP, DNS, UDP, ETHERNET, etc.). In the following alternative embodiment, it is illustrated how the acceleration method may accelerate TCPIP. As is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol. For purposes of illustration of TCPIP communication, reference may be made to FIG. 3, wherein the Web server is a TCPIP server.

In TCPIP there are three communication commands that are of particular interest, namely, connect, write, and read. Connect is a command issued by an application in the communication device that is initiating the communication to instruct the TCPIP stack to connect to a remote communication device. The connect message includes the IP address of the communication device, and the port number to connect to. An application uses the write command to instruct the TCPIP stack to send a message (i.e., data) to a communication device to which it is connected. In addition, an application uses the read command to ask the TCPIP stack to provide the message that was sent from the remote communication device to which it is connected. A communication session typically exists of a connect, followed by a read and write on both sides.

FIG. 14 is a flowchart 600 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention. As shown by blocks 601 and 602 when an application of the communication device makes a request to the communications stack to connect with the TCPIP server, that communication is intercepted by the acceleration application.

To find an agent, upon receiving that connect message from the communication device application, which includes the IP address of the TCPIP server and the port to connect to, the acceleration application in the client makes a request to the acceleration server to find out who the agent for the communication with the TCPIP server is. This step is performed in a similar manner to that described with regard to the main HTTP embodiment of the invention (block 604). As shown by block 606, the server then provides the client with a list of agents, for example, a primary agent and four others.

To establish a connection, as shown by block 608, the client issues a TCPIP connect with the primary agent or one of the other agents if the primary agent does not succeed, to create a connection with the agent. The client then sends to the agent the IP address of the TCPIP server and connection port that were provided by the communication device application (block 610). As shown by block 612, that agent in turn

issues a TCPIP connect to the TCPIP server to the port it received from the client, to create a connection with the agent.

FIG. 15 is a flowchart 800 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

As shown by block 802, if the network application within the client wants to send a message to the TCPIP server, the network application within the client writes the message to the TCPIP stack in the operating system of the client. This WRITE command is received by the acceleration application of the client and handled in the manner described below. If the TCPIP server wants to send a message to the client, the TCPIP server writes the message to the TCPIP stack of TCPIP operating system, on the connection to the agent, since this agent is where the server received the original connection. This WRITE command is received by the acceleration application of the agent and handled in the manner described below.

When the acceleration application of the client receives a message from the network application of the client to be sent to the agent, or when the acceleration application of the agent receives a message from the connection to the TCPIP server that is to be sent to the client, the acceleration application proceeds to send the message to the communication device on the other side. For instance, if the client has intercepted the message from the communication application, the client sends the message to the agent, and if it is the agent that intercepted the message from the connection to the TCPIP server, such as the TCPIP server sending a message that is intended for the communication with client, the agent sends the message to the client in the following manner:

As shown by block 804, the acceleration application breaks up the content of the message to chunks and calculates the corresponding checksums, in the same manner as in the main embodiment described herein. The acceleration application then looks up each checksum in its cache database (block 806). As shown by block 808, the acceleration application checks if the checksum exists in the cache database. Hit does, then, as shown by block 810, the acceleration application prepares a list of peers that have already received the chunk of the checksum in the past (if any), and adds the communication device of the other side to the list of communication devices that have received this chunk (adds it to the peer list of the checksum in its database), to be provided to other communication devices requesting this information in the future. As shown by block 812, the list of peers is sent to the receiving communication device, which, as shown by block 814 retrieves the chunks from the peers in the list received, in the same manner as in the main embodiment.

If the checksum does not exist within the cache database of the sending communication device then, as shown by block 820, the acceleration application adds the checksum and chunk to its cache database, sends the chunk to the communication device on the other side, and adds the other communication device to the list of peers for that checksum in its database.

As shown by block 816, a determination is then made as to whether all chunks have been received. If all chunks have not been received, the process continues on again from block 806.

Once all data has been received, as shown by block 818, the acceleration application passes the data on to the

Appx1259

19

requester. Specifically, in the client, the acceleration application passes on the complete data to the communication application, and in the agent, the acceleration application passes on the complete data to the requesting TCPIP server.

It should be emphasized that the above-described embodiments of the present invention are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiments of the invention without departing substantially from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

The invention claimed is:

**1**. A method for use with a web server that stores a first web-page identified by a first Uniform Resource Locator (URL), the method by a first client device comprising:

communicating with a second server;

receiving, from the second server, the first URL;

sending, to the web server over the Internet, the first URL;

receiving, the first web-page from the web server over the Internet in response to the sending of the first URL; and

sending the received first web-page to the second server, in response to the receiving of the first URL.

**2**. The method according to claim **1**, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.

**3**. The method according to claim **2**, for use with a first application stored in the first client device and associated with a first version number, wherein the first message comprises the first version number.

**4**. The method according to claim **3**, for use with a second application that is a version of the first application, is stored in the second server, and is associated with a second version number, wherein the method further comprising receiving, by the first client device from the second server, in response to the first message, a second message that comprises the second version number.

**5**. The method according to claim **4**, wherein the method further comprising downloading over the Internet, by the first client device from the second server, in response to the first message, the second application from the second server, and installing the second application in the first client device as a replacement for the first application.

**6**. The method according to claim **1**, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second web-page identified by a second URL, the method by the first client device further comprising:

receiving the second URL;

sending, to the third server over the Internet in response to the receiving, the second URL; and

receiving the second web-page from the third server over the Internet in response to the sending.

**7**. The method according to claim **6**, further comprising executing, by the first client device, a web browser application or an email application.

**8**. The method according to claim **1**, further comprising periodically communicating over the TCP connection between the second server and the first client device.

20

**9**. The method according to claim **8**, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**10**. The method according to claim **1**, further comprising determining, by the first client device, that the received first web-page, is valid.

**11**. The method according to claim **10**, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**12**. The method according to claim **10**, further comprising:

sending, a message over the Internet in response to the determining that the received first web-page, is not valid; and

receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first web-page.

**13**. The method according to claim **1**, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first web-page, the receiving of the first URL, and the sending of a part of, or the whole of, the stored first web-page, the method is further preceded by:

downloading, by the first client device from the Internet, the software application; and

installing, by the first client device, the downloaded software application.

**14**. The method according to claim **13**, wherein the software application is downloaded from the second server.

**15**. A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **1**.

**16**. The method according to claim **1**, wherein the web server responds to Hypertext Transfer Protocol (HTTP) requests and wherein the sending of the first URL to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first URL.

**17**. The method according to claim **1**, further comprising storing, by the first client device in response to the receiving from the web server, the first web-page.

**18**. The method according to claim **1**, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

**19**. The method according to claim **1**, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP #, SMTP, or SQL standards.

**20**. The method according to claim **1**, wherein the first web-page comprises audio, or video content, and wherein the communicating comprises establishing a Transmission Control Protocol (TCP) connection with a second server.

**21**. The method according to claim **1**, further comprising executing, by the first client device, a web browser application or an email application.

**22**. The method according to claim **1**, further comprising storing, operating, or using, a client operating system.

Appx1260

US 11,044,344 B2

21

**23**. The method according to claim **1**, wherein the steps are sequentially executed.

**24**. A method for use with a web server that stores a first web-page identified by a first Uniform Resource Locator (URL), and for use with an additional web-server that stores a second web-page identified by a second URL, the method by a first device comprising:

receiving, from the second server, the first URL;

sending, to the web server over the Internet, the first URL;

receiving, the first web-page from the web server over the Internet in response to the sending of the first URL;

sending the received first web-page to the second server, in response to the receiving of the first URL;

receiving, from the second server, the second URL;

sending, to the additional web-server over the Internet in response to the receiving of the second URL, the second URL; and

receiving the second web-page from the additional web-server over the Internet in response to the sending.

**25**. The method according to claim **24**, wherein the first device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first device, during, as part of, or in response to, a start-up or power-up of the first device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.

**26**. The method according to claim **25**, for use with a first application stored in the first device and associated with a first version number, wherein the first message comprises the first version number.

**27**. The method according to claim **26**, for use with a second application that is a version of the first application, is stored in the second server, and is associated with a second version number, wherein the method further comprising receiving, by the first device from the second server, in response to the first message, a second message that comprises the second version number.

**28**. The method according to claim **27**, wherein the method further comprising downloading over the Internet, by the first device from the second server, in response to the first message, the second application from the second server, and installing the second application in the first device as a replacement for the first application.

**29**. The method according to claim **24**, wherein the additional web-server is Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests.

**30**. The method according to claim **29**, further comprising executing, by the first device, a web browser application or an email application.

**31**. The method according to claim **24**, further comprising periodically communicating over a TCP connection between the second server and the first device.

**32**. The method according to claim **31**, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**33**. The method according to claim **24**, further comprising determining, by the first device, that the received first web-page, is valid.

**34**. The method according to claim **33**, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**35**. The method according to claim **33**, further comprising:

22

sending, a message over the Internet in response to the determining that the received first web-page, is not valid; and

receiving, over the Internet in response to the sending of the message, from the second server or from a second client device selected from a plurality of client devices, the first web-page.

**36**. The method according to claim **24**, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first web-page, the receiving of the first URL, and the sending of a part of, or the whole of, the stored first web-page, the method is further preceded by:

downloading, by the first device from the Internet, the software application; and

installing, by the first device, the downloaded software application.

**37**. The method according to claim **36**, wherein the software application is downloaded from the second server.

**38**. A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim **24**.

**39**. The method according to claim **24**, wherein the web server responds to Hypertext Transfer Protocol (HTTP) requests and wherein the sending of the first URL to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first URL.

**40**. The method according to claim **24**, further comprising storing, by the first device in response to the receiving from the web server, the first web-page.

**41**. The method according to claim **24**, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

**42**. The method according to claim **24**, wherein the first device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP #, SMTP, or SQL standards.

**43**. The method according to claim **24**, wherein the first web-page comprises audio, or video content, and wherein the communication with the second server comprises establishing a Transmission Control Protocol (TCP) connection.

**44**. The method according to claim **24**, further comprising executing, by the first device, a web browser application or an email application.

**45**. The method according to claim **24**, wherein the first device is a client device and the method further comprising storing, operating, or using, a client operating system.

**46**. The method according to claim **24**, wherein the steps are sequentially executed.

\* \* \* \* \*

Appx1261

**Prosecution History ~ IPR2022-00103**

| Date | Document |
|------|----------|
| 10/29/2021 | Petition for Inter Partes Review |
| 10/29/2021 | Petitioners' Power of Attorney |
| 11/19/2021 | Patent Owner's Mandatory Notices |
| 11/19/2021 | Patent Owner's Power of Attorney |
| 12/9/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 3/9/2022 | Patent Owner's Preliminary Response |
| 6/1/2022 | Scheduling Order |
| 6/1/2022 | Decision - Institution of Inter Partes Review |
| 6/22/2022 | Patent Owner's Updated Mandatory Notices |
| 7/18/2022 | Notice of Stipulation to Move Due Date |
| 7/24/2022 | Notice of Deposition - Freedman |
| 8/10/2022 | Notice of Stipulation to Move Due Date |
| 8/10/2022 | Updated Notice of Deposition - Freedman |
| 9/14/2022 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 9/14/2022 | Patent Owner's Response (Redacted) |
| 9/14/2022 | Patent Owner's Response (Highly Confidential) |
| 9/21/2022 | Petitioners' Objections to Patent Owner's Evidence Served with Its Response |
| 11/1/2022 | Revised Scheduling Order |
| 11/16/2022 | Notice of Deposition - Williams |
| 11/29/2022 | Second Revision to Scheduling Order |
| 12/16/2022 | Patent Owner's Motion to Seal |
| 12/16/2022 | Petitioners' Reply |
| 12/30/2022 | Unopposed Motion for Pro Hac Vice Admission - Harkins |
| 1/13/2023 | Patent Owner's Sur-Reply |
| 1/25/2023 | Petitioners' Oral Argument Request |
| 1/25/2023 | Patent Owner's Request for Oral Argument |
| 2/1/2023 | Order - Pro Hac Vice Admission - Harkins |
| 2/6/2023 | Patent Owner's Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Power of Attorney |
| 2/15/2023 | Order - Requests for Oral Argument |
| 3/9/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 3/9/2023 | Petitioners' Service of Demonstratives |
| 3/9/2023 | Petitioners' Demonstratives |
| 3/22/2023 | Petitioners' Updated Mandatory Notices |
| 5/18/2023 | Oral Hearing Transcript |
| 5/30/2023 | Notice Determining All Challenged Claims Unpatentable |
| 5/30/2023 | Final Written Decision (Private Version) |
| 5/30/2023 | Patent Owner's Updated Mandatory Notices |
| 6/23/2023 | Final Written Decision (Public Version) |
| 7/7/2023 | Patent Owner's Updated Mandatory Notices |

Prosecution History ~ IPR2022-00135

| Date | Document |
|------|----------|
| 11/3/2021 | Petition for Inter Partes Review |
| 11/3/2021 | Petitioner's Power of Attorney |
| 11/24/2021 | Patent Owner's Mandatory Notices |
| 11/24/2021 | Patent Owner's Power of Attorney |
| 11/30/2021 | Patent Owner's Updated Mandatory Notices |
| 12/8/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 3/8/2022 | Patent Owner's Preliminary Response |
| 3/25/2022 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 4/8/2022 | Patent Owner's Sur-reply |
| 4/11/2022 | Petitioner's First Updated Mandatory Notices |
| 5/9/2022 | Patent Owner's Updated Mandatory Notices |
| 6/1/2022 | Scheduling Order |
| 6/1/2022 | Decision - Institution of Inter Partes Review |
| 6/22/2022 | Patent Owner's Updated Mandatory Notices |
| 7/12/2022 | Notice of Deposition - Levin |
| 8/24/2022 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 8/24/2022 | Patent Owner's Response (Redacted) |
| 8/24/2022 | Patent Owner's Response (Highly Confidential) |
| 8/31/2022 | Petitioner's Objections to Evidence Served with Patent Owner's Response |
| 9/20/2022 | Notice of Deposition - Williams |
| 10/13/2022 | Notice of Rescheduled Deposition - Williams |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/16/2022 | Petitioner's Reply to Patent Owner's Response |
| 11/17/2022 | Patent Owner's Provisional Motion to Seal |
| 11/18/2022 | Petitioner's Notice of Filing Redacted Version of Exhibit |
| 11/23/2022 | Patent Owner's Motion to Seal |
| 11/23/2022 | Petitioner's Partial Opposition to Patent Owner's Motion to Seal |
| 12/23/2022 | Patent Owner's Reply to Petitioner's Partial Opposition to Patent Owner's Motion to Seal |
| 12/28/2022 | Patent Owner's Sur-Reply |
| 12/30/2022 | Unopposed Motion for Pro Hac Vice Admission - Harkins |
| 1/12/2023 | Patent Owner's Notice of Corrected Exhibits |
| 1/12/2023 | Order - Conduct of the Proceeding |
| 1/17/2023 | Petitioner's Request for Oral Argument |
| 1/18/2023 | Petitioner's Motion to Exclude Patent Owner's Corrected Exhibits |
| 1/18/2023 | Patent Owner's Request for Oral Argument |
| 1/25/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 2/1/2023 | Order - Pro Hac Vice Admission - Harkins |
| 2/3/2023 | Petitioner's Second Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Power of Attorney |

**Prosecution History ~ IPR2022-00135**

| Date | Document |
|---|---|
| 2/6/2023 | Petitioner's Third Updated Mandatory Notices |
| 2/10/2023 | Order - Requests for Oral Argument |
| 2/16/2023 | Petitioner's Notice of Filing Exhibits |
| 2/24/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 2/24/2023 | Petitioner's Notice of Filing Demonstrative Exhibits |
| 2/27/2023 | Petitioner's Objections to Patent Owner's Demonstrative Exhibits |
| 3/13/2023 | Oral Hearing Transcript (originally entered into IPR2022-00138 (Paper 49) on March 8, 2023) |
| 5/23/2023 | Oral Hearing Transcript |
| 5/25/2023 | Notice Determining All Challenged Claims Unpatentable |
| 5/25/2023 | Final Written Decision (Private Version) |
| 5/31/2023 | Final Written Decision (Public Version) |
| 7/7/2023 | Patent Owner's Updated Mandatory Notices |

Prosecution History ~ IPR2022-00138

| Date | Document |
|------|----------|
| 11/4/2021 | Petition for Inter Partes Review |
| 11/4/2021 | Petitioner's Power of Attorney |
| 11/16/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 11/30/2021 | Patent Owner's Mandatory Notices |
| 11/30/2021 | Patent Owner's Power of Attorney |
| 2/16/2022 | Patent Owner's Preliminary Response |
| 3/15/2022 | Order - Conduct of the Proceeding |
| 3/25/2022 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 4/8/2022 | Patent Owner's Sur-Reply |
| 4/11/2022 | Petitioner's First Updated Mandatory Notices |
| 5/9/2022 | Patent Owner's Updated Mandatory Notices |
| 5/11/2022 | Scheduling Order |
| 5/11/2022 | Decision - Institution of Inter Partes Review |
| 6/22/2022 | Patent Owner's Updated Mandatory Notices |
| 7/12/2022 | Notice of Deposition - Levin |
| 8/5/2022 | Patent Owner's Motion to Seal and to Enter the Proposed Protective Order |
| 8/5/2022 | Patent Owner's Response (Redacted) |
| 8/5/2022 | Patent Owner's Response (Highly Confidential) |
| 8/12/2022 | Petitioner's Objections to Evidence Served with Patent Owner's Response |
| 8/26/2022 | Patent Owner's Motion to Withdraw Paper 18 and to Seal and to Enter the Joint Protective Order |
| 9/20/2022 | Notice of Deposition - Williams |
| 10/7/2022 | Notice of Stipulation to Move Due Dates |
| 10/13/2022 | Notice of Rescheduled Deposition - Williams |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/14/2022 | Patent Owner's Provisional Motion to Seal |
| 11/14/2022 | Petitioner's Reply to Patent Owner's Response |
| 11/18/2022 | Petitioner's Notice of Filing Redacted Version of Exhibit |
| 11/23/2022 | Petitioner's Partial Opposition to Patent Owner's Motion to Seal |
| 11/23/2022 | Patent Owner's Motion to Seal |
| 12/19/2022 | Patent Owner's Sur-Reply |
| 12/23/2022 | Patent Owner's Reply to Petitioner's Partial Opposition to Patent Owner's Motion to Seal |
| 12/28/2022 | Petitioner's Request for Oral Argument |
| 12/29/2022 | Patent Owner's Request for Oral Argument |
| 12/30/2022 | Unopposed Motion for Pro Hac Vice Admission - Harkins |
| 1/12/2023 | Patent Owner's Notice of Corrected Exhibits |
| 1/12/2023 | Order - Conduct of the Proceeding |
| 1/12/2023 | Order - Requests for Oral Argument |
| 1/18/2023 | Petitioner's Motion to Exclude Patent Owner's Corrected Exhibits |
| 1/25/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |

**Prosecution History ~ IPR2022-00138**

| Date | Document |
|------|----------|
| 2/1/2023 | Order - Pro Hac Vice Admission - Harkins |
| 2/3/2023 | Petitioner's Second Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Power of Attorney |
| 2/6/2023 | Petitioner's Third Updated Mandatory Notices |
| 2/7/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 2/7/2023 | Petitioner's Notice of Filing Demonstrative Exhibits |
| 2/8/2023 | Petitioner's Notice of Filing Exhibits |
| 3/8/2023 | Oral Hearing Transcript |
| 5/9/2023 | Notice Determining All Challenged Claims Unpatentable |
| 5/9/2023 | Final Written Decision (Private Version) |
| 5/16/2023 | Final Written Decision (Public Version) |
| 7/7/2023 | Patent Owner's Updated Mandatory Notices |

Prosecution History ~ IPR2022-00353

| Date | Document |
|------|----------|
| 12/23/2021 | Petition for Inter Partes Review |
| 12/23/2021 | Petitioners' Power of Attorney |
| 1/11/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 1/13/2022 | Patent Owner's Mandatory Notices |
| 1/13/2022 | Patent Owner's Power of Attorney |
| 4/11/2022 | Patent Owner's Preliminary Response |
| 6/22/2022 | Patent Owner's Updated Mandatory Notices |
| 7/1/2022 | Scheduling Order |
| 7/1/2022 | Decision - Institution of Inter Partes Review |
| 8/10/2022 | Notice of Deposition - Freedman |
| 9/19/2022 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 9/19/2022 | Patent Owner's Response (Redacted) |
| 9/19/2022 | Patent Owner's Response (Highly Confidential) |
| 9/26/2022 | Petitioners' Objections to Patent Owner's Evidence Served with Its Response |
| 11/1/2022 | Revised Scheduling Order |
| 11/16/2022 | Notice of Deposition - Williams |
| 11/29/2022 | Second Revision to Scheduling Order |
| 12/16/2022 | Patent Owner's Motion to Seal |
| 12/16/2022 | Petitioners' Reply |
| 12/30/2022 | Unopposed Motion for Pro Hac Vice Admission - Harkins |
| 1/13/2023 | Patent Owner's Sur-Reply |
| 1/25/2023 | Petitioners' Oral Argument Request |
| 1/25/2023 | Patent Owner's Request for Oral Argument |
| 2/1/2023 | Order - Pro Hac Vice Admission - Harkins |
| 2/6/2023 | Patent Owner's Updated Mandatory Notices |
| 2/6/2023 | Patent Owner's Updated Power of Attorney |
| 2/15/2023 | Order - Requests for Oral Argument |
| 3/9/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 3/9/2023 | Petitioners' Service of Demonstratives |
| 3/9/2023 | Petitioners' Demonstratives |
| 3/22/2023 | Petitioners' Updated Mandatory Notices |
| 5/18/2023 | Oral Hearing Transcript |
| 5/30/2023 | Patent Owner's Updated Mandatory Notices |
| 6/27/2023 | Notice Determining All Challenged Claims Unpatentable |
| 6/27/2023 | Final Written Decision (Private Version) |
| 7/6/2023 | Final Written Decision (Public Version) |
| 7/7/2023 | Patent Owner's Updated Mandatory Notices |

**Prosecution History for IPR2021-01492**

| Date | Document |
|---|---|
| 09/03/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,257,319 |
| 09/03/2021 | Petitioner's Power of Attorney by NetNut Ltd. |
| 09/27/2021 | Patent Owner's Power of Attorney |
| 09/27/2021 | Patent Owner's Mandatory Notices |
| 09/27/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 10/22/2021 | Patent Owner's Updated Mandatory Notices |
| 11/24/2021 | Patent Owner's Updated Mandatory Notices |
| 11/30/2021 | Patent Owner's Updated Mandatory Notices |
| 12/27/2021 | Patent Owner's Preliminary Response |
| 01/18/2022 | Petitioner's Preliminary Reply |
| 01/28/2022 | Patent Owner's Preliminary Sur-Reply |
| 03/21/2022 | Decision Granting Institution of *Inter Partes* Review |
| 03/21/2022 | Scheduling Order |
| 04/07/2022 | Order Staying Concurrent *Ex Parte* Reexamination – *37 C.F.R. § 42.122(a)* |
| 05/09/2022 | Patent Owner's Updated Mandatory Notices |
| 05/18/2022 | Patent Owner's Notice of Settlement and Related Court Order |
| 05/24/2022 | Patent Owner's Joint Motion to Terminate as to Petitioner due to Settlement |
| 05/24/2022 | Patent Owner's Joint Request to File Settlement Agreement as Business Confidential Information and be Kept Separate from the Patent Files |
| 05/25/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 05/27/2022 | Order Dismissing Petitioner from the Proceeding – *37 C.F.R. § 42.5* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 07/11/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 08/22/2022 | Order Modifying Schedule – *37 C.F.R. § 42.5* |
| 08/31/2022 | Order – Stay of Proceedings – *37 C.F.R. § 42.5* |
| 10/19/2022 | Decision Granting Institution of *Inter Partes* Review and Grant of Joinder, IPR2022-00861 (joined with IPR2021-01492; terminated) |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/16/2022 | Revised Joint Scheduling Order |
| 12/01/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 12/06/2022 | Patent Owner's Notice of Joint Stipulation |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

1

| Date | Document |
|---|---|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Order Adjusting One-Year Pendency Due to Joinder |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/10/2023 | Petitioners' Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioners' Updated Mandatory Notice |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/03/2023 | Petitioners' Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioners' Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioners' Motion to Exclude Evidence in Sur-Reply |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Petitioners' Notice of Filing of Demonstrative Exhibits |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/22/2023 | Final Written Decision (Private Version) |
| 09/27/2023 | Final Written Decision (Public Version) |
| 09/27/2023 | Patent Owner's Updated Mandatory Notices |
| 09/27/2023 | Patent Owner's Notice of Appeal |

**Prosecution History for IPR2021-01493**

| Date | Document |
| --- | --- |
| 09/03/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,484,510 |
| 09/03/2021 | Petitioner's Power of Attorney by NetNut Ltd. |
| 09/27/2021 | Patent Owner's Power of Attorney |
| 09/27/2021 | Patent Owner's Mandatory Notices |
| 09/27/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 10/22/2021 | Patent Owner's Updated Mandatory Notices |
| 11/30/2021 | Patent Owner's Updated Mandatory Notices |
| 12/27/2021 | Patent Owner's Preliminary Response |
| 01/18/2022 | Petitioner's Preliminary Reply |
| 01/28/2022 | Patent Owner's Preliminary Sur-Reply |
| 03/21/2022 | Decision Granting Institution of *Inter Partes* Review |
| 03/21/2022 | Scheduling Order |
| 04/07/2022 | Order Staying Concurrent *Ex Parte* Reexamination – *37 C.F.R. § 42.122(a)* |
| 05/09/2022 | Patent Owner's Updated Mandatory Notices |
| 05/18/2022 | Patent Owner's Notice of Settlement and Related Court Order |
| 05/24/2022 | Patent Owner's Joint Motion to Terminate as to Petitioner due to Settlement |
| 05/24/2022 | Patent Owner's Joint Request to File Settlement Agreement as Business Confidential Information and be Kept Separate from the Patent Files |
| 05/25/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 05/27/2022 | Order Dismissing Petitioner from the Proceeding – *37 C.F.R. § 42.5* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 07/11/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 08/22/2022 | Order Modifying Schedule – *37 C.F.R. § 42.5* |
| 08/31/2022 | Order – Stay of Proceedings – *37 C.F.R. § 42.5* |
| 10/19/2022 | Decision Granting Institution of *Inter Partes* Review and Grant of Joinder, IPR2022-00862 (joined with IPR2021-01493; terminated) |
| 10/19/2022 | Revised Joint Scheduling Order |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 12/01/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 12/06/2022 | Patent Owner's Notice of Joint Stipulation |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |
| 01/06/2023 | Patent Owner's Response (Private Version) |

| Date | Document |
|---|---|
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Order Adjusting One-Year Pendency Due to Joinder |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/10/2023 | Petitioners' Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioners' Updated Mandatory Notice |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/03/2023 | Petitioners' Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioners' Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioners' Motion to Exclude Evidence in Sur-Reply |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Petitioners' Notice of Filing of Demonstrative Exhibits |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/22/2023 | Final Written Decision (Private Version) |
| 09/22/2023 | Notice Determining All Challenged Claims Unpatentable |
| 09/25/2023 | Final Written Decision (Public Version) |
| 09/27/2023 | Patent Owner's Updated Mandatory Notices |
| 09/27/2023 | Patent Owner's Notice of Appeal |

**Prosecution History for IPR2022-00915**

| Date | Document |
|------|----------|
| 04/21/2022 | Petition for *Inter Partes* Review of U.S. Patent No. 10,257,319 |
| 04/21/2022 | Petitioner's Power of Attorney |
| 04/21/2022 | Petitioner's Motion for Joinder to *Inter Partes* Review |
| 05/04/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 05/09/2022 | Patent Owner's Power of Attorney |
| 05/09/2022 | Patent Owner's Mandatory Notices |
| 05/23/2022 | Patent Owner's Opposition to Motion for Joinder |
| 05/23/2022 | Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/23/2022 | Petitioner's Declaration in Support of Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/25/2022 | Order – Conduct of the Proceedings – *37 C.F.R. § 42.70* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 06/23/2022 | Patent Owner's Preliminary Response |
| 06/23/2022 | Petitioner's Reply in Support of Motion for Joinder |
| 07/29/2022 | Decision Denying Motion for Joinder – *35 U.S.C. § 315(c); 37 C.F.R. § 42.122* |
| 08/01/2022 | Panel Change Order – Conduct of the Proceedings – *37 C.F.R. § 42.5* |
| 08/26/2022 | Petitioner's Preliminary Reply to Preliminary Response |
| 09/02/2022 | Patent Owner's Preliminary Sur-Reply |
| 09/15/2022 | Decision Granting Institution of *Inter Partes* Review |
| 09/15/2022 | Scheduling Order |
| 09/29/2022 | Petitioner's Objections to Patent Owner's Evidence Submitted with Patent Owner's Preliminary Response |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/03/2022 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 11/15/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 11/17/2022 | Petitioner's Updated Power of Attorney |
| 11/22/2022 | Patent Owner's Updated Mandatory Notices |
| 11/23/2022 | Patent Owner's Updated Notice of Deposition of Mr. Keith J. Teruya |
| 12/01/2022 | Revised Joint Scheduling Order |
| 12/06/2022 | Petitioner's Notice of Joint Stipulation to Modify Schedule |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

1

| Date | Document |
|---|---|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/16/2023 | Petitioner's Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioner's Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/04/2023 | Petitioner's Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioner's Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioner's Motion to Exclude Evidence |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/06/2023 | Petitioner's Notice of Filing of Demonstrative Exhibit |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/13/2023 | Final Written Decision (Private Version) |
| 09/15/2023 | Final Written Decision (Public Version) |
| 09/18/2023 | Patent Owner's Notice of Appeal |

Appx1450

**Prosecution History for IPR2022-00916**

| Date | Document |
|------|----------|
| 04/21/2022 | Petition for *Inter Partes* Review of U.S. Patent No. 10,484,510 |
| 04/21/2022 | Petitioner's Power of Attorney |
| 04/21/2022 | Petitioner's Motion for Joinder to *Inter Partes* Review |
| 05/04/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 05/09/2022 | Patent Owner's Power of Attorney |
| 05/09/2022 | Patent Owner's Mandatory Notices |
| 05/23/2022 | Patent Owner's Opposition to Motion for Joinder |
| 05/23/2022 | Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/23/2022 | Petitioner's Declaration in Support of Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/25/2022 | Order – Conduct of the Proceedings – *37 C.F.R. § 42.70* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 06/23/2022 | Patent Owner's Preliminary Response |
| 06/23/2022 | Petitioner's Reply in Support of Motion for Joinder |
| 07/29/2022 | Decision Denying Motion for Joinder – *35 U.S.C. § 315(c); 37 C.F.R. § 42.122* |
| 08/01/2022 | Panel Change Order – Conduct of the Proceedings – *37 C.F.R. § 42.5* |
| 08/26/2022 | Petitioner's Preliminary Reply to Preliminary Response |
| 09/02/2022 | Patent Owner's Preliminary Sur-Reply |
| 09/15/2022 | Decision Granting Institution of *Inter Partes* Review |
| 09/15/2022 | Scheduling Order |
| 09/29/2022 | Petitioner's Objections to Patent Owner's Evidence Submitted with Patent Owner's Preliminary Response |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/03/2022 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 11/15/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 11/17/2022 | Petitioner's Updated Power of Attorney |
| 11/22/2022 | Patent Owner's Updated Mandatory Notices |
| 11/23/2022 | Patent Owner's Updated Notice of Deposition of Mr. Keith J. Teruya |
| 12/01/2022 | Revised Joint Scheduling Order |
| 12/06/2022 | Petitioner's Notice of Joint Stipulation to Modify Schedule |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

1

| Date | Document |
|------|----------|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/16/2023 | Petitioner's Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioner's Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/04/2023 | Petitioner's Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioner's Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioner's Motion to Exclude Evidence |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/06/2023 | Petitioner's Notice of Filing of Demonstrative Exhibit |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/13/2023 | Final Written Decision (Private Version) |
| 09/15/2023 | Final Written Decision (Public Version) |
| 09/18/2023 | Patent Owner's Notice of Appeal |

2

4. Rather, a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: **the** client device, **the** first server/second server, and **the** web server.'"

Ex. 1014, 10 (italicized emphasis in original, other emphasis added); *see also* Freedman, ¶ 54.

## VII. REASONS FOR THE RELIEF REQUESTED UNDER 37 C.F.R. §§ 42.22(A)(2) AND 42.104(B)(4)

### A. Grounds 1 and 2 – Crowds Anticipates or Renders Obvious Claims 1, 2, 6, 7, 15, 16, and 18-23

#### 1. *Crowds overview*

Crowds describes a system "for protecting users' anonymity on the world-wide-web." Crowds, 1; Freedman, ¶ 57. Users are grouped "into a large and geographically diverse group (crowd) that collectively issues requests on behalf of its members." Crowds, 1; Freedman, ¶ 57. Because of that, Crowds states:

Web servers are unable to learn the true source of a request because it is equally likely to have originated from any member of the crowd, and even collaborating crowd members cannot distinguish the originator of a request from a member who is merely forwarding the request on behalf of another.

Crowds, 1; Freedman, ¶ 57.

In Crowds, "a user first joins a 'crowd' of other users" in order "[t]o execute web transactions." Crowds, 2; Freedman, ¶ 58. Crowds explains that the user's web requests are passed through members of the crowd instead of directly to a web server:

- 24 -

> The user's request to a web server is first passed to a random member of the crowd. That member can either submit the request directly to the end server or forward it to another randomly chosen member, and in the latter case the next member chooses to submit or forward independently. When the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator. Even crowd members cannot identify the initiator of the request, since the initiator is indistinguishable from a member that simply forwards a request from another.

Crowds, 2; Freedman, ¶ 58.

Because Crowds teaches the use of many proxies in the crowd, Crowds has an advantage over the usage of single proxies because Crowds "presents no single point at which a passive attack can cripple all users' anonymity." Crowds, 6-7; Freedman, ¶ 59. Therefore, an attacker would be unable to compromise the system by obtaining control over a single proxy. Crowds, 7; Freedman, ¶ 59.

More specifically, Crowds operates through use of "jondos," and a jondo is a software application that operates on a user's computer. *See* Crowds, 8 ("A user is represented in a crowd by a process on her computer called a jondo."); Freedman, ¶ 60. A jondo is "pronounced 'John Doe' and meant to convey the image of a faceless participant." Crowds, 8; Freedman, ¶ 60. When "[t]he user … starts the jondo on the user's computer," the jondo "contacts a server called the blender to request admittance to the crowd." Crowds, 8; Freedman, ¶ 60. "If admitted, the

- 25 -

blender reports to this jondo the current membership of the crowd and information that enables this jondo to participate in the crowd." Crowds, 8; Freedman, ¶ 60.

After receiving a user request from the browser, the jondo "initiates the establishment of a random path of jondos that carries its users' transactions to and from their intended web servers." Crowds, 8; Freedman, ¶ 61. The user's jondo selects a random jondo and forwards the web request to it. Crowds, 8; Freedman, ¶ 61. The second jondo either sends the web request to the web server, or forwards the request onto yet another (third) random jondo. Crowds, 8; Freedman, ¶ 61. If the latter option is chosen, then the process repeats. Crowds, 8; Freedman, ¶ 61. Crowds explains:

> [T]he jondo picks a jondo from the crowd (possibly itself) at random, and forwards the request to it. When this jondo receives the request, it flips a biased coin to determine whether or not to forward the request to another jondo; the coin indicates to forward with probability $p_f$. If the result is to forward, then the jondo selects a random jondo and forwards the request to it, and otherwise the jondo submits the request to the end server for which the request was destined. So, each request travels from the user's browser, through some number of jondos, and finally to the end server.

Crowds, 8; Freedman, ¶ 61.

Eventually, the request is sent to the web server. Crowds, 8; Freedman, ¶ 62. The replies from the web server "traverse the same path as the requests, only in reverse." Crowds, 8-9; Freedman, ¶ 62. Examples of jondo paths are shown in

- 26 -

Figure 2 in Crowds (below), where the initiator and its targeted web server are labeled with the same number (as the native figure description explains):



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Crowds, 8-9; Freedman, ¶ 62.  Crowds explains that, in Figure 2, the paths shown are "1→5→server;  2→6→2→server;  3→1→6→server;  4→4→server; 5→4→6→server; and 6→3→server." Crowds, 8; Freedman, ¶ 62.

### 2.    *Limitation 1[p]*

Crowds discloses the preamble.  Freedman, ¶ 73.  The preamble requires that the method is performed by a "first client device" that is used with a "web server" that responds to HTTP requests and "stores a first content identified by a first Uniform Resource Locator (URL)."  The preamble provides explicit antecedent basis support for aspects of the steps of Limitations 1[a], 1[c], and 1[d].

Each of the preamble elements is satisfied for the reasons provided in the discussion of Limitations 1[a] – 1[d] (Sections VII.A.3 - VII.A.6), because, as

Appx1488

discussed below, the steps of Limitations 1[a] – 1[d] are performed by the first client device, and the step of Limitation 1[c] involves a web server that responds to HTTP requests and stores a first content identified by a first URL. Freedman, ¶ 74.

As explained below in connection with the steps of Limitations 1[a] – 1[d], the preamble maps onto Crowds in at least the provided example path of "5→4→6→server" (Crowds, Fig. 2) (hereinafter, the "Mapped Path")) as follows, starting with a depiction of the Mapped Path in green:



**First client device**: as explained below in Limitation 1[a], the device on which jondo "6" in Crowds Fig. 2 resides (hereinafter referred to as "jondo 6").

**Second server** (introduced in Limitation 1[b]): as explained below in Limitation 1[b], the device on which jondo "4" in Crowds Fig. 2 resides (hereinafter referred to as "jondo 4").

**Web server**: as explained below in Limitation 1[c], the web server labeled "5" in Crowds Fig. 2 (hereinafter referred to as "web server 5").

**First Uniform Resource Locator (URL)**: as explained below in Limitation 1[c], the requested URL.

**First content:** as explained below in Limitation 1[c], the requested web page at the requested URL.

Freedman, ¶ 74.

### 3. *Limitation 1[a]*

Crowds discloses Limitation 1[a] because a POSITA would understand that jondo 6 in the Mapped Path is a communication device operating in the role of a client and is executing a web browser application. Freedman, ¶ 75.

First, a POSITA would have understood that jondo 6 is a communication device because it is a device (user's computer) that, due at least in part to the jondo application residing on it, facilitates communication between other devices, including web server 5 and jondo 4 in the Mapped Path. Freedman, ¶ 76; Crowds,

- 29 -

8, 9.[9] Jondo 6 operates in the role of a client at least because, as the web request originating at jondo 5 is traveling to web server 5 in the Mapped Path, jondo 6 is serving as a client of web server 5. Freedman, ¶ 76; Crowds, 8, 9.

Second, a POSITA would have understood that, as Crowds discloses, every jondo device—and therefore jondo 6—is executing a web browser application. Freedman, ¶ 77. Specifically, Crowds explains that each jondo depicted in Figure 2 serves as an initiator and that each "request" by an initiator travels from that device's web browser to its jondo, thus making explicit that jondo 6 in the Mapped Path executes a web browser application:

> The user selects [her] jondo as her web proxy by specifying its host name and port number in her **web browser** as the proxy for all services. Thus, any request coming from the **browser** is sent directly to the jondo. … So, **each request** travels from the user's **browser**, through some number of jondo, and finally to the end server. A possible set of such paths is shown in Figure 2. In this figure, the paths are 1→5→server; 2→6→2→server; 3→1→6→server; 4→4→server; 5→4→6→server; and **6→3→server.**

Crowds, 8 (emphasis added); *see also id.*, 8 n.1, 13-15 (discussing user's browsers), 23-24 (explaining that a given jondo serves as the HTTP proxy for the browser on the device where both the jondo and web browser reside); Freedman, ¶ 77.

---

[9] All citations to page 9 of Crowds are to be understood as including a citation to Crowds Fig. 2.

Crowds also provides a specific web browser application that was executed on each of four computers running jondos in "AT&T Labs" as "Crowds 1.0": "a Netscape 3.01 browser" (Crowds, 16-17; *see also* Crowds, 3 (referencing "the system's user interface in Section 9"), 23-25 (discussing Section 9 and showing a user interface of the web browser in Fig. 6)), which reinforces that a POSITA would understand jondo 6 to be executing a web browser application. Freedman, ¶ 78.

### 4. Limitation 1[b]

Crowds discloses Limitation 1[b] because it discloses that a TCP connection existed between jondo 6 and jondo 4 and a POSITA would have understood that jondo 6 took action to establish (and, thus, established) such a connection. Freedman, ¶ 79; *see also* RFC 793, 34 ("The 'three-way handshake' is the procedure used to establish a [TCP] connection. This procedure normally is initiated by one TCP and responded to by another TCP. The procedure also works if two TCP simultaneously initiate the procedure.").

First, Crowds discloses that jondo 4 in the Mapped Path is a "server" under the above definition because jondo 4 operates in the role of a server (it serves at least jondo 5 by receiving jondo 5's web request and sending it on to jondo 6 and later sending web server 5's response (received from jondo 6) back to jondo 5, and therefore provide a service to jondo 5), and it is not the same physical device as jondo 6 (i.e., the first client device). Freedman, ¶ 80; Crowds, 8-9.

- 31 -

Second, a POSITA would have recognized the existence of a TCP connection between jondo 6 and jondo 4 because, during construction of the Mapped Path, jondo 4 contacts jondo 6 with a message. Freedman, ¶ 81. In particular, Crowds states that each jondo in the path "receives the [first user] request" from the prior jondo and "determines whether or not to forward the request to another jondo" or complete the path and "submit[] the request to the end server for which the request was destined." Crowds, 8; Freedman, ¶ 81. And a POSITA would have recognized that jondo 4 and jondo 6 communicate with each other using a TCP connection, because Crowds mentions failures being "detected by the TCP/IP connection to the jondo breaking or being refused." Freedman, ¶ 81; Crowds, 16.

**Ground 2**: At a minimum, a POSITA would have found it obvious for a TCP connection between jondo 4 and jondo 6 to have been established when jondo 4 connected to jondo 6 because Crowds explains that "[t]he services that must be proxied include Gopher, FTP, HTTP and SSL [i.e., HTTPS]." Freedman, ¶ 82; Crowds, 8 n.1. A POSITA would have recognized that Gopher, FTP, HTTP, and HTTPS all communicate using the TCP protocol, and therefore it would have been obvious to a POSITA for the jondo devices to have established TCP connections between themselves in each communication path, including the Mapped Path, to have carried out such proxied communications. Freedman, ¶ 82.

- 32 -

**Grounds 1 and 2**: Furthermore, a POSITA would have understood that, as reflected in RFC 793,[10] establishing such a (disclosed or obvious) connection required the involvement of both jondo 4 and jondo 6. Freedman, ¶ 83; RFC 793, 31 (§ 3.3), 35 (§ 3.4). And, even if jondo 4 initiated the TCP connection to jondo 6, the "three-way handshake" between jondo 4 and jondo 6 that would have followed in order to establish that connection could not have been completed without jondo 6's involvement. Freedman, ¶ 83; RFC 793, 31 (§ 3.3), 35 (§ 3.4). This is because jondo 6 responds to jondo 4's SYN packet with (1) its own SYN packet, and (2) an ACK packet. Freedman, ¶ 83; RFC 793, 31 (§ 3.3), 35 (§ 3.4). Thus, a POSITA would have understood that, in the Mapped Path, jondo 6 established a TCP connection with jondo 4. Freedman, ¶ 83; RFC 793, 31 (§ 3.3), 35 (§ 3.4). And in

---

[10] RFC 793 is, as reflected on its front page, a September 1981 publication that served as the "DARPA Internet Program Protocol Specification" for the "Transmission Control Protocol." RFC 793, 1; Freedman, ¶ 83 n.7. RFC 793 was submitted by the Applicant and considered by the Office. '342 Patent, 6. It was posted on the Internet and published in the ordinary course by one or more established standards organizations, and was intended to be viewed by the interested Internet engineering audience at large as of its date of publication stated on its cover. Freedman, ¶ 83 n.7.

- 33 -

carrying out its part of the three way handshake to establish a TCP connection, jondo 6 necessarily would have sent its IP address to jondo 4 in the message containing its above-described SYN packet and ACK packet.  Freedman, ¶ 83; *see* RFC 793, 19 (§ 3.1) (explaining that the "Internet Protocol header" of a TCP segment "includ[es] the source and destination host addresses").

### 5.    *Limitation 1[c]*

Crowds discloses Limitation 1[c] because it discloses jondo 6 receiving the web page (requested initially by jondo 5) from web server 5.  Freedman, ¶ 84.

First, a POSITA would have understood that web server 5 in the Mapped Path qualifies as the claimed web server.  As recited in the preamble, the claimed web server responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content that is identified by a first Uniform Resource Locator (URL).  It is instructive to begin with a request from jondo 5 to understand why web server 5 meets these requirements.  Freedman, ¶ 85.

Crowds discloses that users request web pages, and a POSITA would have understood jondo 5 as making such a request.  Freedman, ¶ 86; Crowds, 8 & 8 n.1 (a user selects the jondo on her computer as her web proxy in her web browser for all services, including, as disclosed in footnote 1, HTTP, and her request can result in "a retrieved web page"), 17 (discussing latency in receiving web pages, including

- 34 -

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY
SOURCE CODE

*IPR2022-00103 of Patent No. 11,044,342*

## C. PETITIONERS MISCHARACTERIZE THE '342 PATENT

Petitioners mischaracterize the '342 Patent and take an annotated Figure 3 from Patent Owner's briefing (EX.1009) in Case No. 2:19-cv-395 (E.D. Tex.)(the "Tex. Litigation") out of context to allege that client 102 is a "second server" and that agent 122 is a "first client device." Petition at 21. In the Tex. Litigation, Petitioner-defendants[3] attempted to use the annotated Figure 3 from Patent Owner's briefing to improperly limit the express language of the claims by mischaracterizing a server and a client device as interchangeable. (*See, e.g.,* EX.2019 at 7-8). In its responsive briefing (EX. 2019), Patent Owner explained that the annotated Figure 3 was only used to illustrate the lines of communication showing the steps performed by the proxy client device (*see* EX.2019 at 7-8) and noted that the Petitioner-defendants ignored the accompanying citations to the specification distinguishing between client devices and servers (*see, e.g., id.* at 8 (citing EX.1009 at 3-5 and 17-19)).

---

[3] Excluding Code200, UAB.

9

### A.    PO's Alleged Commercial Success Evidence

For commercial success, PO relies on its "novel 'residential proxy service' that uses residential consumer computers, such as a person's … personal computer having a residential IP address, as a proxy client device according to the claimed methods."  POR, 57.  According to PO, the distinctions of its "residential proxy service" over the prior art, and the features driving its commercial success, are its use of a "residential consumer computer" (i.e., "a proxy client device") with a "residential IP address" (*id.*, 57) and the "scalability of this architecture given the large number of proxy client devices having residential IP addresses" (*id.*, 68). There are several problems with PO's position.

First, the first client device does not require (nor do any of the Challenged Claims require) the use of a consumer computer, much less a "residential" consumer computer, under the Board's preliminary constructions.  Furthermore, neither alternative constructions for "client device" that PO proposes (*see* POR, 11) requires a "residential" device, nor do any of the Challenged Claims.  PO's commercial success evidence lacks the required nexus for at least this reason alone.  *See Nested Bean, Inc. v. Big Beings USA Pty Ltd.*, IPR2020-01234, Paper 34, 42-44 (P.T.A.B. Jan. 24, 2022); *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40, 57-58 (P.T.A.B. Jan. 23, 2020).  Likewise, none of the Challenged Claims requires that the first client device have a "residential IP address," and PO's

- 23 -

commercial success evidence lacks the required nexus for at least this reason alone. *See Nested Bean*, Paper 34, 42-44; *Cisco Sys.*, Paper 40, 57-58.  Nor does any Challenged Claim require "scalability," and PO's commercial success evidence lacks the required nexus for at least this reason alone.  *See Nested Bean*, Paper 34, 42-44; *Cisco Sys.*, Paper 40, 57-58 (rejecting an alleged nexus predicated in part on scalability because, in part, "the claims do not require scalability").

Second, PO's expert admitted that the purported prior-art distinguishing feature of PO's allegedly novel residential proxy service—the "novel" use of a consumer computer (i.e., "a proxy client device") for the claimed first client device, as opposed to a "traditional proxy server" (POR, 57)—was already present in the prior art.  Specifically, PO's expert admitted that all of the user computers in Crowds running jondo software—which includes jondo 6 (i.e., the claimed first client device)—are consumer computers.  Williams, 8:14-9:16.  For at least the additional reason alone that PO's allegedly-novel use of a consumer computer was not, in fact, novel, PO has failed to establish nexus for its commercial success evidence.  *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983).

### B.    PO's Alleged Long-Felt-Need Evidence

It is not clear what PO contends is the long-felt need in question, though it seems to be related to the degree of anonymity for a user of a website.  *See* POR, 72-

- 24 -

73. But anonymity is not claimed, and PO's long-felt need evidence lacks the required nexus for at least this reason alone. *See Nested Bean*, Paper 34, 42-44; *Cisco Sys.*, Paper 40, 57-58. Separately, PO's contention that PO solved the need using "client devices as proxies" is fatal to its position because PO's expert admitted such proxies already existed in the prior art. *See* Williams, 8:14-9:16; *see WBIP*, 829 F.3d at 1329; *Richdel*, 714 F.2d at 1580.

Furthermore, and separately, PO offers no ***objective*** evidence of the problem's existence. *See* POR, 72-73 (citing only expert testimony, trial testimony of its founder, and a PO-authored exhibit). PO also admits that PO itself "was the first company to identify this need." POR, 72. These facts together, and the last by itself, are also fatal to PO's position. *In re Gershon*, 372 F.2d 535, 538 (C.C.P.A. 1967).

### C.    PO's Alleged Copying Evidence

PO's copying allegation is grounded in its contention that Petitioners copied PO's use of a consumer computer for the claimed first client device. *See* POR, 73-74 (arguing about copying of "SDK," which PO mapped to the claimed first client device at POR 58-59). But the use of such a consumer computer was already in the prior art, which defeats the alleged copying's nexus to the claimed invention. *See* Williams, 8:14-9:16; *WBIP*, 829 F.3d at 1329; *Richdel*, 714 F.2d at 1580. Regardless, copying is only equivocal nonobviousness evidence in the absence of more-compelling objective indicia of other secondary considerations (*Ecolochem,*

- 25 -

*Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000)), which does not

exist here.

### D.    PO's Alleged Industry Praise Evidence

PO's alleged industry praise evidence fails for at least the same reasons as its

commercial success evidence.

## VII.    CONCLUSION

The Challenged Claims are invalid.

Dated:  December 16, 2022          /Mark T. Garrett/
                                   Mark T. Garrett

Appx1919

Pursuant to 37 C.F.R. § 42.8, Petitioners provide the following updated mandatory notices, updating information regarding real parties-in-interest, related matters, and back-up counsel.

## I.    Real Party in Interest (37 CFR. § 42.8(b)(1))

As set forth in the Petition, the real parties-in-interest were identified as Petitioners Code200, UAB ("Code200"); Teso LT, UAB ("Teso"); metacluster lt, UAB[1] ("metacluster"); and Oxysales, UAB ("Oxysales"), as well as coretech lt, UAB ("coretech").  Since then, certain of the Petitioners have undergone a corporate restructuring.  Specifically, Petitioners Oxysales and metacluster have been merged into Petitioner Teso, with Teso succeeding to all of oxysales and metacluster's assets, rights, and obligations.  Teso is now operating as oxylabs, UAB.  oxylabs, UAB is wholly owned by Petitioner coretech.

## II.    Related Matters (37 C.F.R. § 42.8(b)(2))

Besides the IPR proceedings listed in the Petition, the following IPR proceedings have been filed against patents claiming priority to the same provisional application as the '342 Patent:

---

[1] The capitalization of metacluster lt as "Metacluster LT" in the Petition was inadvertently incorrect and has been corrected here.

also personally verify that I have read public versions of the Crowds paper in at least as early as 2000, having reviewed and cited the work in my own publication on Free Haven in 2000, and then comparing the anonymity properties of my own work on Tarzan to the Crowds system in my 2002 publication. Exs. 1043, 1044.[4] I also accessed the web page for ACM Transactions on Privacy and Security at https://dl.acm.org/journal/tops on October 29, 2021 and noted that Crowds is listed as the second-most cited article in the journal's history, having been cited 1,185 times.[5]

56.    On October 29, 2021, I performed a search on Google Scholar, an online database typically used by a POSA in this field, and confirmed that Crowds is reported as being cited by 2,739 later publications, with 1,410 of those citations occurring before 2009.[6]

---

[4] Exhibit 1043 is a true and correct copy of "The Free Haven Project: Distributed Anonymous Storage Service" by Roger Dingledine et al. Exhibit 1044 is a true and correct copy of "Tarzan: A Peer-to-Peer Anonymizing Network Layer" by Michael J. Freedman et al.

[5] https://dl.acm.org/doi/10.1145/290163.290168. Ex. 1047.

[6]https://scholar.google.com/scholar?cites=10520214597461437659&as_sdt=5,44&sciodt=0,44&hl=en and

32

57.    Crowds discloses a system "for protecting users' anonymity on the world-wide-web." Crowds, 1. Users are grouped "into a large and geographically diverse group (crowd) that collectively issues requests on behalf of its members." Crowds, 1. On account of that, Crowds states:

> Web servers are unable to learn the true source of a request because it is equally likely to have originated from any member of the crowd, and even collaborating crowd members cannot distinguish the originator of a request from a member who is merely forwarding the request on behalf of another.

Crowds, 1.

58.    In Crowds, "a user first joins a 'crowd' of other users" in order "[t]o execute web transactions." Crowds, 2. Crowds teaches that the user's web requests pass through members of the crowd instead of directly to a web server:

> The user's request to a web server is first passed to a random member of the crowd.  That member can either submit the request directly to the end server or forward it to another randomly chosen member, and in the latter case the next member chooses to submit or forward independently.  When the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator.  Even crowd members cannot

---

https://scholar.google.com/scholar?hl=en&as_sdt=5%2C44&sci-odt=0%2C44&cites=10520214597461437659&scipsc=&as_ylo=&as_yhi=2009.

Ex. 1045.

identify the initiator of the request, since the initiator is indistinguishable from a member that simply forwards a request from another.

Crowds, 2.

59.    Because Crowds discloses the use of many proxies in the crowd, Crowds has an advantage over single proxy systems because Crowds "presents no single point at which a passive attack can cripple all users' anonymity." Crowds, 6-7. Thus, an attacker would be unable to compromise the system by taking control of a single proxy. Crowds, 7.

60.    In particular, the Crowds system operates through use of "jondos," and a jondo is a software application that runs on a user's computer. *See* Crowds, 8 ("A user is represented in a crowd by a process on her computer called a jondo."). A jondo is "pronounced 'John Doe' and meant to convey the image of a faceless participant." Crowds, 8. When "[t]he user … starts the jondo on the user's computer," the jondo "contacts a server called the blender to request admittance to the crowd." Crowds, 8. "If admitted, the blender reports to this jondo the current membership of the crowd and information that enables this jondo to participate in the crowd." Crowds, 8.

61.    After receipt of a user request from the browser, the jondo "initiates the establishment of a random path of jondos that carries its users' transactions to and from their intended web servers." Crowds, 8. The user's jondo selects a random

34

jondo and forwards the web request to it. Crowds, 8. The random (second) jondo either transmits the web request to the web server, or forwards the request onto yet another (third) random jondo. Crowds, 8. If the latter option occurs, then the process repeats. Crowds, 8. Crowds explains:

> [T]he jondo picks a jondo from the crowd (possibly itself) at random, and forwards the request to it. When this jondo receives the request, it flips a biased coin to determine whether or not to forward the request to another jondo; the coin indicates to forward with probability $p_f$. If the result is to forward, then the jondo selects a random jondo and forwards the request to it, and otherwise the jondo submits the request to the end server for which the request was destined. So, each request travels from the user's browser, through some number of jondos, and finally to the end server.

Crowds, 8.

62.    Eventually, a jondo sends the request to the web server. Crowds, 8. The replies from the web server "traverse the same path as the requests, only in reverse." Crowds, 8-9. Examples of jondo paths are shown below in Crowds Figure 2, where the initiator and its targeted web server are labeled with the same number (as the native figure description explains):



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Crowds, 8-9.   Crowds discloses that, in Figure 2, the paths illustrated are "1→5→server;    2→6→2→server;    3→1→6→server;    4→4→server; 5→4→6→server; and 6→3→server."  Crowds, 8.

### B. RFC 1122

63.    The title of Request for Comments ("RFC") 1122 is "Requirements for Internet Hosts – Communication Layers."  RFC 1122 describes requirements for link layer, Internet layer, and transport protocols.  RFC 1122 was published twenty years before the '342 Patent's priority date by the Network Working Group of the Internet Engineering Task Force (IETF) in October 1989.  Applicants submitted RFC 1122 to the Patent Office during prosecution of the '342 Patent.  '342 PH, 190 (Information Disclosure Statement listing RFC 1122 as prior art).  RFCs (and like standards documents) posted on the Internet are published in the ordinary course by established standards organizations, and are intended to be viewed by the interested

36

Appx2331

## C. RFC 2616

66.    Request for Comments (RFC) 2616 was the definitive specification for HTTP version 1.1 protocol when the '624 Provisional was filed in 2009. RFC 2616 was published ten years earlier by the HTTP Working Group of the Internet Engineering Task Force (IETF) in June 1999. RFC 2616 replaced an earlier proposed standard for HTTP/1.1, RFC 2068, published by the IETF in January 1997. RFC 2616 is discussed in the '342 Patent specification and claim 11, and was submitted by the applicants to the Patent Office during prosecution of the Patent. '342 Patent, 16:21-28 *see also* '342 PH, 75 (Information Disclosure State,emt listing RFC 2616 as prior art).

67.    I obtained a copy of RFC 2616 from the IETF website source that I understand to be the repository of IETF's RFCs, and which a POSA would commonly utilize to obtain an electronic copy of the IETF's RFCs. The copy of RFC 2616 that I obtained from https://datatracker.ietf.org/doc/html/rfc2616 is attached as Ex. 1006.

68.    RFC 2616 explains that "the HTTP protocol is a request/response protocol" and that "most HTTP communication is initiated by a user agent [(UA)] and consists of a request to be applied to a resource on some origin server [(O)]." RFC 2616, 10 (§ 1.4).  "HTTP communication usually takes place over TCP/IP connections."  RFC 2616, 11 (§ 1.4).  RFC 2616 discloses that one or more

38

Appx2333

intermediaries (*e.g.*, A, B, and C), such as proxies, gateways, and tunnels, may be present in the request/response chain as depicted in § 1.4 of RFC 2616 and copied below.

```
    request chain ------------------------------------>
UA -----v----- A -----v----- B -----v----- C -----v----- O
    <------------------------------------ response chain
```

RFC 2616, 10-11.  A POSA would have understood that, in the above-depicted request/response chain, intermediaries A, B, and C act as both clients and servers.

69.    RFC 2616 also specifies the means by which clients can make requests to servers and the means by which servers respond to clients.  For example, a client may use the "GET method [to] retrieve whatever information … is identified by the [URL]."  RFC 2616, § 9.3, 34 (§ 5.1) (describing syntax of GET method).  In response to a GET request, the server replies with a response message with the content identified by the URL.  RFC 2616, §§ 6, 6.1.1 (pp. 26-28), 10.2.1 ("an entity corresponding to the requested resource is sent in the response").  In addition, the request and response messages of the client and server pass through any intermediary devices (e.g., A, B, and C) located between the client (UA) and the origin server (O) in the request/response chain, as reflected in the above-depicted request/response chain from RFC § 1.4 set forth above.

39

the cached entry is expired or still valid, the cache "makes a conditional request for a resource for which it has a cache entry" and "includes the associated validator in the request." RFC 2616, 54. "The [origin] server then checks that validator against the current validator for the entity, and, if they match … , it responds with a special status code." RFC 2616, 54. "[A] conditional request looks exactly the same as a normal request for the same resource, except that it carries a special header (which includes the validator) that implicitly turns the method (usually, GET) into a conditional." RFC 2616, 54.

## VII.  COMPARISON OF THE PRIOR ART TO THE CLAIMS

### A.  Crowds

72.   Crowds is introduced above in my Declaration at Section VI.A.

> **1. Limitation 1[p] - A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content that is identified by a first Uniform Resource Locator (URL), the method by a first client device comprising:**

73.   Crowds discloses the preamble of claim 1. The preamble requires that the method is performed by a "first client device" that is used with a "web server," which responds to HTTP requests and "stores a first content identified by a first Uniform Resource Locator (URL)." The preamble provides explicit antecedent basis support for portions of the steps of Limitations 1[a], 1[c], and 1[d].

74.   Each of the preamble elements is satisfied for the reasons provided in the discussion of Limitations 1[a] – 1[d] (Sections VII.A.2 - VII.A.5), because the

41

steps of Limitations 1[a] – 1[d] are performed by the first client device, the step of Limitation 1[c] involves a web server, and the web server responds to HTTP requests and stores a first content identified by a first URL.  As explained below for the steps of Limitations 1[a] – 1[d], the preamble maps onto Crowds in at least the provided example path of "5→4→6→server" (Crowds, Fig. 2) (hereinafter, the "Mapped Path")) as follows, starting with an illustration of the Mapped Path in green:



**First client device:** As explained below in Limitation 1[a], the device on which jondo "6" in Crowds Fig. 2 resides (hereinafter referred to as "jondo 6").

**Second server:** As explained below in Limitation 1[b], the device on which jondo "4" in Crowds Fig. 2 resides (hereinafter referred to as "jondo 4").

**Web server:** As explained below in Limitation 1[c], the web server labeled "5" in Crowds Fig. 2 (hereinafter referred to as "web server 5").

**First Uniform Resource Locator (URL):** As explained below in Limitation 1[c], the requested URL.

**First content:** As explained below in Limitation 1[c], the requested web page at the requested URL.

### 2. Limitation 1[a] - executing, by the first client device, a web browser application or an email application;

75.    Crowds discloses Limitation 1[a] because a POSA would understand that jondo 6 in the Mapped Path is a communication device that operates in the role of a client and executes a web browser application.

76.    First, a POSA would have understood that jondo 6 is a communication device because it is a device (user's computer) that, at least because of the jondo application residing on it, facilitates communication between other devices, including web server 5 and jondo 4 in the Mapped Path. Crowds, 8, 9[7]. Jondo 6 operates in the role of a client due at least in part because, as the web request originating at jondo 5 travels to web server 5 in the Mapped Path, jondo 6 serves as a client of web server 5. Crowds, 8, 9.

---

[7] All citations to Crowds page 9 are to be understood as including a citation to Crowds Figure 2.

77.    Second, a POSA would have recognized that, as Crowds explains, every device running a jondo (hereinafter "jondo device")—and therefore jondo 6—is executing a web browser application.   Specifically, Crowds teaches that every jondo depicted in Figure 2 serves as an initiator and that each "request" by an initiator travels from that device's browser, thus making explicit that jondo 6 in the Mapped Path executes a web browser application:

> The user selects [her] jondo as her web proxy by specifying its host name and port number in her **web browser** as the proxy for all services.   Thus, any request coming from the **browser** is sent directly to the jondo. … So, **each request** travels from the user's **browser**, through some number of jondo, and finally to the end server.   A possible set of such paths is shown in Figure 2. In this figure, the paths are 1→5→server; 2→6→2→server; 3→1→6→server; 4→4→server; 5→4→6→server; and **6**→3→server.

Crowds, 8 (emphasis added); Crowds, 8 n.1, 13-15 (discussing user's browsers), 23-24 (explaining that a given jondo serves as the HTTP proxy for the browser on the device where both the jondo and web browser reside).

78.    Crowds additionally provides a specific web browser application ("Netscape 3.01 browser") that executed on all four computers running jondos in "AT&T Labs" as "Crowds 1.0." Crowds, 16-17; Crowds, 3 (referencing "the system's user interface in Section 9"), 23-25 (discussing Section 9 and depicting a user interface of the web browser in Fig. 6).  This reinforces the idea that a POSA would recognize that jondo 6 is running a web browser application.

44

### 3. Limitation 1[b] - establishing a Transmission Control Protocol (TCP) connection with a second server;

79.    Crowds discloses Limitation 1[b] because it teaches that a TCP connection existed between jondo 6 and jondo 4.  A POSA would have understood that jondo 6 took action to establish (and, thus, established) such a TCP connection.  RFC 793, 34 ("The 'three-way handshake' is the procedure used to establish a [TCP] connection.  This procedure normally is initiated by one TCP and responded to by another TCP.  The procedure also works if two TCP simultaneously initiate the procedure.").

80.    First, Crowds discloses that jondo 4 in the Mapped Path is a "server" under the Petitioners' Construction because jondo 4 operates in the role of a server (it serves at least jondo 5 by receiving jondo 5's web request and sending it on to jondo 6 and later sending web server 5's response (received from jondo 6) back to jondo 5, and therefore provide a service to jondo 5), and it is not the same physical device as jondo 6 (i.e., the first client device).  Crowds, 8-9.

81.    Second, a POSA would have recognized that a TCP connection between jondo 6 and jondo 4 existed because, during construction of the Mapped Path, jondo 4 contacts jondo 6 with a message.  Crowds explains that each jondo in the path "receives the [first user] request" from the prior jondo and "determines whether or not to forward the request to another jondo" or complete the path and "submit[] the request to the end server for which the request was destined."  Crowds, 8.  A

45

POSA would have further understood that jondo 4 and jondo 6 communicate with each other using a TCP connection, because Crowds refers to failures being "detected by the TCP/IP connection to the jondo breaking or being refused."  Crowds, 16.

82.    At a minimum, a POSA would have found a TCP connection between jondo 4 and jondo 6 to have been established when jondo 4 connected to jondo 6 because Crowds states that "[t]he services that must be proxied include Gopher, FTP, HTTP and SSL [i.e., HTTPS]."  Crowds, 8 n.1.  A POSA would have understood that Gopher, FTP, HTTP, and HTTPS all communicate using the TCP protocol, and thus a POSA would have the jondo devices to establish TCP connections between themselves in each communication path, including the Mapped Path, to initiate such proxied communications.

83.    In addition, a POSA would have understood that, as explained in RFC 793, establishing that TCP connection required the participation of both jondo 4 and jondo 6.  RFC 793, 31 (§ 3.3), 35 (§ 3.4).[8]  Even if jondo 4 initiated the TCP connection to jondo 6, the "three-way handshake" between jondo 4 and jondo 6 in order

---

[8] RFC 793's front page states that it is a September 1981 publication that is the "DARPA Internet Program Protocol Specification" for the "Transmission Control Protocol."  RFC 793, 1.  RFC 793 was submitted by the Applicant and considered

# Crowds: Anonymity for Web Transactions

MICHAEL K. REITER

Bell Laboratories, Lucent Technologies

and

AVIEL D. RUBIN

AT&T Labs—Research

In this paper we introduce a system called Crowds for protecting users' anonymity on the world-wide-web. Crowds, named for the notion of "blending into a crowd," operates by grouping users into a large and geographically diverse group (crowd) that collectively issues requests on behalf of its members. Web servers are unable to learn the true source of a request because it is equally likely to have originated from any member of the crowd, and even collaborating crowd members cannot distinguish the originator of a request from a member who is merely forwarding the request on behalf of another. We describe the design, implementation, security, performance, and scalability of our system. Our security analysis introduces *degrees of anonymity* as an important tool for describing and proving anonymity properties.

Categories and Subject Descriptors: C.2.0 [**Computer-Communication Networks**]: General—*Security and protection*; C.2.2 [**Computer-Communication Networks**]: Network Protocols—*Applications*; K.4.1 [**Computers and Society**]: Public Policy Issues—*Privacy*; K.4.4 [**Computers and Society**]: Electronic Commerce—*Security*

General Terms: Security

Additional Key Words and Phrases: Anonymous communication, world-wide-web

## 1. INTRODUCTION

*Every man should know that his conversations, his correspondence, and his personal life are private.*—Lyndon B. Johnson, president of the United States, 1963–69

The lack of privacy for transactions on the world-wide-web, or the Internet in general, is a well-documented fact [Brier 1997; Miller 1997]. While encrypting communication to and from web servers (e.g., using SSL [Garfinkel and Spafford 1997, Ch. 12]) can hide the content of the transaction from an eavesdropper (e.g., an Internet service provider, or a local

Authors' addresses: M. K. Reiter, Bell Laboratories, Lucent Technologies, 700 Mountain Avenue, Room 2A-342, Murray Hill, NJ 07974; email: reiter@research.bell-labs.com; A. D. Rubin, AT&T Labs—Research, 180 Park Avenue, Room A239, Florham Park, NJ 07932–0972; email: rubin@research.att.com.

Permission to make digital/hard copy of part or all of this work for personal or classroom use is granted without fee provided that the copies are not made or distributed for profit or commercial advantage, the copyright notice, the title of the publication, and its date appear, and notice is given that copying is by permission of the ACM, Inc. To copy otherwise, to republish, to post on servers, or to redistribute to lists, requires prior specific permission and/or a fee.
© 1998 ACM 1094-9224/98/1100–0066 $5.00

Code200
Ex. 1004
Page 1 of 27

system administrator), the eavesdropper can still learn the IP addresses of the client and server computers, the length of the data being exchanged, and the time and frequency of exchanges. Encryption also does little to protect the privacy of the client from the server. A web server can record the Internet addresses at which its clients reside, the servers that referred the clients to it, and the times and frequencies of accesses by its clients. With additional effort, this information can be combined with other data to invade the privacy of clients even further. For example, by automatically `fingering` the client computer shortly after an access and comparing the idle time for each user of the client computer with the server access time, the server administrator can often deduce the exact user with high likelihood. Some consequences of such privacy abuses are described in Miller [1997].

In this paper we introduce a new approach for increasing the privacy of web transactions and a system, called *Crowds*, that implements it. Our approach is based on the idea of "blending into a crowd," i.e., hiding one's actions within the actions of many others. To execute web transactions in our model, a user first joins a "crowd" of other users. The user's request to a web server is first passed to a random member of the crowd. That member can either *submit* the request directly to the end server or *forward* it to another randomly chosen member, and in the latter case the next member chooses to submit or forward independently. When the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator. Even crowd members cannot identify the initiator of the request, since the initiator is indistinguishable from a member that simply forwards a request from another.

In studying the anonymity properties provided by this simple mechanism, we introduce the notion of *degrees* of anonymity. We argue that the degree of anonymity provided against an attacker can be viewed as a continuum, ranging from no anonymity to complete anonymity and having several interesting points in between. We informally define these intermediate points and, for our Crowds mechanism described above, we refine these definitions and prove anonymity properties for our system. We expect these definitions and proofs to yield insights into proving anonymity properties for other approaches as well.

An intriguing property of Crowds is that a member of a crowd may submit requests initiated by other users. This has both negative and positive consequences. On the negative side, the user may be incorrectly suspected of originating that request. On the positive side, this property suggests that the mere availability of Crowds offers the user some degree of deniability for her observed browsing behavior, if it is possible that she was using Crowds. Moreover, if Crowds becomes widely adopted, then the presumption that the computer from which a request is received is the computer that originated the request will become decreasingly valid (and thus decreasingly utilized).

The anonymity provided by Crowds is subject to some caveats. For example, Crowds obviously cannot protect a user's anonymity if the content

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 2 of 27

Appx2392

of her web transactions reveals her identity to the web server (e.g., if the user submits her name and credit card number in a web form). More subtly, Crowds can be undermined by executable web content that, if downloaded into the user's browser, can open network connections directly from the browser to web servers, thus bypassing Crowds altogether and exposing the user to the end server. In today's browsers, such executable content takes the form of Java applets and ActiveX controls. Therefore, when using Crowds, it is recommended that Java and ActiveX be disabled in the browser, which can typically be done via a simple preferences menu in the browser.

The rest of this paper is structured as follows: In Section 2, we state the anonymity goals of our system more precisely and introduce the notion of *degrees* of anonymity. This gives us sufficient groundwork to compare our approach to other approaches to anonymity in Section 3. We describe the basic Crowds mechanism in Section 4 and analyze its security in Section 5. We describe the performance and scalability of our system in Sections 6 and 7, respectively. We discuss crowd membership in Section 8, the system's user interface in Section 9, and the obstacles that firewalls present to wide scale adoption of Crowds in Section 10. We conclude in Section 11.

## 2. GOALS

### 2.1 Anonymity

As discussed in Pfitzmann and Waidner [1987], there are three types of anonymous communication properties that can be provided: sender anonymity, receiver anonymity, and unlinkability of sender and receiver. *Sender anonymity* means that the identity of the party who sent a message is hidden, while its receiver (and the message itself) might not be. *Receiver anonymity* similarly means that the identity of the receiver is hidden. *Unlinkability of sender and receiver* means that though the sender and receiver can each be identified as participating in some communication, they cannot be identified as communicating *with each other*.

A second aspect of anonymous communication is the attackers against which these properties are achieved. The attacker might be an eavesdropper that can observe some or all messages sent and received; collaborations consisting of some senders, receivers, and other parties; or variations of these [Pfitzmann and Waidner 1987].

To these two aspects of anonymous communication, we add a third: the *degree* of anonymity. As shown in Figure 1, the degree of anonymity can be viewed as an informal continuum. For simplicity, we describe this continuum with respect to sender anonymity, but it can naturally be extended to receiver anonymity and unlinkability as well. On one end of the spectrum is *absolute privacy*: absolute sender privacy against an attacker means that the attacker can in no way distinguish the situations in which a potential sender actually sent communication and those in which it did not. That is,

Appx2393



Fig. 1. **Degrees of anonymity:** Degrees range from *absolute privacy*, where the attacker cannot perceive the presence of communication, to *provably exposed*, where the attacker can prove the sender, receiver, or their relationship to others.

sending a message results in no observable effects for the attacker. On the other end of the spectrum is *provably exposed*: the identity of a sender is provably exposed if the attacker can identify the sender of a message, and can also prove the identity of the sender to others.

For the purposes of this paper, the following three intermediate points of this spectrum are of interest, listed from strongest to weakest.

—**Beyond suspicion**: A sender's anonymity is beyond suspicion if though the attacker can see evidence of a sent message, the sender appears no more likely to be the originator of that message than any other potential sender in the system.

—**Probable innocence**: A sender is probably innocent if, from the attacker's point of view, the sender appears no more likely to be the originator than to not be the originator. This is weaker than beyond suspicion in that the attacker may have reason to suspect that the sender is more likely to be responsible than any other potential sender, but it still appears at least as likely that the sender is not responsible.

—**Possible innocence**: A sender is possibly innocent if, from the attacker's point of view, there is a nontrivial probability that the real sender is someone else.

It is possible to describe these intermediate points for receiver anonymity and sender/receiver unlinkability as well. When necessary, we define these intermediate points more precisely.

Which degree of anonymity suffices for a user obviously depends on the user and her circumstances. Probable innocence sender anonymity should prevent many types of attackers from *acting* on their suspicions (therefore avoiding many abuses, e.g., cited in Miller [1997]) due to the high probability that those suspicions are incorrect. However, if the user wishes to avoid any suspicion whatsoever—including even suspicions not sufficiently certain for the attacker to act upon—then she should insist on beyond suspicion sender anonymity.

The default degree of anonymity on the web for most information and attackers is *exposed*, as described in Section 1. All recent versions of Netscape Navigator and Internet Explorer are configured to automatically identify the client computer to web servers, by passing information including the IP address and the host platform in request headers.

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 4 of 27

Appx2394

70    •    M. K. Reiter and A. D. Rubin

Table I. Anonymity Properties In Crowds

| Attacker | Sender anonymity | Receiver anonymity |
|---|---|---|
| local eavesdropper | exposed | $P(\text{beyond suspicion}) \xrightarrow[n \to \infty]{} 1$ |
| $c$ collaborating members, | **probable innocence** | $P(\text{absolute privacy}) \xrightarrow[n \to \infty]{} 1$ |
| $n \geq (p_f/(p_f - 1/2))(c + 1)$ | $P(\text{absolute privacy}) \xrightarrow[n \to \infty]{} 1$ | |
| end server | **beyond suspicion** | N/A |

## 2.2 What Crowds Achieves

As described in Section 1, our system consists of a dynamic collection of users, called a *crowd*. These users initiate web requests to various web servers (and receive replies from them), and thus the users are the "senders" and the servers are the "receivers". We consider the anonymity properties provided to an individual user against three distinct types of attackers:

—A **local eavesdropper** is an attacker who can observe all (and only) communication to and from the user's computer.

—**Collaborating crowd members** are other crowd members that can pool their information and even deviate from the prescribed protocol.

—The **end server** is the web server to which the web transaction is directed.

The above descriptions are intended to capture the full capabilities of each attacker. For example, collaborating members and the end server cannot eavesdrop on communication between other members. Similarly, a local eavesdropper cannot eavesdrop on messages other than those sent or received by the user's computer. A local eavesdropper is intended to model, e.g., an eavesdropper on the local area network of the user, such as an administrator monitoring web usage at a local firewall. However, if the same LAN also serves the end server, then the eavesdropper is effectively global, and we provide no protections against it.

The security offered against each of these types of attackers is summarized in Table 1 and justified in the remainder of the paper. As indicated by the omission of an "unlinkability of sender and receiver" column from this table, our system serves primarily to hide the sender or receiver from the attacker. In this table, $n$ denotes the number of members in the crowd (for the moment we treat this as static) and $p_f > 1/2$ denotes the probability of forwarding, i.e., when a crowd member receives a request, the probability that it forwards the request to another member, rather than submitting it to the end server. ($p_f$ is explained more fully in Section 4.) The boldface claims in the table—i.e., probable innocence sender anonymity against collaborating members and beyond suspicion sender anonymity against the end server—are guarantees. The probability of beyond suspicion receiver

Appx2395

anonymity against a local eavesdropper, on the other hand, only increases to one asymptotically as the crowd size increases to infinity. Put another way, if the local eavesdropper is sufficiently lucky, then it observes events that expose the receiver of a web request, and otherwise the receiver is beyond suspicion. However, the probability that it views these events decreases as a function of the size of the crowd. Similarly, a sender's assurance of absolute privacy against collaborating members also holds asymptotically with probability one as crowd size grows to infinity (for a constant number of collaborators). Thus, if the collaborators are unlucky, users achieve absolute privacy. We provide a more careful treatment of these notions in Section 5.

Of course, against an attacker that is comprised of two or more of the attackers described above, our system yields degrees of sender and receiver anonymity that are the minimum among those provided against the attackers present. For example, if a local eavesdropper and the end server to which the user's request is destined collaborate in an attack, then our techniques achieve neither sender anonymity nor receiver anonymity. Another caveat is that all of the claims of sender and receiver anonymity in this section, and their justifications in the remainder of this paper, require that neither message contents themselves nor *a priori* knowledge of sender behavior give clues to the sender's or receiver's identity.

## 2.3 What Crowds Does Not Achieve

Crowds makes no effort to defend against denial-of-service attacks by rogue crowd members. A crowd member could, e.g., accept messages from other crowd members and refuse to pass them along. In our system, such denial-of-service can result from malicious behavior, but typically does not result if (the process representing) a crowd member fails benignly or leaves the crowd. As a result, these attacks are detectable. More difficult to detect are active attacks where crowd members substitute wrong information in response to web requests that they receive from other crowd members. Such attacks are inherent in any system that uses intermediaries to forward unprotected information, but fortunately they cannot be utilized to compromise anonymity directly.

## 3. RELATED WORK

There are two basic approaches previously proposed for achieving anonymous web transactions. The first approach is to interpose an additional party (a *proxy*) between the sender and receiver to hide the sender's identity from the receiver. Examples of such proxies include the Anonymizer (http://www.anonymizer.com/) and the Lucent Personalized Web Assistant [Gabber, Gibbons, Matias, and Mayer 1997] (http://lpwa.com). Crowds provides protection against a wider range of attackers than proxies do. In particular, proxy-based systems are entirely vulnerable to a passive attacker in control of the proxy, since the attacker can monitor and record the senders and receivers of all communication. Our system presents no

Appx2396

single point at which a passive attack can cripple all users' anonymity. In addition, a proxy is typically a single point of failure; i.e., if the proxy fails, then anonymous browsing cannot continue. In Crowds, no single failure discontinues all ongoing web transactions.

A second approach to achieving anonymous web transactions is to use a *mix* [Chaum 1981]. A mix is actually an enhanced proxy that, in addition to hiding the sender from the receiver, also takes measures to provide sender and receiver unlinkability against a global eavesdropper. It does so by collecting messages of equal length from senders, cryptographically altering them (typically by decrypting them with its private key), and forwarding the messages to their recipients in a different order. These techniques make it difficult for an eavesdropper to determine which output messages correspond to which input messages. A natural extension is to interpose a *sequence* of mixes between the sender and receiver [Chaum 1981]. A sequence of mixes can tolerate colluding mixes, as any single correctly-behaving mix server in the sequence prevents an eavesdropper from linking the sender and receiver. Mixes have been implemented to support many types of communication, for example, electronic mail [Gulcu and Tsudik 1996], ISDN service [Pfitzmann, Pfitzmann, and Waidner 1991], and general synchronous communication (including web browsing) [Syverson, Goldschlag, and Reed 1997].

The properties offered by Crowds are different from those offered by mixes. As described above, Crowds provide (probable innocence) sender anonymity against collaborating crowd members. In contrast, in the closest analog to this attack in typical mix systems—i.e., a group of collaborating mix servers—mixes do not provide sender anonymity but do ensure sender and receiver unlinkability [Pfitzmann and Waidner 1987]. Another difference is that mixes provide sender and receiver unlinkability against a global eavesdropper. Crowds does not provide anonymity against global eavesdroppers. However, our intention is for a crowd to span multiple administrative domains, where the existence of a global eavesdropper is unlikely. Another difference is that mixes typically rely on public key encryption, the algebraic properties of which have been exploited to break some implementations [Pfitzmann and Pfitzmann 1990].

Crowds' unique properties admit very efficient implementations in comparison to mixes. With mixes, the length of a message routed through a mix network grows proportionally to the number of mixes through which it is routed, and the mix network must pad messages to fixed lengths and generate decoy messages to foil traffic analysis. Moreover, in a typical mix implementation, routing a message through a sequence of $n$ mixes incurs a cost of $n$ public key encryptions and $n$ private key decryptions on the critical path of the message, which are comparatively expensive operations. Thus, since the unlinkability provided by mixes is tolerant of up to $n - 1$ mixes colluding, increasing $n$ improves anonymity but hurts performance. Privacy in Crowds can similarly be enhanced by increasing the average number of times a request is forwarded among members before being

Appx2397

submitted to the end server, but this should impact performance less because there are no public/private key operations, no inflation of message transmission lengths (beyond a small, constant-size header), and no decoy messages needed.

Another performance advantage of Crowds is that since each user actively participates in the function of the crowd, the throughput of a crowd grows as a function of the number of users. In fact, we show in Section 7 that a crowd can scale almost limitlessly (in theory), in the sense that the load on each user's computer is expected to remain roughly constant as new users join the crowd. With a fixed network of mixes, the load of each server increases proportionally to the number of users, with a resulting linear decrease in throughput.

## 4. CROWD OVERVIEW

As discussed previously, a crowd can be thought of as a collection of users. A user is represented in a crowd by a process on her computer called a *jondo* (pronounced "John Doe" and meant to convey the image of a faceless participant). The user (or a local administrator) starts the jondo on the user's computer. When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd. If admitted, the blender reports to this jondo the current membership of the crowd and information that enables this jondo to participate in the crowd. We defer further discussion of the blender and crowd membership maintenance to Section 8.

The user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services. Thus, any request coming from the browser is sent directly to the jondo.[1] Upon receiving the first user request from the browser, the jondo initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers. More precisely, the jondo picks a jondo from the crowd (possibly itself) at random, and forwards the request to it. When this jondo receives the request, it flips a biased coin to determine whether or not to forward the request to another jondo; the coin indicates to forward with probability $p_f$. If the result is to forward, then the jondo selects a random jondo and forwards the request to it, and otherwise the jondo submits the request to the end server for which the request was destined. So, each request travels from the user's browser, through some number of jondos, and finally to the end server. A possible set of such paths is shown in Figure 2. In this figure, the paths are $1 \rightarrow 5 \rightarrow$ server; $2 \rightarrow 6 \rightarrow 2 \rightarrow$ server; $3 \rightarrow 1 \rightarrow 6 \rightarrow$ server; $4 \rightarrow 4 \rightarrow$ server; $5 \rightarrow 4 \rightarrow 6 \rightarrow$ server; and $6 \rightarrow 3 \rightarrow$ server. Subsequent requests initiated at the same

---

[1]The services that must be proxied include Gopher, FTP, HTTP and SSL. Otherwise, e.g., FTP requests triggered by downloading a web page would not go through the crowd, and would thus reveal the user's IP address to the end server. Java and ActiveX should be disabled in the browser as well, because a Java applet or ActiveX control embedded in a retrieved web page could connect back to its server directly and reveal the user's IP address to that server.

Appx2398



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

jondo follow the same path (except perhaps going to a different end server), and server replies traverse the same path as the requests, only in reverse.

A pseudocode description of a jondo is presented in Figure 3. This figure describes a thread of execution that is executed per received request. This description uses client-server terminology, where one jondo is a *client* of its successor on the path. For each path, indicated by a *path id*, the value next[path_id] is the next jondo on the path. To assign next jondos for paths, each jondo maintains a set *Jondos* of jondos that it believes to be active (itself included). When it chooses to direct the path to another jondo, it selects the next jondo uniformly at random from this set (lines 6, 16, and 26); i.e., "$\xleftarrow{R} S$" denotes selection from the set $S$ uniformly at random. Subsequent sections shed greater light on the operation of a jondo and the pseudocode description of Figure 3.

It is important for the jondo at each position in a path to hold a different path identifier for the path. That is, if a jondo receives a request marked with path_id from its predecessor in a path, then it replaces path_id with a different path identifier stored in translate[path_id] before forwarding the request to its successor (if a jondo). This enables a jondo that occupies multiple positions on a path to act independently in each position: if the path_id remained the same along the path, then the jondo would behave identically each time it received a message on the path, resulting in an infinite loop. Path identifiers should be unique and unpredictable; in our present implementation, new_path_id() (lines 5 and 15) returns a random 128-bit value.

Omitted from the description in Figure 3 is that fact that all communication between any two jondos is encrypted using a key known only to the two

Appx2399

```
(1)    client,request ← receive_request()
(2)    if (client = browser)
(3)        sanitize(request)                                    /* strip cookies and identifying headers */
(4)        if (my_path_id = ⊥)                                  /* if my_path_id is not initialized ... */
(5)            my_path_id ← new_path_id()
(6)            next[my_path_id] ←_R Jondos
(7)        forward_request(my_path_id)
(8)    else                                                     /* client is a jondo */
(9)        path_id ← remove_path_id(request)                    /* remove "incoming" path id */
(10)       if (translate[path_id] = ⊥)                          /* "incoming" path id is new */
(11)           coin ← coin_flip(p_f)                            /* tails with probability p_f */
(12)           if (coin = heads)
(13)               translate[path_id] ← 'submit'
(14)           else
(15)               translate[path_id] ← new_path_id()           /* set "outgoing" path id */
(16)               next[translate[path_id]] ←_R Jondos          /* select next jondo at random */
(17)       if (translate[path_id] = 'submit')
(18)           submit_request()
(19)       else
(20)           forward_request(translate[path_id])

(21)   subroutine forward_request(out_path_id)
(22)       send out_path_id||request to next[out_path_id]
(23)       reply ← await_reply(∞)                               /* wait for reply or recognizable jondo failure */
(24)       if (reply = 'jondo failed')                          /* jondo failed */
(25)           Jondos ← Jondos \ {next[out_path_id]}            /* remove the jondo */
(26)           next[out_path_id] ←_R Jondos                     /* assign a new random jondo for this path */
(27)           forward_request(out_path_id)                     /* try again */
(28)       else                                                 /* received reply from jondo */
(29)           send reply to client

(30)   subroutine submit_request ()
(31)       send request to destination(request)                /* send to destination web server */
(32)       reply ← await_reply(timeout)                        /* wait for reply, timeout, or server failure */
(33)       send reply to client                                /* send reply or error message to client */
```

Fig. 3. Pseudocode description of a jondo.

of them. Encryption keys are established as jondos join the crowd, as is discussed in Section 8.

## 5. SECURITY ANALYSIS

In this section we consider the question of what information an attacker can learn about the senders and receivers of web transactions, given the mechanisms we described in Section 4. The types of attackers we consider were described in Section 2. Our analysis begins with the two attackers for which analysis is more straightforward, namely a local eavesdropper and the end server. This is followed by an analysis of crowd security versus collaborating jondos.

### 5.1 Local Eavesdropper

Recall that a local eavesdropper is an attacker that can observe all (and only) communication emanating from an individual user's computer. When this user initiates a request, the fact that she did so is exposed to the local eavesdropper, since we make no effort to hide correlations between inputs to and outputs from the initiating computer. That is, the local eavesdropper observes that a request output by the user's computer did not result from a corresponding input. Thus, we offer no sender anonymity against a local eavesdropper.

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 10 of 27

Appx2400

The mechanisms we described do, however, typically prevent a local eavesdropper from learning the intended receiver of a request, because every message forwarded on a path, except for the final request to the end server, is encrypted. Thus, while the eavesdropper is able to view any message emanating from the user's computer, it only views a message submitted to the end server (or equivalently a plaintext message containing the end server's address) if the user's jondo ultimately submits the user's request itself. Since the probability that the user's jondo ultimately submits the request is $1/n$ where $n$ is the size of the crowd when the path was created, the probability that the eavesdropper learns the identity of the receiver decreases as a function of crowd size. Moreover, when the user's jondo does not ultimately submit the request, the local eavesdropper sees only the encrypted address of the end server, which we suggest yields receiver anonymity that is (informally) beyond suspicion. Thus, $P(\text{beyond suspicion}) \xrightarrow[n \to \infty]{} 1$ for receiver anonymity.

## 5.2 End Servers

We now consider the security of our system against an attack by the end server only. Because the web server is the receiver, obviously receiver anonymity is not possible against this attacker. However, the anonymity for the path initiator is quite strong. In particular, since the path initiator first forwards to another jondo when creating its path (see Section 4), the end server is equally likely to receive the initiator's requests from any crowd member. That is, from the end server's perspective, all crowd members are equally likely to have initiated the request, and so the actual initiator's sender anonymity is beyond suspicion. It is interesting to note that this result, as opposed to that for collaborating jondos below, does not depend on $p_f$ (the probability of forwarding; see Section 4). Indeed, increasing expected path length offers no additional assurance of anonymity against an end server.

## 5.3 Collaborating Jondos

Consider a set of collaborating (corrupted) jondos in the crowd. A single malicious jondo is simply a special case of this attacker, and our analysis applies to this case as well. Because each jondo can observe plaintext traffic on a path routed through it, any such traffic, including the address of the end server, is exposed to this attacker. The question we consider here is if the attacker can determine who initiated the path.

To be precise, consider any path that is initiated by a non-collaborating member and on which a collaborator occupies a position. The goal of the collaborators is to determine the member that initiated the path. Assuming that the contents of the communication do not suggest an initiator, the collaborators have no reason to suspect any member other than the one from which they immediately received it, i.e., the member immediately preceding the first collaborator on the path. All other noncollaborating

members are each equally likely to be the initiator, but are also obviously less likely to be the initiator than the collaborators' immediate predecessor. We now analyze how confident the collaborators can be that their immediate predecessor is in fact the path initiator.

Let $H_k$, $k \geq 1$, denote the event that the first collaborator on the path occupies the $k$th position on the path, where the initiator itself occupies the 0th position (and possibly others), and define $H_{k+} = H_k \vee H_{k+1} \vee H_{k+2} \vee \ldots$ . Let $I$ denote the event that the first collaborator on the path is immediately preceded on the path by the path initiator. Note that $H_1 \Rightarrow I$, but the converse is not true, because the initiating jondo might appear on the path multiple times. Given this notation, the collaborators now hope to determine $P(I \mid H_{1+})$, i.e., given that a collaborator is on the path, what is the probability that the path initiator is the first collaborator's immediate predecessor? Refining our intuition from Section 2, we say that the path initiator has probable innocence if this probability is at most $1/2$.

*Definition 5.1*   The path initiator has *probable innocence* (with respect to sender anonymity) if $P(I \mid H_{1+}) \leq 1/2$.

In order to yield probable innocence for the path initiator, certain conditions must be met in our system. In particular, let $p_f > 1/2$ be the probability of forwarding in the system (see Section 4), let $c$ denote the number of collaborators in the crowd, and let $n$ denote the total number of crowd members when the path is formed. The theorem below gives a sufficient condition on $p_f$, $c$, and $n$ to ensure probable innocence for the path initiator.

THEOREM 5.2   *If $n \geq (p_f/(p_f - 1/2))(c + 1)$, then the path initiator has probable innocence against $c$ collaborators.*

PROOF.   We want to show that $P(I \mid H_{1+}) \leq 1/2$ if $n \geq (p_f/(p_f - 1/2))(c + 1)$. First note that

$$P(H_i) = \left(\frac{p_f(n - c)}{n}\right)^{i-1}\left(\frac{c}{n}\right)$$

This is due to the fact that in order for the first collaborator to occupy the $i$th position on the path, the path must first wander to $i - 1$ noncollaborators (each time with probability $(n - c)/n$), each of which chooses to forward the path with probability $p_f$, and then to a collaborator (with probability $c/n$). The next two facts follow immediately from this.

$$P(H_{2+}) = \frac{c}{n}\sum_{k=1}^{\infty}\left(\frac{p_f(n - c)}{n}\right)^k = \left(\frac{c}{n}\right)\left(\frac{\dfrac{p_f(n - c)}{n}}{1 - \dfrac{p_f(n - c)}{n}}\right) = \frac{p_f c(n - c)}{n^2 - p_f n(n - c)}$$

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 12 of 27

Appx2402

$$P(H_{1+}) = \frac{c}{n} \sum_{k=0}^{\infty} \left( \frac{p_f(n-c)}{n} \right)^k = \left( \frac{c}{n} \right) \left( \frac{1}{1 - \frac{p_f(n-c)}{n}} \right) = \frac{c}{n - p_f(n-c)}$$

Other probabilities we need are $P(H_1) = c/n$, $P(I \mid H_1) = 1$, and $P(I \mid H_{2+}) = 1/(n-c)$. The last of these follows from the observation that if the first collaborator on the path occupies only the second or higher position, then it is immediately preceded on the path by any noncollaborating member with equal likelihood. Now, $P(I)$ can be captured as

$$P(I) = P(H_1)P(I \mid H_1) + P(H_{2+})P(I \mid H_{2+}) = \frac{c(n - np_f + cp_f + p_f)}{n^2 - p_f n(n-c)}$$

Then, since $I \Rightarrow H_{1+}$ we get

$$P(I \mid H_{1+}) = \frac{P(I \wedge H_{1+})}{P(H_{1+})} = \frac{P(I)}{P(H_{1+})} = \frac{n - p_f(n - c - 1)}{n}$$

So, if $n \geq (p_f/(p_f - 1/2))(c + 1)$, then $P(I \mid H_{1+}) \leq 1/2$. $\square$

As a result of Theorem 5.2, if $p_f = 3/4$, then probable innocence is guaranteed as long as $n \geq 3(c + 1)$. More generally, Theorem 5.2 implies a trade-off between the length of paths (i.e., performance) and ability to tolerate collaborators. That is, by making the probability of forwarding high, the fraction of collaborators that can be tolerated approaches half of the crowd. On the other hand, making the probability of forwarding close to one-half decreases the fraction of collaborators that can be tolerated.

The value of $P(H_{1+})$ derived in the proof of Theorem 5.2 shows that $P(H_{1+}) \to 0$ as $n \to \infty$ if $c$, $p_f$ are held constant. Assuming that collaborators cannot observe a path on which they occupy no positions, it follows that $P(\text{absolute privacy}) \xrightarrow[n \to \infty]{} 1$ for sender anonymity and receiver anonymity. The rate of this growth, however, can be slow if $p_f$ is large.

5.3.1 *Timing Attacks.*  So far the analysis of security against collaborating jondos has not taken timing attacks into account. The possibility of timing attacks in our system results from the structure of HTML, the language in which web pages are written. An HTML page can include a URL (e.g., the address of an image) that, when the page is retrieved, causes the user's browser to automatically issue another request.[2] It is the immediate nature of these requests that poses the greatest opportunity for

---

[2]These URLs are contained in, for example, the `src` attributes of `<embed>`, `<frame>`, `<iframe>`, `<img>`, `<input type=image>`, and `<script>` tags, the background attributes of `<body>`, `<table>`, `<tr>` and `<td>` tags, the content attributes of `<meta>` tags, and others.

timing attacks by collaborating jondos. Specifically, the first collaborating jondo on a path, upon returning a web page on that path containing a URL that will be automatically retrieved, can time the duration until it receives the request for that URL. If the duration is sufficiently short, then this could reveal that the collaborator's immediate predecessor is the initiator of the request.

In our present implementation, we eliminate such timing attacks as follows: When a jondo receives an HTML reply to a request that it either received directly from a user's browser or submitted directly to an end server—i.e., the jondo is either the user's jondo (i.e., the path initiator) or the last jondo on the path—it parses the HTML page to identify all URLs that the user's browser will automatically request as a result of receiving this reply. The last jondo on the path requests these URLs and sends the replies back along the same path on which the original request was received. The user's jondo, upon receiving requests for these URLs from the user's browser, does *not* forward these requests on the path, but rather simply waits for the URLs' contents to arrive on the path and then feeds them to the browser. In this way, other jondos on the path never see the requests that are generated by the browser, and thus cannot glean timing information from them. Note that misbehavior by the last jondo on the path (or any intermediate jondo) can result only in a denial of service, and not in a successful timing attack. In particular, if an attacking jondo inserts an embedded URL into the returning page, the user's jondo will identify it and expect the URL contents to arrive, but will not forward the request for the URL that the user's browser initiates.

This mechanism prevents jondos other than the user's from observing requests automatically generated due to the retrieval of a page. Therefore, all requests observable by attacking jondos are generated by explicit user action. It is conceivable that a user's response to a page (e.g., clicking on a contained URL), if sufficiently rapid, could reveal to the jondo in the first position on the path that its predecessor is the initiator of the path, in a way similar to how an automatic request might. However, the user's response would need to be extremely fast—typically within a fraction of a second of viewing the page—to risk revealing this information. We expect that such response times are uncharacteristic of human browsing, and can be made even less so by educating users of this risk. If, however, this presumption turns out to be incorrect, the user's jondo could insert a random delay per user-generated request, thereby decreasing the chances of revealing this information to virtually zero.

The primary drawback of our present approach to defending against timing attacks is that it is not easily compatible with some web technologies. For example, web pages that contain executable scripts, e.g., written in JavaScript, can make it difficult for a jondo to identify in advance the URLs that a browser will automatically request as a result of interpreting those pages. One way to address this is for the user's jondo to delay requests received from the browser immediately after feeding the browser a page containing JavaScript. A more foolproof defense, which we recom-

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 14 of 27

Appx2404

mend, is for the user to disable JavaScript in the browser when browsing via Crowds; this can be done easily via a preference menu in most browsers. Another technology that presents some difficulties is SSL, a protocol by which web pages can be encrypted during transport. To enable both the user's jondo and the last jondo on the path to parse SSL-retrieved pages, the SSL connection to the web server must be made by the last jondo on the path. In this case, HTTP communication is not protected from jondos on the path, but is protected from other eavesdroppers because all communication between jondos is encrypted. At the time of this writing, SSL is not supported by Crowds.

5.3.2 *Static Paths.* Early in the design of Crowds, we were tempted to make paths much more dynamic than they are in the present system, e.g., by having a jondo use a different path for each of its users, per time period, or even per user request. The advantages of more dynamic paths include the potential for better performance via load balancing among the crowd. In this section, however, we caution that dynamic paths tends to decrease the anonymity properties provided by the system against collaborating jondos. The reason is that the probable innocence offered by Theorem 5.2 vanishes if the collaborators are able to link many distinct paths as being initiated by the same jondo. Collaborating jondos might be able to link paths initiated by the same unknown jondo based on related path content or timing of communication on paths. To prevent this, we made paths static, so the attacker simply does not have multiple paths to link to the same jondo.

To see why multiple linked paths initiated by the same jondo could compromise its user's anonymity, note that collaborating jondos have a higher probability of receiving each path initiation message (i.e., the first request on the path) from the initiator of the path than from any other individual member (see the proof of Theorem 5.2). Multiple paths initiated by the same user's jondo therefore pinpoint that jondo as the one from which the collaborators most often receive the initiating messages. Put another way, if the collaborators identify paths $P_1, \ldots, P_k$ from the same (unknown) initiator, then the expected number of paths on which the first collaborator is directly preceded by the path initiator is

$$\mu = k\left(\frac{(n - p_f(n - c - 1))}{n}\right).$$

By Chernoff bounds, the probability that the first collaborator is immediately preceded by the initiator on substantially fewer of these paths is small: the first collaborator is immediately preceded by the path initiator on fewer than $(1 - \delta)\mu$ paths with probability only $e^{-\mu\delta^2/2}$ (see Motwani and Raghavan [1995, Theorem 4.2]). Thus, the initiator would be identified with high probability.

Again, it is for this reason that a jondo sets up one path for all its users' communications, and this path is altered only under two circumstances.

Appx2405

First, a path is altered when failures are detected in the path. More specifically, paths are only rerouted when the failure of a jondo is unmistakenly detected, i.e., when the jondo executes a *fail-stop* failure [Schlichting and Schneider 1983]. In our present implementation, such failures are detected by the TCP/IP connection to the jondo breaking or being refused; a jondo does not reroute a path based on simply timing out on the subsequent jondo in the path (see line 23 of Figure 3). While this increases our sensitivity to denial-of-service attacks (see Section 2.3), it strengthens our promise of anonymity to the user.

A reasonable question, however, is whether a malicious jondo on a path can feign its own failure in hopes that the path will be rerouted through a collaborator, yielding information that incriminates the path initiator. Fortunately, the answer is "no." If a jondo in a path fails (or appears to fail), the path remains the same up until the predecessor of that faulty jondo, who reroutes the remainder of the path randomly (line 26 of Figure 3). Since the collaborating jondos cannot distinguish whether that predecessor is the originator or not, the random choices made by that predecessor yield no additional information to the collaborators.

The second circumstance in which paths are altered is when new jondos join the crowd. The motivation for rerouting paths is to protect the anonymity of a joining jondo: if existing paths remained static, then the joiner's new path can be easily attributed to the new jondo when it is formed. Thus, to protect joiners, all jondos "forget" all paths after new jondos join, and re-establish paths from scratch. To avoid exposing path initiators to the attack described previously in this section, joins are grouped into infrequent scheduled events called *join commits* (see Section 8). Once a join commit occurs, existing paths are forgotten, and the newly joined jondos are enabled to participate in the crowd. Batching many joins into a single join commit limits the number of times that paths are rerouted and thus the number of paths vulnerable to linkage by collaborators. Moreover, each user is alerted when a join commit occurs and is cautioned from continuing to browse content related to what she was browsing prior to the commit, lest collaborators are attempting to link paths based on that content.

## 6. PERFORMANCE

In this section we describe the performance of Crowds 1.0. As discussed in Section 3, performance is one of the motivating factors behind the design of Crowds and, we believe, a strength of our approach relative to mixes [Chaum 1981] (though there are few published performance results for mix implementations to which to compare our results). And, while Crowds performance is already encouraging, it could be improved further by re-implementing it in a compiled language such as C. Crowds 1.0 is implemented in Perl 5 (a partially interpreted language), which we chose for its rapid prototyping capabilities and its portability across Unix and Microsoft platforms.

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 16 of 27

Appx2406



| Path | Page size (kbytes) | | | | | |
|------|------|------|------|------|------|------|
| length | 0 | 1 | 2 | 3 | 4 | 5 |
| 1 | 288 | 247 | 264 | 294 | 393 | 386 |
| 2 | 573 | 700 | 900 | 1157 | 1369 | 1384 |
| 3 | 692 | 945 | 1113 | 1316 | 1612 | 1748 |
| 4 | 814 | 1004 | 1191 | 1421 | 1623 | 1774 |
| 5 | 992 | 1205 | 1446 | 1620 | 1870 | 2007 |

Fig. 4. Response latency (msecs) as a function of path length and page size.

Results of performance tests on our implementation are shown in Figures 4–5. In these tests, the source of requests was a Netscape 3.01 browser configured to allow a maximum of 4 simultaneous network connections. The crowd consisted of four jondos, each executing on a separate, moderately loaded 150–MHz Sparc 20 running SunOS 4.1.4. The web server was a fairly busy 133–MHz SGI workstation running Irix 5.3 and an Apache web server. All of these computers are located in AT&T Labs, and thus are in close network proximity to one another.

Figure 4 shows the mean latency in milliseconds of retrieving web pages of various sizes (containing no embedded URLs) for various path lengths. Each number indicates the average duration beginning when the user's jondo receives the request from the browser and ending when the page has been written back to the browser. In this figure, the path length is the number of *appearances* of jondos on the path. That is, if a jondo appears $k$ times on a path, then this jondo contributes $k$ to the total path length. So, for example, in Figure 2, the paths initiated by jondos 1, 4, and 6 are each of length two, and the paths initiated by 2, 3, and 5 are each of length three.

One observation we can make from Figure 4 is that the latency sharply increases when the path length increases from one to two. The primary reason for the sharp increase is that a path length of two is the first length at which encryption of page contents takes place. In a path of length one (which would be employed only if there were one crowd member), the user's jondo acts as a simple proxy between the browser and end server, to strip

Appx2407



| Path | Number of 1-kbyte images | | | | |
|------|------|------|------|------|------|
| length | 5 | 10 | 15 | 20 | 25 |
| 1 | 2069 | 4200 | 5866 | 7219 | 8557 |
| 2 | 3313 | 4915 | 6101 | 8195 | 10994 |
| 3 | 4127 | 5654 | 7464 | 9611 | 11809 |
| 4 | 4122 | 6840 | 8156 | 10380 | 11823 |
| 5 | 4508 | 7644 | 9388 | 11889 | 13438 |

Fig. 5. Response latency (msecs) as a function of path length and number of embedded images.

away identifying information from HTTP headers. In a path of length two, however, both the request and reply are passed, and encrypted, between the jondos on the path. To slow the growth of this latency as the path gets longer, this encryption is performed using a *path key*, which is a key shared among all jondos on a path. A path key is created by the jondo initiating the path, and each jondo on a path forwards it to the next jondo by encrypting the path key with a key it shares with the next jondo (see Section 8). The existence of a path key enables requests to be encrypted at the jondo initiating the path, decrypted by the last jondo in the path, and passed by intermediate jondos without encrypting or decrypting the requests. Similarly, replies are encrypted at the last jondo in the path, and decrypted only at the jondo where the path was initiated. The cryptographic operations are performed using an efficient stream cipher, allowing some of the encrypting and decrypting streams for the reply to be generated while the jondos are waiting for the reply from the web server. However, since even this cipher is implemented in Perl for portability, it remains a bottleneck in our implementation.

Figure 5 shows the mean latency in milliseconds of retrieving, via paths of various different lengths, pages containing URLs that are automatically retrieved by the browser (see Section 5.3.1). In these tests, each embedded URL is the address of a 1-kilobyte image resident on the same server as the page that referenced it. Each number indicates the average duration beginning when the user's jondo receives the initial request from the browser and ending when the jondo finishes writing the page and all of the

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 18 of 27

Appx2408

images on the page to the browser. It is clear from Figure 5 that the number of images considerably impacts the latency of responses. Though this is to be expected in general, this effect is particularly pronounced in our implementation, and is due primarily to encryption costs. Moreover, returning images on the path has the effect of serializing their retrieval, which further increases the latency over that achieved by modern browsers alone (which use several network connections to retrieve multiple images concurrently).

Because paths (and thus path lengths) are established randomly at run time, the user cannot choose her path length to predict the request latency she experiences. However, the expected path length can be influenced by modifying the value $p_f$—i.e., the probability that a jondo forwards to another jondo versus submitting to the end server—at all jondos. Specifically, if $n > 1$, the expected length of a path is

$$(1 - p_f) \sum_{k=0}^{\infty} (k + 2)(p_f)^k = (1 - p_f)[\sum_{k=0}^{\infty} k(p_f)^k + 2 \sum_{k=0}^{\infty} (p_f)^k]$$

$$= (1 - p_f)\left[\frac{p_f}{(1 - p_f)^2} + \frac{2}{1 - p_f}\right]$$

$$= \frac{p_f}{1 - p_f} + 2$$

This suggests that multiple types of crowds should exist: those employing a small $p_f$ for better performance but less resilience to collaborating jondos (see Theorem 5.2), and those using a large $p_f$ to increase security with a cost to performance.

Performance seen in practice may differ from Figures 4 and 5, depending on the platforms running jondos and the speed of network connectivity between jondos. In particular, a jondo connected to the Internet via a slow modem link considerably impacts latencies on paths that use it. Again, this suggests multiple types of crowds, namely ones containing only jondos connected via fast links, and ones allowing jondos connected via slower links.

## 7. SCALE

The numbers in Section 6 give little insight into how performance is affected as crowd size grows. We do not have sufficient resources to measure the performance of a crowd involving hundreds of computers, each simultaneously issuing requests. However, in this section, we make some simple analytic arguments to show that the performance should scale well.

The measure of scale that we evaluate is the expected total number of appearances that each jondo makes on all paths at any point in time. For

Appx2409

example, if a jondo occupies two positions on one path and one position on another, then it makes a total of three appearances on these paths. Theorem 7.1 says that the each jondo's expected number of appearances on paths is virtually constant as a function of the size of the crowd. This suggests that crowds should be able to grow quite large.

THEOREM 7.1  *In a crowd of size $n$, the expected total number of appearances that any jondo makes on all paths is*

$$O\left(\frac{1}{(1 - p_f)^2}\left(1 + \left(\frac{1}{n}\right)\right)\right).$$

PROOF.  Let $n$ be the size of the crowd. To compute the load on a jondo, say $J$, we begin by computing the distribution of the number of appearances made by $J$ on each path. Let $R_i$, $i > 0$, denote the event that this path reaches $J$ exactly $i$ times (not counting the first if $J$ initiated the path). Also, define $R_0$ as follows:

$$P(R_0) = (1 - p_f)\sum_{k=0}^{\infty}(p_f)^k\left(\frac{n-1}{n}\right)^k = (1 - p_f)\left(\frac{1}{1 - p_f\dfrac{n-1}{n}}\right)$$

Intuitively, $P(R_0)$ is the probability that the path, once it has reached $J$, will never reach $J$ again. Then, we have

$$P(R_1) = \frac{1}{n}P(R_0)\sum_{k=0}^{\infty}(p_f)^k\left(\frac{n-1}{n}\right)^k = (1 - p_f)\left(\frac{1}{n}\right)\left(\frac{1}{1 - p_f\dfrac{n-1}{n}}\right)^2$$

$$P(R_2) = \frac{1}{n}p_f P(R_1)\sum_{k=0}^{\infty}(p_f)^k\left(\frac{n-1}{n}\right)^k < (1 - p_f)\left(\frac{1}{n}\right)^2\left(\frac{1}{1 - p_f\dfrac{n-1}{n}}\right)^3$$

$$\vdots$$

$$P(R_i) = \frac{1}{n}p_f P(R_{i-1})\sum_{k=0}^{\infty}(p_f)^k\left(\frac{n-1}{n}\right)^k < (1 - p_f)\left(\frac{1}{n}\right)^i\left(\frac{1}{1 - p_f\dfrac{n-1}{n}}\right)^{i+1}$$

From this, the expected number of appearances that $J$ makes on a path formed by another jondo is bounded from above by:

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 20 of 27

Appx2410

86    •    M. K. Reiter and A. D. Rubin

$$\left(\frac{1-p_f}{1-p_f\dfrac{n-1}{n}}\right)\left[\sum_{k=0}^{\infty}k\left(\frac{1}{n-p_f(n-1)}\right)^k\right]$$

$$=\left(\frac{1-p_f}{1-p_f\dfrac{n-1}{n}}\right)\left(\frac{n-p_f(n-1)}{(1-n+p_f(n-1))^2}\right)$$

$$<\frac{n-p_f(n-1)}{(1-n+p_f(n-1))^2}$$

$$=\frac{1}{(1-p_f)(n-1)}+\frac{1}{((1-p_f)(n-1))^2}$$

$$<\frac{2}{(1-p_f)^2(n-1)}$$

Therefore, the expected number of appearances that $J$ makes on all paths is bounded from above by:

$$\frac{2n}{(1-p_f)^2(n-1)}=\frac{2}{(1-p_f)^2}\left(1+\frac{1}{n-1}\right)\qquad\square$$

## 8. CROWD MEMBERSHIP

The membership maintenance procedures of a crowd are those procedures that determine who can join the crowd and when they can join, and that inform members of the crowd membership. We discuss mechanisms for maintaining crowd membership in Section 8.1, and policies regarding who can join a crowd in Section 8.2.

### 8.1 Mechanism

There are many schemes that could be adopted to manage membership of the crowd. Existing *group membership protocols*, tolerant either of benign (e.g., Cristian [1991]; Ricciardi and Birman [1991]; Moser, Melliar-Smith, and Agrawala [1991]) or malicious [Reiter 1996b] faults, can be used for maintaining a consistent view of the membership among all jondos, and the members could use voting to determine whether an authenticated prospective member should be admitted to the crowd. Indeed, a similar approach has been adopted in prior work on secure process groups [Reiter, Birman, and van Renesse 1994]. While providing robust distributed solutions, these approaches have the disadvantages of incurring significant overhead and of providing semantics that are arguably too strong for the application at hand. In particular, a hallmark of these approaches is a guaranteed

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 21 of 27

Appx2411

consistent view of the group membership among the group members, whereas it is unclear whether such a strong guarantee is required here.

In our present implementation we have therefore opted for a simpler, centralized solution. Membership in a crowd is controlled and reported to crowd members by a server called the *blender*. To make use of the blender (and thus the crowd), the user must establish an *account* with the blender, i.e., an account name and password that the blender stores. When the user starts a jondo, the jondo and the blender use this shared password to authenticate each other's communication. As a result of that communication (and if the blender accepts the jondo into the crowd; see Section 8.2), the blender adds the new jondo (i.e., its IP address, port number, and account name) to its list of members, and reports this list back to the jondo. In addition, the blender generates and reports back a list of shared keys, each of which can be used to authenticate another member of the crowd. The blender then sends each key to the other jondo that is intended to share it (encrypted under the account password for that jondo) and informs the other jondo of the new member. At this point all members are equipped with the data they need for the new member to participate in the crowd. However, to protect itself from attacks described in Section 5.3.2, the new member refrains from doing so until it receives a "join commit" message from the blender. This is discussed further in Section 8.2.

Each member maintains its own list of the crowd membership. This list is initialized to that received from the blender when the jondo joins the crowd, and is updated when the jondo receives notices of new or deleted members from the blender. The jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed (see line 25 of Figure 3). This allows for each jondo's list to diverge from others' if different jondos have detected different failures in the crowd. This appears to have little qualitative effect on our security analysis of Section 5, unless attackers are able to prevent communications between correct jondos to the extent that each removes the correct jondos from its list of members.

A disadvantage of this approach to membership maintenance is that the blender is a trusted third party for the purposes of key distribution and membership reporting. Techniques exist for distributing trust in such a third party among many "third party replicas," in a way that the corruption of some fraction of the replicas can be tolerated (e.g., Deswarte, Blain, and Fabre [1991]; Gong [1993]; Reiter [1996a]). In its present, non-replicated form, however, the blender is best executed on a secure computer, e.g., with login access available only at the console. Even though it is a trusted third party for some functions, note that users' HTTP communication is *not* routed through the blender, and thus a passive attack on the blender does not immediately reveal users' web transactions (unlike the Anonymizer; see Section 3). Moreover, the failure of the blender does not interfere with ongoing web transactions (again unlike the Anonymizer). We anticipate that, in future versions of Crowds, jondos will establish shared keys using Diffie-Hellman key exchange [Diffie and Hellman 1976], where the blender

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 22 of 27

Appx2412

serves only to distribute the Diffie-Hellman public keys of crowd members. This will eliminate the present reliance on the blender for key generation.

## 8.2 Policy

It is important, in light of Section 5, that some degree of control over crowd membership be maintained. First, if anyone can add arbitrarily many jondos to a crowd, then a single attacker could launch enough collaborating jondos so that $n < (p_f/(p_f - 1/2))(c + 1)$, at which point Theorem 5.2 no longer offers protection. Second, since joins cause paths to be re-routed (see Section 5.3.2), if joins are allowed to occur frequently and without controls, then paths may be re-routed sufficiently frequently to allow collaborating jondos to mount the correlation attack described in Section 5.3.2. In our present implementation, the blender serves as the point at which joins to the crowd are controlled.

To address the latter concern, the blender batches joins together so they occur in one scheduled, discrete event called a *join commit*. The schedule of join commits is a configurable parameter of the blender, but we envision that one commit per day should typically suffice. The blender informs all crowd members of the join commit, at which point all newly joined members are enabled to participate in the crowd and all old members reset their paths, as described in Section 5.3.2.

The need to limit the number of collaborators that join the crowd suggests that two different types of crowds will exist. The first type would consist of a relatively small (e.g., 10–30) collection of individuals who, based on personal knowledge of each other, agree to form a crowd together. Each member would be allowed to include at most one jondo in the crowd. More precisely, each person would be given one account, and only one jondo per account would be allowed. Each member's personal knowledge of the other members enables her to trust that sufficiently few members collaborate to ensure that $n \geq (p_f/(p_f - 1/2))(c + 1)$.

The second type of crowd would be a much larger "public" crowd, admitting members that might not be known to a substantial fraction of the present membership. The privacy offered by the crowd against collaborating members would rely on the size of the crowd being so large that an attack aimed at making $n < (p_f/(p_f - 1/2))(c + 1)$ would require considerable effort to go undetected. That is, by limiting each user to one account (e.g., the blender administrator sets up an account for a user only after receiving a written, notarized request from that user) and each account to one jondo, and by monitoring and limiting the number of jondos on any one network (using IP address), the attacker would be forced to launch jondos using many different identities and on many different networks to succeed.

## 9. USER INTERFACE

In our present implementation, there are several ways in which a user interacts with her jondo, i.e., the jondo that serves as the HTTP proxy of her browser.

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.



Fig. 6. **Crowd query:** A crowd query shows the jondos that are available, and indicates which one is acting as the user's HTTP proxy for the browser.

(1) The user can issue a *crowd query* by appending `?crowd?` to the end of any URL that she requests. This returns a list of all of the active jondos in the crowd, according to her jondo. The information includes each jondo's account name, its IP address and its port number. An example is shown in Figure 6.

(2) When a user is browsing via the crowd, the word *Crowd:* is prepended to the title of each page. Thus, a user can check whether or not she is using the crowd by looking at the title of the documents in the browser. Of course, a web server could add this word to the title of any document to fool the user, and so this alone should not be relied upon.

(3) Crowds offers other informational pages to the user via the browser, similar to Figure 6. For example, Crowds alerts the user when a join commit occurs.

The savvy Crowds user can also fine-tune her jondo's behavior by way of a configuration file that defines the behavior of her jondo. This configuration file includes, for example, parameter settings to allow or disallow the passage of *cookies*, i.e., data that a web server can download to the user's browser and that the user's browser will include in subsequent requests to

that server. By default, a jondo strips all cookies out of requests it receives from browsers in order to better protect its users' privacy, but the jondo can be configured to let cookies pass. Other configurable parameters of a jondo include, for example, the host and port of the crowd blender, and the account name and password under which the jondo requests admission to the crowd. In the future, other configuration options may be added to give the user further control over her jondo. For example, a parameter could be included to define a threshold so that if the number of crowd members drops below this value, then the user is alerted to this fact. Other parameters could be included that specify which HTTP headers are allowed to pass in requests (presently a jondo strips away any that contain information characterizing the user or her platform) or what types of content (e.g., Java, JavaScript) are allowed to pass into the browser.

## 10. FIREWALLS

Firewalls present a problem for Crowds. Like all network servers, jondos are identified by their IP address and port number. Most corporate firewalls do not allow incoming connections on ports other than a few well-known ones. Thus, a firewall will generally prevent a jondo outside the firewall from connecting to another behind the firewall. For this reason, firewalls represent a barrier to wide-scale intercorporation adoption of Crowds.

Since most firewalls are configured to allow outgoing connections on any port, it is still possible for a jondo to initiate a path that goes outside the firewall and eventually to web servers. However, the firewall gives the first jondo on the path outside that domain a way to verify that the initiating computer resides within the domain: it simply tries to open a connection back to its predecessor on the path, and if that fails, then the path must have originated in the predecessor's domain. Thus, a crowd member behind a firewall is not offered the same anonymity as those that are not.

It is conceivable that if Crowds becomes widespread, and there is demand for a special reserved port, that firewalls can open this port and allow jondos to communicate. Until then, Crowds will be most useful across academic institutions, as a service provided by Internet service providers, and within large corporations.

## 11. CONCLUSION

In this paper we have presented a novel approach to protecting users' privacy while retrieving information on the world-wide-web, and a system that implements it. Our approach works by grouping web users into a geographically diverse collection, called a *crowd*, which retrieves information on its users' behalf by way of a simple randomized routing protocol. Using *degrees of anonymity*, we have characterized the anonymity properties provided by this protocol against several classes of attackers. We have also described the Crowds system that we have implemented, the measures it takes to defend against various attacks resulting from the way the web

works today, and the performance, scalability, and limitations of our system. The principles behind our system can be more broadly applied for anonymizing other forms of communication.

At the time of this writing, we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at `http://www.re-search.att.com/projects/crowds`.

ACKNOWLEDGMENTS

We thank Gerrit Bleumer, Marc Briceno, Hal Finney, Ian Goldberg, David Goldschlag, Raph Levien, Jim McCoy, Fabian Monrose, Michael Reed, Paul Syverson, and David Wagner for many valuable suggestions regarding Crowds and this paper.

REFERENCES

BRIER, S. 1997. How to keep your privacy: Battle lines get clearer. *New York Times* (Jan. 13).

CHAUM, D. 1981. Untraceable electronic mail, return addresses, and digital pseudonyms. *Commun. ACM 24*, 2 (Feb.), 84–88.

CRISTIAN, F. 1991. Reaching agreement on processor group membership in synchronous distributed systems. *Distrib. Comput. 4*, 175–187.

DESWARTE, Y., BLAIN, L., AND FABRE, J. 1991. Intrusion tolerance in distributed computing systems. In *Proceedings of the 1991 IEEE Symposium on Research on Security and Privacy*. IEEE Computer Society Press, Los Alamitos, CA, 110–121.

DIFFIE, W. AND HELLMAN, M. E. 1976. New directions in cryptography. *IEEE Trans. Inf. Theor. 22*, 6.

GABBER, E., GIBBONS, P., MATIAS, Y., AND MAYER, A. 1997. How to make personalized web browsing simple, secure, and anonymous. In *Proceedings of the Conference on Financial Cryptography*. Springer-Verlag, New York, NY.

GARFINKEL, S. AND SPAFFORD, G. 1997. *Web Security and Commerce*. O'Reilly and Associates.

GONG, L. 1993. Increasing availability and security of an authentication service. *IEEE J. Sel. Areas Commun. 5*, 11 (June), 657–662.

GULCU, C. AND TSUDIK, G. 1996. Mixing e-mail with BABEL. In *Proceedings of the Symposium on Network and Distributed System Security*. 2–16.

MILLER, L. 1997. No solitude in cyberspace. *USA Today* (June 9).

MOSER, L. E., MELLIAR-SMITH, P. M., AND AGRAWALA, V. 1991. Membership algorithms for asynchronous distributed systems. In *Proceedings of the 11th IEEE International Conference on Distributed Computing Systems* (Arlington, TX, May). IEEE Computer Society Press, Los Alamitos, CA, 480–488.

MOTWANI, R. AND RAGHAVAN, P. 1995. *Randomized Algorithms*. Cambridge University Press, New York, NY.

PFITZMANN, A. AND PFITZMANN, B. 1989. How to break the direct RSA-implementation of mixes. In *Proceedings of the Conference on Advances in Cryptology* (EUROCRYPT '89).

PFITZMANN, A., PFITZMANN, B., AND WAIDNER, M. 1991. ISDN-mixes: Untraceable communication with very small bandwidth overhead. In *Proceedings of the GI/ITG Conference on Communication in Distributed Systems*. 451–463.

PFITZMANN, A. AND WAIDNER, M. 1987. Networks without user observability. *Comput. Secur. 2*, 6, 158–166.

REITER, M. K. 1996. Distributing trust with the Rampart toolkit. *Commun. ACM 39*, 4 (Apr.), 71–74.

REITER, M. K. 1996. A secure group membership protocol. *IEEE Trans. Softw. Eng. 22* (Jan.), 31–42.

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 26 of 27

Appx2416

REITER, M. K., BIRMAN, K. P., AND VAN RENESSE, R. 1994. A security architecture for fault-tolerant systems. *ACM Trans. Comput. Syst. 12*, 4 (Nov.), 340–371.

RICCIARDI, A. M. AND BIRMAN, K. P. 1991. Using process groups to implement failure detection in asynchronous environments. In *Proceedings of the 10th Annual ACM Symposium on Principles of Distributed Computing* (PODC '91, Montreal, Que., Canada, Aug. 19–21, 1991). ACM Press, New York, NY, 341–353.

SCHLICHTING, R. D. AND SCHNEIDER, F. B. 1983. Fail stop processors: An approach to designing fault-tolerant computing systems. *ACM Trans. Comput. Syst. 1*, 222–238.

SYVERSON, P. F., GOLDSCHLAG, D. M., AND REED, M. G. 1997. Anonymous connections and onion routing. In *Proceedings of the 1997 IEEE Symposium on Security and Privacy*. IEEE Press, Piscataway, NJ.

Received: June 1997;  revised: March 1998;  accepted: March 1998

ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998.

Page 27 of 27

Appx2417

```
Network Working Group                                    R. Fielding
Request for Comments: 2616                                  UC Irvine
Obsoletes: 2068                                            J. Gettys
Category: Standards Track                                 Compaq/W3C
                                                         J. C. Mogul
                                                              Compaq
                                                         H. Frystyk
                                                             W3C/MIT
                                                         L. Masinter
                                                               Xerox
                                                            P. Leach
                                                           Microsoft
                                                     T. Berners-Lee
                                                             W3C/MIT
                                                          June, 1999
```

# Hypertext Transfer Protocol -- HTTP/1.1

## Status of this Memo

This document specifies an Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. Please refer to the current edition of the "Internet Official Protocol Standards" (STD 1) for the standardization state and status of this protocol. Distribution of this memo is unlimited.

## Copyright Notice

Copyright (C) The Internet Society (1999). All Rights Reserved.

## Abstract

The Hypertext Transfer Protocol (HTTP) is an application-level protocol for distributed, collaborative, hypermedia information systems. It is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems, through extension of its request methods, error codes and headers [47]. A feature of HTTP is the typing and negotiation of data representation, allowing systems to be built independently of the data being transferred.

HTTP has been in use by the World-Wide Web global information initiative since 1990. This specification defines the protocol referred to as "HTTP/1.1", and is an update to RFC 2068 [33].

Code200
Ex. 1006
Page 1 of 114

Appx2418

# Table of Contents

**HYPERTEXT TRANSFER PROTOCOL -- HTTP/1.1**.................................................**1**

**Status of this Memo** .................................................................................**1**

**Copyright Notice** ....................................................................................**1**

**Abstract** .................................................................................................**1**

**Table of Contents**...................................................................................**2**

| | | |
|---|---|---|
| **1** | **Introduction** | **7** |
| | 1.1 Purpose | 7 |
| | 1.2 Requirements | 7 |
| | 1.3 Terminology | 8 |
| | 1.4 Overall Operation | 10 |
| **2** | **Notational Conventions and Generic Grammar** | **11** |
| | 2.1 Augmented BNF | 11 |
| | 2.2 Basic Rules | 12 |
| **3** | **Protocol Parameters** | **13** |
| | 3.1 HTTP Version | 13 |
| | 3.2 Uniform Resource Identifiers | 14 |
| | 3.2.1 General Syntax | 14 |
| | 3.2.2 http URL | 14 |
| | 3.2.3 URI Comparison | 15 |
| | 3.3 Date/Time Formats | 15 |
| | 3.3.1 Full Date | 15 |
| | 3.3.2 Delta Seconds | 16 |
| | 3.4 Character Sets | 16 |
| | 3.4.1 Missing Charset | 16 |
| | 3.5 Content Codings | 16 |
| | 3.6 Transfer Codings | 17 |
| | 3.6.1 Chunked Transfer Coding | 18 |
| | 3.7 Media Types | 18 |
| | 3.7.1 Canonicalization and Text Defaults | 19 |
| | 3.7.2 Multipart Types | 19 |
| | 3.8 Product Tokens | 20 |
| | 3.9 Quality Values | 20 |
| | 3.10 Language Tags | 20 |
| | 3.11 Entity Tags | 20 |
| | 3.12 Range Units | 21 |
| **4** | **HTTP Message** | **21** |
| | 4.1 Message Types | 21 |
| | 4.2 Message Headers | 21 |
| | 4.3 Message Body | 22 |
| | 4.4 Message Length | 23 |
| | 4.5 General Header Fields | 23 |

Appx2419

**5      Request** ........................................................................................................**24**
   5.1      Request-Line ..................................................................................................24
      5.1.1      Method ......................................................................................................24
      5.1.2      Request-URI .............................................................................................24
   5.2      The Resource Identified by a Request .........................................................25
   5.3      Request Header Fields ...................................................................................26

**6      Response** ......................................................................................................**26**
   6.1      Status-Line ....................................................................................................26
      6.1.1      Status Code and Reason Phrase .................................................................26
   6.2      Response Header Fields .................................................................................28

**7      Entity** ...........................................................................................................**28**
   7.1      Entity Header Fields .....................................................................................28
   7.2      Entity Body ...................................................................................................29
      7.2.1      Type ..........................................................................................................29
      7.2.2      Entity Length .............................................................................................29

**8      Connections** ................................................................................................**29**
   8.1      Persistent Connections ..................................................................................29
      8.1.1      Purpose ......................................................................................................29
      8.1.2      Overall Operation ......................................................................................30
      8.1.3      Proxy Servers ...........................................................................................31
      8.1.4      Practical Considerations ............................................................................31
   8.2      Message Transmission Requirements ...........................................................31
      8.2.1      Persistent Connections and Flow Control ................................................31
      8.2.2      Monitoring Connections for Error Status Messages .................................31
      8.2.3      Use of the 100 (Continue) Status .............................................................32
      8.2.4      Client Behavior if Server Prematurely Closes Connection ......................33

**9      Method Definitions** ....................................................................................**33**
   9.1      Safe and Idempotent Methods ......................................................................33
      9.1.1      Safe Methods .............................................................................................33
      9.1.2      Idempotent Methods ..................................................................................34
   9.2      OPTIONS .......................................................................................................34
   9.3      GET .................................................................................................................35
   9.4      HEAD ..............................................................................................................35
   9.5      POST ...............................................................................................................35
   9.6      PUT .................................................................................................................36
   9.7      DELETE ..........................................................................................................36
   9.8      TRACE ............................................................................................................37
   9.9      CONNECT .......................................................................................................37

**10     Status Code Definitions** ..........................................................................**37**
   10.1     Informational 1xx ..........................................................................................37
      10.1.1     100 Continue .............................................................................................37
      10.1.2     101 Switching Protocols ...........................................................................38
   10.2     Successful 2xx ...............................................................................................38
      10.2.1     200 OK ......................................................................................................38
      10.2.2     201 Created ...............................................................................................38
      10.2.3     202 Accepted .............................................................................................38
      10.2.4     203 Non-Authoritative Information ..........................................................39
      10.2.5     204 No Content ..........................................................................................39
      10.2.6     205 Reset Content ......................................................................................39
      10.2.7     206 Partial Content ....................................................................................39

Appx2420

10.3      Redirection 3xx...................................................................................................40
    10.3.1      300 Multiple Choices....................................................................................40
    10.3.2      301 Moved Permanently...............................................................................40
    10.3.3      302 Found......................................................................................................40
    10.3.4      303 See Other................................................................................................41
    10.3.5      304 Not Modified..........................................................................................41
    10.3.6      305 Use Proxy...............................................................................................41
    10.3.7      306 (Unused).................................................................................................41
    10.3.8      307 Temporary Redirect................................................................................42
10.4      Client Error 4xx..................................................................................................42
    10.4.1      400 Bad Request............................................................................................42
    10.4.2      401 Unauthorized..........................................................................................42
    10.4.3      402 Payment Required...................................................................................42
    10.4.4      403 Forbidden................................................................................................42
    10.4.5      404 Not Found................................................................................................43
    10.4.6      405 Method Not Allowed..............................................................................43
    10.4.7      406 Not Acceptable.......................................................................................43
    10.4.8      407 Proxy Authentication Required...............................................................43
    10.4.9      408 Request Timeout.....................................................................................43
    10.4.10     409 Conflict...................................................................................................43
    10.4.11     410 Gone........................................................................................................44
    10.4.12     411 Length Required......................................................................................44
    10.4.13     412 Precondition Failed.................................................................................44
    10.4.14     413 Request Entity Too Large........................................................................44
    10.4.15     414 Request-URI Too Long............................................................................44
    10.4.16     415 Unsupported Media Type.........................................................................44
    10.4.17     416 Requested Range Not Satisfiable.............................................................44
    10.4.18     417 Expectation Failed..................................................................................45
10.5      Server Error 5xx..................................................................................................45
    10.5.1      500 Internal Server Error...............................................................................45
    10.5.2      501 Not Implemented.....................................................................................45
    10.5.3      502 Bad Gateway...........................................................................................45
    10.5.4      503 Service Unavailable.................................................................................45
    10.5.5      504 Gateway Timeout....................................................................................45
    10.5.6      505 HTTP Version Not Supported .................................................................45

11        Access Authentication.......................................................................................46

12        Content Negotiation...........................................................................................46
12.1      Server-driven Negotiation....................................................................................46
12.2      Agent-driven Negotiation....................................................................................47
12.3      Transparent Negotiation.......................................................................................47

13        Caching in HTTP................................................................................................47
    13.1.1      Cache Correctness..........................................................................................48
    13.1.2      Warnings.........................................................................................................49
    13.1.3      Cache-control Mechanisms.............................................................................49
    13.1.4      Explicit User Agent Warnings.........................................................................49
    13.1.5      Exceptions to the Rules and Warnings............................................................50
    13.1.6      Client-controlled Behavior..............................................................................50
13.2      Expiration Model.................................................................................................50
    13.2.1      Server-Specified Expiration............................................................................50
    13.2.2      Heuristic Expiration........................................................................................51
    13.2.3      Age Calculations.............................................................................................51
    13.2.4      Expiration Calculations...................................................................................52

Appx2421

13.2.5    Disambiguating Expiration Values ...........................................................53
13.2.6    Disambiguating Multiple Responses ........................................................53
13.3    Validation Model ..........................................................................................53
13.3.1    Last-Modified Dates ...............................................................................54
13.3.2    Entity Tag Cache Validators ...................................................................54
13.3.3    Weak and Strong Validators ...................................................................54
13.3.4    Rules for When to Use Entity Tags and Last-Modified Dates ................56
13.3.5    Non-validating Conditionals ...................................................................57
13.4    Response Cacheability ..................................................................................57
13.5    Constructing Responses From Caches .........................................................57
13.5.1    End-to-end and Hop-by-hop Headers ......................................................58
13.5.2    Non-modifiable Headers .........................................................................58
13.5.3    Combining Headers .................................................................................59
13.5.4    Combining Byte Ranges ..........................................................................59
13.6    Caching Negotiated Responses ....................................................................60
13.7    Shared and Non-Shared Caches ....................................................................60
13.8    Errors or Incomplete Response Cache Behavior ...........................................61
13.9    Side Effects of GET and HEAD ...................................................................61
13.10    Invalidation After Updates or Deletions ....................................................61
13.11    Write-Through Mandatory ..........................................................................61
13.12    Cache Replacement .....................................................................................62
13.13    History Lists ................................................................................................62

14    **Header Field Definitions** ...........................................................................62
14.1    Accept ...........................................................................................................62
14.2    Accept-Charset .............................................................................................64
14.3    Accept-Encoding ..........................................................................................64
14.4    Accept-Language ..........................................................................................65
14.5    Accept-Ranges ..............................................................................................66
14.6    Age .................................................................................................................66
14.7    Allow .............................................................................................................66
14.8    Authorization ................................................................................................66
14.9    Cache-Control ...............................................................................................67
14.9.1    What is Cacheable ...................................................................................68
14.9.2    What May be Stored by Caches ...............................................................69
14.9.3    Modifications of the Basic Expiration Mechanism .................................69
14.9.4    Cache Revalidation and Reload Controls ................................................70
14.9.5    No-Transform Directive ..........................................................................72
14.9.6    Cache Control Extensions ........................................................................72
14.10    Connection ..................................................................................................72
14.11    Content-Encoding .......................................................................................73
14.12    Content-Language .......................................................................................73
14.13    Content-Length ...........................................................................................74
14.14    Content-Location .........................................................................................74
14.15    Content-MD5 ..............................................................................................75
14.16    Content-Range .............................................................................................75
14.17    Content-Type ...............................................................................................77
14.18    Date ..............................................................................................................77
14.18.1    Clockless Origin Server Operation ........................................................78
14.19    ETag .............................................................................................................78
14.20    Expect ..........................................................................................................78
14.21    Expires .........................................................................................................78
14.22    From .............................................................................................................79
14.23    Host ..............................................................................................................79
14.24    If-Match .......................................................................................................80

Appx2422

14.25      If-Modified-Since .......................................................................80
14.26      If-None-Match ...........................................................................81
14.27      If-Range ....................................................................................82
14.28      If-Unmodified-Since ..................................................................82
14.29      Last-Modified ...........................................................................83
14.30      Location ....................................................................................83
14.31      Max-Forwards ..........................................................................83
14.32      Pragma ......................................................................................84
14.33      Proxy-Authenticate ...................................................................84
14.34      Proxy-Authorization ..................................................................85
14.35      Range ........................................................................................85
   14.35.1     Byte Ranges .........................................................................85
   14.35.2     Range Retrieval Requests ....................................................86
14.36      Referer ......................................................................................86
14.37      Retry-After ...............................................................................87
14.38      Server .......................................................................................87
14.39      TE .............................................................................................87
14.40      Trailer .......................................................................................88
14.41      Transfer-Encoding ....................................................................88
14.42      Upgrade .....................................................................................88
14.43      User-Agent .................................................................................89
14.44      Vary ..........................................................................................89
14.45      Via ............................................................................................90
14.46      Warning .....................................................................................91
14.47      WWW-Authenticate ..................................................................92

**15      Security Considerations .............................................................92**
15.1      Personal Information ...................................................................92
   15.1.1     Abuse of Server Log Information ..........................................93
   15.1.2     Transfer of Sensitive Information .........................................93
   15.1.3     Encoding Sensitive Information in URI's ...............................93
   15.1.4     Privacy Issues Connected to Accept Headers .........................94
15.2      Attacks Based On File and Path Names .......................................94
15.3      DNS Spoofing ............................................................................94
15.4      Location Headers and Spoofing ..................................................95
15.5      Content-Disposition Issues .........................................................95
15.6      Authentication Credentials and Idle Clients................................95
15.7      Proxies and Caching ..................................................................95
   15.7.1     Denial of Service Attacks on Proxies ....................................96

**16      Acknowledgments .....................................................................96**

**17      References ..................................................................................97**

**18      Authors' Addresses ...................................................................99**

**19      Appendices...............................................................................100**
19.1      Internet Media Type message/http and application/http ..............100
19.2      Internet Media Type multipart/byteranges ..................................101
19.3      Tolerant Applications .................................................................102
19.4      Differences Between HTTP Entities and RFC 2045 Entities........102
   19.4.1     MIME-Version ......................................................................102
   19.4.2     Conversion to Canonical Form ..............................................103
   19.4.3     Conversion of Date Formats .................................................103
   19.4.4     Introduction of Content-Encoding .........................................103

Appx2423

RFC 2616                              HTTP/1.1                              June, 1999

19.4.5      No Content-Transfer-Encoding.................................................................103
19.4.6      Introduction of Transfer-Encoding ..........................................................103
19.4.7      MHTML and Line Length Limitations......................................................104
19.5      Additional Features...................................................................................104
19.5.1      Content-Disposition ................................................................................104
19.6      Compatibility with Previous Versions ......................................................105
19.6.1      Changes from HTTP/1.0..........................................................................105
19.6.2      Compatibility with HTTP/1.0 Persistent Connections ............................105
19.6.3      Changes from RFC 2068..........................................................................106

**20      Full Copyright Statement....................................................................108**
20.1      Acknowledgement ....................................................................................108

**21      Index ....................................................................................................109**

# 1 Introduction

## 1.1 Purpose

The Hypertext Transfer Protocol (HTTP) is an application-level protocol for distributed, collaborative, hypermedia information systems. HTTP has been in use by the World-Wide Web global information initiative since 1990. The first version of HTTP, referred to as HTTP/0.9, was a simple protocol for raw data transfer across the Internet. HTTP/1.0, as defined by RFC 1945 [6], improved the protocol by allowing messages to be in the format of MIME-like messages, containing metainformation about the data transferred and modifiers on the request/response semantics. However, HTTP/1.0 does not sufficiently take into consideration the effects of hierarchical proxies, caching, the need for persistent connections, or virtual hosts. In addition, the proliferation of incompletely-implemented applications calling themselves "HTTP/1.0" has necessitated a protocol version change in order for two communicating applications to determine each other's true capabilities.

This specification defines the protocol referred to as "HTTP/1.1". This protocol includes more stringent requirements than HTTP/1.0 in order to ensure reliable implementation of its features.

Practical information systems require more functionality than simple retrieval, including search, front-end update, and annotation. HTTP allows an open-ended set of methods and headers that indicate the purpose of a request [47]. It builds on the discipline of reference provided by the Uniform Resource Identifier (URI) [3], as a location (URL) [4] or name (URN) [20], for indicating the resource to which a method is to be applied. Messages are passed in a format similar to that used by Internet mail [9] as defined by the Multipurpose Internet Mail Extensions (MIME) [7].

HTTP is also used as a generic protocol for communication between user agents and proxies/gateways to other Internet systems, including those supported by the SMTP [16], NNTP [13], FTP [18], Gopher [2], and WAIS [10] protocols. In this way, HTTP allows basic hypermedia access to resources available from diverse applications.

## 1.2 Requirements

The key words "MUST", "MUST NOT", "REQUIRED", "SHALL", "SHALL NOT", "SHOULD", "SHOULD NOT", "RECOMMENDED", "MAY", and "OPTIONAL" in this document are to be interpreted as described in RFC 2119 [34].

An implementation is not compliant if it fails to satisfy one or more of the MUST or REQUIRED level requirements for the protocols it implements. An implementation that satisfies all the MUST or REQUIRED level and all the SHOULD level requirements for its protocols is said to be "unconditionally compliant"; one that satisfies all the MUST level requirements but not all the SHOULD level requirements for its protocols is said to be "conditionally compliant."

Appx2424

## 1.3 Terminology

This specification uses a number of terms to refer to the roles played by participants in, and objects of, the HTTP communication.

connection
> A transport layer virtual circuit established between two programs for the purpose of communication.

message
> The basic unit of HTTP communication, consisting of a structured sequence of octets matching the syntax defined in section 4 and transmitted via the connection.

request
> An HTTP request message, as defined in section 5.

response
> An HTTP response message, as defined in section 6.

resource
> A network data object or service that can be identified by a URI, as defined in section 3.2. Resources may be available in multiple representations (e.g. multiple languages, data formats, size, and resolutions) or vary in other ways.

entity
> The information transferred as the payload of a request or response. An entity consists of metainformation in the form of entity-header fields and content in the form of an entity-body, as described in section 7.

representation
> An entity included with a response that is subject to content negotiation, as described in section 12. There may exist multiple representations associated with a particular response status.

content negotiation
> The mechanism for selecting the appropriate representation when servicing a request, as described in section 12. The representation of entities in any response can be negotiated (including error responses).

variant
> A resource may have one, or more than one, representation(s) associated with it at any given instant. Each of these representations is termed a 'variant.' Use of the term 'variant' does not necessarily imply that the resource is subject to content negotiation.

client
> A program that establishes connections for the purpose of sending requests.

user agent
> The client which initiates a request. These are often browsers, editors, spiders (web-traversing robots), or other end user tools.

server
> An application program that accepts connections in order to service requests by sending back responses. Any given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection, rather than to the program's capabilities in general. Likewise, any server may act as an origin server, proxy, gateway, or tunnel, switching behavior based on the nature of each request.

origin server
> The server on which a given resource resides or is to be created.

Appx2425

proxy
>    An intermediary program which acts as both a server and a client for the purpose of making requests on behalf of other clients. Requests are serviced internally or by passing them on, with possible translation, to other servers. A proxy MUST implement both the client and server requirements of this specification. A "transparent proxy" is a proxy that does not modify the request or response beyond what is required for proxy authentication and identification. A "non-transparent proxy" is a proxy that modifies the request or response in order to provide some added service to the user agent, such as group annotation services, media type transformation, protocol reduction, or anonymity filtering. Except where either transparent or non-transparent behavior is explicitly stated, the HTTP proxy requirements apply to both types of proxies.

gateway
>    A server which acts as an intermediary for some other server. Unlike a proxy, a gateway receives requests as if it were the origin server for the requested resource; the requesting client may not be aware that it is communicating with a gateway.

tunnel
>    An intermediary program which is acting as a blind relay between two connections. Once active, a tunnel is not considered a party to the HTTP communication, though the tunnel may have been initiated by an HTTP request. The tunnel ceases to exist when both ends of the relayed connections are closed.

cache
>    A program's local store of response messages and the subsystem that controls its message storage, retrieval, and deletion. A cache stores cacheable responses in order to reduce the response time and network bandwidth consumption on future, equivalent requests. Any client or server may include a cache, though a cache cannot be used by a server that is acting as a tunnel.

cacheable
>    A response is cacheable if a cache is allowed to store a copy of the response message for use in answering subsequent requests. The rules for determining the cacheability of HTTP responses are defined in section 13. Even if a resource is cacheable, there may be additional constraints on whether a cache can use the cached copy for a particular request.

first-hand
>    A response is first-hand if it comes directly and without unnecessary delay from the origin server, perhaps via one or more proxies. A response is also first-hand if its validity has just been checked directly with the origin server.

explicit expiration time
>    The time at which the origin server intends that an entity should no longer be returned by a cache without further validation.

heuristic expiration time
>    An expiration time assigned by a cache when no explicit expiration time is available.

age
>    The age of a response is the time since it was sent by, or successfully validated with, the origin server.

freshness lifetime
>    The length of time between the generation of a response and its expiration time.

fresh
>    A response is fresh if its age has not yet exceeded its freshness lifetime.

stale
>    A response is stale if its age has passed its freshness lifetime.

communication speed for users…" Dkt. 1-2 at Abstract.[1]  As described in the shared specification, "[t]he present invention is related to Internet communication, and more particularly, to improving data communication speed and bandwidth efficiency on the Internet."  *Id*. at 1:23-25. "The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved." *Id*. at 1:54-57.  The '319 and '510 Patents discuss that previous  "proxy servers" fail to provide a "comprehensive solution for Internet surfing," at least in part because they "would need to be deployed at every point around the world where the Internet is being consumed." *Id*. at 2:24-27; *see also* 2:8-23.

Instead, to create a new type of consumer-based network that never existed before, these patents employ "client devices," which are consumer devices that operate as proxies.  Id. at 3:13-55.  The client devices (circled in red below) are modified to function as a client, peer or agent and serve as a proxy in the system, permitting "any number of agents and peers." Id. at 4:43-64.

> The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network **100** is provided by the schematic diagram of FIG. **3.** The network **100** of FIG. **3** contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network **100,** as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. **4.**

> Returning to FIG. **3,** the exemplary embodiment of the network **100** illustrates that one of the communication devices is functioning as a client **102.** The client **102** is capable of communication with one or more peers **112, 114, 116** and one or more agents **122.** For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

---

[1] Citations to the specification of the '319 Patent at Dkt. 1-2 also apply to the same portion of the '510 Patent (Dkt. 1-3).



FIG. 4

FIG. 3

The '614 Patent creates a client device network of "tunnel devices" that are client devices (circled in red below) within a server-client device–web server architecture. Complaint at ¶ 51; Dkt. 1-1 at 1:19-23 ("apparatus and method for improving communication over the Internet by using intermediate nodes, and in particular, to using devices that may doubly function as an end-user and as an intermediate node.").

> Each of devices herein may consist of, include, be part of, or be based on, a part of, or the whole of, the computer 11 or the system 100 shown in FIG. 1. Each of the servers herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any server described in the '604 Patent, such as the web server, the proxy server, or the acceleration server. Each of the clients or devices herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any client or device described in the '604 Patent, such as the peer, client, or agent devices.

> In one example, an accessing to a data server is improved by using an intermediate device referred to as 'tunnel' device, that is executing a 'tunnel' flowchart. FIG. 5 shows a system 30 including two client devices, a client device #1 31a and a client device #2 31b, that may access the data 20 servers *22a* and *22b* using one or more of a tunnel device #1 33a, a tunnel device #2 33b, and a tunnel device #3 33c, under the management and control of an acceleration server 32. These network elements

4

Appx2874

communicates with each other using the Internet 113.  Dkt. 1-1 at 83:4-15.



FIG. 5                                                    FIG. 11

The '614 Patent further improves on the above network by having the proxy client devices **dynamically shift between two states** based on a criteria.  Specifically, the client (tunnel) device is available as a proxy in the first state (for example, when there is sufficiently available bandwidth) and unavailable in the second state (for example, when there is not sufficiently available bandwidth).  Complaint at ¶ 51.   Criteria-based dynamic switching improves the performance of the system by maintaining a new, dynamic network made exclusively of available client devices that can meet a given performance criteria. Dkt. 1-1 at 124:3-13.

A device may be selected to provide a service, such as a tunnel device that may be selected (alone or as part of a group) by a client device as part of the 'Select Tunnels' step l0la in the flowchart 100. The selected tunnel device may shift to the 'offline' state 301 or to the 'congested' state 303, and thus respectively becomes unavailable or less effective to use. In such a case, a new tunnel device, that was not formerly selected, may be now selected as a substitute for the 'offline' or 'congested' tunnel device as part of a 'Replace Device' step 32ld.

5

Appx2875

*Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). Critically, this Court held, "[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact." *Id*. The Court reconfirmed this holding in the context of a Rule 56 Motion for summary judgment in *Berkheimer v. HP Inc.*, holding, "[w]hether claims 4-7 perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018).

> **B.    Defendants misconstrue patent terms to overgeneralize the claims and make them seem more abstract than they are**

"[I]t will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs. L.L.C v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). For claim construction disputes, the Court "must either adopt the non-moving party's constructions or resolve the dispute to whatever extent is needed to conduct the § 101 analysis." *MyMail*, 934 F.3d at 1379.

As addressed in the joint letter brief (Dkt. 24) filed on March 27, 2020, Defendants overgeneralize and misconstrue a number of terms from the Asserted Patent claims in order to argue that the terms are abstract.  For example, Defendants ignore that these methods require a specific, new, dedicated architecture comprising a client device such as a cell phone or laptop that becomes a tunnel device between a server and web server.  Defendants improperly gloss over the differences of the network components referring to all components as "general purpose computers" But traditional client devices do not operate as tunnel devices.  Letter Brief at 2.

Defendants repeatedly ***change*** the required limitation "client device" to the more generic term "device" that is **not the claim limitation**, thereby ignoring the meaning of "client device."

Motion at 18 ("[A]lthough the terms 'device' and 'server' are separately used in the Asserted

Claims, the patent asserts that those terms are intended to be generic and used interchangeably.")

Defendants' reliance on *In re TLI Commc'n* for the proposition that components do not supply an

inventive concept where "the recited physical components behave exactly as expected according

to their ordinary use" actually reinforces the inventive use of client devices within the architecture

of the claimed inventions. Motion at 17 citing 823 F.3d 607 at 613, 615 (Fed. Cir. 2016).

While Plaintiff believes that the following claim terms should be construed according to

their plain and ordinary meaning, given Defendants' misconstruction of the claim terms it is clear

that at least these terms should be construed before the Court can rule in Defendants' favor:

| Patent | Claim Term | Proposed Claim Construction | Intrinsic Evidence |
|--------|-----------|------------------------------|---------------------|
| '319 | Preamble | Preamble is limiting | 19:16-32 |
| '319 | Client device | Consumer computer | 2:44-46 |
| '319 | First server | Internet data server that stores content that is available upon request | 4:62-5:7; 19:16-32 |
| '319 | Second server | Server, which is not the client device or web server | 19:16-32 |
| '510 | Preamble | Preamble is limiting | 19:18-31 |
| '510 | Client Device | Consumer computer | 2:43-49 |
| '510 | Second server | Server, which is not the client device or web server | 19:18-31 |
| '510 | Web server | Internet data server that stores content that is available upon request | 4:64-5:9 |
| '614 | Preamble | Preamble is limiting | 172:44-173:14 |
| '614 | First server | A server, which is not the client device or web server | 4:40-61; 6:27-42; 75:35-59; 83:4-15; 95:62-96:2; 172:44-173:14 |
| '614 | Client device | A client device that can operate as tunnel device | Abstract; 4:40-61; 7:6-26; 52:48-51; 62:33-40; 75:35-59;83:4-15; 95:4-61 |
| '614 | Web server | Internet data server that stores content that is available upon request | 4:40-61; 31:53-32:5; 62:30-33; 83:4-15 |

Page 18 of 36

Appx2883

**C.    The Asserted Patents Satisfy Alice Step One. They Are Directed Toward an Entirely New Network Based on an Innovative Server-Client Device-Web Server Architecture**

Each of the Asserted Patent claims rely upon an innovative, improved networking architecture that operates on top of the Internet—the network is a new, dedicated network created by the inventions of the Asserted Patents and not merely a set of communications occurring over the Internet.  This new architecture comprises a client device, such as a cell phone, serving as a proxy device between a server and web server that relays content requests from the server to the web server and returns the corresponding content from the web server to the server.  The Asserted patents utilize a clear, innovative network system for fetching content using client devices – not simply a generic way to send or receive information.  The claims themselves recite not just generic servers and devices, but servers and <u>client devices</u> in a specific configuration to solve technical problems related to improving the fetching of content on the Internet.

*1.    '319 Patent Claims*

As illustrated in the below annotated figure 3 from the specification, independent claim 1 recites a method that employs a specific, concrete server-client device-web server architecture with the steps performed by the client device: A method for use with a first **<span style="color:red">client device</span>**, for use with a **<span style="color:blue">first server</span>** that comprises a **<span style="color:blue">web server</span>** that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier,



FIG. 3

Appx2884

and for use with a **second server**, the method **by the first client device** comprising:

receiving,  from the **second server**, the first content identifier;

sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and

sending, the first **content by the first client device** to the **second server**, in response to the receiving of the first content identifier.

2.     '510 Patent Claims

Independent claim 1 of the '510 Patent also recites a method that employs the same specific, concrete server-client device-web server architecture illustrated above with steps performed by the client device: A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method **by a first client device** comprising: establishing a Transmission Control Protocol (TCP) connection with a **second server**; sending, to the **web server** over an Internet, the first content identifier;



FIG. 3

receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and

sending the received first content, to the **second server** over the established TCP connection, in response to the receiving of the first content identifier.

15

Appx2885

## IV.    AGREED CONSTRUCTIONS

The Court construes the following terms as agreed by the parties:[3]

| Claim Term / Phrase | Construction |
|---|---|
| **preamble**<br>'319 Patent cl.1<br>'510 Patent cl.1<br>'614 Patent cl.1 | limiting |
| **web server**<br>'510 Patent cls.1 & 16<br>'614 Patent cls.1 & 29 | plain and ordinary meaning |
| **receiving, from the second server, the first content identifier**<br>'319 Patent cl.1 | plain and ordinary meaning |
| **during, as part of, or in response to, a start up**<br>'319 Patent cl.2 | plain and ordinary meaning |
| **during, as part of, or in response to, a start up or power-up**<br>'510 Patent cl.2 | plain and ordinary meaning |
| **in response to connecting to the Internet**<br>'614 Patent cl.1 | plain and ordinary meaning |
| **connected to the Internet**<br>'614 Patent cl.1 | plain and ordinary meaning |
| **performing a task, by the client device, in response to the receiving of the request from the first server**<br>'614 Patent cl.1 | plain and ordinary meaning |
| **above or below the threshold**<br>'614 Patent cl.17 | plain and ordinary meaning |

---

[3] *See* Dkt. No. 126 at 9–10.

Appx2943

| hardware component<br>'614 Patent cls.18–20 | plain and ordinary meaning |
| message that comprises a status<br>'614 Patent cls.25–26 | plain and ordinary meaning |

## V.   CONSTRUCTIONS OF DISPUTED TERMS

### A.   client device ('319 Patent cls.1, 2, 14, 17, 22, 24, and 25; '510 Patent cls.1, 2, 8, 10, 13, 15, 18, and 19)

| Luminati's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| consumer computer | plain and ordinary meaning |

According to Luminati, the specification defines "client device" as a "consumer computer." Dkt. No. 126 at 10 (citing '319 Patent at 2:44–46). The Court should construe the term this way, says Luminati, for two reasons. First, although Luminati does not necessarily disagree with the Court's preliminary construction,[4] a jury can more easily understand "consumer computer." *See* Dkt. No. 176 at 9:08–10 ("we think that a consumer computer is . . . easier for the jury to understand"). Second, Luminati claims the patentee distinguished client devices from servers during the prosecution, a concept better captured by its proposal than the Court's preliminary construction. *Id*. at 8:21–9:01 ("we believe that the way that client device is used in these particular patents . . . is consumer device and consumer computer and specifically not servers"); *see also* Dkt. No. 126 at 11–12.

Defendants counter that Luminati's proposed construction conflicts with the specification, Luminati's earlier admissions in this case, the common understanding of the phrase, and the

---

[4] Based on its initial review of the briefs, the Court preliminarily construed this term as "communication device that is operating in the role of a client."

Appx2944

Court's construction of the term in a prior case. Dkt. No. 138 at 1–2. They criticize Luminati for

relying on three lines from the '319 Patent that refer in passing to computers of consumers when

describing a prior-art peer-to-peer network. *Id.* at 6. They further argue the specification does not

clearly redefine "client device" to mean a "consumer computer." *Id.* at 6–7. If the term must be

construed, Defendants urge the same construction previously adopted by the Court in another case:

"a device that is operating in the role of a client by requesting services, functionalities, or resources

from other devices." *Id.* at 5–6; *id.* at 6 n.4.

Beginning with Luminati's lexicographical argument, the Court finds the language on

which Luminati relies is not sufficient to redefine the meaning of the term to "consumer computer."

As used by the specification, "consumer" simply means a consumer of content, as opposed to a

broadcaster of that content. *See* '319 Patent at 1:54–57 (describing "[t]he need for a new method

of data transfer that is fast for the consumer, cheap for the content distributor and does not require

infrastructure investment for ISPs"); *see also id.* at 1:58–59 ("There have been many attempts at

making the Internet faster for the consumer and cheaper for the broadcaster."). Notably,

"consumer" does *not* appear in connection with the description of the claimed inventions, and the

lines on which Luminati relies are not a clear and explicit statement by the patentee for the disputed

term. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012) (noting

lexicography requires "a clear and explicit statement by the patentee" and any "'implied'

redefinition must be so clear that it equates to an explicit one").

Luminati's second argument—that a client device is specifically not a server—is not

supported by the specification. The patents use a number of terms that require hardware of some

sort, such as communication device, first server, second server, and acceleration server. Each

Appx2945

"communication device" may act as a client,[5] peer, or agent. '319 Patent at 4:48–49; *see also id.* at 3:17–26 (referring to a client communication device, an agent communication device, and a peer communication device). The patents do not include servers as a type of "communication device," but that is not sufficient to construe "client device" as unable to act as a server in all cases. Generally, "[n]egative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012). Luminati cites to no such reason in the '319 or '510 Patents.

Except for Luminati's request for a negative limitation, the parties agree with the Court's preliminary construction. *See* Dkt. No. 176 at 11:13–16, 16:06–07. That construction is consistent with the extrinsic evidence proffered by Luminati in its L.R. 4-2 disclosures. *See* Dkt. No. 138-3 at 1–2 (citing sources that define "client" as, for example, "[t]he role adopted by an application when it is retrieving and/or rendering resources"). The Court therefore adopts its preliminary construction and construes:

- "client device" as "communication device that is operating in the role of a client."

**B.    first server ('319 Patent cl.1, 21)**

| Luminati's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| web server | plain and ordinary meaning |

Claim 1 of the '319 Patent recites "[a] method . . . for use with a first server that comprises

---

[5] "Client device" appears only once in the specification with reference to the disclosed embodiments, where it is used synonymously with "client." *See* '319 Patent at 6:41–47 ("While the present description refers to a request from the client originating from an Internet browser, . . . a request may originate from an email program or any other program that would be used to request data . . . by the client device.").

Appx2946

a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests."
'319 Patent at 19:16–19. Luminati claims its construction would be helpful to a jury by minimizing
jury confusion but does not explain what that confusion might be. Dkt. No. 126 at 13. Defendants
argue such a construction is unnecessary. Dkt. No. 138 at 8.

Luminati claims its construction is consistent with the claim language, but consistency does
not give rise to a dispute over claim scope. Nor has Luminati provided any convincing explanation
about how there might be jury confusion.[6] In accordance with the Court's preliminary construction,
this term should be given its plain and ordinary meaning.[7]

C.    second server ('319 Patent cl.1, 17, 21, and 24; '510 Patent cl.1, 2, 8, 15, and
       18)

| Luminati's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a server that is not the client device or web server | plain and ordinary meaning |

The parties dispute whether the second server must be a distinct device from the client
device and the web server. Luminati argues its construction would assist the jury by clarifying that
the server and client devices are different devices. Dkt. No. 126 at 13. Defendants counter that
Luminati's construction would improperly import a limitation into the claim language. Dkt.
No. 138 at 8–9.

Both the claims and specification show that the client device and second server are different

---

[6] *But see* Dkt. No. 145 at 3 n.1 (citing a clerical error in Luminati's opening brief as evidence of
potential jury confusion).

[7] At the hearing, neither party objected to the Court's preliminary construction of "plain and
ordinary meaning."

devices. Claim 1 of the '510 Patent, for example, recites that the client device establishes a TCP connection with the second server over the Internet. '510 Patent at 19:21–23. Such a connection would not be required if the first client device and second server were the same device. This, of course, is consistent with the purpose of the disclosed inventions—to improve speed and bandwidth efficiency between different devices *through the Internet. Id.* at 1:26–27.

The tougher question is whether the second server and web server can be the same device. Client, peer, agent, and server are roles a device can perform. Nothing in the intrinsic record suggests one device cannot perform both the role of a web server and a second server. To construe the claim in such a way would improperly import a limitation into the claim language. Accordingly, the Court will provide its preliminary construction of this term to the jury and construes:

- "second server" as "server that is not the client device."[8]

### D.    client device ('614 Patent cl.1, 2, 4–6, 9, 15, 18–19, 25, and 28)

| Luminati's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a device using a client dedicated operating system and operating in the role of client by requesting services, functionalities, or resources from the server | plain and ordinary meaning |

Luminati claims the need for a construction based on its belief that Defendants will otherwise "assert that client devices and servers are interchangeable general use computers." Dkt. No. 126 at 16. Because such an assertion is inconsistent with the claim language, says Luminati, it asks for a construction "clarifying that client devices use a client dedicated operating system." *Id.* It argues the prosecution history disavows any broader scope of the term. *Id.* at 17.

---

[8] Neither party objected to the Court's preliminary construction for this term.

Appx2948

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    "client device"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "client device"<br><br>• '510 Patent Claim 1<br>• '968 Patent Claim 1 | consumer computer<br><br>alternatively,<br>• communication device that is operating in the role of a client | communication device that is operating in the role of a client |

**The Parties' Positions**

Plaintiff submits: The "client device" of the Asserted Patents is defined to refer to a consumer computer, such as a laptop, desktop, or smartphone (citing '511 Patent col.2 ll.47–49[4]). These devices are also referred to as "communication devices." Such devices are distinct from the "servers" of the patents, which may encompass devices such as server farms and data centers. Dkt. No. 86 at 15–18.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '511 Patent figs.1, 3, col.2 ll.44–46, col.4 ll.43–55, col.4 l.64 – col.5 l.12, col.12 ll.33–56. **Extrinsic evidence**: Rhyne Decl.[5] ¶ 8 (Plaintiff's Ex. C, Dkt. No. 86-3); Freedman Disclosure[6] ¶¶ 21, 23–24 (Plaintiff's Ex. E, Dkt. No. 86-5).

Defendants respond: As the Court held in the *Teso* Markman Order, "the language on which Luminati relies is not sufficient to redefine the meaning of the term to 'consumer computer'"

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 91) are listed.

[4] Plaintiff cites column 2, lines 44–46 but quotes column 2, lines 47–49.

[5] Declaration of Dr. Vernon Thomas Rhyne III in Support of Plaintiff Luminati Network Ltd.'s Claim Constructions (Nov. 6, 2020).

[6] Patent LR 4-3 Disclosure of Expert Testimony (Nov. 5, 2020).

Appx2969

(quoting *Teso* Markman Order at 11). Further, as the Court previously held, the (common) specification does not mandate that "a client device is specifically not a server." In fact, the Asserted Patents describe that an exemplary communication device comprising a general-purpose assembly of standard computer components may act as the client when performing the role of the client. Further, that the "client device" is defined by its role rather than special equipment comports with the customary meaning of "client" in the art. Dkt. No. 88 at 5–11.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '511 Patent col.2 ll.44–49, col.4 ll.3-4, col.4 ll.49–51, col.4 ll.53–55, col.5 ll.54–62, col.6 ll.18–21, col.6 ll.33–35, col.6 ll.63–67, col.9 ll.21–40, col.16 l.22. **Extrinsic evidence**: Freedman Decl.[7] ¶¶ 30–31, 39–45 (Dkt. No. 88-1); R. Fielding et al., Network Working Group, *RFC 2616 Hypertext Transfer Protocol — HTTP/1.1* at § 1.3 (1999) (Defendants' Ex. 2, Dkt. No. 88-3 at 9–11); *Merriam-Webster Online Dictionary*, "consumer"[8].

Plaintiff replies: "The specification distinguishes 'communication devices' from servers . . . which was recognized by this Court . . . in the Teso [Markman Order]." There is a distinction between a client device acting as a server and a server. Dkt. No. 89 at 4–6.

Plaintiff cites further **intrinsic evidence** to support its position: '968 Patent col.4 l.41 – col.5 l.10; '319 Patent col.2 ll.44–46.

---

[7] Declaration of Dr. Michael Freedman in Support of Defendants' Responsive Claim Construction Brief (Dec. 31, 2020).
[8] https://www.merriam-webster.com/dictionary/consumer. Defendants did not submit a copy of this webpage as an exhibit.

Appx2970

<u>**Analysis**</u>

There appear to be two issues in dispute. First, whether a client device is necessarily a "consumer computer." Second, whether a client device is necessarily not a server. These issues largely parallel the issues addressed in the *Teso* Markman Order and the Court here reiterates and adopts the reasoning and ruling of that order. *Teso* Markman Order at 10–12. Specifically, the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server.

Accordingly, the Court construes "client device" as follows:

- "client device" means "communication device that is operating in the role of a client."

**B.    "first server" and "second server"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "first server"<br><br>• '510 Patent Claim 1 | server that is not the client device or the web server | plain and ordinary meaning |
| "second server"<br><br>• '968 Patent Claim 1 | server that is not the client device or the web server | plain and ordinary meaning |

<u>**The Parties' Positions**</u>

Plaintiff submits: Based on the plain meaning of the claim language, the "first server" and the "second server" are each separate from the recited "web server" and "client device" of the claims. Dkt. No. 86 at 18–20.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '511 Patent col.2 ll.44–46, col.4 ll.43–64.

**Extrinsic evidence**: Rhyne Decl. ¶ 8 (Plaintiff's Ex. C, Dkt. No. 86-3).

13

Defendants respond: There is no need to specify that the "first server" or "second server" is separate from the web server. Such a construction would either be redundant or improperly change the scope of the claim. In fact, Claim 1 of the '968 Patent recites that the second server is "distinct" from the first server. Dkt. No. 88 at 11–13.

In addition to the claims themselves, Defendants cite the following **extrinsic evidence** to support their position: Freedman Decl. ¶¶ 20–35, 46–51 (Dkt. No. 88-1).

Plaintiff replies: The first and second servers are described and claimed as components separate from the web server. Dkt. No. 89 at 6–8.

Plaintiff cites further **extrinsic evidence** to support its position: *Merriam-Webster Online Dictionary*, "distinct"[9].

### Analysis

The issue in dispute appears to be whether one component can simultaneously serve as more than one of: the client device, the first server/second server, and the web server. It cannot.

The "first server" ('511 Patent) and the "second server" ('968 Patent) are distinct from the "client device" and "web server" separately recited in the claims. To begin, they are recited separately in the claims, suggesting that they are distinct components. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (quotation and modification marks omitted)). The recited operation of the claims further suggests a distinction among these components. For instance, Claim 1 of the '511 Patent, a "method by the first server comprising" recites "receiving, from the first

---

[9] https://www.merriam-webster.com/dictionary/distinct. Plaintiff did not submit a copy of this webpage as an exhibit.

client device, the first content identifier," "sending . . . the first content identifier to the web server,"

"receiving . . . the first content from the web server," and "sending the received first content to the

first client device." This plainly is directed to a "first server" acting as an intermediary between

the "client device" and "second server." Claim 1 of the '968 Patent similarly indicates the

distinction among components. It recites "a second server distinct from the first web server" and

"sending, by the requesting client device, to the second server." Again, this is plainly directed to a

method treating the first web server, second server, and client device as three distinct components.

Accordingly, the Court construes "first server" and "second server" as follows:

- "first server" means "server that is not the client device or the web server";

- "second server" means "server that is not the client device or the first web
  server."

### C.    "sending . . . the first content identifier to the web server using the selected IP address"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "sending . . . the first content identifier to the web server using the selected IP address"[10]<br><br>• '511 Patent Claim 1 | the first server sending the Uniform Resource Locator for the first content to the web server using the selected IP address from the stored group of IP addresses | indefinite |

**The Parties' Positions**

Plaintiff submits: The claim "clearly identifies the first content identifier as 'a Uniform

Resource Locator.'" And while the claim broadly requires sending this identifier to the web server

"using the selected IP address" without specifying exactly how the sending uses the selected IP

---

[10] The parties also separately identify "sending … to the web server using the selected IP address," which is a subset of the broader term. Dkt. No. 91-1 at 2.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  |  |
|---|---|
| **Bright Data Ltd.,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | **2:19-cv-00395-JRG** |
| **Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB,** | |
| **Defendants.** | |

## DEFENDANTS' MOTION FOR HEARING REGARDING *O2 MICRO* ISSUE

This case and the related case *Bright Data Ltd. v. Code200, UAB, et al.* (No. 19-cv-396-JRG ("*Code200*")) are each set for trial on August 16, 2021, with pretrial conferences set on August 12, 2021 and August 9, 2021, respectively. Several of the parties' pending motions in these cases concern an underlying dispute as to the proper interpretation and/or application of the Court's construction of certain "server" claim terms.[1] Specifically, it became apparent for the first time based on Bright Data's rebuttal validity expert report that Bright Data takes a position as to the claim scope of "server" that requires the Court's intervention to resolve the parties' dispute pursuant to *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

---

[1]     *See* Oxylabs' Motion to Strike Certain Opinions of Dr. Thomas Rhyne (ECF Nos. 237, 281, 311, 338 (*Teso*) and ECF Nos. 120, 148, 174, 191 (*Code200*)); Bright Data's Motion to Strike Opinions of Dr. Freedman (ECF Nos. 244, 285, 309, 334 (*Teso*) and ECF Nos. 126, 147, 172, 195 (*Code200*)); Oxylabs' Motion for Summary Judgment of Invalidity (ECF Nos. 277, 327, 354, 370 (*Teso*) and ECF Nos. 123, 152, 177, 190 (*Code200*)); Bright Data's Motion for Summary Judgment of No Invalidity (ECF Nos. 242, 287, 310, 335 (*Teso*) and ECF Nos. 129, 149, 171, 196 (*Code 200*)).

For the reasons previously articulated in its briefing (*see* n.1, above), Oxylabs respectfully requests clarification that: (i) as already recited in the existing constructions, the claimed "server" is not the separately recited [first / requesting] client device, but can otherwise be *a* client device, and (ii) as the Court already ruled for another term (i.e., "client device"), the claimed "server" is a device operating in the role of a server and does not require any specific hardware.

To resolve this dispute, Oxylabs proposes the following clarifications shown in underline to the Court's existing claim constructions:

- '319/'510 Patents (*Teso*): "second server" means "a device that is operating in the role of a server and that is not the first client device."

- '614 Patent (*Teso*): "first server" means "a device that is operating in the role of a server by offering information resources, services, and/or applications and that is not the client device."

- '968 Patent (*Code200*): "second server" means "a device that is operating in the role of a server and that is not the requesting client device or the first web server."

- '511 Patent (*Code200*): "first server" means "a device that is operating in the role of a server and that is not the first client device or the web server."

In view of the limited time between the pretrial conferences and trials, Oxylabs respectfully requests a hearing to address this issue in advance of the pretrial conferences.

Oxylabs further respectfully requests that any hearing also address Bright Data's Motion for Protective Order Regarding the Depositions of Edmund Lazarus and Mark Joseph and Reconsideration of Feb. 12, 2021 Order. ECF No. 417. On February 4, 2021, the Court ordered that these depositions go forward. ECF No. 296, Feb. 4, 2021 Hr'g Tr. at 107:11-15; ECF No. 302 at 2. But Bright Data ignored the Order and refused to make the witnesses available—instead, it waited until

1

Appx2997

April 28, 2021, to seek yet another protective order concerning the depositions (the Court declined to grant Bright Data's first request for a protective order). To allow sufficient time prior to trial to conduct these previously ordered depositions, Oxylabs respectfully requests that the Court resolve this fully briefed, pending motion prior to the pretrial conferences.

2

Appx2998

continued, "In contrast, Claim 25 uses the selected IP address as an address of a "source" rather than of an intermediary." *Id.*

The Court did not "inadvertently omit intermediaries from IP addresses that can be used for sending" as Plaintiff's Clarification Request suggests. *See Code200* Action, Dkt. No. 102 at 7. The Court purposefully did not include the language "including intermediaries" because although '511 Patent Claims 2–5 are directed to using a client device as an intermediary, Claim 1 and Claim 25 are not, and in fact Claim 25 uses the selected IP address as an address of a "source" rather than of an intermediary. *See Code200* Action, Dkt. No. 97 at 17–18.

The Court clarifies that the Court's construction does not exclude intermediaries specifically with respect to '511 Patent Claims 2–5. Unlike '511 Patent Claims 1 and 25, "Claims 2 through 5 are directed to using a client device as an intermediary between the first server and the web server." *See Id.* at 18. However, in light of Plaintiff's Clarification Request and in the interest of avoiding jury confusion, the Court amends the construction of "sending . . . the first content identifier to the web server using the selected IP address" to "sending . . . the first content identifier to the web server using the selected IP address as either a sending address or a receiving address." The Court emphasizes that this amendment does not change the scope of the term in any way, but merely seeks to avoid jury confusion.

### III.    "Server" Terms[2]

Defendants' Motion for Hearing requests a "clarification" of the Court's constructions of "first server" and "second server" and a hearing to address this issue in advance of pretrial

---

[2] Citations in this section are to the *Code200* Action unless identified otherwise. The motions in the *Code200* Action and *Teso* Action are nearly identical except the *Teso* Action also urges resolution of another motion. That motion will not be addressed in this order.

7

Appx3007

conferences. Dkt. No. 234 at 1–2. The table below indicates the terms at issue, the relevant patents

for those terms, their current constructions, and the requested "clarifications:"

| Term | Construction | Requested Clarification |
|------|-------------|------------------------|
| "first server" '614 Patent *Teso* | "server that is not the client device" | "a device that is operating in the role of a server by offering information resources, services, and/or applications and that is not the client device" |
| "first server" '511 Patent *Code200* | "server that is not the client device or the web server" | "a device that is operating in the role of a server and that is not the first client device or the web server" |
| "second server" '319/510 Patents *Teso* | "server that is not the client device" | "a device that is operating in the role of a server and that is not the first client device" |
| "second server" '968 Patent *Code200* | "server that is not the client device or the first web server" | "a device that is operating in the role of a server and that is not the requesting client device or the first web server" |

Defendants' Motion for Hearing merely states that "it became apparent for the first time

based on Bright Data's rebuttal validity expert report that Bright Data takes a position as to the

claim scope of "server" that requires the Court's intervention to resolve the parties' dispute

pursuant to *O2 Micro* . . . ." *Id.* at 1.

Plaintiff argues that "while framed as a Motion for Hearing Regarding O2 Micro Issue

('Motion'), Defendants are clearly and improperly requesting new claim constructions on the eve

of trial that were already rejected or waived during claim construction." Dkt. No. 242 at 4.

Plaintiffs note that Defendants did not make these objections in their December 22, 2020

Objections to the Court's Claim Construction Order in *Bright Data Ltd. v. Teso lt UAB et al.*, 2:19-

cv-00395-JRG ("*Teso* Action") or in their February 22, 2021 Objections to this Court's Claim

Construction Order in the *Code200* Action. *Code200*, Dkt. No. 242 at 4 (citing *Teso* Action, Dkt.

No. 200; *Code200* Action, Dkt. No. 103).

Plaintiff contends that Defendants are seeking broad constructions that treat client devices

and servers interchangeably in contradiction of Defendants' denial that they were making such an

Appx3008

argument as noted by the Court in its construction of "client device" for the '614 Patent. *Id.* (citing *Teso* Action, Dkt. No. 191 at 15 ("[Defendants] deny that they will claim client devices and servers are interchangeable general use computers.").

Plaintiff filed their response on July 6, 2021. Defendants' reply deadline was July 13, 2021. Defendants did not file a reply.

The Court's Claim Construction Order in the *Code200* Action stated, "[t]he issue in dispute appears to be whether one component can simultaneously serve as more than one of: the client device, the first server/second server, and the web server. It cannot." Dkt. No. 97 at 13. The Court found the recited operation of the claims suggests a distinction among these components and that claim 1 of the '511 Patent "plainly is directed to a 'first server' acting as an intermediary between the 'client device' and 'second server.'" *Id.* at 15. Defendants' requested clarifications for the *Code200* Action server terms do not challenge this but rather ask the Court to define the "server" in these terms as "a device that is operating in the role of a server" and replace "the client device" with "the requesting client device." Dkt. No. 234 at 2. Defendants' requested clarifications for the *Teso* Action "second server" term likewise asks the Court to define the "server" as "a device that is operating in the role of a server" and replace "the client device" with "the first client device." *Id.* Finally, Defendants' requested clarifications for the *Teso* Action "first server" asks the Court to define the "server" as "a device that is operating in the role of a server by offering information resources, services, and/or applications." *Id.*

Plaintiff points to the Court's construction of "client device" for the '614 Patent as accepting Defendants' denial that they will claim client devices and servers are interchangeable general use computers. Dkt. No. 242 at 4 (citing *Teso* Action, Dkt. No. 191 at 15). With respect to

9

Appx3009

this same "client device" term, the Court's Claim Construction Order "reiterates and adopts the reasoning and ruling of that order." Dkt. No. 97 at 13 (citing *Teso* Action, Dkt. No. 191 at 10–12).

The language "a device that is operating in the role of" is language Defendants urged in the construction of "client device" in the *Teso* Action, language originating in the construction previously adopted by the Court in another case. *Teso* Action, Dkt. No. 191 at 11 (citing Dkt. No. 138 at 5–6; *Id.* at 6 n.4). The Court's Claim Construction Order in the *Teso* Action states that "[Plaintiff's] second argument—that a client device is specifically not a server—is not supported by the specification." *Id.* The Court found "[t]he patents do not include servers as a type of 'communication device,' but that is not sufficient to construe 'client device' as unable to act as a server in all cases." *Id.* at 12.

Plaintiff's argument that Defendant seeks to treat client devices and servers interchangeably, citing to the Court's statement that "[Defendants] deny that they will claim client devices and servers are interchangeable general user computers" is an oversimplification of the issue. It is not that Defendants seek to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . as an indistinguishable computer ↔ computer ↔ computer architecture" as Plaintiffs argue. *See* Dkt. No. 242 at 4. Rather, a component can be *configured* to operate in different roles—so long as it does not "simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *See* Dkt. No. 97 at 13.

The Court's Claim Construction Order in the *Code200* Action stated, "[t]he issue in dispute appears to be whether one component can simultaneously serve as more than one of: the client device, the first server/second server, and the web server. It cannot." Dkt. No. 97 at 13. Consistent with this, the Court construed in the *Teso* Action "client device" in the '614 Patent as "device

Page 10 of 12

Appx3010

operating in the role of a client by requesting services, functionalities, or resources from the server." *Teso* Action, Dkt. No. 191 at 15.

The Court's Claim Construction Order in the *Teso* Action discussed this issue in detail with respect to whether the second server must be a distinct device from the client device and the web server. *Teso* Action, Dkt. No. 191 at 13–14. The Court stated that "[n]othing in the intrinsic record suggests one device cannot perform both the role of a web server and a second server. To construe the claim in such a way would improperly import a limitation into the claim language." *Id.* at 14.

Defendants' Motion for Hearing requests clarifications for the server terms but presents them as new constructions. The Court finds that the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the client device, web server, first server and second server. Said previous findings have already been stated with respect to the constructions as they stand. Accordingly, the Court clarifies that Defendants' understanding of the scope of the constructions, as represented by the requested clarifications in Defendants' Motion for Hearing, is correct. The Court is not changing the construction of "first server" and "second server," as this understanding is already embedded in those terms' construction. Further, the Court is not now changing the scope of the terms in any way, but merely providing a clarification of the scope of the terms as they stand.

## IV. CONCLUSION

The Court **DENIES** Plaintiffs' request to modify the Claim Construction Order with respect to "source address" and **GRANTS** Plaintiffs' request to modify the Claim Construction Order with respect to "sending . . . the first content identifier to the web server using the selected IP address," which the Court now clarifies means "sending . . . the first content identifier to the

Page 11 of 12

Appx3011

Appln. No. 15/957,945
Reply to Office action of September 5, 2018

Hence, similar to the PTAB decision in appeal 2017-011163 dated May 9, 2018, the Examiner's interpretation of the claims as being directed to an abstract idea of creating an index and using that index to search for and retrieve data is an oversimplification of the claims, as the claims do not even mention the creation of an index or the use of such an index or searching and retrieving data, not do the claim mention the words 'index' or 'search'.

c. As admitted in the Action, the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NOY a 'generic computer' as stated in the Action. Under Bilski's MoT test, a claimed process can be patent-eligible under § 101 if: (1) **it is tied to a particular machine or apparatus;** or (2) the process transforms a particular article into a different state or thing." (See Bilski, 545 F.3d at 954 (citing Gottschalk v. Benson, 409 U.S. 63, 70 (1972)).

d. The Action states that the arrangement claimed provides 'conventional computer functions', 'conventional computer implementation', 'generic computer, generic computer components, or a programmed computer'. However, the Examiner does not sufficiently establish that the "ordered combination" of the recited elements also fails to "'transform the nature of the claim' into a patent-eligible application." Alice, 134 S. Ct. at 2355. "[A]n inventive concept can be found in the non-conventional and nongeneric arrangement of known, conventional pieces," even if these pieces constitute generic computer-related components. Bascom Global Internet v. AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Specifically, the

- 4 -

Appln. No. 15/957,945
Reply to Office action of September 5, 2018

claimed components as a combination perform functions that are not merely generic - It is respectfully submitted that the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device, which is unique and solves a specific problem such as anonymity when fetching information.

e. It is noted that "*For computer-implemented inventions like the claimed invention, the question in the second step is whether the computer implementation of the abstract idea involves "more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"*" Content Extraction & Transmission LLC v. Wells Fargo Bank. It is noted that "*Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination.*" Berkheimer v. HP Inc., 881 F.3d 1360, 1369 (Fed. Cir. 2018), and the Action provides no factual evidence regarding to "*well-understood, routine, and conventional*", as required by USPTO memorandum dated April 19, 2018, entitled: "*Changes in Examination Procedure Pertaining to Subject Matter Eligibility, Recent Subject Matter Eligibility Decision (Berkheimer v. HP, Inc.)*".

f. It is respectfully submitted that in a decision of Appeal 2017-010768 dated May 4, 2018 (from application 14/288,506), claims were similarly found to be patent eligible being "*directed to a technical improvement in the communication between computers*". Similarly, in a decision of Appeal 2017-007566 dated May 17, 2018 (from application 14/268,145), claims were similarly found to be patent eligible since they

- 5 -

Appln. No. 14/025,109
Reply to Office action of March 29, 2018

## REMARKS / ARGUMENTS

The examiner's action dated March 29, 2018 ("Action") has been received and its contents carefully noted.

The allowance of claims 38 and 59 is thankfully noted.

Former claims 37-38 are cancelled and their limitations incorporated into claim 26.

Former claim 59 is cancelled and its limitations incorporated into claim 53.

Former claims 49-52 are cancelled.

An allowance is respectfully requested.

- 10 -

Appx3356

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Remarks*

Applicant's amendment dated December 10, 2017 responding to the September 19, 2017

Office Action provided in the rejection of claims 26-66. **Claims 26-66** remain pending in the

application and which have been fully considered by the examiner.

Applicant's arguments filed December 10, 2017 have fully considered; however the

arguments are moot in view of the new ground(s) of rejection.  See rejections below for details.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

**Claims 26-37, 39-58, 60-66** are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Yu et al. (US 2006/0212584) hereinafter "**Yu**", and in view of Chalouhi et al.

(US 2009/0319502) hereinafter "**Chalouhi**".

## Claim 26

**Yu** teaches a method for use with a group of clients [i.e. peer nodes 403, 406, 410 etc.]

for data communication between a web server [i.e. web server 405 or content source 332] storing

a content and a requesting client [i.e. peer node 403] via one or more clients selected from the

Appln. No. 14/025,109
Reply to Office action of September 19, 2017

## REMARKS / ARGUMENTS

The examiner's action dated September 19, 2017 ("Action") has been received and its contents carefully noted.

### Office Action, pages 2-16

Claims 26-66 are rejected under 35 U.S.C. 103(a) as being unpatentable over Garcia-Luna-Aceves *et al.* (US 2002/0007413 – "Garcia") in view of Yu *et al.* (US 2006/0212584 – "Yu").

### Combining Garcia with Yu

a. The Action fails to explain WHY the Garcia and Yu are combinable. If the Examiner contends that they are analogous art being in the same field, **a clear definition stating that field is requested, as required in the rules.**

b. The rationale for combining the Garcia and Yu references is "*… to support content delivery system*". Since both Garcia and Yu describe a 'content delivery system', the rationale provides no linking to the present application, as required in MPEP 2143 that clearly states that "*Any rationale employed must provide **a link between the factual findings and the legal conclusion of obviousness.**"* (Emphasis added). Further, this rationale amounts to nothing more than a conclusory statement, while the Office cannot rely solely on common knowledge or common sense to support its findings. Further, it is settled that the Office should provide a "satisfactory explanation" for the motivation finding that includes an express and **"rational" connection with the evidence presented.** Further, the same rationale was used in former Action to combine Garcia with the Harrow reference, hence further suggesting no linkage to the actually cited references.

- 2 -

Appx3379

Appln. No. 14/025,109
Reply to Office action of September 19, 2017

c. Further, since 'supporting content delivery' is long
desired, the rationale, in fact, confirms that the modification
based on the combination amounts to a solution to a long-felt
solution that serves as a secondary consideration further
supporting non-obviousness.

d. Furthermore, BOTH Garcia and Yu clearly teach schemes for
the stated motivation of '… *to support content delivery
system*.'. Since the inventions in Garcia and Yu are each self-
contained and independently operate effectively to reach at the
rationale motivation:

> *Because each device independently operates
> effectively, a person having ordinary skill in
> the art, who was merely seeking to create a
> better device to drain fluids from a wound,
> would have no reason to combine the features
> of both devices into a single device.*

*Kinetic Concepts v. Smith and Nephew*, 688 F.3d 1342, at 1369

(CAFC, 2012).

e. **Teaching away**: The Garcia reference is silent, and
affectively teaches away, from using clients as content source
for other clients.
1. There is clear distinction in the art and as taught by the
Garcia reference between clients and servers. Client devices,
such as client 105 in the Garcia reference, are end-units that
request information from servers, use client-related software
such as Web browser software, communicate over the Internet
using ISP connection, and are typically consumer owned and
operated (see Figures 1 and 2 in Garcia, as well as paragraphs
0010 and 0085). As shown in Figure 2, a client device typically
connects to the Internet via an ISP using a single connection.

- 3 -

Appx3380

Appln. No. 14/025,109
Reply to Office action of September 19, 2017


2. In contrast, server devices are known in the art to be dedicated devices to store information objects, to be provided to clients upon request (See paragraph 0012 in Garcia, for example).

3. The Garcia invention is directed to introducing a new type of information-object / client mapping device referred to as "Web router". The Web router is a backbone device (see Figure 2), and as taught in paragraph 0082, the 'Web router' communicates with 'its neighbor Web routers' via point-to-point links (paragraph 0091), and may be co-located with another server, such as '… *a Web-server, a web cache, a hosting server, a DNS server or an original content server*' (paragraph 0082). While <u>retaining the client-server basic architecture</u> (See paragraph 0153), the Garcia reference teaches a mapping method for affectively addressing caches, in order to allow low latency in the Internet.

4. The Garcia disclosure is silent, and affectively teaches away, from caching or retrieving information objects from clients, such as by using peer-to-peer scheme. The Garcia reference only teaches caching in servers or backbone-embedded Web routers. The Garcia disclosure is silent, and affectively teaches away, from implementing 'web router' functionality in clients. Further, caching information in clients clearly changes the way of operation of the Garcia network, and since clients are inherently sources limited, such as in bandwidth and storage capability, the latency of fetching information object is expected to be increased, rather than being reduced as intended by the Garcia invention.

5. The Garcia disclosure describes four distinct and non-interoperable selection mechanisms, detailed in paragraph 0104 as follows:

- 4 -

Appx3381

Appln. No. 14/025,109
Reply to Office action of September 19, 2017

> [0104] *In a further embodiment, one of the*
> *following four mechanisms, or, a combination*
> *of some of the following four mechanisms, is*
> *or may be used to communicate the best Web*
> *cache or content server, or the set of Web*
> *caches (more generally the information object*
> *repository(ies)), which should serve a*
> *client's request:*
> [0105] *(1) direct cache selection;*
> [0106] *(2) redirect cache selection;*
> [0107] *(3) remote DNS cache selection; and*
> [0108] *(4) client DNS cache selection.*

However, the Action improperly 'pick and choose' from the different mechanisms. For example, the rejection is based on paragraph 0113 that is part of the "*(1) direct cache selection*" mechanism, and paragraphs 0119-0121 that are part of the "*(2) redirect cache selection*" mechanism.

Regarding claim 26.

Claim 26 recites that "*(d)* **the first server selecting** *one of the clients from the group based on associating the identifiers of the clients with the web server identifier; (e)* **the first server sending** *the identifier of the selected client to the requesting client; …*". The claim explicitly discloses that it is the first server (assumed to be equated to the Control Server 331 in Yu) that makes the selecting, and sends the information about the selection to the requested client device. In contrast, as described in the cited paragraph 0022 and steps 512 & 514 in Figure 5, the Yu reference teaches that **the selection is made by the client device,** after receiving the whole list from the server.

Regarding claim 27.

- 5 -

Appx3382

Appln. No. 14/025,109
Reply to Office action of September 19, 2017


Claim 26 recites that "*(e) the first server sending the identifier of the selected client to the requesting client; (f) the selected client receiving the content from the web server; …*". According to claim 27, the selected client fetch the information from the web server AFTER being selected. In contrast, the Yu reference is based on selecting a client device ONLY based on this client storing in its cache memory the requested information.

Regarding claims 28-29 and 55.

The cited paragraph 0010 in the Garcia reference explicitly teaches HTTP with regard to Internet communication in a server/client scheme, hence further remote from combining with Yu that focuses on peer-to-peer communication.

Regarding claims 30-31 and 56.

The cited paragraph 0096 in the Garcia reference explicitly teaches TCP/IP with regard to WILD scheme between Web routers, hence further remote from combining with Yu that focuses on clients peer-to-peer communication.

Regarding claim 41.

The cited paragraph 0010 in the Garcia reference explicitly teaches URL with regard to Internet communication in a server/client scheme, hence further remote from combining with Yu that focuses on peer-to-peer communication.

Application/Control Number: 14/025,109                                    Page 3
Art Unit: 2459

**Garcia** teaches a method for use with a group of clients for data communication between a web server storing a content and a requesting client via one or more clients selected from the group, for use with a first server, and where the web server, the requesting client, the first server, and the clients in the group are communicatively coupled via the Internet and each is identified in the internet using a distinct identifier, the method comprising the steps of:

(c) the client sending its identifier and the web server identifier to the first server (Garcia, 0113, 0119-0120);

(d) the first server selecting one of the devices based on associating the identifiers of the clients with the web server identifier (Garcia, 0102-0103, 0121, 0153);

(e) the first server sending the identifier of the selected device to the requesting client (Garcia, 0113-0114, 0119-0121, 0153).

**Garcia** fails to teach a group of clients for data communication; (a) each of the devices sending its identifier to the first server; (b) the first server receiving and storing the identifiers of the devices; (d) the first server selecting one of the clients from the group; and (f) the selected client receiving the content from the web server; and (g) the requesting client receiving the content from the selected client.

However, in an analogous art, **Yu** teaches a group of clients for data communication (Yu, figures 2 & 4); (a) each of the devices sending its identifier to the first server (Yu, 0022-0023, 0026); (b) the first server receiving and storing the

Appx3390

Application/Control Number: 14/025,109                                    Page 4
Art Unit: 2459

identifiers of the devices (Yu, 0022-0023); (d) the first server selecting one of the clients

from the group (Yu, 0022, 0026, 0033, 0035); and (f) the selected client receiving the

content from the web server (Yu, 0026, 0033-0037); and (g) the requesting client

receiving the content from the selected client (Yu, 0026, 0031, 0035-0037).

Therefore, it would have been obvious to one having ordinary skill in the art at

the time the invention was made to incorporate the features of a group of clients for data

communication; (a) each of the devices sending its identifier to the first server; (b) the

first server receiving and storing the identifiers of the devices; (d) the first server

selecting one of the clients from the group; and (f) the selected client receiving the

content from the web server; and (g) the requesting client receiving the content from the

selected client, as disclosed by Yu, into the teachings of Garcia. One would be

motivated to support content delivery system.

**Claim 27**

**Garcia in combination with Yu** teach the method according to claim 26 wherein

the steps are sequentially executed (Yu, 0047).

**Claim 28**

Appx3391

Appln. No. 14/025,109
Reply to Office action of January 10, 2017

## REMARKS / ARGUMENTS

The examiner's action dated January 10, 2017 ("Action") has been received and its contents carefully noted.

### Office Action, pages 3-18

Claims 26-66 are rejected under 35 U.S.C. 103(a) as being unpatentable over Garcia-Luna-Aceves et al. (US 2002/0007413 – "Garcia") in view of Harrow et al. (US 2003/0009518 – "Harrow").

**Argument #1**: The Garcia reference is silent, and affectively teaches away, from using clients as content source for other clients.

a. There is clear distinction in the art and as taught by the Garcia reference between clients and servers. Client devices, such as client 105 in the Garcia reference, are end-units that request information from servers, use client-related software such as Web browser software, communicate over the Internet using ISP connection, and are typically consumer owned and operated (see Figures 1 and 2 in Garcia, as well as paragraphs 0010 and 0085). As shown in Figure 2, a client device typically connects to the Internet via an ISP using a single connection.

b. In contrast, server devices are known in the art to be dedicated devices to store information objects, to be provided to clients upon request (See paragraph 0012 in Garcia, for example).

c. The Garcia invention is directed to introducing a new type of information-object / client mapping device referred to as "Web router". The Web router is a backbone device (see Figure

- 2 -

Appx3410

Appln. No. 14/025,109
Reply to Office action of January 10, 2017

2), and as taught in paragraph 0082, the 'Web router' communicates with 'its neighbor Web routers' via point-to-point links (paragraph 0091), and may be co-located with another server, such as '… *a Web-server, a web cache, a hosting server, a DNS server or an original content server*' (paragraph 0082). While retaining the client-server basic architecture (See paragraph 0153), the Garcia reference teaches a mapping method for affectively addressing caches, in order to allow low latency in the Internet.

d. The Garcia disclosure is silent, and affectively teaches away, from caching or retrieving information objects from clients, such as by using peer-to-peer scheme. The Garcia reference only teaches caching in servers or backbone-embedded Web routers. The Garcia disclosure is silent, and affectively teaches away, from implementing 'web router' functionality in clients. Further, caching information in clients clearly changes the way of operation of the Garcia network, and since clients are inherently sources limited, such as in bandwidth and storage capability, the latency of fetching information object is expected to be increased, rather than being reduced as intended by the Garcia invention.

e. The Garcia disclosure describes four distinct and non-interoperable selection mechanisms, detailed in paragraph 0104 as follows:

> *[0104] In a further embodiment, one of the following four mechanisms, or, a combination of some of the following four mechanisms, is or may be used to communicate the best Web cache or content server, or the set of Web caches (more generally the information object repository(ies)), which should serve a client's request:*
> *[0105] (1) direct cache selection;*

- 3 -

Appx3411

Appln. No. 14/025,109
Reply to Office action of January 10, 2017

> [0106] (2) redirect cache selection;
> [0107] (3) remote DNS cache selection; and
> [0108] (4) client DNS cache selection.

However, the Action improperly 'pick and choose' from the different mechanisms. For example, the rejection is based on paragraph 0113 that is part of the "*(1) direct cache selection*" mechanism, and paragraphs 0119-0121 that are part of the "*(2) redirect cache selection*" mechanism.

Combining Garcia with Harrow

a. The rationale for combining the Garcia and Harrow references is "*… to support content delivery system*". Since both Garcia and Harrow describe a 'content delivery system', the rationale provides no linking to the present application, as required in MPEP 2143 that clearly states that "*Any rationale employed must provide **a link between the factual findings and the legal conclusion of obviousness**.*" (Emphasis added). Further, this rationale amounts to nothing more than a conclusory statement, while the Office cannot rely solely on common knowledge or common sense to support its findings. Further, it is settled that the Office should provide a "satisfactory explanation" for the motivation finding that includes an express and **"rational" connection with the evidence presented**.

b. Further, since 'supporting content delivery is long desired, the rationale, in fact, confirms that the modification based on the combination amounts to a solution to a long-felt solution that serves as a secondary consideration further supporting non-obviousness.

c. The devices described by Harrow are communicating over Local Area Network (LAN) using peer-to-peer scheme. Using clients

- 4 -

Appx3412

Appln. No. 14/025,109
Reply to Office action of January 10, 2017


<u>over the Internet as both cache-servers AND clients</u> is clearly
an unexpected result.

<u>Regarding claims 26, 38, 49, 50 and 53</u>.
a. Claim 26 recites the limitations: "… *each of the clients in
the group sending its identifier to the first server; …*" and "…
*the first server receiving and storing the identifiers of the
clients in the group; …*". The rejection is based on paragraphs
0102 and 0113 in Garcia.

    While the mapping scheme described in the Garcia
reference is based on the IP address of the <u>information
requesting</u> client device, the Garcia reference in general, and
the cited paragraphs 0102 and 0113 in particular, is silent
about receiving of identifiers, or even about being contacted
by, clients other than the information-requesting client. In
particular, the Garcia reference is silent about receiving or
storing identifiers of client devices as recited in the claim.

b. Claim 26 recites the limitations: "… *the first server
selecting one of the clients from the group based on
associating the identifiers of the clients with the web server
identifier …*". The rejection is based on paragraphs 0102-0103,
0121, and 0153 in Garcia.

    The cited paragraphs 0102 and 0121 teach selecting
the 'best cache server', and the cited paragraph 0153 teaches
changing the selected cache server upon sensing loading
degradation. However, the Garcia reference in general, and the
cited paragraph in particular, are silent regarding selecting
non-cache server in general, a non-server in particular, and

- 5 -

Appx3413

Appln. No. 14/025,109
Reply to Office action of January 10, 2017


further regarding <u>selecting a client </u>device as recited in the claim.

Further, the selection mechanism described by Garcia (in particular in the cited paragraphs) is based on WILD protocol, as described in paragraphs 0095-0096 and 0099-0100. This protocol is a high level protocol (above TCP) used by backbone devices such as gateways and web routers. Such protocol is not described for, and is not suited for use by, client devices.

<u>Regarding claims 28-29 and 55</u>.

The cited paragraph 0010 in the Garcia reference explicitly teaches HTTP with regard to Internet communication in a server/client scheme, hence further remote from combining with Harrow that discusses peer-to-peer communication in a LAN environment.

<u>Regarding claims 30-31 and 56</u>.

The cited paragraph 0096 in the Garcia reference explicitly teaches TCP/IP with regard to WILD scheme between Web routers, hence further remote from combining with Harrow that discusses clients peer-to-peer communication in a LAN environment.

<u>Regarding claim 41</u>.

The cited paragraph 0010 in the Garcia reference explicitly teaches URL with regard to Internet communication in a server/client scheme, hence further remote from combining with Harrow that discusses peer-to-peer communication in a LAN environment.

<u>Regarding claims 43-44</u>.

- 6 -

Application/Control Number: 14/025,109                                           Page 3
Art Unit: 2459

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

**Claims 26-66** are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Garcia-Luna-Aceves et al. (US 2002/0007413) hereinafter "**Garcia**",

and in view of Harrow et al. (US 2003/0009518) hereinafter "**Harrow**".

## Claim 26

**Garcia** teaches a method for use with a group of clients for data communication

between a web server storing a content and a requesting client via one or more clients

selected from the group, for use with a first server, and where the web server, the

requesting client, the first server, and the clients in the group are communicatively

coupled via the Internet and each is identified in the internet using a distinct identifier,

the method comprising the steps of:

(a) each of the devices sending its identifier to the first server (Garcia, 0102,

0113);

(b) the first server receiving and storing the identifiers of the devices (Garcia,

0102, 0113);

(c) the client sending its identifier and the web server identifier to the first server

(Garcia, 0113, 0119-0120);

(d) the first server selecting one of the devices based on associating the identifiers of the clients with the web server identifier (Garcia, 0102-0103, 0121, 0153);

(e) the first server sending the identifier of the selected device to the requesting client (Garcia, 0113-0114, 0119-0121, 0153).

**Garcia** fails to teach a group of clients for data communication between the web server and a requesting client via one or more clients selected from the group; and (f) the selected client receiving the content from the web server; and (g) the requesting client receiving the content from the selected client.

However, in an analogous art, **Harrow** teaches a group of clients (i.e. clients A-D) for data communication between the web server and a requesting client (i.e. client A) via one or more clients selected from the group; and (f) the selected client (i.e. client D) receiving the content from the web server; and (g) the requesting client (i.e. client A) receiving the content from the selected client (Harrow, 0031, 0034, 0082, 0088).

Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to incorporate the features of a group of clients for data communication between the web server and a requesting client via one or more clients selected from the group; and (f) the selected client receiving the content from the web server; and (g) the requesting client receiving

Appln. No. 14/025,109
Reply to Office action of September 8, 2016

**Amendments to the claims**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of claims:**

1-25. (Cancelled)

26. (Currently amended) A method ~~for use with a group of clients~~ for data communication between a web server storing a content and a <u>requesting</u> client via one or more ~~devices~~ <u>clients selected from the group</u>, for use with a first server, and where the web server, the <u>requesting</u> client, the first server, and the ~~devices~~ <u>clients in the group</u> are communicatively coupled via the Internet and each is identified in the Internet using a distinct identifier, the method comprising the steps of:

(a) each of the ~~devices~~ <u>clients in the group</u> sending its identifier to the first server;

(b) the first server <u>receiving and</u> storing the identifiers of the <u>clients in the group</u> ~~devices~~;

(c) the <u>requesting</u> client sending its identifier and the web server identifier to the first server;

(d) the first server selecting one of the ~~devices~~ <u>clients from the group</u> based on associating the identifiers of the ~~devices~~ <u>clients</u> with the web server identifier;

(e) the first server sending the identifier of the selected ~~device~~ <u>client</u> to the <u>requesting</u> client;

(f) the selected ~~device~~ <u>client</u> receiving the content from the web server; and

- 2 -

Appx3441

Appln. No. 14/025,109
Reply to Office action of September 8, 2016

(g) the requesting client receiving the content from the
selected client ~~device~~.

27. (Previously presented) The method according to claim 26,
wherein the steps are sequentially executed.

28. (Currently amended) The method according to claim 26,
wherein the web server is Hypertext Transfer Protocol (HTTP)
server and responds to HTTP requests from the selected client
~~device~~.

29. (Currently amended) The method according to claim 26,
wherein the first server is HTTP server and responds to HTTP
requests from the requesting client or the ~~clients in the group~~
~~devices~~.

30. (Previously presented) The method according to claim 26,
wherein the web server is Transmission Control Protocol /
Internet Protocol (TCP/IP) server and communicates based on, or
according to, using TCP/IP protocol or connection.

31. (Previously presented) The method according to claim 26,
wherein the first server is a TCP / IP server and communicates
based on, or according to, using TCP/IP protocol or connection.

32. (Previously presented) The method according to claim 26,
wherein the content includes web-page, audio, or video content.

33. (Currently amended) The method according to claim 26,
wherein the first server selecting one of the ~~devices~~ clients
is based on the web server IP address or URL.

34. (Currently amended) The method according to claim 26,
wherein the first server selecting one of the ~~devices~~ clients
is based on the selected client ~~device~~ IP address.

- 3 -

Page 116 of 275

Appx3442



US010069936B2

(12) **United States Patent**
    Shribman et al.

(10) Patent No.: **US 10,069,936 B2**
(45) **Date of Patent:** **Sep. 4, 2018**

(54) **SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION**

(71) Applicant: **HOLA NEWCO LTD.**, Netanya (IL)

(72) Inventors: **Derry Shribman**, Tel Aviv (IL); **Ofer Vilenski**, Moshav Hadar Am (IL)

(73) Assignee: **HOLA NEWCO LTD.**, Netanya (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 485 days.

(21) Appl. No.: **14/025,109**

(22) Filed: **Sep. 12, 2013**

(65) **Prior Publication Data**

US 2014/0019514 A1    Jan. 16, 2014

**Related U.S. Application Data**

(62) Division of application No. 12/836,059, filed on Jul. 14, 2010, now Pat. No. 8,560,604.

(Continued)

(51) **Int. Cl.**
    **H04L 29/06**      (2006.01)
    **H04L 29/08**      (2006.01)
    **H04L 12/24**      (2006.01)

(52) **U.S. Cl.**
    CPC ............ **H04L 67/42** (2013.01); **H04L 41/046** (2013.01); **H04L 67/1002** (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC .... H04L 67/42; H04L 41/046; H04L 67/1002
    (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,922,494 A    11/1975    Cooper et al.
4,937,781 A    6/1990    Lee et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    101075242 A    11/2007
CN    101179389 A    5/2008
(Continued)

OTHER PUBLICATIONS

Notice of Preliminary Rejection in KR Application No. 10-2012-7011711 dated Jul. 15, 2016.
(Continued)

*Primary Examiner* — Minh Chau Nguyen
(74) *Attorney, Agent, or Firm* — May Patents Ltd.

(57) **ABSTRACT**

A system designed for increasing network communication speed for users, while lowering network congestion for content owners and ISPs. The system employs network elements including an acceleration server, clients, agents, and peers, where communication requests generated by applications are intercepted by the client on the same machine. The IP address of the server in the communication request is transmitted to the acceleration server, which provides a list of agents to use for this IP address. The communication request is sent to the agents. One or more of the agents respond with a list of peers that have previously seen some or all of the content which is the response to this request (after checking whether this data is still valid). The client then downloads the data from these peers in parts and in parallel, thereby speeding up the Web transfer, releasing congestion from the Web by fetching the information from multiple sources, and relieving traffic from Web servers by offloading the data transfers from them to nearby peers.

**34 Claims, 15 Drawing Sheets**



Appx3907

**US 10,069,936 B2**

Page 2

### Related U.S. Application Data

(60) Provisional application No. 61/249,624, filed on Oct. 8, 2009.

(52) **U.S. Cl.**
CPC ........ *H04L 67/108* (2013.01); *H04L 67/1023* (2013.01); *H04L 67/1063* (2013.01); *H04L 67/22* (2013.01); *H04L 67/2814* (2013.01); *H04L 67/2819* (2013.01); *H04L 67/02* (2013.01)

(58) **Field of Classification Search**
USPC ...................... 709/201–203, 207
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,758,195 A | 5/1998 | Balmer | |
| 6,061,278 A | 5/2000 | Kato et al. | |
| 6,173,330 B1 | 1/2001 | Guo et al. | |
| 6,466,470 B1 | 10/2002 | Chang | |
| 7,120,666 B2 | 10/2006 | McCanne et al. | |
| 7,203,741 B2 | 4/2007 | Marco et al. | |
| 7,558,942 B1 | 7/2009 | Chen et al. | |
| 7,865,585 B2 * | 1/2011 | Samuels | H04L 67/2842 709/217 |
| 7,970,835 B2 | 6/2011 | St. Jacques | |
| 8,171,101 B2 | 5/2012 | Gladwin et al. | |
| 8,479,251 B2 | 7/2013 | Feinleib et al. | |
| 8,499,059 B2 | 7/2013 | Stoyanov | |
| 8,769,035 B2 | 7/2014 | Resch et al. | |
| 8,832,179 B2 | 9/2014 | Owen et al. | |
| 2001/0033583 A1 | 10/2001 | Rabenko et al. | |
| 2002/0007413 A1 * | 1/2002 | Garcia-Luna-Aceves | G06F 12/1483 709/229 |
| 2002/0065930 A1 | 5/2002 | Rhodes | |
| 2002/0120874 A1 | 8/2002 | Shu et al. | |
| 2002/0123895 A1 | 9/2002 | Potekhin | |
| 2002/0133621 A1 | 9/2002 | Marco et al. | |
| 2003/0009518 A1 * | 1/2003 | Harrow | H04L 47/10 709/203 |
| 2003/0009583 A1 | 1/2003 | Chan et al. | |
| 2003/0074403 A1 * | 4/2003 | Harrow | G06F 17/30206 709/203 |
| 2003/0115364 A1 | 6/2003 | Shu et al. | |
| 2003/0174648 A1 | 9/2003 | Wang et al. | |
| 2003/0200307 A1 * | 10/2003 | Raju | G06F 12/1483 709/224 |
| 2003/0204602 A1 | 10/2003 | Hudson | |
| 2003/0210694 A1 * | 11/2003 | Jayaraman | H04L 67/1008 370/392 |
| 2004/0088646 A1 | 5/2004 | Yeager et al. | |
| 2004/0107242 A1 | 6/2004 | Vert et al. | |
| 2004/0264506 A1 | 12/2004 | Furukawa | |
| 2006/0212584 A1 * | 9/2006 | Yu | G06F 17/30902 709/227 |

| | | | |
|---|---|---|---|
| 2007/0073878 A1 * | 3/2007 | Issa | H04L 67/104 709/225 |
| 2007/0156855 A1 | 7/2007 | Johnson | |
| 2007/0226810 A1 | 9/2007 | Hotti | |
| 2007/0239655 A1 | 10/2007 | Agetsuma et al. | |
| 2008/0008089 A1 | 1/2008 | Bornstein et al. | |
| 2008/0025506 A1 | 1/2008 | Muraoka | |
| 2008/0109446 A1 | 5/2008 | Wang | |
| 2008/0109466 A1 | 5/2008 | Xin | |
| 2008/0125123 A1 | 5/2008 | Dorenbosch et al. | |
| 2008/0222291 A1 | 9/2008 | Weller et al. | |
| 2008/0235391 A1 | 9/2008 | Painter et al. | |
| 2009/0217122 A1 | 8/2009 | Yokokawa et al. | |
| 2009/0279559 A1 | 11/2009 | Wong et al. | |
| 2009/0319502 A1 * | 12/2009 | Chalouhi | H04L 67/104 |
| 2010/0066808 A1 | 3/2010 | Tucker et al. | |
| 2010/0085977 A1 | 4/2010 | Khalid et al. | |
| 2010/0094970 A1 | 4/2010 | Zuckerman et al. | |
| 2010/0115063 A1 | 6/2010 | Gladwin et al. | |
| 2010/0154044 A1 | 6/2010 | Manku | |
| 2010/0235438 A1 | 9/2010 | Narayanan et al. | |
| 2010/0293555 A1 | 11/2010 | Vepsalainen | |
| 2010/0329270 A1 | 12/2010 | Asati et al. | |
| 2011/0087733 A1 | 4/2011 | Shribman et al. | |
| 2011/0314347 A1 | 12/2011 | Nakano et al. | |
| 2012/0099566 A1 | 4/2012 | Laine et al. | |
| 2012/0124239 A1 | 5/2012 | Shribman et al. | |
| 2012/0254456 A1 | 10/2012 | Visharam et al. | |
| 2013/0166768 A1 | 6/2013 | Gouache et al. | |
| 2013/0201316 A1 | 8/2013 | Binder et al. | |
| 2013/0272519 A1 | 10/2013 | Huang | |
| 2014/0082260 A1 | 3/2014 | Oh et al. | |
| 2014/0301334 A1 | 10/2014 | Labranche et al. | |
| 2015/0033001 A1 | 1/2015 | Ivanov | |
| 2015/0067819 A1 | 3/2015 | Shribman et al. | |
| 2015/0358648 A1 | 12/2015 | Limberg | |
| 2016/0021430 A1 | 1/2016 | LaBosco et al. | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0948176 A2 | 10/1999 |
| EP | 2597869 A1 | 5/2015 |
| JP | 2007-280388 A | 10/2007 |
| JP | 2007280388 | 10/2007 |
| KR | 1020090097034 | 9/2009 |
| RU | 2343536 C2 | 10/2009 |
| WO | 2000/018078 A1 | 3/2000 |
| WO | 2010090562 A1 | 8/2010 |
| WO | 2015034752 A1 | 3/2015 |

#### OTHER PUBLICATIONS

R. Fielding et al, RFC 2616: Hypertext Transfer Protocol—HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages).

"On the Leakage of Personally Identifiable Information via Online Social Networks"—Wills et al, AT&T, Apr. 2009 http://www2.research.att.com/~bala/papers/wosn09.pdf.

* cited by examiner

Appx3908



**FIG. 1**

Appx3909



**FIG. 2**

Appx3910



**FIG. 3**



FIG. 4

Appx3912



**FIG. 5**

Appx3913



FIG. 6

Appx3914

**FIG. 7**



300

INITIALIZER SIGNS UP WITH
ACCELERATION SERVER
302

DETERMINE IF THERE IS AN
UPDATED VERSION OF
APPLICATION?
304

INITIALIZER REDIRECTS
OUTGOING NETWORK TRAFFIC
306

INITIALIZER LAUNCHES CLIENT
MODULE AND CONFIGURES
CLIENT MODULE TO INTERCEPT
ALL OUTGOING NETWORK
COMMUNICATIONS
308

INITIALIZER LAUNCHES AGENT
MODULE AND PEER MODULE
310

**FIG. 8**



**FIG. 9**

Appx3917



FIG. 10



CLIENT RECEIVES RESPONSE FROM THE AGENT AND FOR EACH OF X CHUNKS, CLIENT SENDS A REQUEST TO EACH OF THE PEERS LISTED FOR THE CHUNK TO DOWNLOAD THE DATA OF THAT CHUNK     422

PEERS RESPOND REGARDING WHETHER THEY STILL HAVE THE DATA OF THE CHUNK     424

CLIENT SELECTS QUICKEST PEER WITH DATA OF THE CHUCK  426

CHOSEN PEER SENDS CHUNK TO CLIENT     428

CLIENT STORES CHUNKS IN ITS CACHE FOR FUTURE USE     430

IF ANY CHUNKS WERE NOT LOADED FROM ANY OF THE PEERS, CLIENT REQUESTS CHUNKS AGAIN FROM AGENT     432

CLIENT ACKNOWLEDGES TO THE AGENT WHICH OF THE CHUNKS IT RECEIVED PROPERLY     434

AGENT LOOKS UP CHUNKS IN DATABASE OF AGENT AND ADDS CLIENT TO LIST OF PEERS FOR THESE CHUNKS     436

CLIENT PASSES DATA TO APPLICATION OF CLIENT THAT MADE REQUEST 438

CLIENT CHECKS WHETHER ALL OF THE CHUNKS FOR REQUEST WERE RECEIVED     440

**FIG. 11**

420

Appx3919



**FIG. 12**



**FIG. 13**





**FIG. 14**

Appx3922



FIG. 15

*800*

US 10,069,936 B2

**1**

# SYSTEM PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a divisional application of copending U.S. non-provisional patent application entitled "SYSTEM AND METHOD FOR PROVIDING FASTER AND MORE EFFICIENT DATA COMMUNICATION" having Ser. No. 12/836,059, filed Jul. 14, 2010, and claims priority to U.S. provisional patent application entitled "SYSTEM AND METHOD FOR REDUCING INTERNET CONGESTION," having Ser. No. 61/249,624, filed Oct. 8, 2009, both of which are hereby incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present invention is related to Internet communication, and more particularly, to improving data communication speed and bandwidth efficiency on the Internet.

## BACKGROUND OF THE INVENTION

There are several trends in network and Internet usage, which tremendously increase the bandwidth that is being used on the Internet. One such trend is that more and more video is being viewed on demand on the Internet. Such viewing includes the viewing of both large and short video clips. In addition, regular shows and full-featured films may be viewed on the Internet. Another trend that is increasing the traffic on the Internet is that Web sites (such as shopping portals, news portals, and social networks) are becoming global, meaning that the Web sites are serving people in many diverse places on the globe, and thus the data is traversing over longer stretches of the Internet, increasing the congestion.

The increase in bandwidth consumption has created several major problems, a few of which are described below:
The problem for users—the current Internet bandwidth is not sufficient, and thus the effective 'speed' experienced by users is slow;
The problem for content owners—the tremendous amount of data being viewed by users is costing large amounts of money in hosting and bandwidth costs; and
The problem for Internet Service Providers (ISPs)—the growth in Internet traffic is requiring the ISPs to increase the infrastructure costs (communication lines, routers, etc.) at tremendous financial expense.

The need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs, has become a major issue which is yet unsolved.

There have been many attempts at making the Internet faster for the consumer and cheaper for the broadcaster. Each such attempt is lacking in some aspect to become a widespread, practical solution, or is a partial solution in that it solves only a subset of the major problems associated with the increase in Internet traffic. Most of the previous solutions require billions of dollars in capital investment for a comprehensive solution. Many of these attempts are lacking in that much of the content on the Internet has become dynamically created per the user and the session of the user (this is what used to be called the "Web2.0" trend). This may be seen on the Amazon Web site and the Salesforce Web site, for example, where most of the page views on these Web

**2**

sites is tailored to the viewer, and is thus different for any two viewers. This dynamic information makes it impossible for most of the solutions offered to date to store the content and provide it to others seeking similar content.

One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram an example of use of a proxy within a network **2**. A proxy, or proxy server **4**, **6**, **8** is a device that is placed between one or more clients, illustrated in FIG. **1** as client devices **10**, **12**, **14**, **16**, **18**, **20**, that request data, via the Internet **22**, and a Web server or Web servers **30**, **32**, **34** from which they are requesting the data. The proxy server **4**, **6**, **8** requests the data from the Web servers **30**, **32**, **34** on their behalf, and caches the responses from the Web servers **30**, **32**, **34**, to provide to other client devices that make similar requests. If the proxy server **4**, **6**, **8** is geographically close enough to the client devices **10**, **12**, **14**, **16**, **18**, **20**, and if the storage and bandwidth of the proxy server **4**, **6**, **8** are large enough, the proxy server **4**, **6**, **8** will speed up the requests for the client devices **10**, **12**, **14**, **16**, **18**, **20** that it is serving.

It should be noted, however, that to provide a comprehensive solution for Internet surfing, the proxy servers of FIG. **1** would need to be deployed at every point around the world where the Internet is being consumed, and the storage size of the proxy servers at each location would need to be near the size of all the data stored anywhere on the Internet. The abovementioned would lead to massive costs that are impractical. In addition, these proxy solutions cannot deal well with dynamic data that is prevalent now on the Web.

There have been commercial companies, such as Akamai, that have deployed such proxies locally around the world, and that are serving a select small group of sites on the Internet. If all sites on the Web were to be solved with such a solution, the capital investment would be in the range of billions of dollars. In addition, this type of solution does not handle dynamic content.

To create large distribution systems without the large hardware costs involved with a proxy solution, "peer-to-peer file sharing" solutions have been introduced, such as, for example, BitTorrent. FIG. **2** is a schematic diagram providing an example of a peer-to-peer file transfer network **50**. In the network **50**, files are stored on computers of consumers, referred to herein as client devices **60**. Each consumer can serve up data to other consumers, via the Internet **62**, thus taking the load of serving off of the distributors and saving them the associated costs, and providing the consumer multiple points from which to download the data, referred to herein as peers **70**, **72**, **74**, **76**, **78**, thus increasing the speed of the download. However, each such peer-to-peer solution must have some sort of index by which to find the required data. In typical peer-to-peer file sharing systems, because the index is on a server **80**, or distributed among several servers, the number of files available in the system is not very large (otherwise, the server costs would be very large, or the lookup time would be very long).

The peer-to-peer file sharing solution is acceptable in file sharing systems, because there are not that many media files that are of interest to the mass (probably in the order of magnitude of millions of movies and songs that are of interest). Storing and maintaining an index of millions of entries is practical technically and economically. However, if this system were to be used to serve the hundreds of billions of files that are available on the Internet of today, the cost of storing and maintaining such an index would be again in the billions of dollars. In addition, these types of peer-to-peer file sharing systems are not able to deal with dynamic HTTP data.

US 10,069,936 B2

3

In conclusion, a system does not exist that enables fast transmission of most of the data on the Internet, that does not incur tremendous costs, and/or that provides only a very partial solution to the problem of Internet traffic congestion. Thus, a heretofore unaddressed need exists in the industry to address the aforementioned deficiencies and inadequacies.

## SUMMARY OF THE INVENTION

The present system and method provides for faster and more efficient data communication within a communication network. Briefly described, in architecture, one embodiment of the system, among others, can be implemented as follows. A network is provided for accelerating data communication, wherein the network contains: at least one client communication device for originating a data request for obtaining the data from a data server; at least one agent communication device which is assigned to the data server for receiving the data request from the client communication device, wherein the agent keeps track of which client communication devices have received responses to data requests from the assigned data server; at least one peer communication device for storing portions of data received in response to the data request by the at least one client communication device, wherein the portions of data may be transmitted to the at least one client communication device upon request by the client communication device; and at least one acceleration server for deciding which agent communication device is to be assigned to which data server and providing this information to the at least one client communication device.

The present system and method also provides a communication device within a network, wherein the communication device contains: a memory; and a processor configured by the memory to perform the steps of: originating a data request for obtaining data from a data server; being assigned to a data server, referred to as an assigned data server; receiving a data request from a separate device within the network, and keeping track of which client communication devices within the network have received responses to data requests from the assigned data server; and storing portions of data received in response to the originated data request, wherein the portions of data may be transmitted to communication device upon request by the communication device.

Other systems, methods, features, and advantages of the present invention will be or become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional systems, methods, features, and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

Many aspects of the invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. 1 is a schematic diagram providing a prior art example of use of a proxy within a network.

FIG. 2 is a schematic diagram providing a prior art example of a peer-to-peer file transfer network.

4

FIG. 3 is a schematic diagram providing an example of a communication network in accordance with the present invention.

FIG. 4 is a schematic diagram further illustrating a communication device of the communication network of FIG. 3.

FIG. 5 is a schematic diagram further illustrating the memory of FIG. 4.

FIG. 6 is a schematic diagram further illustrating elements of the acceleration application of FIG. 5, as well as communication paths of the acceleration application.

FIG. 7 is a chart further illustrating two of the main databases utilized within the communication network.

FIG. 8 is a flowchart illustrating operation of the acceleration system initializer module.

FIG. 9 is a flowchart further illustrating communication between different elements of the communication network.

FIG. 10 is a flowchart continuing the flowchart of FIG. 9 and focused on agent response to the HTTP request.

FIG. 11 is a flowchart continuing the flowchart of FIG. 10, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent.

FIG. 12 is a flowchart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid.

FIG. 13 is a flowchart outlining operation of the acceleration server.

FIG. 14 is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention.

FIG. 15 is a flowchart further illustrating TCPIP acceleration in accordance with an alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

## DETAILED DESCRIPTION

The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network 100 is provided by the schematic diagram of FIG. 3. The network 100 of FIG. 3 contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100, as is described in detail herein. It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. 4.

Returning to FIG. 3, the exemplary embodiment of the network 100 illustrates that one of the communication devices is functioning as a client 102. The client 102 is capable of communication with one or more peers 112, 114, 116 and one or more agents 122. For exemplary purposes, the network contains three peers and one agent, although it is noted that a client can communicate with any number of agents and peers.

The communication network 100 also contains a Web server 152. The Web server 152 is the server from which the client 102 is requesting information and may be, for example, a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet. It should be noted that the server 152 is not limited to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the

Appx3925

US 10,069,936 B2

**5**

server may be a server capable of handling a different protocol. It should also be noted that while the present description refers to the use of HTTP, the present invention may relate to any other communication protocol and HTTP is not intended to be a limitation to the present invention.

The communication network **100** further contains an acceleration server **162** having an acceleration server storage device **164**. As is described in more detail herein, the acceleration server storage device **164** has contained therein an acceleration server database. The acceleration server database stores Internet protocol (IP) addresses of communication devices within the communication network **100** having acceleration software stored therein. Specifically, the acceleration server database contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. For each such agent, the acceleration server assigns a list of IP addresses.

In the communication network **100** of FIG. **3**, the application in the client **102** is requesting information from the Web server **152**, which is why the software within the communication device designated this communication device to work as a client. In addition, since the agent **122** receives the request from the client **102** as the communication device closest to the Web server **152**, functionality of the agent **122**, as provided by the software of the agent **122**, designates this communication device to work as an agent. It should be noted, that in accordance with an alternative embodiment of the invention, the agent need not be the communication device that is closest to the Web server. Instead, a different communication device may be selected to be the agent.

Since the peers **112, 114, 116** contain at least portions of the information sought by the client **102** from the Web server **152**, functionality of the peers **112, 114, 116**, as provided by the software of the peers **112, 114, 116**, designates these communication devices to work as peers. It should be noted that the process of designating clients, agents, and peers is described in detail herein. It should also be noted that the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network **100** may differ from the number illustrated by FIG. **3**. In fact, the number of clients, agents, peers, acceleration servers, Web servers, and other components of the communication network **100** are not intended to be limited by the current description.

Prior to describing functionality performed within a communication network **100**, the following further describes a communication device **200**, in accordance with a first exemplary embodiment of the invention. FIG. **4** is a schematic diagram for further illustrating a communication device **200** of the communication network **100**, which contains general components of a computer. As previously mentioned, it should be noted that the communication device **200** of FIG. **4** may serve as a client, agent, or peer.

Generally, in terms of hardware architecture, as shown in FIG. **4**, the communication device **200** includes a processor **202**, memory **210**, at least one storage device **208**, and one or more input and/or output (I/O) devices **240** (or peripherals) that are communicatively coupled via a local interface **250**. The local interface **250** can be, for example but not limited to, one or more buses or other wired or wireless connections, as is known in the art. The local interface **250** may have additional elements, which are omitted for simplicity, such as controllers, buffers (caches), drivers, repeaters, and receivers, to enable communications. Further, the local interface **250** may include address, control, and/or data

**6**

connections to enable appropriate communications among the aforementioned components.

The processor **202** is a hardware device for executing software, particularly that stored in the memory **210**. The processor **52** can be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the communication device **200**, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, or generally any device for executing software instructions.

The memory **210**, which is further illustrated and described by the description of FIG. **5**, can include any one or combination of volatile memory elements (e.g., random access memory (RAM, such as DRAM, SRAM, SDRAM, etc.)) and nonvolatile memory elements (e.g., ROM, hard drive, tape, CDROM, etc.). Moreover, the memory **210** may incorporate electronic, magnetic, optical, and/or other types of storage media. Note that the memory **210** can have a distributed architecture, where various components are situated remote from one another, but can be accessed by the processor **202**.

The software **212** located within the memory **210** may include one or more separate programs, each of which contains an ordered listing of executable instructions for implementing logical functions of the communication device **200**, as described below. In the example of FIG. **4**, the software **212** in the memory **210** at least contains an acceleration application **220** and an Internet browser **214**. In addition, the memory **210** may contain an operating system (O/S) **230**. The operating system **230** essentially controls the execution of computer programs and provides scheduling, input-output control, file and data management, memory management, and communication control and related services. It should be noted that, in addition to the acceleration application **220**, Internet browser **214**, and operating system **230**, the memory **210** may contain other software applications.

While the present description refers to a request from the client originating from an Internet browser, the present invention is not limited to requests originating from Internet browsers. Instead, a request may originate from an email program or any other program that would be used to request data that is stored on a Web server, or other server holding data that is requested by the client device.

Functionality of the communication device **200** may be provided by a source program, executable program (object code), script, or any other entity containing a set of instructions to be performed. When a source program, then the program needs to be translated via a compiler, assembler, interpreter, or the like, which may or may not be included within the memory **210**, so as to operate properly in connection with the operating system **230**. Furthermore, functionality of the communication device **200** can be written as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions.

The I/O devices **240** may include input devices, for example but not limited to, a keyboard, mouse, scanner, microphone, etc. Furthermore, the I/O devices **240** may also include output devices, for example but not limited to, a printer, display, etc. Finally, the I/O devices **240** may further include devices that communicate via both inputs and outputs, for instance but not limited to, a modulator/demodulator (modem; for accessing another device, system, or

Appx3926

US 10,069,936 B2

7                                                                          8

network), a radio frequency (RF) or other transceiver, a telephonic interface, a bridge, a router, etc.

When the communication device **200** is in operation, the processor **202** is configured to execute the software **212** stored within the memory **210**, to communicate data to and from the memory **210**, and to generally control operations of the communication device **200** pursuant to the software **212**. The software **212** and the O/S **230**, in whole or in part, but typically the latter, are read by the processor **202**, perhaps buffered within the processor **202**, and then executed.

When functionality of the communication device **200** is implemented in software, as is shown in FIG. **4**, it should be noted that the functionality can be stored on any computer readable medium for use by or in connection with any computer related system or method. In the context of this document, a computer readable medium is an electronic, magnetic, optical, or other physical device or means that can contain or store a computer program for use by or in connection with a computer related system or method. The functionality of the communication device **200** can be embodied in any computer-readable medium for use by or in connection with an instruction execution system, apparatus, or device, such as a computer-based system, processor-containing system, or other system that can fetch the instructions from the instruction execution system, apparatus, or device and execute the instructions. In the context of this document, a "computer-readable medium" can be any means that can store, communicate, propagate, or transport the program for use by or in connection with the instruction execution system, apparatus, or device.

The computer readable medium can be, for example but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or propagation medium. More specific examples (a non-exhaustive list) of the computer-readable medium would include the following: an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM, EEPROM, or Flash memory) (electronic), an optical fiber (optical), and a portable compact disc read-only memory (CDROM) (optical). Note that the computer-readable medium could even be paper or another suitable medium upon which the program is printed, as the program can be electronically captured, via for instance optical scanning of the paper or other medium, then compiled, interpreted or otherwise processed in a suitable manner if necessary, and then stored in a computer memory.

In an alternative embodiment, where the functionality of the communication device **200** is implemented in hardware, the functionality can be implemented with any or a combination of the following technologies, which are each well known in the art: a discrete logic circuit(s) having logic gates for implementing logic functions upon data signals, an application specific integrated circuit (ASIC) having appropriate combinational logic gates, a programmable gate array(s) (PGA), a field programmable gate array (FPGA), etc.

The at least one storage device **208** of the communication device **200** may be one of many different categories of storage device. As is described in more detail herein, the storage device **208** may include a configuration database **280** and a cache database **282**. Alternatively, the configuration database **280** and cache database **282** may be located on different storage devices that are in communication with the communication device **200**. The description that follows assumes that the configuration database **280** and cache database **282** are located on the same storage device, however, it should be noted that the present invention is not intended to be limited to this configuration.

The configuration database **280** stores configuration data that is common to all elements of the communication network **100** and is used to provide set up and synchronization information to different modules of the acceleration application **220** stored within the memory **210**, as is described in further detail herein. The cache database **282** stores responses to HTTP requests that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. As is explained in additional detail herein, the responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to retrieve this information and will use this communication device as either a peer or an agent.

In addition to the abovementioned, as is explained in further detail herein, the cache database **282** has stored therein a list of URLs that the communication device is aware of (i.e., has seen requests for). For each URL, the cache database **282** has stored therein the URL itself, HTTP headers returned by the Web Server for this URL, when the last time was that the contents of this URL was loaded directly from the Web Server, when the contents of the URL had last changed on the Web Server, as well as a list of chunks that contain the contents of this URL, and the chunks of data themselves. Chunks in the present description are defined as equally sized pieces of data that together form the whole content of the URL. It should be noted that while the present description provides for chunks being equally sized pieces of data, in accordance with an alternative embodiment of the invention, the chunks may instead be of different size.

FIG. **5** is a schematic diagram further illustrating the memory **210** of FIG. **4**. As shown by FIG. **5**, the memory **210** may be separated into two basic levels, namely, an operating system level **260** and an application level **270**. The operating system level **260** contains the operating system **230**, wherein the operating system **230** further contains at least one device driver **262** and at least one communication stack **264**. The device drivers **262** are software modules that are responsible for the basic operating commands for various hardware devices of the communication device **200**, such as the processor **202**, the storage device **208** and the I/O devices **240**. In addition, the communication stacks **264** provide applications of the communication device **200** with a means of communicating within the network **100** by implementing various standard communication protocols.

The application level **270** includes any application that is running on the communication device **200**. As a result, the application level **270** includes the Internet browser **214**, which is used to view information that is located on remote Web servers, the acceleration application **220**, as described in more detail below, and any other applications **216** stored on the communication device **200**.

As is explained in additional detail below, the acceleration application **220** intercepts the requests being made by applications of the communication device (client) that use the Internet, in order to modify the requests and route the requests through the communication network. There are various methods that may be used to intercept such requests. One such method is to create an intermediate driver **272**, which is also located within the memory **210**, that attaches itself to all communication applications, intercepts outgoing

Appx3927

US 10,069,936 B2

9

requests of the communication applications of the communication device **200**, such as the Internet browser **214**, and routes the requests to the acceleration application **220**. Once the acceleration application **220** modifies the requests, routes the requests to other system elements on the communication network **100**, and receives replies from other system elements of the communication network **100**, the acceleration application **220** returns the replies to the intermediate driver **272**, which provides the replies back to the requesting communication application.

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application **220**, as well as communication paths of the acceleration application **220**. The acceleration application **220** contains an acceleration system initializer module **222**, which is called when the acceleration application **220** is started. The acceleration system initializer module **222** is capable of initializing all elements of the communication device **200** The acceleration application **220** also contains three separate modules that run in parallel, namely, a client module **224**, a peer module **226**, and an agent module **228**, each of which comes into play according to the specific role that the communication device **200** is partaking in the communication network **100** at a given time. The role of each module is further described herein.

The client module **224** provides functionality required when the communication device **200** is requesting information from the Web server **152**, such as, for example, but not limited to, Web pages, data, video, or audio. The client module **224** causes the communication device **200** having the client module **224** therein to intercept the information request and pass the information request on to other elements of the communication network **100**, such as, servers, agents or peers. This process is further described in detail herein.

The peer module **226** provides functionality required by the communication device **200** when answering other clients within the communication network **100** and providing the other clients with information that they request, which this communication device **200**, having this peer module **226** therein, has already downloaded at a separate time. This process is further described in detail herein.

The agent module **228** provides functionality required when other communication devices of the communication network **100** acting as clients query this communication device **200**, having this agent module **228** therein, as an agent, to obtain a list of peers within the communication network **100** that contain requested information. This process is further described in detail herein.

The acceleration application **220** interacts with both the configuration database **280** and the cache database **282** of the storage device **208**. As previously mentioned herein, the configuration database **280** stores configuration data that may be common to all communication devices of the communication network **100** and is used to provide setup and synchronization information to different modules **222**, **224**, **226**, **228** of the acceleration application **220** stored within the memory **210**.

The cache database **282** stores responses to information requests, such as, for example, HTTP requests, that the communication device **200** has dispatched, either for its own consumption or on behalf of other elements of the communication network **100**. The responses to HTTP requests are stored within the cache database **282** for future use by this communication device **200**, or for other communication devices within the communication network **100** that need to

10

retrieve this same information and will use this communication device **200** as either a peer or an agent. This process is described in detail herein.

Information stored within the cache database **282** may include any information associated with a request sent by the client. As an example, such information may include, meta-data and actual requested data. For example, for an HTTP request for a video, the metadata may include the version of the Web server answering the request from the client and the data would be the requested video itself. In a situation where there is no more room for storage in the cache database, the software of the associated communication device may cause the communication device to erase previous data stored in order to clear room for the new data to store in the cache database. As an example, such previous data may include data that is most likely not to be used again. Such data may be old data or data that is known to no longer be valid. The communication device may choose to erase the least relevant data, according to any of several methods that are well known in the art.

FIG. **7** is a chart further illustrating two of the main databases utilized within the communication network **100**, namely, the acceleration server database **164** and the cache database **282**. As previously mentioned, the acceleration server database **164** stores IP addresses of communication devices located within the communication network **100**, which have acceleration software stored therein. Specifically, the acceleration server database **164** contains stored therein a list of communication devices having acceleration software stored therein that are currently online within the communication network **100**. The acceleration server assigns a list of IP addresses to each communication device functioning as an agent. Each communication device will be the agent for any Web servers whose IP address is in the range 'owned' by that communication device. As an example, when a first ever communication device goes online, namely, the first communication device as described herein having the acceleration application **220** therein, the acceleration server assigns all IP addresses in the world to this communication device, and this communication device will be the agent for any Web server. When a second communication device goes online it will share the IP address list with the first communication device, so that each of the communication devices will be responsible for a different part of the world wide web servers.

The cache database **282** of the communication device **200** has stored therein a list of URLs **286** of which the communication device **200** is aware. The communication device **200** becomes aware of a URL each time that the communication device **200** receives a request for information located at a specific URL. As shown by FIG. **7**, for each URL **288** within the list of URLs **286**, the cache database **282** stores: the URL itself **290**; HTTP headers **292** returned by the Web Server **152** for this URL; when the last time **294** was that the contents of this URL were loaded directly from the Web Server **152**; when the contents of the URL last changed **296** on the Web Server **152**; and a list of chunks **298** that contain the contents of this URL, and the content of the chunk. As previously mentioned, chunks, in the present description, are defined as equally sized pieces of data that together form the entire content of the URL, namely, the entire content whose location is described by the URL. As a non-limiting example, a chunk size of, for example, 16 KB can be used, so that any HTTP response will be split up into chunks of 16 KB. In accordance with an alternative embodiment of the invention, if the last chunk of the response is not

US 10,069,936 B2

11

large enough to fill the designated chunk size, such as 16 KB for the present example, the remaining portion of the chunk will be left empty.

For each such chunk **300**, the cache database **282** includes the checksum of the chunk **302**, the data of the chunk **304** itself, and a list of peers **306** that most likely have the data for this chunk. As is described in additional detail herein, the data for the chunk may be used by other clients within the communication network **100** when other communication devices of the communication network **100** serve as peers to the clients, from which to download the chunk data.

For each chunk, a checksum is calculated and stored along side of the chunk itself. The checksum may be calculated in any of numerous ways known to those in the art. The purpose of having the checksum is to be able to identify data uniquely, whereas the checksum is the "key" to the data, where the data is the chunk. As an example, a client may want to load the contents of a URL, resulting in the agent that is servicing this request sending the checksums of the chunks to the client, along with the peers that store these chunks. It is to be noted that there could be a different peer for every different chunk. The client then communicates with each such peer, and provides the checksum of the chunk that it would like the peer to transmit back to the client. The peer looks up the checksum (the key) in its cache database, and provides back the chunk (data) that corresponds to this checksum (the key). As shown by FIG. **7**, for each peer **308** within the list of peers **306**, the cache database **282** includes the peer IP address **310**, as well as the connection status **312** of the peer, which represents whether the peer **308** is online or not.

In accordance with one embodiment of the invention, the cache database **282** may be indexed by URL and by Checksum. Having the cache database indexed in this manner is beneficial due to the following reason. When the agent is using the cache database, the agent receives a request from a client for the URL that the client is looking for. In such a case the agent needs the cache database to be indexed by the URL, to assist in finding a list of corresponding peers that have the chunks of this URL. When the peers are using this cache database, the peers obtain a request from the client for a particular checksum, and the peers need the database to be indexed by the checksum so that they can quickly find the correct chunk. Of course, as would be understood by one having ordinary skill in the art, the cache database may instead be indexed in any other manner.

Having described components of the communication network **100**, the following further describes how such components interact and individually function. FIG. **8** is a flowchart **300** illustrating operation of the acceleration system initializer module **222** (hereafter referred to as the initializer **222** for purposes of brevity). It should be noted that any process descriptions or blocks in flowcharts should be understood as representing modules, segments, portions of code, or steps that include one or more instructions for implementing specific logical functions in the process, and alternative implementations are included within the scope of the present invention in which functions may be executed out of order from that shown or discussed, including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art of the present invention.

The initializer **222** is the first element of the communication device **200** to operate as the communication device **200** starts up (block **302**). As the initializer **222** starts, it first communicates with the acceleration server **162** to sign up with the acceleration server **162**. This is performed by

12

providing the acceleration server **162** with the hostname, and all IP addresses and media access control (MAC) addresses of the interfaces on the communication device **200** having the initializer **222** thereon.

In accordance with an alternative embodiment of the invention, as shown by block **304**, the initializer **222** checks with the acceleration server **162** whether a more updated version of the acceleration application software is available. This may be performed by any one of many known methods, such as, but not limited to, by providing the version number of the acceleration application software to the acceleration server **162**. The message received back from the acceleration server **162** indicates whether there is a newer version of the acceleration application software or not. If a newer version of the acceleration application software exists, the initializer **222** downloads the latest version of the acceleration application software from the acceleration server **162**, or from a different location, and installs the latest version on the communication device **200**. In addition to the abovementioned, the initializer **222** may also schedule additional version checks for every set period of time thereafter. As an example, the initializer **222** may check for system updates every two days.

As shown by block **306**, the initializer **222** then redirects outgoing network traffic from the communication device **200** to flow through the acceleration application **162**. As previously mentioned, one way to redirect the outgoing network traffic is to insert an intermediate driver **212** that intercepts and redirects the traffic. It should be noted that there are many other ways to implement this redirection, which are well known to those having ordinary skill in the art.

As shown by block **308**, the initializer **222** then launches the client module **224** of the communication device **200**, and configures the client module **224** of the communication device **200** to intercept to all outgoing network communications of the communication device **200** and route the outgoing network communications to the client module **224**, from the intermediate driver **272** or other routing method implemented. This is performed so that the client module **224** is able to receive all network traffic coming from the network applications, modify the network traffic if necessary, and re-route the traffic. As is known by those having ordinary skill in the art, in order to re-route the traffic, the traffic needs to be modified, as an example, to change the destination of requests.

As shown by block **310**, the initializer **222** then launches the agent module **228** and the peer module **226** to run on the communication device **200**. The agent module **228** and peer module **226** listen on pre-determined ports of the communication device **200**, so that incoming network traffic on these ports gets routed to the agent module **228** and peer module **226**. As is explained in further detail herein, the abovementioned enables the communication device **200** to function as an agent and as a peer for other communication devices within the communication network **100**, as needed.

FIG. **9** is a flowchart **350** further illustrating communication between different elements of the communication network **100**, in accordance with the present system and method for providing faster and more efficient data communication.

As shown by block **352**, an application running on the client **200** initiates a request for a resource on a network. Such a request may be, for example, "GET http://www.aol.com/index.html HTTP/1.1". The request may come from an Internet browser **214** located on the client **200**, where the Internet browser **214** is loading a page from the Internet, an

Appx3929

US 10,069,936 B2

13

application that wants to download information from the Internet, fetch or send email, or any other network communication request.

Through the intermediate driver **272**, or other such mechanism as may be implemented that is re-routing the communication to the client module **224** of the client **200**, the resource request is intercepted by the client module **224** that is running on the client **200** (block **354**). The client module **224** then looks up the IP address of the server **152** that is the target of the resource request (e.g., the IP address of the Web server that is the host of www.aol.com in the example above), and sends this IP address to the acceleration server **162** (block **356**) in order to obtain a list of communication devices that the client **200** can use as agents (hereafter referred to as agents). It should be noted that the process of performing an IP lookup for a server is known by one having ordinary skill in the art, and therefore is not described further herein.

In response to receiving the IP address of the server **152**, the acceleration server **162** prepares a list of agents that may be suitable to handle the request from this IP address (block **358**). The size of the list can differ based on implementation. For exemplary purposes, the following provides an example where a list of five agents is prepared by the acceleration server **162**. The list of agents is created by the acceleration server **162** by finding the communication devices of the communication network **100** that are currently online, and whose IP address is numerically close to the IP of the destination Web server **152**. A further description of the abovementioned process is described here in.

As shown by block **360**, the client module **224** then sends the original request (e.g., "GET http://www.aol.com/index.html HTTP/1.1") to all the agents in the list received from the acceleration server **162** in order to find out which of the agents in the list is best suited to be the one agent that will assist with this request.

It should be noted that, in accordance with an alternative embodiment of the invention, the communication device **200** may be connected to a device that is actually requesting data. In such an alternative embodiment, the communication device would be a modular device connected to a requesting device, where the requesting device, such as, for example, a personal data assistant (PDA) or other device, would request data, and the communication device connected thereto, either through a physical connection, wireless connection, or any other connection, would receive the data request and function as described herein. In addition, as previously mentioned, it should be noted that the HTTP request may be replaced by any request for resources on the Web.

FIG. **10** is a flowchart continuing the flowchart **380** of FIG. **9** and focused on agent response to the request. As shown by block **382**, upon receiving the request from the client **200**, each agent that received the request from the client responds to the client **200** with whether it has information regarding the request, which can help the client to download the requested information from peers in the network. Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have.

As shown by block **384**, the client then decides which of the agents in the list to use as its agent for this particular information request. To determine which agent in the list to use as its agent for the particular information request, the client may consider multiple factors, such as, for example, factoring the speed of the reply by each agent and whether

14

that agent does or does not have the information required. There are multiple ways to implement this agent selection, one practical way being to start a timer of a small window of time, such as, for example, 5 ms, after receiving the first response from the agents, and after the small window, choosing from the list of agents that responded, the agent that has the information about the request, or in the case that none of the agents responded, to choose the first agent from the list received from the acceleration server **162**.

As shown by block **386**, after selecting an agent, the client notifies the selected agent that it is going to use it for this request, and notifies the other agents that they will not be used for this request. The client then sends the selected agent a request for the first five chunks of data of the original information request (block **388**). By specifying to the selected agent the requested chunks by their order in the full response, the client receives the peer list and checksums of the requested chunks from the selected agent. As an example, for the first five chunks the client will ask the selected agent for chunks one through five, and for the fourth batch of five chunks the client will ask the agent for chunks sixteen through twenty. As previously mentioned, additional or fewer chunks may be requested at a single time.

As shown by block **390**, after receiving the request from the client, the selected agent determines whether it has information regarding the requested chunks of data by looking up the request in its cache database and determining if the selected agent has stored therein information regarding peers of the communication network that have stored the requested data of the request, or whether the selected agent itself has the requested data of the request stored in its memory. In addition to determining if the selected agent contains an entry for this request in its database, the selected agent may also determine if this information is still valid. Specifically, the selected agent determines whether the data that is stored within the memory of the selected agent or the memory of the peers, still mirrors the information that would have been received from the server itself for this request. A further description of the process utilized by the selected agent to determine if the information is still valid, is described in detail herein.

As shown by block **392**, if the information (requested data of the request) exists and is still valid, then the agent prepares a response to the client, which includes for each of the chunks: (i) the checksum of the chunk; (ii) a list of peers that according to the database of the selected agent contains these chunks; and (iii) if these are the first five chunks of the information, then the selected agent also provides the specific protocol's headers that would have been received from the server, had the initial request from the client been made directly to the server.

As shown by block **394**, the list of peers for each chunk is sorted by geographical proximity to the requesting client. In accordance with the present example, only the five closest peers are kept in the list for every chunk, and the rest of the peers are discarded from this list. As shown by block **396**, the prepared response, namely, the list of closest peers, is sent back to the client. It should be noted that, if this were the last set of chunks to be provided for this request, then it would be beneficial to include information about this to the client.

If the selected agent discovers that it does not have information about this request, or if the selected agent discovers that the information it has is no longer valid, the selected agent needs to load the information directly from the server in order to be able to provide an answer to the requesting client. As shown by block **400**, the selected agent

Appx3930

US 10,069,936 B2

15

then sends the request directly to the server. The selected agent then stores the information it receives from the server (both the headers of the request, as well as chunks of the response itself) in its database, for this particular response to the client, as well as for future use to other clients that may request this data (block **402**). The selected agent then prepares a response (list) for the client, where the response includes the protocol headers (if these are the first five chunks), and the checksums of the five chunks, and provides itself as the only peer for these chunks (block **404**). This list is then sent back to the client (block **406**).

FIG. **11** is a flowchart **420** continuing the flowchart of FIG. **10**, which illustrates actions taken upon receipt of the list of peers, or single peer listing, from the agent. As shown by block **422**, the client receives the response from the agent (including the list of chunks and their corresponding data, including peers and other information previously mentioned) and, for each of the five chunks, the client sends a request to each of the peers listed for the chunk to download the chunk. The chunk request that the client sends to each of the peers is the checksum of the data that the client seeks to receive, which is the key (identifier) of the chunk.

As shown by block **424**, the peers then respond regarding whether they still have the data of the chunk. As an example, some of the peers may not currently be online, some may be online but may have discarded the relevant information, and some may still have the relevant information, namely, the chunk. As shown by block **426**, the client then selects the quickest peer that responds with a positive answer regarding the requested information, the client lets that peer know that it is chosen to provide the client with the chunk, and the client notifies the other peers that they are not chosen.

As shown by block **428**, the chosen peer then sends the chunk to the client. It should be noted that if no peers answer the request of the client, the client goes back to the agent noting that the peers were all negative, and the agent either provides a list of 5 other agents, if they exist, or the agent goes on to download the information directly from the Web server as happens in the case where no peers exist as described above.

The client then stores the chunks in its cache for future use (block **430**), when the client may need to provide the chunks to a requesting communication device when acting as a peer for another client that is looking for the same information. As shown by block **432**, if some of the chunks were not loaded from any of the peers, the client requests the chunks again from the agent in a next round of requests, flagging these chunks as chunks that were not loadable from the client list of peers. In this situation, the agent will load the data directly from the server and provide it back to the client.

The client then acknowledges to the agent which of the chunks it received properly (block **434**). The agent then looks up these chunks in the database of the agent, and adds the client to the list of peers for these chunks, specifically, since this client is now storing these chunks, and can provide these chunks to other clients that turn to it as a peer (block **436**).

As shown by block **438**, the client then passes the data on to the Web browser or other application of the client that made the original request, for it to use as it had originally intended. The client then checks whether all of the chunks for this request were received (block **440**), by checking the flag set by the agent. Specifically, when the agent is providing the list of the last 5 chunks, the agent includes that information as part of its reply to the client, which is referred

16

to herein as a flag. This information is what enables the client to know that all information has been received for a particular resource request.

If the last received chunks were not the last chunks for this request, the processing flow of the client continues by returning to the functionality of block **384** of FIG. **10**, but instead sending the chosen agent a request for the next five chunks of data of the original information request. Alternatively, if all chunks for this request were received, the request is complete, and the flow starts again at block **352** of FIG. **9**.

FIG. **12** is a flowchart **500** illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. Specifically, the following provides an example of how the agent, client, or peer can determine whether particular data that is stored within the memory of the agent, or the memory of a peer or client, still mirrors the information that is currently on the Web server. As shown by block **502**, the HTTP request is looked up in the cache database of the agent, client or peer that is checking the validity of the HTTP request. As an example, the HTTP protocol, defined by RFC 2616, outlines specific methods that Web servers can define within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information such as "max age" to indicate how long this data may be cached before becoming invalid, "no cache" to indicate that the data may never be cached, and using other information.

As shown by block **504**, these standard methods of validation are tested on the HTTP request information in question. As shown by block **506**, a determination is made whether the requested information that is stored is valid or not. If the requested information is valid, a "VALID" response is returned (block **508**). Alternatively, if the requested information is not valid, an HTTP conditional request is sent to the relevant Web server, to determine if the data stored for this request is still valid (block **510**). If the data stored for this request is still valid, a "VALID" response is returned (block **508**). Alternatively, if the data stored for this request is not valid, an "INVALID" response is returned (block **514**). It should be noted, that the abovementioned description with regard to FIG. **12** is an explanation of how to check if HTTP information is still valid. There are similar methods of determining validity for any other protocol, which may be utilized, and which those having ordinary skill in the art would appreciate and understand.

FIG. **13** is a flowchart **550** outlining operation of the acceleration server, whose main responsibility in the present system and method is to provide clients with information regarding which agents serve which requests, and to keep the network elements all up to date with the latest software updates. As shown by block **552**, the acceleration server sends "keep alive" signals to the network elements, and keeps track within its database as to which network elements are online. As shown by block **554**, the acceleration server continues to wait for a client request and continues to determine if one is received.

Once a request is received, the acceleration server tests the type of request received (block **556**). If the client request is to sign up the client within the network, an event that happens every time that the client starts running on its host machine, then that client is added to the list of agents stored on the acceleration server, sorted by the IP address of the client (block **558**).

If the request is to find an agent to use for a particular request, the acceleration server creates a new agent list, which is empty (block **560**). The acceleration server then

Appx3931

US 10,069,936 B2

17

searches the agent database for the next 5 active agents whose IP address is closest to the IP address of the server who is targeted in the request (block 562). In this context, 192.166.3.103 is closer to 192.166.3.212 than to 192.167.3.104. The acceleration server then sends this agent list to the client (block 564).

If instead, the request is to check the version of the latest acceleration software then the acceleration server sends that network element (client, peer or agent) the version number of the latest existing acceleration software version, and a URL from where to download the new version, for the case that the element needs to upgrade to the new version (block 566).

While the abovementioned example is focused on HTTP requests for data, as previously mentioned, other protocol requests are equally capable of being handled by the present system and method. As an example, in separate embodiments the acceleration method described may accelerate any communication protocol at any OSI layer (SMTP, DNS, UDP, ETHERNET, etc.). In the following alternative embodiment, it is illustrated how the acceleration method may accelerate TCPIP. As is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol. For purposes of illustration of TCPIP communication, reference may be made to FIG. 3, wherein the Web server is a TCPIP server.

In TCPIP there are three communication commands that are of particular interest, namely, connect, write, and read. Connect is a command issued by an application in the communication device that is initiating the communication to instruct the TCPIP stack to connect to a remote communication device. The connect message includes the IP address of the communication device, and the port number to connect to. An application uses the write command to instruct the TCPIP stack to send a message (i.e., data) to a communication device to which it is connected. In addition, an application uses the read command to ask the TCPIP stack to provide the message that was sent from the remote communication device to which it is connected. A communication session typically exists of a connect, followed by a read and write on both sides.

FIG. 14 is a flowchart 600 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention. As shown by blocks 601 and 602 when an application of the communication device makes a request to the communications stack to connect with the TCPIP server, that communication is intercepted by the acceleration application.

To find an agent, upon receiving that connect message from the communication device application, which includes the IP address of the TCPIP server and the port to connect to, the acceleration application in the client makes a request to the acceleration server to find out who the agent for the communication with the TCPIP server is. This step is performed in a similar manner to that described with regard to the main HTTP embodiment of the invention (block 604). As shown by block 606, the server then provides the client with a list of agents, for example, a primary agent and four others.

To establish a connection, as shown by block 608, the client issues a TCPIP connect with the primary agent or one of the other agents if the primary agent does not succeed, to create a connection with the agent. The client then sends to the agent the IP address of the TCPIP server and connection port that were provided by the communication device application (block 610). As shown by block 612, that agent in turn

18

issues a TCPIP connect to the TCPIP server to the port it received from the client, to create a connection with the agent.

FIG. 15 is a flowchart 800 further illustrating TCPIP acceleration in accordance with this alternative embodiment of the invention, detailing the communication between the client and the TCPIP server (read and write commands) after the connect phase has completed successfully.

As shown by block 802, if the network application within the client wants to send a message to the TCPIP server, the network application within the client writes the message to the TCPIP stack in the operating system of the client. This WRITE command is received by the acceleration application of the client and handled in the manner described below. If the TCPIP server wants to send a message to the client, the TCPIP server writes the message to the TCPIP stack of TCPIP operating system, on the connection to the agent, since this agent is where the server received the original connection. This WRITE command is received by the acceleration application of the agent and handled in the manner described below.

When the acceleration application of the client receives a message from the network application of the client to be sent to the agent, or when the acceleration application of the agent receives a message from the connection to the TCPIP server that is to be sent to the client, the acceleration application proceeds to send the message to the communication device on the other side. For instance, if the client has intercepted the message from the communication application, the client sends the message to the agent, and if it is the agent that intercepted the message from the connection to the TCPIP server, such as the TCPIP server sending a message that is intended for the communication with client, the agent sends the message to the client in the following manner:

As shown by block 804, the acceleration application breaks up the content of the message to chunks and calculates the corresponding checksums, in the same manner as in the main embodiment described herein. The acceleration application then looks up each checksum in its cache database (block 806). As shown by block 808, the acceleration application checks if the checksum exists in the cache database. If it does, then, as shown by block 810, the acceleration application prepares a list of peers that have already received the chunk of the checksum in the past (if any), and adds the communication device of the other side to the list of communication devices that have received this chunk (adds it to the peer list of the checksum in its database), to be provided to other communication devices requesting this information in the future. As shown by block 812, the list of peers is sent to the receiving communication device, which, as shown by block 814 retrieves the chunks from the peers in the list received, in the same manner as in the main embodiment.

If the checksum does not exist within the cache database of the sending communication device then, as shown by block 820, the acceleration application adds the checksum and chunk to its cache database, sends the chunk to the communication device on the other side, and adds the other communication device to the list of peers for that checksum in its database.

As shown by block 816, a determination is then made as to whether all chunks have been received. If all chunks have not been received, the process continues on again from block 806.

Once all data has been received, as shown by block 818, the acceleration application passes the data on to the

Appx3932

US 10,069,936 B2

requester. Specifically, in the client, the acceleration application passes on the complete data to the communication application, and in the agent, the acceleration application passes on the complete data to the requesting TCPIP server.

It should be emphasized that the above-described embodiments of the present invention are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Many variations and modifications may be made to the above-described embodiments of the invention without departing substantially from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

We claim:

**1.** A method for use with a group of clients for data communication between a web server storing a content and a requesting client via one or more clients selected from the group, for use with a first server, and where the web server, the requesting client, the first server, and the clients in the group are communicatively coupled via the Internet and each is identified in the Internet using a distinct identifier, and further for data communication between a second web server storing a second content and having an identifier in the Internet and a one of the clients via the requesting client, the method comprising the steps of:

(a) each of the clients in the group sending its identifier to the first server;

(b) the first server receiving and storing the identifiers of the clients in the group;

(c) the requesting client sending its identifier and the web server identifier to the first server;

(d) the first server selecting one of the clients from the group based on associating the identifiers of the clients with the web server identifier;

(e) the first server sending the identifier of the selected client to the requesting client;

(f) the selected client receiving the content from the web server;

(g) the requesting client receiving the content from the selected client;

(h) the requesting client sending its identifier to the first server;

(i) the first server storing the requesting client identifier;

(j) one of the clients sending the second web server identifier to the first server;

(k) the first server sending the identifier of the requesting client to the one of the clients;

(l) the requesting client receiving the second content from the second web server; and

(m) the one of the clients receiving the second content from the requesting client.

**2.** The method according to claim **1**, wherein in step (d) the first server selecting two or more of the clients based on associating the identifiers of the clients with the web server identifier; and in step (e) the first server sending the identifiers of the selected two or more clients to the requesting client.

**3.** The method according to claim **2**, further comprising the step of the requesting client selecting one of the clients as the selected client.

**4.** The method according to claim **1**, further comprising the step of the requesting client sending the web server identifier to the selected client.

**5.** The method according to claim **4**, further comprising the step of the selected client communicating with the web server.

**6.** The method according to claim **1**, wherein the steps are sequentially executed.

**7.** The method according to claim **1**, wherein the web server is Hypertext Transfer Protocol (HTTP) server and responds to HTTP requests from the selected client.

**8.** The method according to claim **1**, wherein the first server is HTTP server and responds to HTTP requests from the requesting client or the.

**9.** The method according to claim **1**, wherein the web server is Transmission Control Protocol/Internet Protocol (TCP/IP) server and communicates based on, or according to, using TCP/IP protocol or connection.

**10.** The method according to claim **1**, wherein the first server is a TCP/IP server and communicates based on, or according to, using TCP/IP protocol or connection.

**11.** The method according to claim **1**, wherein the content includes web-page, audio, or video content.

**12.** The method according to claim **1**, wherein the first server selecting one of the clients is based on the web server IP address or URL.

**13.** The method according to claim **1**, wherein the first server selecting one of the clients is based on the selected client IP address.

**14.** The method according to claim **1**, wherein the selected client further storing the content received from the web server.

**15.** The method according to claim **1**, wherein the requesting client sending its identifier and the web server identifier to the first server as part of browser or email application execution.

**16.** The method according to claim **1**, wherein the communication with the web server or the requesting first server is based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**17.** The method according to claim **1**, wherein the communication with the requesting client or the selected client is based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**18.** The method according to claim **1**, wherein the web server identifier, the first server identifier, or the content identification is using a Uniform Resource Locator (URL).

**19.** The method according to claim **1**, wherein the web server identifier, the first server identifier, the requesting client identifier, or any of the client's identifier is using Internet Protocol (IP) address.

**20.** The method according to claim **1**, further comprising the steps of the requesting client sending a communication port number to the selected client, followed by communication between the requesting client and the selected client using the communication port number.

**21.** The method according to claim **1**, wherein step (d) the first server selecting one of the clients based on the geographical location of the clients.

**22.** A method for data communication between a requesting client and a web server storing a content via a second client, for use with a first server and a second client, and where the web server, the requesting client, the first server, and the second client are communicatively coupled via the Internet and each is identified in the Internet using a distinct identifier, and further for data communication with a second web server storing a second content and having an identifier in the Internet and the second clients via the requesting client, the method comprising the steps of:

(a) sending its identifier and the web server identifier to the first server;

(b) receiving from the first server the identifier of the second client;

Appx3933

US 10,069,936 B2

21 22

(c) sending the web server identifier to the second client;

(d) receiving the content associated with the web server from the second client;

(e) receiving the second content from the second web server; and

(f) sending the second content to the second client.

**23**. The method according to claim **22**, wherein the steps are sequentially executed.

**24**. The method according to claim **22**, wherein the first server is HTTP server and responds to HTTP requests.

**25**. The method according to claim **22**, wherein the first server is a TCP/IP server and communicates based on, or according to, using TCP/IP protocol or connection.

**26**. The method according to claim **22**, wherein the content includes web-page, audio, or video content.

**27**. The method according to claim **22**, wherein the steps are part of browser or email application execution.

**28**. The method according to claim **22**, wherein the communication with the web server or the first server is based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**29**. The method according to claim **22**, wherein the communication with the second client is based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**30**. The method according to claim **22**, wherein the web server identifier, the first server identifier, or the content identification is using a Uniform Resource Locator (URL).

**31**. The method according to claim **22**, wherein the web server identifier, the first server identifier, the requesting client identifier, or the second client identifier is using Internet Protocol (IP) address.

**32**. The method according to claim **22**, wherein step (b) comprising the receiving from the first server the identifiers of two or more second clients, and further comprising the step of selecting one out of second clients based on associating the identifiers of the second clients with the web server identifier.

**33**. The method according to claim **22**, further comprising the steps of sending a communication port number to the second client, followed by communication with the second client using the communication port number.

**34**. The method according to claim **22**, further comprising the step of sending the web server identifier to the second client.

* * * * *

Appx3934

1    of constructions that you have referred to as the

2    role-based constructions; correct?

3         A    Yes.

4         Q    And what you -- what we have been discussing

5    are the constructions of client device and server that

6    the board adopted in its institution decisions;

7    correct?

8         A    Yes.

9         Q    Now, your declaration also discusses another

10   set of constructions which you referred to as "Patent

11   owner's proposed construction"; is that correct?

12        A    Yes.

13        Q    Okay.  So my question with that background,

14   Dr. Williams, is, it was not clear to me which or both

15   constructions you were applying in offering your

16   opinion that Bright Data's residential proxy service

17   practices certain claims of the patents.

18        A    Both.

19        Q    Both.  Okay.

20        A    To the extent -- to the extent that the

21   analysis by the petitioners is deemed correct by the

22   board, then the software does the same thing.  To the

23   extent that the correct construction, in my opinion,

24   of the functional-based language, the software does

25   perform that.

                                   Page 32

Appx5448

1       Q   And Dr. Williams, I -- I suspect you are

2   anticipating where I'm going.  Let me bring you to

3   somewhere in your declaration, but I wanted to make

4   sure you had access to the claim chart also.

5       A   Okay.

6       Q   So let me please bring you to paragraph 133,

7   which is on page 60.  And actually, also the text on

8   page 60 that is from paragraph 132, which is in the

9   prior page.  Let me know when you're there.

10      A   One second.

11          Okay.  I'm on page 60.

12      Q   So Dr. Williams, on page 60, there are three

13  indented sections labeled "a," "b," and "c."  That's a

14  summary of the functionality in Bright Data's system;

15  is that correct?

16      A   In general, yes, uh-huh.

17      Q   So I want to use the terms in -- in these

18  things and make sure I understand your mapping to the

19  claim is the -- the only reason I want to use this.

20          So first, Dr. Williams, I want to start with

21  the claim term "second server."  You're mapping the

22  second server to the Super Proxy; is that correct?

23      A   I am.

24      Q   Okay.  And now, for the first client device,

25  if you look three lines down in bullet "b," you see a

                                        Page 33

Appx5449

1    term that says "proxy client device (Peer SDK)."

2         Is that what you're mapping to the first

3    client device?

4         A    Yes.

5         Q    Okay.  And Dr. Williams, if you're able to

6    right now, I want to ask you a question again about

7    that -- that claim step we were talking about in '342,

8    which is Claim 1, Step 4.  So if you're able to kind

9    of put that claim language side by side and leave

10   page 60 of your declaration up, I want to compare

11   this.

12        A    Okay.  Done.

13        Q    Okay.  So if you look in bullet "c," the

14   second sentence of that bullet states:

15        "The proxy client device sends the requested

16   content back to the customer via the Super Proxy

17   through the established connection."

18        Do you see that?

19        A    Yes.

20        Q    And is that the functionality you are mapping

21   to Step 4 of Claim 1 of the '342 patent?

22        A    Yes.

23        Q    So when the proxy client device sends the

24   requested content back to the customer via the Super

25   Proxy, at that moment in time, the proxy client device

Page 34

Appx5450

```
 1    is operating in the role of a server; correct?
 2         A    Yes, in the role-based construction world.
 3         Q    And so the criticism of -- let me strike
 4    that.
 5              So the criticism in your declaration of
 6    Petitioner's mapping to Crowds for Step 4 of Claim 1
 7    of the '342 patent would apply equally to Bright
 8    Data's mapping to its own product; correct?
 9         A    Yes.  Let me make sure my opinion is
10    accurately expressed here.
11              My -- in my opinion, the role-based
12    constructions, while the -- the board and the Court
13    may have provided those, they -- they don't apply and
14    don't make sense to a POSITA in these proceedings.
15              So in my opinion, role-based constructions
16    aren't correct.
17         Q    Understood.
18              And that -- I thought you were trying to
19    short-circuit that, but I just wanted to make sure the
20    record was clear.
21              So let me -- let me try and sum that up and
22    make sure -- I'm sorry.  Go ahead, please.
23         A    Yes.  To the -- to the extent that the panel
24    believes that role-based constructions are correct and
25    that the Petitioner's arguments are correct in terms
```

Page 35

Appx5451

```
1    of -- in terms of Crowds, for example, the Bright Data

2    software does the same thing.

3        Q   Fair enough.  That -- that was the point I

4    wanted to get.

5            There's no daylight here between the mapping

6    to the Bright Data software or this specific claim

7    element, Step 4 of Claim 1, and Petitioner's mapping

8    to Crowds.  They either rise and fall together;

9    correct?

10       A   Well, with the exception of jondo 4 is not a

11   server.  We haven't discussed that.  But in the points

12   that we have discussed, that's correct.

13       Q   Okay.  Dr. Williams, although we've broken up

14   a few times, we've been going over an hour at this

15   point.  Do you want to take a five-minute break?

16       A   That would be great.

17           MR. LEVENTHAL:  Okay.

18           (Recess taken.)

19           MR. LEVENTHAL:  Q.  Dr. Williams, did you

20   discuss the substance of your testimony with anyone

21   over the break?

22       A   No.

23       Q   Dr. Williams, could you please turn to

24   paragraph 74 of the '342 declaration.

25       A   Yes.
```

Page 36

Appx5452

```
 1    "part of 103."
 2            Did you mean part of Figure 3?
 3        A    Part -- part of Figure 3, yes.
 4        Q    Okay.  So in order to map Figure 3 to the
 5    architecture of the claims, it is necessary to add
 6    another server that is not explicitly shown, but that
 7    in your view, the specification describes?
 8        A    That's fair.
 9        Q    Where would that other server be placed on
10    Figure 3?
11        A    Well, traditionally, to the left of Figure 3,
12    communicating into the network of Figure 3.
13        Q    So it would connect to -- it would be to the
14    left of client device, and you would have a line
15    connecting to client -- excuse me.  Let me strike
16    that.
17            So it would be to the left of Client 102, and
18    then you would have a communication line to
19    Client 102?
20        A    Or it could be to the left of Agent 122 and
21    connect to Agent 122.
22        Q    And does figure -- excuse me.
23            Does the text you read in column 5 instruct
24    the reader of the specification what type of server to
25    add and where to add it?
```

Page 45

Appx5461

1      A    Well, it's talking about network 100.

2    Certainly, the -- another server would not be directly

3    connected to Server 152.  And that other server would

4    need to go through the client devices that we

5    discussed earlier in order to provide an effective

6    communication path.

7      Q    I'm not sure I heard an answer, so let me ask

8    my question again.  I apologize.  I'm not sure I heard

9    an answer to the question I asked.

10        So does the text that you identified in

11   column 5 instruct the reader of the specification as

12   to what component should be added to Figure 3 and

13   where?

14     A    I think it's an incomplete question, but I'll

15   try to answer.

16        Yes, a POSITA would understand the

17   architecture described in these paragraphs and the

18   communication architecture of Internet protocols.

19     Q    And please identify in column 5 the

20   description of the specific server that is to be added

21   to Figure 3.

22     A    Column 5 discusses web servers as being

23   included within communication network 100.  And

24   connecting another server into communication

25   network 100 is well understood by a POSITA to have a

                                    Page 46

Appx5462

1   structure which would communicate over an Internet

2   protocol, for example.

3       Q   But please direct me to the specific line in

4   column 5 and the specific words of column 5 that

5   describe the type of server that is to be added to

6   Figure 3.

7       A   Column 5, lines 41 to 48.

8       Q   I see the words "acceleration servers" and

9   "Web servers."

10      Are those the types of servers that column 5

11  instructs the reader to add to Figure 3?

12      A   And other components of the computer --

13  communication network 100 are not intended -- 103 --

14  Figure 3 is "not intended to be limited by the current

15  description."

16      Q   What other components of communication

17  network 100 can be added besides the two types of

18  servers I listed, acceleration server and Web server?

19      A   There are other types of servers.

20      Q   Where does Figure 5 say that -- excuse me.

21      Where does column 5 say "other types of

22  servers"?

23      A   "Other components of the communication

24  network 100 may differ from the number illustrated by

25  FIG. 3."

Page 47

Appx5463

1      Q   So earlier, Dr. Williams, we went through all

2   of the components of communication network 100, which

3   is Figure 3.  And I don't know.  You told me that the

4   only one that is a server is the web server.

5          So I'm asking you:  What other types of

6   servers are the components of communication

7   network 100 of Figure 3?

8      A   Well, you seem to be asking the same question

9   multiple times.  And I'd point you to the language,

10   which is straightforward for a POSITA reading the --

11   this language, that they can add other

12   Internet-capable components to this network without

13   restriction.

14      Q   So column 5 does not explicitly describe any

15   component that has the word "server" in its name,

16   other than acceleration servers and Web servers, as

17   part of communication network 100 of Figure 3;

18   correct?

19      A   Column 5 says what it says.  But it clearly

20   states that other types of components, which a POSITA

21   would know could be other types of servers, can be

22   added to communication network 100.

23      Q   Dr. Williams, I think I'm about at the end of

24   my outline.  If you could give me a five-minute break.

25   I just want to check through and see if I have any --

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|

| Application Number | 16600507 | |
|---|---|---|
| Filing Date | 2019-10-13 | |
| First Named Inventor | Derry Shribman | |
| Art Unit | 2455    2459 | |
| Examiner Name | MINH-CHAU NGUYEN | |
| Attorney Docket Number | HOLA-005-US19 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| /M.N/ | 2 | 20110022582 | A1 | 2010-01-27 | Umesh Unnikrishnan | |
| | 3 | 20040117455 | A1 | 2004-06-17 | David L. Kaminsky | |
| | 4 | 20080134258 | A1 | 2008-06-05 | Goose et al. | |
| | 5 | 20050108244 | A1 | 2005-05-19 | Soren Riise | |
| | 6 | 20070180111 | A1 | 2007-08-02 | Mazen CHMAYTELLI | |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

**FOREIGN PATENT DOCUMENTS**  **Remove**

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button **Add**

**NON-PATENT LITERATURE DOCUMENTS**  **Remove**

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| /M.N/ | 1 | Michael K. Reiter and Aviel D. Rubin, "Crowds: Anonymity for Web Transactions", ACM Transactions on Information and System Security, November 1998 (27 pages) | |

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2008
2 of 22

Appx5626

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 16662800 | |
| Filing Date | 2019-10-24 | |
| First Named Inventor | Derry Shribman | |
| Art Unit | 2459 | |
| Examiner Name | MINH-CHAU NGUYEN | |
| Attorney Docket Number | HOLA-005-US20 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| /M.N/ | 2 | 20110022582 | A1 | 2010-01-27 | Umesh Unnikrishnan | |
| | 3 | 20040117455 | A1 | 2004-06-17 | David L. Kaminsky | |
| | 4 | 20080134258 | A1 | 2008-06-05 | Goose et al. | |
| | 5 | 20050108244 | A1 | 2005-05-19 | Soren Riise | |
| | 6 | 20070180111 | A1 | 2007-08-02 | Mazen CHMAYTELLI | |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add

### FOREIGN PATENT DOCUMENTS   Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add

### NON-PATENT LITERATURE DOCUMENTS   Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| /M.N/ | 1 | Michael K. Reiter and Aviel D. Rubin, "Crowds: Anonymity for Web Transactions", ACM Transactions on Information and System Security, November 1998 (27 pages) | |

Appx5664

## I.    INTRODUCTION

Rather than address the patent claims as written, Defendants continue to misread and misrepresent them to create straw man claims that Defendants then argue are abstract.  But Defendants are not permitted to rewrite the claims to invalidate them.  The Patent Office, with a substantial body of *Alice*-related law to draw on,  reviewed the actual claims of each patent and found them valid.  The clear claim language discloses methods of steps performed by a client device in a new, novel server–client device–web server architecture that Defendants ignore, instead improperly oversimplifying and rewriting the claims as disclosing only an abstract **computer-computer-computer** architecture, which is clearly incorrect in light of the claim language itself and the specifications.[1]  Defendants' approach also defies the clear Section 101 analysis under *Alice* recognizing "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).  Having ignored the language of the claims themselves, Defendants also further attempt to limit the claims to specific figures while ignoring other figures from the specification as well as Luminati's citations to the specification in its Opposition.  Defendants other arguments are similarly unavailing. Defendants do not have evidence in the record to support an unpatentability finding and the motion should be dismissed.  However, even if not dismissed, Defendants could not support such a motion without a favorable claim construction order and additional evidence.

---

[1] Defendants also argue that the claims themselves do not include a "new network."  That is incorrect -- the claims set forth the components of the new network and how they relate to each other in a way that establishes such a network, which is a disclosure of the new network. Moreover, to the extent that enabling a new network is an advantage of the claims, there is no requirement that the claims expressly state their own advantages.  *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, No. 2019-1835, 2020 U.S. App. LEXIS 13876, at *13 (Fed. Cir. Apr. 30, 2020) ("Claims need not articulate the advantages of the claimed combinations to be eligible.")

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2019
4 of 14

Alice step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, No. 2019-1835, 2020 U.S. App. LEXIS 13876, at *6 (Fed. Cir. Apr. 30, 2020).  The Reply fails to dispute that the architecture of the Asserted Patents is described in the specifications as providing a number of advantages over conventional systems, including improved data communication speed, anonymity and untraceability.  Opp. at 2-7. The Asserted Patents claims are directed toward methods of improving networks through the server-client device-web server architecture and should be upheld as valid under *Alice* step one.

> **C.     Defendants Ignore the Clear Language in the Claims and Specifications Distinguishing Between Client Devices and Servers**

Defendants continue to improperly assert that the Court can ignore the clear differences between the above client devices and servers in the claims to wrongly treat them as interchangeable. See e.g. Reply at 1, 5, 6, 9.  Essentially, Defendants improperly oversimplify the patents to argue that the claims reciting **server**–**client device**–**web server** architecture merely involve general purpose computers in communication with one another in a **computer-computer-computer** architecture, but that is not the language employed in the patent claims, and Defendants are not permitted to rewrite claims to invalidate them.

For example, as addressed in the Opposition and ignored in the Reply, the '614 Patent distinguished clients from servers in conventional client-server Internet Architecture (Dkt. 1-1 at 4:40-61), and defined servers as web servers, proxy servers or acceleration servers while

*Freeny v. Fossil Grp., Inc*., No. 2:18-CV-00049-JRG-RSP, 2019 U.S. Dist. LEXIS 36688, at *9 (E.D. Tex. Feb. 12, 2019) (12(b)(6) motion denied for failure to show that the claims were (1) not directed to improvements rooted in technology, and (2) even assuming the patent had been drawn to an abstract idea, had not shown that the ordered combination of elements was conventional).

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2019
7 of 14

modifying client devices to comprise client peers or agents allowing client devices to serve as 'tunnel' devices (*Id.* at 83:4-15). Opp. at 4-5, 7.  Defendants continue to erroneously repeat that devices and servers are interchangeable based on the following quotations from the '614 Patent specification: "each of the devices that are not denoted herein as servers, may equally function as a server in the meaning of client/server architecture" (Dkt. 1-1 at 119:50-53) and "each of the devices denoted herein as servers, may equally function as a client in the meaning of the client/server architecture" (*Id.* at 119:50-53) (emphasis added). Mot. At 18-19 and Reply at 5. Defendants fundamentally misunderstand these quotes to mean that each device in the claim can be replaced with a server and vice-versa.  However, the specification is clearly explaining that patented claims add underlined functionality to devices and servers to allow them to serve as proxies by allowing client devices to "provide facilities or services" and servers to access client devices "for a service or resource" in contrast to conventional client-server Internet architecture. Dkt. 1-1 at 4:40-61.  Additionally, Defendants' citations emphasize that the patent specification refers to the different components having different roles and are not all just used as generic computers.

With regard to the '319 and '510 Patents, the specification clearly contrasts communication devices against servers.  Opp. at 3-4.  Defendants cite no basis from the specifications of these patents to assert that a client device is interchangeable with a server. All the citations Defendants cite refer to a "communication device" that may serve as a client, agent, or peer—the list does not include a server.  Id. at 4.  In addition, as explained in the Opposition and below, these patents disclose the client device as including multiple modules to allow that device to alternatively serve as a client, agent, or peer, depending upon its role in requesting or receiving content.  The purpose set forth in these patents is to use user devices instead of servers to act as proxy nodes in the network. Opp. at 3-7.  That brings the advantages of being able to build a large-scale network of

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2019
8 of 14

specification to read the **server**–**client device**–**web server** architecture out of the claims. Reply at 3-6. In the Opposition, Figure 3 of the '319 and '510 Patents and 12a of the '614 Patent are used to illustrate the lines of communication showing the steps performed by the proxy client device. Defendants attempt to use these specific figures to improperly limit the express language by mischaracterizing Luminati as "view[ing] a 'server' and 'client to be broad enough to encompass one another." Reply at 4, 5. This is not true as Luminati provided extensive support from the specifications of the Asserted Patents distinguishing between client devices and servers. *See e.g.* Opp. at 3-5 and 17-19.

The Asserted Patents disclose a number of embodiments and network combinations, not all of which are captured in a single figure. In addition to the figures shown in the Opposition, the Asserted Patents also include the below figures 1 of the '319 and '510 Patents and Figure 13 of the '614 Patent showing that **servers** can be used as an additional intermediary between the proxy client device of the claims and a second client device originating the requests for content.



FIG. 1                                            FIG. 13

The claim language addressed above clearly describes a **server**–**client device**–**web server** architecture and Defendants cannot get around this by showing that the patents also disclose client device-client device-web server architecture.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2019
11 of 14

## PRETRIAL MOTIONS

1. **Bright Data's Motion to Strike Invalidity Opinions of Expert Michael Freedman (Dkt. No. 244)**

The motion was **DENIED**. (Dkt. No. 469 at 63:11–13).

The Court was persuaded that Dr. Freedman did not disregard the Court's claim construction and noted that the other matters raised in Bright Data's motion are adequately addressed through cross examination. (*Id.* at 63:8–11).

2. **Bright Data's Motion for Partial Summary Judgment of No Invalidity of '319 and '510 Patent Claims (Dkt. No. 242)**

The Motion was **DENIED**. (*Id.* at 63:14–17).

The Court noted that this motion was effectively controlled by the ruling on Bright Data's Motion to Strike Invalidity Opinions of Expert Michael Freedman (Dkt. No. 244). Given that the Court declined to strike Dr. Freedman's invalidity opinions, a fact issue remained regarding the validity of the '319 and '510 Patent claims. (*See id.* at 63:8–14).

3. **Oxylabs' Motion for Summary Judgment of Invalidity (Dkt. No. 277)**

The Motion was **DENIED**. (*Id.* at 63:18–64:2).

The Court was persuaded that Dr. Rhyne put forth sufficient opinions to create a genuine issue of material fact regarding the issue of validity. To the extent that Defendants' Motion for Summary Judgment of invalidity was in essence a motion to reconsider the Court's Section 101 ruling, the Court reaffirmed its prior denial of Defendants' Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) and 35 U.S.C. § 101 (Dkt. No. 210). (*Id.*; *see also* Dkt. No. 303).

4. **Oxylabs' Motion to Strike Expert Opinions of Dr. V. Thomas Rhyne (Dkt. No. 237)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**.

For part (A) of the motion requesting the Court to preclude Dr. Rhyne from offering a conclusion on contributory infringement, the motion was **GRANTED**. (Dkt. No. 469 at 82:21–22).

The Court found that Dr. Rhyne's report merely puts forward boilerplate language from Bright Data's infringement contentions and failed to sufficiently opine in a reliable and specific manner to support a conclusion of contributory infringement. (*Id.* at 82:23–83:1). However, the Court noted that Dr. Rhyne may testify regarding whether an allegedly infringing component constitutes a material part of the invention but may not go beyond that limited discussion in his report. (*Id.* at 83:1–4).

For part (B) of the motion requesting the Court to preclude Dr. Rhyne from opining on induced infringement, the Motion was **DENIED**. (*Id.* at 83:9–10). The Court found that Dr. Rhyne's conclusion of induced infringement and his discussion of third parties utilizing Defendants' software was reliably sufficient to support testimony on induced infringement. (*Id.* at 83:8–15; Dkt. No. 237-2 at ¶¶ 3, 111–14, 163).

For part (C) of the motion requesting the Court to strike Dr. Rhyne's opinions based on Oxylabs' copying, the motion was **DENIED**. (Dkt No. 469 at 84:12–13). However, the Court noted that testimony regarding copying shall be limited to secondary considerations of non-obviousness and may not be used to support infringement theories. (*Id.* at 83:14–21); *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002) (noting that "[w]hile copying may be relevant to obviousness, it is of no import on the question of whether the claims of an issued patent are infringed").

For part (D) of the motion requesting the Court to preclude Dr. Rhyne from testifying that the patents-in-suit cover residential proxies, the motion was **DENIED**. (Dkt. No. 469 at 83:16–17). However, the Court instructed that Dr. Rhyne is not to opine that the claims of the patents-in-suit are *limited* to residential proxies. The Court further rejected and precluded any testimony as to "client device" and "server" being limited to only "residential devices." (*Id.* at 83:18–84:3).

For part (E) of the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness, the motion was **DENIED**. (*Id.* at 84:4–11). The Court found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention. (*Id.* at 84:7–11).

For part (F) of the motion requesting the Court to strike Dr. Rhyne's opinion that "a client device is specifically not a server," the motion was **DENIED**. (*Id.* at 64:3–12). The Court found that Dr. Rhyne does not specifically argue that a "client device is specifically not a server" in his report, but rather offered the opinion in his deposition. (*Id.* at 64:5–8; Dkt. No. 281-2 at 69:8–12). Consistent with his report, the Court instructed that Dr. Rhyne was not to testify before the jury that a client device cannot be a server. (Dkt. No. 469 at 64:10–13).

For part (G) of the motion requesting the Court to preclude Dr. Rhyne's opinions based on Bright Data's infringement contentions, the motion was **DENIED**. (*Id.* at 84:22–85:12). The Court noted that while all experts must testify within the four corners of their reports, where a voluminous appendix is attached, but not discussed or analyzed in the body of the report, such cannot be used to open the door to expert testimony about the appendix before the jury. (*Id.* at 85:2–12).

5.      **Oxylabs' Motion for Summary Judgment of Non-Infringement (Dkt. No. 276)**

The motion was **DENIED**. (*Id.* at 105:22–23). The Court found that Dr. Rhyne's testimony was sufficient to raise a genuine issue of material fact such that summary judgment was improper. (*Id.* at 105:23–106:3).

6.      **Bright Data's Motion to Strike Expert Testimony of Kevin Almeroth, PH.D. (Dkt. No. 241)**

The motion was **DENIED**. (*Id.* at 133:12).

The Court noted that these disputes merely present a situation of dueling experts who have differing opinions. The expert opinions were not sufficiently erroneous or improper to warrant

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| LUMINATI NETWORKS LTD., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:19-CV-00395-JRG |
| | § | |
| TESO LT, UAB,  METACLUSTER LT, | § | |
| UAB,  OXYSALES, UAB, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants Teso LT, UAB, Metacluster LT, UAB, and Oxysales, UAB's (collectively, "Teso") Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) and 35 U.S.C. § 101 (the "Motion"). (Dkt. No. 210). On February 4, 2021, the Court held a hearing on the Motion. Having considered the Motion, the parties' arguments, related briefing, and relevant authority, the Court finds that the Motion should be **DENIED**.

## I.    BACKGROUND

Plaintiff Luminati Networks Ltd. ("Luminati") alleges infringement of U.S. Patent Nos. 10,257,319 (the "'319 Patent"), 10,484,510 (the "'510 Patent"), and 10,469,614 (the "'614 Patent") (collectively, the "Patents-in-Suit"). (Dkt. No. 1). Luminati accuses Teso of infringing: Claims 1, 2, 14, 15, 17, 18, 21, 22, 24-27 of the '319 Patent; Claims 1, 2, 8-11, 13, 15, 16, 18-20, 22, and 23 of the '510 Patent; and Claims 1, 2, 4-6, 9-12, 15-20, 22, 23, 25, 26, and 29 of the '614 Patent (collectively, the "Asserted Claims"). (Dkt. No. 224 at 2).

Previously, Teso filed a Rule 12(b)(6) Motion to Dismiss (the "Motion to Dismiss") contending that the Asserted Claims were unpatentable under 35 U.S.C. § 101. (Dkt. No. 20 at 2–

21). Noting that "claim construction could be of benefit in addressing this issue as it is presented in this case," the Court denied Teso's Motion to Dismiss. (Dkt. No. 85 at 5). On December 7, 2020, Magistrate Judge Payne entered a Claim Construction Opinion and Order in this case. (Dkt. No. 191). On December 30, 2020, Teso filed the instant Motion, re-raising the issue of patent-eligibility of the Patents-in-Suit under 35 U.S.C. § 101. (Dkt. No. 210).

## II.    LEGAL STANDARD

### A.  Rule 12(c)

After the pleadings are closed, but early enough not to delay trial, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). "The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss . . . [t]he plaintiff must plead 'enough facts to state a claim for relief that is plausible on its face.'" *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In a patent case, the Federal Circuit reviews procedural aspects of motions for judgment on the pleadings using regional circuit law. *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1325–26 (Fed. Cir. 2017).

### B.  Patent Eligibility

Anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101.  Since patent protection does not extend to claims that monopolize the "building blocks of human ingenuity," claims directed to laws of nature, natural phenomena, and abstract ideas are not patent eligible.  *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The Supreme Court instructs courts to distinguish between claims that set forth patent-ineligible subject matter and those that "integrate the building blocks into something more." *Id.*

2

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2021
2 of 12

First, the court "determine[s] whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 2355. In doing so, the court must be wary not to over generalize the invention, as "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (omission in original). In other words, the court must distinguish between "ineligible 'abstract-idea-based solution[s] implemented with generic technical components in a conventional way' from the eligible 'technology-based solution' and 'software-based invention[] that improve[s] the performance of the computer system itself.'" *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016) (quoting *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016)) (alteration in original).

If the challenged claims recite a patent-ineligible concept, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012)). This step is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at 2359). The Federal Circuit has explained that "[w]hile the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). As such, "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the

3

Appx6321

relevant field is a question of fact" that must be "proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

Something is not necessarily well-understood, routine, and conventional simply because it is disclosed in a prior art reference. *Exergen Corp. v. KAZ USA, Inc.*, 725 Fed. App'x. 959, 965 (Fed. Cir. 2018). There are many obscure references that may qualify as prior art but are insufficient to establish something is a "well-understood, routine, and conventional activity previously engaged in by scientists who work in the field." *Mayo*, 566 U.S. at 79. Additionally, specific improvements described in a patent specification, "to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Berkheimer*, 881 F.3d at 1369. However, "[w]hen there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field, [patent eligibility] can be decided on summary judgment as a matter of law." *Berkheimer*, 881 F.3d at 1368.

## III.    DISCUSSION

### A.    Representativeness

The Court first notes that Teso bears the burden of either addressing the eligibility of each Asserted Claim or making a showing of the representativeness of any claims asserted to be representative. *See PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021 (E.D. Tex. 2019). Teso addresses each Asserted Claim in its Motion. (*See* Dkt. No. 210). The parties focused their argument at the hearing on the independent claims asserted from the Patents-in-Suit. (*See* Dkt. No. 293 at 6:6–23). Accordingly, the Court's analysis is likewise focused on Claim 1 of each Patent-in-Suit.

4

**B. The Patents-in-Suit**

**Claim 1 of the '319 Patent**, the only independent claim asserted from the '319 Patent, recites:

> A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:
> > receiving, from the second server, the first content identifier;
> > sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
> > receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and
> > sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

(Dkt. No. 1-2 at 19:16–32). **Claim 1 of the '510 Patent**, the only independent claim asserted from the '510 Patent, recites:

> A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
> > establishing a Transmission Control Protocol (TCP) connection with a second server;
> > sending, to the web server over an Internet, the first content identifier;
> > receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
> > sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

(Dkt. No. 1-3 at 19:18–31). In the Claim Construction Order, the term "client device" in the '319 and '510 Patents is construed as "communication device that is operating in the role of a client." (Dkt. No. 191 at 10–12). The term "second server" is construed as "server that is not the client device." (*Id.* at 13–14). **Claim 1 of the '614 Patent**, the only independent claim asserted from the '614 Patent, recites:

> A method for use with a resource associated with a criterion in a client device that communicates with a first server over the Internet, the client device is

5

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2021
5 of 12

Appx6323

identified in the Internet using a first identifier and is associated with first and second state according to a utilization of the resource, the method comprising:

 initiating, by the client device, communication with the first server over the Internet in response to connecting to the Internet, the communication comprises sending, by the client device, the first identifier to the first server over the Internet;

 when connected to the Internet, periodically or continuously determining whether the resource utilization satisfies the criterion;

 responsive to the determining that the utilization of the resource satisfies the criterion, shifting to the first state or staying in the first state;

 responsive to the determining that the utilization of the resource does not satisfy the criterion, shifting to the second state or staying in the second state;

 responsive to being in the first state, receiving, by the client device, a request from the first server; and

 performing a task, by the client device, in response to the receiving of the request from the first server,

 wherein the method is further configured for fetching over the Internet a first content identified by a first content identifier from a web server that is distinct from the first server, and the task comprising:

  receiving, by the client device, the first content identifier from the first server;

  sending, by the client device, the first content identifier to the web server;

  receiving, by the client device, the first content from the web server in response to the sending of the first content identifier; and

  sending, by the client device, the received first content to the first server.

(Dkt. No. 1-1 at 173:44–174:13). In the '614 Patent, "client device" is construed as "device operating in the role of a client by requesting services, functionalities, or resources from the server." (Dkt. No. 191 at 14–15). The term "first server" is construed as "server that is not the client device." (*Id.* at 16).

### C.  The Parties' Contentions

 Teso argues that the Court's claim construction and Luminati's arguments at the claim construction hearing support Teso's argument that the client and server terms merely refer to general purpose computers running software. (Dkt. No. 210 at 3–5). Since the Patents-in-Suit refer to software roles running on general purpose computers, Teso argues that they claim no more than

6

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2021
6 of 12

general purpose computers sending or receiving information over the Internet using an intermediary device. (*Id*. at 5).

Teso argues that Claim 1 of the '319 Patent and Claim 1 of the '510 Patent merely claim the sending and receiving of information over the Internet between client devices and servers, and are therefore abstract. (*Id*. at 15). The addition of the status determination step in Claim 1 of the '614 Patent adds "nothing beyond the routine and conventional step of indicating a device's availability based upon standard criteria such as its connectivity, battery power, or CPU usage." (*Id*. at 16). Further, Teso argues, the dependent claims asserted in this case do not add anything more than conventional steps recited at a high level, and thus fail for the same reasons. (*Id*. at 15, 16) (citing *Mayo*, 566 U.S. at 82). In essence, Teso's argument is that the Asserted Claims are abstract because they describe the typical human interaction of communicating through an intermediary being performed by general purpose computers. (*Id*. at 17–18). Teso also argues that nothing in the Asserted Claims converts the abstract idea into an inventive concept under Step Two of *Alice*. (*Id*. at 19).

Luminati argues that the claimed invention goes beyond mere communications between devices over the Internet, but that the Patents-in-Suit are directed to a new and improved network architecture that operates over the Internet. (Dkt. No. 224 at 12). The invention solves a technical problem with fetching Internet content, Luminati argues, and is therefore not abstract. (*Id*.) The traditional client-server architecture limited client devices to making requests and receiving content, but not acting as peer-proxies. (*Id*. at 13). Luminati argues that the situation is different from human interactions, in part because the Patents-in-Suit recite modifications to client devices, such as software installation, to allow client devices to perform in the recited roles. (*Id*. at 14). Should the Court reach *Alice* Step Two, Luminati argues that Step Two is satisfied because the

7

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2021
7 of 12

claims recite inventive concepts. (*Id*. at 20). Further, Luminati argues that judgment on the pleadings is an inappropriate disposition of the factual inquiry involved in *Alice* Step Two. (*Id*. at 23).

### D. *Alice* Step One

Teso cites *Specialized Monitoring Solutions, LLC v. ADT LLC*, in which the asserted patents claimed a database which stored coded messages and provided access to such messages over the Internet. 367 F. Supp. 3d 575, 585 (E.D. Tex. Feb. 7, 2019) (Bryson, Circuit Judge). In that case, "[t]he claims [did] not recite improvements in technology that help[ed] perform those steps or describe[d] any means of accomplishing those steps other than through the use of a generic computer and commonplace communication networks . . ." *Id*. In contrast, the methods claimed in this case, while including generic computers and common Internet communication protocols, recite a broader network that is *itself* the claimed improvement. Rather than a mere categorization of data, the pairing of servers and peer-proxies describes a network structure that improves the ability of those actors to communicate.

Teso analogizes this case to *Reese v. Sprint Nextel Corp.*, in which the Federal Circuit held that claims reciting methods for the sending and receiving of information were abstract. (*Id*. at 13) (citing 774 Fed. App'x. 656 (Fed. Cir. 2019)). In *Reese*, the patent claims were directed to receiving information—a calling phone number—and sending information—a tone. 774 Fed. App'x. at 660. However, unlike in this case, the patents in *Reese* were "akin to concepts of receiving and displaying (indicating) information . . . that fall into a familiar class of claims directed to abstract ideas." *Id*. If the claimed methods in this case were simply the receipt and forwarding of information over the Internet, Teso might have a compelling argument. However, it

8

Appx6326

is the use of non-traditional client devices that transforms the Asserted Claims into non-abstract subject matter.

Teso also compares this case to *Elec. Pwr. Grp., LLC v. Alstom S.A.*, another case in which the Federal Circuit held that the act of collecting and receiving information, without more, is abstract. (*Id.* at 14) (citing 830 F.3d 1350, 1353 (Fed. Cir. 2016)). In *Electric Power*, the Federal Circuit categorized the collection of information, the mere analysis of information akin to mental steps or by algorithms, and the resulting presentation of that collection and analysis, as abstract. 830 F.3d at 1353–54. As noted above, it is not the individual steps of the method that render the Asserted Claims non-abstract, it is the network architecture as a whole.

Teso argues that *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317 (Fed. Cir. 2020) is "right on point." (Dkt. No. 293 at 29:19). In *Ericsson*, the claimed process of controlling access to resources was "exactly the sort of process that 'can be performed in the human mind, or by a human using a pen and paper . . . .'" 955 F.3d at 1327 (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). However, this case differs from *Ericsson* in that an improvement in network design that addresses the problem of congested networks goes beyond the mere control of access to resources. This is not something a human being can perform using a pen and pad.

The Court finds the instant situation more comparable to *SRI Int'l, Inc. v. Cisco Sys., Inc.*, in which the Federal Circuit concluded that the claimed invention was "directed to an improvement in computer network technology." 930 F.3d 1295, 1303 (Fed. Cir. 2019). Although the purpose of the invention in *SRI* was to improve security by monitoring network traffic, and the Asserted Claims in this case are not designed to improve network security, the Court concludes that the Asserted Claims here are similarly "directed to a technological solution to a technological

9

problem." *Id*. The specifications of the Patents-in-Suit state that the inventions were designed to solve a technological problem: the increased use of bandwidth on the Internet, which slows down networks and increases costs for content providers and Internet Service Providers. (*See, e.g.*, Dkt. No. 1-1 at 1:42–57; Dkt. No. 1-3 at 1:32–60). The use of a non-traditional network structure with a client device acting as a proxy is designed to produce "faster and more efficient data communication within a communication network." (Dkt. No. 1-2 at 4:41–43).

Even more analogous to this case is *Packet Intelligence LLC v. NetScout Sys., Inc*., 965 F.3d 1299 (Fed. Cir. 2020). In *Packet Intelligence*, the Federal Circuit held that a method for monitoring a stream of packets (a "connection flow") exchanged over a computer network was not abstract. *Id*. at 1309–10. Affirming this Court's findings in that case, the Federal Circuit described the representative claim as "meet[ing] a challenge unique to computer networks, identifying disjointed connection flows in a network environment." *Id*. at 1309. Here, as in *Packet Intelligence*, the Asserted Claims address a technological problem unique to computer networks. The Federal Circuit also found that the patent in *Packet Intelligence* "solves a technological problem by identifying and refining a conversational flow such that different connection flows can be associated with each other and ultimately with an underlying application or protocol." *Id*. Likewise, the Asserted Claims here provide a technological solution by routing server requests and receipts through non-traditional client devices, and adding in the '614 Patent the additional step of determining whether the client device is available to perform that function.

The Court is not persuaded that the use of general purpose computers transforms the idea into something abstract. "Software can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route." *Enfish*, 822 F.3d at 1335. The Court here notes that in their claim

10

Appx6328

construction briefing, Teso specifically represented that they would not take the position that they would later assert that client devices and servers are interchangeable general use computers. (*See* Dkt. No. 138 at 11). However, they appear to have taken that position anyway.[1] (*See id*.). The Court finds that the Patents-in-Suit are not abstract because they make use of general-purpose computers, given that the specifications[2] of the Patents-in-Suit describe the functionality as being "provided by software stored within each communication device." (Dkt. No. 1-1 at 83:6–15; Dkt. No. 1-2 at 5:46–48; Dkt. No. 1-3 at 4:48–50). Teso's counsel acknowledged in the hearing that if the claims "concerned a non-abstract software . . . that actually caused a technological improvement . . . putting it on a general purpose computer or using that does not . . . somehow cause it to become abstract." (Dkt. No. 293 at 16:14–18). Teso's counsel also acknowledged that a technological solution could be brought about through the sending and receiving of information through general purpose computers—in other words, that the use of a general purpose computer sending and receiving information was not *per se* abstract. (*Id*. at 32:2–33:6). This reality aside, the Step One analysis leads the Court to conclude that these claims are not abstract but, in fact, bring a new technological solution to an existing technological problem.

### E. *Alice* Step Two

Having concluded that the Asserted Claims are not abstract, the Court does not reach *Alice* Step Two. However, even if the Court reached the opposite conclusion regarding Step One, the question as to whether the Asserted Claims are well-understood, routine, and conventional would contain questions of fact. *See Berkheimer*, 881 F.3d at 1369. On the face of the pleadings, there are factual disputes between the parties on this issue. Accordingly, a judgment on the pleadings

---

[1] Notably, Magistrate Judge Payne took specific note of Teso's position in the Claim Construction Order. (Dkt. No. 191 at 15).
[2] When determining patent-eligibility, the Court considers the claims as a whole and reads the claims in light of the specification. *Data Engine Techs. LLC. v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018).

11

Appx6329

would be inappropriate, even if the Court had reached the opposite conclusion as to Step One and found that the Asserted Claims are directed to an abstract concept.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Teso's Motion should be and hereby is **DENIED**.

**So ORDERED and SIGNED this 12th day of February, 2021.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

12

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2021
12 of 12

## QUESTION NO. 1

Did Bright Data prove by a preponderance of the evidence that Oxylabs infringed **ANY** of the Asserted Claims?

Yes: ____✓____          No: _____

4

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2022
4 of 8

Appx6334

## QUESTION NO. 2

Did Oxylabs prove by clear and convincing evidence that any of the following Asserted Claims are invalid?

| | | |
|---|---|---|
| Claim 1 of the '319 Patent | Yes: _____ | No: ___✓___ |
| Claim 26 of the '319 Patent | Yes: _____ | No: ___✓___ |
| Claim 1 of the '510 Patent | Yes: _____ | No: ___✓___ |
| Claim 22 of the '510 Patent | Yes: _____ | No: ___✓___ |
| Claim 1 of the '614 Patent | Yes: _____ | No: ___✓___ |
| Claim 11 of the '614 Patent | Yes: _____ | No: ___✓___ |
| Claim 16 of the '614 Patent | Yes: _____ | No: ___✓___ |
| Claim 20 of the '614 Patent | Yes: _____ | No: ___✓___ |

5

Appx6335

**If you answered "No" to Question No. 1, _OR_ "YES" to ALL Asserted Claims in Question No. 2, then DO NOT answer Question No. 3.**

**Answer Question No. 3 ONLY as to any Asserted Claim that you have found BOTH to be infringed AND not invalid.**

**QUESTION NO. 3**

Did Bright Data prove by a preponderance of the evidence that Oxylabs willfully infringed **ANY** of the Asserted Claims that you found were infringed?

Yes: ___✓___    No: _____

6

Appx6336

**If you answered "No" to Question No. 1, *OR* "YES" to ALL Asserted Claims in Question No. 2, then DO NOT answer Question No. 4.**

**Answer Question No. 4 ONLY as to any Asserted Claim that you have found BOTH to be infringed AND not invalid.**

**QUESTION NO. 4**

What sum of money, if any, has Bright Data proven by a preponderance of the evidence that it is entitled to receive from Oxylabs as **lost profits**?

Answer in United States Dollars and Cents, if any:

$ _7,474,876.⁰⁰_____

7

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2022
7 of 8

1   entitled to the October 8, 2009, priority date?

2   And that would be paragraph 19 of the other

3   declaration.

4       A.    No.

5       Q.    Okay.  Is October 8, 2009, the time

6   frame you used for the perspective of a person

7   of ordinary skill in the art for all of your

8   opinions in these declarations?

9       A.    Yes.

10      Q.    As of October 8, 2009, is it your

11  belief that using a proxy server as an

12  intermediary between a requesting client device

13  and a web server was well known?

14      A.    Can you repeat the question,

15  please?

16      Q.    Sure.  As of October 8, 2009, is it

17  your opinion that using a proxy server between

18  a requesting client device and a web server

19  would be well known to a person of ordinary

20  skill in the art?

21      A.    I do not believe I put forth any

22  opinion on this matter, nor do I think it

23  influences the opinions I put forth, but I

24  agree with that statement.

25      Q.    Could you turn to paragraph 29 of

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2026
93 of 113

Appx6493

of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III.  AGREED TERMS

In their February 9, 2022 Patent Rule 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 93 at 1), in their briefing (Dkt. No. 106 at 10), and in their March 23, 2022 Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 123, Ex. A at 1, 8 & 14), the parties submit the following agreed-upon construction:

| Term | Agreed Construction |
|------|---------------------|
| Preamble<br><br>'319 Patent, Claim 1<br>'510 Patent, Claim 1<br>'713 Patent, Claim 1 | Limiting |

## IV.  DISPUTED TERMS

The parties present competing proposals for the level of ordinary skill in the art.  "Factors that may be considered in determining [the] level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

Plaintiff proposes: "Consistent with Plaintiff's P.R. 4-3 disclosures, with regard to the Patents-in-Suit, 'a person of ordinary skill in the art ('POSA') would be an individual who, as of

**A. "client" and "client device"**

| "client device" |
|---|
| ('319 Patent, Claims 1, 2, 14, 17, 22, 24, 25;<br>'510 Patent, Claims 1, 2, 8, 10, 13, 15, 18, 19;<br>'713 Patent, Claims 1, 11, 24, 27;<br>'852 Patent, Claims 1, 14, 25, 28;<br>'346 Patent, Claims 1, 15, 20) |

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "Consumer computer" or, in the alternative, "communication device that is operating in the role of a client" | "a device operating in the role of a client"; some devices can be configured to operate in multiple roles including as a client or a server |

Dkt. No. 93, App'x A at 1; Dkt. No. 123, Ex. A at 1, 14, 19 & 24.

Shortly before the start of the April 21, 2022 hearing, the Court provided the parties with the following preliminary construction: "communication device that is operating in the role of a client."

(1)  The Parties' Positions

Plaintiff argues: "[T]he term 'client device' is defined in the patent specification of the Patents-in-Suit: 'In the network 50, files are stored on computers of consumers, referred to herein as client devices 60.' ['319 Patent] at 2:44–46." Dkt. No. 106 at 10.  Plaintiff also argues that Defendant's proposal "would overly broaden the meaning of the term in a manner inconsistent with" the Court's construction in *Teso*. *Id.*  Plaintiff urges:

> NetNut's proposed construction of "a device operating in the role of a client" would remove any meaningful distinction between a client device and server such that any intermediary *computer* or device in a computer ↔ *computer* ↔ computer pathway satisfies both the requirements of a client device and server.  This is contrary to (a) the patent claims; (b) common specification, which as discussed above defines client devices as consumer devices and further contrasts communication devices with servers; (c) the prosecution history of for example the '319 Patent; and (d) extrinsic evidence including this Court's previous claim construction orders issued in the *Teso* Action.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
10 of 55

*Id.* at 12.

Defendant responds that "the word 'communication' in the Court's previous construction is unnecessary, because all devices that communicate over a network, whether clients, servers, or other devices, are understood to be 'communication devices.'" Dkt. No. 115 at 5 (citation omitted). Defendant also argues that "[t]he generic nature of the 'client device' is confirmed by the specification . . . ." *Id.* (citation omitted). Further, Defendant argues that "NetNut's construction is further confirmed by then-existing IETF RFCs, such as RFC 2616, which is referenced in the Asserted Patents." *Id.* at 7 (citations omitted). Finally, Defendant submits that "NetNut's construction is that the device can be configured to operate in different roles, consistent with the Court's previous claim construction orders." *Id.* at 8.

Plaintiff replies: "Ignoring the clear distinctions between client devices and servers that were made in the common specification and patent prosecution history, Defendant does not dispute that its proposed constructions of these terms would cause any computer intermediary in a generic *computer ↔ computer ↔ computer* pathway to satisfy both the requirements of a client device and server in an improper attempt to broaden these claim terms so as to be interchangeable." Dkt. 118 at 1. Plaintiff argues that Defendant's proposal is inconsistent with the Court's claim construction in *Teso*, and Plaintiff also argues that "[t]he common specification references but in no way limits the client device or server in reference to any RFC or protocol." *Id.* at 1–2 (citation omitted).

At the April 21, 2022 hearing, Defendant argued that the term "client device" should not be limited to any particular type of hardware. Rather, Defendant argued, the role or functionality of the device is driven by software.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
11 of 55

(2)  Analysis

Defendant submits: "The parties originally proposed construing 'client' and 'client device' separately but agreed to construe only 'client device.'"  Dkt. No. 115 at 5 n.1.  Plaintiff similarly states that "[t]he same argument applies equally to 'client,' which is only recited in the context of a 'client device.'"  Dkt. No. 106 at 15.

Claim 1 of the '319 Patent, for example, recites (emphasis added):

1.  A method for use with a first *client device*, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first *client device* comprising:
   receiving, from the second server, the first content identifier;
   sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
   receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and
   sending, the first content by the first *client device* to the second server, in response to the receiving of the first content identifier.

The specification discloses, for example, that "[d]ue to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent."  '319 Patent at 4:46–49; *see also id.* at Fig. 6.

In the *Teso CC Order*, the Court construed "client device" to mean "communication device that is operating in the role of a client."  *Teso CC Order* at 10–12.

The specification also discloses:

In the network 50, files are stored on *computers of consumers*, referred to herein as *client devices 60*.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
12 of 55

'319 Patent at 2:44–46 (emphasis added). In the *Teso CC Order*, the Court considered this disclosure, among other evidence, and rejected a proposal that "client device" refers to a "consumer computer." *Teso CC Order* at 11.

In the *Teso Supplemental CC Order*, the Court reinforced the distinction between a client device and a server device by stating:

> The patents do not include servers as a type of 'communication device,' but that is not sufficient to construe 'client device' as unable to act as a server in all cases.
>
> Plaintiff's argument that Defendant seeks to treat client devices and servers interchangeably, citing to the Court's statement that "[Defendants] deny that they will claim client devices and servers are interchangeable general user computers" is an oversimplification of the issue. It is not that Defendants seek to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . as an indistinguishable computer ↔ computer ↔ computer architecture" as Plaintiffs argue. *See* Dkt. No. 242 at 4. Rather, a component can be *configured* to operate in different roles—so long as it does not "simultaneously serve as more than one of: the client device, the first server/second server, and the web server."

*Teso Suppl. CC Order* at 10.

Neither Plaintiff nor Defendant persuasively justifies departing from the Court's prior construction and analysis. The recital of a "client" accompanied by, and interacting with, the recited "servers" in above-reproduced Claim 1 of the '319 Patent reinforces that the recited "client" is distinct from the "servers."

For example, Plaintiff does not justify revisiting the Court's rejection of a proposal to construe a "client device" to be a "consumer" device. *See Teso CC Order* at 11. Neither the opinion of Plaintiff's expert nor the extrinsic evidence cited by Plaintiff compels otherwise. *See* Dkt. No. 106, Ex. F, Feb. 9, 2022 Williams Decl. at ¶ 24; *see also id.*, Ex. G, *Network Fundamentals Study Guide* at p. 6 of 21. Plaintiff's argument that "it is indisputable that the

specification *never* refers to a server as a 'communication device'" likewise does not justify limiting the Court's construction to "consumer" devices.  Dkt. No. 106 at 13–14.

Defendant also asserts that "a POSITA would understand 'client' and the related terms discussed here, to refer to a device operating in the r[o]le of a client but can also have the functions of a server."  Dkt. No. 115 at 8.  For example, Defendant cites deposition testimony of Plaintiff's expert in this regard.  *See* Dkt. No. 115, Ex. E, Feb. 25, 2022 Williams dep. at 89:15– 18 ("Q. Can a personal computer or workstation also have installed on it software that is configured to perform server tasks?  A. Yes.").  To whatever extent this would amount to a device operating in the role of a server as well as operating in the role of a client, the Court has previously found that "a component can be configured to operate in different roles—so long as it does not '*simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.'"  *Teso Suppl. CC Order* at 10 (citation omitted; emphasis added). The industry standard and the expert opinions relied upon by Defendant are extrinsic evidence and do not justify departing from the Court's prior analysis.  *See* Dkt. No. 115 at 7–8 (discussing *id.*, Ex. F, IETF RFC 2616 § 1.3; citing *id.*, Ex. A, Feb. 9, 2022 Claffy Decl. at ¶ 27).  Further, Defendant submits: "Bright Data also suggests that NetNut's construction for 'client device' includes the device simultaneously serving as more than one of the communication devices. This is not what NetNut proposes.  NetNut's construction is that the device can be configured to operate in different roles, consistent with the Court's previous claim construction orders."  Dkt. No. 115 at 8 (citing Dkt. No. 106 at 14).

Finally, disclosure in the specification that a "communication device 200" "contains general components of a computer" ('713 Patent at 5:52–55) does not warrant removing the word "communication" from the Court's prior construction.  As noted in the prosecution history

and as previously discussed by the Court, a "client device" is not merely a general-purpose computer.  *See* Dkt. No. 106, Ex. J, '319 Patent Prosecution History, Oct. 18, 2018 Response at 4–5 (BDNET-0000304–05) ("[T]he claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action."; "[T]he claimed components as a combination perform functions that are not merely generic — It is respectfully submitted that the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device, which is unique and solves a specific problem such as anonymity when fetching information."); *see also Teso*, No. 2:19-CV-395, Dkt. No. 303 (E.D. Tex. Feb. 16, 2021) (denying Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) and 35 U.S.C. § 101) ("it is the use of non-traditional client devices that transforms the Asserted Claims into non-abstract subject matter").

As to any remaining dispute regarding whether a device merely sending a request amounts to "operating in the role of a client" (*see* Dkt. No. 106 at 15; *see also* Dkt. No. 115 at 7 & 9) or whether a device merely responding to a request is operating in the role of a server, any such disputes pertain to implementation details of particular accused instrumentalities and thus present factual disputes regarding infringement rather than any legal question for claim construction.  *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of

some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

The Court therefore hereby construes **"client device"** to mean **"communication device that is operating in the role of a client."**

**B.  "first server"**

| **"first server"**<br>('319 Patent, Claims 1, 21, 25;<br>'713 Patent, Claims 1, 27;<br>'852 Patent, Claims 1, 14, 25, 28;<br>'346 Patent, Claims 1, 15, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "web server" | See construction for "server"; no further construction necessary. |

Dkt. No. 93, App'x A at 6; Dkt. No. 123, Ex. A at 2, 14 & 19; *see id.* at 24–25.

Shortly before the start of the April 21, 2022 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (apart from the Court's construction of 'server,' below)."

(1)  The Parties' Positions

Plaintiff argues that "[b]ased on the plain language of the preamble, which both sides agree is limiting, the first server of the '319, '713 and '852 Patents must be a web server."  Dkt. No. 106 at 16.  Plaintiff also cites the opinion of its expert.  *Id.*, Ex. F, Feb. 9, 2022 Williams Decl. at ¶ 25.

Defendant responds that "'[f]irst server' and 'second server' incorporate the construction for 'server' and do not need further construction."  Dkt. No. 115 at 10.

Plaintiff replies: "Defendant does not dispute that the first server is a web server.  Resp. at 8.  Thus, it would be helpful to construe the 'first server' of the '319, '713 and '852 Patents as a 'web server,' consistent with the other Asserted Patents."  Dkt. No. 118 at 3.

<u>(2)  Analysis</u>

Plaintiff cites language in each of the preambles of Claim 1 of the '319 Patent, Claim 1 of the '713 Patent, and Claim 1 of the '852 Patent, in which the term "first server" appears and as to which the parties agree the preambles are limiting.  Dkt. No. 93 at 1; Dkt. No. 123, Ex. A at 1, 8 & 14.  The claim language cited by Plaintiff specifies that the "first server" "comprises a web server" or "is a web server."  Plaintiff argues that "first server" should therefore be construed as "web server," but because this is already recited by other claim language, Plaintiff's proposal is redundant and unnecessary.

The Court therefore hereby construes **"first server"** to have its **plain meaning**.

**C.  "server" and "second server"**

| **"server"**<br>('319 Patent, Claims 1, 2, 17, 21, 24, 25;<br>'510 Patent, Claims 1, 2, 8, 15, 16, 18;<br>'713 Patent, Claims 1, 27;<br>'852 Patent, Claims 1, 14, 25, 28;<br>'346 Patent, Claims 1, 15, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "a device operating in the role of a server"; some devices can be configured to operate in multiple roles including as a client or a server |

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
17 of 55

| "second server" ('319 Patent, Claims 1, 2, 17, 21, 24, 25; '713 Patent, Claims 1, 11, 24, 27; '852 Patent, Claims 1, 14, 25, 28) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "A server that is not the client device or first server" | See construction for "server"; no further construction necessary |

| "second server" ('510 Patent, Claims 1, 2, 8, 15, 16, 18; '346 Patent, Claims 1, 15, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "A server that is not the client device or web server" | See construction for "server"; no further construction necessary |

Dkt. No. 93, App'x A at 3, 8 & 11; Dkt. No. 123, Ex. A at 1–2, 8–9, 14–15, 19–20 & 24.

Shortly before the start of the April 21, 2022 hearing, the Court provided the parties with the following preliminary constructions:

| Term | Preliminary Construction |
|---|---|
| "server" | "communication device that is operating in the role of a server" [Note: A device cannot simultaneously be both a server and a client] |
| "second server" | "server that is not the client device" |

(1)  The Parties' Positions

Plaintiff submits that its proposed constructions are similar to the *Teso* construction of "second server" as meaning "a server that is not the client device." Dkt. No. 106 at 16.  Plaintiff argues that "[f]or the same reasons provided above with regard to 'client device,' incorporated by reference here, the claims of the Patents-in-Suit clearly distinguish between 'server(s)' and

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
18 of 55

'client device(s)' as shown in the patent claims, patent specification, prosecution history, the *Teso* CC Order, *Teso* Supp. CC Order, *Teso* Alice Order and other extrinsic evidence." *Id.* Plaintiff further argues that "Defendant seeks to modify the Court's earlier claim construction by changing the construction from 'a server that is not the client device' to 'a device operating in the role of a server,' with the purpose of rendering any distinction between intermediary client devices and intermediary servers meaningless." *Id.* at 17.

Defendant responds that "[a]s discussed above for 'client device' and previously held by the Court, some devices can be configured to operate in multiple roles including as a client or a server," and "[a] server is a device acting in the role of a server based on the device having the capability to serve in different roles based on the needs of the network." Dkt. No. 115 at 8–9 (citations omitted). Defendant also argues that "[t]his construction for server is further confirmed by then-existing IETF RFCs, such as RFC 2616, which is referenced in the Asserted Patents." *Id.* at 9 (citations omitted).

Plaintiff replies that "[f]or the same reasons provided above as to 'client device,' Defendant's proposed construction of 'server' and 'second server,' should similarly be rejected." Dkt. No. 118 at 4.

At the April 21, 2022 hearing, Plaintiff objected to the Court's preliminary construction for "server" referring to a "communication" device. Plaintiff argued that the patents-in-suit, as well as the Court's prior findings on claim construction for these patents, distinguish between servers and communication devices. Plaintiff submitted that a "communication" device is a device used for sending messages or making phone calls. Plaintiff contrasted this with a server, which Plaintiff asserted is a "robust" piece of hardware that is "dedicated" to providing content. Plaintiff also argued that Defendant's interpretation would potentially allow for any intermediate

device to qualify as both a "client" and a "server."  As an alternative proposed construction, Plaintiff proposed: "device that is configured to be a server."  In response, Defendant agreed that being a "server" requires some amount of configuration.  Also, Defendant agreed with the Court's preliminary construction for "second server."

<u>(2)  Analysis</u>

Claim 1 of the '319 Patent, for example, recites (emphasis added):

> 1.  A method for use with a first *client device*, for use with a *first server* that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the *first server* stores a first content identified by a first content identifier, and for use with a *second server*, the method by the first *client device* comprising:
> receiving, from the *second server*, the first content identifier;
> sending, to the *first server* over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
> receiving, the first content from the *first server* over the Internet in response to the sending of the first content identifier; and
> sending, the first content by the first *client device* to the *second server*, in response to the receiving of the first content identifier.

In the *Teso CC Order*, the Court construed "second server" to mean "server that is not the client device."  *Teso CC Order* at 14.  The Court also found that "[n]othing in the intrinsic record suggests one device cannot perform both the role of a web server and a second server."  *Id.*

In the *Teso Supplemental CC Order*, the Court reinforced the distinction between a client device and a server device, stating that "a component can be configured to operate in different roles—so long as it does not '*simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.'"  *Teso Suppl. CC Order* at 10 (citation omitted; emphasis added).

In *Teso*, the parties did not present the word "server" itself as a disputed term.  The Court hereby expressly rejects Defendant's proposal of referring generically to "a device," and the Court also rejects the opinions of Defendant's expert to the extent those opinions imply that a

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
20 of 55

device could act as a server and as a client simultaneously.  *See* Dkt. No. 115, Ex. A, Feb. 9, 2022 Claffy Decl. at ¶ 31; *see id.* at ¶¶ 28–32.   Defendant's expert cites disclosure in the specification that an "agent" can respond to requests (by providing responsive information to a client) and can itself make requests (by obtaining information from a server and then passing the information to a client).  *See* '319 Patent at 14:62–15:11.  This disclosure regarding an "agent," however, does not warrant broadening the scope of the term "server," and the opinions of Defendant's expert in this regard are unpersuasive.  *See* Dkt. No. 115, Ex. A, Feb. 9, 2022 Claffy Decl. at ¶ 31.  The industry standard relied upon by Defendant is likewise extrinsic evidence and does not justify departing from the Court's analysis in *Teso*.  (*See* Dkt. No. 115, Ex. F, IETF RFC 2616 § 1.3.)

As to any remaining disputes regarding whether a device merely responding to a request is "operating in the role of a server" (*see* Dkt. No. 106 at 15; *see also* Dkt. No. 115 at 9), any such disputes pertain to implementation details of particular accused instrumentalities and thus present factual disputes regarding infringement rather than any legal question for claim construction.  *See PPG*, 156 F.3d at 1355 ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed*, 483 F.3d at 806 ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon*, 815 F.3d at 1318–19 (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

As to Plaintiff's proposals of distinguishing between the "second server" and the "first server" or the "web server," the appropriate distinctions between the different recited servers are

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
21 of 55

already apparent on the face of the claims at issue.  No explicit construction is required to express these distinctions, and Plaintiff's proposals of "or first server" and "or web server" are therefore rejected as merely tending to confuse rather than clarify the scope of these claims.

Finally, the Court does not construe "server" as a "communication" device because the oral arguments at the April 21, 2022 hearing demonstrated that including the word "communication" would introduce unnecessary confusion as to the nature of the device.  *See Teso CC Order* at 12; *see also Teso Supplemental CC Order* at 10; '319 Patent at 3:17–26 ("client communication device"; "agent communication device"; "peer communication device") & 4:48–49 ("each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100").  Further, the oral arguments demonstrated that the parties have a mutual understanding regarding the functions of a "server" and of the Court's prior finding that, at least for purposes of the claimed inventions, a device does not simultaneously operate as both a client and a server.  The parties neither contested that "server" is a well-known term in the art nor suggested that the patentee used the word "server" to have a special meaning in the patents-in-suit.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"server"**<br><br>('319 Patent, Claims 1, 2, 17, 21, 24, 25;<br>'510 Patent, Claims 1, 2, 8, 15, 16, 18;<br>'713 Patent, Claims 1, 27;<br>'852 Patent, Claims 1, 14, 25, 28;<br>'346 Patent, Claims 1, 15, 17) | **Plain meaning** |

Code200, UAB, et al. v. Bright Data Ltd.<br>IPR2022-00103, EX. 2029<br>22 of 55

| "second server"<br><br>('319 Patent, Claims 1, 2, 17, 21, 24, 25;<br>'713 Patent, Claims 1, 11, 24, 27;<br>'852 Patent, Claims 1, 14, 25, 28) | "server that is not the client device" |
|---|---|
| "second server"<br><br>('510 Patent, Claims 1, 2, 8, 15, 16, 18;<br>'346 Patent, Claims 1, 15, 17) | "server that is not the client device" |

**D.   "Hypertext Transfer Protocol (HTTP)," "HTTP request(s)," "Hypertext Transfer Protocol Secure (HTTPS)," and "HTTPS request(s)"**

| **"Hypertext Transfer Protocol (HTTP)"**<br>('319 Patent, Claims 1, 15;<br>'510 Patent, Claims 1, 11, 16;<br>'346 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Definite / plain and ordinary meaning | "A protocol specified by RFC 2616, that is not encrypted; distinct from HTTPS" |

| **"HTTP request(s)"**<br>('319 Patent, Claims 1, 15;<br>'510 Patent, Claims 1, 11, 16;<br>'852 Patent, Claim 1;<br>'346 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "A request identified by http://, that is not encrypted, as specified by RFC 2616; distinct from HTTPS request(s)" |

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2029
23 of 55



*Meaning of **consumer** in English*

# consumer

***noun*** [ C ]

US  /kənˈsuː.mɚ/   UK 🔊 /kənˈsjuː.məʳ/

**B2**

**a person who buys goods or services for their own use:**

- *The new rates will affect all consumers, including businesses.*
- *consumer rights/advice*

— **Thesaurus: synonyms, antonyms, and examples**

   **a person who buys something**

   shopper *Holiday shoppers mobbed the sale.*

   customer *Stores were lowering prices to attract more customers.*

   punter *UK The shop's running a raffle to pull in the punters.*

   patron *She's been a regular patron of the diner for years.*

   consumer *Consumers did not spend as much last quarter as analysts predicted.*

   buyer *We haven't found a buyer for the house yet.*

   **See more results »**

+ **More examples**

+ **SMART Vocabulary: related words and phrases**

**Want to learn more?**

Contents     To top

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2030
1 of 9

Appx6632



*(Definition of **consumer** from the <u>Cambridge Advanced Learner's Dictionary & Thesaurus</u> © Cambridge University Press)*

---

**consumer** | INTERMEDIATE ENGLISH

# consumer

*noun* [ C ]

US 🔊  /kənˈsu·mər/

SOCIAL STUDIES

**someone who buys goods or services for personal use:**

• *consumer goods/spending*

• *American consumers are becoming informed about the safety of products made for children.*

*(Definition of **consumer** from the <u>Cambridge Academic Content Dictionary</u> © Cambridge University Press)*

---

**consumer** | BUSINESS ENGLISH

# consumer

*noun* [ C ]

UK 🔊  /kənˈsjuːməʳ/  US 🔊

COMMERCE

**a person who buys goods or services for their own use:**

• *The new telephone rates will affect all consumers.*

• **the consumer** *The extra costs of production will be passed on to the consumer.*

• **average/individual, etc. consumer** *These changes will not affect the average consumer.*



Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2030
2 of 9

Appx6633

**consulate** /ˈkɒn.sjʊ.lət/ ⑳ /ˈkɑːn.sjə-/ *noun* [C] the office where a CONSUL works: *the Cuban consulate in Mexico City*

**consult** /kənˈsʌlt/ *verb* **1** ● [T] to get information or advice from a person, book, etc. with special knowledge on a particular subject: *If the symptoms get worse, consult your doctor.* ○ *I'm not quite sure how to get there - I'd better consult a map.* **2** ● [I or T] to have discussions with someone before you make a decision: *Why didn't you consult me about this?* ○ *This afternoon the Prime Minister was consulting with his advisors and we are expecting an announcement shortly.*

**consultancy** /kənˈsʌl.tənt.si/ *noun* [C] a company that gives specialist advice on a particular subject: *a management/financial/recruitment consultancy* **2** [U] the activity of giving advice on a particular subject

**consultant** /kənˈsʌl.tənt/ *noun* [C] **1** ● someone who advises people on a particular subject: *a management/financial/computer consultant* ○ *a firm of public relations consultants* **2** UK a **specialist** (= doctor with special training and knowledge in a particular area of medicine)

**consultation** /ˌkɒn.sʌlˈteɪ.ʃən/ ⑳ /ˌkɑːn-/ *noun* **1** ● [C] a meeting to discuss something or to get advice: *After consultations with our accountants, we've decided how to cut costs within the company.* **2** ● [U] when you discuss something with someone in order to get their advice or opinion about it: *He chose his study course in consultation with his parents and teachers.*

**consultative** /kənˈsʌl.tə.tɪv/ ⑳ /-t̬ə.t̬ɪv/ *adjective* A consultative group or document gives advice about something: *She works for the firm in a consultative capacity.* ○ *to set up a consultative committee*

**consulting** /kənˈsʌl.tɪŋ/ ⑳ /-t̬ɪŋ/ *adjective* [BEFORE NOUN] giving advice on a particular subject: *a consulting lawyer/engineer*

**conˈsulting ˌroom** *noun* [C] an office where a doctor talks to and examines patients

**consumables** /kənˈsjuː.mə.blz/ ⑳ /-ˈsuː-/ *plural noun* goods, especially food, or services which people buy regularly because they are quickly used and need to be replaced quite often: *At this hospital we use up bandages, disposable gloves and other consumables at an alarming rate.*

**consume** /kənˈsjuːm/ ⑳ /-ˈsuːm/ *verb* [T] USE RESOURCE ● **1** ● to use fuel, energy or time, especially in large amounts: *Our high living standards cause our present population to consume 25 percent of the world's oil.* **2** FORMAL to eat or drink, especially a lot of something: *He consumes vast quantities of chips with every meal.* DESTROY ● **3** If a fire consumes something, it destroys it completely. **4** be consumed **by/with sth** to have so much of a feeling that it affects everything you do: *He was consumed with jealousy.*

**consumer** /kənˈsjuː.məʳ/ ⑳ /-ˈsuː.mɚ/ *noun* [C] ● a person who buys goods or services for their own use: *The new telephone rates will affect all consumers including businesses.* ○ *consumer rights/advice*

**consumer durables** /kənˈsjuː.mə ˌdjʊə.rə.blz/ ⑳ /-ˈsuː.mɚ ˌdʊr.ə-/ *plural noun* goods that last a long time and are not intended to be bought very often, such as televisions and cars

**consumerism** /kənˈsjuː.mə.rɪ.zᵊm/ ⑳ /-ˈsuː.mɚ-/ *noun* [U] **1** the state of an advanced industrial society in which a lot of goods are bought and sold **2** DISAPPROVING when too much attention is given to buying and owning things: *He disliked Christmas and its rampant* (= extreme) *consumerism.*

**conˌsumer ˈprice ˌindex** *noun* [C USUALLY SINGULAR] (ABBREVIATION CPI) US FOR **retail price index**

**conˌsumer proˈtection** *noun* of goods and services products and advertise

**conˌsumer soˈciety** *noun* often buy new goods, not need, and which many things

**consuming** /kənˈsjuː.mɪŋ/ ⑳ an emotion that is very strong *passion with him.*

**consummate**
▸ *adjective* [BEFORE NOUN] perfect, or complete in every way *happiness* ○ *He's a consummate ath*
▸ *verb* [T] /ˈkɒn.sjʊ.meɪt/ ⑳ /ˈkɑːn- **1** LEGAL to make a marriage or ra complete by having sex: *The marri summated.* COMPLETE ● **2** FORMAL complete or perfect

**consummation** /ˌkɒn.sjʊˈmeɪ.ʃᵊn/ SEX ● **1** LEGAL when a marriage or is made complete by having sex when something is made complete

**consumption** /kənˈsʌmp.ʃᵊn/ *noun* amount used or eaten: *As a nation junk food is horrifying.* ○ *We need consumption by having fewer cars* uses, eats, or drinks someth *clearly unfit for human consumptio people to eat).* ○ *These products a sumption, but for export.* **3** when ment, etc. is intended for a particu *This memo is for internal consump was not intended for public* **4** OLD-FASHIONED FOR tuberculosis (the lungs)

**consumptive** /kənˈsʌmp.tɪv/ *adjective* IONED (a person) suffering from co live very long - she was (a) consump

**cont.** *adjective* (ALSO **contd**) WRITTEN tinued

Word partners for conta
establish/get in/make contac contact ● be in/keep in rema ● avoid/break off/lose contac frequent/regular contact with ● be in contact with sb

Word partners for
come in/into contact with
sexual contact ● close/direct
sb/sth

Word partners for
build up/make contacts ●
valuable contacts ● a netwo

**contact** /ˈkɒn.tækt/ ⑳ /-t̬- ● **1**
▸ *noun* COMMUNICATION ● **1** ●
with someone, especially
them regularly: *"Have you bee
recently?" "Only by telephone
her - we write a couple of time
enough contact between
been busy at home and ha
with the outside world.* ○ *I'd
my old school friends.* ○ *She
him in Italy.* ○ *Air traffic cont
the pilot of the aircraft ten
○ *The school likes to have a
number, especially for
school hours.* TOUCH ● **2** ●
things touch each othe

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2031
4 of 5



**consult** Ⓐ /kən'sʌlt/ v [T] **1** to get information or advice from a person, esp. an expert, or to look at written material in order to get information ○ [T] *If you don't know the meaning of a word, consult a dictionary.* **2** To consult is also to inform someone about a situation, often in order to get approval for an action you plan to take: [T] *The committee will consult people in the neighborhood before making a recommendation.*

**consultant** Ⓐ /kən'sʌlt·ənt/ n [C] a person who is a specialist in a particular subject and whose job is to give advice and information to businesses, government organizations, etc. ○ *The former general now serves as a consultant to the Pentagon.*

**consultation** Ⓐ /ˌkɑn·səl'teɪ·ʃən/ n [C/U] the act of exchanging information and opinions about something in order to reach a better understanding of it or to make a decision, or a meeting for this purpose ○ [U] *We hope to work in consultation with Congress on how the law should be interpreted.* **2** A consultation is also a meeting with a doctor who is specially trained to give advice to you or other doctors about an illness or its treatment: [C] *The consultation with the pathologist convinced me to have surgery right away.*

**consultative** Ⓐ /kən'sʌl·tət̬·ɪv, 'kɑn·səlˌteɪt̬·ɪv/ adj

**consume** Ⓐ /kən'suːm/ v [T] **1** to use fuel, energy, or time, esp. in large amounts ○ *Weekend shopping chores consumed much of her time.* **2** To consume is also to eat or drink: *They consume a lot of candy.* **3** If a fire consumes something, it destroys it completely: *Fire had consumed the whole building.* **4** Someone can be said to be consumed by/with a feeling if that feeling is extremely strong: *We were consumed with joy and relief, as well as profound gratitude.*

**consumer** Ⓐ /kən'suː·mər/ n [C] *social studies* someone who buys goods or services for personal use ○ *consumer goods/spending* ○ *American consumers are becoming informed about the safety of products made for children.*

**consumerism** n [U] *social studies* protection of consumers against harmful products or business methods

**consummate** /'kɑn·sə·mət, kən'sʌm·ət/ adj perfect; complete in every way ○ *consummate skill*
**consummate** /'kɑn·səˌmeɪt/ v [T] **1** to complete ○ *The deal was consummated with a handshake.* **2** To consummate a marriage is to make it complete by having sex.

**consumption** Ⓐ /kən'sʌm·ʃən/ n [U] **1** an amount of something that is used, or the process of using something, esp. so that there is less of it ○ *Consumption of electricity is always higher during the summer months because of air-conditioning.* **2** *social studies* Consumption is the using of goods and services in an economy, or the amount of goods and services used.

**contact** COMMUNICATION /'kɑn·tækt/ n [U] communication with someone, or with a group or organization ○ *Have you kept in contact with your friends from college?* ○ *The pilot was always in contact with an air traffic controller.*

**contact** /'kɑn·tækt/ v [T] ○ *I tried to contact him at his office but he was out to lunch.*

> **USAGE**
> **contact**
> Remember to use the preposition **with** when you use the phrases make/be in/lose **contact with** someone.
> *When you live abroad it's important not to lose contact with friends and family at home.*
> ~~When you live abroad it's important not to lose contact to friends and family at home.~~

**TOUCH** /'kɑn·tækt/ n [U] the touching of two objects or surfaces ○ *Don't let that glue come into contact with your skin.*

**HELPFUL PERSON** /'kɑn·tækt/ n [C] **1** a person whom you know and who may be able to help you in a useful way, esp. by influencing other people or by sharing knowledge with you ○ *He tried to use his contacts to get a better job in advertising.* **2** A contact is also a person you meet: *My face-to-face contacts outside of the office had been mostly hotel clerks, policemen, and waitresses.*

**contact lens** n [C] a small, round, curved piece of transparent material, esp. plastic, that fits on the surface of an eye to improve sight ○ *I need new contact lenses.*

**contagious** /kən'teɪ·dʒəs/ adj **1** (of a disease) able to be caught by touching someone with the disease or something the person has touched or worn, or (of a person) having this type of disease ○ *a highly contagious strain of flu* **2** *fig.* Contagious also means moving easily from one person to another: *The mood was contagious, and soon everyone was laughing.*

**contain** HAVE INSIDE /kən'teɪn/ v [T] (of an object or area) to have an amount of something inside or within it ○ *How much liquid does this bottle contain?* ○ *Each large crate contains 12 boxes.*

**container** /kən'teɪ·nər/ n [C] a hollow object, such as a box or a bottle, which can be used for holding something esp. for the purposes of carrying or storing ○ *plastic milk containers*

> **USAGE**
> **contain or include?**
> Use **contain** to talk about objects that have something else inside them.
> *This folder contains important letters.*
> *This soup contains garlic and onions.*
> Use **include** to say that something or someone is a part of something else but that there are other parts as well.
> *The team includes two new players.*
> *The price of the ticket includes insurance and tax.*

**INCLUDE** /kən'teɪn/ v [T] to have as a part, or be equal to; include ○ *The information contained on forms would be kept strictly confidential.* ○ *Each food serving contains 95 calories.* ○ *You could retrieve all files that contained certain key words.*

---

dʒ **jump** | j **yes** | əl **little** | əm **hm** | ən **cotton** | ŋ **sing** | ʃ **shoe** | t̬ **meeting** | θ **think** | ð **this** | tʃ **choose** | ʒ **measure**

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2032
4 of 5

6/10/22, 3:59 PM                    Consumer definition and meaning | Collins English Dictionary





Appx6651

eventually constructed a huge business empire. ◻ The novel is constructed from a series of on-the-spot reports.

**construction** ◆◇◇ /kənstrʌkʃ'n/ (constructions)
**1** N-UNCOUNT Construction is the building of things such as houses, factories, roads, and bridges. ◻ He'd already started construction on a hunting lodge. ◻ ...the downturn in the construction industry. ◻ Jim now works in construction. **2** N-UNCOUNT The construction of something such as a vehicle or machine is the making of it. ◻ ...companies who have long experience in the construction of three types of equipment. **3** N-UNCOUNT The construction of something such as a system is the creation of it. ◻ ...the construction of a just system of criminal justice. **4** N-UNCOUNT You use construction to refer to the structure of something and the way it has been built or made. ◻ The Shakers believed that furniture should be plain, simple, useful, practical, and of sound construction. **5** N-COUNT You can refer to an object that has been built or made as a construction. ◻ ...an impressive steel and glass construction. **6** N-COUNT A grammatical construction is a particular arrangement of words in a sentence, clause, or phrase. ◻ Avoid complex verbal constructions. → see skyscraper

**construction paper** N-UNCOUNT Construction paper is a type of stiff, colored paper that children use for drawing and for making things. [AM] ◻ ...a raggedy, three-legged animal cut out of brown construction paper.

**constructive** /kənstrʌktɪv/ ADJ A constructive discussion, comment, or approach is useful and helpful rather than negative and unhelpful. ◻ She welcomes constructive criticism. ◻ After their meeting, both men described the talks as frank, friendly and constructive.

**constructor** /kənstrʌktər/ (constructors) N-COUNT A racing car constructor or aircraft constructor is a company that builds cars or aircraft.

**construe** /kənstruː/ (construes, construing, construed) V-T If something is construed in a particular way, its nature or meaning is interpreted in that way. [FORMAL] ◻ What may seem helpful behavior to you can be construed as interference by others. ◻ He may construe the approach as a hostile act.

**consul** /kɒns'l/ (consuls) N-COUNT; N-TITLE A consul is an official who is sent by his or her government to live in a foreign city in order to help other citizens from his or her country who are in that foreign city. ◻ ...Stephanie Sweet, the British Consul in Tangier.

**consular** /kɒnsjʊlər/ ADJ Consular means involving or relating to a consul or the work of a consul. [ADJ n] ◻ U.S. Consular officials have visited the men, although they have not yet had access to lawyers.

**consulate** /kɒnsjʊlət/ (consulates) N-COUNT A consulate is the place where a consul works. ◻ ...the Canadian consulate in Seattle.

**consult** ◆◇◇ /kənsʌlt/ (consults, consulting, consulted)
**1** V-T/V-I If you consult an expert or someone senior to you or consult with them, you ask them for their opinion, advice, or permission. ◻ Consult your doctor about how much exercise you should get. ◻ He needed to consult with an attorney. **2** V-T If you consult a book or a map, you look in it or look at it in order to find some information. ◻ Consult the chart on page 44 for the correct cooking times. **3** V-RECIP If a person or group of people consults with other people or consults them, or if two people or groups consult, they talk and exchange ideas and opinions about what they might decide to do. ◻ After consulting with her daughter and manager she decided to take on the part, on her terms. ◻ The two countries will have to consult their allies.

**consultancy** /kənsʌltənsi/ (consultancies) **1** N-COUNT A consultancy is a company that gives expert advice on a particular subject. ◻ A survey of 37 hospitals by Newchurch, a consultancy, reveals striking improvements. **2** N-UNCOUNT Consultancy is expert advice on a particular subject which a person or group is paid to provide to a company or organization. [mainly BRIT]

**consultant** ◆◇◇ /kənsʌltənt/ (consultants) **1** N-COUNT A consultant is a person who gives expert advice to a person or organization on a particular subject. ◻ She is a consultant to the government. **2** N-COUNT A consultant is an experienced doctor

---

with a high position, who specializes in one area of medicine. [BRIT; AM usually specialist]

**consultation** /kɒnsəlteɪʃ'n/ (consultations) **1** N-VAR A consultation is a meeting to discuss something. Consultation is discussion about something. ◻ Next week he'll be in Florida for consultations with President Vicente Fox. **2** N-VAR A consultation with a doctor or other expert is a meeting with them to discuss a particular problem and get their advice. Consultation is the process of getting advice from a doctor or other expert. ◻ A personal diet plan is devised after a consultation with a nutritionist. **3** N-COUNT A consultation is a meeting where several doctors discuss a patient and his or her condition and treatment. [AM]

**consultative** /kənsʌltətɪv/ ADJ A consultative committee or document gives advice or makes proposals about a particular problem or subject. ◻ ...the consultative committee on local government finance.

**consulting room** (consulting rooms) N-COUNT A consulting room is the same as a doctor's office. [BRIT]

**consumable** /kənsjuːməb'l/ (consumables) ADJ Consumable goods are items which are intended to be bought, used, and then replaced. ◻ ...demand for consumable articles. ● N-COUNT Consumable is also a noun. ◻ Suppliers add computer consumables, office equipment and furniture to their product range.

> **Word Link**    sume = taking : assume, consume, presume

**consume** /kənsjuːm/ (consumes, consuming, consumed) **1** V-T If you consume something, you eat or drink it. [FORMAL] ◻ Martha would consume nearly a pound of cheese per day. **2** V-T To consume an amount of fuel, energy, or time means to use it up. ◻ Some of the most efficient refrigerators consume 70 percent less electricity than traditional models. **3** → see also consuming

**consumed** /kənsjuːmd/ ADJ If you are consumed with a feeling or idea, it affects you very strongly. [LITERARY] [V-link ADJ with/by n] ◻ They are consumed with jealousy at her success.

**consumer** ◆◆◇ /kənsjuːmər/ (consumers) N-COUNT A consumer is a person who buys things or uses services. ◻ ...claims that tobacco companies failed to warn consumers about the dangers of smoking. → see advertising

**consumer confidence** N-UNCOUNT If there is consumer confidence, people generally are willing to spend money and buy things. ◻ The Fed is keen to ensure that rising joblessness does not hit consumer confidence in the new year.

**consumer credit** N-UNCOUNT Consumer credit is money that is lent to people by organizations such as banks and stores so that they can buy things. ◻ New consumer credit fell to $17 billion in August.

**consumer durable** (consumer durables) N-COUNT Consumer durables are goods which are expected to last a long time, and are bought infrequently. [BRIT, BUSINESS; AM durable goods]

**consumer goods** N-PLURAL Consumer goods are items bought by people for their own use, rather than by businesses. Compare capital goods. [BUSINESS] ◻ The choice of consumer goods available in local shops is small.

**consumerism** /kənsjuːmərɪzm/ **1** N-UNCOUNT Consumerism is the belief that it is good to buy and use a lot of goods. [oft supp n] ◻ They have clearly embraced Western consumerism. **2** N-UNCOUNT Consumerism is the protection of the rights and interests of consumers.

**consumer price index** N-SING The consumer price index is an official measure of the rate of inflation within a country's economy. The abbreviation CPI is also used. [stat the n] ◻ In May the consumer price index fell by 1.1 per cent.

**consumer society** (consumer societies) N-COUNT You can use consumer society to refer to a society where people think that spending money on goods and services is very important. ◻ We live in a consumer society in which money is a massive preoccupation.

**consuming** /kənsjuːmɪŋ/ ADJ A consuming passion or interest is more important to you than anything else. ◻ He has developed a consuming passion for chess. → see also consume, time-consuming

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2034
4 of 5

organization in the world is the Internet Engineering Task Force (IETF). IETF sets the standards that govern how much of the Internet operates.

The second category of networking standards is de facto standards. These standards typically emerge in the marketplace and are supported by technology vendors but have no official backing. For example, Microsoft Windows is a de facto standard, but is not formally recognized by any standards organization. It is simply widely recognized and accepted.

# NETWORK COMPONENTS, DEVICES AND FUNCTIONS

Networks share common devices and functions, such as servers, transmission media (the cabling used to connect the network) clients, shared data (e.g. files and email), network cards, printers and other peripheral devices.

The following is a brief introduction to common network components and devices. You can click any link below to read the full Webopedia definition:

**Server**: A computer or device on a network that manages network resources. Servers are often dedicated, meaning that they perform no other tasks besides their server tasks.

**Client**: A client is an application that runs on a personal computer or workstation and relies on a server to perform some operations.

**Devices**: Computer devices, such as a CD-ROM drive or printer, that is not part of the essential computer. Examples of devices include disk drives, printers, and modems.

**Transmission Media**: the type of physical system used to carry a communication signal from one system to another. Examples of transmission media include twisted-pair cable, coaxial cable, and fiber optic cable.

**Network Operating System (NOS)**: A network operating system includes special functions for connecting computers and devices into a local-area network (LAN). The term network operating system is generally reserved for software that enhances a basic operating system by adding networking features.

**Operating System**: Operating systems provide a software platform on top of which other programs, called application programs, can run. Operating systems perform basic tasks, such as recognizing input from the keyboard, sending output to the display screen, keeping track of files and directories on the disk, and controlling peripheral devices such as disk drives and printers.

**Network Interface Card (NIC)**: An expansion board you insert into a computer so the computer can be connected to a network. Most NICs are designed for a particular type of network, protocol, and media, although some can serve multiple networks.

**Hub**: A common connection point for devices in a network. A hub contains multiple ports. When a packet arrives at one port, it is copied to the other ports so that all segments of the LAN can see all packets.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2035          3/7
3 of 7

Appx6668

**4** INTRODUCTION CHAP. 1

database in Singapore. Networks called **VPNs (Virtual Private Networks)** may be used to join the individual networks at different sites into one extended network. In other words, the mere fact that a user happens to be 15,000 km away from his data should not prevent him from using the data as though they were local. This goal may be summarized by saying that it is an attempt to end the "tyranny of geography."

In the simplest of terms, one can imagine a company's information system as consisting of one or more databases with company information and some number of employees who need to access them remotely. In this model, the data are stored on powerful computers called **servers**. Often these are centrally housed and maintained by a system administrator. In contrast, the employees have simpler machines, called **clients**, on their desks, with which they access remote data, for example, to include in spreadsheets they are constructing. (Sometimes we will refer to the human user of the client machine as the "client," but it should be clear from the context whether we mean the computer or its user.) The client and server machines are connected by a network, as illustrated in Fig. 1-1. Note that we have shown the network as a simple oval, without any detail. We will use this form when we mean a network in the most abstract sense. When more detail is required, it will be provided.



**Figure 1-1.** A network with two clients and one server.

This whole arrangement is called the **client-server model**. It is widely used and forms the basis of much network usage. The most popular realization is that of a **Web application**, in which the server generates Web pages based on its database in response to client requests that may update the database. The client-server model is applicable when the client and server are both in the same building (and belong to the same company), but also when they are far apart. For example, when a person at home accesses a page on the World Wide Web, the same model is employed, with the remote Web server being the server and the user's personal

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2036
5 of 6



computer being the client. Under most conditions, one server can handle a large number (hundreds or thousands) of clients simultaneously.

If we look at the client-server model in detail, we see that two processes (i.e., running programs) are involved, one on the client machine and one on the server machine. Communication takes the form of the client process sending a message over the network to the server process. The client process then waits for a reply message. When the server process gets the request, it performs the requested work or looks up the requested data and sends back a reply. These messages are shown in Fig. 1-2.



Client machine    Request    Server machine

Network

Reply

Client process    Server process

**Figure 1-2.** The client-server model involves requests and replies.

A second goal of setting up a computer network has to do with people rather than information or even computers. A computer network can provide a powerful **communication medium** among employees. Virtually every company that has two or more computers now has **email** (**electronic mail**), which employees generally use for a great deal of daily communication. In fact, a common gripe around the water cooler is how much email everyone has to deal with, much of it quite meaningless because bosses have discovered that they can send the same (often content-free) message to all their subordinates at the push of a button.

Telephone calls between employees may be carried by the computer network instead of by the phone company. This technology is called **IP telephony** or **Voice over IP** (**VoIP**) when Internet technology is used. The microphone and speaker at each end may belong to a VoIP-enabled phone or the employee's computer. Companies find this a wonderful way to save on their telephone bills.

Other, richer forms of communication are made possible by computer networks. Video can be added to audio so that employees at distant locations can see and hear each other as they hold a meeting. This technique is a powerful tool for eliminating the cost and time previously devoted to travel. **Desktop sharing** lets remote workers see and interact with a graphical computer screen. This makes it easy for two or more people who work far apart to read and write a shared blackboard or write a report together. When one worker makes a change to an online document, the others can see the change immediately, instead of waiting several days for a letter. Such a speedup makes cooperation among far-flung groups of people easy where it previously had been impossible. More ambitious forms of remote coordination such as telemedicine are only now starting to be used (e.g.,

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2036
6 of 6

database in Singapore. In other words, the mere fact that a user happens to be 15,000 km away from his data should not prevent him from using the data as though they were local. This goal may be summarized by saying that it is an attempt to end the "tyranny of geography."

In the simplest of terms, one can imagine a company's information system as consisting of one or more databases and some number of employees who need to access them remotely. In this model, the data are stored on powerful computers called **servers**. Often these are centrally housed and maintained by a system administrator. In contrast, the employees have simpler machines, called **clients**, on their desks, with which they access remote data, for example, to include in spreadsheets they are constructing. (Sometimes we will refer to the human user of the client machine as the "client," but it should be clear from the context whether we mean the computer or its user.) The client and server machines are connected by a network, as illustrated in Fig. 1-1. Note that we have shown the network as a simple oval, without any detail. We will use this form when we mean a network in the abstract sense. When more detail is required, it will be provided.



**Figure 1-1.** A network with two clients and one server.

This whole arrangement is called the **client-server model**. It is widely used and forms the basis of much network usage. It is applicable when the client and server are both in the same building (e.g., belong to the same company), but also when they are far apart. For example, when a person at home accesses a page on the World Wide Web, the same model is employed, with the remote Web server being the server and the user's personal computer being the client. Under most conditions, one server can handle a large number of clients.

If we look at the client-server model in detail, we see that two processes are involved, one on the client machine and one on the server machine. Communication takes the form of the client process sending a message over the network to the server process. The client process then waits for a reply message. When the serv-

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2037
6 of 8

7/29/22, 12:27 AM                    EMK acquires Luminati – the world's largest IP proxy network, which brings transparency to the internet - EMK Capital

 (https://www.emkcapital.com/)  

# EMK acquires Luminati – the world's largest IP proxy network, which brings transparency to the internet

by EMK Capital (https://www.emkcapital.com/author/emkwpadmin/) | Aug 10, 2017 | Announcements (https://www.emkcapital.com/category/announcements/) | 0 comments (https://www.emkcapital.com/emk-acquires-luminati-worlds-largest-ip-proxy-network-brings-transparency-internet/#respond)

EMK Capital LLP and Hola Networks Ltd today announced that funds managed by EMK have agreed to acquire a majority shareholding in Luminati, the enterprise proxy network division of Hola, for an enterprise value of $200m. The founders of Hola Networks will retain a significant stake in the company and Ofer Vilenski, Co-Founder, will continue as CEO of Luminati. EMK and the Luminati team will work together to grow Luminati and will continue to invest heavily in enhancing the customer experience and developing additional technologies and services.

Luminati is the world's leading enterprise IP proxy network, and helps make the Web more transparent by allowing businesses to see the internet from the consumers' point of view. In the Internet's early days, web pages were simple – every viewer saw the same page. Today, sites are dynamic – they recognize the viewer and show different content, advertisements and prices based on the viewers' geography, demographics, and other identifying information. Websites can also determine if a competitor is comparing prices, or if a security company is auditing them for potential threats. These trends are eliminating the transparency of the Web: for example, they reduce online retailers' ability to compete as retailers can't reliably see the prices that are presented to consumers; similarly these trends make it difficult for security firms to find malicious sites, as such sites are presented only to users of a certain demographic. These developments have also made it difficult for ad networks & website owners to check that the ads they are delivering are safe, because an unscrupulous ad vendor may present malicious ads only to the unsuspecting user but not to the ad network.

Luminati brings back transparency and trust to the Web by enabling its enterprise customers to access the internet through its proprietary network of over 40 million IP addresses. Luminati helps customers to see the Web as it appears to real consumers, without being blocked, slowed or spoofed and to view the Web from different users' perspectives from any city across the globe. Luminati's technology and patent portfolio allow Luminati to operate the only mass-scale residential IP proxy network in the world.

Luminati serves corporate clients, including Fortune 500 companies, in many different sectors which use Luminati's transparency network for ad verification, brand protection, price comparison, fraud prevention, data collection, cyber security, and application performance measurement. Luminati's residential IP service is required for many businesses that need certainty in the accuracy of the data they collect online and the accuracy of the cyber security checks they conduct.

Luminati's enterprise proxy solutions were separated from Hola in 2014. The Hola Networks group employs a unique model for rapid innovation – Hola Networks engineers and product managers develop technologies from Minimum Viable Products (MVP) to hugely profitable services, as was the case with Luminati. Hola will continue as a standalone company, growing its VPN and video CDN product lines, as well as other new fast growing initiatives. Hola Networks was founded by Ofer Vilenski and Derry Shribman who together earlier founded Jungo (acquired by NDS in 2006).

Appx6786

# IPPN Competitive Landscape – Vertical Market Share

**Key Takeaway: The split between residential, mobile, and data center IPPN verticals is dominated by residential at over 73%, followed by data centers at almost 20%, with mobile at 7% in 2018. Choice of vertical depends on the techniques used by target websites to block visitors**

**Total IPPN Market:**
**Vertical Analysis, Global, 2018**

Residential
73.6%

Data Center
19.4%

Mobile
7.0%

Note: All figures are rounded. The base year is 2018. Source: Frost & Sullivan

F R O S T &#x26; S U L L I V A N

IPPN

45

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2046
45 of 74



# IPPN Competitive Landscape – Market Share

**Key Takeaway: Luminati, Oxylabs, and GeoSurf dominated the global IPPN market in 2018, combining to represent 77.0% of the total market.**

**Total IPPN Market:
Market Share Analysis, Global, 2018**

- Luminati 53.1%
- Oxylabs 13.3%
- Geosurf 10.6%
- Scrapinghub 5.3%
- LimeProxies 1.3%
- Smartproxy 4.0%
- StormProxies 2.7%
- Microleaves 1.7%
- Netnut 1.3%
- Others 6.6%

Others includes companies listed here. Note: All figures are rounded. The base year is 2018. Source: Frost & Sullivan

FROST & SULLIVAN

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2046
48 of 74

48

IPPN

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

47.   In my opinion, a POSA would understand that, normally, a request for content is sent from a client device (discussed in detail below) to a web server. For example, a customer that is considering buying a product from a store may request content associated with that particular product from the store's website. That same customer may also request content associated with that same product at a different store's website. As one example, a customer may request content to see if the product is on sale. Therefore, in my opinion, a POSA would understand that the IP packet would include the Source IP Address associated with the customer's client device.

48.   In my opinion, a POSA would understand that, normally, the web server responds to a request for content by sending the requested content back to the Source IP Address. In some cases, the response to the request for content may be blocked or spoofed due to, for example, the geographic location of the Source IP Address. As another example, multiple requests having the same Source IP Address may become suspicious and subsequently blocked by the web server.

49.   In my opinion, a POSA would understand that, at the time of invention, a different type of network component known as a proxy server may be used as an intermediary between the client device and the web server in order to conceal the original Source IP Address for a request for content. *See* EX. 1001 at Fig. 1. The IP packet will be sent from the original requestor to the proxy server

20

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

and from the proxy server to the web server. When sending the IP packet from the proxy server to the web server, the proxy server will often replace the original Source IP address of the original requestor with its own IP address. Thus, a POSA would understand that the web server will only "see" the IP address of the proxy server. Instead of being blocked or spoofed, the requested content may be sent back to the original requesting network component via the proxy server.

## V.   **INTRODUCTION TO THE CLAIMS OF THE '342 PATENT**

50.    All of the patents claiming priority to Provisional Application No. 61/249,624 filed on October 8, 2009 share the same specification.

51.    Claim 1 of the '342 Patent is the only independent claim. Claim 1 recites a web server.  Claim 1 recites a separate server referred to as the "**second server**" in the '342 Patent.  Finally, claim 1 recites a "**first client device**" serving as an intermediary between the web server and the second server.

52.    Based on my experience in the NetNut Litigation, I note that the '713 and '852 Patents in this same family have claims that additionally recite a "requesting client device" that is not an intermediary.

53.    The '342 Patent claims recite methods performed by a "first client device" within a **second server** ↔ **first client device** ↔ **web server** architecture as shown, for example, in the annotated claims in the following table:

21

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
21 of 95

Appx7161

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

56.    The steps of claim 1 in the '342 Patent are performed by an intermediary client device – a "**first client device**" – located between the second server and the web server.  As discussed below, the common specification discloses a "client device" may be, for example, a requesting client device or an intermediary client device.

## VI.    BACKGROUND OF THE COMMON SPECIFICATION

57.    The common specification distinguishes two prior art systems. The first prior art system is the traditional use of a proxy server as an intermediary between a client device and a web server. *See* '342 Patent at 2:8-39. The second prior art system is the traditional use of a peer-to-peer system using caching client devices. *See* '342 Patent at 2:40-3:3. The common specification explains that the prior art systems are cost prohibitive and do not handle dynamic content due to the typical cache-storage methods. As one example, the traditional use of a proxy server, as discussed above, would require a proxy server in almost every city within the United States and across the world. As another example, the traditional use of a proxy server, as discussed above, may still result in being blocked by the web server, if the IP address of the proxy server is used so regularly that it becomes recognizable and/or because the IP address of the proxy server is a commercial IP address as opposed to residential IP address.

26

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
26 of 95

Appx7166

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

58.    In contrast, Bright Data's novel use of a client device as an intermediary as recited in the claims lowers costs and is able to handle dynamic content. In my opinion, it would not be obvious to a POSA to use a client device, having limited resources unlike a server, as an intermediary proxy.

## VII.    REVIEW OF THE COMMON SPECIFICATION

59.    The common specification provides several exemplary embodiments in the detailed description and the figures showing that both servers and client devices can be configured to operate as intermediaries.  For example, Figure 1 and the associated discussion show a proxy server between one or more client devices and a web server in a communication pathway.  *See, e.g.,* '342 Patent at Fig. 1 and 2:8-15 ("One solution that has been in use is called a "proxy". FIG. 1 is a schematic diagram providing an example of use of a proxy within a network 2. A proxy, or proxy server 4, 6, 8 is a device that is placed between one or more clients, illustrated in FIG. 1 as client devices 10, 12, 14, 16, 18, 20, that request data, via the Internet 22, and a Web server or Web servers 30, 32, 34 from which they are requesting the data.")

27

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
27 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*



**FIG. 3**

62.     As shown in Figure 3, agent 122, in some embodiments, is a client device which can receive requests for content intended for web server 152. *See, e.g.,* '342 Patent at 5:21-29. The common specification also describes that the 'agent' can request this content directly from the web server. *See, e.g.,* '342 Patent at 15:39-42; 15:51-52; 15:63-16:11.

63.     The specification discloses how a communication device can be configured to serve as a client, agent, or peer. *See* '342 Patent at 4:44-50; 5:21-29;

30

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

*see also* '342 Patent at 9:12-50. For example, the specification discloses, when executing the fetching method, the requesting client device may be executing the client module 224 disclosed in FIG. 6, while the proxy client device may be executing the agent module 228 disclosed in FIG. 6.



**FIG. 6**

64.     In my opinion, a POSA would understand that proxy server 6 of Figure 1 could be inserted between client 102 and agent 122 of Figure 3, as shown

31

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
31 of 95

Appx7171

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*

below in a modified version of Figure 3.[1] A POSA would understand the

**requesting client device** ↔ **second server** ↔ **first client device** ↔ **web server**

corresponds to client 102 ↔ proxy server 6 ↔ agent 122 ↔ web server 152, as

annotated in the modified figure below. Therefore, a POSA would understand the

common specification discloses a **requesting client device** ↔ **proxy server** ↔

**proxy client device** ↔ **web server** architecture as well.[2]

---

[1] Petitioners' expert agreed that as of 10/8/2009, using a proxy server between a requesting client device and a web server would be well known to a POSA. EX. 2026 at 93:15-24.

[2] Petitioners appear to agree that the '342 Patent discloses a **requesting client device** ↔ **second server** ↔ **first client device** ↔ **web server** architecture. *E.g.*, Petition at 28. Petitioners (relying on Dr. Freedman) identify the "Mapped Path" of Crowds as a four-component architecture including jondo 5→ jondo 4 → jondo 6 → web server 5. *Id.* Petitioners allege that jondo 4 correspond to the "second server" and that jondo 6 corresponds to the "first client device". *Id.* at 28-29.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
32 of 95

Appx7172

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*



## VIII.   CLAIM CONSTRUCTION

65.    It is my understanding that the first step in a proper invalidity analysis requires construing the relevant claims to determine their scope and meaning in view of the patent's specification, file history, and the understanding of a POSA.

66.    I understand the Court previously construed certain terms of the '319 and '510 Patents and entered a Claim Construction Oder (EX. 1011) and a Supplemental Claim Construction Order (EX. 1014) in the Teso Litigation.  I understand that the Court again construed certain terms of the '319 and '510

33

Appx7173

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

71.    In my opinion, a POSA would understand a client device is a communication device in the context of the specification. This is consistent with the Court's constructions in the Teso Litigation and in the NetNut Litigation. EX. 1011, EX. 1014, EX. 2029. As described in the specification, "each communication device may serve as a client, peer, or agent" ('342 Patent at 4:48-49) which in my opinion, informs a POSA that client 102, peers 112, 114, 116, and agent 122 are all "client devices" in the context of the specification. *See also* '342 Patent at 4:44-50; 5:21-29.

72.    In the NetNut Litigation, Defendant NetNut Ltd. proposed a construction of "client" as "a device operating in the role of a client", but the Court expressly rejected removing the word "communication" from the Court's prior construction of this same term in the Teso Litigation. EX. 2029 at 14. In my opinion, a POSA would understand that 'communication device' has a special meaning in the context of the specification as referring to a 'client device'.

73.    The specification discloses HOW a communication device can be configured to serve as a client, agent, or peer. *E.g.*, '342 Patent at 4:44-50; 5:21-29; *see also* '342 Patent at 9:12-50. For example, as discussed above, the specification discloses a **requesting client device** ↔ **proxy server** ↔ **proxy client device** ↔ **web server** architecture. The specification explains, when executing the fetching method, the requesting client device may be executing the client module 224

35

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
35 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

disclosed in FIG. 6, while the proxy client device may be executing the agent module 228 disclosed in FIG. 6. Therefore, in my opinion, A POSA would understand in the context of the specification, a client device is a consumer computer with specific software to operate in accordance with the claims.

74.    In the specification, this software is disclosed, for example, in Figure 6 showing acceleration application 220 on communication device 200. Figure 6 and the associated text disclose communication devices having client, peer, and agent modules, but no server module. In my opinion, a POSA would understand from the specification that one "client device" may be configured to be the requesting client device and another "client device" may be configured to be the proxy client device. In my opinion, a POSA would understand the term "client device" to have a consistent definition for either the Requestor or the Proxy.

75.    With respect to the modified version of Figure 3 annotated above, in my opinion, a POSA would understand that client 102 corresponds to the requesting client device.

76.    With respect to the modified version of Figure 3 annotated above, in my opinion, a POSA would understand that agent 122 corresponds to the proxy client device. Agent 122 is disclosed as a "client device" (as opposed to a server) that is selected, for example, because agent 122 is closest to the web server 152 (*e.g.*, '342 Patent 5:27; *see also id.* at 5:30-34).

36

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
36 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

77.    In the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone. *See, e.g.*, '342 Patent at 2:44-46 ("In the network 50, files are stored on **computers of consumers**, referred to herein as **client devices**.")(emphasis added). In my opinion, the specification explicitly states that "computers of consumers" are "referred to herein as client devices" and the term "client devices" is used in the claims. *See, e.g.*, '342 Patent at 2:44-46. Therefore, in my opinion, a POSA would understand a "client device" is a consumer computer in the context of the specification. This understanding is also consistent with statements made by Applicant during prosecution of the grandparent application that issued as Patent No. 10,069,936, further discussed below. In my opinion, in the context of the specification, a POSA would understand that a consumer device is distinguished from a commercial device. A POSA would also understand that a consumer device is not a dedicated proxy server.

78.    A "consumer" is commonly defined as "a person who buys goods or services for their own use" or "someone who buys goods or services for personal use". *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/consumer (EX. 2030) and EX. 2031 at 5 and EX. 2032 at 4; *E.g.*, https://www.collinsdictionary.com/us/dictionary/english/consumer (EX. 2033) and EX. 2034 at 4. This is also consistent with statements made by Applicant during

37

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
37 of 95

Appx7177

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

prosecution of the grandparent application that issued as Patent No. 10,069,936, where the applicant stated that client devices are "typically consumer owned and operated." EX. 1019 at 84.

79.    Further, in my opinion, given that the above recited architectures in the '342 Patent claims distinguish between client devices and servers (e.g. **proxy server** ↔ **proxy client device** ↔ **web server**) a POSA would understand that the mere inclusion of three interchangeable general use computers in pathway such as a generic **computer** ↔ **computer** ↔ **computer** architecture would not by itself disclose the recited architecture of the '342 Patent. The District Court repeatedly acknowledged that a client device is not merely a general-purpose computer. *E.g.*, EX. 2029 at 14-15 (NetNut C.C. Order referencing prior orders by the same court).

80.    In my opinion, the recited architecture in the claims of the '342 Patent distinguishes the novel use of a client device, rather than a proxy server, as an intermediary. This understanding is consistent with the Teso Alice Order finding the claims of the '319 and '510 Patent not abstract. EX. 2021 at 8-9 ("If the claimed methods in this case were simply the receipt and forwarding of information over the Internet, Teso might have a compelling argument. However, it is the use of non-traditional client devices that transforms the Asserted Claims into non-abstract subject matter.") This understanding is also consistent with the

38

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

Teso C.C. Order, the Teso Supplemental C.C. Order, and the NetNut C.C. Order. EXS. 1011, 1014, 2029.

81. In my opinion, a POSA would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone. I also agree with the applicant's statements during prosecution that a client device is not a dedicated network element. By contrast, a server is a dedicated network element, as discussed below. I also agree with the applicant's statements during prosecution that a client device typically uses a single or relatively few connections, unlike a server. I also agree with the applicant's statements during prosecution that a client device is resource limited (e.g., bandwidth and storage), unlike a server.

82. In my opinion, a POSA would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs.

83. In my opinion, a POSA would understand "client" to be consistent with its plain and ordinary meaning in the context of "client device" discussed above. A POSA's understanding of client and client device is further evidenced by

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
39 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

extrinsic materials including the February 17, 2015 "Network Fundamentals Study Guide" with a definition of client as "an application that runs on a personal computer or workstation and relies on a server to perform some operations." EX. 2035; *see also* Tanenbaum, et al., "Fifth Edition Computer Networks", EX. 2036 at 5 ("the employees have simpler machines, called clients, on their desks, with which they access remote data, for example, to include in spreadsheets they are constructing"); *see also* Tanenbaum, "Fourth Edition Computer Networks", EX. 2037 at 7.

84.    In my opinion, given the specifications discussion of problems associated with the prior art system of using a proxy server as an intermediary (*e.g.*, '342 Patent at 2:8-39) a POSA would NOT consider a proxy client device to encompass a proxy server.

85.    In my opinion, a POSA would understand there are structural differences between client devices and servers in the context of the specification and I have seen no contradictory disclosure in the specification or in the prosecution histories. Rather, client devices are repeatedly distinguished from servers in the specification and the prosecution histories.

### *1.  REVIEW OF FIGURES IN THE SPECIFICATION*

86.    As discussed below, in my opinion, upon reviewing the specification in general, and Figures 1 and 3 in particular, a POSA would understand that proxy

40

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
40 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

### b. *REVIEW OF FIGURE 1*

94.    For example, Figure 1 depicts prior art. '342 Patent at 3:66-67. Figure 1 shows proxy server 6 between client devices 14,16 and web server 32. In my opinion, a POSA would understand that client devices 14,16 are client devices and not servers; and a POSA would understand that web server 32 is a server and not a client device.

95.    If one were to apply the Board's preliminary role-based constructions, in my opinion, client devices 14,16 are operating in the role of a client and web server 32 is operating in the role of a server. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above. See also, e.g., EX. 2026 at 29:25-30:7 (at the point in time when client device 14 sends a request for content that is received by proxy server 6, that is "an aspect" of client device 14 operating in the role of a client) and 32:19-25 (at the point in time when web server 32 receives a request for content from proxy server 6, there are "aspects" of web server 32 operating in the role of a server) and 34:6-13 (at the point in time when web server 32 sends a response to proxy server 6, "the aspect" of web server 32 is operating in the role of a server) and 35:19-25 (at the point in time when client device 14 receives a response from proxy server 6, there is "an aspect" of client device 14 operating in the role of a client).

44

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
44 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

96.     In Figure 1, the exemplary intermediary is proxy server 6. In my opinion, a POSA would understand that proxy server 6 is a server and not a client device. As shown in Figure 1, proxy server 6 (i) receives requests from client devices 14,16 and (ii) sends requests to web server 32. If one were to apply the Board's preliminary role-based constructions, in my opinion, proxy server 6 would be (i) operating in the role of a server when receiving requests from client devices 14,16 and (ii) operating in the role of a client when sending requests to web server 32. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above. See also, e.g., EX. 2026 at 30:15-25 (at the point in time when proxy server 6 receives a request for content from client device 14, that is "an aspect" of proxy server 6 operating in the role of a server) and 31:14-21 (at the point in time when proxy server 6 sends a request for content to web server 32, that is "an aspect" of proxy server 6 operating in the role of a client).

97.     Additionally, proxy server 6 (iii) receives a response from web server 32 and (iv) sends the received response from web server 32 to client devices 14,16. If one were to apply the Board's preliminary role-based constructions, in my opinion, proxy server 6 would be (iii) operating in the role of a client when receiving responses from web server 32 and (iv) operating in the role of a server when sending the received responses on to client devices 14,16. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above.

45

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

See also, e.g., EX. 2026 at 34:14-21 (at the point in time when proxy server 6 receives a response from web server 32, there is "an aspect" of proxy server 6 operating in the role of a client) and 35:7-14 (at the point in time when proxy server 6 sends a response to client device 14, there are "aspects" of proxy server 6 operating in the role of a server).

### c. *REVIEW OF FIGURE 3*

98.    Figure 3 is an exemplary embodiment of the present invention. '342 Patent at 4:3-5. Figure 3 shows agent 122 between client 102 and web server 152. In my opinion, a POSA would understand that client 102 is a client device and not a server; and a POSA would understand that web server 152 is a server and not a client device.

99.    If one were to apply the Board's preliminary role-based constructions, in my opinion, client 102 is operating in the role of a client and web server 152 is operating in the role of a server. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above.[4]

100.    In Figure 3, the exemplary intermediary is agent 122. In my opinion, a POSA would understand that agent 122 is a client device and not a server.

---

[4] In this IPR, when asked the same step-by-step questions with respect to Figure 3 of the '342 Patent, Dr. Freedman stated that he did not perform that analysis of Figure 3 because it "wasn't relevant for the claims," but that "it does not sound unreasonable." See, e.g., EX. 2026 at 41:10-19.

46

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
46 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

101.   As shown in Figure 3, agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152. If one were to apply the Board's preliminary role-based constructions, in my opinion, agent 122 would be (i) operating in the role of a server when receiving requests from client device 102 and (ii) operating in the role of a client when sending requests to web server 1522. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above.

102.   Additionally, agent 122 (iii) receives a response from web server 1522 and (iv) sends the received response from web server 1522 to client devices 102. If one were to apply the Board's preliminary role-based constructions, in my opinion, agent 122 would be (iii) operating in the role of a client when receiving responses from web server 152 and (iv) operating in the role of a server when sending the received responses on to client device 102. According to Petitioners' expert's trial testimony, Petitioners' expert agrees as discussed above.

### d.   *COMPARISON OF FIGURES 1 AND 3*

103.   If one were to apply the Board's preliminary role-based constructions, Petitioners' expert and I appear to agree that proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time. If one were to apply the Board's preliminary role-based constructions, there is nothing to distinguish the architectures of Figure 1 and Figure 3. Therefore, in my

47

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

opinion, a POSA would understand that proxy server 6 must be structurally different from agent 122, consistent with Patent Owner's proposed constructions. In my opinion, these figures inform a POSA that a server is not a client device and that a client device is not a server. That is, proxy server 6 is not the same as agent 122 and vice versa.

104.   In my opinion, proxy server 6 of Figure 1 (prior art) must be structurally different from agent 122 of Figure 3 (inventive embodiment) because, as discussed above, proxy server 6 and agent 122 would be operating in the same roles at a given moment in time. Therefore, in my opinion, the Board's preliminary role-based constructions are not appropriate because they fail to account for these structural differences between proxy servers and client devices.

## *2. REVIEW OF PROSECUTION HISTORIES*

105.   In my opinion, my understanding of the structural differences between proxy servers and client devices is consistent with the related prosecution histories as well. For example, in each of the Notices of Allowance, the examiner acknowledged that the "environment" in which the methods are performed is novel. *See, e.g.,* Notice of Allowance dated 6/29/2018, EX. 1019 at 17; Notice of Allowance dated 1/23/2019, EX. 1018 at 9; Notice of Allowance dated 10/3/2019, EX. 1017 at 9; Notice of Allowance dated 4/1/2021, EX. 1007 at 12. This understanding is also consistent with the Court's Teso Alice Order acknowledging

48

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

a server into a communication device in the context of the '342 Patent. Regardless of the role being performed, a server is not a communication device.

124.    In my opinion, the "second server" is separate and distinct from the "first client device" of the claims, consistent with the Court's constructions. In my opinion, a server is structurally different from a client device as disclosed in the specification or recited in the patent claims. As discussed above comparing Figures 1 and 3, a POSA would understand that a client device is structurally different from a proxy server. In my opinion, a POSA would understand that agent 122 of Figure 3 is not the same as proxy server 6 of Figure 1.

125.    In my opinion, a POSA would understand the "second server" recited in the claims to be a server that is not a client device. This proposed construction is consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices. A POSA would understand that, in general, a "server" is not a "client device" in the context of the specification. For example, the Court construed "client device" as a communication device in the Teso Litigation and in the NetNut Litigation. Based on the Court's construction for "client device", a server is not a client device at least in part because a server is not a communication device.

126.    In my opinion, a POSA would understand that a server is not a consumer computer. A POSA would consider a server to be a commercial network

56

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

element, rather than a consumer device. A POSA would understand that, unlike a client device, a server is not portable or moved about by a consumer. I also agree with the applicant's statements during prosecution that a server is a dedicated network element, unlike a client device. I also agree with the applicant's statements during prosecution that a server is capable of a large number of connections, unlike a typical client device.

127. Further, in my opinion, a POSA would understand a server (a) to remain online with greater availability and maximum up time to receive requests almost all of the time (switching off servers can be catastrophic to a network); (b) to efficiently process multiple requests from multiple client devices at the same time; (c) to generate various logs associated with the client devices and traffic from/to the client devices; (d) to primarily interface and respond to the client devices, oftentimes without a Graphical User Interface ("GUI"); (e) to have greater fault tolerance and higher reliability with lower failure rates; and/or (f) to provide scalability for increasing resources to serve increasing client demands. These server-attributes distinguish a server from a client device.

128. A POSA's understanding of server is further evidenced by extrinsic materials including the February 17, 2015 "Network Fundamentals Study Guide" with a definition of server as "A computer or device on a network that manages network resources. Servers are often dedicated, meaning that they perform no other

57

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
57 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

tasks besides their server tasks." EX. 2035; *see also* Tanenbaum, et al., "Fifth Edition Computer Networks", EX. 2036 at 5 ("data are stored on powerful computers called servers") and EX. 2036 at 6 ("one server can handle a large number (hundreds or thousands) of clients simultaneously"); *see also* Tanenbaum, "Fourth Edition Computer Networks", EX. 2037 at 7.

129.   To the extent that the Board's constructions are intended to construe any intermediary computer operating in a **computer ↔ computer ↔ computer** architecture as both a client and server, as discussed above, such construction is inconsistent with the disclosure in the '342 Patent, the patent prosecution history of at least the '319 Patent, the Teso C.C. Order, Teso Supplemental C.C. Order, the Teso Alice Order and the NetNut C.C. Order.  A POSA would NOT understand the recited client devices and servers to be merely interchangeable general use computers.

## IX.   **BRIGHT DATA PRACTICES THE CHALLENGED CLAIMS**

130.   My understanding is that Bright Data (which has undergone many name changes) provides a residential proxy service. In my opinion, Bright Data's residential proxy service practices the methods claimed in the '342 Patent, as discussed below. Bright Data's residential proxy service provides various users' client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other users' requesting client devices.

58

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
58 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*

131.    The residential IP addresses of proxy client devices are registered. Bright Data currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service. *See* https://brightdata.com/proxy-types/residential-proxies (EX. 2038).[5]

132.    As confirmed during my conversation with Mr. Kol and as shown in Bright Data's network diagram reproduced below (EX. 2039), Bright Data's residential proxy service operates in the following way:



---

[5] I also understand that Bright Data also provides a Software Development Kit ("SDK") to app developers such that a user may agree to configure its client device to participate in the service as a proxy client device in exchange for free or discounted apps. See also https://brightdata.com/proxy-types/residential-proxies (EX. 2038)("How does Bright Data acquire its residential IPs?")

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
59 of 95

Appx7199

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

    a. Upon using the residential proxy service, the customer's client device establishes a TCP connection between itself and the web server, though the Super Proxy and through one or more proxy client devices. Each Super Proxy is a proxy server located somewhere in the world. During my conversation with Mr. Kol, he explained that Bright Data currently has more than 4,000 Super Proxies worldwide, including in the United States.

    b. A customer sends an HTTP request for content identified by a URL to a Super Proxy. The Super Proxy sends the request for content identified by a URL to a proxy client device (Peer SDK) that in turn, sends the request for content identified by a URL to a web server using the IP address of the proxy client device as the Source IP Address.

    c. The proxy client device obtains the requested content directly from the web server. The proxy client device sends the requested content back to the customer via the Super Proxy through the established connection.

    133. I have also reviewed Bright Data's source code for its residential proxy service. I have compiled a separate appendix with a chart of the '342 Patent claims showing where the claimed features of the '342 Patent are found in Bright Data's residential proxy service, including the source code. EX. 2040 (source code claim chart appendix) and EXS. 2041-2044 (source code itself).

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
60 of 95

Appx7200

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

134.   In my opinion, the residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '342 Patent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122. In my opinion, Bright Data's residential proxy service is "reasonably commensurate in scope with the scope of the claims" of the '342 Patent. As discussed herein, the '342 Patent's claims are directed at the novel use of a proxy client device. In my opinion, as discussed herein, Bright Data's residential proxy service embodies the claimed features of the '342 Patent and is coextensive with them.

135.   During my conversation with Mr. Kol, I confirmed that the features driving the commercial success of Bright Data's residential proxy service is (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses, which are the direct result of the unique characteristics of the '342 Patent claims, i.e., the novel use of a proxy client device to fetch content from a web server.

136.   In my opinion, it is the use of a client device as a proxy that enables Bright Data to create a network with millions of nodes to act as proxies. This is an extremely scalable solution that solves the problems identified in the prior art in

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
61 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*

the background section of the specification. This also solves the problems I

discussed in detail regarding blocking by a web server. These client devices are

otherwise being used by regular consumers for their usual purposes, making proxy

requests created by these devices difficult to distinguish from the requests of the

owners of the client devices.

137. These advantages are noted in the following press release for an

investment that was made in Bright Data (then known as Luminati) by EMK

Capital in 2017:

> Luminati is the world's leading enterprise IP proxy network, and helps make the Web more transparent by allowing businesses to see the internet from the consumers' point of view. In the Internet's early days, web pages were simple – every viewer saw the same page. Today, sites are dynamic – they recognize the viewer and show different content, advertisements and prices based on the viewers' geography, demographics, and other identifying information. Websites can also determine if a competitor is comparing prices, or if a security company is auditing them for potential threats. These trends are eliminating the transparency of the Web; for example, they reduce online retailers' ability to compete as retailers can't reliably see the prices that are presented to consumers; similarly these trends make it difficult for security firms to find malicious sites, as such sites are presented only to users of a certain demographic. These developments have also made it difficult for ad networks & website owners to check that the ads they are delivering are safe, because an unscrupulous ad vendor may present malicious ads only to the unsuspecting user but not to the ad network.

> Luminati brings back transparency and trust to the Web by enabling its enterprise customers to access the internet through its proprietary network of over 40 million IP addresses. Luminati helps customers to see the Web as it appears to real consumers, without being blocked, slowed or spoofed and to view the Web from different users' perspectives from any city across the globe. Luminati's technology and patent portfolio allow Luminati to operate the only mass-scale residential IP proxy network in the world.

> Luminati serves corporate clients, including Fortune 500 companies, in many different sectors which use Luminati's transparency network for ad verification, brand protection, price comparison, fraud prevention, data collection, cyber security, and application performance measurement. Luminati's residential IP service is required for many businesses that need certainty in the accuracy of the data they collect online and the accuracy of the cyber security checks they conduct.

*See* https://www.emkcapital.com/emk-acquires-luminati-worlds-largest-ip-proxy-

network-brings-transparency-internet/ (EX. 2045). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ In my opinion, this acquisition is evidence of

commercial success, showing non-obviousness of the '342 Patent's claims.

62

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
62 of 95

Appx7202

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*

## XIII.  SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

186.  In my opinion, as discussed above with respect to Bright Data

practicing the '342 Patent's claims, the commercial success of Bright Data's

residential proxy service is driven by the claimed features novel use of a proxy

client device. Bright Data's residential proxy service has grown to dominate the

market.  According to a 2019 Report by Frost & Sullivan, by 2018, residential

proxy services accounted for an estimated 73.6% of the "Internet Protocol proxy

network (IPPN)" comprising

"residential IP proxy networks, data

center IP proxy networks, and mobile

IP proxy networks." EX. 2046, 2019

Frost & Sullivan Report at 4 and 45.

Bright Data itself, became the

estimated market leader with an

estimated 53.1% of the IPPN market



in 2018. *Id.* at 48.  Frost and Sullivan identified Bright Data's next biggest

competitors in the 2018 timeframe as Oxylabs at 13.3% and Geosurf at 10.6% of

the IPPN Market. *Id.*  Oxylabs is the brand of Bright Data's largest competitor

comprising five sister companies, Teso LT, UAB, Metacluster, UAB, Oxysales,

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
82 of 95

Appx7222

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

UAB, Code200, UAB and CoreTech, UAB (collectively, "Oxylabs"). EX. 2047,

Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 90:3-93:7.

187. It is my opinion that Bright Data's residential proxy service was a

success  because the use of client devices as proxies solved a long felt, but

unresolved need.  While traditional data center server proxies could provide some

anonymity for the user in accessing a target web site, that web site could still likely

identify data center server IP addresses as proxy addresses, because such data

center server IP addresses were usually (a) associated with commercial IP

addresses; and (b) limited to a block of IP addresses sharing the same IP address

prefix and geographic location. In contrast, Bright Data's proxy client devices have

residential IP addresses that vary widely from one another without being limited to

one block of IP addresses and can have a wide variety of geographic locations.

Further, the use of Bright Data's proxy client devices can dramatically increase the

scale of IP addresses that can be included in a proxy network.  For example, Bright

Data currently touts "72 million+ real residential IPs" "shared by real people in our

community-sharing network" in 195 countries. EX. 2048 at 4. By comparison,

Bright Data touts having 1.6 million datacenter IPs.  EX. 2048 at 7.; *see also e.g.*

EX. 2049, Teso Trial Transcript Day 1, Ofer Vilenski Testimony at 182:22-197:21.

Bright Data was the first company to identify this need and provide a solution

using proxy client devices through Bright Data's residential IP network. *Id.*  Thus,

83

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
83 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

it is my opinion that this problem was well-known and that the inventions in the '342 Patent were the first to solve it.

188.    During the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name "Hola," was presented.  For example, Bright Data's Ofer Vilenski and Oxylabs' Tomas Okmanas[7], both testified that they had a meeting to discuss the "SDK,". EX. 2049, Teso Trial Transcript Day 1, Ofer Vilenski Testimony at 202:12-204:8; EX. 2047, Teso Trial Transcript Day 3,  Tomas Okmanas Testimony at 131:23-132:7; 152:8-153:6.  Specifically, Mr. Vilenski testified that he asked Mr. Okmanas to incorporate Bright Data's SDK in Oxylabs' applications to expand Bright Data's residential proxy network. *Id.*  Mr. Okmanas did not agree to incorporate Bright Data's SDK in Oxylabs' applications, but subsequently released their own SDK for Oxylabs' own residential proxy network.  EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 94:23-95:9; 95:20-97:23.

189.    Within days of his meeting with Mr. Vilenski, Mr. Okmanas testified that he sent an email to a third party stating that he was "looking for a company that could make me an extension and promote it.  Basically what I am looking [for] is a system that works like hola.org."  EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 152:18-153:6.  Mr. Okmanas testified that Oxylabs

---

[7] A founder of Tesonet now Oxylabs.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
84 of 95

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00103 of Patent No. 11,044,342*

was originally in the data center proxy space, but wanted to develop its own

residential proxy service . EX. 2047, Teso Trial Transcript Day 3, Tomas

Okmanas Testimony at 95:20-97:1; 103:18-104:10. Mr. Okmanas testified that he

believed that he needed to do what Bright Data (previously known as Luminati and

Hola) were doing to be successful. *Id.* at 149:13-150:8. In my opinion, this is

strong evidence of copying, which is evidence of non-obviousness.

190.   At the conclusion of the trial, a jury verdict was issued finding that

none of the asserted patent claims were invalid and Oxylabs' infringement was

willful, and that Bright Data was entitled to lost profits. EX. 2022, Jury Verdict.

Despite the jury verdict finding infringement and willfulness, Oxylabs updated its

website stating "[t]he Court has not issued any orders related to continued use of

Oxylabs' residential proxy service…. Oxylabs continues to offer its services in an

uninterrupted manner." EX. 2050 at 8, Oxylabs Legal Timeline. In my opinion,

the commitment of Bright Data's largest competitor to continue offering its

residential proxy service despite the jury verdict of willful infringement is strong

evidence of its continuing need to offer the residential proxy service – a strong

indication of commercial success.

191.   It is my further opinion that Bright Data's residential proxy service

has received industry praise including from competitors, and that that praise is tied

85

Appx7225

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00103 of Patent No. 11,044,342*

to the claims of the '342 Patent as described above.[8] Additionally, competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service.[9]

192.    In my opinion, the evidence of secondary considerations indicates that the inventions claimed in the '342 Patent would not have been obvious to a POSA at the time of invention.

---

[8]*See, e.g.,* https://earthweb.com/residential-proxies/ (EX. 2051 at 23-24).
[9] *See, e.g.,*
 https://smartproxy.com/blog/what-is-the-difference-between-proxy-servers-and-data-centers (EX. 2052);
https://web.archive.org/web/20170913105635/https://microleaves.com/services/backconnect-proxies?promotion=dNPa (EX. 2053);
https://web.archive.org/web/20200701171337/https://oxylabs.io/products/residential-proxy-pool (EX. 2054).

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00103, EX. 2065
86 of 95

**bright** data

21

## Overview of the Challenged Patents

- Commercial Embodiment: Bright Data's Residential Proxy Network



web server

Web Server

first client device

Consumer Computers
(Residential)

second server

SuperProxy

Customers
(Users)

-103, POR at 57-59 and 67; -353, POR at 57-59 and 68

DEMONSTRATIVE EXHIBIT — NOT EVIDENCE

Appx7295

Filed on behalf of Petitioner by:                                    Paper No. __
    Michael N. Rader, Reg. No. 52,146
    Adam R. Wichman, Reg. No. 43,988
    Gregory S. Nieberg, Reg. No. 57,063
    Marie McKiernan (*pro hac vice* application forthcoming)
    WOLF GREENFIELD & SACKS, P.C.
    600 Atlantic Ave.
    Boston, MA 02210-2206
    Tel:  617-646-8000
    Fax:  617-646-8646

## UNITED STATES PATENT AND TRADEMARK OFFICE

————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

THE DATA COMPANY TECHNOLOGIES INC.,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

————————

Case No. TBD
Patent No. 10,257,319

————————

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 *et seq.***

## TABLE OF CONTENTS

MANDATORY NOTICES ...................................................................... xiv

    A.    Real Party-In-Interest – § 42.8(b)(1) ................................... xiv

    B.    Related Matters – § 42.8(b)(2) ............................................. xiv

        1.    United States Patent & Trademark Office .............................. xiv

        2.    United States Patent Trial and Appeal Board ........................ xiv

        3.    U.S. District Court for the Eastern District of Texas ............... xv

    C.    Counsel and Service Information – §§ 42.8(b)(3) and (b)(4) .......... xvi

I.      INTRODUCTION ................................................................... 1

II.     CERTIFICATION OF STANDING ............................................ 2

III.    UNPATENTABILITY GROUNDS ........................................... 2

IV.    OVERVIEW ............................................................................ 3

    A.    Alleged Invention .................................................................. 3

    B.    Challenged Claims ................................................................ 4

    C.    Level of Ordinary Skill in the Art ........................................ 7

    D.    Prosecution History .............................................................. 8

V.     CLAIM INTERPRETATION ..................................................... 8

    A.    PO's Litigation Argument Regarding "Client Device" ........................ 8

    B.    District Court Constructions .................................................. 8

- i -

Appx7356

VI.    GROUND 1: Claims 1, 12-14, 21-27—Anticipated by Plamondon............10

   A.    Plamondon (Ex. 1010)..................................................................10

   B.    Claim 1.........................................................................................15

      1.    Preamble.............................................................................15

      2.    Step 1B...............................................................................18

      3.    Step 1C...............................................................................19

      4.    Step 1D...............................................................................21

      5.    Step 1E...............................................................................23

   C.    Claim 12.......................................................................................25

      1.    Element 12A.......................................................................25

      2.    Element 12B.......................................................................27

   D.    Claim 13.......................................................................................27

      1.    Element 13A.......................................................................27

      2.    Element 13B.......................................................................28

   E.    Claim 14.......................................................................................28

   F.    Claim 21.......................................................................................29

   G.    Claim 22.......................................................................................30

   H.    Claim 23.......................................................................................30

      1.    Element 23A.......................................................................30

      2.    Element 23B.......................................................................31

   I.    Claim 24.......................................................................................31

   J.    Claim 25.......................................................................................33

   K.    Claim 26.......................................................................................33

   L.    Claim 27.......................................................................................33

Appx7357

VII.    GROUND 2:  Claims 28-29—Obvious Over Plamondon ...........................35

    A.    Claim 28 ..............................................................................35

    B.    Claim 29 ..............................................................................35

VIII.   GROUND 3:  Claims 15-17—Obvious Over Plamondon in View of RFC 2616 ...................................................................................36

    A.    Claim 15 ..............................................................................36

    B.    Claim 16 ..............................................................................38

        1.    Element 16A ..............................................................38

        2.    Element 16B ..............................................................39

    C.    Claim 17 ..............................................................................40

IX.     GROUND 4:  Claims 17-18—Obvious Over Plamondon in View of RFC 1122 ...................................................................................41

    A.    Claim 18 ..............................................................................42

    B.    Claim 17 ..............................................................................42

X.      GROUND 5:  Claim 2—Obvious Over Plamondon in View of IEEE 802.11-2007 ...........................................................................43

    A.    IEEE 802.11-2007 (Ex. 1022)...........................................43

    B.    Claim 2 ................................................................................44

        1.    Element 2A ................................................................44

        2.    Element 2B ................................................................44

XI.     GROUND 6:  Claims 2-5, 19-20—Obvious Over Plamondon in View of Price ....................................................................................45

    A.    Price (Ex. 1023)..................................................................45

    B.    Plamondon-Price Combination ...........................................46

Appx7358

C.    Claim 2 ...........................................................................48

    1.    Element 2A ...........................................................48

    2.    Element 2B ...........................................................49

D.    Claim 3 ...........................................................................51

E.    Claim 4 ...........................................................................52

F.    Claim 5 ...........................................................................53

G.    Claim 19 .........................................................................54

    1.    Element 19A .........................................................54

    2.    Element 19B .........................................................55

    3.    Element 19C .........................................................56

H.    Claim 20 .........................................................................57

XII.    GROUND 7:  Claims 6-11—Obvious Over Plamondon in View of Kozat .57

A.    Kozat (Ex. 1024) ...........................................................57

B.    Plamondon-Kozat Combination ....................................59

C.    Claim 6 ...........................................................................62

    1.    Element 6A1 .........................................................62

    2.    Element 6A2 .........................................................62

    3.    Element 6B ...........................................................63

    4.    Element 6C ...........................................................63

    5.    Element 6D ...........................................................64

D.    Claim 7 ...........................................................................65

E.    Claim 8 ...........................................................................66

F.    Claim 9 ...........................................................................66

G.    Claim 10 .........................................................................67

H.    Claim 11 .........................................................................68

XIII.  NO BASIS EXISTS FOR DISCRETIONARY DENIAL ............................69

    A.  Section 314(a):  Litigation Involving Unrelated Parties and
        Different Prior Art Does Not Support Discretionary Denial ..............69

        1.  Factors 5 and 4 Strongly Disfavor Discretionary Denial..........69

        2.  Factors 1-3 Disfavor Discretionary Denial Because
            Petitioner Is Not a Litigation Defendant and There Is No
            Meaningful Overlap Between this IPR and the EDTX Cases ..71

        3.  Factor 6 Favors Institution Because this Petition Is Strong......72

    B.  Section 314(a): The Code200 IPR and NetNut IPR Do Not Support
        Discretionary Denial...........................................................................72

    C.  Section 325(d): This Petition's References and Arguments Were
        Not Addressed During Prosecution...................................................74

    D.  The Recently-Filed Reexamination Request Does Not Support
        Discretionary Denial...........................................................................77

XIV.  CONCLUSION...........................................................................................78

Appx7360

# TABLE OF AUTHORITIES

## CASES

*Adobe v. RAH Color Techs.*,
　　IPR2019-00627, Paper 41 (Sept. 10, 2019) ..........................................77

*Advanced Bionics v. MED-EL*,
　　IPR2019-01469, Paper 6 (Feb. 13, 2020).................................. 74, 76, 77

*Apple v. Fintiv*,
　　IPR2020-00019, Paper 11 (Mar. 20, 2020) ............................. 69, 70, 71

*Apple v. Seven Networks*,
　　IPR2020-00235, Paper 10 (July 28, 2020) ........................................72

*Apple v. Uniloc 2017*,
　　IPR2019-00918, Paper 21 (Oct. 15, 2020) ........................................32

*Bowtech v. MCP IP*,
　　IPR2019-00382, Paper 12 (Aug. 6, 2019).........................................77

*Zillow Grp. v. Int'l Business Machines*,
　　IPR2020-01655, Paper 8 (Mar. 15, 2021) ..........................................9

*Dolby Labs. v. Intertrust Tech.*,
　　IPR2020-00665, Paper 11 (Feb. 16, 2021).........................................72

*Ericsson v. Intellectual Ventures II*,
　　IPR2014-01330, Paper 29 (Feb. 19, 2016).........................................41

*Facebook v. Onstream Media*,
　　IPR2020-01525, Paper 11 (April 5, 2021) ........................................72

*General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*,
　　IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) ................................. 72, 73, 74

*Google v. Jenam Tech.*,
　　IPR2020-00845, Paper 16 (Oct. 8, 2020).........................................73

*Hisense Visual Tech. v. LG Elecs.*,
　　IPR2020-01164, Paper 15 (Jan. 7, 2021) .........................................43

Appx7361

*HyperBranch Med. Tech. v. Confluent Surgical,*
    IPR2018-01099, Paper 14 (Nov. 27, 2018) ........................................76

*Kavo Dental Techs. v. Osseo Imaging,*
    IPR2020-00659, Paper 10 (June 10, 2020) .......................................69

*MED-EL Elektromedizinische Geräte v. Adv. Bionics,*
    IPR2021-00044, Paper 14 (Apr. 6, 2021) ........................................71

*NetNut v. Bright Data,*
    IPR2021-00465, Paper 11 (Aug. 12, 2021) .......................................73

*SHDS v. Truinject,*
    IPR2020-00937, Paper 11 (Nov. 17, 2020) .......................................74

*Unified Patents v. NavBlazer,*
    IPR2020-00983, Paper 11 (Dec. 16, 2020) .......................................70

*Xilinx v. Arbor Global Strategies,*
    IPR2020-01568, Paper 12 (Mar. 5, 2021) ........................................74

## REGULATIONS

37 C.F.R. § 42.100(b) ...........................................................8, 9

37 C.F.R. § 42.104(a).............................................................2

Appx7362

## APPENDIX LISTING OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1001 | U.S. Patent No. 10,257,319 |
| 1002 | Prosecution History of U.S. Patent No. 10,257,319 |
| 1003 | Declaration of Prof. Dave Levin ("Levin") |
| 1004 | Curriculum Vitae of Prof. Dave Levin |
| 1005 | Patent Owner's Opening Claim Construction Brief, *Luminati Networks Ltd. v. Teso LT et al.*, 2:19-cv-00395-JRG, D.I. 126 (E.D. Tex. Sept. 29, 2020) |
| 1006 | Claim Construction Opinion and Order, *Luminati Networks Ltd. v. Teso LT et al.*, 2:19-cv-00395-JRG, D.I. 191 (E.D. Tex. Dec. 7, 2020) |
| 1007 | Patent Owner's Opposition to Motion to Dismiss, *Luminati Networks Ltd. v. Teso LT et al.*, 2:19-cv-00395-JRG, D.I. 28 (E.D. Tex. Apr. 7, 2020) |
| 1008 | Corrected Patent Owner's Preliminary Response, *Code200, UAB, et al. v. Luminati Networks Ltd.*, IPR2020-01266, Paper 16 (PTAB Dec. 9, 2020) |
| 1009 | Supplemental Claim Construction Order, *Bright Data Ltd. v. Teso LT et al.*, 2:19-cv-00395-JRG, D.I. 453 (E.D. Tex. Aug. 6, 2021) |
| 1010 | U.S. Patent Application Publication No. 2008/0228938 ("Plamondon") |
| 1011 | Declaration of Sandy Ginoza for IETF |
| 1012 | Ginoza Decl. Exh. 1, RFC 793: Transmission Control Protocol - DARPA Internet Program Protocol Specification, Information Sciences Institute (September 1981) ("RFC 793") |
| 1013 | Ginoza Decl. Exh. 2, RFC 1001: Protocol Standard for a NetBIOS Service on a TCP/UDP Transport: Concepts and Methods, NetBIOS Working Group (March 1987) ("RFC 1001") |
| 1014 | Ginoza Decl. Exh. 3, RFC 1122:  Requirements for Internet Hosts -- Communication Layers, Internet Engineering Task Force (October 1989) ("RFC 1122") |

| 1015 | Ginoza Decl. Exh. 4, RFC 1630: Universal Resource Identifiers in WWW - A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World-Wide Web, Network Working Group (June 1994) ("RFC 1630") |
| 1016 | Ginoza Decl. Exh. 5, RFC 1738: Uniform Resource Locators (URL), Network Working Group (December 1994) ("RFC 1738") |
| 1017 | Ginoza Decl. Exh. 6, RFC 2187: Application of Internet Cache Protocol (ICP), version 2, National Laboratory for Applied Network Research/UCSD (September 1997) ("RFC 2187") |
| 1018 | Ginoza Decl. Exh. 7, RFC 2616: Hypertext Transfer Protocol -- HTTP/1.1, The Internet Society (June 1999) ("RFC 2616") |
| 1019 | Ginoza Decl. Exh. 8, RFC 2960: Stream Control Transmission Protocol, The Internet Society (October 2000) ("RFC 2960") |
| 1020 | Ginoza Decl. Exh. 9, RFC 6520: Transport Layer Security (TLS) and Datagram Transport Layer Security (DTLS) Heartbeat Extension, Internet Engineering Task Force (February 2012) ("RFC 6520") |
| 1021 | Declaration of Gordon MacPherson for IEEE |
| 1022 | MacPherson Decl. Exh. A, IEEE 802.11-2007 - IEEE Standard for Information Technology - Telecommunications and Information Exchange Between Systems – Local and Metropolitan Area Networks - Specific Requirements - Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, June 12, 2007 ("IEEE 802.11-2007") |
| 1023 | U.S. Patent Application Publication No. 2006/0026304 ("Price") |
| 1024 | U.S. Patent Application Publication No. 2009/0055471 ("Kozat") |
| 1025 | U.S. Patent No. 10,484,510 |
| 1026 | Pages from W. R. Stevens, *TCP/IP Illustrated, Volume 1: The Protocols*. Canada: Addison-Wesley, 1994, chs. 1 & 18, bibliography ("Stevens") |
| 1027 | Prosecution History of U.S. Patent No. 10,491,712 |
| 1028 | U.S. Patent Application Publication No. 2008/0072178 ("Budzisch") |
| 1029 | U.S. Patent Application Publication No. 2002/0178217 ("Nguyen") |

| 1030 | U.S. Patent Publication No. 2005/0125412 ("Glover") |
|------|---------------------------------------------------|
| 1031 | U.S. Patent Application Publication No. 2007/0177513 ("Kuokkannen") |
| 1032 | U.S. Patent No. 7,761,500 ("Eckert") |
| 1033 | Pages from L.L. Peterson, B.S. Davie, *Computer Networks: A Systems Approach*, 4th ed. San Francisco, CA: Elsevier, 2007, chs. 1-2 ("Peterson") |
| 1034 | U.S. Patent Application Publication No. 2009/0187654 ("Raja") |
| 1035 | U.S. Patent Application Publication No. 2002/0169818 ("Stewart") |
| 1036 | U.S. Patent No. 6,351,775 ("Yu-775") |
| 1037 | U.S. Patent Application Publication No. 2002/0059371 ("Jamail") |
| 1038 | P. Mell, T. Bergeron, and D. Henning, "Creating a Patch and Vulnerability Management Program," NIST Special Publication 800-40 Version 2.0, 2005 ("SP 800-40 Ver. 2") |
| 1039 | U.S. Patent Application Publication No. 2004/0153473 ("Hutchinson") |
| 1040 | U.S. Patent Application Publication No. 2006/0236083 ("Fristch") |
| 1041 | U.S. Patent Application Publication No. 2010/0115613 ("Ramaswami") |
| 1042 | U.S. Patent No. 8,041,784 ("Amidon") |
| 1043 | U.S. Patent No. 8,655,838 ("Wright") |
| 1044 | A. Rowstron and P. Druschel, "Pastry: Scalable, Decentralized Object Location, and Routing for Large-Scale Peer-to-Peer Systems." IFIP/ACM International Conference on Distributed Systems Platforms and Open Distributed Processing: Middleware 2001, pp. 329-350 (2001) ("Rowstron") |
| 1045 | S. Ratnasamy, M. Handley, R. Karp and S. Shenker, "Topologically-aware overlay construction and server selection." Proceedings Twenty-First Annual Joint Conference of the IEEE Computer and Communications Societies, vol. 3, pp. 1190-1199 (2002) ("Ratnasamy") |

- x -

| 1046 | V. N. Padmanabhan and L. Subramanian, "An Investigation of Geographic Mapping Techniques for Internet Hosts." ACM SIGCOMM Computer Communication Review, vol. 3,  No. 4, pp. 173–185 (2001) ("Padmanabhan") |
|------|-----------------------------------------------------------------------------------------------|
| 1047 | M.J. Freedman, K. Lakshminarayanan, and D. Mazières, "OASIS: Anycast for Any Service." Proceedings of the 3rd Conference on Networked Systems Design & Implementation, vol. 3, pp. 129-142 (2006) ("Freedman-2006") |
| 1048 | S. Agarwal and J.R. Lorch, "Matchmaking for Online Games and Other Latency-Sensitive P2P Systems." ACM SIGCOMM Computer Communication Review, vol. 39, No. 4, pp. 315-326 (2009) ("Agarwal") |
| 1049 | U.S. Patent No. 8,144,611 ("Agarwal-611") |
| 1050 | H. Casanova, "Benefits and Drawbacks of Redundant Batch Requests." Journal of Grid Computing, vol. 5, pp. 235–250 (2007) ("Casanova") |
| 1051 | U.S. Patent Application Publication No. 2008/0298328 ("Sharma") |
| 1052 | U.S. Patent Application Publication No. 2009/0204700 ("Sudhakar") |
| 1053 | U.S. Patent Application Publication No. 2006/0212584 ("Yu") |
| 1054 | U.S. Patent No. 7,865,585 ("Samuels") |
| 1055 | S. J. Murdoch, "New Tor distribution for testing: Tor Browser Bundle," January 30, 2008 post to tor-talk  mailing list, available at https://lists.torproject.org/pipermail/tor-talk/2008-January/007837.html |
| 1056 | U.S. Patent Application Publication No. 2009/0222515 ("Thompson") |
| 1057 | Defendants' Section 282 Disclosure, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG,  D.I. 450 (E.D. Tex. July 16, 2021) |
| 1058 | Docket, *Bright Data Ltd. v. NetNut Ltd.*, Case No. 2:21-cv-00225-JRG (E.D. Tex.) (as of Nov. 2, 2021) |
| 1059 | Notice of Filing Invalidity Contentions, *Bright Data Ltd. v. Tefincom S.A. d/b/a NordVPN*, Case No. 2:19-cv-00414-JRG,  D.I. 37 (E.D. Tex. Mar. 3, 2021) |

| 1060 | Docket, *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, Case No. 2:19-cv-397-JRG (E.D. Tex.) (as of Nov. 2, 2021) |
| 1061 | Motion for Summary Judgement, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG, D.I. 282 (E.D. Tex. Feb. 8, 2021) |
| 1062 | RESERVED |
| 1063 | Amended Complaint, *Bright Data Ltd. v. Tefincom S.A. d/b/a NordVPN*, Case No. 2:19-cv-00414-JRG, D.I. 22 (E.D. Tex. Nov. 12, 2020) |
| 1064 | Docket, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG (E.D. Tex.) (as of Nov. 2, 2021) |
| 1065 | Docket, *Bright Data Ltd. v. Tefincom S.A. d/b/a NordVPN*, Case No. 2:19-cv-00414-JRG (E.D. Tex.) (as of Nov. 2, 2021) |
| 1066 | Order Denying Motion to Stay Pending Inter Partes Review, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG, D.I. 157 (E.D. Tex. Oct. 30, 2020) |
| 1067 | Decision Denying Institution of *Inter Partes* Review of U.S. Patent No. 10,257,319, *Code200, UAB, et al. v. Luminati Networks Ltd.*, IPR2020-01266, Paper 18 (PTAB Dec. 23, 2020) |
| 1068 | Decision Denying Institution of *Inter Partes* Review of U.S. Patent No. 10,484,510, *Code200, UAB, et al. v. Luminati Networks Ltd.*, IPR2020-01358, Paper 11 (PTAB Dec. 23, 2020) |
| 1069 | Petition for *Inter Partes* Review of U.S. Patent No. 10,257,319, *Code200, UAB et al. v. Luminati Networks Ltd.*, IPR2020-01266, Paper 5 (PTAB Jul. 14, 2020) |
| 1070 | Petition for *Inter Partes* Review of U.S. Patent No. 10,484,510, *Code200, UAB et al. v. Luminati Networks Ltd.*, IPR2020-01358, Paper 5 (PTAB Jul. 28, 2020) |
| 1071 | Prosecution History of U.S. Patent No. 8,560,604 |
| 1072 | Prosecution History of U.S. Patent No. 10,069,936 |
| 1073 | Prosecution History of U.S. Patent No. 10,484,510 |
| 1074 | Order, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG, D.I. 493 (E.D. Tex. Sep. 21, 2021) |

| 1075 | Plaintiff's Motion for Partial Summary Judgment on Certain Invalidity Grounds, *Bright Data Ltd. v. Tefincom S.A. D/B/A NordVPN*, Case No. 2:19-cv-00414-JRG, D.I. 97 (E.D. Tex. Sep. 27, 2021) |
|------|------|
| 1076 | Defendant's Motion for Summary Judgment of Invalidity of the '319, '510, and '511 Patents, *Bright Data Ltd. v. Tefincom S.A. D/B/A NordVPN,* Civil Action No. 2:19-CV-00414-JRG D.I. 99 (E.D. Tex. Sep. 29, 2021) |
| 1077 | Declaration of Adam R. Wichman |
| 1078 | Revised Joint Pretrial Order, *Bright Data Ltd. v. Teso LT et al.*, Case No. 2:19-cv-00395-JRG, D.I. 490 (E.D. Tex. Sept. 17, 2021) |

Appx7368

**MANDATORY NOTICES**

**A.    Real Party-In-Interest – § 42.8(b)(1)**

Petitioner is the Real Party-in-Interest.  Without conceding that the following parties are in fact RPIs, Petitioner also identifies: Avantis Team Technologies Ltd. and Cytronix Ltd.

**B.    Related Matters – § 42.8(b)(2)**

A decision in this proceeding could affect or be affected by the following:

**1.    United States Patent & Trademark Office**

U.S. Patent No. 10,257,319 ("the '319 patent") is a continuation of U.S. Patent No. 10,069,936, which is a division of U.S. Patent No. 8,560,604, which claims priority to U.S. Provisional Application No. 61/249,624.

The following claim the benefit of the filing date of the '319 patent: U.S. Patent Nos. 10,491,712; 11,044,344; 10,484,510; 11,044,342; U.S. Patent Application Nos. 17/332,023; 17/332,077.

Reexamination No. 90/014,875 is a reexamination of the '319 patent.

**2.    United States Patent Trial and Appeal Board**

The '319 patent was at issue in *Code200, UAB et al. v. Luminati Networks Ltd. f/k/a Hola Networks Ltd*., Case No. IPR2020-01266 ("Code200 IPR").[1]

---

[1] Luminati Networks Ltd. is now Bright Data Ltd. ("Patent Owner" or "PO").

The '319 patent is also at issue in *NetNut Ltd. v. Bright Data Ltd.*, Case No. IPR2021-01492 ("NetNut IPR"). NetNut filed its petition on September 3, 2021, using the same prior art and patentability arguments that were presented in the Code200 IPR petition (which the Board denied on discretionary grounds). PO has not yet filed a preliminary patent owner response, and the Board has not ruled on institution.

### 3. U.S. District Court for the Eastern District of Texas

The '319 patent is or has been at issue in the following cases, collectively referred to herein as "the EDTX cases":

- *Bright Data Ltd. v. NetNut Ltd.*, Civil Action No. 2:21-cv-00225-JRG ("the 225 case");
- *Bright Data Ltd. v. Tefincom SA d/b/a NordVPN*, Civil Action No. 2:19-cv-00414-JRG ("the 414 case");
- *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, Civil Action No. 2:19-cv-397-JRG ("the 397 case")[2]; and
- *Bright Data Ltd. v. Teso LT, UAB a/k/a UAB Teso LT et al.*, Civil Action No. 2:19-cv-00395-JRG ("the 395 case").

---

[2] The 397 case was dismissed before Luminati Networks Ltd. changed its name to Bright Data Ltd.

**C.    Counsel and Service Information – §§ 42.8(b)(3) and (b)(4)**

| Lead Counsel | Michael N. Rader, Reg. No. 52,146 |
|---|---|
| **Backup Counsel** | Adam R. Wichman, Reg. No. 43,988<br>Gregory S. Nieberg, Reg. No. 57,063<br>Marie McKiernan (*pro hac vice* application forthcoming) |
| **Service Information** | <u>E-mail</u>:    MRader-PTAB@wolfgreenfield.com<br>AWichman-PTAB@wolfgreenfield.com<br>GNieberg-PTAB@wolfgreenfield.com<br>Marie.McKiernan@wolfgreenfield.com<br><br><u>Post and hand delivery</u>:    Wolf, Greenfield & Sacks, P.C.<br>600 Atlantic Avenue<br>Boston, MA  02210-2206<br><br><u>Telephone</u>: 617-646-8000    <u>Facsimile</u>: 617-646-8646 |

A power of attorney is submitted with the Petition.  Counsel for Petitioner

consents to service of all documents via electronic mail.

- xvi -

Appx7371

Petitioner requests *inter partes* review of claims 1-29 of the '319 patent (Ex. 1001).

## I. INTRODUCTION

The '319 patent describes methods that purportedly provide "faster and more efficient" network communication. The claimed methods are overbroad and read directly on the prior art. For example, claim 1 covers basic proxy server functionality in which a device requests content from a web server through an intermediary device. This functionality was conventional long before the '319 patent and is described in Plamondon (Ex. 1010), the primary reference here.

Patent Owner ("PO") has asserted the '319 patent in litigations against third parties in the Eastern District of Texas ("the EDTX cases").[3] There, PO defended the patentability of claim 1 on the ground that it recites networking devices in a purportedly novel configuration: a device requesting content (which it calls a "server"), an intermediary device or proxy (which it calls a "client device"), and a device storing the content (which it calls a "web server"). PO calls this a "server-client device-web server architecture." Plamondon discloses this exact architecture.

---

[3] Petitioner is not party to any litigation involving the '319 patent.

- 1 -

The dependent claims recite implementation details that Plamondon and other publications described long before the '319 patent. Indeed, in several cases the dependent claims cover networking methods described in foundational protocols and comments that define the Internet. All challenged claims are unpatentable.

## II.    CERTIFICATION OF STANDING

The '319 patent is available for IPR and Petitioner is not barred or estopped from requesting IPR of its claims. 37 C.F.R. § 42.104(a).

## III.    UNPATENTABILITY GROUNDS

Petitioner requests cancellation of claims 1-29 as follows:

| Ground | Reference(s) | Claim(s) | Basis |
|--------|--------------|----------|-------|
| 1 | Plamondon | 1, 12-14, 21-27 | § 102 |
| 2 | Plamondon | 28-29 | § 103 |
| 3 | Plamondon, RFC 2616 | 15-17 | |
| 4 | Plamondon, RFC 1122 | 17-18 | |
| 5 | Plamondon, IEEE 802.11-2007 | 2 | |
| 6 | Plamondon, Price | 2-5, 19-20 | |
| 7 | Plamondon, Kozat | 6-11 | |

- 2 -

Appx7373

## IV.    OVERVIEW

### A.    Alleged Invention

The '319 patent "relate[s] to…improving data communication speed and bandwidth efficiency on the Internet."  1:23-25.[4]  In particular, the patent describes an "acceleration server" that directs requests from clients to "agents" (*i.e.*, proxies), that in turn issue requests to web servers.  13:19-15:42, Fig. 3.



FIG. 3

---

[4] Unless otherwise noted, citations in this section are to the '319 patent (Ex. 1001).

Throughout the petition emphasis is added unless otherwise indicated.

- 3 -

Figure 3 shows a communication network practicing the alleged invention, including "client 102…capable of communication with one or more peers 112, 114, 116 and one or more agents 122," a "Web server 152…from which the client…is requesting information," and an "acceleration server 162." 4:54-5:10. Levin Decl. (Ex. 1003, "Levin") ¶¶ 82-83.

When a client seeks "a resource on a network" (*e.g.*, a webpage) hosted by a web server, it sends the web server's IP address to an acceleration server "to obtain a list of communication devices that the client…can use as agents." 12:62-13:15. If an agent locates peer(s) having the content, the agent directs the client to the peer(s); otherwise, the agent acts a proxy and itself obtains the content from the web server for the client. 13:50-61, 14:62-15:11; Levin ¶¶ 84-85. The patent admits that proxy devices were known in the prior art. Fig. 1, 2:8-23, 2:40-58.

**B.     Challenged Claims**

The '319 patent has 29 claims. The claim wording varies from the wording in the figures and the rest of the specification. For its district court claim construction brief, PO created an annotated figure, reproduced below, mapping claim 1 to Figure 3. Ex. 1005, 4. PO's color textual annotations reflect the wording in independent claim 1.

- 4 -



**'319 Patent, Fig. 3 (with PO's color annotations).**

- The claims' "**second server**" is the specification's "client 102."

- The claims' "**client device**" is the specification's "agent 122."

- The claims' "**first server**" is the specification's "web server 152."

PO argued that this annotated Figure 3 depicts a system practicing method claim 1. Ex. 1005, 4; Ex. 1007, 14.  The arrows purportedly indicate the claimed method steps.[5]

---

[5] Claim 1 of the '319 patent includes steps B-E.  Step A appears in dependent claim 24.

Table 1 below associates steps B-E in PO's annotated Figure 3 with the corresponding elements in claim 1 and includes PO's coloring.  Ex. 1005, 4-5.[6]

**Table 1: Challenged claim 1**

| 1P1 | A method for use with a **first client device**, |
|-----|---|
| 1P2 | for use with a **first server** that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, |
| 1P3 | the **first server** stores a first content identified by a first content identifier, |
| 1P4 | and for use with **a second server**, the method by the **first client device** comprising: |
| 1B | receiving, from the **second server**, the first content identifier; |
| 1C | sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier; |
| 1D | receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and |
| 1E | sending, the first content by the **first client device** to the **second server**, in response to the receiving of the first content identifier. |

---

[6] 1P1 through 1P4 comprise the preamble.

PO admits the claims describe how "a **client device** serves as a proxy between the **server** and **web server**." Ex. 1005, 2. Such proxies were well-known in the prior art. Levin ¶¶ 61-64, 101-104, 203-204.

Dependent claims add other conventional networking features. For example, claim 12 requires "storing" (*e.g.*, caching) content by the **first client device**; claim 17 requires "periodically communicating between the **second server** and the **first client device**"; and claims 22-24 recite using basic Internet techniques like TCP/IP protocol, URLs, and web browsers.

## C.    Level of Ordinary Skill in the Art

PO has argued that a person of ordinary skill in the art ("POSA") for the '319 patent is "an individual who, as of October 8, 2009…had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." Ex. 1008, 18. For purposes of this IPR, Petitioner adopts PO's proposal for the level of ordinary skill in the art. Levin ¶¶ 30-37.

### D.    Prosecution History

Filed in 2018, the '319 patent claims priority, through several applications, to a provisional filed October 8, 2009.  During prosecution, the Examiner provided a single office action rejecting all claims under Sections 101 and 103, the latter based on US2006/0212542 ("Fang") in view of US2011/0035503 ("Zaid").  Ex. 1002, 119-132.  In response, the applicants argued, *inter alia*, that Fang failed to disclose claim limitations 1B-1D.  *Id.*, 168-169.  The Examiner subsequently allowed the claims without meaningful explanation.  *Id.*, 652-653; Levin ¶¶ 86-92.

## V.    CLAIM INTERPRETATION

The court in the EDTX cases construed several '319 patent claim terms.  Exs. 1006, 1009.  Those constructions are relevant here.  37 C.F.R. § 42.100(b).

### A.    PO's Litigation Argument Regarding "Client Device"

PO argued that the '319 patent contributed to the art by implementing proxy server functionality in a "client device," which PO argued should be construed as a "consumer computer," excluding a "server."  Ex. 1005, 10-13.

### B.    District Court Constructions

The district court rejected PO's argument because the specification does not limit "client device" to "consumer computer" and excluding servers is "not supported by the specification."  Instead, the district court construed "client device" as a "communication device that is <u>operating in the role of a client</u>,"

- 8 -

and confirmed that a device meeting this construction still qualifies as a "client device" if it also acts as a server.  Ex. 1006, 10-12.  The district court clarified that "server" means "a device that is operating in the role of a server."  Ex. 1009, 8-11.[7]

For purposes of this IPR, Petitioner adopts the EDTX claim constructions, listed below.  The prior art also renders the claims unpatentable under PO's proposed constructions.

| Term | EDTX Construction | Cite |
|------|-------------------|------|
| "client device" | "communication device that is operating in the role of a client" | Ex. 1006, 12 |
| "first server" | plain and ordinary meaning | Ex. 1006, 13 |
| "second server" | "a device that is operating in the role of a server and that is not the first client device" | Ex. 1009, 8-11 |
| preamble | The court confirmed the parties' stipulation that the claim 1 preamble is limiting. | Ex. 1006, 9 |

Consistent with the district court ruling, all other terms are given their ordinary and customary meaning.  37 C.F.R. § 42.100(b).[8]

---

[7] On September 21, 2021, the court overruled PO's objections and adopted the magistrate's supplemental claim construction order (Ex. 1009).  Ex. 1074.

[8] Petitioner reserves the right to argue in court, if sued for infringement, that claim terms are indefinite.  *Cf. Zillow Grp. v. Int'l Business Machines*, IPR2020-01655, Paper 8, 12 (Mar. 15, 2021).

## VI.   GROUND 1:  CLAIMS 1, 12-14, 21-27—ANTICIPATED BY PLAMONDON

Plamondon discloses every element in—and thus anticipates—claims 1, 12-14 and 21-27.  Throughout this section and the remainder of the petition, all citations are to Plamondon unless otherwise noted.

### A.   Plamondon (Ex. 1010)

Plamondon, published September 18, 2008, is pre-AIA § 102(b) prior art.

Plamondon concerns "data communication networks" and describes systems and methods for accelerating network traffic.  [0001].  Plamondon's Figure 1A (annotated below using the same colors employed by PO for the '319 patent) illustrates a "network environment" which "has one or more **clients 102*a*-102*n*** (also generally referred to as…**client(s) 102**) in communication with one or more **servers 106*a*-106*n*** (also generally referred to as **server(s) 106**…) via one or more networks 104, 104', 104"…via one or more network optimization **appliances 200, 200'** (generally referred to as **appliance 200**)."  [0202].  The network(s) may be, *inter alia*, the Internet.  [0203]; Levin ¶¶ 145-154.



**FIG. 1A**

Plamondon explains that "**appliance 200** is a device for accelerating, optimizing or otherwise improving the performance…of any type and form of network traffic."  [0206].  **Appliance 200** does this, in part, by:

(1)    Acting "as a proxy between a **client** requesting objects [*e.g.*, web pages] and an object **server** responding to **client** requests." [0048].  The **server** may be a "**web server**."  [0045], [0210], [0212], [0418], [0421].

(2)    Retrieving from servers, and caching (*i.e.*, storing), objects that it can serve to a **client** in response to the **client's** request. [0048]-[0053], [0442]-[0453].

Levin ¶¶ 155-157.

Fig. 1A shows multiple **clients**, **appliances**, and **servers**. Fig. 1C (below left, with Petitioner's annotations) shows one "**client**…access[ing] a **server** via a single network optimization **appliance**." [0144]. This parallels PO's mapping of claim 1 to '319 patent Fig. 3 (below right, with PO's annotations, Ex. 1005, 4):

|  |  |
|---|---|
| **Plamondon, Fig. 1C**<br>**(color added by Petitioner).** | **'319 Patent, Fig. 3**<br>**(color added by PO).** |

 

Notwithstanding the distinct icons in Figs. 1A and 1C, "**client 102**, **server 106**, and **appliance 200**…may be deployed as…<u>any type and form of computing device</u>," identified generically as "computing device 100." [0229]. Computing device 100 is "useful for practicing an embodiment of the **client 102**, **server 106** or **appliance 200**." *Id.* Further, "computing device 100 [and thus each **client 102**, **server 106**, and **appliance 200**] can be <u>any</u>…desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone…or other form of computing or telecommunications device." [0238]; Levin ¶¶ 158-160.

- 12 -

Plamondon explains that **client 102** "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u> providing access to hosted applications <u>for other clients</u> 102*a*-102*n*." [0210]; *see also* [0285]. Plamondon further explains that **appliance 200** can be a "separate device" or "could be a part of any **client 102** or **server 106**." [0227]. Plamondon also explains that **servers 106** include web servers hosting web objects (*e.g.*, web pages, files, applications) using known Internet protocols (*e.g.*, HTTP). [0210], [0212], [0246], [0421], [0463], [0498]; Levin ¶ 161.

Per the specification portions cited above, Plamondon discloses the following architecture. Levin ¶¶ 146-162.



- 13 -

**Appliance 200** improves communications in several ways.  Plamondon's Figures 6A-6B, for example, illustrate **appliance 200** acting as a proxy device with a cache between **client 102** and **server 106**.





At step 605, "the **appliance 200** intercepts or otherwise receives any type and form of request for an object from a **client 102**."  [0445].  At step 610, the **appliance 200** determines if the requested object is in its cache.  If it is, at step 615, the **appliance 200** transmits "the cached object to the **client 102** in response to the client's request."  [0446]-[0447].  At step 620—which occurs before, after, or simultaneously with step 615—the **appliance** transmits a request for a status of the object from a **server 106**.  *Id.*  "At step 625, the **appliance 200** receives a status of the object or an updated copy of the object from the **server**," updates its cache and transmits the object to **client 102**.  [0450]-[0451]; Levin ¶¶ 163-164.

- 14 -

**B.** **Claim 1**

    **1.** **Preamble**

        **a.** **Element 1P1**

> A method for use with a **first client device**,

Plamondon's **appliance 200** is the "**first client device**" in a communication path between **client device 102** ("**second server**") and **server 106** ("**first server**"). *E.g.*, Figs. 1A-1C, [0048], [0052], [0077], [0421], [0672]. When **appliance 200** requests, from **server 106**, object(s) on behalf of **client 102** (or forwards **client 102's** request to **server 106,** [0449]), **appliance 200** acts "in the role of a client" under the EDTX's construction of "**first client device**." Ex. 1006, 12. *See* [0048]-[0052], [0444]-[0451], Figs. 6A-6B; Levin ¶ 168.

Plamondon's **appliance 200** is implemented on computing device 100, which can be any "consumer computer" under PO's proposed construction. Ex. 1005, 13. *See* [0229] (**appliance 200** "may be deployed as and/or executed on any type and form of computing device" such as "computing device 100"); [0238] ("computing device 100 can be any workstation, desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone, smart phone."); Levin ¶ 169.

### b.    Element 1P2

> for use with a **first server** that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests

Plamondon's **server 106** is the "**first server**" comprising a web server. [0210] ("**Servers 106** may be...web servers[.]"), [0212], [0045], [0210], [0418], [0421].  Plamondon's **server 106** is an HTTP server.  For example, Plamondon describes **client 102** transmitting an HTTP request to **server 106** and "[i]n response to the request, the **server** transmits an HTTP response."  [0598]; *see also* Abstract, [0105], [0212], [0270], [0421]-[0422], [0445], [0463], [0498], [0639], [0641]; Levin ¶¶ 171-175.

### c.    Element 1P3

> the **first server** stores a first content identified by a first content identifier,

Plamondon's **server 106** ("**first server**") stores content in the form of web objects (*e.g.*, web pages) identified by URLs.  "[T]he **appliance 200** intercepts a web or HTTP page transmitted by a **server 106** to a **client 102** and the page includes a uniform resource locator (URL) or hyperlink identifying an object." [0463].

- 16 -

Appx7387

The web or HTTP pages in Plamondon are examples of "first content," while the URL or hyperlink is the "first content identifier." This is consistent with usage in the challenged claims. For example, claim 23 (depending from claim 1) clarifies that "the first content comprises [a] web-page" and "the first content identifier comprises a…URL." *See also* [0488] (when intercepting pages from **server 106** that were requested by **client 102**, **appliance 200** "identifies a <u>uniform resource locator (URL) for an intercepted page, which may identify one or more objects associated with the page</u>"), Figs. 6A-6B (step 625), [0011]-[0012]; Levin ¶¶ 177-184.

### d.    Element 1P4

and for use with a **second server**, the method by the **first client device** comprising:

Under the EDTX construction, "**second server**" is "a device that is operating in the role of a server and that is not the first client device," while PO argued for "a server that is not the client device or web server." Ex. 1009, 8-11; Ex. 1005, 13. Plamondon's **client 102** is "computing device 100," [0229], and "<u>can be any… server</u>." [0238]. Further, it "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u>…for other clients." [0210]. *See also* [0285], [0443]; Levin ¶¶ 186-187.

Plamondon's **client 102** is distinct from **appliance 200** (the "**first client device**" in the claims) and from **server 106** (the "**web server**" in the claims), and consequently also comprises the "**second server**" under PO's litigation construction. Levin ¶ 188. Further, Plamondon's **client 102** directly parallels the '319 patent's **client 102** that PO identified as the "**second server**" in court. *Supra* § VI.A; Levin ¶ 189. **Appliance 200** performs claimed steps 1B-1E as follows.

### 2. Step 1B

receiving, from the **second server**, the first content identifier;

**Appliance 200** receives requests for web objects ("first content") identified by URLs ("content identifiers") from **client 102** ("**second server**"). *Supra* § VI.B.1.c (discussing 1P3); Figs. 6A-6B; [0444] ("at step 605, the **appliance 200** intercepts or otherwise receives a request for an object from a **client 102**"); *see also* [0672] ("**appliance 200** intercepts a request from a client to a server to obtain the content or object underlined via the URL."), [0011] ("Each request sent by a user begins with resolving a Uniform Resource Locator (URL)."), [0012] ("[E]very HTTP access starts with a URL."). It was well-known in 2009 that a URL, or the URL's more general form the URI, identified content on the Internet. Levin ¶¶ 192-193.

### 3. Step 1C

> sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

Plamondon's **appliance 200** connects to **server 106** via network 104 or 104′ comprising the Internet. [0013], [0203], Figs. 1A-1C, 6A-6B; Levin ¶¶ 145-154.

**Appliance 200** requests objects by URL from **server 106** ("**first server**") based on HTTP requests it intercepts from **client 102**. In Plamondon's parallel revalidation technique, for instance, **appliance 200** revalidates a cached object with **server 106** in parallel with serving the object, from its cache, to **client 102**. [0442]-[0453]. "[T]he **appliance 200** identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator." [0446]; *see also* [0012] ("every HTTP access starts with a URL"). **Appliance 200** then sends the URL to **server 106** to get object status.

If **server 106** caches the object, **appliance 200** sends **server 106** the object request. [0445] (**appliance 200** intercepts HTTP request from **client 102**), [0446] (**appliance 200** sends request to **server 106** to determine if the server caches the object), [0447] (**appliance 200** sends status request to **server 106**), [0449] (**appliance 200** requests current object version from **server 106** over HTTP, including by forwarding the request to **server 106**), [0450] (**appliance 200** receives updated copy of object from **server 106**), *see also* [0041]. Every HTTP request includes a content identifier for the requested content. Levin ¶¶ 195-199.

- 19 -

Appx7390

Plamondon's Figs. 6A-6B illustrate sending this request at step 620. "[T]he **appliance** transmits a request for a status [of] the object from an **originating server**." [0444], *see also* [0488]; Levin ¶¶ 168, 171, 202-206, 214.





**Plamondon Figs. 6A-6B (color annotation added).**

In another example meeting step 1C, Plamondon's proxy connection techniques [0417]-[0441] include the same functionality discussed above: **appliance 200** "intercepts an HTTP session request" from **client 102**, [0421], identifies this as "a connection request," [0422], and forwards the request to **server 106**. [0423]; Levin ¶¶ 168, 171.

The HTTP request identifies content by URL. Abstract ("As every HTTP access starts with a URL…"), [0672]-[0673]; Levin ¶¶ 65-70, 172-175, 178-184, 199.

### 4.    Step 1D

receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and

Plamondon's parallel revalidation of cached objects includes **appliance 200** receiving updated content from **server 106** ("**first server**") in response to sending the URL identifying the requested content. [0450] ("At step 625, the **appliance 200** receives a status of the object or an updated copy of the object from the server."). This communication takes place over the Internet connection described *supra* § VI.B.3 (step 1C). Plamondon's Figs. 6A-6B illustrate this receiving at step 625, which happens in response to the request including the URL at step 620. [0442], [0444], [0449]-[0451]; *see also* [0011]-[0012], [0042], [0047], [0463]; Levin ¶¶ 201-204.

- 21 -

Appx7392





**Plamondon Figs. 6A-6B (color annotation added).**

Plamondon's proxy server functionality likewise includes **appliance 200** receiving requested content over the Internet from **server 106** in response to sending the URL identifying the requested content, which also meets step 1D. [0437] ("the **appliance 200** may receive a <u>response from a conditional request for the object</u> that the object has changed and the response includes an <u>updated version of the object</u>."); Levin ¶¶ 203-204.

### 5.    Step 1E

> sending, the first content by the **first client device** to the **second server**, in response to the receiving of the first content identifier.

After **appliance 200** receives or intercepts the URL identifying requested content, Plamondon's parallel revalidation includes **appliance 200** sending the requested content (the "first content", *supra* § VI.B.1.c) to **client device 102** ("**second server**") in response to receiving the client's request, which included the first content identifier (URL). This includes **appliance 200** immediately sending **client 102** valid cached content. [0444], Fig. 6B (step 615). For example, Plamondon discloses "the **appliance** transmits…the cached object to the **client 102** <u>in response to the client's request</u> at step 615." [0447]; Levin ¶¶ 206-207.

- 23 -





**Plamondon Figs. 6A-6B (color annotation added).**

Appx7395

If "in response to the receiving of the first content identifier" encompasses the **first client device** sending content to the **second server** after requesting it from the **first server**, Plamondon also meets [1E] because Plamondon describes circumstances in which **appliance 200** sends requested content to **client 102** after receiving it from **server 106**. [0451] ("**appliance 200** serves the object received from the **server** at step 625 in response to the first request"). *See also* [0436]-[0437], [0438] ("In some embodiments, the **appliance 200** forwards the **server's** response to the **client 102** instead of the object from the cache."); Levin ¶ 208.

Accordingly, Plamondon anticipates claim 1. Levin ¶ 209.

## C.    Claim 12

### 1.    Element 12A

> The method according to claim 1, further comprising storing, by the **first client device** in response to the receiving from the **first server**, the first content,

In Plamondon's parallel revalidation, **appliance 200** ("**first client device**") stores updated objects ("first content") received from **server 106** ("**first server**"). *Supra* §§ VI.B.3-VI.B.4; [0444] ("At step 625, the **appliance 200** receives…an updated copy of the object from the server. Based on the response from the server, the **appliance 200** updates the cache accordingly. If the object has changed, the **appliance 200** stores the updated object to the cache 232."), Figs. 2A, 6A-6B, [0257], [0450], [0431] (cache 232 resides on **appliance 200**); Levin ¶¶ 211-216.

- 25 -





**Plamondon Figs. 6A-6B (color annotation added).**

### 2.    Element 12B

> and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.

In Plamondon's parallel revalidation, **appliance 200** sends the HTTP request to **server 106** ("**first server**").  This is Plamondon step 620, which meets claim 1 step 1C, *supra* § VI.B.3.  The sending is in response to receiving a message from **client 102** ("**second server**") with the URL ("first content identifier") in Plamondon step 605, which meets step 1B.  *Supra* § VI.B.2.  *See also* [0041], [0242], [0447] ("the appliance transmits the…cached object to **the client 102** <u>in response to the client's request at step 615 and at step 620, also transmits a request for a status the object from an originating server</u>"), [0449], Figs. 6A-6B; Levin ¶¶ 218-219.  Accordingly, Plamondon anticipates claim 12.

### D.    Claim 13

### 1.    Element 13A

> The method according to claim 12, further comprising: receiving, from a **second client device**, the first content identifier; and

**Appliance 200** receives requests for the same content from multiple sources, including a **second client 102**.  [0451] ("**[A]ppliance 200** receives a second request for the object from the same **client 102** or a **different client 102'**").  The additional request includes the URL ("first content identifier") for the same reasons the original request includes it.  *Supra* § VI.B.2; Levin ¶¶ 221-223.

- 27 -

### 2. Element 13B

> sending, the stored first content by the **first client device** to the second client device, in response to the receiving of the first content identifier from the second client device.

Plamondon explains that **appliance 200** ("**first client device**") stores requested content, *supra* § VI.C.1, and sends the first content to the second client device in response to receiving the request from the second client device (which, as discussed above, includes the first content identifier). [0451] ("**appliance 200** serves the object…in response to the first request and serves the received object to the [second] client in response to the second request."); Levin ¶¶ 225-227. Accordingly, Plamondon anticipates claim 13.

### E. Claim 14

> The method according to claim 1, further comprising determining, by the **first client device**, that the received first content, is valid.

Plamondon discusses validating content stored in a cache of **appliance 200** ("**first client device**"). Claim 14 does not limit when the validity determination is performed. The '319 patent describes the determination when a request is received for the cached content. Ex. 1001, 14:24-34. Plamondon includes the same description. [0043] ("the method includes receiving a request for an object from a requester… [and] determining (i) that the object exists in the local cache and (ii) that a status identifier associated with the object indicates that the object is <u>valid</u>"), [0048], [0450]-[0451], *see also* [0508] ("a device, such [as] an **appliance**

- 28 -

**200**…performs this prefreshening technique by checking the status and/or updating cached objects…<u>the device validates or updates the object in the cache</u>."), [0512], [0522]-[0524]; Levin ¶¶ 229-231.  Accordingly, Plamondon anticipates claim 14.

    **F.**    **Claim 21**

> The method according to claim 1, wherein the **first** or **second server** is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the **first client device** is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates respectively with the **first** or **second server** over the Internet based on, or according to, TCP/IP protocol or connection.

       Plamondon describes **appliance 200** ("**first client device**") communicating with **server 106** ("**first server**") over network 104', and with **client 102** ("**second server**") over network 104.  Fig. 1C; *supra* §§ VI.A, VI.B.2-VI.B.3.  Networks 104 and 104' can be the Internet.  [0203]; Levin ¶¶ 145-154.

       Plamondon further describes **appliance 200** having network stack 267 that implements any TCP/IP protocol between **appliance 200** ("**first client device**") and both **client 102** ("**second server**") and **server 106** ("**first server**").  [0252] ("the **appliance 200** has one network stack 267, such as a TCP/IP based stack… used to communicate with a first network, such as network 104, and also with a second network 104'."), [0253]-[0254], [0256]; Levin ¶¶ 233-236.  Accordingly, Plamondon anticipates claim 21.

- 29 -

### G.    Claim 22

The method according to claim 1, wherein the **first client device** communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

Plamondon describes **appliance 200** ("**first client device**") communicating with **client device 102** ("**second server**") and **server 106** ("**first server**") over the Internet through network stack 267.  *Supra* § VI.F.  Network stack 267 communicates according to the TCP or UDP protocols.  [0254] ("any TCP/IP based protocol may be used…any type and form of user datagram protocol (UDP), such as UDP over IP, may be used by the network stack 267"); Levin ¶¶ 238-240. Accordingly, Plamondon anticipates claim 22.

### H.    Claim 23

#### 1.    Element 23A

The method according to claim 1, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL),

As discussed *supra* § VI.B.1.b, **servers 106** are **web servers**.  The "first content" discussed for claim 1 therefore includes web-page content.  [0462], [0532] ("web page"), [0549], [0559].  Plamondon discloses **client 102** "streaming video and/or audio," [0246], so Plamondon's system would also pull audio or video from **server 106**.  Levin ¶¶ 242-244.

As discussed *supra* § VI.B.2, the first content identifier for these objects comprises URLs, which were conventional identifiers for web-based objects. [0011]-[0012].  *See also* [0516], [0525]; Levin ¶ 245.

### 2.    Element 23B

> and wherein the method further comprising executing, by the **first client device**, a web browser application or an email application.

Plamondon teaches a network optimization engine 250 running on **appliance 200**.  [0250], [0252]-[0254], Fig. 2A.  Plamondon teaches that all its techniques, systems and methods "may be deployed in a browser or for a browser," including "any portion of network optimization engine 250" in **appliance 200**. [0680].  This means **appliance 200** executes a web browser application as claimed. *Id.*; *see also* [0012], [0246], [0361], [0680]-[0682]; Levin ¶¶ 247-248.  Accordingly, Plamondon anticipates claim 23.

### I.    Claim 24

> The method according to claim 1, further comprising establishing, by the **first client device**, a Transmission Control Protocol (TCP) connection with the **second server** using TCP/IP protocol.

A TCP connection is "established" when both hosts participate in creating the connection.  Ex. 1011, ¶ 11; Ex. 1012, 10-12; Levin ¶ 116.

- 31 -

RFC 793, an Internet standard from 1981, defines the TCP protocol. RFCs are standards that govern the Internet, are widely distributed without restrictions starting on their dates of publication. Since the 1990s they, including RFC 793, have been maintained and indexed in a repository freely available to the public and widely known by POSAs. Ex. 1011 ¶¶ 1-11; Ex. 1012; Ex. 1031, [0058] (2005 patent application referencing RFC 793); Levin ¶¶ 117-123.[9] Though relied upon only for the meaning of "establish"—and not as an anticipatory or obviousness reference—RFC 793 is thus pre-AIA § 102(b) prior art as the Board has found in similar circumstances. *Apple v. Uniloc 2017*, IPR2019-00918, Paper 21 (Oct. 15, 2020) (claims in patent claiming priority to 2005 unpatentable over RFC 793).

RFC 793 explains, "[t]he [TCP] connection becomes 'established' when sequence numbers have been synchronized in both directions." Ex. 1012, 12. In other words, both sides "establish" the TCP connection. Levin ¶¶ 126, 130; *generally id.* ¶¶ 116-131. Plamondon describes **appliance 200** establishing a TCP connection with **client 102** ("**second server**") via network stack 267. [0256]; Levin ¶¶ 250-262; *see also* [0252]-[0256], [0270], [0350], [0571]-[0572]. This describes **appliance 200** establishing a TCP connection with **client 102** using TCP/IP protocol. Levin ¶¶ 261-262. Thus, Plamondon anticipates claim 24.

---

[9] RFC documents are separately numbered exhibits for convenience. Ex. 1077 ¶ 5.

### J.    Claim 25

> The method according to claim 1, wherein the **first** or **second server** is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the **first client device** communicates over the Internet with the **first** or **second server** based on, or according to, using TCP/IP protocol or connection.

Plamondon anticipates claim 25 for the same reasons it anticipates claim 21. *Supra* § VI.F; Levin ¶ 264.

### K.    Claim 26

> The method according to claim 1, further comprising storing, operating, or using, a client operating system.

Plamondon provides "**appliance 200**...run[s] any operating system such as... Microsoft® Windows...Unix and Linux...Mac OS®." [0249]. These are "client operating system[s]" as claimed. Levin ¶¶ 266-268. Accordingly, Plamondon anticipates claim 26.

### L.    Claim 27

> The method according to claim 1, wherein the steps are sequentially executed.

Plamondon sequentially executes steps [1B]-[1E] of claim 1.

Step 1B: In Plamondon step 605, **appliance 200** ("**first client device**") intercepts an object request from **client device 102** ("**second server**"). [0444]. This request contains a URL ("first content identifier"). *Supra* § VI.B.2.

- 33 -

Step 1C: Subsequently, at Plamondon step 620, **appliance 200** "transmits a request for a status of the object from an **originating server**."  [0444].  This request contains a URL ("first content identifier").  *Supra* § VI.B.3.

Step 1D: Subsequently, at Plamondon step 625, **appliance 200** receives the requested object from **server 106** ("**first server**") in response to the **appliance 200** having sent the first content identifier to **server 106**.  [0450]; *Supra* § VI.B.4.

Step 1E: At Plamondon step 615, **appliance 200** sends the requested content to **client device 102**.  [0444]; *Supra* § VI.B.5.  Plamondon's disclosure includes this step comprising **appliance 200** sending **client device 102** updated content received from the **server**, such that 1E occurs after 1D.  [0451] ("In still another embodiment, the **appliance 200** serves the object received from the server at step 625 in response to the first request."); *see also* [0437] (noting that, upon receipt of the response "includ[ing] an updated version of the object" from the server, "the **appliance 200** may transmit a response to the client's request with the…updated version of the object"); Levin ¶¶ 270-276.

Accordingly, Plamondon anticipates claim 27.

- 34 -

## VII.   GROUND 2:  CLAIMS 28-29—OBVIOUS OVER PLAMONDON

### A.    Claim 28

> A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.

Plamondon's communication device 100, which is "useful for practicing... **appliance 200**," [0229], comprises (i) "a storage device 128, such as one or more hard disk drives" (*e.g.,* "non-transitory computer readable media" as claimed) "for storing application software programs" (*e.g.,* "computer instructions" as claimed) and (ii) "processors" [0230]-[0233] "to perform the operations described herein," [0238], (*e.g.*, executing steps 1B-1E).  *See also* [0251], [0253], [0257].

The POSA would store software, for implementing claim 1's method, in a hard drive (non-transitory medium) in **appliance 200** as an obvious, cheap, easy, and common approach to deploying application software.  Levin ¶¶ 278-281.  This makes claim 28 obvious over Plamondon.

### B.    Claim 29

> A **client device** comprising a non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.

**Appliance 200** ("**client device**") executes claim 1's method via a processor executing software instructions stored in "a non-transitory computer readable medium," rendering claim 28 obvious.  *Supra* § VII.A; Levin ¶¶ 283-285.

## VIII.  GROUND 3:  CLAIMS 15-17—OBVIOUS OVER PLAMONDON IN VIEW OF RFC 2616

### A.    Claim 15

> The method according to claim 14, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

Plamondon anticipates claim 14.  *Supra* § VI.E.  Claim 15 is obvious over Plamondon in view of RFC 2616 (Ex. 1018), a 1999 Internet standard specifying HTTP/1.1.

RFC 2616 is pre-AIA § 102(b) prior art for the same reasons as RFC 793. *Supra* § VI.I; Ex. 1011 ¶ 17; Ex. 1018, 1; Levin ¶¶ 286-289; Ex. 1030, [0003] (2005 patent application discussing use of RFC 2616 for web page retrieval); *Trend Micro v. Cupp Computing*, IPR2019-00641, Paper 7 (July 26, 2019) (instituting IPR over RFC 2616 with challenged-patent priority before 2009).  PO admitted during prosecution that RFC 2616 was published in 1999 (Ex. 1002, 75, 310-423) and conceded in a prior IPR against the '319 patent that RFC 2616 is "prior art."  Ex. 1008, 10-11.

RFC 2616 defines a conditional GET method specifically for validating ("determining") cached objects based on a response HTTP header from a queried server.  "The conditional GET method is intended to reduce unnecessary network usage by allowing cached entities to be refreshed without requiring multiple requests or transferring data already held by the client."  Ex. 1018, 35, 41, 53-55,

- 36 -

Appx7407

82.  In other words, claim 15 recites using known methods in the 1999 HTTP/1.1 standard, in known ways, for their intended use.  Levin ¶¶ 293-294, 299, 303.  The '319 patent itself confirms this.  Ex. 1001, 16:12-46.

Plamondon describes validating cached objects consistent with RFC 2616.  Although it does not specifically mention RFC 2616, Plamondon teaches using a conditional GET in the same way and for the same purpose described in RFC 2616 (and the '319 patent).  Plamondon's parallel revalidation of cached objects includes step 620 wherein **appliance 200** transmits "a conditional HTTP get request" to the **server 106** "to determine the status" of (*i.e.*, validate) a cached object.  [0449], Figs. 6A-6B.  Plamondon's prefresher 904 likewise uses conditional GET for validating cached objects based on "the header information of the response."  [0522]; *generally* [0508]-[0528], Figs. 9A-9B.  Plamondon describes receiving a response with "header information of the object identifying a maximum amount of time for which the object is valid," [0084], and "in response to the received header information, identifying the object already stored in a cache as valid."  [0085].  Plamondon also specifically refers to receiving a "304 Not Modified Response" to a conditional GET request [0523]—a response that RFC 2616 defines for the HTTP header when a document "has not been modified."  Ex. 1018, 63-64; Levin ¶¶ 295-297, 304.

- 37 -

POSAs would have recognized that Plamondon describes using RFC 2616's cache validation methods. POSAs would have referred to RFC 2616 as controlling for systems using HTTP/1.1—the most recent and common HTTP version in 2009—for framing the conditional GET, and parsing the response, including the content of the "304 Not Modified Response," to implement the Plamondon's validation methods "according to, or based on" RFC 2616. This makes claim 15 obvious over Plamondon in view of RFC 2616. Levin ¶¶ 288, 298-299, 305-306.

**B.   Claim 16**

**1.   Element 16A**

> The method according to claim 15, further comprising: sending, a message over the Internet in response to the determining that the received first content, is not valid; and

In Plamondon's parallel revalidation method, **appliance 200** transmits an object status request (a "message") to **web server 106** over the Internet, *e.g.*, after determining that "the remaining period of the expiration of the cached object exceeds a predetermined threshold." [0451]; *see also* [0449]-[0450].

Plamondon describes additional methods to freshen an object based on header information in Figs. 10A-10B. At step 1020, prefetcher 904 in **appliance 200** requests object header information from a second **appliance 200'**. [0537]. At step 1025, **appliance 200** receives the response with object header information indicating, *e.g.*, that a cached object has expired (*i.e.*, is not valid). [0538].

Based on that object information, at step 1030 prefetcher 904 in **appliance 200** requests the object from (*i.e.*, sends a "message" to) **appliance 200'**. [0541]. Levin ¶¶ 310-311.

As discussed in § VI.B.3, **appliance 200** communicates with **server 106** over the Internet. Plamondon describes the second **appliance 200'** on the same network (Internet) as **server 106**. [0203], [0214]; Levin ¶¶ 145-154. Therefore, Plamondon teaches **appliance 200** sending a message (*i.e.*, an update request) to second **appliance 200'** over the Internet after determining that cached content is not valid. Levin ¶ 312.

### 2.    Element 16B

> receiving, over the Internet in response to the sending of the message, from the **second server** or from a **second client device** selected from a plurality of client devices, the first content.

Second **appliance 200'** is the "**second client device**" because it acts "in the role of a client" under the EDXT construction (Ex. 1006, 11-12) (*see* [0202], [0229], [0238], [0452]), and can be 'a consumer computer' under PO's litigation construction (Ex. 1005, 10-13). *Supra* § VI.B.1.a.

- 39 -

Plamondon's prefetcher 904 sends requests to **appliance 200'** because the cache management system indexes **appliance 200'** as maintaining the object. [0446] ("In other embodiments, the cache 232 is located on another device 100, <u>such as an appliance 200'</u>, 205 or server 106."). This is "selecting **appliance 200'** from a plurality of client devices."

In response to the content request at step 1030, at step 1035 **appliance 200** receives the content from **appliance 200'**. [0542], Figs. 10A-10B. As explained above, this exchange takes place over the Internet. Plamondon therefore teaches each limitation in claim 16. Levin ¶¶ 313-316.

Plamondon discloses subject matter meeting each limitation that claim 16 adds to claim 15, making claim 16 obvious over Plamondon in view of RFC 2616.

### C.     Claim 17

| The method according to claim 1, further comprising periodically communicating between the **second server** and the **first client device**. |
| --- |

The '319 patent does not define "periodically communicating," which appears only in claim 17 and claim 18 (which limits the "periodically communicating" to exchanging "keep alive" messages). The district court determined that "periodically communicating" requires "maintaining the communication link and knowing its status." Ex. 1006, 19-20.

In 2009 it was well-known to establish persistent HTTP connections between a client and server. Plamondon describes **appliance 200** communicating over network 104 with **client 102** using HTTP. [0239], [0246], [0254], [0270]. As discussed *supra* § VIII.A, POSAs would recognize that Plamondon describes **appliance 200** transmitting messages consistent with RFC 2616, which makes persistent connection a <u>default</u> behavior in HTTP/1.1, providing several benefits. Ex. 1018, 44-46. A "persistent connection" following RFC 2616 satisfies "periodically communicating" because, like the "keep alive" messages referenced in claim 18, it maintains the communication link between **appliance 200** and **client 102** and knowledge of that link status. Levin ¶¶ 318-328. This makes claim 17 obvious over Plamondon in view of RFC 2616.

## IX.    GROUND 4: CLAIMS 17-18—OBVIOUS OVER PLAMONDON IN VIEW OF RFC 1122

Claims 17-18 are obvious over Plamondon in view of RFC 1122 (Ex. 1014), a 1989 Internet standard. RFC 1122 is pre-AIA § 102(b) prior art for the same reasons as RFC 793. *Supra* § VI.I; *see also* Ex. 1011 ¶ 13; Ex. 1031, [0068] (2005 patent application referencing RFC 1122); Levin ¶¶ 329-331; *Ericsson v. Intellectual Ventures II*, IPR2014-01330, Paper 29, 13 (Feb. 19, 2016) (treating RFC 1122 as POSA's background knowledge where challenged patent claimed priority to 2007).

Appx7412

### A.    Claim 18

> The method according to claim 17, wherein the periodically communicating comprises exchanging 'keep alive' messages.

POSAs recognized the benefits of monitoring the reachability and performance of hosts on the Internet decades before the '319 patent, including quickly recovering from network failures, and adapting to changes in network performance.  Levin ¶¶ 332-341.  RFC 1122 describes TCP "keep alive" messages, which provide this functionality and were widely known and used before 2009.  "A 'keep-alive' mechanism periodically probes the other end of a connection when the connection is otherwise idle, even when there is no data to be sent."  Ex. 1014, 102.

Plamondon describes network 104 between **client 102** ("**second server**") and **appliance 200** ("**first client device**") comprising a TCP link.  [0252]-[0254]; *supra* § VI.I.  POSAs would have provided for Plamondon's **client 102** and **appliance 200** to exchange RFC 1122 TCP keep-alive messages to achieve the benefits noted above.  Levin ¶¶ 342-344, 348-351.  This makes claim 18 obvious over Plamondon in view of RFC 1122.

### B.    Claim 17

Implementing Plamondon with RFC 1122's keep-alive messages renders claim 17 (from which claim 18 depends) obvious for the same reasons as claim 18. *See* § IX.A; Levin ¶ 352.

## X.    GROUND 5:  CLAIM 2—OBVIOUS OVER PLAMONDON IN VIEW OF IEEE 802.11-2007

### A.    IEEE 802.11-2007 (Ex. 1022)

IEEE 802.11-2007, published June 12, 2007, is pre-AIA § 102(b) prior art. Ex. 1021; Ex. 1077 ¶ 6; Ex. 1051, [0015] (2007 patent application referencing IEEE 802.11-2007); Levin ¶¶ 353, 359; *Hisense Visual Tech. v. LG Elecs.*, IPR2020-01164, Paper 15, 5 n.2 (Jan. 7, 2021) (instituting review over IEEE 802.11-2007, which Board found was "published June 12, 2007").

IEEE 802.11 provides the industry standard for Wireless LAN Medium Access Control (MAC) and Physical Layer Specifications.  The 2007 version (Ex. 1022, "IEEE 802.11") governed from 2007-2012.  IEEE 802.11 defines how to use a MAC address (a unique identifier that manufacturers assign to every networking component) in the OSI model's data link layer.  Levin ¶¶ 353-355.

Under IEEE 802.11 an access point, or a device seeking to establish an *ad hoc* wireless network, broadcasts a "beacon" announcing its capabilities, including its MAC address.  Ex. 1022, §§ 6.2.1.2.2 (source MAC address) at 57, 7.2.3 (MAC header) at 79-81, 7.2.3.1 (beacon data) & Table 7-8 at 80-81, § 11.1.1.1 (beacon frames periodically transmitted) at 419, § 11.2.1.3 (beacon frame transmitted every beacon interval) at 426-427; Levin ¶¶ 362-366.  The beacon frame header includes the source MAC address.  Ex. 1022, 79-81; Levin ¶¶ 364, 366. The access point or device broadcasts the beacon frame as part of start-up.  Levin ¶¶ 356-358, 362-370.

- 43 -

**B.    Claim 2**

**1.    Element 2A**

> The method according to claim 1, wherein the **first client device** is identified by a Media Access Control (MAC) address or a hostname,

Plamondon describes **appliance 200** ("**first client device**") communicating with **client 102** ("**second server**") with network stack 267 having "any type and form of a wireless protocol, <u>such as IEEE 802.11</u>."  [0253].  To implement that protocol POSAs would have consulted the then-governing standard, which was IEEE 802.11-2007.  Levin ¶¶ 359-360, 371-375.  As a networking device **appliance 200** would have a MAC address.  The IEEE 802.11 protocol required **appliance 200** to identify itself in a local area network by its MAC address.  *Supra* § X.A; Levin ¶¶ 353-355, 358, 362-366, 375, 381-384.

**2.    Element 2B**

> and wherein the method further comprising sending, by the **first client device**, during, as part of, or in response to, a start-up of the **first client device**, a first message to the **second server**, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.

To establish a wireless network under IEEE 802.11 as Plamonnon describes, in obvious implementations where **appliance 200** is **client 102's** access point for Internet access or desires to establish an *ad hoc* 802.11 link with the **client 102**, **appliance 200** would broadcast a beacon frame with its MAC address during start-up.  *Supra* § X.A; [0203]-[0204], [0215], [0228].  In either case, the IEEE

- 44 -

802.11 beacon would be a "first message" to **client 102** comprising **appliance 200's** MAC address.  Levin ¶¶ 356-358, 362-370, 377-384.

It would have been obvious to POSAs to implement the IEEE 802.11 network between **appliance 200** and **client 102** following IEEE 802.11-2007.  Levin ¶¶ 371-375, 385-386.  Doing so would use the IEEE 802.11 standard in the intended way, with the expected result of providing the local wireless network described in Plamondon, where **appliance 200** is **client 102's** 802.11 access point or in ad-hoc communication with **client 102** over 802.11.  Levin ¶¶ 385-386.

Accordingly, claim 2 is obvious over Plamondon in view of IEEE 802.11.  Levin ¶ 386.

## XI.    GROUND 6:  CLAIMS 2-5, 19-20—OBVIOUS OVER PLAMONDON IN VIEW OF PRICE

### A.    Price (Ex. 1023)

Price, published February 2, 2006, is pre-AIA § 102(b) prior art.  Price describes a system for automatically updating networked device software.  Price, [0003]-[0006], [0025].

Price describes a computing device 12 ("typically a PC") acting as a "coordinating PC" managing software versioning.  Price, [0025]-[0026].  The coordinating computer keeps a list of "version numbers of available... software...for a variety of devices [on a network] and a source for obtaining each piece of device software, such as an Internet URL."  Price, [0050].

Price describes that, when a "device is first activated at block 208-2," the coordinating computer recognizes "the current version of the device's…software" (208-4), and registers the software (208-6). Price, [0048], Fig. 5. If the coordinating computer determines that "a newer version of the same software" exists, it "delivers…the currently available software" to the connected device and the "software version of the…connected device is replaced" with the newer version. Price, [0053], [0065]. *See also id.*, Fig. 6; Levin ¶¶ 387-391.

### B. Plamondon-Price Combination

POSAs had reasons to incorporate Price's functionality in Plamondon's architecture, to update software running on Plamondon's **appliance 200** with one of Plamondon's **clients 102** serving as Price's coordinating computer.

*First*, maintaining the networked devices in Plamondon's architecture presents the software versioning problem that Price solves. POSAs would have wanted an ability to update applications/software run by **appliance 200** because "[d]igital-based devices often require updated software versions." Price, [0004]. POSAs would have wanted to incorporate Price's functionality in Plamondon because Price provided a way to communicate with multiple devices and update each device's applications including, in particular, the application used by **appliance 200** and **clients 102** to implement Plamandon's acceleration techniques. Price, [0007]; *supra* § VI.A; Levin ¶¶ 392, 400.

- 46 -

Appx7417

*Second*, by 2009 the need for regularly applying software patches to networked equipment was well-known in the art as a fundamental best practice for cybersecurity. POSAs would have recognized that combining Price with Plamondon provided a mechanism to apply regular software patching to networked components. Levin ¶¶ 393-400.

*Third*, combining Plamondon's architecture with Price brings together prior art elements (Plamondon's **client** device with Price's coordinating-computer functionality), according to known methods, to yield predictable results (a client device that coordinates software upgrades for other devices, *e.g.*, **appliance 200**) with a reasonable expectation of success. Levin ¶¶ 406-407. The combination comports with the descriptions in both references. Levin ¶¶ 401-405.

Consistent with Plamondon, Price describes "additional layers of proxy systems between the database...and the proxy update server" where "many computer systems act as proxy systems for one or more devices." Price, [0072]. Price's implementation uses a personal computer comprising conventional hardware and networking protocols. Price, [0025]-[0029]. Consistent with Price, Plamondon's **client 102** comprises computing devices with comparable hardware and networking capabilities. Plamondon, [0210], [0229]-[0238], [0452]. Plamondon's **client 102** also acts as both a client and server, [0210], like Price's coordinating computer.

- 47 -

In Plamondon-Price, Plamondon's **client 102** or an instance **102a** provides the Price coordinating computer by incorporating Price's computer instructions for upgrading software applications running on other devices such as **appliance 200**. Price, [0007], [0009], [0025], [0048], [0050], [0065]; Levin ¶ 405. This combination is called "Plamondon-Price."

## C.    Claim 2

### 1.    Element 2A

> The method according to claim 1, wherein the **first client device** is identified by a Media Access Control (MAC) address or a hostname,

Plamondon's **appliance 200** ("**first client device**") is identified by MAC address in an IEEE 802.11-compliant network or wired Ethernet. *Supra* § X; [0253]; Levin ¶¶ 353-355, 358, 362-366, 375, 409. Plamondon describes **appliance 200** connecting to **clients 102** over network 104 by WiFi or Ethernet, using the MAC address as an identifier. [0253]. Price likewise describes connecting the connected device and coordinating computer in an IEEE 802.11 link or Ethernet. Price, [0029] & Fig. 2 (links 70, 74); Levin ¶ 411.

### 2. Element 2B

> and wherein the method further comprising sending, by the **first client device**, during, as part of, or in response to, a start-up of the **first client device**, a first message to the **second server**, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.

As described *supra* § XI.B, Plamondon **client 102a** is the "**second server**" as well as Price's coordinating computer that updates a connected device's software (*e.g.*, **appliance 200**) over a network. Price, [0029], [0041]-[0044], [0048]. Focusing on the Plamondon-Price application layer, when **appliance 200** is "activated" and "operated with initially loaded software," it "automatically register[s]" with the coordinating computer (**client 102a**). Price, [0044], [0048]; Levin ¶ 410.

In Plamondon-Price, the "controlled device" (**appliance 200**) connects to the "coordinating computer" over Plamondon's network 104. Plamondon and Price each make clear that this connection can be an IEEE 802.11 link or Ethernet. Levin ¶¶ 409-411. In these connections each application message will include packets that comprise the **application 200** MAC address. Levin ¶ 412. In these embodiments Plamondon-Price provides a first message from **appliance 200** to **client 102a** comprising the MAC address. *Id.*

- 49 -

Plamondon and Price also each describe embodiments wherein network 104 is the Internet.  Levin ¶¶ 145-154, 413; [0203] (network 104 can be the Internet), Price, [0029] (connection can be "any means").  Using the Internet for network 104 in Plamondon-Price would facilitate software patching or updating across multiple local networks.  Levin ¶ 413.

All packets sent on the Internet comprise the source and destination IP addresses.  When connected over the Internet, POSAs would have recognized that well-known software design principles favor including the connected computer / registering device's IP address in the first message so the coordinating computer could uniquely identify the device.  Levin ¶ 414; Price, [0026], [0045].  In this manner the Plamondon-Price **appliance 200** would identify itself to **client 102a** using its IP address as the source address in the packet header for packets comprising the registration message.  This provides a first message from **appliance 200** to **client 102a** comprising the first IP address. Levin ¶ 415-416.

Accordingly, claim 2 is obvious over Plamondon-Price. Levin ¶ 417.

- 50 -

### D.    Claim 3

> The method according to claim 2, for use with a first application stored in the **first client device** and associated with a first version number, wherein the first message comprises the first version number.

Plamondon's **appliance 200** ("**first client device**") runs applications including an operating system, "browser," "client agent 120," and "user mode applications."  [0012], [0206], [0229], [0237], [0246], [0249], [0250], [0361], [0680]-[0682].  Other functionalities, such as cache manager 232 on **appliance 200**, also comprise software applications.  [0261]  These applications would consist of versions that required periodic update.  *E.g.*, [0249] ("appliance 200 can be running...<u>any of the versions</u> of the Microsoft® Windows operating systems…"); *cf.* Price, [0004]-[0007]; Levin, ¶¶ 420-421.

The first message for Price's device registration, *supra* § XI.C.2, includes device software versions as part of "registering" with the coordinating computer.  Price, [0048] ("At block 208-4, <u>the current version</u> of the device's enabling software and other software is operated <u>and recognized by the coordinating computer 12</u>[.]"), Figs. 3, 5.  POSAs would have found it obvious to include application version numbers in a first message to the coordinating computer (**client 102a**) because it needed that information for its versioning database, and sending this information in a later message would have wasted bandwidth and overhead.  Levin ¶¶ 419, 422-426.

- 51 -

Accordingly, claim 3 is obvious over Plamondon-Price.  Levin ¶ 427.

**E.    Claim 4**

> The method according to claim 3, for use with a second application that is a version of the first application, is stored in the **second server**, and is associated with a second version number, wherein the method further comprising receiving, by the **first client device** from the **second server**, in response to the first message, a second message that comprises the second version number.

When Plamondon-Price's coordinating computer (Plamondon **client 102a** and the "**second server**") determines that a new software version is available to update a connected device (**appliance 200**), the software update is "acquired and loaded into the coordination computer." Price, [0044], Fig. 3 (step 216).  The software update is associated with a version number.  Price, [0044], [0050]-[0051]; Levin ¶ 429.

While Price describes automatically updating managed devices, it also describes notifying the managed device user that software updates are available and letting the user decide whether to update.  Price, [0030], [0032], [0044], [0055], [0071]; Levin ¶ 430.  Price's method, as practiced by Plamondon-Price, renders obvious the claimed "second message" with the updates' software version numbers in at least two ways.  *First*, it would have been obvious for messages that automatically update the managed device's software to contain the new software version number.  *Second*, it would also have been obvious for messages that notify the user of update availability to include the new software version number.

- 52 -

Including the new software version number in these messages would inform **appliance 200** of the version it was receiving, allow **appliance 200** to confirm it was receiving an updated version, and allow the person managing **appliance 200** to determine that the update was needed or desirable.  A message regarding newer version(s) of software would conventionally include version information.  Levin ¶¶ 430-434.

This makes claim 4 obvious over Plamondon-Price. Levin ¶ 434.

### F.    Claim 5

> The method according to claim 4, wherein the method further comprising downloading over the Internet, by the **first client device** from the **second server**, in response to the first message, the second application from the **second server**, and installing the second application in the **first client device** as a replacement for the first application.

As discussed *supra* §§ XI.C-XI.E (claims 2-4), **client 102a** ("**second server**") "acquire[s] and load[s]" updated versions of software run by **appliance 200** (*i.e.*, Plamondon-Price's **first client device**) in response to receiving the first message that registered **appliance 200's** software versions.  Next, the "software update is delivered…to the software-controlled device" (*i.e.*, **appliance 200**). Price, [0044], [0069], Fig. 3 (steps 216, 220).  As noted *supra* § XI.C.2 (claim 2) Plamondon-Price discloses network 104 connecting **client 102a** and **appliance 200** as the Internet.  *See e.g.*, *supra* § VI.F (claim 21), Plamondon, [0203], Fig. 1C; *supra* §§ VI.A, VI.B.2-VI.B.3.  Thus, the above delivery of updated software

- 53 -

Appx7424

occurs by **appliance 200** downloading the software "over the Internet, by the first client device from the second server."  Levin ¶¶ 413-415, 436-437.

Per Price, the delivered software is "for updating" the software-controlled device (*e.g.*, **appliance 200**) so a "user may use the device with the updated software."  Price, [0044].  For example, the "current version software…is loaded" from memory to "replac[e] the prior embedded version."  Price, [0065].  Thus, the new version of the application is installed as a replacement for the previous version (the "first application"), as claimed.  Levin ¶¶ 438-439.

This makes claim 5 obvious over Plamondon-Price.  Levin ¶ 439.

### G.    Claim 19

#### 1.    Element 19A

> The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform [claim 1 steps 1B-1E], the method is further preceded by:

Plamondon describes **appliance 200** ("**first client device**") implemented on a computing device 100 having a processor 101.  [0229], [0232].  As discussed *supra* § VII.A (claim 28), POSAs would have found it obvious to provide **appliance 200** with a software application that performs the steps of claim 1 when executed by a processor on **appliance 200**.  This provides the [19A] software application.  Levin ¶¶ 441-443.

- 54 -

As Price describes (Price, [0043]), and as Plamondon describes for applications like the Citrix ICA, ([0246]), it would have been conventional to provide this software application (as described for claim 28) and any updates from the Internet.  Levin ¶¶ 444-445.  In Plamondon-Price this software upgrade precedes <u>using</u> the updated software to execute the steps of claim 1.

### 2. Element 19B

downloading, by the **first client device** from the Internet, the software application; and

When Price's coordinating computer (Plamondon's **client 102a** in Plamondon-Price) determines that connected device software requires an update, it downloads the new software version.  *Supra* § XI.E.

Within the Plamondon architecture, which applies in Plamondon-Price, **appliance 200** remains the "**first client device**" from claim 1 and, acting as a proxy for **client 102a**, intercepts the request from **client 102a** for an updated software version.  If the requested updated software version is not already in **appliance 200**'s cache, **appliance 200** downloads it over the Internet from a **web server** and forwards it to **client 102a**.  *Supra* §§ VI.B.4-VI.B.5; Levin ¶¶ 447-448.

- 55 -

Subsequently, Price's coordinating computer (embodied in Plamondon's **client 102a** in Plamondon-Price) proceeds, per Price's method (which Plamondon-Price carries out) to transmit the updated software version to **appliance 200** so that **appliance 200**, functioning as a managed device in Price's method, can install it. Price, [0044]. This transmission of the updated software version from **client 102a** to **appliance 200** ("first client device") occurs over the Internet, *supra* §§ VI.F, XI.F, and qualifies as **appliance 200** "downloading" the software application. Levin ¶ 449.

Because **appliance 200** downloads the updated software version from the Internet (first from the **web server**, when acting as a proxy for **client 102a**, and then again from **client 102a**, which acts as Price's coordinating computer), Plamondon-Price meets element 19B. Levin ¶ 450.

### 3.    Element 19C

installing, by the **first client device**, the downloaded software application.

Plamondon-Price **appliance 200** is a managed computer and installs the updated software version it receives from the coordinating computer (**client 102a**). Levin ¶¶ 452-453.

Plamondon-Price thus includes every element of claim 19, and accordingly claim 19 is obvious over Plamondon-Price. Levin ¶ 453.

### H.    Claim 20

> The method according to claim 19, wherein the software application is downloaded from the **second server**.

As explained *supra* § XI.G.2, **appliance 200** downloads the updated software version from the Plamondon-Price coordinating computer **client 102a** ("**second server**").  Levin ¶¶ 455-457.  This makes claim 20 obvious over Plamondon-Price for the same reasons as claim 19.

## XII.   GROUND 7:  CLAIMS 6-11—OBVIOUS OVER PLAMONDON IN VIEW OF KOZAT

### A.    Kozat (Ex. 1024)

Kozat, published February 26, 2009, based on an application filed August 16, 2008, with priority to August 21, 2007, is pre-AIA § 102(e)(1) prior art.

Kozat describes a peer-to-peer ("P2P") content delivery network.  One or more **media servers 101** provide media content to **clients 103** ("**peers**") that cache segments of the content.  Kozat, [0010], [0018], [0029], [0037].  One or more **control servers** "keep track of the current supply, current demand, and predicted future demand of all segments of media files" (*id.*, [0020]), and make caching decisions for the **peers**.  *Id.*, Abstract, [0021], [0029], [0037].

- 57 -

Appx7428



**Kozat Fig. 1 (color added).**

**Control server 102** responds to a requesting **client 103** "with the list of locations [having the desired content, *e.g.*, **peers** or **media servers**] and their possible attributes such as, for example, available resources, distance, etc." *Id.*, [0039]. The requesting client then obtains the content (or portions thereof) from one or more of the identified locations. *Id.* Kozat's techniques improve prior-art peer-to-peer architectures by being able to "optimize[] [the system] with respect to the demand" for various content. *Id.*, [0008], [0010]; Levin ¶¶ 458-462.

### B. Plamondon-Kozat Combination

POSAs would have found implementing Kozat's P2P functionality a natural extension of Plamondon, with Kozat's control-server functionality provided by an **appliance 200** of Plamondon. [0202]-[0214]. Plamondon itself describes caching objects on multiple devices including **appliances 200** ([0446]) and **clients 102** ([0443]) while providing that network 104 connecting **clients 102** and **appliances 200** can have any topology ([0204]). In Plamondon-Kozat, the Plamondon **clients 102** are, per Kozat, peers that cache and serve objects. The Plamondon web **servers 106** are analogous to Kozat's media servers. Levin ¶¶ 463-468.

POSAs would have been motivated to make this combination to augment Plamondon with well-known P2P system benefits. Kozat, [0003]. Combining Plamondon with Kozat's P2P techniques would improve Plamondon's performance by increasing transfer speeds and reducing peak loads, since Kozat's control server would ensure that requests were distributed efficiently among peers. Kozat's P2P technique provided an "effective way to pair peers and match supply and demand." Kozat, [0021]-[0022]. Implementing Kozat's control server in Plamondon's **appliance 200** would further improve **appliance 200**'s role as a "performance enhancing proxy." [0206]; Levin ¶¶ 469, 474.

POSAs would have had a reasonable expectation of success in this "Plamondon-Kozat" combination because both Plamondon and Kozat use conventional computer-system hardware in known ways. Kozat, [0074]-[0078]; Plamondon, [0229]-[0238]; Levin ¶¶ 470, 474.

In Plamondon-Kozat, when Plamondon's **client 102** requests an object (*e.g.*, web page or media file), the device running Kozat's control-server software (**appliance 200**) determines whether the object is cached in the P2P network. If so, Kozat's techniques identify (1) device(s) (a **client 102b** and/or **server 106a**) having at least a portion of the requested content and (2) "attributes" of such devices ("available resources, distance"). Kozat, [0039]; Levin ¶ 471. Following Kozat, either **client 102** or the managing device (**appliance 200**) selects the device(s) from which to obtain the object. Kozat, [0039]. Following Plamondon, **appliance 200** continues as a proxy for **client 102**. [0417]. If the object is not available from devices in the P2P network, **appliance 200** acting as a proxy continues implementing Plamondon's techniques for claim 1 to obtain the object from the originating server (*e.g.*, **server 106**). Levin ¶ 472.

The annotated Plamondon Figure 1A below lists the devices in the challenged claims and integrates Plamondon's **appliance 200** with Kozat's control server in a Plamondon-Kozat combination. Levin ¶ 473.

- 60 -



**FIG. 1A**

- "second server"
- "first server"
- "first client device" (comprises **appliance 200** and Kozat's control server)
- "second client device"
- "third server"

Appx7432

### C.  Claim 6

#### 1.  Element 6A1

> The method according to claim 1, for use with a **third server** that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the **third server** responds to HTTP requests and stores a second content identified by a second content identifier,

Plamondon-Kozat servers 106a-n each comprise a web server that is an HTTP server that responds to HTTP requests.  *Supra* § VI.B.1.b; Plamondon, [0202].  As shown in annotated Figure 1A above, one **server 106a** is the "**first server**" and another **server 106n** is the "**third server**."  It was known that different web servers would store and serve different content, so that **server 106n** would store "second content" (*e.g.*, a second web page) "identified by a second content identifier" (a second URL/URI), as claimed.  [0011], [0210], [0212], [0488].  The same analysis for element 1P2 and step 1C meets 6A1, using the **third server** as the web server.  *Supra* §§ VI.B.1.b, VI.B.3.  Levin ¶¶ 476-477.

#### 2.  Element 6A2

> the method by the **first client device** further comprising:

Plamondon-Kozat **appliance 200** is the "**first client device**," *supra* § VI.B.1.a, and performs steps [6B]-[6D] below.  Levin ¶ 479.

### 3. Element 6B

> identifying, an HTTP request for the second content;

Plamondon-Kozat's **appliance 200** receives, and identifies, **client 102**'s "HTTP requests for the second content." *Supra* § XII.B; Levin ¶ 481.

### 4. Element 6C

> sending, to the **second server** over the Internet in response to the identifying, the second content identifier and a criterion; and

Plamondon-Kozat **client 102a** communicates with **appliance 200** over the Internet. Plamondon, [0203]; *supra* § VI.F (claim 21). Because **appliance 200** has the Kozat control-server functionality, it responds to the request from **client 102a** ("**second server**")—in response to step 6B's identifying—with proposed sources for the content as well as a criterion such as the client's distance to those sources. *Supra* §§ VI.B.3, XII.A; Kozat, [0039] ("Control server 102 replies…back to the requesting client 103 with the <u>list of locations and their possible attributes</u> such as, for example…<u>distance</u>, etc."); Levin ¶¶ 483-490.

POSAs also had reason to include the second content identifier (*e.g.*, URL/URI) of the requested content in the response, *e.g.*, so the requesting client device can match the response to (1) the original request and (2) the received identifiers of clients having the content to download. Levin ¶ 491.

- 63 -

### 5.    Element 6D

receiving, over the Internet in response to the sending, from a **second client device** selected from a plurality of client devices according to the criterion, a part of, or a whole of, the second content.

Plamondon-Kozat **appliance 200** ("**first client device**") communicates with multiple **peer clients 102** over the Internet.  [0202]-[0203]; *supra* § XII.C.4.  In Plamondon-Kozat the multiple **peers** comprising **clients 102** cooperatively cache web object segments under direction of Kozat's control server in **appliance 200**.  *Supra* § XII.B.

Based on the peer client attributes in the message from **appliance 200** (step 6C), **peer client 102a** selects a **peer client 102b** ("**second client device**") to supply the requested content (or segment) from any number of peer clients ("plurality of client devices") caching the requested content.  Alternatively, the control server in **appliance 200** makes the selection.  Kozat, [0039] ("[I]n one embodiment, control server 102 can directly send control messages to a set of locations which they start pushing the requested video segment to the requesting peer.").  It would have been obvious to select peers caching the requested content based on the criteria communicated in step 6C, for example **client 102a**'s distance to such peers, since Kozat and Plamondon both seek to improve efficiency and reduce latency.  [0014].  It was well-known to base peer-to-peer communication on criteria such as distance.  Levin ¶¶ 493-499.

- 64 -

In Plamondon-Kozat, when **peer client 102a** selects **peer client 102b**, **peer client 102a** requests content via **appliance 200** ("**first client device**") as its proxy. Kozat, [0039]; *supra* §§ VI.A, XII.B. In turn, **appliance 200** ("**first client device**") receives the second content, on behalf of **peer client 102a**, from **peer client 102b** ("**second client device**"). *Supra* §§ VI.B.4, XII.B. If the control server in **appliance 200** selects the **peer client 102b** from which to request the content, **appliance 200** would likewise receive the content as **peer client 102a**'s proxy. Levin ¶¶ 500-501.

This makes claim 6 obvious over Plamondon-Kozat. Levin ¶ 501.

### D. Claim 7

> The method according to claim 6, wherein the criterion is stored in the **first client device**, and the method further comprising selecting, by the **first client device**, the **second client device** from the plurality of client devices, according to the stored criterion.

As discussed in step 6C, Plamondon-Kozat's **appliance 200** ("**first client device**") includes the control-server functionality and stores relevant peer attributes ("criteria") such as location/distance. *Supra* § XII.C.4; Kozat, [0035], [0039]; Levin ¶¶ 483-490, 503. In one embodiment Kozat describes the **appliance 200** control server selecting the **peer client 102b** ("**second client device**") having the requested content. Kozat, [0039]; *see also id.*, [0018]; Levin ¶¶ 494, 503.

As discussed in step 6D, POSAs had reasons to design Plamondon-Kozat to make this selection "according to the stored criterion" such as distance. *Supra* § XII.C.5; Levin ¶¶ 493-499, 504-505.

This makes claim 7 obvious for the same reasons as claim 6. Levin ¶ 505.

### E.    Claim 8

> The method according to claim 7, wherein the criterion is based on, or comprises, the geographical location of the plurality of client devices, or a response time when communicating with the **first client device**.

Plamondon-Kozat teaches selecting a peer client based on physical distance from a requesting client. *Supra* §§ XII.C.5, XII.A; Kozat, [0039]; *see also* Kozat, [0071]; Levin ¶ 509. Physical distance is based on the geographic locations of **peer client 102a** and **peer client 102b**. Levin ¶¶ 507-510. This makes claim 8 obvious for the same reasons as claims 6-7. Levin ¶ 510.

### F.    Claim 9

> The method according to claim 7, wherein the **second client device** is the quickest to respond to queries from the **first client device**.

Following Kozat, the control server in **appliance 200** ("**first client device**") calculates "round-trip-communication" and "processing delays" between itself and peers including the "**second client device**" in Plamondon-Kozat. Kozat, [0035]-[0036]. These measures indicate which peer is "quickest to respond to queries from" **appliance 200**. Levin ¶ 512.

POSAs would have had reason to configure Plamondon-Kozat to select the peer ("**second client device**") that responds most quickly because Kozat and Plamondon both seek to improve efficiency and reduce latency, and users generally prefer quicker responses.  [0014]; Levin ¶¶ 513-515.  This makes claim 9 obvious over Plamondon-Kozat.  Levin ¶ 515.

### G.  Claim 10

> The method according to claim 7, further comprising sending, by the **first client device**, a notification message to a device from the plurality of client devices that was not selected as part of the selecting.

Plamondon-Kozat's control server (in **appliance 200**, the "**first client device**") determines whether "different caching is needed at each client and signals the decision to the clients" based on content supply and demand.  Kozat, [0041].  POSAs had reason to notify devices that were not selected to serve requested content, so they could adjust their resources to meet predicted demand.  POSAs would do this one to further Kozat's goal of "maximizing the utility of the available cache space…given the supply and predicted demand."  Kozat, [0021]; Levin ¶¶ 517-519.  Kozat also discloses that clients have "incentive" to "dedicate some of their local resources" to the P2P network.  Kozat, [0039].  POSAs also had reason to notify peers that were not selected that they risked being removed from the P2P network and/or having their "incentives" reduced.  Levin ¶¶ 520-521.  This makes claim 10 obvious over Plamondon-Kozat.  Levin ¶ 521.

Appx7438

## H.    Claim 11

> The method according to claim 6, further comprising executing, by the **first client device**, a web browser application or an email application, and wherein the identifying comprises intercepting, by a driver in the **first client device**, the request for the second content respectively from the web browser application or the email application.

Plamondon teaches that all its techniques, systems and methods "may be deployed in a browser or for a browser," including "any portion of network optimization engine 250" in **appliance 200** ("**first client device**"). [0680]; *see also* [0012].

**Appliance 200** includes interceptor 350, which "includes or is <u>a driver</u>" that "intercepts…a network communication at any point in the network stack" including "an application protocol layer" (the web-browser application). Plamondon, [0346]; *see also* [0247]; [0534] ("forward[ing] the intercepted page to an application, such as a web browser"); [0607] ("appliance 200[] intercepts or otherwise receives any type and form of HTTP communication 1252 between devices…transmitted to a browser of a user"). **Appliance 200** intercepts "by a driver in the first client device, the request for the second content from the web browser application."

- 68 -

A POSA also had reason to bundle Kozat's control-server functionality with Plamondon's web-browser functionality. In 2009, it was common practice to bundle peer-to-peer applications with browsers. For instance, the popular Tor Browser is in fact a bundle of the Tor peer-to-peer anonymity overlay network with a browser pre-configured to use it. Levin ¶¶ 523-527. This makes claim 11 obvious over Plamondon-Kozat. Levin ¶ 528.

## XIII. NO BASIS EXISTS FOR DISCRETIONARY DENIAL

### A. Section 314(a): Litigation Involving Unrelated Parties and Different Prior Art Does Not Support Discretionary Denial

The Board's discretion to deny institution in view of litigation is based on considerations of efficiency, fairness and patent quality. *Apple v. Fintiv*, IPR2020-00019, Paper 11, 5 (Mar. 20, 2020) ("*Fintiv*") (precedential). Where (as here) a petitioner is not involved in litigation and the IPR presents prior art different from that in district court, there is no reason for discretionary denial.

#### 1. Factors 5 and 4 Strongly Disfavor Discretionary Denial

##### a. Factor 5: Petitioner Is Not a Litigation Defendant

Petitioner is neither a defendant nor related to any defendant in litigation concerning the '319 patent. **Factor 5** thus "strongly weighs against…exercising discretion to deny institution." *Kavo Dental Techs. v. Osseo Imaging*, IPR2020-00659, Paper 10, 18 (June 10, 2020); *see also Fintiv*, 13-14.

- 69 -

**b.    Factor 4: There Is No Meaningful Overlap Between this IPR and the EDTX Cases**

While *Fintiv* recognized that the Board can deny institution based on substantial overlap between an IPR petition and litigation, *Fintiv*, 14, a <u>lack</u> of meaningful overlap in prior art <u>weighs against</u> discretionary denial. *Unified Patents v. NavBlazer*, IPR2020-00983, Paper 11, 8-9 (Dec. 16, 2020) ("Because the references asserted here and in the WDTX cases are not the same…this factor weighs against denial."); *Fintiv*, 12-13.  The primary reference, for every ground in this Petition, is Plamondon.  The public record of the EDTX cases gives no indication that any defendant is relying on Plamondon.

- In the 395 case, the defendants' Section 282 disclosure and the joint pretrial order do not list Plamondon.  Exs. 1057, 1078.
- In the 225 case, the defendants have not answered the complaint; prior art has not been identified.  Ex. 1058.
- In the 414 case, cross summary judgment motions on invalidity do not identify Plamondon.  Exs. 1075-1076.
- The 397 case was dismissed on May 21, 2020.  Ex. 1060.

There is also little overlap of secondary references.  Of the five secondary references in this petition's grounds, three (Price, IEEE 802.11-2007, Kozat) are <u>not</u> relied upon by any defendant—they are absent from the Section 282 disclosure and the pretrial order in the 395 case, as well as the summary judgment briefing in the 414 case.  Exs. 1057, 1075-1076, 1078.

- 70 -

RFC 1122 and 2616 appear in the Section 282 disclosure from the 395 case but only RFC 2616 appears in the pretrial order from that case. Similarly, only RFC 2616 appears in the 414 case summary judgment briefing. Exs. 1075-1076.

Moreover, in the 395 case, PO asserts just 2 claims (Ex. 1078, 3), while in the 414 case, PO asserts 5 claims (Ex. 1063, 13). This IPR challenges all 29 claims in the '319 patent. The lack of meaningful overlap with the EDTX cases weighs against discretionary denial.

> **2.    Factors 1-3 Disfavor Discretionary Denial Because Petitioner Is Not a Litigation Defendant and There Is No Meaningful Overlap Between this IPR and the EDTX Cases**

*Fintiv* **Factors 1-3** address the risk that the Board and a district court will duplicate efforts assessing patentability. In this case non-overlapping parties and prior art, between this petition and the EDTX cases, mean that **Factors 1-3** disfavor discretionary denial.

Although the 395 case is in trial, **Factor 3** (investment by district court) weighs against denial due to the lack of overlap. *MED-EL Elektromedizinische Geräte v. Adv. Bionics*, IPR2021-00044, Paper 14, 27-28 (Apr. 6, 2021) (**Factor 3** "weighs against" denial despite district court's investment: "[I]f considerable effort has been made by the parties and court in a parallel litigation, but that effort addresses largely different validity issues as to the '746 patent, the amount of effort may be less relevant to the efficiency and integrity of the system.").

- 71 -

A pre-FWD trial involving an unrelated party does not favor discretionary denial under **Factor 2** (proximity of trial date). *Dolby Labs. v. Intertrust Tech.*, IPR2020-00665, Paper 11, 15-17 (Feb. 16, 2021) (**Factor 2** weighs against denial, despite pre-FWD trial, where "Dolby is not a party to the Texas Actions").

With respect to **Factor 1**, it is not clear how the district court would rule on a stay motion in the 225 or 414 cases. In the absence of additional information, **Factor 1** is neutral. *Facebook v. Onstream Media*, IPR2020-01525, Paper 11, 9-10 (April 5, 2021).

In summary, the lack of overlap means there will be no duplication of effort, and the applicable policies (efficiency, fairness and patent quality) disfavor discretionary denial.

### 3. Factor 6 Favors Institution Because this Petition Is Strong

The petition's "strong showing on the merits" weighs against denial. *Apple v. Seven Networks*, IPR2020-00235, Paper 10, 17 (July 28, 2020).

### B. Section 314(a): The Code200 IPR and NetNut IPR Do Not Support Discretionary Denial

The Board denied the Code200 IPR in its discretion. Ex. 1067. The NetNut petition in IPR2021-01492, which reiterates the art and largely copies the grounds from Code200's petition, has not been instituted, and no preliminary response has been filed. Given that the Board did not assess the Code200 grounds on the merits and the NetNut petition has not been instituted, *General Plastic* is inapplicable.

- 72 -

*Google v. Jenam Tech.*, IPR2020-00845, Paper 16, 5 (Oct. 8, 2020) ("*General Plastic* addressed the situation where the same petitioner filed 'follow-on petitions'…after a first set of petitions was denied <u>on the merits</u>.").

Petitioner's lack of relationship to the Code200 or NetNut petitioners also makes *General Plastic* inapplicable. *NetNut v. Bright Data*, IPR2021-00465, Paper 11, 9 (Aug. 12, 2021) ("[W]e decline to extend *General Plastic* and *Valve* to the situation here: where a follow-on petition is filed by a petitioner who is not the same as previous petitioners and does not have any relationship, much less a significant relationship, with previous petitioners."). Petitioner is a startup incorporated in June 2021; it did not exist when Code200 filed its IPR—or when that IPR was denied institution—and NetNut filed its petition just two months ago. Petitioner did not delay this filing for tactical advantage based on any other IPR.

This petition challenges nearly twice as many claims without materially overlapping the Code200 / NetNut petitions. The Code200 and NetNut petitions challenged 16 and 17 claims, respectively, and did not use Plamondon. They relied upon distinct references Crowds, MorphMix, and Border. The sole common secondary references—RFC 2616 (in Ground 3 herein for claims 15-17) and RFC 1122 (in Ground 4 herein for claims 17-18)—were used in <u>different</u> combinations in the Code200 and NetNut IPRs.

If the Board applies *General Plastic*, these material differences favor institution. *Xilinx v. Arbor Global Strategies*, IPR2020-01568, Paper 12, 10-12 (Mar. 5, 2021) (*General Plastic* analysis did not disfavor institution where later petition challenged additional claims and its grounds presented "materially different challenges").

### C. Section 325(d): This Petition's References and Arguments Were Not Addressed During Prosecution

Under *Advanced Bionics v. MED-EL*, IPR2019-01469, Paper 6 (Feb. 13, 2020) (precedential), this petition does not include the same, or substantially similar, references or arguments from prosecution. The Patent Office never considered any unpatentability ground presented herein.

Other than RFC 2616 (a secondary reference for claims 15-17), the Patent Office never considered any reference presented herein. While the admitted prior art RFC 2616 was of-record during the '319 prosecution, the Examiner never applied RFC 2616 in a claim rejection. Under *Advanced Bionics* Step 1, RFC 2616 cannot justify denying institution. *Group III Int'l v. Everki USA*, IPR2021-00371, Paper 21 (July 9, 2021) (Step 1 not met where petition relied on prior art in IDS not applied by Examiner to reject claims); *SHDS v. Truinject*, IPR2020-00937, Paper 11, 8-12 (Nov. 17, 2020) (Step 1 not satisfied where petition combined of-record art with new art).

- 74 -

No reference herein includes disclosure "substantially similar" to that of any reference used in a claim rejection during prosecution of the '319 patent, or any related application.

One reference, U.S. Patent 7,865,585 ("Samuels," Ex. 1054), bears discussion. Robert Plamondon—the sole inventor for this petition's primary reference—was a co-inventor on Samuels. The Examiner initialed Samuels on an IDS but never discussed it during the '319 patent's prosecution.

Plamondon provides extensive disclosure not found in Samuels. While Samuels and Plamondon share some overlapping material—(Fig. 1A-1E, 2A-2B, 3) and Plamondon, [0202]-[0362]—the Petition relies on Plamondon's <u>additional</u> 321 paragraphs ([0363]-[0682]), spanning 45 pages, with no counterpart in Samuels. This petition challenges claim 1 based on, *inter alia*, Plamondon's Figs. 6A-6B and associated discussion in paragraphs [0442]-[0453]. This subject matter—missing from Samuels—clearly anticipates claim 1. In short, Plamondon's new, non-overlapping subject matter describes functionality—including the parallel revalidation methods described above—that anticipates the steps in challenged claim 1. The Patent Office never considered this functionality when discussing Samuels.

During prosecution of Application 12/836,059 (the '319 patent's grandparent) the Examiner rejected application claims 26-45 over Samuels and another reference ("Marco"). Independent claim 26 required an acceleration server, something not included in the claims challenged here. Citing Samuels Fig. 1A and related disclosure, PO distinguished Samuels arguing—with reference to the component not relevant here—that "appliance optimization devices 200, 200'" was not an "acceleration server." Ex. 1071, 179-188.

Parent case 14/025,109 is similar. During prosecution the Examiner rejected claims combining a different primary reference (Garcia) with Samuels, citing Samuels for functionality different from the functionality recited in challenged claim 1. Ex. 1072, 207-220, 304-327.

In short, there is no overlap in the prosecution of ancestor applications that could justify discretionary denial here. *HyperBranch Med. Tech. v. Confluent Surgical*, IPR2018-01099, Paper 14, 18 (Nov. 27, 2018) (instituting where "no arguments during prosecution of the grandparent '483 patent or any member of the '483 patent family…overlap with Petitioner's arguments").

Further, as shown herein, had the Examiner considered Plamondon, no challenged claim would have issued. *Advanced Bionics* Step 2 focuses on *Becton, Dickinson* factors (c), (e), and (f) (*Advanced Bionics*, 10), which all weigh against denial.

- 76 -

On factor (c), while RFC 2616 was of-record, it was never applied. This weighs "strongly against" discretionary denial. *Adobe v. RAH Color Techs.*, IPR2019-00627, Paper 41, 17-18 (Sept. 10, 2019). Although the Office applied Samuels during the ancestor prosecutions, it lacks the key Plamondon disclosures that anticipate claim 1.

On factors (e) and (f), "if…the Office's previous consideration of the art is not well developed or silent, then a petitioner may show the Office erred by overlooking something persuasive under factors (e) and (f)." *Advanced Bionics*, 10. Had the Examiner considered Plamondon no challenged claim would have issued. The Office never considered the references and combinations in this petition. As none of the references herein were applied, there is no prior analysis to review for error, other than allowance of claims that are unpatentable over the references cited herein as explained above. *Bowtech v. MCP IP*, IPR2019-00382, Paper 12, 13 (Aug. 6, 2019). The Office also lacked the benefit of expert testimony. This new evidence weighs "heavily against denying institution." *Adobe*, 20.

### D.    The Recently-Filed Reexamination Request Does Not Support Discretionary Denial

A reexamination request filed one month ago by one of the Code200 petitioners repeats the same grounds presented in the Code200 IPR. *See* Reexamination No. 90/014,875. It thus fails to support discretionary denial for the same reasons already discussed above.

- 77 -

Appx7448

## XIV.  CONCLUSION

Petitioner requests cancellation of claims 1-29 of the '319 patent.


Dated:  November 3, 2021          Respectfully submitted,

                                  The Data Company Technologies Inc.,

                                  By:   /Michael N. Rader/

                                  Michael N. Rader, Reg. No. 52,146
                                  WOLF, GREENFIELD & SACKS, P.C.

- 78 -

## <u>CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6 (E)(4)</u>

I certify that on November 3, 2021, I will cause a copy of the foregoing document, including any exhibits or appendices filed therewith, to be served via Priority Mail Express International  at the following correspondence address of record for the patent:

> May Patents Ltd. c/o Dorit Shem-Tov
> P.O.B 7230
> Ramat-Gan 5217102
> Israel

Date: November 3, 2021                    /MacAulay Rush/
                                          MacAulay Rush
                                          Paralegal
                                          WOLF, GREENFIELD & SACKS, P.C.

79

Appx7450

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24, the undersigned certifies that the foregoing Petition for *Inter Partes* Review contains 13,935 words excluding a table of contents, a table of authorities, Mandatory Notices under § 42.8, a certificate of service or word count, or appendix of exhibits or claim listing (but including annotations added by Petitioner to figures reproduced in the petition). Petitioner has relied on the word count feature of the word processing system used to create this paper in making this certification.

Date: November 3, 2021                    <u>/MacAulay Rush/</u>
                                          MacAulay Rush
                                          Paralegal
                                          WOLF, GREENFIELD & SACKS, P.C.

80

**CLAIM LISTING**

[**1P1**] 1. A method for use with a **first client device**,

[**1P2**] for use with **a first server** that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests

[**1P3**] the **first server** stores a first content identified by a first content identifier,

[**1P4**] and for use with **a second server**,

the method by the **first client device** comprising:

[**1B**] receiving, from the **second server**, the first content identifier;

[**1C**] sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

[**1D**] receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and

[**1E**] sending, the first content by the **first client** device to the **second server**, in response to the receiving of the first content identifier.


[**2A**] **2.** The method according to claim 1, wherein the **first client device** is identified by a Media Access Control (MAC) address or a hostname,

[**2B**] and wherein the method further comprising sending, by the **first client device**, during, as part of, or in response to, a start-up of the **first client**

81

**device**, a first message to the **second server**, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.

**3.** The method according to claim 2, for use with a first application stored in the **first client device** and associated with a first version number, wherein the first message comprises the first version number.

**4.** The method according to claim 3, for use with a second application that is a version of the first application, is stored in the **second server**, and is associated with a second version number, wherein the method further comprising receiving, by the **first client device** from the **second server**, in response to the first message, a second message that comprises the second version number.

**5.** The method according to claim 4, wherein the method further comprising downloading over the Internet, by the **first client device** from the **second server**, in response to the first message, the second application from the **second server**, and installing the second application in the **first client device** as a replacement for the first application.

82

[6A1] 6. The method according to claim 1, for use with a **third server** that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the **third server** responds to HTTP requests and stores a second content identified by a second content identifier,

[6A2] the method by the **first client device** further comprising:

[6B] identifying, an HTTP request for the second content;

[6C] sending, to the **second server** over the Internet in response to the identifying, the second content identifier and a criterion; and

[6D] receiving, over the Internet in response to the sending, from a **second client device** selected from a plurality of client devices according to the criterion, a part of, or a whole of, the second content.

**7.** The method according to claim 6, wherein the criterion is stored in the **first client device**, and the method further comprising selecting, by the **first client device**, the **second client device** from the plurality of client devices, according to the stored criterion.

**8.** The method according to claim 7, wherein the criterion is based on, or comprises, the geographical location of the plurality of client devices, or a response time when communicating with the **first client device**.

83

**9.** The method according to claim 7, wherein the second client device is the quickest to respond to queries from the first client device.

**10.** The method according to claim 7, further comprising sending, by the first client device, a notification message to a device from the plurality of client devices that was not selected as part of the selecting.

**11.** The method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application, and wherein the identifying comprises intercepting, by a driver in the first client device, the request for the second content respectively from the web browser application or the email application.

**[12A] 12.** The method according to claim 1, further comprising storing, by the first client device in response to the receiving from the first server, the first content,

**[12B]** and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.

84

**[13A] 13.** The method according to claim 12, further comprising: receiving, from a **second client device**, the first content identifier; and

**[13B]** sending, the stored first content by the **first client device** to the **second client device**, in response to the receiving of the first content identifier from the **second client device**.

**14.** The method according to claim 1, further comprising determining, by the **first client device**, that the received first content, is valid.

**15.** The method according to claim 14, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.

**[16A] 16.** The method according to claim 15, further comprising: sending, a message over the Internet in response to the determining that the received first content, is not valid; and

**[16B]** receiving, over the Internet in response to the sending of the message, from the **second server** or from a **second client device** selected from a plurality of client devices, the first content.

85

**17.** The method according to claim 1, further comprising periodically communicating between the **second server** and the **first client device**.

**18.** The method according to claim 17, wherein the periodically communicating comprises exchanging 'keep alive' messages.

**[19A] 19.** The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

**[19B]** downloading, by the **first client device** from the Internet, the software application; and

**[19C]** installing, by the **first client device**, the downloaded software application.

**20.** The method according to claim 19, wherein the software application is downloaded from the **second server**.

Appx7457

**21.** The method according to claim 1, wherein the **first** or **second server** is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the **first client device** is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates respectively with the **first** or **second server** over the Internet based on, or according to, TCP/IP protocol or connection.

**22.** The method according to claim 1, wherein the **first client device** communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.

**[23A] 23.** The method according to claim 1, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL),

**[23B]** and wherein the method further comprising executing, by the **first client device**, a web browser application or an email application.

87

**24.** The method according to claim 1, further comprising establishing, by the **first client device**, a Transmission Control Protocol (TCP) connection with the **second server** using TCP/IP protocol.

**25.** The method according to claim 1, wherein the **first** or **second server** is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the **first client device** communicates over the Internet with the **first** or **second server** based on, or according to, using TCP/IP protocol or connection.

**26.** The method according to claim 1, further comprising storing, operating, or using, a client operating system.

**27.** The method according to claim 1, wherein the steps are sequentially executed.

**28.** A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.

88

**29.** A client device comprising a non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.

Appx7460

Fourth, during reexamination of the child '510 patent, and another family member, the USPTO adopted the court's role-based construction.  Ex. 1110, 3 ('510 reexamination: "client device" is "device that acts, at least at some point, as a client"); Ex. 1111, 70 ('511 reexamination: "A computer can be both a client and a server depending on what role it is playing at a particular time.").  Common terms in related patents with shared specifications must be interpreted consistently. *SightSound*, 809 F.3d at 1316; *accord In re Garrido*, 646 F. App'x 942, 945-946 (Fed. Cir. 2016) (affirming adoption of construction from child patent's reexamination).  Further, "[b]ecause an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight." *St. Clair Intellectual Property Consultants v. Canon*, 412 F. App'x 270, 276 (Fed. Cir. 2011).  The "ongoing negotiation" begun in the '936 prosecution history contradicts PO's arguments and "lacks the clarity" to justify PO's constructions.  *Phillips*, 415 F.3d at 1317.

PO's remaining prosecution history arguments are makeweight.  Arguing that components are "physical apparatuses," and generically referencing claims' "environment" (POR, 27-28), are not "unmistakable disclaimers" of claim scope. *Quest Integrity v. Cokebusters USA*, 924 F.3d 1220, 1229 (Fed. Cir. 2019).

- 16 -

### 1.  Plain meaning.

116.   The POSA would have understood that the plain and ordinary meaning of "establishing a TCP connection using TCP/IP protocol" is participating in creating the TCP/IP connection between devices.

117.   RFC 793, "Transmission Control Protocol: DARPA Internet Program Protocol Specification," is the 1981 Internet standard that defines the Transmission Control Protocol (TCP) referenced in claim 24 and widely used in networking systems.

118.   RFC 793 was prepared by the Information Sciences Institute at the University of Southern California. It is available at https://datatracker.ietf.org/doc/html/rfc793.

119.   RFCs are developed, maintained, and published by the Internet Engineering Task Force (IETF). The IETF is an open community of network designers, operators, vendors, and researchers that develops and publishes Internet protocol standards and best practices. Anyone interested can find a copy of an IETF RFC at the IETF website www.ietf.org. Before 1998, RFCs were publicly available via FTP (a file transfer protocol) from an IETF repository.

120.   The IETF accomplishes its work through Network Working Groups, which are organized into several areas by topic and created by a charter describing a specific problem and deliverable in the form of a guideline or standard.

121.   The Network Working Groups publish specific technical protocols for the Internet through documents called Requests For Comment (RFCs).  The IETF RFCs cover many aspects of computer networking including established practices and procedures, programs, concepts, and Working Group meeting notes.

122.   RFCs involving networking protocols like TCP, IP, and HTTP are known, used, and treated as standards by people working with computer networking. These are regarded as foundational documents for working with the Internet.  RFC 793 is one of these foundational documents.  The POSA would have known that RFC 793 defines the TCP protocol, and that, although multiple subsequent RFCs have updated it, the core components of the protocol defined in RFC 793 remained (and remain to this day).

123.   This RFC development and usage is described in several standard texts that are widely used in undergraduate and graduate instruction in networking, and by practitioners.   For example, the 1994 text W. Richard Stevens, "TCP/IP Illustrated, Volume 1: The Protocols," (Addison-Wesley, 1994) ("Stevens") is a widely known and used reference for fundamental networking principles.  I have personally had and used a copy of Stevens since 2002.  Stevens explains the Internet standardization process and the RFC development process that I described above at pp. 14-15.  Stevens specifically cites RFC 793 in Chapter 18 on TCP connection and

- 46 -

this example Plamondon's appliance 200 has a network communication with the "branch office client" over the Internet. Plamondon's Figure 1A, 1B, and 1C clearly identify the connection between appliance 200 and client 102 as network 104. In other words, in this example, network 104 is an Internet connection between appliance 200 and branch office client 102.

155. In Plamondon Figure 1A below, color annotations are added to indicate the correspondence between the Plamondon "**client 102**" and the '319 patent claim 1 "**second server**"; Plamondon's "**appliance 200**" and the claim 1 "**client device**," and Plamondon's "**web server 106**" with the claim 1 "**web server**."



FIG. 1A

156.  Annotated Fig. 1A shows multiple **clients**, **appliances**, and **servers**.

157.  Plamondon explains that "**appliance 200** is a device for accelerating, optimizing or otherwise improving the performance…of any type and form of network traffic." [0206]. **Appliance 200** does this, in part, by:

(a)  Acting "as a proxy between a **client** requesting objects [*e.g.*, web pages] and an object **server** responding to **client** requests." [0048].  The **server** may be a "**web server**." [0045], [0210], [0212], [0418], [0421].

(b)  Retrieving from servers, and caching (*i.e.*, storing), objects that it can serve to a **client** in response to a **client's** request.  [0048]-[0053], [0442]-[0453].

158.  Annotated Fig. 1C (below left, with Petitioner's annotations) shows one "**client**…access[ing] a **server** via a single network optimization **appliance**" ([0144]), which parallels the Patent Owner's mapping of claim 1 to '319 patent Fig. 3 (below right, with Patent Owner's annotations, Ex. 1005, 4):

**Plamondon, Fig. 1C (color added)**       **'319 Patent, Fig. 3 (color added)**




159.    Though illustrated with distinct icons in Figs. 1A and 1C, "**client 102**, **server 106**, and **appliance 200**…may be deployed as…<u>any type and form of computing device</u>," identified generically as "computing device 100." [0229]; *see also id.* ("computing device 100 [is] useful for practicing an embodiment of the **client 102**, **server 106** or **appliance 200**"). "[C]omputing device 100 [and thus each **client 102**, **server 106**, and **appliance 200**] can be <u>any</u>…desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone…or other form of computing or telecommunications device." [0238].

160.    In short, Plamondon explains that any general-purpose computer from 2007 can be configured to fill the role of client, server, or appliance (the proxy). Among other things, Plamondon makes this clear by an extended recital of generic hardware and software components that can be assembled to form a typical computer. [0229]-[0238]. To serve as computing device 100 or any network component like a client, application, or server—or in the '319 patent claim 1 phrasing, server or client device—the components only need to be capable of communication and have sufficient processing power and memory to provide the required functionality for that component. [0238].

161.    Plamondon explains that **client 102** "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u> providing access to hosted applications <u>for other clients</u> 102*a*-102*n*." [0210];

- 63 -

*see also* [0285].  Plamondon further explains that **appliance 200** can be a "separate device" or it "could be a part of any **client 102** or **server 106**." [0227].  Plamondon also explains that **servers 106** include web servers hosting web objects (*e.g.*, web pages, files, applications) using well-known Internet protocols (*e.g.*, HTTP). [0210], [0212], [0246], [0421], [0463], [0498].

162.  From its specification and Figs. 1A and 1C, Plamondon discloses the following architecture.



163.  **Appliance 200** improves communications in several ways. Plamondon's Figures 6A-6B, for example, illustrate **appliance 200** acting as a proxy device with a cache between **client 102** and **server 106**.

Appx9200





164.   At step 605, "the **appliance 200** intercepts or otherwise receives any type and form of request for an object from a **client 102**."  [0445].  At step 610, the **appliance 200** determines if the requested object is in its cache.  If it is, at step 615, the **appliance 200** transmits "the cached object to the **client 102** in response to the client's request."   [0446]-[0447].   At step 620—which occurs before, after, or simultaneously with step 615—the **appliance** transmits a request for a status of the object from a **server 106**.  *Id.*  "At step 625, the **appliance 200** receives a status of the object or an updated copy of the object from the **server**," updates its cache and transmits the object to **client 102**.  [0450]-[0451]

**2.      Claim 1.**

165.   Claim 1 recites in full, with annotations added to delineate claim elements as in the Petition claim listing:

[**1P1**] A method for use with a first client device, [**1P2**] for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, [**1P3**] the first

- 65 -

server stores a first content identified by a first content identifier, [**1P4**] and for use with a second server, the method by the first client device comprising:

[**1B**] receiving, from the second server, the first content identifier;

[**1C**] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

[**1D**] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

[**1E**] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16-32.

### a.    Preamble

166.    The district court determined that the claim 1 preamble, which is broken into four components 1P1 to 1P4 for discussion here, is limiting.  In this subsection, I point out the correspondence between Plamondon and the requirements in the claim 1 preamble.  Plamondon discloses subject matter meeting every requirement in the claim 1 preamble.

### i.    Element 1P1

167.    Applying the Patent Owner's color annotations, the claim 1 preamble starts:

[**1P1**] A method for use with a **first client device**,

- 66 -

Appx9202

168. Plamondon's **appliance 200** is the "**first client device**" in a communication path between **client device 102** ("**second server**") and **server 106** ("**first server**"). *E.g.*, Figs. 1A-1C, [0048], [0052], [0077], [0336], [0421], [0672]. When **appliance 200** requests, from **server 106**, object(s) on behalf of **client 102** (or simply forwards **client 102's** request to **server 106,** [0449]), **appliance 200** acts "in the role of a client" under the EDTX's construction of "**first client device**." Ex. 1006, 12. *See* [0048]-[0052], [0444]-[0451], Figs. 6A-6B.

169. Plamondon's **appliance 200** is implemented on computing device 100, which can be any "consumer computer" under the Patent Owner's proposed construction (Ex. 1005, 13). [0229] (**appliance 200** "may be deployed as and/or executed on any type and form of computing device" such as "computing device 100"); [0238] ("computing device 100 can be any workstation, desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone, smart phone…or other form of computing or telecommunications device").

### ii.     Element 1P2

170. Claim 1, element 1P2 provides:

[**1P2**] for use with a **first server** that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests

171. Plamondon's **server 106** is the "**first server**" comprising a web server. [0210] ("Servers 106 may be...web servers[.]"), [0212]; *see also* [0045], [0210],

- 67 -

[0418], [0421].   Plamondon's **server 106** is an HTTP server.   For example, Plamondon describes **client 102** transmitting an HTTP request to **server 106** and "[i]n response to the request, the **server** transmits an HTTP response." [0598]; *see also* Abstract, [0105], [0212], [0270], [0421]-[0422], [0445], [0463], [0498], [0639], [0641].   Plamondon describes disposing **appliance 200** between **client 102** and **server 106**, so that **appliance 200** is used with **server 106** as claimed.

172.   It was well-known in the art in 2009 that a "web server" refers to both hardware and software.   The web server hardware is a computer that stores a website's component files and stores and executes web server software, which connects to the Internet and supports data exchange with other web-connected devices.  The web server software includes several components that control how web users access hosted files like HTML documents, images, CSS stylesheets, and Javascript files.   The web server is an HTTP server, which is software that understands URLs and HTTP, accepts HTTP requests, and (when it has the requested content) can respond by delivering the requested content.  In the context described above, Plamondon is referring to both the web server hardware and software.

173.  Two patent application publications from the relevant time frame demonstrate this usage of "web server" in the art.   U.S. Patent Application Publication No. 2008/0072178, "Graphical User Interface (GUI) For Displaying

Software Component Availability As Determined By A Messaging Infrastructure," to Budzisch et al ("Budzisch") was published on March 20, 2008.  At Ex. 1028, ¶ [0007], it explains:

> The term "web server" 104 is largely understood to mean being capable of presenting a web-based interface (e.g., through the downloading of web pages scripted in HTML format) over a network 101.  Accesses to specific web pages associated with the web-based presentation are typically formatted in the HTTP protocol.

174.  U.S. Patent Application Publication No. 2002/0178217, "Method and Apparatus For Scanning A Web Site In A Distributed Data Processing System For Problem Determination," to Nguyen et al. ("Nguyen") was published on November 28, 2002.  It gives a lengthy description of the basic well-known pieces used for World Wide Web content delivery, Ex. 1029 at ¶ [0006]:

> In the Web environment, servers and clients effect data transaction using the Hypertext Transfer Protocol (HTTP), a known protocol for handling the transfer of various data files (e.g., text, still graphic images, audio, motion video, etc.).  Information is formatted for presentation to a user by a standard page description language, the Hypertext Markup Language (HTML).  In addition to basic presentation formatting, HTML allows developers to specify "links" to other Web resources identified by a Uniform Resource Locator (URL). A URL is a special syntax identifier defining a communications path to specific information. Each logical block of information accessible to a client, called a "page" or a "Web page", is identified by a URL. The

- 69 -

URL provides a universal, consistent method for finding and accessing this information[.] . . . Retrieval of information on the Web is generally accomplished with an HTML-compatible browser that browses web sites. A web site is a group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web. The HTML documents in a web site generally cover one or more related topics and are interconnected through hyperlinks. Most web sites have a home page as their starting point, which frequently functions as a table of contents for the site. Many large organizations, such as corporations, will have one or more HTTP servers dedicated to a single web site. However, an HTTP server can also serve several small web sites, such as those owned by individuals.

175.   In this application, Nguyen Fig. 1 shows "server 114" instantiated on a general-purpose computer.  Nguyen describes web server software for "server 114," Ex. 1029 at ¶ [0028]:

Server 114 as illustrated is a web server, also referred to as a HTTP server, is a server software that uses HTTP to serve up HTML documents and any associated files and scripts when requested by a client, such as a web browser. The connection between client and server is usually broken after the requested document or file has been served. HTTP servers are used on Web and Intranet sites. A target resource that is scanned by agents may include other resources in addition to a web server. For example, without limitation, a target resource may be a web site[.]

- 70 -

### iii.    Element 1P3

176.    Claim 1, element 1P3 provides:

[**1P3**] the **first server** stores a first content identified by a first content identifier,

177.    Plamondon's **server 106** ("**first server**") stores content in the form of web objects (*e.g.*, web pages) identified by URLs.  "[T]he **appliance 200** intercepts a <u>web or HTTP page</u> transmitted by a **server 106** to a **client 102** and the page includes a <u>uniform resource locator (URL) or hyperlink identifying an object</u>." [0463].

178.    The web or HTTP pages in Plamondon are examples of "first content," while the URL or hyperlink is the "first content identifier."  This is consistent with the usage in the challenged claims.  For example, '319 patent claim 23 (depending from claim 1) clarifies that "the first content comprises [a] web-page" and "the first content identifier comprises a Uniform Resource Locator (URL)."  *See also* Plamondon, [0488] (when intercepting pages from **server 106** that were requested by **client 102**, **appliance 200** "identifies a <u>uniform resource locator (URL) for an intercepted page, which may identify one or more objects associated with the page</u>"), Figs. 6A-6B (step 625), [0011]-[0012].

179.    RFC 1738, "Uniform Resource Locators (URL)," by Tim Berners-Lee et al., was published in 1994.  RFC 1738 defines the URL and its use as a content

address and identifier in networking. RFC 1738 explains that when used in HTTP, "[t]he HTTP URL scheme is used to designate Internet resources." Ex. 1011 ¶ 15; Ex. 1016, § 3.3 at 9.

180.    RFC 1630, "Uniform Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World-Wide Web," also by Tim Berners-Lee, was also published in 1994 and defines the earlier and related concept of a Uniform Resource Identifier or URI. RFC 1630 explains that "In order to abstract the idea of a generic object, the web needs the concepts of the universal set of objects, and of the universal set of names or addresses of objects. A Universal Resource Identifier (URI) is a member of this universal set of names in registered name spaces and addresses referring to registered protocols or name spaces. A Uniform Resource Locator (URL), defined elsewhere [in RFC 1738], is a form of URI which expresses an address which maps onto an access algorithm using network protocols." Ex. 1011 ¶ 14; Ex. 1015, Introduction at 1.

181.    Anyone working in networking in 2009 would have understood that both a URL and a URI identify web page content.

182.    Contemporary publications confirm that it was well-understood to use a URI or a URL as a content identifier in a networking system. For example, U.S. Patent No. 7,761,500, "URL Based Communication Protocol From A Client

- 72 -

Computer to A Network Device," to Eckert et al. issued on July 20, 2010 from an

application filed February 29, 2000 ("Eckert"). It describes a proxy system where

"A proxy…receiv[es] requests for a URI…forward[s] the reformatted request

toward the server identified by the URI." Ex. 1032, 8:28-31.  More generally, it

explains at 9:33-52:

> URIs have been known by many names: WWW addresses, Universal
> Document Identifiers, Universal Resource Identifiers, and finally the
> combination of Uniform Resource Locators (URL) and Names (URN).
> As far as HTTP is concerned, Uniform Resource Identifiers are simply
> formatted strings which identify—via name, location, or any other
> characteristic—a network resource.
>
> URIs in HTTP can be represented in absolute form or relative to some
> known base URI, depending upon the context of their use. The two
> forms are differentiated by the fact that absolute URIs always begin
> with a scheme name followed by a colon. . . . The "http" scheme is used
> to locate network resources via the HTTP protocol. This section defines
> the scheme-specific syntax and semantics for http URLs.

183.   The URL role as a content identifier is fundamental to Internet and

network communication.  For example, Larry L. Peterson and Bruce S. Davie,

"Computer Networks: A Systems Approach," (4th Ed. Elsevier 2007) ("Peterson")

is a common and well-known networking reference used by students and

professionals.  I have owned a copy of Peterson since 2002.  On page 4 it explains

- 73 -

that "each selectable object on a [web] page is bound to an identifier for the next page to be viewed. This identifier, called a Uniform Resource Locator (URL), is used to provide a way of identifying all the possible pages that can be viewed from your web browser." Ex. 1033, at 4; *generally id.* § 1.1 at 4-6.

184. As Nguyen explained, it was well-known in 2009 that the Uniform Resource Locator (URL) identifies the content of a web page and where to find it on the World Wide Web. It is a web page or resource address. It contains the protocol used to access the resource, the server location (by IP address or domain name), and optionally the port number on the server. Ex. 1029, ¶ [0006] ("In addition to basic presentation formatting, HTML allows developers to specify "links" to other Web resources identified by a Uniform Resource Locator (URL). A URL is a special syntax identifier defining a communications path to specific information. Each logical block of information accessible to a client, called a "page" or a "Web page", is identified by a URL. The URL provides a universal, consistent method for finding and accessing this information[.]").

### iv.    Element 1P4

185. Claim 1, element 1P4 provides:

[**1P4**] and for use with a **second server**, the method by the **first client device** comprising:

- 74 -

Appx9210

186.   Under the EDTX construction, "**second server**" is "a device that is operating in the role of a server and that is not the **first client device**", while the Patent Owner argued for "a server that is not the **client device** or **web server**."  Ex. 1009, 8-11; Ex. 1005, 13.  Plamondon's **client 102** is "computing device 100," [0229], and "can be any… server."  [0238].  Further, it "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u>…for other clients."  [0210].  *See also* [0285], [0443].  Plamondon describes using **appliance 200** with **client 102**.

187.   Various contemporaneous patent documents confirm that it was known in the art to define a server as a general-purpose computer acting as a server.  Eckert explains that "Any given program may be…both a client and a server."  Ex. 1032, 7:61-64.  Similarly, U.S. Patent No. 6,351,775, "Loading Balancing Across Servers In A Computer Network," issued on February 26, 2003, and explains that "[a]ny computer that performs a task at the command of another computer is a server." Ex. 1036, 1:43-44.

188.   Plamondon's **client 102** is distinct from **appliance 200** (the "first client device" in the claims) and from **server 106** (the "web server" in the claims), and thus also comprises the "**second server**" under Patent Owner's litigation construction.

189.   Further, as explained above, at § VIII.A.1, Plamondon's **client 102** directly parallels the '319 patent's description of **client 102** that Patent Owner identified as the "**second server**" in court.

190.   Plamondon's **appliance 200** performs claimed method steps 1B-1E as follows.

### b.     Step 1B

191.   Step 1B provides:

[**1B**] receiving, from the **second server**, the first content identifier;

192.   **Appliance 200** receives requests for web objects ("first content") identified by URLs ("content identifiers") from **client 102** ("**second server**"). *See* § VIII.A.2.a.iii (discussing 1P3); [0444] ("at step 605, the **appliance 200** intercepts or otherwise receives a request for an object from a **client 102**"); *see also* [0672] ("**appliance 200** intercepts a request from a client to a server to obtain the content or object <u>identified via the URL</u>."), *generally* [0011] ("Each request sent by a user begins with resolving a Uniform Resource Locator (URL)."), [0012] ("[E]very HTTP access starts with a URL.").

193.   I explained above at ¶¶ 179-184 how a URL provides a server address on the World Wide Web.  Several more contemporary patent publications confirm this understanding and usage in the art.  For example:

the actual destination server (server B) to the proxy server (server A), in addition to providing the file name on the actual destination server that is to be downloaded to the client machine, where server A indicates the server the client machine thinks he is communicating with, and server B is another server in the communication loop." Ex. 1037, ¶ [0005].

### c.    Step 1C

194.   Step 1C provides:

[**1C**] sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

195.    Plamondon describes **appliance 200** connecting to **server 106** via network 104', *e.g.*, the Internet.  [0013], [0203], Figs. 1A-1C, 6A-6B.

196.   Plamondon describes **appliance 200** requesting objects by URL from the **server 106** (the "**first server**") based on the HTTP requests that it intercepts from **client 102**.  Every HTTP object request includes a content identifier for the requested object.

197.   For example, in Plamondon's parallel revalidation of cached objects (a technique in which **appliance 200** revalidates an object in its cache with **server 106** in parallel with serving the cached object to **client 102**, *see* [0442]-[0453]), **appliance 200** sends the URL to **server 106** to get the object status from **server 106**.

- 78 -

198.   If the object is cached on **server 106**, then **appliance 200** sends **server 106** the object request.  [0445] (**appliance 200** intercepts HTTP request from **client 102**), [0446] (**appliance 200** sends request to **server 106** to determine if the server caches the object), [0447] (**appliance 200** sends **server 106** a request for status), [0449] (**appliance 200** requests current object version from **server 106** over HTTP, including by forwarding the client's request to **server 106**), [0450] (**appliance 200** receives updated copy of object from **server 106**), *generally* [0041].

199.   Plamondon makes clear that in at least one embodiment the content identifier in the parallel revalidation method is a URL.  *See* [0446] ("In one embodiment, the appliance 200 identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator of the request.").  Subsequent operations on the object request, including **appliance 200** sending an HTTP object request to **server 106** at step 620, would use the same identifier.  This is also consistent with descriptions of HTTP messages throughout Plamondon, which starts by explaining that "every HTTP access starts with a URL." [0012].

### d.    Step 1D

200.   Step 1D provides:

[**1D**] receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and

- 79 -

201.    Plamondon's parallel revalidation of cached objects includes **appliance 200** receiving updated content from **server 106** ("**first server**") in response to sending the URL identifying the requested content.   [0450] ("At step 625, the **appliance 200** receives a status of the object or <u>an updated copy of the object</u> from the server.").  The communication takes place over the Internet connection described above §§ VIII.A.1 & VIII.A.2.c (step 1C).  Plamondon's Figs. 6A-6B illustrate this receiving at step 625, which happens in response to the request including the URL at step 620.  [0442], [0444], [0449]-[0451]; *see also* [0011]-[0012], [0042], [0047], [0463].

202.    The point of Plamondon's parallel revalidation is to use the conditional GET to facilitate responding to a content request with cached content, if the cached content remains valid, or updating the cached content with an updated copy from the web server—and sending that updated copy back to the client—if the content has changed.  Plamondon describes this at [0442],

> With the parallel revalidation technique described herein, the cache revalidates the object with the originating server in parallel with serving the cached object in response [to] the request. . . . If the object has changed after all, the cache gets an updated copy <u>in response to</u> the conditional request, and future object requests will get the updated object in the cache. Otherwise, you get a response that reports that it has not been modified.

- 80 -

Plamondon makes clear that the conditional request is the conditional GET from **appliance 200** to **web server 106**, which contains the URL or "first content identifier." At [0443], Plamondon refers specifically to "a cache of the **appliance 200**." Putting this together, when Plamondon describes the cache of **appliance 200** getting "an updated copy <u>in response to</u> the conditional request," (*see also* [0450]), this is **appliance 200** "receiving the first content" from the "originating server" [0444] or **web server** (**first server**) "over the Internet in response to the sending of the first content identifier."

203. Plamondon's proxy server functionality likewise includes **appliance 200** receiving requested content over the Internet from **server 106** in response to sending the URL identifying the requested content. [0437] ("the appliance 200 may receive a response from a conditional request for the object that the object has changed and the response includes an updated version of the object.").

204. This proxy architecture described in claim 1 and Plamondon was well-known in the art long before 2009. For example, Jamail, the 2002 patent publication mentioned above, describes conventional proxy server architectures at length. In a summary introduction, it explains (Ex. 1037, ¶ [0005]):

> The client machine sends a message to the proxy server to inform the proxy server of the final destination server that the client machine wants to talk to. In general, the client machine does this by providing the website name or URL address of the actual destination server (server

- 81 -

Providing Faster and More Efficient Data Communication." The '614 Patent, filed on December 10, 2018, shares the same inventors, but is in a separate family ("Second Family") with a separate specification claiming priority to a provisional application filed on August 28, 2013. The '614 Patent is titled: "System and Method for Improving Internet Communication by Using Intermediate Nodes." The asserted patents in both families claim methods utilizing a novel **server** – **client device** – **web server** architecture, whereby a **client device** serves as a proxy between the **server** and **web server**.

The '319 and '510 Patents create a "system designed for increasing network communication speed for users…" Ex. A at Abstract.[1] The '319 and '510 Patents discuss that previous "proxy servers" fail to provide a "comprehensive solution for Internet surfing," in part because they "would need to be deployed at every point around the world where the Internet is being consumed." *Id.* at 2:24-27; *see also* 2:8-23. Instead, to create a new type of consumer-based network that never existed before, these patents employ "**client devices**" that operate as proxies. *Id.* at 3:13-55. The client devices are modified to function as a client, peer or agent and serve as a proxy in the system, permitting "any number of agents and peers." *Id.* at 4:43-64.

Similarly, the '614 Patent creates a client device network of "**tunnel devices**" that are **client devices** within a **server** – **client device** – **web server** architecture. Ex. C at 1:19-23.

> Each of devices herein may consist of, include, be part of, or be based on, a part of, or the whole of, the computer 11 or the system 100 shown in FIG. 1. Each of the servers herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any server described in the '604 Patent, such as the web server, the proxy server, or the acceleration server. Each of the clients or devices herein may consist of, may include, or may be based on, a part or a whole of the functionalities or structure (such as software) of any client or device described in the '604 Patent, such as the peer, client, or agent

---

[1] For simplicity, all references to the shared specification of the '319 and '510 Patents will be made to the specification of the '319 Patent at Ex. A, but will be understood to include the corresponding citation from the '510 Patent at Ex. B.

company's otherwise publicly available pricing information. To overcome these artificial hinderances, the proxy service of the claims sends requests through one or more of a large group of proxy client devices, such as individual cell phone devices. As the proxy devices belong to real people who otherwise send such requests to target web servers as customers, the target will allow the queries and not artificially block them.

**B.    The Asserted Claims**

In the present action, Luminati asserts infringement of independent claim 1 and dependent claims 2, 14, 15, 17, 18, 21, 22, 24, 25, 26, and 27 of the '319 Patent, independent claim 1 and dependent claims 2, 8, 9, 10, 11, 13, 15, 16, 18, 19, 20, 22, and 23 of the '510 Patent, and independent claim 1 and dependent claims 2, 4, 5, 6, 7, 9, 10, 11, 12, 15, 16, 17, 18, 19, 20, 22, 23, 25, 26, 28 and 29 of the '614 Patent.

Although each of the Asserted Claims involve methods performed within a **server** – **client device** – **web server** architecture, the claim terms differ int hat the "first" **server** in the '319 and '510 Patents is referred to as the "second" **server** in the '614 Patent. Fig. 3 is annotated below to illustrate the claimed steps [A], [B], [C], [D], and/or [E] performed by the **client device** in conjunction with the **server** and **web server**.



Regarding the First Family of patents, representative independent claim 1 of the '319 Patent claims as follows:

1. A method for use with a first **client device**, for use with a **first server** that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that

4

Appx9340

responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a **second server**, the method by the first **client device** comprising:

[B] receiving, from the **second server**, the first content identifier;

[C] sending, to the **first server** over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

[D] receiving, the first content from the **first server** over the Internet in response to the sending of the first content identifier; and

[E] sending, the first content by the first client device to the **second server**, in response to the receiving of the first content identifier.

Representative independent claim 1 of the '510 Patent claims as follows:

1. A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first **client device** comprising:

[A] establishing a Transmission Control Protocol (TCP) connection with a **second server**;

[C] sending, to the **web server** over an Internet, the first content identifier;

[D] receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and

[E] sending the received first content, to the **second server** over the established TCP connection, [B] in response to the receiving of the first content identifier.

Dependent claim 2 of the '319 Patent adds to claim 1 the element of "wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further 35 comprising sending, by the first client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname," while dependent claim 2 of the '510 Patent adds the identical element to claim 1, except that the underlined term is "the first client IP address." Dependent claims 14 and 10 of the '319 and '510 Patents respectively add to claim 1 "further comprising determining, by the first client device, that the received first content, is valid." Dependent claims 15 and 11 of the '319 and '510 Patents respectively add to claim 14 and 10 respectively "wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." Dependent claims 17 and 8 of the '319

| | |
|---|---|
| '614 Pat. Claim 1 | |
| **"performing a task, by the client device, in response to the receiving of the request from the first server"**<br><br>'614 Pat. Claim 1 | Plain and ordinary meaning |
| **"above or below the threshold"**<br><br>'614 Pat. Claim 17 | Plain and ordinary meaning |
| **"hardware component"**<br><br>'614 Pat. Claims 18, 19 and 20 | Plain and ordinary meaning |
| **"message that comprises a status"**<br><br>'614 Pat. Claim 25 and 26 | Plain and ordinary meaning |

## VI.    DISPUTED TERMS FOR CLAIM CONSTRUCTION

### A.    Client Device (First Family)

| Claim Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "Client device"<br><br>('319 Pat., cl. 1, 2, 14, 17, 22, 24, and 25; '510 Pat., cl. 1, 2, 8, 10, 13, 15, 18, and 19) | "Consumer computer" | Plain and ordinary meaning |

The term "client device" is defined in the patent specification of the '319 and '510 Patents: "In the network 50, files are stored on computers of consumers, referred to herein as client devices 60." Ex. A at 2:44-46.[2] Dr. Rhyne has provided his opinion that as to the claims of the patents-in-suit "a POSA would understand the term 'client device' to refer to a consumer computer." Rhyne Declaration, Ex. D at ¶ 6.

---

[2] For simplicity, all references to the shared specification of the First Family will be made to the specification of the '319 Patent, but will be understood to include the corresponding citation from the '510 Patent.

Consistent with this definition, figure 3 illustrates a communication network 100 showing "client" 100, "peers" 112, 114, and 116, "agent" 122, "web server" 152, and "acceleration server" 162, which has a "storage device" 164. Ex. A at Fig. 3. The specification clearly distinguishes between (a) "communication devices" of the client/peer/agent, (b) a web server, and (c) an acceleration server. The specification further describes the communication devices as serving as a "client," "peer" or "agent" depending upon the requirements of the network.

> The present system and method provides for faster and more efficient data communication within a communication network. An example of such a communication network **100** is provided by the schematic diagram of FIG. **3**. <u>The network **100** of FIG. **3** contains multiple communication devices. Due to functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon requirements of the network **100**, as is described in detail herein.</u> It should be noted that a detailed description of a communication device is provided with regard to the description of FIG. **4….**

> <u>The communication network **100** also contains a Web server **152**.</u> The Web server **152** is the server from which the client **102** is requesting information and may be for example, a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet. It should be noted that the server **152** is not limited to being an HTTP server. In fact, if a different communication protocol is used within the communication network, the server may be a server capable of handling a different protocol….

> <u>The communication network **100** further contains an acceleration server **162**</u> having an acceleration server storage device **164**.

> *Id*. at 4:43-64 (emphasis added); *see also e.g. Id*. at 12:33-56.

Dr. Rhyne uses figure 3 to explain that "a POSA would also understand client 102 and agent 122 to both be client devices operating as a 'client' and an 'agent' respectively." Ex. D at ¶ 6. This is further supported by Figure 6[3], which shows the "communication device" as comprising a 'client module,' 'peer module' and 'agent module.' Ex. A at Fig. 6

---

[3] Figure 6 is a schematic diagram illustrating elements of the acceleration application of Figure 5, which is a schematic diagram illustrating the memory of Figure 4, which is a schematic diagram illustrating a communication device of the communication network of Figure 3. Ex. A at 4:6-13.



FIG. 3

FIG. 6

FIG. **6** is a schematic diagram further illustrating elements of the acceleration application **220,** as well as communication paths of the acceleration application **220.** The acceleration application **220** contains an acceleration system initializer module **222,** which is called when the acceleration application **220** is started. The acceleration system initializer module **222** is capable of initializing all elements of the communication device **200** The acceleration application **220** also contains three separate modules that run in parallel, namely, a client module **224,** a peer module **226,** and an agent module **228,** each of which comes into play according to the specific role that the communication device **200** is partaking in the communication network **100** at a given time. The role of each module is further described herein.

The client module **224** provides functionality required when the communication device **200** is requesting information from the Web server **152,** such as, for example, but not limited to, Web pages, data, video, or audio. The client module **224** causes the communication device **200** having the client module **224** therein to intercept the information request and pass the information request on to other elements of the communication network **100,** such as, servers, agents or peers. This process is further described in detail herein.

Ex. A at 9:13-36.

Defense expert Dr. Freedman provided a declaration with Defendants' P.R. 4-3 disclosures

that confirm a "client device" can be a client, peer or agent. However, Defendants then improperly

interpret this term broadly to be a "general purpose computer," which Defendants improperly

12

Appx9348

assert includes servers. *Id.* at ¶ 23. Such a construction is contrary to the clear language of the claims as further clarified in the specifications and prosecution histories, which distinguish the "client device" from servers, namely the "first server," "second server," and/or "web server" of the claims. This interpretation is also contrary to the specification as shown above, which distinguishes between communication devices with the functionality of a client/peer/agent and the servers of the network in these patents. *See also e.g.* Ex. A at Fig. 1.

Consistent with the claim language, the definition provided by the specification and the detailed discussion therein, a "client device" should be construed to mean "consumer computer."

**B.    First Server (First Family)**

| Claim Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "First server" <br><br> ('319 Pat., cl. 1, 21) | "Web server" | Plain and ordinary meaning |

Based on the plain language of the preamble, which both sides agree is limiting, the first server must be a web server. Ex. A at 19:17 ("… a first server that comprises a web server…."). Furthermore, a POSA would understand the first server to be a web server. Ex. D at ¶ 7. Consistent with the claim language, the "first server" of the '319 Patent is the "web server" in the server – client device – web server architecture of the claims. (In contrast, the '614 Patent uses "first server" as the "server.") Construing the "first server" of the '319 Patent as a "web server," consistent with the other Asserted Patents, would be helpful to the jury by minimizing jury confusion. *Huawei*, 2017 U.S. Dist. LEXIS at *33.

**C.    Second Server (First Family)**

| Claim Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "Second server" <br><br> ('391 Pat., cl. 1, 2, 17, 21, 24, and 25) | "A server that is not the client device or first server" | Plain and ordinary meaning |

In the case of *Luminati Networks Ltd. v UAB Tesonet et al.*, case no. 2:18-cv- 299 ("Tesonet Case"), the Court issued a claim construction order regarding another patent in the same family and sharing the same specification, finding "client device" to mean "a device that is operating in the role of a client by requesting services, functionalities, or resources from other devices." Ex. F, Tesonet Case at ECF 121 at 51. Here, Defendants request the Court to simply enter a construction of plain and ordinary meaning to leave them free to assert that client devices and servers are interchangeable general use computers. This position is clearly inconsistent with the claim language, specification and '614 patent prosecution history. Consequently, Luminati asks for a claim construction clarifying that client devices use a client dedicated operating system.

During prosecution of the '614 Patent, the inventor took clear positions overcoming prior art by distinguishing client devices from server devices. For example in the inventor's May 15, 2019 response to an office action ("Action"), the inventor asserted the following argument:

> "Client vs. server actions.
>
> The Action is based on the Sigurdsson reference to teach the limitations of "A method for use with a resource associated with a criterion **in a client device** that communicates with a server over the Internet, **the client device** is identified in the Internet using a first identifier and is associated with first and second state according to a utilization of the resource, the method comprising ... sending, **by the client device,** the first identifier to the server over the Internet; periodically or continuously determining, **by the client device,** whether the resource utilization satisfies the criterion; responsive to the determining that the utilization of the resource satisfies the criterion, shifting, **by the client device** to the first state or staying in the first state; responsive to the determining that the utilization of the resource does not satisfy the criterion, shifting, **by the client device** to the second state or staying in the second state; ...". (Emphasis added).
>
> However, the Action equates the various recited steps to action performed by the server device 106, which is clearly a server device and NOT a client device. The Sigurdsson reference is silent regarding any client device associated with a resource or with a criterion as recited in the claim, the Sigurdsson reference is silent regarding any client device periodically or continuously determining a state based on the resource and any criterion, and is further silent regarding any shifting between states of any client device, as recited in the claim."

16

Appx9352

*See. e.g.* Ex. E at LUM-00148121-22. (emphasis in original).

The patentee distinguished between "client devices" and "servers" consistent with the language of the '614 patent claims, and the prosecution history disavows the broader claim scope that Defendants would apply under their version of "plain and ordinary meaning." *See Rheox, Inc. v. Entact, Inc.,* 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.") (quoting *Standard Oil Co. v. Am. Cyanamid Co*., 774 F.2d 448, 452 (Fed. Cir. 1985); *Poly-America, L.P. v. API Indus., Inc.,* 839 F. 3d 1131, 1136-37 (Fed. Cir. 2016) (arguments in prosecution history may disavow broader claim scope).

Luminati's proposed claim construction is also consistent with the '614 Patent specification, which discloses that "[a] client device (in server/client architecture) typically receives information resources, services, and applications from servers, and is using a client dedicated or oriented operating system." Ex. C at 7:6-9; *see also Id*. at 75:35-59 ("Each of the network elements herein, such as the first, second, and third servers, may store, operate, or use, a server operating system … Each of the network elements herein, such as the first, second, and third devices, may store, operate, or use, a client operating system…"); *see also, e.g.* Ex. C at Abstract; 4:40-8:59; 7:6-26; 52:48-51; 62:33-40; 75:35-59; 83:4-15; 95:4-61. Consistent with the patent prosecution history and this disclosure, in Dr. Rhyne's opinion, "a POSA would understand the term "client device" to refer to "a device using a client dedicated operating system and operating in the role of the client by requesting services, functionalities, or resources from servers." Ex. D at ¶ 31.

Appx9353

Patent Owner respectfully submits that the issue of claim construction presents a threshold issue in connection with the determination of whether to institute.    More specifically, in discussing claim construction, Petitioners misleadingly cite to a paper that Patent Owner filed in the 395 District Court case in opposition to a motion to dismiss. (Paper 5 at 13-14)  Petitioners characterized the opposition paper as "confirm[ing] that Luminati [Patent Owner] views a 'server' and 'client' to be broad enough to encompass one another, and that Luminati [Patent Owner] equates the 'client device' with 'the agent,'" (Paper 5 at 13-14).

What Petitioners' *omitted from the record before the Board* was a subsequent paper (a sur-reply – Ex. 2010) that Patent Owner also filed in the 395 District Court case that further explained the annotated figure (Fig. 3) that Petitioners included and discussed in the Petition. (Paper 5 at 14).   The sur-reply explained in detail the mischaracterizations regarding the figure:

> Having   ignored   the   claim   language,   Defendants   attempt   to
> mischaracterize the specification to read the server-client device-web
> server architecture out of the claims.  Reply at 3-6.  In the Opposition,
> Figure 3 of the '319 and '510 Patents and 12a of the '614 Patent are
> used to illustrate lines of communication showing the steps performed
> by the proxy client device.  Defendants attempt to use these specific
> figures to improperly limit the express language *by mischaracterizing
> Luminati as "view[ing] a 'server' and 'client' to be broad enough to*

19

> *encompass one another.*" Reply at 4, 5.  *This is not true* as Luminati
> provided extensive support from the specifications of the Asserted
> Patents distinguishing between client devices and servers.  *See e.g.*,
> Opp. at 3-5 and 17-19. (emphasis added)

Ex. 2010, pages 10-11 of the PDF.

Patent Owner had filed the sur-reply on May 5, 2020, so Petitioners could have supplied the paper to the Board in their July 14, 2020 Petition to present a more complete, accurate accounting of the statements made in the 395 District Court case.

Additionally, in ruling on the motion to dismiss, the District Court concluded that "[t]he Court is persuaded that claim construction could be of benefit in addressing this issue as it is presented in this case."  (Ex. 2011 at 5).  The Court therefore DENIED the motion to dismiss without prejudice to refiling after the Court issues its claim construction order.[8]  (*Id.*)  The Court's order issued on July 15, 2020 – one day after Petitioners filed the instant Petition – so Petitioners could not have submitted the order with the Petition.[9]

---

[8] The Court noted that should Defendants elect to refile their motion, they must either address the eligibility of each asserted claim or make an adequate showing of the representativeness of any claims addressed as representative. (*Id.*)

[9] Notably, Petitioners did not submit the Court's order (Ex. 2009) in their Petition (Paper 5) seeking review of US Patent No. 10,484,510 (Case IPR2020-01358) which was submitted on July 28, 2020, even though Petitioners were advancing essentially the same arguments.

Patent Owner submits that the foregoing illustrates why, consistent with *Fintiv* factor 3, the Board should decline to institute because the Court has already addressed and will soon be further addressing a number of the exact same issues before the Board.  Notwithstanding, should the Board decide to proceed and to address claim construction, Patent Owner provides the following proposed constructions and support for terms likely at issue in this proceeding, taken from ECF 105-1, chart attachment to Joint Claim Construction and Prehearing Statement filed August 18, 2020 (Ex. 2002):

| Term | Proposed Construction | Support |
|------|----------------------|---------|
| Preamble | Is a limitation | |
| "Client device" | "Consumer computer" | Intrinsic Evidence: Figs. 1, 2, 3, 6 and associated discussion in specification; 2:8-23; 2:44-46; 2:40-52; 4:41-5:7; 5:21-41; 5:49-57; 9:12-9:50; 12:33-12:56; 12:62-13:3; 14:62-15:11; '319 Patent claim 1, 26; LUM-00149131-149135 [ATTACHED TO CLAIM CONSTRUCTION REPLY]; <br><br> Extrinsic Support: <br><br> Expert declaration/testimony; <br><br><br> PC Mag Encyclopedia: Definition of "computing device": "Any electronic equipment controlled by a CPU, including desktop and laptop computers, smartphones and tablets. It usually refers to a general-purpose device that can accept software for many purposes in contrast with a dedicated unit of equipment such as a network switch or router." <br> https://www.pcmag.com/encyclopedia/term/66551/computing-device <br><br> LUM-00003575 <br><br> RFC 1983 at 11: Definition of "client": A computer system or process that requests a service of another computer system or process. A workstation requesting the contents of a file from a file server is a client of the file server. <br> https://tools.ietf.org/html/rfc1983 |

Patent Owner also respectfully notes that the "plain and ordinary meanings" advanced by Petitioners are at complete odds with the express language of the claims.  For example, Petitioners have advanced a theory that a "client device" and a "server" refer only to the *role* that a device is currently performing.  Thus, even though claim 1 expressly recites "[a] method *by the first client device* comprising …," under Petitioners' theory the client device would (presumably) switch between the role of "client" (when requesting content) and "server" (when responding to a request from another device).  Patent Owner submits that any such interpretation of the claims would be nonsensical and "unreasonable."  *See* July 2019 PTAB Trial Practice Guide Update at 19.

## VI.    THE ART CITED IN THE ALLEGED GROUNDS

The Grounds identify three primary references, plus one Network Working Group "Request for Comments" and the "knowledge of a POSA." (Paper 5 at 5-6). A brief summary of each of the primary references follows.

### A. CROWDS

Crowds (Ex. 1011) describes a system comprised of groups ("crowds") of user computers that can interact with one or more web servers. (Ex. 1011 at 8-9, Dr. Rhyne Dec. Ex. 2012 at ¶22).  In order to participate in a crowd, a user installs

25

## A. GROUND 1: FAILURE OF CROWDS TO ANTICIPATE CLAIM 1

As discussed above, Crowds generally discloses a system comprised of a "crowd" of user computers that can interact with one or more web servers. Each user computer runs a process called a "jondo" that allows the computer to (if admitted) join a crowd. Crowds does not disclose – and Petitioners do not allege that Crowds discloses - any "second server" outside of the various members of the crowd. Instead, Petitioners allege that a member of the Crowd – "jondo 4" would be the "second server" recited in Challenged Claim 1 ("the 'second server' would be jondo '4'") (Paper 5 at 19-20).

When describing Crowds, Petitioners also allege that "[i]n Crowds, a user's request to a web server is *not passed directly to the web server*, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again." (Paper 5 at 17)(emphasis added). This allegation is untrue, and misrepresents the disclosure of Crowds. As discussed above, the forwarding of requests from jondo-to-web server or from jondo-to-jondo-to-web server is based on the flip of a (logical) biased coin. (Crowds Exhibit 1011 at 8). Crowds expressly states that when a jondo receives a request from a user's browser, "the jondo picks a jondo from the crowd (*possibly itself*) at random, and forwards the request to it." (*Id.*)(emphasis added). Thus, a jondo may decide to forward a

35

user's request directly to a web server, without forwarding the request to any other user/jondo.

Because of the architecture and operation of Crowds, the *initiator* of a request does not (necessarily) enjoy anonymity as to the target web server.  Rather, the system of Crowds merely offers an initiator "some degree of deniability" that it originated a particular request. (Crowds Ex. 1011 at 2).  Moreover, the architecture of Crowds leads to unpredictable or "particularly pronounced" latency (*Id*. at 19).  Contrary to the deficiencies of Crowds, even Petitioners acknowledged that Crowds fails to achieve the claimed benefits of the '319 Patent – "congestion and latency reduction and anonymity …" (Paper 5  at 51).

Comparing Crowds to the express limitations of Challenged Claim 1, a number of the express limitations are neither taught nor suggested, including:

| Preamble: "second server" | Crowds fails to disclose a "second server" |
| | Crowds fails to disclose a "second server" that does not communicate directly with a web server |
| "receiving, from the second server …" | Crowds fails to disclose a "second server" |

| | Crowds fails to disclose "receiving, from the second server …" |
|---|---|
| "sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier." | Crowds fails to disclose sending the first content by the first client device to the second server<br><br>Crowds fails to disclose that the first content is sent to the second server in response to receiving of the first content identifier [from the second server] |

Because the architecture and operation of Crowds differs from the "second server – client first device – web server" architecture/operation of the '319 patent, Crowds neither teaches nor suggests the method of Challenged Claim 1.  At least for the above reasons, Ground 1 fails.

## B. GROUND 2: FAILURE OF CROWDS + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "Ground 2 combines the teaching of Crowds with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications." (Paper 5 at 30).  As to Claim 1, Petitioners offer no evidence

forwards the URL content to the downstream proxy server and parses the URL content to obtain the embedded object *prior to the web browser having to issue an embedded object request message*." (Border Ex. 1017 at 2:54-58)(emphasis added)

Because Border addresses completely different issues than the issues solved by the '319 Patent, the architecture and operation of Border is completely different than Challenged Claim 1. Comparing Border to the express limitations of Challenged Claim 1, a number of the express limitations are neither taught nor suggested, including:

| | |
|---|---|
| Preamble: "first client device" | Border fails to disclose a "first client device" that communicates with a "first server" (a "web server") |
| "receiving, from the second server …" | As the claimed method is performed by the "first client device," Border fails to disclose a "first client device" that performs "receiving, from a second server …" |
| "sending, to the first server …." | Broder fails to disclose a "first client device" that performs "sending, to the first server …" |

| | |
|---|---|
| "receiving, the first content from the first server …." | Border fails to disclose a "first client device" that performs "receiving, the first content from the first server …" |
| "sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier." | Border fails to disclose sending the first content by the first client device to the second server<br><br>Broder fails to disclose that the first content is sent to the second server in response to receiving of the first content identifier [from the second server] |

Like the arguments advanced in each Ground, Petitioners' argument, in large part, is based on unreasonable interpretation of the claim language. By way of example, Petitioners' position as to how "the preamble [of claim 1] maps onto Border" is as follows:

"First **client device**: Upstream **server** 107" (Petition at 40)(emphasis added)

40

Appx9472

Petitioners' entire discussion and analysis of Challenged Claim 1 repeats this same false premise – that the claimed "first *client* device" is somehow met by "Upstream *server* 107." (*Id.*)  Petitioners ignore the express limitations of the claims regarding the identity of specific elements *and the claimed communications there-between*.

Because the architecture and operation of Border differs from the "second server – first client device – web server" architecture of the '319 Patent, Crowds neither teaches nor suggests the method of Challenged Claim 1.  At least for the above reasons, Ground 3 fails.

### D. GROUND 4: FAILURE OF CROWDS + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "Ground 4 is based upon a combination of the teaching of Border with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications." (Paper 5 at 49).  As to Claim 1, Petitioners offer no evidence beyond hindsight that "[e]ven if 'first client device' is construed to refer to a consumer computer instead of a device acting in the role of a client, it would have been obvious to a POSA, in view of RFC 2616 and a POSA's knowledge of Internet communications in 2009 to modify upstream server 107 to operate on a consumer computer." (Paper 5 at 50-51).

41

Petitioners *re-imagined* architecture of MorphMix is simply not what is disclosed. MorphMix unambiguously discloses a different architecture and operation than the method of Challenged Claim 1. And because of these differences, MorphMix suffers from the problems discussed above – problems which are not present in the invention of Challenged Claim 1.

Comparing MorphMix to the express limitations of Challenged Claim 1, a number of the express limitations are neither taught nor suggested, including:

| Preamble: "second server" | MorphMix fails to disclose a "second server" |
|---|---|
| "receiving, from the second server …" | MorphMix fails to disclose a "second server"<br><br>MorphMix fails to disclose "receiving, from the second server …" |
| "sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier." | MorphMix fails to disclose sending the first content by the first client device to the second server<br><br>MorphMix fails to disclose that the first content is sent to the second server in |

44

| | response to receiving of the first content identifier [from the second server] |
| --- | --- |

Because the architecture and operation of MorphMix differs from the "second server – first client device – web server" architecture of the '319 Patent, MorphMix neither teaches nor suggests the method of Challenged Claim 1.  At least for the above reasons, Ground 5 fails.

## F.  GROUND 6 FAILURE OF MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "the rationale for combining Crowds with the same general knowledge of a POSA and RFC 2616" "is the same for MorphMix as for Crowds …" (Paper 5 at 69).  Thus, Ground 6 (pertaining to MorphMix) fails for at least the same reasons explained above as to Ground 2 (pertaining to Crowds).

In advancing Ground 6, Petitioners again rely on pure hindsight to allege that "it would have been obvious" to incorporate a "second server" into MorphMix. (Petition at 69-70).  And again, the Federal Circuit has cautioned that hindsight analysis – as engaged in by Petitioners – is impermissible and cannot form the basis for obviousness pursuant to 35 USC 103. (*See KSR Int'l Co. v. Teleflex, Inc.* 550 U.S. 398, 421, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ("A factfinder should be