**VOLUME IV OF V, PAGES Appx21753-40491**

**2023-2144, 2023-2145, 2023-2146, 2023-2147,
2023-2414, 2023-2415, 2023-2442 and 2023-2443**

# United States Court of Appeals
# for the Federal Circuit

BRIGHT DATA LTD.,

*Appellant,*

– v. –

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB, OXYSALES, UAB, THE DATA COMPANY TECHNOLOGIES INC., MAJOR DATA UAB, CORETECH LT, UAB,

*Appellees.*

*On Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-00103, IPR2022-00135, IPR2022-00138, IPR2022-00353, IPR2022-00915, IPR2022-00916, IPR2021-01492, IPR2022- 00861, IPR2021-01493 and IPR2022-00862*

## JOINT APPENDIX

KORULA T. CHERIAN
ROBERT M. HARKINS, JR.
CHERIAN LLP
2001 Addison Street, Suite 275
Berkeley, California 94704
(510) 944-0190
sunnyc@cherianllp.com
bobh@cherianllp.com

THOMAS M. DUNHAM
RONALD R. WIELKOPOLSKI
CHERIAN LLP
1901 L Street NW, Suite 700
Washington, DC 20036
(202) 838-1560
tomd@cherianllp.com
ronw@cherianllp.com

*Counsel for Appellant*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (323482)

DANIEL S. LEVENTHAL
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
(713) 651-5151
daniel.leventhal@nortonrosefulbright.com

MARK T. GARRETT
STEPHANIE N. DEBROW
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
(512) 474-5201
mark.garrett@nortonrosefulbright.com
stephanie.debrow@nortonrosefulbright.com

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200
jonathan.franklin@nortonrosefulbright.com

*Counsel for Appellees Code200, UAB,
Teso LT, UAB, metacluster lt, UAB,
Oxysales, UAB, and coretech lt, UAB*

MICHAEL N. RADER
WOLF GREENFIELD & SACKS, PC
605 Third Avenue, 25th Floor
New York, New York 10158
(212) 697-7890
mrader@wolfgreenfield.com

ADAM WICHMAN
WOLF GREENFIELD & SACKS, PC
600 Atlantic Avenue, 23rd Floor
Boston, Massachusetts 02210
(617) 646-8000
awichman@wolfgreenfield.com

*Counsel for Appellee The Data Company
Technologies Inc.*

JASON R. BARTLETT
WENSHENG MA
MASCHOFF BRENNAN
450 Sansome Street, Suite 1005
San Francisco, California 94111
(418) 738-6334
jbartlett@mabr.com
vma@mabr.com

*Counsel for Appellee Major Data UAB*

# TABLE OF CONTENTS
# JOINT APPENDIX

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 37 | Final Written Decision: original (IPR2022-00103) | 5/30/2023 | Appx1 |
| 49 | Final Written Decision: original (IPR2022-00135) | 5/25/2023 | Appx151 |
| 50 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal Granting Motion to Exclude 35 U.S.C. § 318(a); 37 C.F.R. § 42.14; 37 C.F.R. § 42.64 (IPR2022-00138) | 5/9/2023 | Appx323 |
| 36 | Final Written Decision: JUDGMENT Final Written Decision Determining All Challenged Claims Unpatentable Granting Motions to Seal 35 U.S.C. § 318(a); 37 C.F.R. § 42.14(IPR2022-00353) | 6/27/2023 | Appx493 |
| 53 | Final Written Decision (IPR2021-1492) | | Appx647 |
| 53 | Final Written Decision (IPR2021-1493) | | Appx714 |
| 50 | Final Written Decision (IPR2022-0915) | | Appx957 |
| 50 | Final Written Decision (IPR2022-0916) | | Appx1045 |
| 1001 | Exhibit 1001 – United States Patent No. 11,044,342 (IPR2022-00103) | | Appx1137 |
| 1001 | Exhibit 1001 – United States Patent No. 10,257,319 (IPR2022-00135) | | Appx1170 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1001 | Exhibit 1001 - United States Patent No. 10,484,510 (IPR2022-00138) | | Appx1199 |
| 1002 | Exhibit 1002 - United States Patent No. 11,044,344 (IPR2022-00353) | | Appx1229 |
| | Certified Index (IPR2022-00103) | | Appx1439 |
| | Certified Index (IPR2022-00135) | | Appx1440 |
| | Certified Index (IPR2022-00138) | | Appx1442 |
| | Certified Index (IPR2022-00353) | | Appx1444 |
| | Certified List IPR2021-01492 | | Appx1445 |
| | Certified List IPR2021-01493 | | Appx1447 |
| | Certified List IPR2022-00915 | | Appx1449 |
| | Certified List IPR2022-00916 | | Appx1451 |
| | **IPR2022-00103** | | |
| 1 | 342 IPR Petition | 10/29/2021 | Appx1485 |
| 15 | Patent Owner Response [Public] | 9/14/2022 | Appx1775 |
| 21 | Petitioners' Reply | 12/16/2022 | Appx1916 |
| 34 | Petitioners' Updated Mandatory Notices | 3/22/2023 | Appx2080 |
| 1003 | Exhibit 1003: Freedman Declaration | 10/29/2021 | Appx2327 |
| 1004 | Exhibit 1004: Crowds | 10/29/2021 | Appx2391 |
| 1006 | Exhibit 1006: RFC 2616 | 10/29/2021 | Appx2418 |
| 1009 | Exhibit 1009: Opp to MTD | 10/29/2021 | Appx2873 |
| 1011 | Exhibit 1011: Teso CC Order | 10/29/2021 | Appx2943 |
| 1012 | Exhibit 1012: Code200 CC Order | 10/29/2021 | Appx2969 |
| 1013 | Exhibit 1013: Teso O2 Micro Motion | 10/29/2021 | Appx2996 |
| 1014 | Exhibit 1014: Teso Supp CC Order | 10/29/2021 | Appx3007 |
| 1018 | Exhibit 1018: '319 PH | 10/29/2021 | Appx3207 |
| 1019 | Exhibit 1019: '936 PH | 10/29/2021 | Appx3356 |
| 1024 | Exhibit 1024: '936 Patent | 10/29/2021 | Appx3907 |
| 1050 | Exhibit 1050: Williams Deposition Transcript | 12/16/2022 | Appx5448 |
| 2008 | Exhibit 2008 - select portions of 11044342 PH | 3/9/2022 | Appx5626 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2009 | Exhibit 2009 - select portions of 11044344 PH | 3/9/2022 | Appx5664 |
| 2019 | Exhibit 2019 - EDTX-2-19-cv-00395-47 Sur Reply | 3/9/2022 | Appx6294 |
| 2020 | Exhibit 2020 - EDTX-2-19-cv-00395-476 Order | 3/9/2022 | Appx6306 |
| 2021 | Exhibit 2021 - EDTX-2-19-cv-00395-303 Order | 3/9/2022 | Appx6319 |
| 2022 | Exhibit 2022 - EDTX-2-19-cv-00395-516 Jury Verdict | 3/9/2022 | Appx6334 |
| 2026 | Exhibit 2026 - Freedman Deposition Transcript 8.23.2022 | 9/14/2022 | Appx6493 |
| 2029 | Exhibit 2029 - EDTX-2-21-cv-225-146 | 9/14/2022 | Appx6584 |
| 2030 | Exhibit 2030 - CONSUMER _ Cambridge English Dictionary | 9/14/2022 | Appx6632 |
| 2031 | Exhibit 2031 - Cambridge Advanced Learners Dictionary | 9/14/2022 | Appx6644 |
| 2032 | Exhibit 2032 - Cambridge Academic Content Dictionary | 9/14/2022 | Appx6649 |
| 2033 | Exhibit 2033 - CONSUMER _ Collins English Dictionary | 9/14/2022 | Appx6651 |
| 2034 | Exhibit 2034 - Collins COBUILD Advanced Dictionary | 9/14/2022 | Appx6664 |
| 2035 | Exhibit 2035 - Network Fundamentals Study Guide | 9/14/2022 | Appx6668 |
| 2036 | Exhibit 2036 - Computer Networks 5th ed | 9/14/2022 | Appx6677 |
| 2037 | Exhibit 2037 - Computer Networks 4th ed | 9/14/2022 | Appx6684 |
| 2045 | Exhibit 2045 - EMK acquires Luminati | 9/14/2022 | Appx6786 |
| 2046 | Exhibit 2046 - Frost Sullivan Report (2019) | 9/14/2022 | Appx6833 |
| 2065 | Exhibit 2065 - Williams Declaration [Public] | 9/14/2022 | Appx7160 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2071 | Exhibit 2071 - Patent Owner's Demonstrative Exhibits | 3/9/2023 | Appx7295 |

## IPR2022-00135

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review | 11/3/2021 | Appx7355 |
| 23 | Petitioner's Reply to Patent Owner's Response | 11/16/2022 | Appx7876 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/3/2021 | Appx9181 |
| 1005 | Exhibit 1005 - Patent Owner's Opening Claim Construction Brief, Luminati Networks Ltd. v. Teso LT et al., 2:19-cv-00395-JRG | 11/3/2021 | Appx9338 |
| 1008 | Exhibit 1008 - Corrected Patent Owner's Preliminary Response, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/3/2021 | Appx9451 |
| 1010 | Exhibit 1010 - U.S. Patent Application Publication No. 2008/0228938 ("Plamondon") | 11/3/2021 | Appx9493 |
| 1080 | Exhibit 1080 - U.S. Patent Application Publication No. US 2003/0009518 (Harrow) | 11/16/2022 | Appx16828 |
| 1108 | Exhibit 1108 - Declaration of Dr. Vernon Thomas Rhyne III in Support of Plaintiff Luminati Network Ltd.'s Claim Constructions, Bright Data Ltd. v. Teso LT et al. (E.D. Tex. Sept. 29, 2020) | 11/16/2022 | Appx17940 |
| 1110 | Exhibit 1110 - Non-Final Office Action mailed March 23, 2022, Reexamination No. 90/014,876 | 11/16/2022 | Appx18038 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1111 | Exhibit 1111 - Final Office Action mailed June 21, 2022, Reexamination Nos. 90/014,827 & 90/014,624 | 11/16/2022 | Appx18131 |
| 1115 | Exhibit 1115 - Complaint, Luminati Networks Ltd. v. Teso LT et al. (E.D. Tex. Dec. 6, 2019) | 11/16/2022 | Appx18218 |
| 2002 | Exhibit 2002 - US10469614 | 3/8/2022 | Appx18549 |
| 2009 | Exhibit 2009 - EDTX-2-19-cv-00395-145 Reply | 3/8/2022 | Appx18951 |

## IPR2022-00138

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petitioner for Inter Partes Review | 11/4/2021 | Appx20128 |
| 1003 | Exhibit 1003 - Declaration of Prof. Dave Levin ("Levin") | 11/4/2021 | Appx21753 |
| 1008 | Exhibit 1008 - Patent Owner's Preliminary Response, Code200 UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx21964 |
| 1067 | Exhibit 1067 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27389 |
| 1068 | Exhibit 1068 - Decision Denying Institution of Inter Partes Review, Code200, UAB, et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27401 |
| 1069 | Exhibit 1069 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01266 | 11/4/2021 | Appx27404 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1070 | Exhibit 1070 - Petition for Inter Partes Review, Code200, UAB et al. v. Luminati Networks Ltd., IPR2020-01358 | 11/4/2021 | Appx27486 |

## IPR2022-00353

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | 344 IPR Petition | 12/23/2021 | Appx32756 |
| 2025 | Exhibit 2025 - Williams Declaration [Public] | 9/19/2022 | Appx38198 |

## IPR2021-01492

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of US Patent No. 10,257,319 | 9/3/2021 | Appx38947 |
| 12 | Institution Decision: Grant | 3/21/2022 | Appx39170 |
| 20 | Order: Termination as to Petitioner | 5/27/2022 | Appx39238 |
| 25 | Institution decision and grant of joinder, IPR2022-00861 | 10/19/2022 | Appx39297 |
| 40 | Petitioners' Reply to Patent Owner's Opposition | 3/20/2023 | Appx39580 |
| 41 | Patent Owner's Sur-Reply | 5/1/2023 | Appx39627 |
| 51 | Other: Hearing transcript | 6/9/2023 | Appx39752 |
| 1005 | Expert Declaration of Keith J. Teruya | 9/3/2021 | Appx40448 |
| 1008 | Ex. 1008 (MorphMix) | 9/3/2021 | Appx40570 |
| 1012 | Ex. 1012 (US6,795,848 to Border) | 9/3/2021 | Appx41496 |
| 1021 | Ex. 1021 (EDTX-2-19-cv-00395 Pre-trial Transcript) | 9/3/2021 | Appx41946 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1102 | EDTX-2-21-cv-00225 Docket Sheet | 1/18/2022 | Appx42187 |
| 1111 | Ex. 1111 - Deposition Transcript of Dr. Tim A. Williams, dated February 23, 2023 | 3/20/2023 | Appx42574 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx45236 |

### IPR2021-01493

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 2 | Petition for Inter Partes Review of U.S. Patent No. 10,484,510 | 9/3/2021 | Appx46015 |
| 19 | Order: Dismissing Petitioner From the Proceeding | 5/27/2022 | Appx46300 |
| 24 | Institution decision and grant of joinder, IPR2022-00862 | 10/19/2022 | Appx46356 |
| 2065 | EX. 2065 - Williams Declaration [Public] | 1/6/2023 | Appx52520 |

### IPR2022-00861

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx53405 |

### IPR2022-00862

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 7 | Motion for Joinder | 4/18/2022 | Appx58751 |

**IPR2022-00915**

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx64071 |
| 14 | Decision denying Motion for Joinder | 7/29/2022 | Appx64264 |
| 1111 | Deposition Transcript of Dr. Tim A. Williams | 3/20/2023 | Appx67615 |
| 2013 | EX. 2013 - EDTX-2-19-cv-395-282 | 6/23/2022 | Appx69372 |

**IPR2022-00916**

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 1 | PETITION FOR INTER PARTES REVIEW | 4/21/2022 | Appx71096 |
| 14 | Decision Denying Motion for Joinder | 7/29/2022 | Appx71292 |

this example Plamondon's appliance 200 has a network communication with the "branch office client" over the Internet. Plamondon's Figure 1A, 1B, and 1C clearly identify the connection between appliance 200 and client 102 as network 104. In other words, in this example, network 104 is an Internet connection between appliance 200 and branch office client 102.

153. In Plamondon Figure 1A below, color annotations are added to indicate the correspondence between the Plamondon "**client 102**" and the '510 patent claim 1 "**second server**"; Plamondon's "**appliance 200**" and the claim 1 "**client device**," and Plamondon's "**web server 106**" with the claim 1 "**web server**."



FIG. 1A

154.   Annotated Fig. 1A shows multiple **clients**, **appliances**, and **servers**.

155.   Plamondon explains that "**appliance 200** is a device for accelerating, optimizing or otherwise improving the performance…of any type and form of network traffic."  [0206].  **Appliance 200** does this, in part, by:

(a)   Acting "as a proxy between a **client** requesting objects [*e.g.*, web pages] and an object **server** responding to **client** requests."  [0048].  The **server** may be a "**web server**."  [0045], [0210], [0212], [0418], [0421].

(b)   Retrieving from servers, and caching (*i.e.*, storing), objects that it can serve to a **client** in response to a **client's** request.  [0048]-[0053], [0442]-[0453].

156.   Annotated Fig. 1C (below left, with Petitioner's annotations) shows one "**client**…access[ing] a **server** via a single network optimization **appliance**" ([0144]), which parallels the Patent Owner's mapping of claim 1 to '510 patent Fig. 3 (below right, with Patent Owner's annotations, Ex. 1005, 4):

**Plamondon, Fig. 1C (color added)**     **'510 Patent, Fig. 3 (color added)**




- 61 -

157.   Though illustrated with distinct icons in Figs. 1A and 1C, "**client 102**, **server 106**, and **appliance 200**…may be deployed as…<u>any type and form of computing device</u>," identified generically as "computing device 100." [0229]; *see also id.* ("computing device 100 [is] useful for practicing an embodiment of the **client 102**, **server 106** or **appliance 200**"). "[C]omputing device 100 [and thus each **client 102**, **server 106**, and **appliance 200**] can be <u>any</u>…desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone…or other form of computing or telecommunications device." [0238].

158.   In short, Plamondon explains that any general-purpose computer from 2007 can be configured to fill the role of client, server, or appliance (the proxy). Among other things, Plamondon makes this clear by an extended recital of generic hardware and software components that can be assembled to form a typical computer. ([0229]-[0238].)   To serve as computing device 100 or any network component like a client, application, or server—or in the '510 patent claim 1 phrasing, server or client device—the components only need to be capable of communication and have sufficient processing power and memory to provide the required functionality for that component. [0238].

159.   Plamondon explains that **client 102** "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u> providing access to hosted applications <u>for other clients</u> 102*a*-102*n*." [0210];

- 62 -

Appx21755

*see also* [0285].  Plamondon further explains that **appliance 200** can be a "separate device" or it "could be a part of any **client 102** or **server 106**." [0227].  Plamondon also explains that **servers 106** include web servers hosting web objects (*e.g.*, web pages, files, applications) using well-known Internet protocols (*e.g.*, HTTP). [0210], [0212], [0246], [0421], [0463], [0498].

160.   From its specification and Figs. 1A and 1C, Plamondon discloses the following architecture.



161.   **Appliance 200** improves communications in several ways. Plamondon's Figures 6A-6B, for example, illustrate **appliance 200** acting as a proxy device with a cache between **client 102** and **server 106**.

- 63 -





162.   At step 605, "the **appliance 200** intercepts or otherwise receives any type and form of request for an object from a **client 102**."  [0445].  At step 610, the **appliance 200** determines if the requested object is in its cache.  If it is, at step 615, the **appliance 200** transmits "the cached object to the **client 102** in response to the client's request."  [0446]-[0447].  At step 620—which occurs before, after, or simultaneously with step 615—the **appliance** transmits a request for a status of the object from a **server 106**.  *Id.*  "At step 625, the **appliance 200** receives a status of the object or an updated copy of the object from the **server**," updates its cache and transmits the object to **client 102**.  [0450]-[0451]

### 2.    Claim 1.

163.   Claim 1 recites in full, with annotations added to delineate claim elements as in the Petition claim listing:

1. [**1P**] A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified

- 64 -

Appx21757

by a first content identifier, the method by a **first client device** comprising:

[**1A**] establishing a Transmission Control Protocol (TCP) connection with a **second server**;

[**1C**] sending, to the **web server** over an Internet, the first content identifier;

[**1D**] receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and

[**1E**] sending the received first content, to the **second server** over the established TCP connection, [**1B**] in response to the receiving of the first content identifier.

Ex. 1001, 19:18-31.

### a.    Preamble [1P]

164.   The district court determined that the claim 1 preamble is limiting.  In this subsection, I point out the correspondence between Plamondon and the requirements in the claim 1 preamble.  Plamondon discloses subject matter meeting every requirement in the claim 1 preamble.

165.   Applying the Patent Owner's color annotations, the claim 1 preamble starts:

[**1P**] A method for use with a **web server** that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified

- 65 -

by a first content identifier, the method by a **first client device** comprising:

166. Plamondon's **appliance 200** is the "**first client device**" in a communication path between **client device 102** ("**second server**", below) and **server 106** ("**web server**"). *E.g.*, Figs. 1A-1C, [0048], [0052], [0077], [0421], [0672]. When **appliance 200** requests, from **server 106**, object(s) on behalf of **client 102** (or forwards **client 102's** request to **server 106,** [0449]), **appliance 200** acts "in the role of a client" under EDTX's construction of "**first client device**." Ex. 1006, 12. *See* [0048]-[0052], [0444]-[0451], Figs. 6A-6B.

167. Plamondon's **appliance 200** is implemented on computing device 100, which can be any "consumer computer" under PO's proposed construction (Ex. 1005, 13). [0229] (**appliance 200** "may be deployed as and/or executed on any type and form of computing device" such as "computing device 100"); [0238] ("computing device 100 can be any workstation, desktop computer, laptop or notebook computer, server, handheld computer, mobile telephone, smart phone").

168. It was well-known in the art in 2009 that a "web server" refers to both hardware and software. The web server hardware is a computer that stores a website's component files and stores and executes web server software, which connects to the Internet and supports data exchange with other web-connected devices. The web server software includes several components that control how web

- 66 -

users access hosted files like HTML documents, images, CSS stylesheets, and Javascript files. The web server is an HTTP server, which is software that understands URLs and HTTP, accepts HTTP requests, and (when it has the requested content) can respond by delivering the requested content. In the context described above, Plamondon is referring to both the web server hardware and software.

169. Two patent application publications from the relevant time frame demonstrate this usage of "web server" in the art. U.S. Patent Application Publication No. 2008/0072178, "Graphical User Interface (GUI) For Displaying Software Component Availability As Determined By A Messaging Infrastructure," to Budzisch et al ("Budzisch") was published on March 20, 2008. At Ex. 1028, ¶ [0007], it explains:

> The term "web server" 104 is largely understood to mean being capable of presenting a web-based interface (e.g., through the downloading of web pages scripted in HTML format) over a network 101. Accesses to specific web pages associated with the web-based presentation are typically formatted in the HTTP protocol.

170. U.S. Patent Application Publication No. 2002/0178217, "Method and Apparatus For Scanning A Web Site In A Distributed Data Processing System For Problem Determination," to Nguyen et al. ("Nguyen") was published on November

- 67 -

28, 2002.  It gives a lengthy description of the basic well-known pieces used for

World Wide Web content delivery, Ex. 1029 at ¶ [0006]:

> In the Web environment, servers and clients effect data transaction using the Hypertext Transfer Protocol (HTTP), a known protocol for handling the transfer of various data files (e.g., text, still graphic images, audio, motion video, etc.).  Information is formatted for presentation to a user by a standard page description language, the Hypertext Markup Language (HTML).  In addition to basic presentation formatting, HTML allows developers to specify "links" to other Web resources identified by a Uniform Resource Locator (URL). A URL is a special syntax identifier defining a communications path to specific information. Each logical block of information accessible to a client, called a "page" or a "Web page", is identified by a URL. The URL provides a universal, consistent method for finding and accessing this information[.] . . . Retrieval of information on the Web is generally accomplished with an HTML-compatible browser that browses web sites. A web site is a group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web. The HTML documents in a web site generally cover one or more related topics and are interconnected through hyperlinks. Most web sites have a home page as their starting point, which frequently functions as a table of contents for the site.  Many large organizations, such as corporations, will have one or more HTTP servers dedicated to a single web site. However, an HTTP server can also serve several small web sites, such as those owned by individuals.

171.   In this application, Nguyen Fig. 1 shows "server 114" instantiated on a general-purpose computer.  Nguyen describes web server software for "server 114," Ex. 1029 at ¶ [0028]:

> Server 114 as illustrated is a web server, also referred to as a HTTP server, is a server software that uses HTTP to serve up HTML documents and any associated files and scripts when requested by a client, such as a web browser. The connection between client and server is usually broken after the requested document or file has been served. HTTP servers are used on Web and Intranet sites. A target resource that is scanned by agents may include other resources in addition to a web server. For example, without limitation, a target resource may be a web site[.]

172.   Plamondon's **server 106** is the "**web server**."  [0210] ("Servers 106 may be...web servers[.]"), [0212], [0045], [0210], [0418], [0421].  Plamondon's **server 106** is also an HTTP server.  For example, Plamondon describes **client 102** transmitting an HTTP request to **server 106** and "[i]n response to the request, the **server** transmits an HTTP response." [0598]; *see also* Abstract, [0105], [0212], [0270], [0421]-[0422], [0445], [0463], [0498], [0639], [0641].

173.   Plamondon's **server 106** stores content in the form of web objects (*e.g.*, web pages) identified by URLs.  "[T]he **appliance 200** intercepts a <u>web or HTTP page</u> transmitted by a **server 106** to a **client 102** and the page includes a <u>uniform resource locator (URL) or hyperlink identifying an object</u>."  [0463].  The web or

- 69 -

HTTP pages in Plamondon are examples of "first content," while the URL or hyperlink is the "first content identifier."  It was well-known in the art by 2009 that a URL, or the URL's more general form the Uniform Resource Identifier (URI), identified content located on the Internet.

174.   The web or HTTP pages in Plamondon are examples of "first content," while the URL or hyperlink is the "first content identifier."  This is consistent with the usage in the challenged claims.  For example, '510 patent claim 20 (depending from claim 1) clarifies that "the first content comprises [a] web-page" and "the first content identifier comprises a Uniform Resource Locator (URL)."  *See also* Plamondon, [0488] (when intercepting pages from **server 106** that were requested by **client 102**, **appliance 200** "identifies a <u>uniform resource locator (URL) for an intercepted page, which may identify one or more objects associated with the page</u>"), Figs. 6A-6B (step 625), [0011]-[0012].

175.   RFC 1738, "Uniform Resource Locators (URL)," by Tim Berners-Lee et al., was published in 1994.  RFC 1738 defines the URL and its use as a content address and identifier in networking.  RFC 1738 explains that when used in HTTP, "[t]he HTTP URL scheme is used to designate Internet resources." Ex. 1011 ¶¶ 15, Ex. 1016, § 3.3 at 9.

176.   RFC 1630, "Uniform Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as

used in the World-Wide Web," also by Tim Berners-Lee, was also published in 1994 and defines the earlier and related concept of a Uniform Resource Identifier or URI. RFC 1630 explains that "In order to abstract the idea of a generic object, the web needs the concepts of the universal set of objects, and of the universal set of names or addresses of objects. A Universal Resource Identifier (URI) is a member of this universal set of names in registered name spaces and addresses referring to registered protocols or name spaces. A Uniform Resource Locator (URL), defined elsewhere [in RFC 1738], is a form of URI which expresses an address which maps onto an access algorithm using network protocols." Ex. 1011 ¶ 14; Ex. 1015, Introduction at 1.

177. Anyone working in networking in 2009 would have understood that both a URL and a URI identify web page content.

178. Contemporary publications confirm that it was well-understood to use a URI or a URL as a content identifier in a networking system. For example, U.S. Patent No. 7,761,500, "URL Based Communication Protocol From A Client Computer to A Network Device," to Eckert et al. issued on July 20, 2010 from an application filed February 29, 2000 ("Eckert"). It describes a proxy system where "A proxy…receiv[es] requests for a URI…forward[s] the reformatted request toward the server identified by the URI." Ex. 1032, 8:28-31. More generally, it explains at 9:33-52:

URIs have been known by many names: WWW addresses, Universal Document Identifiers, Universal Resource Identifiers, and finally the combination of Uniform Resource Locators (URL) and Names (URN). As far as HTTP is concerned, Uniform Resource Identifiers are simply formatted strings which identify—via name, location, or any other characteristic—a network resource.

URIs in HTTP can be represented in absolute form or relative to some known base URI, depending upon the context of their use. The two forms are differentiated by the fact that absolute URIs always begin with a scheme name followed by a colon. . . . The "http" scheme is used to locate network resources via the HTTP protocol. This section defines the scheme-specific syntax and semantics for http URLs.

179.   The URL role as a content identifier is fundamental to Internet and network communication.  For example, Larry L. Peterson and Bruce S. Davie, "Computer Networks: A Systems Approach," (4th Ed. Elsevier 2007) ("Peterson") is a common and well-known networking reference used by students and professionals.  I have owned a copy of Peterson since 2002.  On page 4 it explains that "each selectable object on a [web] page is bound to an identifier for the next page to be viewed.  This identifier, called a Uniform Resource Locator (URL), is used to provide a way of identifying all the possible pages that can be viewed from your web browser." Ex. 1033, at 4; *generally id.* § 1.1 at 4-6.

Appx21765

180.   As Nguyen explained, it was well-known in 2009 that the Uniform Resource Locator (URL) identifies the content of a web page and where to find it on the World Wide Web.  It is a web page or resource address.  It contains the protocol used to access the resource, the server location (by IP address or domain name), and optionally the port number on the server. Ex. 1029, ¶ [0006] ("In addition to basic presentation formatting, HTML allows developers to specify "links" to other Web resources identified by a Uniform Resource Locator (URL).  A URL is a special syntax identifier defining a communications path to specific information. Each logical block of information accessible to a client, called a "page" or a "Web page", is identified by a URL. The URL provides a universal, consistent method for finding and accessing this information[.]").

181.   This is consistent with usage in the challenged claims.  For example, claim 20 (depending from claim 1) clarifies that "the first content comprises [a] web-page" and "the first content identifier comprises a Uniform Resource Locator (URL)." *See also* Plamondon, [0488] (when intercepting pages from **server 106** that were requested by **client 102**, **appliance 200** "identifies a <u>uniform resource locator (URL) for an intercepted page, which may identify one or more objects associated with the page</u>"), Figs. 6A-6B (step 625), [0011]-[0012].

182.   Plamondon's **appliance 200** performs claimed method steps 1A and 1C-1E as follows. This analysis does not treat the final clause in step 1E, which the

Patent Owner marks "1B," as a separate method step, but as shown below Plamondon nonetheless discloses that subject matter as well.

### b.    Step 1A

183.   Step 1A provides:

[**1A**] establishing a Transmission Control Protocol (TCP) connection with a **second server**;

184.   Under the EDTX construction, "**second server**" is "a device that is operating in the role of a server and that is not the **first client device**", while the Patent Owner argued for "a server that is not the **client device** or **web server**." Ex. 1009, 8-11; Ex. 1005, 13.   Plamondon's **client 102** is "computing device 100," [0229], and "can be any… server." [0238].  Further, it "has the capacity to function as both a client node seeking access to applications on a server <u>and as an application server</u>…for other clients." [0210].  *See also* [0285], [0443].  Plamondon describes using **appliance 200** with **client 102**.

185.   Various contemporaneous patent documents confirm that it was known in the art to define a server as a general-purpose computer acting as a server.  Eckert explains that "Any given program may be…both a client and a server." Ex. 1032, 7:61-64.  Similarly, U.S. Patent No. 6,351,775, "Loading Balancing Across Servers In A Computer Network," issued on February 26, 2003, and explains that "[a]ny

Appx21767

computer that performs a task at the command of another computer is a server." Ex. 1036, 1:43-44.

186.   Plamondon's **client 102** is distinct from **appliance 200** (the "first client device" in the claims) and from **server 106** (the "web server" in the claims), and thus also comprises the "**second server**" under Patent Owner's litigation construction.  Further, as explained above, at § VIII.A.1, Plamondon's **client 102** directly parallels the '510 patent's description of **client 102** that Patent Owner identified as the "**second server**" in court.

187.   Applying the construction explained above, Section VII.C, Plamondon describes **appliance 200** establishing a TCP connection with **client 102** via network stack 267.  Plamondon describes network stack 267 as a TCP/IP based stack to communicate on network 104 between **appliance 200** and **client 102**. *See, e.g.,* Plamondon, [0252] ("In one embodiment, the **appliance 200** has one network stack 267, such as a TCP/IP based stack, for communicating on a network 105 [sic], such with the **client 102** and/or the server 106. In one embodiment, the network stack 267 is used to communicate with a first network, such as network 104, and also with a second network 104".")  Note that Plamondon's reference to "network 105" here is clearly an error meant to refer to network 104—it is Plamondon's <u>only</u> reference to "network 105" whereas Plamondon otherwise refers 64 times (including in the

- 75 -

immediately following sentence) to "network 104" connecting **appliance 200** as shown, *e.g.*, in Fig. 1A.

188. Plamondon repeatedly describes hardware for establishing a TCP connection between **appliance 200** and **client 102**:

- "In one embodiment, the network stack 267 includes a transport control protocol (TCP) over the network layer protocol of the internet protocol (IP), generally referred to as TCP/IP." [0253].

- "In view of a TCP/IP based network, any TCP/IP based protocol may be used[.] . . . In another embodiment, the network stack 267 comprises any type and form of transport control protocol[.]" [0254].

- "[T]he network stack 267 may include one or more network drivers Supporting the one or more layers, such as a TCP driver or a network layer driver." [0255].

189. Plamondon likewise provides many descriptions of using TCP connections. For example,

- "In one embodiment, multi-protocol compression engine 238 compresses bi-directionally between clients 102a-102n and servers 106a-106n any TCP/IP based protocol[.]" [0270].

- "[I]n one embodiment, the interceptor 350 operates or interfaces with the transport layer of the network stack 267 transparently to any

Appx21769

protocol layer below the transport layer, such as the network layer, and any protocol layer above the transport layer, such as the session, presentation or application layer protocols. . . . As such, the client agent 120 and/or interceptor 350 interfaces with or operates at the level of the transport layer to secure, optimize, accelerate, route or load-balance any communications provided via any protocol carried by the transport layer, such as any application layer protocol over TCP/IP." [0350].

190.  Plamondon specifically explains, "In one embodiment, <u>the **appliance 200** provides for or maintains a transport layer connection between a **client 102** and **server 106**</u> using a single network stack 267." [0256] This "transport layer connection" includes the TCP connection that Plamondon describes leading to [0256] and noted above.  'Providing or maintaining' the TCP connection means that that **appliance 200** participates in establishing the TCP connection with **client 102** (and **server 106**).  This is **appliance 200** "establishing a Transmission Control Protocol (TCP) connection with a **second server**" as claimed.  Moreover, Plamondon describes in detail the process by which **client 102** and **server 106** establish a TCP connection via **appliance 200** at [0275]:

> <u>When an end node, such as the **client 102**, opens a new TCP connection with another end node, such as the **server 106**</u>, the **client 102** sends a TCP packet with a synchronization (SYN) header bit set, or a SYN packet, to the **server 106**. In the present example, **client 102** opens a

transport layer connection to **server 106**. When the SYN packet passes through **appliance 200**, **appliance 200** inserts, attaches or otherwise provides a characteristic TCP header option to the packet, which announces its presence. If the packet passes through a second appliance, in this example **appliance 200'** the second appliance notes the header option on the SYN packet. The **server 106** responds to the SYN packet with a synchronization acknowledgment (SYN-ACK) packet.

As I explained in Section VII.C.1, the TCP connection establishment process specifically involves sending the SYN and SYN+ACK packets. In this quoted example, **appliance 200** establishes a TCP connection with **client 102** when it inserts itself in the SYN and SYN+ACK message exchange.

191. Plamondon also describes other embodiments where **appliance 200** likewise establishes a TCP connection with **client 102** such as at [0256]:

> In some embodiments, the **appliance 200** effectively terminates the transport layer connection by changing, managing or controlling the behavior of the transport control protocol connection between the **client** and the **server**. In these embodiments, the **appliance 200** may use a single network stack 267. In other embodiments, the <u>**appliance 200** terminates a first transport layer connection, such as a TCP connection of a **client 102**</u>, and <u>establishes a second transport layer connection to a **server 106**</u> for use by or on behalf of the **client 102**, e.g., the second transport layer connection is terminated at the **appliance 200** and the **server 106**. The first and second transport layer connections may be established via a single network stack 267.

- 78 -

Appx21771

In this context "terminating" a TCP connection does not mean "closing" the connection; rather, it means being one of the end-hosts involved in establishing and maintaining the TCP connection. More specifically, the quoted text means that **appliance 200** establishes a TCP connection with **client 102** and establishes a different connection (which might also be TCP) with **server 106**. What Plamondon describes here is commonly referred to as "split TCP," in which a middlebox (here, **appliance 200**) "splits" a single TCP connection (the one between **client 102** and **server 106**) into two: one between **client 102** and **appliance 200**, and another between **appliance 200** and **server 106**. The typical role of a split TCP middlebox is to acknowledge and forward packets from one of the connections to the other; this confers several well-known benefits, such as allowing the TCP connection's throughput to increase more quickly. To reiterate, this is not "terminating" in the sense of ending or closing a TCP connection; to the contrary, this means that **appliance 200** establishes and maintains that TCP connection. These additional embodiments likewise provide **appliance 200** "establishing a Transmission Control Protocol (TCP) connection with a **second server**" as claimed.

192. Plamondon likewise describes **appliance 200** intercepting messages from **client 102** "via any type and form of session between a **client 102** and a **server 106**" [0571], where "the session may include any session communication via a transport layer connection, such as a TCP/IP connection. In some embodiments, the

session is established for or on behalf of a user, such as user of **client 102** or an application thereof." [0572].

193.    In short, Plamondon describes **appliance 200** "establishing a Transmission Control Protocol (TCP) connection with a **second server**" as claimed.

### c.    Step 1C

194.    Step 1C provides:

[**1C**] sending, to the **web server** over an Internet, the first content identifier;

195.    Plamondon describes **appliance 200** connecting to **server 106** (the "**web server**") via network 104', *e.g.*, the Internet.  [0013], [0203], Figs. 1A-1C, 6A-6B.  *See also* ¶¶ 144-152, above.

196.    **Appliance 200** requests objects by URL from **server 106** ("**first server**") based on HTTP requests it intercepts from **client 102**.  This occurs, for example, in Plamondon's parallel revalidation technique (in which **appliance 200** revalidates a cached object with **server 106** in parallel with serving the object to **client 102**).  [0442]-[0453].  "In one embodiment, the **appliance 200** identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator of the request." [0446]; *see also* [0012] ("every HTTP access starts with a URL").  **Appliance 200** then sends the URL to **server 106** to get the object status.

- 80 -

197.   If the object is cached on **server 106**, **appliance 200** sends **server 106** the object request.  [0445] (**appliance 200** intercepts HTTP request from **client 102**), [0446] (**appliance 200** sends request to **server 106** to determine if the server caches the object), [0447] (**appliance 200** sends status request to **server 106**), [0449] (**appliance 200** requests current object version from **server 106** over HTTP, including by forwarding the request to **server 106**), [0450] (**appliance 200** receives updated copy of object from **server 106**), *see also* [0041].  Every HTTP request includes a content identifier for the requested content.

198.   Plamondon's Figs. 6A-6B illustrate sending this request at step 620. "[T]he **appliance** transmits a request for a status [of] the object from an **originating server**."  [0444], *see also* [0488] ("[P]refetcher 704 [in **appliance 200**] determines one or more object identifiers from the URL, generates requests for the objects, and transmits the requests to a **server**.").

199.   As another example in Plamondon that meets step 1C, Plamondon's proxy connection techniques [0417]-[0441] include the same functionality discussed above: **appliance 200** "intercepts an HTTP session request" from **client 102**, [0421], identifies this as "a connection request," [0422], and forwards the request to **server 106**, [0423].

200.   As described throughout Plamondon, the HTTP request identifies content by URL.  Abstract ("As every HTTP access starts with a URL that includes

- 81 -

a hostname that must be resolved via domain name resolution into an IP address, the present solution helps accelerate HTTP access."), [0672]-[0673].

201.    Despite the claim's somewhat convoluted wording, it is worth noting that **appliance 200** intercepts the content identifiers and requests for web objects ("first content") identified by URLs ("content identifiers") from **client 102** ("**second server**").    *See* [0444] ("at step 605, the **appliance 200** intercepts or otherwise receives a request for an object from a **client 102**"); *see also* [0672] ("**appliance 200** intercepts a request from a client to a server to obtain the content or object <u>identified via the URL</u>."), *generally* [0011] ("Each request sent by a user begins with resolving a Uniform Resource Locator (URL)."), [0012] ("[E]very HTTP access starts with a URL.").

202.    I explained above at ¶¶ 175-180 how a URL provides a server address on the World Wide Web.    Several more contemporary patent publications confirm this understanding and usage in the art.    For example:

- U.S. Patent Application Publication No. 2009/0187654, "Systems and Methods For Monitoring Components Of A Remote Access Server Farm," published on July 23, 2009 ("Raja"), provides: "The client node 102N, via the web browser 480, transmits a request 482 to access a Uniform Resource Locator (URL) address corresponding to an HTML page residing on server 106N." Ex. 1034, ¶ [0163].

- U.S. Patent Application Publication No. 2002/0169818, "Method and Apparatus For Efficient Storage and Retrieval of Objects In And From An Object Storage Device," to Stewart et al., published on November 2, 2002 ("Stewart"), explains that "A uniform resource locator (URL) is a unique identifier for a particular content location in the Internet. Every object located on the Internet has an associated URL." Ex. 1035, ¶ [0006].

- U.S. Patent Application Publication No. 2002/0059371, "Caching Proxy Streaming Appliance Systems and Methods," to Jamail et al., published on May 16, 2002 ("Jamail"), explains client messages to a web server via a proxy,  that "The client machine sends a message to the proxy server to inform the proxy server of the final destination server that the client machine wants to talk to.  In general, the client machine does this by providing the website name or URL address of the actual destination server (server B) to the proxy server (server A), in addition to providing the file name on the actual destination server that is to be downloaded to the client machine, where server A indicates the server the client machine thinks he is communicating with, and server B is another server in the communication loop."  (Ex. 1037, ¶ [0005].)

- 83 -

**d.    Step 1D**

203.   Step 1D provides:

[**1D**] receiving, the first content from the **web server** over the Internet in response to the sending of the first content identifier; and

204.   Plamondon describes **appliance 200** connecting to **server 106** via network 104', which comprises the Internet.  [0013], [0203], Figs. 1A-1C, 6A-6B; *supra* § VIII.A.2.c (step 1C).  Plamondon describes **appliance 200** requesting objects by URL from the **server 106** (the "**web server**") based on the HTTP requests that it intercepts from **client 102.**  Every HTTP object request includes a content identifier for the requested object.

205.   To elaborate, in Plamondon's parallel revalidation of cached objects (a technique in which **appliance 200** revalidates an object in its cache with **server 106** in parallel with serving the cached object to **client 102**, *see* [0442]-[0453]), **appliance 200** sends the URL to **server 106** to get the object status from **server 106**.

206.   If the object is cached on **server 106**, then **appliance 200** sends **server 106** the object request.  [0445] (**appliance 200** intercepts HTTP request from **client 102**), [0446] (**appliance 200** sends request to **server 106** to determine if the server caches the object), [0447] (**appliance 200** sends **server 106** a request for status), [0449] (**appliance 200** requests current object version from **server 106** over HTTP,

- 84 -

including by forwarding the client's request to **server 106**), [0450] (**appliance 200** receives updated copy of object from **server 106**), *generally* [0041].

207.   The point of Plamondon's parallel revalidation is to use the conditional GET to facilitate responding to a content request with cached content, if the cached content remains valid, or updating the cached content with an updated copy from the web server—and sending that updated copy back to the client—if the content has changed.  Plamondon describes this at [0442],

> With the parallel revalidation technique described herein, the cache revalidates the object with the originating server in parallel with serving the cached object in response [to] the request. . . . If the object has changed after all, the cache gets an updated copy <u>in response to</u> the conditional request, and future object requests will get the updated object in the cache. Otherwise, you get a response that reports that it has not been modified.

Plamondon makes clear that the conditional request is the conditional GET from **appliance 200** to **web server 106**, which contains the URL or "first content identifier."  At [0443], Plamondon refers specifically to "a cache of the **appliance 200**."  Putting this together, when Plamondon describes the cache of **appliance 200** getting "an updated copy <u>in response to</u> the conditional request," (*see also* [0450]), this is **appliance 200** "receiving the first content" from the "originating server" [0444] or **web server** (**first server**) "over the Internet in response to the sending of the first content identifier."

- 85 -

208.   Plamondon's proxy server functionality likewise includes **appliance 200** receiving requested content over the Internet from **server 106** in response to sending the URL identifying the requested content.  [0437] ("the appliance 200 may receive a response from a conditional request for the object that the object has changed and the response includes an updated version of the object.").

209.   This proxy architecture described in claim 1 and Plamondon was well-known in the art long before 2009.  For example, Jamail, the 2002 patent publication mentioned above, describes conventional proxy server architectures at length.  In a summary introduction, it explains (Ex. 1037, ¶ [0005]):

> The client machine sends a message to the proxy server to inform the proxy server of the final destination server that the client machine wants to talk to. In general, the client machine does this by providing the website name or URL address of the actual destination server (server B) to the proxy server (server A), in addition to providing the file name on the actual destination server that is to be downloaded to the client machine, where server A indicates the server the client machine thinks he is communicating with, and server B is another server in the communication loop. In response, the proxy server connects to the actual destination server. The proxy server then retrieves the file from the actual destination Server and Sends that file back to the client machine.

### e. Step 1E

210.   Step 1E provides:

[**1E**] sending the received first content, to the **second server** over the established TCP connection, in response to the receiving of the first content identifier.

211.   Applying step 1E to Plamondon, Plamondon describes several embodiments in which **appliance 200** sends received content to **client 102** in response to receiving the URL comprising the content identifier. In the parallel revalidation method, for example, Plamondon describes cases in which **appliance 200** sends the requested content from a cache; it describes another case in which **appliance 200** sends the requested content from an updated content it receives, as part of the content validation, from a **web server** or origin server (the repository of the original content).

212.   Plamondon describes that after **appliance 200** receives or intercepts the URL that identifies the requested content, Plamondon's parallel revalidation includes **appliance 200** sending the requested content (i.e., the "first content") to **client device 102** ("**second server**") in response to the client's request, which includes the first content identifier (URL). This includes **appliance 200** immediately sending **client 102** valid cached content. [0444], Fig. 6B (step 615).

Appx21780

"[T]he **appliance** transmits…the cached object to the **client 102** <u>in response to the client's request</u> at step 615." [0447].

213.   If "in response to the receiving of the first content identifier" encompasses the **first client device** sending content to the **second server** after requesting it from the **first server**, Plamondon also meets [1E] because Plamondon describes circumstances in which **appliance 200** sends requested content to **client 102** after receiving it from **server 106**. [0451] ("**appliance 200** serves the object received from the **server** at step 625 in response to the first request"). *See also* [0436]-[0437], [0438] ("In some embodiments, the **appliance 200** forwards the **server's** response to the **client 102** instead of the object from the cache.").

214.   Summarizing this analysis, Plamondon describes subject matter that meets each limitation in claim 1. With my understanding of the law as summarized above, this means that Plamondon anticipates claim 1, making claim 1 unpatentable.

### 3.   Claim 10.

215.   Claim 10 provides:

The method according to claim 1, further comprising determining, by the **first client device**, that the received first content, is valid.

- 88 -

216.   As I explained above, Plamondon describes subject matter that meets each limitation in claim 1.

217.   Plamondon includes a heavy focus on validating content stored in the cache of **appliance 200** ("**first client device**").  Claim 10 does not limit when the validity determination is performed.  The '510 patent describes it being performed when a request is received for the content, *i.e.*, after the content was stored in the agent's (*i.e.*, **client device's**) cache.  Ex. 1001, 14:24-34.  Plamondon is identical. [0043] ("the method includes receiving a request for an object from a requester… [and] determining (i) that the object exists in the local cache and (ii) that a status identifier associated with the object indicates that the object is <u>valid</u>"), [0048], [0450]-[0451], *see also* [0508] ("a device, such [as] an **appliance 200**…performs this prefreshening technique by checking the status and/or updating cached objects…<u>the device validates or updates the object in the cache</u>."), [0512], [0522]-[0524].

218.   Plamondon describes subject matter that meets each limitation in claim 10.  With my understanding of the law as summarized above, this means that Plamondon anticipates claim 10, making it unpatentable.

### 4.   Claim 12.

#### a.   Element 12A.

219.   Claim 12, element **12A** provides (with element numbering added):

- 89 -

[**12A**] The method according to claim 10, further comprising: sending, a message over the Internet in response to the determining that the received first content, is not valid; and

220.   As I just explained, Plamondon describes subject matter that meets every limitation in claim 10.

221.   Plamondon's parallel revalidation method provides that **appliance 200** transmits an object status request (a "message") to **web server 106** over the Internet after determining that "the remaining period of the expiration of the cached object exceeds a predetermined threshold."  [0451]; see also [0449]-[0450].

222.   Plamondon describes additional methods to freshen an object based on header information.  For example, Plamondon describes determining whether to refresh an object based on object header information in Figs. 10A-10B.  At step 1020, prefetcher 904 in **appliance 200** requests object header information from a second **appliance 200'**.  [0537], Figs. 10A-10B.  At step 1025, **appliance 200** receives the response with object header information indicating, for example, that a cached object has expired (i.e., is not valid).  [0538], Fig. 10A.  Based on that object information, at step 1030 prefetcher 904 in **appliance 200** requests the object from (i.e., sends a "message" to) **appliance 200'**.  [0541], Figs. 10A-10B.

223.   Plamondon describes the second **appliance 200'** on the same network (Internet) as server 106.  [0203], [0214].  Therefore, Plamondon discloses **appliance 200** sending a message (i.e., an update request) to second **appliance 200'** over the

- 90 -

Internet after determining that cached content is not valid.    This meets claim 12 element [12A].

### b.    Element [12B].

224.    Claim 12, element **12B** provides:

[**12B**] receiving, over the Internet in response to the sending of the message, from the <span style="color:green">**second server**</span> or from a <span style="color:orange">**second client device**</span> selected from a plurality of client devices, the first content.

225.    Plamondon's second <span style="color:orange">**appliance 200'**</span> is the "<span style="color:orange">**second client device**</span>" because it acts in the role of a client per the EDXT construction (Ex. 1006, 11-12), *see* [0202], [0229], [0238], [0452], and can be a consumer computer under the Patent Owner's litigation construction (Ex. 1005, 10-13), *see* [0202], [0229], [0238].

226.    Plamondon's prefetcher 904 knows to send requests to second <span style="color:orange">**appliance 200'**</span> because the cache management system indexes <span style="color:orange">**appliance 200'**</span> as maintaining the object.  [0446] ("In other embodiments, the cache 232 is located on another device 100, <u>such as an appliance 200'</u>, 205 or server 106.").  This is selecting <span style="color:orange">**appliance 200'**</span> from a plurality of client devices, as claimed.

227.    In response to the content request at step 1030, at step 1035 <span style="color:red">**appliance 200**</span> receives the content from <span style="color:orange">**appliance 200'**</span>.  [0542], Figs. 10A-10B.  As explained immediately above, this exchange takes place over the Internet.

228.   Plamondon describes subject matter that meets each limitation in claim 12.  With my understanding of the law as summarized above, this means that Plamondon anticipates claim 12, making claim 12 unpatentable.

**5.    Claim 15.**

229.   Claim 15 provides:

The method according to claim 1, further comprising receiving, by the **first client device** from the **second server** over the established TCP connection, the first content identifier.

230.   As I explained above, Plamondon describes subject matter that meets each limitation in claim 1.

231.    Plamondon describes **appliance 200** requesting objects by URL from the **server 106** ("**first server**") based on the HTTP requests that it intercepts from **client 102**.  For example, in Plamondon's parallel revalidation of cached objects, **appliance 200** revalidates an object in its cache with **server 106** in parallel with serving the cached object to **client 102**.  [0442]-[0453].  "[A]t step 605, the **appliance 200** intercepts or otherwise receives a request for an object from a **client 102**."  [0444].  "In one embodiment, the **appliance 200** identifies, parses, extracts or otherwise determines a name or identifier of the object of the request, such as the uniform resource locator of the request." [0446].  This communication wherein

- 92 -

**appliance 200** receives the URL (first content identifier) from **client 102** takes place over the established TCP connection (*see* § VIII.A.2.b (step 1A)).

232.    Plamondon describes subject matter that meets each limitation in claim 15.  With my understanding of the law as summarized above, this means that Plamondon anticipates claim 15, making claim 15 unpatentable.

### 6.    Claim 16

233.   Claim 16 provides:

> The method according to claim 1, wherein the sending of the first content identifier to the **web server** over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.

234.   As I explained above, Plamondon describes subject matter that meets each limitation in claim 1.

235.   In Plamondon's parallel revalidation, **appliance 200** sends an HTTP request to **server 106** ("**web server**"), which is Plamondon step 620 that meets step 1C of claim 1 (*supra* § VIII.A.2.c).  This HTTP request to **server 106** includes the URL for the first content, which **appliance 200** received in a message from **client 102** in Plamondon step 605.  *See* [0442]-[0453].

Appx21786

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB; AND
OXYSALES, UAB,
Petitioners
v.
LUMINATI NETWORKS LTD.,
Patent Owner

_____

Case IPR2020-01358

Patent 10,484,510

_____

## PATENT OWNER'S PRELIMINARY RESPONSE
## UNDER 37 CFR §42.107

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Data Co Exhibit 1008
Data Co v. Bright Data

## TABLE OF CONTENTS

I.      INTRODUCTION....................................................................................1

II.     THE PETITION SHOULD BE DENIED BECAUSE THE PARALLEL
        DISTRICT COURT LITIGATION, WHICH ASSERTS THE SAME
        PRIOR ART AS THIS PETITION, BEGINS JURY SELECTION ON
        MAY 10, 2021, OVER EIGHT MONTHS BEFORE A FINAL
        DETERMINATION WOULD BE EXPECTED IN THIS IPR .................4

        A.  FACTOR 1.......................................................................................5
        B.  FACTOR 2.......................................................................................7
        C.  FACTOR 3.....................................................................................10
        D.  FACTOR 4.....................................................................................12
        E.  FACTOR 5.....................................................................................13
        F.  FACTOR 6.....................................................................................15

III.    OVERVIEW – THE '319 PATENT DISCLOSES AND CLAIMS
        METHODS USING A NOVEL NETWORK ARCHITECTURE THAT
        IS NOT DISCLOSED IN ANY OF THE PRIOR ART ADVANCED BY
        PETITIONERS ...................................................................................16

        A.  THE CHALLENGED CLAIMS.......................................................18
        B.  PRIORITY DATE..........................................................................19

IV.     PERSON OF ORDINARY SKILL IN THE ART ...............................19

V.      CLAIM CONSTRUCTION ................................................................20

VI.     THE ART CITED IN THE ALLEGED GROUNDS .............................26

        A.  CROWDS........................................................................................26
        B.  BORDER.........................................................................................29
        C.  MORPHMIX...................................................................................32

VII.    THE FAILED GROUNDS OF ALLEGED INVALIDITY .....................35

        A.  GROUND 1: FAILURE OF CROWDS TO ANTICIPATE CLAIM 1 .36
        B.  GROUND 2: FAILURE OF CROWDS + RFC 2616 + GENERAL
            KNOWLEDGE TO RENDER OBVIOUS CLAIM 1 ...........................38
        C.  GROUND 3: FAILURE OF BORDER TO ANTICIPATE CLAIM 1 ..39
        D.  GROUND 4: FAILURE OF CROWDS + RFC 2616 + GENERAL
            KNOWLEDGE TO RENDER OBVIOUS CLAIM 1 ...........................42

Appx21965

    E.   GROUND 5  - FAILURE OF MORPHMIX TO ANTICIPATE CLAIM
       1 ...............................................................................................43
    F.   GROUND 6 FAILURE OF MORPHMIX + RFC 2616 + GENERAL
       KNOWLEDGE TO RENDER OBVIOUS CLAIM 1 ...........................46

**VIII. CONCLUSION** ............................................................................**47**

ii

# TABLE OF AUTHORITIES

## AGENCY DECISIONS

*Apple Inc. v. Fintiv Inc.,*
IPR2020-00019, Paper 11 (PTAB March 20, 2020)
(precedential, designated May 5, 2020)............... 1, 2, 4, 5, 7, 10, 12, 13, 15, 22, 47

*Google LLC f/k/a Google Inc. v. Personalized Media Communications, LLC*,
IPR2020-00719, Paper 16 (PTAB August 31, 2020) ........................................... 8-9

*Google LLC f/k/a Google Inc. v. Personalized Media Communications, LLC*,
IPR2020-00720, IPR2020-00722, IPR2020-00723 and IPR2020-00724 ................9

## CASES

*KSR Int'l Co. v. Teleflex, Inc.*
550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)......................... 39, 43, 47

## RULES AND RULEMAKING

PTAB Office Trial Practice Guide, July 2019 Update ...................................... 1, 26

| EXHIBIT LIST | |
|---|---|
| 2001 | Oxylabs' Motion To Stay Pending *Inter Partes* Reviews (public-redacted) in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 131 |
| 2002 | Joint Claim Construction and Prehearing Statement support in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 105-1 |
| 2003 | Plaintiff's Markman opening brief in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG No. 126 |
| 2004 | Defendants' Markman response brief in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 138 |
| 2005 | Plaintiff's Markman reply brief in the *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 145 |
| 2006 | Stipulation filed in IPR2020-01266 on November 20, 2020, Paper No 14. |
| 2007 | Oxysales' Answer (public-redacted) in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG, ECF. No. 95 |
| 2008 | November 5, 2020 ECF notice from the district court moving jury selection from May 3 to May 10, 2021. *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG |
| 2009 | Dr. Thomas Rhyne Markman Declaration in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG, ECF No. 126-5 |
| 2010 | Sur-reply on Motion to Dismiss in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 47 |
| 2011 | Order on Motion to Dismiss in *Luminati v. Teso Lt UAB et al.*, E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 85 |
| 2012 | Declaration of Dr. Thomas Rhyne |
| 2013 | Amended Rule 7.1 disclosure statement from Luminati v. Teso Lt UAB et al., E.D. Texas, Case No. 2:19-cv-00395-JRG ECF No. 55 |

| | |
|---|---|
| 2014 | Code200's Rule 7.1 Disclosure Statement in Luminati v. Code200 et al., E.D. Texas, Case No. 2:19-cv-00396-JRG ECF No. 28. |
| 2015 | Order Denying Motion to Stay pending *Inter Partes* Review; *Luminati v. Teso Lt UAB et al.,* E.D. Texas, Case No. 2:19-cv-00395-JRG, ECF 157 |
| 2016 | Declaration of Thomas M. Dunham |

## I.    INTRODUCTION

Patent Owner Luminati Networks, Ltd. ("Patent Owner") hereby submits this Patent Owner Preliminary Response ("POPR") in response to the Petition (Paper 5) filed by Code200, UAB; Teso LT, UAB; Metacluster Lt, UAB; and Oxysales, UAB ("Petitioners") requesting *inter partes* review of claims 1, 2, 6-11, 13, and 15-24 (see Exhibit 1007, Petitioner's list of challenged claims) of U.S. Patent No. 10,484,510 ("the '510 Patent").

Patent Owner respectfully requests that the Patent Trial and Appeal Board ("Board") exercise its discretion and deny institution for two separate reasons.[1]

First, the Petition should be dismissed based upon the *Fintiv* factors governing parallel district court proceedings.[2]  Specifically, the parallel district court litigation, which asserts exactly the same prior art as the Petition (*See* Ex. 2006, Stipulation

---

[1] In this POPR, Patent Owner is only addressing select issues demonstrating that review should not be instituted.  In so doing, Patent Owner is not acquiescing to other issues raised by Petitioners and reserves the right to address all issues and to challenge all points raised by Petitioners in any future response if proceedings are instituted.  *See* PTAB Office Trial Practice Guide, July 2019 Update, p. 18-21 (Docket No. PTO-P-2019-0025, Federal Register 33925-33926).

[2] *Apple Inc. v. Fintiv Inc.,* IPR2020-00019, Paper 11 (PTAB March 20, 2020) (precedential, designated May 5, 2020)

Appx21970

from IPR2020-01266, Paper No. 14 at ¶¶ 3-4), begins jury selection on May 10,[3] 2021, over eight months before a final determination would be expected in this IPR. Additionally, the claim construction hearing in the district court litigation occurred on November 17, 2020.[4]  The claim construction hearing lasted 3 hours and 20 minutes, and included both Court personnel and a court-appointed technical advisor. *See* ECF Document 175.  Thus, the Court has already invested significant resources and will likely issue its claim construction ruling before an institution decision would even issue in this proceeding. For at least these reasons, the *Fintiv* factors overwhelmingly support the Board's discretion to deny institution.

Second, the Challenged Claims of the '510 Patent are strongly novel and non-obvious when compared to the prior art relied on by Petitioners.  As explained below, Petitioners' Grounds *all depend upon a common premise* – that the "plain and ordinary meanings" of the claim terms "second server" and "client device" are such that each of these distinctly-claimed devices would be met by a "general purpose computer" such that a "server" and a "client" are broad enough to encompass one

---

[3] On November 5, 2020, the Court issued a docket entry resetting the jury selection date from May 3 to May 10, 2021.  Ex. 2008.

[4] Briefing on claim construction was completed on October 20, 2020.  Copies of the opening, responsive and reply claim construction briefs are being submitted herewith as Exhibits 2003, 2004, and 20 05 to this POPR.

another. (Paper 5 at 13-15).  Indeed, in discussing the Grounds, Petitioners equate

these claim terms *to ignore the express limitations recited in the claims*.

Claim 1 (the only independent claim), recites a method for use with a specific

architecture arranged as depicted below:

**Second Server** *< - >* **First Client Device** *< - >* **First Server**

*Petitioners concede this point*, expressly including a graphic in the Petition showing

this precise arrangement:



(Paper 5 at 9-10).

Yet the three primary references relied upon by Petitioners operate using

significantly different architectures (depicted below), each thereby failing to achieve

the advantages realized by the method of the '510 claims:

3

**Crowds**:    User computer[5] < - > User computer < - > Web Server

**Border**:    Client Device < - > Downstream Server < - > Upstream Server <

- > Web Server

**Morphmix**:    Peer < - > Peer < - > Server

As explained below, because the primary references relied upon by Petitioners operate using different architectures than the method of Challenged Claim 1, they each fail to anticipate Claim 1. Further, the alleged combinations set forth in Grounds 2, 4 and 6 fail to render obvious Claim 1 for at least the same reasons.

## II.    THE PETITION SHOULD BE DENIED BECAUSE THE PARALLEL DISTRICT COURT LITIGATION, WHICH ASSERTS THE SAME PRIOR ART AS THIS PETITION, BEGINS JURY SELECTION ON MAY 10, 2021, OVER EIGHT MONTHS BEFORE A FINAL DETERMINATION WOULD BE EXPECTED IN THIS IPR

Petitioners voluntarily raised the parallel Eastern District of Texas proceedings (Case No. 2:19-cv-00395-JRG) ("the 395 District Court case") (Paper 5 at page 6, Section III) as an issue, and argue that the *Fintiv* factors do not compel a decision to deny institution. The *Fintiv* factors, however, substantially favor a decision to deny institution because the 395 District Court case involves exactly the

---

[5] As explained in Crowds, each participating user computer is called a *jondo*: "A *user* is represented in a crowd by a process *on her computer* called a jondo …" Ex. 1011 at 8 (emphasis added).

4

same prior art and all but five dependent claims of the '510 Patent challenged here are also asserted in the litigation. Paper 5 at 8. The Board should also consider the Petitioners' two other petitions, one filed before and one filed after the present Petition, challenging the remaining two patents asserted in the 395 District Court case (USP 10,257,319 challenged by Petitioners on July 14, 2020 in IPR2020-01266, and USP 10,469,614 challenged by Petitioners on September 4, 2020 in IPR2020-01506). If IPRs were instituted, a final determination in IPR2020-01506 would not issue until *more than nine months after trial will have occurred*.

Also, while Petitioners argue that petitioner Code200's status as not having been sued for infringement of the '510 Patent bodes in favor of institution, the close corporate relationship between Code200 and the remaining Petitioners has not been fully disclosed to the Board. When that close relationship is considered (they are parent and multiple sister subsidiaries, all with direct or indirect common or overlapping owners - Ex. 2007), it renders Petitioners' arguments unpersuasive, if not misleading.

## A. FACTOR 1.

*Fintiv* factor 1 is "whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted."

On October 1, 2020, Petitioners (excluding Code200, which is not a party to the 395 District Court case) filed a sealed opposed motion to stay the 395 District Court case pending the *inter partes* reviews in which they concede as a general rule that such stays are not granted.  *See E*x. 2001 public/redacted version ("Oxylabs is aware that this Court typically does not grant a stay pending IPRs not yet instituted.")

The Court recently denied Petitioner's motion as premature.  *See* Order signed October 29, 2020, filed October 30, 2020, ECF 157 (Ex. 2015).  The Court held that "a stay of these proceedings in advance of the PTAB's decision on whether or not to institute *inter partes* review of any of the Asserted Patents should be denied."

The Court further ordered that the Defendants could refile the motion but only after the Board's institution decision on the last of the patents to be acted upon by the Board:

> "Accordingly, the Motion is **DENIED WITHOUT PREJUDICE** to refiling of the same, which shall be permitted within fourteen (14) days following the PTAB's institution decision regarding the last of the patents-in-suit to be acted upon by the PTAB."

*Id*. at 3.

In summary, the Court: (i) denied a stay before an institution decision by the Board; (ii) denied Defendants' ability to seek a stay until after an institution decision

issues as to all of the district court patents involved under Board review; and (iii) has

not indicated one way or the other whether a stay is likely to be granted at that time.

Further, Petitioners have also mischaracterized the briefing in the prior

litigation proceeding.  Patent Owner filed the complaint for the 395 District Court

case on December 6, 2019.  Patent Owner then filed a motion to consolidate in the

then pending case of *Luminati Networks Ltd. v. UAB Tesonet et. al.*, Case No. 2:18-

cv-299 ("Tesonet Case"), ECF 305 at 5, seeking a new trial date to be held as early

as July 2020 to *accelerate* the date by which Patent Owner's '510 Patent

infringement claims would be tried.  Petitioners Teso and Metacluster opposed that

motion by arguing that a trial date for this action in 2021 was more realistic (Tesonet

Case, ECF 317 at 5).

Given that the Court has not granted a stay and would not likely grant a stay

given the lateness of the Petition, this factor favors denial of institution.


### B. FACTOR 2

*Fintiv* factor 2 is the "proximity of the court's trial date to the Board's

projected statutory deadline for a final written decision."

The date for jury selection in the 395 District Court case is May 10, 2021.  *See*

November 5, 2020 docket entry.

In contrast, the date for the Board's projected final written decision is: (i) Patent Owner's POPR deadline of November 20, 2020, (ii) plus an estimated two-to-three months for the Board to enter an institution decision, (iii) plus 12 months for a final determination, or January 20, 2021 or later. This is over ***eight months after*** jury selection in the 395 District Court case.

The Board should also consider the impact of the follow-on Petition challenging the '614 patent also asserted in the 395 District Court case. IPR2020-01506 challenging the '614 patent was filed on September 5, 2020, and has a POPR deadline of December 9, 2020. Adding two-to-three months for an estimated institution decision and a year for a final determination, the final written decision would be expected on February 9, 2022 or later. This is approximately ***nine months after*** jury selection in the 395 District Court case.

As discussed above in Factor 1, Petitioners' discussion about extensions requested by Patent Owner in prior district court cases mischaracterize the positions taken by Petitioner and Patent Owner. Moreover, Petitioners' one sentence reference to a potential COVID -19 trial delay (Paper 5 at 8) is also sheer speculation at this point, more than six months before jury selection is scheduled. The PTAB also declined to speculate on this point in another recent decision:

"Petitioner further argues that the trial date may change because the

COVID-19 pandemic has "significantly disrupted docket schedules including in Texas, which may cause delay of the trial that is still months away." (Citation omitted)

We understand Petitioner's position, but we decline to speculate whether that date will change due to COVID-19 disruptions…"

*Google LLC f/k/a Google Inc. v. Personalized Media Communications, LLC* PTAB-IPR2020-00719, Decision Denying Institution of *Inter Partes* Review, Paper 16 at 11, August 31, 2020.   That decision came among a series of Board decisions[6] denying institution because, in part, the final determination date would have been 10 months after the district court trial would have taken place.

The Board also noted that it is aware that the Eastern District of Texas recently conducted a jury trial:

> We are also cognizant, however, that the District Court for the Eastern District of Texas has recently completed a jury trial. *See* Ex. 2021, 60–63 (docket for *Optis Wireless Tech., LLC v. Apple, Inc.*, 2:19-cv-00066 (E.D. Tex. Feb. 25, 2019) (showing a jury trial held between August 3, 2020 and August 11, 2020)).

---

[6] Board decisions denying institution on the same day involving related IPRs between the same parties occurred in IPR2020-00720, IPR2020-00722, IPR2020-00723 and IPR2020-00724.

9

*Google LLC f/k/a Google Inc. v. Personalized Media Communications, LLC* PTAB-IPR2020-00719, Decision Denying Institution of *Inter Partes* Review, Paper 16 at 11, August 31, 2020.

Taking the timing of the petitions on the '614 patent and the '510 patent into account, this factor strongly favors denial of institution.

### C. FACTOR 3

*Fintiv* factor 3 is "investment in the parallel proceeding by the court and the parties."

The case is *not* at a very early stage, as Petitioners allege. Quite to the contrary. As of the time that Patent Owner's POPR was filed in this case on November 20, 2020, the parties' district court *Markman* briefing was already completed (briefing was completed on October 20, 2020 – (Ex. 1004 at ECF 145) and the Markman hearing was held three days earlier on November 17, 2020). According to the Court's docket entry, the Markman hearing lasted 3 hours and 20 minutes, and involved both Court personnel and a court-appointed technical advisor. As explained further below, a Markman decision will likely be entered before January 20, 2021. The parties have already invested heavily in the district court case by briefing the Markman issues and preparing for and attending the Markman hearing. The Court has as well, having reviewed the Markman briefing and prepared

for and held the Markman hearing, and will undoubtedly be well on its way towards issuing a Markman decision if not having already done so.

Patent Owner has been a party in two other infringement actions before Judge Gilstrap in the Eastern District of Texas over the last two years.  In one case, the Markman order issued *10 calendar days* after the Markman hearing.[7]  In the other case, the Markman order issued *20 calendar days* after the Markman hearing.[8]  Both of these times would have the Markman Order in this case issuing before the estimated institution date of January 20, 2021.

Moreover, in the IPR challenging the '614 patent, which is also in the 395 District Court case, the institution decision would be expected even later (February 9, 2021) (see calculations several paragraphs above).  Certainly, the Markman decision, which will address claim construction issues in all three of the '319, '510 and '614 asserted patents, will likely have issued long before February 9, 2021 given this court's promptness at issuing Markman orders.

---

[7] *Luminati v. Bi Science,* ED Texas case no. 2-18 cv 00483, Markman hearing on November 26, 2019 (ECF. No. 126); Claim Construction Memorandum Opinion and Order issued December 6, 2019.  (ECF. No. 130).

[8] *Luminati v. UAB Tesonet*, ED Texas case no. 2-18 cv 00299, Markman hearing on July 31, 2019 (ECF. No. 102); Claim Construction Memorandum Opinion and Order issued August 20-21, 2019 (on docket August 20, entered August 21) (ECF. No. 121).

11

Moreover, as Petitioners acknowledge (Paper 5 at 8), expert discovery in the 395 District Court case will close on January 21, 2021, which is approximately two months after the POPR in this case is due and one month before the three-months-after-POPR date for an institution decision to issue.

Taking the timing of this and the other two petitions into account, this factor strongly favors denial of institution.

### D. FACTOR 4

*Fintiv* factor 4 is "overlap between issues raised in the petition and in the parallel proceeding."

The overlap between the issues raised in the petition and in the parallel proceeding is substantial.  Petitioner challenges the claims based on three primary references, namely Crowds, Morphmix, and Border, and one Internet Request for Comments, namely RFC 2616.  Petitioner identified all four of those pieces of prior art in its Invalidity Contentions served on Luminati in the 395 District Court case.  ((*See* Ex. 2006, Stipulation from IPR2020-01266, Paper No. 14 at ¶¶ 3-4).  In fact, Petitioners do not even contest that the exact same prior art is asserted in the 395 District Court case as in this Petition.

Petitioners' arguments are thus limited to stating that while Luminati asserts claims 1, 2, 8-11, 13, 15-16, 18-20 and 22-23 in the 395 District Court case, the

12

Petition also challenges dependent claims 6-7, 17, 21 and 24, which are not at issue

in the Lawsuit.  Paper 5 at 8.  This is not a significant difference, however.  Only

claim 1 of the '510 Patent is independent.  The Petition therefore does not challenge

any other independent claim not asserted in the district court, because there are none.

Moreover, resolution of the patentability of independent claim 1 in the district court

is also likely to have an impact on dependent claims 6-7, 17, 21 and especially claim

24, which recites:

> 24. A non-transitory computer readable medium containing computer instructions that, ***when executed by a computer processor, cause the processor to perform the method according to claim 1.***

(Emphasis added).

Because of the substantial overlap between the invalidity challenges in the

395 District Court case and the Grounds asserted in the Petition, Factor 4 strongly

favors denial of institution.

### E. FACTOR 5

The fifth *Fintiv* factor is "whether the petitioner and the defendant in the

parallel proceeding are the same party."  Three of the four petitioners, namely, Teso

LT, Metacluster LT and Oxysales, ***are*** the defendants in the parallel 395 District

Court case.  This strongly favors a decision not to institute.  The fourth petitioner,

Code200, has not been sued by Luminati for infringement of the '510 patent. However, the Petition's suggestion that Code200 should therefore somehow be treated differently from the other Petitioners (Paper 5 at 9) is misleading in that it fails to acknowledge the close corporate relationship between Code200 and the other defendants/petitioners. Specifically, Coretech LT is the parent company of the sister Petitioners (Teso LT, Code200, Metacluster and Oxysales). They were formed when Lithuanian company Tesonet changed its name to Teso LT and reorganized in 2018. *See* Exhibits 2013 and 2014. (Ex. 2007 – "Oxylabs further admits that, in 2018, Tesonet underwent a corporate restructuring and, as a result of that restructuring, (i) Tesonet's name was changed to Teso LT, UAB and (ii) Metacluster, Oxysales, code200, UAB ("Code200"), and coretech lt, UAB ("Coretech") were created. Oxylabs admits that Teso, Metacluster, Oxysales, Code200 and Coretech share, directly or indirectly, common or overlapping owners.") All of the petitioners, including Code200, are therefore under common direct or indirect ownership and control. *Id.* That may explain why Code200 inserted itself into the present IPR petition without having been sued for infringement of the '510 patent – it is under the control of the petitioners' common owner, and thus presumably did so for the benefit of its parent Coretech Lt and sister subsidiaries Teso LT, Metacluster and Oxysales who were sued for infringement of the '510 patent. Exhibits 2013 and

2014.  With that relationship in mind, the fact that Code200 has not been sued for infringement of the '510 patent does not bode in favor of institution, as the Petition alleges. To the contrary, it cuts against institution, inasmuch as Code200 is related to the other petitioners and all of them are under the control of their common parent company.   That relationship, undisclosed and certainly not fully explained by Petitioners, is a substantial factual omission, and strongly favors denial of institution.[9]

### F. FACTOR 6

*Fintiv* factor 6 is: "other circumstances that impact the Board's exercise of its discretion, including the merits."

Petitioners argue that the merits are substantially in their favor, but this is not the case, as shown in the sections that follow.  First, Petitioners' reading of the claims is unreasonable – an issue that will be resolved by the 395 District Court case. Additionally, the asserted prior art is weak and does not render the '510 patent

---

[9] If additional briefing is requested/permitted before an institution decision is made, the Petitioners should be required to affirmatively identify their current and past corporate relationship to one another, including Code200, and including ownership or control of one another.  This should have been disclosed in the Petition, especially when Petitioners argued that Code200 should be treated differently than the other Petitioners simply because it is not a defendant in the 395 District Court case.

unpatentable. Indeed, institution should be denied not only because of parallel litigation but also on the merits.


### III.    OVERVIEW - THE '510 PATENT DISCLOSES AND CLAIMS METHODS USING A NOVEL NETWORK ARCHITECTURE THAT IS NOT DISCLOSED IN ANY OF THE PRIOR ART ADVANCED BY PETITIONERS

The '510 Patent describes a novel "system designed for increasing network communication speed for users …" Ex. 1001 at Abstract. To achieve the advantages described in the specification, the '510 Patent claims methods utilizing a novel "second server – first client device - web server" architecture, whereby a "first client device" serves as a proxy between the "second server" and "web server."

A problem in the art was the fact that certain websites with public information nevertheless create technological roadblocks to obtaining that information from certain requesting devices. For example, it is a routine practice of companies to obstruct their competitors from accessing the company's otherwise publicly available pricing information. To overcome these artificial hinderances, the proxy service of the claims sends requests through one or more of a large group of proxy "client devices," such as individual cell phone devices. As the proxy devices belong to real people who otherwise send such requests to target web servers as customers, the target will allow the queries and not artificially block them.

16

Appx21985

This problem was specifically mentioned in Plaintiff's Opening Markman brief in the '395 District Court case: "Using this novel service permits a user to access content from a server that might otherwise block the request or return a fake response. For example, a retailer can use this service to request pricing data from a competitor by appearing to that competitor as a potential customer." Ex. 2003 at 1.

The '510 Patent explains that previous "proxy servers" fail to provide a "comprehensive solution for Internet surfing," in part because they "would need to be deployed at every point around the world where the Internet is being consumed." *Id*. at 2:27-30; *see also* 2:11-26. Instead, to create a new type of consumer-based network that never existed before, the '510 Patent employs "client devices" that operate as proxies. Id. at 3:16-57.

Claim 1, the only claim expressly addressed in this POPR, recites a method for use over the unique "second server – first client device – web server" architecture recited in the claim:

1. A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:

   establishing a Transmission Control Protocol (TCP) connection with a second server;

sending, to the web server over an Internet, the first content identifier;

receiving, the first content from the web server over the Internet in response

to the sending of the first content identifier; and

sending the received first content, to the second server over the established

TCP connection, in response to the receiving of the first content identifier.

It is clear from Claim 1 that the method, which is performed "**by a first client**

**device**" comprises:

- "establishing a … connection with a second server"

- "sending, to the web server over an Internet, …"

- "receiving, the first content from the web server …"; and

- "sending the received first content, to the second server …"

The unique arrangement of the devices recited in the claim, together with the

specific steps that are recited, serve to differentiate the '510 Challenged Claims from

prior art systems and to achieve the advantages of the inventions.

### A. THE CHALLENGED CLAIMS

The '510 Patent contains 24 claims, with only Claim 1 being independent.

The Petition challenges claims 1, 2, 6-11, 13, and 15-24 of the '510 Patent.  In the

395 District Court case, Patent Owner is asserting claims 1-2, 8-11, 13, 15-16, 18-

20, and 22-23.  Thus, there is complete overlap regarding the independent claim.

Further, only dependent claims 6-7, 17, 21, and 24 are at issue in the Petition but not in the 395 District Court case.

### B. PRIORITY DATE

The '510 Patent claims priority back through U.S. Patent No. 10,257,319 (the subject of Case IPR2020-01266) and earlier continuation and divisional applications to provisional application number 61/249,624 filed October 8, 2009. Petitioners have not contested (for purposes of the Petition) this priority date. (Paper 5 at 12).

## IV. PERSON OF ORDINARY SKILL IN THE ART

Patent Owner submits that a person of ordinary skill in the art ("POSA") in the field of the '510 Patent (such as Dr. Thomas Rhyne whose declaration is concurrently submitted) would be an individual who, as of October 8, 2009, the filing date of the provisional application, had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications.

Petitioner's proposed qualifications of a POSA are not materially different (Paper 5 at 12-13), at least in terms of affecting a decision as to whether to institute *inter partes* review of the Challenged Claims.

19

## V.    CLAIM CONSTRUCTION

The Petition states that "[t]he claim terms at issue in the Challenged Claims require no express claim construction, as the plain and ordinary meanings apply." (Paper 5 at 13).  Patent Owner disagrees, as the meaning of a number of claim terms are in dispute in the 395 District Court claim construction proceedings, as addressed in detail in the briefings and as argued at the Markman hearing on November 17, 2020 in that case.[10]

Patent Owner respectfully submits that the issue of claim construction presents a threshold issue in connection with the determination of whether to institute.   More specifically, in discussing claim construction, Petitioners misleadingly cite to a paper that Patent Owner filed in the 395 District Court case in opposition to a motion to dismiss. (Paper 5 at 13-15).  Petitioners characterized the opposition paper as "confirm[ing] that Luminati [Patent Owner] views a 'server' and 'client' to be broad enough to encompass one another, and that Luminati [Patent Owner] equates the 'client device' with 'the agent,'" (Paper 5 at 14).

What Petitioners' *omitted from the record before the Board* was a subsequent paper (a sur-reply – Ex. 2010) that Patent Owner also filed in the 395 District Court

---

[10] *See* Exhibits 2003, 2004 and 2005.  In addition, Dr. Rhyne's Markman declaration in the 395 case is submitted as Ex. 2009.

case that further explained the annotated figure (Fig. 3) that Petitioners included and

discussed in the Petition. (Paper 5 at 14).  The sur-reply explained in detail the

mischaracterizations regarding the figure:

> Having ignored the claim language, Defendants attempt to mischaracterize the specification to read the server-client device-web server architecture out of the claims.  Reply at 3-6.  In the Opposition, Figure 3 of the '319 and '510 Patents and 12a of the '614 Patent are used to illustrate lines of communication showing the steps performed by the proxy client device.  Defendants attempt to use these specific figures to improperly limit the express language *by mischaracterizing Luminati as "view[ing] a 'server' and 'client' to be broad enough to encompass one another*." Reply at 4, 5.  *This is not true* as Luminati provided extensive support from the specifications of the Asserted Patents distinguishing between client devices and servers.  *See e.g*., Opp. at 3-5 and 17-19. (emphasis added)

Ex. 2010, pages 10-11 of the PDF.

Patent Owner had filed the sur-reply on May 5, 2020, so Petitioners could

have supplied the paper to the Board in their July 28, 2020 Petition to present a more

complete, accurate accounting of the statements made in the 395 District Court case.

Additionally, in ruling on the motion to dismiss, the District Court concluded

that "[t]he Court is persuaded that claim construction could be of benefit in

addressing this issue as it is presented in this case." (Ex. 2011 at 5).  The Court

therefore DENIED the motion to dismiss without prejudice to refiling after the Court issues its claim construction order.[11] (*Id.*) The Court's order issued on July 15, 2020 so Petitioners could have submitted the order with the Petition on July 28th.

Patent Owner submits that the foregoing illustrates why, consistent with *Fintiv* factor 3, the Board should decline to institute because the Court has already addressed – both in ruling on the motion to dismiss and in conducting the Markman hearing on Nov. 17th - a number of the exact same issues before the Board. Notwithstanding, should the Board decide to proceed and to address claim construction, Patent Owner provides the following proposed constructions and support for terms likely at issue in this proceeding, taken from ECF 105-1, chart attachment to Joint Claim Construction and Prehearing Statement filed August 18, 2020 (Ex. 2002):

| Term | Proposed Construction | Support |
|------|----------------------|---------|
| Preamble | Is a limitation | |

---

[11] The Court noted that should Defendants elect to refile their motion, they must either address the eligibility of each asserted claim or make an adequate showing of the representativeness of any claims addressed as representative. (*Id.*)

| "Client device" | "Consumer computer" | Intrinsic Evidence₁: Figs. 1, 2, 3, 6 and associated discussion in specification; 2:8-23; 2:44-46; 2:40-52; 4:41-5:7; 5:21-41; 5:49-57; 9:12-9:50; 12:33-12:56; 12:62-13:3; 14:62-15:11; '319 Patent claim 1, 26; LUM-00149131-149135 [ATTACHED TO CLAIM CONSTRUCTION REPLY]; |
| --- | --- | --- |
| | | Extrinsic Support: |
| | | Expert declaration/testimony; |
| | | PC Mag Encyclopedia: Definition of "computing device": "Any electronic equipment controlled by a CPU, including desktop and laptop computers, smartphones and tablets. It usually refers to a general-purpose device that can accept software for many purposes in contrast with a dedicated unit of equipment such as a network switch or router." https://www.pcmag.com/encyclopedia/term/66551/computing-device |
| | | LUM-00003575 |
| | | RFC 1983 at 11: Definition of "client": A computer system or process that requests a service of another computer system or process. A workstation requesting the contents of a file from a file server is a client of the file server. https://tools.ietf.org/html/rfc1983 |
| | | RFC 2828 at 39: Definition of "Client": (I) A system entity that requests and uses a service provided by another system entity, called a 'server.' https://tools.ietf.org/html/rfc2828 W3 Glossary of Terms for Device Independence at 2: Definition of "Client": The role adopted by an application when it is retrieving and/or rendering resources or resource manifestations. |
| | | https://www.w3.org/TR/di-gloss/#ref-wca-terms W3 Hypertext Glossary: Definition of "Client": A program which requests services of another program. Normally the browser is a client of a data server. https://www.w3.org/History/19921103-hypertext/hypertext/WWW/Terms.html |
| | | IEV ref 732-01-12 definition of "client": "functional unit that requests and receives services from a server." LUM-00003490-3491 RFC 2828 at 157: Definition of "Server": (I) A system entity that provides a service in response to requests from other system entities called client. https://tools.ietf.org/html/rfc2828 W3 Glossary of Terms for Device Independence at 4: Definition of "Server": The role adopted by an application when it is supplying resources or resource manifestations. https://www.w3.org/TR/di-gloss/#ref-wca-terms |

| | | |
|---|---|---|
| | | W3 Hypertext Terms: Definition of "Server": A program which provides a service to another, known as the client. In a hypertext system, a server will provide hypertext information to a browser." |
| | | https://www.w3.org/History/19921103-hypertext/hypertext/WWW/Terms.html |
| | | Merriam Webster: Definition of "server": A computer in a network that is used to provide services (such as access to files or shared peripherals or the routing of e-mail) to other computers in the network. |
| | | https://www merriam-webster.com/dictionary/server |
| | | LUM-00003579 |
| | | IEV ref 732-01-12 definition of server: "functional unit that provides services to workstations, to personal computers or to other functional units in a computer network" |
| | | http://www.electropedia.org/iev/iev.nsf/display?openform&ievref=732-01-12 |
| | | LUM-00003576 |
| "Second server" | "A server that is not the client device or web server" | Intrinsic Support: '510 Patent 19:18-31; claim 1 |
| | | Extrinsic Support: |
| | | Expert declaration/testimony; |
| | | RFC 1983 at 49: Definition of "server": A provider or resources (e.g. file servers and name servers). |
| | | https://tools.ietf.org/html/rfc1983 |
| | | RFC 2828 at 157: Definition of "Server": (I) A system entity that provides a service in response to requests from other system entities called client. |
| | | https://tools.ietf.org/html/rfc2828 |
| | | W3 Glossary of Terms for Device Independence at 4: Definition of "Server": The role adopted by an application when it is supplying resources or resource manifestations. |
| | | https://www.w3.org/TR/di-gloss/#ref-wca-terms |
| | | Definition of "Server": A program which provides a service to another, known as the client. In a hypertext system, a server will provide hypertext information to a browser." |
| | | https://www.w3.org/History/19921103-hypertext/hypertext/WWW/Terms html |
| | | Merriam Webster: Definition of "server": A computer in a network that is used to provide services (such as access to files or shared peripherals or the routing of e-mail) to other computers in the network. |
| | | https://www merriam-webster.com/dictionary/server |

24

| | | |
|---|---|---|
| | | LUM-00003579 |
| | | IEV ref 732-01-12 definition of server: "functional unit that provides services to workstations, to personal computers or to other functional units in a computer network" |
| | | http://www.electropedia.org/iev/iev nsf/display?openform&ievref=732-01-12 |
| | | LUM-00003576 |
| | | RFC 1983 at 11: Definition of "client": A computer system or process that requests a service of another computer system or process. A workstation requesting the contents of a file from a file server is a client of the file server. |
| | | https://tools.ietf.org/html/rfc1983 |
| | | RFC 2828 at 39: Definition of "Client": (I) A system entity that requests and uses a service provided by another system entity, called a 'server.' |
| | | https://tools.ietf.org/html/rfc2828 |
| | | W3 Glossary of Terms for Device Independence at 2: Definition of "Client": The role adopted by an application when it is retrieving and/or rendering resources or resource manifestations. |
| | | https://www.w3.org/TR/di-gloss/#ref-wca-terms |
| | | W3 Hypertext Glossary: Definition of "Client": A program which requests services of another program. Normally the browser is a client of a data server. |
| | | https://www.w3.org/History/19921103-hypertext/hypertext/WWW/Terms html |

See Dr. Rhyne's Markman declaration (Exhibit 2009) which is part of the "Expert declaration/testimony."

Patent Owner also respectfully notes that the "plain and ordinary meanings" advanced by Petitioners are at complete odds with the express language of the

claims.  For example, Petitioners have advanced a theory that a "client device" and a "server" refer only to the *role* that a device is currently performing.  Thus, even though claim 1 expressly recites "[a] method *by a first client device* comprising …," under Petitioners' theory the client device would (presumably) switch between the role of "client" (when requesting content) and "server" (when responding to a request from another device).  Patent Owner submits that any such interpretation of the claims would be nonsensical and "unreasonable."  *See* July 2019 PTAB Trial Practice Guide Update at 19.

## VI.    THE ART CITED IN THE ALLEGED GROUNDS

The Grounds identify three primary references, plus one Network Working Group "Request for Comments" and the "knowledge of a POSA." (Paper 5 at 5-6).  A brief summary of each of the primary references follows.

### A. CROWDS

Crowds (Ex. 1011) describes a system comprised of groups ("crowds") of user computers that can interact with one or more web servers. (Ex. 1011 at 8-9, Dr. Rhyne Dec. Ex. 2012 at ¶22).  In order to participate in a crowd, a user installs software on his/her computer to initiate a process called a "jondo." (Ex. 1011 at 8, Ex. 2012 at ¶22) "When the jondo is started, it contacts a server called the *blender*

to request admittance to the crowd." (Ex. 1011 at 8, Ex. 2012 at ¶22)(emphasis original).  If a jondo gets admitted into a crowd, "the blender reports to [the new] jondo the current membership of the crowd and information that enables this jondo to participate in the crowd." (Ex. 1011 at 8, Ex. 2012 at ¶22)

The user can "select[] this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services.  Thus, any request coming from the browser is sent directly to the jondo." (Ex. 1011 at 8, Ex. 2012 at ¶23)  "Upon receiving the first user request from the browser, the jondo initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers."  (Ex. 1011 at 8, Ex. 2012 at ¶23)(emphasis original).  "More precisely, the jondo picks a jondo from the crowd (*possibly itself*) at random, and forwards the request to it."  (Ex. 1011 at 8, Ex. 2012 at ¶23)(emphasis added).  "When this jondo receives the request, it flips a biased coin to determine whether or not to forward the request to another jondo; the coin indicates to forward with probability $p_f$." (Ex. 1011 at 8, Ex. 2012 at ¶23)  "So, each request travels from the user's browser, through some number of jondos, and finally to the end server." (Ex. 1011 at 8, Ex. 2012 at ¶23).  "[S]erver replies traverse the same path as the requests, only in reverse." (Ex. 1011 at 8, Ex. 2012 at ¶23)  Figure 2 of Crowds depicts various members of a crowd and a possible set of paths:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Notably, each jondo is merely a process running on a user's computer. Thus, the only disclosed communication architecture(s) is/are as follows:

(i) User Computer <-> Web Server

(ii) User Computer <-> User Computer <-> Web Server

As explained above, because a user's jondo may (when it "flips the coin") decide to transmit the user's request directly to the appropriate web server (without sending the request to another jondo), the identity(s) of the members of the crowd do not (necessarily) remain anonymous to the web server. Rather, the system of

28

Crowds offers a user "some degree of deniability" (that it *originated* a particular request) – not necessarily anonymity.  (Exhibit 1011 at 2, Ex. 2012 at ¶26).

Finally, in addition to numerous security risks described in Crowds, the system suffers from a number of additional weaknesses such as: (i) unpredictable or "particularly pronounced" latency (Ex. 1011 at 19, Ex. 2012 at ¶27); and (ii) an inability to handle firewalls ("Firewalls present a problem for Crowds.") (Ex. 1011 at 25, Ex. 2012 at ¶27).  Because of the limitations associated with the Crowds architecture and implementation, "Crowds will be most useful across academic institutions, as a service provided by Internet service providers, and within large corporations." (Ex. 1011 at 25, Ex. 2012 at ¶27).

### B. BORDER

Border (Ex. 1017) describes "a communication system for receiving web content." (Border at Abstract, Ex. 2012 at ¶28).  As shown in Border Figs. 1 and 2 (below), "[a] downstream proxy server receives a URL request message from a web browser, in which the URL request message specifies a URL content that has an embedded object."  (Ex. 1017 at 3:34-38, Ex. 2012 at ¶28). "An upstream proxy server receives the URL request message from the downstream proxy server."  (Ex. 1017 at 3:34-38, Ex. 2012 at ¶28).  "The upstream proxy server selectively forwards the URL request message to a web server and receives the URL content from the

29

web server.  (Ex. 1017 at 3:34-38, Ex. 2012 at ¶28). "The upstream proxy server forwards the URL content to the downstream proxy server and parses the URL content *to obtain the embedded object* prior to receiving a corresponding embedded object request message initiated by the web browser."  (Ex. 1017 at 3:34-38, Ex. 2012 at ¶28)(emphasis added).

*FIG. 1*



Appx21999

*FIG. 2*



As described in the specification, the system of Border relates to obtaining "embedded objects" from a web server (or from a local cache) "prior to receiving corresponding embedded object requests initiated by [a] web browser." (Ex. 1017 at 5:45-49, Ex. 2012 at ¶29).

To that end, the disclosed system incorporates two servers, each having its own cache ("downstream server 105 checks its cache 115 to determine whether the requested URL has been previously visited" (Ex. 1017 at 5:19-21, Ex. 2012 at ¶30) and "upstream server 117 in turn searches for the URL HTML in its cache 117"). "[I]f the HTML page is not found in cache 117, the server 117 issues the GET URL HTML request [to-sic] web server 109 for the HTML page." (Ex. 1017 at 5:34-36, Ex. 2012 at ¶30). "[U]pstream server 117 parses the HTML page and requests the

31

embedded objects within the HTML page from the web server 109; the embedded objects are requested prior to receiving corresponding embedded object requests initiated by the web browser 103." (Ex. 1017 at 43-48, Ex. 2012 at ¶30).

"[D]ownstream proxy server 105 initiates and maintains a TCP connection to the upstream proxy server 107 as needed to carry HTTP transactions." (Ex. 1017 at 7:50-53, Ex. 2012 at ¶31). "The persistent TCP connection may also be set up when the first transaction is required and torn down after the connection has been idle for some period." (Ex. 1017 at 7:56-58, Ex. 2012 at ¶31).

The disclosed architecture over which the system operates is:

**Border**:

User Computer <-> Downstream Server <-> Upstream Server <-> Web Server

### C. MORPHMIX

MorphMix (Ex. 1013) discloses "a peer-to-peer-based dynamic mix network …" (MorphMix at 115, Ex. 2012 at ¶33). Fig. 5 of MorphMix depicts the "Basic Idea of MorphMix":



**Figure 5.1:** *Basic idea of MorphMix.*

In the disclosed system, "[a]t any time, Morphmix consists of a set of participating nodes." (Ex. 1013 at 118, Ex. 2012 at ¶34).  Nodes can join and leave the system at any time and must therefore not necessarily participate in the MorphMix protocol all the time." (Ex. 1013 at 118, Ex. 2012 at ¶34).  "We assume that at any time, a node knows about some other nodes, i.e., their IP addresses, the ports on which the MorphMix application is listening for incoming connection requests, and their public keys." (Ex. 1013 at 118, Ex. 2012 at ¶34). "Learning about other nodes requires a peer discovery mechanism …" (Ex. 1013 at 118, Ex. 2012 at ¶34).

"A node that is participating in MorphMix has established a *virtual link* to one or more other MorphMix nodes at any time." (Ex. 1013 at 119, Ex. 2012 at

¶35)(emphasis original). "In MorphMix, a virtual link means that (1) there is a TCP connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." (Ex. 1013 at 119, Ex. 2012 at ¶35). "In Figure 5.1, [node] *a* has five neighbors because it has established virtual links to five other nodes." (Ex. 1013 at 119, Ex. 2012 at ¶35).

"Since MorphMix is basically a circuit-based mix network, a node establishes a circuit via some other nodes to access servers in the Internet anonymously." (Ex. 1013 at 119, Ex. 2012 at ¶36). A node can be established by "[a]nyone who has access to a computer that is connected to the Internet should be able to join and use MorphMix after having installed the MorphMix software." (Ex. 1013 at 116, Ex. 2012 at ¶36).

MorphMix operates by creating one or more anonymous tunnels – "[A]n anonymous tunnel is set up hop-by-hop in the sense that the initiator picks the first intermediate node and establishes the layer of encryption with it." (Ex. 1013 at 134, Ex. 2012 at ¶37). "Then the initiator tells the first intermediate node to append another node to the tunnel and establishes the layer of encryption with the second intermediate node." (Ex. 1013 at 134, Ex. 2012 at ¶37). "This continues until the initiator decides the tunnel is long enough." (Ex. 1013 at 134, Ex. 2012 at ¶37). "The key is that the initiator selects only the first intermediate node and each node along

the anonymous tunnel then picks the following node." (Ex. 1013 at 134, Ex. 2012 at ¶37).

The architecture and configuration of MorphMix suffers from a number of problems.  For example, "a centralized lookup service that keeps track of the nodes that are currently participating in MorphMix is out of the question." (Ex. 1013 at 135, Ex. 2012 at ¶37). "Free riding" is also a problem in MorphMix, where "users only consume but do not provide the files that they download to others." (Ex. 1013 at 143, Ex. 2012 at ¶37).  "MorphMix suffers from the same problem." (Ex. 1013 at 143, Ex. 2012 at ¶37).

The disclosed architecture over which MorphMix operates is:

**MorphMix**:          Peer < - > Peer < - > Server

## VII.   THE FAILED GROUNDS OF ALLEGED INVALIDITY

As mentioned above, this POPR is limited to select reasons why institution should be denied.  Consistent with the limited nature of this paper, only select distinctions between Independent Claim 1 and the references cited in the Grounds are discussed below.  Patent Owner expressly reserves the right to address all issues and to challenge all points raised by Petitioners in any future response if proceedings are instituted.

35

### A. GROUND 1: FAILURE OF CROWDS TO ANTICIPATE CLAIM 1

As discussed above, Crowds generally discloses a system comprised of a "crowd" of user computers that can interact with one or more web servers. Each user computer runs a process called a "jondo" that allows the computer to (if admitted) join a crowd. Crowds does not disclose – and Petitioners do not allege that Crowds discloses - any "second server" outside of the various members of the crowd. Instead, Petitioners allege that a member of the Crowd – "jondo 4" would be the "second server" recited in Challenged Claim 1 ("the 'second server' would be jondo '4'") (Paper 5 at 19-20).

When describing Crowds, Petitioners also allege that "[i]n Crowds, a user's request to a web server is *not passed directly to the web server*, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again." (Paper 5 at 17)(emphasis added). This allegation is untrue, and misrepresents the disclosure of Crowds. As discussed above, the forwarding of requests from jondo-to-web server or from jondo-to-jondo-to-web server is based on the flip of a (logical) biased coin. (Crowds Exhibit 1011 at 8). Crowds expressly states that when a jondo receives a request from a user's browser, "the jondo picks a jondo from the crowd (*possibly itself*) at random, and forwards the request to it." (*Id.*)(emphasis added). Thus, a jondo may decide to forward a

36

user's request directly to a web server, without forwarding the request to any other user/jondo.

Because of the architecture and operation of Crowds, the *initiator* of a request does not (necessarily) enjoy anonymity as to the target web server. Rather, the system of Crowds merely offers an initiator "some degree of deniability" that it originated a particular request. (Crowds Ex. 1011 at 2). Moreover, the architecture of Crowds leads to unpredictable or "particularly pronounced" latency (*Id*. at 19). Petitioners acknowledgment of the claimed benefits of the '510 Patent – "congestion and latency reduction and anonymity …" (Paper 5 at 53) are simply not met by Crowds.

Comparing Crowds to the express limitations of Challenged Claim 1, a number of the express limitations are neither taught nor suggested, including:

| Preamble and claim elements: "first client device" | Crowds fails to disclose a "first client device" for performing the claimed method |
|---|---|
| "establishing a Transmission Control Protocol (TCP) connection with a second server …" | Crowds fails to disclose a "first client device" "establishing a Transmission |

| | |
|---|---|
| | Control Protocol (TCP) connection with a second server" |
| "sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier." | Crowds fails to disclose a a "first client device" sending the received first content to a second server, in response to the receiving of the first content identifier |

Because the architecture and operation of Crowds differs from the "second server – client first device – web server" architecture/operation of the '510 patent, Crowds neither teaches nor suggests the method of Challenged Claim 1. At least for the above reasons, Ground 1 fails.

### B. GROUND 2: FAILURE OF CROWDS + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "Ground 2 combines the teaching of Crowds with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications." (Paper 5 at 31). As to Claim 1, Petitioners offer no evidence beyond hindsight that "[e]ven if Crowds were deemed not to disclose a 'server' as a jondo – despite the express disclosure – it would have been obvious to a POSA that

any of the commonly understood types of 'servers' that have IP addresses could be used." (Paper 5 at 34).

First, this is pure hindsight analysis, as evidenced by Petitioners use of the term "*could* be used." (emphasis added) (*See KSR Int'l Co. v. Teleflex, Inc.* 550 U.S. 398, 421, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").

Second, although Petitioners used the phrase "despite the *express disclosure*" (emphasis added) to argue that a "second server" was disclosed, Petitioners cite no authority for that proposition. Because there is none.

At least for the above reasons, Ground 2 fails.


## C. GROUND 3: FAILURE OF BORDER TO ANTICIPATE CLAIM 1

As discussed above, Border generally discloses a communication system for receiving web content containing embedded objects. (Border Ex. 1017 at Abstract) The disclosed system utilizes two proxy servers (each including local cache) disposed between a "user computer" and a "web server." (Border Ex. 1017 at 3:34-38) The alleged advantage of the system of Border is that "the upstream proxy server forwards the URL content to the downstream proxy server and parses the URL

content to obtain the embedded object *prior to the web browser having to issue an*
*embedded object request message*." (Border Ex. 1017 at 2:54-58)(emphasis added)

Because Border addresses completely different issues than the issues solved
by the '510 Patent, the architecture and operation of Border is completely different
than Challenged Claim 1.   Comparing Border to the express limitations of
Challenged Claim 1, a number of the express limitations are neither taught nor
suggested, including:

| Preamble and claim elements: "first client device" | Border fails to disclose a "first client device" that performs the claimed method steps |
|---|---|
| "establishing a Transmission Control Protocol (TCP) connection with a second server;" | As the claimed method is performed by the "first client device," Border fails to disclose a "first client device" that establishes a TCP connection with "a second server" |
| "sending, to the web server …." | Border fails to disclose a "first client device" that performs "sending, to the web server …" |

| "receiving, the first content from the web server …." | Border fails to disclose a "first client device" that performs "receiving, the first content from the web server …" |
|---|---|
| "sending the received first content, to the second server … in response to the receiving of the first content identifier." | Border fails to disclose sending the first content by the first client device to the second server |
| | Border fails to disclose that the first content is sent to the second server in response to receiving of the first content identifier [from the second server] |

Like the arguments advanced in each Ground, Petitioners' argument, in large part, is based on unreasonable interpretation of the claim language. By way of example, Petitioners' position as to how "the preamble [of claim 1] maps onto Border" is as follows:

"First **client device**: Upstream **server** 107" (Petition at 41)(emphasis added)

41

Petitioners' entire discussion and analysis of Challenged Claim 1 repeats this same false premise – that the claimed "first *client* device" is somehow met by "Upstream *server* 107." (*Id.*)  Petitioners ignore the express limitations of the claims regarding the identity of specific elements *and the claimed communications there-between*.

Because the architecture and operation of Border differs from the "second server – first client device – web server" architecture of the '510 Patent, Border neither teaches nor suggests the method of Challenged Claim 1.  At least for the above reasons, Ground 3 fails.

### D. GROUND 4: FAILURE OF BORDER + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "Ground 4 is based upon a combination of the teaching of Border with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications." (Paper 5 at 52).  As to Claim 1, Petitioners offer no evidence beyond hindsight that "[e]ven if 'first client device' is construed to refer to a consumer computer instead of a device acting in the role of a client, it would have been obvious to a POSA, in view of RFC 2616 and a POSA's knowledge of Internet communications in 2009 to modify upstream server 107 to operate on a consumer computer." (Paper 5 at 53).

42

Again, this is pure hindsight analysis, as evidenced by Petitioners use of the

term "*it would have been obvious ... to modify ...*" (emphasis added)  The Federal

Circuit has cautioned that hindsight analysis – as engaged in by Petitioners – is

unacceptable and cannot form the basis for obviousness pursuant to 35 USC 103.

(*See KSR Int'l Co. v. Teleflex, Inc.*  550 U.S. 398, 421, 127 S. Ct. 1727, 167 L. Ed.

2d 705 (2007) ("A factfinder should be aware, of course, of the distortion caused by

hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").

At least for the above reasons, Ground 4 fails.


### E.  GROUND 5 FAILURE OF MORPHMIX TO ANTICIPATE CLAIM 1

As discussed above, MorphMix generally discloses "a peer-to-peer-based

dynamic mix network …" (MorphMix Ex. 1013 at 115)  The network of MorphMix

consists of a set of participating nodes, where "[a] node that is participating in

MorphMix has established a *virtual link* to one or more other MorphMix nodes at

any time." (*Id*. at 119)(emphasis original).  "Since MorphMix is basically a circuit-

based mix network, a node establishes a circuit via some other nodes to access

servers in the Internet anonymously."  (*Id*).

MorphMix operates by creating one or more anonymous tunnels.  (*Id*. at 134)

However, the architecture and configuration of MorphMix suffers from a number of

problems.  For example, "a centralized lookup service that keeps track of the nodes that are currently participating in MorphMix is out of the question" (*Id*. at 135) "Free riding" is also a problem in MorphMix, where "users only consume but do not provide the files that they download to others." (*Id*. at 143)  "MorphMix suffers from the same problem." (*Id*.)  Additionally, MorphMix suffers from poor performance and increased latency: "Compared to Figure 8.1, the download times are significantly longer.  The better the bandwidth of the node, the more severe the performance penalty from which it suffers." (Ex. 1013 at 227).  Finally, a MorphMix tunnel completely fails when any node along a tunnel fails or leaves: "The most significant limitation of MorphMix is that if any node along a tunnel can no longer be reached for any reason, the tunnel fails." (Ex. 1013 at 256).

The disclosed architecture over which MorphMix operates is:

**Morphmix**:    Peer < - > Peer < - > Server

In advancing Ground 5, Petitioners ignore the express disclosure of MorphMix and instead redefine the nodes – to equate "client devices" with "servers" - in the following way:

First **client device**: last **node** (c).

Second **server**: intermediate **node** (b).

(Petition at 60)(emphasis original)

Petitioners *re-imagined* architecture of MorphMix is simply not what is disclosed.    MorphMix unambiguously discloses a different architecture and operation than the method of Challenged Claim 1.  And because of these differences, MorphMix suffers from the problems discussed above – problems which are not present in the invention of Challenged Claim 1.

Comparing MorphMix to the express limitations of Challenged Claim 1, a number of the express limitations are neither taught nor suggested, including:

| Preamble and claim elements: "first client device" | MorphMix fails to disclose a "first client device" that performs the claimed method steps |
|---|---|
| "establishing a Transmission Control Protocol (TCP) connection with a second server;" | As the claimed method is performed by the "first client device," MorphMix fails to disclose a "first client device" that establishes a TCP connection with "a second server" |
| "sending, to the web server …." | MorphMix fails to disclose a "first client device" that performs "sending, to the web server …" |

45

| "receiving, from the web server …" | MorphMix fails to disclose "receiving, from the web server …" |
| --- | --- |
| "sending the received first content, to the second server …, in response to the receiving of the first content identifier." | MorphMix fails to disclose sending the first content by the first client device to the second server<br><br>MorphMix fails to disclose that the first content is sent to the second server in response to receiving of the first content identifier [from the second server] |

Because the architecture and operation of MorphMix differs from the "second server – first client device – web server" architecture of the '510 Patent, MorphMix neither teaches nor suggests the method of Challenged Claim 1. At least for the above reasons, Ground 5 fails.

### F. GROUND 6 FAILURE OF MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE TO RENDER OBVIOUS CLAIM 1

Petitioners allege that "the rationale for combining Crowds with the same general knowledge of a POSA and RFC 2616" "is the same for MorphMix as for

Crowds …" (Paper 5 at 74).  Thus, Ground 6 (pertaining to MorphMix) fails for at least the same reasons explained above as to Ground 2 (pertaining to Crowds).

In advancing Ground 6, Petitioners again rely on pure hindsight to allege that it "would have been obvious" to incorporate a "second server" into MorphMix. (Petition at 74-75).  And again, the Federal Circuit has cautioned that hindsight analysis – as engaged in by Petitioners – is impermissible and cannot form the basis for obviousness pursuant to 35 USC 103. (*See KSR Int'l Co. v. Teleflex, Inc.*  550 U.S. 398, 421, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").

At least for the above reasons, Ground 6 fails.

## VIII.  CONCLUSION

For at least the reasons explained above, Patent Owner respectfully requests that the Board deny institution of this *inter partes* review.  The *Fintiv* factors, alone, strongly weigh against institution.  Moreover, the lack of merit of the Petition coupled with the fact that the 395 District Court already has the very same claim construction and prior art issues squarely before it further dictates that the requested institution should be denied.

Respectfully submitted,

Date:  November 20, 2020          By: /s/ Thomas M. Dunham

Thomas M. Dunham
Reg. No. 39,965
Don F. Livornese
Reg. No. 32,040

RUYAKCHERIAN LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEYS FOR PATENT OWNER
LUMINATI NETWORKS LTD.

48

Appx22017

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This Patent Owner Preliminary Response "POPR" consists of no more than 9554 words, excluding table of contents, table of authorities, certificate of service, this certificate, or table of exhibits. The POPR complies with the type-volume limitation of 14,000 words as mandated in 37 C.F.R. §42.24. In preparing this certificate, counsel has relied on the word count of the word-processing system used to prepare the paper (Microsoft Word).

Respectfully submitted,

Date: November 20, 2020

By: /s/ Thomas M. Dunham
Thomas M. Dunham
Reg. No. 39,965
Don F. Livornese
Reg. No. 32,040

RUYAKCHERIAN LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEYS FOR PATENT OWNER
LUMINATI NETWORKS LTD.

49

Appx22018

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. § 42.6(e) on the

undersigned date on Petitioner by email as authorized by the Petitioner at the

following email addresses:

ctolliver@ccrglaw.com

jscott@ccrglaw.com

Respectfully submitted,

Date: November 20, 2020          By: /s/ Thomas M. Dunham/
                                 Thomas M. Dunham
                                 Reg. No. 39,965
                                 Don F. Livornese
                                 Reg. No. 32,040

                                 RUYAKCHERIAN LLP
                                 1901 L Street NW, Suite 700
                                 Washington, D.C. 20036
                                 (202) 838-1567

                                 ATTORNEYS FOR PATENT OWNER
                                 LUMINATI NETWORKS LTD.

50

IPR2020-01266
Patent 10,257,319 B2

Prelim. Resp. 12; Ex. 1038. Petitioner argues that because the fourth petitioner, Code200, is not a party to the Texas Litigation, this factor "weighs in favor of institution." Pet. 9. Patent Owner responds that this argument "fails to acknowledge the close corporate relationship between Code200 and the other defendants/petitioners." Prelim. Resp. 12.

After reviewing the corporate structure of the named petitioners, Patent Owner concludes: "Code200 is related to the other petitioners and all of them are under the control of their common parent company." Prelim. Resp. 13 (citing Exs. 2013, 2014). Petitioner does not challenge this assertion.

We find that the overlap between the defendants in the Texas Litigation and petitioners this proceeding, even without considering the relationship of Code 200 to the other petitioners, is substantial, and favors denial of institution.

*vi. Other Considerations*

The final *Fintiv* factor takes into account any other relevant circumstances. Petitioner contends the '319 patent "is extraordinarily weak." Pet. 9. Patent Owner responds "Petitioners' reading of the claims is unreasonable — an issue that will be resolved by the . . . District Court." Prelim. Resp. 13–14.

Having reviewed Petitioner's unpatentability arguments and Patent Owner's responses, and based on the limited record before us, we do not find that the merits outweigh the other *Fintiv* factors favoring denial of institution.

11

APPx27389

claim 1 in the district court is also likely to have an impact on the additional dependent claims challenged here. *Id*. at 13.

In light of the common prior art asserted here and in the 395 district court case, as well as the common challenge to the sole independent claim of the '510 patent, we agree with the Patent Owner that the overlap in issues between the two proceedings is substantial. Accordingly, we determine that this factor favors denial of institution of *inter partes* review.

### F. Factor 5 — Commonality of Parties in Parallel Proceedings

Petitioner asserts that Code200 is a named petitioner here, but is not a defendant in the 395 district court case. Pet. 9. Patent Owner argues that three of the four named petitioners are also defendants in the 395 district court case. PO Resp. 13. Patent Owner also asserts that there is a close corporate relationship between Code200 and the other petitioners because they share a common parent company. *Id*. at 14 (citing Ex. 2013, Ex. 2014). Petitioner does not challenge this contention.

Given the commonality of most of the parties in this proceeding and 395 district court case, we find that this factor favors denial of institution.

### G. Factor 6 — Other Circumstances

Petitioner contends that the challenged patent is "extraordinarily weak," and policy favors instituting review under these circumstances. Pet. 9. Patent Owner disagrees, arguing that Petitioner's reading of the claims is unreasonable and the asserted prior art is weak. Prelim. Rep. 15–16.

We have reviewed Petitioner's unpatentability arguments and Patent Owner's preliminary responses, and based on the limited record before us, we do not find that the merits outweigh the other *Fintiv* factors favoring denial of institution.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB; AND
OXYSALES, UAB, Petitioners,

v.

LUMINATI NETWORKS LTD.,
Patent Owner.

_____

Case IPR2020-01266
Patent No. 10,257,319

_____

**PETITION FOR INTER PARTES REVIEW
OF U.S. PATENT NO. 10,257,319**

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Data Co Exhibit 1069
Data Co v. Bright Data

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................. 1

II.  STATUTORY PREDICATES ............................................... 2

    A. Mandatory Notices (37 CFR § 42.8) ................................. 2

        1. Real Parties-In-Interest ............................................. 2

        2. Related Matters .......................................................... 2

        3. Lead and Back-Up Counsel ....................................... 4

        4. Service Information ................................................... 4

    B. Payment of Fees (37 CFR § 42.103) ................................. 5

    C. Certification of Standing (37 CFR § 42.104(a)) ................. 5

    D. Identification of Challenges (37 CFR § 42.104(b)(1)-(2)) ... 5

III. INSTITUTION SHOULD BE GRANTED (35 U.S.C. § 314(a)) ........... 6

    A. Factor 1 ........................................................................... 7

    B. Factor 2 ........................................................................... 7

    C. Factor 3 ........................................................................... 8

    D. Factor 4 ........................................................................... 8

    E. Factor 5 ........................................................................... 9

    F. Factor 6 ........................................................................... 9

IV.  OVERVIEW OF THE PATENT ............................................ 9

    A. Claims .............................................................................. 9

    B. Specification ................................................................... 10

    C. Priority Date ................................................................... 12

    D. Alleged Benefit of the Patent ......................................... 12

V.   LEVEL OF SKILL IN THE ART ........................................ 12

VI.  CLAIM CONSTRUCTION (37 CFR § 4 2.104(b)(3)) .......... 13

VII. OVERVIEW OF PRIOR ART REFERENCES ................... 15

    A. Crowds ........................................................................... 15

    B. MorphMix ...................................................................... 15

    C. Border ............................................................................. 16

    D. RFC 2616 ........................................................................ 16

i

VIII.  GROUNDS FOR INVALIDITY (37 CFR § 42.104(b)(4)-(5)) ..........17

  A. GROUND 1: ANTICIPATION OF CLAIMS 1, 21-22, AND 24-27 BY CROWDS.........................................................................17

    1. Claim 1 .....................................................................................18

      a) Preamble...........................................................................18

      b) Claim step (a) ("receiving, from the second server, the first content identifier") ....................................................19

      c) Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier") ....................................23

      d) Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")...........................................................25

      e) Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier") ........................................................26

    2. Claim 2.....................................................................................26

    3. Claims 21-22 and 24-25............................................................28

    4. Claim 26...................................................................................29

    5. Claim 27...................................................................................29

  B. GROUND 2: OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-18, 21-22, AND 24-27 BY CROWDS + RFC 2616 + GENERAL KNOWLEDGE ........................................................................30

    1. Claim 1.....................................................................................32

    2. Claim 14...................................................................................33

    3. Claim 15...................................................................................34

    4. Claim 17...................................................................................35

    5. Claim 18...................................................................................37

    6. Claims 2, 21-22 and 24-27.......................................................37

  C. GROUND 3: ANTICIPATION OF CLAIMS 1, 12, 14, 21-22, 24-25, AND 27-29 BY BORDER ...............................................38

    1. Claim 1.....................................................................................40

      a) Preamble...........................................................................40

Appx27406

b) Claim step (a) ("receiving, from the second server, the first content identifier") ....................................................................40

c) Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier").........................................................43

d) Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier") ....................................................................44

e) Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")...................................................45

2. Claim 12 .........................................................................................46

3. Claim 14 .........................................................................................46

4. Claims 21-22 and 24-25 ..............................................................47

5. Claim 27 .........................................................................................48

6. Claims 28-29 .................................................................................48

D. GROUND 4: OBVIOUSNESS OF CLAIMS 1, 12, 14-15, 17-18, 21-22, AND 24-29 BY BORDER + RFC 2616 + GENERAL KNOWLEDGE ..................................................................49

1. Claim 1 ...........................................................................................50

2. Claim 15 .........................................................................................52

3. Claims 17-18 .................................................................................53

4. Claim 26 .........................................................................................55

5. Claims 12, 14, 21-22, 24-25, and 27-29 ........................................55

E. GROUND 5: ANTICIPATION OF CLAIMS 1, 2, 17, 19, 21-22, AND 24-27 BY MORPHMIX ..................................................................56

1. Claim 1 ...........................................................................................57

a) Preamble.....................................................................................57

b) Claim step (a) ("receiving, from the second server, the first content identifier") ....................................................................57

c) Claim step (b) ("sending, to the first server over the Internet, Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")...................................................61

iii

d)  Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")............................................................63

e)  Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")......................................................63

2. Claim 2................................................................................64

3. Claim 17..............................................................................65

4. Claim 19..............................................................................66

5. Claims 21-22 and 24-25..........................................................67

6. Claim 26..............................................................................68

7. Claim 27..............................................................................68

F. GROUND 6: OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-19, 21-22, AND 24-27 BY MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE .................................................................69

1. Claim 1................................................................................69

2. Claims 14-15........................................................................70

3. Claim 18..............................................................................71

4. Claims 2, 17, 19, 21-22 and 24-27............................................72

iv

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 1001 | United States Patent No. 10,257,319 to Shribman et al. |
| 1002 | File History for United States Patent No. 10,257,319 |
| 1003 | Minute Entry: Scheduling Conference, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1004 | Docket Control Order, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1005 | Luminati Mtn. to Consolidate and Reset Trial, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1006 | Order: Pretrial Conference, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1007 | Petitioners' Chart of Challenged Claims |
| 1008 | Luminati's Opposition to Defendants' Motion to Dismiss, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1009 | Declaration of Michael Freedman, Ph. D. with curriculum vitae and testifying list |
| 1010 | Luminati's Opening Claim Construction Brief, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1011 | Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, Nov. 1998, at 66-92 |
| 1012 | Declaration of Scott Delman (regarding Crowds) |
| 1013 | Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Doctoral Thesis) |
| 1014 | Declaration of Marc Rennhard (regarding MorphMix) |
| 1015 | Declaration of Bernhard Plattner (regarding MorphMix) |
| 1016 | Declaration of Andreas Berz (regarding MorphMix) |
| 1017 | United States Patent No. 6,795,848 to Border et al. |
| 1018 | Network Working Group, RFC 2616 |
| 1019 | Network Working Group, RFC 1180 |
| 1020 | ACM Award Winners, Michael J. Freedman |
| 1021 | Network Working Group, RFC 791 |
| 1022 | Network Working Group, RFC 2460 |
| 1023 | Network Working Group, RFC 793 |

v

| 1024 | Network Working Group, RFC 959 |
|------|--------------------------------|
| 1025 | Network Working Group, RFC 821 |
| 1026 | Network Working Group, RFC 918 |
| 1027 | Network Working Group, RFC 937 |
| 1028 | Network Working Group, RFC 1939 |
| 1029 | Network Working Group, RFC 1034 |
| 1030 | Network Working Group, RFC 1035 |
| 1031 | Network Working Group, RFC 1945 |
| 1032 | Roger Dingledine, Michael Freedman, & David Molnar, *The Free Haven Project: Distributed Anonymous Storage Service* (2000) |
| 1033 | Michael Freedman & Robert Morris, *Tarzan: A Peer-to-Peer Anonymizing Network Layer* (2000) |
| 1034 | Google Scholar: Crowds Citations |
| 1035 | Google Scholar: MorphMix citation in Alessandro Acquisti, et al., *Digital Privacy: Theory, Technologies, and Practices* (2007) |
| 1036 | Network Working Group, RFC 1122 |
| 1037 | Amended Complaint for Patent Infringement, *Luminati Networks Ltd. v. Code200, UAB et al.*, 2:19-cv-00396-JRG (E.D. Tex.) |
| 1038 | Complaint for Patent Infringement, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |

vi

Appx27410

## I.     INTRODUCTION

U.S. Patent No. 10,257,319 ("Patent"), with a priority date of 2009, claims the sending of basic Internet information, using the HTTP protocol, through a proxy device that retrieves content from the target web server and returns the content to the requesting device. Not surprisingly, the alleged invention was well known to a person of "ordinary skill in the art" as of 2009 ("POSA") and is invalidated by the Crowds, Border, and MorphMix references discussed herein. None of these references were before the examiner during prosecution. Further, the references expressly identify the same alleged benefit as patent owner Luminati Networks Ltd. ("Luminati")—anonymous retrieval of web data, relieving traffic congestion, and decreasing network latency.

In short, Luminati did not come close to being the first to invent a web proxy, and its Patent should be invalidated. Accordingly, there is a reasonable likelihood that Petitioners would prevail with respect to at least one of the claims challenged in this Petition.

1

## II.    STATUTORY PREDICATES

### A.    Mandatory Notices (37 CFR § 42.8)

#### 1.    Real Parties-In-Interest

The real parties-in-interest are the Petitioners Code200, UAB, Teso LT, UAB, Metacluster LT, UAB, and Oxysales, UAB (collectively, "Petitioners"); as well as coretech lt, UAB.

#### 2.    Related Matters

The Patent is currently the subject of the litigation styled *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.). Further, U.S Pat. Nos. 10,484,511 and 10,637,968 (both claiming the benefit of 61/249,624 (the Patent's provisional application number)), are currently the subject of the litigation styled *Luminati Networks Ltd. v. Code 200, UAB et al.*, 2:19-cv-00396-JRG (E.D. Tex.) and *Luminati Networks, Ltd. v. NetNut, Ltd.*, 2:20-cv-00188-JRG (E.D. Tex.). Further, the Patent, as well as U.S. Pat. Nos. 10,484,510 and 10,484,511 (both claiming the benefit of 61/249,624 (the Patent's provisional application number)), are currently the subject of the litigation styled *Luminati Networks Ltd. v. Tefincom S.A. D/B/A NordVPN*, 2:19-cv-00414-JRG (E.D. Tex.).

The Patent Application Information Retrieval (PAIR) system indicates that U.S. Application Nos. 16/278,106 (issued as U.S. Pat. 10,491,712), 16/662,800 (pending), 16/278,107 (issued as U.S. Pat. 10,484,510), and 16/600,507 (pending) all claim the benefit of 15/957,945 (the Patent's application number). Further, the

2

following patent applications and patents claim the benefit of 61/249,624 (the Patent's provisional application number): 12/836,059 (issued as U.S. Pat. 8,560,604), 14/025,109 (issued as U.S. Pat. 10,069,936), 15/957,942 (issued as U.S. Pat. 10,313,484), 15/957,945 (issued as U.S. Pat. 10,257,319), 15/957,950 (issued as U.S. Pat. 10,225,374), 16/031,636 (issued as U.S. Pat. 10,616,375), 16/278,106 (issued as U.S. Pat. 10,491,712), 16/278,107 (issued as U.S. Pat. 10,484,510), 16/278,109 (issued as U.S. Pat. 10,484,511), 16/278,104 (issued as U.S. Pat. 10,523,788), 16/278,105 (issued as U.S. Pat. 10,469,628), 16/368,002 (issued as U.S. Pat. 10,582,013), 16/368,041 (issued as U.S. Pat. 10,582,014), 16/396,695 (issued as U.S. Pat. 10,491,713), 16/396,696 (issued as U.S. Pat. 10,637,968), 16/600,504 (pending), 16/600,505 (pending), 16/600,506 (pending), 16/600,507 (pending), 16/662,800 (pending), 16/693,306 (pending), 16/782,073 (pending), 16/782,076 (pending), 16/807,661 (pending), 16/807,691 (pending), 16/910,724 (pending), and PCT/US10/51881 (issued as WO 2011/044402).

3

### 3.    Lead and Back-Up Counsel

| Lead Counsel | Back-Up Counsel |
|---|---|
| Craig Tolliver<br>Registration No. 45,975<br>ctolliver@ccrglaw.com<br>469-587-7263<br><br>Postal and Hand-Delivery Address<br>Charhon Callahan Robson & Garza, PLLC<br>3333 Lee Parkway<br>Suite 460<br>Dallas, TX 75219 | George "Jorde" Scott<br>Registration No. 62,859<br>jscott@ccrglaw.com<br>469-587-7264<br><br>Postal and Hand-Delivery Address<br>Charhon Callahan Robson & Garza, PLLC<br>3333 Lee Parkway<br>Suite 460<br>Dallas, TX 75219 |

### 4.    Service Information

| | |
|---|---|
| Electronic mail | 1.  ctolliver@ccrglaw.com<br>2.  jscott@ccrglaw.com |
| Postal (and hand-delivery) mailing address | Charhon Callahan Robson & Garza<br>3333 Lee Parkway, Suite 460<br>Dallas, Texas 75219 |
| Telephone | (214) 521-6400 |
| Facsimile | (214) 764-8392 |

Additionally, Petitioners consent to electronic service via e-mail at the e-mail addresses noted above.

4

Appx27414

### B.    Payment of Fees (37 CFR § 42.103)

The required fee is paid through an online credit card, and the office is authorized to charge any fee deficiencies and credit any overpayments to Deposit Acct. No. 603576 (Customer ID No. 172361).

### C.    Certification of Standing (37 CFR § 42.104(a))

Petitioners certify that the Patent is available for IPR and that Petitioners are not barred or estopped from requesting IPR of the Challenged Claims on the grounds alleged herein. Luminati filed a complaint alleging infringement by Teso LT, UAB; Metacluster LT, UAB; and Oxysales, UAB of the Patent on December 6, 2019 and served the complaint on Metacluster LT, UAB (the earliest served defendant) on February 18, 2020. Ex. 1038. Both dates are less than twelve months prior to filing of this Petition. Petitioners have not filed a civil action challenging the validity of any claim of the Patent within the meaning of 35 U.S.C. 315(a).

### D.    Identification of Challenges (37 CFR § 42.104(b)(1)-(2))

Petitioners request cancellation of the challenged claims on the following grounds:

| Ground | Claims | Challenge |
|--------|--------|-----------|
| 1 | 1-2, 21-22, 24-27 | Anticipated by Crowds (§102) |
| 2 | 1-2, 14-15, 17-18, 21-22, 24-27 | Obvious in view of Crowds + Knowledge of POSA + Request for Comments ("RFC") 2616 (§103) |

5

| 3 | 1, 12, 14, 21-22, 24-25, 27-29 | Anticipated by Border (§102) |
|---|---|---|
| 4 | 1, 12, 14-15, 17-18, 21-22, 24-29 | Obvious in view of Border + Knowledge of POSA + RFC 2616 (§103) |
| 5 | 1-2, 17, 19, 21-22, 24-27 | Anticipated by MorphMix (§102) |
| 6 | 1-2, 14-15, 17-19, 21-22, 24-27 | Obvious in view of MorphMix + Knowledge of POSA + RFC 2616 (§103) |

## III.    INSTITUTION SHOULD BE GRANTED (35 U.S.C. § 314(a))

Petitioner Code200 has been sued by Luminati for alleged patent infringement, but Luminati has (as of yet) *not filed* any lawsuit alleging infringement of the Patent by Code200. This weighs in favor of institution with respect to Code200.

The other petitioners (co-petitioners) were sued by Luminati for alleged infringement of the Patent, as noted above. As to the co-petitioners, however, the *Fintiv*[1] factors, discussed below, show that the Board should not exercise its discretion to deny institution in view of *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-CV-00395-JRG (E.D. Tex.) ("Lawsuit").

---

[1] *Apple Inc. v. Fintiv Inc.*, IPR2020-00019, Paper 11 (PTAB March 20, 2020) (precedential, designated May 5, 2020)

6

### A.    Factor 1

The first factor is whether the court may grant a stay if a proceeding is instituted. The Lawsuit is at a very early stage. The Scheduling Conference did not occur until May 18, 2020. Ex. 1003. The Docket Control Order issued June 3, 2020. Ex. 1004. Claim construction is set for November 10, 2020. *Id.*

No party has requested a stay of the Lawsuit pending the IPR, and the Board has previously "decline[d] to infer" how a District Court would decide a stay motion. *Fintiv*, Paper 15 at 12. Factor 1 is neutral.

### B.    Factor 2

The second factor concerns the proximity of the Lawsuit trial date to the Board's projected final written decision. While jury selection is currently set for May 3, 2021 (Ex. 1004), Luminati has previously sought to abandon its trial dates as the "day of reckoning" approaches. In *Luminati Networks Ltd. v. UAB Tesonet and Metacluster UAB*, No. 2:18-cv-00299-JRG (E.D.Tex.) ("Prior Lawsuit"), Luminati, on December 23, 2019, filed an opposed motion to reset the trial date just over one week before the January 3, 2020 pretrial hearing at which co-petitioners' dispositive motions regarding Section 101 invalidity and non-infringement were to be heard. Ex. 1005 at 2. Luminati sought to delay the February 3, 2020 trial date for at least five months until "after July 2020." *Id.* at 1.

7

The parties settled the Prior Lawsuit at the pretrial conference, prior to resolution of dispositive motions. Ex. 1006.

In view of Luminati's history and the potential for COVID-related delays (which are more likely to affect a jury trial), Factor 2 is neutral.

### C.    Factor 3

Factor 3 concerns "investment in the parallel proceedings." The Lawsuit is at a very early stage, with the Docket Control Order issuing June 2, 2020. Ex. 1004. Luminati did not provide its infringement contentions, and therefore did not identify its asserted claims, until May 4, 2020. *Id.* This Petition was filed just 10 weeks after the asserted claims were disclosed, and over seven months before co-petitioners' statutory deadline for filing an IPR. *Id.* Expert discovery does not close until January 21, 2021. *Id.*

Given the early stages of the case, and the prompt filing of this Petition, Factor 3 weighs strongly in favor of institution.

### D.    Factor 4

Factor 4 concerns the overlap between the claims at issue in the Petition and the Lawsuit. Luminati asserts claims 1-2, 14-15, 17-18, 21-22, and 24-27 in the Lawsuit. In addition to these claims, this Petition also challenges claims 12, 19, 28, and 29, which are not at issue in the Lawsuit. Factor 4 weighs in favor of institution.

8

### E.    Factor 5

Factor 5 concerns the overlap between the parties in the Petition and the parties in the Lawsuit. Petitioner Code200 is not a defendant in the Lawsuit, although it has been sued by Luminati as to alleged infringement of related patents. Ex. 1037. Factor 5 weighs in favor of institution.

### F.    Factor 6

Factor 6 concerns "other circumstances." The challenged Patent is extraordinarily weak. Luminati has essentially claimed the exchange of standard Internet information via a typical intermediary computer device to perform web requests for a client. That basic concept has been well known for decades.

Policy favors the Board instituting review so that Luminati may not continue to pursue parties with infringement claims based on an invalid alleged invention that was known well before the 2009 priority date.

## IV.    OVERVIEW OF THE PATENT

### A.    Claims

Claim 1, the only independent claim of the Patent, is included in the attached Exhibit 1007, which lists the Challenged Claims.

The Patent claims ordinary devices that exchange standard Internet requests or content in a routine way. Claim 1 recites the standard use of an intermediary, where the "first client device" acts as an intermediary to retrieve from a web server

9

(first server) content requested by a "second server," and send the content to the second server.

The following is an illustration of Claim 1:



The dependent Challenged Claims merely recite additional steps known to a POSA, including that "TCP/IP" is used or that an HTTP header used in the prior art RFC 2616 standard is used.

## B.   Specification

The Patent's specification confirms that the claim terms used in the Patent have broad and generic meanings and may be satisfied by standard computers. Figure 3 depicts "peer[s]," a "client," and an "agent" communicating, with the "agent" forming a connection to the web server:

10



**FIG. 3**

Ex. 1001, Fig. 3. The Patent specification states with respect to Figure 3 that "[t]he network 100 of FIG. 3 contains multiple communication devices," that "*each communication device may serve as a client, peer, or agent*." *Id.* at 4:44-53.[2]

A "communication device" contains "general components of a computer" and "may serve as a client, agent, or peer." *Id.* at 5:52-57. For example, "[t]he communication device 200 includes a processor 202, memory 210, [and] at least one storage device 208 . . ." *Id.* at 5:59-63. Other off-the-shelf features of the "communication device" include "ROM, hard drive, tape, CDROM, etc." and that its input/output devices may include a keyboard or mouse. *Id.* at 6:14-24, 6:61-7:3.

---

[2] Unless otherwise noted, all emphases in quotations have been added in this Petition.

11

### C.    Priority Date

The Patent claims priority to provisional application 61/249,624 filed on October 8, 2009. The prior art references asserted in this Petition pre-date the October 8, 2009 date, and Petitioners do not contest (for purposes of this Petition only) that the Patent has a priority date of October 8, 2009 ("Priority Date").

### D.    Alleged Benefit of the Patent

Luminati has argued that the Patent allows for the benefit of "untraceability and anonymity." Ex. 1008 at 6. Luminati asserts that data center proxies "with a limited number of commercial IP addresses" could easily be blocked by a web server, whereas the usage of many "millions" of consumer devices as proxies provided many more IP addresses belonging to consumers, which could not easily be blocked. *Id.* at 6-7.

Even if these concepts—which are not claimed—were somehow relevant to Luminati's alleged invention, the prior art presented in this Petition teaches precisely the benefit of using many ordinary computer users as proxies that can send anonymous web requests on behalf of others.

## V.    LEVEL OF SKILL IN THE ART

Dr. Michael Freedman opines that a POSA to which the Patent pertains would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), as well as two or more years' experience working with and

12

programming networked computer systems as of the Priority Date. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols. Ex. 1009, ¶¶ 27-29. Dr. Freedman also opines as to relevant knowledge a POSA would possess as of the Priority Date. *Id.* at ¶¶ 30-41.

## VI.    CLAIM CONSTRUCTION (37 CFR § 4 2.104(B)(3))

The claim terms at issue in the Challenged Claims require no express claim construction, as the plain and ordinary meanings apply. Further, Petitioners understand that issues of indefiniteness are not resolved in an IPR and do not raise them here, but Petitioners do not waive any applicable indefiniteness challenges. Petitioners provide the following additional discussion regarding claim construction.

As discussed above in Section IV.B, general purpose computers, such as those with keyboards, memory, and hard drives, serve in the claimed roles shown in Figure 3—client, peer, or agent—and facilitate communication with a web server. Figure 3, and its related discussion, align with the "first client device," "second server," and "first server" (or "web server") of the Asserted Claims.

Luminati expressly represented in the Lawsuit that the "first client device" is depicted by the "agent" box and the "second server" is depicted by the "client" box in Figure 3:

13



FIG. 3

Ex. 1008 at 15-16 (Luminati's annotated figure, denoting "second server" in green, "first client device" in red, and "first server" in blue). This confirms that Luminati views a "server" and "client" to be broad enough to encompass one another, and that Luminati equates the "client device" with the "agent," which is described in the Patent as a standard computer (per Section IV.B above).

Luminati made a substantially similar representation in the Prior Lawsuit involving two patents that were also owned by Luminati, addressed technologies in the same field as the Patent, and listed the same inventors as the Patent. For those two patents, Luminati asserted that "client device" has a plain and ordinary meaning. Ex. 1010 at 25. Luminati cited extrinsic evidence showing that a POSA understands a "client" device to fulfill the *role* of requesting and receiving services from a server.

14

*Id.* (citing RFC 1392). Luminati also cited to a definition of client as a "functional unit that requests and receives services from a server." *Id.*

Luminati has confirmed the Patent's disclosure that a general purpose computer is used in the claimed invention, and that the references to a "client device" or "server" in the Challenged Claims specify the current role of the computer device. *See* Ex. 1009, ¶¶ 42-48.

## VII.    OVERVIEW OF PRIOR ART REFERENCES

### A.    Crowds

*Crowds: Anonymity for Web Transactions* ("Crowds" (Ex. 1011)) is an article authored by Michael K. Reiter of Bell Laboratories and Aviel D. Rubin of AT&T Labs, and published in 1998 in the ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, Pages 66-92. Crowds states that it was published in November 1998. ACM confirms in a declaration that Crowds was published in November 1998. Ex. 1012; Ex. 1009, ¶¶ 49-50. Crowds is accordingly prior art under 35 U.S.C. § 102(b). Crowds was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### B.    MorphMix

*MorphMix - A Peer-to-Peer-based System for Anonymous Internet Access* ("MorphMix" (Ex. 1013)) is a doctoral thesis authored by Marc Rennhard, of the Swiss Federal Institute of Technology, Computer Engineering and Networks

15

Laboratory; Zurich, Switzerland. MorphMix states that it was published in 2004. Dr. Rennhard, the supervisor of Dr. Rennhard's thesis (Dr. Plattner), and the Swiss National Library, each confirmed in a declaration that MorphMix was indeed published in 2004. Exs. 1014-1016; Ex. 1009, ¶¶ 52-54. MorphMix is accordingly prior art under 35 U.S.C. § 102(b). MorphMix was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### C.   Border

United States Patent 6,795,848 ("Border" (Ex. 1017)) issued to Border et al. on September 21, 2004. Border is accordingly prior art under 35 U.S.C. § 102(b). Border was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### D.   RFC 2616

Request for Comments ("RFC") 2616 was the definitive specification for the HTTP/1.1 protocol on the Priority Date. RFC 2616 was published ten years earlier by the HTTP Working Group of the Internet Engineering Task Force (IETF) in June 1999. RFC 2616 is also discussed in the Patent specification and claim 23, and was submitted to the Patent Office during prosecution of the Patent. Ex. 1001, 16:12-46; *see also* Ex. 1002, p. 411 (IDS listing RFC 2616 as prior art). RFCs (and like standards documents) posted on the Internet are published in the ordinary course by established standards organizations, and are intended to be viewed by the interested

16

Internet engineering audience at large as of their dates of publication at stated on the cover of each. Ex. 1009, ¶¶ 55-56.

## VIII.  GROUNDS FOR INVALIDITY (37 CFR § 42.104(B)(4)-(5))

### A.    GROUND 1: ANTICIPATION OF CLAIMS 1, 21-22, AND 24-27 BY CROWDS

Crowds is a system "for protecting users' anonymity on the world-wide-web." Ex. 1011 at 66.[3] "Web servers are unable to learn the true source of a request because it is equally likely to have originated from any member of the crowd." *Id.* In Crowds, a user's request to a web server is not passed directly to the web server, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again. The web request is eventually submitted to the web server by a random member, "thus preventing the end server from identifying its true initiator." *Id.* at 67.

A "user is represented in a crowd by a process on her computer called a jondo." *Id.* at 73. Once admitted to the crowd, the jondo receives "the current membership of the crowd and information that enables this jondo to participate in the crowd." *Id.* After receiving the user request from the browser, the jondo "initiates the establishment of a random path of jondos that carries its users' transactions to and from their intended web servers." *Id.*

---

[3] The page numbering is that of the ACM journal, such that page 66 is the first page of Crowds.

17

Crowds illustrates example jondo paths in Figure 2:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

### 1. Claim 1

#### a) <u>**Preamble**</u>

Petitioners will assume that the preamble of Claim 1 is limiting. The preamble requires that the method is performed by a "first client device" that is used with a "second server" and a "first server," where the "first server" is an HTTP web server which "stores a first content identified by a first content identifier." The preamble provides antecedent basis support for the following method steps.

Each of the preamble elements is satisfied for the reasons provided in the discussion of claim steps (a)-(d), because, as discussed below, each of steps (a)-(d) is by the first client device, is used with a first server (steps (b) and (c)) and second server (steps (a) and (d)), and the first server (web server) is an HTTP server that responds to HTTP requests and stores a first content identified by a first content

18

identifier (steps (b) and (c)). As explained below in connection with steps (a)-(d), the preamble maps onto Crowds (in at least the provided example path) as follows:

**First client device:** jondo "6."

**Second server:** jondo "4."

**First server:** Web server.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Crowds therefore discloses the preamble. Ex. 1009, ¶¶ 57-91.

### b)  <u>Claim step (a)[4] ("receiving, from the second server, the first content identifier")</u>

Crowds discloses that a random path of jondos (applications on user's computers) is created to retrieve web pages from a web server after the web request is initiated by a users' browser. A path is created when the requesting user's jondo "forwards the request" to another jondo, which either submits the request to the target web server or "forwards the request" to another jondo, at which point the next jondo makes the same decision. Ex. 1011 at 73. "So, each request travels from the user's browser, through some number of jondos, and finally to the end server." *Id.*

One example path (among many) noted by Crowds is "5→4→6→server," where the initiator would be jondo "5," which would forward the web request to

---

[4] Petitioners herein refer to the four claim steps as steps (a)-(d), although Claim 1 does not recite them with letters.

19

jondo "4" on another user's computer, which would forward the request to jondo "6" on another user's computer, which would make the request to the target web server. *Id.* at 73, Fig. 2. The "first client device" communicating with the web server would be jondo "6" and **the "second server" would be jondo "4,"** from which jondo "6" receives the content identifier of the web content to be retrieved.

Colored in green below is the "5→4→6→server" path in Figure 2, and the red circle corresponds to the first client device ("6") receiving, from the second server ("4"), the first content identifier:



As discussed in Section VI.A, any standard computer may be a "client." But even if "client device" were to be construed as a particular computer used by an individual consumer, that is precisely what Crowds discloses. Crowds depends on using a large crowd of "users" where many users "might not be known to a

substantial fraction of the present membership." *See, e.g.*, *id.* at 67, 88. A user simply starts the jondo application "on her computer." *Id.* at 73. Crowds was programmed for portability across platforms, including Microsoft, and uses a graphical user interface such as through a Netscape web browser. *Id.* at 81, 89. A user's jondo has a standard IP address and port number. *Id.* at 90.

As also discussed in Section VI.A, the Patent does not require the "second server" to comprise any particularized equipment, and the Patent instead discloses ordinary computers in the claimed roles.[5] Regardless, Crowds discloses that jondo "4" in the above example is a "server" as commonly understood because jondo "4" accepted a connection from jondo "5" to send back a response. As Crowds notes, "server replies traverse the same path as the requests, only in reverse." *Id.* at 74.

A POSA would understand from Crowds that any equipment with an IP address could serve as a "jondo," and a POSA would understand that a server has an IP address. *Id.* at 87 (IP address), 90 ("*Like all network servers*, jondos are identified by their IP address and port number."). Ex. 1009, ¶¶ 95-96.

Every jondo may serve as an initiator, an intermediate jondo, or as the final jondo making the request to the target web server:

---

[5] *See also* Ex. 1018 (RFC 2616 describing server and client as roles).

21



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Crowds explains that the above "paths are 1→5→server; 2→6→2→server; 3→1→6→server; 4→4→server; 5→4→6→server; and 6→3→server." Ex. 1011 at 73. Every user's jondo therefore may serve at any point in the path.

Crowds is a system for "execut[ing] web transactions" (*id.* at 67) and requests to "web servers" (*id.* at 66, 73, Fig. 2) and therefore discloses web pages as "first content." Crowds specifically refers to the retrieval of a "web page" or "web pages" using the system. *Id.* at 73 n.1 ("downloading a web page"); *id.* at 79 (referring to a jondo "returning a web page"); *id.* at 82 (referring to latency results for "retrieving web pages of various sizes").

The above web requests include the "content identifier" which identifies the content sought so the target web server may be contacted. The use of at least URLs as "first content identifier[s]," or web page identifiers, is disclosed in Crowds. The Crowds user interface states, "To begin browsing anonymously, simply open a

22

URL." *Id.* at 89 (Fig. 6). A "user can issue a crowd query by appending ?crowd? to the end of any URL that she requests." *Id.*

Crowds therefore discloses this claim limitation. Ex. 1009, ¶¶ 92-99.

      c)    **Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

Multiple web servers are shown in Figure 2 and discussed on page 72. The web server or "end server" is the server "for which the request was destined." Ex. 1011 at 73. Further, HTTP must be included in the proxied services. *Id*. at 73 n.1; *id.* at 80 (referring to "HTTP communication"), at 87 (same), at 83 ("HTTP headers"), at 90 (same), at 88 (the jondo "serves as the HTTP proxy of [user's] browser"). Further, per Figure 6, URLs are used and jondos operate as HTTP proxies:

23



Fig. 6. **Crowd query:** A crowd query shows the jondos that are available, and indicates which one is acting as the user's **HTTP proxy** for the browser.

In the example "5→4→6→server" path discussed above, the "first client device" (jondo "6") sends the web request via HTTP to the target web server, or "first server." *Id.* at 73-74, Fig. 2. Circled in red below is the step corresponding to the first client device ("6") sending to the first server ("Web Server[]") the HTTP request comprising the first content identifier:

Appx27434



Crowds therefore discloses this claim limitation. Ex. 1009, ¶¶ 100-05.

> **d)**     **Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

As discussed immediately above, the "first client device" (jondo "6" above) sends the first content identifier to the first server, or target web server. The primary purpose of Crowds is for the last jondo in the path to receive the "first content," such as the user specified web page. The initiating jondo establishes the random path of jondos "that carries its users' transactions to **and from** their intended web servers." Ex. 1011 at 73. Further, "server replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. Accordingly, the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first

content) for sending back down the path to the requesting user; *see also id.* at 82 (discussing latency for "retrieving web pages").

Crowds therefore discloses this claim limitation. Ex. 1009, ¶¶ 106-10.

### e) Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")

As discussed immediately above, Crowds discloses that the first client device (jondo "6" in the above example path) receives the first content from the web server. Further, as explained above in sub-section (b), jondo "6" previously receives the first content identifier from the second server (jondo "4" in the above example path). Further, as explained immediately above in sub-section (d), the random path of jondos "carries its users' transactions to **and from** their intended web servers." Ex. 1011 at 73. Further, "server replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. The first client device (here, jondo "6") sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo). The second server, jondo "4," can then send the web page content back to the requesting user (here, jondo "5").

Crowds therefore discloses this claim limitation. Ex. 1009, ¶¶ 111-13.

### 2.    Claim 2

As discussed in Section VIII.A.1.a-b, the "first client device" is disclosed in Crowds as a jondo. Crowds further discloses that a jondo has a host name: "The user

selects this jondo as her web proxy by specifying its *host name* and port number in her web browser as the proxy for all services." Ex. 1011 at 73; *id.* at Fig. 6 (identifying host names of multiple jondos).

Crowds also discloses a setup phase for new jondos, such that other jondos learn their IP address, port number, and account name, and these other jondos use this information to select a jondo as a proxy. Crowds discloses that a jondo can communicate directly with other jondos during startup to share information: "jondos will establish shared keys using Diffie-Hellman key exchange [Diffie and Hellman 1976], where the blender serves only to distribute the Diffie-Hellman public keys of crowd members." *Id.* at 87-88. A POSA would understand that Diffie-Hellman is a cryptographic key-exchange protocol, also used in the SSL/TLS protocol employed by HTTPS, whereby two nodes directly communicate to establish a shared cryptographic key not known by anybody else. The messages sent as part of that key exchange would include the IP address of both sender and recipient, and thus the other jondo would receive a message from the first jondo, during the first jondo's initialization period, that includes the first jondo's IP address and port number. Ex. 1009, ¶ 116.

Crowds therefore discloses Claim 2. *Id.* at ¶¶ 114-17.

27

### 3.    Claims 21-22 and 24-25

Claims 21-22 and 24-25 each add additional limitations that relate to the second server's and/or the first client device's use of the TCP/IP protocol. Crowds expressly confirms the usage of TCP/IP. In discussing potential points of failure, Crowds states that "such failures are detected by the **TCP/IP connection to the jondo** breaking or being refused . . ." Ex. 1011 at 81. Because each of the second server and first client device is a jondo (Section VIII.A.1.b), their connection is disclosed as a TCP/IP connection.

Further, per Section VIII.A.1.c, Crowds discloses the use of the HTTP protocol for communications between jondos and web servers. A POSA would have understood at the relevant time period that HTTP works on top of TCP, at the application layer of the TCP/IP networking model. Ex. 1009, ¶ 120. Like HTTP, the TCP/IP networking model was well known to a POSA. *Id.* Crowds' disclosure of usage of HTTP would therefore also disclose usage of TCP/IP. *Id.*

Crowds also states that "any request coming from the browser is sent directly to the jondo," and requires that "[t]he services that must be proxied include Gopher, **FTP**, HTTP and SSL." Ex. 1011 at 73 n.1. The first client device therefore also communicates over the Internet based on FTP.

Crowds therefore discloses Claims 21-22 and 24-25 because Crowds discloses the first client device establishing a TCP connection with the second server using

28

the TCP/IP protocol, and the first client device and the second server communicating over the Internet[6] using TCP/IP. Ex. 1009, ¶¶ 118-29.

### 4.    Claim 26

Crowds discloses the use of a client operating system. The authors tested Crowds by operating jondos on a computer with an operating system, specifically SunOS 4.1.4. Ex. 1011 at 82. As discussed in Section VIII.A.1.b, the jondo is the application on a user's computer that serves as the first client device. Further, Crowds discloses that the application was programmed to allow for "portability across Unix and Microsoft platforms." *Id.* at 81. A POSA would understand Unix, Microsoft, and SunOS to refer to client operating systems. Ex. 1009, ¶¶ 131.

Claim 26 is therefore disclosed by Crowds. *Id.* at ¶¶ 130-32.

### 5.    Claim 27

As explained above, the four method steps are executed sequentially, in the order listed in Claim 1. As explained there with respect to the example path "5→4→6→server," the web request is forwarded along the path, such that the "first client device" (here, jondo "6") receives the web request (and content identifier in the URL) from the "second server" (here, jondo "4"), and sends the web request to the "first server" or target web server. Ex. 1011 at 73 and Fig. 2. "[S]erver replies

_____

[6] Crowds is designed for "web transactions" over the Internet. Ex. 1011 at 67. Jondos are "connected to the Internet." *Id.* at 84.

29

traverse the same path as the requests, only in reverse." *Id.* at 74. Per Sections VIII.A.1.d-e above, the "first client device" receives the web content from the web server, and sends the content back to the "second server." The claims steps are disclosed as being executed sequentially.

Claim 27 is therefore disclosed by Crowds. Ex. 1009, ¶¶ 133-35.

**B.     GROUND 2: OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-18, 21-22, AND 24-27 BY CROWDS + RFC 2616 + GENERAL KNOWLEDGE**

If any Challenged Claim discussed above in Section VIII.A is not anticipated by Crowds, it would have been obvious to a POSA. Further, Challenged Claims 14-15, and 17-18 would have been obvious to a POSA.

Ground 2 combines the teaching of Crowds with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications. This general knowledge is also reflected in part by the disclosure of IETF RFC 2616 which is prior art and is referenced in the Patent. In addition to combining Crowds with the general knowledge of a POSA, Crowds could also be combined with the disclosure of RFC 2616 itself as discussed herein.

The Patent assumes a basic understanding of computers and Internet communications by a POSA, including HTTP requests and the TCP/IP protocol. The Patent claims reference HTTP requests (e.g., Claim 1) and TCP/IP protocols (e.g., Claims 21-22, 24-25). Further, the patentees clearly did not invent their cited Internet

30

protocols. The Patent discloses that a web server may be "a **typical HTTP server**, such as those being used to deliver content on any of the many such servers on the Internet." Ex. 1001 at 4:64-67. The Patent admits that HTTP and TCP/IP are known to a POSA, stating, "**As is known by those having ordinary skill in the art**, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." *Id.* at 17:22-24.

Further, the Patent expressly cites to RFC 2616 for a definition of HTTP. *Id.* at 16:21-28; *id.* at 20:44-46 (Claim 15 referring to an HTTP header "according to, or based on, IETF RFC 2616"). Further, the Patent cites RFC 2616 as prior art: "R. Fielding et al, RFC 2616: Hypertext Transfer Protocol-HTTP/1.1, Jun. 1999, retrieved from the Internet http://rcf-editor.org [retrieved Apr. 15, 2002] (114 pages)." *Id.* (cover page).

A POSA indeed would possess the types of knowledge referenced by the Patent. Dr. Freedman discusses the Internet background of which a POSA would have been knowledgeable in 2009, including the standards that specified pertinent Internet protocols. Ex. 1009, ¶¶ 30-41, 137-44.

A POSA clearly would have a powerful motivation to combine the disclosure of Crowds with a POSA's general Internet knowledge (as specifically noted in the claim-by-claim application below) and/or the disclosure of RFC 2616 governing HTTP. Crowds specifically concerns Internet and world-wide-web communications

31

and specifically references HTTP, HTML, URLs, TCP/IP, which are standard Internet protocols. Section VIII.A; Ex. 1009, ¶ 145.

A POSA would understand that Crowds (and the Patent) calls upon a POSA to make reference to such background knowledge, and a POSA would do so. *Id.* at ¶ 146.

### 1.    Claim 1

To the extent Crowds is deemed not to anticipate Claim 1 (Section VIII.A.1, above), Claim 1 nevertheless would have been obvious in view of the knowledge of a POSA.

If "second server" is construed to require specialized server equipment—which it should not be, per Section V above—Claim 1 would be rendered obvious. Crowds teaches that a jondo, which may serve at any point along the anonymous path, is identified by an IP address and/or port number. And "[l]ike all network **servers**, jondos are identified by their **IP address and port number**." Ex. 1011 at 90. Further, per Section VIII.A.1.b, Crowds teaches that a jondo provides information to other requesting jondos, fulfilling the typical role of a server. Ex. 1009, ¶¶ 148-49.

This indicates to a POSA that a jondo, with an IP address and port number, could be a "network server[]." *Id.* at ¶ 150. A POSA would understand that, as Crowds discloses, servers typically have an IP address and/or port number to

32

communicate via the Internet, and typically responds to requests for information from clients. *Id.* Given that a jondo described in Crowds possesses and IP address and port number and responds to requests for information from other jondos, and given that there is no restriction on the type of equipment that may serve as a jondo, a POSA would understand that any type of typical server equipment could serve as a jondo. *Id.* A POSA would have been aware, in 2009, of many types of equipment commonly serving as a "server," including workstation computers and those computers running UNIX and Microsoft operating systems as disclosed by Crowds. *Id.* Such equipment would typically have a network connection and an IP address and/or port number. *Id.* Even if Crowds were deemed not to disclose a "server" as a jondo—despite the express disclosure—it would have been obvious to a POSA that any of the commonly understood types of "servers" that have IP addresses could be used. *Id.*

Claim 1 accordingly would have been obvious to a POSA to the extent not anticipated by Crowds. *Id.* at ¶¶ 151-54.

### 2.    Claim 14

The first client device of Crowds communicates with the target server (first server) via HTTP. Section VIII.A.1.c. A POSA would know from the HTTP/1.1 protocol standard (RFC 2616) that HTTP has a number of mechanisms to determine that content exchanged from a server to a requesting client is valid. Ex. 1009, ¶ 162.

33

Certain of these are defined by the "Cache-Control" directives in HTTP/1.1 (Ex. 1018, § 14.9), which are used to ensure proper cache management so that HTTP/1.1 clients always receive fresh content. Ex. 1018, § 13. These directives are transmitted in HTTP headers and include information such as "no-cache", "no-store", and "max-age". *Id.*, § 14.9. These identical standard "Cache-Control" directives are disclosed by the Patent as a suggested means to ensure validity, and thus the Patent discloses relying on the standard cache-validation mechanisms in HTTP to ensure validity. Ex. 1009, ¶¶ 161, 163-64.

Claim 15, which depends from Claim 14, specifies that the determining (of validity) is based on the HTTP header "according to, or based on, IETF RFC 2616."

Claim 14 accordingly would have been obvious to a POSA based on the disclosure of Crowds in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). *Id.* at ¶¶ 165.

### 3.    Claim 15

As discussed immediately above, Claim 14 would have been obvious, including because the "determining" is based on the received HTTP header according to, or based on, IETF RFC 2616. Claim 15 accordingly would have been obvious to a POSA based on the disclosure of Crowds in view of both the general

34

knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). Ex. 1009, ¶¶ 166-68.

### 4.     Claim 17

As explained in Sections VIII.A.1.b-c, each of the "second server" and "first client device" is a jondo, communicating via the HTTP protocol to send web requests. A POSA would understand that all jondos in the path, including the second server and the first client device, communicate via HTTP. Ex. 1009, ¶¶ 170; Ex. 1011 at 90 (discussing potential parameters "that specify which HTTP headers are allowed to pass in requests" or which may be stripped away).

A POSA would be motivated to combine the teaching of Crowds with a POSA's general knowledge, particularly regarding HTTP, and/or the disclosure of the RFC 2616 governing HTTP. Section VIII.B. Claim 17 would have been obvious to a POSA because the process of "periodically communicating" was a standard feature of devices communicating via HTTP (as the second server and first client device communicate). The default behavior in HTTP/1.1 is the use of "persistent connections," where two HTTP end-points send more than one HTTP request and response pair. Ex. 1018, § 8.1. Persistent connections were also supported in HTTP/1.0 with the use of explicit Keep-Alive HTTP headers and also documented in HTTP/1.1. Ex 1018, §§ 8.1.3, 13.5.1, 19.6. Jondos in Crowds, which communicate via HTTP, would use persistent connections to periodically communicate between

35

HTTP end-points. Crowds also discloses support for embedded images within webpages, which would cause HTTP clients and servers to re-use persistent connections to fetch both web objects using the same TCP/IP connection. Ex. 1009, ¶ 172; Ex. 1011 at 83.

Crowds also discloses using TCP/IP, both explicitly (e.g., Ex. 1011 at 81) and implicitly through its of HTTP (Section VIII.A.3), where both jondo "6" and jondo "4" are TCP endpoints. It would be obvious to a POSA to rely on knowledge of the TCP protocol for periodic communications between jondos, including the use of TCP Keep-Alive messages. Ex. 1009, ¶ 173. TCP keep-alive messages, including how the use of such messages teach this claim and would be obvious to a POSA, are discussed further with respect to the system of Border below in Section VIII.D.3, which is incorporated herein.

Further, Crowds discloses group membership management techniques by which jondos track the liveness of other jondos in the system. "The jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed (see line 25 of Figure 3). This allows for each jondo's list to diverge from others' if different jondos have detected different failures in the crowd." Ex. 1011 at 87. This occurs because jondos periodically communicate with one another, and thus detect when another jondo fails to respond to the periodic communication. A POSA

36

would understand that a peer-to-peer system such as Crowds would maintain group membership by periodically communicating to ensure the liveness of other jondos.

Claim 17 accordingly would have been obvious to a POSA based on the disclosure of Crowds in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). Ex. 1009, ¶ 175.

### 5.    Claim 18

Petitioners refer to the discussion above regarding Claim 17, where Petitioners explained that Claim 17 would have been obvious to a POSA. In that same discussion, Petitioners explained that the "periodically communicating" included the exchange of "keep alive" messages, which would have been obvious to a POSA based on Crowds in view of the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). Ex. 1009, ¶¶ 177-78. For the same reasons, Claim 18 would have been obvious to a POSA.

### 6.    Claims 2, 21-22 and 24-27

As discussed in Sections VIII.A.2-5, Crowds discloses the additional limitations of claims 2, 21-22 and 24-27. Therefore, if claim 1 is rendered obvious by the disclosure of Crowds in view of both the general knowledge of a POSA and the disclosure of RFC 2616, these claims are also rendered obvious. *See id.* at ¶¶ 155-59, 179-200.

Appx27447

### C.    GROUND 3: ANTICIPATION OF CLAIMS 1, 12, 14, 21-22, 24-25, AND 27-29 BY BORDER

Border is "related to retrieving web content using proxy servers." Ex. 1017 at 1:16-18. The claimed benefits include "reliev[ing] traffic congestion and network latency." *Id.* at 1:26.

The communication system 100 of Border includes user station 101, downstream proxy server 105, upstream proxy server 107, and web server 109:



*Id.* at Fig. 1. User stations 101 use communication system 100 to request and receive web content stored on web servers 109. *Id.* at 1:34-35. Proxy servers 105 and 107 act as intermediary devices between one or more user stations 101 and many web servers 109. *Id.* at 4:29-31.

Border discloses proxy servers that can operate on "general purpose personal computers," and further discloses an exemplary computer system 701 that can be configured as a proxy server. *Id.* at 4:52-54; 10:6-11:54. Computer system 701 is comprised of generic personal computer components, such as a processor, memory,

38

storage, a network interface card, and input/output devices. *Id.* at 10:6-11:54. Proxy servers 105 and 107 communicate using a persistent HTTP over TCP connection, and are referenced as HTTP proxy servers. *Id.* at 4:8-14; 4:29-31; Ex. 1009, ¶ 204.

Figure 2 of Border shows the communications that occur when a user station requests and receives web content stored on a web server:



*Id.* at Fig. 2. To request web content at a particular URL, a browser 103 of user station 101 sends an HTTP GET request containing the URL to downstream proxy server 105. *Id.* at 5:14-17. If downstream proxy server 105 does not have a copy of the content stored in its cache, downstream server 105 sends an HTTP GET request containing the URL to upstream proxy server 107. If upstream proxy server 107 does not have a copy, it sends an HTTP GET request to web server 109. Web server 109 transmits the content at the URL to upstream server 107, which stores the content in its cache. Upstream server 117 then forwards the content to downstream server 105,

39

which stores the content in its cache, and then forwards the content to web browser 103. Ex. 1009, ¶¶ 205-07.

### 1.  Claim 1

#### a)  <u>Preamble</u>

As explained in Section VIII.A.1.a, the preamble provides antecedent basis support for the four method claim steps that follow, and Petitioners explain that the preamble is satisfied in connection with the discussion of the method steps (a)-(d). As explained below, the preamble maps onto Border as follows:

**First client device:** Upstream server 107.

**Second server:** Downstream server 105.

**First server:** Web server 109.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Thus, Border discloses the preamble. Ex. 1009, ¶¶ 208-229.

#### b)  <u>Claim step (a) ("receiving, from the second server, the first content identifier")</u>

As discussed, downstream server 105 is the "second server," upstream server 107 is the "first client device," and the requested URL is a "first content identifier."

Border "provides a communication system for retrieving web content." Ex. 1017 at 1:33-35. Web content is retrieved from a web server that stores the web content by sending a "URL request message to [the] web server and receiving the

40

URL content from the web server[.]" *Id.* at 2:44-35. An "individual piece of web content," i.e. a "first content," "is identified, that is, addressed, by an Internet address, referred to as a Uniform Resource Locator (URL). *Id.* at 1:62-2:2. As shown in Figure 2, web browser 103 sends a GET request to downstream server 105, which forwards the request to upstream server 107, which makes the GET request to web server 109. The response to the GET request—the content at the requested URL— is then returned through the same path in reverse.

Any standard computer may serve in the role of a "client." Section VI.A. Border discloses that upstream server 107 is a "client," as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server, and thus acts as an HTTP client when requesting content from an HTTP server. Even if "client device" were construed as a "consumer" computer, the physical computer hardware on which upstream server 107 operates is a general purpose personal computer, comprised of, among other components, processor 705, memory 707 and 709, storage 711, display 713, keyboard 715, mouse 717, and wired or wireless communication interface 719. *Id.* at 10:6-11:54; Fig. 7. Further, the proxy servers may run on "general purpose personal computer[s]." Ex. 1009, ¶¶ 210-11.

Downstream server 105 is the "second server," as it accepts a connection from web browser 103 in order to send back a response to web browser 103's GET

41

request. Downstream server 105 retrieves the requested first content by communicating with web server 109 (the "first server") through upstream server 107 ("first client device").

Web browser 103 sends a GET request containing the URL for the content "HTML"[7] to downstream server 105. Downstream server 105 then sends a GET request containing the URL to upstream server 107, as shown in green in Figure 2:

*FIG. 2*



Therefore, Border discloses "receiving, from the second server, the first content identifier" by the first client device because upstream server 107 ("first client

---

[7] Border uses "HTML" as the exemplary URL of a request from web browser 103. Ex. 1017 at 18-19 ("For the purposes of explanation, the HTML page is addressed as URL "HTML.").

device") receives the URL ("first content identifier") from downstream server 105 ("second server"). Ex. 1009, ¶¶ 230-31.

    c)    **Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

The first client device discussed above is used with "many web servers (e.g. web server 109)," each of which is a first server. Ex. 1017 at 2:29-31. Upstream server 107 issues a GET request[8] to web server 109 for the content at a specified URL, as shown in green in Figure 2:

FIG. 2



---

[8] The GET request is defined by RFC 2616 §9.3, and is therefore an "HTTP request." Ex. 1009, ¶ 215.

43

*Id.* at 5:33-36.

Border therefore discloses the first client device "sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier". Ex. 1009, ¶¶ 232-34.

> **d)** **Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

In response to upstream server 107 "issu[ing] the GET URL HTML request the web server 109 for the HTML page[,] . . . the web server 109 transmits the requested HTML page to the upstream server[,]" as shown in green in Figure 2:

*FIG. 2*



44

*Id.* at 5:34-37. Thus, Border teaches the first client device receiving the first content (the web page at the requested URL) from the first server in response to sending the first content identifier (the requested URL).

Border therefore discloses "receiving, the first content from the first server over the Internet in response to the sending of the first content identifier" by the first client device. Ex. 1009, ¶¶ 235-36.

> **e)**   **Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

After receiving the web page at the requested URL from web server 109, upstream server 107 "forwards the HTML page to the downstream server 105[,]" as shown in green in Figure 2:



FIG. 2

*Id.* at 5:38-40. Downstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a "server." *Id.*

Border therefore discloses "receiving, the first content from the first server over the Internet in response to the sending of the first content identifier" by the first client device. Ex. 1009, ¶¶ 237-40.

### 2.    Claim 12

Border discloses upstream server 107 sending the GET request to web server 109 after it receives the requested URL from downstream server 105, where upstream server 107 is further comprised of HTTP cache 117. Ex. 1017 at 4:8-11. In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.* at 5:36-38. Border therefore discloses claim 12. Ex. 1009, ¶¶ 241-44.

### 3.    Claim 14

As explained for claim 12, Border discloses upstream server 107 storing the received first content in HTTP cache 117 to provide in response to future requests. If upstream server 107 receives a subsequent request for the received first content, Border teaches that upstream server 107 may determine whether such content is still valid by sending a conditional HTTP GET request using IF MODIFIED SINCE headers to web server 109. Ex. 1017 at 7:5-10, 9:14-15. If there has been no change

46

to the received first content since it was stored in cache 117, then the content is still valid and web server 109 returns a NO CHANGE response. *Id.* The servers with caches perform this action "to avoid stale information [and] determine whether the information stored at URL HTML has been updated since the time it was last requested." *Id.* at 6:55-57. Border therefore discloses the first client device determining that the received first content is valid. Ex. 1009, ¶¶ 245-47.

### 4. Claims 21-22 and 24-25

Border discloses the additional limitations of claims 21-22 and 24-25, which each add additional limitations that relate to the second server's and/or the first client device's use of the TCP protocol. Downstream server 105 and upstream server 107 maintain and communicate over a persistent TCP connection to carry HTTP transactions, shown in Figure 1 by the connection labeled "P-TCP." Ex. 1017 at Figure 1; 4:11-15; 7:50-52. TCP communications of communication system 100 are made over IP. *Id.* at 7:32-35. Therefore, the first client device (upstream server 107) establishes a TCP connection with the second server (downstream server 105) using the TCP/IP protocol. Further, the first client device (upstream server 107) communicates over the Internet based on at least one of the standards—TCP— enumerated in claim 22. As discussed above, at least the second server (downstream server 105) is a TCP/IP server that communicates over the Internet using the TCP/IP protocol. As also discussed above, the first client device (upstream server 107) is a

47

TCP/IP client that communicates over the Internet with the second server using the TCP/IP protocol. Therefore, Border discloses the additional limitations of these claims. Ex. 1009, ¶¶ 248-54.

### 5. Claim 27

Border discloses the additional limitations of claim 27. As discussed in Sections VIII.C.1.b-e, Border teaches the sequential execution of the claim 1 steps, as shown in green in Figure 2:



Ex. 1009, ¶¶ 255-58.

### 6. Claims 28-29

Border discloses computer system 701 that can be configured to operate upstream server 107, which is a client device as discussed above in Section VIII.C.1.b. Ex. 1017 at 10:6-8. Computer system 701 is comprised of processor 705,

48

main memory 707, and storage device 711. *Id.* at 10:6-24. Upstream server 107, operating on computer system 701, interacts within system 100:

> in response to processor 705 executing one or more sequences of one or more instructions contained in main memory 707. Such instructions may be read into main memory 707 from another computer-readable medium, such as storage device 711. Execution of the sequences of instructions contained in main memory 707 causes processor 705 to perform the process steps described herein.

*Id.* at 10:35-43. The storage device is a "non-volatile[,]" i.e. non-transitory, "computer-readable medium." *Id.* at 10:50-58. Therefore, Border discloses a client device (upstream server 107) that comprises a non-transitory computer readable medium meeting Claims 28-29. Ex. 1009 at ¶¶ 259-62.

### D.     GROUND 4: OBVIOUSNESS OF CLAIMS 1, 12, 14-15, 17-18, 21-22, AND 24-29 BY BORDER + RFC 2616 + GENERAL KNOWLEDGE

If any Challenged Claim discussed above in Section VII.C is not anticipated by Border, it would have been obvious to a POSA. Further, Challenged Claims 15, 17-18, and 26 would have been obvious to a POSA.

Ground 4 is based upon a combination of the teaching of Border with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications. As discussed with respect to Ground 2 in Section VIII.B (which is incorporated by reference into Ground 4), this general knowledge is also reflected in part by the disclosure of RFC 2616. Therefore, in addition to combining Border

with the general knowledge of a POSA, Border could also be combined with the disclosure of RFC 2616 itself.

Border discloses a system for retrieving web content, and states that "HTTP is an application level protocol that is employed for information transfer over the Web." Ex. 1017 at 10:26-29. Border expressly incorporates RFC 2616 and discusses it throughout. *Id.* Border also specifically references the usage of HTML, URLs, and TCP/IP, all of which are indicative of standard Internet communications. *See* Sections VIII.C.1 and VIII.C.4. A POSA would have a powerful motivation to combine the disclosure of Border with a POSA's general Internet knowledge (as specifically noted in the claim-by-claim application below) and/or the disclosure of RFC 2616 governing HTTP. Ex. 1009, ¶¶ 264-65.

A POSA would understand that the teaching of Border—as well as the Patent—calls upon a POSA to make reference to such background knowledge, and a POSA would do so. *Id.* at ¶ 266.

### 1.    Claim 1

Border anticipates Claim 1. *See* Section VIII.C.1. Even if it does not, Claim 1 is rendered obvious by Border in view of the knowledge of a POSA.

Even if "first client device" is construed to refer to a consumer computer instead of a device acting in the role of a client, it would have been obvious to a POSA, in view of RFC 2616 and a POSA's knowledge of Internet communications

50

in 2009 to modify upstream server 107 to operate on a consumer computer. Ex. 1009, ¶ 268. The claimed benefits of the Patent—congestion and latency reduction and anonymity—are met through the use of an intermediary acting in the role of a client to a web server, not any specialized hardware on which the intermediary operates. This is evidenced by the lack of any meaningful difference between the components of communication device 200 of the Patent and the components of computer system 701 of Border. *Compare* Ex. 1001 at 5:58-6:24 *with* Ex. 1017 at 10:6-11:54; Ex. 1009, ¶ 269. This is further evidenced by RFC 2616's definition of proxy, e.g., the first client device, as "[a]n intermediary program which acts as both a server and a client[.]" Ex. 1018 at § 1.3.

Finally, a POSA would understand that upstream server 107 could operate on a consumer computer by the disclosure of Border alone. Border expressly discloses that user station 101—the end user's computer—can be a "personal computer." Ex. 1017 at 3:58-61. Further, downstream server 105 can run on a "general purpose personal computer," and downstream server 105 and upstream server 107 can run on identical hardware (computer system 701). *Id.* at 4:51-53; 11:6-8. Ex. 1009, ¶ 270.

It would have been obvious to a POSA in 2009 that any computing device capable of operating a "proxy" as defined in RFC 2616 could be used as a first client

51

device. Claim 1 accordingly would have been obvious to a POSA to the extent not anticipated by Border. Ex. 1009, ¶¶ 267-72.

### 2.    Claim 15

Border discloses the first client device determining that the received first content is valid. Section VIII.C.3. Border also discloses upstream server 107 communicating with web server 109 via HTTP and storing received first content in cache 117. *See* Section VIII.C.2. It would therefore be obvious to a POSA to utilize the methods described in RFC 2616 to determine the validity of cached content. Ex. 1009, ¶¶ 280-82. RFC 2616 specifies a caching proxy's (e.g., upstream server 107) use of HTTP headers received from an origin server (e.g. web server 109) to determine the validity of cached content. For example, an origin server may include the Expires header in a response to an HTTP GET request, which "gives the date/time after which the response is considered stale[,]" i.e., not valid. Ex. 1018 at § 14.21. Alternatively, an origin server may include the Cache-Control header with a max-age directive in response to a GET request, which specifies the amount of time after which the response is considered stale. *Id.* at §§ 13.2.4; 14.9; 14.9.3. The caching proxy stores these headers received from the origin server, and uses them to determine whether the stored content is valid. Further, even after the expiry time or max-age period of a piece of cached content, Border discloses, and RFC 2616 § 13

52

details, the use of conditional HTTP GET requests to validate content stored in cache 117 on the upstream server 107. Ex. 1017 at 5:25-5:47, 7:5-19.

Claim 15 accordingly would have been obvious to a POSA based on the disclosure of Border in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). Ex. 1009, ¶¶ 277-83.

### 3.    Claims 17-18

Border discloses downstream server 105 and upstream server 107 communicating via HTTP over a persistent TCP connection. Section VIII.C.4. It would therefore be obvious to a POSA to rely on a POSA's general knowledge, including of the TCP protocol, for periodic communications between downstream server 105 and upstream server 107, including the use of TCP Keep-Alive messages. Ex. 1009, ¶ 286.

RFC 1122 expressly discloses the use of "TCP Keep-Alives" to "periodically probe[] the other end of a connection when the connection is otherwise idle, even when there is no data to be sent[,]" to confirm that an idle connection is still active. Ex. 1036 at § 4.2.3.6; Ex. 1009, ¶ 286. Specifically, TCP keep-alive messages ensure that a persistent connection is still alive, such that if either TCP endpoint would lose its connection, each end-point would be notified promptly so it could open a new connection or connect to a different peer. This helps reduce the failure "detection

53

and recovery" period when the two end-points want to actually communicate an application message (such as a HTTP request/response), because the two end-points are continually checking that the connection is healthy. Further, it serves to maintain proper information about the connection (such as the connection measured round-trip-time, and the congestion signals from the network or peer), so again that the connection can be utilized in an efficient manner. Such behavior is beneficial in settings like those disclosed by Border, so that the downstream and upstream proxy servers can communication in an efficient manner once a browser actually makes an HTTP request to the downstream server, and not suffer from a failed, slow, or lower-throughput TCP connection, as could be the case if the proxies were not utilizing TCP keep alive messages. Ex. 1009, ¶ 286.

Further, a POSA would have been motivated to combine the teaching of Border with a POSA's general knowledge, particularly regarding HTTP. It would be obvious to a POSA to rely on his knowledge of the HTTP protocol for periodic communications between downstream server 105 and upstream server 107, including the use of HTTP/1.1 "persistent connections" or HTTP/1.0 Keep-Alive headers. *Id.* at ¶ 287. The use of such messages would be obvious to a POSA, and are discussed further with respect to the system of Crowds above in Section VIII.B.4, which is incorporated herein.

54

Claims 17 and 18 accordingly would have been obvious to a POSA based on the disclosure of Border in view of the general knowledge of a POSA. *Id.* at ¶ 288.

### 4.    Claim 26

Upstream server 107 operates on computer system 701. Section VIII.C.6. There is no meaningful difference between the hardware of computer system 701 of Border and communication device 200 of the Patent, and upstream server 107 can therefore operate on a "general purpose personal computer." Section VIII.A.1. All computers, including computers commonly used by consumers, have used operating systems (such as Microsoft or Apple operating systems) for many decades, and continue to do so. Ex. 1009, ¶ 293. Thus, the use of an operating system on a general purpose personal computer would have been well known to a POSA by the 2009 timeframe. *Id.* at 293-94.

### 5.    Claims 12, 14, 21-22, 24-25, and 27-29

Border discloses the additional limitations of claims 12, 14, 21-22, 24-25, and 27-29. Sections VIII.C.2-6. Therefore, if claim 1 is rendered obvious by the disclosure of Border in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA), these claims are also rendered obvious. *See* Ex. 1009, ¶¶ 273-283, 289-291, 295-303.

55

E.    **GROUND 5: ANTICIPATION OF CLAIMS 1, 2, 17, 19, 21-22, AND 24-27 BY MORPHMIX**

MorphMix states its goal as "achieving anonymous Internet access" and "to provide anonymity for the masses and aim at a large number of nodes distributed all around the world." Ex. 1013 at 14, 109.[9] An individual can join MorphMix with a computer "connected to the Internet" that is capable of running applications "such as web browsers" and that has an IP address. *Id.* at 234.

MorphMix describes a set of "nodes," each node identified by its IP address and connected to one or more other MorphMix nodes at any time, where there is a TCP connection between any two connected nodes. *Id.* at 98-99. To access an Internet web server anonymously, a node "establishes a circuit via some other nodes" forming an "anonymous tunnel." *Id.* at 99. If a web browser sends a request to a node, the first node sends the IP address and port of the targeted web server "to the final node." *Id.* at 103. The final node then "connects to the server" and the "connection has been established." *Id.* "Sending data back from the server to the client works exactly in the opposite way." *Id.* at 105.

---

[9] The page numbering is that of the doctoral thesis, such that page 1 of the thesis (which page 21 of Ex. 1013) is the first page of MorphMix.

56

1.    **Claim 1**

a)    <u>**Preamble**</u>

As explained in Section VIII.A.1.a above, the preamble provides antecedent basis support for the four method steps that follow, and Petitioners explain that the preamble is satisfied in connection with the discussion of the method steps (a)-(d). As explained below, the preamble maps onto MorphMix as follows (in the example path discussed below):

**First client device:** last node ($c$).

**Second server:** intermediate node ($b$).

**First server:** server ($s$).

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Thus, MorphMix discloses the preamble. Ex. 1009, ¶¶ 308-26.

b)    <u>**Claim step (a) ("receiving, from the second server, the first content identifier")**</u>

MorphMix discloses that a random path of nodes (applications on user's computers) is created to retrieve web pages from a web server after the web request is initiated by a user's browser. The client "sends $ip_s$ and $p_s$" to the access program node on the local computer. Ex. 1013 at 103. $Ip_s$ and $p_s$ are the host (target) server's ip address and port. *Id.* at 20. The node establishes an "anonymous tunnel by sending an end-to-end message to the final node that contains $ip_s$ and $p_s$." *Id.* at 103. The final

57

node then connects to the target server and "forward[s] the data it receives through the anonymous connection" to the target server. *Id.* at 104.

One potential path of nodes is that the initiator (*a*) sends the request to an intermediate node (*b*), which sends the request to the last node (*c*), which sends the request to the server (*s*):



**Figure 5.1:** *Basic idea of MorphMix.*

*Id.* at Fig. 5.1.

In this example, the "second server" is the node that provides the first content identifier to the first client device (final node *c*). The "second server" is the prior node *b*, which had "forwarded" the payload[10] to node *c*. *Id.* at 105. The "first client device" is the last node in the tunnel (node "*c*"), which communicates with the web server.

---

[10] A POSA would understand that the "payload" would include the data identifying the requested web page to be provided to the web server. Ex. 1009, ¶ 328.

Figure 5.4 of MorphMix shows that computer information is passed from node $b$ (second sever) to node $c$ (first client device), which then connects with the web server. Figure 5.4 is annotated in red below to show the node $b$ (second server) sending to node $c$ (first client device) information that includes the ip address ($ip_s$) and port ($p_s$) of the server, as well as the application data (AD) which identifies the web content, so that node c may send it to the server:



**Figure 5.4:** *Anonymous connections and cell forwarding.*

The Patent does not require the "second server" to be any type of particularized computer equipment. Section VI.A. Regardless, MorphMix discloses that node $b$ in the above example is a "server" as commonly understood because node $b$ accepted a connection from node $a$ in order to send back a response, because "[s]ending data back from the server to the client works exactly in the opposite way."

59

*Id.* at 105.[11] Every node "can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 98. Not only is this consistent with the meanings of "client" and "server" (Section VI.A; Ex. 1009, ¶¶ 42-48), but MorphMix expressly states that a "sender" of data is a "client," while a "recipient" is a "server." Ex. 1013 at 13.

Any standard computer may serve in the role of a "client." Section VI.A. Even if "client device" were to be construed as a "consumer" computer used by an individual consumer, that is precisely what MorphMix discloses: "Anybody who has access to a computer that is connected to the Internet should be able to join and use MorphMix after having installed the MorphMix software." Ex. 1013 at 96. A computer need only have a public IP address to join, and "any computer with a dial-up connection capable of running a modern graphical web browser should be sufficient." *Id.* MorphMix "can handle as many nodes as there are public IP addresses." *Id* at 234.

Because the above requests are web requests, they include the "content identifier" which identifies the content sought from the target web server. MorphMix

---

[11] A POSA would understand that any server equipment could serve as a node, because a node simply must have an IP address, and a server has an IP address. Ex. 1013 at 98 (node is "identified with its public IP address"); *id.* at 149 (MorphMix "can handle as many nodes as there are public IP addresses").

states, "MorphMix can anonymise any TCP-based application but in its first version, **we focus on web browsing and MorphMix supports HTTP (both versions 1.0 and 1.1) and HTTPS**." *Id.* at 103. MorphMix also describes performance scenarios where "the web server is contacted anonymously through MorphMix" using both HTTP 1.0 and 1.1. *Id.* at 206-07. A POSA would understand that HTTP includes transmission of URLs or other web page content identifiers, so that a web page may be retrieved. Ex. 1009, ¶ 337.

MorphMix therefore discloses this claim limitation. *Id.* at ¶¶ 327-338.

<div style="margin-left:2em">

c)    <u>Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")</u>

</div>

In the example *a* to *b* to *c* node path discussed above, node *c* is the final node and the "first client device." Node *c* determines from the header information that it is the "final node," and that a portion of the "payload" "must be sent to the web server using the ip address and port number. Ex. 1013 at 105 (steps 10-11). Therefore, "the server eventually receives AD," or application data. *Id.* (step 12). If final node *c* receives a host name for the web server, it must resolve the host name to an IP address to send information to the web server. *Id.*

Figure 5.4 shows the application data (AD), which identifies the web content, being passed from the first client device (node *c*) to the web server ("first server") as indicated in red:

<div style="text-align:center">61</div>



**Figure 5.4:** *Anonymous connections and cell forwarding.*

The target server ("first server") is a web server. Ex. 1013 at 204 (referring to "the connection between the final node in a tunnel and the web server" and the "TCP connection to the web server"). MorphMix further states that "the client application can send the information about the server to contact and the application data together to the access program, as is done by web browsers when they use a web proxy." *Id.* at 105. MorphMix's report of its "[s]imulation results" evaluated the amount of time "to completely download a web page." *Id.* at 205.

HTTP requests are sent through the node tunnels to the web server. MorphMix "focus[es] on web browsing and MorphMix supports HTTP (both versions 1.0 and 1.1) and HTTPS." *Id.* at 103. Further, "with HTTP 1.1, all object[s] of a web page

62

are downloaded through a single anonymous connection and a single TCP connection between the final node and the web server." *Id.* at 207.

A POSA would understand that the information sent to the target web server includes the "first content identifier," such as a URL (as commonly used with HTTP requests), so that the data can be sent "back from the server to the client." *Id.* at 105; Ex. 1009, ¶ 344.

MorphMix therefore discloses this claim limitation. *Id.* at 339-45.

### d) Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")

The last node in the path receives the "first content," such as the web page, specified by the user. MorphMix confirms that "[s]ending data back from the server to the client works exactly in the opposite way" as the information is sent to the server. Ex. 1013 at 105. Accordingly, the first client device in MorphMix (the last node before the target web server) receives the requested first content (such as a web page) for sending back down the path to the requesting user.

MorphMix therefore discloses this claim limitation. Ex. 1009, ¶¶ 346-48.

### e) Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")

"Sending data back from the server to the client works exactly in the opposite way" as compared to the path the data takes from the initiator node *a*, to node *b*, to

63

node *c*, and finally to the web server. Ex. 1013 at 104-05. Accordingly, the first client device (node *c*) sends the first content (or web page content) back to the second server (node *b*, the prior node in the path). The second server, node *b*, can then send the web page content back to the requesting user (node *a* in this example path).

MorphMix therefore discloses this claim limitation. Ex. 1009, ¶¶ 349-51.

### 2. Claim 2

In MorphMix, a node is the "first client device," as discussed in Section VIII.E.1.b, and a node is identified by its IP address. Ex. 1013 at 98 ("public IP address"); *id.* at 109 ("node identified with its IP address"). MorphMix also discloses that a "host name" may be sent instead of an IP address. *Id.* at 105.

When a node joins the MorphMix network, it sends a message to other nodes comprising the node's IP address, port, public key, and other information as part of its start-up. Ex. 1013 at 132-133. In particular, MorphMix discloses a "peer discovery mechanism that enables MorphMix nodes to learn about other nodes." *Id.* at 131. "While participating in MorphMix and setting up anonymous tunnels, a node learns about a variety of other nodes. Every selection it gets contains the IP addresses, ports, public keys, and node levels of several nodes." *Id.* at 133. MorphMix thus discloses that a node (such as the node *c* in Figures 5.1 and 5.4, which as described above is also a "first client device"), when joining the MorphMix network and thus starting

64

up, sends its node information (including its IP address) to other nodes (including node *b* in in Figures 5.1 and 5.4, which as described above is also a "second server").

MorphMix therefore discloses Claim 2. Ex. 1009, ¶¶ 352-55.

### 3.  Claim 17

The "second server" and "first client device" of MorphMix are nodes, and each communicates via the MorphMix protocol for establishing and maintaining virtual tunnels. Section VIII.E.1.b. Each sends HTTP protocol messages through this tunnel for the purpose of sending web requests.

In particular, MorphMix discloses a number of protocol messages between nodes that are immediately next to each other within the virtual tunnels disclosed by MorphMix, such as node *c* (the first client device) and node *b* (the second server). These messages are "used to set up virtual links, to set up and terminate anonymous tunnels, for peer discovery, to get status information about neighbors, for flow control, and to carry end-to-end messages." Ex. 1013 at 267. Such periodic communication involves node *c* asking node *b* about further nodes as part of peer discovery (*id.* at 269), sending requests for the other node's status (*id.* at 271), sending messages with virtual "credit" that are used for flow control (*id.* at 273), and others.

MorphMix also discloses that node *c* (the "first client device") and node *b* (the "second server") communicate periodically to transmit HTTP messages that the final node *c* subsequently uses to request HTTP content from the web server ("first

65

server"). These HTTP messages are transmitted over MorphMix anonymous virtual tunnels and the HTTP data is sent periodically over "virtual link data messages" between node *b* and node *c*, which transmit the HTTP request and response. Ex. 1013 at 273.

MorphMix therefore discloses Claim 17. Ex. 1009, ¶¶ 356-59.

### 4. Claim 19

MorphMix discloses downloading and installing from the Internet, by the first client device, a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the steps of claim 1 (described above in Sections VIII.E.1.b-d). MorphMix discloses that consumer computers can be the "first client device" of Claim 19: "any computer with a dial-up connection capable of running a modern graphical web browser should be sufficient." *See* Section VIII.E.1.b; Ex. 1013 at 96. A processor, common on such computers, is simply "any device for executing software instructions," such as the instructions found in the MorphMix application. *See* Ex. 1001 at 6:5-13; Ex. 1009, ¶ 362. The "MorphMix application" is disclosed as being available to "[a]nybody who has access to a computer that is connected to the Internet . . . *after having installed the MorphMix software.*" Ex. 1013 at 96, 98 (emphasis added). "The MorphMix prototype is free software and is available with full source code . . . at the MorphMix project web page" (citing Internet website

66

http://www.tik.ee.ethz.ch/~morphmix). *Id.* at 286. That same webpage "also contains information about how to configure and run the prototype." *Id.* It is the downloaded (from the Internet) and installed MorphMix software application that instructs the processor of the first client device to perform the steps described in Sections VIII.E.1.b-d, incorporated here.

Claim 19 is therefore disclosed by MorphMix. Ex. 1009, ¶¶ 360-65.

### 5.    Claims 21-22 and 24-25

MorphMix confirms the usage of TCP/IP connections. "[T]here is a TCP connection" between nodes. Ex. 1013 at 99; 101 (nodes *a*, *b*, and *c* "are communicating directly with each other across TCP connections"); Fig. 2.3 (TCP connections). A TCP connection is also "established between the final node in the tunnel and the server." *Id.* at 100. MorphMix therefore discloses TCP/IP communications between all nodes (and hence the first client device and second server) and between the final node (first client device) and target web server (first server).

MorphMix also discloses FTP, as MorphMix "can be used to anonymise FTP downloads." *Id.* at 236. MorphMix also discloses the use of UDP. *Id.* at 21 (links between mixes "can make use of TCP or UDP"); *id.* at 37 (Fig. 2.6 showing both TCP/IP and UDP connections between mixes).

67

MorphMix discloses Claims 21-22 and 24-25 because MorphMix, at a minimum, discloses the first client device establishing a TCP connection with the second server using the TCP/IP protocol, and the first client device and the second server communicating over the Internet using the TCP/IP protocol. Ex. 1009, ¶¶ 366-77.

### 6.    Claim 26

MorphMix discloses the use of a client operating system. MorphMix discusses the need to avoid disclosing information "about the user's operating system or web browser." Ex. 1013 at 38. MorphMix also discloses performance tests on MorphMix using "Linux as operation system." *Id.* at 129.

Claim 26 is therefore disclosed by MorphMix. Ex. 1009, ¶¶ 378-80.

### 7.    Claim 27

As explained in Section VIII.E.1, the four method steps are executed sequentially, in the order listed in Claim 1. For example, the "first client device" (node *c*) receives the web request (and content identifier) from the "second server" (node *b*), and sends the web request to the "first server" or target web server. "Sending data back from the server to the client works exactly in the opposite way." Ex. 1013 at 105. Therefore, for the reasons explained in Sections VIII.E.1.b-e above, the claims steps are executed sequentially, according to the disclosure of MorphMix.

Claim 27 is therefore disclosed by MorphMix. Ex. 1009, ¶¶ 381-83.

68

### F.    GROUND 6: OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-19, 21-22, AND 24-27 BY MORPHMIX + RFC + GENERAL KNOWLEDGE

If any Challenged Claim discussed above in Section VIII.E is not anticipated by MorphMix, it would have been obvious to a POSA. Further, Challenged Claims 14-15, and 18 would have been obvious to a POSA.

Petitioners refer to and incorporate herein Section VIII.B. regarding the rationale for combining Crowds with the same general knowledge of a POSA and RFC 2616. The reason for combination is the same for MorphMix as for Crowds given their similarity of disclosures. MorphMix specifically concerns Internet and World-Wide-Web communications, TCP/IP and HTTP (which is the subject matter of RFC 2616). *See* Sections VIII.E.5 and VIII.E.1.c. Further, MorphMix expressly cites to RFC 2616 (reference [45]). Ex. 1013 at 3, 205, 249. A POSA would understand that MorphMix—as well as the Patent—calls upon a POSA to make reference to such background knowledge, and a POSA would do so. Ex. 1009, ¶¶ 386-94.

#### 1.    Claim 1

To the extent MorphMix is deemed not to anticipate Claim 1 (*see* Section VIII.E.1), Claim 1 would be rendered obvious in view of the knowledge of a POSA.

First, if "second server" is construed to refer to some type of specialized server equipment, Claim 1 at a minimum would have been obvious to a POSA for the same

69

reasons explained above in Section VIII.B.1 with respect to Crowds. Like Crowds, MorphMix makes reference to servers, stating that a "sender" of data is a "client," while a "recipient" is a "server." Ex. 1013 at 13. As stated in Section VIII.E.1.b, any computer with an IP address may be a node, and it would have been obvious to a POSA that any server would have an IP address and could serve as a "node" in MorphMix. Ex. 1009, ¶¶ 396-98.

Second, if MorphMix is deemed to not disclose a "first content identifier" of Claim 1, at a minimum it would have been obvious to a POSA. As discussed above in Sections VIII.E.1.b-c, MorphMix discloses the use of HTTP to send requests from an initiating client to a web server. It also "focus[es] on web browsing" and HTTP versions 1.0 and 1.1. Ex. 1013 at 103. A POSA would have understood that HTTP requests involved content identifiers to identify desired web content, typically in the form of a URL. Ex. 1009, ¶¶ 402-03. RFC 2616 (which concerns HTTP 1.1) expressly discusses use of URLs. Ex. 1018 at § 3.2.

Claim 1 accordingly would have been obvious to a POSA to the extent not anticipated by MorphMix. Ex. 1009, ¶¶ 395-404.

### 2. Claims 14-15

MorphMix discloses, with respect to Claim 1, that the first client device communicates with the target server (first server) via HTTP. Section VIII.E.1.c. A

70

POSA understands that the HTTP protocol therefore would also govern the receipt of content by the first client device. Ex. 1009, ¶ 410.

For the same reasons explained above in Sections VIII.B.2-3 (for Crowds), a POSA would have understood from HTTP and RFC 2616 that the first client device (node) would determine that the received content is valid through the HTTP protocol, including through the HTTP header.

Claims 14-15 accordingly would have been obvious to a POSA based on the disclosure of MorphMix in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA). Ex. 1009, ¶¶ 410-15.

### 3.    Claim 18

As explained above in Section VIII.E.1.b, each of the "second server" and "first client device" of MorphMix is a node, and they communicate via the HTTP protocol over persistent connections to send web requests. A POSA would understand that all nodes in the path, including the second server and the first client device, communicate via HTTP. Ex. 1009, ¶¶ 416, 419-20.

For the same reasons explained above in Section VIII.B.4-5 (concerning Crowds) and VIII.D.3 (concerning Border), Claims 17-18 would have been obvious to a POSA in view of MorphMix and a POSA's general knowledge regarding HTTP,

71

TCP, and/or the disclosure of RFCs 2616 and 1122. This includes the usage of both TCP "Keep Alive" messages and HTTP "Keep-Alive" headers.

Claim 18 accordingly would have been obvious to a POSA based on the disclosure of MorphMix in view of both the general knowledge of a POSA and the disclosure of RFCs 2616 and 1122. *Id.* at ¶¶ 422-423.

### 4. Claims 2, 17, 19, 21-22 and 24-27

As discussed in Sections VIII.E.2-7, MorphMix discloses the additional limitations of claims 2, 17, 19, 21-22 and 24-27. Therefore, if claim 1 is rendered obvious by the disclosure of MorphMix in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA), these claims are also rendered obvious. *See* Ex. 1009, ¶¶ 405-09, 416-21, 424-51.

72

Dated: July 14, 2020

Respectfully submitted,

CHARHON CALLAHAN ROBSON &
GARZA, PLLC

/Craig Tolliver/

Craig Tolliver (Reg. No. 45,975)
George "Jorde" Scott (Reg. No. 62,859)
3333 Lee Parkway, Suite 460
Dallas, TX 75219
(214) 521-6400

73

Appx27483

## CERTIFICATION OF WORD COUNT

The undersigned hereby certifies that the portions of the above-captioned PETITION FOR INTER PARTES REVIEW specified in 37 C.F.R. §42.24 has 13,743 words, in compliance with the 14,000 word limit set forth in 37 C.F.R. §42.24. This word count was prepared using Microsoft Word/Office 365 and includes words added to images as annotations.

Dated: July 14, 2020

Respectfully submitted,

CHARHON CALLAHAN ROBSON & GARZA, PLLC

/Craig Tolliver/

Craig Tolliver (Reg. No. 45,975)
Lead Attorney for Petitioners
3333 Lee Parkway, Suite 460
Dallas, TX 75219
(214) 521-6400

74

Appx27484

## CERTIFICATE OF SERVICE

Pursuant to 37 CFR §§ 42.6(e)(1), 42.6(e)(4)(iii), and 42.105, the undersigned

certifies that on July 14, 2020, a complete and entire copy of this Petition for *Inter*

*Partes* Review and all supporting exhibits and Powers of Attorney were deposited

for delivery to Luminati Networks, Ltd. (1) via Priority Mail Express International

at the correspondence address of record (May Patents Ltd.) for the '319 Patent and

(2) via Priority Mail Express at the address of Luminati Networks, Ltd.'s counsel in

the related matter styled *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-

00395-JRG (E.D. Tex.) as follows:

| May Patents Ltd. c/o Dorit Shem-Tov P.O.B 7230 Ramat-Gan 5217102 Israel | Korula T. Cherian RuyakCherian LLP 1936 University Ave, Suite 350 Berkeley, CA 94702 |
|---|---|

Dated: July 14, 2020

Respectfully submitted,

CHARHON CALLAHAN ROBSON & GARZA, PLLC

/Craig Tolliver/

Craig Tolliver (Reg. No. 45,975)
Lead Attorney for Petitioners
3333 Lee Parkway, Suite 460
Dallas, TX 75219
(214) 521-6400

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB; AND
OXYSALES, UAB, Petitioners,

v.

LUMINATI NETWORKS LTD.,
Patent Owner.

_____

Case IPR2020-01358
Patent No. 10,484,510

_____

**PETITION FOR INTER PARTES REVIEW
OF U.S. PATENT NO. 10,484,510**

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Data Co Exhibit 1070
Data Co v. Bright Data

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     STATUTORY PREDICATES............................................................... 2

        A.  Mandatory Notices (37 CFR § 42.8) ......................................... 2

            1.    Real Parties-In-Interest ...................................................... 2

            2.    Related Matters.................................................................. 2

            3.    Lead and Back-Up Counsel ................................................ 4

            4.    Service Information ............................................................ 4

        B.  Payment of Fees (37 CFR § 42.103) ......................................... 5

        C.  Certification of Standing (37 CFR § 42.104(a))......................... 5

        D.  Identification of Challenges (37 CFR § 42.104(b)(1)-(2))......... 5

III.    INSTITUTION SHOULD BE GRANTED (35 U.S.C. § 314(a)) ......... 6

        A.  Factor 1 ..................................................................................... 7

        B.  Factor 2 ..................................................................................... 7

        C.  Factor 3 ..................................................................................... 8

        D.  Factor 4 ..................................................................................... 8

        E.  Factor 5 ..................................................................................... 9

        F.  Factor 6 ..................................................................................... 9

IV.     OVERVIEW OF THE PATENT ......................................................... 9

        A.  Claims ....................................................................................... 9

        B.  Specification .............................................................................. 10

        C.  Priority Date .............................................................................. 12

        D.  Alleged Benefit of the Patent .................................................... 12

V.      LEVEL OF SKILL IN THE ART ...................................................... 12

VI.     CLAIM CONSTRUCTION (37 CFR § 4 2.104(b)(3)) ....................... 13

VII.    OVERVIEW OF PRIOR ART REFERENCES .................................. 15

        A.  Crowds....................................................................................... 15

        B.  MorphMix .................................................................................. 15

        C.  Border ........................................................................................ 16

        D.  RFC 2616 ................................................................................... 16

i

VIII.    GROUNDS FOR INVALIDITY (37 CFR § 42.104(b)(4)-(5))........................................ 17

    A.    GROUND 1: ANTICIPATION OF CLAIMS 1-2, 6-7, 15-16, AND 18-23 BY CROWDS ............................................................................................................ 17

        1.    Claim 1 ........................................................................................ 18

            a)    Preamble ............................................................................. 18

            b)    Claim step (a) ("establishing a Transmission Control Protocol (TCP) connection with a second server") ........................................... 19

            c)    Claim step (b) ("sending, to the web server over an Internet, the first content identifier") ............................................................. 22

            d)    Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier") .... 24

            e)    Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier") ............................................................. 25

        2.    Claim 2 ........................................................................................ 25

        3.    Claim 6 ........................................................................................ 26

        4.    Claims 7 and 21 .......................................................................... 27

        5.    Claim 15 ...................................................................................... 28

        6.    Claim 16 ...................................................................................... 29

        7.    Claims 18-19 ............................................................................... 30

        8.    Claim 20 ...................................................................................... 30

        9.    Claim 22 ...................................................................................... 30

        10.    Claim 23 .................................................................................... 31

    B.    GROUND 2: OBVIOUSNESS OF CLAIMS 1-2, 6-11, 13, 15-16, AND 18-23 BY CROWDS + RFC 2616 + GENERAL KNOWLEDGE ........................... 31

        1.    Claim 1 ........................................................................................ 33

        2.    Claims 8-9 ................................................................................... 35

        3.    Claims 10-11 ............................................................................... 37

        4.    Claim 13 ...................................................................................... 38

        5.    Claims 2, 6-7, 15-16, 18-19, and 20-23 ...................................... 38

    C.    GROUND 3: ANTICIPATION OF CLAIMS 1, 6, 10, 15-20, AND 23-24 BY BORDER ............................................................................................................ 39

        1.    Claim 1 ........................................................................................ 41

            a)    Preamble ............................................................................. 41

            b)    Claim step (a) ("establishing a Transmission Control Protocol (TCP) connection with a second server") ........................................... 42

Appx27488

c)  Claim step (b) ("sending, to the web server over an Internet, the first content identifier ") ............................................................................ 44

d)  Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier") ... 45

e)  Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier") .................................................................... 46

2.  Claim 6 ....................................................................................................... 47

3.  Claim 10 ..................................................................................................... 47

4.  Claim 15 ..................................................................................................... 48

5.  Claim 16 ..................................................................................................... 49

6.  Claim 17 ..................................................................................................... 49

7.  Claims 18-19 .............................................................................................. 50

8.  Claim 20 ..................................................................................................... 50

9.  Claim 23 ..................................................................................................... 50

10. Claim 24 ..................................................................................................... 51

D.  GROUND 4: OBVIOUSNESS OF CLAIMS 1, 6, 8-11, 13, 15-20, AND 22-24 BY BORDER + RFC 2616 + GENERAL KNOWLEDGE ......................... 52

1.  Claim 1 ....................................................................................................... 53

2.  Claims 8-9 .................................................................................................. 54

3.  Claim 11 ..................................................................................................... 56

4.  Claim 13 ..................................................................................................... 57

5.  Claim 22 ..................................................................................................... 58

6.  Claims 6, 10, 15-20, and 23-24 ................................................................. 58

E.  GROUND 5: ANTICIPATION OF CLAIMS 1-2, 6-8, 13, 15-16, AND 18-23 BY MORPHMIX ............................................................................................ 59

1.  Claim 1 ....................................................................................................... 60

a)  Preamble .............................................................................................. 60

b)  Claim step (a) ("establishing a Transmission Control Protocol (TCP) connection with a second server") ................................................. 60

c)  Claim step (b) ("sending, to the web server over an Internet, the first content identifier") ............................................................................ 64

d)  Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier") .... 66

e)  Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier") .................................................. 66

2.    Claim 2 ........................................................................................ 67

3.    Claim 6 ........................................................................................ 67

4.    Claims 7 and 21 .......................................................................... 69

5.    Claim 8 ........................................................................................ 70

6.    Claim 13 ...................................................................................... 71

7.    Claim 15 ...................................................................................... 72

8.    Claim 16 ...................................................................................... 72

9.    Claims 18-19 ............................................................................... 72

10.   Claim 20 ...................................................................................... 72

11.   Claim 22 ...................................................................................... 73

12.   Claim 23 ...................................................................................... 73

F.    GROUND 6: OBVIOUSNESS OF CLAIMS 1-2, 6-11, 13, 15-16, AND
18-23 BY MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE ..................... 74

1.    Claim 1 ........................................................................................ 74

2.    Claim 9 ........................................................................................ 75

3.    Claims 10-11 ............................................................................... 76

4.    Claims 2, 6-8, 13, 15-16, and 18-23 ........................................... 77

iv

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 1001 | United States Patent No. 10,484,510 to Shribman et al. |
| 1002 | File History for United States Patent No. 10,484,510 |
| 1003 | Minute Entry: Scheduling Conference, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1004 | Docket Control Order, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1005 | Luminati Mtn. to Consolidate and Reset Trial, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1006 | Order: Pretrial Conference, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1007 | Petitioners' Chart of Challenged Claims |
| 1008 | Luminati's Opposition to Defendants' Motion to Dismiss, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1009 | Declaration of Michael Freedman, Ph. D. with curriculum vitae and testifying list |
| 1010 | Luminati's Opening Claim Construction Brief, *Luminati Networks Ltd. v. UAB Tesonet, et al.*, 2:18-cv-0299-JRG (E.D. Tex.) |
| 1011 | Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, Nov. 1998, at 66-92 |
| 1012 | Declaration of Scott Delman (regarding Crowds) |
| 1013 | Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Doctoral Thesis) |
| 1014 | Declaration of Marc Rennhard (regarding MorphMix) |
| 1015 | Declaration of Bernhard Plattner (regarding MorphMix) |
| 1016 | Declaration of Andreas Berz (regarding MorphMix) |
| 1017 | United States Patent No. 6,795,848 to Border et al. |
| 1018 | Network Working Group, RFC 2616 |
| 1019 | Network Working Group, RFC 1180 |
| 1020 | ACM Award Winners, Michael J. Freedman |
| 1021 | Network Working Group, RFC 791 |
| 1022 | Network Working Group, RFC 2460 |
| 1023 | Network Working Group, RFC 793 |
| 1024 | Network Working Group, RFC 959 |

| 1025 | Network Working Group, RFC 821 |
| 1026 | Network Working Group, RFC 918 |
| 1027 | Network Working Group, RFC 937 |
| 1028 | Network Working Group, RFC 1939 |
| 1029 | Network Working Group, RFC 1034 |
| 1030 | Network Working Group, RFC 1035 |
| 1031 | Network Working Group, RFC 1945 |
| 1032 | Roger Dingledine, Michael Freedman, & David Molnar, *The Free Haven Project: Distributed Anonymous Storage Service* (2000) |
| 1033 | Michael Freedman & Robert Morris, Tarzan: A Peer-to-Peer Anonymizing Network Layer (2000) |
| 1034 | Google Scholar: Crowds Citations |
| 1035 | Google Scholar: MorphMix citation in Alessandro Acquisti, et al., *Digital Privacy: Theory, Technologies, and Practices* (2007) |
| 1036 | Network Working Group, RFC 1122 |
| 1037 | Amended Complaint for Patent Infringement, *Luminati Networks Ltd. v. Code200, UAB et al.*, 2:19-cv-00396-JRG (E.D. Tex.) |
| 1038 | Complaint for Patent Infringement, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |

## I.    INTRODUCTION

U.S. Patent No. 10,484,510 ("Patent"), with a priority date of 2009, claims the sending of basic Internet information, using the HTTP protocol, through a proxy device that retrieves content from the target web server and returns the content to the requesting device. Not surprisingly, the alleged invention was well known to a person of "ordinary skill in the art" as of 2009 ("POSA") and is invalidated by the Crowds, Border, and MorphMix references discussed herein. None of these references were before the examiner during prosecution. Further, the references expressly identify the same alleged benefit as patent owner Luminati Networks Ltd. ("Luminati")—anonymous retrieval of web data, relieving traffic congestion, and decreasing network latency.

In short, Luminati did not come close to being the first to invent a web proxy, and its Patent should be invalidated. Accordingly, there is a reasonable likelihood that Petitioners would prevail with respect to at least one of the claims challenged in this Petition.

1

## II.    STATUTORY PREDICATES

### A.    Mandatory Notices (37 CFR § 42.8)

#### 1.    Real Parties-In-Interest

The real parties-in-interest are the Petitioners Code200, UAB, Teso LT, UAB, Metacluster LT, UAB, and Oxysales, UAB (collectively, "Petitioners"); as well as coretech lt, UAB.

#### 2.    Related Matters

The Patent claims the benefit of provisional application 61/249,624, and is a continuation of (among other applications) U.S. Application No. 14/025,109; IPR2020-01266 asserts challenges to U.S. Patent No. 10,257,319, which claims the benefit of the same provisional, and is a continuation of the same application.

The Patent is currently the subject of the litigation styled *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.). Further, U.S Pat. Nos. 10,484,511 and 10,637,968 (both claiming the benefit of 61/249,624 (the Patent's provisional application number)), are currently the subject of the litigation styled *Luminati Networks Ltd. v. Code 200, UAB, et al.*, 2:19-cv-00396-JRG (E.D. Tex.) and *Luminati Networks, Ltd. v. NetNut, Ltd.*, 2:20-cv-00188-JRG (E.D. Tex.). Further, the Patent, as well as U.S. Pat. Nos. 10,257,319 and 10,484,511 (both claiming the benefit of 61/249,624 (the Patent's provisional application number)), are currently the subject of the litigation styled *Luminati Networks Ltd. v. Tefincom S.A. D/B/A NordVPN*, 2:19-cv-00414-JRG (E.D. Tex.).

2

The Patent Application Information Retrieval (PAIR) system indicates that U.S. Application No. 16/600,507 (pending) claims the benefit of 16/278,107 (the Patent's application number). Further, the following patent applications and patents claim the benefit of 61/249,624 (the Patent's provisional application number): 12/836,059 (issued as U.S. Pat. 8,560,604), 14/025,109 (issued as U.S. Pat. 10,069,936), 15/957,942 (issued as U.S. Pat. 10,313,484), 15/957,945 (issued as U.S. Pat. 10,257,319), 15/957,950 (issued as U.S. Pat. 10,225,374), 16/031,636 (issued as U.S. Pat. 10,616,375), 16/278,106 (issued as U.S. Pat. 10,491,712), 16/278,107 (issued as U.S. Pat. 10,484,510), 16/278,109 (issued as U.S. Pat. 10,484,511), 16/278,104 (issued as U.S. Pat. 10,523,788), 16/278,105 (issued as U.S. Pat. 10,469,628), 16/368,002 (issued as U.S. Pat. 10,582,013), 16/368,041 (issued as U.S. Pat. 10,582,014), 16/396,695 (issued as U.S. Pat. 10,491,713), 16/396,696 (issued as U.S. Pat. 10,637,968), 16/600,504 (pending), 16/600,505 (pending), 16/600,506 (pending), 16/600,507 (pending), 16/662,800 (pending), 16/693,306 (pending), 16/782,073 (pending), 16/782,076 (pending), 16/807,661 (pending), 16/807,691 (pending), 16/910,724 (pending), and PCT/US10/51881 (issued as WO 2011/044402).

3

### 3. Lead and Back-Up Counsel

| Lead Counsel | Back-Up Counsel |
|---|---|
| Craig Tolliver<br>Registration No. 45,975<br>ctolliver@ccrglaw.com<br>469-587-7263<br><br>Postal and Hand-Delivery Address<br>Charhon Callahan Robson & Garza, PLLC<br>3333 Lee Parkway<br>Suite 460<br>Dallas, TX 75219 | George "Jorde" Scott<br>Registration No. 62,859<br>jscott@ccrglaw.com<br>469-587-7264<br><br>Postal and Hand-Delivery Address<br>Charhon Callahan Robson & Garza, PLLC<br>3333 Lee Parkway<br>Suite 460<br>Dallas, TX 75219 |

### 4. Service Information

| | |
|---|---|
| Electronic mail | 1. ctolliver@ccrglaw.com<br>2. jscott@ccrglaw.com |
| Postal (and hand-delivery) mailing address | Charhon Callahan Robson & Garza<br>3333 Lee Parkway, Suite 460<br>Dallas, Texas 75219 |
| Telephone | (214) 521-6400 |
| Facsimile | (214) 764-8392 |

Additionally, Petitioners consent to electronic service via e-mail at the e-mail addresses noted above.

**B.    Payment of Fees (37 CFR § 42.103)**

The required fee is paid through an online credit card, and the office is authorized to charge any fee deficiencies and credit any overpayments to Deposit Acct. No. 603576 (Customer ID No. 172361).

**C.    Certification of Standing (37 CFR § 42.104(a))**

Petitioners certify that the Patent is available for IPR and that Petitioners are not barred or estopped from requesting IPR of the Challenged Claims on the grounds alleged herein. Luminati filed a complaint alleging infringement by Teso LT, UAB; Metacluster LT, UAB; and Oxysales, UAB of the Patent on December 6, 2019 and served the complaint on Metacluster LT, UAB (the earliest served defendant) on February 18, 2020. Ex. 1038. Both dates are less than twelve months prior to filing of this Petition. Petitioners have not filed a civil action challenging the validity of any claim of the Patent within the meaning of 35 U.S.C. 315(a).

**D.    Identification of Challenges (37 CFR § 42.104(b)(1)-(2))**

Petitioners request cancellation of the challenged claims on the following grounds:

| Ground | Claims | Challenge |
|--------|--------|-----------|
| 1 | 1-2, 6-7, 15-16, 18-23 | Anticipated by Crowds (§102) |
| 2 | 1-2, 6-11, 13, 15-16, 18-23 | Obvious in view of Crowds + Knowledge of POSA + Request for Comments ("RFC") 2616 (§103) |

| 3 | 1, 6, 10, 15-20, 23-24 | Anticipated by Border (§102) |
|---|---|---|
| 4 | 1, 6, 8-11, 13, 15-20, 22-24 | Obvious in view of Border + Knowledge of POSA + RFC 2616 (§103) |
| 5 | 1-2, 6-8, 13, 15-16, 18-23 | Anticipated by MorphMix (§102) |
| 6 | 1-2, 6-11, 13, 15-16, 18-23 | Obvious in view of MorphMix + Knowledge of POSA + RFC 2616 (§103) |

## III.  INSTITUTION SHOULD BE GRANTED (35 U.S.C. § 314(A))

Petitioner Code200 has been sued by Luminati for alleged patent infringement, but Luminati has (as of yet) *not filed* any lawsuit alleging infringement of the Patent by Code200. This weighs in favor of institution with respect to Code200.

The other petitioners (co-petitioners) were sued by Luminati for alleged infringement of the Patent, as noted above. As to the co-petitioners, however, the *Fintiv*[1] factors, discussed below, show that the Board should not exercise its discretion to deny institution in view of *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-CV-00395-JRG (E.D. Tex.) ("Lawsuit").

---

[1] *Apple Inc. v. Fintiv Inc.*, IPR2020-00019, Paper 11 (PTAB March 20, 2020) (precedential, designated May 5, 2020)

6

### A.     Factor 1

The first factor is whether the court may grant a stay if a proceeding is instituted. The Lawsuit is at a very early stage. The Scheduling Conference did not occur until May 18, 2020. Ex. 1003. The Docket Control Order issued June 3, 2020. Ex. 1004. Claim construction is set for November 10, 2020. *Id.*

No party has requested a stay of the Lawsuit pending the IPR, and the Board has previously "decline[d] to infer" how a District Court would decide a stay motion. *Fintiv*, Paper 15 at 12. Factor 1 is neutral.

### B.     Factor 2

The second factor concerns the proximity of the Lawsuit trial date to the Board's projected final written decision. While jury selection is currently set for May 3, 2021 (Ex. 1004), Luminati has previously sought to abandon its trial dates as the "day of reckoning" approaches. In *Luminati Networks Ltd. v. UAB Tesonet and Metacluster UAB*, No. 2:18-cv-00299-JRG (E.D.Tex.) ("Prior Lawsuit"), Luminati, on December 23, 2019, filed an opposed motion to reset the trial date just over one week before the January 3, 2020 pretrial hearing at which co-petitioners' dispositive motions regarding Section 101 invalidity and non-infringement were to be heard. Ex. 1005 at 2. Luminati sought to delay the February 3, 2020 trial date <u>for at least five months</u> until "after July 2020." *Id.* at 1.

7

The parties settled the Prior Lawsuit at the pretrial conference, prior to resolution of dispositive motions. Ex. 1006.

In view of Luminati's history and the potential for COVID-related delays (which are more likely to affect a jury trial), Factor 2 is neutral.

## C.    Factor 3

Factor 3 concerns "investment in the parallel proceedings." The Lawsuit is at a very early stage, with the Docket Control Order issuing June 2, 2020. Ex. 1004. Luminati did not provide its infringement contentions, and therefore did not identify its asserted claims, until May 4, 2020. *Id.* This Petition was filed less than 3 months after the asserted claims were disclosed, and over six months before co-petitioners' statutory deadline for filing an IPR. *Id.* Expert discovery does not close until January 21, 2021. *Id.*

Given the early stages of the case, and the prompt filing of this Petition, Factor 3 weighs strongly in favor of institution.

## D.    Factor 4

Factor 4 concerns the overlap between the claims at issue in the Petition and the Lawsuit. Luminati asserts claims 1-2, 8-11, 13, 15-16, 18-20, and 22-23 in the Lawsuit. In addition to these claims, this Petition also challenges claims 6-7, 17, 21, and 24, which are not at issue in the Lawsuit. Factor 4 weighs in favor of institution.

8

### E.    Factor 5

Factor 5 concerns the overlap between the parties in the Petition and the parties in the Lawsuit. Petitioner Code200 is not a defendant in the Lawsuit, although it has been sued by Luminati as to alleged infringement of related patents. Ex. 1037. Factor 5 weighs in favor of institution.

### F.    Factor 6

Factor 6 concerns "other circumstances." The challenged Patent is extraordinarily weak. Luminati has essentially claimed the exchange of standard Internet information via a typical intermediary computer device to perform web requests for a client. That basic concept has been well known for decades.

Policy favors the Board instituting review so that Luminati may not continue to pursue parties with infringement claims based on an invalid alleged invention that was known well before the 2009 priority date.

## IV.    OVERVIEW OF THE PATENT

### A.    Claims

Claim 1, the only independent claim of the Patent, is included in the attached Exhibit 1007, which lists the Challenged Claims.

The Patent claims ordinary devices that exchange standard Internet requests or content in a routine way. Claim 1 recites the standard use of an intermediary, where the "first client device" acts as an intermediary to retrieve from a web server content requested by a "second server," and send the content to the second server.

9

The following is an illustration of Claim 1:



The dependent Challenged Claims merely recite additional steps known to a POSA, including that "TCP/IP" is used or that an HTTP header used in the prior art RFC 2616 standard is used.

## B.    Specification

The Patent's specification confirms that the claim terms used in the Patent have broad and generic meanings and may be satisfied by standard computers. Figure 3 depicts "peer[s]," a "client," and an "agent" communicating, with the "agent" forming a connection to the web server:

10



FIG. 3

Ex. 1001, Fig. 3. The Patent specification states with respect to Figure 3 that "[t]he network 100 of FIG. 3 contains multiple communication devices," that "*each communication device may serve as a client, peer, or agent*." *Id.* at 4:46-55.[2]

A "communication device" contains "general components of a computer" and "may serve as a client, agent, or peer." *Id.* at 5:54-59. For example, "[t]he communication device 200 includes a processor 202, memory 210, [and] at least one storage device 208[.]" *Id.* at 5:61-64. Other off-the-shelf features of the "communication device" include "ROM, hard drive, tape, CDROM, etc." and that its input/output devices may include a keyboard or mouse. *Id.* at 6:16-26, 6:63-7:5.

---

[2] Unless otherwise noted, all emphases in quotations have been added in this Petition.

11

### C.    Priority Date

The Patent claims priority to provisional application 61/249,624 filed on October 8, 2009. The prior art references asserted in this Petition pre-date the October 8, 2009 date, and Petitioners do not contest (for purposes of this Petition only) that the Patent has a priority date of October 8, 2009 ("Priority Date").

### D.    Alleged Benefit of the Patent

Luminati has argued that the Patent allows for the benefit of "untraceability and anonymity." Ex. 1008 at 6. Luminati asserts that data center proxies "with a limited number of commercial IP addresses" could easily be blocked by a web server, whereas the usage of many "millions" of consumer devices as proxies provided many more IP addresses belonging to consumers, which could not easily be blocked. *Id.* at 6-7.

Even if these concepts—which are not claimed—were somehow relevant to Luminati's alleged invention, the prior art presented in this Petition teaches precisely the benefit of using many ordinary computer users as proxies that can send anonymous web requests on behalf of others.

## V.    LEVEL OF SKILL IN THE ART

Dr. Michael Freedman opines that a POSA to which the Patent pertains would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), as well as two or more years' experience working with and

12

programming networked computer systems as of the Priority Date. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols. Ex. 1009, ¶¶ 27-29. Dr. Freedman also opines as to relevant knowledge a POSA would possess as of the Priority Date. *Id.* at ¶¶ 30-41.

## VI.    CLAIM CONSTRUCTION (37 CFR § 4 2.104(B)(3))

The claim terms at issue in the Challenged Claims require no express claim construction, as the plain and ordinary meanings apply. Further, Petitioners understand that issues of indefiniteness are not resolved in an IPR and do not raise them here, but Petitioners do not waive any applicable indefiniteness challenges. Petitioners provide the following additional discussion regarding claim construction.

As discussed above in Section IV.B, general purpose computers, such as those with keyboards, memory, and hard drives, serve in the claimed roles shown in Figure 3—client, peer, or agent—and facilitate communication with a web server. Figure 3, and its related discussion, align with the "first client device," "second server," and "web server" of the Asserted Claims.

Luminati expressly represented in the Lawsuit that the "first client device" is depicted by the "agent" box and the "second server" is depicted by the "client" box in Figure 3:

13



FIG. 3

Ex. 1008 at 15-16 (Luminati's annotated figure, denoting "second server" in green, "first client device" in red, and "web server" in blue). This confirms that Luminati views a "server" and "client" to be broad enough to encompass one another, and that Luminati equates the "client device" with the "agent," which is described in the Patent as a standard computer (per Section IV.B above).

Luminati made a substantially similar representation in the Prior Lawsuit involving two patents that were also owned by Luminati, addressed technologies in the same field as the Patent, and listed the same inventors as the Patent. For those two patents, Luminati asserted that "client device" has a plain and ordinary meaning. Ex. 1010 at 25. Luminati cited extrinsic evidence showing that a POSA understands a "client" device to fulfill the *role* of requesting and receiving services from a server.

14

*Id.* (citing RFC 1392). Luminati also cited to a definition of client as a "functional unit that requests and receives services from a server." *Id.*

Luminati has confirmed the Patent's disclosure that a general purpose computer is used in the claimed invention, and that the references to a "client device" or "server" in the Challenged Claims specify the current role of the computer device. *See* Ex. 1009, ¶¶ 42-48.

## VII.  OVERVIEW OF PRIOR ART REFERENCES

### A.  Crowds

*Crowds: Anonymity for Web Transactions* ("Crowds" (Ex. 1011)) is an article authored by Michael K. Reiter of Bell Laboratories and Aviel D. Rubin of AT&T Labs, and published in 1998 in the ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, Pages 66-92. Crowds states that it was published in November 1998. ACM confirms in a declaration that Crowds was published in November 1998. Ex. 1012; Ex. 1009, ¶¶ 49-50. Crowds is accordingly prior art under 35 U.S.C. § 102(b). Crowds was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### B.  MorphMix

*MorphMix - A Peer-to-Peer-based System for Anonymous Internet Access* ("MorphMix" (Ex. 1013)) is a doctoral thesis authored by Marc Rennhard, of the Swiss Federal Institute of Technology, Computer Engineering and Networks

15

Laboratory; Zurich, Switzerland. MorphMix states that it was published in 2004. Dr. Rennhard, the supervisor of Dr. Rennhard's thesis (Dr. Plattner), and the Swiss National Library, each confirmed in a declaration that MorphMix was indeed published in 2004. Exs. 1014-1016; Ex. 1009, ¶¶ 52-54. MorphMix is accordingly prior art under 35 U.S.C. § 102(b). MorphMix was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### C.    Border

United States Patent 6,795,848 ("Border" (Ex. 1017)) issued to Border et al. on September 21, 2004. Border is accordingly prior art under 35 U.S.C. § 102(b). Border was not before the Patent Office during prosecution of the Patent. *See* Ex. 1002.

### D.    RFC 2616

Request for Comments ("RFC") 2616 was the definitive specification for the HTTP/1.1 protocol on the Priority Date. RFC 2616 was published ten years earlier by the HTTP Working Group of the Internet Engineering Task Force (IETF) in June 1999. RFC 2616 is also discussed in the Patent specification and claim 11, and was submitted to the Patent Office during prosecution of the Patent. Ex. 1001, 16:21-28 *see also* Ex. 1002, p. 407 (IDS listing RFC 2616 as prior art). RFCs (and like standards documents) posted on the Internet are published in the ordinary course by established standards organizations, and are intended to be viewed by the interested

16

Internet engineering audience at large as of their dates of publication at stated on the cover of each. Ex. 1009, ¶¶ 55-56.

## VIII.  GROUNDS FOR INVALIDITY (37 CFR § 42.104(B)(4)-(5))

### A.    GROUND 1: ANTICIPATION OF CLAIMS 1-2, 6-7, 15-16, AND 18-23 BY CROWDS

Crowds is a system "for protecting users' anonymity on the world-wide-web." Ex. 1011 at 66.[3] "Web servers are unable to learn the true source of a request because it is equally likely to have originated from any member of the crowd." *Id.* In Crowds, a user's request to a web server is not passed directly to the web server, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again. The web request is eventually submitted to the web server by a random member, "thus preventing the end server from identifying its true initiator." *Id.* at 67.

A "user is represented in a crowd by a process on her computer called a jondo." *Id.* at 73. Once admitted to the crowd, the jondo receives "the current membership of the crowd and information that enables this jondo to participate in the crowd." *Id.* After receiving the user request from the browser, the jondo "initiates the establishment of a random path of jondos that carries its users' transactions to and from their intended web servers." *Id.*

---

[3] The page numbering is that of the ACM journal, such that page 66 is the first page of Crowds.

17

Crowds illustrates example jondo paths in Figure 2:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

### 1.    Claim 1

#### a)    <u>**Preamble**</u>

Petitioners will assume that the preamble of Claim 1 is limiting. The preamble requires that the method is performed by a "first client device" that is used with a "web server" that responds to HTTP requests and "stores a first content identified by a first content identifier." The preamble provides antecedent basis support for the following method steps.

Each of the preamble elements is satisfied for the reasons provided in the discussion of claim steps (a)-(d), because, as discussed below, steps (a)-(d) are used by the first client device, steps (b)-(c) are used with a web server, and the web server responds to HTTP requests and stores a first content identified by a first content

18

identifier (steps (b)-(c)). As explained below in connection with steps (a)-(d), the preamble maps onto Crowds (in at least the provided example path) as follows:

**First client device:** jondo "6."

**Second server:** jondo "4."

**Web server:** Web server.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Crowds discloses the preamble. Ex. 1009, ¶¶ 57-84.

### b)     <u>Claim step (a)[4] ("establishing a Transmission Control Protocol (TCP) connection with a second server")</u>

Crowds discloses that a random path of jondos (applications on user's computers) is created to retrieve web pages from a web server after the web request is initiated by a users' browser. A path is created when the requesting user's jondo "forwards the request" to another jondo, which either submits the request to the target web server or "forwards the request" to another jondo, at which point the next jondo makes the same decision. Ex. 1011 at 73. "So, each request travels from the user's browser, through some number of jondos, and finally to the end server." *Id.*

One example path (among many) noted by Crowds is "5→4→6→server," where the initiator would be jondo "5," which would forward the web request to

---

[4] Petitioners herein refer to the four claim steps as steps (a)-(d), although Claim 1 does not recite them with letters.

19

jondo "4" on another user's computer, which would forward the request to jondo "6" on another user's computer, which would make the request to the target web server. *Id.* at 73, Fig. 2. The "first client device" communicating with the web server would be jondo "6" and **the "second server" would be jondo "4,"** from which jondo "6" receives the content identifier of the web content to be retrieved.

Crowds depends on using a large crowd of "users" where many users "might not be known to a substantial fraction of the present membership." *See, e.g.*, *id.* at 67, 88. A user simply starts the jondo application "on her computer." *Id.* at 73. A user's jondo has a standard IP address and port number. *Id.* at 90.

As also discussed in Section VI, the Patent does not require the "second server" to comprise any particularized equipment, and the Patent instead discloses ordinary computers in the claimed roles.[5] Regardless, Crowds discloses that jondo "4" in the above example is a "server" as commonly understood because jondo "4" accepted a connection from jondo "5" to send back a response. As Crowds notes, "server replies traverse the same path as the requests, only in reverse." *Id.* at 74.

A POSA would understand from Crowds that any equipment with an IP address could serve as a "jondo," and a POSA would understand that a server has an IP address. *Id.* at 87 (IP address), 90 ("*Like all network servers*, jondos are identified by their IP address and port number."). Ex. 1009, ¶¶ 87-88.

_____

[5] *See also* Ex. 1018 (RFC 2616 describing server and client as roles).

20

Every jondo may serve as an initiator, an intermediate jondo, or as the final jondo making the request to the target web server:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Crowds explains that the above "paths are 1→5→server; 2→6→2→server; 3→1→6→server; 4→4→server; 5→4→6→server; and 6→3→server." Ex. 1011 at 73. Every user's jondo therefore may serve at any point in the path.

Crowds expressly confirms the usage of TCP/IP. In discussing potential points of failure, Crowds states that "such failures are detected by the **TCP/IP connection to the jondo** breaking or being refused…" *Id.* at 81. Because the second server and first client device are jondos, their connection is disclosed as a TCP/IP connection. Therefore, a TCP connection is established between the first client device and the second server.

Further, per Section VIII.A.1.c below, Crowds discloses the use of the HTTP protocol for communications between jondos and web servers. A POSA would have

21

understood at the relevant time period that HTTP works on top of TCP, at the application layer of the TCP/IP networking model. Ex. 1009, ¶ 126. Like HTTP, the TCP/IP networking model was well known to a POSA. *Id.* Therefore, Crowds' usage of HTTP also discloses usage of TCP/IP. *Id.*

Crowds discloses this limitation. Ex. 1009, ¶¶ 85-92.

### c)    Claim step (b) ("sending, to the web server over an Internet, the first content identifier")

Crowds is a system for "execut[ing] web transactions" (Ex. 1011 at 67) and requests to "web servers" (*id.* at 66, 73, Fig. 2) and therefore discloses web pages as "first content." Crowds specifically refers to the retrieval of a "web page" or "web pages" using the system. *Id.* at 73 n.1 ("downloading a web page"); *id.* at 79 (referring to a jondo "returning a web page"); *id.* at 82 (referring to latency results for "retrieving web pages of various sizes").

The above web requests include the "content identifier" which identifies the content sought so the target web server may be contacted. The use of at least URLs as "first content identifier[s]," or web page identifiers, is disclosed in Crowds. The Crowds user interface states, "To begin browsing anonymously, simply open a URL." *Id.* at 89 (Fig. 6). A "user can issue a crowd query by appending ?crowd? to the end of any URL that she requests." *Id.*

Multiple web servers are shown in Figure 2 and discussed on page 72. The web server is the server "for which the request was destined." Ex. 1011 at 73.

22

Additionally, HTTP must be included in the proxied services. *Id*. at 73 n.1; *id.* at 80

("HTTP communication"), 87 (same), 83 ("HTTP headers"), 90 (same), 88 (the

jondo "serves as the HTTP proxy of [user's] browser"). Further, per Figure 6, URLs

are used and jondos operate as HTTP proxies:



Fig. 6. **Crowd query:** A crowd query shows the jondos that are available, and indicates which
one is acting as the user's **HTTP proxy** for the browser.

In the example "5→4→6→server" path discussed above, the "first client

device" (jondo "6") sends the web request via HTTP to the target web server. *Id.* at

73-74, Fig. 2. Circled in red below is the step corresponding to the first client device

sending to the web server the HTTP request comprising the first content identifier:

23



Crowds discloses this limitation. Ex. 1009, ¶¶ 93-98.

    **d)**    **Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier")**

The primary purpose of Crowds is for the last jondo in the path to receive the "first content," such as the user specified web page. The initiating jondo establishes the random path of jondos "that carries its users' transactions to **and from** their intended web servers." Ex. 1011 at 73. Further, "server replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. Accordingly, the first client device in Crowds (the last jondo before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user; *see also id.* at 82 (discussing latency for "retrieving web pages").

Crowds discloses this limitation. Ex. 1009, ¶¶ 99-103.

Appx27516

e) **Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier")**

As discussed immediately above, the first client device (jondo "6" in the above example path) receives the first content from the web server, the random path of jondos "carries its users' transactions to **and from** their intended web servers[,]" and "server replies traverse the **same path as the requests, only in reverse**." Ex. 1011 at 73-74. The jondo "6" sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo). The jondo "4" can then send the web page content back to the requesting user (here, jondo "5"). Further, a TCP connection exists between jondos "6" and "4." Section VIII.A.1.b.

Crowds discloses this limitation. Ex. 1009, ¶¶ 104-06.

## 2. Claim 2

The "first client device" is disclosed in Crowds as a jondo. Sections VIII.A.1.a-b. Crowds further discloses that a jondo has a host name: "The user selects this jondo as her web proxy by specifying its *host name* and port number in her web browser as the proxy for all services." Ex. 1011 at 73; *id.* at Fig. 6 (identifying host names of multiple jondos).

Crowds also discloses a setup phase for new jondos, such that other jondos learn their IP address, port number, and account name, and these other jondos use this information to select a jondo as a proxy. Crowds discloses that a jondo

25

communicates directly with other jondos during startup to share information: "jondos will establish shared keys using Diffie-Hellman key exchange [Diffie and Hellman 1976], where the blender serves only to distribute the Diffie-Hellman public keys of crowd members." *Id.* at 87-88. A POSA would understand that Diffie-Hellman is a cryptographic key-exchange protocol, also used in the SSL/TLS protocol employed by HTTPS, whereby two nodes directly communicate to establish a shared cryptographic key not known by anybody else. The messages sent as part of that key exchange would include the IP address of both sender and recipient. Thus, the other jondo would receive a message from the first jondo comprising the first jondo's IP address during the first jondo's initialization period. Ex. 1009, ¶ 109.

Crowds discloses Claim 2. *Id.* at ¶¶ 107-10.

### 3. Claim 6

As explained in Section VIII.A.1.b, Figure 2 of Crowds discloses several exemplary paths of jondos and web servers. In addition to the 5→4→6→server "5" path discussed above in Section VIII.A.1 (green), Crowds discloses a 3→1→6→server "3" path (blue):

26



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

*See* Ex. 1011 at 73. For the same reasons the 5→4→6→server "5" path discloses Claim 1, the 3→1→6→server "3" path discloses Claim 6: jondo "6" (first client device) receives a request comprising a second content identifier from jondo "1," which it sends to server "3" (web server). Jondo "6" then receives the second content from server "3." *Id.* at 74.

Crowds discloses Claim 6. *Id.* at ¶¶ 111-13.

### 4.    Claims 7 and 21

Claims 7 and 21 differ only in that they depend from different claims.

As discussed in Section VIII.A.1.c, Crowds was programmed to be used with "a graphical user interface such as through a Netscape *web browser*" and a jondo "serves as the HTTP proxy of [user's] browser." Ex. 1011 at 81, 88-89. Further,

27

every jondo may serve as an initiator, an intermediate jondo, or as the final jondo making the request to the target web server—and in some instances, a jondo may serve in multiple roles in the same path:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Thus, every jondo, including jondo "6" (the first client device), executes a web browser application. Additionally, jondo "2" in the 2→6→2→server "2" path (purple) serves as the initiator—which executes a web browser application to initiate a request—as well as the final jondo (the first client device).

Crowds discloses Claims 7 and 21. *Id.* at ¶¶ 114-16, 135-37.

### 5.    Claim 15

The first client device is jondo "6," the second server is jondo "4,", and a TCP connection exists between jondo "6" and jondo "4." Sections VIII.A.1.b-c. Colored

28

in green below is the "5→4→6→server" path in Figure 2, and the red circle corresponds to the first client device (jondo "6") receiving, from the second server (jondo "4"), the first content identifier:



Crowds discloses Claim 15. *Id.* at ¶¶ 117-20.

### 6.    Claim 16

As discussed in Sections VIII.A.1.b-c, jondo "6" (the first client device) sends a HTTP request to the web server over the Internet that comprises the first content identifier.

Crowds discloses Claim 16. *Id.* at ¶¶ 121-23.

29

### 7. Claims 18-19

A TCP connection is established between jondo "6" and jondo "4," and jondo "6" and jondo "4" communicate over the TCP connection. Sections VIII.A.1.b, VIII.A.1.d-e.

Crowds also states that "any request coming from the browser is sent directly to the jondo," and requires that "[t]he services that must be proxied include…**FTP**[.]" Ex. 1011 at 73 n.1. The first client device therefore also communicates over the Internet based on FTP.

Crowds discloses Claims 18-19. Ex. 1009, ¶¶ 124-31.

### 8. Claim 20

As discussed in Sections VIII.A.1.b-e, Crowds discloses that the first content is a web page identified by a URL.

Crowds discloses Claim 20. *Id.* at ¶¶ 132-34.

### 9. Claim 22

Crowds' authors tested Crowds by operating jondos on a computer with an operating system, specifically SunOS 4.1.4. Ex. 1011 at 82. Further, Crowds was programmed to allow for "portability across Unix and Microsoft platforms." *Id.* at 81. A POSA would understand Unix, Microsoft, and SunOS to refer to client operating systems. Ex. 1009, ¶¶ 139.

Crowds discloses Claim 22. *Id.* at ¶¶ 138-40.

30

### 10.    Claim 23

The four method steps are executed sequentially, in the order listed in Claim 1. Sections VIII.A.1.b-e. Communications between jondos occur over TCP connections, and therefore a TCP connection is established between the first client device and the second server before the web request is forwarded along the 5→4→6→server "5" path. The first client device (jondo "6") then receives the web request from the second server (jondo "4"), and sends the web request to the web server. Ex. 1011 at 73 and Fig. 2. The first client device then receives the web content from the web server, and sends the content back to the second server.

Crowds discloses Claim 23. Ex. 1009, ¶¶ 141-43.

### B.    GROUND 2: OBVIOUSNESS OF CLAIMS 1-2, 6-11, 13, 15-16, AND 18-23 BY CROWDS + RFC 2616 + GENERAL KNOWLEDGE

If any Challenged Claim discussed above in Section VIII.A is not anticipated by Crowds, it would have been obvious to a POSA. Further, Challenged Claims 8-11 and 13 would have been obvious to a POSA.

Ground 2 combines the teaching of Crowds with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications. This general knowledge is also reflected in part by the disclosure of RFC 2616 which is prior art and is referenced in the Patent. In addition to combining Crowds with the general

31

knowledge of a POSA, Crowds could also be combined with the disclosure of RFC 2616 itself as discussed herein.

The Patent assumes a basic understanding of computers and Internet communications by a POSA, including HTTP requests and the TCP/IP protocol. The Patent claims reference HTTP requests and the TCP/IP protocol (e.g., Claims 1, 8, 11, 15-16, 18-19). The patentees did not invent their cited Internet protocols. The Patent discloses that a web server may be "a **typical HTTP server**, such as those being used to deliver content on any of the many such servers on the Internet." Ex. 1001 at 4:65-5:2. The Patent admits that HTTP and TCP/IP are known to a POSA, stating, "**As is known by those having ordinary skill in the art**, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." *Id.* at 17:23-25.

The Patent expressly cites to RFC 2616 for a definition of HTTP. *Id.* at 16:21-28; Claim 11. Further, the Patent cites RFC 2616 as prior art. *Id.* at 3 (References Cited).

A POSA would possess the types of knowledge referenced by the Patent. Dr. Freedman discusses the Internet background which a POSA would have been knowledgeable of in 2009, including the standards that specified pertinent Internet protocols. Ex. 1009, ¶¶ 30-41, 145-52.

32

A POSA clearly would have been motivated to combine the disclosure of Crowds with a POSA's general Internet knowledge (as specifically noted in the claim-by-claim application below) and/or the disclosure of RFC 2616 governing HTTP. Crowds specifically concerns Internet and world-wide-web communications and specifically references HTTP, HTML, URLs, TCP/IP, which are standard Internet protocols. Section VIII.A; Ex. 1009, ¶ 153.

A POSA would understand that Crowds (and the Patent) calls upon a POSA to make reference to such background knowledge, and a POSA would do so. Ex. 1009 ¶ 154.

### 1.    Claim 1

To the extent Crowds is deemed not to anticipate Claim 1 (Section VIII.A.1, above), Claim 1 nevertheless would have been obvious in view of the knowledge of a POSA.

If "second server" is construed to require specialized server equipment—which it should not be, per Section VI above—Claim 1 would be rendered obvious. Crowds teaches that a jondo, which may serve at any point along the anonymous path, is identified by an IP address and/or port number. And "[l]ike all network **servers**, jondos are identified by their **IP address and port number**." Ex. 1011 at 90. Further, per Section VIII.A.1.b, Crowds teaches that a jondo provides

33

information to other requesting jondos, fulfilling the typical role of a server. Ex. 1009, ¶¶ 156-57.

This indicates to a POSA that a jondo, with an IP address and port number, could be a "network server[]." *Id.* at ¶ 158. A POSA would understand that, as Crowds discloses, servers typically have an IP address and/or port number to communicate via the Internet, and typically responds to requests for information from clients. *Id.* Given that a jondo possesses an IP address and port number and responds to requests for information from other jondos, and given that there is no restriction on the type of equipment that may serve as a jondo, a POSA would understand that any type of typical server equipment could serve as a jondo. *Id.* A POSA would have been aware, in 2009, of many types of equipment commonly serving as a "server," including workstation computers and those computers running UNIX and Microsoft operating systems, as disclosed by Crowds. *Id.* Such equipment would typically have a network connection and an IP address and/or port number. *Id.* Even if Crowds were deemed not to disclose a "server" as a jondo—despite the express disclosure—it would have been obvious to a POSA that any of the commonly understood types of "servers" that have IP addresses could be used. *Id.*

Claim 1 would have been obvious to a POSA to the extent not anticipated by Crowds. *Id.* at ¶¶ 156-62.

Appx27526

### 2.    Claims 8-9

Each of the "second server" and "first client device" is a jondo, communicating via the HTTP protocol over the established TCP connection to send web requests. Sections VIII.A.1.b-c. A POSA would understand that all jondos in the path, including the second server and the first client device, communicate via HTTP. Ex. 1009, ¶¶ 175; Ex. 1011 at 90 (discussing potential parameters "that specify which HTTP headers are allowed to pass in requests" or which may be stripped away).

A POSA would be motivated to combine the teaching of Crowds with a POSA's general knowledge, particularly regarding HTTP, and/or the disclosure of the RFC 2616 governing HTTP. Section VIII.B. Claims 8-9 would have been obvious to a POSA because the process of "periodically communicating," including through exchanging keep alive messages, was a standard feature of devices communicating via HTTP. The default behavior in HTTP/1.1 is the use of "persistent connections," where two HTTP end-points send more than one HTTP request and response pair. Ex. 1018, § 8.1. Persistent connections were also supported in HTTP/1.0 with the use of explicit Keep-Alive HTTP headers and also documented in HTTP/1.1. Ex 1018, §§ 8.1.3, 13.5.1, 19.6. Jondos in Crowds, which communicate via HTTP, would use persistent connections to periodically communicate between HTTP end-points. Crowds also discloses support for embedded images within

35

webpages, which would cause HTTP clients and servers to re-use persistent connections to fetch both web objects using the same TCP/IP connection. Ex. 1009, ¶ 172; Ex. 1011 at 83.

Crowds also discloses using TCP/IP, both explicitly (e.g., Ex. 1011 at 81) and implicitly through its use of HTTP (Section VIII.A.1.c), where both jondo "6" and jondo "4" are TCP endpoints. It would be obvious to a POSA to rely on knowledge of the TCP protocol for periodic communications between jondos, including the use of TCP Keep-Alive messages. Ex. 1009, ¶ 173. TCP keep-alive messages, including how the use of such messages teach this claim and would be obvious to a POSA, are discussed further with respect to the system of Border below in Section VIII.D.2, which is incorporated herein.

Further, Crowds discloses group membership management techniques by which jondos track the liveness of other jondos in the system. "The jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed (see line 25 of Figure 3). This allows for each jondo's list to diverge from others' if different jondos have detected different failures in the crowd." Ex. 1011 at 87. This occurs because jondos periodically communicate with one another, and thus detect when another jondo fails to respond to the periodic communication. A POSA would understand that a peer-to-peer system such as Crowds would maintain group membership by periodically communicating to ensure the liveness of other jondos.

36

Claims 8-9 accordingly would have been obvious to a POSA based on Crowds in view of the general knowledge of a POSA and RFC 2616. Ex. 1009, ¶¶ 174-83.

### 3.    Claims 10-11

The first client device of Crowds communicates with the target server (web server) via HTTP. Section VIII.A.1.c. A POSA would know from the HTTP/1.1 protocol standard (RFC 2616) that HTTP has a number of mechanisms to determine that content exchanged from a server to a requesting client is valid, including based on received HTTP headers specified by RFC 2616. Ex. 1009, ¶ 162. Certain of these are defined by the "Cache-Control" directives in HTTP/1.1 (Ex. 1018, § 14.9), which are used to ensure proper cache management so that HTTP/1.1 clients always receive fresh content. Ex. 1018, § 13. These directives are transmitted in HTTP headers and include information such as "no-cache", "no-store", and "max-age". *Id.*, § 14.9. These identical standard "Cache-Control" directives are disclosed by the Patent as a suggested means to ensure validity, and thus the Patent discloses relying on the standard cache-validation mechanisms in HTTP to ensure validity. Ex. 1009, ¶¶ 185, 187-88.

Claims 10-11 accordingly would have been obvious to a POSA based on Crowds in view of the general knowledge of a POSA and RFC 2616. *Id.* at ¶¶ 184-92.

37

4.      **Claim 13**

The jondo is the application on a user's computer that serves as the first client device. Section VIII.A.1.b. Specifically, jondos operate within the computer's web browser application: "[t]he user selects this jondo as her web proxy…in her web browser." Ex. 1011 at 73; Fig. 6. Each user "request travels from the user's browser" and the jondo "serves as the HTTP proxy of her browser." *Id.* at 73, 88; *see also* Ex. 1018 § 1.1 (describing HTTP as "application-level protocol"). At the time Crowds was published, multiple versions of web browser applications were known to POSAs. Ex. 1011 at 69, 82 ("[a]ll recent versions of Netscape Navigator and Internet Explorer" and "a Netscape 3.01 browser"). It would have been obvious to a POSA to download and install from the Internet, by the first client device (a user's computer), a software application (a web browser application) that includes computer instructions that, when executed by a computer processor (on the user's computer), cause the processor to perform the steps of claim 1 (described above in Sections VIII.A.1.b-e). Ex. 1009, ¶ 194.

Claim 13 accordingly would have been obvious to a POSA based on Crowds in view of the general knowledge of a POSA and RFC 2616. *Id.* at ¶¶ 193-95.

5.      **Claims 2, 6-7, 15-16, 18-19, and 20-23**

Crowds discloses the additional limitations of claims 2, 6-7, 15-16, 18-19, and 20-23. Sections VIII.A.2-10. Therefore, if claim 1 is rendered obvious by the

38

disclosure of Crowds in view of both the general knowledge of a POSA and the disclosure of RFC 2616, these claims are also rendered obvious. *See id.* at ¶¶ 163-73, 196-226.

### C.    GROUND 3: ANTICIPATION OF CLAIMS 1, 6, 10, 15-20, AND 23-24 BY BORDER

Border is "related to retrieving web content using proxy servers." Ex. 1017 at 1:16-18. The claimed benefits include "reliev[ing] traffic congestion and network latency." *Id.* at 1:26.

The communication system 100 of Border includes user station 101, downstream proxy server 105, upstream proxy server 107, and web server 109:



*Id.* at Fig. 1. User stations 101 use communication system 100 to request and receive web content stored on web servers 109. *Id.* at 1:34-35. Proxy servers 105 and 107 act as intermediary devices between one or more user stations 101 and many web servers 109. *Id.* at 4:29-31.

Border discloses proxy servers that can operate on "general purpose personal computers," and further discloses an exemplary computer system 701 that can be configured as a proxy server. *Id.* at 4:52-54; 10:6-11:54. Computer system 701 is comprised of generic personal computer components, such as a processor, memory, storage, a network interface card, and input/output devices. *Id.* at 10:6-11:54. Proxy servers 105 and 107 communicate using a persistent HTTP over TCP connection, and are referenced as HTTP proxy servers. *Id.* at 4:8-14; 4:29-31; Ex. 1009, ¶ 230.

Figure 2 of Border shows the communications that occur when a user station requests and receives web content stored on a web server:



Ex. 1017 at Fig. 2. To request web content at a particular URL, a browser 103 of user station 101 sends an HTTP GET request containing the URL to downstream proxy server 105. *Id.* at 5:14-17. If downstream proxy server 105 does not have a copy of the content stored in its cache, downstream server 105 sends an HTTP GET

40

request containing the URL to upstream proxy server 107. If upstream proxy server 107 does not have a copy, it sends an HTTP GET request to web server 109. Web server 109 transmits the content at the URL to upstream server 107, which stores the content in its cache. Upstream server 117 then forwards the content to downstream server 105, which stores the content in its cache, and then forwards the content to web browser 103. Ex. 1009, ¶¶ 231-33.

### 1.    Claim 1

#### a)    <u>Preamble</u>

As explained in Section VIII.A.1.a, the preamble provides antecedent basis support for the four method claim steps that follow, and Petitioners explain that the preamble is satisfied in connection with the discussion of the method steps (a)-(d). As explained below, the preamble maps onto Border as follows:

**First client device:** Upstream server 107.

**Second server:** Downstream server 105.

**Web server:** Web server 109.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Border discloses the preamble. Ex. 1009, ¶¶ 234-44.

Appx27533

**b)**      <u>Claim step (a) ("establishing a Transmission Control Protocol (TCP) connection with a second server")</u>

Downstream server 105 is the "second server," upstream server 107 is the "first client device," and the requested URL is a "first content identifier."

Border "provides a communication system for retrieving web content." Ex. 1017 at 1:33-35. Web content is retrieved from a web server that stores the web content by sending a "URL request message to [the] web server and receiving the URL content from the web server[.]" *Id.* at 2:44-35. An "individual piece of web content," i.e. a "first content," "is identified, that is, addressed, by an Internet address, referred to as a Uniform Resource Locator (URL). *Id.* at 1:62-2:2. As shown in Figure 2, web browser 103 sends a GET request to downstream server 105, which forwards the request to upstream server 107, which makes the GET request to web server 109. The response to the GET request—the content at the requested URL— is then returned through the same path in reverse.

Any standard computer may serve in the role of a "client." Section VI. Border discloses that upstream server 107 is a "client," as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server, and thus acts as an HTTP client when requesting content from an HTTP server. Even if "client device" were construed as a "consumer" computer, the physical computer hardware on which upstream server 107 operates is a general purpose personal computer, comprised of, among other components, processor 705,

42

memory 707 and 709, storage 711, display 713, keyboard 715, mouse 717, and communication interface 719. Ex. 1017 at 10:6-11:54; Fig. 7. Further, the proxy servers may run on "general purpose personal computer[s]." Ex. 1009, ¶¶ 237-38.

Downstream server 105 is the "second server," as it accepts a connection from web browser 103 in order to send back a response to web browser 103's GET request. Downstream server 105 retrieves the requested first content by communicating with web server 109 through upstream server 107 ("first client device").

Border also discloses downstream server 105 and upstream server 107 maintaining and communicating over a persistent TCP connection to carry HTTP transactions, shown in Figure 1 by the connection labeled "P-TCP." Ex. 1017 at Figure 1; 4:11-15; 7:50-52. TCP communications of communication system 100 are made over IP. *Id.* at 7:32-35. Therefore, a TCP connection is established between the first client device and the second server.

Border discloses this limitation. Ex. 1009, ¶¶ 245-49.

43

c)    **Claim step (b) ("sending, to the web server over an
Internet, the first content identifier ")**

The first client device discussed above is used with "many web servers (e.g.
web server 109)." Ex. 1017 at 2:29-31. Upstream server 107 issues a GET request[6]
to web server 109 for the content at a specified URL, as shown in green in Figure 2:

*FIG. 2*



*Id.* at 5:33-36.

Border discloses this limitation. Ex. 1009, ¶¶ 250-51.

---

[6] The GET request is defined by RFC 2616 § 9.3, and is therefore an "HTTP
request." Ex. 1009, ¶ 240.

**d)    Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier")**

In response to upstream server 107 "issu[ing] the GET URL HTML request the web server 109 for the HTML page[,]…the web server 109 transmits the requested HTML page to the upstream server[,]" as shown in green in Figure 2:



*FIG.* 2

Ex. 1017 at 5:34-37. Thus, Border teaches the first client device receiving the first content (the web page at the requested URL) from the web server in response to sending the first content identifier (the requested URL).

Border discloses this limitation. Ex. 1009, ¶¶ 252-53.

45

**e)** **Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier")**

After receiving the web page from web server 109, upstream server 107 "forwards the HTML page to the downstream server 105[,]" as shown in green in Figure 2:



Ex. 1017 5:38-40. Downstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a "server." *Id.* A TCP connection exists between upstream server 107 and downstream server 105. Section VIII.A.1.b.

Border discloses this limitation. Ex. 1009, ¶¶ 254-57.

46

### 2.     Claim 6

Border "provides a communication system for retrieving web content." Ex. 1017 at 1:33-35; Section VIII.C. To accomplish that retrieval, upstream server 107 issues a GET request to web server 109 for the content at a specified URL. Ex. 1017 at 5:33-36. Web server 109 is the "web server" of claim 1. Border explicitly discloses an additional embodiment where "HTTP proxy server 105 and 107 acts as an intermediary between one or more browsers *and many web servers*," with server 109 being only an exemplary web server. *Id.* at 4:30-32 (emphasis added); *see also id.* at 5:60-61 ("multiple web servers exist"). Any of these "many" or "multiple" web servers can be a "third server" that "stores a second content identified by a second content identifier." Further, upstream server 107 would send and receive the second content identifier and second content in the same manner as described above in Section VIII.C.1 regarding the first content identifier and the first content.

Border discloses Claim 6. *Id.* at ¶¶ 258-60.

### 3.     Claim 10

As explained for claim 17 below, Border discloses upstream server 107 storing the received first content in HTTP cache 117 to provide in response to future requests. If upstream server 107 receives a subsequent request for the received first content, upstream server 107 may determine whether such content is still valid by sending a conditional HTTP GET request using IF MODIFIED SINCE headers to

47

web server 109. Ex. 1017 at 7:5-10, 9:14-15. If there has been no change to the content since it was stored in cache 117, then the content is still valid and web server 109 returns a NO CHANGE response. *Id.* Upstream server 107 performs this action "to avoid stale information [and] determine whether the information stored at URL HTML has been updated since the time it was last requested." *Id.* at 6:55-57. Border therefore discloses the first client device determining that the received first content is valid. Ex. 1009, ¶¶ 261-63.

### 4.   Claim 15

A TCP connection exists between upstream server 107 and downstream server 105. Section VIII.C.1.b. Further, web browser 103 sends a GET request containing the URL for the content "HTML"[7] to downstream server 105. Downstream server 105 then sends a GET request containing the URL to upstream server 107, as shown in green in Figure 2:

---

[7] Border uses "HTML" as the exemplary URL of a request from web browser 103. Border, 5:18-19 ("For the purposes of explanation, the HTML page is addressed as URL 'HTML.'").

48

*FIG. 2*



Border discloses Claim 15. *Id.* at ¶¶ 264-66.

### 5.    Claim 16

As discussed in Section VIII.C.1.c, upstream server 107 (the first client device) sends a HTTP request to the web server over the Internet that comprises the first content identifier.

Border discloses Claim 16. *Id.* at ¶¶ 267-69.

### 6.    Claim 17

Border discloses upstream server 107 is further comprised of HTTP cache 117. Ex. 1017 at 4:8-11. In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.* at 5:36-38.

49

Border discloses claim 17. Ex. 1009, ¶¶ 270-73.

### 7.    Claims 18-19

A persistent TCP connection is established between upstream server 107 and downstream server 105, and, upstream server 107 and downstream server 105 communicate persistent TCP connection. Sections VIII.C.1.b, VIII.C.1.e.

Border discloses claims 18-19. *Id.* at ¶¶ 274-77.

### 8.    Claim 20

As discussed in Sections VIII.C and VIII.C.4, Border discloses that "[f]or the purposes of explanation, the HTML page is addressed as URL 'HTML.'"

Border discloses Claim 20. *Id.* at ¶¶ 278-80.

### 9.    Claim 23

As discussed in Sections VIII.C.1.b-e, Border teaches the sequential execution of the claim 1 steps, as shown in green in Figure 2:

50



*FIG. 2*

Border discloses Claim 23. *Id.* at ¶¶ 281-84.

### 10. Claim 24

Border discloses computer system 701 that can be configured to operate upstream server 107, which is a client device as discussed in Section VIII.C.1.b. above. Ex. 1017 at 10:6-8. Computer system 701 is comprised of processor 705, main memory 707, and storage device 711. *Id.* at 10:6-24. Upstream server 107, operating on computer system 701, interacts within system 100:

> in response to processor 705 executing one or more sequences of one or more instructions contained in main memory 707. Such instructions may be read into main memory 707 from another computer-readable medium, such as storage device 711. Execution of the sequences of instructions contained in main memory 707 causes processor 705 to perform the process steps described herein.

51

*Id.* at 10:35-43. The storage device is a "non-volatile[,]" i.e. non-transitory, "computer-readable medium." *Id.* at 10:50-58.

Border discloses Claim 24. Ex. 1009 at ¶¶ 285-87.

### D.    GROUND 4: OBVIOUSNESS OF CLAIMS 1, 6, 8-11, 13, 15-20, AND 22-24 BY BORDER + RFC 2616 + GENERAL KNOWLEDGE

If any Challenged Claim discussed above in Section VII.C is not anticipated by Border, it would have been obvious to a POSA. Further, Challenged Claims 8-9, 11, 13, and 22 would have been obvious to a POSA.

Ground 4 is based upon a combination of the teaching of Border with the general knowledge of a POSA with regard to HTTP and TCP/IP Internet communications. As discussed with respect to Ground 2 in Section VIII.B (which is incorporated by reference into Ground 4), this general knowledge is also reflected in part by the disclosure of RFC 2616. Therefore, in addition to combining Border with the general knowledge of a POSA, Border could also be combined with the disclosure of RFC 2616 itself.

Border discloses a system for retrieving web content, and states that "HTTP is an application level protocol that is employed for information transfer over the Web." Ex. 1017 at 10:26-29. Border expressly incorporates RFC 2616 and discusses it throughout. *Id.* Border also specifically references the usage of HTML, URLs, and TCP/IP, all of which are indicative of standard Internet communications. *See*

52

Sections VIII.C.1 and VIII.C.4. A POSA would have been motivated to combine the disclosure of Border with a POSA's general Internet knowledge (as specifically noted in the claim-by-claim application below) and/or the disclosure of RFC 2616 governing HTTP. Ex. 1009, ¶¶ 289-90.

A POSA would understand that the teaching of Border—as well as the Patent—calls upon a POSA to make reference to such background knowledge, and a POSA would do so. *Id.* at ¶ 291.

### 1.    Claim 1

Border anticipates Claim 1. *See* Section VIII.C.1. Even if it does not, Claim 1 is rendered obvious by Border in view of the knowledge of a POSA.

Even if "first client device" is construed to refer to a consumer computer instead of a device acting in the role of a client, it would have been obvious to a POSA, in view of RFC 2616 and a POSA's knowledge of Internet communications in 2009 to modify upstream server 107 to operate on a consumer computer. Ex. 1009, ¶ 293. The claimed benefits of the Patent—congestion and latency reduction and anonymity—are met through the use of an intermediary acting in the role of a client to a web server, not any specialized hardware on which the intermediary operates. This is evidenced by the lack of any meaningful difference between the components of communication device 200 of the Patent and the components of computer system 701 of Border. *Compare* Ex. 1001 at 5:51-6:42 *with* Ex. 1017 at 10:6-11:54; Ex.

53

1009, ¶ 294. This is further evidenced by RFC 2616's definition of proxy, e.g., the first client device, as "[a]n intermediary program which acts as both a server and a client[.]" Ex. 1018 at § 1.3.

Finally, a POSA would understand that upstream server 107 could operate on a consumer computer by the disclosure of Border alone. Border expressly discloses that user station 101—the end user's computer—can be a "personal computer." Ex. 1017 at 3:58-61. Further, downstream server 105 can run on a "general purpose personal computer," and downstream server 105 and upstream server 107 can run on identical hardware (computer system 701). *Id.* at 4:51-53; 11:6-8; Ex. 1009, ¶ 295.

It would have been obvious to a POSA in 2009 that any computing device capable of operating a "proxy" as defined in RFC 2616 could be used as a first client device. Claim 1 would have been obvious to a POSA to the extent not anticipated by Border. Ex. 1009, ¶¶ 292-97.

### 2.    Claims 8-9

Border discloses downstream server 105 and upstream server 107 communicating via HTTP over a persistent TCP connection. Section VIII.C.4. It would therefore be obvious to a POSA to rely on a POSA's general knowledge, including of the TCP protocol, for periodic communications between downstream

54

server 105 and upstream server 107, including the use of TCP Keep-Alive messages. Ex. 1009, ¶ 303.

RFC 1122 expressly discloses the use of "TCP Keep-Alives" to "periodically probe[] the other end of a connection when the connection is otherwise idle, even when there is no data to be sent[,]" to confirm that an idle connection is still active. Ex. 1036 at § 4.2.3.6; Ex. 1009, ¶ 303. Specifically, TCP keep-alive messages ensure that a persistent connection is still alive, such that if either TCP endpoint would lose its connection, each end-point would be notified promptly so it could open a new connection or connect to a different peer. Such behavior is beneficial in settings like those disclosed by Border, so that the downstream and upstream proxy servers can communication in an efficient manner once a browser actually makes an HTTP request to the downstream server, and not suffer from a failed, slow, or lower-throughput TCP connection. Ex. 1009, ¶ 303.

Further, it would be obvious to a POSA to rely on his knowledge of the HTTP protocol for periodic communications between downstream server 105 and upstream server 107, including the use of HTTP/1.1 "persistent connections" or HTTP/1.0 Keep-Alive headers. *Id.* at ¶ 304. The use of such messages would be obvious to a POSA, and are discussed further with respect to the system of Crowds above in Section VIII.B.2, which is incorporated herein.

55

Claims 8-9 accordingly would have been obvious to a POSA based on Border in view of the general knowledge of a POSA and RFC 2616. *Id.* at ¶¶ 301-305.

### 3.    Claim 11

Border discloses the first client device determining that the received first content is valid. Section VIII.C.3. Border also discloses upstream server 107 communicating with web server 109 via HTTP and storing received first content in cache 117. *See* Section VIII.C.3. It would therefore be obvious to a POSA to utilize the methods described in RFC 2616 to determine the validity of cached content. Ex. 1009, ¶¶ 309-11. RFC 2616 specifies a caching proxy's (e.g., upstream server 107) use of HTTP headers received from an origin server (e.g. web server 109) to determine the validity of cached content. For example, an origin server may include the Expires header in a response to an HTTP GET request, which "gives the date/time after which the response is considered stale[,]" i.e., not valid. Ex. 1018 at § 14.21. Alternatively, an origin server may include the Cache-Control header with a max-age directive in response to a GET request, which specifies the amount of time after which the response is considered stale. *Id.* at §§ 13.2.4; 14.9; 14.9.3. The caching proxy stores these headers received from the origin server, and uses them to determine whether the stored content is valid. Further, even after the expiry time or max-age period of a piece of cached content, Border discloses, and RFC 2616 § 13

56

details, the use of conditional HTTP GET requests to validate content stored in cache 117 on the upstream server 107. Ex. 1017 at 5:25-5:47, 7:5-19.

Claim 11 accordingly would have been obvious to a POSA based on Border in view of the general knowledge of a POSA and RFC 2616. Ex. 1009, ¶¶ 306-12.

### 4. Claim 13

Any standard computer may serve in the role of a "client." Section VIII.C.1.b. Upstream server 107 operates on a general purpose personal computer comprised of at least a processor, memory, and communication interface. Ex. 1017 at 10:6-11:54; Fig. 7. "Further, the instructions to support the system interfaces and protocols of [communication] system 100 may reside on a computer-readable medium." *Id.* at 10:51-53. Those "instructions," executed on "processor 705", can be received from a remote computer "over a telephone line using a modem," and stored in "main memory 707, from which processor 705 retrieves and executes the instructions." *Id.* at 11:7-23; 11:39-54 (the client device can "receive data, including program code, through" Internet networks). Thus, Border discloses downloading, from the Internet, and installing program code (the software application) that instructs the processor of the first client device to perform the steps described in Sections VIII.C.1.b-e.

Furthermore, most computers, including computers commonly used by consumers, are capable of downloading software applications from the Internet and installing such applications. Ex. 1009, ¶ 315. Thus, the download and install on a

57

general purpose personal computer of a software application that causes the computer's processor to perform the steps described in Sections VIII.C.1.b-e. would have been well known to a POSA by the 2009 timeframe. *Id.*

Claim 13 accordingly would have been obvious to a POSA based on Border in view of the general knowledge of a POSA and RFC 2616. Ex. 1009, ¶¶ 313-16.

### 5.    Claim 22

Upstream server 107 operates on computer system 701. Section VIII.C.10. There is no meaningful difference between the hardware of computer system 701 of Border and communication device 200 of the Patent, and upstream server 107 can operate on a "general purpose personal computer." Sections VIII.C.1.b, VIII.D.1. All computers, including computers commonly used by consumers, have used operating systems for many decades. Ex. 1009, ¶ 333. Use of an operating system on a general purpose personal computer would have been well known to a POSA before 2009. *Id.*

Claim 22 accordingly would have been obvious to a POSA based on Border in view of the general knowledge of a POSA and RFC 2616. Ex. 1009, ¶¶ 332-34.

### 6.    Claims 6, 10, 15-20, and 23-24

Border discloses the additional limitations of claims 6, 10, 15-20, and 23-24. Sections VIII.C.2-10. Therefore, if claim 1 is rendered obvious by the disclosure of Border in view of both the general knowledge of a POSA and the disclosure of RFC

58

2616 (which also evidences the knowledge of a POSA), these claims are also rendered obvious. *See* Ex. 1009, ¶¶ 298-300, 306-12, 317-31, 335-40.

**E.     GROUND 5: ANTICIPATION OF CLAIMS 1-2, 6-8, 13, 15-16, AND 18-23 BY MORPHMIX**

MorphMix states its goal as "achieving anonymous Internet access" and "to provide anonymity for the masses and aim at a large number of nodes distributed all around the world." Ex. 1013 at 14, 109.[8] An individual can join MorphMix with a computer "connected to the Internet" that is capable of running applications "such as web browsers" and that has an IP address. *Id.* at 234.

MorphMix describes a set of "nodes," each node identified by its IP address and connected to one or more other MorphMix nodes at any time, where there is a TCP connection between any two connected nodes. *Id.* at 98-99. To access an Internet web server anonymously, a node "establishes a circuit via some other nodes" forming an "anonymous tunnel." *Id.* at 99. If a web browser sends a request to a node, the first node sends the IP address and port of the targeted web server "to the final node." *Id.* at 103. The final node then "connects to the server" and the "connection has been established." *Id.* "Sending data back from the server to the client works exactly in the opposite way." *Id.* at 105.

_____

[8] The page numbering is that of the doctoral thesis, such that page 1 of the thesis (which page 21 of Ex. 1013) is the first page of MorphMix.

### 1.    Claim 1

#### a)    <u>Preamble</u>

As explained in Section VIII.A.1.a above, the preamble provides antecedent basis support for the four method steps that follow, and Petitioners explain that the preamble is satisfied in connection with the discussion of the method steps (a)-(d). As explained below, the preamble maps onto MorphMix as follows (in the example path discussed below):

**First client device:** last node ($c$).

**Second server:** intermediate node ($b$).

**Web server:** server ($s$).

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

MorphMix discloses the preamble. Ex. 1009, ¶¶ 345-59.

#### b)    <u>Claim step (a) ("establishing a Transmission Control Protocol (TCP) connection with a second server")</u>

MorphMix discloses that a random path of nodes (applications on user's computers) is created to retrieve web pages from a web server after the web request is initiated by a user's browser. The client "sends $ip_s$ and $p_s$" to the access program node on the local computer. Ex. 1013 at 103. $Ip_s$ and $p_s$ are the host (target) server's ip address and port. *Id.* at 20. The node establishes an "anonymous tunnel by sending an end-to-end message to the final node that contains $ip_s$ and $p_s$." *Id.* at 103. The final

60

node then connects to the target server and "forward[s] the data it receives through the anonymous connection" to the target server. *Id.* at 104.

One potential path of nodes is that the initiator (*a*) sends the request to an intermediate node (*b*), which sends the request to the last node (*c*), which sends the request to the server (*s*):



**Figure 5.1:** *Basic idea of MorphMix.*

*Id.* at Fig. 5.1.

In this example, the "second server" is the node that provides the first content identifier to the first client device (final node *c*). The "second server" is the prior node *b*, which had "forwarded" the payload[9] to node *c*. *Id.* at 105. The "first client device" is the last node in the tunnel (node "*c*"), which communicates with the web server.

---

[9] A POSA would understand that the "payload" would include the data identifying the requested web page to be provided to the web server. Ex. 1009, ¶ 361.

Appx27553

Figure 5.4 of MorphMix shows that computer information is passed from node $b$ (second sever) to node $c$ (first client device), which then connects with the web server. Figure 5.4 is annotated in red below to show the node $b$ sending to node $c$ information that includes the IP address ($ip_s$) and port ($p_s$) of the server, as well as the application data (AD) which identifies the web content, so that node c may send it to the server:



**Figure 5.4:** *Anonymous connections and cell forwarding.*

The Patent does not require the "second server" to be any type of particularized computer equipment. Section VI.A. Regardless, MorphMix discloses that node $b$ in the above example is a "server" as commonly understood because node $b$ accepted a connection from node $a$ in order to send back a response, because "[s]ending data back from the server to the client works exactly in the opposite way."

62

*Id.* at 105.[10] Every node "can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 98. Not only is this consistent with the meanings of "client" and "server" (Section VI; Ex. 1009, ¶¶ 42-48), but MorphMix expressly states that a "sender" of data is a "client," while a "recipient" is a "server." Ex. 1013 at 13.

MorphMix discloses that "Anybody who has access to a computer that is connected to the Internet should be able to join and use MorphMix after having installed the MorphMix software." Ex. 1013 at 96. A computer need only have a public IP address to join, and "any computer with a dial-up connection capable of running a modern graphical web browser should be sufficient." *Id.* MorphMix "can handle as many nodes as there are public IP addresses." *Id* at 234.

MorphMix also confirms the usage of TCP/IP connections. "[T]here is a TCP connection" between nodes. Ex. 1013 at 99, 101 (nodes *a*, *b*, and *c* "are communicating directly with each other across TCP connections"), Fig. 2.3 (TCP connections). MorphMix therefore discloses that a TCP connection is established between all nodes, including the first client device and second server.

---

[10] A POSA would understand that any server equipment could serve as a node, because a node simply must have an IP address, and a server has an IP address. Ex. 1013 at 98 (node is "identified with its public IP address"); *id.* at 149 (MorphMix "can handle as many nodes as there are public IP addresses").

63

Because the above requests are web requests, they include the "content identifier" which identifies the content sought from the target web server. MorphMix states, "MorphMix can anonymise any TCP-based application but in its first version, **we focus on web browsing and MorphMix supports HTTP (both versions 1.0 and 1.1) and HTTPS**." *Id.* at 103. A POSA would understand that HTTP includes transmission of URLs or other web page content identifiers, so that a web page may be retrieved. Ex. 1009, ¶ 371.

MorphMix discloses this limitation. *Id.* at ¶¶ 360-72.

### c) Claim step (b) ("sending, to the web server over an Internet, the first content identifier")

In the example *a* to *b* to *c* node path discussed above, node *c* is the final node and the "first client device." Node *c* determines from the header information that it is the "final node," and that a portion of the "payload" must be sent to the web server using the IP address and port number. Ex. 1013 at 105 (steps 10-11). Therefore, "the server eventually receives AD," or application data. *Id.* (step 12).

Figure 5.4 shows the application data (AD), which identifies the web content, being passed from the first client device (node *c*) to the web server (indicated in red):

64



**Figure 5.4:** *Anonymous connections and cell forwarding.*

The target server is a web server. Ex. 1013 at 204. MorphMix further states that "the client application can send the information about the server to contact and the application data together to the access program, as is done by web browsers when they use a web proxy." *Id.* at 105.

HTTP requests are sent through the node tunnels to the web server. MorphMix "focus[es] on web browsing and MorphMix supports HTTP (both versions 1.0 and 1.1) and HTTPS." *Id.* at 103. Further, "with HTTP 1.1, all object[s] of a web page are downloaded through a single anonymous connection and a single TCP connection between the final node and the web server." *Id.* at 207.

A POSA would understand that the information sent to the target web server includes the "first content identifier," such as a URL (as commonly used with HTTP

65

requests), so that the data can be sent "back from the server to the client." *Id.* at 105; Ex. 1009, ¶ 378.

MorphMix discloses this limitation. *Id.* at ¶ 373-79.

> **d)** **Claim step (c) ("receiving, the first content from the web server over the Internet in response to the sending of the first content identifier")**

The last node in the path receives the "first content," such as the web page, specified by the user. MorphMix confirms that "[s]ending data back from the server to the client works exactly in the opposite way" as the information is sent to the server. Ex. 1013 at 105. Accordingly, the first client device in MorphMix (the last node before the target web server) receives the requested first content (such as a web page) for sending back down the path to the requesting user.

MorphMix discloses this limitation. Ex. 1009, ¶¶ 380-82.

> **e)** **Claim step (d) ("sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier")**

Since "[s]ending data back from the server to the client works exactly in the opposite way[,]" the first client device (node *c*) sends the first content back to the second server (node *b*). The second server can then send the first content back to the requesting user (node *a* in this example). As discussed in Section VIII.E.1.b, a TCP connection exists between node *c* and node *b*.

MorphMix discloses this limitation. Ex. 1009, ¶¶ 383-85.

66

### 2.    Claim 2

The first client device is a node, which is identified by its IP address. Ex. 1013 at 98 ("public IP address"), 109 ("node identified with its IP address"); Section VIII.E.1.b. MorphMix also discloses a "host name" may be sent instead of an IP address. *Id.* at 105.

When a node joins the MorphMix network, it sends a message to other nodes comprising the node's IP address, port, public key, and other information as part of its start-up. Ex. 1013 at 132-133. In particular, MorphMix discloses a "peer discovery mechanism that enables MorphMix nodes to learn about other nodes." *Id.* at 131. "While participating in MorphMix and setting up anonymous tunnels, a node learns about a variety of other nodes. Every selection it gets contains the IP addresses, ports, public keys, and node levels of several nodes." *Id.* at 133. MorphMix thus discloses that the first client device (node $c$), when joining the MorphMix network and thus starting up, sends its node information (including its IP address) to other nodes, including the second server (node $b$).

MorphMix discloses Claim 2. Ex. 1009, ¶¶ 386-89.

### 3.    Claim 6

As explained in Section VIII.E.1.b, MorphMix discloses that a random path of nodes is created to retrieve web pages from a web server. One potential path of

67

nodes is that the initiator (*a*) sends the request to an intermediate node (*b*), which sends the request to the last node (*c*), which sends the request to the server (*s*):



**Figure 5.1:** *Basic idea of MorphMix.*

Ex. 1013 at Fig. 5.1. In this path, web server (s) is the "web server" of claim 1. MorphMix also discloses that "[s]ince MorphMix is basically a circuit-based mix network, a node establishes a circuit via some other nodes to access **servers** in the Internet anonymously." Ex. 1013 at 99 (emphasis added). Figure 5.2 explicitly lists multiple server (s) targets, denoted at $S_1$, $S_2$, and $S_3$:



**Figure 5.2:** *Multiple anonymous connections within one anonymous tunnel.*

*Id.* at 100 (Fig. 5.2). Any of the other "servers" identified in MorphMix (*e.g.*, $S_1$, $S_2$, and $S_3$) can be a "third server" that "stores a second content identified by a second content identifier." Further, the final node (node *c*) would send and receive the

Appx27560

second content identifier and second content in the same manner as described above

in Section VIII.E.1 regarding the first content identifier and the first content.

MorphMix discloses Claim 6. *Id.* at ¶¶ 390-92.

### 4. Claims 7 and 21

Claims 7 and 21 differ only in that they depend from different claims.

As discussed in Section VIII.E.1.b, each MorphMix node is capable of

running a modern graphical web browser. Further, every node may serve as an

initiator (*a*), an intermediate node (*b*), or a last node (*c*):



**Figure 5.1:** *Basic idea of MorphMix.*

Ex. 1013 at Fig. 5.1. MorphMix simulator uses "web browsing" as the example

application to analyze performance, as "web browsing will be one of the prime

applications" if MorphMix were widely deployed. *Id.* at 200. In that simulation,

"*browsing time* is the time a user running a node is browsing the Web per day." *Id.*

at 204 (emphasis in original). Thus, every node, including the last node (node *c*) (the

first client device), executes a web browser application.

69

MorphMix discloses Claims 7 and 21. Ex. 1009, ¶¶ 393-95, 424-26.

### 5.     Claim 8

The "second server" and "first client device" of MorphMix are nodes, and each communicates via the MorphMix protocol for establishing and maintaining virtual tunnels. Section VIII.E.1.b. Each sends HTTP protocol messages through this tunnel for the purpose of sending web requests.

MorphMix discloses a number of protocol messages between nodes that are immediately next to each other within the virtual tunnels disclosed by MorphMix, such as node $c$ (first client device) and node $b$ (second server). These messages are "used to set up virtual links, to set up and terminate anonymous tunnels, for peer discovery, to get status information about neighbors, for flow control, and to carry end-to-end messages." Ex. 1013 at 267. Such periodic communication involves node $c$ asking node $b$ about further nodes as part of peer discovery (*id.* at 269), sending requests for the other node's status (*id.* at 271), sending messages with virtual "credit" that are used for flow control (*id.* at 273), and others.

MorphMix also discloses that node $c$ and node $b$ communicate periodically to transmit HTTP messages that the final node $c$ subsequently uses to request HTTP content from the web server. These HTTP messages are transmitted over MorphMix anonymous virtual tunnels and the HTTP data is sent periodically over "virtual link

70

data messages" between node *b* and node *c*, which transmit the HTTP request and response.  Ex. 1013 at 273.

MorphMix discloses Claim 8. Ex. 1009, ¶¶ 396-400.

### 6.    Claim 13

Consumer computers can be the "first client device" of Claim 13: "any computer with a dial-up connection capable of running a modern graphical web browser should be sufficient." *See* Section VIII.E.1.b; Ex. 1013 at 96. A processor, common on such computers, is simply "any device for executing software instructions," such as the instructions found in the MorphMix application. *See* Ex. 1001 at 6:7-15; Ex. 1009, ¶ 403. The "MorphMix application" is disclosed as being available to "[a]nybody who has access to a computer that is connected to the Internet…*after having installed the MorphMix software*." Ex. 1013 at 96, 98 (emphasis added). "The MorphMix prototype is free software and is available with full source code…at the MorphMix project web page" (citing Internet website http://www.tik.ee.ethz.ch/~morphmix). *Id.* at 286. That same webpage "also contains information about how to configure and run the prototype." *Id.* It is the downloaded (from the Internet) and installed MorphMix software application that instructs the processor of the first client device to perform the steps described in Sections VIII.E.1.b-e.

MorphMix discloses Claim 13. Ex. 1009, ¶¶ 401-06.

71

### 7.    Claim 15

As discussed in Section VIII.E.1.b, final node *c* (first client device) receives the first content identifier from the intermediate node *b* (second server) over the TCP connection established between the nodes.

MorphMix discloses Claim 15. *Id.* at ¶¶ 407-09.

### 8.    Claim 16

As discussed in Section VIII.E.1.c, final node *c* sends a HTTP request to the web server over the Internet that comprises the first content identifier.

MorphMix discloses Claim 16. *Id.* at ¶¶ 410-412.

### 9.    Claims 18-19

A TCP connection is established between node *c* and node *b*, and node *c* and node *b* communicate over the TCP connection. Sections VIII.E.1.b, VIII.E.1.e.

MorphMix also discloses FTP, as MorphMix "can be used to anonymise FTP downloads." Ex. 1013 at 236. MorphMix also discloses the use of UDP. *Id.* at 21 (links between mixes "can make use of TCP or UDP"); *id.* at 37 (Fig. 2.6 showing both TCP/IP and UDP connections between mixes).

MorphMix discloses Claims 18-19. Ex. 1009, ¶¶ 413-420.

### 10.    Claim 20

MorphMix is used to create a node tunnel to a web server in order to retrieve web pages from a web server after the web request (which contains a URL identifying the web page) is initiated by a user's browser. Sections VIII.E.1.b-c.

72

Further, MorphMix discloses that HTTP requests specify a URL of the web object. Ex. 1013 at 3.

MorphMix discloses Claim 20. *Id.* at ¶¶ 421-23.

### 11.    Claim 22

MorphMix discloses the use of a client operating system. MorphMix discusses the need to avoid disclosing information "about the user's operating system or web browser." Ex. 1013 at 38. MorphMix also discloses performance tests on MorphMix using "Linux as operation system." *Id.* at 129.

MorphMix discloses Claim 22. Ex. 1009, ¶¶ 427-29.

### 12.    Claim 23

The four method steps are executed sequentially, in the order listed in Claim 1. Communications between nodes occur over TCP connections, and therefore a TCP connection is established between node *c* and node *b* before the web request is made. Node *c* then receives the web request (and content identifier) from node *b*, and sends the web request to the target web server. "Sending data back from the server to the client works exactly in the opposite way." Ex. 1013 at 105. Therefore, as explained in Sections VIII.E.1.b-e, the claim steps are executed sequentially.

MorphMix discloses Claim 23. Ex. 1009, ¶¶ 430-32.

73

**F. GROUND 6: OBVIOUSNESS OF CLAIMS 1-2, 6-11, 13, 15-16, AND 18-23 BY MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE**

If any Challenged Claim discussed above in Section VIII.E is not anticipated by MorphMix, it would have been obvious to a POSA. Further, Challenged Claims 9-11 would have been obvious to a POSA.

Petitioners refer to and incorporate herein Section VIII.B. regarding the rationale for combining Crowds with the same general knowledge of a POSA and RFC 2616. The reason for combination is the same for MorphMix as for Crowds given their similarity of disclosures. MorphMix specifically concerns Internet and World-Wide-Web communications, TCP/IP and HTTP (which is the subject matter of RFC 2616). *See* Sections VIII.E.5, VIII.E.1. Further, MorphMix expressly cites to RFC 2616 (reference [45]). Ex. 1013 at 3, 205, 249. A POSA would understand that MorphMix—as well as the Patent—calls upon a POSA to make reference to such background knowledge, and a POSA would do so. Ex. 1009, ¶¶ 435-43.

**1. Claim 1**

To the extent MorphMix is deemed not to anticipate Claim 1, Claim 1 would be rendered obvious in view of the knowledge of a POSA.

First, if "second server" is construed to refer to some type of specialized server equipment, Claim 1 at a minimum would have been obvious to a POSA for the same reasons explained above in Section VIII.B.1 with respect to Crowds. Like Crowds,

74

MorphMix makes reference to servers, stating that a "sender" of data is a "client," while a "recipient" is a "server." Ex. 1013 at 13. Any computer with an IP address may be a node, and it would have been obvious to a POSA that any server would have an IP address and could serve as a "node." Ex. 1009, ¶¶ 445-47; Section VIII.E.1.b.

Second, if MorphMix is deemed to not disclose a "first content identifier" of Claim 1, at a minimum it would have been obvious to a POSA. MorphMix discloses the use of HTTP to send requests from an initiating client to a web server. Sections VIII.E.1.b-c. It also "focus[es] on web browsing" and HTTP versions 1.0 and 1.1. Ex. 1013 at 103. A POSA would have understood that HTTP requests involved content identifiers, e.g., URLs, to identify desired web content. Ex. 1009, ¶¶ 451-52.

Claim 1 would have been obvious to a POSA to the extent not anticipated by MorphMix. Ex. 1009, ¶¶ 444-53.

## 2.    Claim 9

Each of the "second server" and "first client device" of MorphMix is a node that communicates via the HTTP protocol over persistent connections to send web requests. Section VIII.E.1.b. A POSA would understand that all nodes in the path, including the second server and the first client device, communicate via HTTP. Ex. 1009, ¶¶ 465, 468-69.

Appx27567

For the same reasons explained above in Section VIII.B.2-3 (concerning Crowds) and VIII.D.2 (concerning Border), Claim 9 would have been obvious to a POSA in view of MorphMix and a POSA's general knowledge regarding HTTP, TCP, and/or the disclosure of RFCs 2616 and 1122. This includes the usage of both TCP "Keep Alive" messages and HTTP "Keep-Alive" headers.

Claim 9 accordingly would have been obvious to a POSA based on MorphMix in view of the general knowledge of a POSA and the disclosure of RFC 2616. *Id.* at ¶¶ 471-72.

### 3.    Claims 10-11

MorphMix discloses, with respect to Claim 1, that the first client device communicates with the target server via HTTP. Section VIII.E.1.c. A POSA understands that the HTTP protocol therefore would also govern the receipt of content by the first client device. Ex. 1009, ¶ 473.

For the same reasons explained above in Sections VIII.B.3. (for Crowds), a POSA would have understood from HTTP and RFC 2616 that the first client device (node) would determine that the received content is valid through the HTTP protocol, including through the HTTP header.

Claims 10-11 accordingly would have been obvious to a POSA based on MorphMix in view of the general knowledge of a POSA and the disclosure of RFC 2616. Ex. 1009, ¶¶ 473-78.

76

### 4. Claims 2, 6-8, 13, 15-16, and 18-23

MorphMix discloses the additional limitations of claims 2, 6-8, 13, 15-16, and 18-23. Sections VIII.E.2-7. Therefore, if claim 1 is rendered obvious by the disclosure of MorphMix in view of both the general knowledge of a POSA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSA), these claims are also rendered obvious. *See* Ex. 1009, ¶¶ 454-70, 479-514.

Dated: July 28, 2020                    Respectfully submitted,

                                        CHARHON CALLAHAN ROBSON &
                                        GARZA, PLLC

                                        /Craig Tolliver/

                                        Craig Tolliver (Reg. No. 45,975)
                                        George "Jorde" Scott (Reg. No. 62,859)
                                        3333 Lee Parkway, Suite 460
                                        Dallas, TX 75219
                                        (214) 521-6400

Appx27570

## <u>CERTIFICATION OF WORD COUNT</u>

The undersigned hereby certifies that the portions of the above-captioned PETITION FOR INTER PARTES REVIEW specified in 37 C.F.R. § 42.24 has 13,971 words, in compliance with the 14,000 word limit set forth in 37 C.F.R. § 42.24. This word count was prepared using Microsoft Word/Office 365 and includes words added to images as annotations.

Dated: July 28, 2020

Respectfully submitted,

CHARHON CALLAHAN ROBSON & GARZA, PLLC

/Craig Tolliver/

Craig Tolliver (Reg. No. 45,975)
Lead Attorney for Petitioners
3333 Lee Parkway, Suite 460
Dallas, TX 75219
(214) 521-6400

Appx27571

## CERTIFICATE OF SERVICE

Pursuant to 37 CFR §§ 42.6(e)(1), 42.6(e)(4)(iii), and 42.105, the undersigned certifies that on July 28, 2020, a complete and entire copy of this Petition for *Inter Partes* Review and all supporting exhibits and Powers of Attorney were deposited for delivery to Luminati Networks, Ltd. via Priority Mail Express (or by means at least as fast and reliable as Priority Mail Express) (1) at the correspondence address of record (May Patents Ltd.) for the '510 Patent and (2) at the address provided for service by Luminati Networks, Ltd.'s counsel in the related matter styled *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) as follows:

| May Patents Ltd. c/o Dorit Shem-Tov<br>P.O.B 7230<br>Ramat-Gan 5217102<br>Israel | RuyakCherian LLP<br>c/o Ronald Wielkopolski<br>309 Silver Glade Place<br>Rockville, MD 20850 |
|---|---|

Dated: July 28, 2020

Respectfully submitted,

CHARHON CALLAHAN ROBSON & GARZA, PLLC

/Craig Tolliver/

Craig Tolliver (Reg. No. 45,975)
Lead Attorney for Petitioners
3333 Lee Parkway, Suite 460
Dallas, TX 75219
(214) 521-6400

80

Appx27572

IPR2022-00353
Patent 11,044,344 B2

how the first device performs Limitations 24[a]-24[g] (Sections VII.B.2-VII.B.8).
Freedman, ¶ 119.

As explained below in connection with the steps of Limitations 24[a] – 24[g], the preamble maps onto Crowds in at least the provided example paths of "5→4→6→server 5" (Crowds, Fig. 2) (hereinafter, the "Mapped Path") and "5→4→6→server 3" (hereinafter, the "Additional Path") as follows, starting with a depiction of the Mapped Path (green) and the Additional Path (red):



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

**First device:** as explained below in Limitation 24[a], jondo 6.

**Second server:** as explained below in Limitation 24[a], jondo 4.

**Web server:** as explained below in Limitation 24[b], web server 5.

**Additional web server:** as explained below in Limitation 24[f], the web server labeled "3" in Crowds Fig. 2 (hereinafter "web server 3").

- 44 -

Appx32756

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00353 of Patent No. 11,044,344*

132.    To the extent that the Board's constructions are intended to construe any intermediary computer operating in a **computer ↔ computer ↔ computer** architecture as both a client and server, as discussed above, such construction is inconsistent with the disclosure in the '344 Patent, the patent prosecution history of at least the '319 Patent, the Teso C.C. Order, Teso Supplemental C.C. Order, the Teso Alice Order and the NetNut C.C. Order.  A POSA would NOT understand the recited client devices and servers to be merely interchangeable general use computers.

## IX.    <u>**BRIGHT DATA PRACTICES THE CHALLENGED CLAIMS**</u>

133.    My understanding is that Bright Data (which has undergone many name changes) provides a residential proxy service. In my opinion, Bright Data's residential proxy service practices the methods claimed in the '344 Patent, as discussed below. Bright Data's residential proxy service provides various users' client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other users' requesting client devices.

134.    The residential IP addresses of proxy client devices are registered. Bright Data currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy

61

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00353, EX. 2025
61 of 98

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

client devices in its residential proxy service. *See* https://brightdata.com/proxy-types/residential-proxies (EX. 2038).[5]

135.   As confirmed during my conversation with Mr. Kol and as shown in Bright Data's network diagram reproduced below (EX. 2039), Bright Data's residential proxy service operates in the following way:



a.   Upon using the residential proxy service, the customer's client device establishes a TCP connection between itself and the web server, though the Super Proxy and through one or more proxy client devices. Each Super Proxy is a proxy server located somewhere in the world. During my

---

[5] I also understand that Bright Data also provides a Software Development Kit ("SDK") to app developers such that a user may agree to configure its client device to participate in the service as a proxy client device in exchange for free or discounted apps. See also https://brightdata.com/proxy-types/residential-proxies (EX. 2038)("How does Bright Data acquire its residential IPs?")

62

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00353 of Patent No. 11,044,344*

conversation with Mr. Kol, he explained that Bright Data currently has more than 4,000 Super Proxies worldwide, including in the United States.

b.  A customer sends an HTTP request for content identified by a URL to a Super Proxy. The Super Proxy sends the request for content identified by a URL to a proxy client device (Peer SDK) that in turn, sends the request for content identified by a URL to a web server using the IP address of the proxy client device as the Source IP Address.

c.  The proxy client device obtains the requested content directly from the web server. The proxy client device sends the requested content back to the customer via the Super Proxy through the established connection.

136.   I have also reviewed Bright Data's source code for its residential proxy service. I have compiled a separate appendix with a chart of the '344 Patent claims showing where the claimed features of the '344 Patent are found in Bright Data's residential proxy service, including the source code. EX. 2040 (source code claim chart appendix) and EXS. 2041-2044 (source code itself).

137.   In my opinion, the residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '344 Patent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122. In my opinion, Bright Data's residential proxy service is "reasonably

63

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

commensurate in scope with the scope of the claims" of the '344 Patent. As discussed herein, the '344 Patent's claims are directed at the novel use of a proxy client device. In my opinion, as discussed herein, Bright Data's residential proxy service embodies the claimed features of the '344 Patent and is coextensive with them.

138.   During my conversation with Mr. Kol, I confirmed that the features driving the commercial success of Bright Data's residential proxy service is (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses, which are the direct result of the unique characteristics of the '344 Patent claims, i.e., the novel use of a proxy client device to fetch content from a web server.

139.   In my opinion, it is the use of a client device as a proxy that enables Bright Data to create a network with millions of nodes to act as proxies. This is an extremely scalable solution that solves the problems identified in the prior art in the background section of the specification. This also solves the problems I discussed in detail regarding blocking by a web server. These client devices are otherwise being used by regular consumers for their usual purposes, making proxy requests created by these devices difficult to distinguish from the requests of the owners of the client devices.

64

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

140.    These advantages are noted in the following press release for an

investment that was made in Bright Data (then known as Luminati) by EMK

Capital in 2017:

> Luminati is the world's leading enterprise IP proxy network, and helps make the Web more transparent by allowing businesses to see the internet from the consumers' point of view. In the Internet's early days, web pages were simple – every viewer saw the same page. Today, sites are dynamic – they recognize the viewer and show different content, advertisements and prices based on the viewers' geography, demographics, and other identifying information. Websites can also determine if a competitor is comparing prices, or if a security company is auditing them for potential threats. These trends are eliminating the transparency of the Web: for example, they reduce online retailers' ability to compete as retailers can't reliably see the prices that are presented to consumers; similarly these trends make it difficult for security firms to find malicious sites, as such sites are presented only to users of a certain demographic. These developments have also made it difficult for ad networks & website owners to check that the ads they are delivering are safe, because an unscrupulous ad vendor may present malicious ads only to the unsuspecting user but not to the ad network.
>
> Luminati brings back transparency and trust to the Web by enabling its enterprise customers to access the internet through its proprietary network of over 40 million IP addresses. Luminati helps customers to see the Web as it appears to real consumers, without being blocked, slowed or spoofed and to view the Web from different users' perspectives from any city across the globe. Luminati's technology and patent portfolio allow Luminati to operate the only mass-scale residential IP proxy network in the world.
>
> Luminati serves corporate clients, including Fortune 500 companies, in many different sectors which use Luminati's transparency network for ad verification, brand protection, price comparison, fraud prevention, data collection, cyber security, and application performance measurement. Luminati's residential IP service is required for many businesses that need certainty in the accuracy of the data they collect online and the accuracy of the cyber security checks they conduct.

*See* https://www.emkcapital.com/emk-acquires-luminati-worlds-largest-ip-proxy-

network-brings-transparency-internet/ (EX. 2045). ███████████████████

███████████████████████████████████████████

███████████████. In my opinion, this acquisition is evidence of

commercial success, showing non-obviousness of the '344 Patent's claims.

141.    As further evidence of Bright Data's commercial success, just last

year alone, I understand that Bright Data's residential proxy service ██████

█████████████████████████████████████. In my opinion, this

revenue is evidence of commercial success, showing non-obviousness of the '344

Patent's claims.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00353, EX. 2025
65 of 98

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

pathway. See also e.g., claim 12 of the '344 Patent ("…a second client device selected from a plurality of client devices…"). For example, the '344 Patent explains that a proxy client device can be selected based on the geographic proximity of the proxy client device to the web server. See, e.g., '344 Patent at 13:25-29; *see also id.* at 5:25-27; 13:62-64; 15:6-12; 16:65-17:6. In contrast, Crowds states that the pathway is determined based on the flip of a biased coin. EX. 1004 at 8.

## XIII.    <u>SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS</u>

190.    In my opinion, as discussed above with respect to Bright Data practicing the '344 Patent's claims, the commercial success of Bright Data's residential proxy service is driven by the claimed features novel use of a proxy client device. Bright Data's residential proxy service has grown to dominate the market.  According to a 2019 Report by Frost & Sullivan, by 2018, residential proxy services accounted for an estimated 73.6% of the "Internet Protocol proxy network (IPPN)" comprising "residential IP proxy networks, data center IP proxy networks, and mobile IP proxy



85

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00353, EX. 2025
85 of 98

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
*IPR2022-00353 of Patent No. 11,044,344*

networks." EX. 2046, 2019 Frost & Sullivan Report at 4 and 45. Bright Data itself, became the estimated market leader with an estimated 53.1% of the IPPN market in 2018. *Id*. at 48. Frost and Sullivan identified Bright Data's next biggest competitors in the 2018 timeframe as Oxylabs at 13.3% and Geosurf at 10.6% of the IPPN Market. *Id*. Oxylabs is the brand of Bright Data's largest competitor comprising five sister companies, Teso LT, UAB, Metacluster, UAB, Oxysales, UAB, Code200, UAB and CoreTech, UAB (collectively, "Oxylabs"). EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 90:3-93:7.

191.   It is my opinion that Bright Data's residential proxy service was a success because the use of client devices as proxies solved a long felt, but unresolved need. While traditional data center server proxies could provide some anonymity for the user in accessing a target web site, that web site could still likely identify data center server IP addresses as proxy addresses, because such data center server IP addresses were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location. In contrast, Bright Data's proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations. Further, the use of Bright Data's proxy client devices can dramatically increase the scale of IP addresses that can be included in a proxy network. For example, Bright

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00353, EX. 2025
86 of 98

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

Data currently touts "72 million+ real residential IPs" "shared by real people in our community-sharing network" in 195 countries. EX. 2048 at 4. By comparison, Bright Data touts having 1.6 million datacenter IPs.  EX. 2048 at 7.; *see also e.g.* EX. 2049, Teso Trial Transcript Day 1, Ofer Vilenski Testimony at 182:22-197:21. Bright Data was the first company to identify this need and provide a solution using proxy client devices through Bright Data's residential IP network. *Id*.  Thus, it is my opinion that this problem was well-known and that the inventions in the '344 Patent were the first to solve it.

192.   During the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name "Hola," was presented.  For example, Bright Data's Ofer Vilenski and Oxylabs' Tomas Okmanas[7], both testified that they had a meeting to discuss the "SDK,". EX. 2049, Teso Trial Transcript Day 1, Ofer Vilenski Testimony at 202:12-204:8; EX. 2047, Teso Trial Transcript Day 3,  Tomas Okmanas Testimony at 131:23-132:7; 152:8-153:6.  Specifically, Mr. Vilenski testified that he asked Mr. Okmanas to incorporate Bright Data's SDK in Oxylabs' applications to expand Bright Data's residential proxy network.  *Id.*  Mr. Okmanas did not agree to incorporate Bright Data's SDK in Oxylabs' applications, but subsequently released their own SDK for

---

[7] A founder of Tesonet now Oxylabs.

Code200, UAB, et al. v. Bright Data Ltd.
IPR2022-00353, EX. 2025
87 of 98

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

Oxylabs' own residential proxy network.  EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 94:23-95:9; 95:20-97:23.

193.   Within days of his meeting with Mr. Vilenski, Mr. Okmanas testified that he sent an email to a third party stating that he was "looking for a company that could make me an extension and promote it.  Basically what I am looking [for] is a system that works like hola.org."  EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 152:18-153:6.  Mr. Okmanas testified that Oxylabs was originally in the data center proxy space, but wanted to develop its own residential proxy service .  EX. 2047, Teso Trial Transcript Day 3, Tomas Okmanas Testimony at 95:20-97:1; 103:18-104:10.  Mr. Okmanas testified that he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful.  *Id.* at 149:13-150:8. In my opinion, this is strong evidence of copying, which is evidence of non-obviousness.

194.   At the conclusion of the trial, a jury verdict was issued finding that none of the asserted patent claims were invalid and Oxylabs' infringement was willful, and that Bright Data was entitled to lost profits. EX. 2022, Jury Verdict. Despite the jury verdict finding infringement and willfulness, Oxylabs updated its website stating "[t]he Court has not issued any orders related to continued use of Oxylabs' residential proxy service…. Oxylabs continues to offer its services in an uninterrupted manner." EX. 2050 at 8, Oxylabs Legal Timeline.  In my opinion,

88

Appx38225

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*IPR2022-00353 of Patent No. 11,044,344*

the commitment of Bright Data's largest competitor to continue offering its

residential proxy service despite the jury verdict of willful infringement is strong

evidence of its continuing need to offer the residential proxy service – a strong

indication of commercial success.

195.   It is my further opinion that Bright Data's residential proxy service

has received industry praise including from competitors, and that that praise is tied

to the claims of the '344 Patent as described above.[8] Additionally, competitors like

Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a

residential proxy service.[9]

196.   In my opinion, the evidence of secondary considerations indicates that

the inventions claimed in the '344 Patent would not have been obvious to a POSA

at the time of invention.

---

[8]*See, e.g.,* https://earthweb.com/residential-proxies/ (EX. 2051 at 23-24).
[9] *See, e.g.,*
 https://smartproxy.com/blog/what-is-the-difference-between-proxy-servers-and-data-centers (EX. 2052);
https://web.archive.org/web/20170913105635/https://microleaves.com/services/backconnect-proxies?promotion=dNPa (EX. 2053);
https://web.archive.org/web/20200701171337/https://oxylabs.io/products/residential-proxy-pool (EX. 2054).

89

**In the**
**UNITED STATES PATENT AND TRADEMARK OFFICE**

—————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

—————————

**NetNut Ltd.**
*Petitioner*,

v.

**Bright Data Ltd.**
*Patent Owner*.

—————————

Case IPR2021-01492

U.S. Patent No. 10,257,319

—————————

**PETITION FOR *INTER PARTES* REVIEW**

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*2042-04-319-IPR (US 10,257,319)*                    *Petition for Inter Partes Review*

# Contents

1  **INTRODUCTION**                                                        **1**

2  **STATUTORY PREDICATES**                                                **2**

   2.1  Mandatory Notices (37 CFR § 42.8) . . . . . . . . . . . . . . .   2

      2.1.1  Real Parties-In-Interest . . . . . . . . . . . . . . . .   2

      2.1.2  Related Matters . . . . . . . . . . . . . . . . . . . .   2

      2.1.3  Lead and Backup Counsel . . . . . . . . . . . . . .   8

      2.1.4  Service Information . . . . . . . . . . . . . . . . . .   9

   2.2  Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

3  **DISCRETIONARY CONSIDERATIONS**                                        **10**

   3.1  *Fintiv* Factors . . . . . . . . . . . . . . . . . . . . . . . .  11

      3.1.1  Factor 1—Existence or likelihood of a stay . . . . . .  11

      3.1.2  Factor 2—Proximity of trial date to final written decision  11

      3.1.3  Factor 3—Investment in parallel proceedings . . . . .  11

      3.1.4  Factor 4—Overlap in issues raised . . . . . . . . . .  11

      3.1.5  Factor 5—Whether the parties are the same . . . . . .  12

      3.1.6  Factor 6—Other circumstances including the merits . .  12

   3.2  *General Plastic* Factors . . . . . . . . . . . . . . . . . . . .  12

      3.2.1  Factor 1—Prior petition by same petitioner . . . . . .  12

      3.2.2  Factor 2—Petitioner's prior knowledge of asserted art .  13

      3.2.3  Factor 3—Petitioner's prior receipt of preliminary response or institution decision . . . . . . . . . . . . . .  13

Appx38948

3.2.4    Factor 4—Elapsed time since the petitioner learned of the asserted art . . . . . . . . . . . . . . . . . . . . 14

3.2.5    Factor 5—Explanation of time elapsed since prior petition . . . . . . . . . . . . . . . . . . . . . . . . 14

3.2.6    Factor 6—The finite resources of the Board . . . . . . 15

3.2.7    Factor 7—The requirement for a final written decision within a year . . . . . . . . . . . . . . . . . . . . 15

**4    OVERVIEW OF THE '319 PATENT    15**

4.1    Claims . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.2    Specification . . . . . . . . . . . . . . . . . . . . . . 17

4.3    Priority Date . . . . . . . . . . . . . . . . . . . . . . 20

**5    LEVEL OF SKILL IN THE ART    20**

**6    CLAIM CONSTRUCTION    21**

**7    OVERVIEW OF CITED ART    26**

7.1    Crowds . . . . . . . . . . . . . . . . . . . . . . . . . 26

7.2    MorphMix . . . . . . . . . . . . . . . . . . . . . . . . 26

7.3    Border . . . . . . . . . . . . . . . . . . . . . . . . . . 27

7.4    RFCs . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**8    GROUNDS FOR INVALIDITY    28**

8.1    GROUND 1: ANTICIPATION OF CLAIMS 1, 19, and 21-29 BY CROWDS . . . . . . . . . . . . . . . . . . . . 28

8.1.1     Claim 1 . . . . . . . . . . . . . . . . . . . . . .    29

8.1.2     Claims 19, and 28-29 (corresponding recorded media,

downloading, and device)   . . . . . . . . . . . . . . .    37

8.1.3     Claims 21-22 and 24-25 (communications via TCP)   .    37

8.1.4     Claim 23 (running a browser)   . . . . . . . . . . .    38

8.1.5     Claim 26 (client O/S) . . . . . . . . . . . . . . .    38

8.1.6     Claim 27 (sequential execution)   . . . . . . . . . .    39

8.2     GROUND 2:  OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-

19, and 21-29 OVER CROWDS + RFC 2616 + GENERAL

KNOWLEDGE   . . . . . . . . . . . . . . . . . . . .    39

8.2.1     Claim 1 . . . . . . . . . . . . . . . . . . . . . .    40

8.2.2     Claim 2 (client device identifies itself on startup)   . . .    41

8.2.3     Claims 14-15 (validity check)   . . . . . . . . . . .    42

8.2.4     Claims 17-18 (periodically communicating) . . . . . .    43

8.2.5     Claims 19 and 21-29 . . . . . . . . . . . . . . . .    43

8.3     GROUND 3:  ANTICIPATION OF CLAIMS 1, 12, 14, 21-22,

24-25, AND 27-29 BY BORDER . . . . . . . . . . . . . .    44

8.3.1     Claim 1 . . . . . . . . . . . . . . . . . . . . . .    46

8.3.2     Claim 12 (storing the received content)   . . . . . . .    52

8.3.3     Claim 14 (validity check) . . . . . . . . . . . . . .    52

8.3.4     Claims 21-22 and 24-25 (communications via TCP)   .    53

8.3.5     Claim 27 (sequential execution)   . . . . . . . . . . .    53

8.3.6     Claims 28-29 (corresponding recorded media and de-

vice) . . . . . . . . . . . . . . . . . . . . . . . . .    54

8.4    GROUND 4: OBVIOUSNESS OF CLAIMS 1, 12, 14-15, 17-
       19, 21-22, 24-25, and 27-29 OVER BORDER + RFC 2616 +
       GENERAL KNOWLEDGE  . . . . . . . . . . . . . . . .    55

       8.4.1    Claim 1 . . . . . . . . . . . . . . . . . . . . .    56

       8.4.2    Claim 15 (validity check, RFC 2616)  . . . . . . . .    57

       8.4.3    Claims 17-18 (periodically communicating) . . . . . .    57

       8.4.4    Claim 19 (downloading software application)  . . . . .    58

       8.4.5    Claims 12, 14, 21-22, 24-25, and 27-29  . . . . . . .    59

8.5    GROUND 5:  ANTICIPATION OF CLAIMS 1, 17, 19, and
       21-29 BY MORPHMIX . . . . . . . . . . . . . . . . .    59

       8.5.1    Claim 1 . . . . . . . . . . . . . . . . . . . . .    61

       8.5.2    Claim 17 (periodically communicating)  . . . . . . .    67

       8.5.3    Claims 19 and 28-29 (corresponding recorded media,
                downloading, and device)  . . . . . . . . . . . . .    69

       8.5.4    Claim 23 (web-page and browser)  . . . . . . . . . .    69

       8.5.5    Claims 21-22 and 24-25 (communications via TCP)  .    69

       8.5.6    Claim 26 (client O/S) . . . . . . . . . . . . . . .    70

       8.5.7    Claim 27 (sequential execution)  . . . . . . . . . .    70

8.6    GROUND 6:  OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-
       19, 21-29 OVER  MORPHMIX + RFC 2616 + GENERAL
       KNOWLEDGE . . . . . . . . . . . . . . . . . . . .    71

       8.6.1    Claim 1 . . . . . . . . . . . . . . . . . . . . .    71

       8.6.2    Claim 2 (client device identifies itself at startup)  . . .    73

       8.6.3    Claims 14-15 (validity check)  . . . . . . . . . . .    74

- iv -

*2042-04-319-IPR (US 10,257,319)*                    *Petition for Inter Partes Review*

8.6.4    Claim 18 (periodically communicating; keep-alives)   .   75

8.6.5    Claims 19 and 21-29 . . . . . . . . . . . . . . . . .   76

- v -

| **EXHIBIT LIST** | |
|---|---|
| 1001 | United States Patent No. 10,257,319 to Shribman *et al.* |
| 1002 | File History for United States Patent No. 10,257,319 |
| 1003 | Petitioners' Chart of Challenged Claims |
| 1004 | Luminati's Opposition to Defendants' Motion to Dismiss, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1005 | Declaration of Keith J. Teruya with curriculum vitae |
| 1006 | Michael Reiter & Aviel Rubin, Crowds: Anonymity for Web Transactions, ACM Transactions on Information and System Security, Vol. 1, No. 1, Nov. 1998, at 66-92 |
| 1007 | Declaration of Scott Delman (regarding Crowds) |
| 1008 | Marc Rennhard, MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access (2004) (Doctoral Thesis) |
| 1009 | Declaration of Marc Rennhard (regarding MorphMix) |
| 1010 | Declaration of Bernhard Plattner (regarding MorphMix) |
| 1011 | Declaration of Andreas Berz (regarding MorphMix) |
| 1012 | United States Patent No. 6,795,848 to Border *et al.* |
| 1013 | Fielding, R. *et al.*, "Hypertext Transfer Protocol – HTTP/1.1", RFC 2616, June 1999 |
| 1014 | Socolofsky, T. and C. Kale, "TCP/IP Tutorial", RFC 1180, January 1991 |
| 1015 | Postel, J., "Internet Protocol", STD 5, RFC 791, September 1981 |
| 1016 | Braden, R., Ed., "Requirements for Internet Hosts - Communication Layers", STD 3, RFC 1122, October 1989 |
| 1017 | Claim Construction Opinion and Order, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |
| 1018 | W3C, Glossary of Terms for Device Independence (Jan. 2005) *available at* https://www.w3.org/TR/di-gloss/#ref-wca-terms |
| 1019 | U.S. Pat. Pub. No. 2009/0037977 |
| 1020 | Supplemental Claim Construction Opinion and Order, *Luminati Networks Ltd. v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |

| Exhibit List (Continued) | |
|---|---|
| 1021 | Transcript of Pretrial Conference, *Luminati Networks Ltd.  v. Teso LT, UAB et al.*, 2:19-cv-00395-JRG (E.D. Tex.) |

## 1.  INTRODUCTION

Petitioner NetNut Ltd. ("Petitioner" or "NetNut") seeks *inter partes* review and cancellation of claims 1-2, 12, 14-15, 17-19, and 21-29 ("Challenged Claims") of U.S. Patent No. 10,257,319, Ex. 1001 (the "'319 patent" or the "Patent"). The Petition is supported by the Exhibits listed above, including the Expert Declaration of Keith J. Teruya (Ex. 1005).

The Patent Owner is Bright Data Ltd. (formerly known as Luminati Networks Ltd.). Since 2018, Patent Owner has been suing its competitors in this field (including Petitioner) on numerous patents stemming from two provisional applications filed respectively in 2009 (relevant to this case) and 2013. Despite pursuing ten district court cases, Patent Owner has avoided most efforts to obtain PTAB review.[1]

The sum and substance of claim 1 of the '319 patent is simply the ordinary process of retrieving content from a web server through a proxy:

**second server <—> client (proxy) device <—> web server**

Patent Owner has asserted that the manner in which the claim language labels the device in the middle (above), as a "client" (rather than a "server") defines a patentably unique "architecture." However, court constructions have rejected the narrow construction of "client" and "server" on which Patent Owner would rely to support that argument. Even if one were to accept Patent

---

[1]  There were two recent exceptions in IPRs, also brought by Petitioner, which were instituted on August 12, 2021. *See* IPR2021-00458, Paper 11; IPR2021-00465, Paper 11.

Owner's unreasonably narrow constructions, there are numerous examples of proxy retrieval scenarios in the prior art that easily meet the claim requirements.

The '319 patent was previously challenged, on the same art presented herein, in a petition (by another competitor) whose institution was denied, but on discretionary grounds. *See Code200, UAB et al. v. Luminati Networks Ltd.*, IPR2020-01266, Paper 18 at 2 (generally, the "'1266 IPR"). The present Petition arises in a different posture, being filed very early in relation to the lawsuit against Petitioner, such that this case is likely to result in a final written decision *before* the trial in the district court case. That timing, plus the plain deficiencies of the '319 patent, strongly favor PTAB review.

## 2.    STATUTORY PREDICATES

### 2.1.    Mandatory Notices (37 CFR § 42.8)

#### 2.1.1.    Real Parties-In-Interest

The real party-in-interest is Petitioner NetNut Ltd. ("Petitioner" or "NetNut").

#### 2.1.2.    Related Matters

**Judicial**

| Matter | Subject Matter |
|---|---|
| *Bright Data Ltd. v. **NetNut Ltd.***, No. 2:21-cv-00225 (E.D. Tx.) | Patent Nos. **10,257,319** and **10,484,510** |

Appx38956

| | |
|---|---|
| *Luminati Networks Ltd. v. Tefincom SA d/b/a NordVPN*, No. 2-19-cv-00414 (E.D. Tx.) | Patent Nos. **10,257,319**; 10,469,614; **10,484,510**; 10,484,511; and 10,637,968 |
| *Luminati Networks Ltd. v. Teso LT, UAB a/k/a UAB Teso LT et al.*, No. 2-19-cv-00395 (E.D. Tx.) | Patent Nos. **10,257,319**; 10,469,614; and **10,484,510** |
| *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 2-19-cv-00397 (E.D. Tx.) | Patent Nos. **10,257,319**; 10,469,614; **10,484,510**; and 10,484,511 |
| *Luminati Networks Ltd. f/k/a Hola Networks Ltd. v. **NetNut Ltd.***, No. 2:20-cv-00188 (E.D. Tx.) | Patent Nos. 10,484,511 and 10,637,968 |
| *Bright Data Ltd. v. code200, UAB et al.*, No. 2-19-cv-00396 (E.D. Tx.) | Patent Nos. 10,484,511 and 10,637,968 |
| *Luminati Networks Ltd. v. BI Science (2009) Ltd. a/k/a BIScience Inc.*, No. 2-19-cv-00352 (E.D. Tx.) | Patent No. 10,410,244 |
| *Luminati Networks Ltd. v. IP Ninja Ltd.*, No. 2-19-cv-00196 (E.D. Tx.) | Patent Nos. 9,241,044 and 9,742,866 |
| *Luminati Networks Ltd. v. BIScience Ltd. a/k/a BIScience Inc.*, No. 2-18-cv-00483 (E.D. Tx.) | Patent Nos. 9,241,044 and 9,742,866 |

| | |
|---|---|
| *Luminati Networks Ltd. v. UAB Tesonet*, No. 2-18-cv-00299 (E.D. Tx.) | Patent Nos. 9,241,044 and 9,742,866 |
| *Luminati Networks Ltd. v. UAB Tesonet*, No. 2-18-cv-00299 (E.D. Tx.) | Patent Nos. 9,241,044 and 9,742,866 |
| *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 21-1664 (Fed. Cir.) | Appeal |
| *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 21-1667 (Fed. Cir.) | Appeal |
| *Luminati Networks Ltd. v. BI Science Inc.*, No. 20-2181 (Fed. Cir.) | Appeal |
| *Bright Data Ltd. v. BI Science (2009) Ltd.*, No. 20-2118 (Fed. Cir.) | Appeal |

**Administrative—PTAB**

| Matter | Subject Matter |
|---|---|
| *Code200, UAB et al v. Luminati Networks Ltd. f/k/a Hola Networks Ltd.*, IPR2020-01266 (Petition denied) | Patent No. **10,257,319** |
| *NetNut Ltd. v. Bright Data Ltd. f/k/a Luminati Networks Ltd.*, IPR2021-00465 (Petition instituted) | Patent No. 9,742,866 |
| *NetNut Ltd. v. Bright Data Ltd. f/k/a Luminati Networks Ltd.*, IPR2021-00458 (Petition instituted) | Patent No. 9,241,044 |

| | |
|---|---|
| *Code200, UAB et al v. Luminati Networks Ltd. f/k/a Hola Networks Ltd.*, IPR2020-01358 (Petition denied) | Patent No. **10,484,510** |
| *Code200, UAB et al v. Luminati Networks Ltd. f/k/a Hola Networks Ltd.*, IPR2020-01506 (Petition denied) | Patent No. 10,469,614 |
| *Code200, UAB et al v. Luminati Networks Ltd. f/k/a Hola Networks Ltd.*, IPR2021-00249 (Petition denied) | Patent No. 10,637,968 |
| *BI Science (2009) Ltd. a/k/a BIScience Inc. v. Luminati Networks Ltd.*, IPR2020-00166 (Terminated prior to institution decision) | Patent No. 9,241,044 |
| *BI Science (2009) Ltd. a/k/a BIScience Inc. v. Luminati Networks Ltd.*, IPR2020-00167 (Terminated prior to institution decision) | Patent No. 9,742,866 |
| *Teso LT, UAB f/k/a UAB Tesonet et al v. Luminati Networks Ltd. f/k/a Hola Networks Ltd.*, IPR2021-00122 (Petition denied) | Patent No. 10,484,511 |

**Administrative—Matters Shown in PAIR**

In the following, the "'624 Family" refers to patents claiming priority to provisional application No. 61/249,624 (the provisional of the '319 patent, filed Oct. 8, 2009), while the "'815 Family" refers to patents claiming priority to a later provisional application, No. 61/870,815 (filed Aug. 28, 2013).

| App. No. | Status/Issued As | Related To |
|---|---|---|
| 12/836,059 | U.S. Pat. No. 8,560,604 | '624 Family |
| 14/025,109 | U.S. Pat. No. 10,069,936 | '624 Family |

Appx38959

| | | |
|---|---|---|
| 14/468,836 | U.S. Pat. No. 9,241,044 | '815 Family |
| 14/930,894 | U.S. Pat. No. 9,742,866 | '815 Family |
| 15/663,762 | U.S. Pat. No. 10,277,711 | '815 Family |
| 15/957,942 | U.S. Pat. No. 10,313,484 | '624 Family |
| 15/957,945 | U.S. Pat. No. 10,257,319 | '624 Family |
| 15/957,950 | U.S. Pat. No. 10,225,374 | '624 Family |
| 16/031,636 | U.S. Pat. No. 10,616,375 | '624 Family |
| 16/140,749 | U.S. Pat. No. 10,652,357 | '815 Family |
| 16/140,785 | U.S. Pat. No. 10,659,562 | '815 Family |
| 16/214,433 | U.S. Pat. No. 10,469,614 | '815 Family |
| 16/214,451 | U.S. Pat. No. 10,440,146 | '815 Family |
| 16/214,476 | U.S. Pat. No. 10,652,358 | '815 Family |
| 16/214,496 | U.S. Pat. No. 10,721,325 | '815 Family |
| 16/278,104 | U.S. Pat. No. 10,523,788 | '624 Family |
| 16/278,105 | U.S. Pat. No. 10,469,628 | '624 Family |
| 16/278,106 | U.S. Pat. No. 10,491,712 | '624 Family |
| 16/278,107 | U.S. Pat. No. 10,484,510 | '624 Family |
| 16/278,109 | U.S. Pat. No. 10,484,511 | '624 Family |
| 16/292,363 | U.S. Pat. No. 10,469,615 | '815 Family |
| 16/292,382 | U.S. Pat. No. 10,447,809 | '815 Family |
| 16/292,364 | Pending | '815 Family |
| 16/292,374 | Pending | '815 Family |
| 16/292,382 | Pending | '815 Family |
| 16/365,250 | Pending | '815 Family |
| 16/365,315 | Pending | '815 Family |
| 16/368,002 | U.S. Pat. No. 10,582,013 | '624 Family |
| 16/368,041 | U.S. Pat. No. 10,582,014 | '624 Family |
| 16/396,695 | U.S. Pat. No. 10,637,968 | '624 Family |
| 16/396,696 | U.S. Pat. No. 10,637,968 | '624 Family |
| 16/524,026 | Pending | '815 Family |

| 16/566,929 | Pending | '815 Family |
|---|---|---|
| 16/567,496 | Pending | '815 Family |
| 16/593,996 | Pending | '815 Family |
| 16/593,999 | Pending | '815 Family |
| 16/600,504 | Pending | '624 Family |
| 16/600,505 | Pending | '624 Family |
| 16/600,506 | Pending | '624 Family |
| 16/600,507 | Pending | '624 Family |
| 16/662,800 | Pending | '624 Family |
| 16/662,883 | Pending | '815 Family |
| 16/693,306 | Pending | '624 Family |
| 16/782,073 | Pending | '624 Family |
| 16/782,076 | Pending | '624 Family |
| 16/807,661 | Pending | '624 Family |
| 16/807,691 | Pending | '624 Family |
| 16/865,362 | Pending | '815 Family |
| 16/865,364 | Pending | '815 Family |
| 16/865,366 | Pending | '815 Family |
| 16/910,724 | Pending | '624 Family |
| 16/910,863 | Pending | '624 Family |
| 16/932,763 | Pending | '815 Family |
| 16/932,764 | Pending | '815 Family |
| 16/932,766 | Pending | '815 Family |
| 16/932,767 | Pending | '815 Family |
| 17/019,267 | Pending | '624 Family |
| 17/019,268 | U.S. Pat. No. 10,931,792 | '624 Family |
| 17/098,392 | U.S. Pat. No. 10,958,768 | '624 Family |
| 17/146,701 | U.S. Pat. No. 11,044,346 | '624 Family |
| 17/146,625 | Pending | '815 Family |
| 17/146,649 | Pending | '815 Family |

| | | |
|---|---|---|
| 17/146,728 | Pending | '624 Family |
| 17/194,272 | Pending | '815 Family |
| 17/194,273 | Pending | '815 Family |
| 17/194,336 | Pending | '624 Family |
| 17/194,339 | Pending | '624 Family |
| 17/241,111 | Pending | '815 Family |
| 17/241,113 | Pending | '815 Family |
| 17/241,119 | Pending | '815 Family |
| 17/331,980 | Pending | '624 Family |
| 17/332,001 | Pending | '624 Family |
| 17/332,023 | Pending | '624 Family |
| 17/332,077 | Pending | '624 Family |
| 17/332,116 | Pending | '624 Family |
| 17/332,171 | Pending | '624 Family |
| 17/332,220 | Pending | '624 Family |
| 17/332,260 | Pending | '624 Family |
| 17/332,290 | Pending | '624 Family |
| 90/014,624 | Pending | '624 Family |
| 90/014,652 | Pending | '624 Family |
| 17/395,926 | Pending | '624 Family |
| 90/014,816 | Pending | '624 Family |
| 90/014,827 | Pending | '624 Family |

### 2.1.3.   Lead and Backup Counsel

| | |
|---|---|
| **Lead Counsel** | Ronald Abramson, #34,762 |
| **Back-up Counsel** | M. Michael Lewis, #50,478 |
| | Ari J. Jaffess, #74,558 |

### 2.1.4.   Service Information

| Electronic Mail | (1) ron.abramson@listonabramson.com |
|---|---|
| | (2) ari.jaffess@listonabramson |
| | (3) michael.lewis@listonabramson.com |
| Postal (and hand-delivery) mailing address | Liston Abramson LLP, 405 Lexington Ave, 46th Floor, New York, NY 10174 |
| Telephone | (212) 257-1630 |
| Facsimile | (914) 462-4175 |

Additionally, Petitioner consents to electronic service via e-mail at the e-mail addresses noted above.

### 2.2.   Other

The USPTO is authorized to charge any required fees, including the fee as set forth in 37 C.F.R. §42.15(a) and any excess claim fees, to Deposit Account 603258.

Pursuant to 37 C.F.R. §42.104(a), Petitioner certifies that the '319 patent is available for *inter partes* review and that Petitioner is not barred or estopped from requesting *inter partes* review challenging the patent claims on the grounds identified in this Petition.

Pursuant to 37 CFR § 42.104(b), Petitioner states that it seeks cancellation of the claims listed below on the statutory grounds, patents, and printed publications stated for each:

| No. | Claims | Challenge |
|---|---|---|
| 1 | 1, 19, 21-22, and 24-29 | § 102 Crowds |
| 2 | 1-2, 14-15, 17-19, 21-29 | § 103 Crowds + Knowledge of POSITA + RFC 2616 |
| 3 | 1, 12, 14, 21-22, 24-25, and 27-29 | § 102 Border |
| 4 | 1, 12, 14-15, 17-18, 21-22, 24-25, and 27-29 | § 103 Border + Knowledge of POSITA + RFC 2616 |
| 5 | 1, 17, 19, 21-29 | § 102 MorphMix |
| 6 | 1-2, 14-15, 17-19, 21-29 | § 103 MorphMix + Knowledge of POSITA + RFC 2616 (§ 103) |

## 3.   DISCRETIONARY CONSIDERATIONS

Patent Owner sued Petitioner on June 18, 2021 in the Eastern District of Texas ("EDTX"), No. 2:2-cv-00225 (the "Related Litigation") asserting the Patent against Petitioner.  The Patent was also the subject of a prior IPR by another party (IPR2021-01266), in which institution was denied.  (There are also parallel cases asserting the Patent against other parties.)

This Petition is being filed very early in the Related Litigation, before even the time for Petitioner to answer the complaint.

## 3.1.    *Fintiv* Factors

### 3.1.1.    Factor 1—Existence or likelihood of a stay

This IPR is being filed early in the Related Litigation. Whether the court will grant a stay is not known, and so this factor should be considered neutral.

### 3.1.2.    Factor 2—Proximity of trial date to final written decision

Because of the early filing of this Petition, a final written decision is likely before the EDTX case goes to trial. No trial date has been set. This factor strongly favors institution.

### 3.1.3.    Factor 3—Investment in parallel proceedings

There have been no substantive proceedings in the Related Litigation, which favors institution.

### 3.1.4.    Factor 4—Overlap in issues raised

There have been no invalidity contentions in the Related Litigation and thus there is currently no overlap between this IPR and the Related Litigation. Even if there is some possibility of overlap, Petitioner submits this sole consideration does not warrant non-institution. If the Related Litigation reaches the invalidity contentions phase, Petitioner reserves the right include a stipulation in those contentions to mitigate any overlap concerns.

### 3.1.5.   Factor 5—Whether the parties are the same

The parties in the Related Litigation are the same.  However, this proceeding will likely address the challenged patent before any ruling on the merits in the Related Litigation, favoring institution.  *See Apple Inc. v. Parus Holding, Inc.*, IPR2020-00687, Paper 9 at 21 (this factor can "weigh either in favor of, or against, exercising discretion to deny institution, depending on which tribunal was likely to address the challenged patent first.").

### 3.1.6.   Factor 6—Other circumstances including the merits

The broad court construction of "client device" (and its likewise ruling out any argument that a client device is specifically not a server) makes it highly unlikely that Patent Owner can avoid the art asserted in this Petition, favoring institution.

### 3.2.   *General Plastic* Factors

The Board has recently ruled on *General Plastic* issues in IPRs 2021-00458 and -465, involving the same parties, and those decisions provide considerable guidance.

### 3.2.1.   Factor 1—Prior petition by same petitioner

Petitioner differs from the prior petitioners in IPR2021-01266, and there is no relationship, much less a significant relationship, with them.  Since Petitioner was not involved with the prior IPR challenging the Patent, this

factor strongly favors institution. *See Valve Corp. v. Elec. Scripting Prods.*, IPR2019-00062, Paper 11 at 10 (PTAB Apr. 2, 2019) (designated precedential May 7, 2019) ("*Valve*").

### 3.2.2.    Factor 2—Petitioner's prior knowledge of asserted art

Petitioner was not even sued on the Patent until a year after IPR2021-01266.

IPR2021-01266 was filed on July 14, 2020, only shortly after the time Petitioner was being sued in an earlier filed EDTX action (No. 2:20-cv-00188), on different patents. Petitioner was not sued on the Patent until nearly a year later (June 11, 2021). There is no reason Petitioner should have investigated prior art relative to the Patent prior to Related Litigation.

This factor therefore has little applicability and thus favors institution.

### 3.2.3.    Factor 3—Petitioner's prior receipt of preliminary response or institution decision

Both the Patent Owner Preliminary Response ("POPR") and the Board's Order denying institution in IPR2021-01266 were available to Petitioner prior to this Petition. However, since neither provided a substantial roadmap as any response to the prior art, this factor is at least neutral.

Patent Owner's primary assertions in the POPR consisted of *Fintiv* arguments and a narrow construction that would limit the term "client device" to consumer devices. *See* IPR2021-01266, Paper 16 at 4-14, 19-25, 40, 43. The arguments on the *Fintiv* factors provide no guidance as to the prior art, while the claim construction defense was mooted by the *Markman* order in

another lawsuit on the Patent. *See* Ex. 1017 at 12 (interpreting "client device" broadly to mean a "communication device that is operating in the role of a client.") Hence, the POPR in IPR2021-01266 provides little guidance as to technical deficiencies in the Petition beyond those hinging on now-mooted claim construction arguments.

More significantly, the Board's basis for denying institution of IPR2021-01266 was premised on discretionary factors. *See* IPR2021-01266, Paper 18 at 2, 6-11. The decision denying institution thus provides no roadmap for adapting any challenges based on prior art, and the grounds asserted in this Petition remain substantially the same as in the prior petition. This factor thus favors institution, or is at least neutral.

### 3.2.4.  Factor 4—Elapsed time since the petitioner learned of the asserted art

This factor, and factor 5 below, concern the situation where the second petition is filed by a party using prior art allegedly newly discovered after receiving the Board's unfavorable decision in the first petition. *See General Plastic* at 10.

In contrast to *General Plastic*, however, this petition relies upon the same art as the Prior petition, favoring institution.

### 3.2.5.  Factor 5—Explanation of time elapsed since prior petition

Petitioner has proceeded with its own Petition because, since the Prior Petition filed by unrelated parties, Petitioner has been separately sued on the challenged patent. In response to such suit, Petitioner has acted quickly,

bringing this IPR within about two months of being sued on the Patent. This factor thus favors institution.

### 3.2.6.   Factor 6—The finite resources of the Board

Since there are no other cases before the Board challenging the Patent, this factor favors institution. *See Valve* at 15.

### 3.2.7.   Factor 7—The requirement for a final written decision within a year

There is nothing about this case that should impede the Board in rendering a decision within a year after institution, favoring institution.

## 4.    OVERVIEW OF THE '319 PATENT

The '319 patent resulted from a Track One procedure.  Ex. 1002 at 358.  The only art-based rejection was under § 103, based on Fang *et al.*, US2006/0212542, in view of Zaid *et al.*, US2011/0035503. *Id.* at 302. The applicant traversed by arguing that Fang *et al.* disclosed fetching content from the wrong server (*id.* at 287-88).  The subsequent action was an allowance. *Id.* at 46.

### 4.1.   Claims

The Challenged Claims are listed in Ex. 1003.

The following figure schematically represents the data flow corresponding to claim 1, and the steps performed by the intermediate device (in the middle of the figure):



'319 Patent Claim 1 Data Flow

This is the data flow of a conventional "proxy server"—a device that stands in the middle to relay requests and responses to and from an ordinary web server.

The only other aspect of claim 1 is that it refers to the device in the middle of this diagram, performing the role of a proxy for purposes of the claim, as a "client device," and to the device (on the left), requesting content through the middle device, as a "server." However, the "client" labelling of the middle device follows from the fact that it operates in the role of a client relative to the web server (on its right). Likewise, the device on the left can be a "server" where it otherwise *also* has a role as a server. Thus, the claim's mere labelling of devices implies very little. There are no structural or procedural claim limitations that require either the left-hand or middle devices to have any special features or capabilities, other than the ability of the left-hand device to act in the role of a server, and the ability of the middle device to act in the role of a client. Prior art exists that provides proxy functionality and satisfies these minimal additional role requirements.

As will be individually addressed, the dependent Challenged Claims merely recite additional common steps, for example such as that "TCP/IP" is used, or that an HTTP header used in the prior art RFC 2616 standard is used, additional features commonly found in proxy devices well known in the art.

### 4.2.    Specification

The '319 patent uses as an example a peer-to-peer swarm of devices, provisioned so they can variously act as either "clients" or "servers" (and sometimes as both), at various times and under various circumstances.

In the disclosure, any of a plurality of "communication devices," running a common "acceleration application" 220, can function in different roles, including as a "client" (device that requests content, for example for the client's web browser) "agent" (device that obtains content an origin web server and/or manages its retrieval from peers), or "peer" (device that continues to cache content received while the peer acted as a client or agent):

2042-04-319-IPR (US 10,257,319)                Petition for Inter Partes Review



Fig. 3 from the '319 patent

Network 100 shown in Fig. 3 "contains multiple communication devices," and "each communication device may serve as a client, peer, or agent. . . ." Ex. 1001, 4:44-53. The figure shows "peer[s]," a "client," and an "agent" communicating, with the "agent" forming a connection to a server.

Communication requests generated by applications (*e.g., a web browser*) are intercepted by software running on the same machine. *Id.* The IP address of the content server for the communication request (origin server) is transmitted

to the acceleration server, which provides to the content requester a list of agents to use for retrieving content from the IP address of the origin server. *Id.*, 13:4-15.

The requesting device then sends a copy of the communication request itself (URL) to each of the specified agents. One or more agents respond with a list of peers that have previously seen some or all of the content responsive to this request (after checking whether this data is still valid). *Id.*, 13:31-36, 13:50-61. The client then downloads the data from these peers in parts and in parallel. Retrieving the content as previously cached with multiple peers potentially speeds up the web transfer and reduces traffic with web servers. *Id.*, 15:13-52.

The preferred operation is for requesting clients to obtain as much of the desired content as feasible from peer caches. *See id.*

However, all requested content still must come from its actual origin. If an agent determines that the content request cannot be satisfied from peer caches, processing reverts to a model, more pertinent to the claimed embodiments, in which the agent serves as a retrieval intermediary, as shown in Fig. 3 of the '319 patent: in this scenario (*i.e.*, no cache hit among the connected peers), the agent makes a request directly to the web server for the content, and after the web server sends the data, the agent responds to the requesting client, listing itself as the only peer with responsive data, and then, acting as that peer, transfers the responsive data to the requesting client upon the latter's request

(*id.*, 14:62-15:11), thus implementing at a high level the characteristic proxy server data flow first shown above.[2]

### 4.3.  Priority Date

The '319 patent claims priority to provisional application 61/249,624 (the "2009 Provisional") filed on October 8, 2009 ("Priority Date"). (The claimed priority pre-dates the March 16, 2013 effective date of the First Inventor to File provisions of the AIA.)

## 5.  LEVEL OF SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") in the field to which the '319 patent pertains would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date.  Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols. Ex. 1005 ¶¶ 25-27.  *See also id.* at ¶¶ 51-54, as to the knowledge a POSITA would possess as of the Priority Date.

---

[2] Petitioner reserves any arguments based on lack of enablement or written description, or indefiniteness, which are beyond the scope of this IPR.

## 6.   CLAIM CONSTRUCTION

Exs. 1017 and 1020 are an EDTX decision and a supplemental decision construing terms of the '319 patent.  Petitioner asserts that the court's constructions are appropriate:

Agreed constructions adopted by the court :

| Term | Construction |
|------|-------------|
| preamble | limiting |
| web server | plain and ordinary meaning |
| receiving, from the second server, the first content identifier | plain and ordinary meaning |
| during, as part of, or in response to, a start up | plain and ordinary meaning |

Disputed constructions, as construed by the court:

| Term | Court's Construction |
|------|---------------------|
| client device | communication device that is operating in the role of a client |
| first server | plain and ordinary meaning |
| second server | server that is not the client device (further clarified by supplemental order, *see* below) |

Supplemental ruling (Ex. 1020 at 8, 10):

Appx38975

| Term | Court's Clarification |
|------|----------------------|
| second server | a device that is operating in the role of a server and that is not the first client device |

As to "client device," the court cited Patent Owner's extrinsic evidence, the W3C Glossary of Terms for Device Independence. *See* Ex. 1018 at 4; Ex. 1017 at 12. In IPRs concerning Patent Owner's related patents, the Board construed "client device" in almost these exact terms, as "a device that is operating in the role of a client by requesting services, functionalities, or resources from other devices." IPR2021-00458, Paper 11 at 19 (concerning Patent Owner's Patent No. 9,241,044). *See also* IPR2021-00465, Paper 11 at 14-15 (same, concerning Patent Owner's Patent No. 9,742,866).

In its supplemental ruling (Ex. 1020), the court reaffirmed that "a component can be *configured* to operate in different roles." Ex. 1020 at 10 (emphasis in original).

As to "second server," Patent Owner argued only that it should be distinct from both the client device and the web server. *See* Ex. 1017 at 13. The court went with the first of these requirements, but not the second (*id.* at 14), which, for purposes of this Petition only, Petitioner asserts is reasonable, and in any case makes no difference as to the art cited herein.

The court's supplemental ruling, approving the clarification that the second server is a device "operating in the role of a server," follows the definition of "server" in the W3C Glossary extrinsic evidence source that the court relied on for its similar construction of "client device". *See* Ex. 1018 at 5 ("The

role adopted by an application when it is supplying resources or resource manifestations.")

At a subsequent pretrial conference, the court further instructed that Patent Owner's expert could not testify "that a client device is specifically not a server." Ex. 1021 at 64.

In IPR2021-00458, concerning Patent Owner's patent No. 9,241,044 (similar in substance, though claiming later priority), the Board construed "server" in a similar manner, as a "program accepting and servicing requests from clients; a server may be an origin server or a proxy server." IPR2021-00458, Paper 11 at 21.

Petitioner proposes a construction of "second server" corresponding to the court's clarification (a device that is operating in the role of a server and that is not the first client device).

Consistent with these constructions, the claim terms map to the specification disclosure as follows:



Figure 3 of the '319 patent (annotated)

The "second server" is marked in green (client 102). The "client device" is marked in red (agent 122), and the "first server" is marked in blue (web server 152). While this is a logical and reasonable mapping, it is more than that: this figure, with its green, red, and blue annotations so identifying the circled components comes from Patent Owner's own briefing in related litigation. Ex. 1004 at 19-20 (Patent Owner's Opposition to Motion to Dismiss, No. 2:19-cv-00395-JRG, D.I. 28 (E.D. Tx., April 7, 2020)).

Patent Owner has also argued for construing "client device" as limited to consumer computers. Petitioner asserts that importing such a limitation from embodiments in the specification is unreasonable, where there is no corresponding structural or procedural limitation in the claims themselves, where a district court has declined to do so, and the Board has found otherwise in two similar IPRs.

Further, with regard to "second server," if the term were construed to require specialized hardware, there would be no embodiment disclosed in the specification within the scope of claim 1. Claim 1 requires the the second server to receive the first content. The only devices in the '319 patent that ever receive requested content are the "communication devices," *i.e.*, the clients, peers, and agents (and not the "acceleration server"). All such recipient devices also have roles as clients. To rule that the recipient device must have specialized hardware would leave no corresponding embodiment, and a construction that does not read on any disclosed embodiment is disfavored. *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996) ("a claim interpretation that would exclude the inventor's device is rarely the correct interpretation").

As disclosed in the specification, a "client device" is an entity that receives the content from the intermediate agent device. *See* Ex. 1001, 9:27-36. Yet, the same device, thus acting as a "client" for one content retrieval, can also act, in another content retrieval in the same system, as one the of the intermediate "agent" nodes, and also operate in the role of a server. That is consistent with

the court's supplemental ruling, and with Patent Owner's designation of *client 102* in Fig. 3 as the "second *server.*"

# 7. OVERVIEW OF CITED ART

## 7.1. Crowds

*Crowds: Anonymity for Web Transactions* ("Crowds" (Ex. 1006)) is an article by Michael K. Reiter of Bell Laboratories and Aviel D. Rubin of AT&T Labs, published in 1998 in the ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, Pages 66-92. Crowds states it was published in November 1998. The ACM confirms in a declaration that Crowds was published in November 1998. Ex. 1007. Crowds is cited, for example in U.S. Pat. Pub. No. 2008/0232363 A1, reflecting the public availability of Crowds as of at least 2008. Crowds is accordingly prior art under 35 U.S.C. § 102(b). Crowds was not before the Office during prosecution of the '319 patent. *See* Ex. 1002.

## 7.2. MorphMix

*MorphMix - A Peer-to-Peer-based System for Anonymous Internet Access* ("MorphMix" (Ex. 1008)) is a doctoral thesis by Marc Rennhard, of the Swiss Federal Institute of Technology, Computer Engineering and Networks Laboratory; Zurich, Switzerland. MorphMix states it was published in 2004. Dr. Rennhard, the supervisor of Dr. Rennhard's thesis (Dr. Plattner), and the Swiss National Library, each confirmed in a declaration that MorphMix was published in 2004. Exs. 1009-1011. MorphMix is accordingly prior art under 35

U.S.C. § 102(b).  MorphMix was not before the Office during prosecution of the '319 patent. *See* Ex. 1002.

### 7.3.  Border

United States Patent 6,795,848 ("Border"), Ex. 1012, issued to Border *et al.* on September 21, 2004.  Border is accordingly prior art under 35 U.S.C. § 102(b).  Border was not before the Office during prosecution of the '319 patent. *See* Ex. 1002.

### 7.4.  RFCs

Requests for Comments (RFCs) are published in the ordinary course by the Internet Engineering Taskforce (IETF), an established standards organization, and are intended to be viewed by the interested Internet engineering audience at large as of their dates of publication at stated on the cover of each.  Ex. 1005 ¶¶ 51-52.

RFC 2616 (Ex. 1013) was the definitive specification for the HTTP/1.1 protocol on the Priority Date.  RFC 2616 was published by the HTTP Working Group of the IETF in June 1999.  RFC 2616 is also discussed in the '319 patent specification and recited in claim 23, and was submitted to the patent Office during prosecution of the '319 patent (but not applied by the Examiner).  Ex. 1001, 16:12-46; *see also* Ex. 1002, p. 431 (IDS listing RFC 2616 as prior art). The Patent cites RFC 2616 as prior art, as "retrieved Apr. 15, 2002." Ex. 1001 (cover page).  Other cited RFCs were likewise the generally accepted published specifications for the respective protocols addressed.  Ex. 1005 ¶¶ 52-53.

# 8.   GROUNDS FOR INVALIDITY

## 8.1.   GROUND 1:  ANTICIPATION OF CLAIMS 1, 19, and 21-29 BY CROWDS

Crowds seeks to protect user anonymity on the world-wide-web.  Ex. 1006 at 66.[3]  A user's request to a web server is not passed directly to the web server, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again.  The web request is eventually submitted to the web server by a random member, "thus preventing the end server from identifying its true initiator." *Id.* at 67.

A "user is represented in a crowd by a process on her computer called a jondo." *Id.* at 73.  Once admitted to the crowd, the jondo receives "the current membership of the crowd and information that enables this jondo to participate in the crowd." *Id.*  After receiving the user request from the browser, the jondo "initiates the establishment of a random path of jondos that carries its users' transactions to and from their intended web servers." *Id.*

Crowds illustrates example jondo paths in Figure 2:

---

[3] Citations are to the internal journal page numbers.

2042-04-319-IPR (US 10,257,319)    *Petition for Inter Partes Review*



Figure 2 of Crowds

### 8.1.1.   Claim 1

**Preamble.  A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:**

Crowds discloses a layout in which (*e.g.*, in one instance) jondo 6 serves as the first client device, jondo 4 serves as the second server, and Web Server 5 is the first server.  A "request" for content (*see* Ex. 1006 at 67) originates from jondo 5, going to jondo 4, then to jondo 6, and from there to Web Server 5 (the "5" in this case being in a square symbol), with the requested content being returned over the same path, in reverse. *Id.* at 74.

*2042-04-319-IPR (US 10,257,319)*    *Petition for Inter Partes Review*



Annotated Fig. 2 from Crowds

Jondo 6 may be regarded as a client device in this path (and thus the first client device) for at least the reason that (under the court's construction) it acts as in the role of a client in requesting the service of content from Web Server 5.

Jondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5. Crowds explains that "[its] description uses client-server terminology, where one jondo is a client of its successor on the path." Ex. 1006 at 74. In the figure above, jondo 5 is thus a client of jondo 4 (its successor on the path), and by the same "client-server terminology," jondo 4 serves in the role of a server to jondo 5. Crowds refers to jondos throughout as having involvement in the role of a server, with statements such as "[l]ike all network servers, jondos are identified

by their IP address and port number." *id.* at 90. Jondo 4 may be regarded as a server under this disclosure. Ex. 1005 ¶ 55.

### Claim step (a) ("receiving, from the second server, the first content identifier")

As shown in the path "5→4→6→server" in Fig. 2 of Crowds (above), Crowds discloses that jondo 6 (first client device) receives a "request" (first content identifier or "FCI") from jondo 4 (the second server).

As further addressed in the preceding section above (p. 30 *supra*), jondo 6 may be regarded as the first client device, and jondo 4 may be regarded as the second server, in the present context.

The arrows in Fig. 2 of Crowds each represent "requests," *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server. *See, e.g.*, 1006 at 73; Ex. 1005 ¶ 58-59.

The web server responds to the "request" by returning the requested content. Ex. 1006 at 73-74.

Based on plain and ordinary meaning, which Patent Owner agreed to for the words of this claim step (*see* p. 21, *supra*), the "request" itself may be regarded as the FCI. *See, e.g.*, Ex. 1006 at 75 (pseudocode "send request to destination . . . web server [and] await_reply"); Ex. 1005 ¶ 60.

In any case, each "request" contains a URL. The "requests" are clearly *HTTP requests* as understood by a POSITA, as reflected, *e.g.*, where Crowds notes that the requests have "HTTP headers." Ex. 1006 at 90. An *HTTP*

*request* for content available from a web server by definition contains a URL. Ex. 1005 ¶ 61 (referring to Ex. 1013 at § 5.1.2, a basic fact of which any POSITA would be immediately aware).

The Crowds publication is also clear that the user requests specify URLs. The Crowds user interface states, "To begin browsing anonymously, simply open a URL." *Id.* at 89 (Fig. 6):



Figure 6 of Crowds

A "user can issue a crowd query by appending ?crowd? to the end of any URL that she requests." *Id.* Crowds makes clear that each request amongst the jondos includes the URL, and thus the request from jondo "4" (second server) to jondo "6" (first client device) includes the first content identifier URL. *See*

*id.* at 67 ("The user's request to a web server is first passed to a random member of the crowd."); *id.* at 73 ("the jondo picks a jondo from the crowd (possibly itself) at random, and forwards the request to it . . . .").

Crowds therefore discloses this claim limitation. Ex. 1005 ¶¶ 62-64.

**Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

Jondo 6, having received the FCI per step (a), then sends it in an HTTP request to the web server, according to step (b).

Multiple web servers are shown in Figure 2 and discussed on page 72 of Ex. 1006. The web server or "end server" is the server "for which the request was destined." Ex. 1006 at 73. Further, HTTP must be included in the proxied services. *Id.* at 73 n.1; *id.* at 80 (referring to "HTTP communication"), at 87 (same), at 83 ("HTTP headers"), at 90 (same), at 88 (the jondo "serves as the HTTP proxy of [user's] browser"). Further, per Figure 6, URLs are used and jondos operate as HTTP proxies:



Fig. 6. **Crowd query:** A crowd query shows the jondos that are available, and indicates which one is acting as the user's HTTP proxy for the browser.

Figure 6 of Crowds

In the example "5→4→6→server" path discussed above, the "first client device" (jondo "6") sends the web request via HTTP to the target web server, or "first server." *Id.* at 73-74, Fig. 2. Circled in red below is the step corresponding to the first client device ("6") sending to the first server ("Web Server[]") the HTTP request comprising the FCI:

Appx38988



Figure 2 of Crowds (annotated)

According to Crowds, when jondo "6" determines that it should be the final jondo in the path (based upon a random determination), "the jondo submits the request to the end server for which the request was destined." *Id.* at 73. Since this is an HTTP request, a POSITA would know (as noted above) that the request must include the URL of the FCI. Ex. 1005 ¶¶ 65-68.

Crowds therefore discloses this claim limitation. Ex. 1005 ¶¶ 65-69.

**Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c).

As discussed immediately above, the "first client device" (jondo "6" above) sends the FCI to the first server, or target web server "5". The last jondo in the

*2042-04-319-IPR (US 10,257,319)*                    *Petition for Inter Partes Review*

path then receives the "first content," such as the user specified web page. The initiating jondo establishes the random path of jondos "that carries its users' transactions to **and from** their intended web servers." Ex. 1006 at 73. Further, "server replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. Accordingly, the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user. *See also id.* at 82 (discussing latency for "retrieving web pages").

Crowds therefore discloses this claim limitation. Ex. 1005 ¶¶ 70-72.

**Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

As discussed regarding step (c) above, the first client device (jondo 6) receives the first content from the web server. In response, it then sends the content on to the requester, jondo 4, per step (d).

Jondo "6" previously receives the FCI from the second server (jondo "4" in the above example path). Further, as explained immediately above, the random path of jondos "carries its users' transactions to **and from** their intended web servers." Ex. 1006 at 73. "[S]erver replies traverse the **same path as the requests, only in reverse**." *Id.* at 74. The first client device (here, jondo "6") sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo). The second server, jondo "4," can then send the web page content back to the requesting user (here, jondo "5").

Crowds therefore discloses this claim limitation. Ex. 1005 ¶¶ 73-75.

### 8.1.2.   Claims 19, and 28-29 (corresponding recorded media, download-ing, and device)

Ex. 1006 at 91 discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of claims 19, 28 and 29. *See* Ex. 1005 ¶¶ 76-77.[4]

### 8.1.3.   Claims 21-22 and 24-25 (communications via TCP)

Claims 21-22 and 24-25 each add additional limitations that relate to the use of TCP by the second or first (web) server, and/or the first client device.  Crowds confirms the usage of TCP/IP: "failures are detected by the TCP/IP connection to the jondo breaking or being refused . . . ." Ex. 1006 at 81.  Because the second server and first client device are jondos (Section 8.1.1), this discloses that they establish a TCP connection with each other (claims 21 and 24-25).

Further, per Section 8.1.1, Crowds discloses the use of the HTTP protocol for communications between jondos and web servers.  A POSITA would have understood at the time that HTTP works on top of TCP, at the application layer of the TCP/IP networking model. Ex. 1005 ¶¶ 78-80.  Like HTTP, the TCP/IP networking model was well known to a POSITA. *Id.*  Crowds' disclosure of usage of HTTP would therefore additionally disclose usage of TCP/IP (with both the first and second servers), per claims 21, 24, and 25. *Id.* ¶ 81.

---

[4] For purposes hereof, Petitioner will treat the steps recited in the first clause of claim 19 as corresponding to steps (b)-(d) of claim 1.

Appx38991

Crowds, 73 n.1 states that FTP requests must also go through the crowd. The first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP) (claim 22).

Crowds therefore discloses Claims 21-22 and 24-25. Ex. 1005 ¶¶ 78-82.

### 8.1.4.    Claim 23 (running a browser)

Ex. 1006 at 79 discloses the first content being a web page. Crowds also discloses the first content identifier being a URL and the first client device executing a web browser application. *See id.* at 89 (using Netscape browser to browse a web page at a URL).

A POSITA would thus understand Crowds to disclose claim 23. Ex. 1005 ¶¶ 83-84.

### 8.1.5.    Claim 26 (client O/S)

Crowds discloses jondos "*storing, operating, or using, a client operating system,*" specifically SunOS 4.1.4. Ex. 1006, 82. Crowds further discloses that the jondo software application was programmed to allow for "portability across Unix and Microsoft platforms." *Id.*, 81. A POSITA would understand Unix, Microsoft, and SunOS to refer to client operating systems. Ex. 1005 ¶ 85.

Claim 26 is therefore disclosed by Crowds. *Id.* at ¶¶ 85-86.

### 8.1.6.  Claim 27 (sequential execution)

The four method steps are executed sequentially, in the order in Claim 1. The web request is forwarded along the path (*e.g.*, 5→4→6→server) such that the "first client device" (here, jondo "6") receives the web request (and content identifier in the URL) from the "second server" (here, jondo "4"), and sends the web request to the "first server" or target web server.  Ex. 1006 at 73 and Fig. 2.  "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 74.  Per Section 8.1.1 above, the "first client device" receives the web content from the web server, and sends it back to the "second server." This is in the claimed sequence.

Claim 27 is therefore disclosed by Crowds. Ex. 1005 ¶¶ 87-89.

### 8.2.  GROUND 2:  OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-19, and 21-29 OVER CROWDS + RFC 2616 + GENERAL KNOWLEDGE

If the features addressed in Section 8.1 are not considered anticipated by Crowds, those claims, as well as claims 2, 14-15 and 17-18, would have been obvious to a POSITA.

Working in the field of the '319 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol.  Ex. 1005 ¶ 91.  The '319 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." 1001, 4:64-67.  It admits that HTTP and TCP/IP are known to a POSITA, stating,

"*As is known by those having ordinary skill in the art*, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." *Id.*, 17:22-24 (emphasis added).

The Patent cites to RFC 2616 for a definition of HTTP. *Id.*, 16:21-28; *id.*, 20:44-46 (Claim 15 referring to an HTTP header "according to, or based on, IETF RFC 2616").

Crowds concerns communications using these same protocols. *See, e.g.*, Ex. 1006 at 81 (TCP), 88-89 (HTTP). Since Crowds was directed at improving the same types of communications, a POSITA developing software for like applications would have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP. *See* Sections 8.1.1 & 8.1.3; Ex. 1005 ¶¶ 90-94.

### 8.2.1.  Claim 1

Accepting the constructions proposed herein, it follows that Crowds anticipates claim 1.  In any case, claim 1 would be obvious given Crowds and general Internet knowledge including RFC 2616.

Patent Owner sought to construe "client device" as a "consumer computer." Ex. 1017 at 10.  There is no § 102 issue on that score, as jondos in Crowds clearly operate on consumer-class computers (*see, e.g.*, Ex. 1006 at 73, wherein the same computer running the jondo also runs a web browser).

As for the "second server," Crowds states that, "[l]ike all network servers, jondos are identified by their IP address and port number."  Ex. 1006 at 90. Further, per Section 8.1.1, Crowds teaches that a jondo provides information

to other requesting jondos, fulfilling the typical role of a server. There is no restriction as to type of equipment for running a jondo. Ex. 1005 ¶¶ 96-98.

Even if the Board were to construe "second server" as requiring a specialized data-center class device, such an adaptation would have been obvious. Crowds raises processing loads among the crowd. Ex. 1006 at 80-85. To improve performance, a POSITA could have put some higher-powered devices (such as data center servers) in the "mix," to run as proxy servers (like a jondo), without (in those instances) running their own web browsers. A POSITA would have been aware, in 2009, of equipment commonly used as "servers," including workstation computers and computers running UNIX and Microsoft operating systems as disclosed by Crowds (*id.* at 82). Such servers have IP addresses and port numbers as required by Crowds. It would have been an obvious substitution of known equipment, with predictable results, to improve performance per the potential need suggested by Crowds. Claim 1 accordingly would have been obvious to the extent not anticipated by Crowds. 1005 at ¶¶ 98-99.

### 8.2.2.    Claim 2 (client device identifies itself on startup)

Claim 2 recites that the first client device is identified by attributes such as a MAC address or hostname, and that when it starts up it sends is IP address, MAC address, or hostname to the second server.

Crowds discloses that jondos have host names: "The user selects this jondo as her web proxy by specifying its host name and port number in her web

browser as the proxy for all services." Ex. 1006 at 73; *id.* at Fig. 6 (identifying host names of multiple available jondos).

Crowds also discloses a setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy. In the setup phase, the Blender gets the IP address of the joining jondo. *Id.* at 87. The blender then informs the other jondos of the new member and shared key, so that "all members are equipped with the data they need for the new member to participate in the crowd." *Id.*

Thus, it would be obvious to a POSITA that the other jondo (*e.g.*, the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address. Ex. 1005 ¶¶ 100-02.

### 8.2.3.    Claims 14-15 (validity check)

Claims 14 and its dependent, claim 15, concern the first client device determining the validity of the received first content.

RFC 2616 discloses headers that implement both of these claims. Ex. 1013 at § 14.9. The techniques for this taught by RFC 2616 are identical to the "Cache-Control" directives utilized in the Patent to implement this functionality. It would have been obvious for a POSITA faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616. 1005 ¶ 103.

### 8.2.4.  Claims 17-18 (periodically communicating)

Crowds discloses that jondos periodically communicate with each other to ensure the liveness of other jondos (per claim 17).  Ex. 1006 at 87 (referring to line 25 of Figure 3).  As addressed below, a POSITA would have known that such verification could be easily done by using standard "keep-alive" messaging (per claim 18).

The random path retrieval mechanism itself (discussed above), especially where a web page with multiple embedded objects (images, etc.) is involved, entails periodic communication between the first client device and the second server, separately meeting the limitations of claim 17.  Ex. 1005 ¶¶ 104.

As for claim 18, a "keep-alive" mechanism for TCP connections (involving "periodically probing the other end of a connection") is disclosed in RFC 1122.  *See* Ex. 1016 § 4.2.3.6.  The Crowds disclosure confirms that jondos communicate over TCP/IP connections:  in discussing potential points of failure, Crowds states that "such failures are detected by the *TCP/IP connection to the jondo* breaking or being refused. . . ." (*id.* at 81) reflecting that Crowds relies upon TCP connections.  It would have been obvious to a POSITA to have performed this disclosed "detecting" by using the "keep-alive" implementation taught by RFC 1122.  Ex. 1005 ¶¶ 105.

### 8.2.5.  Claims 19 and 21-29

As discussed in Sections 8.1.3-8.1.6, Crowds discloses the additional limitations of claims 19, and 21-29.  Therefore, if claim 1 is rendered obvious by

Crowds in view of both the general knowledge of a POSITA and RFC 2616, these claims are also rendered obvious. *See* Ex. 1005 at ¶¶ 106.

### 8.3.    GROUND 3: ANTICIPATION OF CLAIMS 1, 12, 14, 21-22, 24-25, AND 27-29 BY BORDER

Border seeks to "relieve traffic congestion and network latency" by "retrieving web content using proxy servers." Ex. 1012, 1:16-26.

The communication system 100 of Border includes user station 101, downstream proxy server 105, upstream proxy server 107, and web server 109:



Figure 1 of Border

*Id.* at Fig. 1. Going from right to left, user stations 101 use communication system 100 to request and receive web content stored on web servers 109. *Id.*, 1:34-35. Proxy servers 105 and 107 act as intermediary devices between one or more user stations 101 and many web servers 109. *Id.*, 4:29-31.

Appx38998

Border's proxy servers can operate on "general purpose personal computers." *Id.*, 4:52-54; 10:6-11:54. Proxy servers 105 and 107 communicate using a persistent HTTP over TCP connection, and are referenced as HTTP proxy servers. *Id.*, 4:8-14; 4:29-31.

Figure 2 of Border shows the communications that occur when a user station requests and receives web content stored on a web server:



Figure 2 of Border

*Id.* at Fig. 2.

To request web content at a particular URL, a browser 103 of user station 101 sends an HTTP GET request containing the URL to downstream proxy server 105. *Id.*, 5:14-17. If downstream proxy server 105 does not have a copy

of the content stored in its cache, downstream server 105 sends an HTTP GET request containing the URL to upstream proxy server 107.  If upstream proxy server 107 does not have a copy, it sends an HTTP GET request to web server 109.  Web server 109 transmits the content at the URL to upstream server 107, which stores the content in its cache.  Upstream server 107 then forwards the content to downstream server 105, which stores the content in its cache, and then forwards the content to web browser 103.

### 8.3.1.   Claim 1

**Preamble**

As explained in Section 8.1.1, the preamble provides antecedent support for the four method claim steps that follow, and is satisfied by the features cited below for method steps (a)-(d).

The preamble maps onto Border as follows:

**First client device:** Upstream server 107.

**Second server:** Downstream server 105.

**First server:** Web server 109.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

Ex. 1005 ¶¶ 107-08.

**Claim step (a) ("receiving, from the second server, the first content identifier")**

Downstream server 105 is the "second server," upstream server 107 is the "first client device," and the requested URL is the FCI.

Web content is retrieved from a web server that stores the web content by forwarding a "URL request message to a web server and receiv[ing] the URL content from the web server. . . ." Ex. 1012, 2:52-54. An "individual piece of web content," *i.e.*, a "first content," "is identified, that is, addressed, by an Internet address, referred to as a Uniform Resource Locator (URL)." *Id.*, 1:62-2:2. As shown in Figures 1 and 2, web browser 103 sends a GET request to downstream server 105, which forwards the request to upstream server 107, which passes the GET request to web server 109. The response to the GET request—the content at the requested URL—is then returned through the same path in reverse.

Any standard computer may serve in the role of a "client." *See* Section 8.3. Border discloses that upstream server 107 is a "client," as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server, and thus acts as an HTTP client when requesting content from an HTTP server. Even if "client device" were construed as a "consumer" computer, the physical computer hardware on which upstream server 107 operates is a general purpose personal computer. *See id.*, 10:6 to 11:54; Fig. 7. The proxy servers may run on "general purpose personal computer[s]." *Id.*, 4:52-53.

Downstream server 105 (expressly called a "server") is the "second server," as it accepts a connection from web browser 103 and sends back a response to web browser 103's GET request. Downstream server 105 retrieves the requested first content by communicating with web server 109 (the "first server") through upstream server 107 ("first client device").

Web browser 103 sends a GET request containing the URL for the content "HTML"[5] to downstream server 105.  Downstream server 105 then sends a GET request containing the URL to upstream server 107, as shown in green in Figure 2:



Figure 2 of Border (annotated)

Border discloses this limitation. Ex. 1005 ¶¶ 109-15.

[5]   Border uses "HTML" as the exemplary URL of a request from web browser 103. Ex. 1012, 5:18-19 ("For the purposes of explanation, the HTML page is addressed as URL "HTML.").

**Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

Upstream server 107 (the first client device) issues a GET request[6] to web server 109 for the content at a specified URL, as shown in green in Figure 2:



Figure 2 of Border (annotated)

*Id.* at 5:33-36.

Border discloses this limitation. Ex. 1005 ¶ 117.

---

[6] The GET request is defined by RFC 2616 § 9.3, and is therefore an "HTTP request." Ex. 1005 ¶ 116.

**Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

In response to upstream server 107 "issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server," as shown in green in Figure 2:



Figure 2 of Border (annotated)

Ex. 1012, 5:34-37. Thus, Border teaches the first client device receiving the first content (the web page at the requested URL) from the first server in response to sending the FCI (the requested URL).

Border discloses this limitation. Ex. 1005 ¶¶ 118-20.

**Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

After receiving the web page at the requested URL from web server 109, upstream server 107 "forwards the HTML page to the downstream server 105," as shown in green in Figure 2:



Figure 2 of Border (annotated)

Ex. 1012, 5:38-40. Downstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, per the second server's role as a "server." *Id*.

Border discloses this limitation. Ex. 1005 ¶¶ 121-23.

### 8.3.2.    Claim 12 (storing the received content)

Border discloses upstream server 107 sending the GET request to web server 109 after it receives the requested URL from downstream server 105, where upstream server 107 further comprises HTTP cache 117.  Ex. 1012, 4:8-11.  In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.*, 5:36-38.

Border therefore discloses claim 12. Ex. 1005 ¶¶ 124.

### 8.3.3.    Claim 14 (validity check)

As explained for claim 12, Border discloses upstream server 107 storing the received first content in HTTP cache 117 to provide in response to future requests.  If upstream server 107 receives a subsequent request for the received first content, Border teaches that upstream server 107 may determine whether such content is still valid by sending a conditional HTTP GET request using IF MODIFIED SINCE headers to web server 109. Ex. 1012, 7:5-10, 9:14-15.  If there has been no change to the received first content since it was stored in cache 117, then the content is still valid and web server 109 returns a NO CHANGE response.  *Id.*  The servers with caches perform this action "to avoid stale information [and] determine whether the information stored at URL HTML has been updated since the time it was last requested." *Id.*, 6:55-57.  Border therefore discloses claim 14. Ex. 1005 ¶¶ 125.

### 8.3.4.    Claims 21-22 and 24-25 (communications via TCP)

Border discloses the additional limitations of claims 21-22 and 24-25, which each add additional limitations that relate to the second server's and/or the first client device's use of the TCP protocol. Downstream server 105 and upstream server 107 maintain and communicate over a persistent TCP connection to carry HTTP transactions, shown in Figure 1 by the connection labeled "P-TCP." Ex. 1012 at Figure 1; 4:11-15; 7:50-52. TCP communications of communication system 100 are made over IP. *Id.*, 7:32-35. Therefore, the first client device (upstream server 107) establishes a TCP connection with the second server (downstream server 105) using the TCP/IP protocol. Further, the first client device (upstream server 107) communicates over the Internet based on at least one of the standards——TCP——enumerated in claim 22. At least the second server (downstream server 105) is a TCP/IP server that communicates over the Internet using the TCP/IP protocol. As also discussed above, the first client device (upstream server 107) is a TCP/IP client that communicates over the Internet with the second server (as well as the first server) using the TCP/IP protocol. Therefore, Border discloses the additional limitations of these claims. Ex. 1005 ¶ 126-29.

### 8.3.5.    Claim 27 (sequential execution)

Border discloses the additional limitations of claim 27. As discussed in Section 8.3.1, Border teaches the sequential execution of the claim 1 steps, as shown in green in Figure 2:



Figure 2 of Border (annotated)

Ex. 1005 ¶¶ 130-32.

### 8.3.6.    Claims 28-29 (corresponding recorded media and device)

Border discloses computer system 701 that can be configured to operate upstream server 107, which is a client device as discussed above in Section 8.3.1. Ex. 1012, 10:6-8. Computer system 701 is comprised of processor 705, main memory 707, and storage device 711. *Id.*, 10:6-24. Upstream server 107, operating on computer system 701, interacts within system 100:

> in response to processor 705 executing one or more sequences of one
>
> or more instructions contained in main memory 707. Such instruc-

tions may be read into main memory 707 from another computer-readable medium, such as storage device 711.  Execution of the sequences of instructions contained in main memory 707 causes processor 705 to perform the process steps described herein.

*Id.*, 10:35-43.  The storage device is a "non-volatile[,]" *i.e.*, non-transitory, "computer-readable medium." *Id.*, 10:50-58.  Therefore, Border discloses a client device (upstream server 107) that comprises a non-transitory computer readable medium meeting Claims 28-29.  Ex. 1005 at ¶¶ 133-34.

### 8.4.  GROUND 4: OBVIOUSNESS OF CLAIMS 1, 12, 14-15, 17-19, 21-22, 24-25, and 27-29 OVER BORDER + RFC 2616 + GENERAL KNOWLEDGE

As noted in connection with Ground 8.2 (and supported there by specific citations), working in the field of the '319 patent assumes a basic understanding of computers and Internet communications by a POSITA, including the standards governing HTTP requests and the TCP/IP protocol; the Patent contemplates a web server as "a typical HTTP server," and the Patent admits that HTTP and TCP/IP are known to a POSITA. The Patent cites to RFC 2616 for a definition of HTTP, and recognizes it as prior art.

Border expressly incorporates RFC 2616 and discusses it throughout.  Ex. 1012, 7:26-29.  Border also specifically references the usage of HTML, URLs, and TCP/IP, all of which are indicative of standard Internet communications.  *See* Section 8.3.1

Since Border is also directed at improving those communications (in this case, latency), within the same standards-defined environment, a POSITA developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP. Ex. 1005 ¶¶ 135-37.

### 8.4.1.   Claim 1

Accepting the constructions proposed herein, it follows that Border anticipates claim 1.

"Server" and "first content identifier"—There is no question that downstream server 105 (the "second server") is disclosed as a "server" and that the GET request disclosed in Border transmits a content identifier (URL). Nor is there any difference between the data flow recited in claim 1 and that disclosed in Border. Ex. 1005 ¶¶ 138-39.

As for the "first client device"—Border expressly discloses that its proxy servers can be implemented on personal computers. Ex. 1012, 3:58-61; 4:51-53; 10:6-11:8. Thus either proxy server 105 or 107 could run on a PC. To the extent that is deemed insufficient disclosure of a consumer computer (should that even be required), it would have been obvious to a POSITA, based on general Internet knowledge, that any computing device capable of operating a "proxy" as defined in RFC 2616, could serve as a first client device, and that this would include most consumer computers with a network interface. Ex. 1005 ¶¶ 140-42. Thus, to the extent not anticipated by Border, claim 1 as a whole would have been obvious. *Id.*

### 8.4.2.   Claim 15 (validity check, RFC 2616)

Border discloses the first client device determining the received (and cached) first content valid, based on a NO CHANGE response from the web server on a later request. *See* Section 8.3.3.

RFC 2616 discloses highly similar, standardized, mechanisms for accomplishing this, with response headers including such as "expires" and "Cache-Control: max-age". *E.g.*, Ex. 1013 §§ 13.2.1, 13.2.4. The framework provided in RFC 2616 for cache management in this manner (*e.g.*, the entire 25-page § 13 and much of the even longer § 14) is highly detailed, and provides a richer set of controls for cache management than what is disclosed in Border, to avoid both stale data and unnecessary retrievals and storage and bandwidth consumption. Ex. 1005 ¶¶ 143-44.

Border itself already cites RFC 2616 as documenting HTTP. Ex. 1012, 7:26-32. It would have been advantageous, and obvious to a POSITA, in view of the additional (and standardized) cache control mechanisms of RFC 2616, to have incorporated those further mechanisms into an implementation making use of the other teachings of Border, with predictable results. 1005 ¶ 145.

### 8.4.3.   Claims 17-18 (periodically communicating)

Border discloses downstream server 105 and upstream server 107 communicating via HTTP over a persistent TCP connection. *See* Section 8.3. It would be obvious to a POSITA to rely on general knowledge, including of the use of keep alive messages to maintain a persistent connection. Ex. 1005 ¶ 146.

As referenced in Sec. 8.2.3, RFC 1122 expressly discloses the use of "TCP Keep-Alives" to "periodically probe[] the other end of a connection when the connection is otherwise idle, even when there is no data to be sent," to confirm that an idle connection is still active. Ex. 1016 at ¶¶ 4.2.3.6; Ex. 1005 ¶ 146-47. TCP keep-alive messages ensure that a persistent connection is still alive, such that if either TCP endpoint would lose its connection, each end-point would be notified promptly so it could open a new connection or connect to a different peer. Such behavior is beneficial in settings like those disclosed by Border, so the downstream and upstream proxy servers can communicate efficiently once a browser actually makes an HTTP request to the downstream server, and not suffer from a failed, slow, or lower throughput TCP connection, as could be the case if the proxies were not utilizing TCP keep alive messages. Ex. 1005 ¶¶ 148.

A POSITA knowing that Border used persistent connections would have been motivated to use keep alives as taught by RFC 1122 as a standard manner of maintaining such connections. *Id.* at ¶ 149.

Claims 17-18 accordingly would have been obvious to a POSITA based on Border in view of the general knowledge of a POSITA. *Id.* at ¶ 150.

### 8.4.4.    Claim 19 (downloading software application)

Border discloses non-transitory computer-readable media for performing the steps of claim 1 (*see* Section 8.3.6). As reflected, *e.g.*, in Sections 8.1.2 and 8.5.3, it is routine and would have been obvious to download and install such software applications, in this case, software to run the proxy devices in Border. Ex. 1005 ¶¶ 134.

### 8.4.5.   Claims 12, 14, 21-22, 24-25, and 27-29

Border discloses the additional limitations of claims 12, 14, 21-22, 24-25, and 27-29. *See* Sections 8.3.2-8.3.6. Therefore, if claim 1 is rendered obvious by Border in view of both the general knowledge of a POSITA and/or RFC 2616, these claims are also rendered obvious. *See* Ex. 1005 ¶ 151.

## 8.5.   GROUND 5:  ANTICIPATION OF CLAIMS 1, 17, 19, and 21-29 BY MORPHMIX

Like Crowds, MorphMix seeks "[to] achiev[e] anonymous Internet access." Ex. 1008 at 14, 109.[7]

MorphMix describes a set of "nodes," each node identified by its IP address and connected to one or more other MorphMix nodes at any time, where there is a TCP connection between any two connected nodes. *Id.* at 98-99.  A node "establishes a circuit via some other nodes" forming an "anonymous tunnel." *Id.* at 99.  If a web browser sends a request to a node, the first node sends the IP address and port of the targeted web server "to the final node." *Id.* at 103.  The final node then "connects to the server" and the "connection has been established." *Id.*  "Sending data back from the server to the client works exactly in the opposite way." *Id.* at 105.

"MorphMix is basically a circuit-based mix network, [in which] a node establishes a circuit via some other nodes to access servers in the Internet anonymously." *Id.*  at 99.  MorphMix is specifically designed to support

---

[7] The cited page numbering is the internal numbering of the thesis.

web browsing over its circuits. *See id.* (explaining how MorphMix supports circuits that carry several communications in order to better accommodate web browsing). *See also id.* at 74 (example of "support[ing] 100000 web users"), 103 ("we focus on web browsing"), 204 ("Web Browsing Secenario"). MorphMix also teaches that user activity on the world wide web entails requests for content made via sending a URL: *"A web session is defined as a continuous series of user activity via URL requests." Id.* at 74 (emphasis added).

The following is illustrative:



**Figure 5.1:** *Basic idea of MorphMix.*

Figure 5.1 of MorphMix

MorphMix discloses that a random path of nodes (applications on user's computers) is created. Each client runs an access program on the local computer (Ex. 1008 at 103). The client "sends $ip_s$ and $p_s$" to the access program. *Id.* ( $ip_s$ and $p_s$ are the host (target) server's ip address and port, *Id.* at 20). The

node establishes an "anonymous tunnel by sending an end-to-end message to the final node that contains $ip_s$ and $p_s$." *Id.* at 103. The final node then connects to the target server and "forward[s] the data it receives through the anonymous connection" to the target server. *Id.* at 104.

One potential path of nodes (shown in Fig. 5.1 of MorphMix, page 60 above) is that the initiator (a) sends the request to an intermediate node (b), which sends the request to the last node (c), which sends the request to the server (s).

In this example, the "first client device" is the last node in the tunnel (node "c"), which communicates with the server (s), which may be a web server (*see id.* at 74, 204). The "second server" is the device at node (b), which provides the FCI to the first client device (final node c). *Id.* at 105. To do this, the "second server" (b) forwards a "payload" to node c. *Id.* at 105. The payload carries "application data" (*id.* at 104), which, for an application requesting web content, includes the data identifying the requested web page to be provided to the web server. Ex. 1005 ¶¶ 152-58.

### 8.5.1.  Claim 1

**Preamble**

As explained in Section 8.1.1 above, the preamble provides antecedent support for the four method steps that follow. The features discussed below for steps (a)-(d) thus also satisfy the terms of the preamble.

The preamble maps onto the above disclosure from MorphMix as follows:

**First client device:** last node (c).

**Second server:** intermediate node (b).

**First server:** server (s).

**First content identifier:** the "application data" (or the requested URL it contains).

**First content:** requested web page at the requested URL.

*See* Ex. 1005 ¶¶ 159-60.

**Claim step (a) ("receiving, from the second server, the first content identifier")**

MorphMix discloses node b (second server) sending the application data (the FCI, or containing the FCI) to node c (first client device).

Figure 5.4 of MorphMix shows that in the course of servicing a request from node a, "application data" (for the request) is passed from node b (second sever) to node c (first client device), which then connects with the web server.

Figure 5.4 is annotated in red below to show the node b (second server) sending to node c (first client device) information that includes the ip address ($ip_s$) and port ($p_s$) of the server, as well as the application data (AD) which identifies the web content, so that node c may send it to the server:



**Figure 5.4:** *Anonymous connections and cell forwarding.*

Figure 5.4 of MorphMix (annotated)

As to the "second server," claim 1 does not require any type of particularized computer equipment. *See* Section 6. Regardless, MorphMix discloses that node b in the above example is a "server" as commonly understood because node b accepts a connection from node a in order to send back a response, further disclosing that "[s]ending data back from the server to the client works exactly in the opposite way." Ex. 1008 at 105. Node b thus responds to requests from node a by providing a service to node a, characteristic of a server, as explained in Section 6. Every node "can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 98. That a node can act as a client in one relation and as a server in another is consistent with the meanings of "client" and "server" (Section 6; Ex. 1005 ¶¶ 161-66),

but MorphMix expressly states that a "sender" of messages (*e.g.*, requests) is a "client," while a "recipient" is a "server." Ex. 1008 at 13.

In addition, MorphMix discloses an embodiment in which a common MorphMix node outside a NAT gateway is accessed as a proxy by multiple users. *Id.* at 143. In this embodiment, that node would be node a in Figure 5.1 (as opposed to node b), but node a qualifies as a "server" by any definition, and node c still receives the FCI (the "application data") from it, via the tunnel through node b.

As for node c being a "client," any standard computer may serve in the role of a "client" as construed per Section 6. Even if the term "client device" were to be construed as a "consumer" computer, that is precisely what MorphMix discloses: "Anybody who has access to a computer that is connected to the Internet should be able to join and use MorphMix after having installed the MorphMix software." *Id.* at 96; *see also id.* at 234. A computer need have only a public IP address to join, and "any computer with a dialup connection capable of running a modern graphical web browser should be sufficient." *Id.* MorphMix "can handle as many nodes as there are public IP addresses." *Id.* at 234.

Because the above requests are web requests, they include the "content identifier" which identifies the content sought from the target web server. MorphMix refers to this throughout as the "application data" (AD). Based on plain and ordinary meaning, the AD would constitute a "content identifier." The requests in MorphMix explicitly may be HTTP requests, and a POSITA would understand that by definition a HTTP request contains a URL, clearly

a content identifier. *See* Ex. 1013 § 5.1.2. Morphmix states that "with HTTP 1.1, all object[s] of a web page are downloaded through a single anonymous connection and a single TCP connection between the final node and the web server" (Ex. 1008 at 207), and that web browsing entails "a continuous series of user activity via URL requests." *Id.* at 74. *See also* Ex. 1005 ¶¶ 167-70. Thus, a POSITA would understand the AD to either be the FCI, or to contain a URL as the FCI. It includes the FCI, such as a URL, so that the corresponding requested data could be sent "back from the server to the client." *Id.* at 105; Ex. 1005 ¶ 170.

MorphMix therefore discloses this claim limitation. *Id.* at ¶¶ 171.

**Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

Node c (first client device) sends a HTTP request comprising the FCI (AD and/or the URL within the AD) to the first server (s).

In the example a to b to c node path discussed above, node c is the final node and the "first client device." Node c determines from the header information that it is the "final node," and that a portion of the "payload" "must be sent to the web server using the ip address and port number. Ex. 1008 at 105 (steps 10-11). Therefore, "the server eventually receives AD," or application data. *Id.* (step 12). If final node c receives a host name for the web server, it must resolve the host name to an IP address to send information to the web server. *Id.*

Figure 5.4 shows the application data (AD), which identifies the web content, being passed from the first client device (node c) to the web server ("first server") as indicated in red:



**Figure 5.4:** *Anonymous connections and cell forwarding.*

Figure 5.4 of MorphMix (annotated)

MorphMix teaches that web browsing entails "a continuous series of user activity via URL requests" (*Id.* at 74), making clear that the AD as shown in the above figure conveys URLs, so that the web server can respond with the information (also application data) to send back the requesting device.  Ex. 1005 ¶¶ 172-75.

MorphMix therefore discloses this claim limitation. *Id.* ¶ 176.

**Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

The last node in the path (the first client device, node c) receives the "first content," such as the web page, specified by the user.  MorphMix confirms that

"[s]ending data back from the server to the client works exactly in the opposite way" as the information is sent to the server. Ex. 1008 at 105. The first client device in MorphMix (the last node before the target web server) receives the requested first content (such as a web page) for sending back down the path to the requesting user, which is done, as explained above, in response to sending the FCI constituting or present in the application data "AD."

MorphMix therefore discloses this claim limitation. Ex. 1005 ¶¶ 177-78.

**Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

"Sending data back from the server to the client works exactly in the opposite way" as compared to the path the data takes from the initiator node a, to node b, to node c, and finally to the web server. Ex. 1008 at 104-05. The first client device (node c) sends the first content (or web page content) back to the second server (node b, the prior node in the path), which occurs in response to having received the FCI. The second server, node b, can then send the web page content (the "first content") back to the requesting user (node a in this example path).

MorphMix therefore discloses this claim limitation. Ex. 1005 ¶¶ 179-80.

### 8.5.2. Claim 17 (periodically communicating)

The "second server" and "first client device" of MorphMix are nodes, and each communicates via the MorphMix protocol for establishing and maintaining virtual tunnels. *See* Section 8.5.1. Each sends HTTP protocol messages

through this tunnel to handle web requests. This constitutes "periodically communicating" as recited in claim 17.

MorphMix discloses several protocol messages between nodes immediately next to each other within the virtual tunnels disclosed by MorphMix, such as node c (the first client device) and node b (the second server). These messages are "used to set up virtual links, to set up and terminate anonymous tunnels, for peer discovery, to get status information about neighbors, for flow control, and to carry end-to-end messages." Ex. 1008 at 267. Such periodic communication involves node c asking node b about further nodes as part of peer discovery (*id.* at 269), sending requests for the other node's status (*id.* at 271), sending messages with virtual "credit" that are used for flow control (*id.* at 273), and others.

MorphMix also discloses that neighboring nodes, such as node c (the "first client device") and node b (the "second server"), communicate periodically to transmit HTTP messages that the final node c uses to request HTTP content from the web server ("first server"). These HTTP messages are transmitted over MorphMix's anonymous virtual tunnels, and the HTTP data is sent periodically over "virtual link data messages" between node b and node c, which transmit the HTTP request and response. Ex. 1008 at 273.

MorphMix therefore discloses Claim 17. Ex. 1005 ¶¶ 181-84.

### 8.5.3.  Claims 19 and 28-29 (corresponding recorded media, download-ing, and device)

MorphMix discloses downloading and installing from the Internet, by the first client device, a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the steps of claim 1 (described above in Section 8.5.1).

Claim 19 is therefore disclosed by MorphMix.  Furthermore, the device having downloaded this software possesses a machine-readable medium per claim 28 and, having installed such software, constitutes a device as recited in claim 29. Ex. 1005 ¶¶ 185-86.

### 8.5.4.  Claim 23 (web-page and browser)

MorphMix discloses the first content being a web page. Ex. 1008 at 107, 205.  MorphMix also discloses the FCI being a URL and the first client device executing a web browser application.  *See id.* at 74 (URL requests of web sessions using browsers), 96 (MorphMix in browser application), 100 (same). MorphMix thus anticipates claim 23. *See* 1005 ¶ 187.

### 8.5.5.  Claims 21-22 and 24-25 (communications via TCP)

MorphMix confirms the usage of TCP/IP connections.  "[T]here is a TCP connection" between nodes.  Ex. 1008 at 99; 101 (nodes a, b, and c "are communicating directly with each other across TCP connections"); *id.* at 22, Fig. 2.3 (TCP connections).  A TCP connection is also "established between the final node in the tunnel and the server." *Id.* at 100.  MorphMix therefore discloses TCP/IP communications between all nodes (and hence the first client

device and second server) and between the final node (first client device) and target web server (first server).

MorphMix also discloses FTP, as MorphMix "can be used to anonymise FTP downloads." *Id.* at 236. MorphMix also discloses the use of UDP. *Id.* at 21 (links between mixes "can make use of TCP or UDP"); *id.* at 37 (Fig. 2.6 showing both TCP/IP and UDP connections between mixes).

MorphMix discloses Claims 21-22 and 24-25 because MorphMix, at a minimum, discloses the first client device establishing a TCP connection with the second server using the TCP/IP protocol, and the first client device and the second server (as well as the first server) communicating over the Internet using the TCP/IP, FTP, and/or UDP protocols. Ex. 1005 ¶¶ 1887-90.

### 8.5.6.  Claim 26 (client O/S)

MorphMix discloses the use of a client operating system. MorphMix discusses the need to avoid disclosing information "about the user's operating system or web browser." Ex. 1008 at 38. MorphMix also discloses performance tests on MorphMix using "Linux as operation system." *Id.* at 129.

Claim 26 is therefore disclosed by MorphMix. Ex. 1005 ¶ 191.

### 8.5.7.  Claim 27 (sequential execution)

As explained in Section 8.5.1, the four method steps are executed sequentially, in the order of Claim 1. For example, the "first client device" (node c) receives the web request (and content identifier) from the "second server" (node b), and sends the web request to the "first server" or target web server. "Sending data back from the server to the client works exactly in the opposite

way." Ex. 1008 at 105.  Therefore, for the reasons explained in Section 8.5.1 above, the claims steps are executed sequentially.

Claim 27 is therefore disclosed by MorphMix. Ex. 1005 ¶¶ 192-93.


## 8.6.   GROUND 6: OBVIOUSNESS OF CLAIMS 1-2, 14-15, 17-19, 21-29 OVER MORPHMIX + RFC 2616 + GENERAL KNOWLEDGE

As noted in connection with Ground 8.2 (and supported there by specific citations), working in the field of the '319 patent assumes a basic understanding of computers and Internet communications by a POSITA, including the standards governing HTTP requests and the TCP/IP protocol; the Patent contemplates a web server as "a typical HTTP server," and the Patent admits that HTTP and TCP/IP are known to a POSITA. The Patent cites to RFC 2616 for a definition of HTTP, and recognizes it as prior art.

Like Crowds, MorphMix also concerns communications using these protocols. *See, e.g.*, Ex. 1008 at 18 (using TCP and/or UDP), 103 "MorphMix supports HTTP"). Since Morphmix was also directed at improving those communications (in this case, providing anonymity), within the same standards-defined environment, a POSITA developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP. Ex. 1005 ¶¶ 194-95.

### 8.6.1.   Claim 1

Accepting the constructions proposed herein, it follows that Morphmix anticipates claim 1.

As noted in Section 6, Patent Owner sought to construe "client device" as a "consumer computer." Ex. 1017 at 10. There is no § 102 issue with MorphMix on that score, as MorpMix (expressly called a "peer-to-peer" based system) clearly contemplates the use of consumer-class computers (*see, e.g.*, Ex. 1008 at 96 (referring to "[a]nybody who has access to a computer that is connected to the Internet," with a public IP address or NAT (router/access point).

As for the "second server," as discussed in Section 8.5.1, node b acts in the role of a server to node a, and in any case, as discussed at page 64 *supra*, a MorphMix node may be set up as a server outside a NAT gateway. To this extent this leaves any issue under § 102 it would have been obvious to use dedicated server hardware to set up such a multi-user MorphMix node. 1005 ¶¶ 196-97.

To the extent the limitation "first content identifier" is not deemed sufficiently disclosed by MorphMix, its statement that web browsing would include "continuous series of user activity via URL requests" (Ex. 1008 at 74) would render it obvious to implement MorphMix by passing a URL in the AD in order to retreive the requested content, and the POSITA would know from RFC 2616 § 5.1.2 that a URL includes a content identifier. Ex. 1013 at §§ 1.3, 3.2.

Claim 1 accordingly would have been obvious to a POSITA to the extent (if any) not anticipated by MorphMix. Ex. 1005 ¶¶ 198-99.

### 8.6.2.    Claim 2 (client device identifies itself at startup)

Claim 2 recites that the first client device is identified by an IP address or hostname, and that when it starts up, it sends the second server its IP address, MAC address, or hostname.

In MorphMix, a node is the "first client device," as discussed in Section 8.5.1, and a node is identified by its IP address. Ex. 1008 at 98 ("public IP address"); *id.* at 109 ("node identified with its IP address").

When a node joins the MorphMix network, it sends a message to other nodes comprising the node's IP address, port, public key, and other information as part of its start-up. *Id.* at 132-133. MorphMix discloses a "peer discovery mechanism that enables MorphMix nodes to learn about other nodes." *Id.* at 131. "While participating in MorphMix and setting up anonymous tunnels, a node learns about a variety of other nodes. Every selection it gets contains the IP addresses, ports, public keys, and node levels of several nodes." *Id.* at 133. MorphMix thus discloses that a node (such as the node c in Figures 5.1 and 5.4, which as described above is also a "first client device"), when joining the MorphMix network and thus starting up, sends its node information (including its IP address) to other nodes (including node b in in Figures 5.1 and 5.4, which as described above is also a "second server").

A POSITA would know that a MAC address is an element of the data link layer of the open systems interconnection (OSI) basic reference model underlying network communications over the Internet. *See* U.S. Pat. Pub. No. 2009/0037977, Ex. 1019 ¶ [0025]. A POSITA would therefore have recognized

that that a user system participating as a node in MorphMix would have a MAC address, as part of an industry standard network adapter by which it attached to the network.

MorphMix therefore discloses the first client device communicating its IP address to the second server upon startup, and it would have been obvious that to work in a standard Internet environment the first client device would have had a MAC address to do so, therefore making it obvious to have met the limitations of Claim 2. Ex. 1005 ¶¶ 200-204.

### 8.6.3.   Claims 14-15 (validity check)

MorphMix discloses, regarding Claim 1, that the first client device communicates with the target server (first server) via HTTP. *See* Section 8.6.1 A POSITA understands that the HTTP protocol therefore would also govern the receipt of content by the first client device. Ex. 1005 ¶ 205.

For the same reasons explained above in Section 8.2.3 (for Crowds), a POSITA would have understood from HTTP and RFC 2616 that the first client device (node) would determine that the received content is valid through the HTTP protocol, including through the HTTP header.

Claims 14-15 accordingly would have been obvious to a POSITA based on MorphMix in view of the general knowledge of a POSITA and/or RFC 2616. Ex. 1005 ¶¶ 206-07.

### 8.6.4.    Claim 18 (periodically communicating; keep-alives)

As explained above in Section 8.5.1, each of the "second server" and "first client device" of MorphMix is a node, and they communicate via the HTTP protocol over persistent connections ("circuits")) to send web requests. MorphMix teaches that, for web browsing, all nodes in the path, including the second server and the first client device, communicate via HTTP, over the established circuits. Ex. 1005 ¶¶ 208.

For the same reasons explained above in Section 8.2.4 (concerning Crowds) and 8.4.3 (concerning Border), Claim 18 would have been obvious to a POSITA based on MorphMix and a POSITA's general knowledge regarding HTTP, TCP, and RFCs 2616 and 1122. This includes the usage of both TCP "Keep Alive" messages and HTTP "Keep-Alive" headers, to keep connections open.

Claims 18 accordingly would have been obvious to a POSITA. *Id.* at ¶¶ 209-10.

### 8.6.5.  Claims 19 and 21-29

As discussed in Sections 8.5.2-8.5.7, MorphMix discloses the additional limitations of claims 19 and 21-29.  Therefore, if claim 1 is rendered obvious by MorphMix in view of the general knowledge of a POSITA and/or the disclosure of RFC 2616, these claims are also rendered obvious.  *See* Ex. 1005 ¶ 211.

Respectfully submitted,

*/Ronald Abramson/*
Ronald Abramson

Dated:  September 3, 2021

LISTON ABRAMSON LLP
The Chrysler Building
405 Lexington Avenue, 46 FL
New York, NY 10174
Telephone:  (212) 822-0163

Appx39030

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 CFR § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Patent Owner Preliminary Response totals 13,836, which is less than the 14,000 allowed under 37 CFR §§ 42.24(a)(1)(i); 42.24(b)(1).

*/Ronald Abramson/*
Ronald Abramson

Dated: September 3, 2021

## CERTIFICATE OF SERVICE (37 C.F.R. § 42.6(e), 42.105(b))

The undersigned hereby certifies that the above-captioned PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 10,257,319, Petitioner's Power of Attorney, and all supporting exhibits were served in their entirety on September 3, 2021 via Priority Mail Express International, on the following:

May Patents Ltd. c/o Dorit Shem-Tov
P.O.B. 7230
Ramat-Gan 5217102
ISRAEL
(PAIR Correspondence Address for U.S. Patent No. 10,257,319)

The above-captioned PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 10,257,319, Petitioner's Power of Attorney, and all supporting exhibits were also served in their entirety via e-mail on September 3, 2021 on Patent Owner's U.S. counsel in the pending litigation in concerning the '319 patent, as follows:

Korula T. Cherian
Ruyak Cherian, LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704
sunny@ruyakcherian.com
Ronald Wielkopolski
Ruyak Cherian, LLP
1700 K St NW, Suite 810
Washington, DC 20006
ronw@ruyakcherian.com

/Ronald Abramson/
Ronald Abramson

Dated: September 3, 2021

IPR2021-01492
Patent 10,257,319 B2

definition of a person of ordinary skill in the art "are not materially

different," and that our decision would be the same using either definition.

### C.    Claim Construction

For this *inter partes* review, the Board applies the same claim

construction standard as that applied in federal courts. *See* 37 C.F.R

§ 42.100(b) (2019).  Under this standard, claim terms "are generally given

their ordinary and customary meaning" as understood by a person of

ordinary skill in the art in question at the time of the invention. *Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citations

omitted).  "In determining the meaning of the disputed claim limitation, we

look principally to the intrinsic evidence of record, examining the claim

language itself, the written description, and the prosecution history, if in

evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d

1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Extrinsic evidence is "less significant than the intrinsic record in

determining 'the legally operative meaning of claim language.'" *Phillips*,

415 F.3d at 1317 (citation omitted).

Petitioner asserts that the district court's constructions in *Luminati*

*Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (Teso

Litigation)[9], are appropriate in this case.  Pet. 21.  In particular, Petitioner

points to two claim construction orders in that case—the "*Teso* Order" (Ex.

1017) and the "*Teso* Supplemental Order" (Ex. 1020).  Pet. 21–22.  In the

Teso Litigation, the parties agreed to certain constructions adopted by the

district court.  *Id.* at 21.  Thus, the district court construed the preamble of

---

[9] The case caption in this litigation was later changed to identify plaintiff as
Bright Data Ltd.  Ex. 1020, 1.

18

IPR2021-01492
Patent 10,257,319 B2

claim 1 of the '319 patent to be limiting, and construed certain other terms to have their "plain and ordinary meaning." *Id.* In addition, the district court construed certain disputed terms, including "client device" and "second server." *Id.* at 21–22. The district court construed "client device" as "communication device that is operating in the role of a client." Ex. 1017, 12. The district court initially construed "second server" as "server that is not the client device." *Id.* at 14. Later, the court granted the defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." Ex. 1020, 8, 11.

At this stage, Patent Owner agrees that we should apply the claim constructions in the *Teso* Order for the preamble, "client device," and "second server." Prelim. Resp. 48. For "second server," Patent Owner proposes that we apply the district court's construction of that term from the *Teso* Order ("server that is not the client device"). *Id.* (citing Ex. 1017, 14). Patent Owner quotes from the Supplemental Order, which states that the district court "is not now changing the scope of the terms in any way," and alleges Petitioner is "seeking a broader construction of the term 'second server' to remove the requirements that it be a server." *Id.* at 49.

For the purposes of this decision, we adopt the district court's construction for the "second server" as clarified in the *Teso* Supplemental Order. Ex. 1020, 11. Thus, we adopt the district court's original construction, with the clarification that the second server is "a device that is operating in the role of a server and that is not the first client device." *Id.* at 8. This construction is consistent with the extrinsic evidence offered by Petitioner (Ex. 1018, 5), as well as the construction of "server" adopted by

IPR2021-01492
Patent 10,257,319 B2

the Board in IPR2021-00458, involving a patent similar to the '319 patent. *See* IPR2021-00458, Paper 11. 21.  Specifically, we adopt the district court's clarification that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server."  Ex. 1020, 10 (internal quotation marks omitted).

We only construe terms that are necessary to resolve disputed disputes.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").  At this stage, no other terms require explicit construction.  To the extent we need to interpret any other terms, we will do so in the context of the analysis of the prior art that follows.

### D.  Description of the Principal Prior Art References

#### 1.  Crowds (Ex. 1006)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions."  Ex. 1006, 2.  In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server.  *Id.*  In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator."  *Id.*  In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)."  *Id.* at 8.  "When the jondo is started, it

20

Trials@uspto.gov                                           Paper No. 20
571-272-7822                                        Entered:  May 27, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

NETNUT LTD.,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

_____

IPR2021-01492
Patent 10,257,319 B2

_____

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges.*

GIANNETTI, *Administrative Patent Judge.*

ORDER
Dismissing Petitioner From the Proceeding
*37 C.F.R. § 42.5*

IPR2021-01492
Patent 10,257,319 B2

## I. BACKGROUND

NetNut Ltd. ("Petitioner") filed a Petition (Paper 2) requesting *inter partes* review of claims 1, 2, 12, 14, 15, 17–19, and 21–29 (the "challenged claims") of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent"). Patent Owner, Bright Data Ltd., filed a Preliminary Response (Paper 9). The Board instituted *inter partes* review as to all challenged claims of the '319 patent and all of the asserted grounds of unpatentability stated in the Petition.  Paper 12.

After institution, with Board authorization, Petitioner and Patent Owner filed a "Joint Motion to Terminate as to Petitioner" (Paper 17, "Joint Motion").  The Joint Motion seeks termination of this proceeding and related proceeding IPR2021-01493 as to Petitioner NetNut Ltd. due to settlement. *Id.* at 1. The parties represent that "the Parties have settled their disputes," and because "the Board has not made a decision on the merits," the Board must terminate as to Petitioner.  *Id.*

In a separate motion, the parties jointly request that the Settlement Agreement (Ex. 2019) be treated as confidential business information and kept separate from the '319 patent files, pursuant to 35 U.S.C. § 317(b) and 37 C.F.R. § 42.74(c).  Paper 18, 2.

## II. DISCUSSION

Under 35 U.S.C. 317(a), "[a]n inter partes review instituted under this chapter shall be terminated with respect to any petitioner upon the joint request of the petitioner and the patent owner, unless the Office has decided the merits of the proceeding before the request for termination is filed."

2

IPR2021-01492
Patent 10,257,319 B2

The parties certify that they have complied fully with 37 C.F.R. § 42.74(b) by filing the written Settlement Agreement, reflected in Exhibit 2019, with the Board, that the agreement reflects a final settlement and resolution of all disputes between the parties relating to the '319 patent, and that there are no other collateral agreements or understandings made in connection with, or in contemplation of, the termination sought. *Id.* at 2.

The parties have also filed a May 15, 2022, order of the district court in *Bright Data Ltd, v. NetNut Ltd.*, Case No. 2:21-cv-00225-JRG-RSP (E.D. Tex.), dismissing with prejudice all pending claims and causes of action in that case. Ex. 2018.

We find that for the reasons given by the parties, we grant the motion to terminate Petitioner NetNut Ltd. in this proceeding. "There are strong public policy reasons to favor settlement between the parties to a proceeding. . . . The Board expects that a proceeding will terminate after the filing of a settlement agreement, unless the Board has already decided the merits of the proceeding." Consolidated Trial Practice Guide 86 (November 2019).[1]

We also find that there is good cause for granting the joint request to file the Settlement Agreement as confidential. Paper 18. We find that the Settlement Agreement contains sensitive business confidential information that would substantially harm their business interests if publicly disclosed. *Id.* at 2.

III. ORDER

In consideration of the foregoing, it is hereby

---

[1] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated).

Appx39240

IPR2021-01492
Patent 10,257,319 B2

ORDERED that the parties' Joint Motion to Terminate as to Petitioner is *granted* and Petitioner NetNut Ltd. is dismissed as Petitioner; and

FURTHER ORDERED that the parties' Joint Request to File Settlement Agreement as Business Confidential Information (Paper 18) is *granted,* and Exhibit 2019 shall remain sealed and kept separate from the files of the '319 patent, consistent with 37 C.F.R. § 42.74(b).

FOR PETITIONER:

Ronald Abramson
Mord Lewis
Ari Jaffess
LISTON ABRAMSON LLP
ron.abramson@listonabramson.com
michael.lewis@listonabramson.com
ari.jaffess@listonabramson.com

FOR PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
RUYAKCHERIAN LLP
tomd@ruyakcherian.com
elizabetho@ruyakcherican.com

4

Appx39241

IPR2022-00861
Patent 10,257,319 B2

## VI.  ORDER

Accordingly, it is:

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted as to claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent on the grounds set forth in the Petition;

FURTHER ORDERED that the Motion for Joinder is *granted*;

FURTHER ORDERED that IPR2022–00861 is joined to IPR2021-01492, pursuant to 37 C.F.R. §§ 42.72, 42.122, with IPR2022-00861 terminated;

FURTHER ORDERED that the Revised Scheduling Order entered concurrently shall govern the joined proceedings;

FURTHER ORDERED that all future filings in the joined proceeding are to be made only in IPR2021-01492;

FURTHER ORDERED that Petitioner shall be the named petitioner in the case caption in IPR2021-01492 for all further submissions in that case; and

FURTHER ORDERED that a copy of this Decision and the Revised Scheduling Order shall be entered into the record of IPR2021-01492.

40

Appx39297

PO asks the Board to abandon the claim constructions adopted and reaffirmed by the District Court. Instead, PO seeks to define "client device" and "second server" by applying checklists of physical characteristics—entirely absent from the patent specification—that are so vague and subjective that PO's expert could offer no standards to govern their application. Alternatively, PO seeks to apply a new "at all times" restriction to the District Court's role-based claim constructions even though such a restriction expressly conflicts with the claim language and, as PO's expert admitted, would render the claims incapable of being practiced.

## I.  THE BOARD SHOULD REJECT PO'S PROPOSED CONSTRUCTIONS FOR "CLIENT DEVICE" AND "SECOND SERVER"

### A.  PO's Proposed Constructions for "Client Device" are Inappropriate

PO and Dr. Williams provide eight characteristics that Williams "developed in discussion with attorneys" (EX-1111, 22:10-13) to define "client device":

- "Consumer computer";

- "Typically portable and easily moved";

- "Not a dedicated network element";

- "Uses single or relatively few connections";

- "Resource limited (e.g., bandwidth and storage), unlike a server";

- "Regularly switched off and taken offline";

- "Capable of processing only a limited number of requests at any given

1

time"; and

- "Lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs."

POR, 25-27; EX-2065 ¶¶ 118, 122-23; EX-1111, 53:24-54:8.

### 1.   PO's proposed "client device" characteristics are highly subjective and indefinite

PO's "client device" characteristics are replete with terms of subjective degree (e.g., "easily moved," "relatively few," "resource limited") that expressly require comparisons with other (unidentified) equipment and invite shifting determinations as to whether they are practiced. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (claim scope "cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention"); *Halliburton Energy Servs., Inc. v. M-I, LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008).

**"Consumer computer"**:   According to PO, "consumer computer" requires a "client device" to be <u>owned and operated</u> by a "consumer." EX-1111, 54:4-8, 187:6-11; EX-2065 ¶ 119. So if claim 1 were practiced by a "client device," the claim would no longer be practiced if the <u>same device</u> were owned and operated by a non-"consumer." Williams testified that a "consumer" is "not a commercial enterprise," but could not qualify himself as a "consumer" because he sometimes "operate[s] as a business." EX-1111, 15:20-16:6.

PO's "consumer computer" restriction is unworkable. In a hypothetical where a

2

bank issued cell phones for employee use during the business day, Williams opined that the phones would be consumer computers if the bank allowed the employee to add software causing the phone to perform the claimed method steps. EX-1111, 195:5-18. But if the *bank* installed the software, the "phone was not operating as a consumer computer and is not a first client device." *Id.*, 195:19-196:1, 191:23-194:23.[1]

**"Typically portable and easily moved"**:  Many factors typically influence whether something is "easily moved," but Williams testified "it doesn't matter" who would be moving a device to determine whether it is "easily moved." EX-1111, 17:3-6. Yet Williams opined a 60-pound desktop computer is "easily moved" because <u>he</u> could move it "probably one handed." *Id.* 40:4-9.  Williams did not know how far a device would need to be "easily" moved, and he had no weight limit. *Id.*, 24:2-14, 40:4-20.

Williams testified that a heavier object may be portable to a six-year-old consumer because the child could "ask their adult supervisor to move the device." *Id.*, 26:2-10. Therefore, whether something is "easily moved" may turn on whether a person can recruit others to help, further evidencing the vagueness of PO's proposal.

**"Uses single or relatively few connections"**:  Williams provides no numerical limit, opining that a client device has "relatively few" connections compared to a

---

[1] Though the patent says no such thing, Williams testified the "legal" terms of an "arrangement" whereby a person acquired a potential "consumer computer" might "influence a POSA's decision" as to consumer ownership and operation.  EX-1111, 188:8-21.

"server." *Id.*, 27:22-28:19. He has no particular "server" to use for comparison. *Id.*, 38:23-39:3.

**"Resource limited" (bandwidth and storage)**: Williams provides no number for bandwidth limitation "since that number changes over time and with technology development." *Id.*, 31:8-23. He has no number or metric to determine whether a device is limited in storage. *Id.*, 34:11-19.

**"Regularly switched off and taken offline"**: Williams testified that one must consider a device's "availability time." *Id.*, 46:21-47:17. He testified that a server is available 99.9 or 99.99 percent of the time and, if a device was available 99.8 percent of the time, that "could" be a characteristic of a client device. *Id.*, 45:10-46:20. Williams never explains how "availability" is measured.

**"Lesser fault tolerance, lesser reliability, and lesser scalability"**: Williams provides no metrics to measure these highly subjective factors. *Id.*, 50:1-51:20.

## 2.   PO's "client device" characteristics are not in the specification

The purported "client device" characteristics discussed above are absent from the specification. PO's expert attempts to provide specification support only for "consumer computer," citing to the '319 patent (2:44-46) as stating: "In the network 50, files are stored on computers of consumers, referred to herein as client devices." EX-2065 ¶ 112; POR, 23. There are three major problems with this.

First, the statement does not define client devices as "consumer computers." The

4

**B.    PO's Proposed Constructions for "Second Server" are Inappropriate**

PO cites to Williams' declaration as support for the purported characteristics that define a server:

- "Not a consumer computer";

- "Commercial network element, rather than a consumer device";

- "Not portable or moved about by a consumer";

- "Dedicated network element";

- "Capable of a large number of connections, unlike a typical client device";

- "Remain online with greater availability and maximum up time to receive requests almost all of the time";

- "Efficiently process multiple requests from multiple client devices at the same time";

- "Generate various logs associated with the client devices and traffic from/to the client devices";

- "Primarily interface and respond to the client devices, oftentimes without a Graphical User Interface";

- "Have greater fault tolerance and higher reliability with lower failure rates"; and

- "Provide scalability for increasing resources to serve increasing client

6

demands."

POR, 29-30; EX-2065 ¶¶ 132-33.

### 1. PO's proposed "server" characteristics are highly subjective and indefinite

PO and Williams again provide no metrics to determine compliance with PO's subjective characteristics:

**"Not a consumer computer":** According to Williams, "a consumer would not own a server per the claims and specifications of the patents in suit."[4] EX-1111, 79:8-12. Therefore, a device's status as a "server" would change depending on who is deemed to legally own the device at any given time, which is inappropriate for claim construction purposes.

**"Not portable or moved about by a consumer":** Williams provides no weight limit, nor could he state how far a device needs to be "moved about." *Id.*, 89:18-90:7. But Williams considers the bulky computer below to be "portable":

---

[4] Nothing in the claims or specification prohibits a "consumer" from owning a server.

*IPR2021-01492 of Patent No. 10,257,319*



*Id.*, 69:8-12.

Combining this with Williams' testimony that portability depends on whether a "weak" person could recruit volunteers to move a device (*see* Section I.A), there is no consistent way to assess portability.

**"[L]arge number of connections"**:  Williams testified that, today, a "typical[]" server handles "hundreds" of connections, yet he had no "quantification in mind" as to how many connections a server would have had in 2015.  EX-1111, 90:8-91:21.  In 2018, there would be "less than today" but "more than 2015."  *Id.*

**"Greater fault tolerance and higher reliability," "[S]calability"**:  Williams cannot identify any "hard and fast number" for these criteria.  *Id.*, 94:1-95:5.

###### 2.    PO's proposed "server" construction is unsupported by the specification

PO's "second server" characteristics are entirely absent from the specification.

8

use of "client devices" in place of "servers" (as PO defines them) or vice versa in proxy chains, as well as the subject matter of claims 18, 19, and 24 raised by PO in its Response. Section III.B-C. None of the proposed combinations concern anonymity, latency, or anything else in PO's "teaching away" arguments.

Williams testified that "teaching away" informed not only his obviousness analysis, but also his anticipation analysis. EX-1111, 150:17-152:2. But "teaching away" is irrelevant to anticipation. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

### E.    PO's Alleged Secondary Considerations of Non-Obviousness Lack Nexus

PO asserts that two features "driv[e]" the commercial success of its "residential proxy service": use of "residential IP addresses" and "scalability" from the "large number" of clients with "residential IP addresses." POR, 68-69. PO therefore admits a lack of nexus because neither feature is claimed. The '319 patent never uses the words "residential," "scalable," or "scalability." It instead states that the number of network components is not a limitation, and the claims are not so limited. EX-1001, 5:45-48, claim 1.

Williams admits that use of "residential" IP addresses is not claimed. EX-1111, 56:4-6, 56:19-57:6. He testified that "[y]ou can still infringe these claims by having <u>nonresidential</u> IPs assigned to the first client device." *Id.*, 56:10-12, 172:4-11. The architecture of the '319 patent therefore could be used with <u>either</u>

24

residential or commercial IP addresses, but Williams considered "no data points to describe commercial success" from use of commercial IP addresses. *Id.*, 175:11-176:6.[8]

Williams cites to 2021 sales figures for "commercial success," but provides no analysis tying them to any allegedly embodying PO product. EX-2065 ¶ 270. Williams did not know the name of the allegedly practicing PO product or what product corresponded to the source code he reviewed. EX-1111, 166:3-167:3. Williams "[had] not opined" and did not know the years when the source code he reviewed was implemented in any product, therefore rendering irrelevant any sales figures. *Id.*, 167:13-24. The same is true regarding any year(s) of market share data. *Id.*, 183:10-184:5.

Williams did nothing to determine commercial "success," other than observing "revenues in the millions of dollars per month." *Id.*, 168:23-169:3. Williams did not have "the data" to know what feature(s) drove revenue. *Id.*, 176:7-177:21. Williams opines that <u>twelve</u> additional, non-claimed product features shown on pages 3 and 4 of his Exhibit 2040 also "drive commercial success," but he lacked "the data" to know by how much. *Id.*, 182:21-183:9. Williams did not know how PO's market share would change if commercial IP

---

[8] Williams' citation to alleged industry praise is similarly untied to the claimed invention and concerns "residential IP addresses." EX-2065 ¶ 276.

addresses rather than the non-claimed (but allegedly important) "residential IP addresses" were used. *Id.*, 184:6-185:12.[9]

## IV.    PO'S CRITICISM OF MR. TERUYA LACKS MERIT

PO complains that Teruya failed to "consistently" apply his understandings regarding clients and servers but does not explain its argument.  POR, 56; EX-2065 ¶ 257.  PO appears to disagree with Teruya because he does not follow PO's "at all times" restriction, and instead uses the claim language.  Teruya carefully explained how the prior art components meet the claim language.  EX-2067.

PO complains that Teruya used hindsight bias but again does not explain its argument.  POR, 57.  Williams' discussion does not match Teruya's testimony that he did not try to immediately match up a claim with a reference, and instead carefully analyzed the references to understand the teachings.  EX-2065 ¶ 255; EX-2067, 31:9-41:1.

Teruya considered potential teaching away, and PO is incorrect to state otherwise.  POR, 57.  Teruya testified that he did not spend as much time on MorphMix's or Crowd's detailed discussion of statistical probabilities—details that are not relevant to the patent claims—as he did with MorphMix's and Crowd's discussion of structure and architecture.  EX.2067, 74:5-25.

---

[9] Williams does not state, and does not know, what was allegedly copied, much less whether any allegedly claimed feature was copied.  EX-2065 ¶¶ 273-275; EX-1111, 185:13-186:16.

**IV.     PETITIONERS MISCHARACTERIZE PO'S CONSTRUCTIONS**

Unlike Petitioners' constructions, PO's constructions are consistent with the specification, the claim language, and the prosecution history statements made by Applicant during prosecution, which all differentiate client devices and servers.

PO explains that a POSA would understand a "client device" means a "consumer computer" based on express lexicography in the specification. POR at 22; EX.1001 at 2:44-46; *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 908 (2014)("… claims are to be read in light of the patent's specification and prosecution history").

PO explains that a POSA would understand a "second server" means a "server that is not a client device". POR at 28. PO does not propose that a "second server" is anything that is not a consumer computer, e.g., a router or switch. The "second server" is a server and a server is not a client device in the context of the '319 Patent.

Contrary to Petitioners' arguments, PO does not seek to "apply[] checklists of physical characteristics". *See* Reply at 1. PO does not suggest that a certain number of characteristics must be satisfied in order to qualify as a "client device" or a "server." PO simply discussed some characteristics known to a POSA that differentiate client devices and servers in this context. PO used relative terms

14

because the specification discloses two types of network components: client devices (including clients, peers, and agents) and servers (including acceleration servers, proxy servers, and web servers). Petitioners ignore the context of the patent itself.

Many of the characteristics discussed (*see, e.g.*, POR at 26-27 and 29-30) are drawn directly from the prosecution histories; they are also consistent with extrinsic materials that further support Dr. Williams' expert testimony regarding the understandings of a POSA. Petitioners mischaracterize the discussion of these characteristics to suggest, for example, that the claimed "client device" is **required** to be owned and operated by a consumer. Reply at 2. However, PO explained that this is just one of many characteristics that may be evaluated.[5] Determination of ownership is not a claim limitation and is ultimately a legal conclusion. However, identification of a "client device" in the context of the '319 Patent is within the skillset of a POSA. With respect to evaluating, for example, number of

---

[5] In the example briefed by Petitioners (Reply at 2-3), an employee versus a company installing and operating an app on a company-issued cellphone relates to personal use versus commercial use. A POSA would evaluate if, for example, the company requires the cellphone always be available/online, plugged in, etc. such that it could be used reliably as a proxy. Context matters.

15

connections, bandwidth/storage, and availability/reliability, Petitioners ignore any

background knowledge or common sense of a POSA.[6]

Finally, Petitioners allege that the characteristics are "vague and subjective,"

but provide **no expert testimony** from Mr. Teruya in support of their allegations.

Reply at 1; TPG at 73; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908

(2014)("… definiteness is to be evaluated from the perspective of someone skilled

in the relevant art."). Petitioners also rely on the wrong standard for

---

[6] During deposition, Petitioners questioned Dr. Williams on whether an Apple

MacBook Pro laptop, Apple iPhone 14 Pro Max phone, Apple Mac Mini, or Intel

Server satisfied each "checklist" characteristic. The main problem with Petitioners'

line of questioning is Petitioners' failure to consider the context of the '319 Patent.

Petitioners asked incomplete hypotheticals about each component, in isolation,

without any details as to context such as the context provided in the claims.

indefiniteness.[7] Petitioners' Reply does not even address the correct Supreme

Court standard:

> "Cognizant of the competing concerns, we read §112, ¶2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."

*Nautilus* at 910.

Consistent with the statutory purpose of §112, PO respectfully submits that

the public is on notice of the scope of the claimed inventions. *See id.* at 909-910.

The claims recite a novel "second server – client device – web server" architecture

---

[7] Petitioners rely on *Datamize* and *Halliburton* which both apply the "insolubly

ambiguous" standard for indefiniteness. *Datamize, LLC v Plumtree Software, Inc.*,

417 F.3d 1342, 1347 (Fed. Cir 2005); *Halliburton Energy Servs. v. M-I LLC*, 514

F.3d 1244, 1250 (Fed. Cir. 2008). The USPTO issued a memo clarifying the

approach to indefiniteness as set forth in *Nautilus*. *See* USPTO, Approach to

Indefiniteness under 35 U.S.C. § 112 in AIA Post-grant Proceedings (Jan. 6, 2021),

https://www.uspto.gov/sites/default/files/documents/IndefinitenessMemo.pdf.

17

that is necessarily distinct from (1) a prior art "client device – proxy server – web server" architecture (*see* Fig. 1) and also from (2) a prior art "client device – client device – web server" architecture (*see* Fig. 2). As made clear during prosecution of the '319 Patent, the claims recite a client device located between two servers which is not disclosed or taught by the prior art. POR at 21; EX.1002 at 282-283.

### A.    LEXICOGRAPHY IN THE SPECIFICATION SUPPORTS PO'S CONSTRUCTIONS

The specification expressly defines client devices as consumer computers. The phrase "referred to herein as" is definitional and has been recognized as such by the Federal Circuit.[8] *Kyocera Senco Indus. Tools, Inc. v. ITC*, 22 F.4th 1369, 1379 (Fed. Cir. 2022). As in *Kyocera*, "[t]he surrounding written description language supports this interpretation." *Id.* at 1378. As explained in the POR and herein, Petitioners' purely role-based constructions would be inconsistent with the specification.

The patentee's lexicographical definition is not incidental; it sets forth a solution to the prior art problems. The patent expressly discloses the need for "a

---

[8] Additionally, because the patentee defined "client devices" as consumer computers, the patentee need not re-mention "consumer computers" elsewhere in the specification. *Contra* Reply at 5.

18

IPR2022-00915 (Patent 10,257,319 B2)
IPR2022-00916 (Patent 10,484,510 B2)
IPR2021-01492 (Patent 10,257,319 B2)
IPR2021-01493 (Patent 10,484,510 B2)

1    Tolliver says a consumer computer, we don't know consumer computer is, I

2    think he'd also have to say he doesn't know what a communications device is.

3        I have to say I think Mr. Tolliver has argued in every independent

4    claim my client has ever asserted that we've been to that there's something he

5    doesn't understand about it that renders it indefinite.  I might be wrong about

6    that, but it's certainly the majority of such claims.

7        But Mr. Tolliver seems to understand what a communication device is.

8     He's proposing that as the construction.  And if you use communication

9    device, you reach the same result that we're talking about.  A communication

10   device is a computer owned by a consumer that's not a known server

11   hardware.  When you go to Dell, it's a laptop or a desktop.  It's not what they

12   call a server at Dell.  And a phone is a consumer device, obviously.

13       If an IT person was hired to go buy a server for their network and they

14   came back with a phone, and so they thought they'd accomplish their goal, in

15   2009 they would be fired.  There is no real indefiniteness of the

16   understanding of a server versus a consumer computer at the time this patent

17   specification and the original claims were filed.

18       JUDGE McSHANE:  Mr. Harkins, if I might jump in here, just a quick

19   question.  It seems pretty clear that for the server, you are espousing that the

20   server has a certain structure; is that correct?

21       MR. HARKINS:  Correct.

22       JUDGE McSHANE:  Yes.  Now, what I'm hearing is that for the client

23   device, you're saying the structure is a structure that is not a server.  Is that

24   your position in a nutshell?

47

## 8.2.  Border

44.    United States Patent 6,795,848 ("Border" (Ex. 1017)) issued to Border *et al.* on September 21, 2004.  Border is "related to retrieving web content using proxy servers." Ex. 1012 at 1:16-18.  According to Border, benefits in doing so include "reliev[ing] traffic congestion and network latency." *Id.* at 1:26.

45.    The communication system 100 of Border includes user station 101, downstream proxy server 105, upstream proxy server 107, and web server 109:



Figure 1 of Border

*Id.* at Fig. 1. This illustration depicts the content request going from right to left.  User stations 101 use communication system 100 to request and receive web content stored on web servers 109.  *Id.* at 1:34-35.  Proxy servers 105 and 107 act as intermediary devices between one or more user stations 101 and many web servers 109. *Id.* at 4:29-31.

46.    Border discloses proxy servers that can operate on "general purpose personal computers," and further discloses an exemplary computer

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 19 of 80

system 701 that can be configured as a proxy server. *Id.* at 4:52-54; 10:6-11:54. Computer system 701 is comprised of generic personal computer components, such as a processor, memory, storage, a network interface card, and input/output devices. *Id.* at 10:6-11:54. Proxy servers 105 and 107 communicate using a persistent HTTP over TCP connection, and are referenced as HTTP proxy servers. *Id.* at 4:8-14; 4:29-31.

47. Figure 2 of Border shows the communications that occur when a user station requests and receives web content stored on a web server:



Figure 2 of Border

*Id.* at Fig. 2. To request web content at a particular URL, a browser 103 of user station 101 sends an HTTP GET request containing the URL to downstream proxy server 105. *Id.* at 5:14-17. If downstream proxy server

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 20 of 80

Appx40449

105 does not have a copy of the content stored in its cache, downstream server 105 sends an HTTP GET request containing the URL to upstream proxy server 107. If upstream proxy server 107 does not have a copy, it sends an HTTP GET request to web server 109. Web server 109 transmits the content at the URL to upstream server 107, which stores the content in its cache. Upstream server 107 then forwards the content to downstream server 105, which stores the content in its cache, and then forwards the content to web browser 103.

### 8.3.  MorphMix

48.    *MorphMix - A Peer-to-Peer-based System for Anonymous Internet Access* ("MorphMix" (Ex. 1008)) is a doctoral thesis authored by Marc Rennhard, of the Swiss Federal Institute of Technology, Computer Engineering and Networks Laboratory; Zurich, Switzerland. MorphMix states that it was published in 2004.

49.    MorphMix states its goal as "achieving anonymous Internet access" and "to provide anonymity for the masses and aim at a large number of nodes distributed all around the world." Ex. 1008 at 14, 109. An individual can join MorphMix with a computer "connected to the Internet" that is capable of running applications "such as web browsers" and that has an IP address. *Id.* at 234.

50.    MorphMix describes a set of "nodes," each node identified by its IP address and connected to one or more other MorphMix nodes at any time, where there is a TCP connection between any two connected nodes. *Id.* at 98-99. To access an Internet web server anonymously, a node "establishes a circuit via some other nodes" forming an "anonymous tunnel." *Id.* at 99. If a web browser sends a request to a node, the first node sends the IP

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 21 of 80

address and port of the targeted web server "to the final node." *Id.* at 103. The final node then "connects to the server" and the "connection has been established." *Id.* "Sending data back from the server to the client works exactly in the opposite way." *Id.* at 105.

## 8.4.  Internet RFCs and Standards

51.   The background, against which every POSITA in the field works, is specified in published and well-known Internet RFCs, and in standards promulgated by standards bodies such as the International Standards Organization (ISO). These bodies publish their standards online as a regular activity, which are relied on and considered definitive by the Internet engineering community.  The web sites of the standards organizations are intended as official channels of publication.  The publication dates noted in the standards documents themselves are reliable.

52.   It is well known that RFCs are initially published on the website of the Internet Engineering Task Force (ietf.org/rfc.html), and are publicly accessible on the Internet.  Based on my long history of work in this field, in many complex projects, I can attest that RFCs are widely looked to throughout the Internet community for definitive guidance on the latest standards for building and integrating Internet services.  This has been true for decades now. As of 2009, RFCs were (as they are today) indexed by and instantly searchable and retrievable through Internet search engines. The title of the RFCs themselves ("Request for Comments") indicate that the RFCs were intended for publication and would have been accessible to interested artisans seeking documents related to the standards that govern the design use, and management of core Internet services, and

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 22 of 80

saging. A POSITA would further understand that the random path retrieval mechanism itself (discussed above), especially where a web page with multiple embedded objects (images, etc.) is involved, entails periodic communication between the first client device and the second server, separately meeting the limitations of claim 17.

105.    A "keep-alive" mechanism for TCP connections (involving "periodically probing the other end of a connection") is disclosed in RFC 1122. *See* Ex. 1016 § 4.2.3.6. The Crowds disclosure confirms that jondos communicate over TCP/IP connections: in discussing potential points of failure, Crowds states that "such failures are detected by the TCP/IP connection to the jondo breaking or being refused. . . ." 1006 at 81. A POSITA would know that this shows that Crowds relies upon TCP connections. It would have been obvious to a POSITA to have performed this disclosed "detecting" by using the "keep-alive" implementation taught by RFC 1122.

## 10.5.   Claims 19, and 21-29

106.   As discussed previously, Crowds discloses the additional limitations of claims 19, and 21-29. These claims would thus also be obvious to a POSITA.

## 11.   GROUND 3: ANTICIPATION OF CLAIMS 1, 12, 14, 21-22, 24-25, AND 27-29 BY BORDER

## 11.1.   Claim 1

### Preamble

107.   The preamble of Claim 1 maps onto Border as follows:

**First client device:** Upstream server 107.

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 38 of 80

**Second server:** Downstream server 105.

**First server:** Web server 109.

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

108.   Border thus discloses the preamble.

**Claim step (a) ("receiving, from the second server, the first content identifier")**

109.     As discussed above, downstream server 105 is the "second server," upstream server 107 is the "first client device," and the requested URL is a "first content identifier." Border "provides a communication system for retrieving web content." Ex. 1012 at 2:44-45. Web content is retrieved from a web server that stores the web content by forwarding a "URL request message to a web server and receiv[ing] the URL content from the web server. . . ." *Id.* at 2:52-54. An "individual piece of web content," *i.e.*, a "first content," "is identified, that is, addressed, by an Internet address, referred to as a Uniform Resource Locator (URL)." *Id.* at 1:62-2:2.

110.   As shown in Figures 1 and 2, web browser 103 sends a GET request to downstream server 105, which forwards the request to upstream server 107, which passes the GET request to web server 109. The response to the GET request — the content at the requested URL — is then returned through the same path in reverse.

111.   Any standard computer may serve in the role of a "client." Border discloses that upstream server 107 is a "client," as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server, and thus acts as an HTTP client when requesting content from an HTTP server.

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 39 of 80

Appx40468

112.    Moreover, the physical computer hardware on which upstream server 107 operates is a general purpose personal computer, comprised of, among other components, processor 705, memory 707 and 709, storage 711, display 713, keyboard 715, mouse 717, and wired or wireless communication interface 719. *Id.* at 10:6 to 11:54; Fig. 7. Further, the proxy servers may run on "general purpose personal computer[s]." *Id.* at 4:52-53. A POSITA would thus understand that upstream server 107 can be a "client."

113.    Downstream server 105 (which is specifically called a "server") is the "second server," as it accepts a connection from web browser 103 in order to send back a response to web browser 103's GET request. Downstream server 105 retrieves the requested first content by communicating with web server 109 (the "first server") through upstream server 107 ("first client device").

114.    Web browser 103 sends a GET request containing the URL for the content "HTML"[1] to downstream server 105. Downstream server 105 then sends a GET request containing the URL to upstream server 107, as shown in green in Figure 2:

---

[1]    Border uses "HTML" as the exemplary URL of a request from web browser 103. Ex. 1012 at 5:18-19 ("For the purposes of explanation, the HTML page is addressed as URL 'HTML.'").

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 40 of 80

Appx40469



Figure 2 of Border (annotated)

115.    Therefore, a POSITA would recognize Border as disclosing "receiving, from the second server, the first content identifier" by the first client device because upstream server 107 ("first client device") receives the URL ("first content identifier") from downstream server 105 ("second server").

**Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

116.    The first client device discussed above is used with "many web servers (*e.g.* web server 109)," each of which is a first server.  Ex. 1012 at 4:29-32.  A GET request is defined by RFC 2616 § 9.3, and a POSITA

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 41 of 80

*2042-04-319-IPR (US 10,257,319)*                    *Declaration of Keith J. Teruya*

would recognize that it can be an "HTTP request." Upstream server 107 issues a GET request to web server 109 for the content at a specified URL, as shown in green in Figure 2:



Figure 2 of Border (annotated)

*Id.* at 5:33-36.

117.    A POSITA would therefore understand Border to disclose the first client device "sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier".

**Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 42 of 80

Appx40471

118.    In response to upstream server 107 "issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server," as shown in green in Figure 2:



Figure 2 of Border (annotated)

*Id.* at 5:34-37.

119.    Thus, Border teaches the first client device receiving the first content (the web page at the requested URL) from the first server in response to sending the first content identifier (the requested URL).

120.    Border therefore discloses "receiving, the first content from the first server over the Internet in response to the sending of the first content identifier" by the first client device.

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 43 of 80

Appx40472

**Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

121.    After receiving the web page at the requested URL from web server 109, upstream server 107 "forwards the HTML page to the downstream server 105," as shown in green in Figure 2:



Figure 2 of Border (annotated)

*Id.* at 5:38-40.

122.    Downstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a "server." *Id.*

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 44 of 80

Appx40473

123.   Border therefore discloses "receiving, the first content from the first server over the Internet in response to the sending of the first content identifier" by the first client device.

## 11.2.   Claim 12

**12.   The method according to claim 1, further comprising storing, by the first client device in response to the receiving from the first server, the first content, and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.**

124.   Border discloses upstream server 107 sending the GET request to web server 109 after it receives the requested URL from downstream server 105, where upstream server 107 is further comprised of HTTP cache 117. Ex. 1012 at 4:8-11. In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.* at 5:36-38. Border therefore discloses claim 12.

## 11.3.   Claim 14

**14.   The method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.**

125.   As explained for claim 12, Border discloses upstream server 107 storing the received first content in HTTP cache 117 to provide in response to future requests. If upstream server 107 receives a subsequent request for the received first content, Border teaches that upstream server 107 may determine whether such content is still valid by sending a conditional HTTP GET request using IF MODIFIED SINCE headers to web server 109.

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 45 of 80

Appx40474

149.    A POSITA knowing that Border used persistent connections would have been motivated to use keep alives as taught by RFC 1122 as a standard manner of maintaining such connections.

150.    Claims 17-18 accordingly would have been obvious to a POSITA based on Border in view of the general knowledge of a POSITA.

## 12.4.    Claims 12, 14, 21-22, 24-25, and 27-29

151.    Border discloses the additional limitations of claims 12, 14, 21-22, 24-25, and 27-29, as discussed above in Ground 3. Therefore, if Claim 1 is obvious to a POSITA by the disclosure of Border in view of both the general knowledge of a POSITA and the disclosure of RFC 2616 (which also evidences the knowledge of a POSITA), these claims would also be obvious to a POSITA.

## 13.    GROUND 5: ANTICIPATION OF CLAIMS 1, 17, 19, 21-29 BY MORPHMIX

152.    Like Crowds, MorphMix seeks "[to] achiev[e] anonymous Internet access." Ex. 1008 at 14, 109.[2]

153.    MorphMix describes a set of "nodes," each node identified by its IP address and connected to one or more other MorphMix nodes at any time, where there is a TCP connection between any two connected nodes. *Id.* at 98-99. A node "establishes a circuit via some other nodes" forming an "anonymous tunnel." *Id.* at 99. If a web browser sends a request to a node, the first node sends the IP address and port of the targeted web server "to the final node." *Id.* at 103. The final node then "connects to the

---

[2]  The cited page numbering is the internal numbering of the thesis.

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 54 of 80

Appx40483

server" and the "connection has been established." *Id.* "Sending data back from the server to the client works exactly in the opposite way." *Id.* at 105.

154.   "MorphMix is basically a circuit-based mix network, [in which] a node establishes a circuit via some other nodes to access servers in the Internet anonymously." *Id.* at 99.   MorphMix is specifically designed to support web browsing over its circuits. *See id.* (explaining how MorphMix supports circuits that carry several communications in order to better accommodate web browsing). *See also id.* at 74 (example of "support[ing] 100000 web users"), 103 ("we focus on web browsing"), 204 ("Web Browsing Scenario"). MorphMix also teaches that user activity on the world wide web entails requests for content made via sending a URL: *"A web session is defined as a continuous series of user activity via URL requests." Id.* at 74 (emphasis added).

155.   The following is illustrative:



**Figure 5.1:** *Basic idea of MorphMix.*

Figure 5.1 of MorphMix

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 55 of 80

156.   MorphMix discloses that a random path of nodes (applications on users' computers) is created.  Each client runs an access program on the local computer (Ex. 1008 at 103). The client "sends $ip_s$ and $p_s$" to the access program. *Id.* ( $ip_s$ and $p_s$ are the host (target) server's IP address and port, *Id.* at 20).  The node establishes an "anonymous tunnel by sending an end-to-end message to the final node that contains $ip_s$ and $p_s$." *Id.* at 103. The final node then connects to the target server and "forward[s] the data it receives through the anonymous connection" to the target server. *Id.* at 104.

157.   One potential path of nodes (shown in Fig. 5.1 of MorphMix, above) is that the initiator (a) sends the request to an intermediate node (b), which sends the request to the last node (c), which sends the request to the server (s).

158.   In this example, the "first client device" is the last node in the tunnel (node "c"), which communicates with the server (s), which may be a web server (*see id.* at 74, 204).  The "second server" is the device at node (b), which provides the first content identifier to the first client device (final node c).  *Id.* at 105.  To do this, the "second server" (b) forwards a "payload" to node c.  *Id.* at 105.  The payload carries "application data" (*id.* at 104), which, for an application requesting web content, includes the data identifying the requested web page to be provided to the web server.

## 13.1.  Claim 1

**Preamble**

159.   The preamble maps onto MorphMix as follows (in the example path discussed below):

**First client device:** last node (c).

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 56 of 80

Appx40485

**Second server:** intermediate node (b).

**First server:** server (s).

**First content identifier:** requested URL.

**First content:** requested web page at the requested URL.

160.  Thus, MorphMix discloses the preamble.

**Claim step (a) ("receiving, from the second server, the first content identifier")**

161.    MorphMix discloses node b (second server) sending the application data (the first content identifier, or containing the first content identifier) to node c (first client device).

162.    Figure 5.4 of MorphMix shows that in the course of servicing a request from node a, "application data" (for the request) is passed from node b (second sever) to node c (first client device), which then connects with the web server.

163.  Figure 5.4 is annotated in red below to show the node b (second server) sending to node c (first client device) information that includes the IP address ($ip_s$) and port ($p_s$) of the server, as well as the application data (AD) which identifies the web content, so that node c may send it to the server:

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 57 of 80

Appx40486



**Figure 5.4:** *Anonymous connections and cell forwarding.*

Figure 5.4 of MorphMix (annotated)

164.    MorphMix discloses that node b in the above example is a "server" as commonly understood because node b accepts a connection from node a in order to send back a response, further disclosing that "[s]ending data back from the server to the client works exactly in the opposite way." *Id.* at 105.  Node b thus responds to requests from node a by providing a service to node a, characteristic of a server as a POSITA knows.

165.   Every node "can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 98.  That a node can act as a client in one relation and as a server in another is consistent with the meanings of "client" and "server," as a POSITA knows.

166.   MorphMix also expressly states that a "sender" of messages (*e.g.*, requests) is a "client," while a "recipient" is a "server." *Id.* at 13.

167.    In addition, MorphMix discloses an embodiment in which a common MorphMix node outside a NAT gateway is accessed as a proxy by

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 58 of 80

multiple users. *Id.* at 143. In this embodiment, that node would be node a in Figure 5.1 (as opposed to node b), but node a is a "server" as understood by a POSITA, and node c still receives the first content identifier (the "application data") from it, via the tunnel through node b.

168.    MorphMix also discloses: "Anybody who has access to a computer that is connected to the Internet should be able to join and use MorphMix after having installed the MorphMix software." *Id.* at 96; *see also id.* at 234. A computer need have only a public IP address to join, and "any computer with a dialup connection capable of running a modern graphical web browser should be sufficient." *Id.* MorphMix "can handle as many nodes as there are public IP addresses." *Id.* at 234. A POSITA would thus understand MorphMix to also disclose client devices.

169.    Because the above requests are web requests, they include the "content identifier" that identifies the content sought from the target web server. MorphMix refers to this throughout as the "application data" (AD). A POSITA would know that this AD constitutes a "content identifier." The requests in MorphMix explicitly may be HTTP requests, and a POSITA would understand that by definition an HTTP request contains a URL, which is clearly a content identifier. *See* Ex. 1013 § 5.1.2.

170.    MorphMix states that "with HTTP 1.1, all object[s] of a web page are downloaded through a single anonymous connection and a single TCP connection between the final node and the web server" (Ex. 1008 at 207), and that web browsing entails "a continuous series of user activity via URL requests." *Id.* at 74. Thus, a POSITA would understand the AD to either be the first content identifier, or to contain a URL as the first content identifier. It includes the first content identifier, such as a URL, so that the

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 59 of 80

Appx40488

corresponding requested data could be sent "back from the server to the client." *Id.* at 105.

171.    A POSITA would thus understand MorphMix to disclose this claim limitation.

**Claim step (b) ("sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier")**

172.    Node c (the first client device) sends a HTTP request comprising the first content identifier (AD and/or the URL within the AD) to the first server (s).

173.    In the example a to b to c node path discussed above, node c is the final node and the "first client device." Node c determines from the header information that it is the "final node," and that a portion of the "payload" "must be sent to the web server using the IP address and port number. Ex. 1008 at 105 (steps 10-11). Therefore, "the server eventually receives AD," or application data. *Id.* (step 12). If final node c receives a host name for the web server, it must resolve the host name to an IP address to send information to the web server. *Id.*

174.    Figure 5.4 shows the application data (AD), which identifies the web content, being passed from the first client device (node c) to the web server ("first server") as indicated in red:

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 60 of 80



Figure 5.4 of MorphMix (annotated)

175.    MorphMix teaches that web browsing entails "a continuous series of user activity via URL requests" (*Id.* at 74), which a POSITA would understand as making clear that the AD as shown in the above figure conveys URLs, so that the web server can respond with the information (also application data) to send back the requesting device.

176.    A POSITA would thus understand MorphMix to disclose this claim limitation.

**Claim step (c) ("receiving, the first content from the first server over the Internet in response to the sending of the first content identifier")**

177.    The last node in the path receives the "first content," such as the web page, specified by the user.  MorphMix confirms that "[s]ending data back from the server to the client works exactly in the opposite way" as the information is sent to the server. Ex. 1008 at 105. Accordingly, the first client device in MorphMix (the last node before the target web server)

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 61 of 80

receives the requested first content (such as a web page) for sending back down the path to the requesting user, which is done, as explained above, in response to the sending of the "first content identifier" present in the application data "AD."

178.    A POSITA would thus understand MorphMix to disclose this claim limitation.

**Claim step (d) ("sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier")**

179.    "Sending data back from the server to the client works exactly in the opposite way" as compared to the path the data takes from the initiator node a, to node b, to node c, and finally to the web server. Ex. 1008 at 104-05. Accordingly, the first client device (node c) sends the first content (or web page content) back to the second server (node b, the prior node in the path), which occurs in response to having received the first content identifier. The second server, node b, can then send the web page content (the "first content") back to the requesting user (node a in this example path).

180.    A POSITA would thus understand MorphMix to disclose this claim limitation.

## 13.2.   Claim 17

**17.   The method according to claim 1, further comprising periodi-cally communicating between the second server and the first client device.**

181.    The "second server" and "first client device" of MorphMix are nodes, and each communicates via the MorphMix protocol for establish-

NetNut Ltd. v. Bright Data Ltd.
Exhibit 1005
Page 62 of 80